Ahren A. Tiller, Esq. [SBN 250608]
BLC LAW CENTER, APC
1230 Columbia St., Suite 1100
San Diego, CA 92101
Telephone No. (619) 894-8831
Facsimile No. (866) 444-7026
Email: ahren.tiller@blc-sd.com

Attorneys for Creditors
JAIME RODRIGUEZ, and
ANA LIDIA GOMEZ

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

In re

THE ORIGINAL MOWBRAY'S TREE
SERVICE, INC., a Delaware corporation

      Debtor and
      Debtor-in-Possession,

BK Case No.: 8:24-bk-12674-TA

Chapter 11

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
CREDITOR, JAIME RODRIGUEZ AND
ANA LIDIA GOMEZ'S MOTION TO
APPOINT A CHAPTER 11 TRUSTEE
PURSUANT TO 11 U.S.C. 1104(a); AND
MOTION TO SUBSTANTIVELY
CONSOLIDATE PINO TREE SERVICES,
INC., MOWBRAY WATERMAN
PROPERTY, LLC, AND PHOENIX
TRAFFIC MANAGEMENT, INC. WITH
THE DEBTOR'S BANKRUPTCY CASE**

Date:   March 5, 2025
Time:  10:00am
Location: 411 West Fourth St. Ctrm 5B
         Santa Ana, CA 92701

Hon. Theodor C. Albert

-0-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................3

        1.  Pino Tree Services, Inc. .................................................................................6

        2.  Mowbray Waterman Property, LLC ..............................................................8

        3.  Phoenix Traffic Management, Inc. ...............................................................11

III.    ARGUMENT .......................................................................................................12

        A.  THIS COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE TO OVERSEE
            THESE PROCEEDINGS PURSUANT TO 11 U.S.C. § 1104(a).......................13

        B.  THIS COURT SHOULD SUBSTANTIVELY CONSOLIDATE DEBTOR'S
            BANKRUPTCY ESTATE WITH ITS AFFILIATES..........................................20

            1.  Applicable Law ...................................................................................20

                a.  Purpose of Substantive Consolidation .................................................20

                b.  Factors for Determining Appropriateness of Substantive
                    Consolidation .................................................................................21

            2.  The Debtor and Affiliates Should Be Consolidated, Because There Is A
                Substantial Identity Between The Entities, And Creditors Dealt With
                Debtor And The Affiliates As If They Were the Same Economic Unit ....24

                a.  The Debtor and Affiliates Share Financial Statements........................25

                b.  There Is a Unity of Interests and Ownership Between Debtor and the
                    Affiliates ........................................................................................25

                c.  There Is Shared Management Between Debtor and the Affiliates ......25

                d.  Debtor and Affiliates Operate from a Single Physical Location  ........24

                e.   There Are Intercompany Transfers (labeled as loans) Between Debtor
                    and the Affiliates................................................................................25

                f.  Intercompany Guaranties on Loans Between Debtor and MWP.........28

                g.  Segregating and Ascertaining Assets and Liabilities...........................28

                h.  There Are Transfers of Debtor's Assets Without Formal Observance of
                    Corporate Formalities .....................................................................30

                i.  There Is Commingling of Assets and Business Functions..................31

                j.  Debtor and Affiliates Are More Profitable if Consolidated................32

            3.  Consolidation Is Necessary to Avoid Severe Harm and To Realize
                Substantial Benefits for Creditors.................................................................33

                a.  Notice to Affiliates' Creditors ............................................................32

            4.  Debtor and Affiliates Should Be Consolidated Nunc Pro Tunc, Because
                Their Affairs Are So Entangled That Consolidation Will Benefit All
                Creditors.........................................................................................35

        C.  SHOULD THIS COURT FIND IT PREMATURE TO APPOINT A CHAPTER
            11 TRUSTEE, THEN THIS COURT MUST AT MINIMUMM CONSOLIDATE
            THE "AFFILIATES" TO MITIGATE THE CONFLICTS OF INTEREST THAT
            EXIST ........................................................................................................35

IV.     CONCLUSION....................................................................................................35

-1-

## TABLE OF EXHIBITS

1 – First 341 Transcript – 12/6/2024

2 – Marticello Letter dated 12/20/2024

3 – Second 341 Transcript – 1/3/2025

4 – PTS Management Agreement dated 1/1/2024

5 – PTS Line of Credit Agreement dated 1/1/2024

6 – MWP Guaranty of PNC Loan dated 10/28/2022

7 – MWP Corporate Documents

8 – MWP Real Estate Title Search

9 – MWP Parking Yard Lot Map & Title Records for Debtor, MWP, and Founders Lots.

10 – MWP Loan Agreement with Debtor.

11 – MWP Deeds of Trust Securing PNC Loan to MWP's Real Estate

12 – MWP Lucas Lane Property Title Documents

13 – MWP and PTM Lien Search Results

14 – PTS UCC-1 Lien Search Results, with 3 UCC-1 Liens attached.

15 – PTM Corporate Documents

16 – Transcript of Robin Mowbray Deposition dated 5/30/2023

17 – 7/8/20 Final Settlement Closing Statement for 686 Mill St. Purchase.

18 – Declaration of Ruben Sainos [Doc. 3] dated 10/18/2024

19 – Debtors Schedule A/B [Doc. 170] dated 11/15/2024, pp. 10-17.

20 – Debtor's Statement of Financial Affairs [Doc. 170] dated 11/15/2024, pp. 160-161

21 – Rule 2015.3 Report for PTS [Doc. 224] dated 12/19/2024

-ii-

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3

*In re Augie/Restivo*, 860 F.2d 515 (2nd Cir. 1988)..................................................................19

4

*Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270 (DC Cir. 1987)......20, 21

5

*In re Bashas' Inc.*, 437 B.R. 874 (Bankr. D. Ariz. 2010)..........................................................22

6

7

*In re Bellevue Place Assocs.*, 171 B.R. 615 (Bankr. N.D. Ill. 1994) ..........................................13

8

*In re Bonded Mailings, Inc.* 20 B.R. 781 (Bankr. E.D. N.Y. 1982) ...........................................13

9

*Alexander v. Compton (In re Bonham)*, 229 F.3d 750 (9th Cir. 2000).................................*Passim*

10

*In re Breland*, 570 B.R. 643 (Bankr. S.D. Ala. 2017) ...............................................................16

11

*Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc.*,

12
    227 B.R. 606 (S.D.N.Y. 1998)..........................................................................................13

13

*James Talcott, Inc. v. Wharton* (*In re Continental Vending Machine Corp.*),

14
    517 F.2d 997(2d Cir. 1975).............................................................................................19

15

F*ederal Deposit Insurance Corp. v. Colonial Realty Co.*,
    966 F.2d 57 (2d Cir. 1992).............................................................................................19

16

17

*Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245 (11 Cir. 1991)....................30

18

*In re Elite Auto Dealer, Inc.*,
    No. 20-12221-MKN, 2020 Bankr. LEXIS 2007 (Bankr. D. Nev. July 8, 2020)...............13

19

*In re Gen. Oil Distributors, Inc.*, 42 B.R. 402 (Bankr. E.D.N.Y. 1984)......................................12

20

21

*In re Great Northeastern Lumber & Millwork Corp.*,
    20 B.R. 610 (Bankr. E.D. Pa. 1982) ...............................................................................14

22

*In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174 (Bankr. Pa. 1984) ........................14

23

*Labankoff v. U.S. Trustee (In re Labankoff)*,

24

    2010 Bankr. LEXIS 5083, 2010 WL 6259969 (B.A.P. 9th Cir. June 14, 2010) ..............13

25

*In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. W. Va. 1980)..............................................................14

26

*In re McCorhill Publ'g Inc.*, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987)...................................... 14-15

27

*In re Microwave Prods. Of Am., Inc.*, 102 B.R. 666 (Bankr. W.D. Tenn. 1989) .........................14

28

-iii-

*Leslie v. Mihranian (In re Mihranian)*, 937 F.3d 1214 (9th Cir. 2019) ........................................21

*Leslie v. Mihranian (In re Mihranian)*,
    No. CC-17-1048-KuSA, 2017 Bankr. LEXIS 4124 (B.A.P. 9th Cir. 2017).....................22

*North v. Desert Hills Bank (In re North)*, 212 F. App'x 626 (9th Cir. 2006) ................................12

*In re Oklahoma Refining Co.*, 838 F.2d 1133 (10thCir. 1988).......................................................13

*In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60 (Bankr. Pa, 1981) ...........................................14

*Reider v. FDIC (In re Reider)*, 31 F.3d 1102 (11th Cir. 1994)......................................................20

*Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941) .................................................20

*In re Sharon Steel Corp.*, 86 B.R. 455 (Bankr. W.D. Pa. 1989).....................................................14

*Smith v. Concord Coal Corp. (In re Concord Coal Corp.)*,
    11 B.R. 552 (Bankr. W. Va. 1981) ....................................................................................14

*In re Vecco Construction Indus.*, 4 B.R. 407 (Bankr. E.D. Va. 1980).........................................23

*In re Velde*, No. 18-11651-A-11, 2018 Bankr. LEXIS 2810 (Bankr. E.D. Cal. Sep. 12, 2018)....13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATUTES**

11 U.S.C. § 547 ...........................................................................................................12, 35

11 U.S.C. § 548 ...........................................................................................................12, 35

11 U.S.C. § 550 ...........................................................................................................12, 35

11 U.S.C. § 1104 .........................................................................................................*Passim*

-v-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

### I.

### INTRODUCTION

As the old adage goes, here "*the fox is in the henhouse*."  In this Bankruptcy Case, the Director of the Debtor, Robin Mowbray, has looted the assets of the Estate, and grossly mismanaged the Debtor's business in favor of her other wholly-owned affiliated entities. Here, Ms. Mowbray transferred millions of dollars in assets out of the Bankruptcy Estate to her three wholly owned other entities: (1) Mowbray Waterman Property, LLC ["MWP"]; (2) Pino Tree Service, Inc. ["PTS"], and (3) Phoenix Traffic Management, Inc. ["PTM"] (hereinafter collectively referred to as the "Affiliates").  Further, Ms. Mowbray diverted the Debtor's revenue streams to her other entity PTS, and so severely breached her fiduciary duties owed to this Bankruptcy Estate, that her further involvement in this case cannot be allowed to proceed further. Unlike a typical Chapter 11, whereby a debtor can employ an outside neutral Chief Restructuring Officer ("CRO") to ethically fulfill their duties as the debtor-in-possession, here the inherent conflicts of interest between Debtor and the Affiliates cannot be mitigated, as the CRO reports directly to Ms. Mowbray, who cannot ethically administer this Estate, due to her multiple direct conflicts of interest, which are unresolvable as a result of Ms. Mowbray's conflicting fiduciary duties owed to the Affiliates. Thus, Ms. Mowbray must be replaced, and a Chapter 11 Trustee must be appointed.

Further, this Debtor's Bankruptcy Estate needs to be substantively consolidated with the aforementioned Affiliates. In this case, Ms. Mowbray disregarded all corporate formalities and commingled the assets of her various entities, so much so, that these four entities are essentially "one single economic unit," as all major creditors dealt with Debtor and the Affiliates as one. Further, it will be impossible to untangle these Entities and thereby obtain the Debtor's true value – without consolidation.  Historically, Ms. Mowbray primarily conducted her tree service business through the Debtor, and then used said profits to buy real property assets in the name of her other 100% owned entity: Mowbray Waterman Property, LLC ("MWP").  Here, Ms. Mowbray would use her other wholly owned entity "Phoenix Traffic Management, Inc." ("PTM") as the Debtor's primary vendor, charging well above market rates for said services, and in doing so transferring

-1-

millions in funds to and from her Affiliates without any formal corporate minutes, fair value considerations, and most importantly without any respect for their separate legal entity statuses.

