# Exhibit 1

1                OFFICE OF THE UNITED STATES TRUSTEE

2                       SANTA ANA DIVISION

3

4   In Re:                        )  Case No. 8:24-bk-12674-TA
                                  )
5   THE ORIGINAL MOWBRAY'S TREE   )  Chapter 11
    SERVICE, INC.,                )
6                                 )
              Debtor.             )
7   _____)

8                           341(a) MEETING

9                   NANCY GOLDENBERG, Presiding

10                          --oOo--

11                   Friday, December 6, 2024

12             411 West Fourth Street, Suite 7160
                     Santa Ana, CA 92701
13

14  APPEARANCES:

15  For the Debtor:              ROBERT S. MARTICELLO, ESQ.
                                 Raines, Feldman, Littrell, LLP
16                               3200 Park Center Drive
                                 Suite 250
17                               Costa Mesa, California 92626
                                 (949) 783-7606
18

19  For the United States        NANCY S. GOLDENBERG, ESQ.
      Trustee:                   Office of the United States
20                                 Trustee
                                 411 West 4th Street
21                               Suite 7160
                                 Santa Ana, California 92701
22                               (714) 338-3416

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

1  APPEARANCES:  (cont'd.)

2  For Jamie Rodriguez and        TREVOR M. QUIRK, ESQ.
      Ana Gomez:                  Quirk Law Firm, LLP
3                                 877 South Victoria Avenue
                                  Suite 111
4                                 Ventura, California 93003
                                  (805) 650-7778
5
                                  DONALD W. REID, ESQ.
6                                 Law Office of Donald W. Reid
                                  Post Office Box 2227
7                                 Fallbrook, California 92088
                                  (951) 777-2460
8

9  For AmTrust North America:     ALAN C. HOCHHEISER, ESQ.
                                  Maurice Wutscher
10                                23611 Chagrin Boulevard
                                  Suite 207
11                                Beachwood, Ohio 44122
                                  (216) 220-1129
12

13 For John Deere Construction    JAMES MACLEOD, ESQ.
      and Finance Company, John   The Dunning Law Firm
14    Deere, Deere and Company,   9619 Chesapeake Drive
      John Deere Finance:         Suite 210
15                                San Diego, California 92123
                                  (858) 974-7600
16

17 For Pamela Metcalf Canelas:    ESTELA O. PINO, ESQ.
                                  Pino & Associates
18                                1520 Eureka Road, Suite 101
                                  Roseville, California 95661
19                                (916) 641-2288

20 For Ronnie Jordan:             KENNETH J. CATANZARITE, ESQ.
                                  Catanzarite Law Corporation
21                                2331 West Lincoln Avenue
                                  Anaheim, California 92801
22                                (714) 520-5544

23

24

25

iii

1 APPEARANCES:  (cont'd.)

2 For PNC Bank:                    MICHAEL B. LUBIC, ESQ.
                                   K&L Gates, LLP
3                                  10100 Santa Monica Boulevard
                                   Suite 800
4                                  Los Angeles, California 90067
                                   (310) 552-5030
5

6 Transcriber:                     Briggs Reporting Company, Inc.
                                   9711 Cactus Street
7                                  Suite B
                                   Lakeside, California 92040
8                                  (310) 410-4151

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

iv

1                            I N D E X

2   WITNESSES:                                    EXAMINATION

3   BRIAN WEISS                                        4
                                                      27
4                                                     40
                                                      55
5                                                     63
                                                      76
6                                                     77
                                                      78

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

1

1    SANTA ANA, CALIFORNIA FRIDAY, DECEMBER 6, 2024 10:00 AM

2                              --oOo--

3          TRUSTEE GOLDENBERG:  My name is Nancy Goldenberg

4    and I'm an attorney with the Office of the United States

5    Trustee.  We are going to be conducting telephonically a

6    meeting of creditors under Section 341 of the Bankruptcy

7    Code in a Chapter 11 filing by the name of The Original

8    Mowbray's Tree Service, Inc., case number 8:24-12674-TA.

9          The filing was made on October 18th, 2024.  Today

10   is December 6, 2024, and it is approximately 10:00 a.m.  The

11   meeting will be tape recorded as required by the bankruptcy

12   rules.  So I would ask everyone who is going to participate

13   to speak clearly when asking or answering questions.

14         I'm going to now take roll and ask those parties

15   whose names I call to identify yourselves for the record and

16   who you represent.

17         First, Robert Marcela -- Marcello (phonetic).

18         MR. MARTICELLO:  Yeah.  Good morning, Ms.

19   Goldenberg.  Robert Marticello of Raines, Feldman, Littrell,

20   on behalf of the Debtor.

21         TRUSTEE GOLDENBERG:  And, Mr. Weiss?

22         MR. WEISS:  Good morning.  It's Brian Weiss with

23   Force 10 Partners, Chief Restructuring Officer for

24   Mowbray's.

25         TRUSTEE GOLDENBERG:  Okay.

2

1        And, Mr. Quirk?

2        MR. QUIRK:  Trevor Quirk for Jaime Rodriguez and

3 Ana Gomez.

4        TRUSTEE GOLDENBERG:  And Mr. Reid?

5        MR. REID:  Yes.  Good morning.  Don Reid for --

6 also for Jaime Rodriguez and Ana Gomez.

7        TRUSTEE GOLDENBERG:  Okay.

8        And Ms. Pena (phonetic)?

9        MS. PINO:  Pino.

10        TRUSTEE GOLDENBERG:  "Pino."

11        MS. PINO:  Good morning, Ms. Goldenberg.

12        TRUSTEE GOLDENBERG:  Sure.

13        MS. PINO:  This is Estela Pino, P, as in Paul, I,

14 N, as in Nancy, O.  I am representing as bankruptcy counsel

15 Pamela Metcalf Canelas (phonetic), who is represented as a

16 personal injury plaintiff by Dreyer, Babich, Buccola, Wood

17 and Campora.

18        TRUSTEE GOLDENBERG:  Okay.

19        The next person I'm aware who's on the line is Mr.

20 Hochheiser.

21        MR. HOCHHEISER:  Yes.  Alan Hochheiser on behalf

22 of AmTrust North America.

23        TRUSTEE GOLDENBERG:  Thank you.

24        Mr. Lubic?

25        MR. LUBIC:  Yes.  Michael Lubic of K&L Gates for

3

1 PNC Bank.

2          TRUSTEE GOLDENBERG:  Okay.

3          Mr. MacLeod?

4          MR. MACLEOD:  James MacLeod here for John Deere

5 Construction and Finance Company, John Deere, Deere and

6 Company, John Deere Finance.

7          TRUSTEE GOLDENBERG:  Mr. Catanzarite?

8          MR. CATANZARITE:  Good morning, Ms. Goldenberg.

9 Left sitting is plaintiff's counsel, Ronnie Jordan, in an

10 action pending in San Bernardino County.

11          TRUSTEE GOLDENBERG:  Okay.

12          Is there anyone on the line who wishes to

13 participate whose name I have not called?  Okay.  Hearing no

14 answer, we'll proceed.

15          And I would ask Mr. Marticello, can you please

16 confirm that the person on the line who has identified

17 themselves as Brian Weiss is in fact that party, a

18 representative of this Debtor, because you have personal

19 knowledge that Mr. Weiss does hold that position?

20          MR. MARTICELLO:  Yes, that is correct.

21          TRUSTEE GOLDENBERG:  Okay.  And, Mr. Weiss, what

22 is your position as the representative of this Debtor?

23          MR. WEISS:  I serve as Chief Restructuring

24 Officer.

25          TRUSTEE GOLDENBERG:  Okay.  And, Mr. Weiss, will

4

1  you please raise your right hand so I could swear you in?

2          MR. WEISS:  Yes.

3          TRUSTEE GOLDENBERG:  Okay.  Thank you.

4       BRIAN WEISS - DEBTOR'S REPRESENTATIVE - SWORN

5          THE WITNESS:  Yes.

6          TRUSTEE GOLDENBERG:  Okay.  Thank you.  And again,

7  if I hesitate it's just because I'm taking some notes.

8                              EXAMINATION

9  BY TRUSTEE GOLDENBERG:

10 Q    Mr. Weiss --

11         MS. PINO:  Ms. Goldenberg?

12         TRUSTEE GOLDENBERG:  Yes?

13         MS. PINO:  This is Estela Pino, and I'm having a

14 difficult time hearing Mr. Weiss.  Is anybody else having

15 that problem?

16         MR. CATANZARITE:  Ken Catanzarite joins.

17         TRUSTEE GOLDENBERG:  Okay.  Mr. Weiss, is there

18 any -- can you raise your voice a bit or get closer to the

19 phone?

20         MR. WEISS:  Sure.

21         TRUSTEE GOLDENBERG:  Okay.  Thank you for that

22 information.  Ms. Pino, if it continues, just let us know.

23 BY TRUSTEE GOLDENBERG:

24 Q    Mr. Weiss, did you have the opportunity to read the

25 petition and schedules in this case before they were filed

5

1  with the court?

2  A    Yes.

3  Q    And to your knowledge, is all of -- are all of the

4  Debtor's assets listed in this filing?

5  A    To the best of my knowledge, yes.

6  Q    And are all of the Debtor's liabilities listed in this

7  filing?

8  A    To the best of my knowledge, yes.

9          TRUSTEE GOLDENBERG:  And counsel could assist with

10 this.  Do you intend to make any changes to the information

11 currently on file with the court?

12         MR. MARTICELLO:  Not at this time.

13         TRUSTEE GOLDENBERG:  Okay.

14 BY TRUSTEE GOLDENBERG:

15 Q    Mr. Weiss, do you agree with your -- with Debtor's

16 counsel's representation?

17 A    Yes, I do.

18 Q    Okay.  Mr. Weiss, what were the circumstances that

19 required this company to file for bankruptcy?

20 A    There were a couple.  First, there was a large judgment

21 or a litigation against the company.  And, in addition, they

22 are over-levered with respect to the amount of debt and the

23 ability to service the debt from a cash-flow perspective.

24 Q    Okay.  Can we get a little more detail with respect to

25 the -- first of all, the large judgment.  Who holds that

6

1 judgment and when was it obtained?

2          MR. MARTICELLO:  This is Robert Marticello.  It --

3 I believe Mr. Weiss is referring to a verdict that was

4 rendered in, I believe, in July in the magnitude of just

5 under $90,000,000.  And that is by the plaintiffs that Mr.

6 Quirk represents.

7          TRUSTEE GOLDENBERG:  Okay.  And what was the basis

8 for the judgment -- or what was the basis for the claim?

9          MR. MARTICELLO:  This is Robert Marticello again.

10 I wasn't involved in the underlying litigation, but in

11 short, my understanding is that it was a verdict based on

12 alleged negligence of failure to supervise an employee who

13 obtained a company vehicle, drove it after hours without a

14 license and under the influence, and caused a car accident

15 against Mr. Quirk's claimants -- clients.

16          TRUSTEE GOLDENBERG:  Okay.  And is there any

17 ongoing action with respect to that judgment, appeal or

18 anything of that sort?

19          MR. MARTICELLO:  Yes.  The claimants filed a

20 motion for stay relief that is set for hearing on December

21 17th to proceed with entry of a judgment.  The judgment was

22 actually entered without our -- that we became aware of in

23 connection with preparing an opposition to that motion,

24 post-petition in violation of the stay.  But the motion

25 seeks to stay relief to have the judgment entered, proceed

7

1  to collect against insurance, and allow the Debtor to

2  proceed with its post-judgment remedies, which would be --

3  again, I'm not -- I'm not the state court litigator, but a

4  motion for a new trial and/or to reduce the judgment, and,

5  if necessary, to commence an appeal.

6          The Debtor does intend to do those things.  The

7  question with respect to the pending motion for stay relief

8  is just a matter of time, whether we do that now or later to

9  allow us to focus on our efforts to reorganize.

10          TRUSTEE GOLDENBERG:  Okay.  Thank you for that

11  information.

12  BY TRUSTEE GOLDENBERG:

13  Q    Mr. Weiss, you mentioned another factor leading to the

14  filing was over some over-leverage of the company.  Can you

15  elaborate on that, please?

16  A    Sure.  So the company has, you know, various needs and

17  money arrangements with Equipment Funding First, as well as

18  T&C Bates (phonetic), and they're based on the company's

19  historical cash flow.  It was unable to service those --

20  those obligations based on the contractual terms.  The

21  result, the company fell behind on payments to certain

22  vendors and needed to seek bankruptcy protection or to

23  reorganize those efforts.

24  Q    Okay.  We'll go into a little more detail a little

25  later.  Who are the current corporate officers?

8

1  A     So it's Robin Mowbray and Rubin Santos (phonetic).

2  Q     Okay.

3          MR. MARTICELLO:  This is Robert Marticello.  And

4  also Richard Mowbray is the CEO.

5          TRUSTEE GOLDENBERG:  Okay.  I'm sorry, could you

6  repeat that, Bobby?

