# Exhibit 2

# RAINES
## RAINES FELDMAN LITTRELL LLP

3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Main: 310.440.4100

rmarticello@raineslaw.com
www.raineslaw.com

December 20, 2024

**VIA E-MAIL**

Re:     **Responses to Questions of OUST During 11 U.S.C. § 341(a) Meeting of
        Creditors**

Dear Ms. Goldenberg:

This correspondence is in response to the request of the Office of the United States Trustee made during the meeting of creditors on December 6, 2024 pursuant to 11 U.S.C. § 341(a) (the "**341(a) Meeting**") for the following information:  (1) a description of the efforts of The Original Mowbray's Tree Service, Inc. (the "**Debtor**"), to downsize its operations within the one-year period prior to the October 18, 2024 petition date (the "**Petition Date**"); and (2) a summary of the loans between the Debtor and certain affiliates listed in the Debtor's Schedule A/B [Docket No. 170] at 15 of 166, Part 11, No. 71.

In an effort to make this response as comprehensive as possible, by this correspondence, the Debtor also seeks to address, to the best of the recollection of the Debtor and its counsel, the outstanding questions that were raised during the 341(a) Meeting, or shortly thereafter, by counsel to the various other parties in attendance.

Nothing herein is deemed an admission by the Debtor on any matter.  The Debtor reserves any and all rights with respect to any matter asserted herein.  Moreover, the Debtor's Chief Restructuring Officer, Brian Weiss of Force Ten Partners (the "**CRO**"), is undertaking an evaluation of the loans and other agreements between the Debtor and the Debtor's affiliates as part of the Debtor's process to develop its reorganization plan.  The CRO's evaluation is ongoing and could impact certain of the information herein.

1.      **The Debtor's Downsizing Efforts**

During the approximate one-year period prior to the Petition Date, the Debtor undertook several strategic actions to right size its operations based on its reduced revenue from the loss of customer contracts.  Those strategic actions included the following:

- Hiring a seasoned financial professional, Ruben Sainos, as its Chief Financial Officer, to analyze the Debtor's operations and to help lead the Debtor through its efforts to right-size its operations, address its financial challenges, stabilize its business, and strengthen its cash flow.

Los Angeles  •  Orange County  •  New York  •  Chicago  •  Pittsburgh  •  Delaware  •  Boca Raton

10439845.1

- Reducing the salaries of non-union personnel, including executives.  The wages of the Debtor's non-union payroll totaled approximately $705,000 per week as of October 18, 2023.  The Debtor's payroll is currently approximately $297,000 per week.

- Conducting systematic layoffs of hundreds of employees.  As of October 18, 2023, the Debtor had approximately 440 employees.  The Debtor reduced the number of its employees to approximately 180 as of the Petition Date.  This attrition is largely attributable to the Debtor not being awarded future work by Southern California Edison ("**SCE**"), in addition to the Debtor reducing the number of administrative personnel.

- Selling or returning leased idle equipment with the consent of its leasing partners.  For example, the Debtor reduced its monthly lease expense with Altec Capital Services, LLC, the Debtor's largest leasing partner, by approximately $170,000 per month. The Debtor returned all of its leased vehicles with Enterprise, which reduced the Debtor's monthly leasing cost by another $55,000.  The Debtor sold idle equipment leased or financed with Bank of America ("**BOA**") for approximately $4,700,000, and the proceeds were paid directly to BOA to reduce the balance owing.  The Debtor also sold certain other equipment with the proceeds paid to PNC Bank, N.A.

- Renegotiating contracts and suspending services and expenses that were no longer needed by the business.  As an example, the Debtor reduced the administrative services it received and moved to lower cost providers related to internet, phone, and IT services.  The Debtor terminated leases for storing equipment and consolidated stored equipment on other existing storage yards.  The Debtor also closed a leased satellite office in Sacramento.

The Debtor's efforts improved its cash flow.  While the Debtor's revenues are lower than in prior years, the Debtor projects net income of approximately **$1,800,000** on gross revenues of approximately **$40,000,000** for 2024.

