# Exhibit 3

1                    OFFICE OF THE UNITED STATES TRUSTEE

2                         SANTA ANA DIVISION

3

4   In Re:                    )   Case No. 8:24-bk-12674-TA
                              )
5   THE ORIGINAL MOWBRAY'S TREE )   Chapter 11
    SERVICE, INC.,            )
6                             )
            Debtor.           )
7   _____)

8                             341(a) MEETING

9                    KENNETH MISKEN, Presiding

10                          --oOo--

11                  Friday, January 3, 2025

12            411 West Fourth Street, Suite 7160
                    Santa Ana, CA 92701
13

14  APPEARANCES:

15  For the Debtor:           ROBERT S. MARTICELLO, ESQ.
                              Raines, Feldman & Littrell,
16                              LLP
                              3200 Park Center Drive
17                            Suite 250
                              Costa Mesa, California 92626
18                            (949) 783-7606

19  For the United States     KENNETH M. MISKEN, ESQ.
      Trustee:                Office of the United States
20                              Trustee
                              411 West Fourth Street
21                            Suite 7160
                              Santa Ana, California 92701
22                            (714) 338-3405

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

1  APPEARANCES:  (cont'd.)

2  For Jamie Rodriguez and        BRETT F. BODIE, ESQ.
     Ana Gomez:                   BLC Law Center
3                                 1230 Columbia Street
                                  Suite 1100
4                                 San Diego, California 92101
                                  (800) 492-4033
5

6  For Pamela Metcalf Canelas:    ESTELA O. PINO, ESQ.
                                  Pino & Associates
7                                 1520 Eureka Road, Suite 101
                                  Roseville, California 95661
8                                 (916) 641-2288

9  For Ronnie Jordan:             KENNETH J. CATANZARITE, ESQ.
                                  Catanzarite Law Corporation
10                                2331 West Lincoln Avenue
                                  Anaheim, California 92801
11                                (714) 520-5544

12 Transcriber:                   Briggs Reporting Company, Inc.
                                  9711 Cactus Street
13                                Suite B
                                  Lakeside, California 92040
14                                (310) 410-4151

15

16

17

18

19

20

21

22

23

24

25

iii

1                          I N D E X

2    WITNESSES:                                    EXAMINATION

3    BRIAN WEISS                                        3
                                                        4
4                                                      24
                                                       38

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    SANTA ANA, CALIFORNIA  FRIDAY, JANUARY 3, 2025  10:00 AM

2                           --oOo--

3           TRUSTEE MISKEN:  Okay.  Good morning, everyone.

4    We're here today on the continued meeting of creditors of

5    The Original Mowbray's Tree Service, Inc., Case Number 8:24-

6    bk-12674-TA, which was filed in the United States Bankruptcy

7    Court for the Central District of California, Santa Ana

8    Division.  My name is Ken Misken and I am the Assistant

9    United States Trustee for Santa Ana.

10           Today's date is January 3rd, 2025, and the meeting

11   started at 10:00 a.m.  This meeting will be tape recorded at

12   required by the bankruptcy rules, so I ask everyone to speak

13   clearly when asking or answering questions.

14           Debtor's counsel, could you please make your

15   appearance and please spell your name for the record.

16           MR. MARTICELLO (telephonic):  Good morning, Mr.

17   Misken.  This is Robert Marticello of Raines, Feldman,

18   Littrell, on behalf of the Debtor.  R-O-B-E-R-T, M-A-R-T-I-

19   C-E-L-L-O.

20           TRUSTEE MISKEN:  Okay.  Thank you.

21           Debtor's representative, please make your

22   appearance and spell your name, also.

23           MR. WEISS (telephonic):  Good morning.  This is

24   Brian Weiss with Force Ten Partners and the Chief

25   Restructuring Officer. B-R-I-A-N, W-E-I-S-S.

2

1          TRUSTEE MISKEN:  Okay.  Thank you.

2          Are there any other parties on the phone that

3 would like to make an appearance?

4          MR. BODIE (telephonic):  Yes, Mr. Misken.  Brett

5 Bodie on behalf of creditors Jamie Rodriguez and Ana Gomez.

6          TRUSTEE MISKEN:  Okay.  Before we start with

7 questions, I'll ask you, Mr. Weiss, to take an oath to tell

8 the truth.  Please raise your right hand and let me know

9 once you have raised it.

10 I think there's other appearances.

11         TRUSTEE MISKEN:  Okay.  Then please make your

12 appearance.

13         MS. PINO (telephonic):  Hello?  Yes.  My name is

14 Estella Pino.  I'm appearing on behalf of Ms. Metcalf

15 Canelas.

16         TRUSTEE MISKEN:  Okay.  Thank you.  How do you

17 spell your last name, please?

18         MS. PINO:  Pino, P, as in Paul, I, as in Isaac, N,

19 as in Nancy, O.

20         TRUSTEE MISKEN:  Thank you.

21         MS. PINO:  Thank you, sir.

22         TRUSTEE MISKEN:  Anyone else on the phone --

23 Yes -- that wants to make an appearance?

24         MR. CATANZARITE (telephonic):  Yes, please.  Yes,

25 please.  Good morning.  Ken Catanzarite for Ronnie Jordan.

3

1 C-A-T-A-N-Z-A-R-I-T-E.

2          TRUSTEE MISKEN:  Okay.  Anybody else on the phone

3 that wants to make an appearance?  Okay.  Not hearing any.

4 So, we're going to go back to the oath.

5          Mr. Weiss, please raise your right hand, and let

6 me know once you have raised it.

7          MR. WEISS:  I have raised it.

8       BRIAN WEISS - DEBTOR'S REPRESENTATIVE - SWORN

9          THE WITNESS:  Yes.

10          TRUSTEE MISKEN:  Mr. Marticello, is the voice that

11 you just heard take the oath Mr. Weiss?

12          MR. MARTICELLO:  Yes, it is.

13          TRUSTEE MISKEN:  Okay.  I just have a few

14 questions, Mr. Weiss.

15                        EXAMINATION

16 BY TRUSTEE MISKEN:

17 Q    On December 20th, 2024, your counsel sent a letter to

18 Ms. Goldenberg, who's a trial attorney with the U.S.

19 Trustee's Office.  That letter is titled, "responses to

20 questions of OUST during 11 U.S.C. Section 341(a) meeting of

21 creditors."  Are you familiar with that letter?

22 A    Yes, I am.

23 Q    Have you reviewed that letter?

24 A    Yes.

25 Q    Is the information provided in that letter your

4

1  testimony today?

2  A    Yes, it is.

3  Q    At this time do you need to make any changes to any of

4  those representations in that letter?

5  A    No, I do not.

6  Q    Okay.  That's all the questions I have right now.  I'm

7  going to turn it over to the parties on the phone.

8         TRUSTEE MISKEN:  Mr. Bodie, did you have any

9  questions?

10        MR. BODIE:  I do.  Thank you.

11        TRUSTEE MISKEN:  Okay.  Please proceed.

12                    FURTHER EXAMINATION

13 BY MR. BODIE:

14 Q    Mr. Weiss, what Mr. Mowbray's -- the Senior's role at

15 Mowbray's?  That's better.

16 A    You're talking about Richard Mowbray, the --

17 Q    He's the owner of the property.  (Indiscernible.)  What

18 -- go ahead.

19      (Talking over each other.)

20 A    I don't believe there is a current role of him.

21 Q    Okay.  Does he own any shares of the Debtor currently?

22 A    Not that I'm aware of.

23 Q    Does he get a salary, any annual salary from the

24 Debtor?

25 A    No.

5

1  Q    And he did -- was not a senior -- he is the brother of

2  Robin Mowbray, correct?

3  A    I don't know if he's the brother of Robin Mowbray.

4  Q    And I'm sure --

5  A    (Indiscernible) say the father of?

6  Q    I'm -- I'm sorry.  Who's the father, yes.  Meaning,

7  he's the father, correct.  Okay.  Excuse me.  And then what

8  about Ricky Mowbray, Sr., what's his role in Mowbray's?

9          MR. MARTICELLO:  I'm sorry.  This is Robert

10  Marticello.  When you're saying, "Ricky," are you talking

11  about -- so we have Richard Mowbray, who is the CEO of the

12  Debtor.  Is that who you're referring to?

13          MR. BODIE:  I was originally referring to Richard.

14  He said he had no role there.  So I'm calling Richard is the

15  senior, Ricky would be the junior.  So first I asked about

16  Richard.

17          MR. MARTICELLO:  But -- well, what I'm saying is,

18  Mr. Bodie, we don't refer to them that way.  Like I know

19  Richard Mowbray in our minds is the CEO of the Debtor.  His

20  father I believe is also Richard Mowbray, and he goes by

21  Rick.  So when you were asking about whether someone,

22  Richard Mowbray was paid a salary and had a role, you're

23  talking about Rick Mowbray, Richard Mowbray's father,

24  correct?

