# Exhibit 18

**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello, State Bar No. 244256
*rmarticello@raineslaw.com*
Michael L. Simon, State Bar No. 300822
*msimon@raineslaw.com*
3200 Park Center Drive, Suite 250
Costa Mesa, CA 92626
Telephone:     (310) 440-4100
Facsimile:     (310) 499-4877

Proposed Counsel for The Original Mowbray's Tree
Service, Inc., Debtor and Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No: 8:24-bk-12674-TA |
| THE ORIGINAL MOWBRAY'S TREE SERVICE, INC., | Chapter 11 |
| | **DECLARATION OF RUBEN SAINOS IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS** |
| Debtor and Debtor-in-Possession. | |

I, Ruben Sainos, hereby declare under penalty of perjury as follows:

1.     I am the Chief Financial Officer ("**CFO**") of The Original Mowbray's Tree Service, Inc. ("**Mowbray**" or "**Debtor**"), the debtor and debtor in possession in the above-captioned chapter 11 case (the "**Case**" or "**Chapter 11 Case**").  I have served in such capacity since October 2023.

2.     I am over the age of eighteen and authorized to submit this declaration (the "**Declaration**") on behalf of the Debtor, and if called on to testify, I could and would testify competently to the facts set forth in this Declaration.

3.     In my capacity as CFO for the Debtor, I submit this Declaration in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on October 18, 2024 (the "**Petition Date**") and the relief requested

1

pursuant to the Debtor's applications and motions filed contemporaneously herewith.

4.  I have a Master's in Business Administration (MBA), and a Bachelor of Science (BS) in Accounting, and have served in senior financial and accounting positions, including Controller, Director of Finance, Vice President of Finance, and Chief Financial Officer, for various businesses for over twenty (20) years.  Since joining Mowbray's, I have been very involved in its business affairs, financial affairs, and efforts to restructure its operations. Among other responsibilities, I was retained by Mowbray's to assist with its effort to downsize its operations as discussed below.  As a result, I am familiar with the Debtor's operations, business affairs, books and records, and circumstances leading to the filing of the Case. Except as otherwise indicated herein, all facts set forth in this Declaration are based on (a) my personal knowledge of the Debtor's operations and finances, and/or my review of the Debtor's books and records, or relevant documents, (b) information I received from the Debtor's management team and its advisors, and/or (c) my opinion based upon my experience.

## I.  **INTRODUCTION**

5.  The Debtor is a family-owned and operated business with over 50 years of experience in the vegetation management industry.  The Debtor provides vegetation management services, primarily, to utilities, cooperatives, and governmental agency clientele. The Debtor's services include mitigating vegetation hazards and providing quick responses to remedy wildfire or storm damage or other emergencies arising from natural disasters.  The Debtor provides important emergency-response services to communities throughout the United States including related to the recent hurricanes in the Southeast.  The Debtor has recently deployed crews and equipment to both Florida and North Carolina to assist with the disaster relief efforts in response to Tropical Storm Helene and Hurricane Milton.  This includes work for FEMA pursuant to the emergency declarations issued by President Joseph R. Biden.

6.  As more fully explained below, the Debtor has faced significant financial challenges since 2021, including the loss of two large clients, PG&E and Southern California Edison ("**SCE**"), and, as a result, its accounts receivable have declined.  However, the Debtor,

FIRST-DAY DECLARATION

10393126.1

led by its new management team, has worked hard to substantially scale-back expenses and reach agreements with its major creditors to restructure its operations outside of court. In its endeavors to right size its business, the Debtor has received support from many vendors, lenders, and leasing partners. The Debtor has made significant progress pre-petition, including by markedly improved its cash flow.

7.    However, despite the progress to date, the Debtor is still facing financial challenges. The maturity date on the debt owed by the Debtor to its bank—PNC Bank—is fast approaching (December 31, 2024). The Debtor has significant outstanding obligations tied to leased equipment due to the scope of its business in prior years. In addition, the Debtor continues to be hampered by litigation stemming from operations while the Debtor was under prior leadership. This includes the recent verdict in the Rodriguez Matter (defined below) that far exceeds the Debtor's financial capacity to pay. While, as discussed below, the Debtor intends to pursue a new trial and, if needed, an appeal, the Debtor cannot risk the disruption of its operations, the loss of jobs, and the improper disparate treatment of creditors that may result from judgment enforcement efforts. A second lawsuit—commenced by the Debtor's prior CEO—is scheduled to start trial shortly. The Debtor was compelled to file this Case to protect its business and to preserve jobs and the value of its estate for all stakeholders, while restructuring the Debtor's legitimate obligations in an orderly and fair and equitable manner.

8.    The Debtor's efforts are focused on continuing the process it began pre-petition to reduce expenses and strengthen its go-forward business operations. The Debtor will continue to provide critical vegetation management services and intends to promptly confirm a plan of reorganization that preserves its revenue-generating operations, saves nearly 200 jobs, maximizes value for the estate, and ensures that all stakeholders receive fair and equitable treatment. To this end, the Debtor will continue its efforts with creditors to resolve disputes consensually where possible within the Debtor's financial ability to pay as it moves towards plan confirmation.