In the lead up to this Bankruptcy, Ms. Mowbray transferred almost all of the Debtor's business operations and assets to her other entity: PTS, under the guise of the: "PTS Management Agreement." Notably, the CRO, Mr. Weiss, testified that there are currently zero procedures in place to ensure that Debtor adheres to corporate formalities, and thereby ensures that Debtor pay fair market rates to the Affiliates, when acting as Debtor's primary vendors. Therefore, the comingling of the Debtor's and the Affiliates' assets and revenue have so artificially adjusted Debtor's revenue, expenses, and assets, that it will be impossible to accurately ascertain Debtor's true financial condition without substantively consolidating the Debtor with the Affiliates.

To illustrate Ms. Mowbray's gross mismanagement of the Debtor's affairs, in the lead up to the filing of this Bankruptcy Case, while Debtor was insolvent, Ms. Mowbray transferred over $18,936,909.40 to her Affiliates, and then camouflaged and mischaracterized those fraudulent transfers as "back-dated oral loans." Further, Ms. Mowbray transferred an over $25 million-dollar annual revenue contract with Southern California Edison ("SCE") to her subsidiary, Pino Tree Services, Inc. ("PTS"), and mischaracterized the loss of the multi-million dollar SCE contract as the Debtor simply being "outbid."[1] However, the evidence will show that these loans and "management agreements" were in fact a concerted plan to transfer all of Debtor's assets and revenue streams to the Affiliates, in a transparent attempt to lower Debtor's income and deplete Debtor's assets, in order to confirm the lowest General Unsecured Creditor dividend plan possible.

Thus, due to the gross mismanagement and inherent conflicts of interest, along with Ms. Mowbray ignoring corporate formalities and treating the Affiliates and Debtor as "one company," this Court must appoint a Chapter 11 Trustee, and also must enter an order substantively consolidating Ms. Mowbray's Affiliates with the Debtor in this Bankruptcy Case.

---

[1] Notably, in Debtor's Cash Collateral Motion, Debtor referenced being "underbid" for the SoCal Edison Contract, as the reason the Debtor was seeking Chapter 11 Bankruptcy Protection. However, as will be shown below, in 2023-2024 Robin Mowbray's other entity "Pino Tree Services, Inc." actually obtained SoCal Edison as a customer in Debtor's place, in a ploy to continue the Debtor's operations under Ms. Mowbray's other entity PTS, via a management agreement, thus providing an over 10-fold increase in PTS' revenue, at the detriment to the Debtor and this Bankruptcy Estate (ECF No. 5, pp. 8, lns. 10-17).

## II.

## STATEMENT OF FACTS

Established in 1972 by Gloria and John Mowbray (the "Founders"), the Debtor has been providing vegetation management services for over 50 years.  Debtor continues to be a family owned and operated business, and a member of the WMBE (Women and Minority Business Enterprise), because it is now wholly owned and operated by the Founders' daughter, Robin Mowbray (See Exhibit ["Ex."] 18, ¶ 9; see also Ex. 1, 16:3-4).

The services provided by Debtor include, without limitation, manual and mechanical clearing, integrated vegetation management, storm and emergency right-of-way maintenance, and high-hazard tree removal and crane services (collectively referred to as: "Vegetation Management Services"). The Debtor does tree-trimming around power lines, clearing vegetation to prevent forest fires, removal of debris and charred remains after major wildfires in California, and assisting with damage remediation in response to hurricanes. Historically, utility companies have been Debtor's primary clients, including Southern California Edison. Debtor also provides services to governmental agencies and cooperatives (Ex. 18, ¶ 12).

In 2020, Debtor was an extremely successful business, with gross annual revenue totaling: $471 Million, *with net profits of: $69.2 million in 2020 alone* (Ex. 18, ¶ 38).

However, shortly after being served with a multi-million-dollar wrongful termination lawsuit by Debtor's former CEO, Ronnie Jordan ("Wrongful Termination Suit"), as well as the filing of an over $84 Million-dollar personal injury suit by Jamie Rodriguez and Ana Lidia Gomez ("Personal Injury Suit"), Debtor began its plan to transfer the business operations of the Debtor to its ostensible subsidiary entity Pino Tree Service. Inc.("PTS") (Ex. 18, ¶ 14; see also Ex. 1-3; and ECF Nos. 141 & 189; see also Decl. of Ronnie Jordan ["Decl. Jordan"] & ECF No. 141).

As a result of this plan to transfer the Debtor's business operations from the Debtor to PTS, Debtor experienced a substantial decline in revenue over the past four years. The Debtor's gross revenues and net income or losses on such revenues from 2020 to 2024 are set forth in the table below. In the lead up to this Bankruptcy Case, the Debtor incurred substantial decreases in revenue and net losses in 2022, 2023 and 2024 as follows:

| Year | Gross Revenue | Net Income / (Loss) |
|---|---|---|
| 2020 | $471 million | $69.2 million |
| 2021 | $281.9 million | $24.6 million |
| 2022 | $232 million | (loss) (-) $34 million |
| 2023 | $127 million | (loss) (-) $28.9 million |
| 2024 (Q1-Q3) | $28.7 million | $2.0 million |

(See Ex. 18, ¶ 38).

Additionally, just prior to filing this Bankruptcy Case, Debtor began conducting systematic layoffs of hundreds of its employees. As of October 18, 2023, the Debtor had approximately 440 employees, yet after allowing Debtor's wholly-owned entity: PTS to obtain a competing contract with SoCal Edison ("SCE") (*i.e.,* the Debtor's former customer), Debtor reduced the number of its employees to approximately 180 as of the Petition Date (Ex. 2, pp. 2, ¶ 2).

Despite the Debtor losing an alleged $62.9 million dollars from 2022-2023, and laying off over half of its employees, just preceding the filing of this Case, the Debtor transferred $18,936,909.40 to Robin Mowbray's wholly owned other entities: (1) Mowbray Waterman Property, LLC ("MWP"); (2) Pino Tree Services, Inc. ("PTS"), and (3) Phoenix Traffic Management, Inc. ("PTM") (hereinafter collectively referred to as the "Affiliates") (See Ex. 20 – Statement of Financial Affairs, ECF No. 170, pp. 160-161).

As of the Petition date, Debtor possessed a mere $4,228,515.55 in funds in its deposit accounts (Ex. 19 – Sched. A/B, pp. 10, ln. 5). However, within just the 12-month period before filing bankruptcy, Debtor transferred $12,164,256.40 to Pino Tree Services, Inc. ("PTS") (See Ex. 20, pp. 161), as well as transferring $2,883,526.67 to Ms. Mowbray's other company:  Phoenix Traffic Management, Inc. ("PTM") (Ex. 20, pp. 160).  In this situation, despite transferring millions of dollars to PTM, the Debtor inexplicable failed to even memorialize this alleged $2.8 million dollar "loan" in writing (Ex. 3, pp. 6, ¶¶ 4 & 7).  Further, Robin Mowbray brazenly directed the Debtor to transfer another $3,889,126.32 to Ms. Mowbray's other wholly owned entity: Mowbray Waterman Property, LLC ("MWP"), just prior to filing this Bankruptcy Case (See SOFA – Ex. 20, pp. 15, ln. 71).

-4-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

### 1. **Pino Tree Services, Inc.:**

Pino Tree Service, Inc. ("PTS") is owned 100-percent by the Debtor, and the Debtor is owned 100-percent by Robin Mowbray, thus Ms. Mowbray, for all intents and purposes, is the true Principal / Owner of PTS (Ex. 1, 16:2-4). PTS operates in the same field of business as the Debtor, which includes Vegetation Management Services for public utility companies (Ex. 1, 28:2-11). Debtor purchased all of the outstanding shares of PTS from Jacobus D Pino, pursuant to a Stock Purchase Agreement dated May 26, 2022, for a mere $1.5 million dollars (the "PTS Stock Purchase Agreement") (Ex. 2, pp. 4, ¶ 2; see also Ex. 17; & Ex. 18, ¶ 15).

Since the Debtor took over operations of PTS, and began to transfer almost all of its assets and former customers to PTS, it has generated net profits totaling: $5,960,076, which is almost *(4) times its $1,500,000 purchase price,* in just the first 9 months of 2024 alone (*i.e.* Q1-Q3 of 2024) (Ex. 21, pp. 7). As the evidence will show, in order to lower the Debtor's disposable monthly income, so as to avoid paying its creditors, Debtor has participated in a calculated plan to transfer the business operations of the Debtor to PTS (Ex. 2, pp. 3; & Ex. 20, pp. 161).

In accordance with said plan to transfer the business operations of the Debtor to PTS, the Debtor's gross revenue drastically decreased from $232 million in 2022 to a mere $28.7 million in 2024 (ECF No. 5, 8:18-9:2), while PTS' gross revenue correspondingly more than doubled from $16,940,705 in in 2023 to $36,217,397 in just Q1-Q3 of 2024 alone (ECF No. 224, pp. 7).

As evidence of the transfer of operations from the Debtor to PTS, here PTS' net profit of $5,960,076 earned in just the first nine (9) months of 2024, means PTS made $662,230.67 per month on average in profits, which is avg. monthly profits just shy of the amount Debtor paid up-front (*i.e.*, $750,000) to purchase all of PTS (Ex. 21 pp. 9; Ex. 2, pp. 4, ¶ 2). Here, Debtor paid a mere $750,000 upfront to buy PTS, and $750,000 was reduced to a note payable, consisting of 36 payments of $21,075 per month (*Id.*). Thus, to illustrate how much smaller of a company PTS was *before* Ms. Mowbray transferred Debtor's business operations to PTS, now just one month of PTS' profits, *is almost half the entire purchase price Debtor paid to buy PTS in May 2022* (*Id.*).

The reason for this drastic increase in the income of PTS is easily a result of the Ms. Mowbray's plan to drastically downsize Debtor's tree services operations over said same time

-5-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

period.  Said plan to transfer the operations of Debtor to PTS, was even brazenly memorialized in writing and referred to as a "Management Agreement" (See Ex. 4 – Management Agreement; see also Ex. 2, pp. 3).  Here, Debtor and PTS are parties to a Management Fee Agreement dated January 1, 2024 (the "PTS Management Agreement").  In said agreement, the Debtor agreed to provide certain specific services to PTS, including director and officer services and various consulting, planning, administrative, and support services at a discounted rate of only: "35% of average management team's salaries + 25% tax and benefits." (Ex. 2, pp. 3, ¶ 4; Ex. 4, pp. 3, ¶ 2).

Further, Debtor and PTS are parties to another certain Master Vehicle and Equipment Lease Agreement dated September 27, 2022 (the "PTS Equipment Lease") (Ex. 2, pp. 3, ¶ 5). The PTS Equipment Lease allows PTS to not only be managed by the Debtor's officers (so as to acquire Debtor's former customers like SoCal Edison), but to freely use the Debtor's vehicles and equipment to directly compete against the Debtor in the very same field of business, which includes Vegetation Management Services for public utility companies (Ex. 2, pp. 3, ¶¶ 4-5).

In this situation, it is undisputed that the Debtor has transferred its staff, management, officers, contacts, expertise and equipment to PTS (Ex. 2, pp. 3, ¶¶ 4-5; Ex. 3, 9:1, 13:6-10; & Ex. 4), and even funded / capitalized PTS' business operations via transferring at minimum, within just the 12-month period before the petition date, $12,164,256.40 to PTS (Ex. 20, pp. 161). Despite transferring $12,164,256.40 in funds to PTS from October 18, 2023 through October 17, 2024 (Petition date), here Debtor only got around to memorializing said "loans" via a back-dated boilerplate 3-page loan agreement dated January 1, 2024 (See Ex. 5 – PTS Loan agreement).

Here, Robin Mowbray has intentionally orchestrated a scenario, whereby her other company: PTS, has directly competed with the Debtor, taking over customers like SoCal Edison, and in doing so, transferred millions of dollars in revenue, and massive amounts of capital out of this Bankruptcy Estate – to the detriment of the Debtor's creditors (Ex. 1, 28:5-11 & 52:17-20).