7          MR. MARTICELLO:  Richard Mowbray --

8          TRUSTEE GOLDENBERG:  Okay.

9          MR. MARTICELLO:  -- is the company CEO.

10          TRUSTEE GOLDENBERG:  "CEO."  And what is Robin's

11  position?

12          MR. MARTICELLO:  I'm not sure -- this is Robert

13  again.  I'm not sure she is technically an officer.  She is

14  the chairman of the board and is the sole shareholder of the

15  company.

16          TRUSTEE GOLDENBERG:  Okay.  And what about Mr.

17  Santos?

18          MR. MARTICELLO:  He is the CFO of the company.

19          TRUSTEE GOLDENBERG:  Okay.

20  BY TRUSTEE GOLDENBERG:

21  Q     And, Mr. Weiss, when did you obtain your position as

22  Chief Restructuring Officer?

23  A     The middle of August 2024.

24  Q     Okay.  I'm just taking notes.  And who are the current

25  board members?

9

1 A    Currently it's Robin Mowbray, who is the fourth

2 director as well as the secretary.

3 Q    Anyone else?

4 A    No.

5 Q    Okay.  And for how long has Ms. Mowbray held the

6 position as sole shareholder of this company?

7 A    We are (indiscernible) exact time frame.

8 Q    More than two years?

9 A    I think we'll have to get back to you on the specific

10 date.

11 Q    Okay.  We --

12        TRUSTEE GOLDENBERG:  Mr. Catanzarite -- no, no,

13 you can't ask -- okay.  Mr. Catanzarite, please hold any

14 questions you have until the end of my exam.  We can't have

15 people jumping in.

16        MR. CATANZARITE:  I wasn't -- right.  No, no, I

17 wasn't trying to do so.  I'm still having a hard time

18 hearing.

19        TRUSTEE GOLDENBERG:  Okay.

20        MR. CATANZARITE:  I've got my headset turned up

21 completely.  And I'll wait my turn of course.

22        TRUSTEE GOLDENBERG:  Appreciate --

23        MS. PINO:  This is Ms. Pino.  As well, I'm having

24 -- I'm having a hard time hearing Mr. Weiss as well.

25        TRUSTEE GOLDENBERG:  Okay.  Mr. Weiss, if you

*Briggs Reporting Company, Inc.*

10

1  could maybe pick up a separate line or some way to amplify

2  your voice a bit.  Let's go --

3          THE WITNESS:  (Indiscernible.)  Are you having a

4  hard time hearing --

5          TRUSTEE GOLDENBERG:  No.

6          THE WITNESS:  -- Mr. Marticello and I?

7          TRUSTEE GOLDENBERG:  I am not, and it's being

8  recorded.

9          THE WITNESS:  We (indiscernible).

10          TRUSTEE GOLDENBERG:  Yeah.

11          THE WITNESS:  So, I think it may be the other

12  parties telephonic equipment.  If you can hear Mr.

13  Marticello and I clearly, it's not our line.

14          TRUSTEE GOLDENBERG:  Let's keep going.

15          MR. REID:  This is Mr. Reid.  He's just coming

16  across as soft-spoken.

17          TRUSTEE GOLDENBERG:  Okay.  Yeah.  If you could

18  just, maybe just amplify your voice a bit if you would, I'd

19  appreciate it.

20  BY TRUSTEE GOLDENBERG:

21  Q    Mr. Weiss, can you please describe the Debtor's

22  business?

23  A    Sure.  The company is the process -- is in the business

24  of vegetation management, which consists of essentially --

25  in specific terms, trimming trees for large customers such

11

1  as utility companies.

2  Q    Okay.  I'm just making notes.  And how many employees

3  does the Debtor currently have?

4  A    Approximately 200.

5  Q    All full-time?

6  A    A combination of full-time and part-time.

7  Q    And has this figure changed within the last year?

8  A    Yes, it has.

9  Q    About how many -- during calendar year 2023,

10 approximately how many employees did the Debtor have?

11 A    I don't have that figure as I sit here today.

12 Q    Did -- substantial downsizing or you can't really --

13 A    Yeah.  There's (indiscernible).  There has been a

14 downsizing as the company's revenues decrease over the

15 years, and the amount of employees has also decreased.

16 Q    Okay.  Are there any independent contractors in

17 addition to the 200 employees?

18 A    Are you referring to independent contractors with

19 respect to the people who perform the vegetation management,

20 or are you referring to people such as, you know, IT people,

21 like information technology people that --

22 Q    I guess --

23 A    -- would not be employees but provide --

24 Q    I guess both.  Both.

25 A    I think the employee base is primarily employees.

12

1  Q    Okay.

2  A    And there may be a couple of 1099 contractors, but we'd

3  have to get back to you on that.

4  Q    Okay.  Mostly employees.  Okay.  Can you also, if you

5  would, maybe through counsel, just give -- send an e-mail

6  describing the downsizing in the last year.

7  A    Sure, we can provide that.

8  Q    Thank you.  And out of what premises does the Debtor

9  operate?

10  A    It's property as far as a office building in San

11  Bernardino, California.

12  Q    And what's that address?  What's that address?

13  A    It is 171 South Waterman Avenue, San Bernardino,

14  California 92408.

15  Q    And what's the connection to Orange County?

16  A    I, as the Chief Restructuring Officer of the company,

17  have a corporate office located in Irvine, California.

18  Q    Okay.  Are all prepetition bank accounts closed?

19  A    We believe so, yes.

20  Q    And how many debtor-in-possession accounts have been

21  opened?

22       MR. MARTICELLO:  This is Robert Marticello.  I

23  believe it's two, payroll account and operating account,

24  both at the PNC Bank.

25       TRUSTEE GOLDENBERG:  Okay.

13

1  BY TRUSTEE GOLDENBERG:

2  Q    And, Mr. Weiss, have earnings been paid into those

3  accounts since the filing -- or since they were opened?

4  A    Yes.

5  Q    Okay.  Next set of questions I'm going to ask you

6  relate to the statement of financial affairs and schedules.

7  They are docket 170 on the court docket.  If you could just

8  grab a set of those or look at them on your computer.

9      My first question --

10  A    I have them on the computer.

11  Q    Great.  My first question is with respect to schedule

12  B-11.  It's on page 11 of 166 of that document.  It shows

13  accounts receivable of $5,996,656 at the time of the filing.

14  And you could ball park this.  Approximately what is the

15  current figure for receivables since the filing?

16  A    Let's see.  I can actually get you the amount out of

17  the box (indiscernible), if you want to give me just a

18  moment.

19  Q    Sure.

20  A    The balance through November 29th, 2024 is $6,000,926

21  -- I'm sorry, $6,926,133.

22  Q    Okay.  So the receivables went up since the filing.  Is

23  that the -- those are the current receivables?

24  A    There is a component of current and, you know, non-

25  current receivables that are being paid out over time from a

14

1  former customer as a company.

2  Q    Okay.  Do you know the breakdown for that figure?

3  A    I don't have that detail in front of me.

4  Q    Okay.  So the aged receivables on the schedules are

5  approximately $819,000.  That's on page 11 of 166 as well.

6  Do you know if that figure changed substantially since the

7  filing?

8  A    I believe that figure has gone down since the filing.

9  And the increase in the accounts receivable since the

10  petition date is due to higher sales.

11  Q    Okay.  That's good.  Do you believe that the aged

12  receivables, the figure on the schedules, are collectable?

13  A    Yes, we do.

14  Q    Okay.  On schedule B, page 12 of 166, there's an

15  indication that this Debtor owns Pino Tree Services, Inc.

16  What assets are in that corporation?

17  A    The assets consist of a customer contract primarily,

18  and then some equipment and employees.

19  Q    What do you mean by "employees"?

20  A    People who perform vegetation management services.

21  Q    No, but what do you mean, that they are in the -- that

22  you mean they're paid by Pino Tree Services?

23  A    Yes.

24  Q    Okay.  Is it a management company for this Debtor?

25  A    Pino is not a management company, no.

15

1 Q    Okay.  What --

2 A    Pino does receive certain managed services from the

3 Debtor though.

4 Q    Okay.  Receives -- okay.  Can you just explain its

5 relationship to the Debtor?

6 A    That Pino is a -- from a corporate ownership

7 relationship, its the owner of (indiscernible) of the

8 Debtor.

9 Q    Okay.  Is this -- and what functions does it serve for

10 the Debtor?

11 A    It actually, since its a wholly-owned subsidiary, it is

12 a -- it's a separate business from the Debtor --

13 Q    All right.

14 A    -- you know, from a legal entity, but it has a customer

15 contract with a utility company, and it provides services to

16 its customer, to, you know, Pino's customer.

17 Q    Okay.  And do the same -- is the ownership of Pino Tree

18 Services, Inc. also held by Robin Mowtree -- Mowbray?

19 A    It's actually held by Mowbray, which is owned by Robin.

20 Q    Got it.

21        MS. PINO:  This is Estela Pino.  I'm sorry.  I did

22 not hear that answer.

23        TRUSTEE GOLDENBERG:  Could you repeat, please, Mr.

24 Weiss?

25        MR. MARTICELLO:  This is Robert -- go ahead,

16

1 Brian.

2          THE WITNESS:  So, Pino is owned 100-percent by

3 Mowbray, of which Mowbray is owned 100-percent by the Robin

4 Mowbray.

5          TRUSTEE GOLDENBERG:  Okay.  Thank you.

6 BY TRUSTEE GOLDENBERG:

7 Q    The schedules included a breakdown of the vehicles

8 owned or rented by this Debtor.  Can you just give a ball-

9 park estimate of the number?

10 A    Geez, that's --

11 Q    If you know.

12 A    No.  I don't -- I mean, we have it in spreadsheets.

13 Q    Right.

14 A    If I could, you know, if you like I can --

15 Q    No.

16 A    -- pull up the spreadsheets and (indiscernible) --

17 Q    No.  No, it's not necessary because -- no, no.  It's

18 not necessary.  Do you know of the vehicles used by the

19 Debtor, what percentage are owned versus rented?

20 A    That would also be in the schedule that we'd have to

21 (indiscernible).

22 Q    Okay.  All right.  That's fine.

23 A    It's not (indiscernible).

24 Q    All right.

25 A    And I would add just for --

17

1  Q     Yeah.

2  A     And I would just add that -- that, you know, that also

3  requires an analysis of each transaction to determine

4  whether it's a true lease or a capital lease.

5  Q     Got it.  Okay.  With respect to the vehicles used by

6  this Debtor, are all currently insured?

7  A     Yes.

8  Q     Okay.  On schedule B-55, which is on page 14 of 166,

9  there are values for three parcels.  How are those values

10  derived?

11  A     It's based on the acquisition value, so that would be

12  purchase price.

13  Q     And when were they purchased?

14  A     I don't have that with me -- with me.

15  Q     Do you have any idea of the market value?

16  A     We don't.

17  Q     Okay.  On schedule B-71, which is on page 15 of 166,

18  there are -- there's a list of several notes receivable.

19  Could you please describe the terms -- the terms for each of

20  those notes receivable?  We could start with Pino that has a

21  line credit of over $10,000,000.  What were the repayment

22  terms by Pino?

23  A     Give me a minute and I'll pull up the underlying

24  agreement.

25  Q     Okay.

18

1   A    So the first one for Pino --

2   Q    Right.

3   A    -- there was a -- let's see.  That (indiscernible) that

4   is set, couple different ones.

5        (Pause.)

6        MR. MARTICELLO:  Ms. Goldenberg, this is Robert.

7   Would it be easier if the spreadsheet be -- the notes, to

8   the extent that we haven't already?

9        TRUSTEE GOLDENBERG:  How about instead of the --

10  well, you could send the notes as well, but a description of

11  the terms of each of the notes and those -- I mean, the Pino

12  line of credit, Mowbray's waterman loan of over $3.8

13  million, Phoenix Traffic loan of $2.4 million.

14       THE WITNESS:  Yeah, we can provide the summary,

15  and I actually just, I found the, you know, the cell.

16  BY TRUSTEE GOLDENBERG:

17  Q    Okay.

18  A    There's a line of credit that was entered into as

19  January 1st, 2024, with a term -- I'm sorry, with a maturity

20  date of December 1st, 2025, and an interest rate of Wall

21  Street Journal prime plus three-percent based on a 365-day

22  year and monthly interest-only payments.

23  Q    Okay.  Do you think it's collectable?

24  A    Yes, we do.

25  Q    And is the Debtor current -- I'm sorry.  Is this --

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 24 of 88

19

1  this Debtor -- is Pino current on the repayment terms?

2  A    Yes, it is.

3  Q    Okay.  With respect to Mowbray's waterman loan, would

4  it be -- would you be able to pull that up quickly the terms

5  for that loan?

6  A    Yes.  Okay.  I have the agreement up.  And it is a loan

7  agreement that appears to be dated December 31st, 2020, with

8  a interest rate of 4.5-percent, and I don't see the maturity

9  date on that.