2.    **Agreements with Affiliates**
    a.    **Agreements with Pino Tree Service, Inc.**
        i.    **The Line of Credit**

The Debtor's Schedule A/B lists $10,321,046.44 as owing from Pino Tree Service, Inc. ("**PTS**"), as of the Petition Date.  (*See* Schedule A/B at 15 of 166, Part 11, no. 71.)  This sum is based on loans by the Debtor to PTS (the "**PTS Loan**").

The Debtor and PTS are parties to that certain Line of Credit Agreement dated January 1, 2024 (the "**PTS LOC**").  A true and correct copy of the PTS LOC is enclosed herewith as **Exhibit A**.

The terms of the PTS LOC are summarized as follows:

- Principal Amount:  Credit limit of $10,000,000.
- Term:  December 1, 2023, to December 1, 2025.



- Interest Rate:  WSJ prime rate, plus 3% per annum.
- Payments:  Monthly interest-only.  The balance is due on or before the termination date of the Pino LOC.
- Maturity/End Date:  December 1, 2025.

The proceeds of the PTS Loan were used to fund PTS's operations (*e.g.*, payroll, rent, and supplies).  As stated in the Declaration of Mr. Ruben Sainos [Docket No. 3] (the "**Sainos Declaration**"), "PTS was not initially cash flow positive."  (*See* Sainos Decl. at 5, ¶ 15.)  The Debtor provided PTS with the credit line "to assist PTS with its operations and capital needs." (*See id.*)  This includes the capital needed to service the upfront costs of the contract with SCE that PTS was able to secure.  "PTS was able to secure SCE vegetation management contracts for 2024 for certain geographic regions, including regions that the Debtor did not win."  (*See id.*)

The current balance due by PTS to the Debtor is $6,983,740.88 as of December 17, 2024. As discussed in further detail below, and as provided in the budget approved by the Court, PTS has been making payments to the Debtor weekly on account of the PTS Loan.  PTS also made a $4,000,000 paydown of the PTS Loan post-petition.  There have not been any advances by the Debtor to PTS post-petition.

ii.    **The Management Agreement**

The Debtor and PTS are parties to that certain Management Fee Agreement dated January 1, 2024 (the "**PTS Management Agreement**").  A true and correct copy of the PTS Management Agreement is enclosed herewith as **Exhibit B**.  Pursuant to the PTS Management Agreement, the Debtor has agreed to provide certain specific services to PTS, including director and officer services and various consulting, planning, administrative, and support services.  In exchange, PTS pays a management fee.  The management fee has a base of $53,500 per month and is to be adjusted as needed.  The PTS Management Agreement can be terminated by either party upon 30 days prior written notice.

iii.    **The Equipment Lease**

The Debtor and PTS are parties to that certain Master Vehicle and Equipment Lease Agreement dated September 27, 2022 (the "**PTS Equipment Lease**").  A true and correct copy of the PTS Equipment Lease is enclosed herewith as **Exhibit C**.  Pursuant to the PTS Equipment Lease, the Debtor leases to PTS the equipment set forth in one or more Supplements to the lease, including the exhibit thereto.  The Supplement(s) to the PTS Equipment Lease specify the rent that PTS is to pay for each piece of equipment leased.  Generally speaking, the rent is the actual cost to the Debtor, plus a 10% markup.

iv.    **Post-Petition Payments**

Consistent with the Court-approved cash collateral budget, post-petition, PTS is making weekly payments to the Debtor on account of the PTS LOC, the PTS Management Agreement, and the PTS



Equipment Lease.  Through the first eight weeks of this case, PTS has paid to the Debtor $1,980,064.  This is more than was projected through such period due to increased equipment rentals.  In addition, as discussed above, PTS made a payment on the PTS LOC in the amount of $4,000,000.  Thus, the grand total paid by PTS to the Debtor through the first eight weeks of the case is $5,980,064.