25          MR. BODIE:  Correct -- or that was what I first

*Briggs Reporting Company, Inc.*

6

1 asked.  So I believe he answered correctly when he

2 (indiscernible) said to those that he does not have a role

3 or a salary, which I meant the senior or father, correct?

4          MR. MARTICELLO:  Okay.  So now when you're saying

5 Rich, you're referring to Richard Mowbray who's the CEO?

6          MR. BODIE:  Correct.  I'll add senior or junior to

7 be more clear.

8 BY MR. BODIE:

9 Q    So what is the role --

10          MR. MARTICELLO:  Okay.  Thank you.

11 BY MR. BODIE:

12 Q    -- of Richard Mowbray?  Yeah.  What is the role of

13 Richard Mowbray, Jr., at Mowbray's?

14 A    He's the chief executive officer.

15 Q    And does he told shares of Mowbray's?

16 A    I don't believe he told shares.

17 Q    And then does he get an annual salary?

18 A    Yes, he does.

19 Q    Do you know what that salary is?

20 A    Yes, I do.  It is $4,038.72 paid weekly, plus about

21 four -- $642.14 weekly (indiscernible).

22 Q    Okay.  Thank you.  And the 686 East Mill Street address

23 in San Bernardino, is that Mowbray's primary business office

24 address?

25 A    One second.  The company operates out of 686 East Mill

7

1  Street, yeah.

2  Q    And does Mowbray's own the real estate there or lease

3  it from someone?

4  A    It leases the real property from Mowbray Waterman

5  Properties.

6  Q    Okay.  And Mowbray Waterman Property, LLC is what

7  you're referring to, not a subsidiary of Mowbray's, correct?

8  A    No.

9  Q    It's not a subsidiary of Mowbray's?

10  A    No.

11  Q    And is Robin Mowbray to the best of your knowledge

12  listed on the Mowbray Waterman Properties Statement of

13  Information as the CEO of that entity?

14  A    I don't know what her title is in that property.  I

15  know she does have an interest in it.  It's a non-debtor

16  entity, so I haven't studied the -- the ownership or

17  operations of that business.

18  Q    And does -- to the best of your knowledge, does Mowbray

19  Waterman Properties also have its primary business office

20  located at 686 East Mill Street?

21  A    I don't know.

22  Q    You're not sure?  I mean it's listed on the --

23  A    No, I -- hold one sec.  Hold on a second.  I want to

24  say, I didn't say I wasn't sure, I said, "I don't know."

25  Q    Understood.  So you're -- you don't know whether

8

1 Mowbray Waterman Properties' address is the same as

2 Mowbray's, the Debtor's, correct?

3 A    I don't know.  Correct.

4 Q    Okay.  And is Phoenix Traffic's management a subsidiary

5 of Mowbray?

6 A    No.

7 Q    Okay.  And then do you know if Phoenix Traffic

8 Management also has Richard Mowbray, Jr. as the CEO?

9 A    I don't know.

10 Q    Okay.  (Indiscernible) on schedule B, line 71, the

11 Debtor disclosed a loan of $2.4 million to Phoenix Traffic

12 Management.  Are you familiar with that loan?

13 A    (Indiscernible.)

14       MS. PINO:  Mr. Bodie, if I could interrupt?  This

15 is Estela Pino, Mr. Brodie.  You were -- I'm hearing you

16 very faintly.  Could you speak up, please?

17       MR. BODIE:  Certainly.  Can you hear me better

18 now?

19       MS. PINO:  Yes.  Thank you.

20 BY MR. BODIE:

21 Q    I asked, on schedule B, line 71, the Debtor listed a

22 loan of $2.4 million to Phoenix Traffic Management.  Are you

23 familiar with that loan?

24 A    The actual amount listed on line -- on line 71 is

25 2,463,400.89.  Yes.

9

1  Q    Yes.  What was that loan for?

2  A    It was advances made by Mowbray's to Phoenix to fund

3  Phoenix's operating expenses when it lost the cash, as well

4  as for rent credited against the loan for equipment leased

5  by the Debtor to Pino.

6  Q    Okay.  And if it's a separate entity, why did the

7  Debtor provide that loan?

8  A    My understanding --

9            MR. MARTICELLO:  I mean I'm going to object to

10  extent it's repetitive.  You just asked what the loan was

11  for.

12           THE WITNESS:  As I previously stated, Phoenix --

13  for funding of Phoenix Traffic Management's operating

14  expenses when it lost the cash to do so, as well as --

15  BY MR. BODIE:

16  Q    Sure.  Let me -- let me rephrase it.  What benefit did

17  the Debtor receive from that loan to make financial

18  worthwhile for the Debtor to make that loan?  Was it purely

19  interest or was there some other benefit the Debtor

20  received?

21  A    Well, the Debtor did receive benefit because Phoenix

22  provided traffic management services to Mowbray's.  That if

23  it wasn't for the Phoenix Traffic Management, it would have

24  to utilize a third party for those services.

25  Q    Okay.  So did Phoenix do those services at a discount

10

1 for the Debtor of what they would otherwise pay you think?

2 A    No, I didn't say that.

3 Q    So what -- I'm sorry.  So the benefit was they provided

4 services to the Debtor that they would otherwise have to

5 get.  So, I'm not -- and then -- and that was the reason you

6 stated for, they gave them, you know, $2.4 million?  So if

7 the could those services --

8 A    That's not -- no, wait.  No.  I did not -- I did not

9 say that, and please refrain from putting words in my mouth.

10 If you can go back, I can (indiscernible) twice what the

11 purpose of that loan was for, and I just provided what the

12 benefit was.  So, yes.

13 Q    I'm sorry.  I'm not trying to be argumentative, but you

14 said the benefit was they provided services that Mowbray's

15 needed, is that correct?

16 A    Yes.

17 Q    Could Mowbray's have gotten those services from any

18 other vendor to your knowledge?

19 A    Yes, it could have.

20 Q    So that's -- do you know the reason why Mowbray's chose

21 to give a loan of $2.48 million to Phoenix to allow them to

22 provide those services?

23       MR. MARTICELLO:  I'm going to object to the extent

24 that Mr. Weiss lacks personal knowledge because he was not

25 involved with the company at the time the loan was made.

11

1          MR. BODIE:  Okay.  So the chief restructuring

2  officer lacks knowledge about why the loan was paid.

3          MR. MARTICELLO:  You're asking -- you're asking

4  about --

5  BY MR. BODIE:

6  Q    Next question --

7          MR. MARTICELLO:  You're asking him about -- you're

8  asking him about a loan that was made at a time that he was

9  not the chief restructuring officer.  To the extent the

10 purpose of the loan, he answered the question.  He's

11 answered it multiple times.  It's in the memo that we

12 served, that he's already confirmed on the record.

13         THE WITNESS:  I've also stated it twice.  If you

14 want me to do it a third time, I will -- I will do so.

15         MR. BODIE:  No, no, it's fine.  We'll move on.

16 It's still early.

17 BY MR. BODIE:

18 Q    There's on schedule B a loan for 3.889 million to

19 Mowbray Waterman Properties, LLC.  What was that loan for?

20         MR. MARTICELLO:  Again, I'll object to the extent

21 the loan was made at a time that the chief restructuring

22 officer was not the officer of the company, and he lacks

23 personal knowledge, but he can answer to the extent he

24 knows.

25         THE WITNESS:  Yeah.  My understanding was -- and

12

1  again, Mr. Marticello stated it was before I was involved

2  with the company, you know, several years before I was

3  involved with the company, but it was to advance money to

4  Mowbray Waterman Properties for them to purchase real

5  property.

6  BY MR. BODIE:

7  Q    And have Mowbray Waterman made any payments towards

8  that loan and the debt?

9  A    You say has Mowbray Waterman made those payments?

10  Q    Made payments on that loan, yes.

11       MR. MARTICELLO:  I'm going to object to the extent

12  this is repetitive, because it's already stated in the memo

13  that was served and that Mr. Weiss has confirmed on the

14  record.

15       MR. BODIE:  I didn't see an answer about payments.

16  I saw that they gave the loan in the letter.  I'm just

17  asking if they made any payments.

18       MR. MARTICELLO:  It does -- it does talk about how

19  there's a credit every month for rent.