10393126.1

## II.    <u>BACKGROUND OF DEBTOR</u>

### A.    **Brief History of Debtor**

9.      Established in 1972 by Gloria and John Mowbray (the "**Founders**"), Mowbray's (dba Mowbray's Tree Service) has been a cornerstone in California providing vegetation management services for over 50 years.  Mowbray's began as a modest venture and has grown into a resilient company, dedicated to safeguarding communities and the environment.  Mowbray's continues to be a family-owned and operated business, is a member of WMBE (Women and Minority Business Enterprise), and is committed to providing its clients with the safest and most efficient solutions to their vegetation management needs.

10.     John Mowbray suffered a catastrophic brain injury on the job in 1993, leaving him incapacitated.  Gloria Mowbray stepped up to manage the business while also caring for John and raising four children on her own.  Gloria Mowbray passed away in April 2021. Gloria Mowbray was the sole shareholder of Mowbray's from 1993 until her passing, at which time Robin Mowbray, her daughter, became the sole shareholder of Mowbray's.

11.     The Debtor is based in California and provides services throughout the state. The Debtor also provides services and has an equipment yard in Ft. White, Florida.  The Debtor's work outside of California has recently expanded in magnitude and scope due to the disaster relief efforts in response to Tropical Storm Helene and Hurricane Milton.  The Debtor's services in Florida have increased and the Debtor has recently begun providing services in North Carolina as well.  The Debtor has mobilized multiple trucks and crews for FEMA in both North Carolina and Florida.

12.     The services provided by the Debtor include, without limitation, manual and mechanical tree clearing, integrated vegetation management, storm and emergency right-of-away maintenance, high-hazard tree removal and crane services, and natural disaster caused damage remediation (collectively, "**Vegetation Management Services**").  Tree-trimming around power lines, clearing vegetation to prevent forest fires, removal of debris and charred remains after major wildfires in California, and assisting with damage remediation in response to hurricanes—these are the types of important services that the Debtor provides to the

4

10393126.1

communities in which it serves.  Historically, utility companies have been the Debtor's primary

clients, including California's largest energy utility, PG&E as well as SCE.  The Debtor also

provides services to governmental agencies, like FEMA, and cooperatives.

13.     By 2021, in response to California's unprecedented wildfire challenges, the

Debtor expanded significantly, employing over 1,300 professionals and managing an

additional 500 subcontractors.  This period marked the Debtor's peak in operational capacity

and industry presence.  At that time, the Debtor had more than three times the amount of

equipment than it has today.  However, 2022 brought significant challenges.  The bankruptcy

of PG&E, a major client, led to delayed payments to the Debtor.  In addition, PG&E used the

bankruptcy to renegotiate the Debtor's contract to a lower price causing severe financial strain.

For these reasons, the Debtor made the difficult decision to terminate its contract with PG&E.

14.     Towards the end of 2023, another blow came when the Debtor underbid for

SCE's vegetation management contract, resulting in a substantial loss of revenue for 2024.

The business of SCE has become so competitive that winning SCE's contracts required

aggressive pricing that was not profitable for the Debtor.  As such, the silver lining of not

winning SCE's contract may be a net gain to the Debtor's bottom line.  The loss of PG&E and

SCE left the Debtor grappling with managing the cost of the payroll and excess equipment

necessary for servicing the large contracts of these former clients.

15.     The Debtor has one wholly-owned subsidiary, Pinos Tree Service Inc. ("**PTS**").

The Debtor purchased PTS in July 2022 from Jacobus Pino, who remains the CEO.  Formerly

headquartered in Idyllwild, California, PTS also provides Vegetation Management Services.

Prior to the acquisition by the Debtor, PTS primarily served as a subcontractor for the Debtor

and other prime contractors.  While PTS was not initially cash flow positive, its profitability

has improved.  PTS was able to secure SCE vegetation management contracts for 2024 for

certain geographic regions, including regions that the Debtor did not win.  As reflected in the

Budget (as defined below), the Debtor receives certain revenues from PTS, *e.g.*, management

fees for business administrative services, rent for use of the Debtor's equipment in servicing

PTS's contracts, and repayments of a credit line made available by the Debtor to assist PTS

1   with its operations and capital needs.  Only Mowbray's has filed for bankruptcy protection;

2   PTS has not.

3         **B.**    **Current Operations**

4         16.    As discussed above, the Debtor is currently owned by Robin Mowbray, the

5   youngest daughter of the Founders.  Since Gloria's passing in 2021, Robin has been the

6   Chairwoman of the Debtor's Board.  Richard Mowbray (grandson of the Founders) has been

7   the Debtor's Chief Executive Officer since late 2020.  I have served as the Debtor's CFO for

8   one year.  Prior to the Petition Date, the Debtor retained Brian Weiss of Force Ten Partners,

9   LLC, as its Chief Restructuring Officer ("**CRO**"), to lead the Debtor through its formal

10  restructuring process, including this Case.