In this case, Debtor makes the dubious claim in its Motion for Use of Cash Collateral that:
Towards the end of 2023, another blow came when the Debtor was underbid for Southern California Edison's ("SCE") vegetation management contract, resulting in a substantial loss of revenue for 2024. The business of SCE has become so competitive that winning SCE's contracts required pricing that was not profitable for the Debtor. As such, the silver lining of not winning SCE's contract may be a net gain to the Debtor's bottom line. The loss of

1
2

> PG&E and SCE left the Debtor grappling with managing the cost of the payroll and excess equipment necessary for servicing the large contracts of these former clients. (See Sainos Decl. at ¶ 14.)
> (ECF No. 5, 8:10-17; see also Ex. 18 – Sainos Decl., ¶ 14).

3      However, despite said claims above, the Debtor *was not underbid by an outside*

4   *competitor*, in fact the Debtor did not even bid on the SoCal Edison ("SCE") Vegetation

5   Management Service contract for 2024, yet rather Robin Mowbray directed her other entity PTS

6   to be the company to bid for and take over said $25+ million-dollar annual SCE contract, at the

7   direct expense of the Debtor, and thereby the Creditors of this Estate (Ex. 1, 28:5-11 & 52:17-20).

8      **2.   Mowbray Waterman Property, LLC:**

9      On August 17, 2017, Mowbray Waterman Property, LLC ("MWP") was formed in the

10   State of California by its 100% Managing Member, Robin Mowbray, with its principal place of

11   business being the same corporate headquarters as the Debtor located at: 686 E. Mill Street, Fl. 2,

12   San Bernadino, CA 92408 (Ex. 7, pp. 1-2; see also Ex. 16, pp. 95 - 98).

13      MWP was formed as a real estate holding company for the Debtor, and MWP's sole

14   business is the acquiring, holding and leasing of said real property (Ex. 1, 43:18-25; & Ex. 2, pp.

15   5-6).  MWP currently owns multiple pieces of real property listed below as follows:

16      (1). Lot # 1 Waterman Ave, San Bernardino, CA 92408 – Purchased 9/5/17 for $100,000

17      (2). Lot # 2 San Felipe Rd, San Bernardino, CA 92410 – Purchased 12/21/17 for $150,500

18      (3). 686 E Mill St, San Bernardino, CA 92408 – Purchased 7/8/20 for $4,600,000.

19      (4). Lots # 3 E Rialto Ave, San Bernardino, CA 92408 – Purchased 6/23/21 for $70,000

20      (5). Allen St, San Bernardino, CA 92408 – Purchased 4/25/22 for $2,165,000.

21      (6). 17332 Millwood Dr. Visalia, CA 93292 – Purchased 5/31/22 for $375,000.

22      (7). 9546 Elder Creek Rd, Sacramento, CA 95829 – Purchased 8/16/22 for $2,200,000.

23      (See Ex. 8 – MWP Title Reports; & Ex. 9 – MWP's Waterman Lots # 1-3 Map & Report).

24      In this situation, this Debtor has historically used the profits from their Vegetation

25   Management Services business to purchase real property for Robin Mowbray's real property

26   holding company: MWP (Ex. 1, 43:18-25; Ex. 2, pp. 5-6 & pp. 7 ¶ 5; Ex. 8; & Ex. 9).  For

27   example, Property No. 3, list above: 686 E. Mill Street, was purchased by Debtor for MWP on

28   July 8, 2020, for $4,600,000, and the purchase price was, in part, financed by a loan to MWP by

-7-

1    Bank of The Sierra ("Sierra Bank") in the amount of $2,990,000 secured by the Property and

2    guaranteed by Debtor. According to the Closing Statement, Debtor advanced $1,821,000 to MWP

3    in connection with the purchase (via three deposits into escrow on February 13, June 25, and July

4    8, 2020) (Ex. 17). However, this alleged "loan" given to MWP to purchase Mill St. was only later

5    memorialized in writing via a 112-word, single paragraph loan agreement dated 12/31/2020,

6    signed only by Robin Mowbray on behalf of both MWP and Debtor (Ex. 10).  686 Mill Street is a

7    very large commercial building, which is likely now worth over $10 million (Ex. 8, pp. 48-50).

8         To demonstrate how intermingled and closely related MWP is with the Debtor, the name:

9    "Waterman," in Mowbray Waterman Property, LLC is due to its first real estate holding being the

10    purchase of Property No. 1 above, which is one of nine (9) vacant lots next to: 171 "Waterman"

11    Street, San Bernardino, CA 92404 (APN: 0136-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; 0136-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; & 0136-311-

12    01-0000) ("MWP Waterman Lots"). The MWP Waterman Lots are merely three (3) small parcels

13    / portions of a much physically larger vacant commercial / industrial lot consisting of 9 total

14    parcels (See Ex. 9, pp. 2-10 – Map of Lots).  The MWP Waterman Lots are 3 of 9 parcels directly

15    adjacent to the Debtor's 3 vacant lots of land listed on Schedule B (APN: 0136-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;

16    0136-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; & 0136-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 ["Debtor's Waterman Lots"]) (Ex. 19, pp. 14, ln. 55).

17    Uncoincidentally, the other adjacent 3 of the 9 parcels of vacant land are owned by Robin

18    Mowbray's parents (the "Founders"), John and Gloria D. Mowbray (APN: 0136-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;

19    0136-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; & 0136-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 ["Founder's Waterman Lots"]) (See Ex. 9, pp. 8-19).

20         It is clear when looking at the aerial photographs and maps of the parcels contained in

21    pages 2-9 of Exhibit 9, that the Debtor stores its vehicles and equipment freely across the

22    intertwined MWP Waterman Ave. Lots, Debtor's Waterman Lots, and Founder's Lot without any

23    fencing, borders, or restrictions, because they operate as one economic unit / company (See Ex. 9

24    – Aerial Map showing vehicles & equipment stored across all 9 lots, without fencing or borders).

25         To further illustrate how significantly the Debtor and MWP's financial affairs are

26    intertwined, and as evidence that said two entities are *one singular economic unit,* on October 28,

27    2022, MWP agreed (for no consideration) to be a co-guarantor for the $20 million line of credit

28    issued by PNC Bank to the Debtor ("PNC Loan"), and MWP further agreed to provide PNC Bank

-8-

1   with $20 million First Deeds of Trust encumbering two of MWP's multi-million dollar properties

2   (*i.e.*, Allen St. & 9546 Elder Creek Rd.), for Debtor's PNC Loan (See Ex. 11).

3           On July 18, 2024, as evidence of the collusion and cohesive shared interests between

4   Debtor and MWP, here MWP had PNC Bank record said $20 million dollar deeds of trust against

5   its real property located at: 9546 Elder Creek Rd, Sacramento, CA 95829, and Allen St. San

6   Bernardino, CA 92408 (*i.e.*, exactly 91 days prior to the Bankruptcy Case filing – coincidentally

7   just one day outside of the 11 U.S.C. § 547(a) preference period) (Ex. 8, pp. 6; & Ex. 11, pp. 2).

8           In further support of the Debtor and MWP being inextricably related, as well as to show

9   how transparently intertwined the financial affairs of MWP and the Debtor are, the Debtor's

10  former CEO, Ronnie Jordan had acquired in his first year record contracts and revenues for the

11  Debtor, therefore in response, on May 10, 2019, MWP purchased a property located at: 1515

12  Lucas Lane, Redlands, CA 92374-2758 (APN: 0168-071-62) ("Lucas Lane Property"), for a

13  purchase price $691,500, as part of Mr. Jordan's compensation package, for use as Mr. Jordan's

14  personal residence while he acted as CEO for Debtor (See Decl. Jordan, ¶ 2; see also Ex. 12).

15          Here, Mr. Jordan was promised conveyance of title to the Lucas Lane property at the end

16  of his contract term, and while he and his wife resided there, he was not charged any rent and all

17  expenses and maintenance for the residence were paid by the Debtor or MWP.  After Debtor's

18  former CEO, Ronnie Jordan was terminated as CEO for the Debtor in January of 2022, MWP

19  attempted to evict Mr. Jordan from said Lucas Lane Property, and during said eviction

20  proceedings MWP through Robin Mowbray's supporting declaration confirmed to the State Court

21  that Ronnie Jordan (*i.e.* the former CEO of Debtor) was an ex-employee of Mowbray Waterman

22  Property, LLC, because the Debtor and MWP's operations were run by Mr. Jordan's observation

23  "as one company" (Decl. Jordan, ¶¶ 2-5).  MWP even signed a grant deed transferring the Lucas

24  Lane Property to the Mr. Jordan, as part of a settlement of his claims against MWP and the

25  Debtor (Decl. Jordan, ¶ 5; see also Ex. 13, pp. 2 & 19-22).

26          Further, as another example of the collusion and lack of corporate formalities and

27  separateness between Debtor and MWP, the Debtor leases MWP's properties, yet no funds are

28  actually exchanged for said rent payments, rather the Debtor merely gets "credits" from MWP

-9-

against the previously listed loans, further demonstrating how these entities are merely *one financial unit with no real separateness* (Ex. 3, 18:12-19:2; & Ex. 2, pp. 5-6, ¶ 1).

Thus, since the Debtor provided the funds to purchase the aforementioned eight (8) properties for MWP, and the Debtor and MWP operate as a single financial unit, the aforementioned properties are equitable property of this Bankruptcy Estate (Ex. 1, 2, 8, 9 & 11).

### 3. <u>Phoenix Traffic Management, Inc.</u>

On March 30, 2021, Phoenix Traffic Management, Inc. ("PTM") was formed in the State of California by its 100% Shareholder and CEO, Robin Mowbray, with its principal place of business being once again, the same corporate headquarters as the Debtor and MWP located at: 686 E. Mill Street, San Bernadino, CA 92408 (Ex. 9, pp. 2-4). PTM provides California Contractor State Licensing Board licensed traffic services for the Debtor (Ex. 1, 33:7-12). In this situation, the Debtor uses Robin Mowbray's other entity PTM to provide traffic services related to the Debtor's Vegetation Management Services and the Debtor admittedly pays "above market" rates to PTM for said services (Ex. 1, 50:8-17).

The Debtor's Schedule A/B lists $2,463,400.89 owing from PTM to the Debtor, as of the Petition Date ("PTM Loan") (Ex. 19, pp. 15 of 166, No. 71.) The PTM Loan reflects a combination of advances by the Debtor to PTM used to fund PTM's operating expenses and credits for rent and equipment leased by the Debtor to PTM. The current balance due to the Debtor on the PTM Loan is: $2,477,565.62 as of December 17, 2024. However, shockingly, despite the PTM Loan balance exceeding $2.4 million, the Parties have never drafted nor executed any written loan agreement (Ex. 2, pp. 6, ¶ 4).