10  Q    Do you know if the Debtor is currently receiving

11  payments on that loan?

12  A    I believe so.

13  Q    Okay.  And how much of those -- what's the magnitude of

14  those payments, if you know?

15  A    I don't know, but it's -- I know that we're receiving

16  payments, so I can -- actually I'd have to check up on the

17  record.

18  Q    Okay.  And I would ask, and counsel could assist with

19  this, just provide additional documentation with respect to

20  the maturity date and the payments, since that appears to be

21  -- I assume that it's owned by insiders, held by insiders?

22  A    Yes.

23  Q    Okay.  So we'd need a little more information with

24  respect to that.  Okay.  The final receivable is the Phoenix

25  Traffic loan for $2,463,400.  Are you familiar with the

20

1  terms for that receivable?

2  A    Yes, I am.

3  Q    Okay.  What would that be?

4  A    So, give me a second.

5  Q    Sure.

6  A    Everything is with the definition, so I'm just --

7  Q    Sure.

8  A    -- trying to pick through the -- I'm sorry, Ms.

9  Goldenberg.  Based on the information I have on my system, I

10 can't easily find the terms without taking up some more time

11 on searching through documents.

12 Q    That's fine.

13 A    So many documents.

14 Q    Then I will just ask you to provide that information to

15 my office within the next 10 days, and to those -- any party

16 that reaches out to your counsel and asks for copies of all

17 of these payables.

18 A    Sure.

19 Q    I mean -- right, payables.  And is Phoenix Traffic --

20 A    (Indiscernible) call.

21 Q    Is the entity that has the Phoenix Traffic loan an

22 insider to this Debtor?

23 A    Yes, it is.

24 Q    Okay.  What is the status of the lawsuit that the

25 Debtor has pending against Flexible Funding?  That's on page

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 26 of 88

21

1 16 of 166.

2          MR. MARTICELLO:  Ms. Goldenberg, this is Robert

3 Marticello.

4          TRUSTEE GOLDENBERG:  Sure.

5          MR. MARTICELLO:  I can get more information for

6 you on this.  My current understanding of the status is we

7 -- I believe we filed the complaint.  There is a cross-

8 complaint that the -- and it is against the bankruptcy

9 estate I believe in Texas.

10          There was a cross-complaint filed against the

11 Debtor, and I believe that's where it sits.  I don't believe

12 there's been material litigation since the cross-complaint

13 was filed.  The company has separate counsel, Reed Smith,

14 that it was using prepetition in that suit.  So I can

15 certainly get more information, but that's my current

16 understanding.

17          TRUSTEE GOLDENBERG:  Okay.  And will the Debtor be

18 retaining the litigation counsel in this bankruptcy to

19 continue the litigation?

20          MR. MARTICELLO:  We have not determined whether it

21 makes economic sense to proceed with that litigation at this

22 time, so we have not decided whether we're going to employ

23 prepetition counsel to continue with the litigation.

24          TRUSTEE GOLDENBERG:  Okay.  Do you know the basis

25 for the litigation?

22

1        MR. MARTICELLO:  I believe it has to do with AR

2   that Flexible Funding is -- I believe is an accounts

3   receivable factor.  And it has to do with accounts

4   receivable that the Debtor believes it is owed that were

5   paid to Flexible Funding.

6        TRUSTEE GOLDENBERG:  Okay.

7   BY TRUSTEE GOLDENBERG:

8   Q    Mr. Weiss, are the payments on the secured loans on all

9   the vehicles and equipment current to your knowledge?

10  A    They're not current, no.

11  Q    Okay.  Can you -- can you give a little bit more

12  information on that?

13  A    And you referring to prepetition now or post-petition

14  or both?

15  Q    Let's talk about prepetition.

16  A    Yeah.  The prepetition amounts are viewed to be the

17  lessors are not current in many instances.

18  Q    Okay.  And those are listed on the schedules?

19       MR. MARTICELLO:  Post-petition, yes.  This is

20  Robert Marticello.  Post-petition we have on balance -- and

21  this goes back to what I was saying, Ms. Goldenberg --

22       TRUSTEE GOLDENBERG:  Sure.

23       MR. MARTICELLO:  -- about whether some of these

24  transactions through leases versus capital leases, we have

25  amounts in our current cash collateral budget for both.  The

23

1 payments on the -- on what we believe are capital leases are

2 budgeted but have not been paid pending discussions with the

3 counterparties on adequate protection.

4          TRUSTEE GOLDENBERG:  Okay.  Okay.  Thank you.

5 BY TRUSTEE GOLDENBERG:

6 Q    It looks like according to the schedules that there's

7 not -- there's insigant (sic), small, a very small amount of

8 tax obligations that aren't current, is that true?  Do you

9 believe the most tax obligations are current?

10 A    Yes.

11 Q    Okay.  And schedule F lists a number of employee claim

12 -- wage claims.  Have those been paid pursuant to the

13 court's earlier order in this case allowing payment to a

14 number of employees?

15 A    Yes.  The prepetition wages were all authorized by --

16 authorized by the court (indiscernible) the case post-

17 petition pursuant to court approval.

18 Q    Okay.  Great.  Next I'm going to jump to statement of

19 financial affairs on page 135 of 166.  And the response to

20 that question shows a significant reduction in gross income

21 this year when compared to 2023 and 2022.  Can you explain

22 the reason for that?

23 A    Yes.  The company had lost certain historical customer

24 contracts primarily Pacific Gas and Electric and Southern

25 California Edison.  So the loss of those contracts, which

24

1 were the company's largest customers, are why we're sitting

2 here today.

3 Q    Okay.  What is the current average monthly income?

4 A    It's about just a tad under 4,000,000 a month for the

5 Debtor.

6 Q    And what is the current break even?

7 A    It's -- if you look at it from a Ethoca (phonetic)

8 perspective, it's probably in the -- call it $3,000,000

9 range per month.

10 Q    Okay.  And what steps has the company taken or does it

11 plan to take to further improve the financial situation?

12 A    The company has taken some pretty dramatic steps over

13 the past year, you know, with respect to reducing its

14 workforce and turning back -- turning back and/or selling

15 idle equipment.

16 Q    Okay.

17 A    So that was kind of the first step.  But then, you

18 know, it just continued to -- continued to monitor the

19 customer -- I'm sorry, the employee payroll levels and the

20 amounts of equipment the company uses, as well as obtaining

21 new customer contracts to rebuild the business that it lost.

22 Q    Okay.  Statement of financial affairs number seven,

23 list the number of lawsuits pending against the Debtor.

24 What's the status of the lawsuit by De Lage Landen Financial

25 Services -- or lodge?  I guess it's the first one.

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 30 of 88

25

1          MR. MARTICELLO:  This is Robert Marticello.  I

2  don't know the status of this particular lawsuit.

3          THE WITNESS:  I know there were -- I think it's an

4  equipment lender --

5  BY TRUSTEE GOLDENBERG:

6  Q    Got it.

7  A    -- (indiscernible).

8  Q    Okay.  And are any of the listed lawsuits going to be

9  brought into bankruptcy court?

10         MR. MARTICELLO:  We haven't made a determination

11  with respect to any -- any of these lawsuits, whether there

12  will be a removal.

13         TRUSTEE GOLDENBERG:  Okay.  All right.

14         And my final question would be -- if counsel could

15  assist or answer this.  How -- just give us a description, a

16  general description of how this Debtor plans to reorganize

17  and the timing for that.

18         MR. MARTICELLO:  So we are currently focused on

19  working on the plan projections and developing the plan.

20  Based on the court's order at the status conference this

21  week, we have a deadline of March 1st to file a plan.  We

22  fully expect to meet that deadline.

23         In terms of a high-level description of the

24  reorganization, the case was filed to continue the work that

25  the Debtor was doing pre-bankruptcy to strengthen its cash

26

1  flow in light of the loss of revenues.  We've moved to

2  reject certain leases to further reduce the equipment to

3  improve cash flow.  Cash flow has improved this year while

4  revenues are down.  The net has improved, and the plan is to

5  propose a reorganization plan based on the smaller footprint

6  and restructure the Debtor's secured and unsecured

7  obligations.

8          TRUSTEE GOLDENBERG:  Okay.  Very good.

9  BY TRUSTEE GOLDENBERG:

10 Q    And, Mr. Weiss, do you agree with Debtor's counsel's

11 recitation?

12 A    He articulated probably a little better than I could,

13 yes.

14 Q    Okay.  I appreciate it.  All right.  Well, thank you.

15          TRUSTEE GOLDENBERG:  I have no further questions.

16 I'm going to call out names and ask the creditor

17 representatives on the line if they have any questions for

18 this Debtor representative.

19          I'll start with Mr. Quirk or Mr. Reid, since you

20 both represent the same clients.

21          MR. REID:  Yeah.  This is Mr. Reid.  I do have

22 questions, but I think my intention was to go after Mr.

23 Catanzarite's line of questioning --

24          TRUSTEE GOLDENBERG:  Okay.

25          MR. REID:  -- if that's all right?

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 32 of 88

27

1          TRUSTEE GOLDENBERG:  Of course.

2          Mr. Catanzarite, you want to start then?

3          MR. CATANZARITE:  Yes, I'd be happy to do so.

4    Thank you very much.

5                     FURTHER EXAMINATION

6    BY MR. CATANZARITE:

7    Q    May I inquire if Mr. Weiss is sitting -- is he sitting

8    with counsel?  Is he also sitting with Mr. Santos?

9    A    I am sitting with counsel, Mr. Marticello, in my office

10   in Irvine, California, and Mr. Santos is not with me.

11          MR. MARTICELLO:  You mean by "Santos" you mean --

12   are referring to Rubin Sainos?

13          MR. CATANZARITE:  Thank you for that, Bobby.  So a

14   Rubin Santo is Santos, yes.

15          MR. MARTICELLO:  He is not with us.

16          MR. CATANZARITE:  Okay.

17   BY MR. CATANZARITE:

18   Q    All right.  I have a few questions for you, and thank

19   you for the time.  First I wanted to ask, have you

20   analytically looked at whether or not what the level of

21   income is on Pino Tree Service and tell me why Pino Tree

22   Services' revenue and expenses, related assets and

23   liabilities are not consolidated within this submission.

24   A    So, Pino is a wholly-owned subsidiary that is a non-

25   debtor.  And so at this time there is not (indiscernible)

28

1  Pino to file for Chapter 11.

2  Q    Well, nevertheless, isn't it true that Pino itself

3  operates in the same business?  True so far?

4  A    Yes, it -- yes, it does.

5  Q    And it has one of the same customers that previously

6  has enjoyed a relationship with Mowbray's.  That they have

7  Southern California Edison as a major contract valued at

8  about 25,000,000 a year, is that correct?

9  A    It does -- Pino does have a -- you know, Southern

10 California Edison as a customer, which was a former customer

11 of Mowbray's, yes.

12 Q    And it's also true that according to the schedules that

13 you've given us, that that's why the credit was over --

14 A    And, sir, would you mind phrasing your question with --

15 you know, just as ask me the question, plus, is it -- it

16 true, just so I can, you know, answer the question yes or no

17 and then provide some commentary, please.

18          MR. CATANZARITE:  I'm sorry.  I was trying to get

19 a better connection.  You still hear me?

20          THE WITNESS:  We can.

21          MS. PINO:  Very vaguely.

22          MR. CATANZARITE:  Yeah, I'm trying to improve

23 that.  How about now?

24          THE WITNESS:  We can hear you fine.

25          MR. CATANZARITE:  Okay.

29

1           THE WITNESS:  I can.

2           MR. CATANZARITE:  I'm sorry for that.

3  BY MR. CATANZARITE:

4  Q    Okay.  So, did you in -- and I know analytically your

5  company has a very broad-base reputation based upon what I

6  review on-line.  Did you value, did you conduct a valuation

7  of Pino Tree Service?

8  A    Actually as part of our plan of reorganization process,

9  we will be performing a valuation of Pino.

10  Q    And --

11  A    So we have not yet, but we will be doing that.

12  Q    And have you examined the documentation where Pino Tree

13  Service is alleged to be, at least as I understand this

14  petition, wholly owned by Mowbray's?

15  A    If your question is, is Pino 100-percent -- is 100-

16  percent owned or wholly owned by Mowbray's, the answer is,

17  yes.

18  Q    Well, I -- Bobby and I had this conversation at

19  sometime ago, and you may have been present.  And I asked

20  for the documentation that supported the alleged transaction

21  wherein Mowbray's owned 100-percent of Pino, as opposed to

22  Robin Mowbray, whose deposition I took and she said she

23  owned 100-percent of Pino.

24      Do you -- have you actually -- do you have available

25  those documents?

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 35 of 88

30

1        MR. MARTICELLO:  I -- this is Robert Marticello.

2  I have seen the transaction documents between the company

3  and Jacobus Pino when the company purchased his company.