**v.        The Stock Purchase Agreement**

The Debtor purchased all of the outstanding shares of PTS from Jacobus D Pino ("**Pino**") pursuant to a Stock Purchase Agreement dated May 26, 2022 (the "**PTS Stock Agreement**").  A true and correct copy of the Stock Purchase Agreement, and related documents, are enclosed herewith as **Exhibit D**.  The purchase price was $1,500,000.  Of this sum, $750,000 was paid by the Debtor upfront and $750,000 was reduced to a note payable to Pino (the "**Pino Note**").  The Pino Note requires thirty-six monthly payments of $21,075 and provides that the principal amount of the Pino Note shall bear interest at .75% per annum.  Approximately $126,007.10 remains due on the Pino Note.

The Debtor and Pino also executed a Security Agreement dated July 1, 2022, purporting to grant a security interest in 50% of the stock purchased by the Debtor in PTS.  As provided in the Security Agreement, upon an uncured default thereunder, and depending on the balance owing on the Pino Note at the time of any such uncured default, Pino could assert an entitlement to a percentage of the Debtor's stock in PTS that was to serve as collateral for the Pino Note in full satisfaction of the balance owing.  (*See* Ex. D, Security Agreement, at § 3.)  The Debtor reserves any and all rights pursuant to the Security Agreement and the Bankruptcy Code with respect to any lien asserted by Pino pursuant.

**b.        Agreements with Mowbray Waterman Property LLC**
**i.        The Mowbray Waterman Loan**

The Debtor's Schedule A/B lists $3,889,126.32 owing from Mowbray Waterman Property, LLC ("**MWP**"), as of the Petition Date.  (*See* Schedule A/B at 15 of 166, Part 11, no. 71.)  This sum is based on loans by the Debtor to MWP (the "**MWP Loan**").

The Debtor and MWP entered into a Loan Agreement dated December 31, 2020 (the "**MWP Loan Agreement**").  A true and copy of the MWP Loan Agreement is enclosed herewith as **Exhibit E**.  The terms of the MWP Loan Agreement are summarized as follows:

- Principal Amount:  $1,599,718.33.
- Interest Rate:  4.5% per annum.

The Debtor provided loans to MWP in addition to the loan reflected in the MWP Loan Agreement.  The Debtor reserves any and all rights with respect to the terms of such other loans, including whether such loans are subject to, or are governed by, the terms in the MWP Agreement.  The repayment of the MWP Loan is discussed below.



ii.      **MWP Real Property Leases**

As disclosed in the Sainos Declaration, the Debtor leases certain real property from MWP. There are three lease agreements between the Debtor and MWP.  This includes a lease of the second floor of the real property located at 686 E. Mill Dr., San Bernadino, CA 92408 (the "**Mill St. Property**") pursuant to that certain 686 E. Mill St. 2nd Floor San Bernardino CA 92408 Rental Agreement between the parties dated January 1, 2023 (the "**Mill St. Lease**").  A true and correct copy of the Mill St. Lease is enclosed herewith as **Exhibit F**.

The terms of the Mill St. Lease are summarized as follows:

- Rent:  The Debtor was not charged rent during the first year.  Commencing January 1, 2024, rent is $10,000 per month.  (*See* Ex. F at 1, § 3.)

- Term:  The initial term was one year, January 1, 2023 to December 31, 2023.  Each year, the lease automatically renews for a successive one-year term unless either party provides written notice of non-renewal at least 60 days prior to the expiration of the then-current term.  (*See* Ex. F at 1, § 2.)

The Debtor leases certain real property parcels from MWP, APNs 0136-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, 0136-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, and 0136-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, to use as a parking yard (the "**Parking Yard Lease**"). A true and correct copy of the Parking Yard Lease is enclosed herewith as **Exhibit G**.

The terms of the Parking Yard Lease are summarized as follows:

- Rent:  The Debtor was not charged rent during the first year.  Commencing January 1, 2024, rent is $3,000 per month.  (*See* Ex. G at 1, § 3.)