20       THE WITNESS:  If you'll refer to page -- memo,

21  page six, Roman Numeral Number III, that in lieu of paying

22  cash rent, there's a book entry that's made that reduces the

23  -- the loan payments.

24  BY MR. BODIE:

25  Q    Okay.  Understood.  And on schedule B also there's a

13

1  loan of 10.3 million to Pino Tree Service.  What was that

2  loan for?

3          MR. MARTICELLO:  Same objection with respect to

4  lack of personal knowledge.

5          You can answer to the extent he know, Mr. Weiss.

6          THE WITNESS:  Yeah.  My understanding is that it

7  was funds advanced to Pino to fund its operating expenses

8  and the start of its business.  So, to fund the business and

9  working capital requirements.

10 BY MR. BODIE:

11 Q    Okay.  And has the Debtor adopted any procedures to

12 address conflicts of interest in its existing loans to these

13 related entities with regards to these loans?

14         MR. MARTICELLO:  I'm sorry, you -- your question

15 got a bit garbled.  Conflict of interest as to what?

16 BY MR. BODIE:

17 Q    As to --

18         MS. PINO:  Mr. Bodie, you're fading again.  Please

19 -- please speak more loudly and maybe a little bit slower,

20 because you're asking very good questions and we all want to

21 hear them.

22 BY MR. BODIE:

23 Q    Has the Debtor adopted any procedures addressing

24 conflict of interests inherent in its business dealings with

25 these entities with regards to these loans?  Meaning, you

14

1 know, normally you'd have arms' length transactions.  Each

2 side's negotiating to look out for their own interests.

3 Here, it sounds like they're, you know, related.  Was there

4 any procedure regarding conflicts of interest with regard to

5 these loans?

6         MR. MARTICELLO:  I'll just object to the extent

7 that it assumes facts not in evidence and includes the

8 counsel's opinion as to business dealings.

9         But, Mr. Weiss, you can answer.

10         THE WITNESS:  So prior to my involvement with the

11 company, I'm not aware of, you know, what procedures were in

12 place to address any conflicts.  But based on what we do

13 know, is that there was a loan agreement that memorialized

14 returns of the amounts advanced.

15         And then, also, you know, agreements in place

16 whereby Mowbray's provides administrative services to Pino,

17 and they are at a cost-plus-10-percent basis, which, you

18 know, based on my experience is, you know, within a

19 reasonable -- reasonable range of -- you know, with respect

20 to a markup.

21 BY MR. BODIE:

22 Q    Okay.  And Pino --

23         MR. MARTICELLO:  And I would -- and, Mr. Bodie, if

24 I may.  I would just add, in addition, as stated in the memo

25 which Mr. Weiss has confirmed on the record, re-evaluating

15

1 and evaluating each of the transactions with the affiliates

2 and we have been making adjustments as Mr. Weiss determines

3 are appropriate.

4         MR. BODIE:  Okay.  Understood.  So, if I

5 understood his testimony right -- I'm checking, it was that

6 there was a loan agreement and a cost-plus benefit.  That

7 those, as far as I understood, were answers about whether

8 there was any procedures in place regarding conflicts of

9 interest.  Are there any procedures now that you know of?

10         MR. MARTICELLO:  Other than what I just stated --

11 this is Robert Marticello.  And stated in the memo?

12         MR. BODIE:  Yeah.

13         THE WITNESS:  As a -- I'm not aware of any

14 conflicts of interest, you know, procedures that are in

15 place.  But also there's -- not being since my involvement

16 that I'm aware of that would give rise to a conflict that

17 has occurred since my appointment.

18 BY MR. BODIE:

19 Q    Okay.  And to you knowledge, is Pino Tree Service a

20 vendor of the Debtor?

21 A    They are a vendor, yes.

22 Q    And is Phoenix Traffic a vendor of the Debtor?

23 A    Yes.

24 Q    Okay.  And is Mowbray Waterman a vendor of the Debtor?

25 A    Yes.

16

1 Q    To your knowledge, who negotiates what on behalf of

2 those entities with regards to any dealings that the Debtor

3 has with them?

4        MR. MARTICELLO:  Objection as to time and the

5 question's vague.  Are you referring to now or historically?

6        MR. BODIE:  "Historically" first, and then we can

7 ask now.

8        MR. MARTICELLO:  Then I'll object to the extent

9 Mr. Weiss lacks personal knowledge because he wasn't

10 involved at the time, but you may answer to the extent you

11 know.

12        THE WITNESS:  Yeah.  So prior to my appointment I

13 was not involved.  Subsequent to my appointment, you know,

14 myself and the company's management reviewed the

15 transactions with the related parties, any -- subsequent to

16 their -- that are leaving.

17 BY MR. BODIE:

18 Q    So currently are you saying that yourself put those --

19 the -- you handled the review, is that correct?

20 A    Yeah.  Myself in conjunction with the management of the

21 company, yes.

22 Q    Okay.  And the management of the company, would that

23 include like Robin Mowbray, I assume, and Richard Mowbray,

24 Jr.?

25 A    Yes, and Rubin Sanos with the above.

17

1  Q    Understood.  Okay.  And can you tell me what properties

2  the Debtor leases from Mowbray Waterman?

3          MR. MARTICELLO:  I'll object to the extent this is

4  repetitive.  It's in the memo that Mr. Weiss has already

5  confirmed on the record.

6          MR. BODIE:  Okay.  Then let me --

7  BY MR. BODIE:

8  Q    That when were the leases for the properties in the

9  memo entered into?

10         MR. MARTICELLO:  I'll object to the extent it's

11 repetitive, because it was included in the memo and served

12 with the memo.

13         MR. BODIE:  (Indiscernible.)

14         THE WITNESS:  So if you look on page five, Roman

15 Numeral Number II, you'll note pre-leasing.  You know, the

16 lease commenced January 1, 2024 with respect to what we

17 refer to the "parking yard lease."  The rent commenced

18 January 1st, 2024.  And then in terms of Visalia lease, it

19 was January 1, 2024.

20 BY MR. BODIE:

21 Q    And what was the reason of the physical entity to on

22 those dates?

23         MR. MARTICELLO:  I'm going to object to the extent

24 that Mr. Weiss lacks personal knowledge because he was not

25 an officer of the company at the time that the leases were

18

1 entered into.

2            You can answer to the extent you know.

3            THE WITNESS:  Yeah.  It was prior to my

4 involvement with the company, so I don't know.

5 BY MR. BODIE:

6 Q    To the best of your knowledge, were there rents paid

7 for those properties prior to those leases being entered

8 into?

9 A    Let's see.  So during the -- I can only get -- talking

10 about properties, so it's -- that's the Mill Street

11 property.  The Debtor was not charged rent during the first

12 year with respect to the parking yard leases.  The Debtor

13 was not charged rent during the first year with respect to

14 (indiscernible).  The Debtor was not charged rent during the

15 first year.

16 Q    Okay.  And just to confirm.  Are the payments under

17 those leases -- again, we can go property by property.  Are

18 they actual payments or discounts on loans as you discussed

19 in the previous transaction?

20            MR. MARTICELLO:  Are you asking now, Mr. Bodie --

21 are you asking now, are -- is there an actual payment or a

22 credit?  Okay.

23            MR. BODIE:  Correct.

24            THE WITNESS:  Yes.  Currently, the first

25 (indiscernible) payments are credits.

19

1 BY MR. BODIE:

2 Q    Okay.  They are credits.

3     The next question I had is, the Debtor lists on its

4 schedules a schedule D, a line of credit from PNC Bank in

5 the amount of just over 7,000,000.  Are you familiar with

6 that line of credit?

7 A    Yes.

8 Q    On the proof of claim filed with regards to that, it

9 shows that Mowbray Waterman Property guaranteed that line of

10 credit.  Are you familiar with that?

11 A    Well, I have not reviewed the proof of claim.  I am,

12 again, familiar with the collateral that is prior to that.

13 Mowbray Waterman Property is a guarantor.

14 Q    What was the reason that Mowbray Waterman Property was

15 the guarantor to that loan to the Debtor?

16 A    That was prior to my involvement with the company, so I

17 don't know.

18 Q    Okay.  On the motion for use of cash collateral that

19 was filed in this case, there contains a section stating

20 that a large blow to the Debtor's financial condition came

21 in 2023 when the Debtor was underbid for a Southern

22 California Edison vegetation management contract and lost

23 significant revenue.  Is that correct?