11        17.    To perform the Vegetation Management Services, the Debtor owns and leases

12  substantial equipment including specialized tree care equipment, such as a fleet of 75-ft. aerial

13  lift trucks, cranes, spider lifts, and grapple trucks, as well as advanced mechanized equipment

14  for hazardous tree removal and other forestry trucks and equipment (collectively, the

15  "**Equipment**").  Examples of the Debtor's equipment and the services it provides can be seen

16  here: https://www.mowbrays.com/about-us/equipment/ and

17  https://www.mowbrays.com/mowbrays-in-action/.  The Debtor's unparalleled experience and

18  top-of-the-line Equipment allows it to provide superior productivity while prioritizing human

19  safety by providing a safer working environment for its operators regardless of the size or

20  location of the trees.

21        18.    The Debtor owns three parcels of real property located in San Bernardino,

22  California.  The Debtor also leases 11 properties (10 in California and 1 in Florida).  The

23  Debtor's leased real property is comprised of office space in California and yards upon which

24  the Equipment is stored and maintained.  As discussed below, certain of the Debtor's leases are

25  with affiliates.

26        19.    As of the Petition Date, the Debtor has nearly 200 employees on a full-time or

27  part-time basis (the "**Employees**").  Approximately 61% of the Employees are represented by

28  either Local Union 47 of the International Brotherhood of Electrical Workers, AFL-CIO

("**Union 47**"), or Local Union 1245 of the International Brotherhood of Electrical Workers, AFL-CIO ("**Union 1245**, " and together with Union 47, the "**Unions**").  The Unions are each subject to a collective bargaining agreement entered into as of June 1, 2022, and expiring on September 30, 2027 (each a "**CBA**", and together, the "**CBAs**").  The Unions represent Employees of the Debtor regularly employed in California performing line clearance tree trimming and vegetation control on certain property located in Southern California (Union 47) or Northern California (Union 1245), and, in each case, excluding office clerical employees, guards, and supervisors.  The remaining Employees (including all the Employees in Florida) are not represented by the Unions.  Many of the Employees are certified arborists and highly trained professionals experienced with Equipment operations and mitigating vegetation and tree removal risks.

20.     In addition to the Employees, the Debtor regularly utilizes the services of independent contractors or temporary personnel (collectively, "**Independent Contractors**"). The Independent Contractors provide services under contract with the Debtor related to logistics, tree trimming for special projects, and other services to fulfill various ordinary course operational needs.

**C.     Intercompany Transactions**

21.     The Debtor leases its current headquarters, an equipment yard, and a parking yard from an affiliated entity, Mowbray's Waterman Property, LLC ("**MWP**").  An affiliate of the Debtor, Phoenix Traffic Management, LLC ("**PTM**"), provides traffic control and safety services to the Debtor and PTS, as needed, in connection with their respective vegetation management jobs.  The Debtor leases trucks or other equipment to PTS and PTM.  The Debtor provides the following services and support to PTS and PTM:

a.     The Debtor manages the business affairs of PTS in exchange for a monthly management fee;

b.     The Debtor leases trucks and other equipment to PTS and PTM and provides supplies and parts to PTS and PTM;

c.     The Debtor's health insurance plan covers PTS's employees and PTS

10393126.1

reimburses the Debtor for its share; and

d.    The Debtor provides PTS and PTM with other miscellaneous services, such as, fleet maintenance, vehicle repair, and office IT related services.

22.    The Debtor reflects intercompany transactions as journal entry receivables or payables in the respective entities' accounting ledgers, as applicable.  If and to the extent that, historically, an affiliate lacked the cash to pay a particular expense, it was booked as a loan by the Debtor to such affiliate.  All intercompany cash transfers are tracked in the respective entity's accounting ledger and are reconciled on a monthly basis and, therefore, the Debtor can ascertain, trace, and account for intercompany transfers.  The Debtor intends to account for all post-petition transactions with affiliates in accordance with past historical practice.  The intercompany transactions discussed herein are an essential component of the Debtor's operations and cash flow.  As reflected in the Budget, the Debtor is paid weekly by PTS for the services discussed above and in repayment of the line of credit by the Debtor to PTS.  To the extent that such intercompany transactions are to continue post-petition in the ordinary course, they are included in the Budget and are being paid for in cash.

D.    **Prepetition Liabilities**

23.    As discussed below, the Debtor's prepetition liabilities generally consist of: (i) outstanding borrowings under a $20 million revolving credit facility from PNC Bank; (ii) operating lease and capital lease obligations for the Equipment; (iii) trade debt to vendors and other counterparties incurred in the ordinary course of operations; and (iv) general litigation claims (including those currently in litigation or subject to settlements).  Each category of liabilities is discussed in more detail below.

i.    **Borrowings**

24.    In 2022, the Debtor obtained financing from PNC Bank ("**PNC**") pursuant to a loan agreement dated October 28, 2022 (the "**PNC Loan**").  The PNC Loan provided for, among other things, a revolving line of credit not to exceed $20,000,000 and letters of credit not to exceed $5,000,000.  As of the Petition Date, the outstanding balance of the PNC Loan was approximately $7,038,514.41.  To my knowledge, the PNC Loan is secured by liens on all

8

or substantially all of the Debtor's assets (excluding real property owned by the Debtor).  To facilitate the PNC Loan to the Debtor, the Debtor's obligations under the PNC Loan were guaranteed by Robin Mowbray and MWP (an entity she owns).  The guaranty from MWP to PNC is secured by certain of its real property.