Despite there being no written loan agreement, to illustrate the gross mismanagement and comingling of assets between Robin Mowbray's Affiliates and the Debtor, below is a list of the transfers Debtor made to Robin Mowbray's wholly owned non-debtor company: PTM, in just the 12 months preceding this bankruptcy filing, pursuant to "oral loans" as follows:

10/25/2023 Phoenix Traffic Management Inc $146,315.04
10/31/2023 Phoenix Traffic Management Inc $200,738.70
11/1/2023 Phoenix Traffic Management Inc $144,224.38
11/8/2023 Phoenix Traffic Management Inc $123,765.38
11/15/2023 Phoenix Traffic Management Inc $121,299.24
11/21/2023 Phoenix Traffic Management Inc $126,414.51

11/28/2023 Phoenix Traffic Management Inc $168,430.04
11/29/2023 Phoenix Traffic Management Inc $80,344.38
12/4/2023 Phoenix Traffic Management Inc $7,899.51
12/4/2023 Phoenix Traffic Management Inc $14,354.83
12/6/2023 Phoenix Traffic Management Inc $150,044.10
12/11/2023 Phoenix Traffic Management Inc $5,846.14
12/13/2023 Phoenix Traffic Management Inc $157,291.60
12/14/2023 Phoenix Traffic Management Inc $21,523.61
12/20/2023 Phoenix Traffic Management Inc $4,071.50
12/20/2023 Phoenix Traffic Management Inc $141,071.98
12/27/2023 Phoenix Traffic Management Inc $121,205.43
12/29/2023 Phoenix Traffic Management Inc $18,802.50
12/29/2023 Phoenix Traffic Management Inc $20,236.73
12/29/2023 Phoenix Traffic Management Inc $43,186.46
1/3/2024 Phoenix Traffic Management Inc $ 98,770.05
1/9/2024 Phoenix Traffic Management Inc $149,135.47
1/10/2024 Phoenix Traffic Management Inc $66,571.04
1/17/2024 Phoenix Traffic Management Inc $83,415.30
1/17/2024 Phoenix Traffic Management Inc $224,590.65
1/18/2024 Phoenix Traffic Management Inc $17,863.45
1/24/2024 Phoenix Traffic Management Inc $70,276.15
1/25/2024 Phoenix Traffic Management Inc $48,048.31
1/31/2024 Phoenix Traffic Management Inc $71,722.19
2/5/2024 Phoenix Traffic Management Inc $2,814.13
2/7/2024 Phoenix Traffic Management Inc $72,253.87
2/13/2024 Phoenix Traffic Management Inc $161,000.00
**Phoenix Traffic Management Inc Total: 2,883,526.67**
(See SOFA, Part 13, No. 30, pp. 160 – Ex. 20, pp. 2).

PTM owes the Debtor millions of dollars as a result of the above-referenced transfers (Ex. 2, pp. 6, ¶ 4 & Ex. 19).  Further, PTM is the Debtor's largest vendor. However notably, the CRO, Mr. Weiss testified at the Debtor's continued 341(a) meeting of creditors, that there are no procedures in place to resolve conflicts of interest amongst the Affiliates, and thereby ensure that the Debtor pays fair market-prices for Ms. Mowbray's other Affiliates' services – yet in fact the CRO testified the Debtor pays "above market rates" to PTM (Ex. 1, 50:8-17; & Ex. 3, 14:10-22).

Lastly, the CRO is unaware of PTM possessing any other creditors (apart from the Debtor) (Ex. 3, 52:10-53:17; see also Ex. 13 – UCC Lien Search showing PTM having no UCC-1 Liens recorded), thus there will be no prejudice to any creditors of PTM, should this Court substantively consolidate PTM with the Debtor and bring them into this Bankruptcy Case (*Id.*).

As explained above, the Debtor's Principal Robin Mowbray is the 100% shareholder and decision maker for the Debtor, yet she is also the 100% owner and shareholder / member of the aforementioned Affiliates (See Ex. 1, 2, 7, 15, 16 & 18).  Therefore, due to Robin Mowbray's gross mismanagement and unwaivable inherent conflicts of interests between said Affiliates, it

-11-

1  would be in the best interest of all creditors and the Bankruptcy Estate to appoint a Chapter 11

2  Trustee, and further enter an order substantively consolidating the aforementioned Affiliates with

3  the Debtor in this Bankruptcy Case (See Ex. 1-21).

**III.**

**ARGUMENT**

**A.  THIS COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE TO OVERSEE THESE PROCEEDINGS PURSUANT TO 11 U.S.C. § 1104(a):**

8      In this Bankruptcy Case, the inherent conflicts of interest between Debtor and the

9  Affiliates cannot be mitigated, as Ms. Mowbray cannot ethically administer this Estate, due to her

10  multiple direct conflicts of interest, which are unresolvable, because of her conflicting fiduciary

11  duties owed to the Affiliates. Thus, Ms. Mowbray must be replaced, and a Chapter 11 Trustee

12  must be appointed pursuant to 11 U.S.C. § 1104(a).

13      At any time after the commencement of the case, but before confirmation of a plan, on

14  request of a party in interest or the United States trustee, and after notice and a hearing, the court

15  shall order the appointment of a trustee— "the court shall order the appointment of a trustee" to

16  oversee Chapter 11 proceedings. 11 U.S.C. § 1104(a). "The court shall order the appointment of a

17  trustee-- (1) for cause . . . (2) if such appointment is in the best interest of creditors . . . or (3) if

18  grounds exist to convert or dismiss the case under section 1112." *North v. Desert Hills Bank* (In re

19  N.), 212 F. App'x 626, 626 (9th Cir. 2006).

20      Cause is not a defined term under 11 U.S.C. § 1104(a). Whether a particular act or

21  omission rises to the level of cause requires consideration of all pertinent facts and circumstances.

22  *In re Gen. Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) ("Implicit in a finding

23  of incompetence, dishonesty, etc., for purposes of § 1104(a)(1), is whether the conduct shown

24  rises to a level sufficient to warrant the appointment of a trustee"). *In re Velde*, No. 18-11651-A-

25  11, 2018 Bankr. LEXIS 2810, at *4-5 (Bankr. E.D. Cal. Sep. 12, 2018).  The burden of

26  establishing cause rests with the moving party. See *Labankoff v. U.S. Trustee (In re Labankoff),*

27  2010 Bankr. LEXIS 5083, 2010 WL 6259969, at *3 (B.A.P. 9th Cir. June 14, 2010).

28

-12-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

1    Cause to appoint a Chapter 11 Trustee includes "...fraud, dishonesty, incompetence, or

2    gross mismanagement of the affairs of the debtor by current management, either before or after

3    the commencement of the case, or similar cause, but not including the number of holders of

4    securities of the debtor or the amount of assets or liabilities of the debtor; or (2) if such

5    appointment is in the interests of creditors, any equity security holders, and other interests of the

6    estate, without regard to the number of holders of securities of the debtor or the amount of assets

7    or liabilities of the debtor. 11 U.S.C. § 1104(a)." *In re Elite Auto Dealer, Inc.*, No. 20-12221-

8    MKN, 2020 Bankr. LEXIS 2007, at *10 (Bankr. D. Nev. July 8, 2020).

9    Cause and the best interest of creditors and other parties are separate and independent

10    bases for granting a motion to appoint a trustee under 11 U.S.C. § 1104(a); see also CDCA Local

11    Bankruptcy Rule 1001-2(a)(5) ("includes" and "including" are not limiting). Therefore, the list of

12    the enumerated "causes" under Section 1104(a)(1) of the Bankruptcy Code, is non-exhaustive.

13    See *In re Bellevue Place Assocs.,* 171 B.R. 615, 622-623 (Bankr. N.D. Ill. 1994). A court's

14    determination of cause is within the discretion of the court and due consideration must be given to

15    the various interests involved in the bankruptcy proceeding. *Id.* at 623-624. Some cases have held

16    that, once a court finds that "cause" exists to appoint a trustee under 11 U.S.C. § 1104(a)(1), a

17    trustee shall be appointed and there is no discretion to deny relief. *In re Oklahoma Refining Co.*,

18    838 F.2d 1133, 1136 (10th Cir. 1988); see also *In re Bonded Mailings, Inc.* 20 B.R. 781, 786

19    (Bankr. E.D. N.Y. 1982).

20    Numerous courts throughout the country have found that conflicts of interest involving a

21    principal of a debtor (like Robin Mowbray) are grounds for an appointment of a Chapter 11

22    Trustee per 11 U.S.C. § 1104(a). A chapter 11 debtor and its managers owe fiduciary duties to

23    the estate. *Hirsch v. Pennsylvania Textile Corp., Inc. (In re Centennial Textiles, Inc*., 227 B.R.

24    606, 612 (S.D.N.Y. 1998). Where a Debtor has material conflicts of interest with its interrelated

25    business entities, that alone is grounds for appointment of a Chapter 11 Trustee. See *In re*

26    *Microwave Prods. Of Am., Inc*., 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (chapter 11 trustee

27    appointed where debtor was not in a "strong position" to pursue possible claims due to a conflict

28    of interest and fraudulent transfers, and "a trustee would likely be able to investigate claims that

-13-

could result in additional sums of money coming into the estate"); see also *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (conflicting interest in various related entities held by the debtor's directors warranted the appointment of a trustee); *In re Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 176-177 (Bankr. Pa. 1984) (an independent trustee was needed to protect the interests of creditors when "an obvious conflict of interest exists in the management of the two corporations because the officers and principals of the parent corporation are the same individuals as the officers and the principals of the debtor."); see also *In re Great Northeastern Lumber & Millwork Corp.*, 20 B.R. at 611-12 (the "appointment of a trustee to investigate the circumstances of the debtor and its relationship to other entities" was in the interest of all of the debtor's creditors pursuant to § 1104(a)(2)); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60, 62-63 (Bankr. Pa, 1981) (appointing a trustee is in the best interests of the creditors when the principals of the debtor occupied conflicting positions in transferee companies); and *Smith v. Concord Coal Corp. (In re Concord Coal Corp.*), 11 B.R. 552, 554 (Bankr. W. Va. 1981) (appointment of a trustee was justified where loyalty of debtor's current management was called into question due to competing business interests and potential for intercompany dealings); *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. W. Va. 1980) (appointing a trustee under § 1104(a)(2) where "[t]he magnitude of the number of intercompany transactions places current management [of the debtor] in a position of having grave potential conflicts of interest and the presumption arises that the current management of [the debtor] will be unable to make the impartial investigations and decisions demanded in evaluating and pursuing inter-company claims on behalf of [the debtor]."); see also *In re Sharon Steel Corp.*, 86 B.R. 455 (Bankr. W.D. Pa. 1989) (Appointment of trustee to manage Chapter 11 debtor under 11 USCS § 1104(a)(1) is appropriate in light of management's self-dealing, transfer of huge assets to other companies under common control and away from the reach of creditors.)

In a strikingly similar case, the court in *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) found that a Chapter 11 Debtor had similarly intertwined affiliated entities, also shared office space, shared finances, equipment and allocated non-cash "credits" in lieu of actual rent payments, thus the Court in *McCorhill* found that the affairs of the affiliated

-14-

entities and that debtor entity were so intertwined that the estate could only be properly served by

appointing a Chapter 11 Trustee who lacked the inherent conflicts created by the directors'

competing loyalties to both the Debtor and its affiliated companies.  The court in *McCorhill* held

in pertinent part as follows:

> …where there are questionable inter-company financial transfers and the
> principals of the debtor occupy conflicting positions in the transferee companies, a
> trustee should be appointed in the best interests of creditors and all parties in
> interest in order to investigate the financial affairs of the debtor. *In re Philadelphia
> Athletic Club, Inc.*, 15 B.R. 60 (Bankr. E.D. Pa. 1981); *In re L. S. Good & Co.*, 8
> B.R. at 315. In the instant case, the debtor's directors have conflicting interests in
> various affiliated entities located in the same office suite with the debtor. These
> entities do not pay rent for their occupancy. There are various expenses and
> obligations which the debtor has assumed or paid with respect to these entities, as
> reflected in a so-called "exchange account" in the total sum of $ 252,100. The
> debtor's president has closely intertwined the affairs of the debtor corporation with
> those of the affiliated entities in which he has a financial interest which are located
> in the same suite so that the interests of creditors of this estate may have been
> prejudiced.
>
> … the affairs of the corporation are so closely intertwined with those of the
> individuals that the Bankruptcy Judge was not clearly erroneous in inferring from
> corporate misdeeds evidence of the individuals' incapacity to manage their affairs.
> *In re Brown*, 31 B.R. 583 at 585 (D.D.C. 1983). The debtor has made
> undocumented loans to its principals which have not been repaid. This sort of
> gratuitous "borrowing" is, moreover, a conflict of interest requiring the
> appointment of a trustee to protect creditors.