4        MR. CATANZARITE:  Would you be kind enough to send

5  those to everyone that requests?

6        MR. MARTICELLO:  I would like to review them to

7  determine whether there's any kind of confidentiality

8  clause.  Provided that is not an issue, then I don't have an

9  issue providing those documents to you.

10        MR. CATANZARITE:  Thank you for that.

11  BY MR. CATANZARITE:

12  Q    Now with respect to Pino, as I see it from the

13  schedules, Pino, there's no valuation associated with Pino,

14  yet Mowbray's loaned on a line-of-credit basis over

15  $10,000,000, and perhaps more, since -- by the way, is there

16  a limit on the line of credit advances or is it capped at

17  the existing 10-plus-million-dollar number?

18  A    I don't believe there's a limit per se, but the Debtor

19  is not lending -- increasing that line of credit to Pino.

20  Q    And what -- do you happen to know what Pino's revenue

21  was in 2024 year to date and 2023, and what its

22  profitability was?

23  A    I didn't -- I can definitely access that information on

24  my server.  But as I -- and if you'd me to do so, I can --

25  I'll pull it up right now for you.

31

1  Q    Well, would it be easier for -- if you just provided us

2  the -- however it's easiest for you guys to do it, the P and

3  L and balance sheet for Pino as of 12-31-23, 12-31-22

4  perhaps, and year to date '24.  If you could send that to

5  us, at least that might answer some of our questions without

6  me asking direct questions about what he recalls.  Would you

7  agree to do that?

8          MR. MARTICELLO:  Not at -- this is Robert

9  Marticello.  Not at this time.  There is a reporting that's

10  required under the code for Pino, which we will do, which

11  will have certain financial information.  It may have what

12  you're requesting, but I don't know that as I sit here

13  today.  And I'm not willing to agree to go beyond that,

14  what's required by the code for a non-debtor.

15          MR. CATANZARITE:  Okay.  I notice -- I notice that

16  Pino -- I pulled up the Secretary of State information, the

17  SOI dated as of 10-1-24, and it lists Mr. Sainos as CFO,

18  Robin as secretary, and Jacobus de Pino, CEO, and Richard

19  Mowbray as the director of this company.

20          And then we have this line of credit, and I

21  understand that there's a shared -- there's a shared staff.

22  In other words, Richard is a director, Robin's a secretary,

23  and Rubin is a CFO.  Is it -- is it accurate to say that the

24  financial operations and overall management of Pino are

25  managed concurrently by the same officers of Mowbray's?

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 37 of 88

32

1      MR. MARTICELLO:  I don't know.  This is Robert

2  Marticello.  I don't believe that's entirely true.  I think

3  there is some overlap in the officers, but as you just said,

4  Jacobus Pino is the CEO of the company.  He is not an

5  officer of the Debtor.

6      MR. CATANZARITE:  Okay.

7  BY MR. CATANZARITE:

8  Q    I've heard some explanation or some contention

9  advanced, shall we say, "industry scuttlebutt," that Jacobus

10  Pino -- de Pino, claims he has a right to re-take 100-

11  percent of Pino Tree Service, is that correct?

12  A    That would be governed by the transaction documentation

13  with respect to the purchase of the company by Mowbray's.

14  Q    And are those documents you --

15  A    I believe what you just said it correct based on --

16  hold on.  Based on -- based on my preliminary review of

17  those documents, I do not believe what you just said is

18  correct.

19  Q    Okay.  Thank you for that.  Okay.  Phoenix, one of the

20  other shall we say, "debtors to the Debtor," is Phoenix

21  Traffic, right, Phoenix Traffic?  Who owns Phoenix Traffic?

22  A    It's a non-debtor entity that I -- is not under my

23  purview so I can't define on the ownership of that entity.

24  Q    Isn't -- so, it has the same directors and officers.

25  Essentially, it's got Mr. Sainos as CFO, Scott Robin is

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 38 of 88

33

1 secretary.  It has Richard is the CEO, and Richard Mowbray

2 as the director.  Is Richard Mowbray, the CEO of Mowbray's,

3 the Debtor, is he the owner of Pino Traffic (sic) -- or, I'm

4 sorry, of Phoenix Traffic?

5 A    As I mentioned a minute ago, it's a non-debtor that I'm

6 not -- it's not in my purview so I don't know.

7 Q    Okay.  And Phoenix Traffic, do you all understand it is

8 an affiliate of Mowbray's that provides the component part

9 of the license California Contractor State Licensing Board

10 licensed traffic services for Mowbray operations?

11 A    It is traffic management.  It does provide traffic

12 management services for Mowbray's, the Debtor.

13 Q    Do you know what this revenue was in 2023 and '22.

14 Same questions as I had asked you for Pino.

15 A    So, as I mentioned a minute ago and a minute before

16 that, with all due respect, is I don't have -- I don't know

17 the financial condition, I don't know the owner, you know,

18 for certain, or officers of, you know, traffic management,

19 you know, of Phoenix.

20 Q    In other words, if you were to look at the sphere of

21 influence of Mowbray's, its directors, its officers, Pino's

22 directors, its officers and ownership and Phoenix, these are

23 all companies that are licensed contractors with the State

24 of California, and all of them are sharing in an overall

25 management conducted by Mowbray's, the Debtor, yet these are

34

1 two subsidiaries and/or affiliates whose revenue, expenses

2 and assets and liabilities are not reflected in the Debtor's

3 filings, including you're putting unknown on Pino Tree

4 Service.  Can you tell me why you did that?

5          MR. MARTICELLO:  I'm going to object.  I'm going

6 to object.  That wasn't a question, it was a long statement.

7          And are you going to ask a question, Mr.

8 Catanzarite, or are you just going to make statements based

9 on what you think you know about non-debtors?

10          Correct, the Debtor didn't list the assets and

11 liabilities and operations of non-debtors in the Debtor's

12 schedules.  That is correct.

13          MR. CATANZARITE:  But what if Pino, for example,

14 what if objectively Pino itself alone with a great IS net

15 score -- by the way, do you know what the (indiscernible)

16 net score of Pino is today?

17          MR. MARTICELLO:  Ms. Goldenberg, I would

18 appreciate -- I mean, if you're willing to have some

19 restraints on the question, because we're not getting

20 questions, we're just getting statements.

21          TRUSTEE GOLDENBERG:  Well, more than that, Mr.

22 Catanzarite --

23          MR. CATANZARITE:  Respectfully, (indiscernible) --

24       (Speaking over each other.)

25          TRUSTEE GOLDENBERG:  Wait.  Mr. Catanzarite, aside

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 40 of 88

35

1  from asking the Debtor representative questions, we can't go

2  so far afield.  You're certainly welcome under -- to get a

3  Rule 2004 order and ask detailed questions about the

4  Debtor's affiliates.

5          I asked questions, and I think you've already also

6  asked questions with respect to the notes payable by these

7  entities and their relationship to these debtors.  And we're

8  also going to get in writing some terms for these loans that

9  this -- that the Chapter 11 Debtor made to these entities.

10 But to the -- you need to stay more on track, if you would,

11 with respect to the schedules, statements of financial

12 affairs or any information directly bearing on this Chapter

13 11.

14          MR. CATANZARITE:  Okay.  I respect -- I was --

15 that's what I was endeavoring to do is determine --

16          TRUSTEE GOLDENBERG:  Okay.

17          MR. CATANZARITE:  -- the valuation of these assets

18 that are reflected and the long notes payable that are

19 reflected by those obligors.  But I'll ask some additional

20 questions.

21          TRUSTEE GOLDENBERG:  Sure.

22 BY MR. CATANZARITE:

23 Q    Can you tell me, please, whether or not the Debtor has

24 pending or has considered filing a employee retention credit

25 application?

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 41 of 88

36

1 A    I don't have the answer for you.  It's a pretty vague

2 question.

3 Q    You're familiar with -- strike that.

4      It's the case I think that --

5 A    I'm familiar with an ERC, but, you know, what's your

6 phrasing question?

7 Q    Sure.  The ERC credit -- the ERC credit would allow a

8 substantial recovery, because this company had -- it might

9 have had 1,000 employees at the time this was applicable

10 quarter to quarter.

11     It's my understanding that some in the industry are

12 taking the position, that is, some of the tree cutters in

13 the industry are taking the position that even though their

14 income may not have declined, that the because of the

15 distancing limitations that were employed by the government

16 and then the utilities themselves, that the amount of

17 revenue was -- although it may have been the same as the

18 preceding period, was nevertheless lower than it could have

19 been because of the distancing.

20     Have any of you heard about that or evaluated that as a

21 possible asset for recovery by Mowbray's Tree Service?

22          MR. MARTICELLO:  Mr. Catanzarite, it's really hard

23 to follow the question when it's preceded by a statement of

24 information that you believe is accurate.  And he's already

25 answered the question.  He said he doesn't have an answer on

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 42 of 88

37

1 an employee retention credit.

2          MR. CATANZARITE:  Okay.

3 BY MR. CATANZARITE:

4 Q    This company, Mowbray's Tree Service, was a Subchapter

5 S Corporation as of the date it was filed.  Was a

6 termination filing associated with the short period -- tax

7 period January 1, '24 through the date of petition filed or

8 elected?

9 A    No.

10 Q    Can you show me why not?

11          MR. MARTICELLO:  I didn't even recall it.  Did you

12 understand the question?

13          THE WITNESS:  Yeah.  I think filing the period tax

14 return for the prepetition period.

15 BY MR. CATANZARITE:

16 Q    Let me refine the question.  Robert Mowbray as a sole

17 shareholder of Mowbray's Tree Service would have --

18 A    (Indiscernible) let me just -- let me just cut you off

19 here.  We would need to consult our tax advisors.

20 Q    Fair enough.  Thank you.  Let me ask a question about,

21 shall we say, insider transactions within four years of the

22 bankruptcy -- bankruptcy filing.  Has the Debtor compiled

23 the list of such transactions?

24 A    List of what transactions?

25 Q    Yes.  In other words, I see you were kind enough to

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 43 of 88

38

1 provide a set of schedules that showed transactions with

2 insiders showing disbursements within one year of the

3 petition.  Do you have a similar analysis done for -- within

4 four years of the petition, therefore, an additional three

5 years?

6 A    Well, we do not.  In the schedules we provide for a

7 two-year look-back as well.  It's not just one year.

8 Q    Okay.  But let -- but it would be the case, wouldn't

9 it, that there may be monies that are sent to Robin Mowbray

10 within, say, three and four years back that should be

11 scheduled and recovered on behalf of the Debtor?

12          MR. MARTICELLO:  That's incorrect, because there's

13 not been the schedules beyond the two-year period on the

14 schedules.

15          If there are transfers that we need to analyze as

16 we move toward the plan confirmation, we'll do so.  And if

17 there are claims that we need to address in our plan, we

18 intend to do so.  And our goal would be to address and

19 resolve any potential fraudulent transfer or preference by

20 -- in connection with our plan.

21 Q    Okay.  Thank you.

22 BY MR. CATANZARITE:

23 Q    And let me ask you a question.  In terms of valuation,

24 have you done any preliminary evaluation of Mowbray's and/or

25 its subsidiary Pino in preparation for the plan of

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 44 of 88

39

1 reorganization?

2 A    Not yet.

3 Q    You -- is it your intention or expectation rather to

4 engage a valuation expert?

5 A    We haven't made that determination yet.

6 Q    Okay.  If you don't engage an evaluation expert, who

7 would put a value on Mowbray's?

8 A    It would be Force 10 Partners.

9 Q    I'm sorry.  It's sort of scratchy.  It would be who?

10 A    It could be Force 10 Partners.

11 Q    Your firm?

12 A    Yes.

13 Q    Have you looked at the schedules -- let's see.  You

14 told me about a $4,000,000 claim -- or told -- told us all

15 about the $4,000,000 claim with -- help me out here, the --

16 A    The (indiscernible) funding litigation.

17 Q    Yes.  Have you looked at their schedules and statement

18 of affairs?

19        MR. MARTICELLO:  I have not.  This is Robert

20 Marticello.  I have not.  I don't believe (indiscernible) --

21        TRUSTEE GOLDENBERG:  Mr. Catanzarite, we have kind

22 of a full house here, and we need questions of the Debtor

23 representative, not of counsel, with respect to, you know,

24 how the case is going to proceed.  So, if you could maybe

25 take another five minutes or so and ask questions with

40

1  respect to facts --

2         MR. CATANZARITE:  I'm happy --

3         TRUSTEE GOLDENBERG:  I'm sorry.  Go ahead.

4         MR. CATANZARITE:  Yeah, I'm fine.  And with the

5  expectation we'll be getting some additional information --

6         TRUSTEE GOLDENBERG:  Right.

7         MR. CATANZARITE:  -- I will yield to whoever is

8  next.

9         TRUSTEE GOLDENBERG:  Okay.  I think that would be

10 Mr. Reid.

11        MR. REID:  Yeah.  Thank you for that.  Okay.  I'll

12 try to be brief.