- Term:  The initial term was one year, January 1, 2023 to December 31, 2023.  Each year, the lease automatically renews for a successive one-year term unless either party provides written notice of non-renewal at least 60 days prior to the expiration of the then-current term.  (*See* Ex. G at 1, § 2.)

The Debtor leases an additional real property from MWP, the real property located at 17332 Millwood Dr., Visalia, CA 93292, to use as a parking yard pursuant to that certain Visalia Yard Rental Agreement dated January 1, 2023 (the "**Visalia Lease**").  A true and correct copy of the Visalia Lease is enclosed herewith as **Exhibit H**.

The terms of the Visalia Lease are summarized as follows:

- Rent:  The Debtor was not charged rent during the first year.  Commencing January 1, 2024, rent is $1,000 per month.  (*See* Ex. H at 1, § 3.)



- Term:  The initial term was one year, January 1, 2023 to December 31, 2023.  Each year, the lease automatically renews for a successive one-year term unless either party provides written notice of non-renewal at least 60 days prior to the expiration of the then-current term.  (*See* Ex. H at 1, § 2.)

### iii.    Post-Petition Payments

The Debtor does not pay rent to MWP in cash.  Rather, each month, a book entry (credit) is made against the MWP Loan in the amount of $14,000 for the monthly rent due on the Mill St. Lease, the Parking Yard Lease, and the Visalia Lease.

The current balance due by MWP to the Debtor on account of the MWP Loan is $3,861,126 as of December 17, 2024.  The balance as of the Petition Date has been reduced due to the rent credit discussed above.

### c.    Agreements with Phoenix Traffic Management
### i.    The Phoenix Traffic Management Loan

The Debtor's Schedule A/B lists $2,463,400.89 owing from Phoenix Traffic Management, LLC ("**PTM**"), as of the Petition Date.  (*See* Schedule A/B at 15 of 166, Part 11, no. 71.)  This sum is based on loans by the Debtor to PTM (the "**PTM Loan**").  The PTM Loan reflects a combination of advances by the Debtor to PTM used to fund PTM's operating expenses when it lacked the cash to do so and credits for rent for equipment leased by the Debtor to PTM.  The current balance due by PTM to the Debtor is $2,477,565.62 as of December 17, 2024.  The small increase reflects an invoice for equipment rent that is to be paid to the Debtor this month.  As discussed below, there was no loan agreement between the Debtor and PTM as of the Petition Date.

### ii.    The Equipment Lease

The Debtor and PTM are parties to that certain Master Vehicle and Equipment Lease Agreement dated March 1, 2022 (the "**PTM Equipment Lease**").  A true and correct copy of the PTM Equipment Lease is enclosed herewith as **Exhibit I**.  The PTM Equipment Lease governs the terms of the vehicles that PTM leases from the Debtor.  The schedule of equipment attached to the PTM Equipment Lease has been superseded.

The Debtor's business dealings with PTM, including that it leases equipment to PTM (in addition to PTS), is set forth in the Sainos Declaration.  (*See* Sainos Decl. at 7-8, ¶ 21.)  The Sainos Declaration also provides that "[i]f and to the extent that, historically, an affiliate lacked the cash to pay a particular expense, it was booked as a loan by the Debtor to such affiliate."  (*See id.* at 8, ¶ 22.)

### iii.    Repayment of the PTM Loan

There is currently no written loan agreement for the PTM Loan.  However, the CRO has been evaluating the appropriate terms for the PTM Loan, including requiring interest at a market



rate, and the terms will be reduced to a written agreement. This process is underway. In addition, the expectation is that PTM will pay management fees to the Debtor. Moving forward, the Debtor expects to receive the collective sum of approximately $86,000 per month from PTM (paid weekly). This sum should keep PTM current on its monthly equipment rent obligations to the Debtor (estimated to be about $40,000 per month), provide a management fee to the Debtor of $14,000 per month, and pay monthly interest and some principal amortization on the PTM Loan.

**3.    Alleged Additional Property**

There were three questions raised at the 341(a) Meeting with respect to real property allegedly owned by the Debtor.