24 A    Yes, it is.

25 Q    Can you explain what occurred that led to that lost

20

1 revenue and losing that contract?  I mean in a little more

2 detail than just that it was outbid.

3 A    That was prior of my involvement with the company, so I

4 don't have knowledge.

5 Q    And when to the best of your knowledge did the Debtor

6 cease doing any services for Southern California Edison?

7 A    I don't have the -- I don't have the exact date.  But

8 if you'd like, you can follow-up and we'll provide that to

9 you.

10 Q    Okay.  And do you know who might have that information

11 at Mowbray's?

12 A    It was be, you know, Robin Mowbray, Richard Mowbray or

13 Rubin Sanos.

14 Q    Okay.  Do you know approximately, it doesn't have to be

15 exact, how much revenue was lost as a result of losing that

16 Southern California Edison contract?

17 A    I don't know the exact dollars, but it was definitely

18 significant.

19 Q    And to your knowledge, did the Debtor bid on 2023 or

20 2024, in those years, any other -- any SCE contracts, or did

21 it stop bidding after it lost that one?

22 A    That was before my involvement, so I'd have to refer to

23 the company for that answer.

24 Q    Okay.  And when you say for that answer for the

25 company, would that be the same people that would have that

21

1 knowledge that you named to -- in the last question?

2 A    Yes.

3 Q    Okay.  The motion -- also, the cash collateral motion

4 states that Pacific Gas and Electric used its own bankruptcy

5 case to re-negotiate a contract with Mowbray's to a lower

6 price, and that that led to the Debtor terminating that

7 contract.  Is that correct, and can you provide any more

8 information that you know of that led to the loss of revenue

9 from that PG&E contract?

10 A    Based on (indiscernible), that was the case, but the

11 facts surrounding the loss of the contract was before my

12 engagement, so I'm not familiar with all the facts.

13 Q    Okay.  I want to turn now -- and this my last new set

14 of questions, to the periodic report and related entities

15 filed by the Debtor, to ECF 224.  Are you familiar with

16 that document?

17 A    I am, yes.  I need to pull it up if there is questions.

18 Q    If you can, that'd be great.  Just let me know whenever

19 you have it.  I have just a few questions about it.

20 A    Okay.

21 Q    And that states -- you know, it states in there that in

22 fiscal year end of 2023, Pino Tree Service, Inc. had about

23 1.8 million in assets, but by quarter three of 2024, that

24 had jumped to about 19.9 million in assets.  Cash on hand

25 jumped by 1,000,000, account receivables jumped by 16.4

22

1  million.  Can you explain what caused that significant rise

2  in Pino's assets?

3  A    Yes.  What page are you referring to?

4  Q    I believe it is on the second or third page.  Let me

5  pull it up.  It states -- here.  Let me grab it.  Hold on

6  (indiscernible).  On page five of 21.

7  A    Okay.  I have that up.

8  Q    That it shows total assets end of fiscal year 2023, 1.8

9  million.  By quarter three 2024, 19.9 million.

10 A    Yes.

11 Q    Are you aware of what caused that significant rise in

12 assets over that period of time?

13          MR. MARTICELLO:  I'm going to object to the extent

14 Mr. Weiss lacks personal knowledge because he's not an

15 officer of Pino Tree Service.

16          But, Mr. Weiss, you can answer to the extent you

17 know.

18          THE WITNESS:  Sure.  So it was primarily driven by

19 an increase in accounts receivable that went from 769,000

20 and change to almost 17.6 million.

21 BY MR. BODIE:

22 Q    And when you say, "accounts receivable," is that due to

23 a contract that Pino, you know, obtained for vegetation

24 management?

25 A    Yes.

23

1  Q    And was that with Southern California Edison to your

2  knowledge?

3  A    Yes, it is.

4  Q    Was that the contract that Mowbray was outbid on?

5  A    Yes, it was, amongst other parties, yes.

6  Q    Okay.

7  I'm going to object to the -- I'm going to (indiscernible).

8  I'm going to object to the extent that the question is

9  repetitive of the questions asked by Mr. Reid at the last

10 341(a), and Mr. Weiss did address this question.

11        It's not as simple as a contract.  It's not as

12 simple as a contract, as I believe was explained at the last

13 341(a), because there's bids for various regions.

14        MR. BODIE:  No.  No problem.  I -- that's all.  He

15 already answered all that I had to ask about that.  I just

16 had one other question.

17 BY MR. BODIE:

18 Q    You mentioned that -- who does he report to?  Who does

19 the chief restructuring officer report to at Mowbray's?

20 A    That was be to Robin Mowbray.

21 Q    "To Robin Mowbray."  Okay.

22        MR. BODIE:  That's all I have.  Thank you, guys.

23        TRUSTEE MISKEN:  Okay.  Thank you, Mr. Bodie.

24        Ms. Pino, did you have any questions?

25        MS. PINO:  I do, but I believe Mr. Catanzarite has

24

1   some questions.  I'll just (indiscernible) him first.

2            TRUSTEE MISKEN:  Okay.

3            Mr. Catanzarite?

4            MR. CATANZARITE:  Okay, hang -- sure.  Hang on.  I

5   took off my headset, so I might be clearer.  Okay.

6                      FURTHER EXAMINATION

7   BY MR. CATANZARITE:

8   Q    So I have some questions on Phoenix Traffic Management,

9   Inc.  And I have sent an e-mail to mister -- to Robert, Mr.

10  Monticello (phonetic), and I asked some questions.  Did he

11  perhaps share that with you, that e-mail?

12           TRUSTEE MISKEN:  Not that I'm aware of.

13           THE WITNESS:  I don't think I've seen it.

14           MR. CATANZARITE:  I'm sorry?

15           TRUSTEE MISKEN:  Are you asking the U.S. Trustee's

16  Office?

17           MR. CATANZARITE:  No, no.  I'm asking -- I'm

18  asking if mister -- I had sent it to Nancy Goldberg, as well

19  as Mr. Monticello.

20  BY MR. CATANZARITE:

21  Q    And I simply asked, did -- was the e-mail reviewed that

22  talked about -- asked about Phoenix Traffic control (sic)?

23  A    Yeah.  I'd have to look back at my e-mail I received.

24  And, unfortunately, I receive a lot of e-mails from Mr.

25  Marticello, so I don't know which specific one you're

*Briggs Reporting Company, Inc.*

25

1  referring to.

2  Q    Okay.

3  A    Now we'll have (indiscernible) out here today.

4  Q    Well, I see, if I look at docket 170, page 160, and I

5  look at Phoenix Traffic control, and I see it listed as a

6  vendor.  I see payments of 2.8 -- two-million-eight-hundred-

7  eighty-three-thousand-five-hundred-and-twenty-six dollars.

8  Am I reading this report correctly, that in the period

9  October '23 through February of '14 (sic), that amount of

10  money was sent to or for the benefit of Phoenix Traffic

11  control?

12          MR. MARTICELLO:  I'm sorry, Mr. Catanzarite.  I'm

13  not sure what document you're referring to.  This is Bobby.

14          MR. CATANZARITE:  Sure.  Docket 170, page 160.

15          MR. MARTICELLO:  That's --

16          MR. CATANZARITE:  It's a 166-page document.

17          MS. PINO:  This is Estela Pino.  What's the title

18  of the document, Mr. Catanzarite?

19          MR. CATANZARITE:  What page?  Docket 170 --

20          MS. PINO:  No.  What is the title of the docket?

21  I have documents listed as -- it's by name, not my docket

22  number.

23          MR. CATANZARITE:  It's the schedules, Ms. Pino.

24  It's the bankruptcy schedules.

25          MS. PINO:  Okay.

26

1          MR. CATANZARITE:  Yes.

2          MS. PINO:  Okay.  Thank you.

3          MR. MARTICELLO:  Hold on.  Mr. Catanzarite, I'm --

4  I have a paper copy and I'm turning to the page.

5          MR. CATANZARITE:  Okay.

6          MR. MARTICELLO:  Okay.  We've -- I've got that

7  page up.  Just turn to page 160, 1-6-0?

8          MR. CATANZARITE:  Yes, 1-6-0.

9  BY MR. CATANZARITE:

10  Q    So my question, you -- so Mr. Brodie asked whether or

11  not Phoenix Traffic control was a vendor.  You described

12  services that Phoenix Traffic control was providing,

13  meaning, traffic control for projects that Mowbray's Tree

14  Service was on.  Does Mowbray's Tree Service then bill for

15  the subcontract services of Phoenix Traffic control?  Does

16  it bill the end user on the contract, prime contract?

17  A    For those services, yes, that it provides, that it

18  subcontracts from Phoenix Traffic Management, my

19  understanding is, yes, it does.