### ii.      Lease Obligations

25.      Due to the nature of the Debtor's business, the Debtor has substantial operating and capital lease obligations.  All or substantially all of the Debtor's Equipment is leased or subject to capital lease obligations with several lessors.  The Debtor's capital lease obligations are secured by the corresponding Equipment.  Altec Capital Services, LLC ("**Altec**"), and Bank of America ("**BOA**") are the largest and second largest lessor of Equipment to the Debtor, respectively.  The Debtor is a party to approximately 200 equipment lease agreements with Altec ("**Altec Lease Agreements**").  Most (if not all) of Altec Lease Agreements are for a term of seventy-two (72) months and cover one to three items of Equipment.  Prepetition, the Debtor paid approximately $430,000 per month to Altec under the Altec Lease Agreements.

26.      The Debtor is a party to that certain Master Lease Agreement, dated as of June 20, 2017, with BOA (collectively with all amendments and Schedules thereto, the "**MLA**").  BOA asserts that approximately $8.9 million is owing, including approximately $3.6 million in past due rent, and $177,135 in late fees (the "**BOA Obligation**").  The Debtor was in forbearance discussions with BOA prior to the filing of the Case and the Debtor intends to continue in its discussions with BOA in order to reach a consensual resolution pursuant to a plan.  The Debtor has approximately six other Equipment lessors in addition to BOA and Altec.

### iii.      Trade Debt

27.      The Debtor has various unsecured liabilities incurred in the ordinary course of operations.  In addition to the lease obligations discussed above, the Debtor's unsecured trade liabilities include liabilities for fuel, insurance premium financing, credit cards, utilities, and suppliers of parts among other ordinary course obligations.  The Debtor has attempted to stay relatively current on its day-to-day operating expenses.  As such, the Debtor's general

1    unsecured debt is a relatively small component of its outstanding obligations.

2         **iv.     Litigation**

3         28.     Lawsuits related to property damage or personal injury are not uncommon in

4    the vegetation management industry.  In addition, like many California employers, the Debtor,

5    from time to time, is subject to claims from employees on various grounds.  Further, the

6    expansion of the Debtor's operations under prior management led to increased litigation

7    exposure.  The Debtor is subject to a number of disputed, unliquidated, and contingent claims

8    tied to pending litigation.  The Debtor lacks the resources to defend the pending litigation and

9    certain matters present a risk of an adverse judgment that could significantly exceed the

10    Debtor's ability to pay and, as a result, could cripple the Debtor's operations entirely, making it

11    impossible to sustain business activities.  The discussion that follows is not an exhaustive

12    discussion of the Debtor's pending litigation but summarizes two of the more pressing matters

13    as of the Petition Date.

14         29.     One example of the pending litigation facing the Debtor is the matter of *Jaime*

15    *Rodriguez, et al. v. The Original Mowbray's Tree Service, Inc., et al.* (San Bernardino County

16    Superior Court Case Number CIVDS2003809) (the "**Rodriguez Matter**").  In December

17    2019, Mr. Rodriguez and Ms. Gomez (together the "**Rodriguez Plaintiffs**") were struck by a

18    vehicle driven by an employee of the Debtor outside of his working hours, who, without

19    authorization, accessed and drove one of the Debtor's vehicles while intoxicated causing a

20    vehicle collision that injured the Rodriguez Plaintiffs.  The Rodriguez Plaintiffs alleged,

21    among other things, that the Debtor negligently hired, retained, and failed to properly

22    supervise such employee.  On July 16, 2024, the jury returned a verdict awarding the

23    Rodriguez Plaintiffs damages of nearly $84 million, comprised of approximately $34.8 million

24    in compensatory damages and $49 million in punitive damages (the "**Rodriguez Verdict**").

25         30.     While the Debtor is truly sympathetic to the harm caused to the Rodriguez

26    Plaintiffs, it disputes liability and believes that there were numerous errors at trial and that the

27    record is replete with issues.  For example, during the trial, the Rodriguez Plaintiffs' attorney

28    posted on social media evidence that the trial court excluded.  The Debtor's oral motion for a

mistrial on this basis (made during the trial) was denied.  In addition, the damage award is grossly excessive based on the evidence offered at trial.  The Debtor intends to move for a new trial and, if necessary, will pursue an appeal of any adverse judgment.

31.     Prior to the conclusion of the trial, the Debtor attempted to reach a settlement with the Rodriguez Plaintiffs in good faith and within the Debtor's financial wherewithal.  However, the Debtor's offers were summarily rejected.

32.     The Debtor objected to the form of the proposed judgment and a status conference is set in the Rodriguez Matter on December 3, 2024.