In this case, Debtor is 100% owned by Robin Mowbray and Debtor owns 100% of the

shares of Pino Tree Service, Inc. ("PTS"), thus for all intents and purposes Ms. Mowbray owns

PTS.  Robin Mowbray is also the 100% owner of MWP and PTM, her other two (2) alter-ego

Affiliates.  As a result of this intertwined corporate structure, Robin Mowbray is the sole and true

master of the Debtor and all of the Affiliates.  The Affiliates, however, are all recipients of

significant transfers of money well within the period where those transfers could be recovered by

Debtor as either preferential payments or constructive and/or actual fraudulent transfers pursuant

to 11 U.S.C. §§ 544, 547, 548 and 550.  For example, under Ms. Mowbray's leadership, the

Debor flagrantly transferred over $18,936,909.40 to her other 100% owned alter-ego Affiliates

just months before the filing of this Bankruptcy Case (ECF No. 170, pp. 160-161), yet Debtor

possessed a mere $4,228,515.55 in funds in its deposit accounts on the date of filing bankruptcy

(Ex. 19, pp. 10, line. 5).  Here, within just 12-months before filing this bankruptcy case, Ms.

-15-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

1  Mowbray directed Debtor to transfer over $12,164,256.40 to her subsidiary PTS (Ex. 20, pp.

2  161), over $2,883,526.67 to her other wholly owned entity: PTM (Ex. 20, pp. 160), yet failed to

3  even memorialize in writing what the Debtor now claims were "oral multi-million-dollar loans"

4  owed by PTM to the Debtor (Ex. 3, pp. 6, ¶¶ 4 & 7).

5       These transfers alone create an unresolvable conflict of interest.  How could Robin

6  Mowbray, as the CEO and owner of Debtor, pursue any action to recover said preferential

7  payments and/or fraudulent transfers to her Affiliates, while also being the 100% owner of those

8  entities? She cannot simultaneously fulfill her fiduciary duty owed to the Affiliates, while also

9  fulfilling her obligations to act in the best interest of the Debtor's Estate, in an adversarial role

10  regarding millions in pre-petition transfers. See *In re Breland*, 570 B.R. 643, 660 (Bankr. S.D.

11  Ala. 2017) ("Mr. Breland is the sole owner, or co-owner, of various affiliated entities to which

12  assets were transferred prior to filing bankruptcy, creating a conflict between his position as

13  debtor in possession and in his potential position as the defendant in a fraudulent transfer action.")

14       Here, the same unavoidable conflicts are present with regards to the Debtor's ongoing

15  business operations.  Contrary to the Debtor's Motion for Use of Cash Collateral (ECF No. 5),

16  Debtor didn't get "outbid" on the Debtor's SoCal Edison ("SCE") Contract, yet instead Robin

17  Mowbray let her other company: PTS enter into a new contract to provide tree services to the

18  Debtor's former customer SCE, using Debtor's vehicles, directors, management, and millions in

19  capital to do so (Ex. 4-5), which in turn increased her other entity PTS' net income from $142,331

20  in 2023, to a staggering $5,960,076 in just the first 9 months (*i.e.*, Q1-Q3) of 2024 alone (Ex. 21,

21  pp. 9).  As PTS uses the Debtor's facilities, uses its employees, uses its equipment, and is in the

22  exact same line of business, any contracts that PTS could obtain, so too could the Debtor.  Yet,

23  the Debtor's revenue has drastically fallen in the lead up to this bankruptcy filing, while PTS's

24  revenue *from the same available resources* has risen drastically (*Id.* - PTS' Qtr. Report, pp. 5-9).

25       The financial numbers tell the truth about the inherent conflicts present in this case, thus

26  said conflicts of interest require a Chapter 11 Trustee to ensure the Estate's interests are protected.

27  The striking decline in the Debtor's revenue occurring at the same time as PTS' striking rise in

28  revenue, demonstrates that PTS and the other Affiliates are being enriched to the direct detriment

-16-

of Debtor and its creditors. Ms. Mowbray has participated in a calculated plan to transfer the

majority of the Debtor's assets and revenue to PTS, which is evidenced by PTS' income

increasing drastically in the first 9 months of 2024 (Ex. 21, pp. 7), while the Debtor's Revenue

decreased from $471 million in 2020, down to $232 million in 2022, and dropped to a staggering

mere $28.2 million in Q1-Q3 of 2024 (Ex. 18, pp. 12, ¶ 38).  Ms. Mowbray expects this Court to

believe that the Debtor's income decreased almost 10-fold from 2022 to 2024, while

coincidentally her other entity PTS' revenue increased ten-fold in said same time frame? (See

PTS' Quarterly Report, ECF No. 224 – Ex. 21, pp. 5; & Sainos Decl. - Ex. 18, pp. 12, ¶ 38).

Furthermore, the Debtor's Chief Restructuring Officer, Brian Weiss, testified under oath,

at the January 3, 2025, Meeting of Creditors that he reports solely to Robin Mowbray, who is the

ultimate decision maker of the Debtor in these proceedings. Mr. Weiss stated as follows:

> Q: …WHO DOES THE CHIEF RESTRUCTURING OFFICER REPORT TO AT
> MOWBRAY'S?
> A: THAT WAS TO BE ROBIN MOWBRAY.
> (Ex. 3, 23:18-20)
>
> Q: MR. WEISS, HOW LONG HAVE YOU BEEN THE CHIEF
> RESTRUCTURING OFFICE OF THE DEBTOR?
> A: MID-AUGUST OF 2024
> Q: AND AS CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, WHO
> DO YOU REPORT TO?
> A: I THINK I ANSWERED THAT A FEW MINUTES AGO. I REPORT TO
> THE BOARD.OF DIRECTORS, WHICH IS ROBIN MOWBRAY.
> (Ex. 3, 38:11-17).

The CRO, Mr. Weiss went on to explain that the millions in loans made to the Affiliates

by Debtor in the leadup to this Bankruptcy Case, are not being repaid via direct cash payments,

but instead MWP merely provides Debtor with "credits" allocated for "rent" for the office space

that MWP "owns" (*i.e.,* the real properties Debtor provided the actual funds to purchase).

> Q: I'M JUST ASKING IT THEY MADE ANY PAYMENTS [on the loans]
> A: IN LIEU OF PAYING CASH RENT, THERE'S A BOOK ENTRY THAT IS
> MADE THAT REDUCES THE – THE LOAN PAYMENTS.
>
> (Ex. 3, pp. 12, ll. 15-23).

Mr. Weiss further confirmed under oath, when asked about whether Debtor and the

Affiliates have any procedures in place to address any conflicts of interest between the

Debtor and the Affiliates, Mr. Weiss testified that they do not, as follows:

Q:  ARE THERE ANY [conflict of interest avoidance] PROCEDURES NOW THAT YOU KNOW OF?
A: … I'M NOT AWARE OF ANY CONFLICTS OF INTEREST, YOU KNOW, PROCEDURES THAT ARE IN PLACE….
(Ex. 3, 15:9 – 15).

Thus, as the CRO has admittedly testified, Robin Mowbray is the sole decision maker for both Debtor and the Affiliates. The Affiliates are entities that are allegedly indebted to Debtor in excess of $16 million dollars, yet merely provide Debtor with rent "credits" on these alleged "loans" given by Debtor in the lead up to the bankruptcy filing (Ex. 3, 12:15-23).  Further, PTS is a direct competitor of Debtor, who operates in the same field, uses the Debtor's offices, equipment and employees, bids on substantially similar contracts, and yet *there are no procedures in place to avoid any conflicts of interest* regarding day-to-day business decisions that are ultimately made only by Robin Mowbray (Ex. 3, 12:9-15).  This system cannot possibly produce a result that will produce anything other than the transfer of wealth from the Debtor to the non-debtor Affiliates, and ostensibly to Ms. Mowbray - out of the reach of the Debtor's creditors.  The massive shift in the balance sheets and revenue of the Debtor in the immediate leadup to the bankruptcy filing underscores the problems inherent in such a conflicted and intertwined operation.

Therefore, due to the aforementioned gross mismanagement, conflicts of interest, blatant breaches of Ms. Mowbray's fiduciary duties, and her unwaivable conflicts of interests due to the Affiliates being large vendors and/or competitors of the Debtor, as well as the Affiliates owing Debtor millions of dollars pursuant to poorly documented loans, Robin Mowbray must be removed from this case, and this Court must appoint a Chapter 11 Trustee immediately pursuant to 11 U.S.C. § 1104(a), so as to halt any further despoliation of this Bankruptcy Estate.

**B.  THIS COURT SHOULD SUBSTANTIVELY CONSOLIDATE DEBTOR'S BANKRUPTCY ESTATE WITH ITS AFFILIATES**

The relationship described above, between the Debtor and Ms. Mowbray's wholly-owned Affiliates, is the exact scenario by which substantive consolidation of non-debtor entities and a debtor were meant to rectify, as Mr. Mowbray has historically used her multiple non-debtor entities ("Affiliates") interchangeably as *one single economic unit*, and in anticipation of filing

-18-

bankruptcy, transferred almost all of Debtor's assets and income streams to Ms. Mowbray's non-debtor Affiliates, in order to transparently minimize Debtor's distribution to its creditors.

### 1. Applicable Law

#### a. Purpose of Substantive Consolidation

It is well settled that bankruptcy courts have the power to order substantive consolidation of a debtor and non-debtor entities. "Orders of substantive consolidation combine the assets and liabilities of separate and distinct - but related - legal entities into a single pool and treat them as though they belong to a single entity." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 764 (9th Cir. 2000) (citing F*ederal Deposit Insurance Corp. v. Colonial Realty Co.*, 966 F.2d 57, 58-59 (2d Cir. 1992)). "Substantive consolidation 'enables a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation.'" *Id.* (quoting *James Talcott, Inc. v. Wharton* (*In re Continental Vending Machine Corp.*), 517 F.2d 997, 1000 (2d Cir. 1975)). "The consolidated assets create a single fund from which all claims against the consolidated debtors are satisfied; duplicate and inter-company claims are extinguished; and the creditors of the consolidated entities are combined for purposes of voting on reorganization plans." *Id.* (citing *In re Augie/Restivo*, 860 F.2d 515, 518 (2nd Cir. 1988)). "Without the check of substantive consolidation, debtors could insulate money through transfers among inter-company shell corporations with impunity." *In re Bonham, 229 F.3d, at 764.* "The primary purpose of substantive consolidation 'is to ensure the equitable treatment of all creditors.'" *Id.*

"The bankruptcy court's power of substantive consolidation has been considered part of the bankruptcy court's general equitable powers since the passage of the Bankruptcy Act of 1898." *Id.* at 764 (citing *Reider v. FDIC (*In re Reider), 31 F.3d 1102, 1105 (11th Cir. 1994); and *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 85 L. Ed. 1293, 61 S. Ct. 904 (1941)). "Although substantive consolidation was not codified by the Bankruptcy Reform Acts of 1978 or 1994, as were related provisions allowing for procedural consolidation or joint administration, courts, as well as the bankruptcy rules, recognize its validity and have ordered substantive consolidation subsequent to the enactment of the Bankruptcy Code." *Id.* at 763 (citing

*Reider*, 31 F.3d at 1107). "At present, consistent with its historical roots, the power of substantive

consolidation derives from the bankruptcy court's general equity powers as expressed in § 105 of

the Bankruptcy Code." *Id.* at 764.

### b. Factors for Determining Appropriateness of Substantive Consolidation

Although it is a case-by-case inquiry, the Ninth Circuit has adopted a two-factor test to

guide the determination of whether substantive consolidation is appropriate: "(1) whether

creditors dealt with the entities as a single economic unit and did not rely on their separate

identity in extending credit; or (2) whether the affairs of the debtor are so entangled that

consolidation will benefit all creditors." *Bonham*, 229 F.3d, at 766. (quotation omitted) (adopting

the test set forth by the Second Circuit in *Union Sav. Bank v. Augie/Restivo Banking Co., Ltd.* (In

re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515, 519 (2d Cir. 1988)). Either factor is sufficient

to support substantive consolidation. *Id. Leslie v. Mihranian* (In re Mihranian), No. CC-17-1048-

KuSA, 2017 Bankr. LEXIS 4124, at *9 (B.A.P. 9th Cir. Dec. 4, 2017).