13                    FURTHER EXAMINATION

14 BY MR. REID:

15 Q    Mr. Weiss, do you know what the Debtor's income, net

16 taxable income was in 2020 approximately?

17 A    Not off the top of my head.

18 Q    Okay.  And then same question for '21, '22, would that

19 be the same response?

20 A    Yeah.  As we sit here today to go over these

21 (indiscernible) and provide those and statement of financial

22 affairs, I don't, but it is something that we have and we

23 can access.

24 Q    And then did the Debtor have net operating losses or

25 taxable losses essentially for '22 and '23 tax years?

41

1  A    My understanding is that (indiscernible) is a tech

2  corporation, so it may not necessarily have NOL's.  It may

3  pass through to shareholders.

4  Q    Okay.  Has the company ever applied for ERC credits?

5  A    I don't have the answer as we sit here today.

6  Q    Are you aware if the Debtor owns a real property in

7  Arrowhead, approximately one acre in its name?

8  A    We're checking.

9  Q    I can give you an APN, if that would be helpful.

10 A    I'm just referring to the Debtor's schedules.  If you

11 have any --

12 Q    Well, what I say --

13 A    It's nothing (indiscernible) as the Debtor's stated

14 assets and liabilities under Section 55, item C, an

15 Arrowhead address.

16 Q    Right.

17 A    (Indiscernible) --

18 Q    So the APN is -- yeah.  The APN is 0330-011-46-W, as in

19 water, 000.

20 A    That does not appear on the Debtor's stated assets and

21 liabilities, and I don't recognize that as an asset or a

22 piece of real property that the Debtor owns.

23      MR. MARTICELLO:  Mr. Reid, if you're -- if you're

24 willing to send me what information you have on that, I'm --

25 you know, we're happy to take a look at it.

42

1          MR. REID:  Sure.  Yeah, will do.

2   BY MR. REID:

3   Q    Okay.  I want to go up -- turn your attention to these

4   loans to affiliates.  For the Pino line of credit for

5   10,000,000, 10.3 million, I believe, Mr. Weiss, you

6   testified previously that that was pursuant to a credit line

7   agreement -- or a line-of-credit agreement dated January

8   1st, 2024, is that correct?

9   A    Yes.

10  Q    Do you know when those -- when that was actually

11  funded?

12  A    I think at various points.  I don't have the schedules

13  as I sit here today with the dates of each funding.

14  Q    Was it funded before or after the agreement was dated?

15  A    As I sit here today, I don't have that detail.

16  Q    Is it your understanding that Mowbray's was extending

17  credit to Pino prior to 2024?

18  A    As we sit here today, I don't have the details so I

19  can't answer that.

20          MR. REID:  And I believe, counsel, you previously

21  said that you would provide all these relevant notes and

22  credit -- line-of-credit agreements to those who request, is

23  that correct?

24          MR. MARTICELLO:  For these three, yes.

25          MR. REID:  Okay.

43

1 BY MR. REID:

2 Q    And then the waterman -- the loan to Mowbray Waterman,

3 do you know when that loan was funded?

4 A    As we sit here today, the only information I have is

5 when the loan had been with -- the loan had been

6 (indiscernible).

7 Q    Do you know whether that loan was before or after that

8 agreement was dated and signed?

9 A    I think I just answered your question previously.

10 Q    What, that you don't know, is that your response?

11 A    Yes.  As we sit here today, I know what the loan

12 agreement's dated, and I -- just to be crystal clear, I

13 don't know if the loan was -- if there were payments prior

14 to or subsequent to December 31st.

15 Q    Do you know the basis for that loan to Mowbray

16 Waterman?

17 A    No, I don't.

18 Q    Do you know what Mowbray Waterman used those loan

19 proceeds for?

20 A    No, I don't.

21 Q    Do you know what type of business Mowbray Waterman is

22 in?

23 A    I believe it owns real property.

24 Q    That's the line of business, that it owns real

25 property?

44

1        MR. MARTICELLO:  That's what Mr. Weiss said, and I
2   feel like we're getting kind of a step or two far afield
3   from the Debtor and its schedules.
4        MR. REID:  I don't think so.  We're talking about
5   the loan, and I'm going to start turning to real property
6   that the Debtor leases from Mowbray Waterman.
7   BY MR. REID:
8   Q    So are most of the Debtor's operations at the 171
9   Waterman address that you identified previously?
10  A    If you can clarify it with me by most of their
11  operations.
12  Q    Is that where most of their employees are located and
13  most of their trucks?
14  A    No.
15  Q    Where is their primary place of business?
16  A    Well, again, you're -- you need -- if you're asking if
17  Mowbray's corporate headquarters is located in San
18  Bernardino, that's one question.  And is that what you're
19  asking, because the company does have employees deployed at
20  customer sites in, you know, North Carolina, Northern
21  California, et cetera.  So, if you just could be specific
22  with your questions and --
23  Q    Sure.
24  A    -- I think we can sort of help you out a little bit
25  more.

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 50 of 88

45

1 Q    It looks -- it looks like the vast majority of its

2 employees and trucks appear to be located at this 686 East

3 Mill Street building on San Bernardino, is that correct?

4 A    I believe that the employees are located on -- you

5 know, generally at job sites located, as I mentioned, in

6 North Carolina, Florida and Northern California.  And

7 generally, those trucks and equipment follows the employees

8 as opposed to just sitting idle in the yard.

9 Q    Do you know if the Debtor -- well, okay.  So the Debtor

10 leases -- leases the 686 East Mill Street property from

11 Mowbray Waterman, is that correct?

12         MR. MARTICELLO:  Can you -- Mr. Reid, can you

13 point us to a particular property in the schedule that

14 you're referring to?

15         MR. REID:  Yeah.  It's in your schedule G.

16         MR. MARTICELLO:  Do you have the page?

17         TRUSTEE GOLDENBERG:  Mr. Reid, do you have the

18 page of the schedule G on the PDA --

19         MR. REID:  Yeah.

20         TRUSTEE GOLDENBERG:  -- PDF of the schedules?

21         MR. REID:  Yeah.  I just moved away from it.

22         TRUSTEE GOLDENBERG:  Of course.

23         MR. REID:  It's 2.17 on schedule G.

24         TRUSTEE GOLDENBERG:  Well, what's the page of the

25 PDF?  I've got 160-page -- sixty-six page of PDF, Mr. Reid.

*Briggs Reporting Company, Inc.*

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 51 of 88

46

1          MR. REID:  It's --

2          MR. MARTICELLO:  One-thirty-one.

3          MR. REID:  -- one-thirty-one of 166.

4    BY MR. REID:

5    Q    Do you know who on behalf of the Debtor negotiated that

6    lease for 686 East Mill Street on behalf of the Debtor?

7    A    No.

8    Q    Do you know who the managing member of Mowbray Waterman

9    Property, LLC, is?

10   A    That would be the corporate documents.  No.

11   Q    Okay.  I'll represent to you that it is Robin Mowbray

12   as the managing member of that entity.

13          MR. MARTICELLO:  I don't know at the time -- this

14   is Robert Marticello.  There wasn't a (indiscernible).

15          MR. REID:  It's --

16      (Speaking over each other.)

17          MR. MARTICELLO:  Wait a minute.  I'm talking -- we

18   talking about the operations and organization of a non-

19   debtor.

20          MR. REID:  So what I'm concerned about is how are

21   these -- the Debtor does business with a number of

22   affiliates.  And who is negotiating on behalf of the Debtor

23   and who is negotiating on behalf of the affiliates?  And how

24   do we know that that is market rates?

25          TRUSTEE GOLDENBERG:  Mr. Reid, you need to put

47

1 those in questions.  You've got to --

2         MR. REID:  For (indiscernible) --

3         TRUSTEE GOLDENBERG:  -- you've got to ask the

4 Debtor representative and move forward --

5         MR. REID:  I understand.

6         TRUSTEE GOLDENBERG:  -- with that.

7         MR. REID:  I understand.  I was just explaining

8 the (indiscernible) Mr. Marticello briefly.

9 BY MR. REID:

10 Q    Do you know, Mr. Weiss, whether the Debtor leases other

11 real estate from Mowbray Waterman?

12 A    Yeah, they do.

13 Q    Specifically -- okay.  Specifically there's some vacant

14 land off of the intersection of Waterman and Rialto?

15 A    If you have a specific address, if you want to describe

16 that to me.  Or alternatively in -- you know --

17 Q    I don't have one, mister --

18 A    -- 131, you've got 1-7, you've got 1-8, you've got 1-9,

19 it lists real property that the Debtor leases from Mowbray

20 Waterman, LLC.  Is that what you're referring to?

21 Q    Yeah, but it looks like Mowbray Waterman, LLC --

22 Mowbray Waterman Property, LLC owns some additional real

23 estate near the intersection of Waterman and Rialto in San

24 Bernardino.  And according to satellite images, there's a

25 bunch of trucks on there, like related to the Debtor's

48

1  business.  Do you -- are you aware of any other properties

2  leased by the Debtor from Mowbray Waterman?

3  A    The only ones that I'm aware of are located at 2.17,

4  2.18 and 2.19.

5         MR. MARTICELLO:  Mr. Reid, do you have the address

6  of the one you're referring to?

7         MR. REID:  It's a number of APN's.  I don't have

8  an actual address.  I can forward those to you off-line.

9         MR. MARTICELLO:  Yes, please do, and I'll take a

10  look at it.

11  BY MR. REID:

12  Q    Do you know -- and I may be -- do you know what the

13  OSHA safety rating is for the Debtor at the moment?

14  A    No.

15  Q    Okay.  Do you know if that safety rating has declined

16  in the, say, past five years?

17  A    I don't know the safety rating today nor the history of

18  the past five years.

19  Q    This should be on my notes.  And then did Mowbray

20  Waterman guarantee a loan to PNC that's held by the Debtor,

21  is that correct?

22         MR. MARTICELLO:  This is Robert Marticello.  That

23  is correct.

24  BY MR. REID:

25  Q    Has Mowbray Waterman guaranteed any other debts on

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 54 of 88

49

1 behalf of the Debtor?

2          MR. MARTICELLO:  I mean -- this is Robert

3 Marticello.  Not to my knowledge, but, again, I'm not -- I

4 don't represent Mowbray's Waterman.  I don't know the full

5 extent of its assets and liabilities.

6 BY MR. REID:

7 Q    Did Pino Tree Service guarantee any debts on behalf of

8 the Debtor?

9 A    Not that I'm aware of.

10 Q    And is there -- does the Debtor have any procedures or

11 protocols for negotiating insider transactions with

12 affiliates, such as --

13          MR. MARTICELLO:  I would object.  He's

14 testified --

15 BY MR. REID:

16 Q    -- you know, leases --

17          MR. MARTICELLO:  It's kind of vague.  Mr. Reid,

18 the question is vague.

19          MR. REID:  Okay.  I'll rephrase.  I'll rephrase.

20 I'll rephrase.

21 BY MR. REID:

22 Q    Does the Debtor have any sort of procedures or

23 protocols for negotiating leases with Mowbray Waterman

24 Property, LLC?

25          MR. MARTICELLO:  Say it again?  With Mowbray

50

1  Waterman.

2        THE WITNESS:  Yeah.  And with respect to since I

3  have been involved, the procedure is that I review -- I

4  would review and approve those types of transactions.  Prior

5  to my involvement, I'm not aware of what the company

6  procedures were or weren't.

7  BY MR. REID:

8  Q    All right.  And -- okay.  And then same question for

9  the Debtor's contracting for traffic services with Phoenix

10 Traffic Management.  Were there any sort of procedures or

11 oversight to essentially ensure that the Debtor's only

12 paying fair-market value for those services?

13        MR. MARTICELLO:  Again, I'm going to object.  It's

14 vague.  The question's vague.

15        You can answer -- right.

16        THE WITNESS:  The method -- we believe that we're

17 paying above market.

18 BY MR. REID:

19 Q    Do you know who negotiated on behalf of the Debtor for

20 traffic services provided by Phoenix Traffic Management?

21 A    I don't.

22 Q    Do you know who on behalf of the Debtor -- okay.

23 Actually, withdraw that.

24        Do you know who the trustee of the Gloria Mowbray

25 separate property trust is?

51

1        MR. MARTICELLO:  I'm objecting.  This has nothing
2  to do with the Debtor.  And honestly, I'm --
3        MR. REID:  Well --
4        MR. MARTICELLO:  -- starting to get the sense that
5  this is being used -- that this is being used -- this 341(a)
6  is not being used to ask questions of the Debtor's
7  representative about the Debtor's operations or schedules,
8  but to do digging for collection efforts outside of the
9  estate, and that's not an appropriate use of the 341(a).
10        MR. REID:  The Debtor lists lease agreements with
11  the Gloria Mowbray separate property trust on 2.11 and 2.12
12  of schedule G.  That's page 130.  I'm asking who is the
13  trustee of that trust?
14        TRUSTEE GOLDENBERG:  And, counsel, I don't think
15  you should answer -- counsel, let the Debtor representative
16  answer, and if he doesn't know, he needs to say he doesn't
17  know.
18        THE WITNESS:  I don't know.
19  BY MR. REID:
20  Q    Do you know when those two leases were negotiated
21  between the Debtor and the Gloria Mowbray separate property
22  trust?
23  A    Not off the top of my head.  I'd have to look at our
24  files.
25  Q    Do you have those lease agreements in your files?