**a.    Arrowhead**

There was a question concerning real property located in Arrowhead, California, APN 0330-011-461 or APN 0330-011-4610000. We have not received any further information since the 341(a) Meeting regarding this property. To our knowledge, the Debtor does not own any real property in Arrowhead. The Debtor is *leasing* property in Arrowhead from the County of San Bernardino (the "**County**"). The address of the property leased is 667 HWY 173, Lake Arrowhead, CA 92352. The Debtor pays the County $744 per month. The Debtor has been unable to locate the most recent lease with the County. The Debtor is currently subleasing the real property to Rancho Tree Service for $850 per month.

**b.    Rialto**

There was a question concerning a property located in or on "Rialto." It was stated during the 341(a) Meeting that satellite images reflect trucks on the property. We have not received any further information or specifics since the 341(a) Meeting concerning this real property. Our best guess, based on the limited information concerning this alleged property, is that the property is one of the parcels adjacent to 171 S. Waterman, San Bernardino, CA, listed in the Debtor's Schedule A/B at 14 of 166, Part 9, Nos. 55.1, 55.2, and 55.3. One of those parcels is at the corner of E. Rialto Ave. and San Felipe Rd.

**c.    Mill Street**

There was a question whether "Mowbray's" purchased the Mill St. Property for $5 million in cash in 2021. The suggestion seemed to be that the Debtor purchased this property. The Mill St. Property was purchased by MWP in July 2020 for $4,600,000 and the purchase price was, in part, financed from a loan to MWP by Bank of The Sierra ("**Sierra Bank**") in the amount of $2,990,000 secured by the Mill St. Property and guaranteed by the Debtor. According to the enclosed Final Settlement Statement, the Debtor advanced $1,821,000 to MWP in connection with the purchase (via three deposits into escrow on February 13, June 25, and July 8, 2020). In addition to the Mill St. Lease discussed above, the Mill St. Property is leased to the County pursuant to a Lease Agreement between the County and the prior owners of the Mill St. Property (the "**County**



**Mill St. Lease**").  The term of County Mill St. Lease has expired and the County continues to occupy the premises on a month-to-month basis at the rate of $35,124 per month. Enclosed are the following:

- **Exhibit J** – The Grant Deed, DOC# 2020-0228183, transferring the Mill St. Property to MWP.
- **Exhibit K** – The loan documents between MWP and Sierra.
- **Exhibit L** – Deed of Trust, DOC# 2020-0228184, granted to Sierra Bank.
- **Exhibit M** – The Final Settlement Statement.
- **Exhibit N** – County Mill Lease.

As described above, the Debtor does not pay rent to MWP in cash.  Rather, each month, a book entry (credit) is made against the MWP Loan.

4.  **Workers Compensation Insurance Collateral**

As stated in the *Global Notes Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* (the "**Global Notes**"), the Workers Compensation Insurance Collateral listed in the Debtor's Schedule A/B at 16 of 166, Part 11, No. 13, is based on two letters of credit that were previously issued by PNC Bank, N.A. ("**PNC**"), and JPMorgan Chase Bank, N.A. ("**JPM**").  (*See* Global Notes at 4 of 166.)  The amount paid under the letter of credit issued by PNC was $2,620,000.  The Debtor understands that this sum was paid to Berkshire Hathaway, Homestate Insurance Company ("**Berkshire**") on or about February 2024.  This sum is included in the balance listed for PNC's debt in the Debtor's Schedule D at 38 of 166.  The Debtor understands that JPM paid $2,742,971 to Starr Indemnity ("**Starr**") on or about March 28, 2023.  The Debtor's current estimation is the amount paid to Berkshire is subject to asserted claims of approximately $2,105,398.35, and the amount paid to Starr is subject to asserted claims of $1,459,845.86, for a grand total of $3,565,344.21 to date, and leaving a collective balance of $1,797,626.79.  This balance could be reduced further as multiple claims remain open.

Sincerely,

*Robert Marticello*

Robert Marticello
of Raines Feldman Littrell LLP