20  Q    Well, you're aware Phoenix Traffic Management -- well,

21  strike that.

22        Are you aware that Phoenix Traffic Management is itself

23  a licensed contractor?

24  A    Yes.

25  Q    Okay.  Are you aware of how much revenue Phoenix

27

1  Traffic Management, Inc. derives from its licensed

2  contracting activities other than from that associated with

3  Mowbray's Tree Service?

4  A    No, I'm not.

5  Q    I think Mr. Sano's prepared financial statements -- I

6  know he prepared financial statements for Pino Tree Service.

7  I also note from the Secretary of State website that Mr.

8  Sano is also the CFO of Phoenix Traffic Management.  Are you

9  aware of that?

10 A    I reviewed the corporate documents for that entity.

11 Q    From --

12 A    (Indiscernible) --

13 Q    In other words, does Mr. Sanos report to you?

14 A    Yes, he does.

15 Q    Okay.  So, since he's reporting --

16 A    With reporting --

17 Q    -- to you, have you ever -- I'm sorry.  I didn't hear

18 that.

19 A    With report -- with respect to the Debtor entity.

20 Q    So he's a CFO of Phoenix Traffic Management.  He

21 reports to you only with respect to Mowbray's Tree Service?

22 He doesn't talk to you about Phoenix Traffic Management?

23 A    No.

24 Q    And so you don't know, even though he's a CFO -- is he

25 a CFO under a separate, independent contract then with

28

1  Phoenix Traffic Management?

2  A    I don't -- I don't -- not that I'm aware of.

3  Q    CFO is a licensed employee, is a -- strike that.

4      A CFO is an individual who is employed as an employee

5  of a company, such as Phoenix Traffic Management, right?

6  A    We --

7          MR. MARTICELLO:  I would object to the extent the

8  question was vague and difficult to understand.

9          THE WITNESS:  So, Mr. Sanos is --

10 BY MR. CATANZARITE:

11 Q    Well, you tell me.  You tell me then -- Mr. Weiss, you

12 tell me, what is your understanding --

13 A    I'm -- first I'm going to answer your question, okay,

14 so let me finish.  Mr. Sanos is the CFO of Mowbray's Tree

15 Services.  Mowbray's Tree Services, you know, it is the

16 Debtor, and he reports to me with respect to debtor

17 activities.

18 Q    Have you completed your answer?

19 A    Yes.

20 Q    Okay.  He's also the CFO of Phoenix Traffic Management.

21 What's his role with that company then?

22          MR. MARTICELLO:  I'm going to object to the extent

23 the question is repetitive.  I believe it was asked and

24 answered.

25          THE WITNESS:  You had stated that pursuant to the

29

1 Secretary of State website that he is the chief financial

2 officer for Phoenix Traffic Management.  So, with respect to

3 what services he provides to them is pursuant to a

4 management agreement.  However, as it relates to the day-to-

5 day operations of Phoenix Traffic Management, I'm not aware,

6 you know, the services that he provides to them on a

7 detailed basis.

8 BY MR. CATANZARITE:

9 Q    Well, pursuant to the management agreement for Phoenix

10 Traffic Management, Inc., does Mr. Sanos or your firm

11 provide financial statement reporting?

12 A    My firm, no.  Mr. Sanos, possibly.

13 Q    Okay.  Same question with respect to Pino Tree Service.

14 Mr. Sanos is listed as the CFO of Pino Tree Service.  Again,

15 does he provide financial statements for Phoenix -- for Pino

16 Tree Service?

17 A    Yes, he does.

18 Q    Okay.  And those you've reviewed --

19 A    And to be clear -- and let me just clarify something.

20 And to be clear, the reason I know what he does for Pino, as

21 opposed to Phoenix Traffic Management on a detailed basis,

22 is that Pino's a wholly owned subsidiary of the Debtor, and

23 Phoenix Traffic Management isn't.

24 Q    He's also CFO of Mowbray Waterman Properties, correct?

25         MR. MARTICELLO:  I'm going to object to the extent

30

1  that Mr. Weiss lacks personal knowledge to answer that

2  question, as he's not an officer of Mowbray Waterman

3  Properties.

4          THE WITNESS:  As I mentioned in a prior question,

5  I don't have any capability in the infrastructure of Mowbray

6  Waterman Properties.  It's a non-debtor entity.

7  BY MR. CATANZARITE:

8  Q    Mowbray Waterman Properties is a non-debtor of have no

9  knowledge of, is that correct?

10  A    Correct.

11  Q    Now, is the same answer -- and answer is, who is the

12  owner of -- we know that Robin Mowbray is the owner of

13  Mowbray Waterman Property.  We know that Pino Tree Service

14  is owed by Mowbray -- Pino Tree Service is owned by -- by

15  the Debtor.  Who owns the stock of Phoenix Traffic

16  Management, Inc.?

17          MR. MARTICELLO:  I'm going to object to the extent

18  that I'm not sure we all know exactly what Mr. Catanzarite

19  is saying.  I'm also going to object to the extent that Mr.

20  Weiss lacks personal knowledge to answer questions about a

21  non-debtor entity.

22          You can answer to the extent you know.

23          THE WITNESS:  Yeah.  I don't know.

24  BY MR. CATANZARITE:

25  Q    Are you a curious individual, Mr. Weiss?

31

1        TRUSTEE MISKEN:  All right.  This is Ken Misken,

2  U.S. Trustee.  Please ask appropriate questions relating to

3  the schedules and statement of financial affairs.  And

4  please don't have any personal attacks.

5        MR. CATANZARITE:  That's not a personal attack.

6        TRUSTEE MISKEN:  It sounds like it.  So, please

7  move on.

8  BY MR. CATANZARITE:

9  Q   Mr. Weiss -- Mr. Weiss, whether or not you have --

10        TRUSTEE MISKEN:  I'm giving you a lot of leeway

11  here.  So, you know -- this is Ken Misken, the Assistant

12  U.S. Trustee.  Please let me talk.

13        I'm letting you ask a lot of questions about non-

14  debtor entities and giving you a lot of leeway.  You know,

15  we did have a two-and-a-half hour 341 meeting a couple weeks

16  ago.  So, you know, please ask your questions and let's move

17  on.

18  BY MR. CATANZARITE:

19  Q   Are any of the officers of Mowbray's Tree Service also

20  officers of Pino Tree Service?

21  A   Yes.

22  Q   Do they receive separate salaries?  Does Robin Mowbray

23  receive a separate salary from Pino Tree Service?

24  A   No.

25  Q   Does Rick Mowbray receive a separate salary from Pino

32

1 Tree Service?

2 A    No.

3 Q    With respect to Phoenix Traffic Management, Inc., does

4 Robin Mowbray receive a salary from Phoenix Traffic

5 Management?

6 A    With respect to Phoenix Traffic Management, I do not

7 have any visibility into the books and records, so I can't

8 answer that.

9 Q    How about Rick Mowbray, who is listed as the CEO of

10 Phoenix Traffic Management.  As CEO of Mowbray's Tree

11 Service, does he also receive a salary from Phoenix Traffic

12 Management?

13 A    It's the same answer I just gave you with respect to

14 Robin Mowbray.  If your next question is with respect to

15 Rubin, it would be the same answer I gave you previously

16 with respect to Robin.

17 Q    Has Phoenix Traffic Management, Inc. signed or

18 guaranteed the PNT -- PNC loan?

19 A    I don't -- I don't recall.

20         MR. MARTICELLO:  This is Robert Marticello.  Not

21 to my knowledge.

22 BY MR. CATANZARITE:

23 Q    Can you tell me where the business office of Phoenix

24 Traffic Management is?

25         MR. MARTICELLO:  I'll object to the extent that

*Briggs Reporting Company, Inc.*

33

1 Mr. Weiss lacks personal knowledge with respect to a non-

2 debtor entity that he's not an officer of.

3          THE WITNESS:  Yeah.  I don't know.

4 BY MR. CATANZARITE:

5 Q    Okay.  Mowbray Waterman Properties has a lease with the

6 County of San Bernardino.  Are you aware of that?

7          MR. MARTICELLO:  I'm going to object to the extent

8 it's repetitive, as it's stated in the memo that we served

9 and Mr. Weiss confirmed on the record.

10          MR. CATANZARITE:  Well, okay.  Tell me what the

11 lease rate is today then.

12          MR. MARTICELLO:  It's also stated in the memo.

13 I'll object again on the basis that the question is

14 repetitive, asking questions that were answered in a memo

15 that Mr. Weiss has already confirmed on the record.