33.     Another example is the matter of *Ronnie D. Jordan v. The Original Mowbray's Tree Service, Inc., et al*. (San Bernardino County Superior Court Case Number CIVSB2201281 ) (the "**Jordan Matter**").  Mr. Jordan was the CEO of the Debtor from May 2018 to November or December 2020 and the Debtor terminated Mr. Jordan's employment on January 7, 2022.  Mr. Jordan sued the Debtor asserting, among other things, that he is entitled to $7.2 million to $15.2 million in compensation pursuant to alleged enforceable written and oral agreements.  The Debtor disputes the amount owed, including due to Mr. Jordan's conduct while serving as the CEO of the Debtor and the resulting damage to the Debtor.  A mandatory settlement conference occurred on September 6, 2024.  The Debtor attended this conference with its restructuring professionals.  While the Debtor tried in good faith to settle this matter (at the settlement conference and thereafter), a settlement has not been reached.  The trial readiness conference was held on October 17, 2024 and the trial is set to start on October 21, 2024.  In light of the other financial difficulties discussed herein, the Debtor does not believe incurring the significant cost of a trial with Mr. Jordan is warranted.

### E.     The Debtor's Efforts to Right-Size Operations

34.     In light of the financial difficulties facing the Debtor, the Debtor has undertaken several strategic actions to right-size operations consistent with its reduced revenue, including, among other things: (a) in 2023, hiring me, a seasoned financial professional with extensive experience in operations and financial distress to stabilize the Debtor's financial health, as CFO; (b) implementing a salary reduction for all non-union

personnel; (c) conducting systematic layoffs of hundreds of employees to streamline operations and reduce costs; (d) renegotiating contracts and suspending unnecessary services and expenses; (e) returning or selling leased equipment to reduce liabilities with the support of the Debtor's leasing partners; and (f) negotiating forbearance or other agreements with lenders and lessors.

35.     The Debtor has worked hard with its major creditors to reach consensual arrangements where possible.  This includes the forbearance with PNC discussed in further detail below.  The Debtor has, with the consent of Altec, BOA**,** and other leasing companies, sold certain of its leased equipment.  Generally, in my dealings, the Debtor's vendors, lessors and lenders have been supportive of the Debtor's efforts.

36.     The Debtor's efforts to restructure and strengthen its business includes the restructuring of its management.  Robin Mowbray, who has been employed by Mowbray's since 2003, stepped up from Human Resources to Chairwoman in 2021, Richard Mowbray was promoted to CEO in late 2020 (to take the place of Mr. Jordan), and, in October 2023, I was hired as CFO, to analyze the Debtor's financials and strengthen the Debtor's balance sheet.

### III.     EVENTS LEADING UP TO THIS CASE

37.     The Debtor experienced a substantial decline in revenue over the past four years, primarily due to the loss of key utility customers (PG&E and SCE).

38.     The Debtor's gross revenues and net income or loss on such revenues from 2020 to 2024 are as follows:

| Year | Gross Revenue | Net Income/(Loss) |
|---|---|---|
| 2020 | $471 million | 69.2 million |
| 2021 | $281.9 million | 24.6 million |
| 2022 | $232 million | ($34 million) |
| 2023 | $127 million | ($28.9 million) |
| 2024[1] | $28.7 million | $2.0 million |

---

[1]   YTD August 31, 2024.

FIRST-DAY DECLARATION

10393126.1

39.      As can be seen from the foregoing, the Debtor incurred substantial net losses in 2022 and 2023.  However, with my assistance and the hard work of the Debtor's management, the Debtor's profitability has improved in 2024 despite the loss of significant revenue.  The figures for 2023 and 2024 are preliminary figures, subject to CPA review and revision.

40.      In 2022, the Debtor was in default under the PNC Loan.  As part of its efforts to resolve its financial difficulties outside of court, the Debtor reached a forbearance agreement with PNC (the "**Forbearance Agreement**").  The Forbearance Agreement was negotiated over an extended period of time.  The negotiation of the Forbearance Agreement was part of the Debtor's prepetition efforts to avoid a bankruptcy filing.  Under the terms of the Forbearance Agreement, the maturity date was extended to December 31, 2024.  The Forbearance Agreement required certain interim payments to PNC, all of which the Debtor timely made.

41.      Through the efforts set forth above, the Debtor has made substantial progress downsizing its operations and improving its cash flow pre-petition.  It was possible that, due to consensual arrangements reached or being negotiated by the Debtor with its creditors, the Debtor could avoid bankruptcy (at least at this time).  However, Mowbray's is still carrying debt of the much larger company it once was.  The extended maturity date for the PNC Loan was fast approaching and the filing of the Case will provide an opportunity for further structured negotiations with PNC related thereto.  The pending litigation has been a drain on resources and would continue to be.  Moreover, the Debtor lacks the assets or liquidity to satisfy the Rodriguez Verdict (should it stand) and any attempt to collect a judgment based on the Rodriguez Verdict (while the Debtor pursues a new trial or an appeal) would be severely disruptive to the Debtor's operations.  The Debtor cannot expose its employees to a loss of jobs or the communities it serves to a loss of services, particularly the emergency services Mowbray's provides after natural disasters, such as, fires and hurricanes.

42.      The Debtor filed this Case to preserve its operations and nearly 200 jobs, maximize value for the estate and all stakeholders, continue the Debtor's efforts to right size its operations and work towards a more financially stable future, and to address its legitimate

obligations in an orderly and fair and equitable manner through a chapter 11 plan.