The first factor, reliance on the separate credit of the entity, is based on the consideration

that lenders "structure their loans according to their expectations regarding the borrower and do

not anticipate either having the assets of a more sound company available in the case of

insolvency or having the creditors of a less sound debtor compete for the borrower's assets." *In re

Augie/Restivo*, 860 F.2d, at 518-19. Consolidation under the second factor, entanglement of the

debtor's affairs, is justified only where "the time and expense necessary even to attempt to

unscramble them [is] so substantial as to threaten the realization of any net assets for all the

creditors" or where no accurate identification and allocation of assets is possible." *In re

Augie/Restivo, 860 F.2d,* at 519; see also *Bonham*, 229 F.3d, at 766.

In *Bonham*, the Ninth Circuit adopted the Second Circuit's approach (*Augie/Restivo*) as

follows:

> The Second Circuit's approach is more grounded in substantive consolidation and
> economic theory; it is also more easily applied. Thus, we adopt it and utilize it in
> our analysis of this case. In applying the Second Circuit's test, we must determine
> whether Bonham's creditors either dealt with WPI, APFC and Bonham as a single
> economic unit and did not rely on the separate credit of each of the consolidated
> entities; or, whether the operations of WPI and APFC were excessively entangled

-20-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

with Bonham's affairs to the extent that consolidation will benefit all creditors. *See In re Augie/Restivo*, 860 F.2d at 518.

*Bonham*, 229 F.3d at 766-767.

"Either factor is sufficient to support substantive consolidation." *Leslie v. Mihranian* (In re Mihranian), No. CC-17-1048-KuSA, 2017 Bankr. LEXIS 4124, at *10 (B.A.P. 9th Cir. 2017).

"When the *Bonham* case is considered in its complete context, it is clear that the Ninth Circuit did not require bankruptcy courts to look only to the two [factors]... set forth above, in some 'Pavlovian' way." *In re Bashas' Inc*., 437 B.R. 874, 929 (Bankr. D. Ariz. 2010) (citing *In re Bonham*, 229 F.3d at 767). 'The basic rules, and the discretion to apply them, stem solely and completely from a weighing of the equities, and a decision which emanates from one guiding light: 'Is this reasonable under the circumstances?'" *Id.* at 929." *In re Mihranian*, 2017 Bankr. LEXIS 4124, at *10.

Further, the Ninth Circuit ruled that "…we leave it to the discretion of the bankruptcy court to determine in light of the equitable nature of substantive consolidation whether nunc pro tunc consolidation should be ordered." *In re Bonham*, 229 F.3d 750, 771 (9th Cir. 2000)

Here, substantive consolidation of the Affiliates and Debtor is appropriate under both of the tests laid out above, as the Affiliates are all truly alter-egos of the Debtor; creditors provided them credit as one single economic unit; plus, Debtor's and Affiliates' assets, income, and cross-collateralized debts are so entangled that consolidation will be the only means to acquire the Debtor's true financial condition, and thereby fairly treat all creditors.

Further, the Affiliates have no major independent creditors apart from the Debtor, thus when balancing the harms and weighing the equities, the only equitable remedy is ordering consolidation of the Affiliates with the Debtor into this Bankruptcy case *nunc pro tunc*.

### 2. There Is A Substantial Identity Between The Entities, And Creditors Dealt With Debtor And The Affiliates As If They Were the Same Economic Unit

The evidentiary record undoubtedly shows Debtor and Affiliates are a single economic unit. Specifically, there is a substantial identity between Debtor and Affiliates, and substantive consolidation of the Affiliates is necessary to prevent harm and provide a benefit to creditors.

-21-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

Courts have noted a non-determinative list of factors that a court should consider in determining whether a proponent of substantive consolidation has established a *prima facie* case for substantive consolidation. *Bonham*, 229 F.3d at 765 n.10. "These factors include: (1) the presence or absence of consolidated financial statements; (2) the unity of interests and ownership between various corporate entities; (3) the existence of parent and intercorporate guarantees on loans; (4) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (5) the existence of transfers of assets without formal observance of corporate formalities; (6) the commingling of assets and business functions; (7) the profitability of consolidation at a single physical location." *Id.* (citing *In re Vecco Construction Indus.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980). Here, when examining the relevant factors above, the Affiliates and Debtor possess a shared identity, as well as creditors dealt with them as the same economic unit, as follows:

**a. The Debtor and Affiliates Share Financial Statements**

First, although Debtor and Affiliates may technically possess separate profit and losses and balance sheets, here the Debtor and Affiliates share the same CFO, Ruben Sainos, and freely and interchangeably use each other's properties, equipment, cash reserves, employees, and customers (Ex. 2, pp. 1; Ex. 3:42:14-16; Ex. 4-11, & 14). Further, Debtor listed MWP's real properties on its financial statements to obtain Debtor's $20,000,000 PNC Loan (Ex. 6 & 11).

**b. There Is a Unity of Interests and Ownership Between Debtor and the Affiliates**

Second, the Debtor and the Affiliates share a unity of interest. They are all wholly owned, directly or indirectly, by Robin Mowbray. Ms. Mowbray owns a 100% interest in Debtor, MWP and PTM, and the Debtor owns a 100% interest in PTS.

**c. There Is Shared Management Between Debtor and the Affiliates**

Third, Debtor and the Affiliates share the same management team.

| Company | Director | CEO | CFO | Secretary |
|---------|----------|-----|-----|-----------|
| Debtor | Robin Mowbray | Richard Mowbray | Ruben Sainos | Robin Mowbray |
| PTS | Richard Mowbray | Jacobus De Pino | Ruben Sainos | Robin Mowbray |

| PTM | Robin Mowbray | Richard Mowbray | Ruben Sainos | Robin Mowbray |
|---|---|---|---|---|
| MWP | Robin Mowbray, Managing Member | | | |

Further, Debtor manages PTS's business affairs pursuant to the PTS Management Agreement.  Here, Debtor and PTS are parties to a Management Fee Agreement dated January 1, 2024 (the "PTS Management Agreement" - Ex. 4).  In said PTS Management Agreement, the Debtor agreed to provide certain specific services to PTS, including director and officer services and various consulting, planning, administrative, and support services at a discounted rate of only: "35% of average management team's salaries + 25% tax and benefits." (Ex. 2, pp. 3, ¶ 4; Ex. 4, pp. 3).  In sum, Debtor has set up a scenario, whereby PTS has obtained all of the benefits, expertise and professional relationships / connections that Debtor's management team has developed over their decades in operation, for the mere price of 35% of the average management team's salaries and 25% of their tax and benefits. (*Id.*).

### d. Debtor and Affiliates Operate from a Single Physical Location:

Fourth, Debtor and the Affiliates all share the same primary place of business: 686 E. Mill Dr., 2nd Floor, San Bernardino, CA 92408. The PTS Loan and PTS Management Agreement both list Mill Street as the primary place of business for Debtor and PTS, and public corporate records for MWP and PTM also list the Mill Street Property as their primary place of business (Ex. 2, 4, 7, & 15).

Further, to illustrate the close physical location of Debtor and its Affiliates' operations, one need only look at "Exhibit 9," which contains aerial photos of "MWP's Waterman Lots" proximity to "Debtor's Waterman Lots," and "the Founder's Lots."  Here, as can be seen by aerial photographs and maps of the parcels, the Affiliates store Debtor's vehicles and equipment freely across all of the entities' adjacent lots, without fencing, borders, and/or restrictions (See Ex. 9).

### e.  There Are Intercompany Transfers (labeled as loans) Between Debtor and the Affiliates

Fifth, Debtor has made substantial intercompany transfers to the Affiliates that dwarfed Debtor's own funds on hand.  By the CFO, Mr. Sainos' own admission, "[T]he intercompany

-23-

1   transactions discussed herein are an essential component of the Debtor's operations and cash

2   flow." (Ex. 18 – Decl. Sainos, ¶ 22). On the Petition Date, Debtor's loans to the Affiliates totaled

3   $16,673,573.60 (Ex. 19, pp. 15).  Despite having only $4,228,515.55 in cash on hand, Ms.

4   Mowbray flagrantly transferred millions of dollars to her other 100% owned Affiliates, just

5   months before the filing of this Bankruptcy Case.  For example, within just 12-months before the

6   Petition date, Debtor transferred $12,164,256.40 to its subsidiary PTS, yet only later signed a PTS

7   Loan Agreement on 1/1/2024, *after* $3,506,071.89 was already transferred to PTS from 10/26/23

8   through 12/26/23 (Ex. 20, pp. 160; see also Ex. 5). Debtor transferred $2,883,526.67 to Ms.

9   Mowbray's other wholly owned entity: PTM (Ex. 20, pp. 160), yet has failed to even memorialize

10  this alleged "PTM Loan" in writing (See Ex. 2, pp. 6, ¶ 6 & pp. 7, ¶ 1).

11      PTS owes the Debtor $10,321,046.44 (Ex. 2, at 2, ¶ 6). "The proceeds of the PTS Loan

12  were used to fund PTS's operations (*e.g.*, payroll, rent, and supplies). As stated in the Declaration

13  of Mr. Ruben Sainos, 'PTS was not initially cash flow positive.' (Ex. 18, at 5, ¶ 15; see also Ex.

14  2, pp. 3, ¶ 2). Debtor provided PTS with the credit line "to assist PTS with its operations and

15  capital needs." (*Id.*).  This includes the capital needed to service the upfront costs of the contract

16  with SCE that PTS was able to secure. 'PTS was able to secure SCE vegetation management

17  contracts for 2024 for certain geographic regions, including regions that Debtor did not win.'"

18  (Ex. 18, at 5, ¶ 15; Ex. 2, pp. 3, ¶ 2).

19      Further, the other Affiliate MWP owes $3,889,126.32 to Debtor under the MWP Loan

20  Agreement (Ex. 20, pp. 15, ln. 71). Debtor allegedly loaned $1,599,718.33 to MWP pursuant to

21  the MWP Loan Agreement dated 12/31/2020, in addition to other funds being deposited into

22  escrow for MWP's purchase of: 686 Mill Street Property ("Mill St. Property"), which pre-dated

23  said one-paragraph loan agreement (Ex. 2, pp. 7, ¶ 5; Ex. 10).

24      Here, Debtor paid the down payment into escrow for MWP to purchase the Mill St.

25  Property via three installment payments on 2/13/2020 ($50,000), 6/25/2020 ($50,000), and

26  7/8/2020 ($1,721,000) (Ex. 17).  Despite Debtor labeling these transfers as "loans," said

27  $1,821,000 in total payments were made 10, 6, and 5 months respectively, *before* MWP and

28  Debtor executed their mere 112-word, one paragraph, MWP Loan Agreement dated 12/31/2020

-24-

(Ex. 10 & 17).  Thus, the MWP transfers were yet another "oral loan," which was later partially

memorialized in writing unilaterally by Robin Mowbray (Ex. 10). Likewise, Debtor later loaned

additional amounts to MWP *without any written agreement whatsoever* (Ex. 2, pp. 4, ¶ 6).

As of the Petition date, PTM owed $2,463,400.89 to Debtor under the PTM Loan (Ex. 19,

pp. 15, ln. 71). "The PTM Loan reflects a combination of advances by Debtor to PTM used to

fund PTM's operating expenses when it lacked the cash to do so, and credits given to PTM for

rent and for equipment leased by the Debtor to PTM." (Ex. 2, pp. 6, ¶ 4). In sum, these

outstanding loans were over *four times* the amount of Debtor's cash on hand on the Petition Date

(See Ex. 19 – Sched. B, pp. 15, ln. 71, & pp. 17, ln. 80).