52

1  A     I suspect we do.

2  Q     And would you be willing to provide us copies of those?

3  A     If counsel agrees for me to provide them, then, yes.

4  Q     Okay.  I can talk off-line with Mr. Marticello.  I want

5  to draw your attention real fast.  On 2.12 of schedule G it

6  looks like there's a lease for 171 Waterman Avenue, and that

7  the agreement is with the Gloria Mowbray separate property

8  trust.  And then going down to 2.16 of schedule G, it also

9  looks like there's a lease for the same property with Joseph

10  Bottimay (phonetic).  Do you know -- and then, likewise,

11  2.18, it says there's the same lease with Mowbray Waterman

12  Property, LLC.  Can you explain why --

13  A     Let me -- let me --

14  Q     -- there's three lessors of that property?

15  A     Yeah.  Yeah.  Let me -- it may be your parcelization

16  issue.  So let me -- let us get you an answer on that.

17  Q     Okay.  Okay.  And do you know why -- so, the Debtor no

18  longer provides services for Southern California Edison, is

19  that correct?

20  A     That's correct.

21  Q     But it's fully-owned subsidiary does in the

22  (indiscernible) Pino, is that correct?

23  A     Yes.

24  Q     Do you know why that contract or book of business from

25  Southern California Edison basically went from the Debtor to

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 58 of 88

53

1 Pino?

2          MR. MARTICELLO:  I'm going to object to the form

3 of the question because it assumes that the client went from

4 the Debtor to Pino.  But go ahead, Mr. Weiss.

5          THE WITNESS:  So the book of business didn't

6 transfer.  My understanding was Mowbray's, the Debtor, had

7 contracts with -- in Southern California for certain

8 geographic regions, and it lost its business.

9          And, you know, Pino, which was in the business,

10 had relationships with Southern California Edison within

11 different geographic regions than what Mowbray's had been

12 contracted for.  And through a competitive bidding process

13 for Southern California Edison, Mowbray's won that business

14 -- I'm sorry, Pino won the business for that geographic

15 region, and Mowbray's hurt -- you know, when it bid on

16 certain Southern California Edison projects, it lost

17 business.

18 BY MR. REID:

19 Q    Then Mowbray's or Pino -- or let me rephrase.  Did

20 Mowbray's and Pino ever bid for the same contract or same

21 geographical scope?

22 A    That would have been done before my time, so I'd have

23 to ask the company.

24 Q    Okay.  But it's -- and just -- just to confirm.  It's

25 your understanding that Mowbray's and Pino are essentially

54

1  in the same line of business, vegetation management and --

2  A    Yes.

3  Q    -- tree services?  Okay.

4  A    Yes.

5  Q    All right.

6         MR. REID:  I think that's all the questions I have

7  for the moment.

8         TRUSTEE GOLDENBERG:  Thank you.

9         MR. QUIRK:  I have a couple of questions --

10        TRUSTEE GOLDENBERG:  We're going to --

11        MR. QUIRK:  -- (indiscernible).  Can I ask a

12  couple --

13        TRUSTEE GOLDENBERG:  We're going to go -- I'm

14  going to go through the list of the parties on the line, and

15  your turn will come, okay?

16        Ms. Pino --

17        MR. QUIRK:  That was my party.  That was my

18  client.  It was my client.

19        MR. REID:  That was Trevor --

20        MR. QUIRK:  Yeah, this is Trevor Quirk.

21        TRUSTEE GOLDENBERG:  I'm -- okay.  Mr. Quirk, it's

22  got to --

23        MR. QUIRK:  Because I've got (indiscernible) --

24        TRUSTEE GOLDENBERG:  Your -- okay.  I understand

25  that -- maybe several questions and that's it, because your

55

1  client has already, you know, used a substantial amount of

2  time.  So, please, yeah, do your follow-up and then we'll

3  move on.

4                    FURTHER EXAMINATION

5  BY MR. QUIRK:

6  Q    Mr. Weiss, Robin Mowbray testified that Pino was using

7  Mowbray's trucks and equipment.  Do you have any fact to

8  suggest that is false?

9  A    No.

10 Q    Robin Mowbray testified that Mowbray's made

11 $213,000,000 in revenue in 2019.  Is that true?

12 A    I wouldn't have that information as we sit here today.

13          MR. MARTICELLO:  And a clarification on the

14 question.  We disclosed in our first-day pleadings that Pino

15 rents trucks from Mowbray's and pays rent for that usage.

16 BY MR. QUIRK:

17 Q    Mr. Weiss, do you have any information to suggest that

18 Robin Mowbray's testimony, that Mowbray's made $14.4 million

19 in profit in 2019 was false?

20 A    I haven't reviewed her testimony nor validated whether

21 or not those statements are true or not.

22 Q    In 2020, the revenue the 472,000,000.  Do you have any

23 facts to suggest that her testimony regarding Mowbray's

24 revenue in 2020 was incorrect?

25          MR. MARTICELLO:  Mr. Quirk, I'm going to object to

56

1  the form of the question.  Ask a question about the Debtor,

2  not whether Ms. Mowbray's testimony was true or false in

3  another proceeding.

4  BY MR. QUIRK:

5  Q    Did Mowbray's have revenue of $472,000,000 in 2020?

6         UNIDENTIFIED SPEAKER:  Hey, girlie.  What?

7       (Pause.)

8         TRUSTEE GOLDENBERG:  Echo.  I'm sorry.

9         THE WITNESS:  Would you mind re-asking that

10 question?

11 BY MR. QUIRK:

12 Q    I think the question was regarding Mowbray's revenue in

13 2020.  Was it $472,000,000 as Robin Mowbray testified to in

14 the underlying trial?

15 A    Yeah.  I'm not sure what she testified in the trial,

16 however, looking at the first-day declaration of Rubin, the

17 2020 year gross revenue was 471,000,000.

18 Q    And profits that year were $69,630,755, correct?

19 A    No.  Pursuant to the first-day declaration of Rubin it

20 was $69.2 million.

21 Q    Thank you for the clarification.  2021, revenue of

22 $53,980,000 and change, true?

23 A    You said in 2021?

24 Q    Yes.

25 A    Pursuant to Mr. Rubin's first-day declaration, 2021

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 62 of 88

57

1 gross revenue was 281.9 million.

2 Q    Two-hundred-and-eighty-one-point-nine million.   Profit

3 that year was 26,000,000 and change, is that true?

4 A    No.

5 Q    Okay.  What was the profit?

6 A    Twenty-four-point-six million according to the first-

7 day declaration of Rubin.  And if you're going to ask me the

8 gross revenues for 2023/2024, I'm getting these from Mr.

9 Rubin's first-day declarations at docket number three, page

10 12.

11 Q    And I'm also understanding from your testimony today

12 that you have done no analysis to determine how the

13 $107,000,000 -- I'm just adding up the 2019, 2020 and 2021

14 profit, how the $107,000,000 was distributed, is that right?

15 A    That is correct.

16 Q    And so you have no information whatsoever about that --

17 that profit?

18 A    I had not done an analysis of that profit for those

19 years.

20 Q    And whether it was used to -- whether it was put back

21 into the company or distributed to -- 100-percent to Robin

22 Mowbray or her brother or her nephew --

23 A    I think --

24 Q    -- you just don't know?

25 A    Let me stop you here.  I think I answered that

58

1 question.

2          MR. MARTICELLO:  And as I said before, we intend

3 to analyze any transfers, and if there are alleged claims

4 that are fraudulent transfer claims, our goal will be to

5 address them in some way in connection with our plan.

6 BY MR. QUIRK:

7 Q    Speaking of transfers, is it true that Mowbray's

8 purchased the 686 Mill Street address for cash, $4.5 million

9 in cash, after 2019?

10          MR. MARTICELLO:  So, Mr. Quirk, can you point us

11 to a -- are you referring to something in the schedules?

12          MR. QUIRK:  I'm referring to testimony that was

13 provided to me in the underlying lawsuit that was the

14 (indiscernible) for this bankruptcy filing.

15          MR. MARTICELLO:  Let's focus on -- let's focus on

16 the Debtor's schedules.  We don't have the -- we don't have

17 the testimony.  We were not there.  If there's a particular

18 property in the schedules that you want to ask about, then

19 ask about it.

20          MR. QUIRK:  I just tried to but your doing these

21 speaking objections.

22 BY MR. QUIRK:

23 Q    So I'm asking about --

24          MR. MARTICELLO:  Well, I'm trying to -- I'm trying

25 to focus -- I'm trying to focus the question so we can

59

1  answer it.  And throwing addresses out that that you've got

2  testimony about --

3       (Speaking over each other.)

4            MR. QUIRK:  (Indiscernible) --

5            TRUSTEE GOLDENBERG:  If Mr. Weiss is aware of a

6  property that the Debtor owns that's not on the schedules,

7  he could answer Mr. Quirk that he's aware of it.  If he's

8  not, he could answer, no.

9  BY MR. QUIRK:

10 Q    So the question is about 686 Mill Street.  Is it true

11 that Mowbray Waterman bought that property for $4.5 million

12 cash after 2019?

13 A    I don't know.

14 Q    Is it also true that the County of San Bernardino is

15 paying Mowbray's $30,000 a month in rent for that property?

16            MR. MARTICELLO:  Hold up there.  Are you talking

17 -- are you asking about the Debtor?

18            MR. QUIRK:  That's Mowbray's, right?

19            MR. MARTICELLO:  You said Mowbray, right?  Whether

20 Mowbray's Waterman is Mowbray's the Debtor.  So, which

21 Mowbray's are you referring to?

22 BY MR. QUIRK:

23 Q    Which Mowbray's is receiving $30,000 a month in rent

24 for 686 Mill Street from the County of San Bernardino?

25 A    I don't believe the Debtor is receiving that, and I

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 65 of 88

60

1 have no knowledge --

2 Q    Is that belief based on --

3 A    -- (indiscernible) if this Debtor -- if the Debtor's

4 entity is receiving it.  What is it based on?

5 Q    Yes.

6 A    Books and records and cash flow.

7 Q    Do you have a copy of the lease agreement concerning

8 686 Mill Street between the County of San Bernardino and

9 either Mowbray entity?

10       MR. MARTICELLO:  So either Mowbray, that's --

11 you're asking if we have a lease agreement between San

12 Bernardino and either the Debtor or Waterman?

13       MR. QUIRK:  My question is to Mr. Weiss.

14 BY MR. QUIRK:

15 Q    Mr. Weiss, do you have a copy of the lease agreement

16 between the County of San Bernardino wherein it is paying

17 $30,000 per month to Mowbray's, and the -- when I say

18 Mowbray's, I'm being intentionally vague because that's what

19 I was told.  It was -- there was never any differentiation

20 between Mowbray's Waterman's properties and Mowbray's.

21     Robin Mowbray told me that Mowbray's Waterman's

22 property is owned wholly by Mowbray the Debtor here.  So

23 whoever the agreement is between, have you seen that

24 agreement?  Do you have a copy of it?

25 A    No.

61

1          TRUSTEE GOLDENBERG:  Five more minutes, Mr. Quirk.

2    BY MR. QUIRK:

3    Q    Now, is it --

4          MR. QUIRK:  Thank you.  And I doubt I'm going to

5    need that much.

6          TRUSTEE GOLDENBERG:  Okay.

7    BY MR. QUIRK:

8    Q    Is it true that 686 is the Debtor's, Mowbray's

9    principal place of business?  That's where Robin Mowbray

10   walks every day and goes upstairs to work.

11         MR. MARTICELLO:  I'm going to object to the extent

12   it's a legal question, but go ahead, Mr. Weiss.

13         THE WITNESS:  It is the company's corporate

14   headquarters.  As to whether she walks there every day, I

15   don't know her mode of transportation.

16   BY MR. QUIRK:

17   Q    How do you know it's the company's corporate

18   headquarters?

19   A    Because that's where the company's offices are located.

20   Q    Is it also true that Mowbray's, the Debtor, purchased

21   Pino in 2023 for $900,000?

22   A    Give me just a second.  Let me see that number.

23   Information's actually in our global rider.  That is

24   incorrect.

25   Q    Great.  How much did it -- what portion of that is

62

1 incorrect, the year or the amount?

2 A    The amount.  And according to our global notes in here,

3 the purchase price was 1,500,000.

4 Q    And the year was?

5 A    May 26, 2022.

6 Q    Phoenix Traffic Management was formed in 2021, correct?

7 A    I don't know.

8 Q    Phoenix Traffic Management, 100-percent of its assets

9 are sitting on Mowbray's properties, true?