16          TRUSTEE MISKEN:  Well, this is Ken Misken.  Mr.

17 Weiss, can you just point to the memo where it's listed?

18 Maybe that -- we could just kind of move this along.

19          THE WITNESS:  It's in the details with respect to

20 the Mowbray Waterman Properties leases on page five.  And

21 then also beginning on page four under subsection B.

22          MR. MARTICELLO:  And on page eight, Mr. Misken it

23 says that, "the county continues to occupy the premiss on a

24 month-to-month basis at the rate of 35,124 per month."

25          MR. CATANZARITE:  Okay.  Thank you for that.

34

1  BY MR. CATANZARITE:

2  Q    So, if you tell me -- if the county lease rate in the

3  lease that ended on -- in 2022, some two years ago, had a

4  rate of 35,124 a month, can you tell me why the rate hasn't

5  increased since that time?

6           MR. MARTICELLO:  I'm going to object.  I'm going

7  to object to the extent that Mr. Catanzarite is asking a

8  question about the operations of a non-debtor entity that

9  Mr. Weiss is not a officer of.

10          Mr. Weiss, you can answer the question to the

11  extent you know.

12          THE WITNESS:  I don't know.  I'm not an officer of

13  that entity.

14  BY MR. CATANZARITE:

15  Q    Okay.  The -- looking at -- returning to docket 170 of

16  the schedules, page 160 and 161.  There is a -- for Pino

17  Tree Service, there's a reference for payments,

18  subcontracting payments ranging between October 26, 2023 and

19  June 11, 2024, in the total amount of $12,164,256.  When the

20  payments are "subcontractor payments," is that pursuant to a

21  separate written contract or -- in other words, where

22  Mowbray's Tree Service is using Pino to fulfill a prime

23  contract that MTS has, is that -- Mowbray Tree Service has,

24  is that what's going on?

25  A    Yeah.  I don't know.  I mean, those transactions were

35

1 in 2023, prior to my involvement, but I don't have any

2 knowledge.

3 Q    Okay.   These -- there's -- in the time period October

4 26 through December 21, 2023, the payments are listed as

5 subcontractor payments to Pino Tree Service.   Then beginning

6 December 26, 2023, they're all -- all of the payments are

7 then described as "loan to Pino Tree Service."  Do you know

8 -- I mean, do you know the reason that there was that change

9 and whether or not there are any further subcontractor

10 payments following June of 2024 to Pino Tree Service?

11 A    So, I don't know why they're -- there was that change.

12 That, you know, prior to June 2024, I'm not aware of the

13 purpose.

14 Q    And I had a question -- I had asked some questions

15 during the first session.   I asked about employee retention

16 credits and whether or not these employee retention credits

17 have been applied for.   And, if so, for what periods, and

18 what had happened, if anything, with respect to such

19 payments.  Can you tell me whether or not anyone looked into

20 that question, and can you update us on whether or not there

21 was any ERC credits due to Mowbray's Tree Service?

22 A    Yeah.  So we haven't applied for those.  It's kind of,

23 you know, on a list to investigate.

24 Q    So, with respect to the ERC credits, as are commonly

25 referred to, it's your -- you're telling us, nobody applied

36

1 for any credit in '20 or '21?

2 A    No --

3          MR. MARTICELLO:  Object to the extent it's been

4 testified -- he asked -- he answered the question.

5          But go ahead, Mr. Weiss.

6          THE WITNESS:  Yeah, not that I'm aware of.

7 BY MR. CATANZARITE:

8 Q    Do you know who on behalf of Mowbray's Tree Service

9 would have been charged with responsibility to investigate

10 or determine whether or not ERC credits were available to

11 Mowbray's Tree Service?

12 A    I could only speculate.  Again, this is back in 2021 --

13 '20 and '21 time period, you know, way before my

14 involvement.  And I know there was -- you know, the current

15 CFO was not employed with Mowbray's at that time, so.

16          MR. MARTICELLO:  And, Mr. Catanzarite, if you're

17 asking for us to look into it now, whether the Debtor is

18 entitled to employee retention credits, we're happy to look

19 into that.

20          MR. CATANZARITE:  I'd appreciate that.

21 BY MR. CATANZARITE:

22 Q    And the question would be, if Mowbray's Tree Service is

23 now foreclosed from any quarters of 2020 from applying for

24 those credits, to the extent they're available, what

25 investigation will there be with respect to the

37

1  professionals responsibility for the failure to have

2  submitted the credits?

3           MR. MARTICELLO:  This is Robert Marticello.  I

4  don't know if you're waiting for a response from us.  I --

5  we'll looking into whether the Debtor is entitled to

6  credits.

7           TRUSTEE MISKEN:  Yeah.  And this is Ken Misken,

8  Assistant U.S. Trustee.  That sounds like a hypothetical

9  question.  I don't know if he could answer it.

10          MR. CATANZARITE:  Yeah, he may not be able to.  I

11  had -- normally it would be the outside accountants.

12  There's an auditor involved in this company.  But let me ask

13  a question.

14 BY MR. CATANZARITE:

15 Q   Are you -- are you aware of who the auditing firm was

16 that prepared audited reports of any kind or review reports,

17 or even compilation reports, the outside accountants for

18 Mowbray's Tree Service.  Do you know who those folks are and

19 would you provide us with a summary of who was -- who was

20 responsible for that, those duties beginning in 2020

21 forward?

22 A   Yeah, we can provide that to you.  And with respect to

23 who the accountants were, I'm almost positive -- I need to

24 make sure there wasn't a change (indiscernible).  It'd be

25 E.E.S., independent accountants that issued review reports.

38

1 And I believe they do the cash work, also, is Soren McAdam.

2 Q    Okay.  Thank you for that.

3          MR. CATANZARITE:  I don't -- thank you for your

4 time, Mr. Weiss.  I don't have any further questions.

5          TRUSTEE MISKEN:  Okay.  Thank you, sir.

6          Ms. Pino, do you have any questions?

7          MS. PINO:  I do.  I have a few questions.  Thank

8 you.

9                    FURTHER EXAMINATION

10 BY MS. PINO:

11 Q    Mr. Weiss, how long have you been the chief

12 restructuring officer of the Debtor?

13 A    Mid-August of 2024.

14 Q    And as chief restructuring officer, who do you report

15 to?

16 A    I think I answered that a few minutes ago.  I report to

17 the board of directors or director, which is Robin Mowbray.

18 Q    Anyone else?

19 A    Maybe some -- no.  But, you know, when it comes to the

20 restructuring efforts, I'm basically, you know, running the

21 restructuring process.

22 Q    And in running the restructuring process, you're

23 responsible for collecting the amounts owed to the Debtor by

24 Mowbray Waterman, correct?

25 A    That is correct.

39

1 Q    And the amount of the scheduled debt is $3,000,889, 126

2 cents -- and $126.32, and some of that is not reduced to any

3 type of promissory note, correct?

4 A    You're referring to Phoenix Traffic Management?

5        MR. MARTICELLO:  No, I think she said Waterman.

6 BY MS. PINO:

7 Q    No.  Mowbray Waterman Properties, LLC.

8        MR. MARTICELLO:  And I'll object, just to the

9 extent this is covered in the memo.

10        But, Mr. Weiss, you can answer to the extent you

11 know.

12        MS. PINO:  Are there -- I just laid the

13 foundation --

14        THE WITNESS:  Sorry.

15        MS. PINO:  -- for the question, that he's

16 responsible for collecting that, correct?

17        MR. MARTICELLO:  The question was about if there's

18 a loan agreement for the Waterman loan, and that's

19 specifically is addressed in the memo.  So I'm objecting to

20 the extent that this is already covered in the memo that Mr.

21 Weiss confirmed on the record.  But he can answer to the

22 extent -- I'm not saying he couldn't answer.

23        THE WITNESS:  Could you please ask that question

24 one more time?

25 //

40

1  BY MS. PINO:

2  Q    You are responsible for collecting the loan or the

3  amounts owed to the Debtor from Mowbray Waterman Properties,

4  LLC, correct?

5  A    Yes.

6  Q    And as part of your responsibilities to date, did you

7  take a note then to undertake an investigation as to the

8  ownership of Mowbray Waterman Property, LLC?