43.     A true and correct copy of the Debtor's 13-week cash budget is annexed hereto as **Exhibit 1** (the "**Budget**").  I prepared the Budget with the assistance of the Debtor's CRO and restructuring professionals.  In my opinion, the Budget is reasonable based on the Debtor's actual pre-petition income and expenses.  The Debtor's projected revenues are based on the Debtor's recent historical trends adjusted based on the expectations of Debtor's management, including a recently awarded contract.  The Debtor's projected expenses are similarly based on the Debtor's recent historical expense trends and future expected costs.  As set forth in the Budget, the Debtor is projected to operate on a cumulative cash flow positive basis after operations, financing (inclusive of payments to PNC and other secured creditors), and professional fees over the next thirteen weeks.  The Debtor projects an ending cash balance over such thirteen-week period of $4,670,159 (including after restructuring costs).  Thus, with restructuring costs, the Debtor is projected to largely break even over the next thirteen weeks with a small increase in cash as set forth in the Budget.

## IV.     THE FIRST DAY MOTIONS

44.     Contemporaneously with the filing of this Declaration, the Debtor has filed or will file the motions specified below (collectively, the "**First Day Motions**") to minimize the disruption and adverse effects of the commencement of the Case on the Debtor's operations and to preserve value for its estate, creditors, and all stakeholders.

45.     The First Day Motions are as follows:

- Cash Management Motion - *Debtor's Emergency Motion for Order Authorizing Continued Use of Debtor's Bank Accounts and Cash Management System to the Extent Set Forth Herein.*

- Cash Collateral Motion - *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral.*

- Wage Motion: *Debtor's Emergency Motion for Entry of Order Authorizing Payment of Certain Pre-Petition Employee-Related Claims and Granting*

14

*Related Relief.*

- <u>Utility Motion</u>: *Debtor's Emergency Motion for Order: (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (B) Deeming Utilities Adequately Assured of Future Performance; and (C) Establishing Procedures For Determining Adequate Assurance of Payment Under 11 U.S.C. § 366.*

- <u>Insurance Motion</u>: *Debtor's Emergency Motion for Order Authorizing Debtor to Continue Insurance Programs, Honor Terms of Premium Financing Agreements, Satisfy Related Prepetition Obligations and Granting Related Relief.*

46.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto), and the facts set forth in the First Day Motions are incorporated herein by reference.  To the best of my knowledge, the facts set forth in each of the First Day Motions are true and correct.  If called upon to testify, I could and would testify competently to the facts set forth in each of the First Day Motions.

47.     As described in the First Day Motions, I believe that the Debtor's requests for relief are narrowly tailored, are necessary to avoid irreparable harm pending a final hearing, and are essential to avoid uncertainty and to allow the Debtor to operate without disruptions, as well as to preserve the value of the Debtor's estate, and are in the best interests of the Debtor's estate, creditors, and other stakeholders.

48.     For the reasons described herein and in the First Day Motions, I believe that the relief requested in the Motions should be granted by the Court, with such other and further relief for the Debtor as the Court deems just and proper, in the most expeditious manner possible.

///

///

///

FIRST-DAY DECLARATION

10393126.1

1        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

2   true and correct to the best of my knowledge and belief.