### f.    Intercompany Guaranties on Loans Between Debtor and MWP

Sixth, the largest institutional loans obtained by Debtor and MWP were secured by

intercompany guaranties.

In connection with MWP's purchase of the Mill Street Property in July of 2020, Debtor

guaranteed MWP's obligations to Sierra Bank under the mortgage loan, which was in addition to

Debtor making the $1,821,000 down payment into escrow on behalf of MWP (Ex. 2, pp. 7, ¶ 5).

In connection with Debtor's PNC Loan dated October 2022, MWP guaranteed Debtor's

obligations to PNC (Ex. 4).  To illustrate the lack of corporate formalities and comingling of

Debtor and the Affiliates, here the Debtor's largest liquidated / noncontingent claim of

$7,038,514 owed to PNC Bank was in fact guaranteed by MWP "*for no consideration*" (Ex. 4).

The MWP guaranty was further secured by $20,000,000 deeds of trust listing PNC as the

Beneficiary against MWP's real properties, which were recorded 2 years later on July 18, 2024,

*just 91 days* before the Petition Date (uncoincidentally just *one day after the preferential transfer*

*period* to invalidate said $20,000,000 Deeds of Trusts pursuant to § 547) (Ex. 6 & Ex. 8, pp. 5).

Both institutional lenders (Sierra Bank and PNC) treated Debtor and MWP as the same

economic entity when structuring their transactions. As discussed below, Movants are not aware

of PTS or PTM having any major creditors other than the obligations owed to the Debtor above.

Thus, MWP must be substantively consolidated into this case, as it would be an abuse of the

bankruptcy court process to allow only the minimal remaining assets of the Debtor (not the

-25-

1   substantial real properties and millions in cash transferred to the Affiliates), to be used to satisfy

2   the Debtor's Creditors' claims in this Bankruptcy Case.

3               **g.   Segregating and Ascertaining Assets and Liabilities**

4           Seventh, there is considerable difficulty in segregating and ascertaining the individual

5   assets of Debtor and the Affiliates. This is due primarily to the Debtor financing the start-up and

6   operations of the Affiliates, as well as the substantial ongoing business dealings with the

7   Affiliates as Debtor's main vendors and sub-contractors.

8           Debtor transferred at least $18,936,909.40 to the Affiliates (Ex. 19, ln. 71). These millions

9   in transfers have been characterized as loans to the separate Affiliates.  However, these companies

10  are owned and managed by the same person (Robin Mowbray). They are engaged in the same

11  business (PTS) or related businesses (MWP and PTM), and these businesses were not adequately

12  capitalized initially, relying entirely on Debtor's largesse (Ex. 2).

13          Regarding MWP, its purchase of the Mill Street Property in July of 2020 was funded

14  entirely by Debtor, because MWP was inadequately capitalized to close the transaction. MWP

15  purchased the Mill St. Property for $4,600,000 (Ex. 2, pp. 7, ¶ 8).  However, Debtor made

16  additional loans to MWP that were not separately memorialized in writing.  Here, MWP used said

17  other loans to continue to acquire additional real estate funded by the Debtor's alleged "loans"

18  (Ex. 8, 9, 10, & 12).  Finally, MWP does not actually repay the MWP Loan. Rather, Debtor

19  merely receives "credits" for monthly "rent" charges against the MWP Loan to use properties

20  Debtor actually provided the funds to purchase in the first place (Ex. 3, 18:11-19:2).

21           Regarding PTM, this company was also inadequately capitalized and entirely reliant upon

22  Debtor's "loans" (which were brazenly never even memorialized via a written loan agreement)

23  (Ex. 2, pp. 6, ¶ 7 – pp. 7, ¶ 1).  Likewise, Debtor "leases" its vehicles and equipment to PTM

24  pursuant to the PTM Equipment Lease (Ex. 2, pp. 6, ¶ 5). In short, PTM relies entirely upon

25  Debtor's financing, vehicles, and equipment to operate (Ex. 2, pp. 6-7).

26          Regarding PTS, Debtor purchased the company on May 26, 2022 (during pending

27  litigation) (Ex. 2, pp. 4, ¶ 2).  Prior to the acquisition by the Debtor, PTS primarily served as a

28  subcontractor for Debtor. (*Id).*  Just five months later, on 10/28/2022, Debtor obtained the PNC

1   Loan with a credit limit of $20,000,000 secured by the MWP guaranty and deeds of trust (Ex. 8).

2   Thereafter, Debtor proceeded to fund PTS' operations, while Debtor's revenues and assets

3   dwindled. By the Petition Date, PTS owed Debtor $10,321,046.44 on the PTS Loan (Ex. 2, pp. 6,

4   ¶ 6), and Debtor owed approximately $7,038,514.41 on the PNC Loan (Ex. 18, ¶ 24).

5       Further, in addition to the Debtor transferring over $18 million of liquid assets to MWP,

6   PTS, and PTM, leading up to and in anticipation of this bankruptcy filing, Debtor also transferred

7   millions in untraceable business revenue to Robin Mowbray's other entity, PTS.  For example,

8   the debtor allegedly lost a contract in excess of $25 million in annual revenue for tree services for

9   SoCal Edison, *yet uncoincidentally around that same time period, one of the Affiliates, PTS*

10  *gained SoCal Edison as a customer* (Ex. 18, ¶ 37; & Ex. 1, 28:5-11 & 52:17-20).

11      At the continued January 3, 2025, 341(a) Meeting of Creditors, the CRO, Mr. Weiss

12  testified that Robin Mowbray's other company PTS, coincidently now has a SoCal Edison

13  contract, and that PTS has an "…increase in accounts receivable that went from 769,000 and

14  change to almost 17.6 million…" due to the SoCal Edison "…contract that Mowbray (*i.e.* Debtor)

15  was outbid on." (Ex. 3, 22:22-23:45).  Here, even with a forensic accountant, it is impossible to

16  truly know the countless other unknown contracts the Debtor "lost" to these Mowbray's related

17  Affiliates, as the "…Debtor's business is robust, providing vegetation management services

18  throughout Southern California, Florida, and North Carolina to utilities, cooperatives, and

19  governmental agencies." (ECF No. 5, 2:16-18). This is even more perilous, due to the Debtor's

20  possible huge increases in tree service contract opportunities, resulting from the recent LA fires.

21      Therefore, this is yet another reason these entities must be substantively consolidated.  In

22  this situation, allowing the Debtor to be the only party responsible to pay the debts of Ms.

23  Mowbray's Entities, would allow the Debtor to intentionally and inequitably dilute the revenue

24  and assets of this Bankruptcy Estate to the benefit of Robin Mowbray's other 100% owned

25  Affiliates, by allowing PTS to bid on said contracts - at the expense of the creditors in this Case.

26      In sum, due to the difficulty in segregating and ascertaining the companies' individual

27  assets and liabilities, and the large transfer of revenue from Debtor to PTS, it would be truly

28  impossible to recapture said lost revenue, assets, and equitably allocate the debts owed amongst

the Affiliates and Debtor, as even a forensic accountant would be unable to know where Debtor

ends and the Affiliates begin.  Thus, the Affiliates and Debtor must be substantively consolidated.

### h.  There Are Transfers of Debtor's Assets Without Formal Observance of Corporate Formalities

Eighth, Debtor has transferred millions of dollars to its Affiliates without formal

observance of corporate formalities. First and foremost, Debtor does not have any policy to

address the conflicts of interest inherent with its extensive business dealings with the Affiliates.

The same individuals who were "negotiating" these agreements on behalf of the related

companies - own said companies. This led to improper documentation, and loans without any

writing memorializing the terms of these transactions. Notably the CRO, testified at the Debtor's

continued 341(a) meeting of creditors, that there are no procedures in place to ensure that the

Debtor and Affiliates adhere to corporate formalities, and thereby ensure Debtor pays fair market-

prices for the Affiliates' services as vendors – in fact the CRO actually testified to the contrary,

stating the Debtor pays "above market rates" to PTM (Ex. 1, 50:8-17; see also Ex. 3, 14:10-22).

Regarding PTS, Debtor began advancing funds to PTS as early as 10/26/2023 (but likely

much earlier when the PNC Loan was obtained in 10/2022) (Ex. 20). However, the PTS Loan was

not signed until 1/1/2024.  Likewise, it is believed that PTS also began using Debtor's directors,

management, vehicles, and equipment well before the PTS Management Agreement dated

1/22/2024 (Ex. 4 – PTS Management Agreement).

Regarding MWP's purchase of the Mill St. Property, Debtor paid the down payment into

escrow with three installment payments on 2/13/2020 ($50,000), 6/25/2020 ($50,000), and

7/8/2020 ($1,721,000) (Ex. 17). These were months before MWP's mere 1-paragraph, 112-word

MWP Loan Agreement, dated 12/31/2020 was executed (Ex. 10). Likewise, Debtor later loaned

additional amounts to MWP without any written agreement whatsoever (Ex. 2, pp. 4, ¶ 6).

Regarding PTM, Debtor loaned $2,463,400.89 to PTM *without any written agreement* (*Id*. at ¶ 7).

In sum, Debtor transferred millions of dollars to the Affiliates without following corporate

formalities, such as even obtaining written loan agreements or any procedures to address the

conflicts of interest inherent in these dealings (Ex. 2, pp. 6, ¶ 6 - pp. 7, ¶ 1; & Ex. 3, 14:10-22).

-28-

### i.    There Is Commingling of Assets and Business Functions

Ninth, there is commingling of assets and business functions. Debtor's commingling of assets with the Affiliates is addressed above. Debtor's commingling of business functions warrants additional discussion.

Debtor and the Affiliates operate as separate spokes of a larger wheel. Together, they provide comprehensive vegetation management services. Debtor and PTS both provide vegetation Management Services. PTM provides traffic management services that are necessary to conduct said Vegetation Management Services. MWP owns the real estate holdings from which Debtor, PTS, and PTM operate (including Mill St. Property & storage at Waterman Lots) (Ex. 8 & 9).

Debtor and the Affiliates are managed by the same people, and they share the same vehicles and equipment, which are stored on MWP's real estate.  Likewise, Debtor manages the business affairs of PTS, leases trucks and other equipment to PTS and PTM, provides supplies and parts to PTS and PTM, provides health insurance to PTS's employees, and provides other miscellaneous services, such as fleet maintenance, vehicle repair, and office IT related services. (Ex. 19 - Sainos Decl. at 7-8, ¶ 21).  Debtor further provides PTM director and officer services and various consulting, planning, administrative, and support services. In exchange, PTS merely pays a discounted management fee of only: "35% of average management team's salaries + 25% tax and benefits." (Ex. 2, pp. 3, ¶ 4; Ex. 4, pp. 3, ¶ 2).

Finally, with PTS specifically, Debtor and PTS are direct competitors in the same industry.  However, PTS now has an over $25 million-dollar annual contract to provide Vegetation Management Services to SoCal Edison ("SCE") as a customer, despite the Debtor stating in its Motion for Use of Cash Collateral, that the Debtor was "outbid" and the loss of the SCE Contract was a devastating financial blow to the Debtor's business (ECF No. 5, pp. 8, lns. 10-16; see also Ex. 18, ¶ 14).  Despite any dubious claims that the SCE Contract was for a different region than the Debtor's prior contract, the fact remains that PTS won the SCE contract to the detriment of the Debtor and its Creditors. PTS was only able to obtain said $25+ million annual revenue SCE contract, due to the Debtor providing PTS with the resources, expertise, and

-29-

In Re The Original Mowbray's Tree Service, Inc.  8:24-bk-12674-TA
Memorandum of Points and Authorities in Support of Motion to Consolidate and Appoint a Chapter 11 Trustee

1  connections from the same people who manage Debtor, for a discounted rate of only: "35% of

2  average management team's salaries + 25% tax and benefits." (Ex. 2, pp. 3, ¶ 4; Ex. 4, pp. 3, ¶ 2).