10 A    I don't know.

11 Q    All of the Phoenix Traffic Management's officers and

12 directors are the same or -- strike that.

13      Phoenix Traffic Management's officers that are

14 registered with the Secretary of State are the same officers

15 that Mowbray's has.  Do you know that to be true?

16 A    I don't know.

17          MR. QUIRK:  That's all I got.  Thanks.

18          TRUSTEE GOLDENBERG:  Thank you.

19          Okay.  Next I'll ask Ms. Pino, any questions for

20 you?

21          MS. PINO:  I do.  I have questions.  Thank you.

22 And by the way, it's Pino, and no relation to Pino Tree

23 Service.

24          MR. CATANZARITE:  That's good to know.

25          MS. PINO:  It's always disinterested here.

63

FURTHER EXAMINATION

BY MS. PINO:

1 Q    Mr. Weiss, you signed the schedules and the statement

2 of financial affairs on behalf of the Debtor, correct?

3 A    Yes.

4 Q    And prior to filing those statements -- the schedules,

5 did you make any attempt to value Pino's Tree Service?

6 A    No.

7         MS. PINO:  Ms. Goldenberg, is there a committee in

8 this case?

9         TRUSTEE GOLDENBERG:  No.

10        MS. PINO:  Has one been solicited?

11        TRUSTEE GOLDENBERG:  Yes.

12        MS. PINO:  Okay.  All right.

13 BY MS. PINO:

14 Q    Mr. Weiss, are the tax returns of the Debtor current?

15 A    I believe so.

16 Q    You don't know?

17 A    I believe so.  Yes.

18 Q    And who prepared the most recent tax returns for the

19 Debtor?

20 A    The mid-section on (indiscernible) name the firm.  I

21 believe Ms. Thorn (phonetic).

22 Q    Have you had any interactions whatsoever with the

23 professionals that prepared the tax returns from the -- for

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 69 of 88

64

1  the Debtor?

2  A    Yes.

3  Q    There is a general statement here that precedes the

4  schedules.  Who prepared that document?

5  A    I think it (indiscernible), if I may see what document

6  number you're referring to, or if it's within these

7  schedules I would (indiscernible) --

8  Q    I'm referring to the global notes regarding Debtor's

9  schedules -- I'm referring to the global notes.

10 A    Okay.  Thanks for the clarification.  What was your

11 question?

12 Q    Who prepared the global notes?

13 A    It was done under my direction, between myself, one of

14 my associates, and the team at Raines Feldman.

15 Q    I'm sorry, I didn't hear the last name.

16 A    Edmund (phonetic) the -- my legal counsel at Raines,

17 Feldman, Littrell.

18 Q    How come the global notes aren't signed?

19         MR. MARTICELLO:  I mean, this is -- this is Robert

20 Marticello.  There's no particular reason.  They're not

21 typically signed.  I never have them signed in any case

22 we've done.

23         MS. PINO:  They're just unverified statements,

24 correct?

25         MR. MARTICELLO:  I don't know if I would say

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 70 of 88

65

1 they're unverified.  I mean, they're an integral part of the

2 bankruptcy schedules.

3       MS. PINO:  And they're not subscribed to under

4 penalty of perjury, correct?

5       MR. MARTICELLO:  I think that's probably correct.

6       TRUSTEE GOLDENBERG:  Ms. Pino, can you just please

7 move on and ask questions with respect to the filing.

8       MS. PINO:  I -- well, I was.  They keep referring

9 to it as part of the filing, but it is an unverified

10 statement --

11       TRUSTEE GOLDENBERG:  All right.  It is what it is.

12       MS. PINO:  -- (indiscernible).

13       TRUSTEE GOLDENBERG:  Right.

14       MS. PINO:  Confirming, just confirming that.

15 BY MS. PINO:

16 Q    Mr. Weiss, I'd like to direct your attention to the

17 attachment to SOFA, part two, number four, page 154 of

18 docket entry number 17 -- docket number 170.  These are

19 payments --

20 A    Okay.

21 Q    -- or other transfers of property made within one year

22 before the filing that benefited an insider.

23 A    Okay.

24 Q    Did you compile that document?

25 A    I did not.  It was compiled by the financial

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
            Exhibit 1 - 12/6/2024 341(a) Transcript    Page 71 of 88

66

1 advisor/accountant to the Debtor, Grobstein Teeple, under my

2 direction.

3 Q    And there are a number of payments and the recipients

4 are beneficiary or it's the Gloria Mowbray separate property

5 trust, do you see that?  That's the first insider.  How is

6 it Gloria Mowbray's separate property trust an insider to

7 the Debtor?

8 A    I don't know.  I'd have to ask to see who put it

9 together.

10        MR. MARTICELLO:  I'll note for your, Gloria

11 Mulberry -- Mowbray is Robin Mowbray's mother.  She's

12 deceased.  That is her trust.

13 BY MS. PINO:

14 Q    Mr. Weiss, did you know that before Debtor's counsel

15 made that statement?

16 A    That Ms. (indiscernible) Mowbray is the deceased?  Yes,

17 I did.

18 Q    Do you know who the beneficiaries are of the Gloria

19 Mowbray separate property trust?

20 A    No, I don't.

21 Q    And it looks like the taxes for the Gloria Mowbray

22 separate property trust have been paid by the Debtor.  Do

23 you know that would be the case?

24 A    I don't.

25 Q    Then the next set of payments are to Jacobus Pino.  And

67

1  how is Jacobus Pino an insider of the Debtor?

2  A    He is an officer of Pino.  So out of abundance of

3  caution, we included those statements in this schedule.

4  Q    The more I've seen --

5  A    He's an -- this is our proof, he's an officer of an

6  insider as a wholly-owned affiliate.

7  Q    A wholly-owned affiliate"?

8  A    Subsidiary.

9  Q    Thank you.  Is the note to Mr. Pino secured?

10  A    I believe it's secured by the stock of Pino.

11  Q    And do you know who has to possession of the stock?

12  A    I don't.

13  Q    Have you ever looked at a corporate minute book for the

14  Debtor?

15  A    No, I have not.

16  Q    Have you ever looked at a corporate minute book for the

17  Debtor's wholly-owned subsidiary, Pino Tree Service?

18  A    No.

19  Q    The next set of transactions benefitting the Debtor

20  were transactions which benefitted Mowbray Equipment Rental,

21  LLC.  Do you know what that is?

22  A    Which page are you referring to?

23         MR. MARTICELLO:  She's on the same page.

24  BY MS. PINO:

25  Q    I'm still on -- on the same page, 154 of 166 of the PDF

68

1 that's docket number 170.

2          MR. MARTICELLO:  Right here.

3          THE WITNESS:  Okay.  Are you referring to the

4 $200?

5          MR. MARTICELLO:  Yes.  I --

6          THE WITNESS:  I don't know.

7 BY MS. PINO:

8 Q    Okay.  Then there is payments for the benefit of

9 Richard John Mowbray for Alex Bucket Truck lease payments.

10 Do you know what those payments were for?

11 A    It was for a truck lease for the benefit of Richard

12 Mowbray.

13 Q    And how is Richard Mowbray an insider of the Debtor?

14 A    He is the chief executive officer.

15 Q    So in the next set of transactions is for Robin Mowbray

16 for payment for taxes to the City of Bernardino (sic), a

17 warrant system, and lists on the taxes went to the Franchise

18 Tax Board.  Were the -- a retention of what shareholders --

19 the sole shareholder of the Debtor being paid directly by

20 the Debtor?

21 A    These expenses, yes.  They were paid by the Debtor, and

22 then credited to a distribution to Ms. Mowbray.

23 Q    And there are tax payments to the Franchise Tax Board

24 on page 155 for the benefit of Mowbray Waterman Properties,

25 LLC.  Why were those tax payments made by the Debtor for

69

1  another entity?

2  A    I don't know.

3  Q    Okay.  All right.  Do you know -- so Mr. Quirk's

4  clients have a verdict against the Debtor of $90,000,000, is

5  that correct?

6          MR. MARTICELLO:  Approximately.

7  BY MS. PINO:

8  Q    Okay.

9  A    Approximately.

10  Q    And, Mr. Weiss, do you know the basis of that verdict?

11  A    I think at the onset of this 341(a) meeting, Mr.

12  Marticello provided the overview.  So, he probably said it a

13  little more eloquently than I could have.  So --

14  Q    Yeah, but he didn't say it under penalty of perjury, so

15  I'd like for you to answer the question, please.

16  A    Okay.  So, it stems an auto accident that an employee

17  that was off hours -- reportedly off hours that worked for

18  Mowbray's, took a truck and, you know, had a -- had an

19  accident and injured somebody or somebodys.

20  Q    And is an insurance company providing defense for the

21  Debtor on account of that claim?

22  A    Yes.

23  Q    And which insurance company is that?

24  A    (Indiscernible.)

25  Q    Okay.  And do you know if there are any co-defendants

70

1 in that action?

2 A    I don't.

3 Q    And do you know if there is -- were any 998 offers of

4 settlement in that action made by the plaintiffs?

5 A    I don't know.

6 Q    Have you explored the possibility of whether there is a

7 bad-faith action against the insurance company that is

8 insuring the Debtor as a result of that verdict?

9 A    No.

10 Q    Who can sign on the DIP accounts, the debtor-in-

11 possession accounts?

12 A    Just Mr. Sainos, and I believe Robin and Richard, and I

13 can, also.

14 Q    So, Robin and Richard Mowbray can sign on the debtor-

15 in-possession accounts?

16 A    Yes, they can.

17 Q    Was the Pino Tree Service business purchased by the

18 Debtor after the initiation of the lawsuit by Mr. Quirk's

19 law -- client?

20 A    What was date of the lawsuit?

21 Q    Do you know the date of the lawsuit was initiated, Mr.

22 Weiss?

23 A    If you could provide me with the date of that lawsuit,

24 I can tell you whether or not the acquisition was consumed

25 prior to or subsequent to then.

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 76 of 88

71

1        MS. PINO:  Mr. Quirk, what were the -- date of the

2  lawsuit initiated by your client?

3        MR. QUIRK:  2020.  The answer is, yes.

4        MS. PINO:  Okay.  Thank you.

5        THE WITNESS:  What -- how about this.  I'll answer

6  that question.  So pursuant to the stock purchase agreement,

7  Pino was purchased in 2022.

8  BY MS. PINO:

9  Q    Okay.  Who can sign checks for Pino?

10 A    I believe Mr. Sainos and Robin Mowbray and Richard

11 Mowbray.

12 Q    Who signed the line-of-credit agreement between Pino

13 and the Debtor?

14 A    I'm sorry.  Did you ask who signed or who signs,

15 present tense or plural?

16 Q    Who signed?  Who signed?  Who signed?  You said it was

17 January 1st of 2024.  Who signed that agreement on behalf

18 of --

19 A    Okay.  You said that -- you asked who signed the Pino

20 stock purchase agreement or the Pino line-of-credit

21 agreement?

22 Q    "Line-of-credit agreement," an asset of the Debtor.

23 A    The -- my understanding who did it was executed by

24 Richard Mowbray as the lender on behalf of The Original

25 Mowbray's Tree Service, Inc., and it was counter-signed by

72

1 Rubin Sainos, the CFO, on behalf of the borrower, Pino Tree

2 Services, Inc.

3 Q    That should say Sainos is the CFO of the Debtor,

4 correct?

5 A    Yes.

6 Q    Who signed the note from -- is it a note from Phoenix

7 Traffic to the Debtor?

8 A    Do you want me to look in my file?

9 Q    You'd have to look at it?  No.

10         MS. PINO:  For the record, I'd like to -- any

11 documents that are provided to the U.S. Trustee that haven't

12 been agreed to be provided during this call, I would like a

13 copy.  And I'll send my e-mail address to Mr. Marticello.

14 BY MS. PINO:

15 Q    Is the loan from the Debtor to Pino Tree Service

16 secured, the line of credit?

17 A    Give me one second.  I don't believe so.

18 Q    Is the loan to Phoenix Traffic secured?

19 A    I can start looking through these files if you want,

20 or, you know, Mr. Marticello can provide (indiscernible).

21         TRUSTEE GOLDENBERG:  I think we asked for details,

22 a summary of these --

23         THE WITNESS:  Let me know your preference.

24         TRUSTEE GOLDENBERG:  -- these transactions.

25 //

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 78 of 88

73

1  BY MS. PINO:

2  Q    Are there any counterclaims pending against the Debtor?

3  A    I'm going to need to turn back to the schedules.  In

4  looking at the schedules in section seven, I don't see

5  anything that specifically references (indiscernible), but I

6  do see wage-and-hour claim litigation, or potential pre-

7  litigation matters.

8  Q    So do you know if any of those pending litigation

9  matters are counterclaims?