9  A    We have not investigated who owns the (indiscernible)

10 Waterman property.

11 Q    Have you investigated the authority of Mowbray Waterman

12 Properties to pay that loan to the Debtor?

13 A    Yeah, we already evaluated it.

14 Q    What have you done to date to evaluate the ability of

15 Mowbray Waterman Properties, LLC to pay the Debtor?

16 A    So we evaluated their kind of -- based on, you know,

17 financial statements provided to us recently, the ability to

18 re-pay the loan.  And we're looking at having the

19 (indiscernible) prepare tax flow projections so we can see

20 what a reasonable amortization (indiscernible) for a loan in

21 order -- that's going to pay down that balance based on the

22 cash flows it has.

23 Q    And who provided you these financial statements that

24 you were recently provided?

25 A    That would have been Rubin Sanos.

41

1  Q    And did those financial statements reflect that -- all

2  the ownership of Mowbray Waterman Properties, LLC?

3  A    No, they did not.  The financial statements are -- it's

4  not part of the financial information.  It doesn't, you

5  know, it doesn't list on the face of them the ownership

6  interest.

7  Q    Do you recall if those financial statements have a

8  positive equity balance?

9  A    Let me -- give me a second.  I can see it.  I can

10  verify.  I can pull them up.  No, I don't have those

11  financial statements on my -- on my network right now.

12  Q    Have you discussed those financial statements with

13  anyone?

14  A    I discussed with Mr. Sanos with respect -- he's trying

15  to -- trying to structure arrangement to get the note re-pay

16  date from the cash flows of -- of Mowbray Waterman

17  Properties, but, you know, we're still in process of

18  analyzing the data.

19  Q    Were other financial statements provided to you?

20  A    I mean, I don't have them on my hard drive -- on my

21  computer as I sit here today.  If you want to follow-up with

22  an e-mail, I can provide you with that information.

23  Q    Actually, if I can request a copy of the financial

24  statements.

25          MR. MARTICELLO:  You know, this is Robert

42

1 Marticello.  And this relates to Mr. Catanzarite's request

2 as well.  Waterman has its own counsel.  I'm discussing the

3 request we've received for financial statements for Waterman

4 with counsel, and I'm happy to circle back with you on that

5 after the 341(a).

6          MS. PINO:  Who's Waterman's counsel?

7          MR. MARTICELLO:  Roye Zur of Elkins Kalt.

8          MS. PINO:  Can you e-mail me that name and the

9 firm name (indiscernible)?

10          MR. MARTICELLO:  Sure.  Yes, we'll do that.

11          MS. PINO:  Thank you.  That way I have correct

12 spellings and all that.

13 BY MS. PINO:

14 Q    So Mr. Sanos provided the financial statements for

15 Mowbray Waterman Properties, LLC.  Do you know where Mr.

16 Sanos reports to work, Mr. Weiss?

17 A    Yes, I do.  With respect to Mowbray's Tree Service?

18 Q    Okay.  That's a start.  Where does he report to work?

19 A    You want the address?  The address is 686 East Mills

20 Drive, San Bernardino, California.

21 Q    Do you know where he reports to work for Mulberry's

22 (phonetic) Waterman Properties, LLC?

23 A    Quick clarification.  It's Mowbray, not Mulberry's.

24 Q    Sorry.  English is my second language.  I apologize.

25 A    Better than my -- it's my first, but yours is better

43

1 than mine, so.  I don't know.  I would expect it would be --

2 because there's a management agreement between some

3 entities, it would probably be the 686 East Mill Drive

4 address.

5 Q    And do you know if the books and records of the Debtor

6 are kept digitally?

7 A    Yes, they are.

8 Q    And are the books and records of Mowbray Waterman

9 Properties, LLC kept digitally?

10 A    I don't know.

11 Q    Do you know if they're kept on the same hardware?

12 A    I don't know.

13 Q    Is Mr. Sanos part of the management of the Debtor?

14 A    Yes.

15 Q    Now Phoenix Traffic owes $2,463,489 to the Debtor at

16 the time the petition was filed.  Is it your responsibility

17 as the chief restructuring officer to collect that loan from

18 Phoenix Traffic?

19 A    Yes, it is.

20 Q    As part of your responsibility have you undertaken any

21 examination of the ownership -- or investigation to

22 determine the ownership of Phoenix Traffic?

23 A    On the ownership, no.

24 Q    Have you taken any steps to ascertain the financial

25 condition of Phoenix Traffic?

44

1  A    Yes.

2  Q    And what are those steps?  Please describe them.

3  A    Sure.  We've analyzed the financial statements, the

4  most recent financial statements of Phoenix Traffic

5  Management that were provided by Mr. Sanos.  And based on

6  that we're developing a plan, including the documentation of

7  a re-payment schedule, to get that loan re-paid based on

8  cash flows generated by that entity.

9           MR. MARTICELLO:  And this is Robert Marticello.

10 And that is discussed at page seven of the -- six and seven

11 of the memo.

12 BY MS. PINO:

13 Q    And when were those financial statements provided?

14 A    We -- let me see if I have them.  I believe they were

15 around December 16th, 2024.

16 Q    And those were internally prepared?

17 A    Internally prepared by (indiscernible), I believe so,

18 as a first, you know, audited financial.

19 Q    Have you received any proper financial statements

20 relating to Phoenix?

21 A    No.

22 Q    Have you received any audited financial statements

23 relating to Phoenix?

24 A    No.

25 Q    Have you received any reviewed financial statements

45

1 relating to Phoenix?

2 A    No.

3 Q    So the only financial statements you have from --

4 relating to Phoenix were internally prepared by Phoenix?  I

5 just want to make sure I understand.

6 A    Is that a question or a statement?

7 Q    It's a question.

8 A    The only -- yeah.  The only financial that I've -- the

9 only financials I've received for Phoenix are internally

10 prepared financial statements.

11 Q    And to your knowledge, they were prepared by Mr. Sorno

12 (phonetic), who is a member of the management of the Debtor,

13 is that correct?

14 A    Yes.

15 Q    With regards to Waterman -- Mulberry (phonetic)

16 Waterman Properties, LLC, do you -- have you received any

17 compiled financial statements to that entity?

18 A    No, I have not received any compiled reviews or audited

19 financial statements, only internally prepared financial

20 statements.

21 Q    Prepared by Mr. Sanos, who is also a member of the

22 management of the Debtor, correct?

23 A    Yes.

24 Q    And, I'm sorry.  I think Mr. Catanzarite asked about

25 financial statements for the Debtor, and I'm not sure that I

46

1  understood the questions or answers.  So if repeat, please,

2  I apologize in advance.  But do you know if the Debtor has

3  had any compiled financial statements prepared in the last

4  four years?

5  A    I don't believe so.  I believe the financial statements

6  that have been prepared by a third-party accounting firm are

7  for the years of -- that I have, 2019 to 2022, and they're

8  reviewed financial statements by the firm of Soren McAdams.

9  Q    Would it be possible to obtain copies of those?

10  A    I would defer to counsel to answer that question.

11           MR. MARTICELLO:  What was the -- I'm sorry.  What

12  was the request?

13           THE WITNESS:  For the (indiscernible) 2022, Ms.

14  Soren McAdam --

15           MS. PINO:  For the -- the reviewed financial

16  statements for 2019 through 2022 inclusive.

17           MR. MARTICELLO:  I'm going to discuss with the --

18  with Mr. Weiss after the 341(a), and I'll circle back with

19  you on that.  I mean, my thinking is I don't have an issue

20  with it and -- but I do want to review what we're providing

21  before we provide it.

22  BY MS. PINO:

23  Q    Sitting here today, Mr. Weiss, do you have any

24  understanding why the loan from the Debtor to Phoenix

25  Traffic Management was not documented by a note?

47

1  A    I don't know.

2  Q    Have you ever asked?

3  A    They just didn't document it, yeah.

4  Q    And sitting here today, do you know why a portion of

5  the loan from -- from the Debtor to Mulberries (phonetic)

6  Waterman Properties, LLC was not documented?

7  A    No.

8  Q    Have you asked?

9  A    Yes.  They hadn't documented it.  That was it.

10 Q    And who did you ask?

11 A    It would have been Rubin Sanos.

12 Q    And who in management of the Debtor would have been

13 responsible for documenting that loan?

14     MR. MARTICELLO:  I'll object to the extent that

15 Mr. Weiss lacks personal knowledge because these

16 transactions happened before he was an officer of the

17 company.

18     But you can ask -- answer to the extent you know.

19     THE WITNESS:  It would have been management

20 directing its, you know, probably legal counsel to draft

21 those documents.

22     MS. PINO:  I have no further questions.  And I

23 just want to make sure that my requests for documents is --

24 I'd like the financial statements provided by Waterman

25 Mowbray Properties, LLC.  For the Phoenix Traffic and the

48

1 reviewed financial statements for the Debtor which were

2 referenced by Mr. Weiss, which I believe, for 2019, 2020,

3 '21 and 2022.