3

4   Executed on: October 18, 2024          By: _____

                                             Ruben Sainos

FIRST-DAY DECLARATION

10393126.1

# EXHIBIT "1"

| The Original Mowbray's Tree Service Inc. Weekly Cash Flow | Week 1 Ended 10/25/2024 | Week 2 Ended 11/1/2024 | Week 3 Ended 11/8/2024 | Week 4 Ended 11/15/2024 | Week 5 Ended 11/22/2024 | Week 6 Ended 11/29/2024 | Week 7 Ended 12/6/2024 | Week 8 Ended 12/13/2024 | Week 9 Ended 12/20/2024 | Week 10 Ended 12/27/2024 | Week 11 Ended 1/3/2025 | Week 12 Ended 1/10/2025 | Week 13 Ended 1/17/2025 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Collections | 673,000 | 923,000 | 573,000 | 573,000 | 573,000 | 573,000 | 576,000 | 576,000 | 576,000 | 576,000 | 573,000 | 573,000 | 573,000 | 7,911,000 |
| Pino Mgmt. Fees / Lease / Loan | 233,747 | 155,600 | 155,600 | 235,600 | 155,600 | 180,600 | 188,250 | 188,250 | 263,250 | 213,250 | 155,600 | 155,600 | 155,600 | 2,436,547 |
| **Total Receipts** | **906,747** | **1,078,600** | **728,600** | **808,600** | **728,600** | **753,600** | **764,250** | **764,250** | **839,250** | **789,250** | **728,600** | **728,600** | **728,600** | **10,347,547** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Salaries & Wages | 297,517 | 297,664 | 297,412 | 295,719 | 291,509 | 289,564 | 289,870 | 290,961 | 295,131 | 296,272 | 297,768 | 295,512 | 294,959 | 3,829,857 |
| Health Insurance | 66,081 | - | - | - | 66,081 | - | - | - | 66,081 | - | - | - | - | 198,243 |
| Worker's Comp | - | - | - | 241,130 | - | - | - | 185,575 | - | - | - | - | 185,833 | 612,538 |
| Union Dues | - | - | - | 417,383 | - | - | - | 321,219 | - | - | - | - | 321,667 | 1,060,269 |
| Occupancy | 5,821 | 2,661 | 3,261 | 2,345 | 2,513 | 5,936 | 3,250 | 2,339 | 2,506 | 5,929 | 3,944 | 2,267 | 2,429 | 45,202 |
| Insurance | 103,463 | 66,836 | - | - | - | 548,836 | - | - | - | 223,462 | - | - | - | 942,596 |
| Utilities | 10,285 | 9,834 | 8,797 | 8,761 | 9,265 | 9,629 | 10,099 | 10,717 | 9,395 | 8,875 | 9,399 | 9,905 | 9,332 | 124,293 |
| Repair and Maintenance | 9,103 | 8,844 | 9,269 | 8,882 | 9,018 | 7,868 | 8,170 | 7,654 | 7,659 | 8,206 | 7,612 | 7,547 | 8,086 | 107,917 |
| Office Supplies | 6,679 | 6,938 | 6,540 | 6,568 | 6,647 | 6,339 | 6,726 | 6,577 | 6,420 | 6,382 | 6,783 | 6,589 | 6,454 | 85,642 |
| Vehicles Expenses | 58,728 | 59,383 | 62,179 | 60,330 | 62,425 | 58,744 | 58,500 | 56,067 | 57,263 | 57,617 | 57,548 | 58,185 | 56,325 | 763,294 |
| OC Professionals | 5,318 | 5,398 | 5,763 | 6,206 | 3,439 | 3,367 | 3,252 | 3,502 | 3,771 | 4,061 | 3,994 | 4,245 | 4,412 | 56,726 |
| Tools and Supplies | 51,667 | 51,846 | 52,436 | 53,178 | 53,510 | 53,641 | 54,018 | 54,783 | 55,722 | 56,123 | 56,586 | 54,786 | 54,869 | 703,166 |
| Property Taxes - Real | - | - | - | - | - | - | - | 51,193 | - | - | - | - | - | 51,193 |
| Bank Expenses | - | 8,000 | - | - | - | - | 8,000 | - | - | - | 8,000 | - | - | 24,000 |
| Other | 4,895 | 4,970 | 5,065 | 5,017 | 5,172 | 5,336 | 5,198 | 4,846 | 4,870 | 4,960 | 4,772 | 4,812 | 4,878 | 64,792 |
| **Total Operating Disbursements** | **619,558** | **522,374** | **450,723** | **1,105,521** | **443,498** | **506,505** | **995,917** | **995,432** | **442,735** | **514,507** | **679,868** | **443,847** | **949,244** | **8,669,729** |
| **Operating Cash Flow** | **287,189** | **556,226** | **277,877** | **(296,921)** | **285,102** | **247,095** | **(231,667)** | **(231,182)** | **396,515** | **274,743** | **48,732** | **284,753** | **(220,644)** | **1,677,818** |
| **Cumulative Operating Cash Flow** | **287,189** | **843,415** | **1,121,292** | **824,371** | **1,109,473** | **1,356,568** | **1,124,901** | **893,719** | **1,290,233** | **1,564,977** | **1,613,709** | **1,898,462** | **1,677,818** | **1,677,818** |
| **Financing** | | | | | | | | | | | | | | |
| PNC Interest Payments | - | - | 67,940 | - | - | - | - | 67,940 | - | - | - | 67,940 | - | 203,819 |
| Equipment Loans | 17,535 | 158,424 | 26,826 | 41,348 | 14,959 | 21,638 | 153,733 | 49,227 | 21,060 | 12,987 | 158,559 | 25,127 | 43,062 | 744,487 |
| Equipment Rentals | - | 44,603 | - | - | - | - | 44,603 | - | - | - | 44,603 | - | - | 133,809 |
| **Total Financing** | **17,535** | **203,027** | **94,766** | **41,348** | **14,959** | **21,638** | **198,336** | **117,167** | **21,060** | **12,987** | **203,162** | **93,067** | **43,062** | **1,082,115** |
| **Cash Flow After Financing** | **269,654** | **353,199** | **183,111** | **(338,269)** | **270,143** | **225,456** | **(430,004)** | **(348,349)** | **375,454** | **261,756** | **(154,430)** | **191,686** | **(263,706)** | **595,703** |
| **Cumulative Cash Flow After Financing** | **269,654** | **622,853** | **805,964** | **467,696** | **737,839** | **963,295** | **533,291** | **184,943** | **560,397** | **822,153** | **667,722** | **859,408** | **595,703** | **595,703** |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| Utility Deposits | - | - | - | - | - | 115,023 | - | - | - | - | - | - | - | 115,023 |
| Force Ten Partners (CRO) | - | - | - | - | - | - | 60,000 | - | - | - | 60,000 | - | - | 120,000 |
| Raines Feldman (Debtor's Counsel) | - | - | - | - | - | - | 75,000 | - | - | - | 75,000 | - | - | 150,000 |
| Grobstein Teeple | - | - | - | - | - | - | 10,000 | - | - | - | 10,000 | - | - | 20,000 |
| **Total Restructuring Disbursements** | **-** | **-** | **-** | **-** | **-** | **115,023** | **145,000** | **-** | **-** | **-** | **145,000** | **-** | **-** | **405,023** |
| Beginning Cash Balance | 4,479,479 | 4,749,133 | 5,102,333 | 5,285,444 | 4,947,175 | 5,217,318 | 5,327,751 | 4,752,748 | 4,404,399 | 4,779,853 | 5,041,609 | 4,742,178 | 4,933,865 | 4,479,479 |
| Net Change in Cash | 269,654 | 353,199 | 183,111 | (338,269) | 270,143 | 110,433 | (575,004) | (348,349) | 375,454 | 261,756 | (299,430) | 191,686 | (263,706) | 190,680 |
| **Ending Cash Balance** | **4,749,133** | **5,102,333** | **5,285,444** | **4,947,175** | **5,217,318** | **5,327,751** | **4,752,748** | **4,404,399** | **4,779,853** | **5,041,609** | **4,742,178** | **4,933,865** | **4,670,159** | **4,670,159** |