3  **j.    Debtor and Affiliates Are More Profitable if Consolidated:**

4  Lastly, in addition to Debtor transferring over $18 million of liquid assets to the Affiliates

5  leading up to and in anticipation of this bankruptcy filing, Debtor also transferred millions in

6  untraceable business revenue to Robin Mowbray's other entity, PTS.  Debtor lost the SCE

7  contract in excess of $25 million in annual revenue for tree services (Ex. 18, ¶ 14), yet

8  coincidentally around that same time period, the other affiliate entity, PTS gained SCE as a

9  customer (Ex. 1, 28:5-11). Thus, said SCE revenue should come into this Estate.

10  Therefore, based upon these ten (10) factors, there is clearly a substantial identity between

11  Debtor and the Affiliates, the Debtor's operations with the Affiliates are intertwined and

12  inextricably commingled, the Debtor's and Affiliates' creditors dealt with them as if they were

13  the same, and as will be more thoroughly explained below, here, Consolidation of Debtor and its

14  Affiliates will benefit all creditors, and avoid severe harm to the Creditors of this Estate.  Thus,

15  under the circumstances, substantive consolidation of the Debtor and Affiliates is warranted.

16  **3.  Consolidation Is Necessary to Avoid Severe Harm and To Realize Substantial**

17  **Benefits for Creditors**

18  Substantive consolidation is necessary to avoid harm to the Estate and realize a benefit for

19  Debtor's creditors. As discussed above, Debtor incurred debt and transferred millions of dollars to

20  its Affiliates while its own assets and revenues were precipitously declining.  Here, Ms. Mowbray

21  used Debtor's millions in profits from 2020-2021 to buy Real Estate for her Affiliate: MWP, and

22  gave millions in capital injections to her other Affiliate non-debtor entities: PTM and PTS.

23  Further, in addition to providing capital, equipment, and employees, Ms. Mowbray engaged in a

24  calculated plan to transfer the business operations of the Debtor to PTS, under the guise of an

25  inequitable "PTS Management Agreement." (Ex. 4).  Thus, Debtor's creditors will be

26  substantially harmed if this Court does not consolidate the Debtor with the Affiliates.

27  Further, there will be no prejudice to the Affiliates' creditors. Here, Sierra Bank and PNC

28  have fully secured claims against MWP's real estate, and MWP and PTM do not possess any

UCC liens according to recent searches (Ex. 13). Also, PTS has merely minor trade creditors, which overlap the Debtor's regular vendors, along with merely three (3) minor secured loans for the purchase of two Vermerr Stump Cutters, and a Caterpillar 299D3XE Compact Track Loader (Ex. 14). Therefore, the Debtor is the only known major creditor of the Affiliates (Ex. 3, 52:10-53:17; see also Ex. 13 – PTM & MWP UCC-1 Search; & Ex. 14 – PTS' three UCC-1 Liens).

As discussed above, this demonstrates that (1) Debtor and the Affiliates have a substantial identity, and (2) consolidation is necessary to avoid severe harm to creditors, and to realize a major benefit to creditors. Therefore, an Order of substantive consolidation of the Debtor and the Affiliates, bringing said Affiliates into this Estate nunc pro tunc back to the Petition Date, would be the only equitable remedy to rectify said harm.

### a. Notice to Affiliates' Creditors

"Courts have ordered substantive consolidation in numerous procedural contexts. For example, a bankruptcy court may order substantive consolidation as a contested matter upon motion by the involved parties, … or via an adversary proceeding or other procedural device, as long as there is notice and an opportunity to be heard." *Bonham*, 229 F.3d at 765 n.9 (citing cases). "[A] party moving for substantive consolidation must provide notice of the motion to the creditors of a putative consolidated non-debtor." *Mihranian*, 937 F.3d at 1218.

As discussed above, the Affiliates truly have no other real creditors apart from Debtor and the: (1) cross-collateralized PNC Loan, (2) Ronnie Jordan who is suing both Debtor and MWP as an alter-ego, (3) monthly minor regular trade creditors of PTS, (4) three minor equipment purchase agreements (Ex. 14), and (5) Bank of Sierra, which is a non-recourse fully secured purchase money loan. Here, PNC Bank forced MWP to sign on as co-guarantor for the Debtor's PNC Loan, because PNC Bank was aware that MWP is where all of the Debtor's real property assets are located. Thus, there is absolutely no prejudice to PNC or any other creditor, as the PNC Loan is fully secured to the Debtor's collateral as well as MWP's multi-million-dollar portfolio of real property assets (See ECF No. 5; see also Ex. 8-9 – MWP's Real Property Title Reports). Further, since these Affiliates have no independent creditors of their own (apart from the above), there is no harm or prejudice, should this Court consolidate Debtor with the Affiliates.

As discussed above, Debtor is the only major creditor of MWP, other than the fully secured Sierra Bank non-recourse loan, and the co-guaranteed PNC Loan. Thus, even if said creditors (who were noticed of this Motion) object, any negligible harm to said Affiliate creditors will be far outweighed by the harm to Debtor's creditors should consolidation not be ordered.

Therefore, to the extent that the Affiliates identify creditors who have not been noticed with this Motion, their counsel should provide the name and address of the creditor, as well as the amount and basis for their claim against the Affiliate(s). Movants can then provide proper notice and a right to request a hearing and oppose this Motion.

### 4. Debtor and Affiliates Should Be Consolidated Nunc Pro Tunc, Because Their Affairs Are So Entangled That Consolidation Will Benefit All Creditors

"[W]e leave it to the discretion of the bankruptcy court to determine in light of the equitable nature of substantive consolidation whether nunc pro tunc consolidation should be ordered." *In re Bonham*, 229 F.3d 750, 771. "Bonham commingled her personal assets with those of WPI and APFC, and failed to maintain any corporate distinction between those entities to the extent that there was little to distinguish Bonham, WPI and APFC. As such, the filing date of the original involuntary bankruptcy petition is the controlling date from which to measure the limitations period for the trustee's avoidance actions." *Id.*

As discussed above, PTS' Net Profits increased from $142,331 in 2023, to $5,960,076 *in Q1-Q3 2024 alone* (ECF No. 224, pp. 9). Here, clearly the Debtor's plan to transfer the majority of its assets and revenue to PTS has worked, because PTS's income and assets have increased drastically up to and through the filing of this Bankruptcy Case, while the Debtor's revenue and subsequent profits have uncoincidentally drastically decreased (Ex. 21, pp. 7; & Ex. 18, ¶ 35). Further, there are millions in insider preferential payments to all of the Affiliates (Ex. 20).

Therefore, it is clear that Debtor began winding down its operations, while simultaneously ramping up the business operations of its Affiliate and direct competitor: PTS. This was a brazen attempt to continue to operate the Debtor's profitable tree business, merely under the name of its non-debtor Affiliate, so as to pay a much small dividend to Debtor's creditors. Thus, in order to recover said profits, consolidation must be granted *nunc pro tunc* back to the Petition date.

Instead of Debtor being forced to incur substantial administrative fees for adversary proceedings, as well as fees for forensic accountants, in order to attempt to recover said properties and loans owed to the Estate by the Affiliates, here, Consolidation is the *only remedy* that will provide oversight, transparency, reporting requirements, court approval of property transfers and insider compensation, and/or allow this Court to ascertain the Debtor's true financial condition.

Thus, due to the aforementioned entanglement of the Debtor's and Affiliates' financial affairs, substantive consolidation nunc pro tunc is the only way to equitably benefit all Creditors.

**C. SHOULD THIS COURT FIND IT PREMATURE TO APPOINT A CHAPTER 11 TRUSTEE, THEN THIS COURT MUST AT MINIMUMM CONSOLIDATE THE "AFFILIATES" TO MITIGATE THE CONFLICTS OF INTEREST THAT EXIST:**

As discussed above, the Debtor's Principal Robin Mowbray is the 100% owner of the Debtor, as well as 100% owner of the Affiliates, which are regular vendors and beneficiaries of $16 million in outstanding loans owed to the Debtor.  Debtor loaned over $10 million to Ms. Mowbray's entity PTS, another $3 million to PTM, and $2 million to MWP.   Here, had Debtor not loaned over $16 million to the Affiliates preceding this bankruptcy filing, then Debtor would have had *four times* as much cash on hand on the Petition date.

The Affiliates have no major creditors apart from the Debtor, and a fully secured Bank of Sierra non-recourse mortgage, along with the PNC Loan that MWP co-guaranteed in order to obtain said $20 million PNC Loan (Ex. 6).  Thus, the Affiliates' creditors will not be prejudiced by consolidation, as Debtor is their only major creditor apart from PNC Bank and Bank of Sierra (who will be paid in full via said properties' sales and/or via Debtor's Plan of Reorganization).

Allowing Robin Mowbray to operate the other Affiliates, and continue to dilute the Debtor's cash flow by using her other company: PTS and PTM as vendors without oversight from the U.S. Trustee and/or procedures to ensure the Debtor is paying the Affiliates fair market value for said insiders' compensation, would be a complete abuse of the bankruptcy court process.  The truth is that Robin Mowbray cannot serve two masters, therefore she cannot fulfill her fiduciary duties to the its Creditors, while still fulfilling her fiduciary duties owed to: PTS, MWP, and PTM - as these entities are Debtor's main vendors, owe the estate admittedly over $16 million per the

-33-

1  Debtor's own schedules, and therefore should be targets of multiple fraudulent conveyance and

2  preferential payment recovery actions pursuant to 11 U.S.C. §§ 547, 548, and 550.

3          Therefore, should this Court choose not to immediately appoint a Chapter 11 Trustee, then

4  the only way Robin Mowbray and her CRO can ethically fulfill their fiduciary duties to the

5  Debtor and this Estate, while Robin Mowbray also simultaneously fulfills her fiduciary duties to

6  her non-debtor Affiliates, is to have her other Affiliates substantively consolidated *nunc pro tunc*

7  into this Bankruptcy Case – as the aforementioned inherent conflicts of interest cannot be waived.

8          Put simply, unless the Affiliates merge their assets and income into this Estate, and face

9  the same oversight and reporting requirements as the Debtor, then Ms. Mowbray cannot continue

10  to run the operations of Debtor and simultaneously run the operations of her Affiliates.  Should a

11  Chapter 11 Trustee not immediately be appointed, this Court must then in turn immediately

12  substantively consolidate the Affiliates with the Debtor into these bankruptcy proceedings *nunc*

13  *pro tunc* back to the Petition date of: October 18, 2024.

14                                          **IV.**

15                                    **CONCLUSION**

16          For the foregoing reasons, due to the gross mismanagement and inherent conflicts of

17  interest possessed by Ms. Mowbray, this Court should appoint a Chapter 11 Trustee.  Further,

18  since the Debtor's Principal disregarded corporate formalities, commingled millions in assets with

19  her Affiliates, transferred hundreds of millions in gross revenue to her other entity: PTS, and said

20  Affiliates have no other major unsecured creditors apart from the Debtor, this Court should

21  substantively consolidate the Affiliates with the Debtor nunc pro tunc back to the Petition Date.

22          However, should this Court find that the immediate Appointment of a Chapter 11 Trustee

23  is premature, then this Court must immediately appoint an Examiner per 11 U.S.C. § 1104(c), and

24  consolidate Debtor with its Affiliates, so as to resolve the inherent conflicts of interest that exist

25  regarding Mr. Mowbray's conflicting fiduciary duties owed to the Debtor and her Affiliates.

26  Dated: February 6, 2025,        Submitted by:    */s/ Ahren A. Tiller, Esq.*
                                                      Ahren A. Tiller, Esq.
27                                                    Bankruptcy Law Center, APC
                                                      Attorneys for Creditors
28                                                    JAIME RODRIGUEZ

                                          -34-