10 A    I don't.

11 Q    Is that information that you can obtain?

12 A    Yes, we should be able to.

13 Q    Other than the officers and directors, as you've

14 already testified to, are there any shared employees between

15 Pino Tree Service and the Debtor?

16 A    They're not shared, meaning they're employed by both

17 agencies.  There is a management agreement between Pino and

18 Mowbray's whereby certain (indiscernible) services are

19 provided to Pino on behalf of Mowbray's for a monthly fee.

20 Q    And when you say "Mowbray's," because there's a lot of

21 Mowbray's here, you're talking about the Debtor, correct?

22 A    Yeah.  When I speak about Mowbray's, I speak about the

23 Debtor.  (Indiscernible) many people asking many questions

24 throughout this 341(a), I don't represent any of the other

25 non-debtor entities, just Mowbray's, the Debtor.

74

1  Q    And is this management agreement an executory contract?

2           MR. MARTICELLO:  That's a legal question.  I don't

3  know.  We'd have to look at that.

4  BY MS. PINO:

5  Q    Is the management agreement attached or disclosed in

6  the schedule G?  Mr. Weiss?

7           MR. MARTICELLO:  We're looking.  Sorry.  This is

8  Robert.  We're looking through it.

9           MS. PINO:  Yeah, I -- yes.  Okay.  Thank you.

10          TRUSTEE GOLDENBERG:  Ms. Pino, can I just get an

11  estimate about how much -- how many more questions you have

12  time wise?

13          MS. PINO:  I am aware of how long this is taking,

14  and I'm also aware that they're going to have to provide

15  additional information.  So, I would respect -- Ms.

16  Goldenberg, respectfully, that this meeting of creditors not

17  be completed today.

18          TRUSTEE GOLDENBERG:  I'll take it under

19  advisement.  I'm just asking you how much --

20          UNIDENTIFIED SPEAKER:  Nancy, I join -- I join in

21  that request.

22          TRUSTEE GOLDENBERG:  Okay.

23          THE WITNESS:  So to answer your question, no, it's

24  not in the -- in schedule G.

25  //

Case 8:24-bk-12674-TA   Doc 286-5   Filed 02/07/25   Entered 02/07/25 16:12:19   Desc
Exhibit 1 - 12/6/2024 341(a) Transcript   Page 80 of 88

75

1 BY MS. PINO:

2 Q    Will you provide a copy of that management agreement,

3 please?

4 A    I'll speak to (indiscernible) counsel on that.

5         MS. PINO:  Counsel?

6         MR. MARTICELLO:  I didn't -- I didn't realize

7 you're waiting for an -- we'll discuss it after the 341(a),

8 and then I'll circle back with you.

9         MS. PINO:  I need to determine whether it's an

10 executory contract that's missing from the schedule G.

11        MR. MARTICELLO:  Yeah, I will see to that.

12        MS. PINO:  Okay.

13        Ms. Goldenberg, I know we've been going for an

14 excess of two hours, and I appreciate your generosity with

15 time, but I do think that we need to set a deadline for the

16 documents that are to be produced to be produced, and

17 continue the meeting of creditors so -- in order to evaluate

18 the documents.

19        TRUSTEE GOLDENBERG:  We will do so.  Just ask for

20 what you need now before the next meeting.  And I hate to

21 put on short shrift, but the other attorneys I want to give

22 them a little time today, so, please.

23        MS. PINO:  Yes.  I'd be willing to defer matters

24 as long as we're going to continue the fact find.

25        TRUSTEE GOLDENBERG:  Okay.

76

1          MS. PINO:  I appreciate how generous you have been

2  with the time today.

3          TRUSTEE GOLDENBERG:  No worries.

4          Mr. Hochheiser for AmTrust, still with us?  Alan?

5  No.  Gone.

6          Okay.  Mr. Lubic?

7          MR. LUBIC:  Yes, I'm still here.  I was just

8  thinking.  I attended the 341(a) of the Profiterole

9  (phonetic) Department Stores in Cincinnati many years ago,

10 and I think -- I think this one may be longer.

11         TRUSTEE GOLDENBERG:  You'll have an opportunity.

12 We're going to continue it probably to --

13         MR. LUBIC:  Okay.  Right.

14         TRUSTEE GOLDENBERG:  -- so, to January.

15         MR. LUBIC:  So for the record, we would like to

16 get copies of anything that's provided to anyone else that

17 was discussed at this call.  The only questions I have for

18 today are just to clarify.

19                    FURTHER EXAMINATION

20 BY MR. LUBIC:

21 Q    Is Force 10 employed by Pino as well?

22 A    No, we're not.  We're employed by Mowbray's, the

23 Debtor.

24 Q    Okay.  That was -- that was my understanding.

25         MR. LUBIC:  And same question about Raines

Case 8:24-bk-12674-TA    Doc 286-5    Filed 02/07/25    Entered 02/07/25 16:12:19    Desc
Exhibit 1 - 12/6/2024 341(a) Transcript    Page 82 of 88

77

1  Feldman.

2          MR. MARTICELLO:  We're not employed by Pino.

3  We're only employed by the Debtor.

4          MR. LUBIC:  Okay.

5  BY MR. LUBIC:

6  Q    Are you aware -- does Pino have insolvency counsel or

7  counsel employed?

8  A    Not that I'm aware of.

9  Q    If you know.  Okay.  Just thought it would be easier to

10  run questions about Pino to Pino's counsel.

11          MR. LUBIC:  Nothing further for today.

12          TRUSTEE GOLDENBERG:  Thank you, Mr. Lubic.

13          How about Mr. MacLeod?

14          MR. MACLEOD:  Yes.  Thanks so much.  Just some

15  quick questions.

16                        FURTHER EXAMINATION

17  BY MR. MACLEOD:

18  Q    This is primarily with regard to there are eight 333(g)

19  compact tractors out there for Deere.  I saw them listed in

20  the schedule.  But our question is, do you know where

21  they're located?

22  A    As we sit here today, no.  They're likely at a job

23  site.  But if you wanted to have -- if you want to, you

24  know, provide us with some questions, we can, you know,

25  provide you with exactly where they are located as of --

78

1  Q    That would be great.

2  A    -- as of the date of that question.  That could change,

3  you know, tomorrow, but --

4  Q    Absolutely.  Absolutely.  We just want to make sure

5  that they are -- they're all in Mowbray's possession.

6  They're not in any of your subsidiaries or those affiliates,

7  all those other places.  They just, they're being used by

8  Mowbray's, is that right, by the Debtor?

9  A    Let us check and we'll get back to you.

10 Q    Okay.  Yeah, that would be important to find out, given

11 the contract.  And then -- and let's see here.  So -- and I

12 think you mentioned this at the beginning.  I'm sorry, it's

13 been so long since the beginning of the conversation.

14 Everything's insured, right?

15 A    Yes.

16 Q    Okay.  Fantastic.

17         MR. LUBIC:  And I think that's all I'll have for

18 today.  I'll -- I have more, but I'm not -- I'm not going to

19 do them now if we're going to do this again.  Thank you.

20         TRUSTEE GOLDENBERG:  All right.

21         MR. MARTICELLO:  And, Mr. MacLeod?  Mr. MacLeod --

22         MR. MACLEOD:  Yes.

23         MR. MARTICELLO:  -- this is Robert Marticello.  If

24 you have specific questions, give me a call.

25         MR. MACLEOD:  Yes.

79

1          MR. MARTICELLO:  I mean, we don't have to wait

2     for --

3          MR. MACLEOD:  I will.

4          MR. MARTICELLO:  -- a continued 341(a) meeting.

5          MR. MACLEOD:  Yeah.  That's -- we just got the

6     file a few days ago.  I would have reached out.  I

7     apologize, but, I mean, thanks (indiscernible) --

8          MR. MARTICELLO:  No, no, it's fine.  Yeah.

9          MR. MACLEOD:  Did not -- did not expect today's

10    meeting.  Thank you.

11          Thank you so much, everybody.

12          TRUSTEE GOLDENBERG:  Thank you.

13          We're going to continue -- I'm going ask that the

14    documents requested be provided by December 20th.  Is that

15    doable, two weeks?

16          MR. MARTICELLO:  Yes, that's fine.

17          TRUSTEE GOLDENBERG:  Okay.  And we're going to

18    continue the meeting to -- we could do it either January 3rd

19    or January 10th at 10:00 a.m.

20          MR. MARTICELLO:  I would prefer the 10th.

21          TRUSTEE GOLDENBERG:  Okay.

22          MR. MARTICELLO:  This is Robert Marticello.

23          TRUSTEE GOLDENBERG:  Okay.  Then we'll continue

24    the meeting to January 10th at 10:00 a.m.  And I thank

25    everyone for your participation, and please, if you require

80

1 anything more from the Debtor before the examination, just

2 reach out to Debtor's counsel who's very cooperative.  And

3 then you could ask questions at the continued meeting.  So,

4 thank you to everyone.

5         MR. CATANZARITE:  Ms. Goldenberg?

6         TRUSTEE GOLDENBERG:  Yes?

7         MR. CATANZARITE:  Ken Catanzarite here.  May I

8 inquire if we could defer the -- 1-3 I'm -- January 3rd, it

9 was okay, but 1-10, I'm tied up until about 11:00 in two

10 hearings.  Could we start at 11:00?

11         TRUSTEE GOLDENBERG:  That would be fine.  Is that

12 all right with everyone else?

13         MS. PINO:  That's fine with me, Estela Pino.

14         MR. WEISS:  This is Brian Weiss.  I've got a

15 conflict.  I could probably do -- if it's an hour, I can do

16 that, but if it's two hours, then I can't.  I've got another

17 meeting, so.

18         TRUSTEE GOLDENBERG:  How about the 9th?  How about

19 January 9th?

20         MR. WEISS:  Works for me.

21         MR. MARTICELLO:  Brian --

22         MS. PINO:  I am totally booked that day.

23         MR. MARTICELLO:  I have a hearing -- this is

24 Robert Marticello.  I potentially have a hearing conflict

25 that day.

81

1        TRUSTEE GOLDENBERG:  All right.  The 10th then.

2   Mr. Weiss, if -- well, since my questions are done --

3        MR. WEISS:  We can go -- if we don't -- we can go

4   from 10:00 -- if we can go from 10:00 to 11:30, knowing that

5   I'm done at 11:28, then I'm good.  But if it goes any

6   longer --

7        MR. CATANZARITE:  Well, why don't we -- this is

8   Kenny.  This is Kenny again.  If you start at 10:00, I could

9   catch up, and as long as it doesn't end before 11:00 when I

10  get available, that's all I'd like, to have the opportunity

11  to do, if that's okay.

12       MS. PINO:  Why aren't we doing this on January

13  3rd?

14       MR. MARTICELLO:  I think because people said they

15  wanted it on the 10th.

16       MR. CATANZARITE:  Let's --

17       MS. PINO:  Does the 3rd work for everybody?

18  Because that way we don't have a time constraint on Mr.

19  Weiss as the star of the show.

20       MR. WEISS:  I don't know if I'd say "star," but --

21       MS. PINO:  Yeah.

22       TRUSTEE GOLDENBERG:  All right.  Let's do the --

23       MR. WEISS:  This is my second 341(a) today, so.

24       TRUSTEE GOLDENBERG:  Let's do the 3rd then, if we

25  could.  We could do it at 11:00 a.m. if you want, or --

82

1          MR. CATANZARITE:  That is good by Catanzarite.  I

2    only needed 11:00 because of the conflict on the 10th.

3          MS. PINO:  Yeah.  10:00 is fine with me, Estela

4    Pino.

5          TRUSTEE GOLDENBERG:  All right.  I'll put on the

6    docket then.  We're going to continue to January 9th at

7    10:00 a.m.  So I thank everyone for your cooperation.

8          MS. PINO:  Well, is there any way

9    (indiscernible) --

10         TRUSTEE GOLDENBERG:  I'm sorry.  I'm sorry.

11         MS. PINO:  -- January 3rd -- January 3rd.

12         TRUSTEE GOLDENBERG:  My bad.  I have the 3rd

13   written down.  January 3rd.

14         MS. PINO:  Ms. Goldenberg, how do we arrange to

15   get a recording of this meeting?

16         TRUSTEE GOLDENBERG:  Reach out to my office, the

17   general number, and my colleague will answer and tell you

18   what's needed to get a recording.  Okay?

19         MS. PINO:  Okay.  Thank you.

20         TRUSTEE GOLDENBERG:  Okay.

21         MS. PINO:  Thank you.

22         TRUSTEE GOLDENBERG:  Okay.  Thank you, all.  Bye-

23   bye.

24         MR. HOCHHEISER:  Thank you.

25         MS. PINO:  Bye-bye.

83

1        (Proceedings concluded.)

2

3

4            I certify that the foregoing is a correct

5    transcript from the electronic sound recording of the

6    proceedings in the above-entitled matter.

7

8    /s/ Holly Steinhauer_____    12-31-24_____
     Transcriber                    Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25