4          And I also need the names and -- of the attorney

5 and the firm for Waterman -- Mowbray Waterman Property, LLC.

6          TRUSTEE MISKEN:  Okay.  Is there anybody else on

7 the phone that has not asked any questions yet that would

8 like to ask questions?

9          MR. BODIE:  Mr. Misken, this is Attorney Brett

10 Bodie.  I would (indiscernible) --

11          TRUSTEE MISKEN:  I will get back to you in a

12 second.

13          MR. BODIE:  -- (indiscernible).

14          TRUSTEE MISKEN:  I'll get back to you.  I was just

15 asking if there's anybody who has not asked questions that

16 wants to ask questions.

17          Okay.  Not hearing any, Mr. Bodie, do you have any

18 -- I'll give you five minutes to ask any follow-up

19 questions.

20          MR. BODIE:  Thank you.  I just have one follow-up

21 question.

22          TRUSTEE MISKEN:  Okay.

23 BY MR. BODIE:

24 Q    Does Mowbray Waterman Property, LLC own any property

25 that you know of that was not purchased by the Debtor or --

49

1  and/or Richard or Robin Mowbray?

2          MR. MARTICELLO:  Well, I'll object to the extent

3  it's repetitive of information contained in the memo.

4          But, Mr. Weiss, you can answer to the extent you

5  know.

6          THE WITNESS:  Yes.  If I understand your question

7  in -- whether or not Mowbray's purchased Waterman's

8  property, right?

9  BY MR. BODIE:

10 Q    Well, I'm asking, does Mowbray Waterman own any

11 properties not purchased by the Debtor?  Like, in other

12 words, are there other -- any other investors that, you

13 know, put money into properties of Mowbray Waterman or is it

14 all from the Debtor?

15         MR. MARTICELLO:  Vague, like multiple questions

16 and --

17         THE WITNESS:  Yeah.

18         MR. MARTICELLO:  -- it's a little vague and

19 compound.  And same objection with respect to -- to the

20 extent it's already answered in the memo we provided.

21         THE WITNESS:  Yeah.  I'm having a hard time

22 understanding the question, because you're saying that it's

23 -- something about tying the Mowbray (indiscernible) --

24 BY MR. BODIE:

25 Q    Does Mowbray -- does Mowbray Waterman Property own any

50

1  real estate that were not purchased by the Debtor?

2          MR. MARTICELLO:  Same objection.

3          THE WITNESS:  It -- I don't understand your

4  question, because you're saying, does Mowbray Waterman own

5  any property that wasn't purchased by the Debtor.  They both

6  can't own the property.

7          TRUSTEE MISKEN:  So let -- maybe ask it this way.

8          THE WITNESS:  (Indiscernible) they both don't own

9  it.

10 BY TRUSTEE MISKEN:

11 Q    What properties does Mowbray Waterman Property own?

12 A    So, if we want to turn back to the memo that we

13 provided, they are listed on the -- on page five and Roman

14 Numeral II.  I think we've already gone through this.

15 Q    And there's no other properties that Mowbray Waterman

16 Property owns, correct?

17         MR. MARTICELLO:  I'll -- well, go ahead.

18         THE WITNESS:  Yeah.  Not that I'm aware, but

19 again, I'm not -- I'm not an officer or director or have,

20 you know, first-hand knowledge of the affairs of Mowbray

21 Waterman Property.

22 BY MR. BODIE:

23 Q    You're -- what I was asking is, are you aware of any

24 investors in those purchases other than Mowbray, the Debtor?

25         MR. MARTICELLO:  Same objection.  Assumes facts

51

1  not in evidence.  And objection with respect to -- to the

2  extent that Mr. Weiss lacks personal knowledge about these

3  transactions.

4           THE WITNESS:  Yeah.  I don't have personal

5  knowledge.

6  BY MR. BODIE:

7  Q    So you're saying you don't know?

8           MR. MARTICELLO:  Asked and answered.  Same

9  objection.

10           MR. BODIE:  Okay.  Thank you.

11           TRUSTEE MISKEN:  Was that all, Mr. Bodie?

12           MR. BODIE:  That's all I have.

13           TRUSTEE MISKEN:  Okay.  Thank you.

14           Mr. Canzarite (phonetic), do you have any follow-

15  up questions?

16           MR. CATANZARITE:  I do not, other than to ask Mr.

17  Monticello (phonetic) if he would be kind enough to send me

18  the same documents he's sending to any of the other

19  attorneys who've requested documentation from the first and

20  second -- this second session 341(a).

21           TRUSTEE MISKEN:  Yeah.  I would just ask Mr.

22  Marticello if you could just send it to everybody who you

23  sent the letter to, whoever was on that, I'd appreciate it.

24           MR. MARTICELLO:  Yeah.  I mean, to the extent I

25  provide information in response to those requests, I will --

52

1  I will --

2           TRUSTEE MISKEN:  Yeah.

3           MR. MARTICELLO:  -- send it to everyone on that e-

4  mail.

5           TRUSTEE MISKEN:  Appreciate that.

6           Ms. Pino, did you have any follow-up questions?

7           MS. PINO:  I did.  Thank you very much, sir.

8           TRUSTEE MISKEN:  You have the floor.

9  BY MS. PINO:

10  Q    Mr. Weiss, this is kind of a different take on the

11  questions asked by Mr. Brodie.  Have you determined whether

12  Mowbray Waterman Properties, LLC has any creditors other

13  than the Debtor?

14  A    Again, I'm not privy to the detailed financial

15  information, do I don't know.

16           MR. MARTICELLO:  I mean, Mr. Catanzarite --

17  BY MS. PINO:

18  Q    I thought you had them provide it?  I thought you had

19  them provide it --

20  A    Well, again, within financial statements there are --

21  you know, the summary financial statements that I received,

22  but there's also -- there might be details behind those

23  financial statements.  So, for example, with respect to

24  liability, there would be -- you know, there could be trace

25  payables, and I haven't reviewed that list of trace payables

53

1  that may -- may or may not consist of other liability.

2          MR. MARTICELLO:  And, Ms. Pino, the Feuer

3  (phonetic) Bank is listed in the memo as a creditor of

4  Mowbray Waterman.  Mr. Catanzarite's client has litigation

5  against Mowbray Waterman that it's defending.  So there are

6  two creditors there.

7  BY MS. PINO:

8  Q    And have you requested the details for the liabilities

9  of Mowbray Waterman Properties, LLC?

10 A    No.

11 Q    Are you aware if Phoenix Traffic has creditors other

12 than the Debtor?

13 A    Same response as given with respect to Mowbray Waterman

14 Properties.  I haven't looked at the detail.

15 Q    With regard to Phoenix Traffic, have you asked for the

16 detail?

17 A    No.

18          MS. PINO:  That's it.  Thank you.

19          TRUSTEE MISKEN:  Okay.  Thank you, Ms. Pino.

20          Okay.  Anybody else have any questions?

21          MR. BODIE:  This is -- yeah, this is Brett Bodie.

22 This isn't a direct question for the Debtor's

23 representative, it's more for Mr. Marticello just for

24 service reasons.

25          Do you know if Phoenix and Pino have counsel?  You

54

1  said Mr. Zur for Mowbray Waterman, but I was wondering if

2  they have counsel, and, if so, if you know who they are, so

3  we know who have to contact.

4          MR. MARTICELLO:  So for Waterman it's Roye Zur.  I

5  believe he's being retained for Phoenix Traffic Management

6  as well.  Pino Tree Service I'm not aware of any counsel.  I

7  mean, to the extent you requested information for Pino, I am

8  handling that request.

9          MR. BODIE:  Okay.

10         MR. MARTICELLO:  To the extent there's been

11 requested information from Phoenix and Waterman, I am

12 discussing those requests with its counsel.

13         MR. BODIE:  Okay.  Thanks.  Understood.

14         TRUSTEE MISKEN:  Okay.  Any further --

15         MR. BODIE:  That's all I have.

16         TRUSTEE MISKEN:  -- any further questions?  Okay.

17 Not hearing any, I do want to thank everybody for your time.

18 I am going to go ahead and conclude the 341 meeting.  You

19 know, good luck to the reorganization and good luck to the

20 parties-in-interest on the phone as well.  Thank you, all,

21 and have a great day.

22         ALL PARTIES:  Thank you.

23     (Proceedings concluded.)

24

25

55

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/ Holly Steinhauer          1-23-25
     Transcriber                   Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25