| The Original Mowbray's Tree Service Inc. Weekly Cash Flow | Week 1 Ended 10/25/2024 | Week 2 Ended 11/1/2024 | Week 3 Ended 11/8/2024 | Week 4 Ended 11/15/2024 | Week 5 Ended 11/22/2024 | Week 6 Ended 11/29/2024 | Week 7 Ended 12/6/2024 | Week 8 Ended 12/13/2024 | Week 9 Ended 12/20/2024 | Week 10 Ended 12/27/2024 | Week 11 Ended 1/3/2025 | Week 12 Ended 1/10/2025 | Week 13 Ended 1/17/2025 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Collateral Package* | | | | | | | | | | | | | | |
| Cash | 4,749,133 | 5,102,333 | 5,285,444 | 4,947,175 | 5,217,318 | 5,327,751 | 4,752,748 | 4,404,399 | 4,779,853 | 5,041,609 | 4,742,178 | 4,933,865 | 4,670,159 | 4,670,159 |
| Accounts Receivable | 5,725,659 | 5,675,659 | 5,625,659 | 5,575,659 | 5,525,659 | 5,475,659 | 5,425,659 | 5,375,659 | 5,325,659 | 5,275,659 | 5,225,659 | 5,175,659 | 5,125,659 | 5,125,659 |
| FF&E (Net Book Value) | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 | 334,343 |
| Pledged Allen Street Property (net, non debtor) | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 | 1,762,500 |
| Pledged Sacramento Property (net, non debtor) | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| | 14,071,636 | 14,374,835 | 14,507,946 | 14,119,678 | 14,339,821 | 14,400,254 | 13,775,250 | 13,376,901 | 13,702,356 | 13,914,112 | 13,564,681 | 13,706,367 | 13,392,662 | 13,392,662 |
| *PNC Debt* | | | | | | | | | | | | | | |
| Beginning | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 |
| (+) Interest Accrual | - | - | 67,940 | - | - | - | - | 67,940 | - | - | - | 67,940 | - | 203,819 |
| (-) Payments | - | - | (67,940) | - | - | - | - | (67,940) | - | - | - | (67,940) | - | (203,819) |
| **Ending Balance** | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 | 7,041,686 |
| **Equity Cushion (Deficiency)** | 2.00x | 2.04x | 2.06x | 2.01x | 2.04x | 2.05x | 1.96x | 1.90x | 1.95x | 1.98x | 1.93x | 1.95x | 1.90x | 1.90x |
| **Equity Cushion (Deficiency) in $** | 7,029,950 | 7,333,149 | 7,466,260 | 7,077,991 | 7,298,135 | 7,358,568 | 6,733,564 | 6,335,215 | 6,660,669 | 6,872,426 | 6,522,995 | 6,664,681 | 6,350,976 | 6,350,976 |
| *Accounts Receivable Roll Forward* | | | | | | | | | | | | | | |
| Accounts Receivable - Beginning Balance | 5,775,659 | 5,725,659 | 5,675,659 | 5,625,659 | 5,575,659 | 5,525,659 | 5,475,659 | 5,425,659 | 5,375,659 | 5,325,659 | 5,275,659 | 5,225,659 | 5,175,659 | 5,775,659 |
| (+) Sales | 856,747 | 1,028,600 | 678,600 | 758,600 | 678,600 | 703,600 | 714,250 | 714,250 | 789,250 | 739,250 | 678,600 | 678,600 | 678,600 | 9,697,547 |
| (-) Collections | (906,747) | (1,078,600) | (728,600) | (808,600) | (728,600) | (753,600) | (764,250) | (764,250) | (839,250) | (789,250) | (728,600) | (728,600) | (728,600) | (10,347,547) |
| **Accounts Receivable - Ending Balance** | 5,725,659 | 5,675,659 | 5,625,659 | 5,575,659 | 5,525,659 | 5,475,659 | 5,425,659 | 5,375,659 | 5,325,659 | 5,275,659 | 5,225,659 | 5,175,659 | 5,125,659 | 5,125,659 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF RUBEN SAINOS IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **10/18/2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Robert S Marticello**    rmarticello@raineslaw.com, bclark@raineslaw.com;jfisher@raineslaw.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **10/18/2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **10/18/2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/18/2024 | Ja'Nita Fisher | /s/ Ja'Nita Fisher |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**