Robert P. Goe – State Bar No. 137019
Jeffrey W. Broker – State Bar No. 53226
**GOE FORSYTHE & HODGES LLP**
17701 Cowan, Building D, Suite 210
Irvine, CA 92614
Email: rgoe@goeforlaw.com
          jbroker@goeforlaw.com
Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Creditor and Movant Ronnie Jordan

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>THE ORIGINIAL MOWBRAY'S TREE SERVICE, INC.,<br><br>       Debtor and Debtor-in-Possession. | Case No.  8:24-bk-12674-SC<br>Chapter 11 Proceeding<br><br>**DECLARATION OF CREDITOR AND MOVANT RONNIE JORDAN IN SUPPORT OF MOTION BY CREDITOR RONNIE JORDAN FOR ORDER TERMINATING DEBTOR'S PERIODS OF EXCLUSIVITY FOR THE FILING OF A PLAN AND OBTAINING ACCEPTANCE THEREOF, SO AS TO PERMIT THE FILING OF A COMPETING PLAN BY JORDAN'S MOWBRAY ACQUISITION LLC**<br><br>**Hearing:**<br>Date:          August 6, 2025<br>Time:          1:30 p.m.<br>Courtroom:  5C<br>Location:     411 W. Fourth Street<br>                    Santa Ana, CA 92701<br>[Hearing to be conducted via ZoomGov] |

//

//

//

**Jordan Declaration ISO ISO Jordan Motion for Order Terminating Exclusivity**

## DECLARATION OF RONNIE JORDAN

I, Ronnie Jordan, have personal knowledge of each fact set forth in this declaration based upon my observation of, participation in, and recollection of, the matters and events to which I declare. I could and would competently testify to each fact set forth in this declaration if called and duly sworn by this Court. I certify and declare as follows:

*1.* I am over the age of eighteen and a resident of North Carolina. This Declaration is made in support of the *MOTION BY CREDITOR RONNIE JORDAN FOR ORDER TERMINATING DEBTOR'S PERIODS OF EXCLUSIVITY FOR THE FILING OF A PLAN AND OBTAINING ACCEPTANCE THEREOF, SO AS TO PERMIT THE FILING OF A COMPETING PLAN BY JORDAN'S MOWBRAY ACQUISITION LLC.*

2. I am the Plaintiff in *Ronnie D. Jordan v. The Original Mowbray's Tree Service, Inc., et al.* (San Bernardino County Superior Court Case Number CIVSB2201281) (the "Jordan Matter").

3. I have also caused my attorney to file a Proof of Claim and Amended Proof of Claim in The Original Mowbray's Tree Service, Inc. ("Mowbray's") bankruptcy case.

4. I am co-owner of Mowbray Acquisition LLC ("Acquisition") a California limited liability company formed to sponsor the Jordan Plan of Reorganization (the "Jordan Plan") for the stock and assets of Mowbray's.

5. The additional co-owners of Acquisition are Jacob and Kenna Morrow husband and wife and Kenneth Catanzarite.

6. Attached hereto as **Exhibit "1"** is a true and correct copy of the proposed CREDITOR RONNIE JORDAN'S MOWBRAY ACQUISITION LLC'S COMPETING PLAN OF REORGANIZATION (the "Jordan Plan") prepared by myself, my management team and our counsel.

7. Attached hereto as **Exhibit "2"** is a true and correct copy of the proposed CREDITOR RONNIE JORDAN'S MOWBRAY ACQUISITION LLC'S COMPETING PLAN DISCLOSURE STATEMENT (the "Jordan DS") prepared by myself, my management team and our counsel.

1

**Jordan Declaration ISO Jordan Motion for Order Terminating Exclusivity**

8.      Attached as **Exhibit "3"** is a true and correct copy of the proposed INDEX OF EXHIBITS IN SUPPORT OF CREDITOR RONNIE JORDAN'S MOWBRAY ACQUISITION LLC'S COMPETING PLAN DISCLOSURE STATEMENT DATED JULY 9, 2025 (the "Jordan Exhibits") prepared by myself, my management team and our counsel.

9.      Within Exhibit "3" are internal exhibits as follows:

10.     In the Jordan Exhibits, attached as Exhibit "1" is a true and correct copy of the Mowbray's Historical & Forecast numbers modified by my management team including through 2034 derived from Exhibit 1 in the Original Mowbray Tree Service, Inc. Disclosure Statement Exhibits (Exhibit "5" to the Request For Judicial Notice filed concurrently herewith – the "Robin DS").

11.     In the Jordan Exhibits, attached as Exhibit "2" is a true and correct copy of the Pino Tree Service, Inc. ("Pino") Historical & Forecast numbers modified by my management team including through 2034 derived from Exhibit 2 in the Robin DS Exhibits.

12.     In the Jordan Exhibits, attached as Exhibit "3" is a true and correct copy of the Mowbray's Liquidation Analysis modified by my management team derived from Exhibit 3 in the Robin DS Exhibits wherein we added $5 million to the liquidation values associated with Pino and taking the amount due the General Unsecured Creditors to $21 million under the Jordan Plan.

13.     In the Jordan Exhibits, attached as Exhibit "4" is a true and correct copy of the forecast prepared by my management team reflecting payments to General Unsecured Creditors ("GUC") of $21 million with $1 million contributed by the owners of Acquisitions as New Value and paid to the GUC.  This forecast reflects our assessment of maintaining or replacing the forecast revenue in the Debtor's Chapter 11 Plan of Reorganization (the "Robin Plan") and the addition of an initial $20 million of revenue increasing by $10 million per year until reaching an added $50 million with an added 15% Profit Margin adding incrementally to payments to the GUC over time with a payoff in 4 years if the Jordan Plan is confirmed where I have agreed to subordinate my receipt of payouts to GUCs.  I will not take any share of the initial $1 million paid.

**Jordan Declaration ISO Jordan Motion for Order Terminating Exclusivity**

14.     In the Jordan Exhibits, attached as Exhibit "5" is a true and correct copy of the forecast prepared by my management team reflecting payments to General Unsecured Creditors ("GUC") of $21 million under the cash flows forecast in the Robin Plan which take 11 years to payoff the GUCs comparing unfavorably to 4 years under the Jordan Plan.

15.     In the Jordan Exhibits, attached as Exhibit "6" is a true and correct copy of my resume.

16.     In the Jordan Exhibits, attached as Exhibit "7" is a true and correct copy of management team member James Kelly's bio.

17.     In the Jordan Exhibits, attached as Exhibit "8" is a true and correct copy of the financial statements handed to me when I met in San Bernardino with Richard E. Mowbray ("Richard E." the brother of Robin and father of Richard J. Mowbray ("Richard J.")). I reviewed Exhibit 8 at the time of my meeting with Alan Phang CFO of Mowbray's and Richard E. during which meeting Phang told me, confirmed by Richard E., that if I was not successful in turning around Mowbray's it would have to file bankruptcy because it could not pay its debts as they came due.

18.     In the Jordan Exhibits, attached as Exhibit "9" is a true and correct copy of the Rick E. June 2018 announcement of my hiring as Chief Executive officer ("CEO") of The Original Mowbray's Tree Service, Inc. ("Mowbray's" or "Debtor").

19.     In the Jordan Exhibits, attached as Exhibit "10" is a true and correct copy of the July 17, 2018 "Shotcaller" Facebook Announcement of my hiring as CEO of Mowbray's.

20.     In the Jordan Exhibits, attached as Exhibit "18" is a true and correct copy of the REV Capital Letter of Intent dated June 30, 2025, describing a credit facility to finance our management teams forecast expansion of operations to generate added revenues in the amount of $20,000,000.

21.     The Jordan Plan provides: (1) $21 million payable to the General Unsecured Creditors ("GUC") which is an increase from the $15.6 million proposed by Robin Mowbray in the Robin Plan at ECF Docket Nos. 363, 364 and 365, (2) a $1 million "New Value" contribution on the "Effective Date" payable to the GUC to be applied against the $21 million, (3) forecast

**Jordan Declaration ISO Jordan Motion for Order Terminating Exclusivity**

increased revenue aided by a $20 million Credit Facility to pay GUC in a projected 4 year time

frame with Jordan voluntarily subordinating his claim only in the event of confirmation of the

Jordan Plan – compared to the Robin Plan at with a term over 9 years to reach a payout $15.6

million and 11 years to reach a payout $21 million, (4) an experienced and seasoned vegetation

management team with 100 years of deep industry experience, (5) not only saving jobs but

offering former employees an opportunity to return as revenue increases utilizing the talented

Mowbray's workers and (6) saving the Mowbray's brand after 50 years of operation and

continuing to provide valued services.

22.     In my meeting May-June 2018 in California with Richard E. Mowbray ("Richard

E." the brother of Robin and father of Richard J.) I learned Mowbray's was insolvent (being

unable to pay its debts as they came due) and sought me out to solve the problems of lack of

revenue and poor management.  At that meeting Richard E. recruited me in May-June 2018 to

relocate from Florida to California to become CEO of Mowbray's as was confirmed by his

deposition and his Sworn statement taken 2 months after I was fired on January 7, 2022

confirming that he had promised me 10% of the profits and that Robin knew about the promise at

the time made and did not dispute the terms or Richard E.'s authority.  At the meeting with

Richard E. I also met Alan Phang, the CFO of Mowbray's, and he provided me with the financial

statements for year-to-date 2018 and the prior 2017 showing losses on both an income statement

and cash flow basis, a copy of which is at Exhibit 3, Internal Exhibit 8.  Alan Phang, confirmed

by Richard E. stated in review of Exhibit 8 that if I was unable to turn Mowbray's around they

would need to file bankruptcy and that prior to 2017 Mowbray's had never had a year with

revenue in excess of $70 million.

23.     I worked very hard with a focus on safety and efficient use of subcontractors and

our teams and turned a 2018 year to date loss into a full year profit and immediately thereafter led

Mowbray's to historical record revenues and profits.  Over the 4 years I was employed

Mowbray's revenue exceeded $1 billion with $111 million in profits from 2018 through 2021.

24.     The Jordan Plan management team has a combined over 100 years experience in

vegetation management services including myself with 25 years' experience, and Jacob and

4

Kenna Morrow with 20 years each deep vegetation management experience, Kenneth Catanzarite with 20 years contracting, development and demolition experience and James Kelly a former 30 year plus high level SCE executive with industry experience.

25.    The Jordan Plan pays $42 million collectively to all creditors including $21 million to the General Unsecured Creditors with $1 million from a New Value capital infusion paid to GUC on the Effective Date, will expand revenue with a $20 million credit facility and pay all the GUC significantly sooner while I subordinate my personal claim only upon confirmation of the Jordan Plan.

26.    By the Jordan Plan, I propose to rescue the insolvent Mowbray's in 2025 just as I was asked to and succeeded in do so after June 2018, providing payments to creditors, employment for its employees and service to customers.

27.    This increased payout is forecast from increased revenue supported by a $20 million credit facility and by bringing the C-31 Traffic Control revenue in through a wholly owned subsidiary, eliminating Phoenix Traffic Management owned by Robin.

28.    The Jordan Plan projections pay the GUCs in 4 years when Jordan's subordination is considered.  In contrast, the Robin Plan, if paying the same $21 million payout requires an unfeasible and speculative 11 year payment to the GUC.

29.    The Effective Date of the Jordan Plan will be the first Business Day that is fifteen (15) days after the entry of an order confirming the Jordan Plan ("Confirmation Order"), provided there has been no order staying the effectiveness of the Confirmation Order.

30.    Since my termination, the fortunes of Mowbray's have plummeted downward because of incompetent management with no real hope for improvement presented in the Debtor's (Robin's) DS and Plan.  The revenue declines were not from the PGE bankruptcy which was January 2019 through July 2020 while Jordan was CEO and revenue and profits increased to $471 million in 2020 with $69 million of profits.  The declines reflect management's ability to operate maintaining, not ruining, industry relationships and a focus on safety.  Mowbray's fatality accident November 10, 2021 adversely impacted the safety score and cost it business.

//

**Jordan Declaration ISO Jordan Motion for Order Terminating Exclusivity**

31.     The Robin Plan shows no change in the vegetation management side of the business with the inexperienced Richard J. remaining in charge after having overseen revenue declines from $471 million to less than $70 million, coincidently the same position as his father Richard E. found himself in May 2018 when he desperately recruited me.

32.     The Robin Plan admits payment of even the $15.7 million to GUCs will take 9 years; if they were to pay $21 million that would take 11 years. *See*, Jordan Exhibits 4 and 5.

33.     The Jordan Plan contemplates growing revenues with financing through a $20 million credit facility dependent upon Jordan and Jacob Morrow being involved as CEO and President respectively based upon the negotiations with the potential lender.

34.     PGE was in bankruptcy the entire time I was CEO racking up record years in 2019 at $214 million in revenue and $14.4 million in profits and 2020 with $471 million in revenue and $69.2 million in profits.  In 2022-2023 there was a dispute commonly known in the industry when Mowbray's demanded a payment of $250,000 to continue work on the PGE job and after payment was received walked off the job anyway.  That is the reason PGE will not work with Mowbray's today.  Jacob Morrow and I have relationships with PGE and believe a change of managerial control will position Mowbray's for business once again with PGE.

35.     I have no confidence in the Debtor, I do not trust the Debtor because of the actions of management that led to my termination, in reviewing the records the case is going nowhere, and if the Robin Plan were confirmed payments to the GUCs are unlikely to be made.

36.     The Robin Plan is unfair to general unsecured creditors and contains terms and assumptions that render the Debtor's Plan unconfirmable.  It is predicated upon the self-interest of Robin that is adverse to the interests of general unsecured creditors and has little or no support from the major creditors in the case.

37.     There have been no post-petition negotiations on the part of the Debtor, either through its management or its attorneys, with me or my attorneys.  I hold at this time an Allowed Claim in this case in the amount of $43,395,996.00.  The Jordan Matter is pending in San Bernardino Superior Court.  As the holder of such a substantial claim, my exclusion from the negotiation process is remarkable.

**Jordan Declaration ISO Jordan Motion for Order Terminating Exclusivity**

1          I certify and declare under penalty of perjury under the laws of the State of

2 California, the State of North Carolina and the United States that the foregoing is true and correct.

3

4         Executed July 14, 2025 at Robbinsville, NC

5

6                   _____

7                         Ronnie Jordan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**7**

**Jordan Declaration ISO Jordan Motion for Order Terminating Exclusivity**

**Exhibit 1**

Robert P. Goe – State Bar No. 137019
Jeffrey W. Broker – State Bar No. 53226
**GOE FORSYTHE & HODGES LLP**
17701 Cowan, Building D, Suite 210
Irvine, CA 92614
Email: rgoe@goeforlaw.com
        jbroker@goeforlaw.com
Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Creditor Ronnie Jordan

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE ORIGINIAL MOWBRAY'S TREE SERVICE, INC.,<br><br>      Debtor and Debtor-in-Possession. | Case No.  8:24-bk-12674-SC<br><br>Chapter 11 Proceeding<br><br>**CREDITOR RONNIE JORDAN'S MOWBRAY ACQUISITION LLC'S COMPETING PLAN OF REORGANIZATION** |

# **TABLE OF CONTENTS**

I.  EXECUTIVE SUMMARY – THE JORDAN PLAN PAYS GENERAL UNSECURED CREDITORS $21 MILLION (PLUS GUC INTEREST) SOONER INCLUDING AN INITIAL $1 MILLION NEW VALUE CONTRIBUTION ..................................................5

  A.  Former Mowbray's CEO Ronnie Jordan and His New Management Team ............5

  B.  Ronnie Jordan's Plan is to Again Successfully Lead Mowbray's ............................7

  C.  The Jordan Plan Will Pay the GUC $21 million with $1 Million Paid on the Effective Date Following its Confirmation – More Money Sooner Than That Proposed in the Robin Plan ..............................................................................8

II.  THE JORDAN PLAN ..................................................................................................9

  A.  The Jordan Plan Provides for a Reorganization of Mowbray's and Its Affairs ........9

  B.  What Creditors and Interest Holders Will Receive Under the Jordan Plan .............10

  C.  Allowance and Treatment of Unclassified Claims ................................................10

    1. Administrative Claims ......................................................................................10

      a. Ordinary Course Administrative Claims ........................................................12

      b. Non-Ordinary Course Administrative Claims ................................................12

      c. Professional Fee Claims ................................................................................13

    2. Priority Tax Claims ..........................................................................................13

  D.  Allowance and Treatment of Classified Claims and Interests ...............................16

    1. Summary of Classes ........................................................................................16

    2. Secured Claims ...............................................................................................17

      a. Secured Claim of PNC Bank .........................................................................17

      b. Secured Claim of Jacobus Pino .....................................................................19

    3. Classes of Priority Unsecured Claims ..............................................................48

    4. Classes of General Unsecured Claims ..............................................................49

    5. Class of Interest Holders ..................................................................................51

III.  MEANS FOR IMPLEMENTATION OF THE JORDAN PLAN ......................................51

  A.  Funding of the Jordan Plan .................................................................................52

  B.  Jordan and Acquisition's $1 Million New Value Contribution ..............................53

  C.  Substantive Consolidation Option .......................................................................54

  D.  Sale of Real Properties .......................................................................................55

  E.  Reorganized Debtor Retention of Professionals and Fees and Expenses ...............55

  F.  The Reorganized Debtor as Disbursing Agent ......................................................55

  G.  The Bond ...........................................................................................................56

  H.  Release of Liens .................................................................................................56

I.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes .........................................................................................................56

J.    The Reorganized Debtor's Post-Confirmation Management ...........................57

K.    Powers and Duties of the Reorganized Debtor ...............................................57

L.    Default on Obligations to Holders of Allowed Claims...................................58

IV.    CLAIM OBJECTIONS AND PROCEDURES FOR RESOLVING DISPUTED CLAIMS, THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2025 .................59

A.    Standing ...........................................................................................................59

B.    No Distribution Pending Allowance ................................................................59

C.    Reserves for Disputed Claims..........................................................................59

D.    Claims Paid by Third Parties ...........................................................................60

V.    DISTRIBUTIONS ...................................................................................................60

A.    Distributions for Claims Allowed as of the Effective Date ............................60

B.    Distributions on Account of Claims Allowed After the Effective Date .................60

    1. Payments and Distributions on Disputed Claims.....................................60

    2. Special Rules for Distributions to Holders of Disputed Claims..........................61

C.    Delivery and Distributions and Undeliverable or Unclaimed Distributions...........61

    1. Delivery of Distributions in General .......................................................61

    2. Undeliverable Distributions .....................................................................61

    3. Distributions of Unclaimed Property .......................................................62

D.    Compliance with Tax Requirements/Allocations.............................................62

V.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............62

A.    Assumption of Executory Contracts and Unexpired Leases............................62

B.    Rejection of Executory Contracts or Unexpired Leases Not Assumed ..................65

VI.    PRESERVATION OF CAUSES OF ACTION, AVOIDANCE ACTIONS FOR THE REORGANIZED DEBTOR...............................................................................................66

VII.    PRESERVATION OF TAX REFUND AND EMPLOYEE RETENTION CREDIT REFUND CLAIMS FOR THE REORGANIZED DEBTOR ..........................................67

VIII.    RETENTION OF JURISDICTION .........................................................................67

IX.    EFFECT OF CONFIRMATION OF THE JORDAN PLAN...................................69

A.    Binding Nature of Plan ....................................................................................69

B.    Discharge ..........................................................................................................69

C.    Injunction .........................................................................................................70

D.    Vesting of Property in the Reorganized Debtor...............................................71

E.    Modification of the Plan ..................................................................................71

**3**
**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization**

F.    Exculpations and Releases ...................................................................... 71

G.    Submission of Post-Confirmation Reports ............................................. 71

H.    Quarterly Fees ......................................................................................... 72

I.    Post-Confirmation Conversion/Dismissal .............................................. 72

J.    Final Decree ............................................................................................ 72

X.    CONCLUSION ................................................................................................. 73

TABLE OF DEFINITIONS ......................................................................................... 74

A.    Definitions ............................................................................................... 74

B.    Rules of Construction .............................................................................. 82

C.    Rules of Interpretation ............................................................................ 83

D.    Exhibits .................................................................................................... 83

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization**

1    Ronnie Jordan ("Jordan"), an unsecured creditor and one of the owners and CEO of

2  Mowbray Acquisition LLC ("Acquisition"), hereby submits his/its/their Competing Chapter 11

3  Plan of Reorganization (the "Jordan Plan")[1] for all of the assets and capital stock of The Original

4  Mowbray's Tree Service, Inc., the Debtor and Debtor-in-Possession in the above-captioned case

5  ("Mowbray's" or the "Debtor").

6  **I.      EXECUTIVE SUMMARY – THE JORDAN PLAN PAYS GENERAL UNSECURED**

7  **CREDITORS $21 MILLION (PLUS GUC INTEREST) SOONER INCLUDING AN**

8  **INITIAL $1 MILLION NEW VALUE CONTRIBUTION**

9    The Jordan Plan proposes to pay $21 million to the General Unsecured Creditors[1]

10  ("GUC") with interest starting with $1 million from a 'New Value' capital infusion on the

11  Effective Date, will expand revenue with a new $20 million credit facility, and pay all creditors

12  (expected in 4 years) while subordinating Ronnie Jordan's personal claim only if the Jordan Plan

13  is confirmed.  The proposed payment to GUC will bear interest for each calendar quarter

14  beginning on and after the Effective Date, at the Federal Judgment Rate in effect on the first

15  Business Day of such year (the "GUC Interest Rate").  As explained hereinbelow, Jordan rescued

16  the insolvent Mowbray's in June 2018 from bankruptcy, and in 2025 seeks to again rescue

17  Mowbray's employees, customers and creditors from its present dire situation with the Jordan

18  Plan.

19    **A.      Former Mowbray's CEO Ronnie Jordan and His New Management Team**

20    Acquisition is a newly formed California limited liability company owned in part by

21  Jordan, the former Chief Executive Officer ("CEO") of Mowbray's, which he rescued from

22  insolvency and thereafter successfully ran from June 2018 through 2021, taking its revenues

23  during that time from $88 million to $471 million.  Jordan is a 25 year plus seasoned Utility

24  Vegetation Management ("UVM") executive.  His co-owners in Acquisition, "Jacob" and "Keena"

25

26

27  [1] Unless otherwise defined herein, the definition of any capitalized term may be found in the Table
of Definitions

28

Morrow, husband and wife are also seasoned UVM executives, and current owners of Coleman Environmental Engineering, Inc. ("Coleman") a recognized vegetation management and disaster recovery company established in 2016.  Kenneth J. Catanzarite ("Catanzarite") is an attorney and owner of Aegis Builders, Inc. a California licensed contractor established in 2005 and a co-owner of Coleman and of Acquisition.

Jordan will serve as CEO of Mowbray's under the Jordan Plan, the same position he held until he was wrongfully terminated by Robin Mowbray ("Robin") and her nephew Richard John Mowbray ("Richard J.") on January 7, 2022.  Jordan successfully ran Mowbray's to its objectively undisputed greatest years of sales and profitability where over 4 years he took revenues to over $1 billion of UVM work and over $111 million of profits.  Jordan brings a wealth of experience in UVM and disaster recovery, including drought and bark beetle tree removal, and USFS fuel reduction.  Jordan has run 400 crews with multiple major utilities in California including Southern California Edison ("SCE"), Pacific Gas & Electric ("PGE"), in California, Oregon, and Arizona. Jordan has a clear understanding of industry needs throughout the United States.

Jacob Morrow, with over 20 years of UVM industry experience, will serve as President of Mowbray's in the same role as he has with Coleman pursuant to the Jordan Plan.  Jacob joined Coleman in 2020, became an owner in 2023, and has since guided its day-to-day operations. Jacob grew Coleman revenues from approximately $12 million in 2023, to $44 million in 2024 and a run rate as of June 24, 2025, of over $60 million by adeptly leveraging resources, attracting new talent, and successfully delivering on critical projects leading to significant growth.  Coleman employs over 330 employees in California and Washington and is a prime contractor to PGE. Jacob and Coleman also have extensive experience in a wide range of projects, including work for SCE from arborist initiatives and forestry efforts to wildfire response, cleanup, and habitat restoration as well as disaster recovery.

Kenna also with over 20 years of UVM industry experience, will be Vice President of Mowbray's with the same role as she has with Coleman.  Kenna has more than 20 years of Logging, UVM and construction management experience along the East and West Coasts.  Kenna has served as vegetation and field oversight manager for a variety of fire disaster, system

1    hardening and disaster recovery projects.  She has extensive experience interacting with regulators

2    and the public on high-profile work sites across the country founding her own logging and tree-

3    cutting company.  Kenna leads Coleman's field efforts in disaster response as well as UVM.

4    Kenna is a Native American Indian and member of the Yurok tribe and is of Siletz and Karuk

5    tribal descent.

6         Catanzarite will be Vice President of Mowbray's with the same role as he has held since

7    2023 in Coleman and since 2005 has been the President of Aegis Builders Inc.  Catanzarite has

8    extensive construction experience in land clearing and development, as well as demolition.

9    Catanzarite holds California Contractor's State Licensing Board ("CSLB") licenses: A General

10   Engineering Contractor; B General Building Contractor; C-21 Building Moving/Demolition

11   Contractor; and C-31 - Construction Zone Traffic Control Contractor.  These licenses, necessary

12   for disaster recovery and land clearing work, will be added to Mowbray's and Pino, Mowbray's

13   wholly owned subsidiary Pino Tree Service ("PTS").  Catanzarite is also a retired Certified Public

14   Accountant (Ohio) and Chartered Financial Analyst.

15        James Kelly ("Kelly") will be an Advisor of Mowbray's in the role of guiding utility

16   company relationships.  Kelly has extensive executive level utility company experience including

17   with SCE.  Kelly retired from SCE after 38 years of service including overseeing contracting for

18   vegetation management services as "senior vice president of Transmission & Distribution."  He

19   was responsible while at SCE for the operation and maintenance of an electrical grid comprised of

20   over 12,000 miles of transmission and 100,000 miles of distribution lines spread across a 50,000-

21   square-mile service area.  Mr. Kelly oversaw an organization of over 8,000 employees in the

22   utility's Transportation and Distribution business unit.  He will consult in connection with

23   Mowbray's strategies for securing more vegetation management services contracts.

24        B.    __Ronnie Jordan's Plan is to Again Successfully Lead Mowbray's__

25        Ronnie Jordan has experienced this very same scenario before with Mowbray's.  In May to

26   June 2018, Jordan was recruited by Richard Edward Mowbray ("Richard E.", Robin's Brother and

27   Richard J.'s father) to leave his job in Florida to relocate and work for Mowbray's because

28   Mowbray's was at the time, early 2018, insolvent and might have to declare bankruptcy at that

time.  Alan Phang the long serving Chief Financial Officer ("CFO") at the time explained to Ronnie that Mowbray's needed $6.5 million per month as its "break-even point" with the January to April 2018 Revenue of $25,839,872 versus Monthly Payments of $28,727,511 showing a loss on cash flow of $2,887,639.  At that time the debt on equipment was $35,900,000 with monthly payments of $645,000.  Jordan was told Mowbray's had perhaps 2-3 months of cash and given its debt level would need to file bankruptcy unless Jordan was able to immediately turn the business around.  Jordan, always up to a challenge, reached an agreement with Richard E. to immediately come to work for Mowbray's with the objective to turn the business around.

Jordan led the Mowbray's army of workers and delivered record revenue and profits and in return Mowbray's kept all the profits for Robin and her family and reneged on the 10% of profits he was promised.  Jordan was forced to sue Mowbray's in January 2022 with a well supported $43 million claim for recruiting him to relocate from Florida to save the business from bankruptcy and then reneging on the promise to pay him a 10% of profits bonus plus statutory penalties for recruiting him to move from Florida to California.

The Jordan Plan with Jordan and its experienced management team proposes a comeback and profitable operations (again) which will pay all creditors more and sooner than proposed in the Robin Mowbray Plan (the "Robin Plan") on file in this case.  The Jordan Plan is a 'competing Plan' to the Robin Plan.

**C.** **The Jordan Plan Will Pay the GUC $21 million with $1 Million Paid on the Effective Date Following its Confirmation – More Money Sooner Than That Proposed in the Robin Plan**

Simply put, the Jordan Plan seeks to acquire all of Mowbray's stock and its assets, substantially increase its revenue from its presently anemic level, and utilizing the Jordan, Jacob, Kenna and Kelly industry contacts be in a position to thereafter pay the General Unsecured Creditors ("GUC") more money sooner.  This objective will initially be accomplished by an immediate capital infusion of $1,000,000 as the first payment on the Effective Date following confirmation of the Jordan Plan applied against the GUC amount payable of $21,000,000 (at the GUC Interest Rate starting on the Effective Date), an increase of $5,400,000 or 35% more than the

Robin Plan's $15.6 million.  Jordan, as a show of his confidence, will subordinate payment on his

unsecured claim to the $21 million payment to the other unsecured creditors in the event that the

Jordan Plan is Confirmed by the Court.

The Jordan Plan has also arranged a $20 million credit facility to allow Mowbray's to have

sufficient working capital to finance its anticipated increase in business, revenues and profits.

There is no stated or inferred capability on the part of Mowbray's to achieve that under the Robin

Plan.

Compared to the Robin Plan, the Jordan Plan not only saves Mowbray's business and the

jobs of its currently reduced employee counts, but it *expands* the business and opportunities and

will give hiring priority to those employees who have lost their jobs as a result of the substantial

reduction in business from those employed when Jordan was in charge  to the dramatically

reduced workforce as it exists today.  The Jordan Plan restructures Mowbray's obligations, pays

$1 million immediately to the GUC, has arranged financing for increased revenues, continues

operations, providing essential vegetation management services and disaster relief assistance to

communities coast to coast, while expanding the business through the existing business contacts of

Coleman and the substantial contacts of the Jordan management team.

## II.    THE JORDAN PLAN

### A.    The Jordan Plan Provides for a Reorganization of Mowbray's and Its Affairs

The Jordan Plan is a reorganizing plan.  Distributions to the Holders of Allowed Secured

Claims will be made by the reorganized Debtor the capital stock of which will be owned by

Jordan's new company Acquisition.  The distributions will be made by the Reorganized Debtor

without the need for a Plan Trust to overcome any perceived conflict of interest by new

management and to also have significant administration cost savings.  No Distributions will be

made to the Holders of any Disputed Claims unless and until they become Allowed Claims.  The

Projections supporting the Jordan Plan are attached hereto as Exhibit 1 - Mowbray Financials and

Projections; Exhibit 2 - PTS Financials and Projections; Exhibit 3 - Mowbray's Liquidation

Analysis; and Exhibit 4 - Forecast With Increased Revenues and GUC Payoff.

1

2      **B.      What Creditors and Interest Holders Will Receive Under the Jordan Plan**

3          As required by the Bankruptcy Code, the Jordan Plan classifies Claims and Interests in

4  various Classes according to their rights of priority.  The Jordan Plan states whether each Class of

5  Claims or Interests is impaired or unimpaired.  The Jordan Plan sets forth the treatment each Class

6  will receive.  In no event shall any creditor receive more than the creditor's Allowed Claim in the

7  Debtor's case.

8      **C.      Allowance and Treatment of Unclassified Claims**

9          Certain types of claims are not placed into voting classes; instead, they are unclassified.

10 They are not considered impaired, and they do not vote on the Jordan Plan because they are

11 automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such,

12 the Jordan Plan has not placed the following claims in a class:

13          **1.      Administrative Claims**

14         Administrative Claims are Claims for costs or expenses of administering the Debtor's

15 Chapter 11 case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The Bankruptcy

16 Code requires that all administrative claims be paid on the Effective Date of the Jordan Plan,

17 unless a particular claimant agrees to a different treatment.  The following chart lists all the

18 Debtor's estimated § 507(a)(2) administrative claims and their treatment under the Jordan Plan:

19

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtor, including Administrative Tax Claims | Varies by day | Unless the Debtor objects to an Ordinary Course Administrative Claim, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of the Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |

| Clerk's Office | $0 | Any outstanding Clark's Office fees will be paid in full on the Effective Date from the cash of the Reorganized Debtor. |
|---|---|---|
| OUST Fees | $0 | Any outstanding OUST Fees will be paid in full on the Effective Date from the cash of the Reorganized Debtor. |
| Administrative Tax Claims | $0 | Unless the Debtor objects to an Administrative Tax Claim, each Administrative Tax Claim shall be allowed and paid in the ordinary course of the Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim. |

| Professional Fees Claims (From Robin Plan Subject to Court Approval) | | |
|---|---|---|
| **Description** | **Estimated Amount Owed[2]** | **Treatment** |
| Raines Feldman Littrell LLP, general bankruptcy counsel | $1,200,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Grobstein Teeple LLP | $60,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |

[2] These amounts are only estimates (including future estimates as of confirmation) and are subject to change. The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower. The Reorganized Debtor reserves the right to object to any or all of these Professional Fees Claims.

| Force Ten Partners, LLP | $1,000,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
|---|---|---|
| Examiner | $150,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| **Total** | $2,410,000 | |

The following applies to Administrative Claims asserted against the Estate:

### a.    Ordinary Course Administrative Claims

Unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim. However, any request for payment, or motion to allow a Claim as an Ordinary Course Administrative Claim must be filed with the Bankruptcy Court and served on the Reorganized Debtor and the Office of the United States Trustee ("OUST") by no later than sixty (60) days after the Effective Date.

### b.    Non-Ordinary Course Administrative Claims

A Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor to the extent that it is allowed by the Bankruptcy Court only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both files with the Bankruptcy Court a request for allowance and payment

of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel for the Reorganized Debtor and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows the Non-Ordinary Course Administrative Claim.

Any party-in-interest, including, but not limited to, the Reorganized Debtor, may file an objection to such a request for payment within the time provided by the Rules of Bankruptcy Procedure ("RBP") or the Local Bankruptcy Rules ("LBR") or within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course Administrative Claims who do not timely file and serve a request for payment will be forever barred from asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estate, the Debtor, the Reorganized Debtor, or their respective assets.

### c. **Professional Fee Claims**

A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the Effective Date (or such further date if extended by Court Order), the Person holding the Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of the Bankruptcy Court.  The Reorganized Debtor or any other party-in-interest may file an objection to such an application within the time provided by the RBP or LBR or within any other period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do not timely file and serve an application for allowance and payment will be forever barred from asserting these Claims against the Estate, the Debtor, the Reorganized Debtor, or their respective assets.

### 2. **Priority Tax Claims**

Priority Tax Claims include certain unsecured income, sales, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five years from the order for relief, unless the holder agrees to a different treatment.

The following charts list the Debtor's known section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Priority Tax Claims (From Robin Plan) | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| California Department of Tax and Fee Administration ("CDTFA") | Claim Amount: $269.00 per Schedules<br><br>Priority Claim Amount: $269.00 per Schedules | Any Allowed Priority Tax Claim of the CDTFA will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the CDTFA is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Reorganized Debtor shall have the right to prepay any Allowed Priority Tax Claim of the CDTFA in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the CDTFA will receive the treatment afforded to Allowed Claims in Class 16. |
| Internal Revenue Service ("IRS") | Claim Amount: $63,589.17 per Proof of Claim 37-1<br><br>Priority Claim Amount: $63,589.17 per Proof of Claim 37-1 | The proof of claim filed by the IRS, Proof of Claim 37-1, is for payroll taxes for the tax period ending December 31, 2024. Because those taxes have been paid, the IRS will not receive a further recovery on the Claim it asserts through Proof of Claim 37-1. |

| State of Florida – Department of Revenue (**"State of Florida"**) | Claim Amount: $14.00 per Proof of Claim 142-1<br><br>Priority Claim Amount: $14.00 per Proof of Claim 142-1 | Any Allowed Priority Tax Claim of the State of Florida will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the State of Florida is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority T ax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.  The Reorganized Debtor shall have the right to prepay any Allowed Priority Tax Claim of the State of Florida in full at any time and without penalty or fee, in its sole and absolute discretion. Any Allowed Claim of the State of Florida in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" |

|  | of the Allowed Priority Tax Claim. |
|---|---|

**D.** **Allowance and Treatment of Classified Claims and Interests**

**1.** **Summary of Classes**

As required by the Bankruptcy Code, the Jordan Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. The chart below lists Classes of Claims and Interests established under the Jordan Plan and indicates whether the Class is impaired or unimpaired by the Jordan Plan. A Class is unimpaired if the Jordan Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| Summary Class | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of PNC Bank, N.A. |
| 2 | Secured Claim of Jacobus Pino |
| 3 | Secured Claim of Albach Finanz AG |
| 4 | Secured Claim of Ally Bank |
| 5 | Secured Claim of Altec Capital Services, LLC |
| 6 | Secured Claim of FNB |
| 7 | Secured Claim of Pathward, National Association |
| 8 | Secured Claim of U.S. Bank Equipment Finance |
| 9 | Secured Claim of Bank of America, N.A. |
| 10 | Secured Claim of Ford Motor Credit Company, LLC |
| 11 | Secured Claim of General Motors |
| 12 | Secured Claim of John Deere |
| 13 | Secured Claim of Samara Equipment |
| 14 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |

| 15 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
|---|---|
| 16 | General Unsecured Claims |
| 17 | Subordinated Jordan Unsecured Claim *Only* Upon Confirmation of Jordan Plan |
| 18 | Insider Claims |
| 19 | Interest Holder |

## 2.  Secured Claims

Secured Claims are Claims secured by valid liens on property of the Estate.

### a.  Secured Claim of PNC Bank

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | PNC Bank, N.A. Collateral: the PNC Collateral Total Claim Amount: $7,038,514.41 as of the Petition Date per the Cash Collateral Stipulation. Interest Rate: 6.57% | N | Y | PNC shall have an Allowed Secured Claim on the Effective Date in the amount that PNC is owed on such date under the PNC Loan Documents, inclusive of any interest at the non-default rate of 6.57% and reasonable costs and attorney's fees that accrue prior to the Effective Date and to which PNC is entitled in accordance with the terms of the PNC Loan Documents, the Cash Collateral Stipulation, and 11 U.S.C. § 506(b), less any recoveries, including Other Recoveries, and payments received by PNC before or after the Effective Date (the "Allowed PNC Secured Claim"). The Debtor projects that the Allowed PNC Secured Claim will total approximately $6,386,587.68 as of the Effective Date.[3] |

---

[3] This is the amount the Debtor projects the PNC balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

The Reorganized Debtor shall pay the PNC Secured Claim in full as follows:

**Effective Date Payment**: Within ten (10) Business Days after the Effective Date, the Reorganized Debtor shall make a payment to PNC on account of the PNC Secured Claim in the amount of $2,000,000 (the "PNC Effective Date Payment**").

**Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the PNC Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $134,584.34 (a "PNC Monthly Payment").

**Maturity Date**: The Reorganized Debtor shall pay the PNC Secured Claim in full by the date that is three (3) years after the Effective Date (the "PNC Maturity Date").

**Interest Rate**: 6.57% per annum simple interest.

**Other Recoveries**. If and to the extent that PNC receives any Other Recoveries on account of the PNC Secured Claim, then the PNC Secured Claim as to the Reorganized Debtor shall be automatically reduced accordingly by the amount of such Other Recoveries.

**Default**: If the Reorganized Debtor fails to make the PNC Effective Date Payment or a PNC Monthly Payment to PNC when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by PNC to the Reorganized Debtor and its counsel (collectively, an "Uncured PNC Default"), then PNC may file and serve

| | | | | | a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the PNC Collateral permitted under the PNC Loan Documents.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**Jordan Plan Controls**: If and to the extent that there is a conflict between the PNC Loan Documents and the Jordan Plan, the Jordan Plan shall control.<br><br>**Lien**. PNC shall retain the PNC Security Interests in the PNC Collateral in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed PNC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed PNC Secured Claim, PNC's Security Interests shall be released and the Reorganized Debtor shall retain title to the PNC Collateral free and clear of the PNC Security Interests.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the PNC Secured Claim. |

b.    <u>**Secured Claim of Jacobus Pino**</u>

| Secured Claim of Jacobus Pino | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2 | Jacobus Pino<br><br>• Collateral: Ownership interests in PTS<br><br>• Total Claim Amount: $167,673.76 as of the Petition Date per Schedules<br><br>Interest Rate: 0.75% | N | Y | Jacobus Pino asserts a Claim in the amount of $167,007 on account of the remaining balance owed on the Pino Note (the "Pino Claim").  As a compromise, including Pino waiving and releasing as of the Effective Date (i) any interest or fees to which Pino asserts he is entitled under the PTS Transaction Documents, and (ii) any right to assert that he is entitled to any portion of the Debtor's ownership interests in PTS, the Reorganized |

Debtor shall pay the Pino Claim in full as follows:

**Monthly Payments:** Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Pino Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $21,047.15. The Pino Claim shall be paid in six (6) equal monthly payments of $21,047.15. The Pino Claim shall not accrue interest on or after the Effective Date.

**Jordan Plan Controls**: If and to the extent that there is a conflict between the PTS Transaction Documents and the Jordan Plan, the Jordan Plan shall control.

**Lien**. Any valid, enforceable, perfected, and unavoidable lien(s) held by Pino in any assets of the Estate shall be retained by Pino in and to the same extent, validity, and priority as of the Petition Date pending payment of the Pino Claim in full as provided herein. Upon full satisfaction of the Pino Claim, any and all liens of Pino on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of Pino's liens.

The treatment proposed herein shall be in full settlement and satisfaction of the Pino Claim.

c.  **Secured Claims Related to Vehicles or Equipment**

| Secured Claim Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 3 | Albach Finanz AG | N | Y | Class 3 consists of the Secured Claim of Albach Finanz AG ("Albach"). The Claim of Albach arises from the |

| | | | |
|---|---|---|---|
| • Collateral: the "**Machine**" as defined in Exhibit A of Albach's proof of claim, Claim No. 144-1 (the "**Albach Collateral**")<br><br>• Total Claim Amount: $81,500.00 (projected as of the Effective Date) | | | Operate Lease Agreement attached as Exhibit A (the "Albach Agreement") to its Proof of Claim No. 144-1. The treatment herein is for all Claims asserted by Albach.<br><br>Albach shall have an Allowed Secured Claim in the collective amount of $81,500 as of the Effective Date, based on the net present value of the future payments due under the Albach Agreement, as calculated by the Debtor (the "Allowed Albach Secured Claim").[4] Under no circumstances shall Albach receive more than the Allowed Albach Secured Claim with interest after the Effective Date as provided herein.  The Allowed Albach Secured Claim arising thereunder shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall make a payment in the amount of $1,458.56 (an "Albach Monthly Payment").<br><br>**B. Maturity Date**: The Reorganized Debtor shall pay the Albach Secured Claim in full by the date that is five (5) years after the Effective Date (the "Albach Maturity Date").<br><br>**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to the Albach Secured Claim in the Albach Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the Albach Maturity Date. |

---

[4] This is the amount the Debtor projects the collective Albach balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

**D. Interest Rate**: 2.84% per annum simple interest.

**E. Default**: Upon the Effective Date, the Albach Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make any Albach Monthly Payment on the Albach Secured Claim to Albach when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Albach to the Reorganized Debtor and its counsel (collectively, an "Uncured Albach Default"), then Albach may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to collateral securing the Albach Secured Claim permitted under the Albach Agreement. The Reorganized Debtor shall have the right to oppose such motion.

**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Albach Agreement and the Jordan Plan, the Plan shall control.

**G. Lien**. Any valid, enforceable, perfected, and unavoidable lien held by Albach in the Albach Collateral shall be retained by Albach in and to the same extent, validity, and priority as of the Petition Date pending payment of the ALbach Secured Claim in full as provided herein. Upon full satisfaction of the Albach Secured Claim, any and all liens of Albach on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.

The treatment proposed herein shall be in full settlement and satisfaction of the Albach Secured Claim.

| 4 | Ally Bank<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $295,486.77 (projected as of the Effective Date) | N | Y | Class 4 consists of the Secured Claims of Ally Bank ("Ally"). The Claims of Ally arise from various loan agreements with the Debtor, each of which was secured by a particular vehicle (each, an "Ally Agreement" and collectively, the "Ally Agreements"). The treatment herein is for all Claims asserted by Ally.<br><br>Ally shall have an Allowed Secured Claim in the collective amount of $295,486.77 as of the Effective Date, based on the net present value of the future payments due under the Ally Agreements, as calculated by the Debtor (the "Allowed Ally Secured Claim").[5] Under no circumstances shall Ally receive more than the Allowed Ally Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ally Secured Claim shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Ally Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $5,613.75 (an "Ally Monthly Payment").<br><br>**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed Ally Secured Claim in full by the date that is five (5) years after the Effective Date (the "Ally Maturity Date").<br><br>**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of vehicles or equipment |

---

[5] This is the amount the Debtor projects the collective Ally balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

under the Ally Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based by the Ally Maturity Date.

**D. Interest Rate**: 5.28% per annum simple interest.

**F. Default**: Upon the Effective Date, the Ally Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Ally Monthly Payment on the Allowed Ally Secured Claim to Ally when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ally to the Reorganized Debtor and its counsel (collectively, an "Uncured Ally Default"), then Ally may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ally Agreement and serving as Ally's collateral as permitted under the Ally Agreements.  The Reorganized Debtor shall have the right to oppose such motion.

**G. Jordan Plan Controls**: If and to the extent that there is a conflict between the Ally Agreements and the Jordan Plan, the Jordan Plan shall control.

**H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ally in any assets of the Estate to secure the Allowed Ally Secured Claim shall be retained by Ally in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Ally Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ally Secured Claim, any and all liens of Ally on assets of the

| | | | | | Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of Ally's liens. The treatment proposed herein shall be in full settlement and satisfaction of the Ally Secured Claims. |
|---|---|---|---|---|---|
| 5 | Altec Capital Services, LLC • Collateral: Various equipment • Total Claim Amount: $4,816,724.31 | N | Y | | Class 5 consists of the Secured Claims of Altec. The Claims of Altec arise from various equipment leases or financing agreements between the Debtor and Altec (each, an "Altec Agreement" and collectively, the "Altec Agreements"). The treatment herein is for all Claims asserted by Altec, including, without limitation, Claims for which Altec is the servicer. Altec shall have an Allowed Secured Claim in the collective amount of $4,816,724.31 as of the Effective Date, based on the net present value of the future payments due under the Altec Agreements, as calculated by the Debtor (the "Allowed Altec Secured Claim").[6] Under no circumstances shall Altec receive more that the Allowed Altec Secured Claim with interest after the Effective Date as provided herein. As to each Altec Agreement, Altec's Secured Claim arising thereunder (each, an "Altec Secured Claim") shall be paid as follows: **A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Altec Agreement for such Altec Secured Claim starting with the monthly payment or installment due and unpaid |

---

[6] This is the amount the Debtor projects the collective Altec balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

as of the Petition Date, and the Reorganized Debtor shall continue making such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Altec Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an "Altec Monthly Payment."

**B. Maturity Date**: Any maturity date or expiration date with respect to such Altec Secured Claim in the corresponding Altec Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Altec Monthly Payment required by such Altec Agreement (the "Altec Maturity Date") and any lump sum payment due by the Reorganized Debtor under such Altec Agreement upon the Altec Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Altec Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such Altec Secured Claim in the corresponding Altec Agreement, including, without limitation, at the Altec Maturity Date in such Altec Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement.

**D. Interest Rate**: 7.6% blended rate per annum simple interest for Altec Secured Claims.

**E. Default**: Upon the Effective Date, each Altec Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make an Altec Monthly Payment on an Altec Secured Claim to Altec when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the Reorganized Debtor and its counsel (collectively, an "Uncured Altec Default"), then Altec may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as Altec's collateral that is the subject to the Uncured Altec Default permitted under the subject Altec Agreement. The Reorganized Debtor shall have the right to oppose such motion.

**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Altec Agreements and the Jordan Plan, the Jordan Plan shall control.

**G. Lien**: With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.

Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization**

| | | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Altec Secured Claims. |
|---|---|---|---|---|---|
| 6 | FNB Equipment Finance<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $91,845.49 (projected as of the Effective Date) | N | Y | | Class 6 consists of the Secured Claims of FNB Equipment Finance ("FNB"). The Claims of FNB arise from various equipment leases or financing agreements between the Debtor and FNB or FNB's predecessor in interest (each, an "FNB Agreement" and collectively, the "FNB Agreements"). The treatment herein is for all Claims asserted by FNB.<br><br>FNB shall have an Allowed Secured Claim in the collective amount of $91,845.49 as of the Effective Date based on the net present value of the future payments due under the FNB Agreements, as calculated by the Debtor (the "Allowed FNB Secured Claim").[7] Under no circumstances shall FNB receive more than the FNB Allowed Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each FNB Agreement, FNB's Secured Claim arising thereunder (each, an "FNB Secured Claim") shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the FNB Agreement for such FNB Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each |

---

[7] This is the amount the Debtor projects the collective FNB balance to be as of the Effective Date, inclusive of budgeted post-petition payments

calendar month thereafter until such monthly payments or installments are completed under the terms of such FNB Agreement, as extended by the Plan. The monthly payments required herein shall each be referred to as an "FNB Monthly Payment."

**B. Maturity Date**: Any maturity date or expiration date with respect to such FNB Secured Claim in the corresponding FNB Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final FNB Monthly Payment required by such FNB Agreement (the "FNB Maturity Date") and any lump sum payment due by the Reorganized Debtor under such FNB Agreement upon the FNB Maturity Date shall be made at such time as extended herein and in accordance with the terms of such FNB Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such FNB Secured Claim in the corresponding FNB Agreement, including, without limitation, at the FNB Maturity Date in such FNB Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the FNB Maturity Date for such FNB Agreement.

**D. Interest Rate**: 6.25% blended rate per annum simple interest for all FNB Secured Claims.

**E. Default**: Upon the Effective Date, each FNB Agreement shall not be considered in default as to the

| | | | | | Reorganized Debtor. If the Reorganized Debtor fails to make an FNB Monthly Payment on an FNB Secured Claim to FNB when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by FNB to the Reorganized Debtor and its counsel (collectively, an "Uncured FNB Default"), then FNB may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as FNB's collateral that is the subject of the Uncured FNB Default permitted under the subject FNB Agreement. The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the FNB Agreements and the Jordan Plan, the Jordan Plan shall control. |
| | | | | | **G. Lien**: With respect to each FNB Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by FNB in any assets of the Estate to secure such FNB Secured Claim shall be retained by FNB in and to the same extent, validity, and priority as of the Petition Date pending payment of such FNB Secured Claim in full as provided herein.  Upon full satisfaction of such FNB Secured Claim, any and all lien of FNB securing such FNB Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the FNB Secured Claims. |
| 7 | Pathward, National Association<br><br>• Collateral: Various | N | Y | Class 7 consists of the Secured Claims of Pathward, National Association ("Pathward"). The Claims of Pathward arise from various agreements for |

| | equipment

• Total Claim Amount: $400,079.03 (projected as of the Effective Date | | | certain vehicles and equipment between the Debtor and Pathward's predecessor in interest (each, a "Pathward Agreement" and collectively, the "Pathward Agreements").  The treatment herein is for all Claims asserted by Pathward.

Pathward shall have an Allowed Secured Claim in the amount of $400,079.03 as of the Effective Date, based on the net present value of the future payments due under the Pathward Agreements as calculated by the Debtor (the "Allowed Pathward Secured Claim").[8] Under no circumstances shall Pathward receive more than the Allowed Pathward Secured Claim with interest after the Effective Date as provided herein.

As to each Pathward Agreement, Pathward's Secured Claim arising thereunder each, a "Pathward Secured Claim" shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Pathward Agreement for such Pathward Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Pathward Agreement, as extended by the Plan.  The monthly payments |

---

[8] This is the amount the Debtor projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization**

required herein shall each be referred to as a "Pathward Monthly Payment."

**B. Maturity Date**: Any maturity date or expiration date with respect to such Pathward Secured Claim in the corresponding Pathward Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Pathward Monthly Payment required by such Pathward Agreement (the "Pathward Maturity Date") and any lump sum payment due by the Reorganized Debtor under such Pathward Agreement upon the Pathward Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Pathward Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Pathward Secured Claim in the corresponding Pathward Agreement, including, without limitation, at the Pathward Maturity Date in such Pathward Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Pathward  Maturity Date for such Pathward Agreement.

**D. Interest Rate**: 2.0% blended rate per annum simple interest for all Pathward Secured Claims.

**E. Default**: Upon the Effective Date, each Pathward Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Pathward Monthly Payment on a Pathward Secured Claim to Pathward when due

| | | | | | |
|---|---|---|---|---|---|
| | | | | | herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel (collectively, an "Uncured Pathward Default"), then Pathward may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Pathward's collateral that is the subject of the Uncured Pathward Default permitted under the subject Pathward Agreement. The Reorganized Debtor shall have the right to oppose such motion.

**G. Jordan Plan Controls**: If and to the extent that there is a conflict between the Pathward Agreements and the Jordan Plan, the Jordan Plan shall control.

**H. Lien**: With respect to each Pathward Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure such Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of such Pathward Secured Claim in full as provided herein.  Upon full satisfaction of such Pathward Secured Claim, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.

The treatment proposed herein shall be in full settlement and satisfaction of the Pathward Secured Claims. |
| 8 | U.S. Bank Equipment Finance<br><br>• Collateral: Various equipment | N | Y | | Class 8 consists of the Secured Claims of U.S. Bank Equipment Finance ("US Bank"). The Claims of US Bank arise from various finance agreements between the Debtor and US Bank or US Bank's predecessor in interest (each, a |

| | | • Total Claim Amount: $50,160.65 (projected as of the Effective Date) | | | "US Bank Agreement" and collectively, the "US Bank Agreements"). The treatment herein is for all Claims asserted by US Bank.

US Bank shall have an Allowed Secured Claim in the collective amount of $50,160.65 as of the Effective Date, based on the net present value of the future payments due under the US Bank Agreements, as calculated by the Debtor (the "Allowed US Bank Secured Claim").[9] Under no circumstances shall US Bank receive more than the Allowed US Bank Secured Claim with interest after the Effective Date as provided herein.  As to each US Bank Agreement, US Bank's Secured Claim arising thereunder (each a "US Bank Secured Claim") shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under US Bank Agreement for such US Bank Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such US Bank Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an (a "US Bank Monthly Payment").

**B. Maturity Date**: Any maturity date or expiration date with respect to such |

---

[9] This is the amount the Debtor projects the collective US Bank balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

34

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization**

US Bank Secured Claim in the corresponding US Bank Agreement shall be extended to the calendar month after the Reorganized Debtor makes the US Bank Monthly Payment required by such US Bank Agreement (the "US Bank Maturity Date") and any lump sum payment due by the Reorganized Debtor under such US Bank Agreement upon the US Bank Maturity Date shall be made at such time as extended herein and in accordance with the terms of such US Bank Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such US Bank Secured Claim in the corresponding US Bank Agreement, including, without limitation, at the US Bank Maturity Date in such US Bank Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the US Bank Maturity Date for such US Bank Agreement.

**D. Interest Rate**: 6.57% blended rate per annum simple interest for all US Bank Secured Claims.

**E. Default**: Upon the Effective Date, each US Bank Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a US Bank Monthly Payment on a US Bank Secured Claim to US Bank when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by US Bank to the Reorganized Debtor and its counsel (collectively, an "Uncured US Bank Default"), then US Bank may file and serve a motion with the Bankruptcy

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Court to obtain authorization to exercise any remedies as to the particular equipment(s) serving as US Bank's collateral that is the subject of the Uncured US Bank Default permitted under the subject US Bank Agreements. The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the US Bank Agreements and the Jordan Plan, the Jordan Plan shall control.<br><br>**G. Lien**: With respect to each US Bank Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by US Bank in any assets of the Estate to secure such US Bank Secured Claim shall be retained by US Bank in and to the same extent, validity, and priority as of the Petition Date pending payment of such US Bank Secured Claim in full as provided herein. Upon full satisfaction of such US Bank Secured Claim, any and all liens of US Bank securing such US Bank Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the US Bank Secured Claims. |
| 9 | Bank of America, N.A.<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $6,866,127.94 (projected as of the Effective Date) | N | Y | | Class 9 consists of the Secured Claim of BOA. The Claims of BOA arise from various equipment leases or financing agreements between the Debtor and BOA (each, a "BOA Agreement" and collectively, the "BOA Agreements"). The treatment herein is for all Claims asserted by BOA.<br><br>BOA shall have an Allowed Secured Claim in the collective amount of $6,866,127.94 as of the Effective Date, |

based on the net present value of the future payments due under the BOA Agreements, plus amounts due and unpaid as of the Petition Date under the BOA Agreements, as calculated by the Debtor (the "Allowed BOA Secured Claim").[10] Under no circumstances shall BOA receive more that the Allowed BOA Secured Claim with interest after the Effective Dates provided herein.

As to each BOA Agreement, BOA's Secured Claim arising thereunder (a "BOA Secured Claim") shall be paid as follows:

**A. Maturity Date**: The maturity date or expiration date in such BOA Agreement shall be extended to the earlier of (I) the date that is equal to the number of months in which payments under such BOA Agreement have come due and were not made prior to the Effective Date, plus thirty-six months from the Effective Date (the "BOA Repayment Period"). Any lump sum payment due by the Reorganized Debtor under such BOA Agreement upon or at the end of the BOA Repayment Period shall be made in accordance with the terms of such BOA Agreement and subject to Paragraph C. below.

**B. Monthly Payments**: The BOA Secured Claim arising under such BOA Agreement shall be paid in equal monthly installments amortized over the BOA Repayment Period for such BOA Agreement (each, a "BOA Monthly Payment"). The Reorganized Debtor shall make the first BOA Monthly Payment on the first Business Day of the first full calendar month after the

---

[10] This is the amount the Debtor projects the collective BOA balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | | Effective Date, and the BOA Monthly Payments shall continue each calendar month thereafter during the BOA Repayment Period and until the BOA Repayment Period ends. |

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment under such BOA Agreement, including, without limitation, at the end of the BOA Repayment Period, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights at the time set forth in the BOA Agreement as adjusted and extended based on the BOA Repayment Period.

**D. Interest rate**: 5.47% per annum simple interest.

**E. Default**: Upon the Effective Date, each BOA Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a BOA Monthly Payment to BOA on account of a BOA Secured Claim when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by BOA to the Reorganized Debtor and its counsel (collectively, a "Uncured BOA Default"), then BOA may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicle(s) or equipment subject to the BOA Agreement giving rise to such BOA Secured Claim as permitted under such BOA Agreement. The Reorganized Debtor shall have the right to oppose such motion.

**F. Jordan Plan Controls**: If and to the extent that there is a conflict between

| | | | | the BOA Agreements and the Jordan Plan, the Jordan Plan shall control.<br><br>**G. Lien**: With respect to each BOA Secured Claim, any valid, perfected, and unavoidable lien of BOA shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of such BOA Secured Claim in full as provided herein. Upon full satisfaction of such BOA Secured Claim, BOA's lien securing such BOA Secured Claim shall be released and the Reorganized Debtor shall retain title to the collateral subject to such lien free and clear of such lien.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the BOA Secured Claims. |
|---|---|---|---|---|
| 10 | Ford Motor Credit Company, LLC<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $1,596,788.42 (projected as of the Effective Date) | N | Y | Motor Credit Company ("Ford"). The Claims of Ford arise from various installment agreements with the Debtor, each of which was secured by a particular vehicle (each, a "Ford Agreement" and collectively, the "Ford Agreements"). The treatment herein is for all Claims asserted by Ford.<br><br>Ford shall have an Allowed Secured Claim in the collective amount of $1,596,788.42 as of the Effective Date, based on the net present value of the future payments due under the Ford Agreements, as calculated by the Debtor (the "Allowed Ford Secured Claim").[11] Under no circumstances shall Ford receive more than the Allowed Ford Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ford Secured Claims shall be paid as follows: |

---

[11] This is the amount the Debtor projects the collective Ford balance to be as of the Effective Date, inclusive of budgeted post-petition payments

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, and continuing on the first Business Day of each calendar month thereafter until the Allowed Ford Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $30,207.87 (a "Ford Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed Ford Secured Claim in full by the date that is 5 years after the Effective Date (the "Ford Bank Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ford Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the Ford Maturity Date.

**D. Interest Rate**: 5.1% per annum simple interest.

**E. Default**: Upon the Effective Date, the Ford Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Ford Monthly Payment on the Allowed Ford Secured Claim to Ford when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ford to the Reorganized Debtor and its counsel (collectively, an "Uncured Ford Default"), then Ford may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as

| | | | | Ford's collateral as permitted under the Ford Agreements. The Reorganized Debtor shall have the right to oppose such motion. |
|---|---|---|---|---|
| | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Ford Agreements and the Jordan Plan, the Jordan Plan shall control. |
| | | | | **G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ford in any assets of the Estate to secure the Allowed Ford Secured Claim shall be retained by Ford in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ford Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ford Secured Claim, any and all liens of Ford securing the Allowed Ford Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ford Secured Claim. |
| 11 | AmeriCredit Financial Services, Inc. dba GM Financial<br><br>• Collateral: various vehicles<br><br>• Total Claim Amount: $121,388.59 (projected as of the Effective Date) | N | Y | Class 11 consists of the Secured Claims of AmeriCredit Financial Services, Inc. dba GM Financial ("GM"). The Claims of GM arise from various agreements between the Debtor and GM (each, a "GM Agreement" and collectively, the "GM Agreements") The treatment herein is for all Claims asserted by GM.<br><br>GM shall have an Allowed Secured Claim in the collective amount of $121,388.59 as of the Effective Date, based on the net present value of the future payments due under the GM Agreements as calculated by the Debtor |

(the "Allowed GM Secured Claim").[12] Under no circumstances shall GM receive more than the Allowed GM Secured Claim with interest after the Effective Date as provided herein.

The Allowed GM Secured Claim shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed GM Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $2,352.54 (a "GM Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed GM Secured Claim in full by the date that is 5 years after the Effective Date (the "GM Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the GM Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the GM Maturity Date.

**D. Interest Rate**: 6.1% per annum simple interest.

**E. Default**: Upon the Effective Date, the GM Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a GM Monthly

---

[12] This is the amount the Debtor projects the collective GM balance to be as of the Effective Date, inclusive of budgeted post-petition payments

| | | | | |
|---|---|---|---|---|
| | | | | Payment on the Allowed GM Secured Claim to GM when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by GM to the Reorganized Debtor and its counsel (collectively, an "Uncured GM Default"), then GM may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements. The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the GM Installment Agreements and the Jordan Plan, the Jordan Plan shall control.<br><br>**G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by GM in any assets of the Estate to secure the Allowed GM Secured Claim shall be retained by GM in and to the same extent, validity, and priority as of the Petition Date pending payment of such GM Secured Claim in full as provided herein. Upon full satisfaction of the Allowed GM Secured Claim, any and all liens of GM securing the Allowed GM Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed GM Secured Claim. |
| 12 | John Deere Construction & Forestry Company<br><br>• Collateral: Various | N | Y | Class 12 consists of the Secured Claims of John Deere Construction & Forestry Company ("John Deere"). The Claims of John Deere arise from various equipment agreements between the |

| | equipment | | | Debtor and John Deere (each, a "John Deere Agreement" and collectively, the "John Deere Agreements"). The treatment herein is for all Claims asserted by John Deere. |
| | • Total Claim Amount: $139,039.60 (projected as of the Effective Date) | | | |
| | | | | John Deere shall have an Allowed Secured Claim in the amount of $139,039.60 as of the Effective Date, based on the net present value of the future payments due under the John Deere Agreements, as calculated by the Debtor (the "Allowed John Deere Secured Claim").[13] Under no circumstances shall John Deere receive more than the Allowed John Deere Secured Claim with interest after the Effective Date as provided herein. |
| | | | | The Allowed John Deere Secured Claim shall be paid as follows: |
| | | | | **A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed John Deere Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $2,317.33 (a "John Deere Monthly Payment"). |
| | | | | **B. Maturity Date**: The Reorganized Debtor shall pay the Allowed John Deere Secured Claim in full by the date that is 5 years after the Effective Date (the "John Deere Maturity Date"). |
| | | | | **C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the John Deere |

---

[13] This is the amount the Debtor projects the collective John Deere balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the John Deere Maturity Date.

**D. Interest Rate**: 0.0% per annum simple interest.

**E. Default**: Upon the Effective Date, the John Deere Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a John Deere Monthly Payment to John Deere when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by John Deere to the Reorganized Debtor and its counsel (collectively, an "Uncured John Deere Default"), then John Deere may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the John Deere Agreements and serving as John Deere's collateral as permitted under the John Deere Agreements. The Reorganized Debtor shall have the right to oppose such motion.

**G. Jordan Plan Controls**: If and to the extent that there is a conflict between the John Deere Installment Agreements and the Jordan Plan, the Jordan Plan shall control.

**H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by John Deere in any assets of the Estate to secure the Allowed John Deere Secured Claim shall be retained by John Deere in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed John Deere Secured Claim in full as provided herein. Upon full satisfaction of the

| 13 | Samsara Capital Finance | N | Y | |
|---|---|---|---|---|

Allowed John Deere Secured Claim, any and all liens of John Deere securing the Allowed John Deere Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.

The treatment proposed herein shall be in full settlement and satisfaction of the Allowed John Deere Secured Claim.

**13** — Samsara Capital Finance

• Collateral: Various equipment

• Total Claim Amount: $217,251.13 (projected as of the Effective Date)

N   Y

Class 13 consists of the Secured Claims of Samsara Capital Finance ("Samsara"). The Claims of Samsara arise from made multiple equipment loans between the Debtor and Samsara (each, a "Samsara Agreement" and collectively, the "Samsara Agreements"). The treatment herein is for all Claims asserted by Samsara.

Samsara shall have an Allowed Secured Claim in the amount of $217,251.13 as of the Effective Date, based on the net present value of the future payments due under the Samsara Agreements, as calculated by the Debtor (the "Allowed Samsara Secured Claim").[14] Under no circumstances shall Samsara receive more than the Allowed Samsara Secured Claim with interest after the Effective Date as provided herein.

As to each Samsara Agreement, Samsara's Secured Claim arising thereunder (each, a "Samsara Secured Claim") shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the second full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until each Samsara Secured Claim is

---

[14] This is the amount the Debtor projects the collective Samsara balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

paid in full, the Reorganized Debtor shall make a payment in the amount of $19,750.10 (a "Samsara Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Samsara Secured Claims in full by the date that is 11 months after the Effective Date (the "Samsara Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Samsara Secured Claim in the subject Samsara Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by on the Samsara Maturity Date for such Samsara Agreement.

**D. Interest Rate**: 0.0% per annum simple interest.

**E. Default**: Upon the Effective Date, each Samsara Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Samsara Monthly Payment to Samsara when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Samsara to the Reorganized Debtor and its counsel (collectively, an "**Uncured Samsara Default**"), then Samsara may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Samsara's collateral that is the subject of the Uncured Samsara Default permitted under the subject Samsara Agreement. The Reorganized Debtor shall have the right to oppose such motion.

| | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Samsara Agreements and the Jordan Plan, the Jordan Plan shall control. |
| | | | | **G. Lien**: With respect to each Samsara Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Samsara in any assets of the Estate to secure such Samsara Secured Claim shall be retained by Samsara in and to the same extent, validity, and priority as of the Petition Date pending payment of such Samsara Secured Claim in full as provided herein. Upon full satisfaction of such Samsara Secured Claim, any and all liens of Samsara securing such Samsara Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Samsara Secured Claims. |

### 3.    Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes. The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective Date equal to the allowed amount of such Claim. However, a Class of Priority Unsecured Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

The Debtor is unaware of any Priority Unsecured Claims. However, in an abundance of caution, the following chart lists all Classes containing the Debtor's section 507(a)(4), (a)(5), (a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Priority Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5)<br><br>Estimated total amount of claims: $0.00[15] | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 4 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (I) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |
| 15 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 5 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (I) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |

**4.** **Classes of General Unsecured Claims**

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 16 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims and will receive a total of $21,000,000 in payments and interest at the GUC Interest Rate.  This Class shall receive a $1,000,000 payment on the Effective Date to be applied against the payments called for hereunder.<br><br>On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution in |

---

[15] The Debtor's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim.<br><br>The Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions from the Reorganized Debtor as follows:<br><br>On each Quarterly Distribution Date each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from the Reorganized Debtor calculated with a payout that considers all claims at face value and makes adjustments for Allowed General Unsecured Claims as determined after objections and final orders including potential set off litigation.<br><br>The treatment proposed herein shall be in full satisfaction of the Claims in Class 16. |
| 17 | General Unsecured Claim of Ronnie Jordan | N | Y | | This Class consists of the Allowed Claim of Ronnie Jordan (a member-manager of Acquisitions and to be CEO under the Jordan Plan) who has agreed to consensually subordinate his claim under the Plan to the Allowed General Unsecured Creditors in Classes 16 only in the event of confirmation of the Jordan Plan. Ronnie Jordan shall not receive any Distributions under the Plan until and unless all of the Allowed General Unsecured Claims in Class 16 have been paid in full. |
| 18 | General Unsecured Claim of Insiders | Y | Y | | This Class consists of the Claims of Insiders against the Debtor.  These claims are separately classified because the Debtor has claims under evaluation against them arising from Insider Avoidance Actions and the Loan Causes of Action and are to be deemed to be "Disputed Claims".  To the extent there is a Class 18 Allowed General Unsecured Claim then the payout shall |

|  |  |  |  | be Pro Rata based upon the Disputed Claims procedure described hereinbelow. |

### 5.    Class of Interest Holders

Interest Holders are the parties who hold ownership Interests in the Debtor.  The following chart describes the treatment for Interest Holders in the Debtor.

| Interest Holders | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 19 | Robin Mowbray | Y | Y | On the Effective Date, Robin Mowbray, the sole shareholder of the Debtor shall not retain any existing or future Equity Interests in the Debtor/Reorganized Debtor.  Her shares of stock in the Debtor shall be cancelled and in the event she does not agree to transfer and endorse the shares to Mowbray's treasury upon the Effective Date, all of her shares shall be canceled and a new certificate in the name of Mowbray Acquisition LLC shall be issued by Jordan on behalf of the Reorganized Debtor.  Robin Mowbray's Equity Interests will be redeemed or cancelled under the plan on the Effective Date and 10,000 shares of authorized stock of Mowbray's pursuant to its Articles of Incorporation shall be issued to Acquisitions in return for a cash payment on the Effective Date of $1,000,000 to fund the $1,000,000 payment to Class 16 described hereinabove. |

### III.    MEANS FOR IMPLEMENTATION OF THE JORDAN PLAN

This Section is intended to explain how the Reorganized Debtor intends to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Jordan Plan after the occurrence of the Effective Date.  This Section provides information

1  regarding the funding sources for the Jordan Plan obligations, and other material issues bearing

2  upon performance of the Jordan Plan.

3      A.    **Funding of the Jordan Plan**

4      The payments under the Jordan Plan by the Reorganized Debtor will be initially funded

5  from the above described $1,000,000 cash contribution, classified as $1,000,000 for the newly

6  issued capital stock to Acquisitions for 100% control via 100% of the capital stock of the

7  Reorganized Debtor.  As reflected in the Projections, the Distributions to the Holders of Secured

8  Claims will be paid by the Reorganized Debtor from its post-Effective Date cash flow.

9      Distributions to the Holders of Allowed General Unsecured Claims will be made by the

10  Reorganized Debtor.  The Holders of Allowed General Unsecured Claims will receive a Pro Rata

11  Distribution of Available funds on a quarterly basis.  With the exception of the $1,000,000, the

12  Reorganized Debtor will fund the GUC Payment Amount from its post-Effective Date operations.

13      The Reorganized Debtor will pay the GUC Payment Amount as follows: Beginning on the

14  Effective Date a payment of $1,000,000 and thereafter payments shall be paid on the GUC

15  Payment Commencement Date, and continuing each quarter thereafter until the GUC Payment

16  Amount is fully funded, and cash flow permitting as projected, the Reorganized Debtor will pay to

17  the GUC the amount set forth at page 10 of 18 of the Projections under "General Unsecured

18  Claims" for such quarter as increased by Exhibit 4 (each, a "Jordan Plan Payment"). The

19  Reorganized Debtor projects funding the full GUC Payment Amount within four (4) years of the

20  Effective Date. (See Ex. 4.)  The Reorganized Debtor shall have the right to prepay the GUC

21  Payment Amount in full at any time and without any penalty.  Upon the Reorganized Debtor fully

22  funding the GUC Payment Amount, it shall have no further obligation to the GUC.

23      As reflected in the Projections, the Reorganized Debtor's post-Effective Date cash flow

24  includes substantial funds from PTS and Phoenix Traffic Management Inc. ("PTM").  The

25  Reorganized Debtor is projected to receive nearly $10.8 million per year from PTS on account of

26  management fees and equipment rent. (See Ex. 1 at 2 of 18.)  PTS is projected to repay the PTS

27  Loan with interest less than one year after the Effective Date.  (See Ex. 2 at 8 of 10.) In addition,

28  the Reorganized Debtor is to receive substantial annual distributions from PTS's available cash

flow.  (See Ex. 1 at 8 of 18.)  The projected annual distributions collectively exceed $14.5 million over the term the Plan.  The Reorganized Debtor is projected to receive not less than $720,000 on an annual basis from the to be formed subsidiary to hold the CSLB C31 license to provide traffic control services thereby eliminating PTM management fees and equipment rent.  The *to be formed* traffic control company will contribute all of its profits towards the projected payments to GUC until the GUC Payment is paid in full.  (See Ex. 4.)

In addition, as provided in Section III.E.2. below, the Reorganized Debtor will be vested with all Causes of Action, which are comprised of all Insider Avoidance Actions, the Loan Causes of Action, excluding the Excluded Claims.  Any payments on the PTM Loan and the Mowbray's Waterman Properties LLC ("MWP") Loan within the amounts set forth in the Projections shall be paid to the Reorganized Debtor and distributed to GUC to be applied against the $21 million.  Acquisitions will investigate claims described as the Avoidance Actions and/or Loan Causes of Action and/or other insider claims against Robin, Richard J., PTM, MWP and the Gloria Mowbray Separate Property Trust as well as asserting other claims available.  The Holders of Allowed General Unsecured Claims will share pro rata in Net Recoveries as payments to be applied against the $20 million balance remaining to the GUC.

**B.      Jordan and Acquisition's $1 Million New Value Contribution**

On the Effective Date, Acquisitions shall contribute to the Debtor the sum of $1,000,000 (the "New Value Contribution") as a new value contribution.

The New Value Contribution or, if applicable, the Winning Bid Contribution shall be paid to the Reorganized Debtor to be used as part of the Reorganized Debtor's cash flow to pay operating expenses and/or make the Distributions required by the Jordan Plan.

The New Value Contribution shall be subject to overbids in accordance with the Overbid Procedures attached hereto as Exhibit 5.  However, in the event Acquisition is not the winning bidder then Jordan shall not subordinate his Class 17 claim, and his general unsecured claim shall be considered a part of Class 16.  Acquisitions intends to seek approval of the Overbid Procedures in accordance with the Court's order approving the Disclosure Statement for dissemination.  The material dates and deadlines set forth in the Overbid Procedures are as follows:

1.      Only Qualified Bidders may submit bids on the Reorganized Debtor Equity Interests;

2.      All bids for the Reorganized Debtor Equity Interests must be Qualified Bids in accordance with the Overbid Procedures;

3.       The Bid Deadline to submit Qualified Bids is five (5) Business Days after the Voting Deadline (and assuming an impaired Class of Allowed Unsecured Claims votes in favor of the Jordan Plan);

4.      Any Qualified Bid must exceed the value of the New Value Contribution by $50,000 in addition to meeting the other Qualified Bid requirements set forth in the Overbid Procedures;

5.      The Auction on the Reorganized Debtor Equity Interests will occur on the date that is no later than three (3) Business Days before the deadline for the Debtor to file its memorandum in support of confirmation of the Jordan Plan;

6.      Bids by Qualified Bidders during the Auction must exceed the previous bid by at least $25,000;

7.      The Winning Bidder for the Reorganized Debtor Equity Interests shall be determined by the Court and subject to approval of the Court at the Confirmation Hearing.

**C.      <u>Substantive Consolidation Option</u>**

Jordan and Acquisitions reserve the right to file a motion seeking to substantively consolidate the Estate of the Debtor with any Affiliate, MWP and/or RM Estates, if it is determined that the legal requirements for such substantive consolidation can be satisfied and that such substantive consolidation is in the best interests of the Estate and will not be detrimental to the Mowbray's Estate, including, without limitation, as part of a compromise to be approved with confirmation of the Jordan Plan.  In addition, should the Court, by Final Order in connection with confirmation of the Jordan Plan, substantively consolidate the Estate of the Debtor with any Affiliate (upon motion by the Debtor or otherwise), then the assets of such Affiliate shall be deemed property of the Estate as of the Effective Date and shall vest in the Reorganized Debtor as provided herein, and the Claims against such Affiliate shall be treated in accordance with the

treatment of similarly situated claims in the Jordan Plan, i.e., any General Unsecured Claims shall receive the treatment in Classes 16, 17 and 18.

### D.    Sale of Real Properties

After the Effective Date, the Reorganized Debtor shall be authorized but not required (except as otherwise expressly set forth below in this Section III.D.), to sell any Estate Real Property.  Pending the Jordan Plan Term End Date, the sale or encumbering any Estate Real Property shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real Property shall not be sold or encumbered absent an order of the Court.  The Reorganized Debtor may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

As an alternative to the sale of any Estate Real Property as provided or required herein, the Reorganized Debtor may incur or obtain financing secured by such property as necessary to pay Allowed Claims pursuant to an order of the Court.

### E.    Reorganized Debtor Retention of Professionals and Fees and Expenses

On or after the Effective Date, the Reorganized Debtor may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as it deems necessary and appropriate to assist in carrying out its rights or duties under the Jordan Plan. Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtor.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtor (the "Reorganized Debtor Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtor.

The Reorganized Debtor Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses.  The Reorganized Debtor shall pay, without further order, notice, or application to the Court, the reasonable fees and actual expenses of any Reorganized Debtor Professionals.

### F.    The Reorganized Debtor as Disbursing Agent

The Reorganized Debtor shall serve as the disbursing agent under the Jordan Plan for the distribution of all funds called for under the Jordan Plan to Holders of Allowed General Unsecured

1    Claims and shall be responsible for making all Distributions to the Holders of Allowed Unsecured

2    Claims required under the Jordan Plan.

3    **G.    The Bond**

4    The Reorganized Debtor shall not be required to post a bond or surety or other security for

5    the performance of its duties under the Jordan Plan.

6    **H.    Release of Liens**

7    Except as otherwise expressly provided in the Jordan Plan for the Holders of Allowed

8    Claims in Classes 1 through 15, or the Confirmation Order, or in any document, instrument or

9    other agreement created in connection with the Jordan Plan, on the Effective Date, all mortgages,

10   deeds of trust, liens, or other security interests in or against property of the Estate shall be released.

11   The Jordan Plan Trustee and the Reorganized Debtor shall be empowered to file such pleadings

12   and/or record such documents or instruments as necessary to eliminate, expunge or release such

13   liens from their respective assets.

14   **I.    Effectuating Documents; Further Transactions; Exemption from Certain**

15       **Transfer Taxes**

16   The Reorganized Debtor may take all actions to execute, deliver, file or record such

17   contracts, instruments, releases and other agreements or documents and take such actions as may

18   be necessary or appropriate to effectuate and implement the provisions of the Jordan Plan without

19   the need for any approvals, authorizations, actions or consents except for those expressly required

20   pursuant hereto.

21   Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto

22   shall not be subject to any stamp tax or other similar tax or governmental assessment in the United

23   States, and the Confirmation Order shall direct the appropriate state or local governmental officials

24   or agents to forgo the collection of any such tax or governmental assessment and to accept for

25   filing and recordation instruments or other documents pursuant to such transfers of property

26   without the payment of any such tax or governmental assessment.  Such exemption(s) specifically

27   applies, without limitation, to all documents necessary to evidence and implement the provisions

28   of and the distributions to be made under the Jordan Plan.

**J.      The Reorganized Debtor's Post-Confirmation Management**

On the Effective Date the then existent members of the Board of Directors of Mowbray's is/are deemed to be removed and Acquisition as sole shareholder, as a result of the Jordan Plan Confirmation, shall promptly appoint a new Board of Directors.  It is anticipated the new Board of Directors of Mowbray's will appoint Ronnie Jordan to serve as CEO, Jacob Morrow to serve as President, Keena Morrow to serve as Vice President and Kenneth Catanzarite to serve as Vice President, Secretary and interim CFO of the Reorganized Debtor and each shall serve as members of the Reorganized Debtor's Board of Directors (the "Mowbray's Board") and the Board of Directors of PTS.  To the extent that the Debtor's bylaws are inconsistent with the Jordan Plan, the Jordan Plan shall control.

**K.      Powers and Duties of the Reorganized Debtor**

On and after the Effective Date and except as otherwise set forth in the Jordan Plan, and notwithstanding anything to the contrary in the Debtor's bylaws, the Reorganized Debtor shall have the power and authority to take such actions as necessary to carry out and implement the terms of the Jordan Plan, including, without limitation, the following:

a.      Receiving the New Value $1,000,000 and issuing the 10,000 shares of Mowbray's capital stock and making the Distributions required by the Reorganized Debtor under the Jordan Plan;

b.      Filing motions or commencing proceedings to determine the allowability, classification, and priority of Claims and Interests;

c.      Administering the terms of the Jordan Plan, the Confirmation Order, or any Order of the Court;

d.      Opening or closing any accounts the Reorganized Debtor determines reasonable, necessary, or required under the Jordan Plan;

e.      Reviewing, approving, and paying the fees and costs incurred by the Reorganized Debtor Professionals after the Effective Date;

f.      Operate and use its revenues and cash provided they comply with the payment terms in the Jordan Plan;

g.      Filing, prosecuting, or compromising any Estate Claims;

h.      Filing motions or commencing proceedings to seek an injunction, judgment or order, or taking any other action as may be necessary or appropriate to enforce the terms of, or to restrain interference with, the Jordan Plan or the Confirmation Order;

i.      Filing or amending any income, payroll or other tax returns, Federal or state, including without limitation for Employee Retention Credit ("ERC") Claims; and

j.      Taking any other action reasonably necessary or appropriate, in the Reorganized Debtor's discretion, related to the Debtor's operations or to implement the Jordan Plan.

On the Effective Date, all actions contemplated by the Jordan Plan shall be deemed authorized and approved in all respects, subject to the provisions of the Jordan Plan, by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without any further requirement of further action by the Reorganized Debtor.

**L.      Default on Obligations to Holders of Allowed Claims**

The failure of the Reorganized Debtor to (i) make a payment to the Holder of an Allowed Secured Claim, or (ii) make a payment to the GUC when such payment is due under the Jordan Plan shall constitute a "Default" under the Jordan Plan.  Upon a Default, the party to whom such payment was required to be made, as the case may be (i.e., the Holder of the Allowed Secured Claim may, in such party's discretion, provide written notice of such default to the Reorganized Debtor and its counsel.  If the Reorganized Debtor fails to cure such Default within thirty (30) days of receipt of the written notice, then such Default shall be an "Uncured Default" and the party noticing the Default may, after meeting and conferring with the Reorganized Debtor in good faith to determine whether the Uncured Default can be consensually resolved, file a motion with the Bankruptcy Court seeking dismissal or conversion of the Chapter 11 Case(s) under 11 U.S.C. § 1112(b).  This remedy is in addition to any remedy expressly granted to, or permitted by, the Holder of an Allowed Secured Claim in the treatment in the Jordan Plan for such Holder.  The remedy provided by this Section III.L. shall otherwise be the sole remedy for any Uncured Default under the Jordan Plan.

**IV.    CLAIM OBJECTIONS AND PROCEDURES FOR RESOLVING DISPUTED CLAIMS, THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2025**

### A.    Standing

On the Effective Date, the Reorganized Debtor and any other party-in-interest shall have standing to file objections to Claims.  An objection to any Claim, whether based on the Schedules or any proof of claim, may be filed after the Effective Date by such parties by the Claim Objection Deadline (as such deadline may be extended as provided herein).  The Reorganized Debtor and any other party-in-interest may seek to extend the Claim Objection Deadline for "cause" by a motion filed prior to the Claim Objection Deadline (as may be extended).  There is no limit to the number of extensions that may be sought.  As used herein, the "Claim Objection Deadline" shall mean the date that is one (1) year after the Effective Date.  The Reorganized Debtor may settle or compromise any Disputed Claim without approval or order of the Court, notice, or hearing.  The Reorganized Debtor shall be deemed the real party in interest in any objections to Claims commenced prior to or after the Effective Date.

### B.    No Distribution Pending Allowance

No Claim shall be paid under the Jordan Plan unless it is an Allowed Claim.  Notwithstanding any other provision of the Jordan Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### C.    Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution called forunder the Plan, the Disbursing Agent shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve for all Disputed Claims as otherwise required herein, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the

Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.

Unless otherwise provided in the treatment with respect to a particular Claim, if a Disputed Claim

ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall

be distributed on the earlier of: (a) the Distribution Date following the date when the Disputed

Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an

Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim

because the Disputed Claim does not become an Allowed Claim shall be returned to the

Reorganized Debtor.

### D.  **Claims Paid by Third Parties**

To the extent that the Holder of a Claim receives any Other Recoveries (before or after the

Effective Date) on account of such Claim, (i) the Holder of such Claim shall be required to, within

thirty (30) days of the receipt of such Other Recoveries, file an amended Proof of Claim reflecting

a reduction of such Claim in the amount of such Other Recoveries, and (ii) whether or not such

amended Proof of Claim is filed, the Claim shall be deemed disallowed and reduced in the amount

of such Other Recoveries as of the Holder's receipt of such Other Recoveries without an objection

having to be filed and without any further notice, action, order, or approval by the Court, and any

Pro Rata Distributions or Distributions to which such Holder is otherwise entitled under the Plan

shall be adjusted accordingly.

## V.  **DISTRIBUTIONS**

### A.  **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Jordan Plan, a Final Order, or as agreed to by the

relevant parties, the Reorganized Debtor shall make initial distributions under the Jordan Plan on

account of Claims Allowed before the Effective Date on or as soon as practicable after the

Effective Date.

### B.  **Distributions on Account of Claims Allowed After the Effective Date**

#### 1.  **Payments and Distributions on Disputed Claims**

Except as otherwise provided in the Jordan Plan, a Final Order or as agreed to by the

relevant parties, distributions under the Jordan Plan on account of a Disputed Claim that becomes

1 an Allowed Claim after the Effective Date shall be made as soon as practicable after the Disputed

2 Claim becomes an Allowed Claim.

3       **2.**     **Special Rules for Distributions to Holders of Disputed Claims**

4      Notwithstanding any provision otherwise in the Jordan Plan, and except as otherwise

5 agreed to by the relevant parties, no partial payments and no partial distributions shall be made

6 with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim

7 have been resolved by settlement or Final Order.  In the event that there are Disputed Claims

8 requiring adjudication and resolution the Reorganized Debtor shall establish appropriate reserves

9 for potential payment of such Claims.

10     **C.**    **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

11       **1.**     **Delivery of Distributions in General**

12      Except as otherwise provided herein, the Reorganized Debtor shall make distributions to

13 Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's

14 records as of the date of any such distribution or any Proof of Claim filed by that Holder.

15       **2.**     **Undeliverable Distributions**

16      Distributions to Holders of Allowed Claims will be sent to the last known address set forth

17 on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof

18 of claim was filed.  Holders of Allowed Claims may change the address to which the distributions

19 will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of

20 the change of address on the Reorganized Debtor.  If a distribution is returned as undeliverable,

21 the Reorganized Debtor shall hold the distribution and shall not be required to take any further

22 action with respect to the delivery of the distribution unless and until the Reorganized Debtor is

23 notified in writing of the then-current address of the person or entity entitled to receive the

24 distribution.  Unless and until the Reorganized Debtor is so notified, such distribution shall be

25 deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision

26 below for distribution of Unclaimed Property.

27 //

28 //

### 3.     Distributions of Unclaimed Property

If any distributions are returned to the Reorganized Debtor or the Jordan Plan Trustee as undeliverable, then such distributions shall be deemed to be "Unclaimed Property." Nothing contained in this Jordan Plan shall require the Reorganized Debtor or anyone else, to attempt to locate such person or entity. The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtor. If such person or entity presents itself within six (6) months of the date of the payment returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity. If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

### D.     Compliance with Tax Requirements/Allocations

In connection with the Jordan Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Jordan Plan to the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Jordan Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

## V.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, any executory contracts and unexpired leases identified on the schedule of executory contracts and unexpired leases to be assumed filed with the memorandum or pleading in support of confirmation of the Jordan Plan (the "Schedule of Assumed Agreements")

shall be deemed assumed by the Reorganized Debtor, as the case may be.  The Schedule of Assumed Agreements will identify any amounts that must be paid to cure defaults under the executory contracts to be assumed under the Jordan Plan (the "Cure Amount").  The Debtor reserves the right to amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; (b) modify the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The Debtor will provide notice of any amendment to the Schedule of Assumed Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment as well as to Jordan and his attorneys.

Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a final determination of the Cure Amount and a final determination that the Debtor has shown adequate assurance of future performance.  Further, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults arising from, out of, or related to the executory contract or unexpired lease, including any claims that were or could have been asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and you object to the assumption of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must file and serve upon the Debtor and its counsel a written objection within the deadline for objecting to the confirmation of the Jordan Plan.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Jordan Plan for such non-debtor party.  If a dispute arises regarding (a) whether the Debtor has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Reorganized Debtor reserves the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative Cure Amount (an "Alternative Cure Amount"), then the Debtor may amend the Schedule of Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the right of the Reorganized Debtor to either, up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date (the "Cure Motion Deadline"), (1) file a motion to determine the appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease.  Any such motion or notice of any such amendment will be served on the party to the executory contract or unexpired lease affected by the motion (or its attorney, if any). If the Reorganized Debtor does not, by the Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease, then the Cure Amount will be the

Alternative Cure Amount and such amount will be paid to the applicable non-debtor party within fifteen (15) days after the Cure Motion Deadline (unless otherwise expressly set forth in the Jordan Plan for such non-debtor party). If the Reorganized Debtor has filed such a motion and does not timely amend the Schedule of Assumed Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.

The Cure Amount will be paid to the applicable non-debtor party as soon as reasonably practicable following the expiration of the 15-day deadline or as otherwise expressly set forth in the Plan for such non-debtor party.

**B.**     **Rejection of Executory Contracts or Unexpired Leases Not Assumed**

On the Effective Date, the Reorganized Debtor will be deemed to have rejected any and all executory contracts and unexpired leases not identified on the Schedule of Assumed Agreements.

The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contracts and unexpired leases. Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the Reorganized Debtor and its counsel within thirty (30) days of the later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed Agreements by the Debtor to eliminate the executory contract or unexpired lease. Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor, the Reorganized Debtor, the Estate and their respective property. Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims.

IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE JORDAN PLAN.

## VI.    PRESERVATION OF CAUSES OF ACTION, AVOIDANCE ACTIONS FOR THE REORGANIZED DEBTOR

The Plan reserves for the Reorganized Debtor all rights to commence and pursue, as appropriate, any and all Estate Claims, whether arising prior to or after the Petition Date, in any court or other tribunal.  On the Effective Date, the Reorganized Debtor is vested with authority to enforce, file, litigate, prosecute, settle and collect Estate Claims, including Avoidance Actions although the Reorganized Debtor will not be required to do so unless it determines that doing so would be in the best interests of its creditors or Interest Holders.

While the Debtor has attempted to identify Estate Claims in the Disclosure Statement which may be pursued, and hereby incorporate by reference those disclosures and provisions, the failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to limit the rights of the Debtor or the Reorganized Debtor to pursue any Estate Claim that is expressly vested in such party in the Jordan Plan.  Unless an Estate Claim against any Person is expressly waived, relinquished, released, vested in the Jordan Plan Trust, compromised or settled as provided or identified in the Jordan Plan, any Confirmation Order or prior Bankruptcy Court order, the Debtor and the Reorganized Debtor expressly reserve Estate Claims for later adjudication.  Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to any Estate Claim upon or after Confirmation or consummation of the Jordan Plan.

All Estate Claims are preserved under the Jordan Plan for the benefit of the Estate and the Reorganized Debtor, as applicable under the terms of the Jordan Plan.  The Reorganized Debtor may settle or compromise any Estate Claims without further notice, motion, or order of the Bankruptcy Court.  Any recoveries on Estate Claims shall be paid to the Reorganized Debtor and be used to pay operating expenses or make payments on account of Allowed Claims and/or Interests in accordance with the terms of the Plan.

//

//

1    ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF

2  THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE

3  ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

4  RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR

5  RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER INFORMATION.

6  HOWEVER, ALL RIGHTS OF THE DEBTOR, THE REORGANIZED DEBTOR AND THE

7  ESTATE ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS

8  WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE OR OTHER LAW

9  (OTHER THAN THE INSIDER AVOIDANCE ACTIONS, WHICH ARE VESTED IN THE

10  PLAN TRUST).

11  **VII.    PRESERVATION OF TAX REFUND AND EMPLOYEE RETENTION CREDIT**

12  **REFUND CLAIMS FOR THE REORGANIZED DEBTOR**

13    The Reorganized Debtor will be expressly authorized pursuant to the Confirmation Order

14  on the Effective Date to file amended tax returns, including without limitation payroll tax returns,

15  to facilitate Employee Retention Credit claims, whether or not the time for filing same has

16  otherwise expired ("ERC Claims").  Any recovery net of expenses on said claims, if any, less the

17  tax related adjustment to expenses shall be used as a source to repay any outstanding GUC claims,

18  if any and otherwise applied to secured claims.

19  **VIII.    RETENTION OF JURISDICTION**

20    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

21  Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the

22  Chapter 11 Case and all entities with respect to all matters related to the Case, the Debtor, the

23  Reorganized Debtor, and the Jordan Plan as legally permissible, including, without limitation,

24  jurisdiction to:

25    1.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or

26  secured or unsecured status of any Claim, including, without limitation, the resolution of any and

27  all objections to the allowance or priority of any Claim;

28

2.     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Jordan Plan, for periods ending on or before the Confirmation Date;

3.     Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party;

4.     Resolve any issues related to any matters adjudicated in the Case;

5.     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Jordan Plan;

6.     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Estate Claims that are pending as of the Effective Date or that may be commenced in the future, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Jordan Plan and all other rights, contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Jordan Plan;

8.     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Jordan Plan or any entity's obligations incurred or rights granted in connection with the Jordan Plan;

9.     Issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Jordan Plan, except as otherwise provided in the Jordan Plan;

10.     Enforce the terms of the Jordan Plan;

11.     Enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.     Resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any right, contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan; and

13.     Enter an order concluding the Case.

## IX.    EFFECT OF CONFIRMATION OF THE JORDAN PLAN

### A.    Binding Nature of Plan

CONFIRMATION OF THE JORDAN PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (i) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (ii) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASE OR (iii) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

### B.    Discharge

The Debtor will receive a discharge upon the entry of the Confirmation Order.  Nothing herein shall limit the effect of confirmation as described in §§ 524 and/or 1141 of the Bankruptcy Code.  Upon discharge, the Reorganized Debtor and its assets will, to the fullest extent permitted by § 1141 of the Bankruptcy Code, including, without limitation as provided in § 1141(d)(1)(A) of the Bankruptcy Code, be deemed discharged and released from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities of any nature whatsoever, whether known or unknown, that arose before the Effective Date or that are based upon, arise from, or otherwise relate to acts, events, omissions, transactions, or other activities of any kind that occurred before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(I), in each case, regardless of whether: (1) a proof of claim based on such a debt is filed or deemed filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the person holding the Claim based on such a debt has accepted the Jordan Plan; provided, however, that in no event shall the Debtor be discharged of any obligations remaining under the Jordan Plan as of the Effective Date.

Except as expressly provided in the Jordan Plan, pursuant to § 1141(d)(5)(A), the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor to the fullest extent allowed under § 1141 of the Bankruptcy Code.  The Reorganized Debtor will not be liable for any Claims and will only have any obligations that are specifically provided for in the Plan.  Holders of any Claims or debts against the Debtor will, upon the Effective Date, be enjoined

1  from taking any action to collect, recover, or offset any such Claim or debt against the

2  Reorganized Debtor or as a personal liability of the Reorganized Debtor.

3       Except as otherwise expressly provided in the Jordan Plan or the Confirmation Order, all

4  persons will be precluded from asserting or pursuing against the Reorganized Debtor, the Estate,

5  the Jordan Plan Trustee, or their respective property for any Claims based on, arising from, or in

6  connection with any act, event, omission, transaction, or other activity of any kind that occurred

7  before the Effective Date, and any debt of the Debtor or Claim against the Debtor, whether

8  secured or unsecured, which was in default up to the Effective Date, will no longer be deemed in

9  default and will be deemed in good standing.

10      **C.    Injunction**

11      All Persons or entities who have held, hold, or may hold Claims (other than Claims that are

12  unimpaired under the Jordan Plan), and all other parties in interest in the Case, along with their

13  respective current and former employees, agents, officers, directors, principals, and direct and

14  indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of

15  any Claim or cause of action treated, discharged, released, or settled under the Jordan Plan, (i)

16  commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or

17  other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral,

18  administrative, or other forum) on account of such Claim or cause of action or against the

19  Reorganized Debtor; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any

20  manner or means, whether directly or indirectly, of any judgment, award, decree, or order against

21  the Reorganized Debtor; (iii) creating, perfecting, or enforcing in any manner, directly or

22  indirectly, any encumbrance of any kind against the Reorganized Debtor; (iv) asserting any right

23  of setoff, subrogation, or recoupment of any kind, against any obligation due from the

24  Reorganized Debtor, or against the property or interests in property of the Debtor or Reorganized

25  Debtor, on account of such Claims; (v) commencing or continuing in any manner any action or

26  other proceeding of any kind on account of, in connection with, or with respect to any such Claims

27  released or settled pursuant to the Jordan Plan; or (vi) taking any act to obtain possession or collect

28  from respective assets of the Reorganized Debtor; provided, however, that nothing contained

herein shall preclude such entities from exercising their rights pursuant to and consistent with the terms of the Jordan Plan.

### D.   Vesting of Property in the Reorganized Debtor

Except as otherwise provided in the Jordan Plan and excluding the Trust Causes of Action, the confirmation of the Jordan Plan vests title to all property whatsoever of the Debtor and the Estate in the Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but, pending the payment of all Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the Jordan Plan.

### E.   Modification of the Plan

The Jordan Plan may be modified at any time before confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on the Jordan Plan. Jordan may also seek to modify this Plan at any time after confirmation only if (i) the Jordan Plan has not been substantially consummated, and (ii) the Bankruptcy Court authorizes the proposed modification(s) after notice and a hearing.

### F.   Exculpations and Releases

To the maximum extent permitted by law, neither the Debtor, the Reorganized Debtor, Jordan, Acquisitions, nor any of their professionals employed or retained by any of them (collectively, the "Exculpated Parties"), shall have or incur liability to any person or entity for any Official Actions taken or omission made in good faith in connection with or related to the formulation and implementation of the Jordan Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Jordan Plan, or the consummation and implementation of the Jordan Plan and the transactions contemplated thereby.

### G.   Submission of Post-Confirmation Reports

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Jordan Plan. The status report shall be served on each of the following or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties

1    that receive notice of electronic filings in the Chapter 11 Cases.  Further status reports shall be

2    filed every 120 days and served on the same entities.

3         **H.**    **Quarterly Fees**

4         Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to

5    the OUST on or before the Effective Date. Quarterly fees accruing under 28 U.S.C. § 1930(a)(6)

6    after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the

7    entry of an order dismissing the Case or converting the Case to Chapter 7, at the rate in effect at

8    the time such fees are due.

9         **I.**    **Post-Confirmation Conversion/Dismissal**

10        After the Jordan Plan is confirmed, a creditor or party in interest may bring a Motion, only

11   after notice and a hearing, to convert or dismiss the Chapter 11 Case under Bankruptcy Code

12   section 1112(b) if there is an Uncured Default as defined hereinabove or other material default in

13   performing the Plan.  If the Bankruptcy Court orders the Chapter 11 Case converted to Chapter 7

14   after the Jordan Plan is confirmed, then all property that had been property of the estate and vested

15   in the Reorganized Debtor, and that has not been distributed under the Plan will revest in the

16   Chapter 7 Estate.  The automatic stay will be reimposed upon the revested property only to the

17   extent that relief from stay was not previously authorized by the Bankruptcy Court during the

18   Chapter 11 Case.  The Confirmation Order may also be revoked under very limited circumstances.

19   The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a

20   party in interest brings an adversary proceeding to revoke the confirmation within 180 days after

21   the entry of the Confirmation Order.

22        **J.**    **Final Decree**

23        Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the

24   Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final decree to close

25   the Chapter 11 Case.  The Reorganized Debtor shall be responsible for the timely payment of all

26   fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

27   //

28   //

1

**X.**      **CONCLUSION**

2

Jordan and Acquisitions believe that the Jordan Plan is in the best interests of all creditors

3

and stakeholders and urges the Holders of Allowed Claims to vote in favor of the Jordan Plan.

4

5

6                                                    **GOE FORSYTHE & HODGES LLP**

7    Dated: July 16, 2025                          /s/ Robert P. Goe

8                                                    By:  Robert P. Goe
                                                          Jeffrey W. Broker
9                                                    Attorneys for Creditor Ronnie Jordan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF DEFINITIONS

2    **A.    Definitions**

3    The following defined terms are used in the Disclosure Statement and in this Plan. Any

4    capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the

5    Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the

6    Bankruptcy Rules.

7    "Acquisition" means Mowbray Acquisition LLC, a California limited liability company

8    formed June 11, 2025 Secretary of State No. B20250160715.

9    "Administrative Claim" means a Claim for costs and expenses of the administration of a

10   Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a

11   Claim of a Professional employed at the expense of the Estate and any fees or charges asserted

12   against the Estate under 28 U.S.C. § 1930

13   "Administrative Tax Claim" means an Administrative Claim or other Claim that is not an

14   Allowed Secured Claim and that a government unit asserts against Debtors for taxes (or for related

15   interest or penalties) for any tax period that, either in whole or in part, falls within the period

16   beginning on the Petition Date and ending on the Effective Date.

17   "Affiliates" means, collectively, PTS, PTM, and MWP.

18   "Allowed" means a Claim that is either (a) listed in the Schedules filed with the Bankruptcy

19   Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount

20   and as to which no timely objection has been filed; or (b) with respect to which a proof of claim

21   has been filed by the Claims Bar Date, and as to which either (i) no objection or motion to estimate

22   was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or

23   order of the Bankruptcy Court, or (ii) any such objection has been determined with the Claim being

24   allowed by a Final Order.  The amount of an Allowed Claim shall be as follows: (a) if the creditor

25   did not file a proof of claim with the Bankruptcy Court on or before the Claims Bar Date, (1) the

26   amount of the creditor's Claim as listed in the operative Schedules as not disputed, contingent,

27   unliquidated or unknown, or (2) the amount fixed by Final Order of the Bankruptcy Court in

28   resolving any timely filed objection or other motion disputing the amount of such Claim; or (b) if

1  the creditor filed a proof of claim with the Bankruptcy Court on or before the Claims Bar Date and

2  the claim is not a Contingent Claim, (1) the amount stated in such proof of claim if no objection to

3  such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy

4  Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final

5  Order of the Bankruptcy Court if an objection to such proof of claim was filed within the time

6  period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy

7  Court. Any Claim for which a proof of claim is not filed by the Claims Bar Date and that is not

8  listed in the Schedules or is listed in the Schedules as disputed, unliquidated, contingent or unknown

9  shall be zero, and no distribution shall be made on account of such Claim. An Allowed Claim shall

10  not include any unmatured or post-petition interest unless otherwise stated in the Plan.

11  "Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim"

12  means an Allowed Claim in the specified Class and/or of the specified type.

13  "Allowed Administrative Claim" means an Administrative Claim allowed pursuant to

14  Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

15  "Allowed General Unsecured Claim" means an Allowed Unsecured Claim that is not

16  entitled to priority.

17  "Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable

18  Lien against property in which an Estate has as interest, or which is subject to setoff under Section

19  533 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section

20  506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's

21  interest in such property, or to the extent of the mount subject to any setoff as the case may be.

22  "Available Funds" means the projected estimated annual amount of funds described in the

23  Financial Projections attached hereto as Exhibit "4" to be paid to the GUC, with interest, under the

24  category labeled 'DEBT ROLL FORWARD – Jordan Model'.

25  "Avoidance Action" means causes of action arising under 11 U.S.C. §§ 510, 541, 542, 544,

26  545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common law,

27  including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to

28  prosecute such causes of action.

"Bankruptcy Case" or "Case" means the bankruptcy case of the Debtor under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:24-bk-12674-SC.

"Bankruptcy Code" or "Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California.

"Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a).

"Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

"Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and includes any claims based on, arising from, or connected with any work performed by the Debtor prior to the Petition Date, or

(ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claims Bar Date" means February 20, 2025, the date the Court set as the deadline for creditors to file proofs of claim against the Debtor's Estate.

"Class" means the group of Claims classified in the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

"Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the

1  Jordan Plan

2      "Debtor" means The Original Mowbray's Tree Service, Inc.

3      "Disclosure Statement" means the *Disclosure Statement Describing Creditor Ronnie*

4  *Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization*, including as it may be

5  further amended or modified.

6      "Disputed Claim" means all or any part of a Claim that is the subject of a timely objection

7  or request for estimation filed on or before the Claims Objection Deadline (as such deadline may

8  be extended), which objection or request for estimation has not been withdrawn or determined by

9  a Final Order of the Bankruptcy Court.  In addition, prior to the later of (a) the Claims Objection

10 Deadline, (b) if prior to the Claim Objection Deadline, a motion to disallow or estimate the Claim

11 is filed, then the date upon which such motion is determined by Final Order, or (c) if a proceeding

12 is pending to determine the validity, amount, or characterization of the Claim before a court of

13 competent jurisdiction (and if and to the extent that, prior to the Effective Date, the Bankruptcy

14 Court entered an order lifting the automatic stay to allow the proceeding to proceed to final

15 judgment), then the date upon which such proceeding, including, without limitation, any appeal or

16 remanded or further proceedings in or related to such proceeding, is resolved by a Final Order, any

17 Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

18 calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the proof

19 of claim is listed in the Schedules, (2) the Claim corresponding to the proof of claim is listed in the

20 Schedules as disputed, contingent, unliquidated, or unknown, (3) the amount of the Claim as

21 specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the

22 Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the priority

23 or classification of the Claim as specified in the Proof of Claim differs from the priority of any

24 corresponding Claim listed in the Schedules.

25     "Distribution" means the Cash that is required to be distributed under the Jordan Plan to the

26 holders of Allowed Claims and Interests.

27     "Effective Date" means the date that is the fifteenth (15th) day after entry of the

28 Confirmation Order.

"ERC Credit" and "ERC Claim" means the Employee Retention credits that may be pursued by amended returns, appeals and or litigation, resulting in an ERC Claim.

"Estate" means the bankruptcy estate of the Debtor created under Section 541 of the Bankruptcy Code in the Case.

"Estate Claims" means any and all claims and causes of action that constitute property of the Estate including, but not limited to, any Avoidance Actions, equitable subordination or debt recharacterization actions, any causes of action or claims for recovery of any amounts owing to the Debtor or the Estate, and any claims or causes of action against the Debtor's insurance carriers.

"Estate Real Property" means any real property that an Estate has an interest in.

"File," "Filed," or "Filing" means duly and properly filed with the Court and reflected on the Court's official docket.

"Final Order" means an order or judgment entered by the applicable court on its docket.

a.      That has not been reversed, rescinded, stayed, modified, or amended;

b.      That is in full force and effect;

c.      With respect to which the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; and

d.      With respect to which any appeal, motion or petition for review, remand, rehearing, or reconsideration, or writ of certiorari that is Filed has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, reconsideration, or a writ of certiorari was sought, and any remanded or further proceedings following such appeal, petition, or writ have been resolved by Final Order.

"General Unsecured Claim" means an unsecured Claim against the Debtor, however arising, not entitled to priority under § 507(a) of the Bankruptcy Code.

"GUC Interest Rate" shall mean, for each calendar quarter beginning on and after the Effective Date, the Federal Judgment Rate in effect on the first Business Day of such year.

"GUC Payment Amount" means the lesser of (a) $21,000,000, plus simple interest per quarter on the balance of such amount not yet paid to the Plan Trust at the GUC Interest Rate, and

1  (b) the total amount of Allowed General Unsecured Claims.

2  "GUC Payment Commencement Date" means the fifteenth (15th) Business Day after the

3  Effective Date from the $1,000,000 New Value contribution followed by the incremental net

4  income forecast in Exhibit 1 after tax payment obligations but not later than the third anniversary

5  of the Effective Date.

6  "Holder" means an entity holding a Claim.

7  "Insider" shall have the meaning in 11 U.S.C. § 101(31).

8  "Insider Avoidance Action" means any Avoidance Action against any Insider, excluding

9  any Excluded Claim.

10  "Interest" means any "equity security" as provided by Section 101(16) of the Bankruptcy

11  Code.

12  "Jordan" shall mean creditor Ronnie Jordan former CEO of Mowbray's.

13  "Jordan Plan" means the *Creditor Ronnie Jordan's Mowbray Acquisition LLC's Competing*

14  *Plan of Reorganization* filed in this case.

15  "Lien" means any lien, encumbrance, pledge or other charge against property.

16  "Liquidation Analysis" means the liquidation analysis setting forth what Holders of

17  Allowed Claims will receive in a chapter 7 liquidation and attached to the Index as Exhibit 3.

18  "Loan Causes of Action" means any Estate Claims or Avoidance Actions against PTM or

19  MWP including without limitation to collect the respective balances on the PTM Loan and MWP

20  Loan in excess of the amounts to be paid to the Reorganized Debtor as set forth in and according

21  to the Projections, which amounts shall be the property of the Reorganized Debtor.

22  "Mill St. Property" means the real property located at 686 E. Mill Street, San Bernardino,

23  CA 92415.

24  "Motion" means a request asking a judge to issue a ruling or order on a legal and/or

25  equitable matter.

26  "MWP" means Mowbray Waterman Property, LLC.

27

28

"Net Recoveries" means any proceeds recovered and received by the Plan Trust on any Trust Causes of Action, net of all attorneys' fees and other costs incurred to recover such proceeds, and less any Trust Costs.

"New Value" means the $1,000,000 contribution by Acquisitions for acquisition of Mowbray's assets and 100% of its capital stock.

"Non-Ordinary Course Administrative Claim(s)" means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

"Ordinary-Course Administrative Claim" means Administrative Claims other than Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative Claims, based upon liabilities that Debtors incur in the ordinary course of their business.

"Other Recoveries" means any amount, property, value, or payment that the Holder of a Claim receives on account of such Claim from a Person who is not the Debtor or from property that is not property of the Estate, including, without limitation, from a co-obligor, insurer, primarily liable party, or guarantor.

"OUST" means the Office of the United States Trustee, Santa Ana Division.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official committee appointed by the OUST, unofficial committee of creditors or equity holders, or entity.

"Petition Date" means October 18, 2024, the day that the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"PNC Collateral" means the "Prepetition Collateral" as that term is defined in the Cash Collateral Stipulation and any other assets of the Estate subject to PNC Security Interests.

"PNC Loan Documents" means the "Prepetition Loan Documents" as that term is defined in the Cash Collateral Stipulation.

"PNC Security Interests" means the "Prepetition Liens" as that term is defined in the Cash

Collateral Stipulation and any replacement liens granted to PNC pursuant to Section 6.b. of the Cash Collateral Stipulation.

"PTM" means Phoenix Traffic Management, Inc.

"PTS" means Pino Tree Service, Inc.

"Projections" means the projections attached hereto as Exhibit 1.

"Jordan Plan Term End Date" means the date that is ten (10) years after the Effective Date.

"Priority Unsecured Claim" means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

"Priority Tax Claim" means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code § 507(a)(8).

"Pro Rata Distribution" means the ratio (expressed as a percentage) of (i) the amount of an Allowed General Unsecured Claim (less any Other Recoveries) to (ii) the sum of the aggregate amounts of all Allowed General Unsecured Claims.

"Professional Fee Claim" means:

a.      A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred on the Estate's behalf, or

b.      A Claim either under Bankruptcy Code § 503(b)(4) for compensation for professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for expenses incurred in making a substantial contribution to the Estate.

"PTS Projections" are the projections attached hereto as **Exhibit 2.**

"Quarterly Distribution Date" means the Business Day selected by the Reorganized Debtor, in its sole and absolute discretion, within forty-five (45) days after a particular calendar quarter to make a Distribution as required by the Jordan Plan.

"Reorganized Debtor" refers to the Debtor upon and after the Effective Date and as reorganized under the Jordan Plan.

"Request for Payment" means a request for the allowance and payment of a Non-Ordinary Course Administrative Claim pursuant to 11 U.S.C. § 503(a).

"Schedules" means the Schedules of Assets and Liabilities filed by the Debtor in the Case, as required by § 521(a)(1) of the Code, Bankruptcy Rule 1007 (b)(l), and Official Bankruptcy Form No. 6, as the Schedules of Assets and Liabilities may have been or may be amended from time to time.

"SOFA" means the Statement of Financial Affairs filed by the Debtor in the Case as required by § 521(a)(1) of the Code and Bankruptcy Rule 1007(b)(l), as the Statement of Financial Affairs may have been or may be amended from time to time.

**B.    Rules of Construction**

The rules of construction in Bankruptcy Code section 102 apply to the Disclosure Statement and the Jordan Plan.  For the purpose of the Disclosure Statement and the Jordan Plan, unless otherwise provided in the Disclosure Statement or this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in the Disclosure Statement or the Jordan Plan to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to the Disclosure Statement and the Jordan Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in the Disclosure Statement and the Jordan Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Disclosure Statement or the Jordan Plan, as the case may be; (vi) the words "herein," "hereunder" and "hereto" refer to the Disclosure Statement or the Jordan Plan in its entirety rather than to a particular portion of the Disclosure Statement or this Plan, as the case may be; (vii) unless otherwise provided in the Disclosure Statement or the Jordan Plan, any reference in the Disclosure Statement or the Jordan Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent

1   with the express terms of the Disclosure Statement or the Jordan Plan, or any other provision in this

2   Section.

3   **C.      Rules of Interpretation**

4        Except as otherwise provided in the Jordan Plan, Bankruptcy Rule 9006(a) applies when

5   computing any time period under the Jordan Plan.

6        Any term used in the Jordan Plan that is not a Defined Term, but that is used in the

7   Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy

8   Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

9        The definition given to any term or provision in the Jordan Plan supersedes and controls

10  any different meaning that may be given to that term or provision in the Disclosure Statement.

11       Whenever it is appropriate from the context, each term, whether stated in the singular or the

12  plural, includes both the singular and the plural.

13       Any reference to a document or instrument being in a particular form or on particular terms

14  means that the document or instrument will be substantially in that form or on those terms or as

15  amended by the terms thereof.

16       Any reference to an existing document means the document as it has been, or may be,

17  amended or supplemented.

18       Unless otherwise indicated, the phrase "under the Jordan Plan" and similar words or phrases

19  refer to the Jordan Plan in its entirety rather than to only a portion of the Jordan Plan.

20       Unless otherwise specified, all references to Sections or Exhibits in the Disclosure

21  Statement are references to this Disclosure Statement's Sections or Exhibits, and all references to

22  Sections or Exhibits in the Jordan Plan are references to the Jordan Plan's Sections or Exhibits

23  Section captions and headings are used only as convenient references and do not affect this

24  Disclosure Statement's or the Jordan Plan's meaning.

25  **D.      Exhibits**

26       The following exhibits are attached hereto:

27       Exhibit 1 – Mowbray's Projections

28       Exhibit 2 – PTS Projections

Exhibit 3 – Liquidation Analysis

Exhibit 4 – Jordan Plan Projections with Added Income, $1 Million and Traffic Control

Exhibit 5 – Overbid Procedures.

**Exhibit 2**

1   Robert P. Goe – State Bar No. 137019
    Jeffrey W. Broker – State Bar No. 53226
2   **GOE FORSYTHE & HODGES LLP**
    17701 Cowan, Building D, Suite 210
3   Irvine, CA 92614
    Email: rgoe@goeforlaw.com
4           jbroker@goeforlaw.com
    Telephone: (949) 798-2460
5   Facsimile: (949) 955-9437

6   Attorneys for Creditor Ronnie Jordan

7

8                **UNITED STATES BANKRUPTCY COURT**

9                 **CENTRAL DISTRICT OF CALIFORNIA**

10                    **SANTA ANA DIVISION**

11

12  In re:                                    Case No.  8:24-bk-12674-SC
                                              Chapter 11 Proceeding
13  THE ORIGINIAL MOWBRAY'S TREE
    SERVICE, INC.,                            **CREDITOR RONNIE JORDAN'S**
14                                            **MOWBRAY ACQUISITION LLC'S**
                                              **DISCLOSURE STATEMENT**
15          Debtor and Debtor-in-Possession.  **DESCRIBING CREDITOR RONNIE**
                                              **JORDAN'S MOWBRAY ACQUISITION**
16                                            **LLC'S COMPETING PLAN OF**
                                              **REORGANIZATION**
17

18                                            **Hearing:**
19                                            Date:        _____, 2025
                                              Time:        1:30 p.m.
20                                            Courtroom:   5C
                                              Location:    411 W. Fourth Street
21                                                         Santa Ana, CA 92701
                                              [Hearing to be conducted via ZoomGov[1]]
22

23

24

25

26

27

28
    _____
    [1] Please refer to Supplemental Notice of Hearing to be Held Remotely Using ZoomGov Audio and
    Video filed concurrently herewith for ZoomGov information

                                   1
    **Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement**

# TABLE OF CONTENTS

I.     **OVERALL CASE SUMMARY COMPARING THE JORDAN PLAN $21 MILLION PAYOUT TO GENERAL UNSECURED CREDITORS WITH THE ROBIN/DEBTOR PLAN $15.6 MILLION PAYOUT TO GENERAL UNSECURED CREDITORS** ..............................................................................7

II.    **JORDAN PLAN EXECUTIVE SUMMARY** ..................................12

    A.   **The Purpose of This Document** ..........................................13

    B.   **Deadlines for Voting and Objecting; Date of Jordan Plan Confirmation Hearing** ..............................................14

        **1. Time and Place of the Confirmation Hearing**..............................14

        **2. Deadline for Voting For or Against the Jordan Plan**................................15

        **3. Deadline for Objecting to Confirmation of the Jordan Plan**....................15

        **4. Identity of Person to Contact for More Information Regarding the JordanPlan**.........................15

        **5. Disclaimer** ..................................................15

III.    **BACKGROUND** ..................................................16

    A.   **Background Regarding the Debtor and Its Operations**..................................16

    B.   **The Debtor's Funded Debt** ..........................................17

    C.   **The Debtor's Affiliates** ..........................................18

        **1. Pino Tree Service, Inc.** ..........................................18

          **a. The Line of Credit** ..........................................19

          **b. Management Agreement** ..........................................20

          **c. Equipment Lease** ..........................................20

          **d. Post-Petition PTS Payments** ..........................................20

        **2. Phoenix Traffic Management, Inc.** ..........................................20

          **a. The PTM Equipment Lease** ..........................................21

          **b. The PTM Loan** ..........................................21

          **c. Post-Petition PTM Payments** ..........................................22

        **3. Mowbray Waterman Property, LLC** ..........................................22

          **a. MWP Loans** ..........................................22

          **b. MWP Real Property Leases** ..........................................23

    E.   **Summary of the Debtor's Assets and Liabilities**..................................23

        **1. The Debtor's Assets** ..........................................24

        **2. The Debtor's Real Property** ..........................................24

        **3. The Debtor's Liabilities** ..........................................24

    F.   **Significant Events During the Bankruptcy Case**..................................25

        **1. Bankruptcy Proceedings** ................................................................... 25

          **a. "First Day" Motions** .......................................................... 25

          **b. Employment of Professionals** ............................................ 25

          **c. Claims Bar Date** ................................................................ 26

          **d. Motion to Reject Unexpired Leases and Servicing Agreement** ........... 26

          **e. Motions for Relief From the Automatic Stay** ........................ 26

          **f. The Judgment Creditors' Trustee and Substantive Consolidation Motion** ............................................................................ 27

          **g. The Debtor's Schedules and Monthly Operating Reports** .................. 28

        **2. Other Proceedings** ....................................................................... 28

          **a. Related Bankruptcy Cases** ................................................ 28

          **b. Potential Avoidance Actions** ............................................. 28

**IV.  THE JORDAN PLAN PAYS $21 MILLION WITH $1 MILLION UPON CONFIRMATION TO GENERAL UNSECURED CREDITORS AND MORE MONEY SOONER** ................................................................................ 29

    **A.**    **Former Mowbray's CEO Ronnie Jordan and His Management Team at Acquisition** ..................................................................... 30

    **B.**    **Ronnie Jordan Proposes to Again Successfully Lead Mowbray's Out of Financial Distress to Increased Revenue and Profitability** ................. 32

    **C.**    **Events Leading to the Debtor's Bankruptcy Filing Are From Mismanagement and Retrace the History From May 2018 When Jordan Was Recruited and Until His Wrongful Termination January 7, 2022** ............ 37

        **1. Mowbray's Had Never Had More than $70 Million in Annual Revenue, Operated at Losses or Breakeven until it Hired Jordan in June 2018 - in 4 Years Jordan Brought in $1 Billion of Revenue and $111 Million in Profits - Following Jordan's Wrongful Termination Mowbray's Has Returned to less than $70 Million of Revenue and Huge Losses Only if Pino is Counted, and Less than $10 Million from Mowbray's Alone** ...... 37

        **2. Debtor's Revenue Present Drop to Less Than $70 Million is a Retrenchment to Pre-2017 Levels and Losses Focused on Shedding Equipment and Employees Rather Than Optimizing its Size With Talented Revenue Building Sources** ............................................. 39

        **3. Mr. Kahn's Supplemental Opinions Attribute Mowbray's 2022-2024 Collapse to Robin and Richard J.'s Mismanagement** ...................... 40

    **D.**    **Historical and Current Financial Condition** ........................................ 42

    **E.**    **The Jordan Plan Forecasts Positive Performance from Increased Revenue Financed With a New $20 Million Credit Facility** .................................. 42

**V.  THE JORDAN PLAN** ................................................................................ 43

    **A.**    **The Jordan Plan Provides for a Reorganization of Mowbray's and Its Affairs** 43

    **B.**    **What Creditors and Interest Holders Will Receive Under the Jordan Plan** ..... 43

C.      Allowance and Treatment of Unclassified Claims................................44

    1. Administrative Claims .................................................................44

      a. Ordinary Course Administrative Claims................................46

      b. Non-Ordinary Course Administrative Claims .....................46

      c. Professional Fee Claims .......................................................47

    2. Priority Tax Claims......................................................................47

D.      Allowance and Treatment of Classified Claims and Interests ............................49

    1. Summary of Classes ....................................................................49

    2. Secured Claims ...........................................................................50

      a. Secured Claim of PNC Bank ................................................51

      b. Secured Claim of Jacobus Pino .............................................53

      c. Secured Claims Related to Vehicles or Equipment.................54

    3. Classes of Priority Unsecured Claims .........................................82

    4. Classes of General Unsecured Claims .........................................83

    5. Class of Interest Holders .............................................................85

VI.   MEANS FOR IMPLEMENTATION OF THE JORDAN PLAN .........................85

A.      Funding of the Jordan Plan .......................................................................85

B.      Jordan and Acquisition's $1 Million New Value Contribution .....................87

C.      Substantive Consolidation Option .............................................................88

D.      Sale of Real Properties ..............................................................................89

E.      Reorganized Debtor Retention of Professionals and Fees and Expenses.........89

F.      The Reorganized Debtor as Disbursing Agent .................................................89

G.      The Bond .....................................................................................................90

H.      Release of Liens .........................................................................................90

I.      Effectuating Documents; Further Transactions; Exemption from Certain
    Transfer Taxes ..........................................................................................90

J.      The Reorganized Debtor's Post-Confirmation Management...........................90

K.      Powers and Duties of the Reorganized Debtor ..........................................91

L.      Default on Obligations to Holders of Allowed Claims ...............................92

V.    DISTRIBUTIONS..............................................................................................92

A.      Distributions for Claims Allowed as of the Effective Date .................................93

B.      Distributions on Account of Claims Allowed After the Effective Date .............93

    1. Payments and Distributions on Disputed Claims ........................93

    2. Special Rules for Distributions to Holders of Disputed Claims .................93

C.      Delivery and Distributions and Undeliverable or Unclaimed Distributions......93

    1. Delivery of Distributions in General................................................93

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement**

**2. Undeliverable Distributions** ........................................................ 93

**3. Distributions of Unclaimed Property** ....................................... 94

**D.** **Compliance with Tax Requirements/Allocations** ......................... 94

**VII.** **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........ 95

**A.** **Assumption of Executory Contracts and Unexpired Leases** ............ 95

**B.** **Rejection of Executory Contracts or Unexpired Leases Not Assumed** .......... 97

**VIII. PRESERVATION OF CAUSES OF ACTION, AVOIDANCE ACTIONS FOR THE REORGANIZED DEBTOR** ........................................................ 98

**IX.** **PRESERVATION OF TAX REFUND AND EMPLOYEE RETENTION CREDIT REFUND CLAIMS FOR THE REORGANIZED DEBTOR** .......... 99

**X.** **CONFIRMATION REQUIREMENTS AND PROCEDURES** ........................... 99

**A.** **Who May Vote on or Object to the Jordan Plan** ........................ 100

**B.** **Who May Vote to Accept or Reject the Jordan Plan** ................... 100

**C.** **What Is an Allowed Claim or Interest** ..................................... 100

**D.** **What Is an Impaired Claim or Interest** .................................... 101

**E.** **Who Is Not Entitled to Vote** .................................................. 101

**F.** **Who Can Vote in More Than One Class** ................................... 101

**G.** **Votes Necessary to Confirm the Jordan Plan** ........................... 102

**H.** **Votes Necessary for a Class to Accept the Jordan Plan** .............. 102

**I.** **Treatment of Non-Accepting Classes ("Cramdown")** ................. 102

**J.** **Liquidation Analysis** ........................................................... 103

**K.** **Feasibility** ......................................................................... 108

**1. Effective Date Payments** ............................................ 108

**2. Post-Effective Date Payments** ..................................... 108

**XI.** **EFFECT OF CONFIRMATION OF THE JORDAN PLAN** ........................... 110

**A.** **Binding Nature of Jordan Plan** ............................................. 110

**B.** **Discharge** .......................................................................... 110

**C.** **Injunction** ......................................................................... 111

**D.** **Vesting of Property in the Reorganized Debtor** ........................ 112

**E.** **Modification of the Plan** ...................................................... 112

**F.** **Exculpations and Releases** ................................................... 112

**G.** **Submission of Post-Confirmation Reports** .............................. 113

**H.** **Quarterly Fees** ................................................................... 113

**I.** **Post-Confirmation Conversion/Dismissal** ............................... 113

**J.** **Final Decree** ...................................................................... 114

**XI.** **RISK FACTORS REGARDING THE JORDAN PLAN** .............................. 114

**XII.  PRESERVATION OF TAX REFUND AND EMPLOYEE RETENTION CREDIT
       REFUND CLAIMS FOR THE REORGANIZED DEBTOR**.........................................116

**XIII. TAX CONSEQUENCES OF THE JORDAN PLAN** ......................................................116

**XIV. CONCLUSION** ..............................................................................................................117

Creditor Ronnie Jordan ("Jordan") for Mowbray Acquisition LLC ("Acquisition") hereby submits this Disclosure Statement Describing Creditor Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization (the "Jordan DS") for all of the capital stock and assets of The Original Mowbray's Tree Service, Inc., the Debtor and Debtor-in-Possession in the above-captioned case (the "Debtor"). This Jordan DS describes Creditor Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan of Reorganization (the "Jordan Plan") to the Plan of Reorganization presented by the Debtor (the "Debtor's Plan" or the "Robin Plan"). The Jordan DS is presented pursuant to § 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances of the Jordan Plan. In support of the Jordan DS, Jordan as CEO of Acquisition and proposed CEO of Mowbray's also submits the concurrently filed index of 18 Exhibits (the "Index"). *Unless otherwise mentioned the Exhibits referred to herein are lodged in the separately filed Index of Exhibits to Creditor Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement. Exhibits 1 through 4 therein are also attached to the separately filed Creditor Ronnie Jordan's Mowbray Acquisition LLC Plan of Reorganization in the same order.*

On October 18, 2024, (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned case (the "Chapter 11 Case" or "Case"). Chapter 11 allows interested persons such as Jordan (a creditor of the Debtor), here via Acquisition, to propose a competing plan to that presented in the Robin Plan to satisfy the claims of creditors. A plan may provide for a creditor (Jordan, <u>as opposed to solely the Debtor</u>) to reorganize the Debtor by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Acquisition is the proponent of the Jordan Plan that was sent to you in the same envelope as this document along with a Ballot.

## I. <u>OVERALL CASE SUMMARY COMPARING THE JORDAN PLAN $21 MILLION PAYOUT TO GENERAL UNSECURED CREDITORS WITH THE ROBIN/DEBTOR PLAN $15.6 MILLION PAYOUT TO GENERAL UNSECURED CREDITORS</u>

The Jordan Plan is objectively superior to the Robin Plan and provides: (1) $21 million payable to the General Unsecured Creditors ("GUC") with Interest at the Federal Judgment Rate commending as of the Effective Date and adjusted quarterly as described in the Jordan Plan, which

1    is an increase from the $15.6 million "plus interest" proposed by Robin Mowbray ("Robin") in the

2    "Robin Plan" filed on behalf of the Debtor at ECF Docket Nos. 363, 364 and 365 with the Clerk of

3    the Court; (2) a $1 million "New Value" contribution on the "Effective Date" to be applied against

4    the $21 million plus Interest payable to the GUC; (3) forecasted increased revenue aided by a $20

5    million Credit Facility to be funded to the Reorganized Debtor to pay GUC in a projected 4 years

6    with Jordan subordinating his claim if the Jordan Plan is confirmed – compared to the Robin Plan

7    at 9 years to a payout $15.6 million and *at least* 11 years to a payout of $21 million; (4) an

8    experienced and seasoned vegetation management team with 100 years of deep industry

9    experience; (5) not only saving jobs but offering former employees the opportunity to return as

10    revenue increases; and (6) saving and revitalizing the Mowbray's brand after 50 years of operation

11    and continuing to provide valued services to the industry with a safety focus.

12        The Jordan Plan forecasts increased revenues from the seasoned management team

13    including Ronnie Jordan, Jacob and Kenna Morrow, Kenneth Catanzarite and James Kelly

14    supported by a $20 million credit facility.  Further, with the Jordan Plan, increased revenues and

15    Jordan subordinating his claim to the other GUCs thereunder, it is anticipated the GUCs other than

16    Jordan, will be paid their share of the $21 million plus Interest in 4-5 years, not the inferior $15.6

17    million plus interest in 9 years under the Robin Plan.  Further, if the Robin Plan agreed to pay the

18    same $21 million the payout would require at least 11 years.

19        Importantly, by way of background, Jordan was hired as Mowbray's CEO in June 2018

20    when the company was also insolvent, unable to pay debts as they came due and 2-3 months away

21    from bankruptcy unless Jordan could turn the company around.  Jordan as CEO of Mowbray's

22    took revenues to $471 million in 2020 and during his four years at the company garnered a total of

23    $1 Billion in revenue and $111 million in profits.

24        The Robin Plan is not feasible because it essentially relies on a single customer of Pino

25    Tree Service, Inc. ("PTS"), Southern California Edison ("SCE") generating $57 million a year

26    (that contract ends in December 2026) and 5-6 small customers of Mowbray's accounting for $8

27    million of revenue.  Combined revenue in 2026 when GUC payments are scheduled to commence

28    are $65 million with 88% of revenues concentrated with SCE.  If the SCE contract is lost, the Plan

**8**
**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement**

1  is patently not feasible because the payments to the GUC will not be paid.  Further, there is a

2  history of Mowbray mismanagement that has returned the company to its current financial

3  condition.  This mismanagement must be compared to when Jordan was desperately recruited to

4  be CEO in May 2018 when comparing the Jordan Plan with the Robin Plan.

5       In 2023 Mowbray had a lucrative vegetation management contract with Pacific Gas &

6  Electric ("PGE").  However, Richard Mowbray got into a dispute with PGE, demanded $250,000

7  which they paid and yet he subsequently pulled all Mowbray's crews off the PGE job.  PGE, the

8  largest utility in California, will not work with Mowbray's existing management.  Mowbray's had

9  another long-term maintenance contract relationship with Sacramento Municipal Utility District

10 ("SMUD").  When Mowbray's caused downed SMUD power lines in 2024, the contract was put

11 out to bid and Mowbray's lost the contract.  Jordan's management team will oversee a rigorous

12 safety program.

13      The Robin Plan at ECF Docket No. 365, page 99, sets out as Total Revenues Breakdown a

14 list of 6 specific customers and "other" in 2024 for revenue of $31.9 million.  That same page

15 shows Customers 1 and 2, which accounted for $22.4 million or 70% of Mowbray's revenue, <u>gone</u>

16 <u>in 2025</u>.  A Customer 6 appears in 2025 with $3.1 million of revenue out of $10.8 million total

17 revenue, then gone in 2026, leaving $7.8 million total revenue with $6.5 million thereafter

18 concentrated in 3 Customers.  Mowbray's is essentially a one customer company with a contract

19 with SCE that ends in 2026.  No new customers are forecast under the Robin Plan and the future

20 of the Debtor under the Robin Plan is dismal.

21      When Jordan took the CEO title at Mowbray's in 2018 he immediately increased revenues

22 with SCE contracts to finish 2018 with $95 million of revenue and turning a profit.  Thereafter,

23 under Jordan's leadership SCE became the biggest revenue source at roughly 60-70% of revenue

24 in the total four years or out of the $1 billion of revenues, $600,000,000 to $700,000,000 of

25 revenue from SCE, and the commensurate relative same share of the $111 million of profits.

26 Jordan led Mowbray's with a focus on safety and yet he was demoted in 2021 and completely

27 sidelined by the end of 2021 with Richard John Mowbray ("Richard J.") and Robin thereafter

28 running the company.  Richard J. and Robin terminated the safety consultant that Jordan had on

board during his successful period and safety suffered resulting in a fatality injury on November 10, 2021.  From that fatality as well as other mismanagement, Richard J. and Robin have reduced Mowbray's revenues from $471 million to less than $10 million; only if Pino is considered there is forecasted $70 million in revenues and ongoing losses.  That is remarkably a similar financial status when Jordan was recruited in May 2018 and thereafter turned Mowbray's around.

The Jordan Plan will focus on building revenues and customers (including PGE) and also growing the relationship with SCE.  When Jordan was CEO of Mowbray's he had a great relationship with both SCE and PGE management; many of those same people remain at those companies today.  Jacob Morrow, as President of Coleman described below, has a prime contract with PGE doing $60 million a year with PGE.  Mr. Morrow knows many of the current PGE management as well, interacting with them at a minimum weekly and at times daily, as well as prior relationships with SCE on the 2020 Mammoth Mountain tree cutting project.  Jacob has discussed generally with his PGE contacts returning Mowbray's to work with PGE and has been assured that should the Jordan Plan management take over, Mowbray's would again be considered for work with PGE.  The Jordan Plan will see management focus upon safety and building back the Mowbray's brand and business to the powerhouse it once was under Jordan's prior leadership with multiple customers and multiple revenue sources.  Further, James Kelly described below, will bring deep utility industry contacts including his many years as an SCE senior level officer to guide Mowbray's along with the Jordan management team.

The Jordan Plan increases the payment to GUC by (1) $5.4 million to $21 million (plus Interest) from $15.6 million "plus interest" proposed under the Robin Plan and provides for $1 million of "New Value" from Acquisition to pay to GUC on the Effective Date, and (2) will increase payments to the GUC from anticipated increased revenue financed by a $20 million credit facility.  The Jordan Plan provides 35% more money with Interest, a $1 million down payment and, via increased revenue, a shorter payoff time.  Jordan supports the Jordan Plan by subordinating payment on his GUC claim until after the other GUC are paid only if the Jordan Plan is confirmed.  Through the Debtor's ongoing operations under Acquisition's new ownership and management team, the Jordan Plan provides realistic and substantial increased value to all of

1    the Holders of Allowed Claims.

2         In sum, the Jordan Plan provides fair and equitable treatment for all Classes of creditors.

3    Each Holder of an Allowed Secured Claim will be paid in full.  The Plan adopts the contractual

4    repayment terms that give rise to the Secured Claims consistent with the Robin Plan.  The Holders

5    of Allowed General Unsecured Claims will receive a pro rata share of the increased $21,000,000

6    GUC Payment Amount with Interest, with Jordan's claim subordinated only if the Jordan Plan is

7    confirmed.  The first GUC Payment will be $1 million on the Effective Date provided by the New

8    Value contribution from Acquisitions for all of the Mowbray's capital stock and assets.  Jordan

9    will not receive any part of the $1 million payment or the balance of the GUC payments called for

10   under the Jordan Plan.

11        In addition, the Plan vests certain potential claims of the Estate, i.e., Insider Avoidance

12   Actions and Loan Causes of Action, in the Reorganized Debtor as opposed to a trust.  This will

13   result in administrative cost savings because a trust is not necessary as there will be no conflict of

14   interest between the Insiders and the Debtor/Reorganized Debtor.  The Holders of Allowed

15   General Unsecured Claims will receive a pro rata share of any Net Recoveries from such actions

16   as a payment against the $21,000,000.  Further, Distributions on account of Disputed Claims will

17   be reserved and paid upon allowance.

18        The Robin Plan relies upon certain cash flows from equipment rental and management fees

19   as well as loan repayments.  The Jordan Plan adopts and anticipates the same level of payments

20   and more as forecast revenue increases are achieved.  The Robin-owned affiliate Phoenix Traffic

21   Management, Inc. ("PTM") owes $2.5 million to Mowbray's and pays interest only.  Under the

22   Jordan Plan, Reorganized Debtor will pursue collection of that $2.5 million debt to increase the

23   payoff amount and shorten the term, with the objective of paying the GUCs earlier as there will be

24   no conflict of interest in doing so.  Further, because PTM is owned by Robin, not Mowbray's, the

25   Jordan Plan will establish as a 100% owned subsidiary of Mowbray's with a Contractor's

26   Licensing Board C-31 Traffic Control contractor and eliminate payments to Robin's PTM

27   altogether, thereby capturing 100% of the contracting overhead and profit in addition to equipment

28   rent conspicuously absent in the Robin Plan.  These added changes will benefit all of the Holders

1  of Allowed Claims under the Jordan Plan.

2  **II.    JORDAN PLAN EXECUTIVE SUMMARY**

3        The Jordan Plan through Mowbray's ongoing operations will pay creditors over the term of

4  the plan in excess of **$42 million** including "Secured Creditors PNC $6.4 million, Equipment

5  Loans $14.7 million and Jacobus Pino $.1 million" for a total secured of $21.2 million and **$21**

6  **million** with Interest to the GUC for a combined **$42.1 million** owing to the $5 million increase in

7  liquidation values attributable to PTS described hereinbelow. (See Ex. 2 at page 2 of 6 and Ex. 3.)

8        In sharp contrast the Robin Plan will pay creditors over the plan term $36 million including

9  a $15.7 million GUC Payment Amount with interest. (ECF Docket No. 364, Ex. 1 page 2 of 6.)

10       The Jordan Plan Reorganized Debtor's post-Effective Date projections borrows from the

11 Robin Plan with material modifications increasing the GUC payout by $5.6 million.  Exhibits 1

12 and 2 are from the Debtor's management under the Robin Plan reflecting the Mowbray's and Pino

13 Projections respectively.  As shown in Exhibit 3 the Robin Plan valued Pino at only $338,000.

14 The Jordan Plan addresses this inexplicable and inequitable valuation by increasing the Pino value

15 to $5,338,000, a 16 times increase.  This leads to the $21 million payout with Interest to GUCs

16 under the Jordan Plan.  See the materially different Liquidation Analysis at Exhibit 3 Page 2 of 5

17 explaining:

18       The Original Mowbray's Tree Service, Inc.

19       Hypothetical Liquidation Analysis

20       (USD$ in 000's)

21       Summary of Recovery

22       ...

23       Average Amount Available for Distribution to General Unsecured Creditors    15,674[000]

24

25       The Acquisition executives have carefully evaluated Pino Tree Service and giving due

26       consideration for its Cash, Accounts Receivable and Accounts Payable as well as its going

27       concern value, notwithstanding that its Southern California Edison contract ends in 2026,

28       believes the $338,000 amount under the Robin Plan is wholly inadequate.  Thus, Jordan's

DS values Pino Tree service at an additional $5,000,000 to be combined with the Robin Plan $15,674,000.

**TOTAL AMOUNT AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED UNDER JORDAN PLAN WILL BE $20,674,000 ROUNDED TO $21,000,000, PLUS INTEREST THEREON FROM THE EFFECTIVE DATE.**

The Jordan Plan importantly includes a $1,000,000 New Value contribution immediately distributed to the GUC on the Effective Date, the increased overall payout of $21,000,000 to the General Unsecured Creditors plus interest, an increased payout forecast from increased revenue supported by a $20 million credit facility and by bringing the C-31 Traffic Control revenue in through a new wholly owned subsidiary, eliminating PTM owned by Robin, not Mowbray's.

As shown in Exhibit 4, the Jordan Plan projections pay the GUCs in 4 years with Jordan's subordination only if the Jordan Plan is confirmed.  In contrast, at Exhibit 5, the Robin Plan, if paying the same $21 million payout, requires an unfeasible and speculative 11 year payment to the GUC.

The Effective Date of the Jordan Plan will be the first Business Day that is fifteen (15) days after the entry of an order confirming the Jordan Plan ("Confirmation Order"), provided there has been no order staying the effectiveness of the Confirmation Order.

A.     **The Purpose of This Document**

This Disclosure Statement summarizes what is in the Jordan Plan and provides certain information relating to the plan and the process the Bankruptcy Court follows in determining whether or not to confirm the plan.  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT**:

(1)     WHO CAN VOTE FOR OR OBJECT TO THE JORDAN PLAN;

(2)     WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., the projected payment on your claim if the Jordan Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO THE PROJECTED TREATMENT OF YOUR CLAIM IN LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE;

(3)     THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING

THE BANKRUPTCY CASE;

(4)     THE FACTORS THE BANKRUPTCY COURT WILL CONSIDER IN

DECIDING WHETHER OR NOT TO CONFIRM THE JORDAN PLAN;

(5)     WHAT IS THE EFFECT OF CONFIRMATION; AND

(6)     WHETHER THE JORDAN PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights.  You should

consider consulting your own lawyer to obtain more specific advice on how the Jordan Plan will

affect you and what is the best course of action for you.  Be sure to read the Jordan Plan as well as

this Jordan DS.  If there are any inconsistencies between the Jordan Plan and the Disclosure

Statement, the provisions of the Jordan Plan will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information"

concerning the Jordan Plan.  The Bankruptcy Court has approved this document as an adequate

Disclosure Statement, containing enough information to enable parties affected by the Jordan Plan

to make an informed judgment about the Jordan Plan.  Any party can now solicit votes for or

against the Jordan Plan.

**B.**     **Deadlines for Voting and Objecting; Date of Jordan Plan Confirmation**

**Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE JORDAN PLAN

DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF

THE JORDAN PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE

BANKRUPTCY COURT LATER CONFIRMS THE JORDAN PLAN, THEN THE JORDAN

PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST

HOLDERS IN THIS CASE.

**1.**     **Time and Place of the Confirmation Hearing**

The hearing where the Bankruptcy Court will determine whether or not to confirm

the Jordan Plan will take place on _____, 2025 at the hour of _____ (the

"Confirmation Hearing"), in Courtroom 5C of the Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth Street, Santa Ana, California 92701.

### 2. Deadline for Voting For or Against the Jordan Plan

If you are entitled to vote, it is in your best interest to do so on a timely basis by filling out the enclosed ballot and returning it in the enclosed envelope to Robert P. Goe, GOE FORSYTHE & HODGES LLP, 17701 Cowan, Building D, Suite 210, Irvine, CA 92614 or email rgoe@goeforlaw.com.  Your ballot must be received by no later than_____, 2025 (the "Voting Deadline"), or it will not be counted.

### 3. Deadline for Objecting to Confirmation of the Jordan Plan

Objections to the confirmation of the Jordan Plan must be filed with the Bankruptcy Court and served upon counsel for Jordan, Robert P. Goe, GOE FORSYTHE & HODGES LLP, 17701 Cowan, Building D, Suite 210, Irvine, CA 92614 or email rgoe@goeforlaw.com.  Your objection must be received by the Jordan's counsel listed above by _____, 2025, or it will not be considered.  The Debtor will file with the Bankruptcy Court and serve the results of the voting by _____, 2025.

### 4. Identity of Person to Contact for More Information Regarding the Jordan Plan

Any interested party desiring further information about the Plan should contact counsel for Jordan, Robert P. Goe, GOE FORSYTHE & HODGES LLP, 17701 Cowan, Building D, Suite 210, Irvine, CA 92614 or email rgoe@goeforlaw.com.

### 5. Disclaimer

The financial data relied upon in formulating the Jordan Plan is based on the Debtor's books and records information provided in its separate Disclosure Statement and Robin Plan which, is disclosed as unaudited.  The information contained in this Disclosure Statement is provided by Acquisition's Management based upon a review of the materials in the Debtor's separate Disclosure Statement and the Robin Plan, ane its revenue estimates and pre-tax profits which is not audited.  The Bankruptcy Court has not yet determined whether or not the Jordan

1    Plan is confirmable and makes no recommendation as to whether or not you should support the

2    Jordan Plan.

3         **THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING
STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS.  SUCH**

4    **STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF
HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-**

5    **LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE,"
"ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER**

6    **VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  JORDAN AND THE
ACQUISITION ADVISORS CONSIDER ALL STATEMENTS REGARDING**

7    **ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING
STATEMENTS.**

8
         **STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT**

9    **GUARANTEES OF THE REORGANIZED DEBTOR'S FUTURE CASH FLOW
AVAILABLE FOR DISTRIBUTION TO CREDITORS.  THERE ARE RISKS,**

10   **UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE
REORGANIZED DEBTOR'S ACTUAL CASH FLOWS TO BE DIFFERENT FROM**

11   **THOSE BEING PROJECTED, AND JORDAN, ACQUISITIONS AND ITS ADVISORS
UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.**

12   **THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS
ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND**

13   **UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO
DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-**

14   **LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, PROJECTIONS AND
OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE**

15   **ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO
HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT**

16   **CANNOT BE PREDICTED. T HEREFORE, ANY ANALYSES, ESTIMATES, OR
RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

17

18   **III.    BACKGROUND**

19         **A.    Background Regarding the Debtor and Its Operations**

20         As of the Petition Date, the Debtor is operating as the debtor in possession pursuant to §§

21   1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed.

22         The Robin Disclosure Statement represents that Mowbray was established in 1972 by

23   Gloria and John Mowbray (the "Founders") and has been in business in California providing

24   vegetation management services for over 50 years.  Mowbray's is currently owned and operated

25   by Robin Mowbray ("Robin"), who is also in her own separate bankruptcy case pending before

26   this Court. Mowbray's encountered growth and cash flow problems in early 2018 necessitating its

27   efforts to find a Chief Executive Officer ("CEO").  From June 2018 until 2021 Jordan was

28   Mowbray's CEO when, as described below it by far had its best years of revenue and profitability.

1   Mowbray's provides services for manual and mechanical clearing, integrated vegetation

2   management, storm and emergency, right-of-way maintenance, high-hazard tree removal and

3   crane services (collectively, "Vegetation Management Services").  Tree-trimming around power

4   lines, clearing vegetation to prevent forest fires, removal of debris and charred remains after major

5   wildfires, and assisting with damage remediation in response to hurricanes – these are the types of

6   important services that the Debtor provides to the communities it serves.  Historically, utility

7   companies have been the Debtor's primary clients, including California's largest energy utility,

8   Pacific Gas & Electric ("PG&E"), as well as Southern California Edison ("SCE").  Debtor also

9   provides services to governmental agencies and cooperatives.

10   The capital stock of Debtor is currently owned 100% by Robin, the youngest daughter of

11   the Founders.  Since 2021, Robin has been the Chairwoman and apparently is the only member of

12   the Debtor's Board.  Richard J. has been the Debtor's CEO since late 2020 after he and Robin

13   demoted Jordan, reduced his role through the end of 2021 and wrongfully terminated him without

14   just cause on January 7, 2022.  Ruben Sainos has served as the Debtor's CFO since 2023.  Prior to

15   the Petition Date, the Debtor retained Brian Weiss of Force 10 Partners as its Chief Restructuring

16   Officer ("CRO") to lead the Debtor through its formal restructuring process.

17   **B.      The Debtor's Funded Debt**

18   Pursuant to a loan agreement dated October 28, 2022 (the "PNC Loan Agreement")

19   between PNC Bank, N.A. ("PNC") and the Debtor, PNC provided the Debtor a secured revolving

20   line of credit not to exceed $20,000,000 and letters of credit not to exceed $5,000,000 (the "PNC

21   Loan").  As of the Petition Date, the Debtor owed PNC approximately $7,038,514 under the PNC

22   Loan, which is believed to be secured by liens on all or substantially all of the Debtor's assets

23   (excluding real property).  The PNC Loan was guaranteed by Robin and Mowbray's Waterman

24   Property, LLC ("MWP"), an affiliate of the Debtor only after trials were set in the Rodriquez and

25   Jordan cases described below.  MWP is also in bankruptcy before this Court.  The guaranty from

26   MWP purports to be secured by two real properties that it owns.  MWP an insider-owned 51% by

27   Robin and 49% by the Gloria Mowbray Separate Property Trust.

28

The Debtor has significant debt secured by its equipment.  The Debtor has approximately 800 pieces of equipment and the Debtor is a party to approximately 200 equipment agreements. The Debtor's equipment includes trucks with 40 to 100-ft aerial platforms and grapple trucks with large cranes to remove debris.  Substantially all of the Debtor's equipment is leased or financed with several lessors.  The Debtor's capital lease obligations are secured by the corresponding equipment. Altec Capital Services, LLC ("Altec"), and Bank of America ("BOA") are the Debtor's primary equipment counterparties, owed approximately $4.8 million and $6.8 million, respectively.

C.    **The Debtor's Affiliates**

The Debtor has three affiliates, Pino Tree Service, Inc. ("PTS"), Phoenix Traffic Management, Inc. ("PTM"), and MWP (collectively, the "Affiliates").

1.    **Pino Tree Service, Inc**.

While Jordan was CEO of Mowbray's he recruited Jacobus D. Pino ("Pino") to work as a pseudo subcontractor.  Jordan and Pino worked well together, and Jordan encouraged Pino to secure a tree cutting CSLB license.  Pino did so and later formed PTS to work as a subcontractor.

After Jordan was wrongfully terminated by Robin and Richard J., its safety program faltered and Mowbray's experienced a significant increase in safety concerns including a November 10, 2021 fatality on a Bear Valley Electric project, resulting in a safety score that precluded it successfully bidding as a prime contractor for most major utilities. Mowbray's failed to demonstrate restorative remedial and sustainable safety measures to retain the work with SCE. (See Supp. Declaration of Lawrence Kahn ¶¶ 19 and 21.)  Rather than correct its safety review problems to repair its safety score and save its work with SCE, Mowbray's in May 2022 purchased all of the outstanding shares of PTS from its founder Pino pursuant to a Stock Purchase Agreement dated May 26, 2022 (the "PTS Stock Agreement").  The purchase price was $1,500,000. Of this sum, $750,000 was paid by the Debtor in cash up front and $750,000 was reduced to a note payable to Pino (the "Pino Note").  Prior to the Debtor's acquisition of PTS, PTS served as a subcontractor for the Debtor on an SCE job that involved multipole subcontractors with the balance of the scope of work lost following the fatality and failure to respond sufficiently

to the safety issues to retain the scope of work. Pino continues to serve as the CEO of PTS.  PTS's

largest customer is SCE under a contract that expires by its terms in 2026.

//

As of December 31, 2024, a balance of $126,007.10 remained due on the Pino Note.  The

Debtor and Pino executed a Security Agreement dated July 1, 2022 (the "Pino Security

Agreement"), purporting to grant a security interest in 50% of the stock purchased by the Debtor

in PTS.  As provided in the Pino Security Agreement, upon an uncured default thereunder, and

depending on the balance owing on the Pino Note at the time of any such uncured default, Pino

could assert an entitlement to a percentage of the Debtor's stock in PTS that was to serve as

collateral for the Pino Note in full satisfaction of the balance owing.

The PTS Stock Agreement, the Pino Security Agreement, and any other documents

executed by the Debtor and Pino in connection with the Debtor's purchase of the stock in Pino

shall be collectively referred to as the "PTS Transaction Documents."

The PTS Projections show income in years 2027 through 2034.  The PTS contract with

SCE runs through 2026.  The PTS contract with SCE will need to be renewed and renegotiated if

there is to be income from that source commencing January 2027.

While the Jordan Plan contemplates no change in the PTS operations, it does anticipate

returning to the Jordan era of safety operations at Mowbray's to improve all safety programs to

protect the workers, improve the ISNet score and put Mowbray's in position to then successfully

bid on large utility projects.  The SCE work has not returned to Mowbray's nor has the SCE Pino

scope been expanded. (See Jordan Exhibits 1 and 2). Jordan through Acquisition, plans to

reconnect with SCE, demonstrate safety reforms and a plan to regain the SCE scope or work with

the aid of Jordan's management team including Jordan, Jacob and Kelly described below. The

Jordan Plan therefore anticipates early engagement with SCE to expand the possible scope of work

and make every effort to seek and obtain renewal of the Mowbray's prior Jordan relationships and

alternatively expansion of the PTS-SCE contract.

### a.    <u>The Line of Credit</u>

The Debtor and PTS are parties to a line of credit agreement dated January 1, 2024 (the

1   "PTS Loan").  Pre-petition, the Debtor provided PTS with the credit line to assist it with its

2   operations and working capital needs.  As of the Petition Date, the balance due by PTS to the

3   Debtor on the PTS Loan was $10,321,046.44.  Payments by PTS post-petition on account of the

4   PTS Loan are discussed below.

5                            **b.      Management Agreement**

6          The Debtor and PTS are parties to a Management Fee Agreement dated January 1, 2024

7   (the "PTS Management Agreement").  Under the PTS Management Agreement, the Debtor

8   provides certain specific services to PTS in exchange for a management fee.

9                            **c.      Equipment Lease**

10         The Debtor and PTS are parties to a Master Vehicle and Equipment Lease Agreement

11  dated September 27, 2022 (the "PTS Equipment Lease").  Under the PTS Equipment Lease, the

12  Debtor leases certain idle equipment to PTS.  The Debtor leases the equipment to PTS at the

13  Debtor's actual cost, plus a markup of 5 to 10% for ancillary costs and a small profit.

14                           **d.      Post-Petition PTS Payments**

15         PTS is making weekly payments to the Debtor.  In total, post-petition through March 7,

16  2025, PTS had paid the Debtor approximately $8,814,263 in management fees, equipment rent,

17  interest, and PTS Loan principal repayments.  On account of the PTS Loan alone, as of March 7,

18  2025, PTS has paid interest to the Debtor of approximately $287,427 and principal in the amount

19  of $4,888,000.  The latter amount includes a $4,000,000 lump sum payment on the PTS Loan in

20  December 2024.  As of March 7, 2025, the balance owed by PTS to the Debtor on the PTS Loan is

21  $5,367,725.  The Debtor has not loaned PTS any funds post-petition. The Debtor projects that the

22  PTS Loan will be paid less than one year after the Effective Date.  (See Ex. 1 at 7 of 18.)

23                      **2.      Phoenix Traffic Management, Inc.**

24         PTM is a Contractors State Licensing Board ("CSLB") C31 - Construction Zone Traffic

25  Control License # 1099826 company owned by unlicensed Robin Mowbray.  PTM has seen a

26  series of Responsible Managing Employees ("RME") as required to perform and bill for such

27  construction work, all of whom have disassociated from PTM as follows: Robert Allen Bailey,

28  Association Date 11/02/2023, Disassociation Date 02/09/2024; Jose Guadalupe Ramirez Flores

Association Date 12/19/2022, Disassociation Date 08/02/2023 and Arturo Franco Jr. Association Date 08/19/2024 Disassociation Date 10/31/2024.  As a result, PTM does not presently have a qualifying RME to oversee and supervise its services and should be unable to bid on, perform and bill for such construction work.

Certain Vegetation Management Services jobs, particularly large jobs, require outside traffic management services.  As such, the services that the Debtor obtained from PTM are services that it would have needed to obtain from a third party.  Pino has substantial payments to PTM in its forecast at Ex. 2 page 2 of 10 "Traffic Control Services" at $2,323, 054 in years 2026-2034.

The Jordan Plan solves this RME problem and profits problem because Acquisition's affiliate Coleman Environmental Engineering Inc. holds a C-31 license and its Responsible Managing Officer ("RMO") will "associate" with a subsidiary and sister company of Mowbray's and PTS to provide all of its and PTS traffic control work.  This will result in an increased payout to Debtor and correspondingly from Debtor to the GUC.

### a.     The PTM Equipment Lease

The Debtor leases certain equipment to PTM pursuant to a Master Vehicle and Equipment Lease Agreement dated March 1, 2022 (the "PTM Equipment Lease").  The Debtor leases certain trucks to PTM that it uses to provide traffic management services.  The trucks that the Debtor leases to PTM would otherwise be idle and the Debtor leases the trucks to PTM at cost, plus a markup of 5-10% for ancillary costs and a small profit.  The PTM Equipment Lease would be transferred to the new Jordan Plan C31 licensee and retained by Mowbray's, not to PTM that is owned 100% by Robin.

### b.     The PTM Loan

Pre-petition, the Debtor made a loan to PTM (the "PTM Loan").  The PTM Loan reflects a combination of advances by the Debtor to PTM to fund PTM's operating expenses and credits for rent for equipment leased by the Debtor to PTM when PTM lacked the cash to pay such rent.  The PTM Loan was not memorialized by a written agreement pre-petition.  Post-petition, the CRO, with the assistance of the Debtor's CFO, evaluated the PTM Loan and implemented repayment

1  terms, including requiring interest at the market rate of prime, plus 2%.  The PTM Loan

2  repayment terms are allegedly being reduced to a written agreement.

3      The PTM Loan is suspect because Exhibit 1 at page 99 of 122 shows 'Interest Only'

4  payments of $233,876 on a balance of $2,461,853.  Acquisitions will move to collect this entire

5  balance and to investigate whether or not there are additional transfers or amounts due to

6  Mowbray's for distribution to the GUC.  The Jordan Plan will pursue collection of the entire loan

7  and evaluate any other insider transfers that may be asserted.

8          **c.**    **Post-Petition PTM Payments**

9      During the Case through March 7, 2025, the Debtor has received approximately $512,448

10  from PTM in management fees, equipment rent, and interest on the PTM Loan, plus $18,000 in

11  repayment of principal on the PTM Loan, for a grand total of $530,448.  The current balance of

12  the PTM Loan is $2,456,219.

13      Remarkably, the Robin Plan does not offer any financial statement to demonstrate that

14  PTM has on hand cash and equivalents of not less than $2.5 million to pay up immediately on the

15  loan from Mowbray's creating an irreconcilable conflict for the current management team at

16  Mowbray's and PTM.  Unless PTM can pay the undisputedly due $2.5 million the Robin Plan

17  does not demonstrate adequate new value and appears not confirmable.

18      Moreover, the Jordan Plan eliminates entirely the need for PTM since it will form a

19  subsidiary with its C-31 licensee to capture all profits from the contracting license for Mowbray's

20  as the 100% owned parent, thereby eliminating any conflict on the part of Robin and the

21  unexplained current loss of revenue.

22          **3.**    **Mowbray Waterman Property, LLC**

23      MWP is a real estate holding company that owns and leases real property.  Robin

24  Mowbray owns 51% of MWP and the Gloria Mowbray Separate Property Trust owns 49% of

25  MWP.  The current sole beneficiary of the trust is Robin Mowbray's father who is disabled.  Robin

26  Mowbray is MWP's managing member.

27          **a.**    **MWP Loans**

28

The Robin Plan states the Debtor provided loans to MWP (the "MWP Loan"). The Robin Plan also states as of the Petition Date, the Debtor was owed $3,889,126.31 from MWP on account of the MWP Loan.

### b.    MWP Real Property Leases

•    The Debtor leases certain real property from MWP pursuant to three written lease agreements between the Debtor and MWP (collectively, the "MWP Leases") as follows:

•    The second floor of the real property located at 686 E. Mill Dr., San Bernardino, CA 92408 (the "Mill St. Property"), constituting of approximately 10,000 square feet, for $10,000 per month, or approximately $1.00 per square foot per month.

•    Certain real property parcels from MWP, APNs 0136-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, 0136-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, and 0136-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, to use as a parking yard for $3,000 per month.

•    The real property located at 17332 Millwood Dr., Visalia, CA 93292, to use as a parking yard for $1,000 per month.

The Debtor does not pay rent to MWP in cash. Rather, each month, a book entry was made against the MWP Loan in the amount of $14,000 for the monthly rent due under the MWP Leases.

It is asserted the Mill St. Property was purchased by MWP in July 2020 for $4,600,000 and the purchase price was, in part, financed from a loan to MWP by Bank of The Sierra ("Sierra Bank") in the amount of $2,990,000 secured by the Mill St. Property. The loan from Sierra Bank was guaranteed by the Debtor. The Debtor advanced $1,821,000 to MWP in connection with the purchase (via three deposits to escrow on February 13, June 25, and July 8, 2020).

A portion of the Mill St. Property (i.e., approximately 19,844 square feet primarily on the first floor) is leased to the County of San Bernardino (the "County") pursuant to a Lease Agreement between the County and the prior owners of the Mill St. Property. The term of lease with the County expired and the County continues to occupy the premises on a month-to-month basis at the rate of $35,124 per month, or approximately $1.77 per square foot per month. MWP pays approximately $15,153 to Sierra Bank per month.

### E.    Summary of the Debtor's Assets and Liabilities

1.      **The Debtor's Assets**

The Debtor's assets primarily consist of the following:

- Cash;

- Accounts receivable;

- Approximately 800 pieces of financed and leased equipment;

- Three real property parcels (further discussed below);

- The right to any surplus on two letters of credit drawn against by two insurance companies pre-petition;

- The Debtor's ownership in PTS;

- The Debtor's loan receivables from the Affiliates MWP and PTM; and

- Claims to be retained under the Jordan Plan by the Reorganized Debtor (as opposed to vesting them in a Trust).

The Debtor's assets are further set forth in the Liquidation Analysis in the Index as Exhibit 3 and the balance sheet included with the Projections in the Index as Exhibit 1.

2.      **The Debtor's Real Property**

The Debtor owns three parcels of real property located in San Bernardino.  These parcels have a collective book value of $245,000.  The Debtor also leases 11 properties (10 in California and 1 in Florida).  This includes the property leased with MWP discussed above.  The Debtor's leased real property is comprised of office space in California and yards upon which the Mowbray's equipment is stored and maintained.

3.      **The Debtor's Liabilities**

The Debtor's primary liabilities consist of the following: (a) the current outstanding balance of the PNC Loan in the approximate amount of $6.9 million; (b) operating and capital lease obligations that currently collectively total approximately $16.2 million (primarily owed to Altec and BOA); (c) trade debt owed to vendors incurred in the ordinary course of operations; and (d) litigation claims, many of which are contingent, disputed, unliquidated, and in unknown amounts.  The litigation claims include claims that are subject to pending litigation that is proceeding post-petition such as the Rodriguez Matter and the Jordan Matter.

F.    **Significant Events During the Bankruptcy Case**

1.    **Bankruptcy Proceedings**

a.    **"First Day" Motions**

On October 18, 2024, the Debtor filed the following "first-day" motions: (1) motion for entry of interim and final orders authorizing use of cash collateral [ECF Docket No. 5] (the "Cash Collateral Motion"); (2) motion for order authorizing continued used of Debtor's bank accounts and cash management system [ECF Docket No. 6] (the "Cash Management Motion"); (3) motion for entry of order authorizing payment of certain pre-petition employee-related claims and granting related relief [ECF Docket No. 7] (the "Payroll Motion"); (4) motion for order authorizing Debtor to continue insurance programs, honor terms of premium financing agreements, satisfy related pre- petition obligations and granting related relief [ECF Docket No. 8] (the "Insurance Motion"); (5) motion for order: (a) prohibiting utility providers from altering, refusing or discontinuing service; (b) deeming utilities adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of payment under 11 U.S.C. § 366 [ECF Docket No. 9] (the "Utilities Motion").  On October 24, 2024, the Court entered orders granting each of the foregoing motions on an interim basis. (See ECF Docket Nos. 70-74).

On November 25, 2024, the Court entered orders granting the Cash Management Motion, the Payroll Motion, and the Utilities Motion on a final basis. (See ECF Docket Nos. 184-186).  On December 2, 2024, the Court entered an order granting the Insurance Motion on a final basis. (See ECF Docket No. 201).  On January 24, 2024, the Court entered an order granting the Cash Collateral Motion on a final basis. (See ECF Docket No. 268).

In connection with the Court's approval of the Cash Collateral Motion on a final basis, the Debtor and PNC entered into a stipulation for use of cash collateral that was approved by the Court [ECF Docket No. 268] (the "Cash Collateral Stipulation").  Among other terms, the Cash Collateral Stipulation provides for payments by the Debtor to PNC.

//

b.    **Employment of Professionals**

On November 25, 2024, the Court entered an order authorizing the Debtor to employ

1   Raines Feldman Littrell LLP as the Debtor's general bankruptcy counsel. (See ECF Docket No.

2   187).

3       On November 25, 2024, the Court entered an order authorizing the Debtor to engage Force

4   Ten Partners, LLC to provide Brian Weiss as the Debtor's CRO and additional advisory personnel

5   to support the Debtor and the CRO. (See ECF Docket No. 188).

6       On December 17, 2024, the Court entered an order authorizing the Debtor to employ

7   Grobstein Teeple LLP as the Debtor's financial advisors. (See ECF Docket No. 220).

8       On December 19, 2024, the Court entered an order authorizing the Debtor to employ Hilco

9   Valuation Services, LLC to appraise certain machinery and equipment. (See ECF Docket No.

10  223).

11          **c.      <u>Claims Bar Date</u>**

12      On December 9, 2024, the Court entered a scheduling order setting a bar date of 60 days

13  following service of the bar date notice as the deadline for the Debtor to serve written notice of the

14  bar date. (See ECF Docket No. 206).  On December 23, 2024, the Debtor served written notice of

15  the bar date. (See ECF Docket No. 235).  Based on the date of service, the bar date was February

16  20, 2025 (the "Claims Bar Date").  (See ECF Docket No. 232).

17          **d.      <u>Motion to Reject Unexpired Leases and Servicing Agreement</u>**

18      As part of its continued efforts to downsize, on November 12, 2024, the Debtor filed the

19  Motion for Order Authorizing Rejection of Certain Unexpired Leases Pursuant to 11 U.S.C. § 365

20  and Fed. R. Bankr. P. 6006, Effective as of the Petition Date [ECF Docket No. 166] (the

21  "Rejection Motion").  By the Rejection Motion, the Debtor sought to reject certain unexpired

22  leases and a servicing agreement in order to reduce the amount of leased equipment and the

23  expenses related thereon.  On December 11, 2024, the Court entered an order granting the

24  Rejection Motion. (See ECF Docket No. 212).

25  //

26  //

27          **e.      <u>Motions for Relief From the Automatic Stay</u>**

28

1    During the Case, four creditors have moved for and obtained stay relief to proceed with

2    certain state court actions.

3    On February 3, 2025, the Court entered an order granting stay relief to allow the plaintiffs

4    in the Rodriguez Matter (the "Rodriguez Plaintiffs") to proceed with such matter to final

5    judgment, including any post-trial motions by the Debtor and any appeals. (See ECF Docket No.

6    236).  The Debtor filed a post-trial motion challenging the judgment entered in the Rodriguez

7    Matter that is scheduled for hearing on April 3, 2025.

8    On February 3, 2025, the Court entered an order granting stay relief to allow Ronnie D.

9    Jordan to proceed with trial in the Jordan Matter.  (See ECF Docket No. 273).

10    On February 24, 2025, the Court entered an order granting stay relief to allow Pamela

11    Metcalf-Kunelis to proceed to final judgment in the state court action in *Pamela Metcalf-Kunellis*

12    *v. Sacramento Municipal Utility District and The Original Mowbray's Tree Service, Inc*., in the

13    Superior Court of California, County of Placer, Case No. S-CV-0049514.  (See ECF Docket No.

14    335).

15    On March 12, 2025, the Court entered an order granting stay relief to allow Ping Liu and.

16    Guifen He to proceed to final judgment in the state court action in Liu, et al. v. The Original

17    Mowbray's Tree Service, Inc., et al., in the Superior Court of California, County of Sacramento,

18    Case No. 24CV000478. (See ECF Docket No. 354).

19    **f.    The Judgment Creditors' Trustee and Substantive Consolidation**

20    **Motion**

21    On February 7, 2025, judgment creditors Jaime Rodriguez and Ana Lidia Gomez (together,

22    the "Judgment Creditors") filed the Motion to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C.

23    § 1104(a); and a Motion to Substantively Consolidate Pino Tree Services, Inc., Mowbray

24    Waterman Property, LLC, and Phoenix Traffic Management, Inc. with the Debtor's Bankruptcy

25    Case [ECF Docket No. 286] (the "Trustee and Substantive Consolidation Motion").  The Trustee

26    and Substantive Consolidation Motion was opposed by the Debtor, PTS, MWP, PNC, and Sierra

27    Bank. (*See*, ECF Docket Nos. 308, 310, 312, 314 and 345).  The Court denied the Trustee and

28    Substantive Consolidation Motion and ordered the appointment of an examiner pursuant to 11

U.S.C. § 1104(c).  (See ECF Docket No. 350).  The entry of the Court's order and the appointment of the examiner are pending.  The examiner's report was filed on July 14, 2025.

### g.    The Debtor's Schedules and Monthly Operating Reports

The Debtor claims it is in compliance with all of its duties under 11 U.S.C. §§ 521, Federal Rule of Bankruptcy Procedure ("FRBP") 1006 and 1007, and the applicable Guidelines of the OUST. On November 15, 2024, the Debtor filed its Schedules and SOFA.  (See ECF Docket No. 170).

Additionally, pursuant to FRBP 2015.3, the Debtor is required to file reports of financial information on non-debtor entities in which he holds a controlling or substantial interest (the "Rule 2015.3 Report").  On December 19, 2024, the Debtor filed its first Rule 2015.3 Report.

The Debtor's 341(a) meeting of creditors was completed on January 3, 2025.  (See ECF Docket No. 242).  The Debtor has timely paid quarterly United States Trustee's fees and has filed its monthly operating reports.

### 2.    Other Proceedings

### a.    Related Bankruptcy Cases

On February 19, 2025, MWP filed a Chapter 11 petition, commencing case no. 8:25-bk-10542-SC (the "MWP Bankruptcy Case").  Also on February 19, 2025, Robin Mowbray file a Chapter 11 petition, commencing case no. 8:25-bk-10543-SC (the "RM Bankruptcy Case").

### b.    Potential Avoidance Actions

Attached to the Index as Exhibit 5 is the Debtor's SOFA, which includes all payments made to creditors during the 90-day period prior to the Petition Date and certain other pre-petition transfers within the one-year and two-year periods prior to the Petition Date based on the Debtor's books and records.  In addition, attached to the Index as Exhibit 6 is a schedule (the "Insider Payment Schedule") prepared by the Debtor from its books and records of payments to or for the benefit of any insider within the four-year period prior to the Petition Date (collectively, the "Insider Payments").  The Insider Payment Schedule includes the payments listed in the Debtor's SOFA.

1    In addition, the Jordan Plan contemplates a comprehensive and separate review of

2    historical records including accounting and bankruptcy records for additional Insider Payments

3    that are direct and indirect.  Indirect payments would be classified as well and pursued.  Additional

4    investigation of various payments to acquire, rehabilitate and improve real properties occupied by

5    Mowbray family members and known to Jordan as involving hundreds of thousands of dollars

6    from Mowbray's during his term as CEO.  These investigations and findings will be in addition to

7    those reflected in Exhibits 5 and 6.

8    All claims will be fully investigated as Avoidance Actions and pursued as warranted for

9    potential recoveries which will be shared with the GUC and applied against the remaining

10   $20,000,000 payout under the Jordan Plan.

11   Avoidance Actions may exist against some or all of the creditors, insiders, or other

12   transferees listed in the SOFA or the Insider Payment Schedule, and, unless expressly released by

13   the Jordan Plan, all Avoidance Actions under 11 U.S.C. §§ 544 through 550, including, but not

14   limited to, claims for the recovery of preferential transfers or fraudulent transfers, are hereby

15   reserved against all entities for the benefit of the Estate.  The omission of the identity of a recipient

16   of a potentially avoidable and recoverable transfer or of a particular payment from Exhibits 5 or 6

17   is unintentional and shall not be deemed a waiver of the right of the estates to recover any

18   distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy

19   Code.  It is possible that a significant majority of the payments are either not avoidable under the

20   legal standards of the Bankruptcy Code or subject to a valid affirmative defense.

21   The Debtor has filed all proofs of claim in the RM Bankruptcy Case and the MWP

22   Bankruptcy Case to preserve any claims the Estate may have.

23   Jordan has filed proofs of claim in the Debtor's case and in both the RM Bankruptcy Case

24   and the MWP Bankruptcy Case as his joint employers and as alter egos of Mowbray's.

25   //

26   //

27   //

28   **IV.    THE JORDAN PLAN PAYS $21 MILLION WITH $1 MILLION UPON**

**CONFIRMATION TO GENERAL UNSECURED CREDITORS AND MORE MONEY SOONER**

The Jordan Plan pays **$42 million** to creditors including **$21 million** to the General Unsecured Creditors with **$1 million** from a New Value capital infusion on the Effective Date, will expand revenue with a **$20 million** credit facility (See Ex. 18) and pay all the GUC sooner while subordinating Jordan's personal claim. As explained herein, Jordan rescued the insolvent Mowbray's in June 2018 from bankruptcy and in 2025 will again rescue Mowbray's employees and customers with the Jordan Plan.

The Robin Plan pays $15.7 million to General Unsecured Creditors and nothing up front from any capital infusion because she proposed only $100,000. Moreover, there is no provision or plan to increase revenue from operating the company instead forecasting flat to declining revenue which as explained below fails to deploy assets and opportunities profitably.

**A.     Former Mowbray's CEO Ronnie Jordan and His Management Team at Acquisition**

The Jordan Plan management team has an unmatched over 100 years of deep vegetation management industry experience coming from multiple sources and disciplines.

Acquisition is a newly formed California limited liability company owned by Jordan, the former CEO of Mowbray's which he rescued from insolvency and then successfully ran from June 2018 through 2021 taking its revenues from $88 million to $471 million. His co-owners in Acquisition, "Jacob" and "Keena" Morrow, husband and wife are also seasoned utility vegetation management executives, owners of Acquisition and current owners of Coleman Environmental Engineering, Inc. ("Coleman") a recognized vegetation management and disaster recovery company established in 2016 (see CSLB licenses described below). Kenneth Catanzarite ("Catanzarite") is an attorney and owner of Aegis Builders, Inc. a California licensed contractor established in 2005 and co-owner of Coleman and Acquisition.

Jordan will serve as CEO of Mowbray's, the same position he had from June 2018 until he was wrongfully terminated by Robin and her nephew Richard J. January 7, 2022. His extensive and detailed resume is attached hereto as Exhibit 6. Jordan brings 25 plus years of Utility Vegetation Management ("UVM") industry experience, including successfully running

Mowbray's to its objectively undisputed greatest years of sales and profitability as shown below at page 32 lines 9-28, securing over $1 billion of revenue from utility vegetation management work and $111 million of profits for Mowbray's in the period 2018-2021. Jordan brings a wealth of experience in UVM and disaster recovery, including Drought and Bark beetle tree removal, USFS Fuel reduction. Jordan has run 400 crews with multiple major utilities in California, Oregon, and Arizona. Jordan has a clear understanding of industry needs on the West and East coasts. Jordan also puts safety first with a rigorous safety program.

Jacob Morrow also with over 20 years of UVM experience will serve as the President of Mowbray's in the same role as he has with Coleman. Jacob joined Coleman in 2020, became an owner in 2023 and has since guided the day-to-day operations. Jacob grew Coleman revenues from approximately $12 million in 2023, to $44 million in 2024 and a run rate as of June 24, 2025 of over $60 million by adeptly leveraging resources, attracting new talent, and successfully delivering on critical projects leading to significant growth. Coleman employs over 300 employees in California and Washington and is a prime contractor to Pacific Gas & Electric ("PGE"). Jacob and Coleman also have extensive experience in a wide range of projects, from arborist initiatives and forestry efforts to wildfire response including the SCE Mammoth mountain project, cleanup, and habitat restoration as well as disaster recovery.

Kenna will be member-manager and Vice President of Mowbray's the same role as she has with Coleman. Kenna has more than 20 years of Logging, UVM and construction management experience along the East and West Coasts. Kenna has served as vegetation and field oversight manager for a variety of fire disaster, system hardening and disaster recovery projects. She has extensive experience interacting with regulators and the public on high-profile work sites across the country founding her own logging and tree-cutting company. Kenna leads Coleman's field efforts in disaster response as well as UVM. Kenna is a Native American Indian and member of the Yurok tribe and is of Siletz and Karuk tribal descent.

Jacob and Kenna will also put safety first with a rigorous safety program.

Catanzarite will be Vice President of Mowbray's the same role as he has held since 2023 in Coleman and since 2005 as President of Aegis Builders Inc. Catanzarite has extensive

construction experience in land clearing and development as well as demolition. Catanzarite holds

California Contractor's State Licensing Board ("CSLB") licenses A General Engineering

Contractor, B General Building Contractor, C-21 Building Moving/Demolition Contractor and C-

31 - Construction Zone Traffic Control Contractor. These licenses, necessary for disaster recovery

and land clearing work, will be added to Mowbray's and PTS at CSLB. Catanzarite is also a

retired Certified Public Accountant (Ohio) and Chartered Financial Analyst.

James Kelly ("Kelly") will be an Advisor of Mowbray's guiding utility company

relationships. Kelly has extensive executive level utility company experience including with SCE

as set out in his biography a copy of which is attached as Exhibit 7. Kelly retired from SCE after

38 years of service including overseeing contracting for vegetation management services as

"Senior Vice President of Transmission & Distribution for SCE, responsible for the operation and

maintenance of an electrical grid comprised of over 12,000 miles of transmission and 100,000

miles of distribution lines spread across a 50,000-square-mile service area. Mr. Kelly led an

organization of over 8,000 employees in the utility's T&D business unit". Kelly will consult on

Mowbray's strategies for securing more vegetation management services.

**B.** **Ronnie Jordan Proposes to Again Successfully Lead Mowbray's Out of Financial Distress to Increased Revenue and Profitability**

Ronnie Jordan has experienced this very same scenario before with Mowbray's. In May to

June 2018 Ronnie was recruited by Richard Edward Mowbray ("Richard E.", Robin's brother and

Richard J.'s father) to leave his job in Florida to work for Mowbray's because Mowbray's was at

the time, early 2018, insolvent and would have to declare bankruptcy if not turned around.

Attached as Exhibit "8" is a set of financial statements handed to Ronnie in these early meetings

confirming the insolvency. Alan Phang the long serving Mowbray's Chief Financial Officer

("CFO Phang") at the time explained to Jordan that Mowbray's needed $6.5 million per month as

its "break-even point" with the January to April 2018 Revenue of $25,839,872 versus Monthly

Payments of $28,727,511 showing a shortfall on cash flow of $2,887,639 (Ex. 8 Bates p. 239). At

that time the debt on equipment was $35,900,000 with monthly payments of $645,000. Jordan was

told Mowbray's had perhaps 2-3 months of cash left and given its debt level would need to file

bankruptcy unless Jordan was able to turn the business around.  Jordan was up to a challenge,

reached an agreement with Richard E. to immediately come to work for Mowbray's with the

objective to turn the business around in return for his salary, vehicles, housing and 10% of

Mowbray's profits which at the time was $0 after years of losses.

In a June 2018 Announcement at Exhibit 9 Richard E. described the Jordan hire as follows

"To: All Mowbray's Employee's (sic) From: Rick (E.) Mowbray" closing the letter with:

> Going forward Ronnie now has the responsibility of being the President and CEO of
> Mowbray's. This position gives him the authority to make decisions regarding the day to
> day operation of Mowbray's and, along with the support of our executive team, direct our
> company to an exciting future. Know that we as a company will support you and are
> excited about our future with you at the helm.
> I believe we are a company of great potential; a potential that you will allow us to achieve.
> Rick

Jordan immediately went to work generating increased business for Mowbray's largely

with SCE initially and putting the substantial equipment string as well as its idle crews to work

generating historic activity which would turn the business around avoiding its bankruptcy in 2018

and leading to record revenue and profits. Seeing the buzz of activity Richard E. followed the

Announcement with a Facebook post on July 17, 2018 (See Exhibit 10) advised the Mowbray's

Army:

> Mowbray's Tree Service is proud & very pleased to announce, **Ronnie Jordan, as
> Mowbray's CEO, and Shot Caller! All Day Everyday!**
> ...
> Ronnie Jordan... many years of business experience. Not only in disaster recovery all over
> the United States, (Ronnie was the VP/ project manager & VP/Business Development at
> Philips & Jordan for over 20 years one of largest disaster recovery companies in the United
> States) but also extensive experience in utility transmission and distribution vegetation
> management, coast to coast.
> At Mowbray's Safety is the most important part of our job.
> And as Ronnie Jordan, quotes
> "There is no Greater Investment, that is also unreplaceable,
> Than the men and women who work so hard here at Mowbray's."
> "Our commitment to safety is always our highest priority"
> ...
> **We have been waiting for you both a long time!**
> **You are in charge of an Army now Sir! That will follow you wherever you lead us.**
> Mowbray's
> SAFETY / QUALITY / & / RELIABILITY
> *Bold emphasis added.*

Jordan led the Mowbray's Army and delivered record revenue and profits but in return

Mowbray's kept all the profits for Robin and her family and reneged on the 10% of profits Jordan

was promised.  Jordan after he was wrongfully terminated by Robin and John J. on January 7, 2022, was forced to sue Mowbray's in January 2022 with a well supported $43 million claim for recruiting him to relocate from Florida to save the business from bankruptcy and then reneging on the promise to pay him a 10% of profits bonus plus statutory penalties for the move from Florida to California.

Importantly, during the pending litigation Richard E. was fired in early 2020 by Robin and Richard J. Richard E. who had recruited and hired Jordan because Mowbray's was insolvent and in desperate need, gave deposition testimony under oath on October 2, 2023 attached at Exhibit 11. That testimony confirmed his Sworn Statement on March 1, 2022 (2 months after Jordan was terminated) at Exhibit 12 and confirmed the 10% of profits agreement and Robin's knowledge of the agreement. (See Ex. 12 at page **14 lines 8-23.)**. Richard E. swore under oath the 10% agreement had not been put in writing because "... things were foreseen as, maybe, even better than what we had discussed here so it wasn't something that we were putting off.  It was just something that we just hadn't stopped and took the time to do.  I don't think we felt very -- we work good together. We trusted one another. We just hadn't gotten around to doing it.". True, Ronnie Jordan trusted Richard E. and Robin and he trusted and mentored Richard J., at the same time he was working night and day to save and then grow Mowbray's.  Robert E. testified that "... My sister Robin knew about [Jordan]... Even though I made the decisions, I always -- I did confide in her and let her know what we were going to do." "Q. Your sister knew the terms of Ronnie's contract that you had agreed, you know – A. Yes. Yes, she did. Q. So she knew the -- in particular, she knew the 10 percent of profits as part of the contract? A. Yes, she did. Q. ... Did she ever disagree with it and say you weren't authorized to do that? A. No. No. Q. All right. A. Never." 22:9-12.  "Q. Yeah. So, in other words, fairly stated, you felt this was a very successful hire and that Ronnie was performing per plan? A. Yes, I did."  After Ronnie Jordan took Mowbray's to $1 billion in revenue and $111 million in profits Robin and Richard J. refused to pay the 10% of profits and terminated Jordan. No doubt Robin and Richard J. felt they did not need Jordan, so they fired him to keep his profit share, but they were wrong.

Jordan has two experts in his pending state court case Kenneth Creal C.P.A. (See Exhibit 13 Report) for his damages calculating his rights to his 10% of profits promised and Lawrence Kahn a Utility Vegetation Management executive, speaker and Tulane University lecturer as well as attorney.

Mr. Kahn's resume and report in the Jordan pending state court case is attached as Exhibit 14 setting out his work experience at pages 1-4, his education at page 5, articles he has authored at pages 5-7, his admissions to practice law and professional and community organizations at pages 7-8. Mr. Kahn provided his opinions regarding the Jordan litigation against Mowbray's, Robin and MWP on January 5, 2024.  As a basis for his opinions he read the first amended complaint and each of the nine depositions in the case including Mr. Jordan, Richard E., Richard J., Robin, Alan Phang the CFO and others, as well as reviewed the deposition exhibits.

Mr. Kahn's opinions have proven to be prescient, appearing at pages 10-16 of Exhibit 14 setting forth 18 opinions including the following:

2. Over the last several years, on average, the [Utility Vegetation Management] UVM business generates revenues across the United States in the billions of dollars. While the exact amount is not known for certain, reliable sources have estimated the industry to be worth between approximately $10 billion and $25 billion annually. In California UVM work alone represents approximately $5 billion annually.
...
4. While highly skilled and safety-conscious workers can perform the work correctly, for a company in the UVM business to succeed, it must have responsible and highly skilled managers and executives.

5. Ronnie D. Jordan ("Ronnie"), the plaintiff in this case, was in 2018 – and remains today – one of the most highly respected executives in the UVM industry in the United States. Based on my knowledge of the industry and working experience, I feel it is safe to say that he is widely regarded as a "top ten" executive in this discipline.

6. It is clear to me that defendant The Original Mowbray's Tree Service, Inc. ("Mowbray's") must also have felt that Ronnie was such an executive. In support of this position, I specifically note:
a. The 2018 compensation package offered to Ronnie by Mowbray's to tempt him to be the Chief Executive Officer ("CEO") of Mowbray's and leave his home in Florida and relocate to California included, among other things:
I. A salary of $250,000;
ii. Housing;
iii. New vehicle;
iv. 10% of Mowbray's profits.
Such a generous compensation package is reserved by companies only for the most valued of executives and is awarded in an effort to not only attract top-level talent, but also to align the executive's interests with those of the company in order to convince the high-value executive to stay with the company on a long-term basis. It is worthy of note that this compensation package offered to Ronnie was structurally consistent with the offer made to

Mike Neal in 2016 (Ex. 34) to be Mowbray's Vice President – he was likewise offered a $250,000 salary and 2% of profits.

...

7. <u>At the time Mowbray's offered the 2018 compensation package to Ronnie</u> in approximately April or May of that year, Ronnie was already well-known in the UVM industry in California from a long list of achievements and success in leading other companies to their most successful years. <u>Mowbray's, on the other hand, was in serious trouble. It had dramatic financial losses to date and negative cash flow, with a projected loss in the millions of dollars for 2018. Mr. Phang admitted that Mowbray's was not doing well financially and could not pay its debts as they came due. **In other words, Mowbray's was, by the classic definition, insolvent.**</u>

8. **It appears evident that the compensation package offered to Ronnie by Mowbray's was a classic "bet the business" decision to save it from bankruptcy and closing.**

9. **Based on financial performance, the decision to hire Ronnie was probably the best business decision Mowbray's had ever made**. <u>Mr. Phang admitted that the best Mowbray's had done on a gross revenue basis since its founding in 2002</u> had been in the $50 million range <u>whereas after hiring Ronnie, Mowbray's skyrocketed as follows:</u>

       a. <u>2018 Operations achieved $92.6 million in sales and $3.1 million in profit</u> (after being in a loss situation for the first four months of the year);

       b. <u>2019 Operations achieved $213.8 million in sales and $17.1 million in profit;</u>

       c. <u>2020 Operations achieved $472.5 million in sales and $69.8 million in profit;</u>

       d. <u>2021 Operations achieved $284.1 million in sales and $31.1 million in profit.</u>

10. **By contrast, it appears that terminating Ronnie may have been among the worst business decisions Mowbray's has made.** Following Ronnie's departure, the company has **suffered numerous setbacks, including a seriously adverse safety challenge, lost at least one major utility client, and is now again contemplating bankruptcy**.

...

16. Ronnie led Mowbray's to a historic string of record-breaking revenues and profits over the course of each of several years. I have seen nothing in the record to suggest that there was any basis for a for-cause firing of Ronnie, even if the employment agreement containing that clause was enforceable as written.

17. It seems to me that **Mowbray's ownership, after enjoying several successive years of extraordinary revenues and profits that resulted from Ronnie's leadership, wrongly believed that it was capable of replacing Ronnie. To be sure, Ronnie was a very expensive employee, but Mowbray's made the mistake of thinking he was a luxury and not a necessity**. It seems that **Mowbray's ownership thought that it could keep the money it would otherwise have had to pay to Ronnie and still keep the operation moving forward**. What they **failed to realize was that knowledgeable, dynamic and successful leaders like Ronnie are very hard to come by, are worth their salt, and are not easily replaced**. Mowbray's ownership inserted their own family members, like **Ricky Mowbray and Robin Mowbray, who had no relevant experience running a massive operation that involved hundreds of tree crews and thousands of vehicles and pieces of equipment** across all of California (and beyond). **Ricky and Robin Mowbray were simply not up to the task of replacing Ronnie**. Serious health and safety problems followed almost immediately and the serious injuries that resulted led to lengthy safety stand downs and massive financial setbacks. These setbacks were exacerbated by

**further errors in keeping employees and equipment idle, failures to pay union benefits, and other challenges often made by inexperienced managers**. Mowbray's appears to have **slipped back into the management style that existed before Ronnie, and the financial status of the company today reflects a similar pre-Ronnie picture.**

18. **The connection between Ronnie and Mowbray's rise from 2018-2021 is plain, and it is clear that it would not have occurred but for Ronnie's leadership of that company**.
*Bold and underline emphasis added.*

Mr. Kahn's expert report was to be presented at the Jordan trial which was continued because of the bankruptcy filings of first Mowbray's in October 2024, and then MWP and Robin bankruptcies in February 2025.  The Robin and MWP bankruptcies were filed to avoid going to trial against Jordan because the Rodriguez Judgment Creditors did not have a judgement against either of them at that time.  Remarkably, Mr. Kahn in January 2024 predicted Mowbray's would end up in bankruptcy as it is today which it had avoided in 2018 due to Jordan's successful term as CEO.

The Jordan Plan with Jordan and its deep management team through Acquisition proposes a comeback and profitable operations which will pay all creditors more money and sooner than proposed in the Robin Plan.

**C.    Events Leading to the Debtor's Bankruptcy Filing Are From Mismanagement and Retrace the History From May 2018 When Jordan Was Recruited and Until His Wrongful Termination January 7, 2022**

**1.    Mowbray's Had Never Had More than $70 Million in Annual Revenue, Operated at Losses or Breakeven until it Hired Jordan in June 2018 - in 4 Years Jordan Brought in $1 Billion of Revenue and $111 Million in Profits - Following Jordan's Wrongful Termination Mowbray's Has Returned to less than $70 Million of Revenue and Huge Losses Only if Pino is Counted, and Less than $10 Million from Mowbray's Alone**

Mowbray's has been incorporated since February 2002.  Importantly, as reported by Mowbray's former CFO Phang in his deposition taken September 29, 2023, a copy of which appears at Ex. 16, Mowbray's prior to the Jordan hire, never had revenues that exceeded $70 million prior to 2017.  Further, at the time of Jordan's hire in June 2018 Mowbray's was not doing

well and was insolvent as it was unable to pay its debts as they came due (Ex. 16, page 82 line 25 to page 83 line10); the April 30, 2018 year to date loss was $4,480,292 compared to a loss as of April 30, 2017 of $2,776,000 (Ex. 16, page 88 line 3 to page 85 line1) and in the ten years Phang had been Mowbray's CFO the company never had revenue exceed $70,000,000 prior to 2017. (Ex. 16 page 101, lines 20-23).

The Robin Plan attempts to justify the revenue decline from 2020 as derived from the PGE bankruptcy filed in 2019 and exited in July 2020. However, the historical performance for context must compare the pre-hiring of Jordan in June 2018 wherein 2017 was a loss, year to date April 30, 2018 was also a large loss and prior to 2017 revenues had not exceeded $70 million.  Against this backdrop, Jordan's hire in June of 2018 brought record revenue, profits and tens of millions in distributions for Robin and Gloria Mowbray and then after Gloria's death distributions to Robin only.  The history follows with **the bold years for Jordan reflecting revenue of $1,059,900,000 (over $1 Billion) and profits of $111,800,000**:

| Year | Gross Revenue | Net Income/(Loss) |
| --- | --- | --- |
| 2017 | $86 million | ($1.6 million) |
| **2018 Ronnie starts June and reverses Loss of $5 million as of May 2018** | **$93 million** | **$3.6 million** |
| **2019** | **$214 million** | **$14.4 million** |
| **2020** | **$471 million** | **$69.2 million** |
| **2021** | **$281.9 million** | **$24.6 million** |
| 2022 | $232 million | ($34 million) |
| 2023 | $127 million | ($28.9 million) |
| 2024 | $39.89 million | ($2,313) |

*Jordan years in bold*

Jordan as CEO managed Mowbray's through the PGE bankruptcy and while accounts receivable from PGE increased to as much as $85 million during that period Jordan managed them down to $10,000.  He was able to finance the PGE business through a $25 million credit facility

which as PGE's receivables were collected was phased out.  The PGE bankruptcy was an

opportunity for work when other UVM contractors either did not want to take the risk or could not

finance the PGE projects available as Jordan skillfully navigated added revenue and profits.

**2.      Debtor's Revenue Present Drop to Less Than $70 Million is a Retrenchment to Pre-2017 Levels and Losses Focused on Shedding Equipment and Employees Rather Than Optimizing its Size With Talented Revenue Building Sources**

Rather than rehire Jordan in 2023 or sooner as revenues fell, or search for exceptional and

rare like talent to increase revenue, the Debtor, radically downsized operations, including, among

other things:

• Hiring a Chief Financial Officer, to analyze the Debtor's operations and down-size its operations.

• Reducing the salaries of non-union personnel, including executives.  The wages of the Debtor's non-union payroll totaled approximately $705,000 per week as of October 18, 2023.  The Debtor's payroll is currently approximately $180,000 per week.

• Conducting systematic layoffs of hundreds of employees.  As of October 18, 2023, the Debtor had approximately 440 employees.  The Debtor reduced the number of its employees to approximately 180 as of the Petition Date and the Debtor currently has approximately 85 employees.

• Renegotiating contracts and suspending services and expenses that is a result of its reduced size.

In 2022, the Debtor was in default on the PNC Loan.  The Debtor reached a forbearance

agreement with PNC (the "Forbearance Agreement").  Under the terms of the Forbearance

Agreement, the maturity date was extended to December 31, 2024.  The Forbearance Agreement

required certain interim payments to PNC, all of which the Debtor states it timely made.

The Debtor sold or returned idle equipment with the consent of the equipment leasing and

financing firms.  Through selling equipment, the Debtor reduced its monthly lease expense with

Altec by approximately $170,000 per month pre-petition.  The Debtor returned all of its leased

vehicles with Enterprise, which reduced the Debtor's monthly leasing cost by another $55,000.

The Debtor sold equipment leased or financed with BOA worth approximately $4,700,000, and the proceeds were paid directly to BOA to reduce the balance owing.  The Debtor also sold certain other equipment with the proceeds paid to PNC.  The Robin Plan states Debtor previously had more than three times the amount of equipment than it had as of the Petition Date.

In July 2024, a jury returned a verdict awarding damages of nearly $84 million in favor of the plaintiffs in the matter of *Jaime Rodriguez, et al. v. The Original Mowbray's Tree Service, Inc., et al.* (San Bernardino County Superior Court Case Number CIVDS2003809) (the "Rodriguez Matter").  The Debtor could not satisfy the verdict and any attempt by the plaintiffs to collect a resulting judgement (pending the Debtor's efforts to pursue a new trial or an appeal) would have been severely disruptive to the Debtor's operations.

A second jury trial in San Bernardino County Superior Court was scheduled to begin in October 2024 in the matter of *Ronnie D. Jordan v. The Original Mowbray's Tree Service, Inc., et al.* (San Bernardino County Superior Court Case Number CIVSB2201281) (the "Jordan Matter"). In light of the other financial difficulties facing the Debtor, the Debtor did not believe incurring the significant cost of a trial in the Jordan Matter was warranted.

3.    **Mr. Kahn's Supplemental Opinions Attribute Mowbray's 2022-2024 Collapse to Robin and Richard J.'s Mismanagement**

Mr. Kahn, Jordan's expert on the UVM industry, has reviewed the Robin Plan and provided Supplemental Opinions at Exhibit 15. Highlights of his opinions follow:

•    The 2022-2023 PGE revenue declines in UVM spending were weather and not PGE bankruptcy-related and such declines could have been offset by providing needed services in Oregon, Washington, Idaho, Nevada, Arizona, Texas and Colorado where utilities increased spending.  In addition, Louisiana, Alabama, Mississippi, Georgia, Florida, North and South Carolina, New Jersey, Ohio, and Pennsylvania utilities were also increasing spending. (Opinions 8-10.)

•    Mowbray's in 2023-2024 was known in the industry at the time to be selling its equipment at fire sale prices. (Opinion 14.)

1    •    Mowbray's should have engaged with utilities in other parts of the country to avoid

2    the decline in revenue and selling its equipment at fire sale prices. (Opinion 15.)

3    •    The PGE bankruptcy was in January 2019 through July 2020, not 2022 and Jordan

4    increased Mowbray's revenues to $471 million, including with PGE during its bankruptcy.

5    (Opinion 17.)

6    •    The loss of revenue particularly SCE was the result of a November 10, 2021

7    fatality a serious safety issue negatively impacting Mowbray's qualifications to work and

8    acquiring the much smaller PTS which even at $60 million currently was a fraction of the Jordan

9    led Mowbray's $120-$350 million with SCE. (Opinions 19-20.)

10    •    In summary at Opinions 19, 21 and 22:

11    19. The SCE business was lost by Mowbray's after Mowbray's demoted and sidelined Mr.

12    Jordan. On November 10, 2021 a Mowbray's employee was involved in a fatal accident

13    while working on a job for Mowbray's at Bear Valley Electric, and this accident, together

14    with the factors leading up to the accident and Mowbray's subsequent response to it, had

15    a severe adverse impact on its safety rating to the point where Mowbray's was no longer

16    qualified to perform work for SCE, at least until its safety program improved. It does not

17    appear that Mowbray's took the required steps to restore itself with SCE.

18    ....

19    21. Mowbray's material decline in revenues instead appears attributable to several factors,
20    including:

21    a. Mowbray's sidelining Mr. Jordan;
       b. Mowbray's failure to continue to build its UVM business within PG&E at a time
22    when PG&E was growing its spend on UVM;
       c. Mowbray's safety failures leading to and following the fatality on November 10,
23    2021 while working at Bear Valley Electric led to a reduced safety rating
       adversely affecting its status to work on projects for SCE;
24    d. Mowbray's was unsuccessful with any rehabilitation efforts that could have
       restored its ability to work directly for SCE; and
25    e. Mowbray's failure to geographically diversify its UVM offerings by providing
       UVM services in other fire-prone states.

26    22. Use of more efficient subcontractors, monitoring field efficiency of crews and
       equipment deployment, and better managing its critical safety program might also have
27    helped Mowbray's grow its UVM business even without Mr. Jordan's assistance.

28

In summary, Mr. Kahn's Supplemental Opinions refute the basis for revenue declines reported in the Robin Plan attributing the same to mismanagement.

**D.**     **Historical and Current Financial Condition**

The Debtor's unaudited financial statement for the year ending December 31, 2024, is included with the Projections. (See Ex. 1 at 10 of 18.) In 2024, the Debtor generated revenues of $39,886,026 and incurred operating expenses of $28,780,892.  The Debtor's operations resulted in a net loss of $2,313. (See id.).

From the Petition Date through March 7, 2025, the Debtor has generated positive cumulative operating cash flow of approximately $7.6 million.  The Debtor has, post-petition, increased its cash on hand from $4.2 million to approximately $11.8 million. Debtor's annual tree service revenues from 2024 to 2025 have declined due to the completion of the Debtor's contract with Sacramento Municipal Utility District ("SMUD").  The SMUD contract did not renew.  As of March 7, 2025, the Debtor has received approximately $9.34 million from PTS and PTM.  The Debtor's recent MOR is attached to the Index as Exhibit 17.

The SMUD contract was lost because of the safety record of Mowbray's including causing damage and destruction to numerous power poles and lines when a Mowbray's worker drove a bucket truck with the bucket extended through the power lines.

**E.**     **The Jordan Plan Forecasts Positive Performance from Increased Revenue Financed With a New $20 Million Credit Facility**

Debtor's performance is projected to increase after the Jordan Plan is confirmed.

Attached to the Index as Exhibit 1 are the Debtor's projections of its post-Effective Date operations through the term of the Jordan Plan. With the exception of Year 1, in which significant accrued restructuring costs are expected to be paid, the Reorganized Debtor is projected to generate net income on an annual basis.  (See Ex. 1 at 2 of 18.) The Jordan Plan projection at Ex. 4 incorporates the $1 million new value (Ex. 4 Line 22 Col. A) as well as Incremental Business Opportunities starting in 2026 with added revenue of $20 million increasing by an incremental $10 million per year through 2029 and then a flat $50 million.  The forecast includes 15% net Margin and incremental income of $3 million to $7.5 million.  To this amount is added interest

expense savings because the GUC debt is retired faster than was projected.  Further, the

conversion of C-31 Licensed work to a subsidiary of Mowbray's will increase that revenue source

by $168,450 per year.  Total Incremental Net Income will range between $1.6 and $4 million to be

paid on GUC debt.  This amount will be in addition to the forecast payments from the Robin Plan .

As shown at Lines 20-25 the GUC are expected to be retired in 5 years by 2030 for all GUC

including Jordan and in 4 years with the subordination of Jordan's claim.

The Reorganized Debtor's projected net income, will include expected amounts from PTS

and increased profits from elimination of PTM.  The Reorganized Debtor's sales are projected to

increase from the Debtor's forecast at just under $8 million per year.  (See id.) The Jordan Plan

projects maintenance of the substantially diminished revenue from Robin and Richard J.'s

mismanagement and additions from the Jordan Plan management team.

## V.    THE JORDAN PLAN

### A.    The Jordan Plan Provides for a Reorganization of Mowbray's and Its Affairs

The Jordan Plan is a reorganizing plan.  Distributions to the Holders of Allowed Secured

Claims will be made by the reorganized Debtor the capital stock of which will be owned by

Jordan's new company Acquisition.  The distributions will be made by the Reorganized Debtor

without the need for a Plan Trust to overcome any perceived conflict of interest by new

management and to also have significant cost savings.  No Distributions will be made to the

Holders of any Disputed Claims unless and until they become Allowed Claims.  The Projections

supporting the Jordan Plan are attached hereto as Exhibit 1 - Mowbray Financials and Projections;

Exhibit 2 - Pino Tree Service, Inc. ("PTS") Financials and Projections; Exhibit 3 - Mowbray's

Liquidation Analysis; and Exhibit 4 - Forecast With Increased Revenues and GUC Payoff.

### B.    What Creditors and Interest Holders Will Receive Under the Jordan Plan

As required by the Bankruptcy Code, the Jordan Plan classifies Claims and Interests in

various Classes according to their rights of priority.  The Jordan Plan states whether each Class of

Claims or Interests is impaired or unimpaired.  The Jordan Plan sets forth the treatment each Class

will receive.  In no event shall any creditor receive more than the creditor's Allowed Claim in the

Debtor's case.

## C.    Allowance and Treatment of Unclassified Claims

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired, and they do not vote on the Jordan Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Jordan Plan has not placed the following claims in a class:

### 1.    Administrative Claims

Administrative Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of the Jordan Plan, unless a particular claimant agrees to a different treatment.  The following chart lists all the Debtor's estimated § 507(a)(2) administrative claims and their treatment under the Jordan Plan:

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtor, including Administrative Tax Claims | Varies by day | Unless the Debtor objects to an Ordinary Course Administrative Claim, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of the Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |
| Clerk's Office | $0 | Any outstanding Clark's Office fees will be paid in full on the Effective Date from the cash of the Reorganized Debtor. |
| OUST Fees | $0 | Any outstanding OUST Fees will be paid in full on the Effective Date from the cash of the Reorganized Debtor. |
| Administrative Tax Claims | $0 | Unless the Debtor objects to an Administrative Tax Claim, each Administrative Tax Claim shall be allowed and paid in the ordinary course of |

| | | the Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim. |
|---|---|---|

| Professional Fees Claims (From Robin Plan Subject to Court Approval) | | |
|---|---|---|
| **Description** | **Estimated Amount Owed[2]** | **Treatment** |
| Raines Feldman Littrell LLP, general bankruptcy counsel | $1,200,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Grobstein Teeple LLP | $60,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Force Ten Partners, LLP | $1,000,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Examiner | $150,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise |

---

[2] These amounts are only estimates (including future estimates as of confirmation) and are subject to change. The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower.  The Reorganized Debtor reserves the right to object to any or all of these Professional Fees Claims.

| | | agreed by the Reorganized Debtor and the Professional. |
|---|---|---|
| **Total** | $2,410,000 | |

The following applies to Administrative Claims asserted against the Estate:

### a.    Ordinary Course Administrative Claims

Unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim. However, any request for payment, or motion to allow a Claim as an Ordinary Course Administrative Claim must be filed with the Bankruptcy Court and served on the Reorganized Debtor and the Office of the United States Trustee ("OUST") by no later than sixty (60) days after the Effective Date.

### b.    Non-Ordinary Course Administrative Claims

A Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor to the extent that it is allowed by the Bankruptcy Court only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both files with the Bankruptcy Court a request for allowance and payment of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel for the Reorganized Debtor and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows the Non-Ordinary Course Administrative Claim.

Any party-in-interest, including, but not limited to, the Reorganized Debtor, may file an objection to such a request for payment within the time provided by the Federal Rules of Bankruptcy Procedure ("FRBP") or the Local Bankruptcy Rules ("LBR") or within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course Administrative Claims who do not timely file and serve a request for payment will be forever barred from

asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estate, the Debtor, the Reorganized Debtor, or their respective assets.

### c. Professional Fee Claims

A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the Effective Date (or such further date if extended by Court Order), the Person holding the Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of the Bankruptcy Court.  The Reorganized Debtor or any other party-in-interest may file an objection to such an application within the time provided by the FRBP or LBR or within any other period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do not timely file and serve an application for allowance and payment will be forever barred from asserting these Claims against the Estate, the Debtor, the Reorganized Debtor, or their respective assets.

### 2. Priority Tax Claims

Priority Tax Claims include certain unsecured income, sales, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five years from the order for relief, unless the holder agrees to a different treatment.

The following charts list the Debtor's known section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Priority Tax Claims (From Robin Plan) | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| California Department of Tax and Fee Administration ("CDTFA") | Claim Amount: $269.00 per Schedules<br><br>Priority Claim Amount: $269.00 per Schedules | Any Allowed Priority Tax Claim of the CDTFA will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority |

| | | |
|---|---|---|
| | | Tax Claim of the CDTFA is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Reorganized Debtor shall have the right to prepay any Allowed Priority Tax Claim of the CDTFA in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the CDTFA will receive the treatment afforded to Allowed Claims in Class 16. |
| Internal Revenue Service ("IRS") | Claim Amount: $63,589.17 per Proof of Claim 37-1<br><br>Priority Claim Amount: $63,589.17 per Proof of Claim 37-1 | The proof of claim filed by the IRS, Proof of Claim 37-1, is for payroll taxes for the tax period ending December 31, 2024. Because those taxes have been paid, the IRS will not receive a further recovery on the Claim it asserts through Proof of Claim 37-1. |
| State of Florida – Department of Revenue ("State of Florida") | Claim Amount: $14.00 per Proof of Claim 142-1<br><br>Priority Claim Amount: $14.00 per Proof of Claim 142-1 | Any Allowed Priority Tax Claim of the State of Florida will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the State of Florida is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid |

| | | |
|---|---|---|
| | | balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. The Reorganized Debtor shall have the right to prepay any Allowed Priority Tax Claim of the State of Florida in full at any time and without penalty or fee, in its sole and absolute discretion. Any Allowed Claim of the State of Florida in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief. Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

### D.    Allowance and Treatment of Classified Claims and Interests

#### 1.    Summary of Classes

As required by the Bankruptcy Code, the Jordan Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. The chart below lists Classes of Claims and Interests established under the Jordan Plan and indicates whether the Class is impaired or unimpaired by the Jordan Plan. A Class is unimpaired if the Jordan Plan leaves

unaltered the legal, equitable, and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| Summary Class | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of PNC Bank, N.A. |
| 2 | Secured Claim of Jacobus Pino |
| 3 | Secured Claim of Albach Finanz AG |
| 4 | Secured Claim of Ally Bank |
| 5 | Secured Claim of Altec Capital Services, LLC |
| 6 | Secured Claim of FNB |
| 7 | Secured Claim of Pathward, National Association |
| 8 | Secured Claim of U.S. Bank Equipment Finance |
| 9 | Secured Claim of Bank of America, N.A. |
| 10 | Secured Claim of Ford Motor Credit Company, LLC |
| 11 | Secured Claim of General Motors |
| 12 | Secured Claim of John Deere |
| 13 | Secured Claim of Samara Equipment |
| 14 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 15 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 16 | General Unsecured Claims |
| 17 | Subordinated Jordan Claim |
| 18 | Subordinated Insider Claims |
| 19 | Interest Holder |

2.    **Secured Claims**

Secured Claims are Claims secured by valid liens on property of the Estate.

a.    **Secured Claim of PNC Bank**

| | | | | |
|---|---|---|---|---|
| **Secured Claim of PNC Bank** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | PNC Bank, N.A. Collateral: the PNC Collateral Total Claim Amount: $7,038,514.41 as of the Petition Date per the Cash Collateral Stipulation. Interest Rate: 6.57% | N | Y | PNC shall have an Allowed Secured Claim on the Effective Date in the amount that PNC is owed on such date under the PNC Loan Documents, inclusive of any interest at the non-default rate of 6.57% and reasonable costs and attorney's fees that accrue prior to the Effective Date and to which PNC is entitled in accordance with the terms of the PNC Loan Documents, the Cash Collateral Stipulation, and 11 U.S.C. § 506(b), less any recoveries, including Other Recoveries, and payments received by PNC before or after the Effective Date (the "Allowed PNC Secured Claim"). The Debtor projects that the Allowed PNC Secured Claim will total approximately $6,386,587.68 as of the Effective Date.[3] The Reorganized Debtor shall pay the PNC Secured Claim in full as follows: **Effective Date Payment**: Within ten (10) Business Days after the Effective Date, the Reorganized Debtor shall make a payment to PNC on account of the PNC Secured Claim in the amount of $2,000,000 (the "PNC Effective Date Payment"). **Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business |

---

[3] This is the amount the Debtor projects the PNC balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Day of each calendar month thereafter until the PNC Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $134,584.34 (a "PNC Monthly Payment").<br><br>**Maturity Date**: The Reorganized Debtor shall pay the PNC Secured Claim in full by the date that is three (3) years after the Effective Date (the "PNC Maturity Date").<br><br>**Interest Rate**: 6.57% per annum simple interest.<br><br>**Other Recoveries**. If and to the extent that PNC receives any Other Recoveries on account of the PNC Secured Claim, then the PNC Secured Claim as to the Reorganized Debtor shall be automatically reduced accordingly by the amount of such Other Recoveries.<br><br>**Default**: If the Reorganized Debtor fails to make the PNC Effective Date Payment or a PNC Monthly Payment to PNC when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by PNC to the Reorganized Debtor and its counsel (collectively, an "Uncured PNC Default"), then PNC may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the PNC Collateral permitted under the PNC Loan Documents.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**Jordan Plan Controls**: If and to the extent that there is a conflict between the PNC Loan Documents and the Jordan Plan, the Jordan Plan shall control. |

| | | | | | **Lien**. PNC shall retain the PNC Security Interests in the PNC Collateral in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed PNC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed PNC Secured Claim, PNC's Security Interests shall be released and the Reorganized Debtor shall retain title to the PNC Collateral free and clear of the PNC Security Interests. |
| | | | | | The treatment proposed herein shall be in full settlement and satisfaction of the PNC Secured Claim. |

**b.      Secured Claim of Jacobus Pino**

| Secured Claim of Jacobus Pino | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2 | Jacobus Pino<br><br>• Collateral: Ownership interests in PTS<br><br>• Total Claim Amount: $167,673.76 as of the Petition Date per Schedules<br><br>Interest Rate: 0.75% | N | Y | Jacobus Pino asserts a Claim in the amount of $167,007 on account of the remaining balance owed on the Pino Note (the "Pino Claim").  As a compromise, including Pino waiving and releasing as of the Effective Date (i) any interest or fees to which Pino asserts he is entitled under the PTS Transaction Documents, and (ii) any right to assert that he is entitled to any portion of the Debtor's ownership interests in PTS, the Reorganized Debtor shall pay the Pino Claim in full as follows:<br><br>**Monthly Payments:** Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Pino Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $21,047.15. The Pino Claim shall be paid in six (6) equal monthly payments of $21,047.15. |

| | | | | The Pino Claim shall not accrue interest on or after the Effective Date. |
| | | | | **Jordan Plan Controls**: If and to the extent that there is a conflict between the PTS Transaction Documents and the Jordan Plan, the Jordan Plan shall control. |
| | | | | **Lien**. Any valid, enforceable, perfected, and unavoidable lien(s) held by Pino in any assets of the Estate shall be retained by Pino in and to the same extent, validity, and priority as of the Petition Date pending payment of the Pino Claim in full as provided herein. Upon full satisfaction of the Pino Claim, any and all liens of Pino on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of Pino's liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Pino Claim. |

### c.    <u>Secured Claims Related to Vehicles or Equipment</u>

| Secured Claim Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 3 | Albach Finanz AG<br><br>• Collateral: the "Machine" as defined in Exhibit A of Albach's proof of claim, Claim No. 144-1 (the "**Albach Collateral**")<br><br>• Total Claim Amount: | N | Y | Class 3 consists of the Secured Claim of Albach Finanz AG ("Albach"). The Claim of Albach arises from the Operate Lease Agreement attached as Exhibit A (the "Albach Agreement") to its Proof of Claim No. 144-1. The treatment herein is for all Claims asserted by Albach.<br><br>Albach shall have an Allowed Secured Claim in the collective amount of $81,500 as of the Effective Date, based |

| | $81,500.00 (projected as of the Effective Date) | | | on the net present value of the future payments due under the Albach Agreement, as calculated by the Debtor (the "Allowed Albach Secured Claim").[4] Under no circumstances shall Albach receive more than the Allowed Albach Secured Claim with interest after the Effective Date as provided herein.  The Allowed Albach Secured Claim arising thereunder shall be paid as follows: |
|---|---|---|---|---|

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall make a payment in the amount of $1,458.56 (an "Albach Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Albach Secured Claim in full by the date that is five (5) years after the Effective Date (the "Albach Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to the Albach Secured Claim in the Albach Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the Albach Maturity Date.

**D. Interest Rate**: 2.84% per annum simple interest.

**E. Default**: Upon the Effective Date, the Albach Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make any Albach

---

[4] This is the amount the Debtor projects the collective Albach balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Monthly Payment on the Albach Secured Claim to Albach when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Albach to the Reorganized Debtor and its counsel (collectively, an "Uncured Albach Default"), then Albach may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to collateral securing the Albach Secured Claim permitted under the Albach Agreement. The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Albach Agreement and the Jordan Plan, the Plan shall control.<br><br>**G. Lien**. Any valid, enforceable, perfected, and unavoidable lien held by Albach in the Albach Collateral shall be retained by Albach in and to the same extent, validity, and priority as of the Petition Date pending payment of the ALbach Secured Claim in full as provided herein. Upon full satisfaction of the Albach Secured Claim, any and all liens of Albach on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Albach Secured Claim. |
| 4 | Ally Bank<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $295,486.77 (projected as of the Effective Date) | N | Y | | Class 4 consists of the Secured Claims of Ally Bank ("Ally"). The Claims of Ally arise from various loan agreements with the Debtor, each of which was secured by a particular vehicle (each, an "Ally Agreement" and collectively, the "Ally Agreements"). The treatment herein is for all Claims asserted by Ally. |

| | | | | | Ally shall have an Allowed Secured Claim in the collective amount of $295,486.77 as of the Effective Date, based on the net present value of the future payments due under the Ally Agreements, as calculated by the Debtor (the "Allowed Ally Secured Claim").[5] Under no circumstances shall Ally receive more than the Allowed Ally Secured Claim with interest after the Effective Date as provided herein.

The Allowed Ally Secured Claim shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Ally Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $5,613.75 (an "Ally Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed Ally Secured Claim in full by the date that is five (5) years after the Effective Date (the "Ally Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of vehicles or equipment under the Ally Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based by the Ally Maturity Date.

**D. Interest Rate**: 5.28% per annum simple interest. |
|---|---|---|---|---|---|

---

[5] This is the amount the Debtor projects the collective Ally balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | **F. Default**: Upon the Effective Date, the Ally Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Ally Monthly Payment on the Allowed Ally Secured Claim to Ally when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ally to the Reorganized Debtor and its counsel (collectively, an "Uncured Ally Default"), then Ally may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ally Agreement and serving as Ally's collateral as permitted under the Ally Agreements.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | | **G. Jordan Plan Controls**: If and to the extent that there is a conflict between the Ally Agreements and the Jordan Plan, the Jordan Plan shall control. |
| | | | | | **H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ally in any assets of the Estate to secure the Allowed Ally Secured Claim shall be retained by Ally in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Ally Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ally Secured Claim, any and all liens of Ally on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of Ally's liens. The treatment proposed herein shall be in full settlement and satisfaction of the Ally Secured Claims. |
| 5 | Altec Capital Services, LLC | N | Y | | Class 5 consists of the Secured Claims of Altec. The Claims of Altec arise |

| | | | | from various equipment leases or financing agreements between the Debtor and Altec (each, an "Altec Agreement" and collectively, the "Altec Agreements"). The treatment herein is for all Claims asserted by Altec, including, without limitation, Claims for which Altec is the servicer.

Altec shall have an Allowed Secured Claim in the collective amount of $4,816,724.31 as of the Effective Date, based on the net present value of the future payments due under the Altec Agreements, as calculated by the Debtor (the "Allowed Altec Secured Claim").[6] Under no circumstances shall Altec receive more that the Allowed Altec Secured Claim with interest after the Effective Date as provided herein.

As to each Altec Agreement, Altec's Secured Claim arising thereunder (each, an "Altec Secured Claim") shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Altec Agreement for such Altec Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue making such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Altec Agreement, as extended by the Plan.  The monthly payments required herein shall each be |
| | • Collateral: Various equipment

• Total Claim Amount: $4,816,724.31 | | | |

---

[6] This is the amount the Debtor projects the collective Altec balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

**59**
**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement**

referred to as an "Altec Monthly Payment."

**B. Maturity Date**: Any maturity date or expiration date with respect to such Altec Secured Claim in the corresponding Altec Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Altec Monthly Payment required by such Altec Agreement (the "Altec Maturity Date") and any lump sum payment due by the Reorganized Debtor under such Altec Agreement upon the Altec Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Altec Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such Altec Secured Claim in the corresponding Altec Agreement, including, without limitation, at the Altec Maturity Date in such Altec Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement.

**D. Interest Rate**: 7.6% blended rate per annum simple interest for Altec Secured Claims.

**E. Default**: Upon the Effective Date, each Altec Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make an Altec Monthly Payment on an Altec Secured Claim to Altec when due herein, and such failure is not cured within thirty (30) days after

| | | | | | |
|---|---|---|---|---|---|
| | | | | | written notice thereof provided by Altec to the Reorganized Debtor and its counsel (collectively, an "Uncured Altec Default"), then Altec may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as Altec's collateral that is the subject to the Uncured Altec Default permitted under the subject Altec Agreement. The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Altec Agreements and the Jordan Plan, the Jordan Plan shall control.<br><br>**G. Lien**: With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.<br><br>Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Altec Secured Claims. |
| 6 | FNB Equipment Finance<br><br>• Collateral: Various equipment | N | Y | | Class 6 consists of the Secured Claims of FNB Equipment Finance ("FNB"). The Claims of FNB arise from various equipment leases or financing agreements between the Debtor and FNB or FNB's predecessor in interest |

| | • Total Claim Amount: $91,845.49 (projected as of the Effective Date) | | | (each, an "FNB Agreement" and collectively, the "FNB Agreements"). The treatment herein is for all Claims asserted by FNB.

FNB shall have an Allowed Secured Claim in the collective amount of $91,845.49 as of the Effective Date based on the net present value of the future payments due under the FNB Agreements, as calculated by the Debtor (the "Allowed FNB Secured Claim").[7] Under no circumstances shall FNB receive more than the FNB Allowed Secured Claim with interest after the Effective Date as provided herein.

As to each FNB Agreement, FNB's Secured Claim arising thereunder (each, an "FNB Secured Claim") shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the FNB Agreement for such FNB Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such FNB Agreement, as extended by the Plan. The monthly payments required herein shall each be referred to as an "FNB Monthly Payment." |

---

[7] This is the amount the Debtor projects the collective FNB balance to be as of the Effective Date, inclusive of budgeted post-petition payments

**B. Maturity Date**: Any maturity date or expiration date with respect to such FNB Secured Claim in the corresponding FNB Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final FNB Monthly Payment required by such FNB Agreement (the "FNB Maturity Date") and any lump sum payment due by the Reorganized Debtor under such FNB Agreement upon the FNB Maturity Date shall be made at such time as extended herein and in accordance with the terms of such FNB Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such FNB Secured Claim in the corresponding FNB Agreement, including, without limitation, at the FNB Maturity Date in such FNB Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the FNB Maturity Date for such FNB Agreement.

**D. Interest Rate**: 6.25% blended rate per annum simple interest for all FNB Secured Claims.

**E. Default**: Upon the Effective Date, each FNB Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make an FNB Monthly Payment on an FNB Secured Claim to FNB when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by FNB to the Reorganized Debtor and its counsel (collectively, an "Uncured FNB

| | | | | |
|---|---|---|---|---|
| | | | | Default"), then FNB may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as FNB's collateral that is the subject of the Uncured FNB Default permitted under the subject FNB Agreement. The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the FNB Agreements and the Jordan Plan, the Jordan Plan shall control. |
| | | | | **G. Lien**: With respect to each FNB Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by FNB in any assets of the Estate to secure such FNB Secured Claim shall be retained by FNB in and to the same extent, validity, and priority as of the Petition Date pending payment of such FNB Secured Claim in full as provided herein.  Upon full satisfaction of such FNB Secured Claim, any and all lien of FNB securing such FNB Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the FNB Secured Claims. |
| 7 | Pathward, National Association<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $400,079.03 (projected as of the Effective Date | N | Y | Class 7 consists of the Secured Claims of Pathward, National Association ("Pathward"). The Claims of Pathward arise from various agreements for certain vehicles and equipment between the Debtor and Pathward's predecessor in interest (each, a "Pathward Agreement" and collectively, the "Pathward Agreements").  The treatment herein is for all Claims asserted by Pathward. |

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement**

Pathward shall have an Allowed Secured Claim in the amount of $400,079.03 as of the Effective Date, based on the net present value of the future payments due under the Pathward Agreements as calculated by the Debtor (the "Allowed Pathward Secured Claim").[8] Under no circumstances shall Pathward receive more than the Allowed Pathward Secured Claim with interest after the Effective Date as provided herein.

As to each Pathward Agreement, Pathward's Secured Claim arising thereunder each, a "Pathward Secured Claim" shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Pathward Agreement for such Pathward Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Pathward Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as a "Pathward Monthly Payment."

**B. Maturity Date**: Any maturity date or expiration date with respect to such Pathward Secured Claim in the corresponding Pathward Agreement shall be extended to the calendar month after the Reorganized Debtor makes the

---

[8] This is the amount the Debtor projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

final Pathward Monthly Payment required by such Pathward Agreement (the "Pathward Maturity Date") and any lump sum payment due by the Reorganized Debtor under such Pathward Agreement upon the Pathward Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Pathward Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Pathward Secured Claim in the corresponding Pathward Agreement, including, without limitation, at the Pathward Maturity Date in such Pathward Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Pathward  Maturity Date for such Pathward Agreement.

**D. Interest Rate**: 2.0% blended rate per annum simple interest for all Pathward Secured Claims.

**E. Default**: Upon the Effective Date, each Pathward Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Pathward Monthly Payment on a Pathward Secured Claim to Pathward when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel (collectively, an "Uncured Pathward Default"), then Pathward may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular

| | | | | equipment serving as Pathward's collateral that is the subject of the Uncured Pathward Default permitted under the subject Pathward Agreement. The Reorganized Debtor shall have the right to oppose such motion.<br><br>**G. Jordan Plan Controls**: If and to the extent that there is a conflict between the Pathward Agreements and the Jordan Plan, the Jordan Plan shall control.<br><br>**H. Lien**: With respect to each Pathward Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure such Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of such Pathward Secured Claim in full as provided herein.  Upon full satisfaction of such Pathward Secured Claim, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Pathward Secured Claims. |
| 8 | U.S. Bank Equipment Finance<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $50,160.65 (projected as of the Effective Date) | N | Y | Class 8 consists of the Secured Claims of U.S. Bank Equipment Finance ("US Bank"). The Claims of US Bank arise from various finance agreements between the Debtor and US Bank or US Bank's predecessor in interest (each, a "US Bank Agreement" and collectively, the "US Bank Agreements"). The treatment herein is for all Claims asserted by US Bank.<br><br>US Bank shall have an Allowed Secured Claim in the collective amount of $50,160.65 as of the Effective Date, based on the net present value of the |

future payments due under the US Bank Agreements, as calculated by the Debtor (the "Allowed US Bank Secured Claim").[9] Under no circumstances shall US Bank receive more than the Allowed US Bank Secured Claim with interest after the Effective Date as provided herein.  As to each US Bank Agreement, US Bank's Secured Claim arising thereunder (each a "US Bank Secured Claim") shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under US Bank Agreement for such US Bank Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such US Bank Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an (a "US Bank Monthly Payment").

**B. Maturity Date**: Any maturity date or expiration date with respect to such US Bank Secured Claim in the corresponding US Bank Agreement shall be extended to the calendar month after the Reorganized Debtor makes the US Bank Monthly Payment required by such US Bank Agreement (the "US Bank Maturity Date") and any lump sum payment due by the Reorganized Debtor under such US Bank Agreement

---

[9] This is the amount the Debtor projects the collective US Bank balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

upon the US Bank Maturity Date shall be made at such time as extended herein and in accordance with the terms of such US Bank Agreement and subject to Paragraph C. below.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such US Bank Secured Claim in the corresponding US Bank Agreement, including, without limitation, at the US Bank Maturity Date in such US Bank Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the US Bank Maturity Date for such US Bank Agreement.

**D. Interest Rate**: 6.57% blended rate per annum simple interest for all US Bank Secured Claims.

**E. Default**: Upon the Effective Date, each US Bank Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a US Bank Monthly Payment on a US Bank Secured Claim to US Bank when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by US Bank to the Reorganized Debtor and its counsel (collectively, an "Uncured US Bank Default"), then US Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment(s) serving as US Bank's collateral that is the subject of the Uncured US Bank Default permitted under the subject US Bank Agreements. The Reorganized Debtor shall have the right to oppose such motion.

| 9 | | | | | |
|---|---|---|---|---|---|

| | | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the US Bank Agreements and the Jordan Plan, the Jordan Plan shall control. |
|---|---|---|---|---|---|
| | | | | | **G. Lien**: With respect to each US Bank Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by US Bank in any assets of the Estate to secure such US Bank Secured Claim shall be retained by US Bank in and to the same extent, validity, and priority as of the Petition Date pending payment of such US Bank Secured Claim in full as provided herein. Upon full satisfaction of such US Bank Secured Claim, any and all liens of US Bank securing such US Bank Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | | The treatment proposed herein shall be in full settlement and satisfaction of the US Bank Secured Claims. |
| 9 | Bank of America, N.A.<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $6,866,127.94 (projected as of the Effective Date) | N | Y | | Class 9 consists of the Secured Claim of BOA. The Claims of BOA arise from various equipment leases or financing agreements between the Debtor and BOA (each, a "BOA Agreement" and collectively, the "BOA Agreements"). The treatment herein is for all Claims asserted by BOA.<br><br>BOA shall have an Allowed Secured Claim in the collective amount of $6,866,127.94 as of the Effective Date, based on the net present value of the future payments due under the BOA Agreements, plus amounts due and unpaid as of the Petition Date under the BOA Agreements, as calculated by the Debtor (the "Allowed BOA Secured |

Claim").[10] Under no circumstances shall BOA receive more that the Allowed BOA Secured Claim with interest after the Effective Dates provided herein.

As to each BOA Agreement, BOA's Secured Claim arising thereunder (a "BOA Secured Claim") shall be paid as follows:

**A. Maturity Date**: The maturity date or expiration date in such BOA Agreement shall be extended to the earlier of (I) the date that is equal to the number of months in which payments under such BOA Agreement have come due and were not made prior to the Effective Date, plus thirty-six months from the Effective Date (the "BOA Repayment Period"). Any lump sum payment due by the Reorganized Debtor under such BOA Agreement upon or at the end of the BOA Repayment Period shall be made in accordance with the terms of such BOA Agreement and subject to Paragraph C. below.

**B. Monthly Payments**: The BOA Secured Claim arising under such BOA Agreement shall be paid in equal monthly installments amortized over the BOA Repayment Period for such BOA Agreement (each, a "BOA Monthly Payment"). The Reorganized Debtor shall make the first BOA Monthly Payment on the first Business Day of the first full calendar month after the Effective Date, and the BOA Monthly Payments shall continue each calendar month thereafter during the BOA Repayment Period and until the BOA Repayment Period ends.

---

[10] This is the amount the Debtor projects the collective BOA balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment under such BOA Agreement, including, without limitation, at the end of the BOA Repayment Period, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights at the time set forth in the BOA Agreement as adjusted and extended based on the BOA Repayment Period.

**D. Interest rate**: 5.47% per annum simple interest.

**E. Default**: Upon the Effective Date, each BOA Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a BOA Monthly Payment to BOA on account of a BOA Secured Claim when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by BOA to the Reorganized Debtor and its counsel (collectively, a "Uncured BOA Default"), then BOA may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicle(s) or equipment subject to the BOA Agreement giving rise to such BOA Secured Claim as permitted under such BOA Agreement. The Reorganized Debtor shall have the right to oppose such motion.

**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the BOA Agreements and the Jordan Plan, the Jordan Plan shall control.

**G. Lien**: With respect to each BOA Secured Claim, any valid, perfected, and unavoidable lien of BOA shall be

| | | | | retained to the same extent, validity, and priority as of the Petition Date pending payment of such BOA Secured Claim in full as provided herein. Upon full satisfaction of such BOA Secured Claim, BOA's lien securing such BOA Secured Claim shall be released and the Reorganized Debtor shall retain title to the collateral subject to such lien free and clear of such lien.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the BOA Secured Claims. |
|---|---|---|---|---|
| 10 | Ford Motor Credit Company, LLC<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $1,596,788.42 (projected as of the Effective Date) | N | Y | Motor Credit Company ("Ford"). The Claims of Ford arise from various installment agreements with the Debtor, each of which was secured by a particular vehicle (each, a "Ford Agreement" and collectively, the "Ford Agreements"). The treatment herein is for all Claims asserted by Ford.<br><br>Ford shall have an Allowed Secured Claim in the collective amount of $1,596,788.42 as of the Effective Date, based on the net present value of the future payments due under the Ford Agreements, as calculated by the Debtor (the "Allowed Ford Secured Claim").[11] Under no circumstances shall Ford receive more than the Allowed Ford Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ford Secured Claims shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, and continuing on the first Business Day of each calendar month thereafter |

---

[11] This is the amount the Debtor projects the collective Ford balance to be as of the Effective Date, inclusive of budgeted post-petition payments

until the Allowed Ford Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $30,207.87 (a "Ford Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed Ford Secured Claim in full by the date that is 5 years after the Effective Date (the "Ford Bank Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ford Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the Ford Maturity Date.

**D. Interest Rate**: 5.1% per annum simple interest.

**E. Default**: Upon the Effective Date, the Ford Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Ford Monthly Payment on the Allowed Ford Secured Claim to Ford when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ford to the Reorganized Debtor and its counsel (collectively, an "Uncured Ford Default"), then Ford may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements. The Reorganized Debtor shall have the right to oppose such motion.

| | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Ford Agreements and the Jordan Plan, the Jordan Plan shall control. |
|---|---|---|---|---|
| | | | | **G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ford in any assets of the Estate to secure the Allowed Ford Secured Claim shall be retained by Ford in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ford Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ford Secured Claim, any and all liens of Ford securing the Allowed Ford Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ford Secured Claim. |
| 11 | AmeriCredit Financial Services, Inc. dba GM Financial<br><br>• Collateral: various vehicles<br><br>• Total Claim Amount: $121,388.59 (projected as of the Effective Date) | N | Y | Class 11 consists of the Secured Claims of AmeriCredit Financial Services, Inc. dba GM Financial ("GM"). The Claims of GM arise from various agreements between the Debtor and GM (each, a "GM Agreement" and collectively, the "GM Agreements") The treatment herein is for all Claims asserted by GM.<br><br>GM shall have an Allowed Secured Claim in the collective amount of $121,388.59 as of the Effective Date, based on the net present value of the future payments due under the GM Agreements as calculated by the Debtor (the "Allowed GM Secured Claim").[12] Under no circumstances shall GM receive more than the Allowed GM |

---

[12] This is the amount the Debtor projects the collective GM balance to be as of the Effective Date, inclusive of budgeted post-petition payments

Secured Claim with interest after the Effective Date as provided herein.

The Allowed GM Secured Claim shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed GM Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $2,352.54 (a "GM Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed GM Secured Claim in full by the date that is 5 years after the Effective Date (the "GM Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the GM Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the GM Maturity Date.

**D. Interest Rate**: 6.1% per annum simple interest.

**E. Default**: Upon the Effective Date, the GM Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a GM Monthly Payment on the Allowed GM Secured Claim to GM when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by GM to the Reorganized Debtor and its counsel (collectively, an "Uncured GM Default"), then GM may

| | | | | file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements. The Reorganized Debtor shall have the right to oppose such motion. |
| --- | --- | --- | --- | --- |
| | | | | **F. Jordan Plan Controls**: If and to the extent that there is a conflict between the GM Installment Agreements and the Jordan Plan, the Jordan Plan shall control. |
| | | | | **G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by GM in any assets of the Estate to secure the Allowed GM Secured Claim shall be retained by GM in and to the same extent, validity, and priority as of the Petition Date pending payment of such GM Secured Claim in full as provided herein. Upon full satisfaction of the Allowed GM Secured Claim, any and all liens of GM securing the Allowed GM Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed GM Secured Claim. |
| 12 | John Deere Construction & Forestry Company<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $139,039.60 (projected as of the Effective Date) | N | Y | Class 12 consists of the Secured Claims of John Deere Construction & Forestry Company ("John Deere"). The Claims of John Deere arise from various equipment agreements between the Debtor and John Deere (each, a "John Deere Agreement" and collectively, the "John Deere Agreements"). The treatment herein is for all Claims asserted by John Deere. |

**Ronnie Jordan's Mowbray Acquisition LLC's Competing Plan Disclosure Statement**

John Deere shall have an Allowed Secured Claim in the amount of $139,039.60 as of the Effective Date, based on the net present value of the future payments due under the John Deere Agreements, as calculated by the Debtor (the "Allowed John Deere Secured Claim").[13] Under no circumstances shall John Deere receive more than the Allowed John Deere Secured Claim with interest after the Effective Date as provided herein.

The Allowed John Deere Secured Claim shall be paid as follows:

**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed John Deere Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $2,317.33 (a "John Deere Monthly Payment").

**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed John Deere Secured Claim in full by the date that is 5 years after the Effective Date (the "John Deere Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the John Deere Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the John Deere Maturity Date.

---

[13] This is the amount the Debtor projects the collective John Deere balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

**D. Interest Rate**: 0.0% per annum simple interest.

**E. Default**: Upon the Effective Date, the John Deere Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a John Deere Monthly Payment to John Deere when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by John Deere to the Reorganized Debtor and its counsel (collectively, an "Uncured John Deere Default"), then John Deere may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the John Deere Agreements and serving as John Deere's collateral as permitted under the John Deere Agreements. The Reorganized Debtor shall have the right to oppose such motion.

**G. Jordan Plan Controls**: If and to the extent that there is a conflict between the John Deere Installment Agreements and the Jordan Plan, the Jordan Plan shall control.

**H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by John Deere in any assets of the Estate to secure the Allowed John Deere Secured Claim shall be retained by John Deere in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed John Deere Secured Claim in full as provided herein. Upon full satisfaction of the Allowed John Deere Secured Claim, any and all liens of John Deere securing the Allowed John Deere Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized

| | | | | Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed John Deere Secured Claim. |
|---|---|---|---|---|
| 13 | Samsara Capital Finance<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $217,251.13 (projected as of the Effective Date) | N | Y | Class 13 consists of the Secured Claims of Samsara Capital Finance ("Samsara"). The Claims of Samsara arise from made multiple equipment loans between the Debtor and Samsara (each, a "Samsara Agreement" and collectively, the "Samsara Agreements"). The treatment herein is for all Claims asserted by Samsara.<br><br>Samsara shall have an Allowed Secured Claim in the amount of $217,251.13 as of the Effective Date, based on the net present value of the future payments due under the Samsara Agreements, as calculated by the Debtor (the "Allowed Samsara Secured Claim").[14] Under no circumstances shall Samsara receive more than the Allowed Samsara Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each Samsara Agreement, Samsara's Secured Claim arising thereunder (each, a "Samsara Secured Claim") shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the second full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until each Samsara Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $19,750.10 (a "Samsara Monthly Payment"). |

---

[14] This is the amount the Debtor projects the collective Samsara balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

**B. Maturity Date**: The Reorganized Debtor shall pay the Samsara Secured Claims in full by the date that is 11 months after the Effective Date (the "Samsara Maturity Date").

**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Samsara Secured Claim in the subject Samsara Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by on the Samsara Maturity Date for such Samsara Agreement.

**D. Interest Rate**: 0.0% per annum simple interest.

**E. Default**: Upon the Effective Date, each Samsara Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Samsara Monthly Payment to Samsara when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Samsara to the Reorganized Debtor and its counsel (collectively, an "**Uncured Samsara Default**"), then Samsara may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Samsara's collateral that is the subject of the Uncured Samsara Default permitted under the subject Samsara Agreement. The Reorganized Debtor shall have the right to oppose such motion.

**F. Jordan Plan Controls**: If and to the extent that there is a conflict between the Samsara Agreements and the Jordan Plan, the Jordan Plan shall control.

| | | | | **G. Lien**: With respect to each Samsara Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Samsara in any assets of the Estate to secure such Samsara Secured Claim shall be retained by Samsara in and to the same extent, validity, and priority as of the Petition Date pending payment of such Samsara Secured Claim in full as provided herein. Upon full satisfaction of such Samsara Secured Claim, any and all liens of Samsara securing such Samsara Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Samsara Secured Claims. |
|---|---|---|---|---|

### 3.   Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes. The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective Date equal to the allowed amount of such Claim. However, a Class of Priority Unsecured Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

The Debtor is unaware of any Priority Unsecured Claims. However, in an abundance of caution, the following chart lists all Classes containing the Debtor's section 507(a)(4), (a)(5), (a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Priority Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Allowed Priority Unsecured Claims | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 4 shall be |

| | | | | |
|---|---|---|---|---|
| | Pursuant to 11 U.S.C. § 507(a)(4) – (5)<br><br>Estimated total amount of claims: $0.00[15] | | | paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (I) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |
| 15 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 5 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (I) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |

### 4.    Classes of General Unsecured Claims

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 16 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims and will receive a total of $21,000,000 in payments and interest at the GUC Interest Rate.  This Class shall receive a $1,000,000 payment on the Effective Date to be applied against the payments called for hereunder.<br><br>On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim. |

---

[15] The Debtor's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions from the Reorganized Debtor as follows:<br><br>On each Quarterly Distribution Date each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from the Reorganized Debtor calculated with a payout that considers all claims at face value and makes adjustments for Allowed General Unsecured Claims as determined after objections and final orders including potential set off litigation.<br><br>The treatment proposed herein shall be in full satisfaction of the Claims in Class 16. |
| 17 | General Unsecured Claim of Ronnie Jordan | N | Y | | This Class consists of the Allowed Claim of Ronnie Jordan (a member-manager of Acquisitions and to be CEO under the Jordan Plan) who has agreed to consensually subordinate his claim under the Plan to the Allowed General Unsecured Creditors in Classes 16 only in the event of confirmation of the Jordan Plan. Ronnie Jordan shall not receive any Distributions under the Plan until and unless all of the Allowed General Unsecured Claims in Class 16 have been paid in full. |
| 18 | General Unsecured Claim of Insiders | Y | Y | | This Class consists of the Claims of Insiders against the Debtor.  These claims are separately classified because the Debtor has claims under evaluation against them arising from Insider Avoidance Actions and the Loan Causes of Action and are to be deemed to be "Disputed Claims".  To the extent there is a Class 18 Allowed General Unsecured Claim then the payout shall be Pro Rata based upon the Disputed Claims procedure described herein below. |

### 5. Class of Interest Holders

Interest Holders are the parties who hold ownership Interests in the Debtor. The following chart describes the treatment for Interest Holders in the Debtor.

| Interest Holders | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 19 | Robin Mowbray | Y | Y | On the Effective Date, Robin Mowbray, the sole shareholder of the Debtor shall not retain any existing or future Equity Interests in the Debtor/Reorganized Debtor. Her shares of stock in the Debtor shall be cancelled and in the event she does not agree to transfer and endorse the shares to Mowbray's treasury upon the Effective Date, all of her shares shall be canceled and a new certificate in the name of Mowbray Acquisition LLC shall be issued by Jordan on behalf of the Reorganized Debtor. Robin Mowbray's Equity Interests will be redeemed or cancelled under the plan on the Effective Date and 10,000 shares of authorized stock of Mowbray's pursuant to its Articles of Incorporation shall be issued to Acquisitions in return for a cash payment on the Effective Date of $1,000,000 to fund the $1,000,000 payment to Class 16 described hereinabove. |

## VI. MEANS FOR IMPLEMENTATION OF THE JORDAN PLAN

This Section is intended to explain how the Reorganized Debtor intends to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Jordan Plan after the occurrence of the Effective Date. This Section provides information regarding the funding sources for the Jordan Plan obligations, and other material issues bearing upon performance of the Jordan Plan.

### A. Funding of the Jordan Plan

1    The payments under the Jordan Plan by the Reorganized Debtor will be initially funded

2    from the above described $1,000,000 cash contribution, classified as $1,000,000 for the newly

3    issued capital stock to Acquisitions for 100% control via 100% of the capital stock of the

4    Reorganized Debtor.  As reflected in the Projections, the Distributions to the Holders of Secured

5    Claims will be paid by the Reorganized Debtor from its post-Effective Date cash flow.

6    Distributions to the Holders of Allowed General Unsecured Claims will be made by the

7    Reorganized Debtor.  The Holders of Allowed General Unsecured Claims will receive a Pro Rata

8    Distribution of Available funds on a quarterly basis.  With the exception of the $1,000,000, the

9    Reorganized Debtor will fund the GUC Payment Amount from its post-Effective Date operations.

10   The Reorganized Debtor will pay the GUC Payment Amount as follows: Beginning on the

11   Effective Date a payment of $1,000,000 and thereafter payments shall be paid on the GUC

12   Payment Commencement Date, and continuing each quarter thereafter until the GUC Payment

13   Amount is fully funded, and cash flow permitting as projected, the Reorganized Debtor will pay to

14   the GUC the amount set forth at page 10 of 18 of the Projections under "General Unsecured

15   Claims" for such quarter as increased by Exhibit 4 (each, a "Jordan Plan Payment"). The

16   Reorganized Debtor projects funding the full GUC Payment Amount within four (4) years of the

17   Effective Date. (See Ex. 4.)  The Reorganized Debtor shall have the right to prepay the GUC

18   Payment Amount in full at any time and without any penalty.  Upon the Reorganized Debtor fully

19   funding the GUC Payment Amount, it shall have no further obligation to the GUC.

20   As reflected in the Projections, the Reorganized Debtor's post-Effective Date cash flow

21   includes substantial funds from PTS and PTM.  The Reorganized Debtor is projected to receive

22   nearly $10.8 million per year from PTS on account of management fees and equipment rent. (See

23   Ex. 1 at 2 of 18.)  PTS is projected to repay the PTS Loan with interest less than one year after the

24   Effective Date.  (See Ex. 2 at 8 of 10.) In addition, the Reorganized Debtor is to receive substantial

25   annual distributions from PTS's available cash flow.  (See Ex. 1 at 8 of 18.)  The projected annual

26   distributions collectively exceed $14.5 million over the term the Plan.  The Reorganized Debtor is

27   projected to receive not less than $720,000 on an annual basis from the to be formed subsidiary to

28   hold the CSLB C31 license to provide traffic control services thereby eliminating PTM

management fees and equipment rent.  The *to be formed* traffic control company will contribute all of its profits towards the projected payments to GUC until the GUC Payment is paid in full.  (See Ex. 4.)

In addition, as provided in Section III.E.2. below, the Reorganized Debtor will be vested with all Causes of Action, which are comprised of all Insider Avoidance Actions, the Loan Causes of Action, excluding the Excluded Claims.  Any payments on the PTM Loan and the MWP Loan within the amounts set forth in the Projections shall be paid to the Reorganized Debtor and distributed to GUC to be applied against the $21 million.  Acquisitions will investigate claims described as the Avoidance Actions and/or Loan Causes of Action and/or other insider claims against Robin, Richard J., PTM, MWP and the Gloria Mowbray Separate Property Trust as well as asserting other claims available.  The Holders of Allowed General Unsecured Claims will share pro rata in Net Recoveries as payments to be applied against the $20 million balance remaining to the GUC.

## B.    Jordan and Acquisition's $1 Million New Value Contribution

On the Effective Date, Acquisitions shall contribute to the Debtor the sum of $1,000,000 (the "New Value Contribution") as a new value contribution.

The New Value Contribution or, if applicable, the Winning Bid Contribution shall be paid to the Reorganized Debtor to be used as part of the Reorganized Debtor's cash flow to pay operating expenses and/or make the Distributions required by the Jordan Plan.

The New Value Contribution shall be subject to overbids in accordance with the Overbid Procedures attached hereto as Exhibit 5.  However, in the event Acquisition is not the winning bidder then Jordan shall <u>not</u> subordinate his Class 17 claim, and his general unsecured claim shall be considered a part of Class 16.  Acquisitions intends to seek approval of the Overbid Procedures in accordance with the Court's order approving the Disclosure Statement for dissemination.  The material dates and deadlines set forth in the Overbid Procedures are as follows:

1.    Only Qualified Bidders may submit bids on the Reorganized Debtor Equity Interests;

2.      All bids for the Reorganized Debtor Equity Interests must be Qualified Bids in accordance with the Overbid Procedures;

3.      The Bid Deadline to submit Qualified Bids is five (5) Business Days after the Voting Deadline (and assuming an impaired Class of Allowed Unsecured Claims votes in favor of the Jordan Plan);

4.      Any Qualified Bid must exceed the value of the New Value Contribution by $50,000 in addition to meeting the other Qualified Bid requirements set forth in the Overbid Procedures;

5.      The Auction on the Reorganized Debtor Equity Interests will occur on the date that is no later than three (3) Business Days before the deadline for the Debtor to file its memorandum in support of confirmation of the Jordan Plan;

6.      Bids by Qualified Bidders during the Auction must exceed the previous bid by at least $25,000;

7.      The Winning Bidder for the Reorganized Debtor Equity Interests shall be determined by the Court and subject to approval of the Court at the Confirmation Hearing.

**C.      Substantive Consolidation Option**

Jordan and Acquisitions reserve the right to file a motion seeking to substantively consolidate the Estate of the Debtor with any Affiliate, MWP and/or RM Estates, if it is determined that the legal requirements for such substantive consolidation can be satisfied and that such substantive consolidation is in the best interests of the Estate and will not be detrimental to the Mowbray's Estate, including, without limitation, as part of a compromise to be approved with confirmation of the Jordan Plan.  In addition, should the Court, by Final Order in connection with confirmation of the Jordan Plan, substantively consolidate the Estate of the Debtor with any Affiliate (upon motion by the Debtor or otherwise), then the assets of such Affiliate shall be deemed property of the Estate as of the Effective Date and shall vest in the Reorganized Debtor as provided herein, and the Claims against such Affiliate shall be treated in accordance with the treatment of similarly situated claims in the Jordan Plan, i.e., any General Unsecured Claims shall receive the treatment in Classes 16, 17 and 18.

### D.    Sale of Real Properties

After the Effective Date, the Reorganized Debtor shall be authorized, but not required (except as otherwise expressly set forth below in this Section III.D.), to sell any Estate Real Property.  Pending the Jordan Plan Term End Date, the sale or encumbering any Estate Real Property shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real Property shall not be sold or encumbered absent an order of the Court.  The Reorganized Debtor may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

As an alternative to the sale any Estate Real Property as provided or required herein, the Reorganized Debtor may incur or obtain financing secured by such property as necessary to pay Allowed Claims pursuant to an order of the Court.

### E.    Reorganized Debtor Retention of Professionals and Fees and Expenses

On or after the Effective Date, the Reorganized Debtor may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as it deems necessary and appropriate to assist in carrying out its rights or duties under the Jordan Plan. Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtor.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtor (the "Reorganized Debtor Professionals") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtor.

The Reorganized Debtor Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses.  The Reorganized Debtor shall pay, without further order, notice, or application to the Court, the reasonable fees and actual expenses of any Reorganized Debtor Professionals.

### F.    The Reorganized Debtor as Disbursing Agent

The Reorganized Debtor shall serve as the disbursing agent under the Jordan Plan for the distribution of all funds called for under the Jordan Plan to Holders of Allowed General Unsecured Claims and shall be responsible for making all Distributions to the Holders of Allowed Unsecured Claims required under the Jordan Plan.

### G.     The Bond

The Reorganized Debtor shall not be required to post a bond or surety or other security for the performance of its duties under the Jordan Plan.

### H.     Release of Liens

Except as otherwise expressly provided in the Jordan Plan for the Holders of Allowed Claims in Classes 1 through 15, or the Confirmation Order, or in any document, instrument or other agreement created in connection with the Jordan Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against property of the Estate shall be released. The Jordan Plan Trustee and the Reorganized Debtor shall be empowered to file such pleadings and/or record such documents or instruments as necessary to eliminate, expunge or release such liens from their respective assets.

### I.     Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Reorganized Debtor may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Jordan Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption(s) specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Jordan Plan.

### J.     The Reorganized Debtor's Post-Confirmation Management

On the Effective Date the then existent members of the Board of Directors of Mowbray's is/are deemed to be removed and Acquisition as sole shareholder, as a result of the Jordan Plan Confirmation, shall promptly appoint a new Board of Directors.  It is anticipated the new Board of Directors of Mowbray's will appoint Ronnie Jordan to serve as CEO, Jacob Morrow to serve as President, Keena Morrow to serve as Vice President and Kenneth Catanzarite to serve as Vice President, Secretary and interim CFO of the Reorganized Debtor and each shall serve as members of the Reorganized Debtor's Board of Directors (the "Mowbray's Board") and the Board of Directors of PTS.  To the extent that the Debtor's bylaws are inconsistent with the Jordan Plan, the Jordan Plan shall control.

**K.      Powers and Duties of the Reorganized Debtor**

On and after the Effective Date and except as otherwise set forth in the Jordan Plan, and notwithstanding anything to the contrary in the Debtor's bylaws, the Reorganized Debtor shall have the power and authority to take such actions as necessary to carry out and implement the terms of the Jordan Plan, including, without limitation, the following:

a.      Receiving the New Value $1,000,000 and issuing the 10,000 shares of Mowbray's capital stock and making the Distributions required by the Reorganized Debtor under the Jordan Plan;

b.      Filing motions or commencing proceedings to determine the allowability, classification, and priority of Claims and Interests;

c.      Administering the terms of the Jordan Plan, the Confirmation Order, or any Order of the Court;

d.      Opening or closing any accounts the Reorganized Debtor determines reasonable, necessary, or required under the Jordan Plan;

e.      Reviewing, approving, and paying the fees and costs incurred by the Reorganized Debtor Professionals after the Effective Date;

f.      Operate and use its revenues and cash provided they comply with the payment terms in the Jordan Plan;

g.      Filing, prosecuting, or compromising any Estate Claims;

h.    Filing motions or commencing proceedings to seek an injunction, judgment or order, or taking any other action as may be necessary or appropriate to enforce the terms of, or to restrain interference with, the Jordan Plan or the Confirmation Order;

//

i.    Filing or amending any income, payroll or other tax returns, Federal or state, including without limitation for Employee Retention Credit ("ERC") Claims; and

j.    Taking any other action reasonably necessary or appropriate, in the Reorganized Debtor's discretion, related to the Debtor's operations or to implement the Jordan Plan.

On the Effective Date, all actions contemplated by the Jordan Plan shall be deemed authorized and approved in all respects, subject to the provisions of the Jordan Plan, by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without any further requirement of further action by the Reorganized Debtor.

**L.    Default on Obligations to Holders of Allowed Claims**

The failure of the Reorganized Debtor to (i) make a payment to the Holder of an Allowed Secured Claim, or (ii) make a payment to the GUC when such payment is due under the Jordan Plan shall constitute a "Default" under the Jordan Plan.  Upon a Default, the party to whom such payment was required to be made, as the case may be (i.e., the Holder of the Allowed Secured Claim under (i) or the Plan Trustee under (ii)), may, in such party's discretion, provide written notice of such default to the Reorganized Debtor and its counsel.  If the Reorganized Debtor fails to cure such Default within thirty (30) days of receipt of the written notice, then such Default shall be an "Uncured Default" and the party noticing the Default may, after meeting and conferring with the Reorganized Debtor in good faith to determine whether the Uncured Default can be consensually resolved, file a motion with the Bankruptcy Court seeking dismissal or conversion of the Chapter 11 Case(s) under 11 U.S.C. § 1112(b).  This remedy is in addition to any remedy expressly granted to, or permitted by, the Holder of an Allowed Secured Claim in the treatment in the Jordan Plan for such Holder.  The remedy provided by this Section III.L. shall otherwise be the sole remedy for any Uncured Default under the Jordan Plan.

**V.    DISTRIBUTIONS**

**A.** **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Jordan Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtor shall make initial distributions under the Jordan Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Effective Date.

**B.** **Distributions on Account of Claims Allowed After the Effective Date**

**1.** **Payments and Distributions on Disputed Claims**

Except as otherwise provided in the Jordan Plan, a Final Order or as agreed to by the relevant parties, distributions under the Jordan Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

**2.** **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Jordan Plan, and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution the Reorganized Debtor shall establish appropriate reserves for potential payment of such Claims.

**C.** **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

**1.** **Delivery of Distributions in General**

Except as otherwise provided herein, the Reorganized Debtor shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution or any Proof of Claim filed by that Holder.

**2.** **Undeliverable Distributions**

Distributions to Holders of Allowed Claims will be sent to the last known address set forth on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof of claim was filed.  Holders of Allowed Claims may change the address to which the distributions will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of

the change of address on the Reorganized Debtor.  If a distribution is returned as undeliverable, the Reorganized Debtor shall hold the distribution and shall not be required to take any further action with respect to the delivery of the distribution unless and until the Reorganized Debtor is notified in writing of the then-current address of the person or entity entitled to receive the distribution.  Unless and until the Reorganized Debtor is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision below for distribution of Unclaimed Property.

### 3.    Distributions of Unclaimed Property

If any distributions are returned to the Reorganized Debtor or the Jordan Plan Trustee as undeliverable, then such distributions shall be deemed to be "Unclaimed Property."  Nothing contained in this Jordan Plan shall require the Reorganized Debtor or anyone else, to attempt to locate such person or entity.  The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtor. If such person or entity presents itself within six (6) months of the date of the payment returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity.  If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

### D.    Compliance with Tax Requirements/Allocations

In connection with the Jordan Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Jordan Plan to the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Jordan Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

//

//

## VII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, any executory contracts and unexpired leases identified on the schedule of executory contracts and unexpired leases to be assumed filed with the memorandum or pleading in support of confirmation of the Jordan Plan (the "Schedule of Assumed Agreements") shall be deemed assumed by the Reorganized Debtor, as the case may be.  The Schedule of Assumed Agreements will identify any amounts that must be paid to cure defaults under the executory contracts to be assumed under the Jordan Plan (the "Cure Amount").  The Debtor reserves the right to amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; (b) modify the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The Debtor will provide notice of any amendment to the Schedule of Assumed Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment as well as to Jordan and his attorneys.

Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a final determination of the Cure Amount and a final determination that the Debtor has shown adequate assurance of future performance.  Further, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults arising from, out of, or related to the executory contract or unexpired lease, including any claims that were or could have been asserted by the non-debtor party to the contract or lease on or prior to

the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and you object to the assumption of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must file and serve upon the Debtor and its counsel a written objection within the deadline for objecting to the confirmation of the Jordan Plan.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Jordan Plan for such non-debtor party.  If a dispute arises regarding (a) whether the Debtor has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Reorganized Debtor reserves the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative Cure Amount (an "Alternative Cure Amount"), then the Debtor may amend the Schedule of Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or

1    unexpired leases not so deleted shall be conditionally assumed, subject to the right of the

2    Reorganized Debtor to either, up to the first (1st) Business Day that is at least sixty (60) days

3    following the Effective Date (the "Cure Motion Deadline"), (1) file a motion to determine the

4    appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely

5    forego assumption of, and, instead, reject the subject executory contract or unexpired lease.  Any

6    such motion or notice of any such amendment will be served on the party to the executory contract

7    or unexpired lease affected by the motion (or its attorney, if any). If the Reorganized Debtor does

8    not, by the Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or

9    amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead,

10   reject the subject executory contract or unexpired lease, then the Cure Amount will be the

11   Alternative Cure Amount and such amount will be paid to the applicable non-debtor party within

12   fifteen (15) days after the Cure Motion Deadline (unless otherwise expressly set forth in the

13   Jordan Plan for such non-debtor party).  If the Reorganized Debtor has filed such a motion and

14   does not timely amend the Schedule of Assumed Agreements within fifteen (15) days after entry

15   of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be

16   assumed, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount

17   ordered by the Court.

18        The Cure Amount will be paid to the applicable non-debtor party as soon as reasonably

19   practicable following the expiration of the 15-day deadline or as otherwise expressly set forth in

20   the Plan for such non-debtor party.

21        **B.**    **Rejection of Executory Contracts or Unexpired Leases Not Assumed**

22        On the Effective Date, the Reorganized Debtor will be deemed to have rejected any and all

23   executory contracts and unexpired leases not identified on the Schedule of Assumed Agreements.

24        The Confirmation Order will constitute a Court order approving the rejection, as of the

25   Effective Date, of such executory contracts and unexpired leases.  Any Claim for damages arising

26   from the rejection under the Plan of any executory contract or unexpired lease must be filed with

27   the Court and served upon the Reorganized Debtor and its counsel within thirty (30) days of the

28   later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed

1    Agreements by the Debtor to eliminate the executory contract or unexpired lease. Any such

2    damage Claims that are not timely filed and served will be forever barred and unenforceable

3    against the Debtor, the Reorganized Debtor, the Estate and their respective property.  Persons

4    holding these Claims who fail to timely file Claims will be barred from receiving any

5    Distributions under the Plan on account of their requested damage Claims.

6         IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU

7    OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE

8    AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE

9    CONFIRMATION OF THE JORDAN PLAN.

10   **VIII.    PRESERVATION OF CAUSES OF ACTION, AVOIDANCE ACTIONS FOR THE**

11   **REORGANIZED DEBTOR**

12        The Plan reserves for the Reorganized Debtor all rights to commence and pursue, as

13   appropriate, any and all Estate Claims, whether arising prior to or after the Petition Date, in any

14   court or other tribunal.  On the Effective Date, the Reorganized Debtor is vested with authority to

15   enforce, file, litigate, prosecute, settle and collect Estate Claims, including Avoidance Actions

16   although the Reorganized Debtor will not be required to do so unless it determines that doing so

17   would be in the best interests of its creditors or Interest Holders.

18        While the Debtor has attempted to identify Estate Claims in the Disclosure Statement

19   which may be pursued, and hereby incorporate by reference those disclosures and provisions, the

20   failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to

21   limit the rights of the Debtor or the Reorganized Debtor to pursue any Estate Claim that is

22   expressly vested in such party in the Jordan Plan.  Therefore, no preclusion doctrine, including,

23   without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim

24   preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to any Estate Claim

25   upon or after Confirmation or consummation of the Jordan Plan.

26        All Estate Claims are preserved under the Jordan Plan for the benefit of the Estate and the

27   Reorganized Debtor, as applicable under the terms of the Jordan Plan.  The Reorganized Debtor

28   may settle or compromise any Estate Claims without further notice, motion, or order of the

1  Bankruptcy Court.  Any recoveries on Estate Claims shall be paid to the Reorganized Debtor and

2  be used to pay operating expenses or make payments on account of Allowed Claims and/or

3  Interests in accordance with the terms of the Plan.

4        ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF

5  THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE

6  ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

7  RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR

8  RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER INFORMATION.

9  HOWEVER, ALL RIGHTS OF THE DEBTOR, THE REORGANIZED DEBTOR AND THE

10  ESTATE ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS

11  WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE OR OTHER LAW

12  (OTHER THAN THE INSIDER AVOIDANCE ACTIONS, WHICH ARE VESTED IN THE

13  PLAN TRUST).

14  **IX.    PRESERVATION OF TAX REFUND AND EMPLOYEE RETENTION CREDIT**

15  **REFUND CLAIMS FOR THE REORGANIZED DEBTOR**

16        The Reorganized Debtor will be expressly authorized pursuant to the Confirmation Order

17  on the Effective Date to file amended tax returns, including without limitation payroll tax returns,

18  to facilitate Employee Retention Credit claims, whether or not the time for filing same has

19  otherwise expired ("ERC Claims").  Any recovery net of expenses on said claims, if any, less the

20  tax related adjustment to expenses shall be used as a source to repay any outstanding GUC claims,

21  if any and otherwise applied to secured claims.

22  **X.    CONFIRMATION REQUIREMENTS AND PROCEDURES**

23       PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE JORDAN

24  PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON

25  CONFIRMING A JORDAN PLAN OF REORGANIZATION IS VERY COMPLEX.  The

26  following discussion is intended solely for the purpose of alerting readers about basic confirmation

27  issues, which they may wish to consider, as well as deadlines for filing claims.  The Debtor

28

CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm the Jordan Plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the plan is feasible. These requirements are NOT the only requirements for confirmation.

### A.    Who May Vote on or Object to the Jordan Plan

Any party in interest may object to the confirmation of the Jordan Plan, but as explained below, not everyone is entitled to vote to accept or reject the Jordan Plan.

### B.    Who May Vote to Accept or Reject the Jordan Plan

A creditor or interest holder has a right to vote for or against the Jordan Plan if that creditor or interest holder has a claim or interest which is both (1) Allowed or allowed for voting purposes, (2) classified in an impaired class, and (3) entitled to receive or retain some property on account of its Claim.

### C.    What Is an Allowed Claim or Interest

As noted above, a creditor or interest holder must first have an Allowed Claim or Interest to have the right to vote.  Generally, any Proof of Claim or Interest will be Allowed, unless a party in interest files an objection to the Claim or Interest.  When an objection to a Claim or Interest is filed, the Person holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE ON ACCOUNT OF PRE-PETITION CLAIMS WAS FEBRUARY 20, 2025. A creditor may have an Allowed Claim even if a Proof of Claim was not timely filed.  A Claim is deemed an Allowed Claim if (1) it is scheduled on the Debtor's Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim.  An Interest is deemed an Allowed Interest if it is scheduled and no party in interest has objected to the Interest.

### D.  What Is an Impaired Claim or Interest

As noted above, the holder of an Allowed Claim only has the right to vote if it is in a Class that is impaired under the Jordan Plan. A Class is impaired if the Jordan Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class comprised of General Unsecured Claims is impaired if the Jordan Plan fails to pay the members of that Class 100% of what they are owed or otherwise impairs the legal rights of the Holders of the Claims.

In this case, the Debtor believes that Class 1-18 are impaired and therefore entitled to vote to accept or reject the Jordan Plan. Parties who dispute the Debtor's characterization of their Claims or Interests as being impaired or unimpaired may file an objection to the Jordan Plan contending that the Debtor has incorrectly characterized the class.

### E.  Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) Claims that are not Allowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Jordan Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Jordan Plan.  Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Jordan Plan do not vote because such Classes are deemed to have rejected the Jordan Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE (AND UNABLE TO VOTE), YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE JORDAN PLAN.

### F.  Who Can Vote in More Than One Class

A creditor whose Claim is an Allowed Claim in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Jordan Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim. Also, a creditor who has a Claim for wages or unpaid vacation, healthcare or retirement benefits may have both a Priority Claim up to the maximum specified in Bankruptcy

Code section 507(a)(4) and (a)(5), provided the conditions for priority treatment as specified under Bankruptcy Code section 507(a) are met, and a General Unsecured Claim for all amounts exceeding the statutory maximum. The Holder of such a Claim may cast a ballot for the priority portion of the Claim and another ballot for the general unsecured portion of the Claim.

//

//

### G. **Votes Necessary to Confirm the Jordan Plan**

If impaired Classes exist, the Court cannot confirm the Jordan Plan unless (1) at least one impaired Class has accepted the Jordan Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Jordan Plan, unless the Jordan Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed below.

### H. **Votes Necessary for a Class to Accept the Jordan Plan**

A Class of Claims is considered to have accepted the Jordan Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Jordan Plan. A Class of Interests is considered to have accepted the Jordan Plan when at least two-thirds (2/3) in amount of the Interest Holders of such Class which actually voted, voted to accept the Jordan Plan.

### I. **Treatment of Non-Accepting Classes ("Cramdown")**

If at least one impaired Class votes to accept the Jordan Plan, and other impaired Classes vote to reject the Jordan Plan, the Court may nonetheless confirm the Jordan Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting Classes are forced to be bound by the terms of a Jordan Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Jordan Plan to be "crammed down" on non-accepting Classes of Claims if it meets all consensual requirements except the voting requirements of Bankruptcy Code section 1129(a)(8) and if the Jordan Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Jordan Plan as referred to in Bankruptcy Code section 1129(b) and applicable case law.

To meet the "fair and equitable" test set forth Bankruptcy Code § 1129(b), the Jordan Plan

1    needs to comply with the "absolute priority rule."  In other words, as to a dissenting Class of

2    General Unsecured Claims that will not be receiving or retaining property of a value that is equal

3    to the Allowed General Unsecured Claim, holders of any claims or interests that is junior to such

4    Class should not receive or retain any non-exempt property except those under Bankruptcy Code

5    section 1115.  However, under the "new value exception," a junior class may still retain property

6    and meet the requirements of the absolute priority rule to the extent the junior class provides "new

7    value," which is value that is: (1) new, (2) substantial, (3) money or money"s worth, (4) necessary

8    for a successful reorganization, and (5) reasonably equivalent to the value or interest received.

9    　　　　The Debtor will ask the Court to confirm the Jordan Plan by "cramdown" on all impaired

10    Classes if any of these Classes do not vote to accept the Jordan Plan.

11    　　　　The Jordan Plan satisfies the Absolute Priority Rule. The Absolute Priority Rule is an issue

12    only if an impaired Class of Unsecured Claims votes to reject the Jordan Plan. If all impaired

13    Classes vote to accept the Jordan Plan, then the Absolute Priority Rule is not triggered. Assuming

14    the Jordan Plan must comply with the Absolute Priority Rule, it does so because the Jordan Plan

15    Provides for $1 Million of New Value Contribution and the increased commitment to pay GUC

16    $21 million while subordinating the Jordan claim, which shall be subject to overbid. Accordingly,

17    the Jordan Plan can be confirmed whether or not the Absolute Priority Rule must be satisfied.

18    　　　**J.    Liquidation Analysis**

19    　　　　To obtain confirmation of the Jordan Plan, the Debtor must show that the Jordan Plan

20    meets the "Best Interests of Creditors Test."  Under that test, if a claimant or interest holder is in

21    an impaired class and that claimant or interest holder does not vote to accept the Jordan Plan, then

22    that claimant or interest holder must receive or retain under the Jordan Plan property of a value not

23    less than the amount that such holder would receive or retain if the Debtor was liquidated under

24    Chapter 7 of the Bankruptcy Code.

25    　　　　In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured

26    creditors are paid first from the proceeds of the sales of properties on which those creditors have

27    liens. Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining

28    sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority

1  share in proportion to the amount of their allowed claim in relationship to the amount of total

2  allowed unsecured claims.  Finally, interest holders receive the balance that remains after all

3  creditors are paid, if any.

4       In order for the Court to be able to confirm this Jordan Plan, the Court must find that all

5  creditors and interest holders who do not accept the Jordan Plan will receive at least as much

6  under the Jordan Plan as such holders would receive under a Chapter 7 liquidation.

7       The Jordan Plan believes that the Best Interests Test is met. The Liquidation Analysis is

8  reflected at Exhibit 3 and includes the $5 million increase described at page 2 of 5:

9       The Acquisition executives have carefully evaluated Pino Tree Service and giving due

10      consideration for its Cash, Accounts Receivable and Accounts Payable as well as its going

11      concern value, notwithstanding that its Southern California Edison contract ends in 2026,

12      believes the $338,000 amount under the Robin Plan is wholly inadequate. <u>Acquisition

13      values Pino Tree service at an additional $5,000,000 to be combined with the Robin Plan

14      $15,674,000.</u>

15      **TOTAL AMOUNT AVAILABLE FOR DISTRIBUTION TO GENERAL

16      UNSECURED UNDER JORDAN PLAN WILL BE $20,674,000 ROUNDING TO

17      $21,000,000**.

18      *Underline and bold in original.*

19  Other than for the $5 million addition described above the Jordan Plan Liquidation Analysis

20  adopts high and low recovery scenarios for the Holders of Allowed General Unsecured Claims in

21  a liquidation of the Debtor in a Chapter 7.  The average based on those high and low recovery

22  scenarios is $15,674,000 plus the $5,000,000 addition to arrive at $20,674,000.  Rounded to

23  $21,00,000, the Jordan Plan, exceeds the $20,674,000 sum. Under the Jordan Plan, the Holders of

24  General Unsecured Claims will receive a pro rata share of the GUC Payment Amount of

25  $21,000,000, with $1 Million paid on the Effective Date, plus interest at the GUC Interest Rate. In

26  addition, the Jordan Plan provides that the Holders of Allowed General Unsecured Claims will

27  receive a pro rata share of any Net Recoveries as payments on the $21,000,000.  The

28

1    subordination of the Jordan Class 17 Claim under the Jordan Plan provides for a significant pro-

2    rata recovery for Class 16 GUC Claimants only in the event that the Jordan Plan is confirmed.

3      The Jordan Plan results in more value to creditors than a Chapter 7 liquidation for multiple

4    reasons and far more value than the Robin Plan.  In addition the Net Recoveries will be prosecuted

5    by persons knowledgeable about insider transactions with a scope broader than disclosed by the

6    Robin Plan. The Distributions through the Jordan Plan will be more efficient and less costly than

7    the liquidation of such assets in a Chapter 7.  The professionals who would assist in evaluation of

8    and potential prosecution of the insider claims have already taken the depositions of Robin,

9    Richard J., Richard E., CFO Phang, Gregory Pegg and others associated with Mowbray's and

10   reviewed thousands of documents and hundreds of financial transactions.  The confirmation of the

11   Jordan will facilitate earlier distributions available to pay the Holders of Allowed Unsecured

12   Claims sooner on the $21,000,000.  Moreover, the Jordan Plan professionals are knowledgeable in

13   the vegetation management business and contracting.

14     The Jordan Plan maximizes the value available for the Holders of Allowed Claims.  First,

15   Holders of Allowed Claims will benefit from the value of the post-Effective Date operations of the

16   Debtor, PTS, and the replaced Robin owned PTM.  As reflected in the PTS Projections, essentially

17   all of PTS's excess cash flow is being paid to the Debtor on an annual basis during the Jordan Plan

18   term. (See Ex. 2 at 8 of 10.)  Second, in a liquidation, it is unlikely that the Debtor and PTS would

19   realize the full value of their respective accounts receivable and existing contracts.  Many of the

20   customer (utility) contracts have onerous provisions that, upon an event of default, enable the

21   customer to withhold payment and offset amounts owing by any damages incurred.  Certain

22   contacts go further, requiring a return of payments already received.  The Jordan Plan preserves

23   and expands the business of the Debtor and PTS, enabling both to perform their obligations under

24   their respective customer contracts, and, as a result, collect the proceeds for services rendered.

25   This value inures to the benefit of the Holders of Allowed Claims under the Jordan Plan.

26     Further, the Jordan Plan preserves the right of creditors to share in any Net Recoveries as

27   added payment against the $21,000,000.  The Jordan Plan vests in the Reorganized Debtor the

28   ongoing standing to investigate and, if appropriate, pursue all Insider Avoidance Actions, Loan

1  Causes of Action, as well as those direct and indirect funds distributed to improve the residences

2  occupied by the Mowbray family nominally titled in trusts in an attempt to shield them for the

3  family to the exclusion of creditors.  While the Jordan Plan contemplates payments on the PTM

4  Loan and the MWP Loan, the Reorganized Debtor will have the right to pursue PTM and MWP to

5  collect the projected unpaid balance, should the determination be made that it is in the best

6  interests the Reorganized Debtor to do so. That is, under the Jordan Plan, the Holders of Allowed

7  General Unsecured Claims are receiving the liquidation value of the Affiliate Loans, plus the

8  potential to collect the full balance owing.

9       Finally, Jordan in his vote of confidence for the Jordan Plan subordinates his claim upon

10  the confirmation of the Jordan Plan to the payment of other GUCs until they are paid in full and

11  takes nothing from the $1 million paid on the Effective Date.

12      Amounts contained in the Liquidation Analysis at Ex. 3 and described in the notes to the

13  Liquidation Analysis include the Debtor's information discussed above and what is understood to

14  be Force Ten's good faith estimates of the projected amounts that a Chapter 7 trustee would

15  receive from the liquidation of the estate's assets except for the material addition by Jordan of $5

16  million of value to PTS.  While the Jordan Plan adopts the analysis it has no information beyond

17  what is in the Robin Plan to evaluate the correctness of the analysis.  The amounts, descriptions,

18  and other information contained herein do not constitute an admission of the amounts of any

19  Claims or an admission or a denial of the existence or values of the assets or liabilities, and are not

20  to be used as such in any legal action, administrative proceeding, or otherwise.  Many of the

21  projections, estimates and notes to this Liquidation Analysis were prepared by Debtor to assist the

22  Bankruptcy Court in making the findings required under Bankruptcy Code § 1129(a)(7) of the

23  Bankruptcy Code and they may not be used or relied upon for any other purpose.

24      The information contained in this Liquidation Analysis is projected and assumed as of the

25  Effective Date.  The Jordan Plan proponent, Acquisition are under no obligation, and expressly

26  disclaim any obligation to publicly update any of the information contained herein, whether as a

27  result of new information, future events, or otherwise.

28      THE JORDAN PLAN PROPONENT, ACQUISITION, BELIEVES THAT ANY

ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

More specifically, the Jordan Plan proponent Acquisition believes that there can be no assurance as to the values that would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Jordan Plan proponent Acquisition's conclusions or concur with such assumptions in making its determinations under Bankruptcy Code section 1129(a)(7).  For example, the Liquidation Analysis necessarily contains an estimate of the amount of the Allowed Claims, which is based on the amounts of the Claims as listed in the Debtor's Schedules or in the Proofs of Claims filed by the claimants (some of which are subject to dispute by the Debtor), as well as estimated Administrative Expense Claims, Priority Unsecured Claims, and Professional Fee Claims.  These estimates are based solely upon the Jordan Plan proponent Acquisition's analysis of the Schedules, the claims asserted against the Debtor, and the Proofs of Claim on file, and the Jordan Plan proponent Acquisition's estimates as to additional Administrative Expense and other Claims that may arise in the event of a conversion of the case from Chapter 11 to Chapter 7.  No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose,

1    including any determination of the value of any Distribution to be made on account of Allowed

2    Claims under the Jordan Plan.  The Liquidation Analysis is being provided solely to disclose to

3    Holders of Claims the potential recoveries in a hypothetical Chapter 7 liquidation of the Debtor,

4    subject to the assumptions set forth therein.  Nothing herein or in the Liquidation Analysis shall be

5    deemed as an admission as to the allowed amount of any Claim.

6    //

7    //

8        **K.**    **Feasibility**

9        Another requirement for confirmation involves the feasibility of the Jordan Plan.  This

10   means that confirmation of the Jordan Plan is not likely to be followed by liquidation, or the need

11   for further financial reorganization, of the Debtor or any successor to the Debtor under the Jordan

12   Plan, unless such liquidation or reorganization is proposed in the Jordan Plan.

13       There are at least two important aspects of a feasibility analysis.

14       **1.**    **Effective Date Payments**

15       The first aspect considers whether there will be enough cash on the Effective Date of the

16   Jordan Plan to pay the amounts due on such date.  The Jordan Plan proponent Acquisition expects

17   to have cash of approximately $8.84 million as of the Effective Date of the Jordan Plan. (See Ex. 1

18   at 5 of 18.)  As demonstrated by the Projections, the Debtor expects that this balance will be

19   sufficient to make the payments required on the Effective Date in accordance with the Jordan Plan

20   as augmented by the $1 million New Value contribution and the anticipated increases in revenue

21   from the management team, including Allowed Administrative Claims, the Initial Jordan Plan

22   Trust Payment, and the PNC Effective Date Payment.  (See Ex. 1, reflecting the Debtor's projected

23   cash balance and the reduction of liabilities between Q2, Q3 and Q4 2025.)

24       **2.**    **Post-Effective Date Payments**

25       The second aspect of feasibility considers whether there will be enough cash over the life

26   of the Jordan Plan to make the Distributions required by the Jordan Plan when required by the

27   Jordan Plan.  The payments required under the Jordan Plan after the Effective Date generally fall

28   into two categories: payments to the Holders of Allowed Secured Claims, and the Jordan Plan

1   payments required to be made by the Reorganized Debtor.  Both categories of payments are

2   feasible under the Jordan Plan.

3        The Reorganized Debtor is projected to operate on a cash flow positive basis post-

4   Effective Date.  With the exception of 2025, in which extraordinary restructuring expenses are to

5   be paid, the Reorganized Debtor is projected to generate net income on an annual basis.  (See Ex.

6   1 at 2 of 18 as supplemented by the forecast increased revenue at Ex. 4).  The Projections

7   demonstrate that the Reorganized Debtor will have sufficient net cash flow to repay its Allowed

8   Secured Claims and to fund GUC Payment Amount, each as required under the Jordan Plan. (See

9   Ex. 4). The Reorganized Debtor is projected to complete its obligations under the Jordan Plan

10  earlier than 2034, with ending cash on hand of approximately $3.3 million.  (See Ex. 1 at 8 of 18

11  as supplemented by the forecast increased revenue at Ex. 4).

12       The Reorganized Debtor is to receive substantial sums from PTS and PTM during the term

13  of the Jordan Plan, the $1 million New Value contribution and increased revenue from its

14  management team. The Reorganized Debtor is projected to receive management fees and

15  equipment rent from PTS of nearly $10.8 million per year.  (See Ex. 1 at 2 of 18).  The PTS Loan

16  is projected to be repaid less than one year after the Effective Date.  (See Ex. 2 at 9 of 10).

17  Essentially, all of PTS's net cash flow is being paid to the Reorganized Debtor.  The PTS Jordan

18  Plan Projections demonstrate that PTS will be able to pay the projected sums to the Debtor.  (See

19  id. 2 at 2 and 8 of 10).  In addition, the Reorganized Debtor is projected to receive over $700,000

20  annually from PTM on account of management fees and equipment rent and $168,450 per year

21  from establishing a C-31 Traffic Control subsidiary.  (See Ex. 1 at 2 of 10 and 4 Line 11).

22       The Debtor has included with this Disclosure Statement the Projections, projecting its post-

23  Effective Date operations, and the PTS Projections, projecting PTS's post-Effective Date

24  operations. (See Exhibits. 1, 2 and 4).  While the projected revenues and expenses upon which the

25  Jordan Plan is based are subject to a variety of unpredictable outside forces and circumstances that

26  could adversely affect the projections, Jordan and Acquisition believe that the Projections and the

27  PTS Projections are based on reasonable assumptions.  Nonetheless, certain factors may be outside

28  of Jordan and Acquisition's present control.

FINANCIAL PROJECTIONS PROVIDED WITH THE DISCLOSURE STATEMENT WILL REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN ASSUMPTIONS SET FORTH WITH SUCH FINANCIAL PROJECTIONS.  THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND ANY FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR.  BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE PROPONENTS' CONTROL, THE REORGANIZED DEBTOR'S ACTUAL CASH FLOW MAY BE DIFFERENT FROM THAT PROJECTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

## XI.    EFFECT OF CONFIRMATION OF THE JORDAN PLAN

### A.    <u>Binding Nature of Jordan Plan</u>

CONFIRMATION OF THE JORDAN PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (i) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (ii) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASE OR (iii) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

### B.    <u>Discharge</u>

The Debtor will receive a discharge upon the entry of the Confirmation Order.  Nothing herein shall limit the effect of confirmation as described in §§ 524 and/or 1141 of the Bankruptcy Code.  Upon discharge, the Reorganized Debtor and its assets will, to the fullest extent permitted by § 1141 of the Bankruptcy Code, including, without limitation as provided in § 1141(d)(1)(A) of the Bankruptcy Code, be deemed discharged and released from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities of any nature whatsoever, whether known or unknown, that arose before the Effective Date or that are based upon, arise from, or otherwise relate to acts, events, omissions, transactions, or other activities of any kind that occurred before the Effective Date, and all debts of the kind

specified in Bankruptcy Code §§ 502(g), 502(h), or 502(I), in each case, regardless of whether: (1) a proof of claim based on such a debt is filed or deemed filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the person holding the Claim based on such a debt has accepted the Jordan Plan; provided, however, that in no event shall the Debtor be discharged of any obligations remaining under the Jordan Plan as of the Effective Date.

Except as expressly provided in the Jordan Plan, pursuant to § 1141(d)(5)(A), the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor to the fullest extent allowed under § 1141 of the Bankruptcy Code. The Reorganized Debtor will not be liable for any Claims and will only have any obligations that are specifically provided for in the Plan. Holders of any Claims or debts against the Debtor will, upon the Effective Date, be enjoined from taking any action to collect, recover, or offset any such Claim or debt against the Reorganized Debtor or as a personal liability of the Reorganized Debtor.

Except as otherwise expressly provided in the Jordan Plan or the Confirmation Order, all persons will be precluded from asserting or pursuing against the Reorganized Debtor, the Estate, the Acquisition, or their respective property for any Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Effective Date, and any debt of the Debtor or Claim against the Debtor, whether secured or unsecured, which was in default up to the Effective Date, will no longer be deemed in default and will be deemed in good standing.

## C.    <u>Injunction</u>

All Persons or entities who have held, hold, or may hold Claims (other than Claims that are unimpaired under the Jordan Plan), and all other parties in interest in the Case, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claim or cause of action treated, discharged, released, or settled under the Jordan Plan, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) on account of such Claim or cause of action or against the

Reorganized Debtor; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any

manner or means, whether directly or indirectly, of any judgment, award, decree, or order against

the Reorganized Debtor; (iii) creating, perfecting, or enforcing in any manner, directly or

indirectly, any encumbrance of any kind against the Reorganized Debtor; (iv) asserting any right

of setoff, subrogation, or recoupment of any kind, against any obligation due from the

Reorganized Debtor, or against the property or interests in property of the Debtor or Reorganized

Debtor, on account of such Claims; (v) commencing or continuing in any manner any action or

other proceeding of any kind on account of, in connection with, or with respect to any such Claims

released or settled pursuant to the Jordan Plan; or (vi) taking any act to obtain possession or collect

from respective assets of the Reorganized Debtor; provided, however, that nothing contained

herein shall preclude such entities from exercising their rights pursuant to and consistent with the

terms of the Jordan Plan.

### D.    Vesting of Property in the Reorganized Debtor

Except as otherwise provided in the Jordan Plan, the confirmation of the Jordan Plan vests

title to all property whatsoever of the Debtor and the Estate in the Reorganized Debtor on and after

the Effective Date, free and clear of all claims and interests, but, pending the payment of all

Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the

Jordan Plan.

### E.    Modification of the Plan

The Jordan Plan may be modified at any time before confirmation.  However, the

Bankruptcy Court may require a new disclosure statement and/or re-voting on the Jordan Plan.

Jordan may also seek to modify this Plan at any time after confirmation only if (i) the Jordan Plan

has not been substantially consummated, and (ii) the Bankruptcy Court authorizes the proposed

modification(s) after notice and a hearing.

### F.    Exculpations and Releases

To the maximum extent permitted by law, neither the Debtor, the Reorganized Debtor,

Jordan, Acquisitions, nor any of their professionals employed or retained by any of them

(collectively, the "Exculpated Parties"), shall have or incur liability to any person or entity for any

Official Actions taken or omission made in good faith in connection with or related to the
formulation and implementation of the Jordan Plan, or a contract, instrument, release, or other
agreement or document created in connection therewith, the solicitation of acceptances for or
confirmation of the Jordan Plan, or the consummation and implementation of the Jordan Plan and
the transactions contemplated thereby.

## G. Submission of Post-Confirmation Reports

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file
a status report with the Bankruptcy Court explaining what progress has been made toward
consummation of the confirmed Jordan Plan. The status report shall be served on each of the
following or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties
that receive notice of electronic filings in the Chapter 11 Cases.  Further status reports shall be
filed every 120 days and served on the same entities.

## H. Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to
the OUST on or before the Effective Date. Quarterly fees accruing under 28 U.S.C. § 1930(a)(6)
after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the
entry of an order dismissing the Case or converting the Case to Chapter 7, at the rate in effect at
the time such fees are due.

## I. Post-Confirmation Conversion/Dismissal

After the Jordan Plan is confirmed, a creditor or party in interest may bring a Motion, only
after notice and a hearing, to convert or dismiss the Chapter 11 Case under Bankruptcy Code
section 1112(b) if there is an Uncured Default as defined hereinabove or other material default in
performing the Plan.  If the Bankruptcy Court orders the Chapter 11 Case converted to Chapter 7
after the Jordan Plan is confirmed, then all property that had been property of the estate and vested
in the Reorganized Debtor, and that has not been distributed under the Plan will revest in the
Chapter 7 Estate.  The automatic stay will be reimposed upon the revested property only to the
extent that relief from stay was not previously authorized by the Bankruptcy Court during the
Chapter 11 Case.  The Confirmation Order may also be revoked under very limited circumstances.

The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry of the Confirmation Order.

### J.    Final Decree

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Case.  The Reorganized Debtor shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

### XI.    RISK FACTORS REGARDING THE JORDAN PLAN

Performance of the obligations under the Jordan Plan are subject to various factors and contingencies, some of which are described in this section.  The following discussion summarizes some of the material risks associated with the Jordan Plan, but is not intended to be exhaustive or exclusive.  Moreover, it should be read in connection with the other disclosures contained in this Disclosure Statement and the Jordan Plan.  Each creditor, in conjunction with its advisors, should supplement the following discussion by analyzing and evaluating the Jordan Plan and the Disclosure Statement as a whole. THE RISKS ASSOCIATED WITH THE JORDAN PLAN MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE JORDAN PLAN.

The Jordan Plan is funded from the $1 million New Value capital infusion and the post-Effective Date cash flow and operations of the Reorganized Debtor, including payments to the Reorganized Debtor from PTM and PTS.  In particular, the Reorganized Debtor's post-Effective Date cash flow includes management fees and equipment rent from PTS, the repayment of the PTS Loan and PTM Loan, and projected distributions from PTS. The ability of PTS and PTM to make such payments and distributions is based on its projected cash flow.  The PTS Projections are attached to the Index as **Exhibit 2**.

The Reorganized Debtor is projected to operate on a cash flow positive basis after the Effective Date. (*See* Ex. 1.)  The projected payments from PTS and PTM, to be replaced by a wholly owned licensed C-31 subsidiary, contribute to such positive cash flow.  The Debtor

1    believes that the Projections and the PTS Projections are reliable projections of their respective

2    future cash flows.  However, each projection is a mere estimate and is based on certain

3    assumptions.  Acquisition believes those assumptions are reasonable.  However, there is a risk that

4    the Reorganized Debtor's actual post-Effective Date operations are materially different than

5    projected. Sales could be less than expected and/or expenses can be more than expected, either of

6    which could impact the ability of the Reorganized Debtor to make the payments contemplated by

7    the Jordan Plan.  There is a similar risk that PTS's post-confirmation operations are different than

8    projected.

9    There are risks associated with the future operations of the Reorganized Debtor, PTS, and

10    PTM, to be replaced by a wholly owned licensed C-31 subsidiary.  The Debtor currently has ten

11    (10) customers.  In addition, the Debtor's customer contracts are, in general, of short duration,

12    typically 2 years.  There is no guarantee that a particular customer will select the Debtor for future

13    work after the expiration of the Debtor's current contract(s).  The management team of Acquisition

14    will cause the Debtor will aggressively pursue new business opportunities through its management

15    team and affiliates.

16    PTS's revenues are largely concentrated in one customer, SCE.  SCE represents

17    approximately 99% of PTS's revenues.  The loss of SCE's contracts would result in a severe

18    disruption to PTS's operations (absent PTS replacing the loss with revenues from another source).

19    Without SCE's contracts, PTS would lack the ability to make the projected payments to the

20    Reorganized Debtor.  PTS's current SCE contracts expire December 31, 2026.  Similar to the

21    Debtor, there is no guarantee that PTS will secure future work from SCE after the expiration of the

22    current contracts.  However, PTS is attempting to extend its existing contracts with SCE and win

23    work from other prospective customers.

24    Importantly, as concerns SCE the Jordan Plan management team Jordan, Jacob and Kelly

25    have years of experience in UVM and working with and withing SCE. Jordan plans to return to

26    the very same safety plans and systems. Jordan's Acquisition's management team will

27    demonstrate a restorative sustainable safety program such as that in place from 2018 through early

28    2021 when Jordan was CEO, not only for the Mowbray's employees but to secure major utility

1    work, including with SCE and PGE.

2         PTM will be replaced by a wholly owned licensed C-31 subsidiary operated by the same

3    Jordan Plan management team at Acquisition. Such replacement is expected to increase

4    profitability for the benefit of Debtor but such an increase is not guaranteed.

5         In addition, operations of PTS and PTM, to be replaced by a wholly owned licensed C-31

6    subsidiary, could be disrupted if the Debtor's operations ceased.  The Debtor provides assistance

7    to both PTS and PTM, to be replaced by a wholly owned licensed C-31 subsidiary, in the form of

8    management services and the rental of equipment, each pursuant to written agreements.  As such,

9    if the Debtor's operations cease, then both such entities' operations would be materially and

10   adversely impacted.

11   **XII.    PRESERVATION OF TAX REFUND AND EMPLOYEE RETENTION CREDIT**

12   **REFUND CLAIMS FOR THE REORGANIZED DEBTOR**

13        The Reorganized Debtor will be expressly authorized pursuant to the Confirmation Order

14   on the Effective Date to file amended tax returns, including without limitation payroll tax returns,

15   to facilitate Employee Retention Credit claims, whether or not the time for filing same has

16   otherwise expired ("ERC Claims").  Any recovery net of expenses on said claims, if any, less the

17   tax related adjustment to expenses shall be used as a source to repay any outstanding GUC claims,

18   if any and otherwise applied to secured claims.  No amount is reflected in the Liquidation Analysis

19   because such a refund claim requires a detailed analysis that has not yet been conducted and such

20   claims are significantly backlogged with the Internal Revenue Service.

21   **XIII.   TAX CONSEQUENCES OF THE JORDAN PLAN**

22        CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE JORDAN

23   PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN

24   ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible

25   tax consequences is intended solely for the purpose of alerting readers about possible tax issues

26   this Jordan Plan may present to the Debtor.  The Debtor CANNOT and DOES NOT represent that

27   the tax consequences contained below are the only tax consequences of the Jordan Plan because

28

1   the Tax Code embodies many complicated rules which make it difficult to state completely and

2   accurately all the tax implications of any action.

3        At this time, it is projected that there will be no federal or state income tax due from the

4   implementation of the Jordan Plan.

5   **XIV.**   <u>**CONCLUSION**</u>

6        Jordan and Acquisition believe that the Jordan Plan is in the best interests of all Holders of

7   Allowed Claims and urge them to vote in favor of the Jordan Plan.

8     Dated: July 16, 2025                   Respectfully submitted by

9                                           **GOE FORSYTHE & HODGES LLP**

10

11                                          By:   <u>/s/ Robert P. Goe</u>

12                                                 Robert P. Goe

13                                               Jeffrey W. Broker

14                                             Attorneys for Creditor and Movant

15                                             Ronnie Jordan

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 3**

Robert P. Goe – State Bar No. 137019
Jeffrey W. Broker – State Bar No. 53226
**GOE FORSYTHE & HODGES LLP**
17701 Cowan, Building D, Suite 210
Irvine, CA 92614
Email: rgoe@goeforlaw.com
        jbroker@goeforlaw.com
Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Creditor Ronnie Jordan

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE ORIGINIAL MOWBRAY'S TREE SERVICE, INC.,<br><br>       Debtor and Debtor-in-Possession. | Case No.  8:24-bk-12674-SC<br>Chapter 11 Proceeding<br><br>**INDEX OF EXHIBITS IN SUPPORT OF DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION** |

//

//

//

Ronnie Jordan ("Jordan"), an unsecured creditor and one of the owners and CEO of Mowbray Acquisition LLC ("Acquisition"), hereby submits the following index of exhibits in support of the Jordan's Disclosure Statement Describing Chapter 11 Plan of Reorganization (the "Disclosure Statement").

| Exhibit No. | Title of Description of Exhibits |
| --- | --- |
| 1 | Ronnie Jordan Modified Mowbray's Historical & Forecast numbers including through 2034 derived from Exhibit 1 in the Robin Mowbray Disclosure Statement Exhibits |
| 2 | Ronnie Jordan Modified Pino Tree Service, Inc. ("Pino") Historical & Forecast numbers including through 2034 derived from Exhibit 2 in the Robin Mowbray Disclosure Statement Exhibits. |
| 3 | Ronnie Jordan The Original Mowbray's Tree Service, Inc. Hypothetical Liquidation Analysis derived from Exhibit 3 in the Robin Mowbray Disclosure Statement Exhibits. |
| 4 | Ronnie Jordan Forecast prepared reflecting payments to General Unsecured Creditors ("GUC") payments under Jordan Plan |
| 5 | Ronnie Jordan Forecast prepared reflecting payments to General Unsecured Creditors ("GUC") payments under Robin Plan |
| 6 | Ronnie Jordan's resume |
| 7 | James Kelly's bio |
| 8 | Year to date April and May 2018 Financial statements and cash flow handed to Ronnie Jordan in May-June 2018 meeting with Richard E. Mowbray and Alan Phang in San Bernardino |
| 9 | Rick E. Mowbray June 2018 announcement Ronnie Jordan as Chief Executive officer ("CEO") |
| 10 | July 17, 2018 "Shotcaller" Facebook Announcement of Ronnie Jordan hiring as CEO. |
| 11 | October 2, 2023 Deposition Transcript of Richard E. Mowbray |
| 12 | March 1, 2022 Sworn Statement of Richard E. Mowbray |
| 13 | Ronnie Jordan Retained expert Kenneth Creal, C.P.A. Damage Calculations |
| 14 | Ronnie Jordan Retained expert Larry Kahn's Resume and Report dated January 5, 2024 |
| 15 | Ronnie Jordan Retained expert Larry Kahn's Supplemental Opinions dated July 5, 2025 |
| 16 | September 29, 2023 Deposition Transcript of Alan Phang the CFO of Mowbray's |

1

**Index of Exhibits to Disclosure Statement**

| 17 | Monthly Operating Report dated July 2, 2025 |
| 18 | REV Capital Letter of Intent dated June 30, 2025 fully executed |

Dated: July 16, 2025                              Respectfully submitted by

**GOE FORSYTHE & HODGES LLP**


By:   /s/ Robert P. Goe
        Robert P. Goe
        Jeffrey W. Broker
        Attorneys for Creditor and Movant
        Ronnie Jordan

2

**Index of Exhibits to Disclosure Statement**

# EXHIBIT "1"

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

## FINANCIAL PROJECTIONS

Mowbray Acquisition LLC ("Acquisition") and Ronnie Jordan ("Jordan") its CEO have elected to adopt for its Plan of Reorganization (the "Plan") financial projections based on the Debtor's current business conditions and projected operating performance ("Financial Projections") as modified by projects set out at Exhibit 3 (the "Jordan Projections"). The financial information for 2024 is unaudited. The Financial Projections include the years beginning in 2025 through the duration of the plan (the "Projection Period") as modified by the Jordan Projections.

Acquisition understands the Financial Projections were prepared by the Debtor's management with the assistance of the Debtor's restructuring advisors and are based upon a number of assumptions made with respect to the future performance of the Debtor's operations. Although the Financial Projections were prepared in good faith with represented to be reasonable assumptions, there can be no assurance the projected financial performance will be realized. As described in detail in the Jordan Disclosure Statement, a variety of risk factors could affect the Debtor's actual financial performance versus `the Financial Projections subject to the Jordan Projections. Accordingly, the Financial Projections should be reviewed in conjunction with consideration of the risk factors set forth in the Jordan Disclosure Statement and the assumptions described therein, including all relevant qualifications and footnotes. Additionally, the Debtor does not anticipate that it will, and it disclaims any obligation to, furnish updated projections to the holders of Claims or Equity Interests after the date of the Jordan Disclosure Statement, or to otherwise make such information public.

Acquisition and Jordan believe that the *Jordan Plan of Reorganization of The Original Mowbray's Tree Service, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* (the "Jordan Plan") meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Jordan Plan. In connection with the formulation and development of the Jordan Plan and for the purposes of determining whether the Jordan Plan would satisfy this feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in these Financial Projections and, accordingly, neither the Debtor nor any independent auditor has expressed an opinion or any other form of assurance on such information or the ability of the Debtor to meet the  Financial Projections. The Debtor's independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

### Principal Assumptions for Financial Projections and Jordan Projections

The Financial Projections and Jordan Projections are based on, and assume the successful implementation of, the Debtor's long-term business plan. Both the business plan and the Financial Projections and Jordan Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtor, emergence from Chapter 11 bankruptcy, its ability to retain existing customer contracts, gain new customer contracts, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtor, including but not limited to vegetation budgets, weather patterns and wildfires. Therefore, although the Financial Projections and Jordan Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period may vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Financial Projections and Jordan Projections or the ability of the Reorganized Debtor to achieve the projected results.

While the Debtor believes that the Financial Projections and Jordan Projections are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

In deciding whether to vote to accept or reject the Jordan Plan, Holders of Claims entitled to vote to accept or reject the Jordan Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections and Jordan Projections.

### Safe Harbor Under the Private Securities Litigation Reform Act of 1995

The Financial Projections and Jordan Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the United States Securities Exchange Act of 1934. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtor and its management as well as Acquisition and its management with respect to the timing of, completion of, and scope of the current restructuring, Jordan Plan and its business plan, market conditions, and the Debtor's future liquidity, as well as the assumptions upon which such statements are based.

While Acquisition and Jordan believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

### Select Risk Factors Related to the Financial Projections and Jordan Projections

The Financial Projections and Jordan Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtor's management and Acquisition's management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements.

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

**FINANCIAL PROJECTIONS**

<u>General Assumptions and Methodology</u>

The Financial Projections and Jordan Projections include the combined projected cash flows of the Debtor and its wholly owned subsidiary, Pino Tree Service, Inc. ("Pino"). The Financial Projections include the Debtor's unaudited actual operating results, balance sheets, and cash flows for the year ending December 31, 2024 and the projected operating results, balance sheets, and cash flows for the years 2025 through the Plan term. The Financial Projections and Jordan Projections were developed by analyzing historical operating trends as adjusted for operational changes made by Acquisition's management to drive efficiencies and overall revenue growth and cost savings.

Projected Allowed Claims and their respective Plan treatments are described below. The Financial Projections assume an Effective Date of October 1, 2025.

*Creditor Treatment*

| Creditor Class | Projected Allowed Claim ($m) | Term (in years) | Interest Rate (in years) | Notes |
|---|---|---|---|---|
| A.  Secured Creditors | | | | |
| 1.   PNC Bank | 6.4 | 3 | 6.57% | Fully secured |
| 2.   Equipment Loans | 14.7 | Up to 5 years | Varies | Mix of capital and operating leases, excludes future buy-out amounts |
| 3.   Jacobus Pino Note Payable | 0.1 | 0.5 | 0.75% | To be paid per original terms |
| B.  Administrative Claims | | | | |
| 1.   Trade and Other | 0.7 | N/A | N/A | To be paid in full in the ordinary course of business based on contractual payment terms or historical practices |
| 2.   Chapter 11 Professional and US Trustee Fees | 2.4 | N/A | N/A | To be paid in full on the later of the Effective Date or allowance by the Bankruptcy Court |
| 3.   Cure Claims | 0.0 | N/A | N/A | Paid in full within 30 days of contract assumption, subject to court approval |
| C.  Priority Unsecured Claims | | | | |
| 1.   Tax Claims | 0.0 | N/A | N/A | Paid in full within 30 days of the Effective Date |
| 2.   Employee Claims | 0.1 | N/A | N/A | Accrued paid time off will be paid in full in the ordinary course; pre-petition wages were paid post-petition, as approved by the Bankruptcy Court |
| D.  General unsecured Claims The Robin Plan provided 15.7 whereas the Jordan Plan pays 21.0 | 21.0 | 6 | 4.21% | To be paid over time with interest at the federal default judgement rate (average 1-year constant maturity (nominal) Treasury yield, as published by the Board of Governors of the Federal Reserve System) |
| E.  Insider Claims | 6.3 | N/A | N/A | To be paid after all other claims paid in full and after determination of offsetting insider claims |
| **Projected Claims** | **51.7** | | | |

The claims above exclude $2.6 million of pre-petition workers compensation claims that are fully collateralized by letters of credit totaling $5.4 million for the benefit of the insurance carriers, that are drawn upon by Berkshire Hathaway Homestate and Starr Speciality Insurance in 2024. The Debtor does not project it will need to provide additional collateral to satisfy these claims.

The Plan will be funded primarily by a $1,000,000 New Value contribution and cash flows generated through ongoing business operations, including Pino. The New Value Contribution of $1,000,000 will be made by Acquisition on the Effective Date.

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

**FINANCIAL PROJECTIONS**

**Analysis of Comparable Recovery under the Debtor's Plan versus a Hypothetical Chapter 7 Liquidation Scenario**

The Plan provides for a recovery to creditors the same or in excess of the amounts to be recovered in a hypothetical Chapter 7 Liquidation as set forth below.

| | Plan of Reorganization | Hypothetical Chapter 11 Liquidation Analysis | Difference | Higher (Lower) or Same | |
|---|---|---|---|---|---|
| Secured | 100% | 100% | 0.0% | SAME | Shown in % recovery |
| Administrative | 100% | 100% | 0.0% | SAME | Shown in % recovery |
| Priority Unsecured | 100% | 100% | 0.0% | SAME | Shown in % recovery |
| General Unsecured | 15.7 | 15.7 | 0.0 | SAME | Shown in $m |
| Insiders | | | | | NA - any recovery to Insiders is deferred until after all other creditors have been paid in full |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| **Income Statement** | | |
| Tree Service Revenues | Based on the current contracts in place, including two new customer contracts, and the expected future revenues to be generated in FY 25 and FY 26 (held flat thereafter) | Based on the current contracts in place, including one main customer, and the expected future revenues to be generated in FY 25 and FY 26 (held flat thereafter) Acquisition's management expects revenue growth forecaset in Exhibit 3. |
| Pino Management Fees & Equipment Lease Income | Projected based on management's budget, includes monthly fees charged for management and other services (eg, health insurance offered to Pino employees through Mowbray's insurance policies) plus monthly vehicle leases for Mowbray's vehicles being used to service Pino jobs | NA |
| Phoenix Management Fees & Equipment Lease Income | Projected based on management's budget, includes monthly fees charged for management services plus monthly vehicle leases for Mowbray's vehicles being used to service Phoenix jobs. | NA |
| Salaries & Wages | Job related wages are projected based on trailing 3 month ("T3M") trends as a % of revenues, inclusive of recent changes in customer contracts, and corporate wages are projected based on current headcount in place | Projected based on trailing 12 month ("TTM") trends as a % of revenues, inclusive of recent changes in customer contracts, since approximately 97% of personnel costs are job related |
| Health Insurance | Projected based on TTM trends as a % of salaries and wages, inclusive of amounts subsequently charged to Pino or Phoenix via Management Fees | Projected based on TTM trends as a % of salaries and wages for amounts incurred directly by Pino, plus projected amounts to be charged by Mowbray's as part of the Management Fees |
| Workers' Comp Insurance | Projected based on TTM trends as a % of salaries and wages | Projected based on TTM trends as a % of salaries and wages |
| Union Dues | Projected based on T3M trends as a % of job related / union wages | Projected based on TTM trends as a % of job related / union wages |
| Occupancy | Projected based on amounts currently being charged by landlords; includes approximately $14k / month charged by Mowbray's Waterman Properties which is paid via a reduction in the amount Due from Waterman (analogous to a "check swap") | Projected based on amounts currently being charged by landlords; includes approximately $6k / month charged by Mowbray's Waterman Properties |
| Insurance | Includes auto, general liability, and other business insurance; projected inclusive of recent annual increases, adjusted for anticipated annual increases and also as a % of revenues to reflect anticipated changes in customer contracts and volume of assets or operations needing to be covered | Includes auto, general liability, and other business insurance; projected inclusive of recent annual increases, adjusted for anticipated annual increases and also as a % of revenues to reflect anticipated changes in customer contracts and volume of assets or operations needing to be covered |
| Advertising | Projected based on TTM trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Utilities | Projected based on T3M monthly trends | Projected based on T3M monthly trends |
| Repair and Maintenance | Projected based on TTM trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Office Supplies | Projected based on T3M monthly trends | Projected based on T3M monthly trends |
| Vehicles Expenses | Includes day-to-day vehicle related expenses (eg, fuel, repairs, maintenance, registration) projected based on TTM trends as a % of revenues | Includes monthly vehicle leases from Mowbray's projected based on current leases in effect, plus day-to-day vehicle related expenses (eg, fuel, repairs, maintenance, registration) projected based on TTM trends as a % of revenues |
| Traffic Control Services | None currently anticipated based on current mix of customer jobs | Includes traffic management services projected based on TTM trends as a % of revenues |
| Management Fees | NA | Monthly management fees projected based on management's budget |
| OC Professionals | Includes ordinary course legal, accounting, and tax services projected based on T3M monthly trends | N/A |
| Tools and Supplies | Projected based on TTM trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Property Taxes | Projected based on 2024 property tax invoices | NA |
| Bank Expenses | Projected based on T3M monthly trends | Projected based on T3M monthly trends |
| Travel & Lodging | Projected based on TTM trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Other | Projected based on T3M monthly trends | Projected based on TTM trends as a % of revenues, plus projected amounts to be charged by Mowbray's as part of the Management Fees |
| (Gain)/Loss on Disposal of Assets | No future asset sales or disposals are currently anticipated | No future asset sales or disposals are currently anticipated |

Mowbray's Tree Service, Inc.
Financial Projections
(USD$)

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| Restructuring Expenses | Includes monthly fee estimates for Ch 11 professionals (projected to remain fully outstanding through the Effective Date), the court-appointed Examiner, and quarterly UST Fees (projected to be paid quarterly in arrears at 0.8% of projected disbursements), plus Restructuring Charges for recording additional obligations owed to creditors as of the Effective Date as per the Plan | NA |
| Depreciation | Projected based on estimated 7 year useful life for new or existing equipment or vehicles, up until such assets are fully depreciated | Projected based on estimated 7 year useful life for new or existing equipment or vehicles, up until such assets are fully depreciated |
| Interest Expense (Income) | Interest expense includes currently proposed adequate protection payments plus projected amounts to service the Plan obligations; interest income includes amounts due from Pino, Phoenix Traffic Management, and Mowbray's Waterman Properties based on the terms of the underlying agreements | Includes interest charged on amounts due to Mowbray's per the terms of that line of credit agreement |
| Income Taxes | Projected at 1.5% of pre-tax income for California S-Corp & LLC taxes | Projected at 1.5% of pre-tax income for California S-Corp & LLC taxes |

Balance Sheet

| | | |
|---|---|---|
| Accounts Receivable | Projected based on T3M customer payment trends | Projected based on expected customer payment trends, including a return to contracted terms during 2025 |
| Prepaid Expenses | Projected based on contractual payment terms as set forth under insurance premium financing agreements, less amounts utilized (time lapse) as of the end of each period | Projected based on contractual payment terms as set forth under insurance premium financing agreements, less amounts utilized (time lapse) as of the end of each period |
| Fixed Assets | Projected based on 2023 and 2024 capital expenditure trends for Mowbray's and Pino, net of Depreciation expense (see above), plus additional amounts for expected future buyouts of existing equipment leases | Equipment to be leased from the Debtor as needed based on historical practice; additional amounts projected based on 2023 and 2024 capital expenditure trends for Mowbray's and Pino, net of Depreciation expense (see above) |
| Long-term Assets, incl Deposits, Insurance Collateral, and Investment in Pino | No changes are projected; note that the Insurance Collateral represents a fully drawn upon letter of credit held by Berkshire Hathaway Homestate and Starr Specialty Insurance | No changes are projected |
| Long-term Receivables | Pino: see Due to (from) Mowbray's below

Phoenix: projected inclusive of monthly interest at prime + 2% less monthly interest-only payments

Waterman: projected inclusive of monthly interest at 4.5% and monthly non-cash Rent expenses (see above) | NA |
| Accounts Payable | Projected using an average vendor payment period of 30 days | Projected based on T3M trends for Accounts Payable Days Sales Outstanding |
| Accrued Expenses | Includes outstanding balances on credit cards (assumed to be held flat based on most recent balances), and other accrued expenses | Includes outstanding balances on credit cards (assumed to be held flat based on most recent balances), and other accrued expenses |
| Accrued Payroll | Includes estimated payroll-related accruals and employee paid time off; projected at current levels going forward | Includes estimated payroll-related accruals and employee paid time off; projected at current levels going forward |
| Accrued Workers Comp Liabilities | Represents estimates for workers' compensation claims that are fully cash collateralized; no changes projected (see Insurance Collateral above) | NA |
| Accrued Chapter 11 Professional Fees | Includes previously incurred Chapter 11 Professional and Examiner Fees that are unpaid pending court approval | NA |
| Liabilities Subject to Compromise | See Creditor Treatment | NA |
| Restructured Debts | See Creditor Treatment | NA |
| Vehicle Loans | NA, see above for Liabilities Subject to Compromise or Restructured Debts | Projected based on recent payments until paid in full |
| Due to (from) Mowbray's | NA | Interest is projected on outstanding amounts due to or from Mowbray's at current terms (prime + 3%); monthly payments are interest-only until maturity when all amounts are due in full |

Mowbray's Tree Service, Inc.
Financial Projections
*(USD$)*

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| Equity - Other Contributions from Subsidiary / Other Distribution | Reflects cash received by Mowbray's from Pino based on cash in excess of working capital needs | Reflects cash received by Mowbray's from Pino based on cash in excess of working capital needs |
| Equity - Tax Contributions from Subsidiary | Reflects cash received by Mowbray's from Pino for estimated income taxes due on Pino's operating profits (see Tax Distributions) | NA |
| Equity - Tax Distributions to Owner | Projected at 49.3% (maximum combined personal rate for federal + state income taxes) of taxable income, if positive; based on 20% of taxable income if any personal NOLs remain in place, otherwise based on 100% of taxable income; distributions to owners are anticipated to be made each quarter | Projected at 49.3% (maximum combined personal rate for federal + state income taxes) of taxable income, if positive; based on 20% of taxable income if any personal NOLs remain in place, otherwise based on 100% of taxable income; distributions to Mowbray's are anticipated to be made each quarter |
| | Note: These tax distributions will be made based on the actual flow through tax liabilities which may or may not differ from these projected amounts | |
| Equity - New Value Contribution | Projected to be made in cash as of the Effective Date | NA |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | |
| Tree Service Revenues | 2,681,624 | 2,798,616 | 2,690,061 | 2,648,061 | 1,970,341 | 1,970,341 | 1,970,341 | 1,970,341 |
| Pino Mgmt. Fees / Leases | 2,545,108 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 |
| Phoenix Mgmt. Fees / Leases | 170,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| **Total Revenues** | **5,396,732** | **5,672,028** | **5,563,474** | **5,521,474** | **4,843,753** | **4,843,753** | **4,843,753** | **4,843,753** |
| Salaries & Wages | 1,283,331 | 1,323,554 | 1,278,536 | 1,261,118 | 980,067 | 980,067 | 980,067 | 980,067 |
| Health Insurance | 193,599 | 199,667 | 192,876 | 190,248 | 147,850 | 147,850 | 147,850 | 147,850 |
| Workers' Comp Insurance | 169,407 | 174,716 | 168,774 | 166,475 | 129,374 | 129,374 | 129,374 | 129,374 |
| Union Dues | 395,620 | 424,669 | 418,817 | 410,011 | 250,587 | 250,587 | 250,587 | 250,587 |
| Occupancy | 74,221 | 63,521 | 63,521 | 63,521 | 63,521 | 63,521 | 63,521 | 63,521 |
| Insurance | 1,017,372 | 1,227,008 | 1,227,008 | 1,227,008 | 1,236,045 | 1,239,279 | 1,239,279 | 1,239,279 |
| Advertising | - | - | - | - | - | - | - | - |
| Utilities | 75,445 | 76,088 | 75,368 | 75,090 | 70,595 | 149,507 | 188,963 | 188,963 |
| Repair and Maintenance | 35,057 | 35,960 | 34,949 | 34,558 | 28,248 | 28,248 | 28,248 | 28,248 |
| Office Supplies | 104,159 | 104,159 | 104,159 | 104,159 | 104,159 | 104,159 | 104,159 | 104,159 |
| Vehicles Expenses | 516,091 | 523,474 | 515,211 | 512,014 | 460,424 | 460,424 | 460,424 | 460,424 |
| Traffic Control Services | - | - | - | - | - | - | - | - |
| OC Professionals | 169,156 | 169,156 | 169,156 | 169,156 | 169,156 | 169,156 | 169,156 | 169,156 |
| Tools and Supplies | 32,535 | 33,837 | 32,379 | 31,815 | 22,714 | 22,714 | 22,714 | 22,714 |
| Property Taxes | 46,248 | 46,248 | 46,248 | 47,173 | 47,173 | 47,173 | 47,173 | 48,116 |
| Bank Expenses | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| Travel & Lodging | 194,876 | 202,678 | 193,946 | 190,567 | 136,050 | 136,050 | 136,050 | 136,050 |
| Other | 53,162 | 53,162 | 53,162 | 53,162 | 53,162 | 53,162 | 53,162 | 53,162 |
| (Gain)/Loss on Disposal of Assets | - | - | - | - | - | - | - | - |
| **Total Operating Expenses** | **4,372,278** | **4,669,897** | **4,586,109** | **4,548,075** | **3,911,124** | **3,993,269** | **4,032,725** | **4,033,669** |
| Force Ten Partners (CRO) | 375,000 | 375,000 | 250,000 | - | - | - | - | - |
| Raines Feldman (Debtor's Counsel) | 500,000 | 375,000 | 250,000 | - | - | - | - | - |
| Grobstein Teeple | 30,000 | 30,000 | 10,000 | - | - | - | - | - |
| Examiner / Plan Trustee | - | 150,000 | 50,000 | - | - | - | - | - |
| UST Fees | 52,282 | 48,653 | 51,193 | 72,462 | 51,108 | 45,480 | 46,439 | 45,927 |
| Restructuring Charges | - | 757,900 | - | - | - | - | - | - |
| **Total Restructuring Expenses** | **957,282** | **1,736,552** | **611,193** | **72,462** | **51,108** | **45,480** | **46,439** | **45,927** |
| **Operating Income** | **67,172** | **(734,422)** | **366,171** | **900,936** | **881,521** | **805,004** | **764,589** | **764,158** |
| Depreciation | 1,384,161 | 1,037,370 | 816,092 | 629,328 | 104,187 | 107,152 | 117,586 | 128,594 |
| Interest Expense (Income) | 804,325 | 799,230 | 199,514 | 161,914 | 188,915 | 268,543 | 245,162 | 223,483 |
| Income Taxes | - | - | - | - | 8,826 | 6,440 | 6,028 | 6,181 |
| **Non-Operating Expenses** | **2,188,486** | **1,836,600** | **1,015,605** | **791,243** | **301,928** | **382,135** | **368,776** | **358,259** |
| **NET INCOME (LOSS)** | **(2,121,314)** | **(2,571,022)** | **(649,434)** | **109,694** | **579,594** | **422,869** | **395,813** | **405,899** |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | | | | |
| Tree Service Revenues | 31,877,368 | 10,818,363 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 |
| Pino Mgmt. Fees / Leases | 7,208,527 | 10,625,345 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 |
| Phoenix Mgmt. Fees / Leases | 800,131 | 710,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| **Total Revenues** | **39,886,026** | **22,153,708** | **19,375,014** | **19,375,014** | **19,375,014** | **19,375,014** | **19,375,014** | **19,375,014** | **19,375,014** | **19,375,014** | **19,375,014** |
| Salaries & Wages | 13,827,619 | 5,146,539 | 3,920,267 | 3,920,267 | 3,920,267 | 3,920,267 | 3,920,267 | 3,920,267 | 3,920,267 | 3,920,267 | 3,920,267 |
| Health Insurance | 695,336 | 776,389 | 591,398 | 591,398 | 591,398 | 591,398 | 591,398 | 591,398 | 591,398 | 591,398 | 591,398 |
| Workers' Comp Insurance | 1,825,341 | 679,372 | 517,497 | 517,497 | 517,497 | 517,497 | 517,497 | 517,497 | 517,497 | 517,497 | 517,497 |
| Union Dues | 4,509,667 | 1,649,117 | 1,002,348 | 1,002,348 | 1,002,348 | 1,002,348 | 1,002,348 | 1,002,348 | 1,002,348 | 1,002,348 | 1,002,348 |
| Occupancy | 232,264 | 264,785 | 254,085 | 254,085 | 254,085 | 254,085 | 254,085 | 254,085 | 254,085 | 254,085 | 254,085 |
| Insurance | 3,259,102 | 4,698,398 | 4,953,881 | 5,003,419 | 5,053,454 | 5,103,988 | 5,155,028 | 5,206,578 | 5,258,644 | 5,311,231 | 5,364,343 |
| Advertising | 2,141 | - | - | - | - | - | - | - | - | - | - |
| Utilities | 524,599 | 301,990 | 598,027 | 755,851 | 755,851 | 755,851 | 755,851 | 755,851 | 755,851 | 755,851 | 755,851 |
| Repair and Maintenance | 371,254 | 140,523 | 112,991 | 112,991 | 112,991 | 112,991 | 112,991 | 112,991 | 112,991 | 112,991 | 112,991 |
| Office Supplies | 367,022 | 416,636 | 416,636 | 416,636 | 416,636 | 416,636 | 416,636 | 416,636 | 416,636 | 416,636 | 416,636 |
| Vehicles Expenses | 3,772,385 | 2,066,790 | 1,841,697 | 1,841,697 | 1,841,697 | 1,841,697 | 1,841,697 | 1,841,697 | 1,841,697 | 1,841,697 | 1,841,697 |
| Traffic Control Services | 126,788 | - | - | - | - | - | - | - | - | - | - |
| OC Professionals | 2,042,196 | 676,624 | 676,624 | 676,624 | 676,624 | 676,624 | 676,624 | 676,624 | 676,624 | 676,624 | 676,624 |
| Tools and Supplies | 412,689 | 130,567 | 90,855 | 90,855 | 90,855 | 90,855 | 90,855 | 90,855 | 90,855 | 90,855 | 90,855 |
| Property Taxes | 257,800 | 185,916 | 189,634 | 193,427 | 197,295 | 201,241 | 205,266 | 209,371 | 213,559 | 217,830 | 222,186 |
| Bank Expenses | 33,271 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 |
| Travel & Lodging | 2,471,914 | 782,066 | 544,201 | 544,201 | 544,201 | 544,201 | 544,201 | 544,201 | 544,201 | 544,201 | 544,201 |
| Other | (201,325) | 212,647 | 212,647 | 212,647 | 212,647 | 212,647 | 212,647 | 212,647 | 212,647 | 212,647 | 212,647 |
| (Gain)/Loss on Disposal of Assets | (5,749,172) | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Expenses** | **28,780,892** | **18,176,360** | **15,970,788** | **16,181,943** | **16,235,846** | **16,290,327** | **16,345,391** | **16,401,047** | **16,457,300** | **16,514,158** | **16,571,627** |
| Force Ten Partners (CRO) | 287,597 | 1,000,000 | - | - | - | - | - | - | - | - | - |
| Raines Feldman (Debtor's Counsel) | 287,597 | 1,125,000 | - | - | - | - | - | - | - | - | - |
| Grobstein Teeple | - | 70,000 | - | - | - | - | - | - | - | - | - |
| Examiner / Plan Trustee | - | 200,000 | - | - | - | - | - | - | - | - | - |
| UST Fees | - | 224,589 | 188,954 | 129,536 | - | - | - | - | - | - | - |
| Restructuring Charges | - | 757,900 | - | - | - | - | - | - | - | - | - |
| **Total Restructuring Expenses** | **575,194** | **3,377,489** | **188,954** | **129,536** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Operating Income** | **10,529,940** | **599,858** | **3,215,272** | **3,063,534** | **3,139,168** | **3,084,687** | **3,029,622** | **2,973,967** | **2,917,714** | **2,860,856** | **2,803,387** |
| Depreciation | 10,573,432 | 3,866,951 | 457,519 | 694,869 | 698,481 | 632,464 | 702,827 | 844,367 | 735,033 | 640,501 | 558,768 |
| Interest Expense (Income) | (41,180) | 1,964,984 | 926,103 | 736,841 | 545,060 | 331,504 | 135,797 | 2,771 | (124,009) | (256,231) | (379,330) |
| Income Taxes | - | - | 27,475 | 24,477 | 28,434 | 31,811 | 32,865 | 31,902 | 34,600 | 37,149 | 39,359 |
| **Non-Operating Expenses** | **10,532,252** | **5,831,934** | **1,411,097** | **1,456,188** | **1,271,975** | **995,778** | **871,488** | **879,041** | **645,624** | **421,419** | **218,798** |
| **NET INCOME (LOSS)** | **(2,313)** | **(5,232,076)** | **1,804,175** | **1,607,346** | **1,867,192** | **2,088,909** | **2,158,134** | **2,094,926** | **2,272,089** | **2,439,437** | **2,584,589** |

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | |
| Tree Service Revenues | 49.7% | 49.3% | 48.4% | 48.0% | 40.7% | 40.7% | 40.7% | 40.7% |
| Pino Mgmt. Fees / Leases | 47.2% | 47.5% | 48.4% | 48.8% | 55.6% | 55.6% | 55.6% | 55.6% |
| Phoenix Mgmt. Fees / Leases | 3.2% | 3.2% | 3.2% | 3.3% | 3.7% | 3.7% | 3.7% | 3.7% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Salaries & Wages | 23.8% | 23.3% | 23.0% | 22.8% | 20.2% | 20.2% | 20.2% | 20.2% |
| Health Insurance | 3.6% | 3.5% | 3.5% | 3.4% | 3.1% | 3.1% | 3.1% | 3.1% |
| Workers' Comp Insurance | 3.1% | 3.1% | 3.0% | 3.0% | 2.7% | 2.7% | 2.7% | 2.7% |
| Union Dues | 7.3% | 7.5% | 7.5% | 7.4% | 5.2% | 5.2% | 5.2% | 5.2% |
| Occupancy | 1.4% | 1.1% | 1.1% | 1.2% | 1.3% | 1.3% | 1.3% | 1.3% |
| Insurance | 18.9% | 21.6% | 22.1% | 22.2% | 25.5% | 25.6% | 25.6% | 25.6% |
| Advertising | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Utilities | 1.4% | 1.3% | 1.4% | 1.4% | 1.5% | 3.1% | 3.9% | 3.9% |
| Repair and Maintenance | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Office Supplies | 1.9% | 1.8% | 1.9% | 1.9% | 2.2% | 2.2% | 2.2% | 2.2% |
| Vehicles Expenses | 9.6% | 9.2% | 9.3% | 9.3% | 9.5% | 9.5% | 9.5% | 9.5% |
| Traffic Control Services | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| OC Professionals | 3.1% | 3.0% | 3.0% | 3.1% | 3.5% | 3.5% | 3.5% | 3.5% |
| Tools and Supplies | 0.6% | 0.6% | 0.6% | 0.6% | 0.5% | 0.5% | 0.5% | 0.5% |
| Property Taxes | 0.9% | 0.8% | 0.8% | 0.9% | 1.0% | 1.0% | 1.0% | 1.0% |
| Bank Expenses | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Travel & Lodging | 3.6% | 3.6% | 3.5% | 3.5% | 2.8% | 2.8% | 2.8% | 2.8% |
| Other | 1.0% | 0.9% | 1.0% | 1.0% | 1.1% | 1.1% | 1.1% | 1.1% |
| Gain/Loss on Disposal of Assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Expenses** | **81.0%** | **82.3%** | **82.4%** | **82.4%** | **80.7%** | **82.4%** | **83.3%** | **83.3%** |
| Force Ten Partners (CRO) | 6.9% | 6.6% | 4.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Raines Feldman (Debtor's Counsel) | 9.3% | 6.6% | 4.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Grobstein Teeple | 0.6% | 0.5% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Examiner | 0.0% | 2.6% | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| UST Fees | 1.0% | 0.9% | 0.9% | 1.3% | 1.1% | 0.9% | 1.0% | 0.9% |
| Restructuring Charges | 0.0% | 13.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Restructuring Expenses** | **17.7%** | **30.6%** | **11.0%** | **1.3%** | **1.1%** | **0.9%** | **1.0%** | **0.9%** |
| **Operating Income** | **1.2%** | **-12.9%** | **6.6%** | **16.3%** | **18.2%** | **16.6%** | **15.8%** | **15.8%** |
| Depreciation | 25.6% | 18.3% | 14.7% | 11.4% | 2.2% | 2.2% | 2.4% | 2.7% |
| Interest Expense (Income) | 14.9% | 14.1% | 3.6% | 2.9% | 3.9% | 5.5% | 5.1% | 4.6% |
| Income Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.1% | 0.1% | 0.1% |
| **Non-Operating Expenses** | **40.6%** | **32.4%** | **18.3%** | **14.3%** | **6.2%** | **7.9%** | **7.6%** | **7.4%** |
| **NET INCOME (LOSS)** | **-39.3%** | **-45.3%** | **-11.7%** | **2.0%** | **12.0%** | **8.7%** | **8.2%** | **8.4%** |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | | | | |
| Tree Service Revenues | 79.9% | 48.8% | 40.7% | 40.7% | 40.7% | 40.7% | 40.7% | 40.7% | 40.7% | 40.7% | 40.7% |
| Pino Mgmt. Fees / Leases | 18.1% | 48.0% | 55.6% | 55.6% | 55.6% | 55.6% | 55.6% | 55.6% | 55.6% | 55.6% | 55.6% |
| Phoenix Mgmt. Fees / Leases | 2.0% | 3.2% | 3.7% | 3.7% | 3.7% | 3.7% | 3.7% | 3.7% | 3.7% | 3.7% | 3.7% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Salaries & Wages | 34.7% | 23.2% | 20.2% | 20.2% | 20.2% | 20.2% | 20.2% | 20.2% | 20.2% | 20.2% | 20.2% |
| Health Insurance | 1.7% | 3.5% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% |
| Workers' Comp Insurance | 4.6% | 3.1% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% |
| Union Dues | 11.3% | 7.4% | 5.2% | 5.2% | 5.2% | 5.2% | 5.2% | 5.2% | 5.2% | 5.2% | 5.2% |
| Occupancy | 0.6% | 1.2% | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% | 1.3% |
| Insurance | 8.2% | 21.2% | 25.6% | 25.8% | 26.1% | 26.3% | 26.6% | 26.9% | 27.1% | 27.4% | 27.7% |
| Advertising | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Utilities | 1.3% | 1.4% | 3.1% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% |
| Repair and Maintenance | 0.9% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Office Supplies | 0.9% | 1.9% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Vehicles Expenses | 9.5% | 9.3% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% |
| Traffic Control Services | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| OC Professionals | 5.1% | 3.1% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% |
| Tools and Supplies | 1.0% | 0.6% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| Property Taxes | 0.6% | 0.8% | 1.0% | 1.0% | 1.0% | 1.0% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% |
| Bank Expenses | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Travel & Lodging | 6.2% | 3.5% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% |
| Other | -0.5% | 1.0% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% |
| Gain/Loss on Disposal of Assets | -14.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Expenses** | **72.2%** | **82.0%** | **82.4%** | **83.5%** | **83.8%** | **84.1%** | **84.4%** | **84.7%** | **84.9%** | **85.2%** | **85.5%** |
| Force Ten Partners (CRO) | 0.7% | 4.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Raines Feldman (Debtor's Counsel) | 0.7% | 5.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Grobstein Teeple | 0.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Examiner | 0.0% | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| UST Fees | 0.0% | 1.0% | 1.0% | 0.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Restructuring Charges | 0.0% | 3.4% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Restructuring Expenses** | **1.4%** | **15.2%** | **1.0%** | **0.7%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** | **0.0%** |
| **Operating Income** | **26.4%** | **2.7%** | **16.6%** | **15.8%** | **16.2%** | **15.9%** | **15.6%** | **15.3%** | **15.1%** | **14.8%** | **14.5%** |
| Depreciation | 26.5% | 17.5% | 2.4% | 3.6% | 3.6% | 3.3% | 3.6% | 4.4% | 3.8% | 3.3% | 2.9% |
| Interest Expense (Income) | -0.1% | 8.9% | 4.8% | 3.8% | 2.8% | 1.7% | 0.7% | 0.0% | -0.6% | -1.3% | -2.0% |
| Income Taxes | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| **Non-Operating Expenses** | **26.4%** | **26.3%** | **7.3%** | **7.5%** | **6.6%** | **5.1%** | **4.5%** | **4.5%** | **3.3%** | **2.2%** | **1.1%** |
| **NET INCOME (LOSS)** | **0.0%** | **-23.6%** | **9.3%** | **8.3%** | **9.6%** | **10.8%** | **11.1%** | **10.8%** | **11.7%** | **12.6%** | **13.3%** |

Mowbray's Tree Service, Inc.

Financial Projections

*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | |
| Cash & Cash Equivalents | 9,568,431 | 8,840,126 | 5,303,782 | 4,486,329 | 8,735,752 | 6,964,896 | 6,460,690 | 6,016,723 |
| Account Receivable | 4,533,912 | 4,924,033 | 4,829,794 | 4,568,139 | 4,069,342 | 4,204,987 | 4,204,987 | 4,069,342 |
| Prepaid Expenses | 1,891,079 | 2,016,757 | 1,594,572 | 720,085 | 1,909,548 | 2,036,483 | 1,610,075 | 726,844 |
| **Total Current Assets** | 15,993,421 | 15,780,917 | 11,728,148 | 9,774,553 | 14,714,641 | 13,206,366 | 12,275,752 | 10,812,909 |
| **Total Fixed Assets** | 4,744,075 | 3,717,485 | 3,055,156 | 3,428,615 | 3,494,328 | 3,904,049 | 4,028,716 | 4,657,139 |
| Deposits | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 |
| Insurance Collateral | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 |
| Investment in Pino | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Affiliate Notes Receivable | 12,117,988 | 12,117,637 | 12,117,281 | 12,116,922 | 6,162,636 | 6,162,268 | 6,161,896 | 6,161,520 |
| **Total Other Assets** | 19,224,658 | 19,224,306 | 19,223,951 | 19,223,592 | 13,269,306 | 13,268,938 | 13,268,566 | 13,268,190 |
| **Total Assets** | 39,962,155 | 38,722,708 | 34,007,255 | 32,426,760 | 31,478,275 | 30,379,352 | 29,573,034 | 28,738,238 |
| Accounts Payable | 424,001 | 417,950 | 417,950 | 396,911 | 361,300 | 412,799 | 412,799 | 399,483 |
| Accrued Expenses | 263,149 | 163,943 | 211,115 | 218,904 | 267,020 | 165,829 | 213,946 | 221,890 |
| Accrued Payroll | 234,845 | 225,134 | 225,134 | 221,377 | 203,672 | 203,672 | 203,672 | 203,672 |
| Accrued Workers Comp Liabilities | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 |
| Accrued Ch 11 Professional Fees | 1,480,194 | 2,410,194 | - | - | - | - | - | - |
| **Total Current Liabilities** | 4,978,232 | 5,793,264 | 3,430,242 | 3,413,234 | 3,408,035 | 3,358,344 | 3,406,460 | 3,401,088 |
| PNC Bank | 6,727,943 | - | - | - | - | - | - | - |
| Equipment Loans | 16,173,971 | - | - | - | - | - | - | - |
| Pre-Petition AP & Other Payables | 13,428,260 | - | - | - | - | - | - | - |
| Insider Notes Payable | 6,462,135 | - | - | - | - | - | - | - |
| **Total Liabilities Subject to Compromise** | 42,792,309 | - | - | - | - | - | - | - |
| Restructured PNC Bank | - | 6,386,588 | 4,064,135 | 3,725,287 | 3,380,843 | 3,030,710 | 2,674,795 | 2,313,002 |
| Restructured Equipment Loans | - | 14,676,392 | 13,166,865 | 11,728,298 | 10,380,801 | 9,121,448 | 8,008,307 | 7,035,865 |
| Jacobus Pino Note | - | 126,007 | 63,063 | - | - | - | - | - |
| Priority Tax Claims | - | 283 | - | - | - | - | - | - |
| Administrative Claims | - | 9,547 | - | - | - | - | - | - |
| General Unsecured Claims | - | 15,673,908 | 15,839,456 | 16,006,751 | 16,175,814 | 16,346,663 | 16,519,316 | 16,693,792 |
| Insider Claims | - | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |
| **Total Restructured Debts** | - | 43,208,853 | 39,469,646 | 37,796,465 | 36,273,586 | 34,834,949 | 33,538,545 | 32,378,787 |
| **Total Liabilities** | 47,770,541 | 49,002,116 | 42,899,888 | 41,209,699 | 39,681,621 | 38,193,292 | 36,945,005 | 35,779,875 |
| **Total Shareholder's Equity** | (7,808,387) | (10,279,408) | (8,892,633) | (8,782,940) | (8,203,346) | (7,813,940) | (7,371,971) | (7,041,638) |
| **Total Liabilities & Shareholder's Equity** | 39,962,155 | 38,722,708 | 34,007,255 | 32,426,760 | 31,478,275 | 30,379,352 | 29,573,034 | 28,738,238 |
| *DSO* | 71.6 | 79.7 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 |
| *DPO (AP+Accrued)* | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | | | | |
| Cash & Cash Equivalents | 11,282,434 | 4,486,329 | 6,016,723 | 6,056,331 | 6,783,277 | 5,297,071 | 2,120,120 | 2,382,513 | 2,362,353 | 2,105,079 | 3,297,133 |
| Account Receivable | 4,996,909 | 4,568,139 | 4,069,342 | 4,069,342 | 4,069,342 | 4,069,342 | 4,069,342 | 4,069,342 | 4,069,342 | 4,069,342 | 4,069,342 |
| Prepaid Expenses | 412,828 | 720,085 | 726,844 | 733,670 | 740,565 | 747,528 | 754,561 | 761,665 | 768,839 | 776,086 | 783,404 |
| **Total Current Assets** | 16,692,172 | 9,774,553 | 10,812,909 | 10,859,343 | 11,593,184 | 10,113,941 | 6,944,023 | 7,213,520 | 7,200,534 | 6,950,507 | 8,149,879 |
| **Total Fixed Assets** | 6,117,981 | 3,428,615 | 4,657,139 | 5,638,761 | 5,113,862 | 4,678,829 | 6,728,308 | 5,920,761 | 5,222,548 | 4,618,867 | 4,096,919 |
| Deposits | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 | 243,699 |
| Insurance Collateral | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 | 5,362,971 |
| Investment in Pino | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Affiliate Notes Receivable | 12,115,349 | 12,116,922 | 6,161,520 | 6,159,974 | 6,158,356 | 6,156,664 | 6,154,894 | 6,153,043 | 6,151,107 | 6,149,082 | 6,146,964 |
| **Total Other Assets** | 19,222,019 | 19,223,592 | 13,268,190 | 13,266,644 | 13,265,026 | 13,263,334 | 13,261,564 | 13,259,713 | 13,257,777 | 13,255,752 | 13,253,634 |
| **Total Assets** | 42,032,171 | 32,426,760 | 28,738,238 | 29,764,748 | 29,972,072 | 28,056,104 | 26,933,896 | 26,393,994 | 25,680,860 | 24,825,126 | 25,500,432 |
| Accounts Payable | 1,110,611 | 396,911 | 399,483 | 399,483 | 399,483 | 399,483 | 399,483 | 399,483 | 399,483 | 399,483 | 399,483 |
| Accrued Expenses | 214,039 | 218,904 | 221,890 | 224,936 | 228,043 | 231,212 | 234,444 | 237,741 | 241,104 | 244,534 | 248,033 |
| Accrued Payroll | 195,250 | 221,377 | 203,672 | 203,672 | 203,672 | 203,672 | 203,672 | 203,672 | 203,672 | 203,672 | 203,672 |
| Accrued Workers Comp Liabilities | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 | 2,576,043 |
| Accrued Ch 11 Professional Fees | 575,194 | - | - | - | - | - | - | - | - | - | - |
| **Total Current Liabilities** | 4,671,137 | 3,413,234 | 3,401,088 | 3,404,134 | 3,407,241 | 3,410,410 | 3,413,642 | 3,416,939 | 3,420,302 | 3,423,732 | 3,427,231 |
| PNC Bank | 6,983,741 | - | - | - | - | - | - | - | - | - | - |
| Equipment Loans | 16,173,971 | - | - | - | - | - | - | - | - | - | - |
| Pre-Petition AP & Other Payables | 13,428,260 | - | - | - | - | - | - | - | - | - | - |
| Insider Notes Payable | 6,462,135 | - | - | - | - | - | - | - | - | - | - |
| **Total Liabilities Subject to Compromise** | 43,048,106 | - | - | - | - | - | - | - | - | - | - |
| Restructured PNC Bank | - | 3,725,287 | 2,313,002 | 805,084 | - | - | - | - | - | - | - |
| Restructured Equipment Loans | - | 11,728,298 | 7,035,865 | 4,636,313 | 2,566,994 | 765,505 | 0 | 0 | 0 | 0 | 0 |
| Jacobus Pino Note | - | - | - | - | - | - | - | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Administrative Claims | - | - | - | - | - | - | - | - | - | - | - |
| General Unsecured Claims | - | 16,006,751 | 16,693,792 | 17,410,322 | 16,463,550 | 13,746,111 | 10,912,034 | 7,956,313 | 4,873,727 | 1,658,830 | - |
| Insider Claims | - | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |
| **Total Restructured Debts** | - | 37,796,465 | 32,378,787 | 29,187,847 | 25,366,672 | 20,847,744 | 17,248,162 | 14,292,441 | 11,209,855 | 7,994,958 | 6,336,128 |
| **Total Liabilities** | 47,719,244 | 41,209,699 | 35,779,875 | 32,591,981 | 28,773,913 | 24,258,154 | 20,661,804 | 17,709,380 | 14,630,157 | 11,418,690 | 9,763,359 |
| **Total Shareholder's Equity** | (5,687,073) | (8,782,940) | (7,041,638) | (2,827,233) | 1,198,159 | 3,797,950 | 6,272,092 | 8,684,614 | 11,050,703 | 13,406,436 | 15,737,073 |
| **Total Liabilities & Shareholder's Equity** | 42,032,171 | 32,426,760 | 28,738,238 | 29,764,748 | 29,972,072 | 28,056,104 | 26,933,896 | 26,393,994 | 25,680,860 | 24,825,126 | 25,500,432 |
| *DSO* | 87.2 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 | 78.1 |
| *DPO (AP+Accrued)* | 55.4 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 |

**Mowbray's Tree Servic**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | |
| Net Income (Loss) | (2,121,314) | (2,571,022) | (649,434) | 109,694 | 579,594 | 422,869 | 395,813 | 405,899 |
| Non-Cash Restructuring Charges | - | 757,900 | - | - | - | - | - | - |
| Depreciation | 1,384,161 | 1,037,370 | 816,092 | 629,328 | 104,187 | 107,152 | 117,586 | 128,594 |
| Change in Operating Assets & Liabilities | | | | | | | | |
| Accounts Receivable | 462,997 | (390,122) | 94,239 | 261,655 | 498,797 | (135,645) | - | 135,645 |
| Other Current Assets | (1,478,251) | (125,678) | 422,186 | 874,487 | (1,189,463) | (126,935) | 426,408 | 883,232 |
| Accounts Payable | (686,610) | (6,051) | - | (21,040) | (35,611) | 51,499 | - | (13,316) |
| Other Current Liabilities | 88,705 | (108,918) | 47,173 | 4,032 | 30,412 | (101,191) | 48,116 | 7,945 |
| Accrued Ch 11 Professional Fees | 905,000 | 930,000 | (2,410,194) | - | - | - | - | - |
| **Total Operating Cash Flows** | (1,445,311) | (476,521) | (1,679,939) | 1,858,156 | (12,085) | 217,749 | 987,923 | 1,547,998 |
| | | | | | | | | |
| Capital Expenditures | (10,256) | (10,779) | (153,763) | (1,002,787) | (169,900) | (516,873) | (242,254) | (757,017) |
| Change in Affiliate Notes Receivable | (2,639) | 351 | 355 | 359 | 5,954,286 | 368 | 372 | 376 |
| Change in Other Long-term Assets | - | - | - | - | 0 | (0) | (0) | - |
| **Total Investing Cash Flows** | (12,895) | (10,428) | (153,407) | (1,002,428) | 5,784,386 | (516,505) | (241,882) | (756,641) |
| | | | | | | | | |
| Debt Repayments | (255,798) | (341,356) | (3,739,207) | (1,673,181) | (1,522,879) | (1,438,637) | (1,296,403) | (1,159,759) |
| New Value Contribution | 0 | 100,000 | - | - | - | - | - | - |
| Contributions from Pino | - | - | 2,034,392 | - | - | - | 74,997 | - |
| Tax Contributions (Distributions), net | - | - | 1,817 | - | - | (33,462) | (28,842) | (75,565) |
| **Total Financing Cash Flows** | (255,798) | (241,356) | (1,702,998) | (1,673,181) | (1,522,879) | (1,472,100) | (1,250,248) | (1,235,324) |
| | | | | | | | | |
| Net Cash Flows | (1,714,004) | (728,304) | (3,536,344) | (817,453) | 4,249,422 | (1,770,856) | (504,207) | (443,967) |
| Beginning Cash | 11,282,434 | 9,568,431 | 8,840,126 | 5,303,782 | 4,486,329 | 8,735,752 | 6,964,896 | 6,460,690 |
| **Ending Cash** | **9,568,431** | **8,840,126** | **5,303,782** | **4,486,329** | **8,735,752** | **6,964,896** | **6,460,690** | **6,016,723** |
| | | | | | | | | |
| **EQUITY ROLLFORWARD** | | | | | | | | |
| Beginning | (5,687,073) | (7,808,387) | (10,279,408) | (8,892,633) | (8,782,940) | (8,203,346) | (7,813,940) | (7,371,971) |
| Net Income (Loss) | (2,121,314) | (2,571,022) | (649,434) | 109,694 | 579,594 | 422,869 | 395,813 | 405,899 |
| Direct Charges to Equity | - | - | - | - | - | - | - | - |
| New Value Contribution | 0 | 100,000 | - | - | - | - | - | - |
| Contributions from Pino | - | - | 2,034,392 | - | - | - | 74,997 | - |
| Tax Contributions from Pino | - | - | 949,650 | - | - | 8,918 | 3,052 | 28,740 |
| Tax Distributions to Owner | - | - | (947,833) | - | - | (42,381) | (31,894) | (104,305) |
| **Ending** | **(7,808,387)** | **(10,279,408)** | **(8,892,633)** | **(8,782,940)** | **(8,203,346)** | **(7,813,940)** | **(7,371,971)** | **(7,041,638)** |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | | | | |
| Net Income (Loss) | (2,313) | (5,232,076) | 1,804,175 | 1,607,346 | 1,867,192 | 2,088,909 | 2,158,134 | 2,094,926 | 2,272,089 | 2,439,437 | 2,584,589 |
| Non-Cash Restructuring Charges | - | 757,900 | - | - | - | - | - | - | - | - | - |
| Depreciation | 10,573,432 | 3,866,951 | 457,519 | 694,869 | 698,481 | 632,464 | 702,827 | 844,367 | 735,033 | 640,501 | 558,768 |
| Change in Operating Assets & Liabilities | | | | | | | | | | | |
| Accounts Receivable | 14,067,373 | 428,770 | 498,797 | - | - | - | - | - | - | - | - |
| Other Current Assets | 462,612 | (307,257) | (6,759) | (6,826) | (6,895) | (6,964) | (7,033) | (7,103) | (7,175) | (7,246) | (7,319) |
| Accounts Payable | 268,392 | (713,701) | 2,572 | (0) | 0 | (0) | 0 | 0 | (0) | (0) | 0 |
| Other Current Liabilities | (1,727,985) | 30,992 | (14,718) | 3,046 | 3,107 | 3,169 | 3,232 | 3,297 | 3,363 | 3,430 | 3,499 |
| Accrued Ch 11 Professional Fees | 575,194 | (575,194) | - | - | - | - | - | - | - | - | - |
| **Total Operating Cash Flows** | 24,216,706 | (1,743,615) | 2,741,586 | 2,298,435 | 2,561,885 | 2,717,578 | 2,857,160 | 2,935,487 | 3,003,311 | 3,076,122 | 3,139,537 |
| Capital Expenditures | 5,471,966 | (1,177,585) | (1,686,043) | (1,676,492) | (173,582) | (197,431) | (2,752,306) | (36,820) | (36,820) | (36,820) | (36,820) |
| Change in Affiliate Notes Receivable | 1,905,503 | (1,573) | 5,955,401 | 1,547 | 1,618 | 1,692 | 1,770 | 1,851 | 1,936 | 2,025 | 2,118 |
| Change in Other Long-term Assets | (2,863,699) | - | (0) | 0 | - | - | 0 | - | (0) | - | - |
| **Total Investing Cash Flows** | 4,513,770 | (1,179,158) | 4,269,358 | (1,674,945) | (171,964) | (195,739) | (2,750,536) | (34,969) | (34,884) | (34,795) | (34,702) |
| Debt Repayments | (20,032,791) | (6,009,541) | (5,417,678) | (3,190,940) | (3,821,175) | (4,518,928) | (3,599,582) | (2,955,721) | (3,082,586) | (3,214,897) | (1,658,830) |
| New Value Contribution | - | 100,000 | - | - | - | - | - | - | - | - | - |
| Contributions from Pino | - | 2,034,392 | 74,997 | 2,762,687 | 2,621,760 | 1,455,499 | 1,342,073 | 1,265,118 | 1,170,373 | 1,038,656 | 944,766 |
| Tax Contributions (Distributions), net | (16,111) | 1,817 | (137,870) | (155,629) | (463,559) | (944,617) | (1,026,066) | (947,521) | (1,076,374) | (1,122,360) | (1,198,718) |
| **Total Financing Cash Flows** | (20,048,902) | (3,873,332) | (5,480,551) | (583,882) | (1,662,975) | (4,008,045) | (3,283,574) | (2,638,124) | (2,988,587) | (3,298,601) | (1,912,782) |
| Net Cash Flows | 8,681,574 | (6,796,105) | 1,530,394 | 39,608 | 726,946 | (1,486,206) | (3,176,950) | 262,393 | (20,160) | (257,274) | 1,192,054 |
| Beginning Cash | 2,600,860 | 11,282,434 | 4,486,329 | 6,016,723 | 6,056,331 | 6,783,277 | 5,297,071 | 2,120,120 | 2,382,513 | 2,362,353 | 2,105,079 |
| **Ending Cash** | **11,282,434** | **4,486,329** | **6,016,723** | **6,056,331** | **6,783,277** | **5,297,071** | **2,120,120** | **2,382,513** | **2,362,353** | **2,105,079** | **3,297,133** |
| **EQUITY ROLLFORWARD** | | | | | | | | | | | |
| Beginning | 31,202,796 | (5,687,073) | (8,782,940) | (7,041,638) | (2,827,233) | 1,198,159 | 3,797,950 | 6,272,092 | 8,684,614 | 11,050,703 | 13,406,436 |
| Net Income (Loss) | (2,313) | (5,232,076) | 1,804,175 | 1,607,346 | 1,867,192 | 2,088,909 | 2,158,134 | 2,094,926 | 2,272,089 | 2,439,437 | 2,584,589 |
| Direct Charges to Equity | (16,111) | - | - | 0 | - | - | 0 | (0) | (0) | 0 | (0) |
| New Value Contribution | - | 100,000 | - | - | - | - | - | - | - | - | - |
| Contributions from Pino | - | 2,034,392 | 74,997 | 2,762,687 | 2,621,760 | 1,455,499 | 1,342,073 | 1,265,118 | 1,170,373 | 1,038,656 | 944,766 |
| Tax Contributions from Pino | - | 949,650 | 40,710 | 302,342 | 352,935 | 1,399,833 | 1,312,377 | 1,222,558 | 1,146,191 | 1,098,494 | 1,009,852 |
| Tax Distributions to Owner | - | (947,833) | (178,580) | (457,971) | (816,494) | (2,344,450) | (2,338,443) | (2,170,080) | (2,222,565) | (2,220,854) | (2,208,570) |
| **Ending** | **(5,687,073)** | **(8,782,940)** | **(7,041,638)** | **(2,827,233)** | **1,198,159** | **3,797,950** | **6,272,092** | **8,684,614** | **11,050,703** | **13,406,436** | **15,737,073** |

Mowbray's Tree Service, Inc.
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **DEBT ROLL FORWARDS** | | | | | | | | |
| **Restructured PNC Bank** | | | | | | | | |
| Beginning Balance | - | - | 6,386,588 | 4,064,135 | 3,725,287 | 3,380,843 | 3,030,710 | 2,674,795 |
| Interest Expense | - | - | 81,301 | 64,905 | 59,309 | 53,620 | 47,838 | 41,960 |
| Payments | - | - | (2,403,753) | (403,753) | (403,753) | (403,753) | (403,753) | (403,753) |
| Ending Balance | - | 6,386,588 | 4,064,135 | 3,725,287 | 3,380,843 | 3,030,710 | 2,674,795 | 2,313,002 |
| **Restructured Equipment Loans** | | | | | | | | |
| Beginning Balance | - | - | 14,676,392 | 13,166,865 | 11,728,298 | 10,380,801 | 9,121,448 | 8,008,307 |
| Interest Expense | - | - | 208,873 | 186,035 | 164,842 | 144,176 | 124,768 | 107,140 |
| Payments | - | - | (1,718,400) | (1,624,601) | (1,512,340) | (1,403,529) | (1,237,909) | (1,079,582) |
| Ending Balance | - | 14,676,392 | 13,166,865 | 11,728,298 | 10,380,801 | 9,121,448 | 8,008,307 | 7,035,865 |
| Future Buy Out Amounts | - | 7,437,238 | 7,294,048 | 6,301,753 | 6,141,058 | 5,633,391 | 5,400,342 | 4,652,530 |
| **Jacobus Pino Note** | | | | | | | | |
| Beginning Balance | - | - | 126,007 | 63,063 | - | - | - | - |
| Interest Expense | - | - | 197 | 79 | - | - | - | - |
| Payments | - | - | (63,141) | (63,141) | - | - | - | - |
| Ending Balance | - | 126,007 | 63,063 | - | - | - | - | - |
| **Priority Tax Claims** | | | | | | | | |
| Beginning Balance | - | - | 283 | - | - | - | - | - |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | (283) | - | - | - | - | - |
| Ending Balance | - | 283 | - | - | - | - | - | - |
| **Administrative Claims** | | | | | | | | |
| Beginning Balance | - | - | 9,547 | - | - | - | - | - |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | (9,547) | - | - | - | - | - |
| Ending Balance | - | 9,547 | - | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | | |
| Beginning Balance | - | - | 15,673,908 | 15,839,456 | 16,006,751 | 16,175,814 | 16,346,663 | 16,519,316 |
| Interest Expense | - | - | 165,547 | 167,296 | 169,063 | 170,848 | 172,653 | 174,476 |
| Payments | - | - | - | - | - | - | - | - |
| Ending Balance | - | 15,673,908 | 15,839,456 | 16,006,751 | 16,175,814 | 16,346,663 | 16,519,316 | 16,693,792 |
| **Insider Claims** | | | | | | | | |
| Beginning Balance | - | - | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | - | - | - | - | - | - |
| Ending Balance | - | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEBT ROLL FORWARDS** | | | | | | | | | | | |
| **Restructured PNC Bank** | | | | | | | | | | | |
| Beginning Balance | | 6,386,588 | 3,725,287 | 2,313,002 | 805,084 | - | - | - | - | - | - |
| Interest Expense | | 146,206 | 202,727 | 107,094 | 15,750 | - | - | - | - | - | - |
| Payments | | (2,807,506) | (1,615,012) | (1,615,012) | (820,835) | - | - | - | - | - | - |
| Ending Balance | | 3,725,287 | 2,313,002 | 805,084 | - | - | - | - | - | - | - |
| **Restructured Equipment Loans** | | | | | | | | | | | |
| Beginning Balance | | 14,676,392 | 11,728,298 | 7,035,865 | 4,636,313 | 2,566,994 | 765,505 | 0 | 0 | 0 | 0 |
| Interest Expense | | 394,908 | 540,926 | 313,546 | 197,081 | 90,610 | 11,463 | 0 | 0 | 0 | 0 |
| Payments | | (3,343,001) | (5,233,360) | (2,713,098) | (2,266,401) | (1,892,099) | (776,968) | - | - | - | - |
| Ending Balance | | 11,728,298 | 7,035,865 | 4,636,313 | 2,566,994 | 765,505 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts | | 6,301,753 | 4,652,530 | 3,012,858 | 2,876,096 | 2,715,486 | - | - | - | - | - |
| **Jacobus Pino Note** | | | | | | | | | | | |
| Beginning Balance | | 126,007 | - | - | - | - | - | - | - | - | - |
| Interest Expense | | 276 | - | - | - | - | - | - | - | - | - |
| Payments | | (126,283) | - | - | - | - | - | - | - | - | - |
| Ending Balance | | - | - | - | - | - | - | - | - | - | - |
| **Priority Tax Claims** | | | | | | | | | | | |
| Beginning Balance | | 283 | - | - | - | - | - | - | - | - | - |
| Interest Expense | | - | - | - | - | - | - | - | - | - | - |
| Payments | | (283) | - | - | - | - | - | - | - | - | - |
| Ending Balance | | - | - | - | - | - | - | - | - | - | - |
| **Administrative Claims** | | | | | | | | | | | |
| Beginning Balance | | 9,547 | - | - | - | - | - | - | - | - | - |
| Interest Expense | | - | - | - | - | - | - | - | - | - | - |
| Payments | | (9,547) | - | - | - | - | - | - | - | - | - |
| Ending Balance | | - | - | - | - | - | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | | | | | |
| Beginning Balance | | 15,673,908 | 16,006,751 | 16,693,792 | 17,410,322 | 16,463,550 | 13,746,111 | 10,912,034 | 7,956,313 | 4,873,727 | 1,658,830 |
| Interest Expense | | 332,843 | 687,041 | 716,530 | 732,487 | 641,078 | 524,440 | 402,796 | 275,931 | 143,620 | 20,428 |
| Payments | | - | - | - | (1,679,259) | (3,358,517) | (3,358,517) | (3,358,517) | (3,358,517) | (3,358,517) | (1,679,259) |
| Ending Balance | | 16,006,751 | 16,693,792 | 17,410,322 | 16,463,550 | 13,746,111 | 10,912,034 | 7,956,313 | 4,873,727 | 1,658,830 | 0 |
| **Insider Claims** | | | | | | | | | | | |
| Beginning Balance | | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |
| Interest Expense | | - | - | - | - | - | - | - | - | - | - |
| Payments | | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |

**Mowbray's Tree Servi**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | |
| **Albach** | | | | | | | | |
| Beginning Balance | - | - | 81,500 | 77,693 | 73,860 | 69,999 | 66,111 | 62,195 |
| Interest Expense | - | - | 569 | 542 | 515 | 487 | 460 | 432 |
| Payments | - | - | (4,376) | (4,376) | (4,376) | (4,376) | (4,376) | (4,376) |
| Ending Balance | - | 81,500 | 77,693 | 73,860 | 69,999 | 66,111 | 62,195 | 58,251 |
| Future Buy Out Amounts | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| **Ally** | | | | | | | | |
| Beginning Balance | - | - | 295,487 | 282,487 | 269,314 | 255,967 | 242,443 | 228,740 |
| Interest Expense | - | - | 3,841 | 3,669 | 3,494 | 3,317 | 3,138 | 2,957 |
| Payments | - | - | (16,841) | (16,841) | (16,841) | (16,841) | (16,841) | (16,841) |
| Ending Balance | - | 295,487 | 282,487 | 269,314 | 255,967 | 242,443 | 228,740 | 214,856 |
| **Altec** | | | | | | | | |
| Beginning Balance | - | - | 4,816,724 | 3,992,275 | 3,213,875 | 2,477,379 | 1,774,711 | 1,124,442 |
| Interest Expense | - | - | 86,415 | 70,691 | 56,392 | 42,528 | 29,453 | 18,000 |
| Payments | - | - | (910,864) | (849,091) | (792,888) | (745,196) | (679,721) | (523,442) |
| Ending Balance | - | 4,816,724 | 3,992,275 | 3,213,875 | 2,477,379 | 1,774,711 | 1,124,442 | 619,000 |
| Future Buy Out Amounts | - | 3,897,659 | 3,754,469 | 3,070,281 | 2,999,945 | 2,688,725 | 2,458,302 | 1,722,240 |
| **Bank of America** | | | | | | | | |
| Beginning Balance | - | - | 6,866,128 | 6,532,469 | 6,194,228 | 5,851,341 | 5,503,746 | 5,151,377 |
| Interest Expense | - | - | 92,351 | 87,769 | 83,124 | 78,415 | 73,641 | 68,802 |
| Payments | - | - | (426,010) | (426,010) | (426,010) | (426,010) | (426,010) | (426,010) |
| Ending Balance | - | 6,866,128 | 6,532,469 | 6,194,228 | 5,851,341 | 5,503,746 | 5,151,377 | 4,794,168 |
| Future Buy Out Amounts | - | 2,861,558 | 2,861,558 | 2,861,558 | 2,861,558 | 2,861,558 | 2,861,558 | 2,861,558 |
| **FNB** | | | | | | | | |
| Beginning Balance | - | - | 91,845 | 66,721 | 41,203 | 15,283 | 0 | 0 |
| Interest Expense | - | - | 1,304 | 910 | 509 | 114 | 0 | 0 |
| Payments | - | - | (26,428) | (26,428) | (26,428) | (15,397) | - | - |
| Ending Balance | - | 91,845 | 66,721 | 41,203 | 15,283 | 0 | 0 | 0 |
| Future Buy Out Amounts | - | 122,310 | 122,310 | 122,310 | 122,310 | - | - | - |
| **Ford** | | | | | | | | |
| Beginning Balance | - | - | 1,596,788 | 1,526,232 | 1,454,771 | 1,382,396 | 1,309,093 | 1,234,851 |
| Interest Expense | - | - | 20,067 | 19,163 | 18,248 | 17,321 | 16,382 | 15,431 |
| Payments | - | - | (90,624) | (90,624) | (90,624) | (90,624) | (90,624) | (90,624) |
| Ending Balance | - | 1,596,788 | 1,526,232 | 1,454,771 | 1,382,396 | 1,309,093 | 1,234,851 | 1,159,659 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | | | | |
| **Albach** | | | | | | | | | | | |
| Beginning Balance | | 81,500 | 73,860 | 58,251 | 42,193 | 25,674 | 8,679 | 0 | 0 | 0 | 0 |
| Interest Expense | | 1,111 | 1,894 | 1,445 | 983 | 509 | 72 | - | - | - | - |
| Payments | | (8,751) | (17,503) | (17,503) | (17,503) | (17,503) | (8,751) | - | - | - | - |
| Ending Balance | | 73,860 | 58,251 | 42,193 | 25,674 | 8,679 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | - | |
| **Ally** | | | | | | | | | | | |
| Beginning Balance | | 295,487 | 269,314 | 214,856 | 157,453 | 96,947 | 33,170 | (0) | (0) | (0) | (0) |
| Interest Expense | | 7,510 | 12,907 | 9,962 | 6,859 | 3,588 | 512 | - | - | - | - |
| Payments | | (33,682) | (67,365) | (67,365) | (67,365) | (67,365) | (33,682) | - | - | - | - |
| Ending Balance | | 269,314 | 214,856 | 157,453 | 96,947 | 33,170 | (0) | (0) | (0) | (0) | (0) |
| **Altec** | | | | | | | | | | | |
| Beginning Balance | | 4,816,724 | 3,213,875 | 619,000 | 137,112 | 52,438 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense | | 157,106 | 146,372 | 19,882 | 7,509 | 1,336 | 0 | 0 | 0 | 0 | 0 |
| Payments | | (1,759,956) | (2,741,247) | (501,770) | (92,184) | (53,774) | - | - | - | - | - |
| Ending Balance | | 3,213,875 | 619,000 | 137,112 | 52,438 | 0 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts | | 3,070,281 | 1,722,240 | 101,300 | 101,300 | - | - | - | - | - | |
| **Bank of America** | | | | | | | | | | | |
| Beginning Balance | | 6,866,128 | 6,194,228 | 4,794,168 | 3,315,599 | 1,787,467 | 517,304 | 0 | 0 | 0 | 0 |
| Interest Expense | | 180,120 | 303,981 | 225,472 | 142,684 | 64,761 | 7,964 | 0 | 0 | 0 | 0 |
| Payments | | (852,020) | (1,704,040) | (1,704,040) | (1,670,816) | (1,334,924) | (525,267) | - | - | - | - |
| Ending Balance | | 6,194,228 | 4,794,168 | 3,315,599 | 1,787,467 | 517,304 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts | | 2,861,558 | 2,861,558 | 2,861,558 | 2,724,796 | 2,665,486 | - | - | - | - | |
| **FNB** | | | | | | | | | | | |
| Beginning Balance | | 91,845 | 41,203 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense | | 2,214 | 623 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments | | (52,857) | (41,825) | - | - | - | - | - | - | - | - |
| Ending Balance | | 41,203 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts | | 122,310 | - | - | - | - | - | - | - | - | |
| **Ford** | | | | | | | | | | | |
| Beginning Balance | | 1,596,788 | 1,454,771 | 1,159,659 | 849,133 | 522,389 | 178,581 | 0 | 0 | 0 | 0 |
| Interest Expense | | 39,230 | 67,382 | 51,969 | 35,751 | 18,686 | 2,667 | 0 | 0 | 0 | 0 |
| Payments | | (181,247) | (362,494) | (362,494) | (362,494) | (362,494) | (181,247) | - | - | - | - |
| Ending Balance | | 1,454,771 | 1,159,659 | 849,133 | 522,389 | 178,581 | 0 | 0 | 0 | 0 | 0 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | |
| **GM** | | | | | | | | |
| Beginning Balance | - | - | 121,389 | 116,156 | 110,844 | 105,450 | 99,973 | 94,412 |
| Interest Expense | - | - | 1,825 | 1,745 | 1,664 | 1,581 | 1,497 | 1,412 |
| Payments | - | - | (7,058) | (7,058) | (7,058) | (7,058) | (7,058) | (7,058) |
| Ending Balance | - | 121,389 | 116,156 | 110,844 | 105,450 | 99,973 | 94,412 | 88,766 |
| **John Deere** | | | | | | | | |
| Beginning Balance | - | - | 139,040 | 132,088 | 125,136 | 118,184 | 111,232 | 104,280 |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | (6,952) | (6,952) | (6,952) | (6,952) | (6,952) | (6,952) |
| Ending Balance | - | 139,040 | 132,088 | 125,136 | 118,184 | 111,232 | 104,280 | 97,328 |
| **Pathward** | | | | | | | | |
| Beginning | - | - | 400,079 | 244,447 | 117,453 | 44,179 | - | - |
| Interest Expense | - | - | 1,741 | 975 | 465 | 106 | - | - |
| Payments | - | - | (157,374) | (127,969) | (73,739) | (44,285) | - | - |
| Ending | - | 400,079 | 244,447 | 117,453 | 44,179 | - | - | - |
| Future Buy Out Amounts | - | 440,370 | 440,370 | 156,665 | 67,575 | - | - | - |
| **Samsara** | | | | | | | | |
| Beginning Balance | - | - | 217,251 | 158,001 | 98,751 | 39,500 | - | - |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | (59,250) | (59,250) | (59,250) | (39,500) | - | - |
| Ending Balance | - | 217,251 | 158,001 | 98,751 | 39,500 | - | - | - |
| **US Bank** | | | | | | | | |
| Beginning | - | - | 50,161 | 38,297 | 28,865 | 21,124 | 14,140 | 8,010 |
| Interest Expense | - | - | 760 | 570 | 432 | 307 | 198 | 108 |
| Payments | - | - | (12,624) | (10,001) | (8,173) | (7,290) | (6,328) | (4,280) |
| Ending | - | 50,161 | 38,297 | 28,865 | 21,124 | 14,140 | 8,010 | 3,838 |
| Future Buy Out Amounts | - | 65,340 | 65,340 | 40,940 | 39,670 | 33,108 | 30,482 | 18,732 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | | | | |
| **GM** | | | | | | | | | | | |
| Beginning Balance | | 121,389 | 110,844 | 88,766 | 65,303 | 40,368 | 13,867 | 0 | 0 | 0 | 0 |
| Interest Expense | | 3,570 | 6,153 | 4,767 | 3,295 | 1,730 | 248 | - | - | - | - |
| Payments | | (14,115) | (28,230) | (28,230) | (28,230) | (28,230) | (14,115) | - | - | - | - |
| Ending Balance | | 110,844 | 88,766 | 65,303 | 40,368 | 13,867 | 0 | 0 | 0 | 0 | 0 |
| **John Deere** | | | | | | | | | | | |
| Beginning Balance | | 139,040 | 125,136 | 97,328 | 69,520 | 41,712 | 13,904 | (0) | (0) | (0) | (0) |
| Interest Expense | | - | - | - | - | - | - | - | - | - | - |
| Payments | | (13,904) | (27,808) | (27,808) | (27,808) | (27,808) | (13,904) | - | - | - | - |
| Ending Balance | | 125,136 | 97,328 | 69,520 | 41,712 | 13,904 | (0) | (0) | (0) | (0) | (0) |
| **Pathward** | | | | | | | | | | | |
| Beginning | | 400,079 | 117,453 | - | - | - | - | - | - | - | - |
| Interest Expense | | 2,717 | 572 | - | - | - | - | - | - | - | - |
| Payments | | (285,343) | (118,025) | - | - | - | - | - | - | - | - |
| Ending | | 117,453 | - | - | - | - | - | - | - | - | - |
| Future Buy Out Amounts | | 156,665 | - | - | - | - | - | - | - | - | - |
| **Samsara** | | | | | | | | | | | |
| Beginning Balance | | 217,251 | 98,751 | - | - | - | - | - | - | - | - |
| Interest Expense | | - | - | - | - | - | - | - | - | - | - |
| Payments | | (118,501) | (98,751) | - | - | - | - | - | - | - | - |
| Ending Balance | | 98,751 | - | - | - | - | - | - | - | - | - |
| **US Bank** | | | | | | | | | | | |
| Beginning | | 50,161 | 28,865 | 3,838 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense | | 1,330 | 1,044 | 49 | - | - | - | - | - | - | - |
| Payments | | (22,625) | (26,071) | (3,887) | - | - | - | - | - | - | - |
| Ending | | 28,865 | 3,838 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts | | 40,940 | 18,732 | - | - | - | - | - | - | - | |

Mowbray's Tree Service, Inc.
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **TOTAL REVENUES BREAKDOWN** | | | | | | | | |
| **Tree Service Revenues** | | | | | | | | |
| Customer 1 | - | - | - | - | - | - | - | - |
| Customer 2 | - | - | - | - | - | - | - | - |
| Customer 3 | 736,454 | 789,057 | 789,057 | 789,057 | 789,057 | 789,057 | 789,057 | 789,057 |
| Customer 4 | 738,184 | 790,911 | 790,911 | 790,911 | 790,911 | 790,911 | 790,911 | 790,911 |
| Customer 5 | 217,109 | 108,555 | - | - | 111,325 | 111,325 | 111,325 | 111,325 |
| Customer 6 | 730,830 | 831,045 | 831,045 | 789,045 | - | - | - | - |
| Other Customers | 259,048 | 279,048 | 279,048 | 279,048 | 279,048 | 279,048 | 279,048 | 279,048 |
| **Total Tree Service Revenues** | 2,681,624 | 2,798,616 | 2,690,061 | 2,648,061 | 1,970,341 | 1,970,341 | 1,970,341 | 1,970,341 |
| **Pino Mgmt. Fees / Leases** | | | | | | | | |
| Mgmt Fee - Administrative Support | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 |
| Mgmt Fee - Health Insurance | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 |
| Mgmt Fee - Other Vehicle Charges | 84,000 | 84,000 | 84,000 | 84,000 | 84,000 | 84,000 | 84,000 | 84,000 |
| Mgmt Fee - Computer and Telecom Charges | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Equipment Leases | 2,116,108 | 2,264,412 | 2,264,412 | 2,264,412 | 2,264,412 | 2,264,412 | 2,264,412 | 2,264,412 |
| **Total Pino Mgmt. Fees / Leases** | 2,545,108 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 | 2,693,412 |
| **Phoenix Mgmt. Fees / Leases** | | | | | | | | |
| Mgmt Fee - Administrative Support | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 |
| Equipment Leases | 128,000 | 138,000 | 138,000 | 138,000 | 138,000 | 138,000 | 138,000 | 138,000 |
| **Total Phoenix Mgmt. Fees / Leases** | 170,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| **AFFILIATE NOTES RECEIVABLE ROLLFORWARDS** | | | | | | | | |
| **Pino Tree Services** | | | | | | | | |
| Beginning Balance | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | - | - | - |
| Interest Income | 156,290 | 156,290 | 156,290 | 156,290 | 104,194 | - | - | - |
| Payments | (156,290) | (156,290) | (156,290) | (156,290) | (6,058,116) | - | - | - |
| Ending Balance | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | - | - | - | - |
| **Mowbray's Waterman Properties** | | | | | | | | |
| Beginning Balance | 3,702,328 | 3,701,978 | 3,701,860 | 3,701,505 | 3,701,146 | 3,700,782 | 3,700,415 | 3,700,043 |
| Interest Income | 41,652 | 41,649 | 41,645 | 41,641 | 41,637 | 41,632 | 41,628 | 41,624 |
| Payments | (42,000) | (42,000) | (42,000) | (42,000) | (42,000) | (42,000) | (42,000) | (42,000) |
| Ending Balance | 3,702,212 | 3,701,860 | 3,701,505 | 3,701,146 | 3,700,782 | 3,700,415 | 3,700,043 | 3,699,667 |
| **Phoenix Traffic Management** | | | | | | | | |
| Beginning Balance | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 |
| Interest Income | 58,469 | 58,469 | 58,469 | 58,469 | 58,469 | 58,469 | 58,469 | 58,469 |
| Payments | (58,469) | (58,469) | (58,469) | (58,469) | (58,469) | (58,469) | (58,469) | (58,469) |
| Ending Balance | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL REVENUES BREAKDOWN** | | | | | | | | | | | |
| **Tree Service Revenues** | | | | | | | | | | | |
| Customer 1 | 16,447,866 | - | - | - | - | - | - | - | - | - | - |
| Customer 2 | 5,872,538 | - | - | - | - | - | - | - | - | - | - |
| Customer 3 | 5,337,432 | 3,103,626 | 3,156,230 | 3,156,230 | 3,156,230 | 3,156,230 | 3,156,230 | 3,156,230 | 3,156,230 | 3,156,230 | 3,156,230 |
| Customer 4 | 3,071,499 | 3,110,917 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 |
| Customer 5 | - | 325,664 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 |
| Customer 6 | - | 3,181,965 | - | - | - | - | - | - | - | - | - |
| Other Customers | 1,148,033 | 1,096,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 |
| **Total Tree Service Revenues** | 31,877,368 | 10,818,363 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 | 7,881,365 |
| **Pino Mgmt. Fees / Leases** | | | | | | | | | | | |
| Mgmt Fee - Administrative Support | | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| Mgmt Fee - Health Insurance | | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 | 360,000 |
| Mgmt Fee - Other Vehicle Charges | | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 |
| Mgmt Fee - Computer and Telecom Charges | | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 | 180,000 |
| Equipment Leases | | 8,909,345 | 9,057,649 | 9,057,649 | 9,057,649 | 9,057,649 | 9,057,649 | 9,057,649 | 9,057,649 | 9,057,649 | 9,057,649 |
| **Total Pino Mgmt. Fees / Leases** | 7,208,527 | 10,625,345 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 | 10,773,649 |
| **Phoenix Mgmt. Fees / Leases** | | | | | | | | | | | |
| Mgmt Fee - Administrative Support | | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 |
| Equipment Leases | | 542,000 | 552,000 | 552,000 | 552,000 | 552,000 | 552,000 | 552,000 | 552,000 | 552,000 | 552,000 |
| **Total Phoenix Mgmt. Fees / Leases** | 800,131 | 710,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 | 720,000 |
| **AFFILIATE NOTES RECEIVABLE ROLLFORWARDS** | | | | | | | | | | | |
| **Pino Tree Services** | | | | | | | | | | | |
| Beginning Balance | | 5,953,923 | 5,953,923 | - | - | - | - | - | - | - | - |
| Interest Income | | 625,162 | 104,194 | - | - | - | - | - | - | - | - |
| Payments | | (625,162) | (6,058,116) | - | - | - | - | - | - | - | - |
| Ending Balance | | 5,953,923 | - | - | - | - | - | - | - | - | - |
| **Mowbray's Waterman Properties** | | | | | | | | | | | |
| Beginning Balance | | 3,701,860 | 3,701,146 | 3,699,667 | 3,698,120 | 3,696,503 | 3,694,811 | 3,693,041 | 3,691,190 | 3,689,254 | 3,687,229 |
| Interest Income | | 166,586 | 166,521 | 166,453 | 166,382 | 166,308 | 166,230 | 166,149 | 166,064 | 165,975 | 165,882 |
| Payments | | (168,000) | (168,000) | (168,000) | (168,000) | (168,000) | (168,000) | (168,000) | (168,000) | (168,000) | (168,000) |
| Ending Balance | | 3,701,146 | 3,699,667 | 3,698,120 | 3,696,503 | 3,694,811 | 3,693,041 | 3,691,190 | 3,689,254 | 3,687,229 | 3,685,111 |
| **Phoenix Traffic Management** | | | | | | | | | | | |
| Beginning Balance | | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 |
| Interest Income | | 233,876 | 233,876 | 233,876 | 233,876 | 233,876 | 233,876 | 233,876 | 233,876 | 233,876 | 233,876 |
| Payments | | (233,876) | (233,876) | (233,876) | (233,876) | (233,876) | (233,876) | (233,876) | (233,876) | (233,876) | (233,876) |
| Ending Balance | | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 | 2,461,853 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | |
| Operating Income | 67,172 | (734,422) | 366,171 | 900,936 | 881,521 | 805,004 | 764,589 | 764,158 |
| Depreciation & Amortization | (1,384,161) | (1,037,370) | (816,092) | (629,328) | (104,187) | (107,152) | (117,586) | (128,594) |
| Interest Expense (Income) | (804,325) | (799,230) | (199,514) | (161,914) | (188,915) | (268,543) | (245,162) | (223,483) |
| Taxable Income | (2,121,314) | (2,571,022) | (649,434) | 109,694 | 588,420 | 429,308 | 401,841 | 412,080 |
| CA LLC & S-Corp Tax Rate | 0.0% | 0.0% | 0.0% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | - | - | - | - | 8,826 | 6,440 | 6,028 | 6,181 |
| | | | | | | | | |
| **Flow Through Taxable Income and NOLs** | | | | | | | | |
| Debtor Net Income | (2,121,314) | (2,571,022) | (649,434) | 109,694 | 579,594 | 422,869 | 395,813 | 405,899 |
| Direct Charges to Equity | - | - | - | - | - | - | - | - |
| Pino Net Income | 446,708 | 626,064 | 1,458,829 | 3,699,827 | (149,770) | (99,399) | 662,050 | 2,678,366 |
| Debtor Flow Through Taxable Income | (1,674,606) | (1,944,958) | 809,395 | 3,809,521 | 429,824 | 323,470 | 1,057,864 | 3,084,265 |
| Owner Personal Income | 68,550 | 68,550 | 68,550 | 68,550 | 68,550 | 68,550 | 68,550 | 68,550 |
| Personal Taxable Income | (1,606,056) | (1,876,408) | 877,945 | 3,878,071 | 498,374 | 392,020 | 1,126,414 | 3,152,815 |
| Maximum % Applied to NOL | 100.0% | 100.0% | 100.0% | 100.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| Personal Taxable Income Applied to NOL | (1,606,056) | (1,876,408) | 877,945 | 3,878,071 | 398,699 | 313,616 | 901,131 | 2,522,252 |
| Personal Taxable Income Subject to Taxes | - | - | - | - | 99,675 | 78,404 | 225,283 | 630,563 |
| | | | | | | | | |
| Beginning NOL | (10,069,708) | (11,675,764) | (13,552,172) | (12,674,227) | (8,796,157) | (8,397,458) | (8,083,842) | (7,182,711) |
| Personal Taxable Income Applied to NOL | (1,606,056) | (1,876,408) | 877,945 | 3,878,071 | 398,699 | 313,616 | 901,131 | 2,522,252 |
| Ending NOL | (11,675,764) | (13,552,172) | (12,674,227) | (8,796,157) | (8,397,458) | (8,083,842) | (7,182,711) | (4,660,459) |
| | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | |
| Total Debtor Flow Through Taxable Income | (1,674,606) | (1,944,958) | 809,395 | 3,809,521 | 429,824 | 323,470 | 1,057,864 | 3,084,265 |
| % NOT Applied to NOL | 0.0% | 0.0% | 0.0% | 0.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Debtor Flow Through Taxable Income Subject to Taxes | (0) | 0 | - | - | 85,965 | 64,694 | 211,573 | 616,853 |
| Estimated Personal Tax Rate | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% |
| Tax Distributions Due to Owner | - | - | - | - | 42,381 | 31,894 | 104,305 | 304,109 |
| | | | | | | | | |
| Beginning Tax Distributions Due to Owner | 947,833 | 947,833 | 947,833 | - | - | 42,381 | 31,894 | 104,305 |
| Tax Distributions Due to Owner | - | - | - | - | 42,381 | 31,894 | 104,305 | 304,109 |
| Tax Distributions to Owner | - | - | (947,833) | - | - | (42,381) | (31,894) | (104,305) |
| Ending Tax Distributions Due to Owner | 947,833 | 947,833 | - | - | 42,381 | 31,894 | 104,305 | 304,109 |

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | | | | |
| Operating Income | 10,529,940 | 599,858 | 3,215,272 | 3,063,534 | 3,139,168 | 3,084,687 | 3,029,622 | 2,973,967 | 2,917,714 | 2,860,856 | 2,803,387 |
| Depreciation & Amortization | (10,573,432) | (3,866,951) | (457,519) | (694,869) | (698,481) | (632,464) | (702,827) | (844,367) | (735,033) | (640,501) | (558,768) |
| Interest Expense (Income) | 41,180 | (1,964,984) | (926,103) | (736,841) | (545,060) | (331,504) | (135,797) | (2,771) | 124,009 | 256,231 | 379,330 |
| Taxable Income | (2,313) | (5,232,076) | 1,831,649 | 1,631,824 | 1,895,627 | 2,120,719 | 2,190,999 | 2,126,828 | 2,306,690 | 2,476,585 | 2,623,948 |
| CA LLC & S-Corp Tax Rate | 0.0% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | - | - | 27,475 | 24,477 | 28,434 | 31,811 | 32,865 | 31,902 | 34,600 | 37,149 | 39,359 |
| | | | | | | | | | | | |
| **Flow Through Taxable Income and NOLs** | | | | | | | | | | | |
| Debtor Net Income | (2,313) | (5,232,076) | 1,804,175 | 1,607,346 | 1,867,192 | 2,088,909 | 2,158,134 | 2,094,926 | 2,272,089 | 2,439,437 | 2,584,589 |
| Direct Charges to Equity | (16,111) | - | - | 0 | - | 0 | (0) | (0) | 0 | (0) | 0 |
| Pino Net Income | 9,631,337 | 6,231,428 | 3,091,248 | 3,023,640 | 2,851,206 | 2,674,129 | 2,492,269 | 2,329,295 | 2,240,128 | 2,060,685 | 1,875,859 |
| Debtor Flow Through Taxable Income | 9,612,913 | 999,352 | 4,895,422 | 4,630,986 | 4,718,398 | 4,763,038 | 4,650,403 | 4,424,221 | 4,512,217 | 4,500,121 | 4,460,448 |
| Owner Personal Income | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 | 274,200 |
| Personal Taxable Income | 9,887,113 | 1,273,552 | 5,169,622 | 4,905,186 | 4,992,598 | 5,037,238 | 4,924,603 | 4,698,421 | 4,786,417 | 4,774,321 | 4,734,648 |
| Maximum % Applied to NOL | 80.0% | 100.0% | 80.0% | 80.0% | 14.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Personal Taxable Income Applied to NOL | 7,909,691 | 1,273,552 | 4,135,698 | 3,924,149 | 736,310 | - | - | - | - | - | - |
| Personal Taxable Income Subject to Taxes | 1,977,423 | 0 | 1,033,924 | 981,037 | 4,256,288 | 5,037,238 | 4,924,603 | 4,698,421 | 4,786,417 | 4,774,321 | 4,734,648 |
| | | | | | | | | | | | |
| Beginning NOL | (17,979,399) | (10,069,708) | (8,796,157) | (4,660,459) | (736,310) | (0) | (0) | (0) | (0) | (0) | (0) |
| Personal Taxable Income Applied to NOL | 7,909,691 | 1,273,552 | 4,135,698 | 3,924,149 | 736,310 | - | - | - | - | - | - |
| Ending NOL | (10,069,708) | (8,796,157) | (4,660,459) | (736,310) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| | | | | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | | | | |
| Total Debtor Flow Through Taxable Income | 9,612,913 | 999,352 | 4,895,422 | 4,630,986 | 4,718,398 | 4,763,038 | 4,650,403 | 4,424,221 | 4,512,217 | 4,500,121 | 4,460,448 |
| % NOT Applied to NOL | 20.0% | 0.0% | 20.0% | 20.0% | 87.4% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Debtor Flow Through Taxable Income Subject to Taxes | 1,922,583 | (0) | 979,084 | 926,197 | 4,126,106 | 4,763,038 | 4,650,403 | 4,424,221 | 4,512,217 | 4,500,121 | 4,460,448 |
| Estimated Personal Tax Rate | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% |
| Tax Distributions Due to Owner | 947,833 | - | 482,689 | 456,615 | 2,034,170 | 2,348,178 | 2,292,649 | 2,181,141 | 2,224,523 | 2,218,560 | 2,199,001 |
| | | | | | | | | | | | |
| Beginning Tax Distributions Due to Owner | - | 947,833 | - | 304,109 | 302,753 | 1,520,429 | 1,524,156 | 1,478,363 | 1,489,424 | 1,491,382 | 1,489,087 |
| Tax Distributions Due to Owner | 947,833 | - | 482,689 | 456,615 | 2,034,170 | 2,348,178 | 2,292,649 | 2,181,141 | 2,224,523 | 2,218,560 | 2,199,001 |
| Tax Distributions to Owner | - | (947,833) | (178,580) | (457,971) | (816,494) | (2,344,450) | (2,338,443) | (2,170,080) | (2,222,565) | (2,220,854) | (2,208,570) |
| Ending Tax Distributions Due to Owner | 947,833 | - | 304,109 | 302,753 | 1,520,429 | 1,524,156 | 1,478,363 | 1,489,424 | 1,491,382 | 1,489,087 | 1,479,518 |

# EXHIBIT "2"

**Pino Tree Service, Inc**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | |
| Tree Service Revenues | 13,206,000 | 13,528,181 | 16,158,459 | 23,090,000 | 11,319,429 | 11,595,583 | 13,850,108 | 19,791,429 |
| **Total Revenues** | **13,206,000** | **13,528,181** | **16,158,459** | **23,090,000** | **11,319,429** | **11,595,583** | **13,850,108** | **19,791,429** |
| | | | | | | | | |
| Salaries & Wages | 5,792,386 | 5,933,701 | 7,087,387 | 10,127,684 | 4,964,903 | 5,086,029 | 6,074,903 | 8,680,872 |
| Health Insurance | 93,599 | 93,687 | 94,404 | 96,293 | 93,085 | 93,161 | 93,775 | 95,394 |
| Workers' Comp Insurance | 288,557 | 295,596 | 353,069 | 504,526 | 247,334 | 253,368 | 302,631 | 432,451 |
| Union Dues | 1,254,570 | 1,285,177 | 1,535,054 | 2,193,550 | 1,075,346 | 1,101,580 | 1,315,760 | 1,880,186 |
| Occupancy | 52,200 | 58,200 | 58,200 | 58,200 | 58,200 | 58,200 | 58,200 | 58,200 |
| Insurance | 1,044,323 | 1,044,323 | 1,115,629 | 1,258,240 | 1,258,240 | 1,258,240 | 1,270,822 | 1,295,987 |
| Advertising | 13,078 | 13,398 | 16,002 | 22,867 | 11,210 | 11,484 | 13,716 | 19,600 |
| Utilities | 80,365 | 80,619 | 82,689 | 88,145 | 78,880 | 79,097 | 80,872 | 85,548 |
| Repair and Maintenance | 20,739 | 21,245 | 25,375 | 36,261 | 17,776 | 18,210 | 21,750 | 31,081 |
| Office Supplies | 75,443 | 75,443 | 75,443 | 75,443 | 75,443 | 75,443 | 75,443 | 75,443 |
| Vehicles Expenses | 2,705,251 | 2,787,365 | 2,889,042 | 3,156,992 | 2,553,678 | 2,712,657 | 2,799,809 | 3,029,480 |
| Traffic Control Services | 542,435 | 555,669 | 663,707 | 948,419 | 464,944 | 476,287 | 568,892 | 812,931 |
| Management Fees | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 |
| OC Professionals | - | - | - | - | - | - | - | - |
| Tools and Supplies | 45,587 | 46,699 | 55,779 | 79,706 | 39,075 | 40,028 | 47,810 | 68,320 |
| Property Taxes | - | - | - | - | - | - | - | - |
| Bank Expenses | 1,057 | 1,057 | 1,057 | 1,057 | 1,057 | 1,057 | 1,057 | 1,057 |
| Travel & Lodging | 88,641 | 90,804 | 108,459 | 154,985 | 75,978 | 77,832 | 92,965 | 132,844 |
| Other | 111,100 | 111,761 | 117,159 | 131,383 | 107,229 | 107,795 | 112,422 | 124,614 |
| Gain/Loss on Disposal of Assets | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **12,419,334** | **12,704,744** | **14,488,456** | **19,143,752** | **11,332,378** | **11,660,469** | **13,140,829** | **17,034,010** |
| | | | | | | | | |
| **Operating Income** | **786,666** | **823,437** | **1,670,003** | **3,946,248** | **(12,950)** | **(64,886)** | **709,279** | **2,757,419** |
| | | | | | | | | |
| Depreciation | 30,429 | 31,548 | 32,668 | 33,788 | 34,907 | 36,027 | 37,146 | 38,266 |
| Interest Expense (Income) | 156,290 | 156,290 | 156,290 | 156,290 | 104,194 | - | - | - |
| Income Taxes | 153,239 | 9,534 | 22,216 | 56,343 | (2,281) | (1,514) | 10,082 | 40,787 |
| **Total Non-Operating Expenses** | **339,959** | **197,373** | **211,174** | **246,421** | **136,820** | **34,513** | **47,228** | **79,053** |
| | | | | | | | | |
| **NET INCOME (LOSS)** | **446,708** | **626,064** | **1,458,829** | **3,699,827** | **(149,770)** | **(99,399)** | **662,050** | **2,678,366** |

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | | | | |
| | | | | | | | | | | | |
| Tree Service Revenues | 57,920,723 | 65,982,640 | 56,556,548 | 56,556,548 | 56,556,548 | 56,556,548 | 56,556,548 | 56,556,548 | 56,556,548 | 56,556,548 | 56,556,548 |
| **Total Revenues** | **57,920,723** | **65,982,640** | **56,556,548** | **56,556,548** | **56,556,548** | **56,556,548** | **56,556,548** | **56,556,548** | **56,556,548** | **56,556,548** | **56,556,548** |
| | | | | | | | | | | | |
| Salaries & Wages | 21,056,986 | 28,941,159 | 24,806,707 | 24,806,707 | 24,806,707 | 24,806,707 | 24,806,707 | 24,806,707 | 24,806,707 | 24,806,707 | 24,806,707 |
| Health Insurance | 20,702 | 377,984 | 375,415 | 375,415 | 375,415 | 375,415 | 375,415 | 375,415 | 375,415 | 375,415 | 375,415 |
| Workers' Comp Insurance | 1,048,986 | 1,441,748 | 1,235,784 | 1,235,784 | 1,235,784 | 1,235,784 | 1,235,784 | 1,235,784 | 1,235,784 | 1,235,784 | 1,235,784 |
| Union Dues | 4,560,722 | 6,268,351 | 5,372,872 | 5,372,872 | 5,372,872 | 5,372,872 | 5,372,872 | 5,372,872 | 5,372,872 | 5,372,872 | 5,372,872 |
| Occupancy | 213,857 | 226,800 | 232,800 | 232,800 | 232,800 | 232,800 | 232,800 | 232,800 | 232,800 | 232,800 | 232,800 |
| Insurance | 4,765,286 | 4,462,515 | 5,083,288 | 5,238,206 | 5,395,352 | 5,557,213 | 5,723,929 | 5,895,647 | 6,072,516 | 6,254,692 | 6,442,332 |
| Advertising | 45,375 | 65,345 | 56,010 | 56,010 | 56,010 | 56,010 | 56,010 | 56,010 | 56,010 | 56,010 | 56,010 |
| Utilities | 279,687 | 331,817 | 324,398 | 324,398 | 324,398 | 324,398 | 324,398 | 324,398 | 324,398 | 324,398 | 324,398 |
| Repair and Maintenance | 110,172 | 103,620 | 88,817 | 88,817 | 88,817 | 88,817 | 88,817 | 88,817 | 88,817 | 88,817 | 88,817 |
| Office Supplies | 243,924 | 301,774 | 301,774 | 301,774 | 301,774 | 301,774 | 301,774 | 301,774 | 301,774 | 301,774 | 301,774 |
| Vehicles Expenses | 7,807,144 | 11,538,650 | 11,095,625 | 11,095,625 | 11,095,625 | 11,095,625 | 11,095,625 | 11,095,625 | 11,095,625 | 11,095,625 | 11,095,625 |
| Traffic Control Services | 4,718,267 | 2,710,230 | 2,323,054 | 2,323,054 | 2,323,054 | 2,323,054 | 2,323,054 | 2,323,054 | 2,323,054 | 2,323,054 | 2,323,054 |
| Management Fees | 712,229 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 | 840,000 |
| OC Professionals | - | - | - | - | - | - | - | - | - | - | - |
| Tools and Supplies | 323,825 | 227,771 | 195,233 | 195,233 | 195,233 | 195,233 | 195,233 | 195,233 | 195,233 | 195,233 | 195,233 |
| Property Taxes | - | - | - | - | - | - | - | - | - | - | - |
| Bank Expenses | 1,902 | 4,229 | 4,229 | 4,229 | 4,229 | 4,229 | 4,229 | 4,229 | 4,229 | 4,229 | 4,229 |
| Travel & Lodging | 1,450,239 | 442,889 | 379,619 | 379,619 | 379,619 | 379,619 | 379,619 | 379,619 | 379,619 | 379,619 | 379,619 |
| Other | 61,867 | 471,404 | 452,060 | 452,060 | 452,060 | 452,060 | 452,060 | 452,060 | 452,060 | 452,060 | 452,060 |
| Gain/Loss on Disposal of Assets | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **47,421,168** | **58,756,286** | **53,167,686** | **53,322,604** | **53,479,750** | **53,641,611** | **53,808,327** | **53,980,045** | **54,156,914** | **54,339,090** | **54,526,731** |
| | | | | | | | | | | | |
| **Operating Income** | **10,499,555** | **7,226,353** | **3,388,862** | **3,233,944** | **3,076,798** | **2,914,937** | **2,748,221** | **2,576,503** | **2,399,634** | **2,217,458** | **2,029,818** |
| | | | | | | | | | | | |
| Depreciation | - | 128,433 | 146,346 | 164,259 | 182,172 | 200,085 | 217,999 | 211,737 | 125,393 | 125,393 | 125,393 |
| Interest Expense (Income) | 868,218 | 625,162 | 104,194 | - | - | - | - | - | - | - | - |
| Income Taxes | - | 241,331 | 47,075 | 46,045 | 43,419 | 40,723 | 37,953 | 35,471 | 34,114 | 31,381 | 28,566 |
| **Total Non-Operating Expenses** | **868,218** | **994,926** | **297,614** | **210,304** | **225,592** | **240,808** | **255,952** | **247,208** | **159,506** | **156,774** | **153,959** |
| | | | | | | | | | | | |
| **NET INCOME (LOSS)** | **9,631,337** | **6,231,428** | **3,091,248** | **3,023,640** | **2,851,206** | **2,674,129** | **2,492,269** | **2,329,295** | **2,240,128** | **2,060,685** | **1,875,859** |

**Pino Tree Service, Inc**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | |
| Tree Service Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| | | | | | | | | |
| Salaries & Wages | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% |
| Health Insurance | 0.7% | 0.7% | 0.6% | 0.4% | 0.8% | 0.8% | 0.7% | 0.5% |
| Workers' Comp Insurance | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Union Dues | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% |
| Occupancy | 0.4% | 0.4% | 0.4% | 0.3% | 0.5% | 0.5% | 0.4% | 0.3% |
| Insurance | 7.9% | 7.7% | 6.9% | 5.4% | 11.1% | 10.9% | 9.2% | 6.5% |
| Advertising | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Utilities | 0.6% | 0.6% | 0.5% | 0.4% | 0.7% | 0.7% | 0.6% | 0.4% |
| Repair and Maintenance | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Office Supplies | 0.6% | 0.6% | 0.5% | 0.3% | 0.7% | 0.7% | 0.5% | 0.4% |
| Vehicles Expenses | 20.5% | 20.6% | 17.9% | 13.7% | 22.6% | 23.4% | 20.2% | 15.3% |
| Traffic Control Services | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% |
| Management Fees | 1.6% | 1.6% | 1.3% | 0.9% | 1.9% | 1.8% | 1.5% | 1.1% |
| OC Professionals | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Tools and Supplies | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Property Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Bank Expenses | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Travel & Lodging | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Other | 0.8% | 0.8% | 0.7% | 0.6% | 0.9% | 0.9% | 0.8% | 0.6% |
| Gain/Loss on Disposal of Assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Disbursements** | **94.0%** | **93.9%** | **89.7%** | **82.9%** | **100.1%** | **100.6%** | **94.9%** | **86.1%** |
| | | | | | | | | |
| **Operating Income** | **6.0%** | **6.1%** | **10.3%** | **17.1%** | **-0.1%** | **-0.6%** | **5.1%** | **13.9%** |
| | | | | | | | | |
| Depreciation | 0.2% | 0.2% | 0.2% | 0.1% | 0.3% | 0.3% | 0.3% | 0.2% |
| Interest Expense (Income) | 1.2% | 1.2% | 1.0% | 0.7% | 0.9% | 0.0% | 0.0% | 0.0% |
| Income Taxes | 1.2% | 0.1% | 0.1% | 0.2% | 0.0% | 0.0% | 0.1% | 0.2% |
| **Total Non-Operating Expenses** | **2.6%** | **1.5%** | **1.3%** | **1.1%** | **1.2%** | **0.3%** | **0.3%** | **0.4%** |
| | | | | | | | | |
| **NET INCOME (LOSS)** | **3.4%** | **4.6%** | **9.0%** | **16.0%** | **-1.3%** | **-0.9%** | **4.8%** | **13.5%** |

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | | | | |
| | | | | | | | | | | | |
| Tree Service Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| | | | | | | | | | | | |
| Salaries & Wages | 36.4% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% | 43.9% |
| Health Insurance | 0.0% | 0.6% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Workers' Comp Insurance | 1.8% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| Union Dues | 7.9% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% | 9.5% |
| Occupancy | 0.4% | 0.3% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| Insurance | 8.2% | 6.8% | 9.0% | 9.3% | 9.5% | 9.8% | 10.1% | 10.4% | 10.7% | 11.1% | 11.4% |
| Advertising | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Utilities | 0.5% | 0.5% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Repair and Maintenance | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Office Supplies | 0.4% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| Vehicles Expenses | 13.5% | 17.5% | 19.6% | 19.6% | 19.6% | 19.6% | 19.6% | 19.6% | 19.6% | 19.6% | 19.6% |
| Traffic Control Services | 8.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% |
| Management Fees | 1.2% | 1.3% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| OC Professionals | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Tools and Supplies | 0.6% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Property Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Bank Expenses | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Travel & Lodging | 2.5% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Other | 0.1% | 0.7% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% |
| Gain/Loss on Disposal of Assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Disbursements** | **81.9%** | **89.0%** | **94.0%** | **94.3%** | **94.6%** | **94.8%** | **95.1%** | **95.4%** | **95.8%** | **96.1%** | **96.4%** |
| | | | | | | | | | | | |
| **Operating Income** | **18.1%** | **11.0%** | **6.0%** | **5.7%** | **5.4%** | **5.2%** | **4.9%** | **4.6%** | **4.2%** | **3.9%** | **3.6%** |
| | | | | | | | | | | | |
| Depreciation | 0.0% | 0.2% | 0.3% | 0.3% | 0.3% | 0.4% | 0.4% | 0.4% | 0.2% | 0.2% | 0.2% |
| Interest Expense (Income) | 1.5% | 0.9% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Income Taxes | 0.0% | 0.4% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| **Total Non-Operating Expenses** | **1.5%** | **1.5%** | **0.5%** | **0.4%** | **0.4%** | **0.4%** | **0.5%** | **0.4%** | **0.3%** | **0.3%** | **0.3%** |
| | | | | | | | | | | | |
| **NET INCOME (LOSS)** | **16.6%** | **9.4%** | **5.5%** | **5.3%** | **5.0%** | **4.7%** | **4.4%** | **4.1%** | **4.0%** | **3.6%** | **3.3%** |

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | |
| | | | | | | | | |
| Cash & Cash Equivalents | 6,963,645 | 7,522,964 | 4,125,087 | 1,887,370 | 4,979,011 | 4,923,671 | 3,945,374 | 1,479,758 |
| Accounts Receivable | 11,259,708 | 11,406,984 | 13,467,489 | 19,222,800 | 9,658,464 | 9,784,701 | 11,550,848 | 16,483,971 |
| Prepaid Expenses | 965,093 | 696,215 | 883,100 | 1,023,777 | 1,164,455 | 838,826 | 909,593 | 1,054,491 |
| **Total Current Assets** | 19,188,446 | 19,626,164 | 18,475,676 | 22,133,947 | 15,801,929 | 15,547,198 | 16,405,814 | 19,018,219 |
| | | | | | | | | |
| PP&E, Gross | 862,455 | 893,803 | 925,152 | 956,500 | 987,848 | 1,019,196 | 1,050,544 | 1,081,892 |
| Accumulated Depreciation | (488,253) | (519,802) | (552,470) | (586,257) | (621,164) | (657,191) | (694,337) | (732,603) |
| **Total Fixed Assets** | 374,202 | 374,002 | 372,682 | 370,242 | 366,684 | 362,005 | 356,207 | 349,289 |
| | | | | | | | | |
| **Total Assets** | 19,562,648 | 20,000,166 | 18,848,358 | 22,504,189 | 16,168,613 | 15,909,203 | 16,762,021 | 19,367,509 |
| | | | | | | | | |
| Accounts Payable | 1,985,374 | 1,825,034 | 2,207,013 | 2,180,407 | 1,971,973 | 1,843,546 | 2,118,201 | 2,088,089 |
| Accrued Expenses | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 |
| Accrued Payroll | 491,073 | 482,698 | 493,955 | 495,658 | 487,695 | 480,516 | 490,165 | 491,626 |
| Other Current Liabilities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | 3,020,855 | 2,852,141 | 3,245,377 | 3,220,474 | 3,004,077 | 2,868,472 | 3,152,776 | 3,124,124 |
| | | | | | | | | |
| Vehicle Loans | 222,077 | 202,246 | 182,415 | 163,323 | 147,836 | 132,349 | 116,862 | 101,375 |
| Mowbray's Line of Credit | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | - | - | - | - |
| **Total Long Term Liabilities** | 6,176,000 | 6,156,169 | 6,136,338 | 6,117,245 | 147,836 | 132,349 | 116,862 | 101,375 |
| | | | | | | | | |
| **Total Liabilities** | 9,196,855 | 9,008,309 | 9,381,715 | 9,337,719 | 3,151,913 | 3,000,820 | 3,269,637 | 3,225,499 |
| | | | | | | | | |
| **Shareholder's Equity** | | | | | | | | |
| Retained Earnings | 9,919,084 | 9,919,084 | 9,919,084 | 9,919,084 | 16,150,512 | 16,150,512 | 16,150,512 | 16,150,512 |
| Distributions to Mowbray's | - | - | (2,034,392) | (2,034,392) | (2,034,392) | (2,034,392) | (2,109,390) | (2,109,390) |
| Tax Distributions | - | - | (949,650) | (949,650) | (949,650) | (958,568) | (961,620) | (990,360) |
| Net Income (Loss) | 446,708 | 1,072,772 | 2,531,600 | 6,231,428 | (149,770) | (249,169) | 412,882 | 3,091,248 |
| **Total Shareholder's Equity** | 10,365,792 | 10,991,856 | 9,466,642 | 13,166,470 | 13,016,700 | 12,908,383 | 13,492,384 | 16,142,010 |
| | | | | | | | | |
| **Total Liabilities & Shareholder's Equity** | 19,562,647 | 20,000,165 | 18,848,358 | 22,504,189 | 16,168,612 | 15,909,203 | 16,762,021 | 19,367,508 |
| | | | | | | | | |
| DSO | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 76 |
| DPO | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |

**Pino Tree Service, Inc.**
Financial Projections
(USD$)

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | | | | |
| Cash & Cash Equivalents | 2,980,549 | 1,887,370 | 1,479,758 | 1,399,704 | 1,277,518 | 1,154,476 | 1,067,872 | 978,296 | 883,794 | 788,721 | 690,796 |
| Accounts Receivable | 15,752,939 | 19,222,800 | 16,483,971 | 16,483,971 | 16,483,971 | 16,483,971 | 16,483,971 | 16,483,971 | 16,483,971 | 16,483,971 | 16,483,971 |
| Prepaid Expenses | 848,053 | 1,023,777 | 1,054,491 | 1,083,706 | 1,113,798 | 1,144,792 | 1,176,717 | 1,209,599 | 1,243,468 | 1,278,352 | 1,314,284 |
| **Total Current Assets** | 19,581,541 | 22,133,947 | 19,018,219 | 18,967,381 | 18,875,287 | 18,783,239 | 18,728,560 | 18,671,866 | 18,611,233 | 18,551,045 | 18,489,051 |
| | | | | | | | | | | | |
| PP&E, Gross | 831,107 | 956,500 | 1,081,892 | 1,207,285 | 1,332,677 | 1,458,070 | 1,583,463 | 1,708,855 | 1,834,248 | 1,959,641 | 2,085,033 |
| Accumulated Depreciation | (457,825) | (586,257) | (732,603) | (896,862) | (1,079,034) | (1,279,120) | (1,497,119) | (1,708,855) | (1,834,248) | (1,959,641) | (2,085,033) |
| **Total Fixed Assets** | 373,282 | 370,242 | 349,289 | 310,423 | 253,643 | 178,950 | 86,344 | - | - | - | - |
| | | | | | | | | | | | |
| **Total Assets** | 19,954,823 | 22,504,189 | 19,367,509 | 19,277,804 | 19,128,930 | 18,962,189 | 18,814,904 | 18,671,866 | 18,611,233 | 18,551,045 | 18,489,051 |
| | | | | | | | | | | | |
| Accounts Payable | 2,920,747 | 2,180,407 | 2,088,089 | 2,101,722 | 2,115,763 | 2,130,225 | 2,145,121 | 2,160,465 | 2,176,268 | 2,192,546 | 2,209,312 |
| Accrued Expenses | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 | 544,409 |
| Accrued Payroll | 372,462 | 495,658 | 491,626 | 491,626 | 491,626 | 491,626 | 491,626 | 491,626 | 491,626 | 491,626 | 491,626 |
| Other Current Liabilities | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | 3,837,618 | 3,220,474 | 3,124,124 | 3,137,756 | 3,151,798 | 3,166,260 | 3,181,156 | 3,196,499 | 3,212,303 | 3,228,581 | 3,245,346 |
| | | | | | | | | | | | |
| Vehicle Loans | 244,198 | 163,323 | 101,375 | 39,426 | - | - | - | - | - | - | - |
| Mowbray's Line of Credit | 5,953,923 | 5,953,923 | - | - | - | - | - | - | - | - | - |
| **Total Long Term Liabilities** | 6,198,121 | 6,117,245 | 101,375 | 39,426 | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Total Liabilities** | 10,035,738 | 9,337,719 | 3,225,499 | 3,177,183 | 3,151,798 | 3,166,260 | 3,181,156 | 3,196,499 | 3,212,303 | 3,228,581 | 3,245,346 |
| | | | | | | | | | | | |
| **Shareholder's Equity** | | | | | | | | | | | |
| Retained Earnings | 287,747 | 9,919,084 | 16,150,512 | 19,241,759 | 22,265,399 | 25,116,606 | 27,790,735 | 30,283,004 | 32,612,298 | 34,852,426 | 36,913,111 |
| Distributions to Mowbray's | - | (2,034,392) | (2,109,390) | (4,872,077) | (7,493,837) | (8,949,336) | (10,291,410) | (11,556,528) | (12,726,901) | (13,765,557) | (14,710,323) |
| Tax Distributions | - | (949,650) | (990,360) | (1,292,702) | (1,645,637) | (3,045,469) | (4,357,846) | (5,580,404) | (6,726,596) | (7,825,090) | (8,834,942) |
| Net Income (Loss) | 9,631,337 | 6,231,428 | 3,091,248 | 3,023,640 | 2,851,206 | 2,674,129 | 2,492,269 | 2,329,295 | 2,240,128 | 2,060,685 | 1,875,859 |
| **Total Shareholder's Equity** | 9,919,084 | 13,166,470 | 16,142,010 | 16,100,620 | 15,977,132 | 15,795,929 | 15,633,748 | 15,475,366 | 15,398,930 | 15,322,464 | 15,243,704 |
| | | | | | | | | | | | |
| **Total Liabilities & Shareholder's Equity** | 19,954,823 | 22,504,189 | 19,367,508 | 19,277,803 | 19,128,930 | 18,962,189 | 18,814,904 | 18,671,866 | 18,611,232 | 18,551,044 | 18,489,050 |
| | | | | | | | | | | | |
| DSO | 67 | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 76 | 76 |
| DPO | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 |

**Pino Tree Service, Inc**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | |
| Net income (Loss) | 446,708 | 626,064 | 1,458,829 | 3,699,827 | (149,770) | (99,399) | 662,050 | 2,678,366 |
| Depreciation | 30,429 | 31,548 | 32,668 | 33,788 | 34,907 | 36,027 | 37,146 | 38,266 |
| Change in Operating Assets & Liabilities | | | | | | | | |
| Accounts Receivable | 4,493,231 | (147,276) | (2,060,505) | (5,755,310) | 9,564,336 | (126,237) | (1,766,147) | (4,933,123) |
| Other Current Assets | (117,040) | 268,877 | (186,884) | (140,677) | (140,677) | 325,628 | (70,766) | (144,898) |
| Accounts Payable | (935,373) | (160,340) | 381,980 | (26,607) | (208,434) | (128,427) | 274,655 | (30,111) |
| Other Current Liabilities | 118,611 | (8,375) | 11,257 | 1,703 | (7,963) | (7,179) | 9,649 | 1,460 |
| **Total Operating Cash Flows** | **4,036,565** | **610,499** | **(362,656)** | **(2,187,277)** | **9,092,398** | **414** | **(853,413)** | **(2,390,041)** |
| | | | | | | | | |
| Capital Expenditures | (31,348) | (31,348) | (31,348) | (31,348) | (31,348) | (31,348) | (31,348) | (31,348) |
| **Total investing Cash Flows** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** |
| | | | | | | | | |
| Vehicle Loans | (22,121) | (19,831) | (19,831) | (19,092) | (15,487) | (15,487) | (15,487) | (15,487) |
| Mowbray's Line of Credit | - | - | - | - | (5,953,923) | - | - | - |
| Distributions to Mowbray's | - | - | (2,034,392) | - | - | - | (74,997) | - |
| Tax Distributions | - | - | (949,650) | - | - | (8,918) | (3,052) | (28,740) |
| **Total Financing Cash Flows** | **(22,121)** | **(19,831)** | **(3,003,873)** | **(19,092)** | **(5,969,410)** | **(24,405)** | **(93,536)** | **(44,227)** |
| | | | | | | | | |
| Net Cash Flows | 3,983,096 | 559,319 | (3,397,877) | (2,237,717) | 3,091,640 | (55,339) | (978,298) | (2,465,616) |
| Beginning Cash | 2,980,549 | 6,963,645 | 7,522,964 | 4,125,087 | 1,887,370 | 4,979,011 | 4,923,671 | 3,945,374 |
| **Ending Cash** | **6,963,645** | **7,522,964** | **4,125,087** | **1,887,370** | **4,979,011** | **4,923,671** | **3,945,374** | **1,479,758** |
| | | | | | | | | |
| **SHAREHOLDER'S EQUITY ROLLFORWARD** | | | | | | | | |
| Beginning Balance | 9,919,084 | 10,365,792 | 10,991,856 | 9,466,642 | 13,166,470 | 13,016,700 | 12,908,383 | 13,492,384 |
| Net Income (Loss) | 446,708 | 626,064 | 1,458,829 | 3,699,827 | (149,770) | (99,399) | 662,050 | 2,678,366 |
| Distributions to Mowbray's | - | - | (2,034,392) | - | - | - | (74,997) | - |
| Tax Distributions | - | - | (949,650) | - | - | (8,918) | (3,052) | (28,740) |
| **Ending Balance** | **10,365,792** | **10,991,856** | **9,466,642** | **13,166,470** | **13,016,700** | **12,908,383** | **13,492,384** | **16,142,010** |
| | | | | | | | | |
| **DEBT ROLLFORWARDS** | | | | | | | | |
| | | | | | | | | |
| **Vehicle Loans** | | | | | | | | |
| Beginning Balance | 241,909 | 222,077 | 202,246 | 182,415 | 163,323 | 147,836 | 132,349 | 116,862 |
| Interest | - | - | - | - | - | - | - | - |
| Payments | (19,831) | (19,831) | (19,831) | (19,092) | (15,487) | (15,487) | (15,487) | (15,487) |
| Ending Balance | 222,077 | 202,246 | 182,415 | 163,323 | 147,836 | 132,349 | 116,862 | 101,375 |
| | | | | | | | | |
| **Mowbray's Line of Credit** | | | | | | | | |
| Beginning Balance | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | - | - | - |
| Interest | 156,290 | 156,290 | 156,290 | 156,290 | 104,194 | - | - | - |
| Payments | (156,290) | (156,290) | (156,290) | (156,290) | (6,058,116) | - | - | - |
| Ending Balance | 5,953,923 | 5,953,923 | 5,953,923 | 5,953,923 | - | - | - | - |

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | | | | |
| Net income (Loss) | 9,631,337 | 6,231,428 | 3,091,248 | 3,023,640 | 2,851,206 | 2,674,129 | 2,492,269 | 2,329,295 | 2,240,128 | 2,060,685 | 1,875,859 |
| Depreciation | - | 128,433 | 146,346 | 164,259 | 182,172 | 200,085 | 217,999 | 211,737 | 125,393 | 125,393 | 125,393 |
| Change in Operating Assets & Liabilities | | | | | | | | | | | |
| Accounts Receivable | (14,983,633) | (3,469,861) | 2,738,829 | - | - | - | - | - | - | - | - |
| Other Current Assets | (402,031) | (175,724) | (30,713) | (29,215) | (30,092) | (30,995) | (31,924) | (32,882) | (33,869) | (34,885) | (35,931) |
| Accounts Payable | 2,179,566 | (740,340) | (92,317) | 13,632 | 14,041 | 14,462 | 14,896 | 15,343 | 15,803 | 16,278 | 16,766 |
| Other Current Liabilities | 668,223 | 123,196 | (4,033) | - | - | - | - | - | - | - | - |
| **Total Operating Cash Flows** | **(2,906,538)** | **2,097,131** | **5,849,359** | **3,172,316** | **3,017,328** | **2,857,682** | **2,693,240** | **2,523,493** | **2,347,455** | **2,167,470** | **1,982,086** |
| | | | | | | | | | | | |
| Capital Expenditures | (40,000) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) |
| **Total Investing Cash Flows** | **(40,000)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** |
| | | | | | | | | | | | |
| Vehicle Loans | (79,113) | (80,875) | (61,948) | (61,948) | (39,426) | - | - | - | - | - | - |
| Mowbray's Line of Credit | 5,684,833 | - | (5,953,923) | - | - | - | - | - | - | - | - |
| Distributions to Mowbray's | - | (2,034,392) | (74,997) | (2,762,687) | (2,621,760) | (1,455,499) | (1,342,073) | (1,265,118) | (1,170,373) | (1,038,656) | (944,766) |
| Tax Distributions | - | (949,650) | (40,710) | (302,342) | (352,935) | (1,399,833) | (1,312,377) | (1,222,558) | (1,146,191) | (1,098,494) | (1,009,852) |
| **Total Financing Cash Flows** | **5,605,720** | **(3,064,917)** | **(6,131,578)** | **(3,126,977)** | **(3,014,121)** | **(2,855,332)** | **(2,654,450)** | **(2,487,676)** | **(2,316,564)** | **(2,137,151)** | **(1,954,618)** |
| | | | | | | | | | | | |
| Net Cash Flows | 2,659,183 | (1,093,179) | (407,612) | (80,054) | (122,185) | (123,042) | (86,603) | (89,576) | (94,502) | (95,073) | (97,925) |
| Beginning Cash | 321,366 | 2,980,549 | 1,887,370 | 1,479,758 | 1,399,704 | 1,277,518 | 1,154,476 | 1,067,872 | 978,296 | 883,794 | 788,721 |
| **Ending Cash** | **2,980,549** | **1,887,370** | **1,479,758** | **1,399,704** | **1,277,518** | **1,154,476** | **1,067,872** | **978,296** | **883,794** | **788,721** | **690,796** |
| | | | | | | | | | | | |
| **SHAREHOLDER'S EQUITY ROLLFORWARD** | | | | | | | | | | | |
| Beginning Balance | 287,747 | 9,919,084 | 13,166,470 | 16,142,010 | 16,100,620 | 15,977,132 | 15,795,929 | 15,633,748 | 15,475,366 | 15,398,930 | 15,322,464 |
| Net Income (Loss) | 9,631,337 | 6,231,428 | 3,091,248 | 3,023,640 | 2,851,206 | 2,674,129 | 2,492,269 | 2,329,295 | 2,240,128 | 2,060,685 | 1,875,859 |
| Distributions to Mowbray's | - | (2,034,392) | (74,997) | (2,762,687) | (2,621,760) | (1,455,499) | (1,342,073) | (1,265,118) | (1,170,373) | (1,038,656) | (944,766) |
| Tax Distributions | - | (949,650) | (40,710) | (302,342) | (352,935) | (1,399,833) | (1,312,377) | (1,222,558) | (1,146,191) | (1,098,494) | (1,009,852) |
| **Ending Balance** | **9,919,084** | **13,166,470** | **16,142,010** | **16,100,620** | **15,977,132** | **15,795,929** | **15,633,748** | **15,475,366** | **15,398,930** | **15,322,464** | **15,243,704** |
| | | | | | | | | | | | |
| **DEBT ROLLFORWARDS** | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Vehicle Loans** | | | | | | | | | | | |
| Beginning Balance | 323,311 | 241,909 | 163,323 | 101,375 | 39,426 | - | - | - | - | - | - |
| Interest | - | - | - | - | - | - | - | - | - | - | - |
| Payments | (81,402) | (78,586) | (61,948) | (61,948) | (39,426) | - | - | - | - | - | - |
| **Ending Balance** | **241,909** | **163,323** | **101,375** | **39,426** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Mowbray's Line of Credit** | | | | | | | | | | | |
| Beginning Balance | 269,090 | 5,953,923 | 5,953,923 | - | - | - | - | - | - | - | - |
| Interest | 658,903 | 625,162 | 104,194 | - | - | - | - | - | - | - | - |
| Payments | 5,025,930 | (625,162) | (6,058,116) | - | - | - | - | - | - | - | - |
| **Ending Balance** | **5,953,923** | **5,953,923** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Forecast | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | |
| | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | |
| Operating Income | 786,666 | 823,437 | 1,670,003 | 3,946,248 | (12,950) | (64,886) | 709,279 | 2,757,419 |
| Depreciation & Amortization | (30,429) | (31,548) | (32,668) | (33,788) | (34,907) | (36,027) | (37,146) | (38,266) |
| Interest Expense (Income) | (156,290) | (156,290) | (156,290) | (156,290) | (104,194) | - | - | - |
| Taxable Income | 599,947 | 635,598 | 1,481,044 | 3,756,170 | (152,051) | (100,912) | 672,132 | 2,719,153 |
| CA LLC & S-Corp Tax Rate | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | 8,769 | 9,534 | 22,216 | 56,343 | (2,281) | (1,514) | 10,082 | 40,787 |
| | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | |
| Pino Flow Through Net Income | 446,708 | 626,064 | 1,458,829 | 3,699,827 | (149,770) | (99,399) | 662,050 | 2,678,366 |
| % NOT Applied to NOL | 0.0% | 0.0% | 0.0% | 0.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Pino Flow Through Taxable Income Subject to Taxes | - | - | - | - | (29,954) | (19,880) | 132,410 | 535,673 |
| Estimated Personal Tax Rate | 0.0% | 0.0% | 0.0% | 0.0% | -29.8% | -15.4% | 21.7% | 49.3% |
| Tax Distributions Due to Mowbray's | - | - | - | - | 8,918 | 3,052 | 28,740 | 264,087 |
| | | | | | | | | |
| Beginning Tax Distributions Due to Mowbray's | 949,650 | 949,650 | 949,650 | - | - | 8,918 | 3,052 | 28,740 |
| Tax Distributions Due to Mowbray's | - | - | - | - | 8,918 | 3,052 | 28,740 | 264,087 |
| Tax Distributions to Mowbray's | - | - | (949,650) | - | - | (8,918) | (3,052) | (28,740) |
| Ending Tax Distributions Due to Mowbray's | 949,650 | 949,650 | - | - | 8,918 | 3,052 | 28,740 | 264,087 |

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | | | | |
| Operating Income | 10,499,555 | 7,226,353 | 3,388,862 | 3,233,944 | 3,076,798 | 2,914,937 | 2,748,221 | 2,576,503 | 2,399,634 | 2,217,458 | 2,029,818 |
| Depreciation & Amortization | - | (128,433) | (146,346) | (164,259) | (182,172) | (200,085) | (217,999) | (211,737) | (125,393) | (125,393) | (125,393) |
| Interest Expense (Income) | (868,218) | (625,162) | (104,194) | - | - | - | - | - | - | - | - |
| Taxable Income | 9,631,337 | 6,472,759 | 3,138,323 | 3,069,685 | 2,894,626 | 2,714,852 | 2,530,222 | 2,364,766 | 2,274,241 | 2,092,066 | 1,904,425 |
| CA LLC & S-Corp Tax Rate | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | 144,470 | 96,861 | 47,075 | 46,045 | 43,419 | 40,723 | 37,953 | 35,471 | 34,114 | 31,381 | 28,566 |
| | | | | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | | | | |
| Pino Flow Through Net Income | 9,631,337 | 6,231,428 | 3,091,248 | 3,023,640 | 2,851,206 | 2,674,129 | 2,492,269 | 2,329,295 | 2,240,128 | 2,060,685 | 1,875,859 |
| % NOT Applied to NOL | 20.0% | 0.0% | 20.0% | 20.0% | 112.8% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Pino Flow Through Taxable Income Subject to Taxes | 1,926,267 | - | 618,250 | 604,728 | 3,214,967 | 2,674,129 | 2,492,269 | 2,329,295 | 2,240,128 | 2,060,685 | 1,875,859 |
| Estimated Personal Tax Rate | 49.3% | 0.0% | 49.3% | 49.3% | 40.9% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% |
| Tax Distributions Due to Mowbray's | 949,650 | - | 304,797 | 298,131 | 1,315,053 | 1,318,346 | 1,228,689 | 1,148,342 | 1,104,383 | 1,015,918 | 924,798 |
| | | | | | | | | | | | |
| Beginning Tax Distributions Due to Mowbray's | - | 949,650 | - | 264,087 | 259,876 | 1,221,994 | 1,140,507 | 1,056,818 | 982,603 | 940,794 | 858,218 |
| Tax Distributions Due to Mowbray's | 949,650 | - | 304,797 | 298,131 | 1,315,053 | 1,318,346 | 1,228,689 | 1,148,342 | 1,104,383 | 1,015,918 | 924,798 |
| Tax Distributions to Mowbray's | - | (949,650) | (40,710) | (302,342) | (352,935) | (1,399,833) | (1,312,377) | (1,222,558) | (1,146,191) | (1,098,494) | (1,009,852) |
| Ending Tax Distributions Due to Mowbray's | 949,650 | - | 264,087 | 259,876 | 1,221,994 | 1,140,507 | 1,056,818 | 982,603 | 940,794 | 858,218 | 773,164 |

# EXHIBIT "3"

**The Original Mowbray's Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in 000's)*

<u>Overview</u>

Section 1129(a)(7) of title 11 of the United States Code (the "Bankruptcy Code") requires that each Holder of an Impaired Allowed Claim or Interest either (i) accept the Ronnie Jordan ("Jordan") as a creditor and CEO of his company Mowbray Acquisition LLC's ("Acquisition") plan of reorganization (the "Jordan Plan") or (ii) receive or retain under the Jordan Plan, property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Jordan Plan. This is referred to as the "Best Interests Test."

To demonstrate that the Jordan Plan satisfies the Best Interests Test under section 1129(a)(7), the Debtor[1] prepared a hypothetical liquidation analysis (the "Liquidation Analysis") which Acquisition adopts in support of the Jordan Plan. The Liquidation Analysis estimates the realizable liquidation value of the Debtor's assets and estimates the distribution to creditors resulting from the liquidation. The Liquidation Analysis indicates that Holders of Allowed Claims in each Impaired Class will receive at least as much under the Jordan Plan as they would if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. Therefore, Acquisition and Ronnie Jordan ("Jordan") believe that the Jordan Plan satisfies the Best Interest Test set forth in section 1129(a)(7) of the Bankruptcy Code.

The Liquidation Analysis is predicated on the Chapter 11 case subsequently being converted to a Chapter 7 case on the Effective Date (the "Liquidation Date", see note [1] below), and a Chapter 7 trustee (the "Trustee") is appointed to convert all assets into cash.

The Liquidation Analysis is based on the Company's estimated book values as of the Liquidation Date unless otherwise noted.

Under Chapter 7, the Debtor's assets would be subject to liquidation, and values would be measured based on the premise that such assets are liquidated in an orderly fashion.

For purposes of this Liquidation Analysis, it is assumed that the Debtor's operations would cease immediately upon conversion to Chapter 7. The Debtor provides certain management services and leases equipment to its wholly-owned subsidiary, Pino Tree Services ("Pino"), pursuant to written agreements.  For this reason, upon the cessation of the Debtor's business and its liquidation in Chapter 7, it is assumed that Pino will also liquidate.  The Trustee will retain certain minimal operational, accounting, information technology, and other management services necessary to wind down the Debtor and Pino and dispose of their respective assets through piecemeal sales, primarily of equipment used in the operation of the businesses. The Trustee would commence a three-month liquidation process, during which time all of the property of the Debtor's Estate would be sold. The amount of proceeds available from the liquidation of the property of the Estate would be the net proceeds (after accounting for costs associated with conducting the liquidation) from the sale of property of the Estate ("Liquidation Proceeds"). This Liquidation Analysis assumes that the Liquidation Proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. The Liquidation Proceeds would be applied in the order of priority set forth in section 726 of the Bankruptcy Code:

Under Chapter 7, the Debtor's assets would be subject to liquidation, and values would be measured based on the premise that such assets are liquidated in an orderly fashion;(i) first, to the Holders of Allowed Secured Claims;
    (ii) second, to the holders of any Super-priority Administrative Claims;
    (iii) third, to holders of Administrative Expense Claims;
    (iv) fourth, to the holders of any other Priority Claims;
    (v) fifth, to the holders of General Unsecured Claims; and
    (v) sixth, to the holders of Insider Claims.

The Liquidation Analysis does not include estimates for: (i) the tax consequences that may be triggered upon the liquidation and sale of property of the Debtor's Estate; (ii) damages as a result of breach or rejection of obligations incurred and leases and executory contracts assumed or entered into; or (iv) recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions. More specific assumptions regarding the liquidation analysis are detailed in the notes below.

Estimating recoveries in any hypothetical Chapter 7 liquidation is an uncertain process involving the subjective use of estimates and assumptions which, although considered reasonable by Debtor's management, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor or the Trustee. These values have not been subject to any review, compilation, or audit by any independent accounting firm. In the event of a Chapter 7 liquidation, the actual results may vary materially from the estimates and projections set forth herein. Similarly, the actual amounts of Allowed Claims in a Chapter 7 liquidation could materially and significantly differ from the amounts of Claims estimated in this Liquidation Analysis.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them elsewhere in this Liquidation Analysis or in the Chapter 11 Plan of Reorganization of Mowbray Acquisition LLC proponent of the Jordan Plan for The Original Mowbray's Tree Service, Inc. Under Chapter 11 of the Bankruptcy Code (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

**The Original Mowbray's Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in 000's)*

<u>Summary of Recovery</u>

The Debtor prepared the table below summarizes the projected proceeds that may be available for distribution to creditors in a hypothetical liquidation of the Debtor's estate under Chapter 7 of the Bankruptcy Code. Acquisition adopts this same analysis. For purposes of this analysis, a potential range of outcomes has been projected in Low and High Scenarios. The likely outcome is in the middle of this range.

The recoveries below do not reflect the potential negative impact on the distributable value available to the Debtor's creditors on account of any unknown or contingent liabilities, including, but not limited to, environmental obligations and unasserted claims.

| | Note | [1] Net Book Value as of 6/30/25 | Liquidation Recovery % Low | Liquidation Recovery % High | Liquidation Value Low | Liquidation Value High |
|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds Available for Distribution** | | | | | | |
| Cash & Cash Equivalents | 2 | 8,740 | 100.0% | 100.0% | 8,740 | 8,740 |
| Accounts Receivable | 3 | 4,924 | 55.8% | 87.2% | 2,746 | 4,293 |
| Prepaid Expenses | 4 | 2,017 | 0.0% | 0.0% | - | - |
| Land | 5 | 245 | 92.0% | 92.0% | 225 | 225 |
| Buildings & Improvements, net | 6 | 261 | 0.0% | 0.0% | - | - |
| Equipment & Autos, net | 7 | 3,211 | 682.3% | 682.3% | 21,912 | 21,912 |
| Deposits | 8 | 244 | 0.0% | 0.0% | - | - |
| Insurance Collateral, net | 9 | 2,787 | 53.8% | 95.4% | 1,499 | 2,658 |
| Liquidation Value of Pino Tree Services, Inc. | 10 | 1,500 | 0.0% | 22.5% | - | 338 |
| Affiliate Notes Receivable | 11 | 12,118 | 40.3% | 58.0% | 4,878 | 7,032 |
| Causes of Action | 12 | Unknown | | | Unknown | Unknown |
| | | | | | 40,000 | 45,198 |
| **Chapter 7 Administrative Costs** | | | | | | |
| Chapter 7 Trustee Fees | 13 | | | | 1,200 | 1,356 |
| Chapter 7 Professional Fees | 14 | | | | 1,250 | 1,250 |
| Operational Wind-down Costs | 15 | | | | 501 | 501 |
| US Trustee Fees | 16 | | | | 320 | 362 |
| | | | | | 2,951 | 3,107 |
| **Net Proceeds Available for Distribution** | | | | | 37,049 | 42,091 |
| **Secured Claims** | | | | | | |
| PNC Bank | 17 | 6,501 | 100.0% | 100.0% | 6,501 | 6,501 |
| Jacobus Pino Note | 18 | 126 | 0.0% | 100.0% | - | 126 |
| Equipment Lenders / Lessors | 19 | 15,937 | 88.2% | 88.2% | 14,064 | 14,064 |
| | | | | | 20,565 | 20,691 |
| **Net Proceeds Available for Distribution after Secured Claims** | | | | | 16,484 | 21,400 |
| **Chapter 11 Administrative Claims** | | | | | | |
| Ch 11 Professional Fees | 20 | 2,410 | 100.0% | 100.0% | 2,410 | 2,410 |
| US Trustee Fees | 21 | 51 | 100.0% | 100.0% | 51 | 51 |
| Accounts Payable & Accrued Expenses | 22 | 682 | 100.0% | 100.0% | 682 | 682 |
| | | | | | 3,144 | 3,144 |
| **Net Proceeds Available for Distribution to Unsecured Creditors** | | | | | 13,341 | 18,257 |
| **Priority Unsecured Claims** | | | | | | |
| Priority Unsecured Claims (Wages & Taxes) | 23 | 125 | 100.0% | 100.0% | 125 | 125 |
| **Total Priority Unsecured Claims** | | | | | 125 | 125 |
| **Amount Available for Distribution to General Unsecured Creditors** | | | | | 13,216 | 18,132 |

| | |
|---|---|
| **Average Amount Available for Distribution to General Unsecured Creditors** | 15,674 |

The Acquisition executives have carefully evaluated Pino Tree Service and giving due consideration for its Cash, Accounts Receivable and Accounts Payable as well as its going concern value, notwithstanding that its Southern California Edison contract ends in 2026, believes the $338,000 amount under the Robin Plan is wholly inadequate. Acquisition values Pino Tree service at an additional $5,000,000 to be combined with the Robin Plan $15,674,000.

**TOTAL AMOUNT AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED UNDER JORDAN PLAN WILL BE $20,674,000 ROUNDING TO $21,000,000**

**The Original Mowbray's Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in 000's)*

**Notes & Significant Assumptions to Liquidation Analysis**

[1] **As of Date:**  The Liquidation Date assumed in this analysis is the same as the Effective Date assumed in the Debtor's Financial Projections.

*GROSS LIQUIDATION PROCEEDS AVAILABLE FOR DISTRIBUTION*

[2] **Cash & Cash Equivalents:**  The amounts shown are the projected cash balances available to the Debtor as of the Liquidation Date, based on projected cash flows.

[3] **Accounts Receivable:**  The collection of amounts due was analyzed by Debtor's management on a per customer basis. While the Debtor has ten customers, the Debtor's sales are currently concentrated with three counterparties subject to pre-existing contracts. In a liquidation, the Debtor would incur contract termination or similar damages that may offset the customer balance due, as well as legal or other collection costs.

| Customer | Notes | AR Balance | Low % | High % | Low Recovery | High Recovery |
|---|---|---|---|---|---|---|
| Customer 3 | a | 685 | 25.0% | 50.0% | 171 | 343 |
| Customer 4 | b | 687 | 50.0% | 75.0% | 343 | 515 |
| Other Customers | c | 1,058 | 50.0% | 100.0% | 529 | 1,058 |
| Pino (Management Fees & Equipment Rentals) | d | 2,338 | 71.5% | 100.0% | 1,671 | 2,338 |
| Phoenix (Management Fees & Equipment Rentals) | e | 156 | 20.0% | 25.0% | 31 | 39 |
| | | 4,924 | | | 2,746 | 4,293 |

a)Per this customer contract, the customer may withhold payment in the event the Debtor cannot comply with its contract and offset any loss, damage, or expense of the customer in connection with the Debtor's services and/or the failure of the Debtor to complete the contract. In this scenario, the Debtor would be unable to perform and a subcontractor would need to be hired to satisfy the Debtor's obligations, likely charging premium pricing due to the need to complete work on an expedited basis to meet project deadlines. Based on these terms, a potential recovery range of 25% to 50% is accordingly assumed on these receivables.

b) While this contract is silent on how to treat an inability to perform, similar to [a] above, it is expected that the Debtor's inability to perform would result in a subcontractor being hired at premium pricing, yielding damage claims to the customer.  A potential recovery range of 50% to 75% is accordingly assumed on these receivables, which is higher than assumed in [a] above due only to the lack of specificity in the contract terms.

c) Includes all other smaller vegetation management customers.  A potential recovery range of 50% to 100% is assumed on these receivables.

d) Includes management fees and equipment rents due from the Debtor's wholly owned subsidiary, Pino.  A potential recovery range is assumed based on the recovery range to unsecured creditors as per Pino's separate liquidation analysis.

e) Includes management fees and equipment rents due from the Debtor's affiliate, Phoenix Traffic Management ("Phoenix"). While Phoenix has one non-affiliate customer, its revenues are largely from services provided to the Debtor and Pino.  In addition, the Debtor provides management services to Phoenix pursuant to a written agreement and rents equipment to Phoenix.  For these reasons, if the Debtor and Pino both liquidate, then it is assumed that Phoenix cease operations. It has minimal assets consisting primarily of Accounts Receivable due from Pino.

[4] **Prepaid Expenses:**  Includes the following categories:

a) Prepaid insurance policies:  Represents prepaid premiums for insurance policies including property, general liability, and auto, that are financed through insurance premium finance companies.  In a liquidation, the amount is not expected to be realized as the policy will have unpaid premiums due, hence prepaid amounts will not be recoverable.

b) Other prepaid amounts:  Represents an immaterial amount (ie, less than $45,000) of prepayments for certain operating expenses.  These amounts would be applied to the payment of post-conversion or post-petition obligations with no anticipated recovery available to creditors of the estate in a liquidation scenario.

[5] **Land:** Consists of three parcels adjacent to 171 S. Waterman Ave in San Bernardino, CA.  Pending an appraisal on such parcels, their current values for purposes of this liquidation analysis are estimated at the amounts shown in the Debtor's Schedules (see Schedule AB, item 55).

| Parcel APN | Type of Interest | Current Value | Net of 8% Selling Costs |
|---|---|---|---|
| 0136-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 | Fee simple | 82 | 75 |
| 0136-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 | Fee simple | 82 | 75 |
| 0136-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 | Fee simple | 82 | 75 |
| | | 245 | 225 |

[6] **Buildings & Improvements, net:** Consist of tenant improvements on various properties leased by the Debtor.  These leasehold improvements are not projected to yield a recovery in liquidation as they are affixed to real property which is subject to a lease that would be rejected.

[7] **Equipment, net:**  Consists of significantly depreciated vehicles and other equipment used to provide vegetation management services to customers, including:

a) Vehicles and equipment:  The Debtor retained Hilco Global to appraise its vehicles and related equipment on a Net Forced Liquidation Value [2] basis. These items include vehicles and equipment that are both owned (the Debtor holds title in the respective asset) and leased (the lessor currently retains title in the respective asset). See note [19] below for further details.

b) Office furniture and equipment:  Represents an immaterial amount of assets which have been in use for quite some time already and are therefore substantially depreciated.  These assets are assumed to have no recovery value.

---

[2] Net Forced Liquidation Value ("NFLV") is defined as an estimated amount of the most probable price expressed in terms of currency in U.S. dollars which the subject equipment inspected could typically be realized at through a properly advertised and conducted public auction sale, held under forced sale conditions, with the seller obligated to sell, and under present day economic trends, as of the effective date of the appraisal report. Conclusions take into consideration physical location, difficulty of removal, physical condition, adaptability, specialization, marketability, overall appearance, and psychological appeal. Further, the ability of the asset group to draw sufficient prospective buyers to ensure competitive offers is considered. All assets are to be sold on a piecemeal basis "as is" with purchasers responsible for removal of the assets at their own risk and expense. Any change in location, condition, deletions or additions to the total assets appraised could change the psychological and/or monetary appeal necessary to gain the values indicated. NFLV includes the costs of liquidation. These costs may include the direct liquidation costs, including marketing, advertising, sale site preparation, removal supervision, accounting, travel, labor expenses, etc., and the cost of occupancy, including real estate taxes or rent, mortgage costs, utilities, insurance, security services, building maintenance personnel, etc.

**The Original Mowbray's Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in 000's)*

**Notes & Significant Assumptions to Debtor's**
**Liquidation Analysis**

[8] **Deposits:** Consist of rent deposits held by landlords and other such amounts held by vendors. Upon a liquidation, the remaining deposits would be applied to the lease contract or outstanding balance, with no anticipated recovery available to creditors of the estate.

[9] **Insurance Collateral, net:** The Debtor historically maintained letters of credit for approximately $5.4 million to secure obligations under previously terminated Workers' Compensation programs. All such letters of credit were drawn upon during 2024. The underlying obligations have recently been actuarially estimated at $2.6 million. Collateral in excess of 105% (High Scenario) to 150% (Low Scenario) of that amount is assumed to be recoverable to other creditors of the Debtor in a liquidation scenario as those underlying obligations are discharged.

[10]     **Wind-down Value of Pino:** Represents the approximate wind-down value of Pino that would flow to the Debtor as its 100% owner, as per Pino's separate wind-down analysis. The Debtor provides management services and leases equipment to Pino pursuant to contractual agreements with the Debtor that are critical to its ongoing operations. Upon the liquidation of the Debtor in a Chapter 7, the Debtor would be unable to provide management services, and the equipment being leased to Pino by the Debtor would be returned to the Debtor and liquidated, rendering Pino unable to continue operating. This would result in the immediate cessation of Pino's business operations. Notwithstanding this narrative in the Robin Plan, this Jordan Plan derives a materially different liquidation value conclusion at page 2 of 5.

|  | Low | High |
|---|---|---|
| Distribution on Pino's Equity Claims in a Liquidation Scenario | - | 338 |
|  | - | **338** |

[11] **Affiliate Notes Receivable:** Consist of amounts from related parties:

|  | Balance | Low | High |  |
|---|---|---|---|---|
| Pino Tree Services | 5,954 | 4,256 | 5,954 | The Debtor holds an unsecured promissory note. Upon a liquidation of the Debtor, Pino would also be liquidated along with the Debtor. |
| *Recovery %* |  | *71.5%* | *100.0%* |  |
| Mowbray's Waterman Properties | 3,702 | 130 | 463 | The Debtor holds an unsecured promissory note. This affiliate is currently subject to separate bankruptcy proceedings. |
| *Recovery %* |  | *3.5%* | *12.5%* |  |
| Phoenix Traffic Management | 2,462 | 492 | 615 | The Debtor holds an unsecured promissory note. This affiliate entity's primary customer is Pino, and so it is assumed to be liquidated along with the Debtor and Pino or that it would otherwise lack the means to pay. |
| *Recovery %* |  | *20.0%* | *25.0%* |  |
|  | **12,118** | **4,878** | **7,032** |  |

[12] **Causes of Action:** In a Chapter 7 liquidation, the Trustee would consider pursuing various potential avoidance actions under Chapter 5 of the Bankruptcy Code, including recovering any preference payments made to creditors during the 90-day period prior to the Petition Date and transfers to insiders. The Debtor has not estimated recoveries for any avoidance actions or other litigation.

*ADMINISTRATIVE CLAIMS AND COSTS TO LIQUIDATE*

[13] **Chapter 7 Trustee Fees:** The Trustee's fees have been estimated to be 3% of funds disbursed or turned over to parties in interest in accordance with section 326 of the Bankruptcy Code. Based on such section of the Bankruptcy Code, in a Chapter 7 liquidation, the Trustee's actual % would be greater.

[14] **Chapter 7 Trustee Professional Fees:** Includes the costs for accounting, tax, legal and other professionals. The professional fees to pursue Chapter 5 causes of actions are assumed to be on a contingency fee basis and are not included as the underlying actions are unknown at this time.

[15] **Operational Wind-down Costs:** Operational wind-down costs are expected to occur over the course of a three month wind-down period. To maximize recoveries on the Debtor's assets, minimize the amount of claims, and generally ensure an orderly liquidation, it is assumed that the Trustee will continue to employ the Debtor's corporate employees to assist with the coordination of the liquidation process.

The Debtor's employees assisting the Trustee with the liquidation will primarily be responsible for assisting the liquidator with preparing the auction of the Vehicles and Equipment, finalization of employee matters, cash collections, payroll and tax reporting, accounts payable and other books and records, and responding to certain legal matters related to the wind-down. The Debtor assumes that these personnel would remain for three months.

| Operational Wind-down Costs | Projected Monthly Cost | Low | High |  |
|---|---|---|---|---|
| Insurance |  | - | - | Assume covered via prepaid amounts (see note [4] above) |
| Document Storage & Retention | 2 | 72 | 72 | Assume for 3 years |
| Occupancy & Rent | 21 | 64 | 64 | Assume for 3 months |
| Utilities | 25 | 75 | 75 | Assume for 3 months |
| SG&A / Corporate Wages | 92 | 290 | 290 | Assume for 3 months, fully loaded at 5% |
|  |  | **501** | **501** |  |

[16] **US Trustee Fees:** The US Trustee's fees have been estimated to be 0.8% of funds disbursed or turned over to parties in interest, as per the current ranges for calculating US Trustee fees.

**The Original Mowbray's Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in 000's)*

**Notes & Significant Assumptions to Liquidation Analysis**

*SECURED, CH 11 ADMINISTRATIVE, PRIORITY UNSECURED, AND GENERAL UNSECURED CLAIMS*

[17] **PNC Bank:** Includes principal and accrued interest plus a yet-to-be-determined amount of fees as of the Liquidation Date for the credit agreement dated October 28, 2022. PNC Bank has a lien on substantially all of the Debtor's assets.

[18] **Jacobus Pino Note:** The former owner of Pino holds a note payable that is secured by a lien on the stock of Pino. In the event of a liquidation, the Trustee would evaluate whether the recovery to the Debtor from a wind-down of Pino would exceed the amount due on this note. It is therefore assumed this note would be paid only in the event the estimated wind-down value of Pino that is attributable to Pino's owners exceeds the amount owed to Jacobus Pino.

[19] **Equipment Lenders / Lessors:** Equipment lenders have secured liens on the underlying equipment leased and/or financed. Based on an appraisal by Hilco Global dated March 7, 2025, to the extent these lenders are fully secured, inclusive of residual buyout amount and estimated liquidation costs, the Trustee will sell all vehicles at their NFLV and use the proceeds to pay the lenders in full (including end of term buyouts), with the excess NFLV inuring to the benefit of the remaining creditors. If any lenders are not fully secured, it is assumed that the equipment will be returned to such lenders and the under secured portion of their claim will be an unsecured deficiency claim.

| | # Vehicles / Equipment | NFLV | Amount Owed (incl Buyout) | Est'd Recovery | Excess NFLV | Deficiency Claim |
|---|---|---|---|---|---|---|
| Albach | 1 | 401 | 132 | 132 | 269 | 0 |
| Ally | 27 | 552 | 295 | 295 | 257 | 0 |
| Altec | 159 | 9,178 | 8,714 | 8,714 | 463 | 0 |
| Bank of America (excl operating leases) | 62 | 1,895 | 3,551 | 1,895 | 0 | 1,655 |
| FNB | 4 | 231 | 214 | 214 | 17 | 0 |
| Ford | 69 | 2,049 | 1,597 | 1,597 | 452 | 0 |
| GM Financial | 21 | 352 | 121 | 121 | 231 | 0 |
| John Deere | 5 | 158 | 139 | 139 | 19 | 0 |
| Pathward | 18 | 1,039 | 840 | 840 | 199 | 0 |
| US Bank | 2 | 115 | 116 | 115 | 0 | 0 |
| Subtotal - Leased Vehicles | 368 | 15,971 | 15,719 | 14,064 | 1,907 | 1,655 |
| Fully owned by Debtor | 403 | 5,941 | NA | NA | 5,941 | 0 |
| Total Vehicles | 771 | 21,912 | 15,719 | 14,064 | 7,848 | 1,655 |
| Samsara GPS Systems | | 0 | 217 | 0 | 0 | 217 |
| Total | | 21,912 | 15,937 | 14,064 | 7,848 | 1,873 |

Note that the above amounts exclude certain leases with Bank of America that have been deemed to be operating leases, where the lessor has retained ownership of the underlying equipment. It is expected that the Debtor will promptly return that equipment to the lessor and reject those leases. The lessor would then be entitled to an unsecured deficiency claim to the extent there were any remaining claims due under those leases.

[20] **Chapter 11 Professional Fees:** Projected based on the Financial Projections for previously incurred professional fees that will be unpaid pending court approval as of the Liquidation Date.

[21] **US Trustee Fees:** Projected as of the Liquidation Date based on the Financial Projections.

[22] **Accounts Payable and Accrued Expenses:** Projected as of the Liquidation Date based on the Financial Projections.

[23] **Priority Unsecured Claims:** Includes the following categories:
   a) Employee wage claims: Includes approximately $125,000 of PTO earned 180 days prior to the Petition Date plus other unpaid but accrued payroll, subject to a cap of $15,150 per employee. Pre-petition wages were paid post-petition as authorized pursuant to court orders.
   b) Tax claims: There are approximately $269 of potential priority unsecured tax claims as per the Debtor's schedules.

**Pino Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in '000s)*

<u>Overview</u>

In a Chapter 7 liquidation scenario of the Debtor, it is anticipated that the Debtor's [1] wholly owned subsidiary, Pino Tree Service, Inc. ("Pino") would also be forced to cease its business operations. The Debtor provides management services and leases equipment to Pino pursuant to contractual agreements with the Debtor that are critical to its ongoing operations. Upon the liquidation of the Debtor in a Chapter 7, the Debtor would be unable to provide management services, and the equipment being leased to Pino by the Debtor would be returned to the Debtor and liquidated, rendering Pino unable to continue operating. This would result in the immediate cessation of Pino's business operations. Notwithstanding this narrative from the Robin Plan, the Jordan Plan arrives at a materially different valuation for Pino see page 2 of 5.

<u>Summary of Recovery</u>

The table below summarizes the projected proceeds that may be available for distribution to creditors in a hypothetical wind-down of Pino. For purposes of this analysis, a potential range of outcomes has been projected in Low and High Scenarios. The likely outcome is in the middle of this range.

The recoveries below do not reflect the potential negative impact on the distributable value available to Pino's creditors on account of any unknown or contingent liabilities, including, but not limited to, environmental obligations and unasserted claims.

| | Note | [1] Net Book Value as of 6/30/25 | Liquidation Recovery % | | Liquidation Value | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Low | High | Low | High |
| **Gross Liquidation Proceeds Available for Distribution** | | | | | | |
| Cash & Cash Equivalents | 2 | 7,523 | 100.0% | 100.0% | 7,523 | 7,523 |
| Accounts Receivable | 3 | 11,407 | 0.5% | 25.8% | 57 | 2,937 |
| Prepaid Expenses | 4 | 696 | 0.0% | 0.0% | - | - |
| Equipment, net | 5 | 374 | 50.5% | 50.5% | 189 | 189 |
| Causes of Action | 6 | Unknown | | | Unknown | Unknown |
| **Total Gross Liquidation Proceeds Available for Distribution** | | | | | 7,769 | 10,649 |
| **Wind-down Costs** | | | | | | |
| Assignee or Equivalent | 7 | | | | 233 | 319 |
| Professional Fees | 8 | | | | 375 | 375 |
| Operational Wind-down Costs | 9 | | | | 376 | 376 |
| **Total Wind-down Costs** | | | | | 984 | 1,070 |
| **Net Proceeds Available for Distribution** | | | | | 6,785 | 9,579 |
| **Secured Claims** | | | | | | |
| Equipment Lenders / Lessors | 10 | 202 | 72.6% | 72.6% | 147 | 147 |
| **Total Secured Claims** | | | | | 147 | 147 |
| **Net Proceeds Available for Distribution after Secured Claims** | | | | | 6,638 | 9,432 |
| **Chapter 11 Administrative Claims** | | | | | | |
| Post-petition Ch 11 Administrative Claims | 11 | | | | - | - |
| **Total Chapter 11 Administrative Claims** | | | | | - | - |
| **Net Proceeds Available for Distribution to Unsecured Creditors** | | | | | 6,638 | 9,432 |
| **Unsecured Claims** | | | | | | |
| Priority Unsecured Claims (Wages & Taxes) | 12 | 483 | 100.0% | 100.0% | 483 | 483 |
| General Unsecured Claims (incl MTS Note) | 13 | 8,612 | 71.5% | 100.0% | 6,156 | 8,612 |
| **Total Unsecured Claims** | | | | | 6,638 | 9,094 |
| **Remaining Proceeds Available for Equity (Mowbray's)** | | | | | - | 338 |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them elsewhere in this Liquidation Analysis or in the Chapter 11 Plan of Reorganization of The Original Mowbray's Tree Service, Inc. Under Chapter 11 of the Bankruptcy Code (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

**Pino Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in '000s)*

<u>Notes & Significant Assumptions to Liquidation Analysis</u>

[1] **As of Date:** The Liquidation Date assumed in this analysis is the same as the Effective Date assumed in the Debtor's Financial Projections.

*GROSS LIQUIDATION PROCEEDS AVAILABLE FOR DISTRIBUTION*

[2] **Cash & Cash Equivalents:** The amounts shown are the projected cash balances available to Pino as of the Liquidation Date, based on projected cash flows.

[3] **Accounts Receivable:** The collection of amounts due was analyzed by customer. Pino's AR is currently concentrated with a single counterparty and generally subject to pre-existing contracts. In a liquidation, Pino would incur contract termination or other damages that may offset the customer balance due, as well as legal or other collection costs.

| Customer | Notes | AR Balance | Low % | High % | Low Recovery | High Recovery |
|---|---|---|---|---|---|---|
| SCE | a | 11,293 | 0.0% | 25.0% | - | 2,823 |
| Others | b | 114 | 50.0% | 100.0% | 57 | 114 |
| | | 11,407 | | | 57 | 2,937 |

a) Per the customer contract, in the event Pino ceases business in the normal course, the customer could suspend payments and demand the return of all payments previously made less any amount as mutually agreed to. A potential recovery range of 0% to 25% is accordingly assumed on these receivables.
b) Includes all other customers. A potential recovery range of 50% to 100% is assumed on these receivables.

[4] **Prepaid Expenses:** Includes the following categories:
    a) <u>Prepaid insurance policies:</u> Represents prepaid premiums for insurance policies including property, general liability, and auto, that are financed through insurance premium finance companies. In a liquidation, this amount is not expected to be realized as the policy will have unpaid premiums due, hence prepaid amounts will not be recoverable.
    b) <u>Other prepaid amounts:</u> Represents an immaterial amount (ie, less than $2,000) of prepayments for certain operating expenses. These amounts would be applied to the payment of post-conversion or post-petition obligations with no anticipated recovery available to creditors of the estate in a liquidation scenario.

[5] **Equipment, net:** Consists primarily of depreciated vehicles and other equipment used to provide vegetation management services to customers, including the following categories:
    a) <u>Vehicles and equipment subject to third party financing:</u> Represents the majority of Pino's PP&E assets, see note [10] below for further specifics.
    b) <u>Other equipment:</u> Represents an immaterial amount of assets which have been in use for quite some time already and are therefore substantially depreciated. These assets are assumed to have no recovery value.

[6] **Causes of Action:** In a Chapter 7 liquidation, the Debtor's Chapter 7 Trustee would consider pursuing various potential avoidance actions under Chapter 5 of the Bankruptcy Code, including recovering any preference payments made to creditors during the 90-day period prior to the Petition Date and transfers to insiders. The Debtor has not estimated recoveries for any avoidance actions or other litigation that may relate to Pino.

*WIND-DOWN COSTS*

[7] **Assignee or Equivalent:** The fees for an Assignee or equivalent have been estimated to be 3% of funds disbursed or turned over to parties in interest.

[8] **Professional Fees:** Includes the costs for accounting, tax, legal and other professionals.

[9] **Operational Wind-down Costs:** Operational wind-down costs are expected to occur over the course of a three month wind-down period. To maximize recoveries on Pino's assets, minimize the amount of claims, and generally ensure an orderly liquidation, it is assumed that an Assignee or equivalent will oversee the wind-down and will continue to employ Pino's corporate employees to assist with the coordination of the liquidation process.

The employees assisting with the liquidation will primarily be responsible for assisting the liquidator with preparing the auction of the Vehicles and Equipment, finalization of employee matters, cash collections, payroll and tax reporting, accounts payable and other books and records, and responding to certain legal matters related to the wind-down. The Debtor assumes that these personnel would remain for three months.

| Operational Wind-down Costs | Projected Monthly Cost | Low | High | |
|---|---|---|---|---|
| Insurance | | - | - | Assume covered via prepaid amounts (see note [4] above) |
| Document Storage & Retention | 2 | 72 | 72 | Assume for 3 years |
| Occupancy & Rent | 19 | 58 | 58 | Assume for 3 months |
| Utilities | 8 | 25 | 25 | Assume for 3 months |
| SG&A / Corporate Wages | 70 | 221 | 221 | Assume for 3 months, fully loaded at 5% |
| | | 376 | 376 | |

**Pino Tree Service, Inc.**
**Hypothetical Liquidation Analysis**
*(USD$ in '000s)*

**Notes & Significant Assumptions to Liquidation Analysis**

*SECURED, CH 11 ADMINISTRATIVE, PRIORITY UNSECURED, AND GENERAL UNSECURED CLAIMS*

[10] **Equipment Lenders / Lessors:** There are four vehicles that have been financed with third party lessors (see note [5] above).  In the event the amount owed on them exceeds the expected Net Forced Liquidation Value ("NFLV") [2] of such vehicles, it is assumed that Pino will return those vehicles to the lessor, at which point the lessor will sell the asset and apply the proceeds to their outstanding obligations with any residual amounts due being treated as an unsecured deficiency claim (see note [13] below). In the event the NFLV exceeds the amount owed to such lessors, it is assumed that Pino will sell the asset directly and retain the excess NFLV for the benefit of other creditors of the estate.

|  | NFLV | Amount Owed | Est'd Recovery | Excess NFLV | Deficiency Claim |
|---|---|---|---|---|---|
| Ford Motor Credit Company | 50 | 8 | 8 | 42 | - |
| De Lage Landen | 17 | 41 | 17 | - | 24 |
| Merchants Bank Equipment Finance | 36 | 51 | 36 | - | 15 |
| Caterpillar Financial Services | 86 | 102 | 86 | - | 16 |
|  | **189** | **202** | **147** | **42** | **55** |

[11] **Chapter 11 Administrative Claims:** Pino is not currently in, and there are no plans to put Pino into, a Chapter 11 bankruptcy proceeding, therefore there would be no Ch 11 administrative claims in a liquidation scenario.

[12] **Priority Unsecured Claims:** While Pino's wind-down is assumed to occur outside of a Chapter 7 bankruptcy filing, amounts that would be subject to priority status in such an event are still expected to be paid in full.  For instance, it is assumed that all of Pino's accrued payroll at the Liquidation Date would need to be paid to facilitate the employees' assistance with securing the assets of Pino in advance of its wind-down.  This is estimated at approximately $483,000, including PTO plus other unpaid but accrued payroll.

[13] **General Unsecured Claims:** A preliminary analysis of general unsecured claims that would be owed as of the Liquidation Date is shown below, as based on the Financial Projections.

|  | Estd. Claim |  |
|---|---|---|
| Accounts Payable | 1,825 |  |
| Due to Mowbray's | 5,954 |  |
| Accrued Expenses | 544 |  |
| Unsecured Deficiency Claims | 55 | Based on average estimated liquidation values (see note [10] above), current vehicle appraisals in process |
| 502(b)(6) Lease Rejection Damages | 233 | Estimated at 12 months of rent |
|  | **8,612** |  |

---

[2] Net Forced Liquidation Value ("NFLV") is defined as an estimated amount of the most probable price expressed in terms of currency in U.S. dollars which the subject equipment inspected could typically be realized at through a properly advertised and conducted public auction sale, held under forced sale conditions, with the seller obligated to sell, and under present day economic trends, as of the effective date of the appraisal report. Conclusions take into consideration physical location, difficulty of removal, physical condition, adaptability, specialization, marketability, overall appearance, and psychological appeal. Further, the ability of the asset group to draw sufficient prospective buyers to ensure competitive offers is considered. All assets are to be sold on a piecemeal basis "as is" with purchasers responsible for removal of the assets at their own risk and expense. Any change in location, condition, deletions or additions to the total assets appraised could change the psychological and/or monetary appeal necessary to gain the values indicated. NFLV includes the costs of liquidation. These costs may include the direct liquidation costs, including marketing, advertising, sale site preparation, removal supervision, accounting, travel, labor expenses, etc., and the cost of occupancy, including real estate taxes or rent, mortgage costs, utilities, insurance, security services, building maintenance personnel, etc.

# EXHIBIT "4"

Jordan Plan
Financial Projections

| | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incremental Business Opportunities** | | | | | | | | | | |
| Jordan Plan Incremental Revenue | 0 | 20,000,000 | 30,000,000 | 40,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| Net Margin  OH&P | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| Incremental Operating Income | 0 | 3,000,000 | 4,500,000 | 6,000,000 | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 |
| Interest Expense Savings from Jordan Plan  <estimated> | | 0 | 40,000 | 120,000 | 200,000 | 250,000 | 300,000 | 280,000 | 140,000 | 20,000 |
| Increased Margin C-31 Sub Replacing PTM   fn1 | | 168,450 | 168,450 | 168,450 | 168,450 | 168,450 | 168,450 | 168,450 | 168,450 | 168,450 |
| Incremental Net Income | 0 | 3,168,450 | 4,708,450 | 6,288,450 | 7,868,450 | 7,918,450 | 7,968,450 | 7,948,450 | 7,808,450 | 7,688,450 |
| Less:  Tax Distributions to Owner | 0 | 1,562,046 | 2,321,266 | 3,100,206 | 3,879,816 | 3,903,796 | 3,928,446 | 3,918,586 | 3,849,566 | 3,790,406 |
| Incremental Jordan Plan Cash Flow | 0 | 1,606,404 | 2,387,184 | 3,188,244 | 3,989,304 | 4,014,654 | 4,040,004 | 4,029,864 | 3,958,884 | 3,898,044 |
| General Unsecured Repayments (R Mowbray model=base pymt) | 0 | 0 | 0 | 1,679,259 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 | 1,679,259 |
| Jordan Plan Debt  Repayments to Gen'l Unsecured | 1,000,000 | 1,606,404 | 2,387,184 | 4,867,503 | 7,347,821 | 7,373,171 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **DEBT ROLL FORWARD -- Jordan Model** | | | | | | | | | | |
| **General Unsecured Claims** | See  fn2 | | | | | | | | | |
| Beginning Balance   (21,000,000 - 1,000,000) | 20,000,000 | 20,210,500 | 19,454,958 | 17,886,827 | 13,772,360 | 7,004,355 | 0 | 0 | 0 | 0 |
| Interest Expense @4.21% per annum | 210,500 | 850,862 | 819,054 | 753,035 | 579,816 | 294,883 | | | | |
| Less:  Year-EndPayment | 0 | -1,606,404 | -2,387,184 | -4,867,503 | -7,347,821 | -7,299,238 | | | | |
| Ending Balance | 20,210,500 | 19,454,958 | 17,886,827 | 13,772,360 | 7,004,355 | 0 | 0 | | | |

Footnotes:

1.  PTM was forecast to be paid $2,323,054 per year when owned by Robin.  A CSLB C-31 subsidiary will be established and handle all such work at forecast OH&P of 15%.  The current forecast
"Phoenix Mgmt. Leases/Fees of $180,000" is 7.7%.  The difference of 7.8% represents add revenue to MTS of $168,450 per year.

2.  FYE 2025 Beginning Balance is $21 million less $1 million paid on 10/1/2025.

# EXHIBIT "5"

Robin Plan Modified @$23 million
Financial Projections

| | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast | FYE 2035 Forecast | FYE 2036 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| General Unsecured Repayments (R Mowbray model=base pymt) | 0 | 0 | 0 | 1,679,259 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 | 3,358,517 |
| **General Unsecured Claims** | | | | | | | | | | | | |
| Beginning Balance     (23,000,000) | 21,000,000 | 21,221,025 | 22,114,430 | 23,045,448 | 22,336,402 | 19,918,248 | 17,398,289 | 14,772,240 | 12,035,634 | 9,183,817 | 6,211,939 | 3,114,945 |
| Interest Expense @4.21% per annum | 221,025 | 893,405 | 931,018 | 970,213 | 940,363 | 838,558 | 732,468 | 621,911 | 506,700 | 386,639 | 261,523 | 131,139 |
| Less:  Year-EndPayment | 0 | 0 | 0 | -1,679,259 | -3,358,517 | -3,358,517 | -3,358,517 | -3,358,517 | -3,358,517 | -3,358,517 | -3,358,517 | -3,246,084 |
| Ending Balance | 21,221,025 | 22,114,430 | 23,045,448 | 22,336,402 | 19,918,248 | 17,398,289 | 14,772,240 | 12,035,634 | 9,183,817 | 6,211,939 | 3,114,945 | 0 |

EXHIBIT "6"

# Ronnie D. Jordan
# Retired

**Email Address**
**jordanronnie1953@gmail.com**

PO Box 190
Robbinsville, NC 28771

**Notable Projects:**

| | |
|---|---|
| 2003-Present | **I have managed tree companies that have done over $1 Billion in CA tree work** |
| 2016-Present | **Obtained and Managed Hazardous Tree Removal and Fire Restoration Contracts for PGE, and Hazardous Tree Removal for SCE because of CA Drought and Bark Beetle declarations** |
| 2003-2013 | **SCE Bark Beetle Tree Removal Project** – P&J |
| | Managed the project which involved removing SCE's 3 year inventory of trees in 6 months using approximately 80 crews. In 3 years we made 14 complete passes over the Bark Beetle areas of San Bernardino, Riverside, and Los Angeles Counties. References: Dave Simmons, Dave Barreira, Larry Grant, SCE VP, and Walt Johnston SCE VP |
| 2008-2011 | USFS Southern California Fuels Reduction |
| 2005-2010 | San Diego County Hazardous Tree Removal - San Diego County/NRCS |
| 2006-2009 | San Bernardino County Fuels Reduction - NRCS |
| 1996 | Hurricane Fran Debris Management, North Carolina - FEMA |
| 1999 | Hurricane Floyd Animal Incineration, North Carolina – FEMA/NC |
| 2002 | Shenandoah Valley Turkey Incineration – FEMA/APHIS/VA |
| 2006-2013 | Vegetation Management – Arizona Public Service, Tucson Electric, SRP |
| 2007-2009 | City of Hollister, CA Seasonal Storage Ponds |
| 2009-2013 | Nome to Council Highway - Akiachak Airport Relocation – AK DOT |

**Experience:**

| | |
|---|---|
| 3/2022-12/23 | Chief Operating Officer Core Tree Care, Inc |
| 5/2018-10/2020 | Chief Executive Officer, The Original Mowbray's Tree Service |
| 2016-4/2018 | Manager Western Division, MLU Services, Inc. |
| 2013-6/2016 | Vice President of Business Development, P&J, Knoxville Office |
| 2003-7/2013 | Project Manager of California Division-P&J: Oversaw all operations and management of tree removal, fuels reduction and earthwork contracts in AZ, AK and CA. Actively pursued earthwork, land clearing and hazardous tree removal projects throughout the Western United States**.** |
| 1996-2006 | Manager of Raleigh, North Carolina Division-P&J: Aggressively pursued land clearing projects throughout the Central East Coast, administrated Master Contracts with Progress Energy and Duke Power for specialized line clearance tree work, managed disaster relief projects and negotiated contracts for animal carcass incineration. |
| 1991-1996 | Equitable Life Insurance – Experienced Sales Force Agent. . Sold life insurance, mutual funds, annuities, group health and life, IRA's, and 401k plans. Agent of the Year in 1996. |

1976-1990      Jordan Bros. Coal Company, Inc. – Owner
Operated 4 underground coal mines. Performed all aspects of management including: sales, development, permitting, safety, trucking, coal processing, equipment acquisition and maintenance, and personnel

**Certifications:**
**FE**MA
ICS00100;
00200; 00700
& 00800.A
CPR/First-Aid
Eagle
Scout/Order of
the Arrow,
Baptist Deacon

**Education:**
1971
Robbinsville
High School -
Honors
1971-1974
Western
Carolina
University,
Cullowhee,
North Carolina
Bachelor of
Science,
Business
Administration
Major: Finance

# EXHIBIT "7"



## James A. Kelly

Jim Kelly retired from Southern California Edison (SCE) after almost 38 years of service with the Company.

Prior to his retirement, Mr. Kelly was the senior vice president of Transmission & Distribution for SCE, responsible for the operation and maintenance of an electrical grid comprised of over 12,000 miles of transmission and 100,000 miles of distribution lines spread across a 50,000-square-mile service area. Mr. Kelly led an organization of over 8,000 employees in the utility's T&D business unit, which also maintains and operates more than 900 substations. SCE's T&D organization serves over 14 million people through about 5 million customer accounts. As head of T&D, Kelly was responsible for an annual capital budget of over $2 billion and O&M of over $500 million.

Mr. Kelly was also president of Edison ESI, a subsidiary company that operates one of the largest electrical and mechanical repair facilities in the U.S., with over 400,000 square feet of shop space under one roof. Edison ESI provides overhaul, maintenance, testing, repair, and calibration of equipment for other utilities, cogenerators, independent power producers, major industries and public agencies.

Kelly was previously the vice president of Engineering & Technical Services, responsible for planning, engineering, and designing SCE's electrical grid, as well as research and development, safety and training. In this role, he formed the company's Advanced Technology organization, which has gained national prominence for its leadership role in electric vehicle and Smart Grid technology. Mr. Kelly was one of the early pioneers of the Smart Grid, developing a roadmap for a smarter, safer, more reliable and more environmentally responsible electric grid. He pioneered the deployment of synchronous phasor measurement, the Distribution Circuit of the Future, and many other advances in grid sensing, monitoring and control. Among many other awards and honors, Jim was selected as the IEEE's "Leader in Power".

Kelly also previously served as SCE's vice president of Regulatory Compliance and Environmental Affairs, and has in-depth experience with environmental regulation,

permitting and licensing. Jim has served as an expert witness for over 20 years in countless regulatory, legislative and legal proceedings.

Since his retirement, Jim has advised or directed a number of firms in the energy space, including:

- Jim is a Director of *S&C Electric Company*, a global provider of equipment and services for electric power systems. Founded in 1911, the Chicago-based company designs and manufactures switching and protection products for electric power transmission and distribution. He chairs the governance committee and serves on the audit committee.
- He is a Director of *System One Holdings*, one of the largest integrated services and workforce solutions firms in the U.S. with more than 9,000 employees and consultants. He serves on the audit committee.
- Jim is a member of the Utility Board of the San Manuel Band of Mission Indians near Highland, California. San Manuel operates San Manuel Casino, as well as other enterprises, and supports neighboring communities as one of the largest employers and philanthropists in the Inland Empire.
- He leads a boutique consulting coalition, *The Power of Leadership*, which advises large US electric utilities on technology and organizational issues.
- He is a Director of *Dynamic Engineers*, a firm that has developed the complex analytics required to perform true Dynamic Line Rating for transmission lines.
- Jim serves as a trusted advisor to *Stantec*, a global consulting, engineering and construction company.
- He is Chairman of the *California Infrastructure Institute*, a non-profit corporation dedicated to finding innovative and environmentally responsible solutions to the problems of the built urban infrastructure.
- Jim served as the founding CEO and a Director of *ARES*, a firm pioneering the use of electric locomotive technology for large-scale energy storage.
- Finally, he has served as a senior advisor and consultant to selected governmental and private clients, including SpaceX, the Port of Long Beach and the Los Angeles County Metropolitan Transportation Authority. He has provided strategic advice and counsel to government agencies and state-owned enterprises in Singapore and Abu Dhabi.

An accomplished and sought-after speaker, Kelly has given hundreds of talks on technology topics, regulatory policy and leadership to gatherings ranging from 20 to 5,000 attendees.

Jim earned a bachelor's degree from California State University, Long Beach, and a master's degree from California State Polytechnic University. He holds teaching credentials in several subjects and has taught at a number of colleges and universities throughout his career.

Among his many philanthropic interests, Kelly has served on the Engineering Advisory Boards for the University of Southern California and California State University, Los Angeles. Jim is also a member of the Industry Advisory Forum at the California Institute of Technology and past vice-chairman of the board at Don Bosco Technical Institute.

Jim is married to Leigh, and has two grown daughters, Maren and Jan. He resides in Sierra Madre and Newport Beach, California.

EXHIBIT "8"

**MONTHLY PAYMENT SUMMARY :**

| | |
|---|---|
| VEHICLE & EQUIPMENT PAYMENT / MONTH | $548,000.00 |
| PICK UP LEASE PAYMENT / ENTERPRISE | $44,000.00 |
| FORD | $53,000.00 |
| **TOTAL VEHICLE PAYMENT PER MONTH** | **$645,000.00** |
| | |
| INSURANCE  - HEALTH - KAISER | $105,157.00 |
| INSURANCE  - HEALTH - HEALTNET | $89,124.00 |
| INSURANCE - DENTAL, LIFE | $10,254.00 |
| INSURANCE  - AUTO | $59,588.00 |
| INSURANCE  - EPLI & LIABILITY | $138,735.00 |
| INSURANCE  - WORKER COMP | $313,349.00 |
| **TOTAL INSURANCE PAYMENT PER MONTH** | **$716,207.00** |
| | |
| **PAYROLL PER WEEK** | **$762,000.00** |
| **PAYROLL PRE MONTH** | **$3,299,460.00** |
| | |
| AMEX | $166,523.00 |
| VISA | $360,357.00 |
| **CREDIT CARD PAYMENT PER MONTH** | **$526,880.00** |
| | |
| **SC FUEL - GASOLINE** | **$236,268.00** |
| | |
| **SUB-CONTRACTOR PAYMENT** | **$735,714.40** |
| | |
| **OTHER AP MISC PAYMENT** | **$293,000.00** |
| | |
| **GRAND TOTAL MONTHLY PAYMENT** | **$6,452,529.40** |

** OUR BREAK-EVEN POINT
** WE NEED TO GENERATED $6.5M PER MONTH TO BREAK-EVEN

| | Total Revenue | Monthly Pmt | Balance |
|---|---|---|---|
| Jan 2017 | $7,827,209 | $6,452,529 | $1,374,680 |
| Feb 2017 | $3,745,103 | $6,452,529 | ($2,707,426) |
| March 2017 | $8,645,350 | $6,452,529 | $2,192,821 |
| April 2017 | $6,533,521 | $6,452,529 | $80,992 |
| May 2017 | $6,145,803 | $6,452,529 | ($306,726) |
| June 2017 | $7,170,589 | $6,452,529 | $718,060 |
| July 2017 | $6,877,707 | $6,452,529 | $425,178 |
| Aug 2017 | $7,336,311 | $6,452,529 | $883,782 |
| Total | $54,281,593 | $51,620,232 | $2,661,361 |



PRIVILEGE: MEMO
TO ATTORNEY

|  | TOTAL OWED | MONTHLY PYMT |
|---|---|---|
| CRANES | 6,000,000.00 | 115,000.00 |
| ALTEC | 23,500,000.00 | 370,000.00 |
| CAT | 500,000.00 | 10,000.00 |
| RDO CHIPPER | 1,400,000.00 | 27,000.00 |
| WELLS FARGRO | 1,000,000.00 | 26,000.00 |
| FORD CREDIT | 2,000,000.00 | 53,000.00 |
| ENTERPRISE | 1,500,000.00 | 44,000.00 |
| TOTAL | 35,900,000.00 | 645,000.00 |

Plaintiff Jordan's PODs 000248

## CASH & FINANCIAL REPORT - 2018

**MONTHLY PAYMENT SUMMARY :**

| | |
|---|---:|
| CRANES | $91,964 |
| TRUCKS & CHIPPERS | $429,881 |
| PICK UP LEASE PAYMENT / ENTERPRISE | $35,839 |
| FORD | $53,319 |
| **TOTAL VEHICLE PAYMENT PER MONTH** | **$611,002** |
| | |
| INSURANCE  - HEALTH - KAISER | $143,097 |
| INSURANCE  - HEALTH - HEALTNET | $68,791 |
| INSURANCE - DENTAL, LIFE | $10,254 |
| INSURANCE  - AUTO | $49,936 |
| INSURANCE - EPLI & LIABILITY | $138,735 |
| INSURANCE  - WORKER COMP | $421,093 |
| **TOTAL INSURANCE PAYMENT PER MONTH** | **$831,906** |
| | |
| **PAYROLL PER WEEK** | **$762,000** |
| **PAYROLL PER MONTH** | **$3,299,460** |
| | |
| AMEX | $181,788 |
| VISA | $198,606 |
| **CREDIT CARD PAYMENT PER MONTH** | **$380,394** |
| | |
| **SC FUEL - GASOLINE** | **$272,740** |
| | |
| **OTHER AP MISC PAYMENT** | **$350,000** |
| | |
| **GRAND TOTAL MONTHLY PAYMENT** | **$5,745,502** |

** OUR BREAK-EVEN POINT
** WE NEED TO GENERATED $6M PER MONTH TO BREAK-EVEN

| | Total Revenue | Monthly Pmt | Balance |
|---|---:|---:|---:|
| Jan 2018 | $4,302,591 | $5,745,502 | ($1,442,911) |
| Feb 2018 | $5,348,551 | $5,745,502 | ($396,951) |
| March 2018 | $5,253,787 | $5,745,502 | ($491,715) |
| April 2018 | $5,394,045 | $5,745,502 | ($351,457) |
| May 2018 | $5,540,898 | $5,745,502 | ($204,604) |
| | | | |
| YTD Total | $25,839,872 | $28,727,511 | ($2,887,639) |
| | | | -11.18% |

Plaintiff Jordan's PODs 000249

9:18 AM
05/09/18
Accrual Basis

The Original Mowbray's Tree Service, Inc.
## Profit & Loss Prev Year Comparison
January through April 2018

| | Jan - Apr 18 | Jan - Apr 17 | $ Change | % Change |
|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | |
| **Income** | | | | |
| 401-000 · Sales - Service | 20,311,926.66 | 26,432,216.11 | -6,120,289.45 | -23.16% |
| 402-000 · Sales-Discount | -310,588.84 | -392,677.33 | 82,088.49 | 20.91% |
| Total Income | 20,001,337.82 | 26,039,538.78 | -6,038,200.96 | -23.19% |
| Gross Profit | 20,001,337.82 | 26,039,538.78 | -6,038,200.96 | -23.19% |
| **Expense** | | | | |
| 601-000 · Salaries and Wages | 8,854,897.87 | 9,367,102.92 | -512,205.05 | -5.47% |
| 603-000 · Equipment Rental | 22,506.92 | 1,029,872.19 | -1,007,365.27 | -97.82% |
| 604-000 · Vehicle Expense - Fuel | 1,033,554.95 | 668,241.85 | 365,313.10 | 54.67% |
| 605-000 · Vehicle Expense - Repairs | 108,821.84 | 119,260.83 | -10,438.99 | -8.75% |
| 606-000 · Vehicle Expense - DMV | 280,566.15 | 164,986.63 | 115,579.52 | 70.05% |
| 606-001 · Vehicle Expense - Smog Fees | 1,300.00 | 1,400.00 | -100.00 | -7.14% |
| 606-002 · Vehicle Expense - Tires | 107,598.45 | 48,686.39 | 58,912.06 | 121.0% |
| 606-003 · Vehicle Expense - Towing | 16,862.13 | 19,805.85 | -2,943.72 | -14.86% |
| 606-004 · Vehicle Expense - Truck Parts | 248,755.68 | 281,813.69 | -33,058.01 | -11.73% |
| 606-005 · Vehicle Expense - Equipment | 0.00 | 91.95 | -91.95 | -100.0% |
| 607-000 · Insurance - Miscellaneous | 16,943.34 | 10,666.82 | 6,276.52 | 58.84% |
| 607-001 · Insurance - Auto | 143,800.06 | 194,754.58 | -50,954.52 | -26.16% |
| 607-002 · Insurance - Liability | 752,284.68 | 532,688.40 | 219,596.28 | 41.22% |
| 607-003 · Insurance - Work Comp | 2,714,110.62 | 2,517,561.85 | 196,548.77 | 7.81% |
| 607-004 · Insurance - Health | 1,181,404.20 | 989,071.49 | 192,332.71 | 19.45% |
| 607-005 · Insurance -Comm Inland Marine | 61,942.68 | 53,949.32 | 7,993.36 | 14.82% |
| 607-007 · Insurance - Dental | 34,484.40 | 26,728.32 | 7,756.08 | 29.02% |
| 607-009 · Insurance - life | 21,335.00 | 13,107.00 | 8,228.00 | 62.78% |
| 607-010 · PENSION | 328,373.36 | 157,342.28 | 171,031.08 | 108.7% |
| 608-000 · Dump Fees | 161,765.33 | 163,832.45 | -2,067.12 | -1.26% |
| 609-000 · Telephone | 99,679.14 | 87,443.09 | 12,236.05 | 13.99% |
| 609-001 · Communication | 68,329.59 | 36,659.60 | 31,669.99 | 86.39% |
| 609-002 · Cable - Directv | 1,142.80 | 880.46 | 262.34 | 29.8% |
| 610-000 · Rent | 78,582.47 | 73,422.81 | 5,159.66 | 7.03% |
| 611-000 · Office Expense | 55,654.20 | 72,338.30 | -16,684.10 | -23.06% |
| 612-000 · Tools | 193,862.53 | 8,790.99 | 185,071.54 | 2,105.24% |
| 613-000 · Supplies | 70,906.65 | 377,030.01 | -306,123.36 | -81.19% |
| 613-001 · Supplies - lubricants | 11,477.99 | 9,650.98 | 1,827.01 | 18.93% |
| 614-000 · Repairs & Maintenance | -4,421.50 | 8,537.68 | -12,959.18 | -151.79% |
| 614-001 · Repairs - Equipment | 13,788.08 | 321.54 | 13,466.54 | 4,188.14% |
| 614-002 · Repairs - Computer | 600.00 | 21,087.97 | -20,487.97 | -97.16% |
| 614-003 · Repairs - Miscellaneous | 0.00 | 48.41 | -48.41 | -100.0% |
| 615-000 · Sub-Contractor | 1,513,802.69 | 5,786,283.31 | -4,272,480.62 | -73.84% |
| 615-001 · Professional Fees - Legal | 185,343.66 | 39,708.02 | 145,635.64 | 366.77% |
| 615-002 · Professional Fees - Accounting | 52,200.00 | 50,750.00 | 1,450.00 | 2.86% |
| 615-003 · Professional Fees - Others | 19,472.05 | 40,621.02 | -21,148.97 | -52.06% |
| 615-004 · Professional Fees - ADP | 43,541.46 | 25,484.48 | 18,056.98 | 70.86% |
| 616-000 · Meal & Entertainment | -354.22 | 11,194.44 | -11,548.66 | -103.16% |
| 616-001 · Travel | 95,211.15 | 132,352.37 | -37,141.22 | -28.06% |
| 616-002 · Employee Meals - Travel | 21,717.79 | 0.00 | 21,717.79 | 100.0% |
| 617-000 · Postage and Delivery | 7,658.44 | 16,853.98 | -9,195.54 | -54.56% |
| 618-000 · Interest Expense | 510,859.71 | 409,616.38 | 101,243.33 | 24.72% |

Plaintiff Jordan's PODs 000250

9:18 AM
05/09/18
Accrual Basis

## The Original Mowbray's Tree Service, Inc.
## Profit & Loss Prev Year Comparison
### January through April 2018

| | Jan - Apr 18 | Jan - Apr 17 | $ Change | % Change |
|---|---|---|---|---|
| 619-000 · Dues and Subscriptions | 35,113.87 | 11,849.67 | 23,264.20 | 196.33% |
| 619-001 · Recruitment | 107.16 | 0.00 | 107.16 | 100.0% |
| 620-000 · Depreciation Expense | 2,344,698.90 | 1,616,900.06 | 727,798.84 | 45.01% |
| 621-000 · Licenses and Permits | 29,243.68 | 54,742.74 | -25,499.06 | -46.58% |
| 622-000 · Labor Taxes | 921,000.46 | 956,966.92 | -35,966.46 | -3.76% |
| 622-001 · Accrued Labor Taxes | -10,469.45 | 82,081.98 | -92,551.43 | -112.76% |
| 623-000 · Utilities | 68.18 | 50.00 | 18.18 | 36.36% |
| 623-001 · Utilities - Gas | 544.29 | 632.00 | -87.71 | -13.88% |
| 623-002 · Utilities - Electric | 4,108.93 | 4,405.77 | -296.84 | -6.74% |
| 623-003 · Utilities - Water | 1,091.06 | 1,377.68 | -286.62 | -20.81% |
| 623-004 · Utilities - Miscellaneous | 4,022.77 | 3,571.79 | 450.98 | 12.63% |
| 625-000 · Lodging - Subsistence | 785,677.31 | 844,493.21 | -58,815.90 | -6.97% |
| 626-000 · Penalties | 589.42 | 1,872.00 | -1,282.58 | -68.51% |
| 627-000 · Advertising | 2,377.20 | 0.00 | 2,377.20 | 100.0% |
| 627-001 · Sales/Marketing - Private | 3,093.60 | 6,403.21 | -3,309.61 | -51.69% |
| 627-002 · Donation / Charity | 2,300.00 | 5,339.85 | -3,039.85 | -56.93% |
| 628-000 · Uniforms | 37,515.19 | 55,257.99 | -17,742.80 | -32.11% |
| 629-000 · State Income Tax | 0.00 | 77,024.00 | -77,024.00 | -100.0% |
| 629-001 · Property Tax | 6,768.69 | 0.00 | 6,768.69 | 100.0% |
| 629-002 · Other Taxes | 11,134.43 | 2,103.73 | 9,030.70 | 429.27% |
| 632-000 · Training & Education | 12,796.84 | 63,284.76 | -50,487.92 | -79.78% |
| 633-000 · Property Damage | 42,220.52 | 15,777.38 | 26,443.14 | 167.6% |
| 634-000 · Bank Service Charges | 1,465.39 | 14,241.61 | -12,776.22 | -89.71% |
| 635-000 · Employee Benefits | 49,268.39 | 93,082.08 | -43,813.69 | -47.07% |
| 635-001 · 401K ER MATCH | 18,695.88 | 0.00 | 18,695.88 | 100.0% |
| 636-000 · Bid Bond | 500.00 | 0.00 | 500.00 | 100.0% |
| 638-000 · Chainsaw Parts | 18,915.02 | 72,013.75 | -53,098.73 | -73.73% |
| 639-000 · Chainsaws | 50,462.03 | 860.92 | 49,601.11 | 5,761.41% |
| 639-001 · Chainsaw Repairs | 5,744.27 | 79,742.80 | -73,998.53 | -92.8% |
| 641-000 · Safety Supplies | 106,203.96 | 419,965.46 | -313,761.50 | -74.71% |
| 642-000 · Vehicle Lease | 410,673.52 | 295,932.11 | 114,741.41 | 38.77% |
| 643-000 · Per Diem Expenses | 395,012.48 | 432,927.50 | -37,915.02 | -8.76% |
| 644-000 · Office Supplies | 22,084.02 | 33,059.36 | -10,975.34 | -33.2% |
| 646-000 · Claim settlements | 38,239.80 | 0.00 | 38,239.80 | 100.0% |
| Total Expense | 24,481,630.15 | 28,816,000.98 | -4,334,370.83 | -15.04% |
| Net Ordinary Income | -4,480,292.33 | -2,776,462.20 | -1,703,830.13 | -61.37% |
| Other Income/Expense | | | | |
| Other Income | | | | |
| 802-000 · Gain/Loss on Disposal of Assets | 0.00 | 37,042.29 | -37,042.29 | -100.0% |
| 803-000 · Miscellaneous income | 0.16 | 15.17 | -15.01 | -98.95% |
| Total Other Income | 0.16 | 37,057.46 | -37,057.30 | -100.0% |
| Other Expense | | | | |
| 804-000 · Micellaneous Expense | 0.00 | -583.00 | 583.00 | 100.0% |
| Total Other Expense | 0.00 | -583.00 | 583.00 | 100.0% |
| Net Other Income | 0.16 | 37,640.46 | -37,640.30 | -100.0% |
| Net Income | -4,480,292.17 | -2,738,821.74 | -1,741,470.43 | -63.59% |

**WIP - APRIL 2018**

Plaintiff Jordan's PODs 000251

9:18 AM
05/09/18
Accrual Basis

### The Original Mowbray's Tree Service, Inc.
### Profit & Loss Prev Year Comparison
#### January through April 2018

| | Jan - Apr 18 | Jan - Apr 17 | $ Change | % Change |
|---|---|---|---|---|
| DAVEY TREE SURGERY COMPANY | | | | |
| PACIFIC GAS & ELECTRIC INC. | 14,344.61 | | | |
| PACIFICORP | 129,880.05 | | | |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | 99,558.39 | | | |
| SOUTHERN CALIFORNIA EDISON | 493,257.84 | | | |
| SOUTHERN CALIFORNIA EDISON DRI | 300,341.77 | | | |
| TOTAL WIP | 1,037,382.66 | | | |
| | | | | |
| Adjusted Net Income | -3,442,909.51 | | | |

Plaintiff Jordan's PODs 000252

EXHIBIT "9"

**To: All Mowbray's Employee's**

**From: Rick Mowbray**

Well it is now official: Ronnie Jordan will be the new CEO here at Mowbray's. Just a few weeks ago neither of us would have ever imagined this would be the path that he or I would be on, yet here we are. Along with Ronnie and his family, I put a lot of thought into this: how would this affect Mowbray's? Would this be a positive move for our company? In the end the answer was "yes".

As I look back there have been two individuals who have stood out and shaped my business career, who "still today" impact how we run our business. First there's Mike Neal and his Team at APS. Mike taught me the true meaning of being safe; that it has to be the most important thing we do here at Mowbray's. That being safe is not just part of our job but it's the "culture of our company that can never be compromised". "Thank you Mike for making this such an important part of our company's philosophy".

Second is Ronnie Jordan. The first thing I remember about Ronnie was that here's this small statured man with big round eyes, grinning from ear to ear, telling me he has the SCE bark beetle contract for all of California. I just laughed at him thinking there was no way he could take on such a task, that he had no idea how to work on trees around power-lines. So with this in mind I didn't want our company working with or for Ronnie. But just about every day he would ask if I would consider working for him. I would always say "no" even to the point that one day I asked him "what don't you understand about the word no"? This went on for weeks until, reluctantly, I was forced, *yes forced*, to say "yes".

Shortly after that he started asking me if I could do more like "add crews and equipment," but he would add that we "had to be safe while doing it". Believe it or not, way back then, I didn't think I could take on what he was asking, *yet look at what we do today*. But Ronnie continued to move forward even though I didn't agree with his pace. I thought "this can't be done", until one day I thought "oh shit, he's going to cut my company right out of a job"! And though I didn't agree with him, I watched as his company continued to grow. At that time Phillips and Jordan mostly worked in other states, but because he was always working and moving forward, I knew that we also had to grow. So even though I was reluctant at first, we grew from 100 to over a 1000 employee's in just 6 months. After that we were not only one of Ronnie's best subcontractors, but for three years straight we cut down more trees faster than anyone and we did this without one recordable injury.

Now I still didn't think him or his company from "somewhere back east" (lol) would make it, but that was 15 years ago! Ronnie Jordan, who made it all happen here for his family's company Phillips and Jordan, is still trimming and removing trees around power lines here in California and now across the United States. After that Phillips and Jordan continued to grow to the point where they've become one of the largest companies in the country who now contract with FEMA for disaster work such as Hurricane relief, Tornadoes, ice storms, flooding and, if I recall correctly, had up to 40,000 union employees working for them in the recovery of those who lost their lives in the 911 twin towers tragedy.

EXHIBIT
MOWBRAY
5/30/23
**6**

In recalling those early days working with Ronnie, and Mike Bartelli will back me up on this, we made millions and millions which allowed our company to grow. But I did not do this by myself. In fact I had the help of hundred's, one of which was Jose Ramirez who I put in charge of the entire operation. This included all of the work and most importantly, the safety of the men. Jose did an outstanding job and I could not have done it without him. Ironically Jose ended up working for Ronnie during the years I was in prison.

During those early years Ronnie encouraged me to do some of the hurricane relief work in Florida. I was reluctant at first but finally he talked me into it. I drove out to Daytona, parked at the raceway and met up with one of the other contractors, ULM tree service, who had become millionaires because of Ronnie. Ronnie set me up with Billy, the owner of the company, who directed me to where the work was. For days I kept calling Ronnie and his younger brother Randy to tell them there was no brush where we were. Thinking I was bullshitting, Randy came out to see me. Sure enough Billy had put me where there was nothing to be taken, nothing to do. I remember Randy laughing and saying "yeah they're afraid of you; you're a threat to them!" So Randy took me to where the work was and gave me my own area; YES I made lots money! So all along Ronnie has encouraged me and helped me do things I thought I couldn't. He has praised me and let me know when I've done a good job but, most importantly, he helped me make Mowbray's a force to be reckoned with. I will always be grateful for that.

So back to him coming on board: When I first heard that Ronnie was interested in working for us I really didn't think much about it as it was something that I could never have imagined; "Ronnie Jordan working for Mowbray's"? But after talking with one of our subcontractors about it I contacted Ronnie, which is when this all began. Because of our past experiences, I've come to like and respect this man. He has always been very approachable and, once you got to know him, he was hard not to like. Being in contact with him again reminded me how important a part he has played in my life. He was successful when I met him yet he took the time to help me strengthen my confidence so that we as a company would be more successful. He taught me that "there is nothing we can't do if we truly believe in ourselves".

So that being said, please welcome Ronnie, his wife Phyllis, and their entire family as they join our family. Like me, I know you will soon see that we could not have a better man than Ronnie Jordan to take the reins of our company and help us unleash the potential this company holds.

"Ronnie and Phyllis, on behalf of my family and the entire Mowbray Company, I want to thank you for accepting our offer to join our company. Plus we want to thank you for the sacrifice your family is making knowing that this decision is delaying your move to Florida to be with your grandson.

Going forward Ronnie now has the responsibility of being the President and CEO of Mowbray's. This position gives him the authority to make decisions regarding the day to day operation of Mowbray's and, along with the support of our executive team, direct our company to an exciting future. Know that we as a company will support you and are excited about our future with you at the helm.
I believe we are a company of great potential; a potential that you will allow us to achieve.

Rick

EXHIBIT "10"

5/30/23, 8:23 AM                    Mowbray's Tree Service, is proud... - Mowbray's Tree Service | Facebook

Sign Up

Email or phone          Password

English (US) · Español ·
Português (Brasil) · Français (France) ·
Deutsch

Privacy · Terms · Advertising · Ad Choices ·
Cookies · More
Meta © 2023

**Mowbray's Tree Service**
July 17, 2018

Mowbray's Tree Service, is proud & very pleased to announce, Ronnie Jordan, as Mowbray's CEO, and Shot Caller!           All Day Everyday!

Ronnie Jordan, along with his wife Phyllis, have many years of business experience.

Not only in disaster recovery all over the United States, ( Ronnie was the VP/ project manager & VP/ Business Development at Philips & Jordan for over 20 years one of largest disaster recovery companies in the United States) but also extensive experience in utility transmission and distribution vegetation management, coast to coast.

At Mowbray's Safety is the most important part of our job.

And as Ronnie Jordan, quotes

"There is no Greater Investment, that is also unreplaceable,

Then the men and women who work so hard here at Mowbray's."

"Our commitment to safety is always our highest priority"

Welcome Mr. & Mrs. Jordan!!

We have been waiting for you both a long time!

You are in charge of an Army now Sir! That will follow you wherever you lead us.

Mowbray's

SAFETY / QUALITY / & / RELIABILITY



119                                                      8 comments

Share

**See more of Mowbray's Tree Service on Facebook**

Log In          or          Create new account

https://www.facebook.com/219700094718522/posts/mowbrays-tree-service-is-proud-very-pleased-to-announce-ronnie-jordan-as-mowbray/203798713…   1/1

Plaintiff Jordan's PODs 001387

EXHIBIT "11"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO


RONNIE D. JORDAN, an            )
individual,                     )
                                )
        Plaintiff,              )
                                )   Case No.:
vs.                            )    CIVSB2201281
                                )
THE ORIGINAL MOWBRAY'S TREE    )
SERVICE, INCORPORATED, a        )
California corporation;         )
MOWBRAY WATERMAN PROPERTY,      )
LLC, a California limited       )
liability company; RICHARD      )
JOHN MOWBRAY, an individual;    )
ROBIN MOWBRAY, an individual;   )
and DOES 1 through 50,          )
inclusive,                      )
                                )
        Defendants.             )
_____)


VIDEOCONFERENCE DEPOSITION OF RICHARD EDWARD MOWBRAY

October 2, 2023

12:59 p.m.


Reported by:
LISA T. OWEN
CSR 4475
Job No.:  450439

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                Page 2
Richard Edward Mowbray, 10/02/2023

1    APPEARANCES:

2

3        For Plaintiff:

4            CATANZARITE LAW CORPORATION
             BY:  KENNETH J. CATANZARITE, ESQ.
5            2331 West Lincoln Avenue
             Anaheim, California  92801
6            714.520.5544
             kcatanzarite@catanzarite.com
7            (Via videoconference.)

8

9        For Defendants:

10           CKB VIENNA, LLP
             BY:  MIN STEPHEN CHO, ESQ.
11           9531 Pittsburgh Avenue
             Rancho Cucamonga, California  91730
12           909.980.1040
             scho@ckbvienna.com
13           (Via videoconference.)

14

15       Also Present:

16           DENISE MOWBRAY
             RONNIE JORDAN
17           (Via videoconference.)

18

19

20

21

22

23

24

25

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE            Page 3
Richard Edward Mowbray, 10/02/2023

1              INDEX TO EXAMINATION

2

3           WITNESS:  RICHARD EDWARD MOWBRAY

4     EXAMINATION                        PAGE

5     By Mr. Catanzarite                 6, 62

6     By Mr. Cho                         58

7

8

9

10

11           INFORMATION REQUESTED:

12                (None)

13

14

15

16           WITNESS INSTRUCTED NOT TO ANSWER:

17                (None)

18

19

20

21

22

23

24

25

1              INDEX TO EXHIBITS

2              RICHARD EDWARD MOWBRAY

3        Jordan vs. The Original Mowbray's Tree Service
                 Incorporated, et al.
4
                Monday, October 2, 2023
5
              Lisa T. Owen, CSR 4475
6

7

8

9

10
    PLAINTIFF'S          DESCRIPTION              PAGE
11
    Exhibit 2-    2017-2018 Profit and Loss;         30
12              6 pages

13   Exhibit 4-    May 28, 2018 typewritten document;    30
                1 page
14
    Exhibit 34-   Letter dated June 3, 2017 to        37
15              Michael Neal from Dwight
                Anderson; 2 pages
16
    Exhibit 40-   Monthly Payment Summary; 1 page     39
17
    Exhibit 47-   Transcript of Remote Sworn Statement  11
18              of Richard Mowbray; 48 pages

19

20

21

22

23

24

25

1          MONDAY, OCTOBER 2, 2023; 12:59 P.M.

2                    *    *    *

3

4          THE REPORTER:  Good afternoon.  My name is Lisa

5    Owen.  I am a certified shorthand reporter in the state

6    of California.  My license number is 4475.  Today's date

7    is Monday, October 2nd, 2023.  And the time is

8    12:59 p.m.

9          Before we proceed, I will ask counsel to agree

10   on the record that there is no objection to this

11   deposition officer administering a binding oath to a

12   witness not appearing personally before me.

13          Mr. Catanzarite, do you agree?

14          MR. CATANZARITE:  I agree.

15          THE REPORTER:  Mr. Cho, do you agree?

16          MR. CHO:  Agree.

17          THE REPORTER:  I will now administer the oath

18   to the witness.

19

20              RICHARD EDWARD MOWBRAY,

21            having been first duly sworn, was

22            examined and testified as follows:

23   //

24   //

25   //

1                          EXAMINATION

2    BY MR. CATANZARITE:

3      Q  Good afternoon, Mr. Mowbray.  How are you?

4      A  Good.

5         How are you doing, sir?

6      Q  I'm doing really fine.  Thank you very much.

7         I understand you're able to walk around; you're

8    back with us, so to speak?

9      A  Yeah, better than ever.  My leg is actually

10   better than it was before.

11     Q  Did they make you taller while they were at it?

12     A  No.  I'm pretty tall enough, I think, at least

13   in my mind.

14     Q  Okay.  Mr. Mowbray, the oath you took is the

15   same as you'll take at the time of trial.

16        Do you understand that?

17     A  I understand that.

18     Q  And I'm entitled to your best recollection of

19   events, some dating back to 2018 and earlier, today.

20        Do you understand that?

21     A  I understand that.

22     Q  Are you on any drugs or medication that would

23   affect your ability to recall?

24     A  No, sir.

25     Q  All right.  And is anyone in the room with

1  you?

2    A   My wife is in here, Denise Mowbray.

3      MR. CATANZARITE:  Hello, Denise Mowbray.

4      How are you?

5      MS. MOWBRAY:  Good.  How are you?

6      THE WITNESS:  Can you hear her?

7      MR. CATANZARITE:  I can.  Thank you.

8    Q   And we're going to be chatting with her

9  tomorrow --

10    A   Yeah.

11    Q   -- so that's just fine by me.

12      Okay.  So I'd only ask that you not pass any

13  love notes or anything else during the course of the

14  deposition.

15    A   We've been together for so long, we done did

16  all of that.

17    Q   All right.  And, Mr. Mowbray, you and I met

18  once before on -- a couple of times before.  But we met

19  once on March 1st, 2022 via Zoom; correct?

20    A   Yeah, we did.

21    Q   Okay.  Now, before we get into that, what did

22  you do to prepare for your deposition here today?

23    A   Nothing.

24    Q   Okay.  Did you meet with any lawyer or anyone?

25    A   I spoke to Stephen for a couple minutes, but

1  just to tell me what time to be here so I wouldn't be

2  late.

3     Q  Are you testifying from your house?

4     A  Yes, I am.

5     Q  All right.  Now, who is -- is a lawyer

6  representing you here today?

7     A  Mr. Cho I think is, Stephen Cho.

8       MR. CHO:  I am representing him.

9       MR. CATANZARITE:  Thank you for that.

10     Q  Okay.  So I don't want to know anything that

11  you've discussed with Mr. Cho.  But did you review any

12  documents in preparation for your deposition here

13  today?

14     A  No, sir.  I have not.

15     Q  Okay.  And how are you presently employed?

16     A  Self-employed.

17     Q  When you say self-employed, is there a company,

18  a license or something?

19     A  Yes, sir.  I do some freelance tree trimming,

20  for hire, I guess, is what I'd say.  So --

21     Q  Do you have any employees?

22     A  No.  I'm the only one.

23     Q  Okay.  And at the time of your accident, who

24  were you employed by?

25     A  By myself.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                 Page 9
Richard Edward Mowbray, 10/02/2023

1    Q   Okay.  All right.  And did you have any

2   employees at the time of the accident?

3    A   No.  It wasn't job related.  I was at a

4   friend's house.

5    Q   Oh, okay.  I understood you were climbing a

6   tree and you --

7    A   I was coming off a ladder.

8    Q   Off a ladder.  All right.

9    A   Yeah.

10    Q   How far -- how high up were you when you fell?

11    A   Oh, sir, I wasn't that high up.  When you break

12   your leg, it doesn't matter how high.  I just -- you

13   know what I'm saying?  I couldn't have been more than

14   6 foot.  It's a shame.  I was just coming -- I was a

15   couple steps from the ground.

16    Q   Wow.  Okay.

17         And you're all recovered now?

18    A   Yeah.  I think my leg is -- like I said, I

19   think this leg is better than my -- the one that's broke

20   is better than the other one.

21    Q   Okay.  All right.  When was the last time you

22   were employed by Mowbray's Tree Service?

23         And for purposes of this record, we'll describe

24   that company as MTS.

25    A   It's been a few years.

 1        MS. DENISE MOWBRAY:  2020.

 2        THE WITNESS:  2020.

 3   BY MR. CATANZARITE:

 4     Q   Okay.  And how did you leave -- come to leave

 5   Mowbray's Tree Service?

 6     A   They decided to let me go on -- for their own

 7   reasons.  And I think they were moving forward, and we

 8   parted ways.

 9     Q   Okay.  Was the parting amicable?

10     A   I don't think so.  I think I was not agreeable.

11   But I wasn't -- I'm not the owner.

12     Q   Okay.  And were you paid any compensation upon

13   separation?

14     A   I -- I wasn't, sir.  You know what I'm saying?

15   It's been a family business.  No, I wasn't.

16     Q   Okay.  Are you receiving any compensation at

17   all from the family business?

18     A   No.  No.

19     Q   The house you live in, who owns that house?

20     A   It's in a trust.

21     Q   Okay.  A family trust of your mom and dad?

22     A   Yes, sir.

23     Q   And your mom and dad, I mean, Gloria and your

24   father; correct?

25     A   Yes, John Mowbray.

1    Q   Okay.  All right.  And under the trust, are you

2   permitted to live there for as long as you want?

3    A   I really don't know.

4    Q   Okay.

5    A   I hope so.  Then I'll have a problem.

6    Q   Okay.  Well, I don't mean to laugh about that.

7   I'm sure you can live there as long as you want.

8        Okay.  So I am going to show you a document.

9   It's marked as Exhibit 47.

10        (Plaintiff's Exhibit 47 was marked for

11        identification.)

12   BY MR. CATANZARITE:

13    Q   I'm going to put it up on the screen for you.

14        Are you able to see that document -- the first

15   page of that document?

16    A   Yes, I see that.

17    Q   All right.  Is it clear to you?  I mean, are

18   you able to see the whole page?

19    A   Yeah.  Yeah.  Ronnie Jordan is the individual,

20   the Original Mowbray's Tree Service, Incorporated; John

21   Mowbray, an individual; Robin Mowbray, an individual, so

22   on, so on.

23    Q   Okay.

24    A   Down at the bottom, Lourdes Perez, something,

25   and -- yes.

1    Q   Right.  She was the shorthand court reporter

2   who took your sworn statement on May (sic) 1st, 2022.

3   And I'm going to go through that statement.

4        First of all, I'm going to ask you, do you

5   recall giving this statement?

6    A   Yeah, I do.  I went to Ronnie's house looking

7   for employment -- well, for some jobs.  And then he

8   wanted to do this deposition, I do recall, at his house.

9    Q   So you were at Ronnie's house on that day?

10    A   Yes.

11    Q   Okay.  Now, tell me on the day -- on that day,

12   March 1st, 2022, do you recall the substance of what you

13   said on that day?

14    A   We'll have to go over that, I think, sir.

15    Q   Okay.

16    A   Again, I wasn't prepared for that.  I went

17   there looking for work.  And he basically -- he set this

18   up with you while I was at the house.  So -- but we can

19   go over all of it.

20    Q   Okay.  So let's look at what we'll describe as

21   the first -- the Index of Examination; there's two

22   exhibits referenced; a set of handwritten notes is

23   Exhibit 1; and a typewritten document dated May 28,

24   2018.

25        Do you see that?

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 13
Richard Edward Mowbray, 10/02/2023

1      A  Yes, sir, I see that.

2      Q  Now, did you receive a copy of this sworn

3  statement from the court reporting service?

4      A  I never did.  I never received anything, sir.

5      Q  Okay.  All right.  Now, this is the deposition

6  of Richard Mowbray, March 1, 2022.

7          What I'd like to do is -- today that is page 4

8  of Exhibit 47.

9      A  Okay.

10      Q  And 47 will be part of this transcript.  And

11  I'd like you to read to yourself all of page 4.  Then

12  when you're done, let me know.

13      A  Do you want me to read it out loud or to just

14  myself, you said; right?

15      Q  Just to yourself.

16      A  Okay.

17          Yes, sir.  I understand that.  You just asked

18  me that before we got going here.  So, basically, the

19  same.

20      Q  All right.  Is everything on that page true and

21  correct?

22      A  Yeah.  You're just asking me if I'm -- yeah.

23  Yes.

24      Q  Okay.  Then we go to page 5.

25          And, again, I'd like you to read page 5 to

1   yourself.  Then when you're done, let me know.

2       A   Yeah.  I read that, sir.  I understand that.

3       Q   Is everything on there true and correct?

4       A   Yeah.  Yeah.  Yeah.

5       Q   Now, all right.  Let's go to page 6.  Please

6   read page 6 to yourself.

7       A   Yeah, I read that.

8       Q   Is everything --

9       A   Yeah.  I mean, it's -- you know, it's hard to

10  read that little print.  But, yeah, I got it.

11      Q   Okay.  Is everything -- everything true and

12  correct, Mr. Mowbray?

13      A   Yes, sir, I think it is.

14      Q   Okay.  And page 7, would you read page 7 to

15  yourself?

16      A   Yeah.  It looks like I did a little disagreeing

17  right there with Ronnie on where Mowbray's actually was

18  in numbers.  But I read that -- or I read it.

19      Q   At the time you made those statements, did you

20  understand them to be true and correct?

21      A   You know, Ken, you know, I've read more here

22  than I probably read -- you know, we sat down awful

23  quickly there.  And I wasn't really prepared.  So, you

24  know, I can't tell you if his numbers are right or mine

25  are right.  It looks like I went on ahead and went with

1   his higher number here, it says.

2       Q   Okay.

3       A   But it shows there vaguely, I didn't know.  I

4   definitely wasn't sure.  So --

5       Q   All right.

6       A   I'm going to leave it at that.  I wasn't

7   sure.

8       Q   We'll come back to that.  Let's read Exhibit

9   (sic) 8.

10      A   Yeah.  We -- I looked for Ronnie.  He had just

11  lost his job with -- I forget the name of the company.

12  He was actually heading home and going to retire.  So

13  that's why I reached out to him.

14      Q   Okay.  When you say heading home, where was he

15  located when you reached out to him?

16      A   It was my understanding he had a place in

17  Florida.  And he had just relocated from there -- I

18  don't know.  He was let go from a company.  I know we

19  both know -- MLU, I think it was.  But, anyways, and he

20  was actually not working at the time.  And that's why I

21  went out and asked him if he wanted to do something here

22  at Mowbray's.

23      Q   Did you --

24      A   What's that, sir?

25      Q   No.  I'm sorry.  Finish your answer, sir.

1     A  My understanding -- and I'm positive he was in

2  Florida at the time.  He had just been released from a

3  company.  And he had went back there.  If I recall, he

4  had -- his grandchild was back there.  And that's where

5  they lived.

6     Q  Okay.  Thank you.  Let's look at page 9,

7  please.

8     A  Yeah.  Yeah, here we go.  It says right there.

9     Q  Okay.  Is everything on that page true and

10  correct?

11     A  Yeah.  I think that's true and correct.

12     Q  Okay.  Let's go to page 10.

13     A  "I was already doing the work for another

14  contractor, Aslan," I think he meant Asplundh there,

15  but -- yeah.

16     Q  I can roll back so you can see the question and

17  answer.

18     A  No, it's okay.  You can roll forward there,

19  sir.

20     Q  Yeah.  I simply want to know on this page 10 --

21     A  Yeah.

22     Q  -- is everything true and correct?

23     A  Yeah.  Yeah.

24     Q  Let's go to page 11.

25     A  Yeah.  That looks correct, sir.

1    Q   Okay.  And let's see.  Then there's this

2   question that begins on 11, line 23, and continues to

3   page 12, line 2; is that correct?  Meetings were at the

4   office?

5    A   Ken, I'm looking, I think -- am I on page 8, or

6   am I on page 15 here?  It looks like I'm on -- what page

7   are we on?  Oh, page 12.  We're on page 12; right?

8    Q   Yeah.  I was showing you --

9    A   Okay.

10    Q   -- to orient you, page 11 begins at 23 and

11   continues --

12    A   Okay.

13    Q   -- the question continues to page 12 --

14    A   Okay.

15    Q   -- line 3.  I just wanted to confirm

16   the meetings were -- the meeting between you, Ronnie and

17   Phyllis Jordan in your office sort of at the end of

18   these, and you say "Yes"; is that correct?

19    A   Yes.  Yes.  Okay.  Yes.  Got you.

20    Q   So now let's move on to 12.  And you're saying

21   at 12, lines 3 to 7, that your wife was there too;

22   that's Denise.  The four of you were together;

23   correct?

24    A   Yeah, she was there.  I mean, she wasn't

25   involved in the meeting, but my wife was there.

1    Q   Uh-huh.  All right.

2        It says at page 12, lines 8 through 14, you

3    were sitting around a desk, and you talk about a

4    conversation.

5        Was that correct, the four of you --

6    A   Yeah.

7    Q   -- were there together?

8    A   Yeah.  We were there, yeah.

9    Q   Okay.

10   A   Now you're on page 13; right?

11   Q   Yeah.

12       Well, let's begin at page 12, line 20,

13   continuing on to page 13, line 3.  It says:

14       "Let me just do that, but you have it in

15   front of you.  I'm going to do it for the

16   benefit of Lourdes," who was the court reporter.

17       "Are you able to see the screen now,

18   Mr. Mowbray?"

19       You say, "Yes, sir."

20       And I marked it as Exhibit -- I call it Exhibit

21   A, but it's marked as Exhibit 1.  And I'm going to show

22   you that document.

23   A   Okay.

24   Q   Do you recall seeing that document at your

25   deposition or sworn statement?

1    A  I can remember seeing it, but I don't remember

2  reading that.  I think you showed -- you know, like I

3  said, I had a problem seeing on the screen there, too,

4  you know.

5    Q  Okay.  So let's go back now to page 13.

6    A  Yes, sir.

7    Q  And I say, "So you" -- first of all, let's get

8  on 13.  Have you read -- read 13 to yourself, please.

9      Is everything on that page correct -- true and

10  correct?

11    A  Yeah.

12    Q  Okay.

13    A  I guess that's right.

14    Q  So I'm going to go to -- I'm going to continue

15  this, 13, line 17 to 14, line 3.  You say, beginning at

16  line 22:

17      "And I was able to -- you know, when

18    she wrote it, she would -- invited me that

19    this is, you know -- it was very close.  You

20    know, the letter was written right in --

21    very close.  We were -- I watched her write

22    it."

23    A  I don't remember saying all of that.  But I

24  remember Phyllis was probably writing something down.  I

25  did not see what she was writing.  But it was just a

1   meeting, Ken.  We just sat down after dinner.  And we

2   were discussing about the future.  That's what I recall.

3      Q   Okay.  Well, back in 2022, you recalled that

4   you were able to see Phyllis writing; you were sitting

5   around a desk with her; correct?

6      A   I don't recall.  I mean, yeah, I guess, you

7   know.  I mean, I can't tell you --

8      Q   And then, Mr. Mowbray --

9      A   Back in '22?  Back in '22?  This is back in --

10     Q   This is back -- well, this is --

11     A   Back in '22, I mean, I wasn't working at

12  Mowbray's then.

13     Q   Okay.  Rick, let's make it easier for Lisa.

14  Let me complete my question.  I'll let you complete your

15  answer --

16     A   Okay.

17     Q   -- okay?

18        All right.  So on this day back in March of

19  2022, your best recollection of events back in 2018 was

20  that you were sitting around a desk with Ronnie and

21  Phyllis, and you could see Phyllis writing.

22        That was your recollection in March of 2022.

23  Correct?

24     A   Yeah.  Yeah.

25     Q   And the exhibit that we marked on that day was

1  an exhibit -- this was the Exhibit 1 that was referred

2  to in that question and answer we had on pages 12 and

3  13.

4         Do you recall that?

5      A   I don't recall this letter -- these letters

6  right here.  But I can recall her writing some notes.

7  Okay?

8      Q   Okay.

9      A   That's what I recollect.

10     Q   Okay.  Now, if we go on to page 14, please read

11  14 to yourself, please.

12     A   Yeah.  I recollect -- I recall some of this

13  conversation here.  Yeah.

14     Q   Okay.  Is it true and -- are your answers true

15  and correct?

16     A   I think, yes.

17     Q   Okay.  So then beginning on page 14 -- well,

18  read page 15 to yourself, and then I have some

19  questions.

20     A   I agreed with this, yeah.  The 10 percent here

21  is vague.  But as far as what we agreed on was not the

22  profits of Mowbray's; it was the profits of what he

23  brought in, any work that he brought in.  Mowbray's was

24  already established when he got there.  We agreed on the

25  cars.  We agreed on hiring Phyllis.  We told him we'd

1  give them a house to live in.

2      Yeah, we talked about a lot of things, Ken, off

3  and on.  We provided for them well.

4      Q   Let's look at the handwritten sheet.  You see

5  on this handwritten sheet, Exhibit 1, which was attached

6  to the deposition on that day -- to your sworn statement

7  on that day, it says 10 percent of profit; right?

8      A   It says that, but I didn't -- I didn't write

9  that.  That's not what -- 10 percent of what?  Of what

10  profit?

11     Q   10 percent of the profits on PG & E, SCE --

12     A   We never --

13     Q   -- and SMD.

14     A   We never discussed that like that.  I mean, we

15  discussed about a 10 percent profit, but it was -- I

16  mean, it was on any work that he would bring in.  I

17  never read this right here.

18     Q   Okay.

19     A   I think you showed me this on the screen when

20  we had the depo; right?

21     Q   Yes, I did.  It is marked as Exhibit 1.

22     A   I just didn't -- I didn't read that.  I

23  apologize.  I didn't read that.

24     Q   Okay.  You said in your deposition -- in your

25  sworn statement, you said that you watched Phyllis

1  read (sic).  So let me go back through -- I'm going to

2  begin on page --

3     A   Okay.

4     Q   -- 14, line 24.  The question I asked you on

5  that day was as follows:

6        "Okay.  Let me summarize.

7        "So the offer -- the agreement, rather,

8     that -- you offered the terms and Ronnie

9     accepted the terms in that meeting; is that

10     correct?

11        "A  Yes, he did."

12        Is that correct?  That's correct testimony?

13     A   Yeah.  Yeah.

14     Q   All right.  Page 15, line 4:

15        "The terms were $250,000 salary for Ronnie.

16        "Was that correct so far?"

17     A   Yes.

18     Q   Yeah.  You agree with that; right?

19     A   Yes, sir.  I agree with that, yes.

20     Q   And line 7:

21        "$55,000 salary for Phyllis; correct?

22        "A  Yep."

23     A   It was around -- yes, sir, I agree with that.

24     Q   Now, at line 9:

25        "Ten percent of the profits of Mowbray's;

1    correct?"

2    A  No.

3    Q  "Answer:  Yes."

4    A  Well, no, I disagree with that.  We never --

5    Q  Wait a minute.  Wait a minute.

6    A  We never agreed on 10 percent of what Mowbray's

7  had or anything like that.

8    Q  Okay.

9    A  No.

10    Q  You're going to get your chance to explain

11  that.  But let me just ask you, at page 9 -- at page 15,

12  line 9, I asked you a question:

13       "Ten percent of the profits of Mowbray's;

14    correct?"

15       Line 11, the answer is, "Yes."

16       That's what is on the page; right?

17    A  It says, "Yes."  Yeah.

18    Q  Okay.  All right.  You said, "Yes."

19       Now, then I said -- on page 15, line 12:

20       "Two cars, one for Phyllis and one for

21    Ronnie, replace every two years; correct?"

22    A  Yes.

23    Q  Line 14:

24       "Answer:  Yes, sir."

25       Page 15, "And you were also going to

1    provide housing for them; correct?"

2        17: "Answer:  Yes."

3    A  Yes.

4    Q  18: "And Mowbray's would provide the housing?"

5        Line 19: "Answer:  Yes, sir."

6        That's correct; right?  What I'm reading is

7    correct?

8    A  Yes, I -- yeah.

9    Q  That's what you testified to on that day,

10   March 1, 2022; correct?

11    A  Yes.

12    Q  Okay.  Is your recollection better today, or

13   was it better in March of 2022?

14    A  Well, Ken, you guys cornered me on this deal

15   here, you know.  So I came there to go look for work.

16   Hell, I was raking leaves in Ronnie's yard there, and

17   all of a sudden he wanted to set this up with you guys.

18   I don't -- you know what I'm saying?  I mean --

19    Q  Are you suggesting or arguing that we tricked

20   you or deceived you?

21    A  I wasn't prepared for this.  Definitely, I was

22   not prepared.  We never -- I wasn't -- I felt -- yeah, I

23   felt a little forced into this.  But I'm not saying you

24   told me to say anything.

25    Q  Okay.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 26
Richard Edward Mowbray, 10/02/2023

1        A   I'm not saying that at all, sir.  Not at all.

2        Q   Okay.  In other words, what I'm asking you is,

3    you were asked a question, and you gave an answer, and

4    no one told you to give any particular answer; is that

5    correct?

6        A   Not by you, that's for sure.  But there was a

7    discussion before I got on there with you with Ronnie.

8    So let's just leave it at -- you know, there's a lot

9    more to this, I think, than what we're discussing

10   here.

11       Q   But at the time we asked you the question -- or

12   I asked you the question, you gave the answer, you had

13   every opportunity to answer in whatever way you wanted;

14   correct?

15       A   You know, yeah, I guess.  Yeah.

16       Q   All right.

17       A   There's some things here that definitely

18   were -- were vague.  Again, I hadn't worked for

19   Mowbray's -- when I went to Ronnie, hell, I had been out

20   for two years.  And I didn't even know half the stuff

21   that was going on there.

22            Anyways, most of this looks like right, Ken.  I

23   can't argue with -- you know, we told him -- I mean, we

24   provided him -- as far as the industry standards, he was

25   above, well taken care of, I mean.

1    Q   Okay.

2    A   And as far as that goes, my mother was the

3  owner of this company.  I want to make sure -- we never

4  mentioned her, you know.  But, you know, everything I

5  did went through her.  She has -- always had the final

6  say.  So I want to make sure that's very clear here,

7  too.  Nobody asked me that.  I don't see a question on

8  there.

9       I remember this.  This is Florida.  You're

10  showing me, I think, sir -- what number page is this

11  one?

12    Q   Page 16.

13    A   Okay.  16.

14    Q   Okay.  You can read page --

15    A   He said he had to take care of his business in

16  Florida.  We did move him out here.  We provided greatly

17  for him.  I want you to know that.  Best job he ever

18  had, he told you that.

19       "You on behalf of Mowbray's are making this" --

20  and anything we discussed, you know, had to go through

21  my mother.  My mother is the one who owned this company.

22  And he knows that.

23    Q   Well, let's read into the record your answer

24  at -- do you see the question on page 16, beginning at

25  line 21?

1    A   Okay.

2    Q   "You on behalf of Mowbray's are making

3    this agreement with Ronnie, who on behalf

4    of Ronnie and Phyllis is accepting the

5    agreement; right?"

6    A   Yes, sir.

7    Q   Line 24:  "Yes, sir."

8    A   Yeah, but that still had to go through --

9    Ronnie knows this, too.  Everything went through my

10   mother.  My mother owned that company.

11   Q   You didn't say that, though, here, did you?

12   A   You didn't ask me that.

13   Q   But you didn't say it.  In fact, nowhere in

14   these 22 pages is there a mention that -- that --

15   A   Ken, Ronnie knows that my mother owned the

16   company.  I mean, that's -- Ronnie knows my mother made

17   the decisions.  I mean, I brought those decisions to

18   her, but she never agreed on giving him 10 percent.

19   Q   Mr. Mowbray, in May of 2018 when you were

20   meeting with Ronnie, the conversation you had was

21   between you and he; correct?

22   A   Yes.  But that's because my mother wasn't

23   there.  But she was very much well aware of the

24   conversation.

25   Q   Was she asked -- you know -- you didn't need --

1   you were spending hundreds of thousands of dollars; you

2   didn't need to talk to your mother about anything, did

3   you, back in May of --

4        MR. CHO:  Objection.

5   BY MR. CATANZARITE:

6    Q   -- 2018?

7        MR. CHO:  Objection.  Lacks foundation.

8        Go ahead and answer.

9        THE WITNESS:  I did have to speak to her.  She

10   would definitely need to know.

11   BY MR. CATANZARITE:

12    Q   We'll come back to that.

13        On page 17 --

14    A   Yes, sir.

15    Q   -- I'd like you to read that to yourself.

16        Is everything there true and correct?

17    A   I think everything is there, yeah.  I think

18   Ronnie was at that time -- I don't know what he was

19   doing after that time.  But, yeah, you're asking me at

20   the time I left -- okay.  It does say right here, was he

21   performing his job?  Yeah, I'd say he was performing his

22   job.  We didn't agree on some things, but --

23    Q   Okay.

24    A   He gave a few million dollars away of ours and

25   I didn't -- I'd say to this day it still wasn't right.

1    But, anyways, that's another story.  So this is page 18?

2        Q   Yes, page 18.

3        A   Okay.  Ken --

4        Q   One second.  Let me first get with Exhibit 2.

5            (Plaintiff's Exhibit 2 was marked for

6            identification.)

7            THE WITNESS:  You're going to put that up, Ken?

8    BY MR. CATANZARITE:

9        Q   One second.  Yeah, let me get that document.

10           Do you see Exhibit 2?

11       A   Yeah.  I see it on the screen here, sir.

12       Q   Okay.  Now, it's marked in this transcript as

13   Exhibit 4.  So I'll identify it as Exhibit 4.

14           (Plaintiff's Exhibit 4 was marked for

15           identification.)

16           THE WITNESS:  Okay.

17   BY MR. CATANZARITE:

18       Q   May 28, 2018.

19       A   You showed me this when we -- when I talked to

20   you that day?

21       Q   Yes.

22       A   Okay.  I know I didn't read it because I can

23   hardly read that right now.  But -- you said his son

24   wrote this, right, or I said that or --

25       Q   Yeah.  We're going to come back to that.

1    A   All right.  Sorry about that.  I'm sorry to --

2    Q   No problem.

3    A   I'm not trying to confuse you.  I'm a

4  little --

5    Q   Okay.  So for Lisa's sake, let's try to keep it

6  a question, pause and an answer.  Okay?

7        Okay.  So I say -- I ask you, page 18, line 2:

8        "Now, this is a one-page document, and

9    it's typed up and it has the date of May 28,

10   2018."

11       That's this document here.  Do you see it?

12   A   Okay.

13   Q   I'll go back to that.

14       "Yes, sir," you say.

15       "Okay."

16       And you answer, quote, "He actually had

17   his son -- I think his son typed this up

18   for us."

19       And then I say, "Very good.

20       "Okay.  Now, do you know, was this just

21   something that someone put on writing but

22   you were all too busy to get it executed?

23   Is that what happened?"

24       And your answer is -- and I'm going to read it

25  into the record, beginning at line 14:

1        "Yeah.  I think with our -- you know,

2    we were -- and I believe that things were

3    foreseen as, maybe, even better than what

4    we had discussed here so it wasn't something

5    that we were putting off.  It was just

6    something that we just hadn't stopped and took

7    the time to do.  I don't think we felt very --

8    we work good together.  We trusted one another.

9    We just hadn't gotten around to doing it."

10    A  I think it's -- I'm sorry.

11    Q  Okay.  That was your answer on that day;

12  correct?

13    A  Yeah.  My answer is even a little bit confusing

14  if you read it again.  Again, we talked about things,

15  but nothing was ever done in writing.

16    Q  Okay.

17    A  And I do recall you showing me that exhibit.

18  But I never read it, sir.  I mean, I never did.

19    Q  Well, this -- but this was talking about that

20  exhibit, meaning, Exhibit 2 in the transcript here, and

21  Exhibit 4 in the other marked documents in the

22  deposition.

23        But that's the document that you received

24  sometime in 2019, isn't it?

25    A  You showed me this, Ken.  And I said yeah.  I

1  never read it.  And I don't recall seeing it.  I know we

2  never signed anything.  I mean, I don't know --

3      Q   Okay.  I'm asking you --

4      A   I never read it.  Ken, I never read it.  You

5  know, I never read the document.  I never --

6      Q   I'm asking you a little bit different question.

7      A   Oh, okay.

8      Q   Do you recall receiving this document sometime

9  in 2019?

10     A   No, I don't recall.  I recall us talking about

11 it.

12     Q   Okay.  All right.  Now, when I asked you on

13 March 1st of 2022 about this document, I'll read you

14 questions 9 through 16 with your response.

15         "Question:  So this -- would it be fair to

16     say this was consistent with the oral

17     agreement that you all had reached back in

18     May 2018?

19         "Answer:  Yeah.  Yes.  We just summarize --

20     yeah.  This was just our formal letter.

21         "Question:  And so the reason it never

22     got executed was just the press of business;

23     is that fair to say?

24         "Answer:  Yes, sir.  I find that fair to

25     say."

1        Okay.  Is that your answer March --

2     A   Yeah.

3     Q   -- 2022; correct?

4     A   That's what you guys recorded.

5     Q   Okay.

6     A   Yes, sir.

7     Q   Okay.  Now, a couple of questions based on your

8   testimony.

9        Back in May of 2018, when you met with Ronnie,

10   you told him you were making the hiring decisions;

11   correct?

12     A   Yeah.  I'm the one who -- I'm the one who went

13   and looked for Ronnie.  Absolutely.

14     Q   Okay.  And when he came to you, you knew he was

15   coming to you from Florida, where he was living at the

16   time; is that correct?

17     A   Yes, sir.

18     Q   Okay.  And you knew that he had to relocate

19   from Florida to California; is that correct?

20     A   Yes.  Yes.

21     Q   And at a time later, do you recall Mowbray's

22   Waterman Properties, LLC buying the Lucas Lane property

23   that Ronnie moved into?

24     A   My -- my sister Robin handled that, yes.

25     Q   Okay.  And was your wife, Denise, involved

1   in -- somewhat in the selection --

2      A   You know, you'd have to ask her, Ken.  But I

3   know that her and Robin were together.  I'm sure -- you

4   know, they hung around.  I mean, they were there every

5   day with each other.

6      Q   Okay.  All right.

7      A   I hope that -- we did buy the house that I

8   didn't live in.  I know that.  So --

9      Q   Okay.

10      A   That's where we did the deposition.

11      Q   You've got to let -- you've got to let me ask

12   the question and stop, and then you can answer the

13   question.  Okay?  Because I see Lisa shaking her head,

14   which means she's very unhappy with us.

15      A   I'm sorry, Lisa.  It's Ken's fault.

16         Go ahead, Ken.

17      Q   All right.  So in your answer on page 14 -- I'm

18   going to come back to your answer.  Okay.  You say on

19   line 11 through 23 -- let me read it into the record:

20         "We started out with a quarter-million-dollar

21         salary.  Her coming in also at, I think,

22         fifty-five, sixty thousand.  I talked about

23         a 10 percent bonus -- I talked about a bonus --

24         a sign-on bonus and a 10 percent bonus on the

25         profits of what Mowbray's would do after him

1    joining forces with us."

2    A   Right.

3    Q   "And so I also talked about cars, you

4    know, that we would provide them with

5    transportation when they needed to fly home

6    first class.  I told them that, you know, we

7    wanted to make sure that they were happy to

8    be here and that they couldn't compare

9    wherever they had worked before to what we

10    were going to do.  That's the kind of" -- "that's

11    the kind of conversations we were having," period,

12    end quote.

13       Have I read that correctly?

14    A   Yeah, except you forgot that we even bought

15   them a dog.  We should have put it on there, too.

16    Q   Right.  I saw that dog.  He's a cute little

17   dog.

18    A   Cuter than Ronnie.

19    Q   Well, yeah, I guess so.

20       Now, is it -- do you know a guy named Michael

21   Neal?

22    A   Yes.  I do know Mike Neal, yes.

23    Q   Okay.  And did you have anything to do with

24   Michael Neal's compensation package?

25    A   Me and Dwight Anderson, I think, at the time.

1    Q   Okay.  And did Dwight Anderson need to get

2    approval from you before he could offer Mr. Neal any

3    compensation?

4    A   He would have to get ahold of me and my

5    mother.

6    Q   Okay.

7    A   Because my mother would have the final say on

8    that.  Robin also was included in on that.

9    Q   Okay.  Now, do you recall what Mr. Neal's

10   compensation was?

11    A   No, I don't, sir.

12    Q   Was Mr. Neal entitled to a percentage of the

13   profits of Mowbray's?

14    A   I don't recall ever discussing that.

15    Q   Okay.  Let me show you Mr. Neal's employment

16   contract.  I'm marking as Exhibit 34 a June 3, 2016

17   letter, Senior Vice President Position Offer to Mike

18   Neal.

19        (Plaintiff's Exhibit 34 was marked for

20        identification.)

21   BY MR. CATANZARITE:

22    Q   Are you able to see that whole page, sir?

23    A   I do see it, Ken.

24    Q   Okay.  You'll see a circled item, "Annual

25   Bonus - 2 percent of the annual net profits per the year

1    end P&L statement."

2        Do you see that?

3    A  I see that.

4    Q  And P&L is profit and loss statement; right?

5    A  Uh-huh.  Yes, sir.

6    Q  All right.  So, in other words, Mr. Neal was

7    going to get a $250,000 salary in 2016 and 2 percent of

8    the annual net profits; correct?

9    A  Yes.  I -- that's what it says, Ken.

10    Q  Okay.  And do you know if Mowbray's ever

11    generated any net profits after Mr. Neal was hired

12    through when he left in 2018?

13    A  Mr. Neal -- I would be guessing.  I know that

14    Mr. Neal went and got us a contract up in Oregon with

15    Pacific Corp.  He was hired for those purposes and --

16    but I don't remember reading this right here.  I think

17    Dwight had this made out.

18    Q  Do you know in May of 2018, when you met with

19    Ronnie Jordan, do you have a recollection of how

20    Mowbray's was doing?

21    A  Mowbray's always was doing good.  Always.

22    Q  Was it making money?

23    A  Always.

24    Q  In May of 2018, do you recall whether or not

25    Mowbray's had a year-to-date profit?

1     A   Mowbray's always profited, Ken.

2     Q   Okay.  Now, profit, I mean -- when I say

3   profit, I mean that the -- the bottom line, so to speak,

4   of the P&L, revenue minus expenses equals profits.  Are

5   we talking about the same thing?

6     A   Well, I wasn't really in charge.  You know,

7   maybe we need to get back to -- Mowbray's always made

8   money.  You know, Ronnie even admitted when he walked

9   into this, it's the best thing that had ever happened to

10  him.  So I can't recall what our profits were, where we

11  were at.  You know, Ken, I couldn't do that for you

12  right now.  We'd have to go back and look at the

13  records.

14    Q   Okay.  So let's look at some records.  Let's

15  look -- let's look at Exhibit 40.

16          (Plaintiff's Exhibit 40 was marked for

17          identification.)

18  BY MR. CATANZARITE:

19    Q   So identified as Exhibit 40 to this transcript

20  is a Monthly Payment Summary.  And there's a discussion

21  of a required break-even -- it says, "Our break-even

22  point," $6.5 million.

23          Do you see that?

24    A   Yeah, I see that.

25    Q   Okay.  And if you look at the revenues,

1  January, February, March, are they all more than 6.5

2  million?

3      A   Not every month, no.

4      Q   Okay.  And then let's look further in this

5  document -- or we'll go to the next -- wait a minute.

6  Let me see.  Let's look at Exhibit 2.  Exhibit 2 to this

7  deposition transcript is the 2017 and 2018 P&L.

8          Do you know if Mowbray's had a profit in 2017?

9      A   You know, I didn't do -- I didn't do that kind

10 of -- we had Alan taking care of that.  You know, again,

11 I did some of the hiring.  I was in production.  You

12 know, I ran the crews and stuff.

13         So, Ken, I -- we made money or we wouldn't be

14 in business, and we wouldn't have been able to pay

15 Ronnie all of that money.  So -- I don't remember --

16 Ken, I don't remember seeing these P&Ls.

17     Q   So look at the bottom of this page, it says --

18 again, it says something like -- here it says we need

19 6 million per month to break even?

20     A   Uh-huh.

21     Q   And the revenues show less than 6 million;

22 correct?

23     A   Yeah.

24     Q   Okay.  Then if we go to the revenues, January

25 to April '18, and January to April '17, you can see that

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                    Page 41
Richard Edward Mowbray, 10/02/2023

1    in -- and this is before you're talking to Ronnie;

2    right?  You're talking to Ronnie in May of 2018.  And

3    you've just completed January to April 2018.

4        Do you see that?

5    A  Yeah.  There's a lot of numbers here, sir.

6    Q  Okay.  Let's focus on these here.  This shows

7    that it is down 6 million in total revenue from the same

8    period in 2017; correct?

9    A  That's what that says, yes.

10    Q  Okay.  And then if we get to the bottom line,

11    net ordinary income for 2017 is, if you look at 17 -- 17

12    is the second column on the right; you see April '17,

13    April '18, so this column right here shows -- and this

14    is page 2 of 3 of this exhibit, this financial statement

15    attached to this Exhibit 2.  It says that total ordinary

16    income is negative 2,700,000; correct?

17    A  Yeah.  That's what it says here.

18    Q  And for 2018, when you're talking with Ronnie,

19    the results are negative 4,480,000; correct?

20    A  Yeah, if that's what we're looking at.  I don't

21    recall ever seeing these.  So --

22    Q  Okay.  So at least on a financial statement

23    basis, Mowbray's was not making money in May of 2018,

24    when you were talking to Ronnie; correct?  Strike that.

25    Well, let me rephrase it.

1        At least in 2018, May, when you're talking to

2   Ronnie Jordan in the presence of Phyllis and your wife,

3   Denise, when you're talking to them about Ronnie being

4   recruited to come from Florida to California, you know

5   or are aware that Mowbray's is losing money?

6        A  Not at all.  I'm not aware of that.  Not at

7   all.  I wouldn't have hired Ronnie if we were losing

8   money.  We didn't bring him there for that.  So I don't

9   recall any of this.

10       Q   Have you seen the financial statements for

11  2018, 2019 --

12       A  No.

13       Q  -- 2020?

14          You've never seen them?

15       A  Never seen them.

16       Q   Okay.  This document is Exhibit 48.  It's

17  marked "Highly Confidential."

18          I don't know, Stephen, do you want to -- do you

19  want to seal the transcript or something?  Or what is

20  your thought?

21          MR. CHO:  Yeah.  Can we do that?  Or do we even

22  need to attach it?  I would prefer to get like a

23  protective order or --

24          MR. CATANZARITE:  You're right, Stephen.  We

25  don't need to attach it.

1    Q   Let me just ask you some questions generally

2  about it then.

3         So if I look at -- what I want to ask you is,

4  in 2018, when you finish the year with Ronnie on board,

5  does the total revenue 93 million 573 sound about

6  right -- total revenue?

7    A   You know, Ken, I never really looked at these

8  numbers.  And we never discussed them even with Ronnie.

9    Q   Okay.

10    A   We just -- you know, we worked every day.

11    Q   Let me ask you a question:  After Ronnie

12  came -- prior -- let me ask the question this way:

13  Prior to Ronnie coming on board, had Mowbray's ever had

14  a year in excess of $90 million?

15    A   I said we did.  But you guys said we didn't.

16  So I'm not even sure.  So that goes to show you what

17  little I knew about -- you know, I mean, I ran our

18  operations in the field and -- but I was not aware of

19  that.

20    Q   Okay.  In 2019 --

21    A   Let me tell you something, even Ronnie

22  inflates -- everybody inflates everything in our

23  business, you know.  So if they asked if you had 20

24  crew, you'd tell them you had 200.  So this really is

25  irrelevant to what I know our -- I hope this sounds

1   right -- to what our operations were.

2        I get the point, you're going to try to show me

3   that Ronnie came along and all of a sudden made Mowbray

4   a bunch of money.  I disagree with that.

5      Q   Well, no.  The question I'm asking you is a

6   little different.  I'm asking --

7      A   Okay.

8      Q   -- what Mowbray's did prior to Ronnie coming on

9   board.  And I'm asking you if you have a recollection of

10  Mowbray's ever exceeding 90 million in revenue prior to

11  Ronnie Jordan being recruited to come to Mowbray's?

12     A   I don't recall.

13     Q   Okay.  Fair enough.

14        And do you know what the total revenue was in

15  2019?

16     A   I think around 300 -- 300,000.

17     Q   According to this page here, it's 216,000.  Do

18  you see that?

19     A   Well, I'm inflating that.  So --

20     Q   Let me try 2020.  Let me try 2020.  Do you

21  recall what Mowbray's did in 2020?

22     A   No, I don't.

23     Q   Do you have a best estimate?

24     A   I'll guess at 300- since I'm stuck on that

25  number.

1    Q   Okay.  So here's 2020.

2    A   Yeah.

3    Q   $472 million.

4    A   See?  I don't recall seeing that.  But that

5  sounds, you know, hey --

6    Q   Okay.  All right.  And --

7    A   It's not what you asked me.  I'm just -- it's

8  just a thought, but anyways.

9    Q   Okay.  And your -- your -- your employment

10  terminated when in 2020?

11    A   My wife said January.  And she knows.  So

12  January of 2020.

13    Q   Okay.  Is Denise still working for the

14  company?

15    A   No, she wasn't.  She just said no.

16    Q   Okay.  Now, have you ever talked to your sister

17  Robin about Ronnie Mowbray's employment agreement with

18  the company?

19    A   We discussed it with -- along with my mother,

20  yeah, at times.

21    Q   Okay.  When do you recall discussing that?

22    A   Before we hired him.

23    Q   Before you hired him?

24    A   Yeah.

25    Q   So how did you -- why were you discussing it

1  before you hired him?

2      A   Well, the salary was high.  It was much higher

3  than industry standards.  And so I knew I'd have to

4  discuss that with my mother.  So we sat down and, of

5  course, you know, I told them that I felt it was worth

6  it and had to get their blessings on a certain portion

7  of that to at least get it going.

8      Q   Okay.  But if we look at Neal's contract, Neal

9  was being paid a salary of 250,000 in 2016; right?

10     A   That's what it says, yes, sir.

11     Q   And 2 percent of profits; correct?

12     A   Yeah.  I wasn't even aware of that.  But I'm

13  sure we agreed on that.

14     Q   Okay.  So was Neal the industry standard as

15  well?

16     A   Neal was above the industry standard.  He has

17  much more credentials than me or Ronnie ever had.  So we

18  brought him on here for his expertise.  He was probably

19  worth a lot more, in my opinion, than Ronnie or me,

20  guarantee you that.

21     Q   Why do you say that?

22     A   He's renowned in the industry.  He knows -- you

23  know, me and Ronnie are good at getting crews together

24  and stuff like that.  The man was a -- you know, he's

25  wrote books and he just -- he was an industry -- I mean,

1    to have him here at Mowbray's was a big thing.

2        Q   It's true, isn't it, though, that in 2016 and

3    2017, Mowbray's had a loss?

4        A   I disagree with that.  But if that's what the

5    P&L shows, hey.  I mean, when Ronnie came in here,

6    nobody discussed we were losing money.  That was never a

7    discussion.

8        Q   Okay.  All right.  Let me ask you, as well,

9    since this lawsuit was filed, have you had any

10   discussions with your sister Robin?

11       A   Very little except that -- I didn't even

12   know -- very little.  Very little discussion.

13       Q   Okay.  Well, what do you recall about the

14   discussions with Robin about Ronnie's lawsuit?

15           It wasn't much discussion about his lawsuit,

16   more a discussion on how his -- he -- him and his

17   brother got together and cost the company -- I don't

18   know -- millions of dollars.

19           And I'm vaguely saying what -- and I think

20   that's why they had to let him go and -- because

21   Mowbray's, something was going on and, you know, they

22   didn't get into details.  But, you know, I did ask them

23   why they let him go.  And so I heard a few things about

24   that.  It wasn't good.

25           And I didn't know that either at the time we

1  all talked.  So, you know, Ronnie was trying to tell me

2  that, you know, he had -- "I made the company more money

3  than they ever made before in their life," you know,

4  that's how he says it.  And I disagree with that.

5       But they must have their reasons for letting

6  him go.  They must have been good reasons, you know.  So

7  I didn't discuss his lawsuit with them.

8     Q   Okay.  Well, we just saw --

9     A   Ronnie told me more -- let me say this:  Ronnie

10  told me more about his lawsuit than anybody did.  And

11  that's what -- that's how I learned about his lawsuit.

12  He told me everything, what he thought he was worth and

13  how he thought -- what I should say and how I should say

14  it.  We discussed that right there at his house.  And I

15  didn't come over to his house to discuss his lawsuit.  I

16  came over there to find some work.  So really, you

17  know -- and I can testify to that all day long.

18     Q   Okay.  I want to focus back on your sister.

19       Do you have any specific recollection about

20  discussions with your sister about Ronnie's lawsuit?

21     A   No.  Very, very little.  I mean, the discussion

22  is that he was trying to sue.

23     Q   How about --

24     A   I didn't tell her all that Ronnie told me, I

25  mean.

1    Q   How about Ricky Mowbray, did you ever discuss

2  Ronnie's lawsuit with Ricky Mowbray?

3    A   No.  No.

4    Q   Okay.  And -- now, I want to go back to before

5  the lawsuit is filed and after Ronnie is working there

6  and before you're asked to leave in January 2020.

7       Do you recall discussing Ronnie's 10 percent

8  profit sharing in that time period?

9    A   It was discussed, but it was always vague, and

10  we always -- Ronnie knows we agreed it would be on work

11  that he brought in.  Never was there a discussion, nor

12  with my mother or my sister even agreed that he was

13  worthy of 10 percent of the monies that -- that was

14  Mowbray's.  I mean, he didn't bring anything other than

15  some subcontractors across from -- you know, a bunch of

16  hillbillies, if you want to ask me, and brought them

17  over here.

18       And then I guess his brother ended up -- it

19  got -- it was a mess really.  And I didn't know all of

20  that, Ken, until afterwards.  So -- you know, Ronnie

21  told me mostly what he was doing at his house.

22    Q   Okay.  What I want to focus --

23    A   Yeah.

24    Q   Here's what I want to focus on, I want to focus

25  on the time period between the time Ronnie relocates

1  from Florida to California from that point period, which

2  is on or about June 1st through the time you leave in

3  January of 2020, what recollection do you have about

4  discussing 10 percent of profits with any of your family

5  members?

6      A   Very little.  You do bring -- you make me

7  recall a lot of things that I even talked to Stephen

8  Cho.  First of all, I wanted to get rid of Ronnie about

9  after the first year he was there.  I never would have

10 agreed to the 10 percent of him taking any profits from

11 what Mowbray's had.

12        He was supposed to get us work in Florida.  And

13 I know I'm going on a tangent here.  But it just -- it

14 irks me here to think about all of this and the way he

15 was paid and treated very well.

16        We didn't discuss but maybe once or twice about

17 how it would be -- you know, if he brought the monies

18 in -- even that letter, I don't recall even reading that

19 letter.  Ronnie was paid above and beyond.  And he must

20 have done something -- I mean, Mowbray's would have kept

21 him if he was doing his job.  That's really all I can

22 tell you, Ken.

23     Q   Well, Mowbray's had a $470 million year in

24 2020.

25     A   And Ronnie -- that wasn't from Ronnie Jordan.

1   It wasn't from Rick Mowbray.  And it wasn't from Gloria

2   Mowbray.  That was from the men and women that worked

3   there so -- and the industry.  Ronnie didn't bring that

4   work.  That work was there, you know.

5       Q   Okay.

6       A   It just makes -- and I'm not -- it just irks me

7   that, you know, somebody is here trying to claim that.

8   That had nothing to do with him.  That's not -- you

9   know, he was paid well and taken good care of.  Hell, he

10  lives in a home up there he never even had to pay for.

11  I'm just upset here.  This is very upsetting, to be

12  honest with you.

13      Q   And you've told us all the reasons it's

14  upsetting?

15      A   Yeah.  I believe that he's gone out of his way

16  here to -- this is really not true.  We were -- never,

17  ever discussed to giving him 10 percent of the profits

18  in -- Mowbray's already had.  That's -- there was no

19  signed --

20          (Interruption in the proceedings.)

21  BY MR. CATANZARITE:

22      Q   On the screen is Mr. Neal's contract.  You

23  offered Mr. Neal $250,000 and 2 percent of the profits.

24  And Ronnie Jordan comes and generates substantial

25  profits.  And do you think he's at least entitled to 2

1  percent?

2      A   Ronnie Jordan didn't bring that in.  And the

3  next thing is, Ronnie Jordan was compensated a lot more

4  than Mike Neal.  We didn't bring Mike a house -- buy him

5  a house and put in Land Rovers and a dog.  So Ronnie was

6  well taken care of.  He even -- you know, he'd still

7  work at Mowbray's if -- he must have done something

8  wrong.  So that 2 percent profit there, I don't even --

9  I don't remember that.  I do remember the salary that we

10  chose to give Mike.

11         We had Dwight Anderson as the CEO then.  He was

12  in charge of, you know, writing this all up.  Again,

13  everything went through my mother.  She was the one who

14  owned the company.

15         So, you know, I think Ronnie was well paid.  He

16  was overpaid.  That's my opinion.  But who am I?

17      Q   He was overpaid?  Tell me why you believe he

18  was overpaid.

19      A   Nobody gets paid and taken care of like we took

20  care of him, sir.  And then the things he did that upset

21  me was, you know, behind my back.  I mean, me and Cho

22  argue about this.  I want you to know, nobody always

23  agrees with me at all, even on that side of the field.

24         There was a lot of things going on that really

25  shouldn't have happened.  You know, bringing family in

1   on here.  It's irrelevant to what we're talking about.

2        So I believe Ronnie has been well compensated

3   for, Ken.  That's my opinion.  Who am I?

4    Q   Okay.

5        MR. CATANZARITE:  All right.  Let me take five

6   minutes and see if I have anything more to ask you,

7   Mr. Mowbray.

8        THE WITNESS:  All righty.

9        MR. CATANZARITE:  Thank you.

10        (Brief recess taken.)

11        MR. CATANZARITE:  Back on the record.

12    Q   Mr. Mowbray, a few more questions.

13        When did you hire Stephen Cho to represent you

14   in this deposition?

15    A   I never hired Stephen Cho to represent me on

16   this.

17    Q   He doesn't represent you in this deposition?

18    A   He says he is and -- but I've never paid him

19   anything or hired him.  So --

20    Q   When did you engage him?  When did you agree

21   that he would represent you in this deposition?

22    A   About a week or so ago.

23    Q   Okay.

24    A   He contacted me.

25    Q   Okay.  So about one week ago; correct?

1    A   Ken, it may have been a couple of weeks ago.

2    Q   All right.

3    A   But there was no conversation over anything

4  like that.

5    Q   All right.  How many times did you meet with

6  Mr. Cho in that couple-of-weeks-ago time period?

7    A   Just one time for 15 minutes.

8    Q   Okay.  Did you meet with anyone else regarding

9  your deposition testimony?

10   A   No, just me and him.

11   Q   Okay.  Did you speak about your deposition

12  testimony with anyone else?

13   A   No, sir.

14   Q   Okay.  Not with Robin, not with --

15   A   No.

16   Q   -- the --

17   A   I haven't even spoke to them in -- in a

18  while.

19   Q   Okay.  And from the time that you left

20  Mowbray's in January of 2020 until a couple of weeks

21  ago, had you spoken with anyone about your deposition?

22   A   No, sir.

23   Q   Had you spoken with anyone in that time

24  period -- again, from January of 2020 to a couple of

25  weeks ago -- had you spoken with anyone about your sworn

1  statement?

2      A   No.  That I gave you, sir?

3      Q   Yes, sir.

4      A   No.

5      Q   Did anyone send you a copy of your sworn

6  statement?

7      A   Nope.  I've never -- I've never -- the first

8  time I've seen an electronic transmission, or whatever

9  it is, is when you showed it to me.

10     Q   Okay.  Now, can you tell me, did you let

11 Mr. Neal go?

12     A   I think we -- I think me and Ronnie let him go,

13 if I recall.

14     Q   Okay.  Why was he let go?

15     A   Ronnie felt that he wanted to do -- well, I

16 think Ronnie just wanted to be the CEO.  He wanted to

17 have it all to himself.  I mean, I brought him in there,

18 we discussed it, we just felt that Mike was going in a

19 different direction.  And, you know, like I said, he was

20 a leader in this industry, and he had other ideas.  And

21 that was really the reasons.

22     Q   I'm going to show you the end of this letter

23 here.  This is the Mike Neal letter.  If you look at --

24 there's a reference here to "Welcome aboard Mike, Rick

25 and I look very much forward to working with you."

1        Do you see that reference?

2     A   Yes, sir.

3     Q   Okay.  And this is Dwight Anderson; he was --

4     A   Yeah.

5     Q   -- CEO at the time?

6        Did you let Dwight Anderson go?

7     A   We didn't -- Dwight was getting older, Ken.

8  And I don't like to talk about that because I'm old too.

9  So we let him go on certain terms, you know what I mean.

10  We retired him, I want to say.

11     Q   Okay.  Was he paid compensation upon

12  termination?

13     A   He was paid some compensation upon termination

14  or --

15     Q   How much was he paid?

16     A   Sir, I honestly don't know.

17     Q   Can you give me a range or estimate?

18     A   No.  My -- that would have been my mother and

19  Dwight.  That's just being honest.

20     Q   I'm talking about Dwight being let go.  Oh, so,

21  in other words --

22     A   I don't know, sir.  I don't recall, Ken.

23     Q   Okay.  You mentioned something about a

24  discussion with your sister about Ronnie's brother.

25        Can you tell me everything you recall

1    discussing with her?

2        A   I think it had to do with some -- which I

3    disagreed with, Ronnie was using some money factoring

4    company, and it was my understanding that the brother --

5    I think his name -- his name is Randy -- Randy Jordan.

6    He was -- he embezzled like millions of dollars.  I

7    guess Ronnie was aware of that.  And I didn't know about

8    this.  I've got to be honest.  I wasn't there.  I

9    couldn't tell you.  This is all hearsay.

10         Ronnie mentioned it to me, too.  He said it

11   wasn't him or he didn't know about it, that his brother

12   was doing it.  But Ronnie was in charge.  So I don't

13   know, sir.  That's the only thing that I heard.

14       Q   Well, I want to focus on what you recall your

15   sister saying about it.

16         Did your sister say --

17       A   She didn't tell me as much as Ronnie told me.

18   So she just said they had an issue with his brother, and

19   they really never even -- to be honest with you, my

20   sister and my son never even really told me why they let

21   Ronnie go.  I learned more from Ronnie than I did

22   anybody.

23       Q   Okay.

24       A   That is the honest truth.

25       Q   Okay.  Well, I'm just focusing on what your

1    sister said to you about Ronnie and his brother Randy.

2        A   Very -- she just said there was some things

3    going on, that if I -- you know, if I knew, you know.

4    And she didn't -- she wasn't asking me if I knew.  But

5    she really didn't tell me.  I heard it from Ronnie.

6        Q   Okay.  And --

7        A   I'm apologizing again, Lisa.

8            But the only thing I was told was -- from my

9    sister was that they had to let Ronnie go because of his

10   brother and a lot of other things.  That's all that was

11   said.

12       Q   Okay.  And did she specify any further the,

13   quote, a lot of other things?

14       A   No.  I wish she would have told me, but she

15   wouldn't.  They're better than I am.  They don't talk.

16       Q   Okay.

17           MR. CATANZARITE:  All right.  Okay.  So,

18   Mr. Mowbray, that's all I have.  I don't know if Stephen

19   has any questions.

20           MR. CHO:  I just have a few.  I just wanted to

21   follow up.

22

23                   EXAMINATION

24   BY MR. CHO:

25       Q   Mr. Mowbray, I think you mentioned earlier

1    about when you went to Ronnie's house in March of 2022,

2    you were looking for work.

3         Did I hear that correctly?

4     A   Yes.  Yes, sir.  That is why I went there,

5    yes.

6     Q   And I heard you say something to the effect

7    that Ronnie asked you to speak to Mr. Catanzarite

8    regarding this case; correct?

9     A   On a couple of occasions, he did.

10     Q   Can you tell me, as you sit here, what -- what

11    did Mr. Jordan ask you to say?

12     A   He wanted me --

13     Q   When did he ask you to say it?

14     A   It was over a couple visits to his home while I

15    was doing some work for him and trying to get -- my

16    reason going there, first of all, was to get some work.

17    Second of all, he started to tell me why he was let go

18    and why he was suing Mowbray's, and that if I would get

19    on this depo with his lawyer and tell him that he was

20    promised 10 percent -- you know, I was in a bad place,

21    Stephen, and, you know, a little upset with my family.

22    You know what I'm saying?

23         And so he told me, you know.  And it was over

24    the course of probably a couple times what he wanted --

25    you know, did I agree with him, you know, what his

1   brother had done.  He told me more than -- he said his

2   brother was embezzling money from a factoring company,

3   that he had no -- no idea about that going on.  And when

4   I talk to Ken, you know, let him know that -- I just,

5   you know, feel -- I felt a little, you know, in the

6   middle of everything.  I hope that makes sense.  I don't

7   know what else to tell you.

8       Q   So when he asked you to talk to Mr. Catanzarite

9   regarding this case, did he ask you to say anything in

10  particular, or did he just ask you to talk to him?

11      A   He was adamant about me telling him that he was

12  deserving of 10 percent and that he had brought so much

13  money to -- and I'm not going to lie to you, I didn't

14  agree with him, but I didn't say it.  I'm just going to

15  be honest with you, you know.  I was in a place where --

16  you know, whatever he said, I didn't -- I just listened

17  to him.  So --

18      Q   So you testified yes to the 10 percent?

19      A   Yes.

20      Q   Because he asked you to say that?

21      A   Yes.  And that he, you know, profited more

22  money than the company ever made.  He said he was

23  terminated wrong and, you know, he said I knew that.  I

24  even had arguments with -- Stephen, I've had arguments

25  over you with him.  So I know you've seen both sides of

1   this.  I know that.

2        So he wanted to make sure that we were -- you

3   know, I was in line with what his thoughts were, you

4   know.  And, you know, I --

5        Q   Has that changed now?

6        A   Oh, absolutely.  I mean, there's a lot of --

7        Q   What made it change?  Pardon me?

8        A   Well, first of all, we never discussed that.  I

9   remember even -- the 10 percent.  It was over the work

10   that he would bring in.  And I think I even had an

11   e-mail.  I think we even discussed this at times, you

12   know.  I tried to appease him and appease my family, my

13   mother, you know.  I don't even -- I didn't even know

14   why they let him go.  He told me.  What he told, he was

15   let go for the wrong reasons.

16        But, you know, I was upset with my family.  You

17   know what I mean?  And I -- you know, I don't speak to

18   them very often.  And so -- they never really discussed

19   this case or anything like that with me.  And that's the

20   honest truth.

21        So I -- you know, I felt like Ronnie was, you

22   know, somebody that -- you know, I was looking for a

23   job, man.  That's really why I was over there.

24        Q   So when you gave your sworn statement to

25   Mr. Catanzarite, did you know that the statements were

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                Page 62
Richard Edward Mowbray, 10/02/2023

1   going to happen, or was that more impromptu?

2      A   I think I knew, you know, that's -- yeah, I

3   think I knew.  They were basically -- you know, he

4   wanted me to defend him.

5      Q   And this took place at Mr. Jordan's house?

6      A   Yes, it did.

7      Q   And you had talked to Mr. Jordan and set the

8   time for Mr. Catanzarite to interview you; is that

9   correct?

10     A   I don't know about the time.  It was asked --

11  it was asked of me twice while I was there, and then I

12  avoided it.  And then I was there with, I think, another

13  person.  And then -- and it was the day I came there for

14  some reason -- to do some work or whatever, but it was

15  that day.  And, you know, he sat me down and got -- Ken

16  is his name.  I can't even say his last name anymore on

17  the video.  That's really how it started.

18         MR. CHO:  Okay.  I have nothing further.

19

20             FURTHER EXAMINATION

21  BY MR. CATANZARITE:

22     Q   I'd like to follow up a little bit, if I may,

23  Mr. Mowbray.

24         I'm going to go back to Exhibit 47 -- which is

25  marked as Exhibit 47.

1      Do you recall I asked you at the end of your

2  deposition, I asked you to tell us whether anyone had

3  told you to say anything, and you said no; if anyone

4  told you any questions, and you said no.

5      Do you recall that?

6    A  I'm sure you said that, and you didn't tell me

7  to say anything, sir.  So --

8    Q  Well, it was broader than that, wasn't it?  It

9  was did anyone tell you to say anything?

10    A  I'm sure you've got it there.  You know, Ken,

11  I'm not arguing with you.  You didn't ask me to say

12  anything out of line, you understand.  There was

13  conversations between me and Ronnie before I got online

14  with you, lots of them.

15    Q  Okay.  Well, let's read together page 22.

16  Let's look first at 21.  Right here, there's a

17  discussion, page 21 -- let me go back one more maybe.

18  Okay.  Page 20, line 5:

19      "Now, let me ask a little bit more about

20      the terms of the agreement.

21      "Who knew about the terms of the agreement

22      you had agreed to with Ronnie?  Who at --"

23      "Answer" -- line 9 to 18 of page 20:

24      "Answer:  My wife knew.  My sister Robin

25      knew about him.  We -- she also played a big

1    part in this.  Even though I made the

2    decisions, I always -- I did confide in her

3    and let her know what we were going to do.

4    My mother, only on occasion.  When it came

5    to signing this, of course, I had told her

6    what we were going to do.  My mother had no --

7    she's never worked in this business at all,

8    never spent her day here.  We just had it in

9    her name back when they -- affirmative action

10    is the reason why I put it in her name.

11       "Question:  I see.

12       "Answer" -- lines 20 to 21 -- "For a

13    minority status.  My father had got an injury.

14    It's a long story, but always --"

15       Line 22:  "Right."

16       "Answer," 23, " -- political purposes, I

17    guess, you know."

18       Have I read that correctly?

19    A   I can't see it on the screen, but it sounds

20  right.

21    Q   Okay.  I'll put it on the screen.  My bad,

22  Mr. Mowbray.  I apologize, sir.

23    A   I think that I -- is that me?  Is that me?

24  It's echoing.

25    Q   Can you see it now?

1    A  I can see it.

2    Q  Okay.

3    A  That looks -- I said that.  My mother -- you

4  know, again, you know, I was in a bad place right there.

5  I wasn't prepared for this.  But my mother did.  She

6  owned the company.  Everybody knew that.  So did Ronnie.

7  And, you know, my thoughts were ran by her.  And even on

8  that -- you know, what we were going to pay him and all

9  of that, I had to get her confirmation, on everything,

10  to be honest with you and -- maybe not the day-to-day

11  stuff.  But Ronnie knows that.  I mean, that's -- he

12  knows all of that.

13    Q  Well, Ronnie wouldn't have known that when you

14  hired him; right?

15    A  Yes, he did know that.

16        MR. CHO:  Objection.  It lacks foundation.

17  Calls for speculation.

18        Answer if you know.

19        THE WITNESS:  Yes, he would have known.

20  BY MR. CATANZARITE:

21    Q  Okay.  Well, how would Ronnie have known the

22  involvement of your mother when you were hiring him and

23  he had never met your mother?

24    A  He met --

25        MR. CHO:  Objection.  It lacks foundation.

1  Calls for speculation.

2      Answer if you know.

3      THE WITNESS:  Ronnie met my mother on --

4  numerous times.  And he knew she was in -- he knew, and

5  she let him know, too, just like she let me know, she

6  owned the company.  And, you know, we -- us men,

7  whatever, it might be our little manly thing here,

8  Ronnie's too, you know, that my mother knew what was --

9  we ran things by her.  Ronnie had to do the same

10  thing.

11  BY MR. CATANZARITE:

12      Q   Okay.  Let's go to line 20 (sic), page -- line

13  24 and 25 of page 20.

14      "Question:  What I'm getting at is, so

15      your sister Robin --"

16      Page 21, line 1:  "Yeah."

17      Line 2, " -- Mowbray; right?  Mowbray --

18      Robin Mowbray?

19      Line 3, "Answer:  Yeah."

20      Line 4, "Your sister knew the terms of

21      Ronnie's contract that you had signed" -- strike

22  that.  Let me reread that.

23      Page 21, line 4, "Your sister knew the terms

24      of Ronnie's contract that you had agreed, you

25      know --"

1    "Answer," line 6, "Yes.  Yes, she did."

2    Line 7 to 8, "Question:  So she knew

3  the -- in particular, she knew the 10 percent

4  of profits as part of the contract?

5    "Answer:  Yes, she did."

6    Line 10 and 11, "Okay.  Did she ever

7  disagree with it and say you weren't

8  authorized to do that?"

9    Line 12, "Answer:  No.  No."

10    Line 13, "All right."

11    And line 14, you answer "Never."

12    Then I ask at line 15, "Question:  And who

13  else would you have talked to about that?

14  Would you have talked to your mother about it

15  at any time?"

16    18, "Yeah.  I spoke to my mother about it.

17  I told her what we were going to do and we

18  would buy them a car.  She never really -- she

19  left it up to me.  She didn't have to worry.

20  I mean, that's why she -- you know, the

21  company made $10 million or $12 million.  No,

22  I mean, she never had to worry.  Didn't have

23  to worry about it.  She couldn't have done

24  this, though."

25    Did I read that correctly?

1    A   Yeah.  From what I'm reading, yeah.

2    Q   Okay.  And then line 25 -- beginning at line

3    25:

4        "Question:  And would it be (sic) fair to

5    say, I think, that the company is roaring at

6    this point; right?  It's making a lot of money

7    with Ronnie there and --

8        "Answer:  Yeah.  We increased what we --

9    well, our revenues.  Again, we were -- I

10    believe we were onto bigger and better things,

11    and I believe that that was because of Ronnie

12    being at the helm of what -- I hired him for

13    that purpose, and he was fulfilling that

14    purpose just like I knew he would," end of

15   sentence.

16       Is that -- was that your testimony?

17   A   I believe I said that in those words, yeah.

18   Q   All right.  Line 9, page 22:

19       "Yeah.  So, in other words, fairly stated,

20    you felt this was a very successful hire and

21    that Ronnie was performing per plan?"

22       Line 12, "Yes, I did.  Yes, I did.

23       "Question:  And actually above plan, I

24    think, would be --"

25       Line 14, "Answer:  I think he was, yes.

1    I think he was, you know --

2       "Okay.  Okay.  And -- well, I think that's

3    all I have to ask you Mr. Mowbray.

4       "Answer:  Okay."

5       Line 19, on page 22, "I have one final

6    question.

7       "Are you in the room here by yourself?"

8       Line 21, "Answer:  Yes, sir, I am."

9       Line 22, "Question:  Okay.  And did anyone

10    tell you what to say about that thing?"

11      24, "Nobody.  Nobody told me.

12      "Question," line 25, "So this is all without

13    coaching or without someone saying," quote,

14    "'Listen.  You need to say this and'" -- end

15    quote -- "none of that occurred; is that right?

16      "Answer:  I didn't even know the questions

17    that I was going to be asked, sir," period, end

18    quote.

19      Have I read that correctly?

20    A   Yes, what I recall.  Yes.

21      MR. CATANZARITE:  All right.  No further

22   questions.

23      MR. CHO:  No further questions.

24      And I need a transcript, please.

25      MR. CATANZARITE:  Oh, I have a -- maybe a

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                    Page 70
Richard Edward Mowbray, 10/02/2023

1   couple more questions, just for the record.

2   BY MR. CATANZARITE:

3       Q   Mr. Mowbray, are you going to be around --

4   you're not going on any European vacations or South

5   American vacations, are you?

6       A   No, sir.

7       Q   So you'll be around -- will you authorize me to

8   send to Mr. Cho, your attorney, a trial subpoena for you

9   to appear at trial?  And then I'll work out an on-call

10  notice.  Is that okay with you?

11      A   You bet, sir.

12          MR. CATANZARITE:  Thank you very much.

13          Nothing further.  Thank you, Lisa.

14          THE REPORTER:  And I follow the Code.  Thank

15  you.

16          (Proceedings concluded at 2:32 p.m.)

17                  *     *     *

18

19

20

21

22

23

24

25

1  STATE OF _____)

2  COUNTY OF _____)
                          ) SS.

3

4

5

6

7      I, the undersigned, declare under penalty

8  of perjury that I have read the foregoing

9  transcript, and I have made any corrections,

10  additions or deletions that I was desirous of

11  making; that the foregoing is a true and correct

12  transcript of my testimony contained therein.

13        EXECUTED this _____ day of _____,

14  20 _____, at _____, _____.
              (City)            (State)

15

16

17

18

19        _____

20        RICHARD EDWARD MOWBRAY

21

22

23

24

25

REPORTER'S CERTIFICATE

1
2
3
4      I, LISA T. OWEN, CSR No. 4475, Certified Shorthand
5  Reporter, certify:
6      That the foregoing proceedings were taken before me
7  at the time and place therein set forth, at which time
8  the witness was put under oath by me;
9      That the testimony of the witness, the questions
10  propounded, and all objections and statements made at
11  the time of the examination were recorded
12  stenographically by me and were thereafter transcribed;
13      That the foregoing is a true and correct transcript
14  of my shorthand notes so taken.
15      I further certify that I am not a relative or
16  employee of any attorney of any of the parties, nor
17  financially interested in the action.
18      I declare under penalty of perjury under the laws
19  of California that the foregoing is true and correct.
20      Dated this 9th day of October, 2023.
21
22
23  _____
24      LISA T. OWEN
        CSR No. 4475
25

## $

**$10**
67:21

**$12**
67:21

**$250,000**
23:15 38:7 51:23

**$470**
50:23

**$472**
45:3

**$55,000**
23:21

**$6.5**
39:22

**$90**
43:14

## 1

**1**
12:23 13:6 18:21 21:1
22:5,21 25:10 66:16

**10**
16:12,20 21:20 22:7,9,
11,15 24:6 28:18 35:23,
24 49:7,13 50:4,10 51:17
59:20 60:12,18 61:9
67:3,6

**11**
16:24 17:2,10 24:15
35:19 67:6

**12**
17:3,7,13,20,21 18:2,12
21:2 24:19 67:9 68:22

**12:59**
5:1,8

**13**
18:10,13 19:5,8,15 21:3
67:10

**14**
18:2 19:15 21:10,11,17
23:4 24:23 31:25 35:17
67:11 68:25

**15**
17:6 21:18 23:14 24:11,
19,25 54:7 67:12

**16**
27:12,13,24 33:14

**17**
19:15 25:2 29:13 40:25
41:11,12

**18**
25:4 30:1,2 31:7 40:25
41:13 63:23 67:16

**19**
25:5 69:5

**1st**
7:19 12:2,12 33:13 50:2

## 2

**2**
5:1 17:3 30:4,5,10 31:7
32:20 37:25 38:7 40:6
41:14,15 46:11 51:23,25
52:8 66:17

**2,700,000**
41:16

**20**
18:12 43:23 63:18,23
64:12 66:12,13

**200**
43:24

**2016**
37:16 38:7 46:9 47:2

**2017**
40:7,8 41:8,11 47:3

**2018**
6:19 12:24 20:19 28:19
29:6 30:18 31:10 33:18
34:9 38:12,18,24 40:7
41:2,3,18,23 42:1,11
43:4

**2019**
32:24 33:9 42:11 43:20
44:15

**2020**
10:1,2 42:13 44:20,21
45:1,10,12 49:6 50:3,24
54:20,24

**2022**
7:19 12:2,12 13:6 20:3,
19,22 25:10,13 33:13
34:3 59:1

**2023**
5:1,7

**21**
27:25 63:16,17 64:12
66:16,23 69:8

**216,000**
44:17

**22**
19:16 20:9,11 28:14
63:15 64:15 68:18 69:5,9

**23**
17:2,10 35:19 64:16

**24**
23:4 28:7 66:13 69:11

**25**
  66:13 68:2,3 69:12

**250,000**
  46:9

**28**
  12:23 30:18 31:9

**2:32**
  70:16

**2nd**
  5:7

---

**3**

**3**
  17:15,21 18:13 19:15
  37:16 41:14 66:19

**300**
  44:16

**300,000**
  44:16

**300-**
  44:24

**34**
  37:16,19

---

**4**

**4**
  13:7,11 23:14 30:13,14
  32:21 66:20,23

**4,480,000**
  41:19

**40**
  39:15,16,19

**4475**
  5:6

**47**
  11:9,10 13:8,10 62:24,25

**48**
  42:16

---

**5**

**5**
  13:24,25 63:18

**573**
  43:5

---

**6**

**6**
  9:14 14:5,6 40:19,21
  41:7 67:1

**6.5**
  40:1

---

**7**

**7**
  14:14 17:21 23:20 67:2

---

**8**

**8**
  15:9 17:5 18:2 67:2

---

**9**

**9**
  16:6 23:24 24:11,12
  33:14 63:23 68:18

**90**
  44:10

**93**

43:5

---

**A**

**ability**
  6:23

**able**
  6:7 11:14,18 18:17 19:17
  20:4 37:22 40:14

**aboard**
  55:24

**about**
  11:6 18:3 20:2 22:2,15
  29:2 31:1 32:14,19
  33:10,13 35:22,23 36:3
  39:5 42:3 43:2,5,17
  45:17 47:13,14,15,23
  48:10,11,19,20,23 49:1
  50:2,3,8,14,16 52:22
  53:1,22,25 54:11,21,25
  56:8,20,23,24 57:7,11,15
  58:1 59:1 60:3,11 62:10
  63:19,21,25 67:13,14,16,
  23 69:10

**above**
  26:25 46:16 50:19 68:23

**absolutely**
  34:13 61:6

**accepted**
  23:9

**accepting**
  28:4

**accident**
  8:23 9:2

**According**
  44:17

**across**

49:15

**action**
64:9

**actually**
6:9 14:17 15:12,20 31:16
68:23

**adamant**
60:11

**administer**
5:17

**administering**
5:11

**admitted**
39:8

**affect**
6:23

**affirmative**
64:9

**after**
20:1 29:19 35:25 38:11
43:11 49:5 50:9

**afternoon**
5:4 6:3

**afterwards**
49:20

**again**
12:16 13:25 26:18 32:14
40:10,18 52:12 54:24
58:7 65:4 68:9

**ago**
53:22,25 54:1,21,25

**agree**
5:9,13,14,15,16 23:18,
19,23 29:22 53:20 59:25
60:14

**agreeable**
10:10

**agreed**
21:20,21,24,25 24:6
28:18 46:13 49:10,12
50:10 63:22 66:24

**agreement**
23:7 28:3,5 33:17 45:17
63:20,21

**agrees**
52:23

**ahead**
14:25 29:8 35:16

**ahold**
37:4

**Alan**
40:10

**all**
6:25 7:16,17 8:5 9:1,8,
17,21 10:17 11:1,17
12:4,19 13:5,11,20 14:5
15:5 18:1 19:7,23 20:18
23:14 24:18 25:17 26:1,
16 31:1,22 33:12,17
35:6,17 38:6 40:1,15
42:6,7 44:3 45:6 47:8
48:1,17,24 49:19 50:8,
14,21 51:13 52:12,23
53:5,8 54:2,5 55:17 57:9
58:10,17,18 59:16,17
61:8 64:7 65:8,12 67:10
68:18 69:3,12,21

**along**
44:3 45:19

**already**
16:13 21:24 51:18

**also**

24:25 35:21 36:3 37:8
63:25

**always**
27:5 38:21,23 39:1,7
49:9,10 52:22 64:2,14

**am**
5:5 8:4,8 11:8 17:5,6
52:16 53:3 58:15 69:8

**American**
70:5

**amicable**
10:9

**an**
11:21 21:1 26:3 31:6
46:25 55:8 57:18 61:10
64:13 70:9

**and**
5:7,22 6:18,19,25 7:8,17
8:15,23 9:1,6,17,23 10:4,
7,12,21,23 11:1,25 12:3,
7,17,23 13:10,20,25
14:3,11,14,20,23,25
15:12,17,19,20,21 16:1,
3,4,9,11,16,22 17:1,2,10,
16,18,20 18:3,20,21
19:7,9,17 20:1,8,20,21,
25 21:2,14,15,18 22:3,13
23:8,20 24:20,25 25:4,16
26:3,20 27:2,20,22 28:4,
21 29:8,16,24 31:6,8,9,
16,19,24 32:2,6,17,20,25
33:1,21 34:13,14,18,21,
25 35:3,12,24 36:3,8,23,
25 37:1,4 38:4,7,10,14,
15 39:12,20,25 40:4,7,
12,14,21,25 41:1,2,10,
13,18 42:2 43:8,18 44:3,
9,14 45:6,9,11 46:3,4,6,
11,23,24,25 47:2,16,17,

19,20,21,23,25 48:4,10,
12,13,14,17 49:4,5,6,9,
16,18,19 50:12,14,15,19,
25 51:1,2,3,6,9,13,23,24,
25 52:2,5,19,20,21 53:6,
18 54:10,19 55:12,19,20,
25 56:3,8,18 57:4,7,18,
20 58:1,4,6,10,12 59:6,
15,18,19,21,23 60:3,12,
13,21,23 61:4,10,12,17,
18,19 62:5,7,11,12,13,15
63:3,4,6,13 64:3 65:7,8,
10,22 66:4,6,13 67:6,7,
11,12,17 68:2,4,7,10,11,
13,20,23 69:2,9,24 70:9,
14

**and'**
69:14

**Anderson**
36:25 37:1 52:11 56:3,6

**annual**
37:24,25 38:8

**another**
16:13 30:1 32:8 62:12

**answer**
15:25 16:17 20:15 21:2
24:3,15,24 25:2,5 26:3,4,
12,13 27:23 29:8 31:6,
16,24 32:11,13 33:19,24
34:1 35:12,17,18 63:23,
24 64:12,16 65:18 66:2,
19 67:1,5,9,11 68:8,25
69:4,8,16

**answers**
21:14

**any**
6:22 7:12,24 8:11,21 9:1
10:12,16 21:23 22:16
26:4 37:2 38:11 42:9

47:9 48:19 50:4,10
58:12,19 63:4 67:15 70:4

**anybody**
48:10 57:22

**anymore**
62:16

**anyone**
6:25 7:24 54:8,12,21,23,
25 55:5 63:2,3,9 69:9

**anything**
7:13 8:10 13:4 24:7
25:24 27:20 29:2 33:2
36:23 49:14 53:6,19 54:3
60:9 61:19 63:3,7,9,12

**anyways**
15:19 26:22 30:1 45:8

**apologize**
22:23 64:22

**apologizing**
58:7

**appear**
70:9

**appearing**
5:12

**appease**
61:12

**approval**
37:2

**April**
40:25 41:3,12,13

**are**
6:3,5,22 7:4,5 8:3,15
10:16 11:1,14,17 14:24,
25 17:7 18:17 21:14
25:19 27:19 28:2 37:22
39:4 40:1 41:19 42:5

46:23 69:7 70:3,5

**argue**
26:23 52:22

**arguing**
25:19 63:11

**arguments**
60:24

**around**
6:7 18:3 20:5,20 23:23
32:9 35:4 44:16 70:3,7

**as**
5:22 6:15 9:24 11:2,7,9
12:20 18:20,21 21:21
22:21 23:5 26:24 27:2
30:12,13 32:3 37:16
39:19 46:14 47:8 52:11
57:17 59:10 62:25 67:4

**ask**
5:9 7:12 12:4 24:11
28:12 31:7 35:2,11 43:1,
3,11,12 47:8,22 49:16
53:6 59:11,13 60:9,10
63:11,19 67:12 69:3

**asked**
13:17 15:21 23:4 24:12
26:3,11,12 27:7 28:25
33:12 43:23 45:7 49:6
59:7 60:8,20 62:10,11
63:1,2 69:17

**asking**
13:22 26:2 29:19 33:3,6
44:5,6,9 58:4

**Aslan**
16:14

**Asplundh**
16:14

**at**

6:11,12,15 8:23 9:2,3
10:16 11:24 12:8,9,18,20
14:19 15:6,20,22 16:2,6
17:3,10,17,21 18:2,12,24
19:15 20:11 22:4 23:24
24:11 26:1,8,11 27:24
29:18,19 31:25 34:15,21
35:21 36:25 39:11,12,14,
15,25 40:6,17 41:11,20,
22 42:1,6 43:3,7 44:24
45:20 46:7,8,23 47:1,25
48:14 49:21 51:25 52:7,
23 55:23 56:5 61:11 62:5
63:1,16,22 64:7 66:14
67:12,15 68:2,5,12 70:9,
16

**attach**
42:22,25

**attached**
22:5 41:15

**attorney**
70:8

**authorize**
70:7

**authorized**
67:8

**avoided**
62:12

**aware**
28:23 42:5,6 43:18 46:12
57:7

**away**
29:24

**awful**
14:22

**B**

**back**
6:8,19 15:8 16:3,4,16
19:5 20:3,9,10,11,18,19
23:1 29:3,12 30:25 31:13
33:17 34:9 35:18 39:7,12
48:18 49:4 52:21 53:11
62:24 63:17 64:9

**bad**
59:20 64:21 65:4

**based**
34:7

**basically**
12:17 13:18 62:3

**basis**
41:23

**be**
7:8 8:1 13:10 14:20
33:15 36:8 38:13 40:13
49:10 50:17 51:11 55:16
57:8,19 60:15 65:10 66:7
68:4,24 69:17 70:3,7

**because**
28:22 30:22 35:13 37:7
47:20 56:8 58:9 60:20
68:11

**been**
5:21 7:15 9:13,25 10:15
16:2 26:19 40:14 48:6
53:2 54:1 56:18

**before**
5:9,12 6:10 7:18,21
13:18 26:7 36:9 37:2
41:1 45:22,23 46:1 48:3
49:4,6 63:13

**begin**

18:12 23:2

**beginning**
19:15 21:17 27:24 31:25
68:2

**begins**
17:2,10

**behalf**
27:19 28:2,3

**behind**
52:21

**being**
42:3 44:11 46:9 56:19,20
68:12

**believe**
32:2 51:15 52:17 53:2
68:10,11,17

**benefit**
18:16

**best**
6:18 20:19 27:17 39:9
44:23

**bet**
70:11

**better**
6:9,10 9:19,20 25:12,13
32:3 58:15 68:10

**between**
17:16 28:21 49:25 63:13

**beyond**
50:19

**big**
47:1 63:25

**bigger**
68:10

**binding**

5:11

**bit**
32:13 33:6 62:22 63:19

**blessings**
46:6

**board**
43:4,13 44:9

**bonus**
35:23,24 37:25

**books**
46:25

**both**
15:19 60:25

**bottom**
11:24 39:3 40:17 41:10

**bought**
36:14

**break**
9:11 40:19

**break-even**
39:21

**brief**
53:10

**bring**
22:16 42:8 49:14 50:6
51:3 52:2,4 61:10

**bringing**
52:25

**broader**
63:8

**broke**
9:19

**brother**
47:17 49:18 56:24 57:4,
11,18 58:1,10 60:1,2

**brought**
21:23 28:17 46:18 49:11,
16 50:17 55:17 60:12

**bunch**
44:4 49:15

**business**
10:15,17 27:15 33:22
40:14 43:23 64:7

**busy**
31:22

**but**
7:18,25 8:11 10:11 12:18
14:10,18 15:3,19 16:15
17:25 18:14,21 19:1,23,
25 21:6,21 22:8,15 24:11
25:23 26:6,11 27:4 28:8,
13,18,22,23 29:19,22
30:1,23 31:21 32:15,18,
19,23 35:2 38:16 43:15,
18 45:4,8 46:8,12 47:4,
22 48:5 49:9 50:13,16
52:16 53:18 54:3 57:12
58:4,8,14 60:14 61:16
62:14 64:14,19 65:5,11

**buy**
35:7 52:4 67:18

**buying**
34:22

**by**
6:2 7:11 8:24,25 9:22
10:3 11:12 26:6 29:5,11
30:8,17 37:21 39:18
51:21 58:24 62:21 65:7,
20 66:9,11 69:7 70:2

---

**C**

---

**California**

5:6 34:19 42:4 50:1

**call**
18:20

**Calls**
65:17 66:1

**came**
25:15 34:14 43:12 44:3
47:5 48:16 62:13 64:4

**can**
7:6,7 11:7 12:18 16:16,
18 19:1 21:6 27:14 30:22
35:12 40:25 42:21 48:17
50:21 55:10 56:17,25
59:10 64:25 65:1

**can't**
14:24 20:7 26:23 39:10
62:16 64:19

**car**
67:18

**care**
26:25 27:15 40:10 51:9
52:6,19,20

**cars**
21:25 24:20 36:3

**case**
59:8 60:9 61:19

**Catanzarite**
5:13,14 6:2 7:3,7 8:9
10:3 11:12 29:5,11 30:8,
17 37:21 39:18 42:24
51:21 53:5,9,11 58:17
59:7 60:8 61:25 62:8,21
65:20 66:11 69:21,25
70:2,12

**CEO**
52:11 55:16 56:5

**certain**
46:6 56:9

**certified**
5:5

**chance**
24:10

**change**
61:7

**changed**
61:5

**charge**
39:6 52:12 57:12

**chatting**
7:8

**Cho**
5:15,16 8:7,8,11 29:4,7
42:21 50:8 52:21 53:13,
15 54:6 58:20,24 62:18
65:16,25 69:23 70:8

**chose**
52:10

**circled**
37:24

**claim**
51:7

**class**
36:6

**clear**
11:17 27:6

**climbing**
9:5

**close**
19:19,21

**coaching**
69:13

**Code**
70:14

**column**
41:12,13

**come**
10:4 15:8 29:12 30:25
35:18 42:4 44:11 48:15

**comes**
51:24

**coming**
9:7,14 34:15 35:21 43:13
44:8

**company**
8:17 9:24 15:11,18 16:3
27:3,21 28:10,16 45:14,
18 47:17 48:2 52:14 57:4
60:2,22 65:6 66:6 67:21
68:5

**compare**
36:8

**compensated**
52:3 53:2

**compensation**
10:12,16 36:24 37:3,10
56:11,13

**complete**
20:14

**completed**
41:3

**concluded**
70:16

**confide**
64:2

**Confidential**
42:17

**confirm**
17:15

**confirmation**
65:9

**confuse**
31:3

**confusing**
32:13

**consistent**
33:16

**contacted**
53:24

**continue**
19:14

**continues**
17:2,11,13

**continuing**
18:13

**contract**
37:16 38:14 46:8 51:22
66:21,24 67:4

**contractor**
16:14

**conversation**
18:4 21:13 28:20,24 54:3

**conversations**
36:11 63:13

**copy**
13:2 55:5

**cornered**
25:14

**Corp**
38:15

**correct**
7:19 10:24 13:21 14:3,

12,20 16:10,11,22,25
17:3,18,23 18:5 19:9,10
20:5,23 21:15 23:10,12,
16,21 24:1,14,21 25:1,6,
7,10 26:5,14 28:21 29:16
32:12 34:3,11,16,19 38:8
40:22 41:8,16,19,24
46:11 53:25 59:8 62:9

**correctly**
36:13 59:3 64:18 67:25
69:19

**cost**
47:17

**could**
20:21 37:2

**couldn't**
9:13 36:8 39:11 57:9
67:23

**counsel**
5:9

**couple**
7:18,25 9:15 34:7 54:1,
20,24 59:9,14,24 70:1

**couple-of-weeks-ago**
54:6

**course**
7:13 46:5 59:24 64:5

**court**
12:1 13:3 18:16

**credentials**
46:17

**crew**
43:24

**crews**
40:12 46:23

**cute**

36:16

**Cuter**
36:18

---

**D**

---

**dad**
10:21,23

**date**
5:6 31:9

**dated**
12:23

**dating**
6:19

**day**
12:9,11,13 20:18,25
22:6,7 23:5 25:9 29:25
30:20 32:11 35:5 43:10
48:17 62:13,15 64:8

**day-to-day**
65:10

**deal**
25:14

**deceived**
25:20

**decided**
10:6

**decisions**
28:17 34:10 64:2

**defend**
62:4

**definitely**
15:4 25:21 26:17 29:10

**Denise**
7:2,3 10:1 17:22 34:25
42:3 45:13

**depo**
22:20 59:19

**deposition**
5:11 7:14,22 8:12 12:8
13:5 18:25 22:6,24 32:22
35:10 40:7 53:14,17,21
54:9,11,21 63:2

**describe**
9:23 12:20

**deserving**
60:12

**desk**
18:3 20:5,20

**details**
47:22

**did**
6:11 7:15,20,21,24 8:11
9:1 10:4 13:2,4 14:16,19
15:23 19:25 22:21 23:11
27:5,16 28:11 29:2,9
32:18 35:7,10 36:23 37:1
40:11 43:15 44:8,21
45:25 47:22 48:10 49:1
52:20 53:13,20 54:5,8,11
55:5,10 56:6 57:16,21
58:12 59:3,9,11,13,25
60:9,10 61:25 62:6 63:9
64:2 65:5,6,15 67:1,5,6,
25 68:22 69:9

**didn't**
15:3 22:8,22,23 26:20
28:11,12,13,25 29:2,22,
25 30:22 35:8 40:9 42:8
43:15 47:11,22,25 48:7,
15,24 49:14,19 50:16
51:3 52:2,4 56:7 57:7,11,
17 58:4,5 60:13,14,16
61:13 63:6,11 67:19,22
69:16

**different**
33:6 44:6 55:19

**dinner**
20:1

**direction**
55:19

**disagree**
24:4 44:4 47:4 48:4 67:7

**disagreed**
57:3

**disagreeing**
14:16

**discuss**
46:4 48:7,15 49:1 50:16

**discussed**
8:11 22:14,15 27:20 32:4
43:8 45:19 47:6 48:14
49:9 51:17 55:18 61:8,
11,18

**discussing**
20:2 26:9 37:14 45:21,25
49:7 50:4 57:1

**discussion**
26:7 39:20 47:7,12,15,16
48:21 49:11 56:24 63:17

**discussions**
47:10,14 48:20

**do**
5:13,15 6:16,20 7:22
8:19,21 12:4,6,8,12,25
13:7,13 15:21 18:14,15,
24 21:4 27:24 30:10
31:11,20 32:7,17 33:8
34:21 35:25 36:10,20,22,
23 37:9,23 38:2,10,18,
19,24 39:11,23 40:8,9
41:4 42:18,21 44:14,17,

20,23 45:21 46:21 47:13
48:19 49:7 50:3,6 51:8,
25 52:9 55:15 56:1 57:2
62:14 63:1,5 64:3,6 66:9
67:8,17

**document**
11:8,14,15 12:23 18:22,
24 30:9 31:8,11 32:23
33:5,8,13 40:5 42:16

**documents**
8:12 32:21

**does**
29:20 43:5

**doesn't**
9:12 53:17

**dog**
36:15,16,17 52:5

**doing**
6:5,6 16:13 29:19 32:9
38:20,21 49:21 50:21
57:12 59:15

**dollars**
29:1,24 47:18 57:6

**don't**
8:10 10:10 11:3,6 15:18
19:1,23 20:6 21:5 25:18
27:7 29:18 32:7 33:1,2,
10 37:11,14 38:16 40:15,
16 41:20 42:8,18,25
44:12,22 45:4 47:17
50:18 52:8,9 56:8,16,22
57:12 58:15,18 60:6
61:13,17 62:10

**done**
7:15 13:12 14:1 32:15
50:20 52:7 60:1 67:23

**down**

11:24 14:22 19:24 20:1
41:7 46:4 62:15

**drugs**
6:22

**duly**
5:21

**during**
7:13

**Dwight**
36:25 37:1 38:17 52:11
56:3,6,7,19,20

———————

**E**

**e-mail**
61:11

**each**
35:5

**earlier**
6:19 58:25

**easier**
20:13

**echoing**
64:24

**EDWARD**
5:20

**effect**
59:6

**either**
47:25

**electronic**
55:8

**else**
7:13 54:8,12 60:7 67:13

**embezzled**
57:6

**embezzling**
60:2

**employed**
8:15,24 9:22

**employees**
8:21 9:2

**employment**
12:7 37:15 45:9,17

**end**
17:17 36:12 38:1 55:22
63:1 68:14 69:14,17

**ended**
49:18

**engage**
53:20

**enough**
6:12 44:13

**entitled**
6:18 37:12 51:25

**equals**
39:4

**established**
21:24

**estimate**
44:23 56:17

**European**
70:4

**even**
26:20 32:3,13 36:14 39:8
40:19 42:21 43:8,16,21
46:12 47:11 49:12 50:7,
18 51:10 52:6,8,23 54:17
57:19,20 60:24 61:9,10,
11,13 62:16 64:1 65:7
69:16

**events**
6:19 20:19

**ever**
6:9 27:17 32:15 37:14
38:10 39:9 41:21 43:13
44:10 45:16 46:17 48:3
49:1 51:17 60:22 67:6

**every**
24:21 26:13 35:4 40:3
43:10

**everybody**
43:22 65:6

**everything**
13:20 14:3,8,11 16:9,22
19:9 27:4 28:9 29:16,17
43:22 48:12 52:13 56:25
60:6 65:9

**Examination**
6:1 12:21 58:23 62:20

**examined**
5:22

**exceeding**
44:10

**except**
36:14 47:11

**excess**
43:14

**executed**
31:22 33:22

**exhibit**
11:9,10 12:23 13:8 15:8
18:20,21 20:25 21:1
22:5,21 30:4,5,10,13,14
32:17,20,21 37:16,19
39:15,16,19 40:6 41:14,
15 42:16 62:24,25

**exhibits**
12:22

**expenses**
39:4

**expertise**
46:18

**explain**
24:10

**F**

**fact**
28:13

**factoring**
57:3 60:2

**fair**
33:15,23,24 44:13 68:4

**fairly**
68:19

**family**
10:15,17,21 50:4 52:25
59:21 61:12,16

**far**
9:10 21:21 23:16 26:24
27:2

**father**
10:24 64:13

**fault**
35:15

**February**
40:1

**feel**
60:5

**fell**
9:10

**felt**
25:22,23 32:7 46:5
55:15,18 60:5 61:21
68:20

**few**
9:25 29:24 47:23 53:12
58:20

**field**
43:18 52:23

**fifty-five**
35:22

**filed**
47:9 49:5

**final**
27:5 37:7 69:5

**financial**
41:14,22 42:10

**find**
33:24 48:16

**fine**
6:6 7:11

**finish**
15:25 43:4

**first**
5:21 11:14 12:4,21 19:7
30:4 36:6 50:8,9 55:7
59:16 61:8 63:16

**five**
53:5

**Florida**
15:17 16:2 27:9,16
34:15,19 42:4 50:1,12

**fly**
36:5

**focus**
41:6 48:18 49:22,24

57:14

**focusing**
57:25

**follow**
58:21 62:22 70:14

**follows**
5:22 23:5

**foot**
9:14

**for**
7:15,22,25 8:9,12,20
9:23 10:6 11:2,10,13
12:7,16,17 15:10 16:13
18:15 20:13 22:3 23:15,
21 24:20 25:1,15,21
26:6,18,20 27:17 30:5,14
31:5,18 34:13 37:19
38:15 39:11,16 41:11,18
42:8,10 45:13 46:18 48:5
51:10 53:3 54:7 59:2,15
61:15,22 62:8,13 64:12
65:5,17 66:1 68:12 70:1,
8

**forced**
25:23

**forces**
36:1

**foreseen**
32:3

**forget**
15:11

**forgot**
36:14

**formal**
33:20

**forward**
10:7 16:18 55:25

**foundation**
29:7 65:16,25

**four**
17:22 18:5

**freelance**
8:19

**friend's**
9:4

**from**
8:3 9:15 10:17 13:3
15:17,18 16:2 34:15,19
37:2 41:7 42:4 49:15
50:1,10,25 51:1,2 54:19,
24 57:21 58:5,8 60:2
68:1

**front**
18:15

**fulfilling**
68:13

**further**
40:4 58:12 62:18,20
69:21,23 70:13

**future**
20:2

---

**G**

**gave**
26:3,12 29:24 55:2 61:24

**generally**
43:1

**generated**
38:11

**generates**
51:24

**get**

7:21 19:7 24:10 30:4,9
31:22 37:1,4 38:7 39:7
41:10 42:22 44:2 46:6,7
47:22 50:8,12 59:15,16,
18 65:9

**gets**
52:19

**getting**
46:23 56:7 66:14

**give**
22:1 26:4 52:10 56:17

**giving**
12:5 28:18 51:17

**Gloria**
10:23 51:1

**go**
10:6 12:3,14,19 13:24
14:5 15:18 16:8,12,24
19:5,14 21:10 23:1 25:15
27:20 28:8 29:8 31:13
35:16 39:12 40:5,24
47:20,23 48:6 49:4
55:11,12,14 56:6,9,20
57:21 58:9 59:17 61:14,
15 62:24 63:17 66:12

**goes**
27:2 43:16

**going**
7:8 11:8,13 12:3,4 13:18
15:6,12 18:15,21 19:14
23:1 24:10,25 26:21
30:7,25 31:24 35:18
36:10 38:7 44:2 46:7
47:21 50:13 52:24 55:18,
22 58:3 59:16 60:3,13,14
62:1,24 64:3,6 65:8
67:17 69:17 70:3,4

**gone**
51:15

**good**
5:4 6:3,4 7:5 31:19 32:8
38:21 46:23 47:24 48:6
51:9

**got**
13:18 14:10 17:19 21:24
26:7 33:22 35:11 38:14
47:17 49:19 57:8 62:15
63:10,13 64:13

**gotten**
32:9

**grandchild**
16:4

**greatly**
27:16

**ground**
9:15

**guarantee**
46:20

**guess**
8:20 19:13 20:6 26:15
36:19 44:24 49:18 57:7
64:17

**guessing**
38:13

**guy**
36:20

**guys**
25:14,17 34:4 43:15

---

**H**

---

**had**
15:10,16,17 16:2,3,4
19:3 21:2 22:20 24:7

26:12,19 27:5,15,18,20
28:8,20 31:16 32:4 33:17
34:18 36:9 38:17,25 39:9
40:8,10 43:13,23,24
46:6,17 47:3,9,20 48:2
50:11,23 51:8,10,18
52:11 54:21,23,25 55:20
57:2,18 58:9 60:1,3,12,
24 61:10 62:7 63:2,22
64:5,6,8,13 65:9,23 66:9,
21,24 67:22

**hadn't**
26:18 32:6,9

**half**
26:20

**handled**
34:24

**handwritten**
12:22 22:4,5

**happen**
62:1

**happened**
31:23 39:9 52:25

**happy**
36:7

**hard**
14:9

**hardly**
30:23

**has**
27:5 31:9 46:16 53:2
58:19 61:5

**have**
8:14,21 9:1,13 11:5
12:14 18:14 19:8 21:18
29:9 35:2 36:13,15,23
37:4,7 38:19 39:12 40:14

42:7,10 44:9,23 45:16
46:3 47:1,9 48:5,6,19
50:3,9,20 52:7,25 53:6
54:1 55:17 56:18 58:14,
18,20 62:18 64:18 65:13,
19,21 67:13,14,19,22,23
69:3,5,19,25

**haven't**
54:17

**having**
5:21 36:11

**he**
12:7,17 15:10,12,14,16,
17,18,19,21 16:1,2,3,14
21:22,23,24 22:16 23:11
25:17 26:24 27:15,17,18,
22 28:21 29:18,20,21,24
31:16 34:14,15,18 37:2,4
38:12,15 39:8 46:16,18,
22,25 47:16 48:2,4,12,
13,22 49:11,12,14,21
50:9,12,14,17,19,21
51:9,10 52:6,7,11,15,17,
20 53:17,18,21,24 55:14,
15,16,19,20 56:3,11,13,
15 57:6,10,11 59:9,12,
13,17,18,19,23,24 60:1,
3,8,9,10,11,12,16,20,21,
22,23 61:2,10,14 62:3,15
65:11,15,19,23,24 66:4
68:13,14,25 69:1

**he'd**
52:6

**he's**
36:16 46:22,24 51:15,25

**head**
35:13

**heading**
15:12,14

**hear**
7:6 59:3

**heard**
47:23 57:13 58:5 59:6

**hearsay**
57:9

**hell**
25:16 26:19 51:9

**Hello**
7:3

**helm**
68:12

**her**
7:6,8 19:21 20:5 21:6
27:4,5 28:18 29:9 35:2,3,
13,21 48:24 57:1 64:2,3,
5,8,9,10 65:7,9 66:9
67:17

**here**
7:2,22 8:1,6,12 13:18
14:21 15:1,21 16:8 17:6
21:6,13,20 22:17 25:15
26:10,17 27:6,16 28:11
29:20 30:11 31:11 32:4,
20 36:8 38:16 40:18
41:5,6,13,17 44:17 46:18
47:1,5 49:17 50:13,14
51:7,11,16 53:1 55:23,24
59:10 63:16 64:8 66:7
69:7

**here's**
45:1 49:24

**hey**
45:5 47:5

**high**
9:10,11,12 46:2

**higher**

15:1 46:2

**Highly**
42:17

**hillbillies**
49:16

**him**
8:8 15:13,15,21 21:25
26:23,24 27:16,17 28:18
34:10 35:25 39:10 42:8
45:22,23 46:1,18 47:1,
16,20,23 48:6 50:10,21
51:8,17 52:4,20 53:18,
19,20 54:10 55:12,17
56:9,10 57:11 59:15,19,
25 60:4,10,11,14,17,25
61:12,14 62:4 63:25
65:8,14,22 66:5 68:12

**himself**
55:17

**hire**
8:20 53:13 68:20

**hired**
38:11,15 42:7 45:22,23
46:1 53:15,19 65:14
68:12

**hiring**
21:25 34:10 40:11 65:22

**his**
12:8 14:24 15:1,11 16:4
27:15 29:21 30:23 31:17
46:18 47:15,16 48:7,10,
11,14,15 49:18,21 50:21
51:15 57:5,11,18 58:1,9
59:14,19,25 60:1 61:3
62:16

**home**
15:12,14 36:5 51:10
59:14

**honest**
51:12 56:19 57:8,19,24
60:15 61:20 65:10

**honestly**
56:16

**hope**
11:5 35:7 43:25 60:6

**house**
8:3 9:4 10:19 12:6,8,9,18
22:1 35:7 48:14,15 49:21
52:4,5 59:1 62:5

**housing**
25:1,4

**how**
6:3,5 7:4,5 8:15 9:10,12
10:4 38:19 45:25 47:16
48:4,11,13,23 49:1 50:17
54:5 56:15 62:17 65:21

**hundreds**
29:1

**hung**
35:4

---

**I**

---

**I'D**
7:12 8:20 13:7,11,25
29:15,21,25 46:3 62:22

**I'LL**
11:5 20:14 30:13 31:13
33:13 44:24 64:21 70:9

**I'M**
6:6,12,18 8:22 9:13
10:11,14 11:7,13 12:3,4
13:22 15:6,25 16:1 17:5,
6 18:15,21 19:14 23:1
25:6,18,23 26:1,2 31:1,3,
24 32:10 33:3,6 34:12

35:3,15,17 37:16 42:6
43:16 44:5,6,9,19,24
45:7 46:12 47:19 50:13
51:6,11 55:22 56:8,20
57:25 58:7 59:22 60:13,
14 62:24 63:6,10,11
66:14 68:1

**I'VE**
14:21 53:18 55:7,8 57:8
60:24

**idea**
60:3

**ideas**
55:20

**identification**
11:11 30:6,15 37:20
39:17

**identified**
39:19

**identify**
30:13

**if**
13:22 14:24 15:21 16:3
21:10 32:14 38:10 39:25
40:8,24 41:10,11,20 42:7
43:3,23 44:9 46:8 47:4
49:16 50:17,21 52:7 53:6
55:13,23 58:3,4,18 59:18
62:22 63:3 65:18 66:2

**impromptu**
62:1

**in**
5:5 6:13,25 7:2 8:12
10:19,20 14:18 15:16
16:1 17:17,25 18:14
19:20 20:3,9,11,18,19,22
21:2,23 22:1,16,24 23:9
25:13,16 26:2,13 27:15

28:13,19 29:3 30:12
32:15,20,21,24 33:9,17
34:9 35:1,8,17,21 37:8
38:6,7,12,14,18,24 39:6
40:4,8,11,14 41:1,2,7,8,
23 42:1,2 43:4,14,18,20,
22 44:10,14,21 45:10
46:9,19,22 47:2,5 48:3
49:6,8,11 50:2,12,18,23
51:10,18,20 52:2,5,12,25
53:14,17,21 54:6,17,20,
23 55:17,18,20 56:21
57:12 59:1,20 60:5,9,15
61:3,10 64:1,2,7,8,10
65:4 66:4 67:3 68:17,19
69:7

**included**
37:8

**income**
41:11,16

**Incorporated**
11:20

**increased**
68:8

**Index**
12:21

**individual**
11:19,21

**industry**
26:24 46:3,14,16,22,25
51:3 55:20

**inflates**
43:22

**inflating**
44:19

**injury**
64:13

**interruption**
51:20

**interview**
62:8

**into**
7:21 25:23 27:23 31:25 34:23 35:19 39:9 47:22

**invited**
19:18

**involved**
17:25 34:25

**involvement**
65:22

**irks**
50:14 51:6

**irrelevant**
43:25 53:1

**is**
5:4,6,7,10 6:9,14,25 7:2 8:5,7,17,20 9:18,19,20 11:17,19 12:22 13:5,7,20 14:3,8,11,13 16:9,22 17:3,18 19:9,19 20:9,10 21:14,21 22:21 23:9,12 24:15,16 25:6,12 26:2,4 27:9,10,21 28:4,14 29:16,17 30:1 31:8,23,24 32:13 33:23 34:1,16,19 36:20 38:4 39:20 40:7 41:1,7,11,12,14,16 42:5, 16,19 43:3,24 44:5 45:13 48:22 49:5 50:2 51:7,11, 16,22 52:3 53:18 55:9,23 56:3 57:5,9,24 59:4 62:8, 16,24 64:10,23 66:14 68:5,16 69:12,15 70:10

**isn't**
32:24 47:2

**issue**
57:18

**it**
6:10,11 9:3,12 11:13,17 12:19 13:13 14:10,13,16, 18,25 15:1,3,6,16,19 16:8 17:6 18:2,13,14,15, 20 19:1,18,19,22,25 20:13 21:14,22 22:7,8, 15,16,21 23:23 24:17 25:13 26:8 28:13 29:20, 25 30:11,13,22 31:5,9, 11,22,24 32:4,5,9,14,18, 24 33:1,4,11,15,21 35:19 36:15,20 37:23 38:9,22 39:21 40:17,18 41:7,15, 17,25 42:22,25 43:2 45:19,25 46:2,5,6,7,10 47:2,15,24 48:4,14 49:9, 10,18,19 50:13,17 51:1,6 54:1 55:9,17,18 57:2,4, 10,11,12,15 58:5 59:13, 14,23 60:14 61:7,9 62:6, 10,11,12,13,14,17 63:8, 10 64:4,8,10,19,21,25 65:1,16,25 66:7 67:7,14, 16,19,23 68:4

**it's**
9:14,25 10:15,20 11:9 14:9 16:18 18:21 30:12 31:9 32:10 35:15 39:9 42:16 44:17 45:7 47:2 51:13 53:1 64:14,24 68:6

**item**
37:24

---

**J**

---

**January**
40:1,24,25 41:3 45:11,12

49:6 50:3 54:20,24

**job**
9:3 15:11 27:17 29:21,22 50:21 61:23

**jobs**
12:7

**John**
10:25 11:20

**joining**
36:1

**Jordan**
11:19 17:17 38:19 42:2 44:11 50:25 51:24 52:2,3 57:5 59:11 62:7

**Jordan's**
62:5

**June**
37:16 50:2

**just**
7:11 8:1 9:12,14 13:13, 15,17,22 15:10,17 16:2 17:15 18:14 19:25 20:1 22:22 24:11 26:8 31:20 32:5,6,9 33:19,20,22 41:3 43:1,10 45:7,8,15 46:25 48:8 50:13 51:6,11 54:7,10 55:16,18 56:19 57:18,25 58:2,20 60:4, 10,14,16 64:8 66:5 68:14 70:1

---

**K**

---

**keep**
31:5

**Ken**
14:21 17:5 20:1 22:2 25:14 26:22 28:15 30:3,7

32:25 33:4 35:2,16 37:23
38:9 39:1,11 40:13,16
43:7 49:20 50:22 53:3
54:1 56:7,22 60:4 62:15
63:10

**Ken's**
35:15

**kept**
50:20

**kind**
36:10,11 40:9

**knew**
34:14,18 43:17 46:3
58:3,4 60:23 62:2,3
63:21,24,25 65:6 66:4,8,
20,23 67:2,3 68:14

**know**
8:10 9:13 10:14 11:3
13:12 14:1,9,21,22,24
15:3,18,19 16:20 19:2,4,
17,19,20 20:7 25:15,18
26:8,15,20,23 27:4,17,20
28:25 29:10,18 30:22
31:20 32:1 33:1,2,5 35:2,
3,4,8 36:4,6,20,22 38:10,
13,18 39:6,8,11 40:8,9,
10,12 42:4,18 43:7,10,
17,23,25 44:14 45:5
46:5,23,24 47:12,18,21,
22,25 48:1,2,3,6,17
49:15,19,20 50:13,17
51:4,7,9 52:6,12,15,21,
22,25 55:19 56:9,16,22
57:7,11,13 58:3,18
59:20,21,22,23,25 60:4,
5,7,15,16,21,23,25 61:1,
3,4,12,13,16,17,21,22,25
62:2,3,10,15 63:10 64:3,
17 65:4,7,8,15,18 66:2,5,
6,8,25 67:20 69:1,16

**known**
65:13,19,21

**knows**
27:22 28:9,15,16 45:11
46:22 49:10 65:11,12

---

**L**

---

**lacks**
29:7 65:16,25

**ladder**
9:7,8

**Land**
52:5

**Lane**
34:22

**last**
9:21 62:16

**late**
8:2

**later**
34:21

**laugh**
11:6

**lawsuit**
47:9,14,15 48:7,10,11,
15,20 49:2,5

**lawyer**
7:24 8:5 59:19

**leader**
55:20

**learned**
48:11 57:21

**least**
6:12 41:22 42:1 46:7
51:25

**leave**
10:4 15:6 26:8 49:6 50:2

**leaves**
25:16

**left**
29:20 38:12 54:19 67:19

**leg**
6:9 9:12,18,19

**less**
40:21

**let**
10:6 13:12 14:1 15:18
18:14 20:14 23:1,6 24:11
30:4,9 35:11,19 37:15
40:6 41:25 43:1,11,12,21
44:20 47:8,20,23 48:9
53:5 55:10,12,14 56:6,9,
20 57:20 58:9 59:17 60:4
61:14,15 63:17,19 64:3
66:5,22

**let's**
12:20 14:5 15:8 16:6,12,
24 17:1,20 18:12 19:5,7
20:13 22:4 26:8 27:23
31:5 39:14,15 40:4,6
41:6 63:15,16 66:12

**letter**
19:20 21:5 33:20 37:17
50:18,19 55:22,23

**letters**
21:5

**letting**
48:5

**license**
5:6 8:18

**lie**
60:13

**life**
48:3

**like**
9:18 13:7,11,25 14:16,25
17:6 19:2 22:14 24:7
26:22 29:15 40:18 42:22
46:24 52:19 54:4 55:19
56:8 57:6 61:19,21 62:22
66:5 68:14

**line**
17:2,3,15 18:12,13
19:15,16 23:4,14,20,24
24:12,15,19,23 25:5
27:25 28:7 31:7,25 35:19
39:3 41:10 61:3 63:12,
18,23 64:15 66:12,16,17,
19,20,23 67:1,2,6,9,10,
11,12 68:2,18,22,25
69:5,8,9,12

**lines**
17:21 18:2 64:12

**Lisa**
5:4 20:13 35:13,15 58:7
70:13

**Lisa's**
31:5

**Listen**
69:14

**listened**
60:16

**little**
14:10,16 25:23 31:4
32:13 33:6 36:16 43:17
44:6 47:11,12 48:21 50:6
59:21 60:5 62:22 63:19
66:7

**live**
10:19 11:2,7 22:1 35:8

**lived**
16:5

**lives**
51:10

**living**
34:15

**LLC**
34:22

**located**
15:15

**long**
7:15 11:2,7 48:17 64:14

**look**
12:20 16:6 22:4 25:15
39:12,14,15,25 40:4,6,17
41:11 43:3 46:8 55:23,25
63:16

**looked**
15:10 34:13 43:7

**looking**
12:6,17 17:5 41:20 59:2
61:22

**looks**
14:16,25 16:25 17:6
26:22 65:3

**losing**
42:5,7 47:6

**loss**
38:4 47:3

**lost**
15:11

**lot**
22:2 26:8 41:5 46:19
50:7 52:3,24 58:10,13
61:6 68:6

**lots**
63:14

**loud**
13:13

**Lourdes**
11:24 18:16

**love**
7:13

**Lucas**
34:22

---

**M**

**made**
14:19 28:16 38:17 39:7
40:13 44:3 48:2,3 60:22
61:7 64:1 67:21

**make**
6:11 20:13 27:3,6 36:7
50:6 61:2

**makes**
51:6 60:6

**making**
27:19 28:2 34:10 38:22
41:23 68:6

**man**
46:24 61:23

**manly**
66:7

**many**
54:5

**March**
7:19 12:12 13:6 20:18,22
25:10,13 33:13 34:1 40:1
59:1

**marked**

11:9,10 18:20,21 20:25
22:21 30:5,12,14 32:21
37:19 39:16 42:17 62:25

**marking**
37:16

**matter**
9:12

**may**
12:2,23 28:19 29:3 30:18
31:9 33:18 34:9 38:18,24
41:2,23 42:1 54:1 62:22

**maybe**
32:3 39:7 50:16 63:17
65:10 69:25

**me**
5:12 7:11 8:1 10:6 12:11
13:12,13,18,22 14:1
18:14 19:18 20:14 22:19
23:1,6 24:11 25:14,24
27:7,10 28:12 29:19
30:4,9,19 32:17,25
35:11,19 36:25 37:4,15
40:6 41:25 43:1,11,12,21
44:2,20 45:7 46:17,19,23
47:8 48:1,9,10,12,24
49:16,21 50:6,14 51:6
52:17,21,23 53:5,15,24
54:10 55:9,10,12 56:17,
25 57:10,17,20 58:4,5,14
59:10,12,17,23 60:1,11
61:7,14,19 62:4,11,15
63:6,11,13,17,19 64:23
66:5,22 67:19 69:11 70:7

**mean**
10:23 11:6,17 14:9 17:24
20:6,7,11 22:14,16 25:18
26:23,25 28:16,17 32:18
33:2 35:4 39:2,3 43:17
46:25 47:5 48:21,25

49:14 50:20 52:21 55:17
56:9 61:6,17 65:11
67:20,22

**meaning**
32:20

**means**
35:14

**meant**
16:14

**medication**
6:22

**meet**
7:24 54:5,8

**meeting**
17:16,25 20:1 23:9 28:20

**meetings**
17:3,16

**members**
50:5

**men**
51:2 66:6

**mention**
28:14

**mentioned**
27:4 56:23 57:10 58:25

**mess**
49:19

**met**
7:17,18 34:9 38:18
65:23,24 66:3

**Michael**
36:20,24

**middle**
60:6

**might**

66:7

**Mike**
36:22 37:17 52:4,10
55:18,23,24

**million**
29:24 39:22 40:2,19,21
41:7 43:5,14 44:10 45:3
50:23 67:21

**millions**
47:18 57:6

**mind**
6:13

**mine**
14:24

**minority**
64:13

**minus**
39:4

**minute**
24:5 40:5

**minutes**
7:25 53:6 54:7

**MLU**
15:19

**mom**
10:21,23

**Monday**
5:1,7

**money**
38:22 39:8 40:13,15
41:23 42:5,8 44:4 47:6
48:2 57:3 60:2,13,22
68:6

**monies**
49:13 50:17

**month**
40:3,19

**Monthly**
39:20

**more**
9:13 14:21 26:9 40:1
46:17,19 47:16 48:2,9,10
52:3 53:6,12 57:21 60:1,
21 62:1 63:17,19 70:1

**most**
26:22

**mostly**
49:21

**mother**
27:2,21 28:10,15,16,22
29:2 37:5,7 45:19 46:4
49:12 52:13 56:18 61:13
64:4,6 65:3,5,22,23 66:3,
8 67:14,16

**move**
17:20 27:16

**moved**
34:23

**moving**
10:7

**Mowbray**
5:20 6:3,14 7:2,3,5,17
10:1,25 11:21 13:6 14:12
18:18 20:8 28:19 44:3
49:1,2 51:1,2 53:7,12
58:18,25 62:23 64:22
66:17,18 69:3 70:3

**Mowbray's**
9:22 10:5 11:20 14:17
15:22 20:12 21:22,23
23:25 24:6,13 25:4 26:19
27:19 28:2 34:21 35:25

37:13 38:10,20,21,25
39:1,7 40:8 41:23 42:5
43:13 44:8,10,11,21
45:17 47:1,3,21 49:14
50:11,20,23 51:18 52:7
54:20 59:18

**Mr**
5:13,14,15,16 6:2,3,14
7:3,7,17 8:7,8,9,11 10:3
11:12 14:12 18:18 20:8
28:19 29:4,5,7,11 30:8,
17 37:2,9,12,15,21 38:6,
11,13,14 39:18 42:21,24
51:21,22,23 53:5,7,9,11,
12 54:6 55:11 58:17,18,
20,24,25 59:7,11 60:8
61:25 62:5,7,8,18,21,23
64:22 65:16,20,25 66:11
69:3,21,23,25 70:2,3,8,
12

**MS**
7:5 10:1

**MTS**
9:24

**much**
6:6 28:23 46:2,17 47:15
55:25 56:15 57:17 60:12
70:12

**must**
48:5,6 50:19 52:7

**my**
5:4,6 6:9,13 7:2 9:18,19
15:16 16:1 17:25 20:14
27:2,21 28:9,10,15,16,22
32:13 34:24 37:4,7
45:11,19 46:4,19 49:12
52:13,16,21 53:3 56:18
57:4,19,20 58:8 59:15,21
61:12,16 63:24 64:4,6,

13,21 65:3,5,7 66:3,8
67:16

**myself**
8:25 13:14

---

**N**

**name**
5:4 15:11 57:5 62:16
64:9,10

**named**
36:20

**Neal**
36:21,22 37:2,12,18
38:6,11,13,14 46:8,14,16
51:23 52:4 55:11,23

**Neal's**
36:24 37:9,15 46:8 51:22

**need**
28:25 29:2,10 37:1 39:7
40:18 42:22,25 69:14,24

**needed**
36:5

**negative**
41:16,19

**net**
37:25 38:8,11 41:11

**never**
13:4 22:12,14,17 24:4,6
25:22 27:3 28:18 32:18
33:1,2,4,5,21 42:14,15
43:7,8 47:6 49:11 50:9
51:10,16 53:15,18 55:7
57:19,20 61:8,18 64:7,8
65:23 67:11,18,22

**next**
40:5 52:3

**no**
5:10 6:12,24 8:14,22 9:3
10:15,18 15:25 16:18
24:2,4,9 26:4 31:2 33:10
37:11 40:3 42:12 44:5,22
45:15 48:21 49:3 51:18
54:3,10,13,15,22 55:2,4
56:18 58:14 60:3 63:3,4
64:6 67:9,21 69:21,23
70:6

**nobody**
27:7 47:6 52:19,22 69:11

**none**
69:15

**Nope**
55:7

**nor**
49:11

**not**
5:12 7:12 8:14 10:10,11
15:20 19:25 21:21 22:9
25:22,23 26:1,6 31:3
38:24 40:3 41:23 42:6
43:16,18 45:7 51:6,8,16
54:14 60:13 63:11 65:10
70:4

**notes**
7:13 12:22 21:6

**nothing**
7:23 32:15 51:8 62:18
70:13

**notice**
70:10

**now**
5:17 7:21 8:5 9:17 12:11
13:2,5 14:5 17:20 18:10,
17 19:5 21:10 23:24
24:19 30:12,23 31:8,20

33:12 34:7 36:20 37:9
39:2,12 45:16 49:4 55:10
61:5 63:19 64:25

**nowhere**
28:13

**number**
5:6 15:1 27:10 44:25

**numbers**
14:18,24 41:5 43:8

**numerous**
66:4

---

### O

**oath**
5:11,17 6:14

**objection**
5:10 29:4,7 65:16,25

**occasion**
64:4

**occasions**
59:9

**occurred**
69:15

**October**
5:1,7

**of**
5:6 6:15,18 7:13,16,18
8:23 9:2,23 10:21 11:15
12:4,12,19,21,22 13:2,6,
8,10,11 15:11 17:17,22
18:5,15,16 19:7,23
20:18,19,22 21:12,22
22:2,7,9,11 23:25 24:6,
13 25:13,17 26:22,25
27:3,15,19 28:2,4,19,23
29:1,3,24 31:9 33:13,22

34:7,9 35:25 36:10,11
37:4,12,13,25 38:7,18,
19,24 39:4,21 40:10,11,
15,17 41:2,5,14,23 42:2,
6,9 43:14,18 44:3,4,9
45:12 46:4,7,9,11,12
47:18 49:13,15,19 50:3,
4,7,8,10,14 51:9,15,17,
23 52:6,12,19,20,23,24
54:1,20,24 55:5,22 57:6,
7 58:9,10,13 59:1,9,16,
17,24 60:6,12,25 61:6,8
62:11 63:1,12,14,20,21,
23 64:5 65:9,12,22
66:13,20,24 67:4 68:6,
11,12,14 69:15

**off**
9:7,8 22:2 32:5

**offer**
23:7 37:2,17

**offered**
23:8 51:23

**office**
17:4,17

**officer**
5:11

**often**
61:18

**Oh**
9:5,11 17:7 33:7 56:20
61:6 69:25

**okay**
6:14 7:12,21,24 8:10,15,
23 9:1,5,16,21 10:4,9,12,
16,21 11:1,4,6,8,23
12:11,15,20 13:5,9,16,24
14:11,14 15:2,14 16:6,9,
12,18 17:1,9,12,14,19

18:9,23 19:5,12 20:3,13,
16,17 21:7,8,10,14,17
22:18,24 23:3,6 24:8,18
25:12,25 26:2 27:1,13,14
28:1 29:20,23 30:3,12,
16,22 31:5,6,7,12,15,20
32:11,16 33:3,7,12 34:1,
5,7,14,18,25 35:6,9,13,
18 36:23 37:1,6,9,15,24
38:10 39:2,14,25 40:4,24
41:6,10,22 42:16 43:9,20
44:7,13 45:1,6,9,13,16,
21 46:8,14 47:8,13 48:8,
18 49:4,22 51:5 53:4,23,
25 54:8,11,14,19 55:10,
14 56:3,11,23 57:23,25
58:6,12,16,17 62:18
63:15,18 64:21 65:2,21
66:12 67:6 68:2 69:2,4,9
70:10

**old**
56:8

**older**
56:7

**on**
5:10 6:22 7:18,19 10:6
11:13,22 12:2,9,11,13
13:20 14:3,17,25 16:9,20
17:2,5,6,7,20 18:10,13
19:3,8,9 20:18,25 21:2,
10,17,21,24,25 22:3,5,6,
7,11,16,19 23:2,4 24:6,
16,19 25:9,14 26:7,21
27:7,19,24 28:2,3,18
29:13,22 30:11 31:21
32:11 33:12 34:7 35:17,
18,24 36:15 37:7,8 41:6,
12,22 43:4,13 44:8,24
46:6,13,18 47:16,21
48:18 49:10,24,25 50:2,

13 51:22 52:23,24 53:1,
11,15 56:9 57:14,25 58:3
59:9,19 60:3 62:16 64:4,
19,21 65:7,9 66:3 69:5
70:4

**on-call**
70:9

**once**
7:18,19 50:16

**one**
8:22 9:19,20 24:20 26:4
27:11,21 30:4,9 32:8
34:12 52:13 53:25 54:7
63:17 69:5

**one-page**
31:8

**online**
63:13

**only**
7:12 8:22 57:13 58:8
64:4

**onto**
68:10

**operations**
43:18 44:1

**opinion**
46:19 52:16 53:3

**opportunity**
26:13

**or**
6:22 7:13,24 8:18 13:13
14:18,24 17:5 18:25 24:7
25:12,19,20 26:11 30:24
38:24 40:5,13 42:5,19,
21,23 46:17,19 49:12
50:2,16 53:19,22 55:8
56:14,17 57:11 60:10

61:19 62:1,14 67:21
69:13 70:4

**oral**
33:16

**order**
42:23

**ordinary**
41:11,15

**Oregon**
38:14

**orient**
17:10

**Original**
11:20

**other**
9:20 26:2 32:21 35:5
38:6 49:14 55:20 56:21
58:10,13 68:19

**our**
32:1 33:20 39:10,21
43:17,22,25 44:1 66:7
68:9

**ours**
29:24

**out**
13:13 15:13,15,21 26:19
27:16 35:20 38:17 51:15
63:12 70:9

**over**
12:14,19 48:15,16 49:17
54:3 59:14,23 60:25
61:9,23

**overpaid**
52:16,17,18

**Owen**
5:5

**own**
10:6

**owned**
27:21 28:10,15 52:14
65:6 66:6

**owner**
10:11 27:3

**owns**
10:19

---

**P**

---

**P&I**
38:1,4 39:4 40:7 47:5

**P&Is**
40:16

**p.m.**
5:1,8 70:16

**Pacific**
38:15

**package**
36:24

**page**
11:15,18 13:7,11,20,24,
25 14:5,6,14 16:6,9,12,
20,24 17:3,5,6,7,10,13
18:2,10,12,13 19:5,9
21:10,17,18 23:2,14
24:11,16,19,25 27:10,12,
14,24 29:13 30:1,2 31:7
35:17 37:22 40:17 41:14
44:17 63:15,17,18,23
66:12,13,16,23 68:18
69:5

**pages**
21:2 28:14

**paid**

10:12 46:9 50:15,19 51:9
52:15,19 53:18 56:11,13,
15

**Pardon**
61:7

**part**
13:10 64:1 67:4

**parted**
10:8

**particular**
26:4 60:10 67:3

**parting**
10:9

**pass**
7:12

**pause**
31:6

**pay**
40:14 51:10 65:8

**Payment**
39:20

**per**
37:25 40:19 68:21

**percent**
21:20 22:7,9,11,15 23:25
24:6,13 28:18 35:23,24
37:25 38:7 46:11 49:7,13
50:4,10 51:17,23 52:1,8
59:20 60:12,18 61:9 67:3

**percentage**
37:12

**Perez**
11:24

**performing**
29:21 68:21

**period**
36:11 41:8 49:8,25 50:1
54:6,24 69:17

**permitted**
11:2

**person**
62:13

**personally**
5:12

**PG**
22:11

**Phyllis**
17:17 19:24 20:4,21
21:25 22:25 23:21 24:20
28:4 42:2

**place**
15:16 59:20 60:15 62:5
65:4

**plaintiff's**
11:10 30:5,14 37:19
39:16

**plan**
68:21,23

**played**
63:25

**please**
14:5 16:7 19:8 21:10,11
69:24

**point**
39:22 44:2 50:1 68:6

**political**
64:16

**portion**
46:6

**Position**
37:17

**positive**
16:1

**prefer**
42:22

**preparation**
8:12

**prepare**
7:22

**prepared**
12:16 14:23 25:21,22
65:5

**presence**
42:2

**presently**
8:15

**President**
37:17

**press**
33:22

**pretty**
6:12

**print**
14:10

**prior**
43:12,13 44:8,10

**probably**
14:22 19:24 46:18 59:24

**problem**
11:5 19:3 31:2

**proceed**
5:9

**proceedings**
51:20 70:16

**production**
40:11

**profit**
22:7,10,15 38:4,25 39:2,
3 40:8 49:8 52:8

**profited**
39:1 60:21

**profits**
21:22 22:11 23:25 24:13
35:25 37:13,25 38:8,11
39:4,10 46:11 50:4,10
51:17,23,25 67:4

**promised**
59:20

**Properties**
34:22

**property**
34:22

**protective**
42:23

**provide**
25:1,4 36:4

**provided**
22:3 26:24 27:16

**purpose**
68:13,14

**purposes**
9:23 38:15 64:16

**put**
11:13 30:7 31:21 36:15
52:5 64:10,21

**putting**
32:5

---

**Q**

---

**quarter-million-dollar**
35:20

**question**
16:16 17:2,13 20:14 21:2
23:4 24:12 26:3,11,12
27:7,24 31:6 33:6,15,21
35:12,13 43:11,12 44:5
64:11 66:14 67:2,12
68:4,23 69:6,9,12

**questions**
21:19 33:14 34:7 43:1
53:12 58:19 63:4 69:16,
22,23 70:1

**quickly**
14:23

**quote**
31:16 36:12 58:13 69:13,
15,18

---

**R**

---

**raking**
25:16

**ran**
40:12 43:17 65:7 66:9

**Randy**
57:5 58:1

**range**
56:17

**rather**
23:7

**reached**
15:13,15 33:17

**read**
13:11,13,25 14:2,6,7,10,
14,18,21,22 15:8 19:8
21:10,18 22:17,22,23
23:1 27:14,23 29:15
30:22,23 31:24 32:14,18
33:1,4,5,13 35:19 36:13

63:15 64:18 67:25 69:19

**reading**
19:2 25:6 38:16 50:18
68:1

**really**
6:6 11:3 14:23 39:6 43:7,
24 48:16 49:19 50:21
51:16 52:24 55:21 57:19,
20 58:5 61:18,23 62:17
67:18

**reason**
33:21 59:16 62:14 64:10

**reasons**
10:7 48:5,6 51:13 55:21
61:15

**recall**
6:23 12:5,8,12 16:3
18:24 20:2,6 21:4,5,6,12
32:17 33:1,8,10 34:21
37:9,14 38:24 39:10
41:21 42:9 44:12,21
45:4,21 47:13 49:7 50:7,
18 55:13 56:22,25 57:14
63:1,5 69:20

**recalled**
20:3

**receive**
13:2

**received**
13:4 32:23

**receiving**
10:16 33:8

**recess**
53:10

**recollect**
21:9,12

**recollection**
6:18 20:19,22 25:12
38:19 44:9 48:19 50:3

**record**
5:10 9:23 27:23 31:25
35:19 53:11 70:1

**recorded**
34:4

**records**
39:13,14

**recovered**
9:17

**recruited**
42:4 44:11

**reference**
55:24 56:1

**referenced**
12:22

**referred**
21:1

**regarding**
54:8 59:8 60:9

**related**
9:3

**released**
16:2

**relocate**
34:18

**relocated**
15:17

**relocates**
49:25

**remember**
19:1,23,24 27:9 38:16
40:15,16 52:9 61:9

**renowned**
46:22

**rephrase**
41:25

**replace**
24:21

**reporter**
5:4,5,15,17 12:1 18:16
70:14

**reporting**
13:3

**represent**
53:13,15,17,21

**representing**
8:6,8

**required**
39:21

**reread**
66:22

**response**
33:14

**results**
41:19

**retire**
15:12

**retired**
56:10

**revenue**
39:4 41:7 43:5,6 44:10,
14

**revenues**
39:25 40:21,24 68:9

**review**
8:11

**Richard**

5:20 13:6

**Rick**
20:13 51:1 55:24

**Ricky**
49:1,2

**rid**
50:8

**right**
6:25 7:17 8:5 9:1,8,21
11:1,17 12:1 13:5,14,20
14:5,17,24,25 15:5 16:8
17:7 18:1,10 19:13,20
20:18 21:6 22:7,17,20
23:14,18 24:16,18 25:6
26:16,22 28:5 29:20,25
30:23,24 31:1 33:12
35:6,17 36:2,16 38:4,6,
16 39:12 41:2,12,13
42:24 43:6 44:1 45:6
46:9 47:8 48:14 53:5
54:2,5 58:17 63:16
64:15,20 65:4,14 66:17
67:10 68:6,18 69:15,21

**righty**
53:8

**roaring**
68:5

**Robin**
11:21 34:24 35:3 37:8
45:17 47:10,14 54:14
63:24 66:15,18

**roll**
16:16,18

**Ronnie**
11:19 14:17 15:10 17:16
20:20 23:8,15 24:21
26:7,19 28:3,4,9,15,16,
20 29:18 34:9,13,23

36:18 38:19 39:8 40:15
41:1,2,18,24 42:2,3,7
43:4,8,11,13,21 44:3,8,
11 45:17 46:17,19,23
47:5 48:1,9,24 49:5,10,
20,25 50:8,19,25 51:3,24
52:2,3,5,15 53:2 55:12,
15,16 57:3,7,10,12,17,21
58:1,5,9 59:7 61:21
63:13,22 65:6,11,13,21
66:3,9 68:7,11,21

**Ronnie's**
12:6,9 25:16 47:14 48:20
49:2,7 56:24 59:1 66:8,
21,24

**room**
6:25 69:7

**Rovers**
52:5

---

### S

**said**
9:18 12:13 13:14 19:3
22:24,25 24:18,19 27:15
30:23,24 32:25 43:15
45:11,15 55:19 57:10,18
58:1,2,11 60:1,16,22,23
63:3,4,6 65:3 68:17

**sake**
31:5

**salary**
23:15,21 35:21 38:7
46:2,9 52:9

**same**
6:15 13:19 39:5 41:7
66:9

**sat**

14:22 20:1 46:4 62:15

**saw**
36:16 48:8

**say**
8:17,20 15:14 17:18
18:19 19:7,15 25:24 27:6
28:11,13 29:20,21,25
31:7,14,19 33:16,23,25
35:18 37:7 39:2 46:21
48:9,13 56:10 57:16
59:6,11,13 60:9,14,20
62:16 63:3,7,9,11 67:7
68:5 69:10,14

**saying**
9:13 10:14 17:20 19:23
25:18,23 26:1 47:19
57:15 59:22 69:13

**says**
15:1 16:8 18:2,13 22:7,8
24:17 38:9 39:21 40:17,
18 41:9,15,17 46:10 48:4
53:18

**SCE**
22:11

**screen**
11:13 18:17 19:3 22:19
30:11 51:22 64:19,21

**seal**
42:19

**second**
30:4,9 41:12 59:17

**see**
11:14,16,18 12:25 13:1
16:16 17:1 18:17 19:25
20:4,21 22:4 27:7,24
30:10,11 31:11 35:13
37:22,23,24 38:2,3
39:23,24 40:6,25 41:4,12

44:18 45:4 53:6 56:1
64:11,19,25 65:1

**seeing**
18:24 19:1,3 33:1 40:16
41:21 45:4

**seen**
42:10,14,15 55:8 60:25

**selection**
35:1

**self-employed**
8:16,17

**send**
55:5 70:8

**Senior**
37:17

**sense**
60:6

**sentence**
68:15

**separation**
10:13

**service**
9:22 10:5 11:20 13:3

**set**
12:17,22 25:17 62:7

**shaking**
35:13

**shame**
9:14

**sharing**
49:8

**she**
12:1 17:24 19:18,25 27:5
28:18,23,25 29:9 45:11,
15 52:13 57:17,18 58:2,

4,5,12,14 63:25 65:5
66:4,5 67:1,2,3,5,6,18,
19,20,22,23

**she's**
35:14 64:7

**sheet**
22:4,5

**shorthand**
5:5 12:1

**should**
36:15 48:13

**shouldn't**
52:25

**show**
11:8 18:21 37:15 40:21
43:16 44:2 55:22

**showed**
19:2 22:19 30:19 32:25
55:9

**showing**
17:8 27:10 32:17

**shows**
15:3 41:6,13 47:5

**sic**
12:2 15:9 23:1 66:12
68:4

**side**
52:23

**sides**
60:25

**sign-on**
35:24

**signed**
33:2 51:19 66:21

**signing**

64:5

**simply**
16:20

**since**
44:24 47:9

**sir**
6:5,24 8:14,19 9:11
10:14,22 12:14 13:1,4,17
14:2,13 15:24,25 16:19,
25 18:19 19:6 23:19,23
24:24 25:5 26:1 27:10
28:6,7 29:14 30:11 31:14
32:18 33:24 34:6,17
37:11,22 38:5 41:5 46:10
52:20 54:13,22 55:2,3
56:2,16,22 57:13 59:4
63:7 64:22 69:8,17 70:6,
11

**sister**
34:24 45:16 47:10 48:18,
20 49:12 56:24 57:15,16,
20 58:1,9 63:24 66:15,
20,23

**sit**
59:10

**sitting**
18:3 20:4,20

**sixty**
35:22

**SMD**
22:13

**so**
6:8 7:11,12,15 8:1,10,20
10:10 11:5,8,21,22 12:9,
18,20 13:18 14:23 15:4,
12 16:16 17:20 19:5,7,14
20:18 21:17 23:1,7,16
25:15 26:8 27:6 30:1,13

31:5,7 32:4 33:15,21
35:8,17 36:3,19 38:6
39:3,10,14,19 40:13,15,
17 41:13,21,22 42:8
43:3,16,23,24 44:19
45:1,11,25 46:3,4,14,17
47:23 48:1,6,16 49:20
51:3 52:5,8,15 53:2,19,
22,25 56:9,20 57:12,18
58:17 59:23 60:8,12,17,
18,25 61:2,18,21,24 63:7
65:6 66:14 67:2 68:19
69:12 70:7

**some**
6:19 8:19 12:7 21:6,12,
18 26:17 29:22 39:14
40:11 43:1 48:16 49:15
56:13 57:2,3 58:2 59:15,
16 62:14

**somebody**
51:7 61:22

**someone**
31:21 69:13

**something**
8:18 11:24 15:21 19:24
31:21 32:4,6 40:18 42:19
43:21 47:21 50:20 52:7
56:23 59:6

**sometime**
32:24 33:8

**somewhat**
35:1

**son**
30:23 31:17 57:20

**sorry**
15:21 31:1 32:10 35:15

**sort**
17:17

**sound**
43:5

**sounds**
43:25 45:5 64:19

**South**
70:4

**speak**
6:8 29:9 39:3 54:11 59:7
61:17

**specific**
48:19

**specify**
58:12

**speculation**
65:17 66:1

**spending**
29:1

**spent**
64:8

**spoke**
7:25 54:17 67:16

**spoken**
54:21,23,25

**standard**
46:14,16

**standards**
26:24 46:3

**started**
35:20 59:17 62:17

**state**
5:5

**stated**
68:19

**statement**
12:2,3,5 13:3 18:25 22:6,

25 38:1,4 41:14,22 55:1,
6 61:24

**statements**
14:19 42:10 61:25

**status**
64:13

**Stephen**
7:25 8:7 42:18,24 50:7
53:13,15 58:18 59:21
60:24

**steps**
9:15

**still**
28:8 29:25 45:13 52:6

**stop**
35:12

**stopped**
32:6

**story**
30:1 64:14

**strike**
41:24 66:21

**stuck**
44:24

**stuff**
26:20 40:12 46:24 65:11

**subcontractors**
49:15

**subpoena**
70:8

**substance**
12:12

**substantial**
51:24

**successful**

68:20

**sudden**
25:17 44:3

**sue**
48:22

**suggesting**
25:19

**suing**
59:18

**summarize**
23:6 33:19

**Summary**
39:20

**supposed**
50:12

**sure**
11:7 15:4,7 26:6 27:3,6
35:3 36:7 43:16 46:13
61:2 63:6,10

**sworn**
5:21 12:2 13:2 18:25
22:6,25 54:25 55:5 61:24

**T**

**take**
6:15 27:15 53:5

**taken**
26:25 51:9 52:6,19 53:10

**taking**
40:10 50:10

**talk**
18:3 29:2 56:8 58:15
60:4,8,10

**talked**
22:2 30:19 32:14 35:22,

23 36:3 45:16 48:1 50:7
62:7 67:13,14

**talking**
32:19 33:10 39:5 41:1,2,
18,24 42:1,3 53:1 56:20

**tall**
6:12

**taller**
6:11

**tangent**
50:13

**tell**
8:1 12:11 14:24 20:7
43:21,24 48:1,24 50:22
52:17 55:10 56:25 57:9,
17 58:5 59:10,17,19 60:7
63:2,6,9 69:10

**telling**
60:11

**Ten**
23:25 24:13

**terminated**
45:10 60:23

**termination**
56:12,13

**terms**
23:8,9,15 56:9 63:20,21
66:20,23

**testified**
5:22 25:9 60:18

**testify**
48:17

**testifying**
8:3

**testimony**
23:12 34:8 54:9,12 68:16

**than**
6:9,10 9:13,19,20 14:22
26:9 32:3 36:18 40:1,21
46:3,17,19 48:3,10 49:14
52:4 57:21 58:15 60:1,22
63:8

**Thank**
6:6 7:7 8:9 16:6 53:9
70:12,13,14

**that**
5:10 6:16,17,20,21,22
7:12,16,21 8:9,10 9:11,
24 10:19 11:6,14,15,16
12:3,9,11,13,14,16,25
13:1,7,17,18,20 14:2,7,
10,18 15:6,8,24 16:9,25
17:2,3,18,21 18:5,14,22,
24 19:2,9,18,23 20:3,20,
22,25 21:1,2,4,23 22:6,7,
8,9,14,16,22,23,25 23:5,
8,9,12,16,18,19,23 24:4,
7,11 25:9,19 26:1,4,17,
21 27:2,7,17,18,22 28:8,
10,11,12,14,15 29:12,15,
18,19 30:7,9,20,23,24,25
31:1,13,21,23 32:2,5,6,
11,17,19,23 33:17,23,24
34:1,16,18,19,23,24
35:3,7,8 36:4,6,7,8,13,
14,16 37:8,14,22 38:2,3,
13 39:3,9,11,23,24 40:9,
10,15,25 41:4,7,9,15,24
42:5,6,8,21 43:16,19
44:3,4,18,19,24 45:4,21
46:4,5,7,12,13,20,21,24
47:2,4,6,11,24,25 48:2,4,
14,17,22,24 49:8,11,12,
13,20 50:1,7,18,25 51:2,
3,4,7,8,15 52:2,8,9,20,
23,24 53:21 54:4,6,19,23
55:2,15,18,21 56:1,8,18

57:4,7,11,13,24 58:3,9,
10 59:3,4,7,18,19 60:3,4,
6,11,12,20,21,23 61:1,2,
5,8,10,19,22,25 62:1,8,
15 63:5,6,8 64:18,23
65:3,6,8,9,11,12,13,15
66:8,21,22,24 67:8,13,25
68:5,11,13,16,17,21
69:10,15,17,19 70:10

**that's**
7:11 9:19 15:13,20 16:4,
11 17:22 19:13 20:2 21:9
22:9 23:12 24:16 25:6,9
26:6 27:6 28:16,22 30:1
31:11 32:23 34:4 35:10
36:10 38:9 41:9,17,20
46:10 47:4,20 48:4,11
50:21 51:8,18 52:16 53:3
56:19 57:13 58:10,18
61:19,23 62:2,17 65:11
67:20 69:2

**the**
5:4,5,7,10,15,17,18 6:14,
15,25 7:6,13 8:22,23 9:2,
15,19,20,21 10:2,9,11,
17,19 11:1,13,14,18,19,
20,24 12:1,11,12,18,21
13:3,5,18 14:19 15:11,20
16:2,13,16 17:3,13,16,
17,22,25 18:5,15,16,17
19:3,20 20:2,25 21:1,20,
21,22,24 22:4,6,11,19,20
23:4,7,8,9,15,25 24:13,
15,16 25:4 26:11,12,20,
24 27:2,5,21,23,24 28:4,
15,17,20,23 29:9,20
30:7,11,16 31:9,25 32:7,
20,21,23 33:5,16,21,22
34:10,12,15,22 35:1,7,
10,12,19,24 36:10,11,25
37:7,12,25 38:8 39:3,4,5,

9,12,25 40:5,7,11,12,17,
21,24 41:7,10,12,19
42:2,10,19 43:4,5,12,18
44:2,5,14 45:13,18 46:2,
14,16,22,24 47:4,13,17,
25 48:2,21 49:5,13,25
50:2,9,10,14,17 51:2,3,
13,17,20,22,23 52:2,9,
11,13,14,20,23 53:8,11
54:16,19 55:7,16,21,22,
23 56:5 57:4,13,24 58:8,
12 59:6,24 60:5,18,22
61:9,15,19,25 62:7,10,
13,17 63:1,20,21 64:1,
10,19,21 65:6,10,19,21
66:3,6,9,20,23 67:3,4,20
68:5,12 69:7,16 70:1,14

**their**
10:6 46:6 48:3,5

**them**
14:20 22:1,3 25:1 36:4,6,
15 42:3,14,15 43:8,24
46:5 47:22 48:7 49:16
54:17 61:18 63:14 67:18

**then**
11:5 12:7 13:11,24 14:1
17:1 20:8,12 21:17,18
24:19 31:19 35:12 40:4,
24 41:10 43:2 49:18
52:11,20 62:11,12,13
67:12 68:2 70:9

**there**
5:10 8:17 11:2,7 12:17
14:3,17,23 15:3,17 16:3,
4,8,14,18 17:21,24,25
18:7,8 19:3 21:24 25:15,
16 26:6,7,21 27:8 28:14,
23 29:16,17 35:4 36:15
42:8 48:14,16 49:5,11
50:9 51:3,4,10,18 52:8,

24 54:3 55:17 57:8 58:2
59:4,16 61:23 62:11,12,
13 63:10,12 65:4 68:7

**there's**
12:21 17:1 26:8,17 39:20
41:5 55:24 61:6 63:16

**these**
17:18 21:5 28:14 40:16
41:6,21 43:7

**they**
6:11 10:6,7 16:5 35:4
36:5,7,8,9 40:1 43:23
47:20,21,23 48:3,5,6
57:18,19,20 58:9,15
61:14,18 62:3 64:9

**They're**
58:15

**thing**
39:5,9 47:1 52:3 57:13
58:8 66:7,10 69:10

**things**
22:2 26:17 29:22 32:2,14
47:23 50:7 52:20,24
58:2,10,13 66:9 68:10

**think**
6:12 8:7 9:18,19 10:7,10
12:14 14:13 15:19 16:11,
14 17:5 19:2 21:16 22:19
26:9 27:10 29:17 31:17
32:1,7,10 35:21 36:25
38:16 44:16 47:19 50:14
51:25 52:15 55:12,16
57:2,5 58:25 61:10,11
62:2,3,12 64:23 68:5,24,
25 69:1,2

**this**
5:10 9:19,23 12:5,8,17
13:2,5,10 16:20 17:1

Case 8:24-bk-12674-SC   Doc 542   Filed 07/16/25   Entered 07/16/25 13:22:57   Desc
Main Document   Page 387 of 700

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                102
Richard Edward Mowbray, 10/02/2023        Index: those..transportation

19:15,19 20:9,10,18
21:1,5,12,20 22:5,17,19
25:14,17,21,23 26:9,22
27:3,9,10,19,21 28:3,9
29:25 30:1,12,19,24
31:8,11,17,20 32:19,25
33:8,13,15,16,20 38:16,
17 39:9,19 40:4,6,17
41:1,6,13,14,15 42:9,16
43:12,24,25 44:17 47:9
48:9 50:14 51:11,16
52:12,22 53:14,16,17,21
55:20,22,23 56:3 57:8,9
59:8,19 60:9 61:1,11,19
62:5 64:1,5,7 65:5 67:24
68:6,20 69:12,14

**those**
14:19 28:17 38:15 68:17

**though**
28:11 47:2 64:1 67:24

**thought**
42:20 45:8 48:12,13

**thoughts**
61:3 65:7

**thousand**
35:22

**thousands**
29:1

**through**
12:3 18:2 23:1 27:5,20
28:8,9 33:14 35:19 38:12
50:2 52:13

**time**
5:7 6:15 8:1,23 9:2,21
14:19 15:20 16:2 26:11
29:18,19,20 32:7 34:16,
21 36:25 47:25 49:8,25
50:2 54:6,7,19,23 55:8

56:5 62:8,10 67:15

**times**
7:18 45:20 54:5 59:24
61:11 66:4

**to**
5:9,10,11,18 6:7,8,18,19,
23 7:8,22,25 8:1,10 10:4,
6 11:2,6,8,13,14,17,18
12:3,4,6,8,14 13:7,11,13,
15,24,25 14:5,6,9,14,20
15:6,8,12,13,15,21
16:12,20,24 17:2,10,13,
15,20,21 18:13,15,17,21
19:5,8,14,15,17 20:4
21:2,10,11,18 22:1,6
23:1 24:10,25 25:9,15,
17,24 26:4,9,13,19 27:3,
6,15,17,20 28:8,17 29:2,
9,10,12,15,25 30:7,19,25
31:1,3,5,13,22,24 32:7,9
33:15,23,24 34:14,15,18,
19 35:2,11,18 36:5,7,9,
10,23 37:1,4,12,17,22
38:7 39:3,7,9,12,19 40:5,
6,14,19,24,25 41:1,2,3,
10,15,24 42:1,3,4,18,19,
22,25 43:3,13,16,25
44:1,2,8,10,11,17 45:16
46:3,6,7 47:1,20 48:1,15,
16,17,18,22 49:4,6,16,
22,24 50:1,7,8,10,12,14
51:7,8,10,11,16,17,25
52:10,22 53:1,6,13,15
54:17,24 55:9,15,16,17,
22,24,25 56:8,10 57:2,8,
10,14,19 58:1,9,20 59:1,
6,7,11,13,14,15,16,17
60:4,7,8,9,10,13,14,17,
18,20 61:2,12,17,24
62:1,4,7,8,14,22,24 63:2,
3,7,9,11,22,23 64:3,5,6,

12 65:8,9,10 66:9,12
67:2,8,13,14,16,17,19,
22,23 68:4 69:3,10,14,17
70:3,7,8,9

**today**
6:19 7:22 8:6,13 13:7
25:12

**Today's**
5:6

**together**
7:15 17:22 18:7 32:8
35:3 46:23 47:17 63:15

**told**
21:25 25:24 26:4,23
27:18 34:10 36:6 46:5
48:9,10,12,24 49:21
51:13 57:17,20 58:8,14
59:23 60:1 61:14 63:3,4
64:5 67:17 69:11

**tomorrow**
7:9

**too**
17:21 19:3 27:7 28:9
31:22 36:15 56:8 57:10
66:5,8

**took**
6:14 12:2 32:6 52:19
62:5

**total**
41:7,15 43:5,6 44:14

**transcript**
13:10 30:12 32:20 39:19
40:7 42:19 69:24

**transmission**
55:8

**transportation**
36:5

**treated**
50:15

**tree**
8:19 9:6,22 10:5 11:20

**trial**
6:15 70:8,9

**tricked**
25:19

**tried**
61:12

**trimming**
8:19

**true**
13:20 14:3,11,20 16:9,
11,22 19:9 21:14 29:16
47:2 51:16

**trust**
10:20,21 11:1

**trusted**
32:8

**truth**
57:24 61:20

**try**
31:5 44:2,20

**trying**
31:3 48:1,22 51:7 59:15

**twice**
50:16 62:11

**two**
12:21 24:20,21 26:20

**typed**
31:9,17

**typewritten**
12:23

## U

**Uh-huh**
18:1 38:5 40:20

**under**
11:1

**understand**
6:7,16,17,20,21 13:17
14:2,20 63:12

**understanding**
15:16 16:1 57:4

**understood**
9:5

**unhappy**
35:14

**until**
49:20 54:20

**up**
9:10,11 11:13 12:18
25:17 30:7 31:9,17 38:14
49:18 51:10 52:12 58:21
62:22 67:19

**upon**
10:12 56:11,13

**upset**
51:11 52:20 59:21 61:16

**upsetting**
51:11,14

**us**
6:8 31:18 33:10 35:14
36:1 38:14 50:12 51:13
63:2 66:6

**using**
57:3

## V

**vacations**
70:4,5

**vague**
21:21 26:18 49:9

**vaguely**
15:3 47:19

**very**
6:6 19:19,21 27:6 28:23
31:19 32:7 35:14 47:11,
12 48:21 50:6,15 51:11
55:25 58:2 61:18 68:20
70:12

**via**
7:19

**Vice**
37:17

**video**
62:17

**visits**
59:14

## W

**wait**
24:5 40:5

**walk**
6:7

**walked**
39:8

**want**
8:10 11:2,7 13:13 16:20
27:3,6,17 42:18,19 43:3
48:18 49:4,16,22,24
52:22 56:10 57:14

**wanted**
12:8 15:21 17:15 25:17
26:13 36:7 50:8 55:15,16
58:20 59:12,24 61:2 62:4

**was**
5:21 6:10 9:3,7,14,21
10:9,10 11:10 12:1,18
14:17 15:12,14,16,18,19,
20 16:1,4,13 17:8,21,24,
25 18:5,16 19:17,19,20,
24,25 20:19,22,25 21:1,
21,22,23 22:5,15,16
23:5,16,23 25:13,16,21
26:6,21,24 27:2 28:20,
23,25 29:18,20,21 30:5,
14 31:20 32:5,11,15,19
33:16,20,22 34:14,15,25
37:8,10,12,19 38:6,11,
15,20,21,22 39:16 40:11
41:23 43:18 44:14 46:2,
5,9,14,16,18,24,25 47:1,
6,9,21 48:1,12,22 49:9,
11,12,13,19,21 50:9,12,
15,19,21 51:2,4,9,18
52:3,5,11,13,15,16,17,
18,21,24 54:3 55:14,18,
19,21 56:3,7,11,13,15
57:3,4,6,7,12 58:2,8,9,10
59:14,15,16,17,18,19,20,
23 60:2,11,15,22 61:3,9,
14,16,21,22,23 62:1,10,
11,12,13,14 63:8,9,12
65:4 66:4,8 68:11,13,16,
20,21,25 69:1,17

**wasn't**
9:3,11 10:11,14,15 12:16
14:23 15:4,6 17:24 20:11
25:21,22 28:22 29:25
32:4 39:6 45:15 46:12
47:15,24 50:25 51:1
57:8,11 58:4 63:8 65:5

**watched**
19:21 22:25

**Waterman**
34:22

**way**
26:13 43:12 50:14 51:15

**ways**
10:8

**we**
5:9 7:15,18,20,21 10:7
12:18 13:18,24 14:22
15:10,18 16:8 17:7 18:8
19:21 20:1,25 21:2,10,
21,24,25 22:2,3,12,14,20
24:4,6 25:19,22 26:11,23
27:3,16,20 29:22 30:19
32:2,4,5,6,7,8,9,14 33:1,
19 35:7,10,20 36:4,6,9,
11,14,15 39:5,7,10
40:10,13,14,18,24 41:10
42:7,8,21,24 43:8,10,15
45:19,22 46:4,8,13,17
47:6,25 48:8,14 49:10
50:16 51:16 52:4,9,11,19
55:12,18 56:7,9,10 61:2,
8,11 63:25 64:3,6,8 65:8
66:6,9 67:17 68:8,9,10

**we'd**
21:25 39:12

**we'll**
9:23 12:14,20 15:8 29:12
40:5

**we're**
7:8 17:7 26:9 30:25
41:20 53:1

**We've**
7:15

**week**
53:22,25

**weeks**
54:1,20,25

**Welcome**
55:24

**well**
11:6 12:7 18:12 20:3,10
21:17 22:3 24:4 25:14
26:25 27:23 28:23 32:19
36:19 39:6 41:25 44:5,19
46:2,15 47:8,13 48:8
50:15,23 51:9 52:6,15
53:2 55:15 57:14,25 61:8
63:8,15 65:13,21 68:9
69:2

**went**
12:6,16 14:25 15:21 16:3
26:19 27:5 28:9 34:12
38:14 52:13 59:1,4

**were**
6:11 8:24 9:5,10,22 10:7,
12 12:9 17:3,16,22 18:3,
7,8 19:21 20:2,4,20
23:15 24:25 26:3,18
28:19 29:1 31:22 32:2,5
34:10 35:3,4 36:7,10,11
39:10,11 41:24 42:7 44:1
45:25 47:6 51:16 59:2
61:2,3,25 62:3 64:3,6
65:7,8,22 67:17 68:9,10

**weren't**
67:7

**what**
7:21 8:1,20 9:13 10:14
12:12,20 13:7 17:6 19:25
20:2 21:9,21,22 22:9
24:6,16 25:6,9,18 26:2,9
27:10 29:18 31:23 32:3

34:4 35:25 36:9 37:9
38:9 39:10 41:9,17,20
42:19 43:3,16,25 44:1,8,
14,21 45:7 46:10 47:4,
13,19 48:11,12,13 49:21,
22,24 50:3,11 53:1 56:9
57:14,25 59:10,22,24,25
60:7 61:3,7,14,17 64:3,6
65:8 66:8,14 67:17 68:1,
8,12 69:10,20

**What's**
15:24

**whatever**
26:13 55:8 60:16 62:14
66:7

**when**
8:17 9:10,11,21 13:12
14:1 15:14,15 19:17
21:24 22:19 26:19 28:19
30:19 33:12 34:9,14 36:5
38:12,18 39:2,8 41:18,24
42:1,3 43:4 45:10,21
47:5 53:13,20 55:9 59:1,
13 60:3,8 61:24 64:4,9
65:13,22

**where**
14:17 15:14 16:4 34:15
35:10 39:10 60:15

**wherever**
36:9

**whether**
38:24 63:2

**which**
22:5 35:14 50:1 57:2
62:24

**while**
6:11 12:18 54:18 59:14
62:11

**who**
8:5,23 10:19 12:2 18:16
27:21 28:3 34:12 52:13,
16 53:3 63:21,22 67:12

**whole**
11:18 37:22

**why**
15:13,20 45:25 46:21
47:20,23 52:17 55:14
57:20 59:4,17,18 61:14,
23 64:10 67:20

**wife**
7:2 17:21,25 34:25 42:2
45:11 63:24

**will**
5:9,17 13:10 70:7

**wish**
58:14

**with**
6:8,25 7:8,24 8:11 12:18
14:17,25 15:11 20:5,20
21:20 23:18,19,23 24:4
25:17 26:7,23 28:3,20
30:4 32:1 33:14,16 34:9
35:5,14,20 36:1,4,23
38:14,18 41:18 43:4,8
44:4 45:17,19 46:4 47:4,
10,14 48:4,7,20 49:2,12
50:4 51:8,12 52:23 54:5,
8,12,14,21,23,25 55:25
56:24 57:1,2,3,18,19
59:19,21,25 60:14,15,24,
25 61:3,16,19 62:12
63:11,14,22 65:10 67:7
68:7 70:10

**without**
69:12,13

**witness**

**5:12,18 7:6 10:2 29:9**
30:7,16 53:8 65:19 66:3

**women**
51:2

**words**
26:2 38:6 56:21 68:17,19

**work**
12:17 16:13 21:23 22:16
25:15 32:8 48:16 49:10
50:12 51:4 52:7 59:2,15,
16 61:9 62:14 70:9

**worked**
26:18 36:9 43:10 51:2
64:7

**working**
15:20 20:11 45:13 49:5
55:25

**worry**
67:19,22,23

**worth**
46:5,19 48:12

**worthy**
49:13

**would**
6:22 14:14 19:18 22:16
25:4 29:10 33:15 35:25
36:4 37:4,7 38:13 42:22
49:10 50:9,17,20 53:21
56:18 58:14 59:18 61:10
65:19,21 67:13,14,18
68:4,14,24

**wouldn't**
8:1 40:13,14 42:7 58:15
65:13

**Wow**
9:16

**write**
19:21 22:8

**writing**
19:24,25 20:4,21 21:6
31:21 32:15 52:12

**written**
19:20

**wrong**
52:8 60:23 61:15

**wrote**
19:18 30:24 46:25

---

**Y**

---

**yard**
25:16

**yeah**
6:9 7:10,20 9:9,18 11:19
12:6 13:22 14:2,4,7,9,10,
16 15:10 16:8,11,15,20,
21,23,25 17:8,24 18:6,8,
11 19:11 20:6,24 21:12,
13,20 22:2 23:13,18
24:17 25:8,22 26:15 28:8
29:17,19,21 30:9,11,25
32:1,13,25 33:19,20
34:2,12 36:14,19 39:24
40:23 41:5,17,20 42:21
45:2,20,24 46:12 49:23
51:15 56:4 62:2 66:16,19
67:16 68:1,8,17,19

**year**
37:25 43:4,14 50:9,23

**year-to-date**
38:25

**years**
9:25 24:21 26:20

**Yep**
23:22

**yes**
8:4,19 10:22,25 11:16,25
12:10 13:1,17,23 14:13
17:18,19 18:19 19:6
21:16 22:21 23:11,17,19,
23 24:3,15,17,18,22,24
25:2,3,5,8,11 28:6,7,22
29:14 30:2,21 31:14
33:19,24 34:6,17,20,24
36:22 38:5,9 41:9 46:10
55:3 56:2 59:4,5 60:18,
19,21 62:6 65:15,19
67:1,5 68:22,25 69:8,20

**you**
5:13,15 6:3,5,6,11,14,16,
20,22 7:1,4,5,6,7,12,17,
22,24 8:3,6,9,11,15,17,
21,24 9:1,5,6,10,11,12,
21 10:4,12,14,16,19
11:1,2,7,8,13,14,17,18
12:4,9,12,18,25 13:2,11,
13,14,17,25 14:9,14,19,
21,22,23,24 15:14,15,23
16:6,16,18 17:8,10,16,
18,19,22 18:2,3,5,14,15,
17,19,22,24 19:2,4,7,8,
15,17,19 20:3,4,6,7,14,
20,21 21:4 22:4,19,24,25
23:4,8,18 24:11,12,18,25
25:9,14,15,17,18,19,20,
23 26:2,3,4,6,7,8,11,12,
13,15,23 27:4,14,17,18,
19,20,24 28:2,11,12,13,
19,20,21,25 29:1,3,15
30:10,19,20,23 31:3,7,
11,14,16,20,22 32:1,14,
17,23,25 33:3,4,6,8,12,
13,17 34:4,9,10,14,15,
18,21 35:2,3,12,18 36:3,

6,14,20,23 37:2,9,15,22
38:2,10,18,19,24 39:6,8,
11,23,25 40:8,9,10,11,25
41:4,11,12,24 42:4,10,18
43:1,3,4,7,10,11,15,16,
17,21,23,24 44:5,9,14,
18,20,23 45:5,7,16,21,
23,25 46:1,5,20,21,22,24
47:8,9,13,21,22 48:1,2,3,
6,16,19 49:1,7,15,16,20
50:2,3,6,17,22 51:4,7,8,
12,22,25 52:6,12,15,17,
21,22,25 53:6,9,13,17,
20,21 54:5,8,11,19,21,
23,25 55:2,5,9,10,19,22,
23,25 56:1,6,9,17,23,25
57:9,14,19 58:1,3,25
59:1,2,6,7,10,11,13,20,
21,22,23,25 60:4,5,7,8,9,
10,13,15,16,18,20,21,23,
25 61:2,3,4,11,13,16,17,
21,22,24,25 62:2,3,7,8,
15 63:1,2,3,4,5,6,9,10,
11,12,14,22 64:17,25
65:3,4,7,8,10,13,18,22
66:2,6,8,21,24 67:7,11,
13,14,20 68:20 69:1,3,7,
10,14 70:3,5,7,8,10,11,
12,13,15

**you'd**
35:2 43:24

**you'll**
6:15 37:24 70:7

**you're**
6:7 9:17 13:12,22 14:1
17:20 18:10 24:10 27:9
29:19 30:7 41:1,2,18
42:1,3,24 44:2 49:6 70:4

**you've**
8:11 35:11 41:3 42:14

51:13 60:25 63:10

**your**
6:18,23 7:22 8:3,12,23
9:12 10:21,23 12:2 15:25
17:17,21 18:24 20:14,19,
22 21:14 22:6,24 24:10
25:12 27:23 29:2 31:24
32:11 33:14 34:1,7,25
35:17,18 42:2,20 45:9,16
47:10 48:18,20 50:4
54:9,11,21,25 55:5 56:24
57:14,16,25 61:24 63:1
65:22,23 66:15,20,23
67:14 68:16 70:8

**yourself**
13:11,15 14:1,6,15 19:8
21:11,18 29:15 69:7

---

**Z**

---

**Zoom**
7:19

EXHIBIT "12"



EXHIBIT
47

Lisa T. Owen, CA CSR 4475
R. Mowbray          Oct 02, 2023

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

```
                                    )
RONNIE D. JORDAN, an                )
individual,                         )
                                    )
          Plaintiff,                )   Case No. CIVSB2201281
     vs.                            )
                                    )
THE ORIGINAL MOWBRAY'S              )
TREE SERVICE,                       )
INCORPORATED, a California          )
corporation; MOWBRAY                )
WATERMAN PROPERTY, LLC, a           )
California limited                  )
liability company; RICHARD          )
JOHN MOWBRAY, an                    )
individual; ROBIN MOWBRAY,          )
an individual; and DOES 1           )
through 50 inclusive,               )
                                    )
          Defendants.               )
_____      )
```

**CERTIFIED COPY**

REMOTE SWORN STATEMENT OF

RICHARD MOWBRAY

March 1, 2022

3:08 p.m.

Lourdes Perez, CSR No. 13995



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001339

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 2
Richard Mowbray, 03/01/2022

```
 1                    APPEARANCES OF COUNSEL

 2

 3    On Behalf of the Plaintiff:

 4         CATANZARITE LAW CORPORATION
           Kenneth J. Catanzarite, Esq.
 5         2331 West Lincoln Avenue
           Anaheim, CA 92801
 6         (714) 520-5544
           kcatanzarite@catanzarite.com
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 3
Richard Mowbray, 03/01/2022

```
 1                      INDEX OF EXAMINATION

 2

 3   WITNESS:  RICHARD MOWBRAY

 4

     EXAMINATION                                        PAGE
 5
     BY MR. CATANZARITE  ...............................   4
 6

 7

 8

 9
                       INDEX TO EXHIBITS
10
     PLAINTIFF'S                                        PAGE
11
     EXHIBIT 1 - Set of Handwritten Notes                13
12
     EXHIBIT 2 - Typewritten document dated May 28,2018   17
13

14               (Retained by Counsel)

15

16

17

18

19

20

21

22

23

24

25
```

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001341

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 4
Richard Mowbray, 03/01/2022

```
 1                DEPOSITION OF RICHARD MOWBRAY
 2                       March 1, 2022
 3
 4                       RICHARD MOWBRAY,
 5     having been first duly sworn, testified as follows:
 6                          EXAMINATION
 7     BY MR. CATANZARITE:
 8          Q.   Now, Rick Mowbray, that's what you prefer to be
 9     called; right?  Rick Mowbray?
10          A.   Yes, sir.
11          Q.   All right.  So if I call you -- I'll call you
12     Mr. Mowbray for purposes of this statement, but I
13     understand that you go by Rick.  I just wanted to
14     coordinate that for the record.
15          A.   Yes.  Okay.
16          Q.   Now, the oath you took is the same oath if you
17     were testifying at the time of trial on Ronnie Jordan's
18     case against Mowbray's.
19               Do you understand that?
20          A.   Yes, sir.
21          Q.   And you're supposed to give us the -- your
22     best recollection of events that happened back in 2018,
23     2019.
24               Are you able to do that?
25          A.   Yes, sir.
```



AdvancedONE LEGAL          (866) 715-7770
                          advancedONE.com

1    Q.   Are you under any drugs or medications that
2    would affect your ability to recall?
3    A.   None at all, sir.
4    Q.   Very good.
5         Is there any reason you can't go forward with
6    your brief testimony here today?
7    A.   No reason at all.
8    Q.   All right.  So I'm going to take you back a
9    little bit to May of 2018 and ask you, how were you then
10   employed?
11   A.   I was in charge of Mowbray Tree Company.  I ran
12   the company, did all the hiring.  I directed the work,
13   who was going to work for us and all the day-to-day
14   operations.
15   Q.   Tell me, Rick, if you can, how many employees,
16   approximately, did Mowbray's --
17   A.   At the time --
18   Q.   -- did Mowbray's have in May of 2018?
19   A.   I want to say probably five to six hundred
20   employees.
21   Q.   Okay.  And then over the course of -- after
22   Ronnie Jordan was hired by Mowbray's through your
23   managerial role, did that work number of employees
24   increase?
25   A.   I think, Ken, it almost doubled, I want to say.



1    Q.   Okay.  So about 1,000 or more employees --

2    A.   Oh, yeah.  Yeah.

3    Q.   -- by that time?

4         Okay.  Now, tell me a little bit about

5    Mowbray's.  What did Mowbray's do in May of 2018?

6    A.   We were basically a utility vegetation

7    management company.  Ninety-five percent of our work was

8    all utility related.  That means we cleared power lines

9    for utilities like Pacific Gas and Electric, SMUD --

10   which is Sacramento Municipal Utility -- Southern

11   California Edison, and we also did some work for

12   Arizona -- APS, Arizona Power Source.

13   Q.   And this type of work -- is this type of work

14   dangerous work, typically?

15   A.   Yes.  It's one of the highest hazard

16   occupations, yes.

17   Q.   Okay.  And are many of these employees that

18   worked for Mowbray's and were under your direction over

19   the years, were they union?

20   A.   Yes, we are union.  IBEW, the International

21   Brotherhood of Electrical Workers Union and -- we're a

22   union company.

23   Q.   And how long had you been, as you described --

24   I think you said you were in charge as the general

25   manager of the operation of Mowbray's.

Plaintiff Jordan's PODs 001344

1          How long had you been in that role?

2     A.    About nine years, from 2011 to -- when Ronnie

3  came on, you know, I'd been already there about eight or

4  nine years.

5     Q.    Now, you -- what was the revenue -- the annual

6  revenue in May of 2018?  Approximately, what was --

7     A.    I'd say about 300 million a year.

8     Q.    Okay.  Was that '19 or '20?  Later in there;

9  right?

10    A.    Oh, later.  When I first got there, we were

11 only doing 12 million a year.  I mean --

12    Q.    Okay.

13    A.    -- the company -- we expanded over -- I mean,

14 every year, we were -- we rapidly increased our revenue

15 from the time I got there.  When I first got there in

16 2011, the revenue here was $12 million, and by the time

17 Ronnie got there in 2018, we were up to 300 or better.

18    Q.    I understood from Ronnie that the 300 million

19 was hit in 2020 and that you were about eighty, ninety

20 million in 2018?

21    A.    I don't believe that that's -- I'm going to go

22 ahead and go with his higher -- his numbers on 2020, but

23 Mowbray's was definitely in a couple hundred million

24 dollars.

25    Q.    Okay.  All right.  Now, going back to what



1    you -- in May of 2009, what caused you to -- did you, on

2    behalf of Mowbray's, want to reach out to Ronnie?  Or

3    tell me how that --

4        A.    Yeah.  I felt we needed to -- I had a CEO, I

5    told you, had been there with me from 2011 up to 2018,

6    which was Dwight Anderson.  And I knew we needed to

7    change the direction we were going in, and I thought

8    Ronnie would fit that position well with his background,

9    and I've worked with him for many years.  So it was my

10   decision to -- at first, to bring him up alongside of

11   Dwight, but right away, I knew we needed to put him in

12   charge of the company.

13       Q.    And what was Ronnie's reputation -- Ronnie

14   Jordan's reputation that caused you, on behalf of

15   Mowbray's, to seek him out?

16       A.    He has a good reputation.  He's good at

17   interfacing with utilities, the management.  And I've

18   always been in the production part of it where I've

19   interfaced better with the men, so I knew that the two

20   of us would work well together.  We both had our

21   strengths and our weaknesses, and I think -- I knew that

22   of him.

23       Q.    Okay.  And did you then -- you reached out,

24   then, on behalf of Mowbray's to Ronnie Jordan.

25            Where was he at at the time?  Do you know?



Plaintiff Jordan's PODs 001346

1    A.   It's my understanding, like he said, he was

2    moving back home to Florida.  That's where his daughter

3    lived with her grandchild.

4         Q.   Okay.

5         A.   And so I reached out when they were heading

6    back home.

7         Q.   Okay.  So you reached out, and he was in

8    Florida through -- you reached out there a gentleman

9    named Mike Bartelli?

10        A.   Yes, sir.

11        Q.   Okay.

12        A.   Mike was like an assistant to me, and I had him

13   reach out.  And he knew Ronnie too so --

14        Q.   Oh, I see.

15             And how did you all know Ronnie?  Because of

16   the work in the industry, that he worked for someone

17   that you were affiliated with or knew about as a

18   competitor?

19        A.   Years ago, when I worked for Southern

20   California Edison, we had a blight called a bark beetle

21   here -- something just came on the screen.

22             Okay.  Ken, we -- way back, I think, in 2004,

23   it had been a little earlier -- we had a blight

24   here called -- it was a bark beetle up in the San

25   Bernardino National Forest, and Ronnie's company had

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001347

1    come in and happened to be awarded a half a billion

2    dollars and it was going to be spent here.  I was

3    already doing the work for another contractor, Aslan

4    [phonetic] Tree Company.  And when Ronnie took it over,

5    then I ended up coming to work for Ronnie, and that's

6    how my relationship started with Ronnie.

7        Q.   Oh, I see.

8             Okay.  So -- and I gather Ronnie, after this

9    reach-out by Mike Bartelli to Ronnie in Florida, Ronnie

10   decides to come visit California; is that right?

11       A.   Yes, sir.

12       Q.   And how did he -- who paid the cost of Ronnie

13   coming to California?

14       A.   I did.  I had Mowbray's pay for that.  We flew

15   him out.  Mike -- Ronnie said my wife purchased the

16   tickets, and we had flown them out here for a few days

17   to, you know, let them see what we were doing, get

18   acquainted with our management, and it went very well.

19       Q.   Okay.  And he was there a couple of days with

20   you?  Were they --

21       A.   Yes, sir.

22       Q.   -- long days, like early morning into the

23   evening?

24       A.   Early mornings, long days.  We made dinner and

25   stayed up till midnight, you know, every day.  Had a


AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001348

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE                    Page 11
Richard Mowbray, 03/01/2022

1   good relationship.

2        Q.   Talking shop; right?

3        A.   Yes, sir.

4        Q.   Okay.  So when you were meeting with Ronnie, do

5   you have a recollection of meeting with Ronnie and

6   somebody named Phyllis?

7        A.   Yes.  Yes, sir.  That's his wife, yeah.

8        Q.   And who is Phyllis?

9        A.   Phyllis is -- she's the one in charge of

10  Ronnie.  She's always -- I've always got a lot of

11  respect for her.  She's a nice lady.  She's very

12  attentive and, you know, Ronnie -- she's always been

13  there.  They've traveled together.  They've worked

14  together.  They've, you know -- I mean, when Ronnie

15  came, it was always Phyllis was there, and I knew we

16  needed -- we only were asking Ronnie for employment, but

17  I knew that we needed her too or we weren't going to get

18  Ronnie.

19       Q.   I see.  So you -- to get Ronnie, you had to

20  hire Phyllis too; is that right?

21       A.   Not like that, but I knew that it was going to

22  be her decision, not Ronnie's, if he came to work here.

23       Q.   Okay.  Okay.  But so while you're there, I

24  understand there may have been a meeting between you and

25  Ronnie Jordan and Phyllis Jordan in your office sort of



(866) 715-7770
advancedONE.com

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 12
Richard Mowbray, 03/01/2022

1   at the end of these --

2       A.   Yes.

3       Q.   -- months of meetings; is that right?

4       A.   And as a matter of fact, my wife was there too,

5   because we were always -- the four of us were together.

6   So we were thinking of -- yeah.  Denise Mowbray was also

7   there.

8       Q.   Okay.

9       A.   And we were sitting around the desk there, and

10  that's when this -- I brought this conversation up, what

11  we thought, you know, the compensation should be for the

12  move and, you know, the monetary money that -- you know,

13  that would be made here and the possibilities.  So it

14  was -- that's how this letter started.

15      Q.   Okay.  So now you've held up -- I gave you two

16  documents to look at.  One of them -- I'm going to put

17  on the screen -- is a set of handwritten notes, and I

18  can share this screen here.

19      A.   Okay.

20      Q.   Let me just do that, but you have it in front

21  of you.  I'm going to do it for the benefit of Lourdes.

22           Are you able to see that screen now,

23  Mr. Mowbray?

24      A.   Yes, sir.

25           MR. CATANZARITE:  Okay.  So this is -- we'll



Plaintiff Jordan's PODs 001350

 1   mark this as Exhibit A, and this document is a set of

 2   handwritten notes.

 3              (Marked for identification, Exhibit 1.)

 4   BY MR. CATANZARITE:

 5       Q.   Now, I know that none of the handwriting on

 6   this is yours; correct?

 7       A.   No, sir.

 8       Q.   Okay.  But what I want to ask you is, when in

 9   May of 2018, when you're meeting with Ronnie and Phyllis

10   in your office, did you -- are you guys -- were you --

11   the three of you sitting around a table together?

12       A.   We were sitting around a desk there at our

13   office -- at our headquarters there in San Bernardino.

14   I think it was after dinner, and we just started a

15   conversation about, you know, where this letter leads

16   to.

17       Q.   Okay.  And did you observe Phyllis making

18   notes?

19       A.   Yes, I did, sir.  She was absolutely right next

20   to me and doing the writing.

21       Q.   Okay.  So --

22       A.   And I was able to -- you know, when she wrote

23   it, she would -- invited me that this is, you know -- it

24   was very close.  You know, the letter was written right

25   in -- very close.  We were -- I watched her write it.

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

1    We talked about it.  She wrote it.

2        Q.    Okay.

3        A.    Detailed conversation.

4        Q.    Okay.  So in this detailed conversation while

5    she's writing her note, you could see what she was

6    writing; is that correct?

7        A.    Yes, sir.  Yes, I could.

8        Q.    Okay.  Now, what were the terms that you

9    offered Ronnie on that day in your office in the

10   presence of Phyllis?  What --

11       A.    We started out with a quarter-million-dollar

12   salary.  Her coming in also at, I think, fifty-five,

13   sixty thousand.  I talked about a 10 percent bonus -- I

14   talked about a bonus -- a sign-on bonus and a 10 percent

15   bonus on the profits of what Mowbray's would do after

16   him joining forces with us.  And so I also talked about

17   cars, you know, that we would provide them with

18   transportation when they needed to fly home first class.

19   I told them that, you know, we wanted to make sure that

20   they were happy to be here and that they couldn't

21   compare wherever they had worked before to what we were

22   going to do.  That's the kind of conversations we were

23   having.

24       Q.    Okay.  So let me summarize.

25             So the offer -- the agreement, rather, that --



Plaintiff Jordan's PODs 001352

1   you offered the terms and Ronnie accepted the terms in

2   that meeting; is that correct?

3       A.   Yes, he did.

4       Q.   The terms were $250,000 salary for Ronnie.

5            Was that correct so far?

6       A.   Yep.

7       Q.   $55,000 salary for Phyllis; correct?

8       A.   Yep.

9       Q.   Ten percent of the profits of Mowbray's;

10  correct?

11      A.   Yes.

12      Q.   Two cars, one for Phyllis and one for Ronnie,

13  replace every two years; correct?

14      A.   Yes, sir.

15      Q.   And you were also going to provide housing for

16  them; correct?

17      A.   Yes, sir.

18      Q.   And Mowbray's would provide the housing?

19      A.   Yes, sir.

20      Q.   And pay for the housing; correct?  Yes.

21           Okay.  And I gather this was a productive

22  discussion and the meeting ended with Ronnie saying he

23  would take the deal that you had proposed; right?

24      A.   Yeah.  Absolutely.  Absolutely.

25      Q.   Okay.  And then he was going to head back to

Plaintiff Jordan's PODs 001353

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 16
Richard Mowbray, 03/01/2022

```
 1   Florida for -- to take care of his business in Florida

 2   and --

 3       A.   Yes.

 4       Q.   -- move back to California; right?

 5       A.   Yes, sir.

 6       Q.   Okay.  And I know that you said you provided

 7   him some moving expenses.

 8            You paid for some moving expenses also from

 9   Florida; right?

10       A.   Yeah.  You know, and I don't know the details

11   on that, but I knew that we were going to cover any cost

12   that was associated with their move or, you know, flying

13   arrangements, anything like that.  We were going to

14   cover all of those expenses and make it, you know, as

15   easy as possible for them to transition back to here.

16       Q.   Okay.  So you realize that as you guys are

17   sitting there talking, this is an oral contract; right?

18   This is --

19       A.   Yes, sir.

20       Q.   -- orally?

21            You on behalf of Mowbray's are making this

22   agreement with Ronnie, who on behalf of Ronnie and

23   Phyllis is accepting the agreement; right?

24       A.   Yes, sir.

25       Q.   And you expected -- is it fair to say you
```

 1  expected that to be a binding contract, that

 2  Mowbray's --

 3      A.   Absolutely.

 4      Q.   -- Mowbray's --

 5      A.   Absolutely.

 6      Q.   -- would perform if Ronnie performed; right?

 7      A.   Yes, sir.

 8      Q.   And was Ronnie performing when you left

 9  Mowbray's?

10      A.   Very well.

11      Q.   Very well.

12      A.   I thought very well.  Better than -- Mowbray's

13  was moving forward.  Again, we had always moved pretty

14  fast, and Ronnie definitely was doing his job.

15      Q.   Excellent.

16           Okay.  Now, there was a time, then, that a

17  second document was presented to you there.  There was a

18  typewritten document.  Now I've got it on the screen --

19      A.   Yes, sir.

20      Q.   -- as Exhibit B -- or Exhibit 2.

21           MR. CATANZARITE:  I'm going to call the first

22  one Exhibit 1, Lourdes, and this one Exhibit 2 because

23  I'm going to send these to you.

24           (Marked for identification, Exhibit 2.)

25  ///

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 18
Richard Mowbray, 03/01/2022

1   BY MR. CATANZARITE:
2       Q.   Now, this is a one-page document, and it's
3   typed up and it has the date of May 28, 2018.
4            But am I to understand you received this later
5   after Ronnie was already there working?
6       A.   Yes, sir.  Yes, Ken.  It was --
7       Q.   Okay.
8       A.   He actually had his son -- I think his son
9   typed this up for us.
10      Q.   Very good.
11           Okay.  Now, do you know, was this just
12  something that someone put on writing but you were all
13  too busy to get it executed?  Is that what happened?
14      A.   Yeah.  I think with our -- you know, we were --
15  and I believe that things were foreseen as, maybe, even
16  better than what we had discussed here so it wasn't
17  something that we were putting off.  It was just
18  something that we just hadn't stopped and took the time
19  to do.  I don't think we felt very -- we work good
20  together.  We trusted one another.  We just hadn't
21  gotten around to doing it.
22      Q.   I see.  I see.  Okay.
23      A.   It could have been done.  We just hadn't done
24  it.  That's the only way I can --
25      Q.   Now, did you tell -- in other words, do I



1   understand it correctly that you could make this

2   decision, that is you could -- well, wait a minute.  Let

3   me finish Exhibit 2.

4           Did you read Exhibit 2 when you received it?

5   A.   Yes, I did.

6   Q.   Did you disagree with any of what was written

7   there?

8   A.   No.  I didn't disagree with anything.

9   Q.   So this -- would it be fair to say this was

10  consistent with the oral agreement that you all had

11  reached back in May 2018?

12  A.   Yeah.  Yes.  We just summarize -- yeah.  This

13  was just our formal letter.

14  Q.   And so the reason it never got executed was

15  just the press of business; is that fair to say?

16  A.   Yes, sir.  I find that fair to say.

17  Q.   And then something happened where you were

18  asked to leave Mowbray's for some reason --

19  A.   Yeah.

20  Q.   -- and you did; right?

21  A.   And I was asked to step aside, and I was going

22  to be compensated for that and I was okay with it.  I

23  mean, Ronnie was taking care of business.  I felt that

24  we were in good hands, and in the end, my wife both

25  decided that she quit working also, you know.

```
 1        Q.   Oh, I see.  I see.

 2        A.   And four months later, then they terminated

 3   Ronnie.

 4        Q.   I see.

 5             Now, let me ask a little bit more about the

 6   terms of the agreement.

 7             Who knew about the terms of the agreement you

 8   had agreed to with Ronnie?  Who at --

 9        A.   My wife knew.  My sister Robin knew about him.

10   We -- she also played a big part in this.  Even though I

11   made the decisions, I always -- I did confide in her and

12   let her know what we were going to do.  My mother, only

13   on occasion.  When it came to signing this, of course, I

14   had told her what we were going to do.  My mother had

15   no -- she's never worked in this business at all, never

16   spent her day here.  We just had it in her name back

17   when they -- affirmative action is the reason why I put

18   it in her name --

19        Q.   I see.

20        A.   -- for the minority status.  My father had got

21   an injury.  It's a long story, but anyways --

22        Q.   Right.

23        A.   -- for political purposes, I guess, you know.

24        Q.   Okay.  What I'm getting at is, so your sister

25   Robin --
```



RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 21
Richard Mowbray, 03/01/2022

1    A.    Yeah.

2    Q.    -- Mowbray; right?  Mowbray -- Robin Mowbray?

3    A.    Yeah.

4    Q.    Your sister knew the terms of Ronnie's contract

5    that you had agreed, you know --

6    A.    Yes.  Yes, she did.

7    Q.    So she knew the -- in particular, she knew the

8    10 percent of profits as part of the contract?

9    A.    Yes, she did.

10   Q.    Okay.  Did she ever disagree with it and say

11   you weren't authorized to do that?

12   A.    No.  No.

13   Q.    All right.

14   A.    Never.

15   Q.    And who else would you have to talked to about

16   that?  Would you have talked to your mother about it at

17   any time?

18   A.    Yeah.  I spoke to my mother about it.  I told

19   her what we were going to do and we would buy them a

20   car.  She never really -- she left it up to me.  She

21   didn't have to worry.  I mean, that's why she -- you

22   know, the company made $10 million or $12 million.  No,

23   I mean, she never had to worry.  Didn't have to worry

24   about it.  She couldn't have done this, though.

25   Q.    And it would be fair to say, I think, that the



(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001359

1  company is roaring at this point; right?  It's making a

2  lot of money with Ronnie there and --

3      A.   Yeah.  We increased what we -- well, our

4  revenues.  Again, we were -- I believe we were onto

5  bigger and better things, and I believe that that was

6  because of Ronnie being at the helm of what -- I hired

7  him for that purpose, and he was fulfilling that purpose

8  just like I knew he would.

9      Q.   Yeah.  So, in other words, fairly stated, you

10 felt this was a very successful hire and that Ronnie was

11 performing per plan?

12     A.   Yes, I did.  Yes, I did.

13     Q.   And actually above plan, I think, would be --

14     A.   I think he was, yes.  I think he was, you

15 know --

16     Q.   Okay.  Okay.  And -- well, I think that's all I

17 have to ask you, Mr. Mowbray.

18     A.   Okay.

19     Q.   I have one final question.

20          Are you in the room here by yourself?

21     A.   Yes, sir, I am.

22     Q.   Okay.  And did anyone tell you what to say

23 about that thing?

24     A.   Nobody.  Nobody told me.

25     Q.   So this is all without coaching or without

AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001360

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE          Page 23
Richard Mowbray, 03/01/2022

1  **someone saying, "Listen.  You need to say this and" --**

2  **none of that occurred; is that right?**

3      A.   I didn't even know the questions that I was

4  going to be asked, sir.

5      **Q.   Okay.**

6          MR. CATANZARITE:  So this is -- we're going

7  to -- this is going to be a sworn statement.  It's going

8  to be sent to me and you -- but let's see.  I'm going to

9  have to work with the reporter on that.  I don't have

10  anything -- further questions for you, Mr. Mowbray.

11          You don't need to correct anything you've told

12  me so far today?

13          THE WITNESS:  No.

14          MR. CATANZARITE:  Okay.  Lourdes, may we go off

15  the record.

16

17          (Proceedings concluded at 3:30 p.m.)

18

19

20

21

22

23

24

25

Plaintiff Jordan's PODs 001361

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE                    Page 24
Richard Mowbray, 03/01/2022

1                    REPORTER'S CERTIFICATION

2

3        I, Lourdes Perez, a Certified Shorthand Reporter,

4   in and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7   that the statement was then taken before me at the time

8   and place herein set forth; that the testimony and

9   proceedings were reported stenographically by me and

10  later transcribed into typewriting under my direction;

11  that the foregoing is a true record of the testimony and

12  proceedings taken at that time.

13

14

15       IN WITNESS WHEREOF, I have subscribed my name this

16  1st day of March, 2022.

17

18

19                          _Lourdes Perez_

20       _____

21       Lourdes Perez, CSR No. 13995

22

23

24

25

AdvancedONE
LEGAL
(866) 715-7770
advancedONE.com

1           DEPOSITION ERRATA SHEET

2

3        DECLARATION UNDER PENALTY OF PERJURY

4

5      I declare under penalty of perjury that I have read

6   the entire transcript of my Deposition taken in the

7   above captioned matter or the same has been read to me,

8   and the same is true and accurate, save and except for

9   changes and/or corrections, if any, as indicated by me

10  on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13      Signed on the _____ day of _____, 20___.

14

15                      _____

16                      RICHARD MOWBRAY

17

18

19

20

21

22

23

24

25



Plaintiff Jordan's PODs 001363

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE                    Page 26
Richard Mowbray, 03/01/2022

1          DEPOSITION ERRATA SHEET

2   Page No._____ Line No._____ Change to:_____

3   _____

4   Reason for change: _____

5   Page No._____ Line No._____ Change to:_____

6   _____

7   Reason for change: _____

8   Page No._____ Line No._____ Change to:_____

9   _____

10  Reason for change: _____

11  Page No._____ Line No._____ Change to:_____

12  _____

13  Reason for change: _____

14  Page No._____ Line No._____ Change to:_____

15  _____

16  Reason for change: _____

17  Page No._____ Line No._____ Change to:_____

18  _____

19  Reason for change: _____

20  Page No._____ Line No._____ Change to:_____

21  _____

22  Reason for change: _____

23

24  SIGNATURE:_____DATE_____

25              RICHARD MOWBRAY



(866) 715-7770
advancedONE.com

**$**

**$10**
21:22

**$12**
7:16 21:22

**$250,000**
15:4

**$55,000**
15:7

**1**

**1**
4:2 13:3 17:22

**1,000**
6:1

**10**
14:13,14 21:8

**12**
7:11

**19**
7:8

**2**

**2**
17:20,22,24 19:3,4

**20**
7:8

**2004**
9:22

**2009**
8:1

**2011**
7:2,16 8:5

**2018**
4:22 5:9,18 6:5 7:6,17,20
8:5 13:9 18:3 19:11

**2019**
4:23

**2020**
7:19,22

**2022**
4:2

**28**
18:3

**3**

**300**
7:7,17,18

**3:30**
23:17

**A**

**ability**
5:2

**able**
4:24 12:22 13:22

**about**
6:1,4 7:2,3,7,19 9:17
13:15 14:1,13,14,16
20:5,7,9 21:15,16,18,24
22:23

**above**
22:13

**absolutely**
13:19 15:24 17:3,5

**accepted**
15:1

**accepting**
16:23

**acquainted**
10:18

**action**
20:17

**actually**
18:8 22:13

**affect**
5:2

**affiliated**
9:17

**affirmative**
20:17

**after**
5:21 10:8 13:14 14:15
18:5

**Again**
17:13 22:4

**against**
4:18

**ago**
9:19

**agreed**
20:8 21:5

**agreement**
14:25 16:22,23 19:10
20:6,7

**ahead**
7:22

**all**
4:11 5:3,7,8,12,13 6:8
7:25 9:15 16:14 18:12
19:10 20:15 21:13 22:16,
25



(866) 715-7770
advancedONE.com

**almost**
  5:25

**alongside**
  8:10

**already**
  7:3 10:3 18:5

**also**
  6:11 12:6 14:12,16 15:15
  16:8 19:25 20:10

**always**
  8:18 11:10,12,15 12:5
  17:13 20:11

**am**
  18:4 22:21

**an**
  9:12 16:17 20:21

**and**
  4:21 5:9,13,21 6:9,11,13,
  17,18,21,23 7:16,19,22
  8:6,7,9,13,17,21,23 9:5,
  7,12,13,15,25 10:1,2,4,5,
  8,12,16,18,19,24 11:5,8,
  12,15,24,25 12:4,9,12,
  13,17 13:1,9,14,17,20,22
  14:14,16,20 15:1,12,15,
  18,20,21,22,25 16:2,6,
  10,14,22,25 17:8,14,22
  18:2,3,15,18 19:14,17,
  20,21,22,24 20:2,11
  21:10,15,19,25 22:2,5,7,
  10,13,16,22 23:1,8

**Anderson**
  8:6

**annual**
  7:5

**another**
  10:3 18:20

**any**
  5:1,5 16:11 19:6 21:17

**anyone**
  22:22

**anything**
  16:13 19:8 23:10,11

**anyways**
  20:21

**approximately**
  5:16 7:6

**APS**
  6:12

**are**
  4:24 5:1 6:17,20 12:22
  13:10 16:16,21 22:20

**Arizona**
  6:12

**around**
  12:9 13:11,12 18:21

**arrangements**
  16:13

**as**
  4:5 6:23,24 9:17 12:4
  13:1 16:14,15,16 17:20
  18:15 21:8

**aside**
  19:21

**ask**
  5:9 13:8 20:5 22:17

**asked**
  19:18,21 23:4

**asking**
  11:16

**Aslan**
  10:3

**assistant**
  9:12

**associated**
  16:12

**at**
  4:17 5:3,7,17 8:10,16,25
  12:1,16 13:12,13 14:12
  20:8,15,24 21:16 22:1,6
  23:17

**attentive**
  11:12

**authorized**
  21:11

**awarded**
  10:1

**away**
  8:11

---

**B**

**back**
  4:22 5:8 7:25 9:2,6,22
  15:25 16:4,15 19:11
  20:16

**background**
  8:8

**bark**
  9:20,24

**Bartelli**
  9:9 10:9

**basically**
  6:6

**be**
  4:8 10:1,2 11:22 12:11,
  13 14:20 17:1 19:9,22
  21:25 22:13 23:4,7,8



**because**
9:15 12:5 17:22 22:6

**been**
4:5 6:23 7:1,3 8:5,18
9:23 11:12,24 18:23

**beetle**
9:20,24

**before**
14:21

**behalf**
8:2,14,24 16:21,22

**being**
22:6

**believe**
7:21 18:15 22:4,5

**benefit**
12:21

**Bernardino**
9:25 13:13

**best**
4:22

**better**
7:17 8:19 17:12 18:16
22:5

**between**
11:24

**big**
20:10

**bigger**
22:5

**billion**
10:1

**binding**
17:1

**bit**

5:9 6:4 20:5

**blight**
9:20,23

**bonus**
14:13,14,15

**both**
8:20 19:24

**brief**
5:6

**bring**
8:10

**Brotherhood**
6:21

**brought**
12:10

**business**
16:1 19:15,23 20:15

**busy**
18:13

**but**
4:12 7:22 8:11 11:16,21,
23 12:20 13:8 16:11
18:4,12 20:21 23:8

**buy**
21:19

**by**
4:7,13 5:22 6:3 7:16 10:9
13:4 18:1 22:20

---

### C

**California**
6:11 9:20 10:10,13 16:4

**call**
4:11 17:21

**called**
4:9 9:20,24

**came**
7:3 9:21 11:15,22 20:13

**can**
5:15 12:18 18:24

**can't**
5:5

**car**
21:20

**care**
16:1 19:23

**cars**
14:17 15:12

**case**
4:18

**CATANZARITE**
4:7 12:25 13:4 17:21
18:1 23:6,14

**caused**
8:1,14

**CEO**
8:4

**change**
8:7

**charge**
5:11 6:24 8:12 11:9

**class**
14:18

**cleared**
6:8

**close**
13:24,25

**coaching**
22:25



**come**
  10:1,10

**coming**
  10:5,13 14:12

**company**
  5:11,12 6:7,22 7:13 8:12
  9:25 10:4 21:22 22:1

**compare**
  14:21

**compensated**
  19:22

**compensation**
  12:11

**competitor**
  9:18

**concluded**
  23:17

**confide**
  20:11

**consistent**
  19:10

**contract**
  16:17 17:1 21:4,8

**contractor**
  10:3

**conversation**
  12:10 13:15 14:3,4

**conversations**
  14:22

**coordinate**
  4:14

**correct**
  13:6 14:6 15:2,5,7,10,13,
  16,20 23:11

**correctly**

19:1

**cost**
  10:12 16:11

**could**
  14:5,7 18:23 19:1,2

**couldn't**
  14:20 21:24

**couple**
  7:23 10:19

**course**
  5:21 20:13

**cover**
  16:11,14

---

**D**

**dangerous**
  6:14

**date**
  18:3

**daughter**
  9:2

**day**
  10:25 14:9 20:16

**day-to-day**
  5:13

**days**
  10:16,19,22,24

**deal**
  15:23

**decided**
  19:25

**decides**
  10:10

**decision**

8:10 11:22 19:2

**decisions**
  20:11

**definitely**
  7:23 17:14

**Denise**
  12:6

**DEPOSITION**
  4:1

**described**
  6:23

**desk**
  12:9 13:12

**detailed**
  14:3,4

**details**
  16:10

**did**
  5:12,16,18,23 6:5,11 8:1,
  23 9:15 10:12,14 13:10,
  17,19 15:3 18:25 19:4,5,
  6,20 20:11 21:6,9,10
  22:12,22

**didn't**
  19:8 21:21,23 23:3

**dinner**
  10:24 13:14

**directed**
  5:12

**direction**
  6:18 8:7

**disagree**
  19:6,8 21:10

**discussed**
  18:16



(866) 715-7770
advancedONE.com

**discussion**
  15:22

**do**
  4:19,24 6:5 8:25 11:4
  12:20,21 14:15,22 18:11,
  19,25 20:12,14 21:11,19

**document**
  13:1 17:17,18 18:2

**documents**
  12:16

**doing**
  7:11 10:3,17 13:20 17:14
  18:21

**dollars**
  7:24 10:2

**don't**
  7:21 16:10 18:19 23:9,11

**done**
  18:23 21:24

**doubled**
  5:25

**drugs**
  5:1

**duly**
  4:5

**Dwight**
  8:6,11

---

**E**

**earlier**
  9:23

**early**
  10:22,24

**easy**
  16:15

**Edison**
  6:11 9:20

**eight**
  7:3

**eighty**
  7:19

**Electric**
  6:9

**Electrical**
  6:21

**else**
  21:15

**employed**
  5:10

**employees**
  5:15,20,23 6:1,17

**employment**
  11:16

**end**
  12:1 19:24

**ended**
  10:5 15:22

**even**
  18:15 20:10 23:3

**evening**
  10:23

**events**
  4:22

**ever**
  21:10

**every**
  7:14 10:25 15:13

**EXAMINATION**
  4:6

**Excellent**
  17:15

**executed**
  18:13 19:14

**Exhibit**
  13:1,3 17:20,22,24 19:3,
  4

**expanded**
  7:13

**expected**
  16:25 17:1

**expenses**
  16:7,8,14

---

**F**

**fact**
  12:4

**fair**
  16:25 19:9,15,16 21:25

**fairly**
  22:9

**far**
  15:5 23:12

**fast**
  17:14

**father**
  20:20

**felt**
  8:4 18:19 19:23 22:10

**few**
  10:16

**fifty-five**
  14:12

**final**
  22:19



**find**
19:16

**finish**
19:3

**first**
4:5 7:10,15 8:10 14:18
17:21

**fit**
8:8

**five**
5:19

**flew**
10:14

**Florida**
9:2,8 10:9 16:1,9

**flown**
10:16

**fly**
14:18

**flying**
16:12

**follows**
4:5

**for**
4:12,14 5:13 6:9,11,18
8:9 9:16,19 10:3,5,14,16
11:11,16 12:11,21 13:3
15:4,7,12,15,20 16:1,8,
15 17:24 18:9 19:18,22
20:20,23 22:7 23:10

**forces**
14:16

**foreseen**
18:15

**Forest**
9:25

**formal**
19:13

**forward**
5:5 17:13

**four**
12:5 20:2

**from**
7:2,15,18 8:5 16:8

**front**
12:20

**fulfilling**
22:7

**further**
23:10

---

### G

**Gas**
6:9

**gather**
10:8 15:21

**gave**
12:15

**general**
6:24

**gentleman**
9:8

**get**
10:17 11:17,19 18:13

**getting**
20:24

**give**
4:21

**go**
4:13 5:5 7:21,22 23:14

**going**
5:8,13 7:21,25 8:7 10:2
11:17,21 12:16,21 14:22
15:15,25 16:11,13 17:21,
23 19:21 20:12,14 21:19
23:4,6,7,8

**good**
5:4 8:16 11:1 18:10,19
19:24

**got**
7:10,15,17 11:10 17:18
19:14 20:20

**gotten**
18:21

**grandchild**
9:3

**guess**
20:23

**guys**
13:10 16:16

---

### H

**had**
6:23 7:1 8:4,5,20 9:12,
20,23,25 10:14,16,25
11:19 14:21 15:23 17:13
18:8,16 19:10 20:8,14,
16,20 21:5,23

**hadn't**
18:18,20,23

**half**
10:1

**hands**
19:24

**handwriting**
13:5



**(866) 715-7770**
advancedONE.com

Plaintiff Jordan's PODs 001370

**handwritten**
12:17 13:2

**happened**
4:22 10:1 18:13 19:17

**happy**
14:20

**has**
8:16 18:3

**have**
5:18 11:5,24 12:20 18:23
21:15,16,21,23,24 22:17,
19 23:9

**having**
4:5 14:23

**hazard**
6:15

**he**
8:16,25 9:1,7,13,16
10:12,19 11:22 15:3,22,
25 18:8 22:7,8,14

**He's**
8:16

**head**
15:25

**heading**
9:5

**headquarters**
13:13

**held**
12:15

**helm**
22:6

**her**
9:3 11:11,17,22 13:25
14:5,12 20:11,12,14,16,
18 21:19

**here**
5:6 7:16 9:21,24 10:2,16
11:22 12:13,18 14:20
16:15 18:16 20:16 22:20

**higher**
7:22

**highest**
6:15

**him**
8:9,10,11,15,22 9:12
10:15 14:16 16:7 20:9
22:7

**hire**
11:20 22:10

**hired**
5:22 22:6

**hiring**
5:12

**his**
7:22 8:8 9:2 11:7 16:1
17:14 18:8

**hit**
7:19

**home**
9:2,6 14:18

**housing**
15:15,18,20

**how**
5:9,15 6:23 7:1 8:3 9:15
10:6,12 12:14

**hundred**
5:19 7:23

---

**I**

---

**I'D**

7:3,7

**I'LL**
4:11

**I'M**
5:8 7:21 12:16,21 17:21,
23 20:24 23:8

**I'VE**
8:9,17,18 11:10 17:18

**IBEW**
6:20

**identification**
13:3 17:24

**if**
4:11,16 5:15 11:22 17:6

**in**
4:22 5:11,18 6:5,24 7:1,
6,8,15,17,19,20,23 8:1,7,
11,18 9:7,16,22,24 10:1,
9 11:9,25 12:20 13:8,10,
13,25 14:4,9,12 15:1
16:1 18:25 19:11,24
20:10,11,15,16,18 21:7
22:9,20

**increase**
5:24

**increased**
7:14 22:3

**industry**
9:16

**injury**
20:21

**interfaced**
8:19

**interfacing**
8:17



(866) 715-7770
advancedONE.com

**International**
6:20

**into**
10:22

**invited**
13:23

**is**
4:16 5:5 6:10,13 10:10
11:8,9,20 12:3,17,25
13:1,6,8,23 14:6 15:2
16:17,18,23,25 18:2,13
19:2,15 20:17,24 22:1,25
23:2,6,7

**it**
5:25 8:9,18 9:23,24 10:2,
4,18 11:15,21 12:13,20,
21 13:14,23,25 14:1
16:14,25 17:18 18:3,6,
13,16,17,21,23,24 19:1,
4,9,14,22 20:13,16,18
21:10,16,18,20,24,25

**it's**
6:15 9:1 18:2 20:21 22:1
23:7

### J

**job**
17:14

**joining**
14:16

**Jordan**
5:22 8:24 11:25

**Jordan's**
4:17 8:14

**just**
4:13 9:21 12:20 13:14
18:11,17,18,20,23 19:12,

13,15 20:16 22:8

### K

**Ken**
5:25 9:22 18:6

**kind**
14:22

**knew**
8:6,11,19,21 9:13,17
11:15,17,21 16:11 20:7,9
21:4,7 22:8

**know**
7:3 8:25 9:15 10:17,25
11:12,14 12:11,12 13:5,
15,22,23,24 14:17,19
16:6,10,12,14 18:11,14
19:25 20:12,23 21:5,22
22:15 23:3

### L

**lady**
11:11

**later**
7:8,10 18:4 20:2

**leads**
13:15

**leave**
19:18

**left**
17:8 21:20

**let**
10:17 12:20 14:24 19:2
20:5,12

**let's**
23:8

**letter**
12:14 13:15,24 19:13

**like**
6:9 9:1,12 10:22 11:21
16:13 22:8

**lines**
6:8

**Listen**
23:1

**little**
5:9 6:4 9:23 20:5

**lived**
9:3

**long**
6:23 7:1 10:22,24 20:21

**look**
12:16

**lot**
11:10 22:2

**Lourdes**
12:21 17:22 23:14

### M

**made**
10:24 12:13 20:11 21:22

**make**
14:19 16:14 19:1

**making**
13:17 16:21 22:1

**management**
6:7 8:17 10:18

**manager**
6:25

**managerial**
5:23



(866) 715-7770
advancedONE.com

**many**
5:15 6:17 8:9

**March**
4:2

**mark**
13:1

**marked**
13:3 17:24

**matter**
12:4

**may**
5:9,18 6:5 7:6 8:1 11:24
13:9 18:3 19:11 23:14

**maybe**
18:15

**me**
5:15 6:4 8:3,5 9:12 12:20
13:20,23 14:24 19:3 20:5
21:20 22:24 23:8,12

**mean**
7:11,13 11:14 19:23
21:21,23

**means**
6:8

**medications**
5:1

**meeting**
11:4,5,24 13:9 15:2,22

**meetings**
12:3

**men**
8:19

**midnight**
10:25

**Mike**

9:9,12 10:9,15

**million**
7:7,11,16,18,20,23 21:22

**minority**
20:20

**minute**
19:2

**monetary**
12:12

**money**
12:12 22:2

**months**
12:3 20:2

**more**
6:1 20:5

**morning**
10:22

**mornings**
10:24

**mother**
20:12,14 21:16,18

**move**
12:12 16:4,12

**moved**
17:13

**moving**
9:2 16:7,8 17:13

**Mowbray**
4:1,4,8,9,12 5:11 12:6,23
21:2 22:17 23:10

**Mowbray's**
4:18 5:16,18,22 6:5,18,
25 7:23 8:2,15,24 10:14
14:15 15:9,18 16:21
17:2,4,9,12 19:18

**Mr**
4:7,12 12:23,25 13:4
17:21 18:1 22:17 23:6,
10,14

**Municipal**
6:10

**my**
8:9 9:1 10:6,15 12:4
19:24 20:9,12,14,20
21:18

---

**N**

**name**
20:16,18

**named**
9:9 11:6

**National**
9:25

**need**
23:1,11

**needed**
8:4,6,11 11:16,17 14:18

**never**
19:14 20:15 21:14,20,23

**next**
13:19

**nice**
11:11

**nine**
7:2,4

**ninety**
7:19

**Ninety-five**
6:7



**no**
5:7 13:7 19:8 20:15
21:12,22 23:13

**Nobody**
22:24

**none**
5:3 13:5 23:2

**not**
11:21,22

**note**
14:5

**notes**
12:17 13:2,18

**now**
4:8,16 6:4 7:5,25 12:15,
22 13:5 14:8 17:16,18
18:2,11,25 20:5

**number**
5:23

**numbers**
7:22

---

**O**

---

**oath**
4:16

**observe**
13:17

**occasion**
20:13

**occupations**
6:16

**occurred**
23:2

**of**
4:1,12,17,22 5:9,11,18,

21,23 6:5,7,13,15,17,21,
25 7:6 8:1,2,10,12,14,18,
20,22,24 9:15 10:12,19
11:5,9,10,25 12:1,3,4,5,
6,16,17,21 13:1,5,9,11
14:10,15,22 15:9 16:1,
14,21,22 18:3 19:6,15,23
20:6,7,13 21:4,8 22:2,6
23:2

**off**
18:17 23:14

**offer**
14:25

**offered**
14:9 15:1

**office**
11:25 13:10,13 14:9

**Oh**
6:2 7:10 9:14 10:7 20:1

**okay**
4:15 5:21 6:1,4,17 7:8,
12,25 8:23 9:4,7,11,22
10:8,19 11:4,23 12:8,15,
19,25 13:8,17,21 14:2,4,
8,24 15:21,25 16:6,16
17:16 18:7,11,22 19:22
20:24 21:10 22:16,18,22
23:5,14

**on**
4:17 7:3,22 8:1,14,24
9:21 12:17 13:5 14:9,15
16:11,21,22 17:18 18:12
20:13 23:9

**one**
6:15 11:9 12:16 15:12
17:22 18:20 22:19

**one-page**
18:2

**only**
7:11 11:16 18:24 20:12

**onto**
22:4

**operation**
6:25

**operations**
5:14

**or**
5:1 6:1 7:3,8,17 8:2 9:17
11:17 16:12 17:20 21:22
22:25

**oral**
16:17 19:10

**orally**
16:20

**other**
18:25 22:9

**our**
6:7 7:14 8:20,21 10:18
13:12,13 18:14 19:13
22:3

**out**
8:2,15,23 9:5,7,8,13
10:15,16 14:11

**over**
5:21 6:18 7:13 10:4

---

**P**

---

**p.m.**
23:17

**Pacific**
6:9

**paid**
10:12 16:8



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

Plaintiff Jordan's PODs 001374

**part**
8:18 20:10 21:8

**particular**
21:7

**pay**
10:14 15:20

**per**
22:11

**percent**
6:7 14:13,14 15:9 21:8

**perform**
17:6

**performed**
17:6

**performing**
17:8 22:11

**phonetic**
10:4

**Phyllis**
11:6,8,9,15,20,25 13:9,
17 14:10 15:7,12 16:23

**plan**
22:11,13

**played**
20:10

**point**
22:1

**political**
20:23

**position**
8:8

**possibilities**
12:13

**possible**
16:15

**power**
6:8,12

**prefer**
4:8

**presence**
14:10

**presented**
17:17

**press**
19:15

**pretty**
17:13

**probably**
5:19

**proceedings**
23:17

**production**
8:18

**productive**
15:21

**profits**
14:15 15:9 21:8

**proposed**
15:23

**provide**
14:17 15:15,18

**provided**
16:6

**purchased**
10:15

**purpose**
22:7

**purposes**
4:12 20:23

**put**
8:11 12:16 18:12 20:17

**putting**
18:17

## Q

**quarter-million-dollar**
14:11

**question**
22:19

**questions**
23:3,10

**quit**
19:25

## R

**ran**
5:11

**rapidly**
7:14

**rather**
14:25

**reach**
8:2 9:13

**reach-out**
10:9

**reached**
8:23 9:5,7,8 19:11

**read**
19:4

**realize**
16:16

**really**
21:20



(866) 715-7770
advancedONE.com

**reason**
  5:5,7 19:14,18 20:17

**recall**
  5:2

**received**
  18:4 19:4

**recollection**
  4:22 11:5

**record**
  4:14 23:15

**related**
  6:8

**relationship**
  10:6 11:1

**replace**
  15:13

**reporter**
  23:9

**reputation**
  8:13,14,16

**respect**
  11:11

**revenue**
  7:5,6,14,16

**revenues**
  22:4

**RICHARD**
  4:1,4

**Rick**
  4:8,9,13 5:15

**right**
  4:9,11 5:8 7:9,25 8:11
  10:10 11:2,20 12:3
  13:19,24 15:23 16:4,9,
  17,23 17:6 19:20 20:22

  21:2,13 22:1 23:2

**roaring**
  22:1

**Robin**
  20:9,25 21:2

**role**
  5:23 7:1

**Ronnie**
  4:17 5:22 7:2,17,18 8:2,
  8,13,24 9:13,15 10:4,5,6,
  8,9,12,15 11:4,5,10,12,
  14,16,18,19,25 13:9 14:9
  15:1,4,12,22 16:22 17:6,
  8,14 18:5 19:23 20:3,8
  22:2,6,10

**Ronnie's**
  8:13 9:25 11:22 21:4

**room**
  22:20

---

### S

**Sacramento**
  6:10

**said**
  6:24 9:1 10:15 16:6

**salary**
  14:12 15:4,7

**same**
  4:16

**San**
  9:24 13:13

**say**
  5:19,25 7:7 16:25 19:9,
  15,16 21:10,25 22:22
  23:1

**saying**
  15:22 23:1

**screen**
  9:21 12:17,18,22 17:18

**second**
  17:17

**see**
  9:14 10:7,17 11:19 12:22
  14:5 18:22 20:1,4,19
  23:8

**seek**
  8:15

**send**
  17:23

**sent**
  23:8

**set**
  12:17 13:1

**share**
  12:18

**she**
  13:19,22,23 14:1,5 19:25
  20:10 21:6,7,9,10,20,21,
  23,24

**she's**
  11:9,10,11,12 14:5 20:15

**shop**
  11:2

**should**
  12:11

**sign-on**
  14:14

**signing**
  20:13

**sir**



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE                        39
Richard Mowbray, 03/01/2022                          Index: sister..that

4:10,20,25 5:3 9:10
10:11,21 11:3,7 12:24
13:7,19 14:7 15:14,17,19
16:5,19,24 17:7,19 18:6
19:16 22:21 23:4

**sister**
20:9,24 21:4

**sitting**
12:9 13:11,12 16:17

**six**
5:19

**sixty**
14:13

**SMUD**
6:9

**so**
4:11 5:8 6:1 8:9,19 9:5,7,
13 10:8 11:4,19,23 12:6,
13,15,25 13:21 14:4,16,
24,25 15:5 16:16 18:16
19:9,14 20:24 21:7 22:9,
25 23:6,12

**some**
6:11 16:7,8 19:18

**somebody**
11:6

**someone**
9:16 18:12 23:1

**something**
9:21 18:12,17,18 19:17

**son**
18:8

**sort**
11:25

**Source**
6:12

**Southern**
6:10 9:19

**spent**
10:2 20:16

**spoke**
21:18

**started**
10:6 12:14 13:14 14:11

**stated**
22:9

**statement**
4:12 23:7

**status**
20:20

**stayed**
10:25

**step**
19:21

**stopped**
18:18

**story**
20:21

**strengths**
8:21

**successful**
22:10

**summarize**
14:24 19:12

**supposed**
4:21

**sure**
14:19

**sworn**
4:5 23:7

**T**

**table**
13:11

**take**
5:8 15:23 16:1

**taking**
19:23

**talked**
14:1,13,14,16 21:15,16

**talking**
11:2 16:17

**tell**
5:15 6:4 8:3 18:25 22:22

**Ten**
15:9

**terminated**
20:2

**terms**
14:8 15:1,4 20:6,7 21:4

**testified**
4:5

**testifying**
4:17

**testimony**
5:6

**than**
17:12 18:16

**that**
4:13,14,19,22,24 5:1,23
6:3,8,17 7:1,8,18,19,21
8:3,8,14,19,21 9:16,17
10:10,14 11:17,20,21
12:3,12,13,20,22 13:5,23
14:6,8,9,17,19,20,25



(866) 715-7770
advancedONE.com

15:2,5,23 16:6,11,12,13,
16 17:1,16 18:12,13,15,
17,18 19:1,2,10,15,16,
22,23,25 21:5,11,16,25
22:5,7,10,23 23:2,3,9

**that's**
4:8 7:21 9:2 10:5 11:7
12:10,14 14:22 18:24
21:21 22:16

**the**
4:14,16,17,21 5:12,13,
17,21 6:15,19,20,24,25
7:5,13,15,16,18 8:7,12,
17,18,19,25 9:16,21,24
10:3,12,15,22 11:9 12:1,
5,9,11,12,13,17,21 13:5,
11,20,24 14:8,9,15,22,25
15:1,4,9,18,20,22,23
16:10,23 17:18,21 18:3,
18,24 19:10,14,15,24
20:5,6,7,11,17,20 21:4,7,
8,22,25 22:6,20 23:3,9,
13,15

**their**
16:12

**them**
10:16,17 12:16 14:17,19
15:16 16:15 21:19

**then**
5:9,21 8:23,24 10:5
15:25 17:16 19:17 20:2

**there**
5:5 7:3,8,10,15,17 8:5
9:8 10:19 11:13,15,23,24
12:4,7,9 13:12,13 16:17
17:16,17 18:5 19:7 22:2

**these**
6:17 12:1 17:23

**they**
6:19 9:5 10:20 14:18,20,
21 20:2,17

**They've**
11:13,14

**thing**
22:23

**things**
18:15 22:5

**think**
5:25 6:24 8:21 9:22
13:14 14:12 18:8,14,19
21:25 22:13,14,16

**thinking**
12:6

**this**
4:12 6:13 10:8 12:10,14,
18,25 13:1,6,15,23 14:4
15:21 16:17,18,21 17:22
18:2,4,9,11 19:1,9,12
20:10,13,15 21:24 22:1,
10,25 23:1,6,7

**those**
16:14

**though**
20:10 21:24

**thought**
8:7 12:11 17:12

**thousand**
14:13

**three**
13:11

**through**
5:22 9:8

**tickets**
10:16

**till**
10:25

**time**
4:17 5:17 6:3 7:15,16
8:25 17:16 18:18 21:17

**to**
4:8,13,21,24 5:2,8,9,13,
19,25 7:2,17,21,25 8:1,2,
4,5,6,10,11,15,24 9:2,12
10:1,2,5,9,10,13,17
11:17,19,21,22 12:16,21,
22 13:8,16,20,22 14:18,
19,20,21,22 15:15,25
16:1,4,11,13,15,25 17:1,
17,21,23 18:4,13,19,21
19:9,15,16,18,21,22
20:8,12,13,14 21:11,15,
16,18,19,20,21,23,25
22:17,22 23:1,4,7,8,9,11

**today**
5:6 23:12

**together**
8:20 11:13,14 12:5 13:11
18:20

**told**
8:5 14:19 20:14 21:18
22:24 23:11

**too**
9:13 11:17,20 12:4 18:13

**took**
4:16 10:4 18:18

**transition**
16:15

**transportation**
14:18

**traveled**
11:13


advancedONE
LEGAL

(866) 715-7770
advancedONE.com

RONNIE D. JORDAN vs ORIGINAL MOWBRAY'S TREE SERVICE                    41
Richard Mowbray, 03/01/2022                          Index: Tree..what

**Tree**
5:11 10:4

**trial**
4:17

**trusted**
18:20

**two**
8:19 12:15 15:12,13

**type**
6:13

**typed**
18:3,9

**typewritten**
17:18

**typically**
6:14

**U**

**under**
5:1 6:18

**understand**
4:13,19 11:24 18:4 19:1

**understanding**
9:1

**understood**
7:18

**union**
6:19,20,21,22

**up**
7:17 8:5,10 9:24 10:5,25
12:10,15 18:3,9 21:20

**us**
4:21 5:13 8:20 12:5
14:16 18:9

**utilities**
6:9 8:17

**utility**
6:6,8,10

**V**

**vegetation**
6:6

**very**
5:4 10:18 11:11 13:24,25
17:10,11,12 18:10,19
22:10

**visit**
10:10

**W**

**wait**
19:2

**want**
5:19,25 8:2 13:8

**wanted**
4:13 14:19

**was**
5:11,13,22 6:7 7:5,6,8,
16,19,23 8:6,9,13,25 9:1,
7,12,24 10:2,19 11:15,21
12:4,6,14 13:14,19,22,24
14:5 15:5,21,25 16:12
17:8,13,14,16,17 18:5,6,
11,17 19:6,9,13,14,21,
22,23 22:5,7,10,14 23:3

**wasn't**
18:16

**watched**
13:25

**way**
9:22 18:24

**we**
6:6,8,11,20 7:10,13,14,
17 8:4,6,7,11,20 9:20,22,
23 10:14,16,17,24 11:15,
16,17 12:5,6,9,11 13:12,
14,25 14:1,11,17,19,21,
22 16:11,13 17:13 18:14,
16,17,18,19,20,23 19:12,
24 20:10,12,14,16 21:19
22:3,4 23:14

**we'll**
12:25

**we're**
6:21 23:6

**weaknesses**
8:21

**well**
8:8,20 10:18 17:10,11,12
19:2 22:3,16

**went**
10:18

**were**
4:17 5:9 6:6,18,19,24
7:10,14,17,19 8:7 9:5,17
10:17,20 11:4,16 12:5,6,
9 13:10,12,25 14:8,20,
21,22 15:4,15 16:11,13
18:12,14,15,17 19:17,24
20:12,14 21:19 22:4

**weren't**
11:17 21:11

**what**
4:8 6:5 7:5,6,25 8:1,13
10:17 12:10 13:8 14:5,8,
10,15,21 18:13,16 19:6
20:12,14,24 21:19 22:3,



(866) 715-7770
advancedONE.com

6,22

**when**
7:2,10,15 9:5,19 10:4
11:4,14 12:10 13:8,9,22
14:18 17:8 19:4 20:13,17

**where**
8:18,25 9:2 13:15 19:17

**wherever**
14:21

**which**
6:10 8:6

**while**
11:23 14:4

**who**
5:13 10:12 11:8 16:22
20:7,8 21:15

**why**
20:17 21:21

**wife**
10:15 11:7 12:4 19:24
20:9

**with**
5:5 7:22 8:5,8,9,17,19
9:3,17 10:6,18,19 11:4,5
13:9 14:11,16,17 15:22
16:12,22 18:14 19:6,8,
10,22 20:8 21:10 22:2
23:9

**without**
22:25

**WITNESS**
23:13

**words**
18:25 22:9

**work**
5:12,13,23 6:7,11,13,14

8:20 9:16 10:3,5 11:22
18:19 23:9

**worked**
6:18 8:9 9:16,19 11:13
14:21 20:15

**Workers**
6:21

**working**
18:5 19:25

**worry**
21:21,23

**would**
5:2 8:8,20 12:13 13:23
14:15,17 15:18,23 17:6
19:9 21:15,16,19,25
22:8,13

**write**
13:25

**writing**
13:20 14:5,6 18:12

**written**
13:24 19:6

**wrote**
13:22 14:1

––––––––––––––

**Y**

––––––––––––––

**yeah**
6:2 8:4 11:7 12:6 15:24
16:10 18:14 19:12,19
21:1,3,18 22:3,9

**year**
7:7,11,14

**years**
6:19 7:2,4 8:9 9:19 15:13

**Yep**

15:6,8

**yes**
4:10,15,20,25 6:15,16,20
9:10 10:11,21 11:3,7
12:2,24 13:19 14:7 15:3,
11,14,17,19,20 16:3,5,
19,24 17:7,19 18:6 19:5,
12,16 21:6,9 22:12,14,21

**you**
4:8,11,13,16,19,24 5:1,5,
8,9,15 6:23,24 7:1,3,5,19
8:1,5,14,23,25 9:7,8,15,
17 10:17,20,25 11:4,5,
12,14,19,24 12:11,12,15,
20,21,22 13:8,10,11,15,
17,22,23,24 14:5,8,17,19
15:1,15,23 16:6,8,10,12,
14,16,21,25 17:8,17,23
18:4,11,12,14,25 19:1,2,
4,6,10,17,20,25 20:7,23
21:5,11,15,16,21 22:9,
14,17,20,22 23:1,8,10,11

**you're**
4:21 11:23 13:9

**you've**
12:15 23:11

**your**
4:21 5:2,6,22 6:18 11:25
13:10 14:9 20:24 21:4,16

**yours**
13:6

**yourself**
22:20



**Exhibit 1**

Plaintiff Jordan's PODs 001381

meeting 9-16-18     Ronnie CEO has exepted the position
Ronnie is in charge. Of          to lead the company.
· 3 to five years with mowbrays

· PG+E - 10% of Profit
SCE - } 250,000.00 Ronnie yearly
        55,000 Phylis yearly.
SMD -/
. Replace cars for Ronnie + Phylis every 2 years
. Pay cars of Now
. Leave mowbrays with new Vehicals when we leave. comp.
. Expenses Paid while on Busoins Travel.
. We will fly home as we need. at Comp Expense. 1st Class.
. We have the company house while we are
  Employeed. 1 month to vacate at departure utilities included.
. Lensurance - MedCare, Blue Cross
. Credit Cards for Both.
. We want a contract in Fl per Rick.


Rick -
Ronnie - CEO
Robin - President
Dicky - V.P.
Sec. Tres. Phylis
Alan - CFO

Plaintiff Jordan's PODs 001382

**Exhibit 2**

Plaintiff Jordan's PODs 001383

**To: All Mowbray's Employee's**

**From: Rick Mowbray**

Well it is now official: Ronnie Jordan will be the new CEO here at Mowbray's. Just a few weeks ago neither of us would have ever imagined this would be the path that he or I would be on, yet here we are. Along with Ronnie and his family, I put a lot of thought into this: how would this affect Mowbray's? Would this be a positive move for our company? In the end the answer was "yes".

As I look back there have been two individuals who have stood out and shaped my business career, who "still today" impact how we run our business. First there's Mike Neal and his Team at APS. Mike taught me the true meaning of being safe; that it has to be the most important thing we do here at Mowbray's. That being safe is not just part of our job but it's the "culture of our company that can never be compromised". "Thank you Mike for making this such an important part of our company's philosophy".

Second is Ronnie Jordan. The first thing I remember about Ronnie was that here's this small statured man with big round eyes, grinning from ear to ear, telling me he has the SCE bark beetle contract for all of California. I just laughed at him thinking there was no way he could take on such a task, that he had no idea how to work on trees around power-lines. So with this in mind I didn't want our company working with or for Ronnie. But just about every day he would ask if I would consider working for him. I would always say "no" even to the point that one day I asked him "what don't you understand about the word no"? This went on for weeks until, reluctantly, I was forced, *yes forced*, to say "yes".

Shortly after that he started asking me if I could do more like "add crews and equipment," but he would add that we "had to be safe while doing it". Believe it or not, way back then, I didn't think I could take on what he was asking, *yet look at what we do today*. But Ronnie continued to move forward even though I didn't agree with his pace. I thought "this can't be done", until one day I thought "oh shit, he's going to cut my company right out of a job"! And though I didn't agree with him, I watched as his company continued to grow. At that time Phillips and Jordan mostly worked in other states, but because he was always working and moving forward, I knew that we also had to grow. So even though I was reluctant at first, we grew from 100 to over a 1000 employee's in just 6 months. After that we were not only one of Ronnie's best subcontractors, but for three years straight we cut down more trees faster than anyone and we did this without one recordable injury.

Now I still didn't think him or his company from "somewhere back east" (lol) would make it, but that was 15 years ago! Ronnie Jordan, who made it all happen here for his family's company Phillips and Jordan, is still trimming and removing trees around power lines here in California and now across the United States. After that Phillips and Jordan continued to grow to the point where they've become one of the largest companies in the country who now contract with FEMA for disaster work such as Hurricane relief, Tornadoes, ice storms, flooding and, if I recall correctly, had up to 40,000 union employees working for them in the recovery of those who lost their lives in the 911 twin towers tragedy.

Plaintiff Jordan's PODs 001384

In recalling those early days working with Ronnie, and Mike Bartelli will back me up on this, we made millions and millions which allowed our company to grow. But I did not do this by myself. In fact I had the help of hundred's, one of which was Jose Ramirez who I put in charge of the entire operation. This included all of the work and most importantly, the safety of the men. Jose did an outstanding job and I could not have done it without him. Ironically Jose ended up working for Ronnie during the years I was in prison.

During those early years Ronnie encouraged me to do some of the hurricane relief work in Florida. I was reluctant at first but finally he talked me into it. I drove out to Daytona, parked at the raceway and met up with one of the other contractors, ULM tree service, who had become millionaires because of Ronnie. Ronnie set me up with Billy, the owner of the company, who directed me to where the work was. For days I kept calling Ronnie and his younger brother Randy to tell them there was no brush where we were. Thinking I was bullshitting, Randy came out to see me. Sure enough Billy had put me where there was nothing to be taken, nothing to do. I remember Randy laughing and saying "yeah they're afraid of you; you're a threat to them!" So Randy took me to where the work was and gave me my own area; YES I made lots money! So all along Ronnie has encouraged me and helped me do things I thought I couldn't. He has praised me and let me know when I've done a good job but, most importantly, he helped me make Mowbray's a force to be reckoned with. I will always be grateful for that.

So back to him coming on board: When I first heard that Ronnie was interested in working for us I really didn't think much about it as it was something that I could never have imagined; "Ronnie Jordan working for Mowbray's"? But after talking with one of our subcontractors about it I contacted Ronnie, which is when this all began. Because of our past experiences, I've come to like and respect this man. He has always been very approachable and, once you got to know him, he was hard not to like. Being in contact with him again reminded me how important a part he has played in my life. He was successful when I met him yet he took the time to help me strengthen my confidence so that we as a company would be more successful. He taught me that "there is nothing we can't do if we truly believe in ourselves".

So that being said, please welcome Ronnie, his wife Phyllis, and their entire family as they join our family. Like me, I know you will soon see that we could not have a better man than Ronnie Jordan to take the reins of our company and help us unleash the potential this company holds.

"Ronnie and Phyllis, on behalf of my family and the entire Mowbray Company, I want to thank you for accepting our offer to join our company. Plus we want to thank you for the sacrifice your family is making knowing that this decision is delaying your move to Florida to be with your grandson.

Going forward Ronnie now has the responsibility of being the President and CEO of Mowbray's. This position gives him the authority to make decisions regarding the day to day operation of Mowbray's and, along with the support of our executive team, direct our company to an exciting future. Know that we as a company will support you and are excited about our future with you at the helm.

I believe we are a company of great potential; a potential that you will allow us to achieve.

Rick

Plaintiff Jordan's PODs 001386

EXHIBIT "13"

**Ronnie D. Jordan v. The Original Mowbray's Tree Service, Incorporated**

Superior Court of the State of California County of San Bernardino: Case No.: CIVSB2201281
Calculation of Compensation due, Lost Earnings, and Related Damages - excluding attorney's fees
Prepared by Kenneth L. Creal, Certified Public Accountant on September 29, 2023 (Updated 1/15/24)

| Period | Scenario 1 - Per Original Employment Contract applied for five year term | | | | | | | Scenario 2 - Adjusted for Revised Contract Signed September 16, 2020 and effective that day | | | | | | | Scenario 3 - If Revised Employment Agreement Deemed Valid as of January 1, 2020 | | | | | | |
| | Principal Balance at Beginning of Period | Payments Made to Plaintiff | Bonus Calculated Per Agreement | Unpaid Salary | Ending Cumulative Total Principal | 10% Interest for the monthly period | Cumulative simple interest | Principal Balance at Beginning of Period | Payments Made to Plaintiff | Calculated Per Agreement (incl. signing bonus paid December 2020) | Unpaid Salary | Ending Cumulative Total Principal | 10% Interest for the monthly period | Cumulative simple interest | Principal Balance at Beginning of Period | Payments Made to Plaintiff | Bonus Calculated Per Agreement | Unpaid Salary | Ending Cumulative Total Principal | 10% Interest for the monthly period | Cumulative simple interest |
| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U |
| Jan-19 | | | $ 652,208 | | $ 652,208 | | | $ 652,208 | | $ 652,208 | | $ 652,208 | | | $ 652,208 | | $ 652,208 | | $ 652,208 | | |
| Feb-19 | $ 652,208 | | | | 652,208 | $ 5,435 | $ 5,435 | $ 652,208 | | | | 652,208 | $ 5,435 | $ 5,435 | $ 652,208 | | | | 652,208 | $ 5,435 | $ 5,435 |
| Mar-19 | 652,208 | | | | 652,208 | 5,435 | 10,870 | 652,208 | | | | 652,208 | 5,435 | 10,870 | 652,208 | | | | 652,208 | 5,435 | 10,870 |
| Apr-19 | 652,208 | | | | 652,208 | 5,435 | 16,305 | 652,208 | | | | 652,208 | 5,435 | 16,305 | 652,208 | | | | 652,208 | 5,435 | 16,305 |
| May-19 | 652,208 | | | | 652,208 | 5,435 | 21,740 | 652,208 | | | | 652,208 | 5,435 | 21,740 | 652,208 | | | | 652,208 | 5,435 | 21,740 |
| Jun-19 | 652,208 | | | | 652,208 | 5,435 | 27,175 | 652,208 | | | | 652,208 | 5,435 | 27,175 | 652,208 | | | | 652,208 | 5,435 | 27,175 |
| Jul-19 | 652,208 | | | | 652,208 | 5,435 | 32,610 | 652,208 | | | | 652,208 | 5,435 | 32,610 | 652,208 | | | | 652,208 | 5,435 | 32,610 |
| Aug-19 | 652,208 | | | | 652,208 | 5,435 | 38,045 | 652,208 | | | | 652,208 | 5,435 | 38,045 | 652,208 | | | | 652,208 | 5,435 | 38,045 |
| Sep-19 | 652,208 | | | | 652,208 | 5,435 | 43,481 | 652,208 | | | | 652,208 | 5,435 | 43,481 | 652,208 | | | | 652,208 | 5,435 | 43,481 |
| Oct-19 | 652,208 | | | | 652,208 | 5,435 | 48,916 | 652,208 | | | | 652,208 | 5,435 | 48,916 | 652,208 | | | | 652,208 | 5,435 | 48,916 |
| Nov-19 | 652,208 | | | | 652,208 | 5,435 | 54,351 | 652,208 | | | | 652,208 | 5,435 | 54,351 | 652,208 | | | | 652,208 | 5,435 | 54,351 |
| Dec-19 | 652,208 | $ (50,000) | | | 602,208 | 5,435 | 59,786 | 652,208 | $ (50,000) | | | 602,208 | 5,435 | 59,786 | 652,208 | $ (50,000) | | | 602,208 | 5,435 | 59,786 |
| Jan-20 | 602,208 | | 1,708,449 | | 2,310,657 | 5,018 | 64,804 | 602,208 | | 1,708,449 | | 2,310,657 | 5,018 | 64,804 | 602,208 | | 1,708,449 | | 2,310,657 | 5,018 | 64,804 |
| Feb-20 | 2,310,657 | | | | 2,310,657 | 19,255 | 84,060 | 2,310,657 | | | | 2,310,657 | 19,255 | 84,060 | 2,310,657 | | | | 2,310,657 | 19,255 | 84,060 |
| Mar-20 | 2,310,657 | | | | 2,310,657 | 19,255 | 103,315 | 2,310,657 | | | | 2,310,657 | 19,255 | 103,315 | 2,310,657 | | | | 2,310,657 | 19,255 | 103,315 |
| Apr-20 | 2,310,657 | | | | 2,310,657 | 19,255 | 122,571 | 2,310,657 | | | | 2,310,657 | 19,255 | 122,571 | 2,310,657 | | | | 2,310,657 | 19,255 | 122,571 |
| May-20 | 2,310,657 | | | | 2,310,657 | 19,255 | 141,826 | 2,310,657 | | | | 2,310,657 | 19,255 | 141,826 | 2,310,657 | | | | 2,310,657 | 19,255 | 141,826 |
| Jun-20 | 2,310,657 | (250,000) | | | 2,060,657 | 19,255 | 161,082 | 2,310,657 | (250,000) | | | 2,060,657 | 19,255 | 161,082 | 2,310,657 | (250,000) | | | 2,060,657 | 19,255 | 161,082 |
| Jul-20 | 2,060,657 | | | | 2,060,657 | 17,172 | 178,254 | 2,060,657 | | | | 2,060,657 | 17,172 | 178,254 | 2,060,657 | | | | 2,060,657 | 17,172 | 178,254 |
| Aug-20 | 2,060,657 | | | | 2,060,657 | 17,172 | 195,426 | 2,060,657 | | | | 2,060,657 | 17,172 | 195,426 | 2,060,657 | | | | 2,060,657 | 17,172 | 195,426 |
| Sep-20 | 2,060,657 | | | | 2,060,657 | 17,172 | 212,598 | 2,060,657 | | | | 2,060,657 | 17,172 | 212,598 | 2,060,657 | | | | 2,060,657 | 17,172 | 212,598 |
| Oct-20 | 2,060,657 | | | | 2,060,657 | 17,172 | 229,770 | 2,060,657 | | | | 2,060,657 | 17,172 | 229,770 | 2,060,657 | | | | 2,060,657 | 17,172 | 229,770 |
| Nov-20 | 2,060,657 | | | | 2,060,657 | 17,172 | 246,942 | 2,060,657 | | | | 2,060,657 | 17,172 | 246,942 | 2,060,657 | | | | 2,060,657 | 17,172 | 246,942 |
| Dec-20 | 2,060,657 | | | | 2,060,657 | 17,172 | 264,114 | 2,060,657 | (250,000) | 250,000 | | 2,060,657 | 17,172 | 264,114 | 2,060,657 | (250,000) | 250,000 | | 2,060,657 | 17,172 | 264,114 |
| Jan-21 | 2,060,657 | | 6,963,075 | | 9,023,732 | 17,172 | 281,287 | 2,060,657 | | 5,457,178 | | 7,517,835 | 17,172 | 281,287 | 2,060,657 | | 1,750,000 | | 3,810,657 | 17,172 | 281,287 |
| Feb-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 356,484 | 7,517,835 | | | | 7,517,835 | 62,649 | 343,935 | 3,810,657 | | | | 3,810,657 | 31,755 | 313,042 |
| Mar-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 431,682 | 7,517,835 | | | | 7,517,835 | 62,649 | 406,584 | 3,810,657 | | | | 3,810,657 | 31,755 | 344,797 |
| Apr-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 506,880 | 7,517,835 | | | | 7,517,835 | 62,649 | 469,232 | 3,810,657 | | | | 3,810,657 | 31,755 | 376,553 |
| May-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 582,078 | 7,517,835 | | | | 7,517,835 | 62,649 | 531,881 | 3,810,657 | | | | 3,810,657 | 31,755 | 408,308 |
| Jun-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 657,275 | 7,517,835 | | | | 7,517,835 | 62,649 | 594,530 | 3,810,657 | | | | 3,810,657 | 31,755 | 440,064 |
| Jul-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 732,473 | 7,517,835 | | | | 7,517,835 | 62,649 | 657,178 | 3,810,657 | | | | 3,810,657 | 31,755 | 471,819 |
| Aug-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 807,671 | 7,517,835 | | | | 7,517,835 | 62,649 | 719,827 | 3,810,657 | | | | 3,810,657 | 31,755 | 503,575 |
| Sep-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 882,869 | 7,517,835 | | | | 7,517,835 | 62,649 | 782,476 | 3,810,657 | | | | 3,810,657 | 31,755 | 535,330 |
| Oct-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 958,066 | 7,517,835 | | | | 7,517,835 | 62,649 | 845,124 | 3,810,657 | | | | 3,810,657 | 31,755 | 567,086 |
| Nov-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 1,033,264 | 7,517,835 | | | | 7,517,835 | 62,649 | 907,773 | 3,810,657 | | | | 3,810,657 | 31,755 | 598,841 |
| Dec-21 | 9,023,732 | | | | 9,023,732 | 75,198 | 1,108,462 | 7,517,835 | | | | 7,517,835 | 62,649 | 970,421 | 3,810,657 | | | | 3,810,657 | 31,755 | 630,597 |
| Jan-22 | 9,023,732 | 3,105,285 | 20,833 | | 12,149,850 | 75,198 | 1,183,660 | 7,517,835 | | 750,000 | 20,833 | 8,288,668 | 62,649 | 1,033,070 | 3,810,657 | | 750,000 | 20,833 | 4,581,490 | 31,755 | 662,352 |
| Feb-22 | 12,149,850 | | 20,833 | | 12,170,683 | 101,249 | 1,284,908 | 8,288,668 | | | 20,833 | 8,309,501 | 69,072 | 1,102,142 | 4,581,490 | | | 20,833 | 4,602,323 | 38,179 | 700,531 |
| Mar-22 | 12,170,683 | | 4,704 | | 12,175,387 | 101,422 | 1,386,331 | 8,309,501 | | | 4,704 | 8,314,205 | 69,246 | 1,171,388 | 4,602,323 | | | 4,704 | 4,607,027 | 38,353 | 738,884 |
| Apr-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 1,487,792 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,240,673 | 4,607,027 | | | | 4,607,027 | 38,392 | 777,276 |
| May-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 1,589,254 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,309,958 | 4,607,027 | | | | 4,607,027 | 38,392 | 815,668 |
| Jun-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 1,690,715 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,379,243 | 4,607,027 | | | | 4,607,027 | 38,392 | 854,060 |

| Period | Scenario 1 - Per Original Employment Contract applied for five year term | | | | | | | Scenario 2 - Adjusted for Revised Contract Signed September 16, 2020 and effective that day | | | | | | | Scenario 3 - If Revised Employment Agreement Deemed Valid as of January 1, 2020 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Principal Balance at Beginning of Period | Payments Made to Plaintiff | Bonus Calculated Per Agreement | Unpaid Salary | Ending Cumulative Total Principal | 10% Interest for the monthly period | Cumulative simple interest | Principal Balance at Beginning of Period | Payments Made to Plaintiff | Calculated Per Agreement (incl. signing bonus paid December 2020) | Unpaid Salary | Ending Cumulative Total Principal | 10% Interest for the monthly period | Cumulative simple interest | Principal Balance at Beginning of Period | Payments Made to Plaintiff | Bonus Calculated Per Agreement | Unpaid Salary | Ending Cumulative Total Principal | 10% Interest for the monthly period | Cumulative simple interest |
| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U |
| Jul-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 1,792,177 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,448,528 | 4,607,027 | | | | 4,607,027 | 38,392 | 892,452 |
| Aug-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 1,893,639 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,517,813 | 4,607,027 | | | | 4,607,027 | 38,392 | 930,843 |
| Sep-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 1,995,100 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,587,098 | 4,607,027 | | | | 4,607,027 | 38,392 | 969,235 |
| Oct-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,096,562 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,656,383 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,007,627 |
| Nov-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,198,023 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,725,668 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,046,019 |
| Dec-22 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,299,485 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,794,953 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,084,411 |
| Jan-23 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,400,946 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,864,239 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,122,803 |
| Feb-23 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,502,408 | 8,314,205 | | | | 8,314,205 | 69,285 | 1,933,524 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,161,195 |
| Mar-23 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,603,870 | 8,314,205 | | | | 8,314,205 | 69,285 | 2,002,809 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,199,587 |
| Apr-23 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,705,331 | 8,314,205 | | | | 8,314,205 | 69,285 | 2,072,094 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,237,979 |
| May-23 | 12,175,387 | | | | 12,175,387 | 101,462 | 2,806,793 | 8,314,205 | | | | 8,314,205 | 69,285 | 2,141,379 | 4,607,027 | | | | 4,607,027 | 38,392 | 1,276,370 |
| Column Totals | | (300,000) | 12,429,017 | 46,370 | 12,175,387 | | 2,806,793 | | (550,000) | 10,017,835 | 46,370 | 9,514,205 | | 2,141,379 | | (550,000) | 6,310,657 | 46,370 | 5,807,027 | | 1,276,370 |

Scenario 1:
| | | |
|---|---|---|
| Total of unpaid compensation with interest through May 31, 2023 | | $ 14,982,180 |
| Per diem interest after May 31, 2023 - used 10% simple | $ 3,336  236 days | $ 787,231 |
| Labor Code Section 203 Penalty (Note 6) | $ 402,634 | $ 402,634 |
| | | $ 16,172,045 |

Scenario 2:
| | | |
|---|---|---|
| Total of unpaid compensation with interest through May 31, 2023 | | $ 11,655,584 |
| Per diem interest after May 31, 2023 | $ 2,607  236 | $ 615,165 |
| Labor Code Section 203 Penalty | $ 120,000 | $ 120,000 |
| | | $ 12,390,749 |

Scenario 3:
| | | |
|---|---|---|
| Total of unpaid compensation with interest through May 31, 2023 | | $ 7,083,398 |
| Per diem interest after May 31, 2023 | $ 1,591  236 | $ 375,468 |
| Labor Code Section 203 Penalty | $ 120,000 | $ 120,000 |
| | | $ 7,578,866 |

The analysis above does not include a $30,000 relocation payment at the end of the period.

1) The Plaintiff's position is that the loss of $3,425.443 at the time he was hired turned around and by year end profits of $ 3,096,637 had occurred turning the loss into a profit of $3,096,637.

2) 2019 net income from operations was $17,084,495 based on the reviewed financials.

3) 2020 net income from operations was $6,963,755 based on the company's financials.

4) 2021 earnings before interest and taxes was $31,052,850 based on the company's financials.

5) For simplicity I did not add back the $300,000 paid to Mr. Jordan, but this could represent an additional $30,000 in bonus becase the bonus should not be deducted in arriving at bonusable net income in my opinion.

6) For the Labor Code Section 203 penalty, I used the bonus payable in 2022 plus the $250,000 base salary divided by 250 working days multiplied by 30 days. If 2021 income was used instead, the daily earnings would be much higher.

Per the revised employment contract signed September 16, 2020, Plaintiff's 2020 bonus of $6,963,075 would need to be pro-rated at minimum 8.5 months / 12 months, or 70% to $4,932,177. The remaining bonus would be calculated at $500,000 base bonus + $250,000 per $50 million incremement thereafter.  $470,525,295 revenue - $200,000,000 = $270,525,295 / $50,000,000 = 5.45.  5 X $250,000 = $1,250,000 + $500,000 base = $1,750,000.
The 2021 bonus of $750,000 is calculated based on the agreement stating a $500,000 base bonus if company sales exceeded $200 million base plus $250,000 for each $50 million increment over base $284,079,290 - $200,000,000 = $84,079,290 / $50,000,000 = 1.68.  1 X $250,000

| | | | |
|---|---|---|---|
| 1/1/2020 | 4,932,178.13 | 8.5 Months | 70% = $6,963,075 x 70% |
| 9/16/2020 | 525,000.00 | 3.5 Months | 30% = $1,750,000 x 30% |
| | 5,457,178.13 | | |

Note - the $1,000,000 bonus in May 2023 is based on the value of real estate and vehiles mentioned in the agreement.

2020 bonus would be calculated as $500,000 base bonus + $250,000 per $50 million incremement thereafter.  $470,525,295 revenue - $200,000,000 = $270,525,295 / $50,000,000 = 5.45.  5 X $250,000 = $1,250,000 + $500,000 base = $1,750,000

The 2021 bonus of $750,000 is calculated based on the agreement stating a $500,000 base bonus if company sales exceeded $200 million base plus $250,000 for each $50 million increment over base $284,079,290 - $200,000,000 = $84,079,290 / $50,000,000 = 1.68.  1 X $250,000 $500,000 base =

Creal PODs 000244

EXHIBIT "14"

# Lawrence J. Kahn

12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

## EXPERIENCE

**Tulane University Law School**                                  **New Orleans, LA**
**Director, Utility Vegetation Management Initiative**            **Oct. 2020 – Date**

Developed first-ever utility vegetation management law and policy initiative; developed major research program to establish a comprehensive and updateable database of all UVM laws, regulations, rules and ordinances in North America; educated law students on UVM law and practice; co-authoring law review style papers with students on UVM comparative law, UVM safety regulation, right tree right place principles and social justice reform; authoring law review style papers on post-wildfire process and procedure, California's inverse condemnation rule, and rights of nature; developed course of formalized study of UVM law and procedure; developed advisory board of industry experts to support future establishment of a UVM institute; developed fundraising strategy and initiatives to support future establishment of a UVM institute; presented scholarly research (with students) at two international conferences on UVM and invited to present scholarly research at two future international conferences; developed CLE program scheduled for late 2022; development of position paper on GAAP accounting requirements relating to utility system hardening and UVM projects; advised various state and local governmental agencies across the US on UVM; advised utilities on UVM law, policy, practice and procedure; forged strategic relationships with industry and NGO leadership; development of model municipal tree ordinance in conjunction with Arbor Day Foundation; authoring and/or co-authoring and publishing numerous other scholarly articles on UVM.

**The UVM Company**                                              **Reno, NV**
**Principal**                                                    **Mar. 2023 – Date**

Advised US-based companies on development of utility vegetation management and disaster response; advised government agencies in California and Texas on utility vegetation management law and policy; advised city governments on utility vegetation management law and policy; advised California investor owned and municipally owned utilities on utility vegetation management law and policy; advised Michigan Attorney General on UVM matters relating to investigation of alleged government failures; co-hosted scoping meeting on behalf of California Office of Energy Infrastructure Safety; provided briefing to Michigan Public Service Commission regarding utility vegetation management law, practice and procedure.

**Essential Vegetation Management Services LLC**                 **Lakeport, CA**
**Director**                                                     **Aug. 2022 – Date**

Direct and oversee safe and environmentally sound vegetation management company focused on fire safety, defensible space, and utility line clearance; developed safety and environment programs; develop bids; oversaw successful sale of majority interest to Native American tribe and assist in guiding progress toward "Super 8(a)" status; assist in business expansion to provide services throughout California and other western fire-prone states.

**BLAST Enterprise Holding Co. LLC**                             **Mountain Lakes, NJ**
**BLAST Technologies Inc.**                                      **Reno, NV**
**Director**                                                     **May 2022 – Date**

Develop and oversee strategic direction of company dedicated to investment in socially conscious endeavors relating to the environment, climate change and social justice; assist in development and direction of acquisition of companies, technologies, investments and cooperative agreements.

## Lawrence J. Kahn
12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

**LJ Kahn Consulting, Inc.**                                    **Mountain Lakes, NJ**
**Proprietor**                                                 **Jan. 2018 – Mar. 2023**

Provided expert advice to group of former officers and directors of major Investor-Owned Utility on strengths and weaknesses of defense in lawsuit involving UVM failures leading to catastrophic losses; expert witness on utility vegetation management in lawsuit between real estate owners relating to the 2017 Mission Fire (Fresno, CA); advised major research institution on development of first-ever utility vegetation management law and policy initiative; guest of Scottish Government to consult on marine recycling; guest of Belgian Government to consult on marine recycling; guest of English Government to consult on marine recycling; guest of Albanian Government to consult on marine port development; advised companies based in Netherlands, Belgium, Scotland, UAE and USA on development of marine recycling facilities; advised companies based in Brazil, Netherlands, Scotland, England, China, UAE and USA on development of decommissioning businesses; advised US-based energy company on development of ESG statement and on meeting ESG requirements relating to offshore exploration assets; advised UK and France-based steel companies on development of steel recycling facilities; advised Dutch and US-based salvage companies on developing International Group bids for salvage and recycling of major casualties; oversaw merger of LJ Kahn Consulting, Inc. into The UVM Company.

**Asomeo Environmental Restoration Industry LLC**              **Sacramento, CA**
**Director, Chief Compliance and Ethics Officer**              **Oct. 2018 – Jul. 2022**

Partnered in founding company together with investor group with aim of developing best in class UVM company; obtained federal and state licensures; obtained state and local permits; developed compliance program; developed health, safety and environmental programs; researched and drafted health & safety manual, tree maintenance and removal manual, heat illness prevention program, injury and illness prevention program and numerous other health, safety and environmental guidance manuals, programs and other documents; guided company to be the first-ever company to pass PG&E safety audit on first attempt; assisted in growing company from startup to over 325 employees and $40MM+ revenues; instructed personnel on health and safety; developed continuous improvement program; developed business opportunities; prepared responses to bids; represented company before utility companies and state regulatory agencies; oversaw external counsel; selected real estate acquisitions for headquarters and field office facilities; oversaw law student internship program; developed strategic partnerships with financiers, SBA, suppliers, vendors, clients; developed utility company initiatives to improve tree worker safety.

**Marine Environmental Remediation Group LLC**                 **Mountain Lakes, NJ**
**MER Group Puerto Rico LLC**                                  **Ceiba, PR**
**Director, Corporate Secretary, General Counsel**            **2015 – 2021**

Founded first marine recycling facility dedicated to health, safety and environmental protection; successfully pitched concept to investors; developed corporate structure and developed all corporate documents, contracts, manuals; developed health and safety manuals and protocols; developed environmental and hazard materials manuals and protocols; developed operations manuals and protocols; developed and oversaw commercial and strategic alliances; guided company to be first entity outside of EU to be qualified to perform ship recycling on EU-flagged and owned vessels under EU Ship Recycling Regulations [2013]; developed industry's first-ever ethical standards for ship recycling; developed industry-leading BMPs for worker health and safety; developed industry-leading BMPs for environmental protection and community education; developed company from concept to fully functioning multi-million dollar facility employing nearly 300 persons; developed advisory committee including former EPA Director, former OSHA Director, retired Admiral and other industry key opinion leaders; engaged with federal, state and territorial regulators; negotiated contracts for vessel purchases, sales of material, labor, equipment, supplies; handled internal legal matters and investigations; oversaw performance of outside

# Lawrence J. Kahn

12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

counsel; registered vessels with flag state authorities; engaged in strategic alliances with NGOs; developed business opportunities for vessel stacking and vessel repair; developed non-traditional business opportunities; developed protocols for a net-zero operation in energy, water, waste, and carbon; guided company to win recognition from Ethical Corporation and delivered keynote address at Ethical Corporation Summit; drafted white paper concerning economic strategy to EU which led to formation of EU commission to study proposals; delivered keynote address to Tradewinds International Ship Recycling Conference in Singapore; prepared company for arrival of Hurricanes Irma and Maria with minimal damage and restoration of operations within one week; coordinated Puerto Rico relief efforts with US Coast Guard and FEMA through facility, outpacing cargo operations at the port of San Juan; led efforts to develop green ship recycling facilities in Chile, Mexico, UAE, Scotland, Belgium, Albania, South Africa, Senegal, Indonesia, and Vietnam.

| | |
|---|---|
| **Summit Business Group LLC** | **Hazleton, PA** |
| **President** | **2013 – 2015** |

Co-founded company to provide environmental solutions R&D and federal market grant- and bid-writing; obtained funding and developed company protocols; hired staff and oversaw company development; business development efforts led to strategic partnership with European companies seeking to enter US federal marketplace and preparation of responses to bid opportunities.

| | |
|---|---|
| **Green Pillar Group LLC** | **Hazleton, PA** |
| **Director** | **2013 – 2015** |

Co-founded company to provide health, safety and environmentally conscious vegetation management solutions in Pennsylvania and New Jersey; obtained funding and developed company protocols; hired staff and oversaw company development; negotiated purchase of heavy equipment and engaged in timber surveys, hazard tree removal plans and operations.

| | |
|---|---|
| **Summit Law Group LP** | **New York, NY** |
| **Proprietor** | **2013 – 2014** |

Founded firm to provide legal advice to successfully transition clients following departure from partnership of former firm.

| | |
|---|---|
| **Meltech Corp.** | **Landover, MD** |
| **General Counsel** | **2013** |

Served as General Counsel to assist general contractor construction company in successfully graduating from SBA 8(a) program; oversaw claims handling; assisted in business development efforts and in drafting and preparing bids.

| | |
|---|---|
| **Seafighter Marine Industries LLC** | **Philadelphia, PA** |
| **President** | **2013** |

Developed plans for re-development of the SS UNITED STATES into land-based multifunctional facility for business and entertainment within the Philadelphia Navy Yard / Philaport property; negotiated contracts with SS UNITED STATES Conservancy, Philaport, Philadelphia Navy Yard and other stakeholders.

| | |
|---|---|
| **Freehill Hogan & Mahar LLP** | **New York, NY** |
| **Partner** | **2007 – 2013** |
| **Associate** | **1999 – 2007** |

Advised and represented clients in a variety of contract, transactional and litigation matters involving maritime and environmental law; developed new law concerning provisional remedies and widely regarded as architect of the use of FRCP Rule B to restrain wire transfers; second-in-charge of firm's transactional law department, overseeing vessel purchase and sale contracts; widely regarded expert on maritime arrest

## Lawrence J. Kahn

12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

and attachment, riparian law, international high seas piracy, treasure salvage, and the recognition and enforcement of foreign judgments and arbitral awards; drafted *amicus* briefs concerning Rule B to the Second Circuit; developed firm's bankruptcy practice; developed firm's maritime fraud practice and widely-considered best maritime fraud attorney in the US; created new judicial law concerning Chapter 15 bankruptcy practice and procedure; litigated federal cases in 20 different US states and before two federal courts of appeal; provided expert testimony on US maritime and/or environmental law in litigations in eighteen different foreign countries on six continents; law firm's lead trainer of new associates; developed multiple new clients for the firm, including the world's (then) third-largest shipping line; one of two main law firm representatives to the Maritime Law Association of the United States; led firm internal legal education committee; top five billing attorney every year; led firm's *pro bono* service; starting right fielder for firm softball team, winners or runners-up in the NY Admiralty League softball championship 14 straight years; 2007 winner, "most spectacular crash" at FH&M / West of England go-kart racing competition.

**DeOrchis Walker & Corsa LLP**                              **New York, NY**
**Associate**                                                **1998 – 1999**
Advised and represented clients in a variety of contract disputes and litigation matters involving maritime and environmental law; won complex bench trial before federal judge and won appellate victory on briefs; led firm asbestos litigation practice; organized firm softball team (playing right field) which won NY Admiralty League softball championship (1999).

**Seamen's Church Institute, Center for Seafarers' Rights**    **New York, NY**
**Staff Attorney**                                           **1995 – 1998**
Advised and represented seafarers from all over the world in the world's only legal aid for merchant seafarers, advocating over 1,000 social justice claims against vessel owners, manning agencies, unions and others; developed "Know Your Rights" pamphlets to advise seafarers of their legal rights in 9 different jurisdictions, with pamphlets translated into seven languages; assisted US delegation to the United Nations International Maritime Organization and United Nations International Labor Organization concerning seafarers rights issues; organized and led first international roundtable in over 100 years on high seas piracy; served as expert and organized defense counsel in GOLDEN VENTURE matter involving seafarers detained for violation of US immigration policy; organized and led international roundtable concerning environmental protection of the oceans; advised port chaplains on legal issues arising from ship visits and handling claims of unsanitary conditions, unsafe conditions, abandonment, pay disputes, and other improper shipboard conditions; organized and led national roundtable concerning the importance of shore leave to seafarer health and wellness; advised Seamen's Church Institute on employee relations; advised Seamen's Church Institute's Board of Directors on legal matters; enhanced the Tulane Law School 1L summer internship program through funding, education and other opportunities for interns; developed New York City law school internship program with Columbia Law School, NYU Law School, Fordham Law School, Brooklyn Law School and St. John's Law School; drafted monthly news articles concerning seafarers' rights for publication in numerous trade and religious publications aimed at maritime ministries; led transition of Center for Seafarers' Rights to utilization of internet (developing verbiage and layout for website), email system, and electronic storage of information; assisted in fundraising efforts; organized joint Seamen's Church / Port Authority of New York and New Jersey softball team (playing right field) to play in NY Admiralty League.

**US Army ARDEC, Division of Land Management**                **Dover, NJ**
**Contracting Officer's Representative**                     **1990 – 1992**
**Biological Technician**                                    **1989 – 1992**
Negotiated and enforced government contracts; oversight of land management environmental remediation projects including the use of natural processes to remove contaminants from soil and water systems;

# Lawrence J. Kahn

12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

performed forestry oversight; conducted base-wide timber and vegetation survey of all overstory and understory species; performed merchantable timber cruises; developed Army's timber harvest RFP for logging services; oversaw safe performance of logging operations; resolved tree service contract disputes; developed the Army hazard tree removal program and RFP for Qualified Line Clearance Arborist (QLCA) work to ensure that tree companies complied with OSHA, DOD, and state requirements, ANSI standards, environmental regulations, and understood the dangers associated with electrical hazards for overhead powerlines, underground powerlines, electrified fences, explosives bunkers and unexploded ordnance hazards; managed the oversight of avian protection and the protection of endangered flora and fauna species on base, organizing raptor count program and ensuring protection of nesting bald eagles; organized and ran fisheries permitting program and conducted studies on water quality, water contamination and health and tracking of fish and amphibians; organized and ran bow and rifle hunting permitting program and developed program for donation of venison to local soup kitchens; developed recycling program and consulted on development of Net Zero standards for Army for energy, water and waste; tested health of bat population and relocated bat colony; resolved environmental dispute concerning development adjacent to wetlands through compromise between Department of the Army and NJ DEP; conducted study on loss of lake habitat to eutrophication; rediscovered Revolutionary War-era Hessian cemetery and coordinated effort with base leadership to provide recognition to site involving US and German dignitaries.

## EDUCATION

| **Tulane University Law School** | **New Orleans, LA** |
|---|---|
| **Juris Doctor, Maritime Law Certificate** | **1995** |

Winner, Maritime Law Center Distinguished Service Award; Winner, Bureau of National Affairs Law Student Award; Board of Managing Editors, Tulane Environmental Law Journal; President, Maritime Law Society; Student Attorney, Environmental Law Clinic; Member, Environmental Law Society; Co-Head Coach, Tulane Fencing Club; created, developed and fundraised for establishment of Tulane Maritime Law Center / Center for Seafarers' Rights 1L summer intern program.

| **Columbia College, Columbia University** | **New York, NY** |
|---|---|
| **Bachelor of Arts, Ancient Studies** | **1992** |

1992 NCAA National Champion and Ivy League Champion Fencing Varsity Team Member (Foil); 1991, 1990 and 1989 Ivy League Champion Fencing Junior Varsity Team Member (Foil); Director (1991-1992), Nightline Peer Counseling Hotline; Peer Counselor (1989-1991), Nightline Peer Counseling Hotline; Columbia University Orchestra 1988-1989 (cello, 2d chair).

| **US Army Logistics Management College** | **Fort Lee, VA** |
|---|---|
| **Contracting Officer's Representative Certification** | **1990** |

## SELECTED PUBLICATIONS AND PRESENTATIONS

"A Proactive Approach to Working with Government on UVM", Lawrence Kahn, UAA Newsline (***pending*** Sept./Oct. 2023)

"Water Safety and the Law", Lawrence Kahn, UAA Newsline (***pending*** June/July 2023)

"Filling a Need", Lawrence Kahn, T&D World Magazine (May 2023)

"Our Duty to Protect Cultural and Historic Sites", Lawrence Kahn, UAA Newsline (Mar./Apr. 2023)

"Tulane Law School and the Development of the Utility Vegetation Management Initiative", Lawrence Kahn, UAA Newsline (Dec. 2022/Jan. 2023)

"20 Years On – What Have We Learned About UVM from the 2003 North American Blackout and the 2003 European Blackout", Lakshmi Kumar and Lawrence Kahn, Presentation to 13th International Symposium: Environmental Concerns in Right-of-Way Management (Oct. 2022)

**Lawrence J. Kahn**
12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

"Understanding Laws and Regulations that Protect Birds and Planning Strategies to Minimize Takings in Infrastructure Development", Timothy Brannan and Lawrence Kahn, Presentation to 13th International Symposium: Environmental Concerns in Right-of-Way Management (Oct. 2022)

"Understanding the Wildfire Litigation Process – Rights and Remedies of Litigants", Charles Lally and Lawrence Kahn, Presentation to 13th International Symposium: Environmental Concerns in Right-of-Way Management (Oct. 2022)

"An Opportunity for Cooperative Utilities to Utilize UVM to Engage in Green Energy and Reduce Pollution", Alexandra Keiser and Lawrence Kahn, Presentation to Trees & Utilities, Milwaukee, Wisconsin (Sept. 2022)

"20 Years On – UVM Lessons to be Learned from the North American and European Blackouts of 2003", Lakshmi Kumar and Lawrence Kahn, Presentation to Trees & Utilities, Milwaukee, Wisconsin (Sept. 2022)

"Understanding Wildfire Litigation in the UVM Context", Charles Lally and Lawrence Kahn, Presentation to Trees & Utilities, Milwaukee, Wisconsin (Sept. 2022)

"Current Policy Research Initiatives Underway at the Tulane Utility Vegetation Management Initiative", Webinar for the ROW Sustainability Summit (Oct. 2022)

"Demarcation of Legal Lines of Responsibility in UVM", *The UVM Podcast*, interview by Nick Ferguson and Steve Cieslewicz (Oct./Nov. 2022)

"The Rule of 70 – Implications for Managing UVM Workloads and Planning", *The UVM Podcast*, interview by Nick Ferguson and Steve Cieslewicz (Aug. 2022)

"Policy Considerations in Sustainably Managing Transmission ROWs", ROW Sustainability Summit, State College, Pennsylvania (June 2022)

"Environmental Litigation Challenges in the UVM Context", Panel Moderator, Tulane Energy & Environmental Law Society Summit 2022 (Mar. 2022)

"An Introduction to the Tulane UVM Initiative and Findings of our First Annual Report on UVM Regulation", Presentation to International Society of Arboriculture Annual Meeting, Dallas, Texas (Dec. 2021)

"Fire, Ice, Floods and Storms: The New Tulane Utility Vegetation Management Initiative", Tulane Distinguished Speakers CLE Program, New Orleans, Louisiana (Nov. 2021)

"Decarbonizing the Maritime Industry Through Better – and Appropriately Incentivized – Vessel Recycling", Presentation at Glasgow City College in Association with COP26 Conference, Glasgow, Scotland (Nov. 2021)

"Tulane's Utility Vegetation Management Initiative", *The UVM Podcast*, interview by Nick Ferguson and Steve Cieslewicz (Oct. 2021)

"Understanding and Improving the UVM Regulatory Environment and an Update on the Collaboration Between the Tulane UVM Initiative and Arbor Day Foundation", Presentation to Trees & Utilities Conference, Minneapolis, Minnesota (Oct. 2021)

"Larry Kahn Speaks Out on Scrapping in the USA, and Much, Much More", *Steel Plate – The Podcast for Ship and Rig Recycling*, interview by Jon Chaplin (Aug. 2021)

"An Introduction to the Tulane UVM Initiative and Understanding the Regulatory Environment Applicable to Municipal Utilities", Presentation to California Municipal Utilities Association, Sacramento, California (Aug. 2021)

"Understanding the Scope of North American UVM Regulations Outside of California and Lessons Learned for California Regulators", Presentation to California Public Utility Commission and California Office of Energy Infrastructure Safety / Wildfire Safety Division, Sacramento, California (Aug. 2021)

"Understanding the UVM Regulatory Environment both Inside and Outside California to Enhance Protections Against Wildfires and Improve Electric Reliability", Presentation to California Investor-Owned Utilities and Municipal Utilities, Sacramento, California (Aug. 2021)

6

## Lawrence J. Kahn

12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

"Preliminary Findings of the Tulane Utility Vegetation Management Initiative's Investigation of North American UVM Laws, Regulations and Ordinances", Keynote Address at Integrated Vegetation Managers Association Spring Meeting, Winnipeg, Manitoba, Canada (Mar. 2021)

"Preliminary Findings of the Tulane Utility Vegetation Management Initiative's Investigation of North American UVM Laws, Regulations and Ordinances", Keynote Address at Professional Vegetation Managers Association Spring Meeting, Edmonton, Alberta, Canada (Mar. 2021)

"Everything American Maritime Attorneys Need to Know About Ship Recycling…But Were Afraid to Ask", 45 Tul. Mar. L.J. 1 (Winter 2020)

"Ship Recycling", Panel Discussion at 29th Annual Admiralty Law Institute "The Life of a Ship: Drawing Board to Scrapyard and Everything in Between" (Apr. 2020)

"Opportunities and Obstacles in Green Ship Recycling in the Middle East", Aleph Steel Conference, Abu Dhabi, U.A.E. (May 2019)

"The Circular Economy – Ethical Considerations in the International Ship Recycling Industry", Keynote Address to Ethical Corporation's Second Responsible Business Summit (West), San Diego, California (Nov. 2018)

"Ship Recycling in the Americas", Keynote Address to Tradewinds Ship Recycling Conference, Singapore (Feb. 2017)

"Opportunities and Obstacles in Decommissioning and Recycling in Chile", Grupo Duao Recycling Conference, Santiago, Chile (Oct. 2016)

"Proposal for Leveling the Playing Field in Ship Recycling", White Paper presented to European Commission Directorate-General for the Environment, Division of Waste Management and Recycling (Jun. 2016)

"Opportunities and Obstacles in Decommissioning in England", British Investment Circular Economy Conference, London, England (May 2016)

"Opportunities and Obstacles in Decommissioning in Belgium", Flanders Investment & Trade Circular Economy Forum, Brussels, Ghent and Zeebruges, Belgium (May 2016)

"Opportunities and Obstacles in Green Ship Recycling in Scotland", Highlands & Islands Economic Development Forum on the Circular Economy, Inverness, Lerwick and Glasgow, Scotland (May 2016)

"A History of Leading in Advocacy for Seafarers", Keynote Address on the 175th Anniversary of Seamen's Church Institute, New York, New York (May 2009)

Jolly Roger with an Uzi:  The Rise and Threat of Modern Piracy, Jack A. Gottschalk, Brian P. Flanagan, Lawrence J. Kahn and Dennis M. Larochelle (2000)

"Protecting Your Cargo from Pirates", Keynote Address to the Marine Insurance Law Forum, New York, New York (Nov. 1997)

"Pirates, Rovers, and Thieves: New Problems with an Old Enemy," 20 Tul. Mar. L.J. 293 (1996)

"Sunken Treasures: Conflicts Between Historic Preservation Law and the Maritime Law of Finds," 7 Tul. Envtl. L.J. 595 (1994), cited in Reeder, John, Brice on Maritime Law of Salvage, 5th Ed. at 316 (2011)

## ADMISSIONS TO PRACTICE LAW

State of New York
United States Court of Appeals, Second Circuit
United States Court of Appeals, Fourth Circuit
United States District Court, Southern District of New York
United States Bankruptcy Court, Southern District of New York
United States District Court, Eastern District of New York
United States District Court, District of New Jersey

## Lawrence J. Kahn

12 Hillcrest Road | Mountain Lakes, NJ 07046
(917) 359-5148
Lkahn4@tulane.edu
lawrencejkahn@gmail.com

**PROFESSIONAL AND COMMUNITY ORGANIZATIONS**

New York State Bar Association
Maritime Law Association of the United States
Utility Arborist Association
International Society of Arboriculture
Tulane Law School Class of 1995 Reunion Committee Co-Chair
Young Friends of Seamen's Church Institute
Mountain Lakes Woodlands Committee
Maritime Association Foundation
Boy Scouts of America BSA, New Jersey Troop 41 Advisor

IN THE SUPERIOR COURT OF CALIFORNIA
FOR THE COUNTY OF SAN BERNARDINO

| | | |
|---|---|---|
| RONNIE D. JORDAN, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CIVSB2201281 |
| | ) | |
| vs. | ) | |
| | ) | |
| THE ORIGINAL MOWBRAY'S TREE | ) | |
| SERVICE, INCORPORATED, a California | ) | |
| corporation; MOWBRAY WATERMAN | ) | |
| PROPERTY, LLC, a California limited | ) | |
| liability company; RICHARD JOHN | ) | |
| MOWBRAY, an individual; ROBIN | ) | |
| MOWBRAY, an individual; and DOES 1 | ) | |
| Through 50 inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------ | ) | |

OPINIONS OF
LAWRENCE J. KAHN

January 5, 2024

My name is Lawrence J. Kahn and I provide the following opinions based on my review of certain documents provided to me with regard to this matter, as set forth below, and based on my knowledge and experience in the field of utility vegetation management.

**Background Material and Information**

These are the documents that were provided to me for review with respect to this matter by counsel for the Plaintiff:

1. First Amended Complaint
2. Depositions and related exhibits of:
   a. Ronnie D. Jordan
   b. Rick Mowbray (with sworn statement)
   c. Robin Mowbray
   d. Ricky Mowbray
   e. Alan Phang
   f. Gregory Pegg
   g. Mike Bartelli
   h. Josh Caudil

1

       i.   Mark Shipp
3.  Expert Report of Kenneth Creal, CPA
4.  Resume of Ronnie D. Jordan
5.  Jordan Summary

In addition, I have taken the opportunity to interview Ronnie D. Jordan in the presence of his counsel on two sessions over the course of several hours in total.

## Opinions

Based upon my review of the foregoing and upon my education, training, background, experience and knowledge, including in particular tree industry work, I have formed these opinions, to be further confirmed by my testimony at my scheduled deposition.

1. The utility vegetation management ("UVM") business involves several disciplines, including but not limited to the pruning, removal, chemical treatment, and planting of trees in proximity to utility infrastructure.

2. Over the last several years, on average, the UVM business generates revenues across the United States in the billions of dollars.  While the exact amount is not known for certain, reliable sources have estimated the industry to be worth between approximately $10 billion and $25 billion annually.[1]  California UVM work alone represents approximately $5 billion annually.

3. UVM work is complicated and extremely hazardous:  tree workers are generally involved in using chainsaws and other dangerous tools to cut trees weighing many tons – usually the trees that they themselves are roped into – in proximity to high voltage power lines. Federal government industry estimates suggest that somewhere in the United States, a tree worker involved in UVM work suffers a fatality, on average, every other week. However, leading experts on health and safety believe that official data is underreported and that the actual number is even higher than this.  Additionally, workers in the UVM industry are prone to numerous life-altering serious casualties from both the work itself and from other work-related causes.

4. While highly skilled and safety-conscious workers can perform the work correctly, for a company in the UVM business to succeed, it must have responsible and highly skilled managers and executives.

5. Ronnie D. Jordan ("Ronnie"), the plaintiff in this case, was in 2018 – and remains today – one of the most highly respected executives in the UVM industry in the United States. Based on my knowledge of the industry and working experience, I feel it is safe to say that he is widely-regarded as a "top ten" executive in this discipline.

6. It is clear to me that defendant The Original Mowbray's Tree Service, Inc. ("Mowbray's") must also have felt that Ronnie was such an executive.  In support of this position, I specifically note:

---

[1] All monetary figures provided in this opinion are in United States dollars.

2

    a. The 2018 compensation package offered to Ronnie by Mowbray's to tempt him to be the Chief Executive Officer ("CEO") of Mowbray's and leave his home in Florida and relocate to California included, among other things:

        i. A salary of $250,000;
        ii. Housing;
        iii. New vehicle;
        iv. 10% of Mowbray's profits.

    Such a generous compensation package is reserved by companies only for the most valued of executives and is awarded in an effort to not only attract top-level talent, but also to align the executive's interests with those of the company in order to convince the high-value executive to stay with the company on a long-term basis. It is worthy of note that this compensation package offered to Ronnie was structurally consistent with the offer made to Mike Neal in 2016 (Ex. 34) to be Mowbray's Vice President – he was likewise offered a $250,000 salary and 2% of profits.

    b. The deposition of Alan Phang, Mowbray's Chief Financial Officer ("CFO"), confirms that both gross revenues and profits from mid-2018 through 2021 were well above Mowbray's historical achievements, and at its height, Mowbray's gross revenues and profits were more than four times Mowbray's best year prior to Ronnie's having joined the company.

7. At the time Mowbray's offered the 2018 compensation package to Ronnie in approximately April or May of that year, Ronnie was already well-known in the UVM industry in California from a long list of achievements and success in leading other companies to their most successful years. Mowbray's, on the other hand, was in serious trouble. It had dramatic financial losses to date and negative cash flow, with a projected loss in the millions of dollars for 2018. Mr. Phang admitted that Mowbray's was not doing well financially and could not pay its debts as they came due. In other words, Mowbray's was, by the classic definition, insolvent.

8. It appears evident that the compensation package offered to Ronnie by Mowbray's was a classic "bet the business" decision to save it from bankruptcy and closing.

9. Based on financial performance, the decision to hire Ronnie was probably the best business decision Mowbray's had ever made. Mr. Phang admitted that the best Mowbray's had done on a gross revenue basis since its founding in 2002 had been in the $50 million range whereas after hiring Ronnie, Mowbray's skyrocketed as follows:

    a. 2018 Operations achieved $92.6 million in sales and $3.1 million in profit (after being in a loss situation for the first four months of the year);
    b. 2019 Operations achieved $213.8 million in sales and $17.1 million in profit;
    c. 2020 Operations achieved $472.5 million in sales and $69.8 million in profit;
    d. 2021 Operations achieved $284.1 million in sales and $31.1 million in profit.

Kahn  PODs 000011

10. By contrast, it appears that terminating Ronnie may have been among the worst business decisions Mowbray's has made.  Following Ronnie's departure, the company has suffered numerous setbacks, including a seriously adverse safety challenge, lost at least one major utility client, and is now again contemplating bankruptcy.

11. Moreover, based on a review of the written materials provided and the interview I conducted of Ronnie, it appears to me that the termination of Ronnie was not only unwise but also improper.  Under the 2020 employment agreement, Ronnie should only have been terminated for "cause", but I have seen nothing to suggest that Ronnie was fired for cause or for any other good reason.

12. Section 5.1(b) of the 2020 employment agreement enumerates 11 separate subparagraphs that describe causes for which Ronnie's employment can be ended by Mowbray's:

    (i)    Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

    (ii)    Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

    (iii)    Based on the Phang, Ricky Mowbray and Robin Mowbray depositions together with the Kim letter terminating Ronnie, there are four items that Mowbray's is arguing that relate to this basis for termination.

        (1)  The $500,000 invoice to Flexible Funding (Ex. 46).  Mowbray's appears to be suggesting that Ronnie attempted to create a false invoice from Mowbray's to Southern California Edison ("SCE") in order to cause Flexible Funding to pay against the invoice and await collection from SCE.  The invoice, however, is in such poor form that it should be expected that someone of Ronnie's knowledge and experience would never have allowed it to issue, even if it was legitimate.  This "invoice", in any event, was never issued to Flexible Funding (or anyone else), and so no harm to Mowbray's with relation to this invoice ever occurred.

        (2)  Withheld funds of $4,152,715.01.  Flexible Funding withheld these amounts from Mowbray's on the basis that they were loaned to Ronnie's brother Randy's company, GCL.  I have seen nothing in the record, however, that shows that Ronnie had anything to do with the problems related to these funds.  Rumor, speculation and innuendo do not amount to "cause" and are not a basis to terminate Ronnie.  Nor are they a basis to withhold salary and bonus due to Ronnie. Mowbray's does have a remedy with regard to these funds if they were, in fact, wrongfully withheld.  Mowbray's should pursue Flexible Funding or GCL.  Ronnie is not now, nor was he then, responsible for either of those companies or their acts.

        (3)  Purchased equipment of $200,000.  Mowbray's purchased $200,000 worth of equipment from Randy's (not Ronnie's) company.  That equipment was represented to have been "free and clear" but appears

4

to have been encumbered.  Again, there is nothing in the record that shows that Ronnie had anything to do with the transaction or that he had verified the "free and clear" nature of the equipment.  Again, rumor, speculation and innuendo do not amount to "cause" and are not a basis to terminate Ronnie.  Nor are they a basis to withhold salary and bonus due to Ronnie.  Mowbray's does have a remedy with regard to these funds if Mowbray's was, in fact, wronged with regard to the status of this equipment.  Mowbray's should pursue GCL.  Ronnie is not now, nor was he then, responsible for either of those companies or their acts.  On the other hand, Mowbray's had an equipment manager whose job it was to verify that equipment being purchased – particularly used or refurbished equipment and parts – was in fact free and clear.  That employee – not Ronnie – was the one who failed to make the proper determination, and that employee's error is not properly attributable to Ronnie.

(4) Wildfire insurance coverage.  Mowbray's is arguing that Ronnie exceeded his authority, or otherwise made an error, in executing an agreement with SCE which specified that Mowbray's had a certain level of insurance coverage against wildfire risk that Mowbray's neither had nor could it even obtain since such coverage was not even available in the insurance market.  Once again, however, this is not "cause" for firing Ronnie.

    a. First, Mowbray's insurance agent provided both documentation and assurances confirming that the required coverage was in fact in place, and Ronnie was entitled to rely on the specialist knowledge of the broker.  Not only was Ronnie justified in relying on the broker's knowledge of the insurance industry, but the broker – in order to be licensed in California to provide such coverage – has malpractice insurance in case the broker fails to place required coverage.

    b. Second, Mowbray's counsel's after-the-fact analysis suggests that the coverage might not have been in place.  Their counsel's analysis is not conclusive, however, and even if it was, it again suggests that the broker was in error, not Ronnie.  The broker's error, relied upon by Ronnie in executing the contract, is not "cause" to fire Ronnie.

    c. Third, to the extent that no such insurance coverage is available in the market, then the contract with SCE includes a term that is impossible to perform.  Ordinarily, when a contract contains an impossible-to-perform clause, it is disregarded from the contract as unenforceable.  Accordingly, even if Ronnie ought to have known that the coverage was unavailable when he signed the contract, no harm could ever have occurred to Mowbray's as a result.

    d. Finally, Mowbray's lost the contract with SCE after terminating Ronnie for reasons entirely unrelated to the

5

wildfire insurance coverage issue.  Accordingly, even if Ronnie knew that such coverage didn't exist, and even if such coverage could have been obtained, it ultimately did not matter because Mowbray's lost the contract with SCE for entirely separate reasons relating to health and safety challenges that arose after Ronnie's departure.

(iv)    Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(v)     Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(vi)    Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(vii)   Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(viii)  Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(ix)    Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(x)     Is not applicable based on my review of the documents in this matter, nor does it appear that Mowbray's is attempting to substantiate a firing on this basis.

(xi)    At most, the depositions of the defendants suggest that the two matters described above that relate to Ronnie's brother Randy were a conflict of interest.  However, Defendants have not made the case that Ronnie was in any way enriched by the matters that passed between Mowbray's and Randy.  There is no showing that Ronnie pushed to favor his brother as a contractor to Mowbray's, nor is there any showing that Ronnie enjoyed any personal gain from any such relationship between Randy, Randy's company, and Mowbray's.  To the contrary, the evidence suggests that whenever Ronnie was aware that Randy was dealing with Mowbray's, Ronnie handed the matter off to others to manage so as to avoid potential conflict of interest.

13. With regard to the handwritten notes to the 2018 employment agreement (Ronnie deposition Ex. 3), I see no provisions concerning loss of compensation or profit sharing. Those handwritten notes were verified by the parties to the discussion, and using that as the basis for the employment agreement that followed, it appears that Mowbray's owes Ronnie money under the original agreement through at least December 31, 2019, and potentially through the date of his termination on January 7, 2022.

6

14. Regarding the 2020 employment agreement (Ronnie deposition Ex.'s 11 and 14), it appears that this document dates from April 24, 2020. The January 7, 2022 terminaion letter (Ex. 20) provides as the "cause" for termination the following:

   a. The $500,000 invoice described above (though not specifically named). This invoice, though, was dated March 5, 2020 and was caught contemporaneously with that time. If this invoice was, in fact, an issue between Mowbray's and Ronnie, then Mowbray's would have been aware of it at the time of the April 24, 2020 employment agreement offer. Only two conclusions can be drawn from this: either Mowbray's was unconcerned with the $500,000 invoice and wanted to keep Ronnie on as CEO with these new terms, or, alternatively, Mowbray's was concerned with the $500,000 invoice and deviously offered the new terms to Ronnie on false pretenses in an effort to unfairly and improperly adjust the employment terms in their favor. Under the circumstances, it seems far more likely that Mowbray's was aware of the $500,000 invoice, knew Ronnie had nothing to do with it, and extended new terms to Ronnie in order to keep him on, and now, after-the-fact, attempted to use this as a manufactured "cause" to terminate him without realizing the date mismatch.

   b. Insurance-related failures to perform duties / gross mismanagement. There are two allegations here.

      i. The first one is for procurement of insurance that led to a breach of contract and increased premiums. The record is devoid of any evidence of any such breach, however, and the SCE withdrawal (Ex. 15) is dated June 29, 2021 – nearly 6 months before Ronnie's termination. If this was a serious failure to perform his duty or gross mismanagement, though, there ought to have been contemporary records of discussions regarding Ronnie, or that included Ronnie, together with some sort of reprimand or warning in June or July of 2021. I have seen no such evidence.

      ii. The second one is for entering into contracts or in failing to enter into contracts that led to litigation with millions of dollars of exposure. Again, there is no support for this whatsoever in the record.

   c. Competitive activity. There is absolutely no support in the record that I have been able to find with regard to any improper future competition. There are allegations, though, of activities with Mowbray's lenders, subcontractors and broker that are purporting to result in a conflict of interest, personal benefit to Ronnie, and potential losses to Mowbray's. These all appear to be untrue, as follows.

      i. As for the post January 1, 2020 employment contract, the notice letter involved millions of dollars in bonus money relating to the matters described in my opinion above at 12(iii)(1-4) above. It is curious that there is no outside third-party firm that substantiates these allegations by Mowbray's. While by itself this absence of substantiation is not evidence that there were no such losses, I do note that Mowbray's offered Ronnie a $3.5 million settlement prior to the termination notice (Ronnie deposition Ex. 13), which suggests to me that they knew they owed him a substantial sum.

7

    ii.  As for the $500,000 invoice, again, the fact that it was dated March 5, 2020, was fully known by Mowbray's at or about that time, and that Mowbray's nonetheless issued an employment agreement to Ronnie on April 24, 2020 suggests that this was a non-issue to Mowbray's at the time.  Moreover, it never left Mowbray's offices and so no harm resulted from the document.  There is certainly nothing to suggest that Ronnie benefitted – or would have benefitted – from this invoice in any way.

    iii.  With regard to the Flexible Funding dispute, this appears to be centered on Ex. 7 without any attached writing.  I see nothing (written or verbal) to support the allegation that Ronnie had verified that the invoices were accurate or provided any other confirmation that should have enticed Flexible Funding to act in the manner it did.  In any event, Flexible Funding filed for bankruptcy and the claims proceeded.  Nothing regarding the Flexible Funding dispute supports a "for cause" firing of Ronnie nor is there anything to show that Ronnie personally benefitted from this dispute.

    iv.  As to the $200,000 equipment purchase from GCL, it was the responsibility of Mr. Phang and the equipment manager at Mowbray's to verify whether equipment being obtained was (or was not) free and clear.  No explanation is provided as to why Ronnie should be responsible for the error made by Mr. Phang and the equipment manager.  This issues does not give rise to a "for cause" firing of Ronnie.

    v.  Finally, with regard to the wildfire insurance coverage, Mowbray's Mr. Phang confirms that SCE did not terminate the relationship with Mowbray's as a result of the wildfire insurance issue.  Mr. Shipp maintains that Mowbray's didn't have the insurance coverage that they thought they had in prior years, but if this is true, the fault lies with the broker, not Ronnie.  Mowbray's counsel reviewed the contracts independently, but never coordinated with the broker to determine whether the correct coverages were in place.  Certainly, then, Mowbray's counsel shares in failure to obtain the proper coverage (assuming it was lacking), and again the fault lies with a party other than Ronnie.  Even assuming Ronnie had any advance knowledge or information that the wildfire insurance coverage was lacking, there is still no "conflict of interest" that gave rise to "personal benefit" in favor of Ronnie – all premiums were paid to the broker and insurer.

15. The 2020 written employment agreement itself is suspect, as it is inconsistent with the terms laid out in the 2018 handwritten notes that were verified by the parties who negotiated it.

16. Ronnie led Mowbray's to a historic string of record-breaking revenues and profits over the course of each of several years.  I have seen nothing in the record to suggest that there was any basis for a for-cause firing of Ronnie, even if the employment agreement containing that clause was enforceable as written.

8

17. It seems to me that Mowbray's ownership, after enjoying several successive years of extraordinary revenues and profits that resulted from Ronnie's leadership, wrongly believed that it was capable of replacing Ronnie. To be sure, Ronnie was a very expensive employee, but Mowbray's made the mistake of thinking he was a luxury and not a necessity. It seems that Mowbray's ownership thought that it could keep the money it would otherwise have had to pay to Ronnie and still keep the operation moving forward. What they failed to realize was that knowledgeable, dynamic and successful leaders like Ronnie are very hard to come by, are worth their salt, and are not easily replaced. Mowbray's ownership inserted their own family members, like Ricky Mowbray and Robin Mowbray, who had no relevant experience running a massive operation that involved hundreds of tree crews and thousands of vehicles and pieces of equipment across all of California (and beyond). Ricky and Robin Mowbray were simply not up to the task of replacing Ronnie. Serious health and safety problems followed almost immediately and the serious injuries that resulted led to lengthy safety stand downs and massive financial setbacks. These setbacks were exacerbated by further errors in keeping employees and equipment idle, failures to pay union benefits, and other challenges often made by inexperienced managers. Mowbray's appears to have slipped back into the management style that existed before Ronnie, and the financial status of the company today reflects a similar pre-Ronnie picture.

18. The connection between Ronnie and Mowbray's rise from 2018-2021 is plain, and it is clear that it would not have occurred but for Ronnie's leadership of that company.

19. I hold each of the above opinions at paragraphs 1-18, inclusive, to a "more likely than not" level of certainty and in fact hold these opinions to a standard of "substantially likely to be the case".

Lawrence J. Kahn
Dated: Friday, January 5, 2024

9

# EXHIBIT "15"

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| THE ORIGINAL MOWBRAY'S TREE | ) | Case No. CIVSB2201281 |
| SERVICE, INC., | ) | |
| | ) | |
| Debtor and Debtor in Possession. | ) | |
| ------------------------------------------------------------- | ) | |

SUPPLEMENTAL OPINIONS OF
LAWRENCE J. KAHN

July 13, 2025

My name is Lawrence J. Kahn and I provide the following supplemental opinions based on my review of certain documents provided to me with regard to this matter, as set forth below, and based on my knowledge and experience in the field of utility vegetation management.

These opinions are meant to be read together with the Opinions I provided in January 2024 in the underlying matter brought against The Original Mowbray's Tree Service Incorporated ("Mowbray's"), Mowbray's Waterman Properties, LLC and Robin Mowbray, all Debtors in this matter, by then Plaintiff (and now Creditor).

**Background Material and Information**
In addition to the documents previously provided to me as set out in my prior Opinions, I was provided these documents by counsel for Mr. Jordan:

1. Mowbray's Disclosure Statement Describing Chapter 11 Plan of Reorganization
2. Mowbray's Index of Exhibits (with exhibits)
3. Mowbray's Chapter 11 Plan of Reorganization
4. Creditor Ronnie Jordan's Mowbray Acquisition LLC draft Mowbray's Plan Disclosure Statement

**Opinions**
Based upon my review of the foregoing and upon my education, training, background, experience and knowledge, including in particular tree industry work, I have formed these opinions, to be further confirmed by my testimony at my scheduled deposition.

1. The Utility Vegetation Management ("UVM") business has – like many industries – experienced periods when demand rises and falls.

1

2. Because of the nature of the work, the rises and falls in UVM tend to be closely tied to weather anomalies because the work is performed outdoors. During periods of prolonged advantageous weather, the utilities that hire companies like Mowbray's take the opportunity to achieve goals that might have required delay during prior years due to poor weather conditions, and *vice versa*.

3. While weather anomalies can impact significant portions of the United States, it is very rare for the entire country to be in a position where outdoor work cannot be performed. For this reason, UVM companies in the United States, whenever possible, take the opportunity to perform UVM (or related) services nationwide.

4. As I noted in my prior Opinions, over the last several years, on average, the UVM business generates revenues across the United States in the billions of dollars. While the exact amount is not known for certain, reliable sources have estimated the industry to be worth between approximately $10 billion and $25 billion annually.[1] California UVM work alone represents approximately $5 billion annually. Overall, it is evident that UVM expenditures by utility companies are – on the whole – on the rise.

5. As the wildfire problem linked to utility ignitions has worsened – at least since 2016 – expenditures on UVM in order to mitigate the risk of a catastrophic wildfire have been steadily rising across the country. Many utility companies are reporting that they are at least doubling their UVM budgets.

6. The largest market for UVM services in the United States, California, did experience a statistically relevant temporary decline, primarily related to the spend of a single utility, Pacific Gas & Electric Co. ("PG&E"). PG&E's UVM spending during the 2017 calendar year experienced a substantial drop of around 24%, perhaps as a result of financial pressures following payouts from earlier fires. But beginning in 2018, PG&E's UVM spend thereafter climbed sharply and substantially. This spend increase continued through at least 2022.

7. By contrast, the other major utilities in California, including but not limited to Southern California Edison ("SCE"), San Diego Gas & Electric ("SDG&E") and Liberty Utilities ("Liberty") all maintained or grew their UVM budgets during this same period.

8. In late 2022 and through approximately the first half of 2023, Northern California experienced a significant increase in rain events which resulted in substantial delays in the performance of UVM work. This had particular impact on both PG&E and Liberty. As a result, some UVM work that was scheduled and planned needed to be delayed because it was unsafe to work outdoors or because related environmental considerations temporarily precluded such work. Meanwhile, however, UVM work in Southern California for SCE and SDG&E was not as significantly impacted by the weather change in Northern California and demand for UVM services by these utilities continued to increase. During this temporary slow-down in UVM work for PG&E, it was common to

---

[1] All monetary figures provided in this opinion are in United States dollars.

see UVM companies shift personnel and associated vehicles and equipment to perform
work in Southern California for SCE and/or SDG&E.

9. During this same time period from 2022-2023, demand for UVM work in other fire-prone
states including but not limited to Oregon, Washington, Idaho, Nevada, Arizona, Texas
and Colorado grew substantially as the major electric utilities all suffered actual or
suspected electric-ignition related wildfires and dramatically increased their UVM spend
to attempt to prevent additional wildfires. Many UVM companies began performing work
in these nearby jurisdictions to offset revenue losses from decreased work from PG&E.

10. Also during this time period in the Southeastern and Mid-Atlantic States, as well as in the
Midwest, demand for UVM services saw a substantial increase in response to the impact
of severe storms that resulted in a tremendous number of downed trees, many of which
interrupted electric service. Some states seeing this increased demand included, but were
not limited to, Louisiana, Alabama, Mississippi, Georgia, Florida, North and South
Carolina, New Jersey, Ohio, and Pennsylvania. Many UVM companies that experienced
a decline in business from PG&E shifted to performing UVM or related services in these
and other states during that time period.

11. Penetrating UVM markets outside of California for companies that are used to providing
services in California for SCE, PG&E or the other major California utilities requires
some paperwork filings and short delays for onboarding, but generally speaking, nearly
all utilities across the country are – and have been – hungry for qualified and experienced
UVM services. It is common across the country to find filings by utilities before their
respective public utility commissions that their UVM goals have been delayed or
extended because sufficient qualified UVM service providers are hard to find. UVM
companies who have performed work for SCE, PG&E or the other California utilities are
generally considered to be the "gold standard" in the industry and are highly sought-after
by utilities around the country.

12. It should be noted that PG&E did not cease UVM operations for any appreciable length
of time during this 2022-2023 period – it all along remained one of the major consumers
of UVM services in the country despite its reduction in spend during this timeframe.

13. While it is true that there are significant pay differentials between California wages for
UVM work and wages elsewhere, numerous other UVM companies found ways to make
the adjustment work. Indeed, at least some utilities were so desirous of qualified UVM
contractors that they were willing to pay California wages in order to have the benefit of
the service.

14. Indeed, when it was learned throughout the industry that Mowbray's was selling its
equipment at fire sale prices, it wasn't long before it was all purchased. Mowbray's had a
reputation in the industry for keeping its equipment in good condition and this gave
confidence to many companies that a purchase of equipment from Mowbray's was a good
investment. The interest in Mowbray's equipment was especially keen because new

3

equipment – particularly bucket trucks – is hard to source and often requires a long wait for purchase from major manufacturers.

15. Under the circumstances, it is surprising that Mowbray's, which had a generally strong reputation for UVM work with SCE and PG&E, should now find itself in bankruptcy. Mowbray's could have – and probably should have – engaged utilities in other parts of the country to offer its services so as to avoid this consequence.

16. In its Disclosure Statement, Mowbray's attributes its post-Mr. Jordan decline from 2022 through 2024 on the following:

> However, 2022 brought significant challenges. The bankruptcy of PG&E, a major client at that time, led to delayed payments to the Debtor. In addition, PG&E used the bankruptcy to renegotiate the Debtor's contract to a lower price causing severe financial strain. For these reasons, the Debtor made the difficult decision to terminate its contract with PG&E. Towards the end of 2023, another blow came when the Debtor was not awarded any vegetation management contracts by SCE, resulting in a substantial loss of revenue for 2024. The loss of PG&E and SCE left the Debtor grappling with the payroll and excess equipment necessary for servicing these former clients.

Docket 363, page 14, lines 20-27.

17. This statement does not tell the full story, however. The PG&E Bankruptcy filing was in January 2019 (not 2022), and PG&E emerged with a reorganization plan in July 2020. During that time, Mr. Jordan was CEO of Mowbray's, and he understood that providing UVM services to PG&E post-petition (after PG&E had filed for bankruptcy) was a smart risk, and he arranged for substantial financing that significantly grew Mowbray's business within PG&E's UVM program which improved Mowbray's revenues to some $471 million in 2020. Under Mr. Jordan's leadership of Mowbray's, work for PG&E while it was in bankruptcy contributed to _**higher**_ revenues and profits.

18. SCE's business represented a substantial part of the revenue produced while Mr. Jordan was CEO of Mowbray's. Mr. Jordan maintained a very successful relationship with SCE. UVM services provided to SCE during Mr. Jordan's time as CEO accounted for approximately 60% of Mowbray's revenues overall and very substantial profits.

19. The SCE business was lost by Mowbray's after Mowbray's demoted and sidelined Mr. Jordan. On November 10, 2021 a Mowbray's employee was involved in a fatal accident while working on a job for Mowbray's at Bear Valley Electric, and this accident, together with the factors leading up to the accident and Mowbray's subsequent response to it, had a severe adverse impact on its safety rating to the point where Mowbray's was no longer qualified to perform work for SCE, at least until its safety program improved. It does not appear that Mowbray's took the required steps to restore itself with SCE.

20. Instead, Mowbray's acquired the substantially smaller Pino Tree Service Inc. ("PTS") and appears to have performed work for SCE via PTS. PTS, though, was a substantially smaller company, and even with almost $60 million of UVM business with SCE, Mowbray's only earned a fraction of the $120-$350 million in revenues that were experienced previously under Mr. Jordan's leadership.

21. Mowbray's material decline in revenues instead appears attributable to several factors, including:

   a. Mowbray's sidelining Mr. Jordan;
   b. Mowbray's failure to continue to build its UVM business within PG&E at a time when PG&E was growing its spend on UVM;
   c. Mowbray's safety failures leading to and following the fatality on November 10, 2021 while working at Bear Valley Electric led to a reduced safety rating adversely affecting its status to work on projects for SCE;
   d. Mowbray's was unsuccessful with any rehabilitation efforts that could have restored its ability to work directly for SCE; and
   e. Mowbray's failure to geographically diversify its UVM offerings by providing UVM services in other fire-prone states.

22. Use of more efficient subcontractors, monitoring field efficiency of crews and equipment deployment, and better managing its critical safety program might also have helped Mowbray's grow its UVM business even without Mr. Jordan's assistance.

23. While some might attribute Mr. Jordan's success while leading Mowbray's to mere luck, I believe instead that the adage (attributed to Louis Pasteur) that "chance favors the prepared mind" is more applicable. It takes talent – not luck – to recognize when a situation is developing and how to take advantage of it. That talent ordinarily requires a combination of intelligence and hard-won past experience and expertise. With regard to the substantial increase in UVM business in California and elsewhere, there were many people who were in the right place at the right time. But only a handful were able to convert that chance into very substantial revenues and profits, and Mr. Jordan was one of those few.

24. The Debtors and Mr. Jordan are offering competing plans for the future of Mowbray's. There are, of course, many factors to consider. For the creditors to recover under either plan though, the success of the revitalized Mowbray's is essential, and Mr. Jordan has demonstrated his ability to lead the company to financial success. There is little reason to doubt that he can do it again.

5

25. I hold each of the above opinions at paragraphs 1-24, inclusive, to a "more likely than not" level of certainty and in fact hold these opinions to a standard of "substantially likely to be the case".

Lawrence J. Kahn
Dated: Monday July 13, 2025

EXHIBIT "16"

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SAN BERNARDINO

_____ )
RONNIE D. JORDAN, an             ) Case No. CIVSB2201281
individual,                      )
                                 )
                Plaintiff,       )
                                 )
     vs.                         )
                                 )
THE ORIGINAL MOWBRAY'S TREE      )
SERVICE, INCORPORATED, et al.,   )
                                 )
                Defendants.      )
_____ )

**CERTIFIED COPY**

VIDEOCONFERENCE DEPOSITION

OF

ALAN PHANG

FRIDAY, SEPTEMBER 29, 2023

Reported By:  Cynthia A. Kennedy, CSR, RPR
              California CSR No. 10415



1    IN THE SUPERIOR COURT OF CALIFORNIA

2        FOR THE COUNTY OF SAN BERNARDINO

3    _____

4    RONNIE D. JORDAN, an         ) Case No. CIVSB2201281
     individual,                 )
5                                 )
                 Plaintiff,       )
6                                 )
         vs.                      )
7                                 )
     THE ORIGINAL MOWBRAY'S TREE  )
8    SERVICE, INCORPORATED, et al., )
                                  )
9             Defendants.   )
10   _____)

11

12

13

14

15

16

17

18

19        VIDEOCONFERENCE DEPOSITION OF ALAN PHANG,

20   commencing from 1:05 p.m. to 4:13 p.m., Friday, the

21   29th of September 2023 taken on behalf of Plaintiff

22   and reported stenographically by Cynthia A. Kennedy,

23   Certified Shorthand Reporter for the State of

24   California, CSR No. 10415, RPR.

25



1                    REMOTE APPEARANCES

2

3   For Plaintiff:

4      CATANZARITE LAW CORPORATION
       By:  Kenneth J. Catanzarite, Esq.
5      2331 West Lincoln Avenue
       Anaheim, California 92801
6      (714) 520-5544
       kcatanzarite@catanzarite.com
7

8   For Defendants:

9      CKB VIENNA LLP
       By:  Min Stephen Cho, Esq.
10     9531 Pittsburgh Avenue,
       Rancho Cucamonga, CA 91730
11     (909) 980-1040
       scho@ckbvienna.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 4
Alan Phang, 09/29/2023

1                    I N D E X

2

3  ALAN PHANG                              PAGE

4  Examination by Mr. Catanzarite              6

5

6

7

8

9            INFORMATION REQUESTED

10               Page  Line

11                29    16

12

13

14            QUESTIONS MARKED

15               (NONE)

16

17

18      WITNESS INSTRUCTED NOT TO ANSWER

19               (NONE)

20

21

22

23

24

25

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 5
Alan Phang, 09/29/2023

```
 1              E X H I B I T S

 2                                        ID

 3  Exhibit 2      Monthly Payment Summary           79

 4  Exhibit 4      Employment Contract               106

 5  Exhibit 16     Leadership Team                   93

 6  Exhibit 19     January 23, 2020 email            94

 7  Exhibit 22     December 28, 2020 letter re
                   Notice of Application of Funds     46
 8
    Exhibit 27     Financial Statements and
 9                 Supplemental Information with
                   Independent Accountants' Review
10                 Report for the Years Ended
                   December 31, 2019 and 2018         100
11
    Exhibit 28     Balance Sheet as of December 31,
12                 2020                               104

13  Exhibit 29     Balance Sheet as of December 31,
                   2021                               110
14
    Exhibit 30     Settlement Agreement, Waiver,
15                 and Release                        115

16  Exhibit 34     June 3rd, 2016 letter from
                   Dwight Anderson to Michael Neal    88
17
    Exhibit 43     Mowbray Waterman Property LLC's
18                 Properties                         119

19  Exhibit 46     Invoice No. 75841                  30

20                      -oOo-

21

22

23

24

25
```

1              REMOTE PROCEEDINGS

2              FRIDAY, SEPTEMBER 29, 2023

3                  1:05 P.M.

4                   -oOo-

5     ALAN PHANG,           witness herein, having

6                  been duly sworn by the

7                  Certified Shorthand Reporter

8                  testified under oath

9                  as follows:

10

11             EXAMINATION

12    BY MR. CATANZARITE:

13      Q.    Good afternoon, Mr. Phang.  Would you

14    please state and spell your complete name for the

15    record?

16      A.    My name is Alan Phang, A-L-A-N P-H-A-N-G.

17      Q.    Have you ever been known by any other name?

18      A.    Well, my legal name on my driving license

19    is Soy Chong Phang, S-O-Y C-H-O-N-G P-H-A-N-G.

20      Q.    And you said a license.  What license?

21      A.    Driving license.

22      Q.    That's your -- I'm having a hard time

23    hearing you.  Talk a little slower, maybe.

24          What other license?

25      A.    A driving license.

1    Q.    Oh, drivers license.

2    A.    Yes.

3    Q.    I have one -- I have one of those.  Okay.

4          Okay.  Mr. Phang --

5    A.    Yes.

6    Q.    -- how are you today?  I'm Mr. Catanzarite.

7    Ken Catanzarite.  I am attorney for Ronnie Jordan, and

8    this is a case against Mowbray's Tree Service, Robin

9    Mowbray, Richard Mowbray, and Mowbray Waterman

10   Properties.

11         Do you know those four folks, the

12   defendants?

13   A.    Yes, I do.

14   Q.    Okay.  And, sir, how are you employed

15   today?

16   A.    I am not employed.  I was just terminated

17   by Mowbray Tree Service in May.

18   Q.    Okay.  You were terminated.  Okay.

19         Is someone representing you here today?

20         MR. CHO:  I am, Steven Cho.

21   Q.    Okay.  Steven Cho.  Okay.

22         And, Mr. Phang, do you -- I just want --

23   need an acknowledgement on the record.  Is your

24   attorney for this deposition Steven Cho?

25   A.    Yes.

1    Q.    He represents you personally; is that

2   correct?

3    A.    Yes.

4    Q.    Okay.  All right.  So, Mr. Cho, you told me

5   that you were terminated by Mowbray's Tree Service in

6   May of 2023; is that correct?

7    A.    Yes.

8    Q.    Why were you terminated?

9    A.    Well, I was not given a reason, but my

10  opinion is I am about to retire, so they wanted me to

11  retire earlier.

12    Q.    Okay.  They -- they wanted you to retire

13  early.

14        How old are you today, Mr. Phang?

15    A.    I'm 65 years old.

16    Q.    Okay.  Let me get a little background

17  information, and let me -- let me give you some

18  admonitions first.

19        Have you ever had your deposition taken

20  before?

21    A.    I have a deposition a year ago with another

22  case for Mowbray Tree Service.

23    Q.    Who was the plaintiff in that action?

24    A.    I beg your pardon?

25    Q.    Who is -- who is the plaintiff in that

1  action?

2    A.    That plaintiff is Mobray's Tree Service.

3  My other company is called Asplin Company.

4          (Court reporter request.)

5          MR. CHO:  I think he said Utility Tree

6  Service, the parent company being Asplin.

7    A.    Yes.

8    Q.    And how long was your deposition in that

9  case?  How many hours?

10   A.    About a couple hours.

11   Q.    Okay.  Do you know the disposition of that

12  case?

13   A.    I -- I cannot hear you well.  Can you

14  repeat?

15   Q.    Can you tell me the disposition?  What

16  happened in that case?

17   A.    What happened is we sue them, they counter

18  sue us.  And we sue them for breach of contract.  The

19  counter suit is for using their wildlife protection

20  plan in order to get the job from Southern California

21  Edison as a prime contractor.

22   Q.    Got it.  Okay.  Do you -- do you -- let me

23  go to the admonitions.

24          You understand your testimony here today is

25  of the same force and effect, and the oath you took is

1  to -- is the same as you would be asked to testify to

2  at the time of trial?

3      A.   Yes.

4      Q.   Okay.  Are you on any drugs or medication

5  that would affect your ability to recall?

6      A.   No.

7      Q.   Are you -- are you -- have you had an

8  opportunity to meet with your attorney Mr. Cho before

9  your deposition here today to discuss how this

10  procedure will take place?

11      A.   Yes, I do.

12      Q.   Okay.  Now, I don't want to know anything

13  about what you and Mr. Cho or any other attorneys that

14  might have been present.  But first tell me whether or

15  not anyone other than you and Mr. Cho were present for

16  this meeting.

17      A.   No.  Only Mr. Cho.

18      Q.   Okay.  And did anyone call into the

19  meeting, come into the meeting, anyone offer any

20  advice during the course of the meeting that was not

21  Mr. Cho?

22      A.   No.

23      Q.   Okay.  During the course of this

24  proceeding, I'm going to ask you some questions, and

25  if you don't understand my question, you need to tell

1  me, please, that you don't understand, and I will try

2  to rephrase.

3         Do you understand that?

4     A.   Yes.

5     Q.   You understand this is not an endurance

6  race, so if you need to take a break, you need a

7  pause, you let us know, and we'll take a break.  And

8  the only thing I would ask is if there's a question

9  pending that you answered the question then pending.

10 Okay?

11    A.   Yes.

12    Q.   All right.  We don't want you to guess or

13 speculate during the course of this deposition, but I

14 am entitled to your best estimate.

15         Do you know the difference between a guess

16 and an estimate?

17    A.   Yes, I do.

18    Q.   Okay.  Very good.  Okay.  Is there any

19 reason that you can't give me your best recollection

20 of events between 2018 and 2000 -- and -- and today as

21 you testify today?

22    A.   Yes.

23    Q.   There is a reason?  I asked you -- let me

24 rephrase.

25         Is there any reason you can't give me your

1    best recollection of events today?

2        A.    No.

3        Q.    Thank you.  Do you know Ronnie Jordan?

4        A.    Yes, I do.

5        Q.    How do you know Ronnie Jordan?

6        A.    He was employed as our CEO of the original

7    Mowbray Tree Service where I work.

8        Q.    Okay.  And were you also an officer at the

9    time of Mr. Jordan's employment?

10        A.    No.

11        Q.    Are you a -- do you hold any title --

12    strike that.

13            Did you hold any title at the time Ronnie

14    Jordan was hired?

15        A.    Yeah.  I was a controller.

16        Q.    You were the controller.

17        A.    Yes.

18        Q.    Have you ever been referred to as the CFO,

19    Chief Financial Officer?

20        A.    Yes.  It was part of my employment.  I

21    think about 2020, I was promoted to be the CFO.

22        Q.    Okay.  Okay.  And how long did you --

23    you're 65 today.  You were terminated in May of 2023.

24            When were you first hired by Mowbray's?

25        A.    I was hire around April of 2012.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 13
Alan Phang, 09/29/2023

1    Q.    2012.  What month in 2012, please?

2    A.    April.  April.

3    Q.    April of 2012.  Okay.

4          And prior to coming to work for Mowbray's,

5    where did you work?

6    A.    I work for Ironman Part & Services for five

7    years.  It's located in Corona.

8              (Court reporter clarification.)

9    Q.    One more time, the name, sir.

10   A.    I work for Ironman -- Ironman,

11   I-R-O-N-M-A-N, Parts & Services in Corona for five --

12   for five years.

13   Q.    You're a little too close perhaps,

14   Mr. Phang.  Maybe slide back just a little bit, just a

15   hair, and see if that's better.  Try that again,

16   please, without leaning forward.

17   A.    I work for Ironman Part & Services in

18   Corona for five years.

19   Q.    Is that Harriman?

20        MR. CHO:  I heard Ironman.

21        MR. CATANZARITE:  Ironman.

22   A.    I-R-O-N-M-A-N.

23   Q.    All right.  Thank you.

24        Okay.  Ironman Parts & Services.

25   A.    Yes.

1    Q.    So that would take us back, if we subtract

2  five years, and that would be back to 2000 -- to

3  2000 -- if I subtract five years, would be back to

4  2007.

5        Where did you work before you went to work

6  for Ironman?

7    A.    I work in Raging Waters in San Dimas.

8    Q.    I didn't get that.

9        MR. CATANZARITE:  Steven, do you know that

10  name?

11        MR. CHO:  Raging Waters in San Dimas.

12    A.    It's an entertainment water park.  It's a

13  water entertainment park.

14    Q.    Got it.  Okay.

15        How long did you work for them?

16    A.    I believe it's, like, 15 years.

17    Q.    15 years.  So let's go with that one.

18        What was your position and function at

19  Raging Waters?

20    A.    I'm the accounting manager.

21    Q.    Okay.  And what was your position and

22  function with Ironman?

23    A.    I'm the senior accountant and accounting

24  manager.

25            (Court reporter clarification.)

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 15
Alan Phang, 09/29/2023

1         MR. CHO:  Repeat the answer, Alan.

2     Q.    Would you repeat that?

3     A.    Work for Ironman as a senior accountant.

4     Q.    Chief accountant?

5     A.    Huh?

6     Q.    Chief accountant?

7         MR. CHO:  No.  Senior accountant.

8     A.    Senior accountant.

9     Q.    I don't know who's got the worst hearing.

10 That means me.  Senior account, okay.

11        All right.  And when you were first

12 hired -- let me ask a preliminary question.  Were

13 you -- when you left Raging Waters, were you asked to

14 leave, or did you quit?  How did you -- your

15 employment end?

16    A.    I leave because the company was sold to a

17 huge enterprises, and they have to send their own

18 people to come to take my place.

19    Q.    Okay.  And Ironman, were you asked to leave

20 Ironman?

21    A.    I leave Ironman voluntarily.  I resigned

22 because I got a job for Mowbray Tree Service.

23    Q.    Thank you for that.  Okay.

24        And when you went to work for Mowbray's,

25 what was your initial position and function?

1      A.    Accounting -- accountant.  I was hired as

2  an accountant.

3      Q.    Now, who did you report to?

4      A.    Report to GGloria Mowbrays.

5      Q.    Did your position as accountant change in

6  any way?

7      A.    Beg your pardon?

8      Q.    Did your position as accountant change?

9      A.    It changes.  Another five years or so, I

10  become accounting manager.

11      Q.    About five years ago, you became accounting

12  manager.

13          So would that have been in 2018?

14      A.    In 2018, I was a controller.

15      Q.    2018, you were the controller.

16          And prior to that, you were the accounting

17  manager?

18      A.    Yes.

19      Q.    Thank you.

20          But when you were the accounting manager,

21  who did you report to?

22      A.    I report to GGloria Mowbrays.

23      Q.    Okay.  And when you became the controller,

24  who did you report to?

25      A.    Same, GGloria Mowbrays.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 17
Alan Phang, 09/29/2023

1     Q.    GGloria Mowbray?

2     A.    Yes.

3     Q.    Okay.

4     A.    The owner of the company.

5     Q.    Okay.  And when did -- and have you ever

6   reported to anyone other than GGloria Mowbray?

7     A.    I also reported to a CEO of the company.

8   At that time, the first CEO ideally is Steven Parker,

9   and then it changed to Dwight Anderson.  I report to

10  the CEO.

11    Q.    You reported to a CEO.  Okay.

12          Who was the CEO again, please, and what

13  year?

14    A.    The first time -- the first time I work

15  with Mowbray's, the CEO is Steven Parker.  He's the

16  one who hired me.  And after Steven Parker, it was

17  Dwight Anderson.

18    Q.    And who was next?

19    A.    I beg your pardon?

20    Q.    Who was next?  Who followed Anderson?

21    A.    When Dwight Anderson retired, They have a

22  new company CEO called Mike Neal.  Mike Neal was not

23  working for a long time and then they hire Ronnie

24  Jordans.

25    Q.    Okay.  Ronnie Mowbray followed Neal.

1    A.    Yes.

2    Q.    Ronnie Mowbray followed Mr. Neal?

3          MR. CHO:  Ronnie Jordan.

4    Q.    I'm sorry, I'll rephrase.

5          Is it accurate to say that Ronnie Jordan

6    then followed Mike Neal?

7    A.    Yes.

8    Q.    And you reported to Ronnie Jordan.

9    A.    Yes, I do.

10   Q.    Thank you.

11         And prior to that, you reported to Mike

12   Neal?

13   A.    Mike Neal, yes.

14   Q.    Okay.  And prior to that, Dwight Anderson?

15   A.    Yes.

16   Q.    And prior to that, someone whose first name

17   I don't have Parker.

18   A.    Steven Parker.  Steven Parker.

19   Q.    Steven Parker.

20   A.    Yes.

21   Q.    And prior to that, you reported to GGloria

22   Mowbray.

23   A.    Yes.

24   Q.    Have you ever reported to Robin Mowbray?

25   A.    I do.

1    Q.    I'm sorry?

2    A.    Yes, I do.

3    Q.    Okay.  So when did you report to Robin

4  Mowbray?

5    A.    Right around -- I would say -- I did

6  estimate about 2018 or '19.

7    Q.    Okay.  Well, Ronnie Jordan -- do you know

8  when Ronnie Jordan was fired?

9    A.    He was let go I believe at the end of 2020.

10    Q.    Okay.  And when did -- when did you start

11  to report to Robin Mowbray?  Was it in 2018 or 2020?

12    A.    Robin Mowbray 2019, '20.

13    Q.    Okay.  All right.  Now, let me ask you

14  something.

15    A.    Yes.

16    Q.    Day to day, would you work with Mr. Jordan?

17    A.    Yes, I do.

18    Q.    Okay.  And do you have an opinion of

19  Mr. Jordan?

20        MR. CHO:  Vague.  Overbroad.

21        But you can go ahead and answer.

22    Q.    Let me -- let me rephrase.

23        You worked with Mr. Jordan from 2018 until

24  the end of sometime in 2020, correct?

25    A.    Yes.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 20
Alan Phang, 09/29/2023

1      Q.    Do you have an opinion about Mr. Jordan's

2   work ethic?

3      A.    Well, he's well-known in the crew business

4   in that field.  In my opinion, when he started with

5   Mowbray's, he's doing very well, but later on, he's

6   did something against Mowbray's, which I don't think

7   is professional.

8          MR. CHO:  Can we -- can we take a break for

9   a second and go off the record?  Because I want to see

10  maybe we can have Alan connect via the phone, if that

11  audio might be better cause I'm -- I'm straining to

12  understand.

13          MR. CATANZARITE:  Let's take -- yeah,

14  it's -- I may be worn out otherwise.

15          Okay.  We're off the record.

16              (Pause in proceedings.)

17  BY MR. CATANZARITE:

18      Q.    Okay.  Mr. Phang, you made a comment,

19  something about Ronnie did something that you thought

20  was -- would you tell me that again, please?

21      A.    I thought was not -- he was not doing as

22  good as the CEO before.

23      Q.    Okay.  But you expanded that a little bit.

24  You said something like he -- he -- well, maybe we'll

25  have Cindie read it back to us.

1      MR. CATANZARITE:  Cindie, do you mind

2  reading back the last Q and A where he said Ronnie did

3  something wrong?

4              (Whereupon the court reporter

5              read back the requested record.)

6    Q.    Okay.  That's the answer.

7        All right.  Mr. Phang, so tell me what you

8  meant by him doing something against Mowbray's.

9    A.    Well, there are several things.  One of the

10  things is he instructed my employee, which is billing

11  manager, to do an invoice to try to collect more money

12  from Flexible Funding, which is our AR financing

13  company, and I caught it, and I question the billing

14  manager for the detail of this invoice, and she was

15  start crying and say she was instructed by Mr. Jordan

16  to do the invoice and not tell me.  But I caught it

17  because I have to submit to agent, to the financing

18  company to get the money, so I stopped the deal.

19        Number two --

20    Q.    Wait a minute.  Wait a minute.  Yeah, go

21  ahead.  Go ahead.  Just give me the string of them,

22  sure.

23    A.    Okay.  So the second issue is, when -- when

24  our company is getting better, I try to avoid going to

25  the AR collection agency to do my funding because I

1  have a bank issue me I think it's 10 or $12 million of

2  credit line, so I -- I tried to get away from the

3  funding company, and when they close the deal, they

4  will hold 4 to $5 million of my money, and I

5  questioned them, and they say that we approve GCL

6  invoice so they fund GCL this money, and then now they

7  have to recover from this money.

8        I questioned them saying that I did not

9  approve those invoices.  They say to me that this

10  invoices was approved by Ronnie Jordan.

11     Q.    Okay.  Anything else?

12     A.    Yes.  One more thing is, we purchase an

13  equipment which is about over $200,000 from GCL, and

14  GCL, as far as I know, is run by Randy Jordan, which

15  is Ronnie brother, and they both instruct me to pay

16  for equipment, and I did, but the equipment was still

17  under the lease, and later on GCL did not pay the

18  lease, and they come to -- took my equipment away,

19  which I think that Ronnie did not protect Mowbray's at

20  all.

21     Q.    Anything else?

22     A.    Insurance.  Why -- why -- why protection --

23  wildfire protection insurance.  When he switch to HUBS

24  International, he sign the contract with SCE without

25  knowing that SCE require a wildlife insurance --

1  wildfire protection insurance.  And that almost cause

2  our contract to be void by SCE.

3          I think if you sign a contract as a CEO on

4  behalf of Mowbray's, you need to have a discussion

5  with the team or to find out exactly what happened

6  before you sign those contract, because the contracts

7  say we need a wildfire protection insurance, and we do

8  not have that.

9      Q.    Anything else?

10     A.    Those -- those are the thing I can think of

11  right now.

12     Q.    Okay.  Now did you discuss any of these

13  with Robin Mowbray?

14     A.    I did.

15     Q.    Okay.  Which of the four did you discuss

16  with her?

17     A.    All of them.

18     Q.    When did you discuss them?

19     A.    Right after the event occur.

20     Q.    Right after what?

21     A.    Right -- right after the event occur.  In

22  other word, when it happened, after a week or so, I

23  discuss with Robert because I'm reporting to Robin.

24     Q.    So we have four events that are over the

25  course of how what period of time?

1    A.    I believe 2019, '20, and '21.

2    Q.    Okay.  And so from 2019 to 2020 or '21, you

3   had -- you observe what you -- what you say is

4   something that Mr. Jordan did, which was against the

5   interest of Mowbray's.  Correct so far?

6    A.    Yes.

7    Q.    Okay.  And did you then -- since the first

8   one was in 2019, did you confront Mr. Jordan saying,

9   Hey, you can't be doing this?  Did you confront him?

10    A.    I cannot.  He is my boss.  I have to talk

11   to Robin, which is the owner.

12    Q.    Okay.  So in other words, the two of you,

13   Robin and yourself.

14         Anyone else involved in this knowledge of

15   these four events?

16    A.    I don't know who else know about this, but

17   I did know Robin, and I discuss about this.

18    Q.    Okay.  And did you ever talk in the

19   presence of any of the attorneys for Mowbray's about

20   any of these four events?

21    A.    I don't recall, but I think probably

22   Mr. Cho or Mr. Kim, which is our corporate attorney,

23   might have known about this because constantly Robin,

24   me, and the attorney have talked about the issue of

25   MTS.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 25
Alan Phang, 09/29/2023

1    Q.    MTS, you mean Mowbray's --

2    A.    Mowbray's Tree Service, yes.

3    Q.    Okay.  So if I use MTS, that will be good

4  for you?

5    A.    Yes.

6    Q.    MTS?  Okay.  Very good.

7          Okay.  All right.  So I -- let's begin at

8  the beginning.

9          You say something about an invoice and some

10  clerk, a lady -- what was her name?

11    A.    Anna Seing.  A-N-N-A S-A-I-Z-N or N-Z.  S

12  -- S-E-I-N-G or -- Anna Seing.

13    Q.    Okay.  And you say that Anna Seing came

14  to -- had approved -- had put an invoice on -- or tell

15  me what the approval process is for invoices at this

16  time.

17    A.    Approval of invoices is, when a job is

18  done, it was sent to a billing department, and the

19  billing department will create an invoice based on the

20  job is done.

21    Q.    How do they create an invoice?  Do they --

22  what sources do they reach out to to create this

23  invoice?

24    A.    They create an invoice based on the

25  summation from our general foreman, which tell the

1  girl in the office the job is completed and is signed

2  by our GF and signed by Southern California general

3  foreman, that both sign it.

4      Q.    Okay.  So this has made -- this information

5  or an invoice is the product of your field person, the

6  general foreman, in cooperation with the SCE -- or

7  Southern California Edison, SCE, general foreman.  So

8  it's an agreement, right?

9      A.    Yes.

10     Q.    Okay.  And then that's sent to the billing

11  department, and the billing department then prepares

12  an invoice.

13          Have I got that correct?

14     A.    Yes.

15     Q.    Okay.  So how is Ronnie Jordan involved in

16  that?  He's not the general foreman.

17     A.    No.  He went over to see Anna or Anna went

18  to see Mr. Jordan.  I don't know who see who.  But

19  Mr. Jordan instructed Anna to do an invoice for

20  500,000 without any backup or work order.

21     Q.    Well -- and so Anna -- you're telling me

22  that Anna, who reports to you, goes ahead and prepares

23  such an invoice?

24     A.    Yes.  When I question her, I said, Why do

25  you do such an invoice without backup or stuff like

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 27
Alan Phang, 09/29/2023

1  that.  It's out of the ordinary process.  She said, I

2  was instructed by Mr. Jordan and not to tell you.

3      Q.    Well, frankly, Mr. Phang, that doesn't make

4  any sense.  What you just told me was that Anna Phang

5  prepared an invoice that wasn't approved by any

6  general foreman in the field, wasn't approved

7  cooperatively by the general foreman in the field for

8  MTS with SCE.  So how in the devil did you expect to

9  be paid?

10        MR. CHO:  Objection.  Lacks foundation.

11  Calls for speculation.  It's argumentative.

12        If you understand the question, Mr. Phang,

13  you can go ahead and answer.

14      A.    I do understand what you say, Mr. Ken --

15  Kenneth, but if you are my boss, you tell me to do

16  something, if I don't follow your instruction, I might

17  get fired by you.  So I think Anna was scared because

18  a CEO -- CEO asked her to do an invoice.  And for my

19  opinion, the invoice was to submit to the AR financing

20  company to get some money, because we got 80 percent

21  of what invoice we submitted.

22        I have to submit to AR agent every week.

23  So when I submit to AR agent, I realize that this

24  invoice is not correct because we do not have even

25  amount of invoice all the time.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 28
Alan Phang, 09/29/2023

1          So I go walk over to Anna and start

2    question Anna.  I say, Anna, I need to look at the

3    backup of this invoice.  I need to verify if this

4    invoice is correct before I send it to Flexible

5    Funding for money, and Anna start crying.  She -- she

6    say, If I tell you the truth, you might fire me.  Then

7    I say, No, I will not fire you, but why do you do

8    that?  Is that a mistake?  Is that overlooking?  Or

9    how did this invoice come from?  She said, I was

10   instructed by Mr. Jordan to do this invoice without

11   backup and not telling you.  That's why I don't know

12   about it.

13       Q.    So did you fire her?

14       A.    I did not fire her.  It's not her fault.

15       Q.    Okay.  So let me ask another question.

16             Where's this invoice?

17       A.    This invoice was deleted.  Like, I go to

18   the system to delete them, but the system still have a

19   copy of the invoice, but I have to void invoice as

20   this transaction does not happen.

21       Q.    Okay.  Where is it?  Where -- where is this

22   invoice that you allege Mr. Jordan had someone

23   prepare?

24       A.    It's with the accounting department.  Our

25   billing department --

1           (Simultaneous crosstalk.)

2     Q.    It's not ever been produced in the case?

3     A.    They --

4           (Court reporter clarification.)

5     Q.    Yes.  Mr. Phang, my question is:  This

6  invoice you -- you claim this invoice does exist

7  today, to the best of your knowledge; is that correct?

8     A.    Yes.

9     Q.    And I'm telling you, sir, I've never seen

10  such an invoice.

11     A.    I don't know if they send it --

12     Q.    Do you have a copy of it?  Do you have a

13  copy of it?

14     A.    I do not because I cannot access my file

15  anymore.

16     Q.    Okay.  Can you ask -- can you ask somebody

17  over at Mowbray's to send us this invoice so that we

18  can look at it together?  Can you do that?

19     A.    Yes, I can.

20     Q.    Okay.  Can you do that -- if we take -- if

21  we take five minutes, can you make that request now?

22           MR. CATANZARITE:  Stephen, can you get us

23  that invoice?

24           MR. CHO:  I don't see why not.  Let me -- I

25  guess it's a question of getting hold of someone at

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 30
Alan Phang, 09/29/2023

1  Mowbray's, so do you want to continue on and maybe at

2  the break do that, or do you want to take the break

3  now?

4          MR. CATANZARITE:  Well, I just thought we

5  could -- I'm happy to take a short break while he

6  makes the phone call.  We could just go off the record

7  briefly, and he could make the call, or you could make

8  the call and see if we can get this important invoice.

9  It should have been provided to us.  So I -- I want to

10 see what --

11         MR. CHO:  I -- I -- yeah, I think it might

12 have already been provided, so let me double check

13 with my office, and let's see if we -- if you want to

14 do that now, we can do that.

15         MR. CATANZARITE:  Yeah, Let's do that.

16         MR. CHO:  All right.  Let's go off the

17 record.

18             (Pause in proceedings.)

19 BY MR. CATANZARITE:

20    Q.   Okay.  So, Mr. Phang, I've marked what I'll

21 identify as Exhibit 14 to this deposition

22 transcript -- I'm sorry, Exhibit 46.

23             Do you see it?

24             (Whereupon Exhibit 46, to be

25             later marked, was referenced.)

1    A.    Yes, I do.

2    Q.    All right.  So I have some questions on

3  this.

4        This is -- this is the invoice that was

5  presented to you by Ms. Anna Seing or was part of a

6  summary that you were asked to send over to Flexible

7  Funding; is that correct?

8    A.    Yes, sir.

9    Q.    Okay.  Now explain what this is.  What is

10  this?

11    A.    This is the --

12    Q.    1 D -- "1 DRI A CREW NT."

13    A.    Okay.

14    Q.    And it's --

15    A.    Okay.  This invoice was created by Anna.

16  This to -- to -- actually, this invoice is billed to

17  Southern California Edison so we can send this invoice

18  to Flexible Funding to collect 80 percent of the

19  money.

20        But when I look at the invoice, in my mind,

21  I don't think we have even number invoices.  So that's

22  trigger my -- my imagination.  This is not a correct

23  invoice.

24        So I went to Anna, my billing manager, and

25  request a backup document on "DRI A CREW," which is

1    stated in the invoice.  I want to see what is the

2    backup of this document.  And she start telling me

3    that was instructed by Mr. Jordan to do this invoice.

4        Q.    Okay.  Had Mr. Jordan ever, to your

5    knowledge, instructed the preparation of any invoice

6    before?

7        A.    No.

8        Q.    Had Mr. Jordan prepared any invoice on his

9    own, put it in the system.

10       A.    No.  It --

11       Q.    Did anyone --

12       A.    It --

13       Q.    Did anyone on Mr. Jordan's behalf, to your

14   knowledge, provide input into a system to generate an

15   invoice like this?

16       A.    No.

17       Q.    Now, I have a question about the

18   description here.

19            So there's a column that says

20   "Description."  There is the -- there are three

21   capital letters, "DRI."

22            Do you know what that stands for?

23       A.    Yes.

24       Q.    What does that stand for?

25       A.    It's a contract we have with Southern

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 33
Alan Phang, 09/29/2023

1  California.  It's called "drought restoration

2  inspection" or something.  "I," I don't remember what

3  it is.  But D stand for drought.  R stand for

4  restoration.  "I" stand for inspection or something.

5  It's -- it's the -- it's the contract we have with

6  Southern California that we can build on for the

7  employee who work under the contract.

8      Q.    Okay.  And then it has a separate letter, a

9  capital A.

10          What does that mean?

11     A.    It means Crew A or Crew B or Crew C.  Crew

12  A is -- I -- I don't remember if Crew A is two-man

13  crew and Crew B is three-man crew or something like

14  that.  But Crew A means they are the crews that work

15  on the project.

16     Q.    Okay.  And I note that the -- I see your

17  point about the round number of 500,000.

18          Where's the PO number filled in here, this

19  blank?

20     A.    When we have a contract with Southern

21  California Edison, we don't need a PO.  We have to

22  describe what the project is.  The project is DRI.

23     Q.    Well, but it goes a little further than

24  that, doesn't it?  You told me before that before you

25  can even invoice that there had to be a concurrence in

1    the field between what work was completed by your

2    general foreman and what work was confirmed as

3    performed by the Southern California Edison's general

4    foreman, correct?

5       A.   Yes.

6           MR. CHO:  Objection.  Lacks found -- hold

7    on.  Objection.  Lacks foundation.  Misstates the

8    prior testimony.

9           To the extent that you understand this

10   question, go ahead and answer.

11          MR. CATANZARITE:  He already answered yes.

12          You have that, don't you, Cindie?

13          THE COURT REPORTER:  I do.

14      Q.   Okay.  Next question, Mr. Cho -- next

15   question, Mr. Phang.

16          MR. CATANZARITE:  You're testifying,

17   Stephen.

18      Q.   Okay.  Mr. Phang --

19      A.   Yes.

20      Q.   Going -- he was throwing me off here.  It

21   has Michael Kim on the picture here for you.

22          Okay.  So this strikes me as unusual in the

23   sense that you said this occurred in -- this occurs on

24   March 5, 2020.  And what other events were occurring

25   around this time At the company?

1          MR. CHO:  Objection.  Lacks foundation.

2  Vague.  Ambiguous.

3          Go ahead and answer.

4     A.    I don't understand your question.

5     Q.    Sure.  Was there a disruption at the

6  company related to the firing of one Richard Mowbray?

7          MR. CHO:  Vague and ambiguous.

8          Answer if you understand.

9     A.    No, I don't understand.

10     Q.    Do you know Richard Mowbray?

11     A.    Rick Mowbray.  I know Rick Mowbray.  There

12  are two Richard Mowbrays.  One is a senior, one is a

13  junior.  They're all called Richard Mowbray, but one

14  we call Rick Mowbrays, another one we call Ricky

15  Mowbray.

16     Q.    Okay.  So I'm focused on the father, the

17  elder, the senior, the Rick Mowbray.  Okay?

18     A.    Yes.  Yes, I know him.

19     Q.    Who's -- how long have you known him?

20     A.    Since I was employed in 2012.

21     Q.    Okay.  Did he hire you?

22     A.    No.

23     Q.    Who hired you?

24     A.    Steven Parker, the -- the CEO at the time I

25  work there.

1    Q.    Okay.  Did you ever report to Rick Mowbray?

2    A.    No.

3    Q.    Did you ever interact with Rick Mowbray?

4    A.    Yes, I do.

5    Q.    Okay.  What was he doing in 2017 and '18?

6    A.    I recall he was the operation manager.

7  When he need to buy something, he have to come to me

8  to request.

9    Q.    And what does "operations manager" mean in

10 that time period?

11   A.    Operation manager means you schedule your

12 worker outside the field, you watch the worker, what

13 they do, or you guide them what you need to do for the

14 company.

15   Q.    Okay.  And who did he report to?

16   A.    I am not sure.

17   Q.    Did he report to the same person you

18 reported to?

19   A.    I don't know that.

20   Q.    Okay.  Did you ever meet with Rick Mowbray

21 and Ronnie and Phyllis Jordan in May of 2018?

22   A.    Yes, I do.

23   Q.    Okay.  What do you recall of that meeting?

24   A.    It was a meeting that Rick Mowbrays

25 introduced Mr. Jordan and Phyllis Jordan to our

1  company, and it was in the conference call -- I mean

2  in the conference room with, like, about 10 managers.

3  I'm one of the person inside.

4      Q.   Okay.  Were you -- were you a member with

5  the 10 managers in the room?

6      A.   Yes, I am.

7      Q.   And where did -- where did Rick Mowbrays --

8  this was in person, right, face to face, correct?

9      A.   Yes.  In the conference room, yes.

10     Q.   Okay.  And so who led the meeting?

11     A.   Rick Mowbrays.

12     Q.   Okay.  And when he -- and in this meeting,

13  I take it you're present, Ronnie Jordan's present,

14  Phyllis Jordan is present, and --

15     A.   Yes.

16     Q.   -- Rick.

17          Who else do you recall being present?

18     A.   Nacho Wata (phonetic).  I don't know if

19  Robin is there.  There are several manager.  I don't

20  recall them anymore.

21     Q.   Okay.  And why was Rick Mowbray, to your

22  knowledge, conducting this meeting?

23     A.   To introduce Mr. Jordan as our CEO of the

24  company and ask every manager to support Mr. Jordan

25  to -- for -- for -- for his function as CEO.

1      Q.    He was introducing him as the new CEO.  And

2  did anyone say, Gee, that's interesting?  Did anyone

3  have anything to say about it?

4      A.    I don't recall that because I myself

5  doesn't know Mr. Jordan in the beginning until we come

6  aboard on the meeting.

7      Q.    Okay.  And so at this meeting, it is an

8  announcement that Mr. Jordan has already been hired,

9  correct?

10     A.    Yes.

11     Q.    Okay.  And he was already been hired as the

12  CEO, correct?

13     A.    Yes.

14     Q.    So he was hired by Rick Mowbray, correct?

15     A.    I don't know who hire him, but in our

16  organization, it has to be hired by the human

17  resources, people who record everything.  But I -- as

18  far as hiring an executive, I'm not involved in that.

19     Q.    So did you raise your hand and say, Gee,

20  I'm -- I'm surprised by this.  How is Mr. Jordan hired

21  as CEO when human resources hasn't reported that

22  event?

23     A.    I -- I -- I didn't raise my hand like that,

24  Mr. Ken.  But I know the company needs a new CEO

25  because Dwight Anderson was -- was old enough to

1  retire, and Mr. O'Neal (sic) was a temporary CEO at

2  that time, and they need a CEO to run the company.

3  But who they hire, I don't have a say so.  I just have

4  to wait until they make the decision, and I'll see

5  who's the next CEO of Mowbray's.  Either Mr. Jordan,

6  Mr. Cannon, I don't know.  But I'm not in the position

7  to decide who to hire because I'm not that board of

8  director of Mowbray's Tree Service.

9      Q.    Okay.  But as Mr. Rick Mowbray spoke, it

10  was clear to you that Ronnie Jordan had already been

11  hired as CEO, correct?

12      A.    Yes.

13      Q.    Okay.  All right.  Back to this invoice.

14          This invoice, Exhibit 46, which is on the

15  screen, this invoice you say came to you when you saw

16  a run -- an aging run that would have allowed you to

17  submit a request for an 80-percent advance against

18  this amount from Flexible Funding, correct?

19      A.    Yes.

20      Q.    And tell me -- tell me, at that time, what

21  was the size of the invoicing going out to Southern

22  California Edison?  I mean, how much money were you

23  building them -- billing them every month?

24      A.    We bill 2 or 3 millions a month, but it

25  consists of about a thousand invoices, and it all

1  varies for the amount.  It can be $200.00.  It can be

2  $700,000.  It depend on what kind of works that was

3  attached to the invoice.

4      Q.    Okay.  All right.  So 2 to 3 million a

5  month.

6          On how many months had you been billing at

7  that pace?

8      A.    It was a few months.  I don't -- I don't

9  recall how many months, but in our work -- workplace,

10  sometimes you bill a lot in a month.  Sometimes you

11  bill less in a month.  It depend on when you finish

12  the grids.  There's a grid means a bundle of work.

13  The bundle of work can be done in three months, two

14  months, or one month.

15          Also, there are work that we bill hourly.

16  When you bill hourly, you have to bill every two weeks

17  when the job is continue.  When you bill a unit price

18  or a bundle price, you bill when the bundle is done.

19  It's called grids.

20      Q.    Uh-huh.

21          (Court reporter clarification.)

22          THE WITNESS:  Yeah, bundle.  Sorry about my

23  accent.

24      Q.    Well, that's okay.

25          What is your -- what is your -- how many

1  languages do you speak, Mr. Phang?

2     A.   I speak -- I speak Chinese.  I speak

3  Cantonese -- well, Cantonese is part of Chinese.  I

4  speak Malay because I came from Malaysia.

5     Q.   Well, I think you're doing quite well, sir.

6  I don't speak any of those languages, so.

7     A.   Thank you.

8     Q.   Okay.  All right.  So, Mr. Phang, I'm back

9  to this invoice.

10     A.   Okay.

11     Q.   And so how much -- how much money was

12  Ronnie Jordan going to get out of this invoice?

13     A.   Nothing.

14     Q.   So he was going to get nothing out of this

15  invoice.

16         So can you -- can you tell me, did you

17  question this Anna Seing as to whether or not she was

18  being honest?

19     A.   I believe she was honest.  She was crying.

20  She was thinking that I'm going to fire her.  But I

21  want to know the truth.  So --

22     Q.   Uh-huh.

23     A.   -- she told me the truth.

24     Q.   Well, how do you know it was the truth?  Do

25  you give her a lie detector test?

1    A.    No.

2          MR. CHO:  Objection.  Lacks foundation.

3          Go ahead and answer.  I think you said no,

4 right?

5    A.    No, but I work with her so many years.

6    Q.    Well, but I'm --

7    A.    I know --

8    Q.    -- asking -- Mr. Phang, I'm asking you an

9 important question here.  You're accusing the CEO in

10 some event in around or about March of 2020 --

11   A.    Yes.

12   Q.    -- of some misconduct, which I don't even

13 understand that's reported solely to you by Anna

14 Seing, and you believe her and not Ronnie Jordan; is

15 that correct?

16   A.    I do.

17   Q.    All right.  And did you go to Ronnie Jordan

18 and show him Exhibit 46 and say, What were you up to?

19 Why were you doing this?  Is this a mistake?  Did you

20 say anything about it?

21   A.    No.

22   Q.    Why?

23   A.    Because I did not submit this to Flexible

24 Funding for money.  I know it's a fraud invoice, so I

25 just delete it.  It's no harm to the Mowbray Tree

1  Service.  Because if I submit this to -- the invoice

2  to the Flexible Funding, they come back and ask me,

3  Alan, I need to see the -- the backup of this invoice.

4  Then I'll be stuck because this is not a correct

5  invoice.  It's a make up invoice.

6     Q.   Made up by Anna Seing.

7     A.   Yes, but instructed by CEO.

8        MR. CATANZARITE:  Move to strike everything

9  after yes.

10     Q.   Now, back to this -- back to this question

11  about why you preferred Anna Seing's version of events

12  and you never -- never spoke to -- I'll rephrase.

13        Did you ever speak -- did you ever notify

14  the lawyers for the company of this invoice in March

15  of 2020?

16     A.   No.

17     Q.   Did you ask Ms. Seing -- Anna Seing to

18  prepare for you a report or memorandum about the

19  event?

20     A.   No.  No.

21     Q.   Did you ask for anyone to prepare a report

22  or memorandum?

23     A.   No.

24     Q.   Okay.  And you didn't notify Mr. Jordan,

25  correct?

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                Page 44
Alan Phang, 09/29/2023

1    A.    No.

2    Q.    And you didn't obtain any written

3 verification or affidavit, nothing from Anna Seing,

4 just her -- what you recall her having said, correct?

5    A.    No.

6    Q.    You mean yes, you didn't do anything other

7 than rely on her verbal testimony, correct?

8    A.    Yes.

9    Q.    Now, her -- when I said testimony, that's a

10 misnomer.

11        You didn't -- she wasn't sworn under oath

12 to tell the truth, right?

13    A.    Yes.

14    Q.    She was or wasn't?

15    A.    She wasn't.

16    Q.    She wasn't.  Okay.

17        And you admit that Mowbray's wasn't harmed,

18 correct?

19    A.    Yes, Mowbray's -- is -- this invoice was

20 made and caught by me, so we did not submit this

21 invoice to either Southern California or Flexible

22 Funding for the money.

23    Q.    Okay.  But let me -- let's answer the

24 question I'm asking as opposed to something -- some

25 narrative that you're giving me.  Let's get the clean

1  question and answer.

2          It's a fact that Mowbray's Tree Service was

3  not harmed by the preparation of this invoice,

4  correct?

5      A.   Yes.  It's not wrong.

6      Q.   Not harmed.

7          It's true that Flexible Funding was not

8  harmed by the preparation of this invoice, Exhibit 46,

9  correct?

10     A.   Yes.

11     Q.   It's true that Southern California Edison

12 was not harmed by the preparation of this invoice, 46,

13 correct?

14     A.   Yes.

15         MR. CHO:  Objection.  Calls for

16 speculation.  Lacks foundation.

17         To the extent you understand, go ahead and

18 answer.

19         MR. CATANZARITE:  Cindie, you've already

20 got the answer, don't you?

21         THE COURT REPORTER:  Yes.  The answer was

22 yes.

23         MR. CATANZARITE:  Thank you.

24     Q.   Okay.  Now I'm going to go to -- I'm going

25 to -- well, I do have one final question.

1         Why the devil is this being raised now?

2         MR. CHO:  Objection.  Lacks foundation.

3   Calls for speculation.

4         Answer if you know.

5   A.    I don't know.

6   Q.    All right.  So number 2 on your list, you

7   says --

8   A.    Flexible funding.

9   Q.    Right.  I'm just looking at my notes on it.

10        This Flexible Funding issue, do I have this

11  correct that this is the basis of an allegation from

12  some lawyers for Flexible Funding that say essentially

13  you're responsible for something GCL Graham Land

14  Company did, correct?

15  A.    Yes.

16  Q.    Okay.  Did you see that letter, by the way,

17  that they sent?  We asked to look at it.

18  A.    No.  I don't recall.

19  Q.    Okay.  One second.  I published Exhibit 22.

20        Are you able to see Exhibit 22, sir?

21            (Whereupon Exhibit 22, to be

22            later marked, was referenced.)

23  A.    Yes.

24  Q.    This is a letter dated December 28, 2020,

25  from a law firm pronounced Pahl & McKay, P-A-H-L.

1    A.    Uh-huh.

2    Q.    And it's to Michael Kim.  That's the

3 gentleman that was assisting you and is the partner of

4 Mr. Cho, correct?

5    A.    Yes.

6    Q.    Okay.  Now this -- this letter, did you

7 ever see it now that you -- does this refresh your

8 recollection that you saw it?

9    A.    I might, but I don't recall.

10    Q.    Okay.  So this is a letter that says, We're

11 going to withhold, as of December 24, 2020, no less

12 than $4,152,715.91, the balance due.

13       Do you see that?

14    A.    Yes.

15    Q.    And then I highlighted, "Notably, before

16 Flexible Funding made any advances to Graham," that

17 means Graham on the invoices, "Flexible Funding

18 obtained verification from Ronnie Jordan, Mowbray's

19 CEO that the invoices were accurate, would be paid,

20 and were not subject to any offset or defenses."

21       Have I read that sentence correctly?

22    A.    Yes.

23    Q.    Okay.  Now, you, sir, did you determine

24 whether or not there was any written verification of a

25 debt in the amount of 4-million-plus dollars?

1    A.    No.

2    Q.    In other words, these gentlemen say, Well,

3 we're going to keep 4 million of Mowbray's money

4 because Graham Land Company -- Graham County Land,

5 GCL, owes us money on invoices that somehow Mr. Jordan

6 verified would be paid, correct?

7    A.    Yes.

8         MR. CHO:  Objection.  Lacks foundation.

9         Alan, you have to wait until I put the

10 objection on the record and then you can answer.

11 Lacks foundation.  Calls for speculation.  I think you

12 answered yes.  But in the future, please wait until I

13 put the objection on the record.

14         Go ahead, sir.

15    Q.    Oh, okay.  Mr. Phang, are you familiar --

16 you've been -- strike that.

17         You've been around as a chief accountant,

18 as a controller, and as a CFO for many, many years

19 from -- based on what you've told me about your

20 background, correct?

21    A.    Yes.

22    Q.    And you know what a verification is, right?

23    A.    Yes.

24    Q.    All right.  A verification -- well, how

25 does an accountant confirm verification of a certain

1   act or transaction?

2       A.    You have to receive a request or aging from

3   the company.  For example, Flexible will send me an

4   aging of Graham County or send me their invoice and --

5   and ask me --

6       Q.    (Zoom audio distortion.)

7       A.    Something wrong with your phone.

8           They will send me a request on the e-mail

9   to verify if these invoice are good, valid, and okay

10  to pay.

11      Q.    Right.  In other words, the verification.

12  Some sort of written acknowledgement that the act or

13  the transaction is approved, correct?

14      A.    Yes.

15      Q.    All right.  And so when this thing was sent

16  and did you say, in your evaluation as the accounting

17  manager, Ain't no verification here for this

18  transaction?  Did you say that?

19      A.    Yes.

20          MR. CHO:  Objection.  Lacks foundation.

21          Go ahead and answer.

22          MR. CATANZARITE:  He already did.  "Yes."

23          You got that, Cindie?

24          THE COURT REPORTER:  I do.

25          MR. CATANZARITE:  Okay.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE            Page 50
Alan Phang, 09/29/2023

1      Q.    Your answer was "Yes," Mr. Phang?

2      A.    Yes.

3      Q.    All right.  So how in the world is this a

4  threatening letter of any legitimate accuracy, if, in

5  fact, there's no verification?

6            MR. CHO:  Objection.  Lacks foundation.

7  Calls for speculation.

8            Answer If you know.

9      A.    I don't know.

10     Q.    In other words, you're -- you seem to be no

11  shrinking violet.  That's a phrase you might not know

12  in Chinese.  You're -- you're no shrinking violet.

13            So it's fair to say, if you didn't think

14  Mowbray's Tree Service owed the money, you would say,

15  I don't think Mowbray's Tree Service owes the money,

16  correct?

17     A.    Yes.

18     Q.    And you told them that.  They don't -- You

19  don't owe this money, right?

20     A.    Yes.

21     Q.    Okay.  So how is Ronnie Jordan responsible

22  for this claim?

23     A.    Well, that's why we sue them.  That's why

24  we want to know who verified the invoices they claim

25  from GCL.  And I was saying I didn't verify the

1  invoice.  I don't want to pay this.  You owe me the

2  money.  But they said no, it's your boss, which is

3  Ronnie Jordan, verified it.

4      Q.   Okay.  And you said, That ain't true

5  either, Ronnie.  There's -- you have no verification

6  by Ronnie Jordan; isn't that accurate?

7      A.   That's why -- that's why --

8          MR. CHO:  Objection.  Lacks foundation.

9  Calls for speculation.

10          Answer if you know.

11      A.   I know, that's why we sue them.

12      Q.   Very good.

13          And you didn't collect because they went

14  into bankruptcy, right?

15      A.   Yes.

16      Q.   All right.  So how is that Ronnie Jordan's

17  fault?

18          MR. CHO:  Objection.  Lacks foundation.

19  Calls for speculation and legal conclusion.

20          Answer if you know.

21      A.   I believe it's Ronnie Jordan and me can

22  approve the invoice, and if I didn't approve it, it

23  has to be Ronnie Jordan who approve it.  As the CEO,

24  you don't approve invoices.  You let your CFO do that.

25  That's why I say Ronnie Jordan is at fault.

1    Q.    Well, let me ask you a clean question here.

2    A.    Yes.

3    Q.    It's true, isn't it -- strike that.

4  Ronnie -- you saw -- you -- strike that.

5          There is nothing in writing that you have

6  seen that was a verification to Flexible Funding that

7  Graham Land -- Graham County Land was owed any money

8  on the invoices by Mr. Jordan, correct?

9    A.    Yes.

10    Q.    That's right.

11          So when you said -- when you just say, if

12  it's not me because I didn't verify, it must be

13  Mr. Jordan, that's not true because there's no

14  verification by Mr. Jordan either, correct?

15          MR. CHO:  Objection.  Lacks foundation.

16  Calls for speculation.

17          Answer if you know.

18    A.    I don't know.  I don't know if Mr. Jordan

19  verified it or not, but I did not verify it.

20    Q.    Let's see.  But you do know insofar as your

21  review of the record, the Mowbray's record, that there

22  is nothing that you've seen that would constitute a

23  writing by Mr. Jordan verifying the GCL invoices that

24  were to be -- were to be to Mowbray's Tree Service to

25  be paid that would support Flexible Funding's advance,

1  correct?

2      A.   Yes.

3           MR. CHO:  Objection.  Lacks foundation.

4           Go ahead and answer.

5      A.   Yes.

6      Q.   Okay.  All right.  Then we're down to -- is

7  there anything else you want to tell me about number

8  2, the Flexible Funding issue?

9      A.   No.

10     Q.   By the way, did you -- was anything

11 recovered against Flexible on this four -- $4 million

12 balance due claim in this letter at Exhibit 22?

13     A.   No.

14     Q.   Okay.  Did Mowbray's file a claim in

15 bankruptcy?

16     A.   I believe so.

17     Q.   Did they receive any payment on the claim?

18     A.   No payment at all.

19     Q.   Okay.  Now, the third item is this

20 equipment issue --

21     A.   Yes.

22     Q.   -- that you told us about.

23          And this is equipment purchased from GCL

24 for the sum of $200,000 and -- and you blame Ronnie

25 Jordan for the equipment having been subject to a

1   lease, correct?

2       A.    Yes.

3       Q.    So tell me, who cut the check for 200,000?

4       A.    I did.

5       Q.    Okay.  And why did you do that without

6   obtaining a purchase and sale agreement or a bill of

7   sale?

8       A.    I did that is because, with the request of

9   my boss, Mr. Jordan, saying that this -- we need this

10  equipment, and this equipment is good to buy, and I

11  need to wire the money right away.

12      Q.    So it was a wire.

13      A.    Yes.

14      Q.    Okay.  And did you receive the equipment?

15      A.    Yes, we did.

16      Q.    Did the equipment go into the field and was

17  subject to billing?

18      A.    I don't understand what you're talking

19  about.

20      Q.    In other words, was the equipment used in

21  the field for a project that allowed you to bill for

22  the use of the equipment?

23      A.    Yes.

24      Q.    Okay.  Now, I want to understand a little

25  more about this.  You say that it was subject to a

1  lease, correct?

2     A.    Yes.

3     Q.    Now, this is equipment -- what type of

4  equipment was this?

5     A.    It's some kind of equipment that use on the

6  field.  I check with my freight manager, and we did

7  receive the equipment, and it was function in the

8  field.  So I didn't go further.  It's not my duty to

9  check if the machine is free and clear.  It's Mr. -- I

10  trust Mr. Jordan, and he instruct me to pay it, I'll

11  pay it.

12     Q.    But Mr. Jordan had never instructed you to

13  buy any equipment before, had he?

14     A.    He did.

15        MR. CHO:  Object.  Lacks foundation.

16        Go ahead and answer.

17     A.    He did.  We talk about buying machinery

18  equipment all the time.

19     Q.    Okay.  And did he sign any purchase and

20  sale agreements?

21     A.    No.

22     Q.    Who did?

23     A.    Sometimes I did.  Sometimes Mrs. Mowbray

24  did, but Mr. Jordan never signed any agreement to buy

25  anything.  But he can instruct me to purchase certain

1  equipment.

2      Q.    Okay.  And in some cases, you would

3  purchase, and in some cases, you would lease, correct?

4      A.    Yes.

5      Q.    Okay.  This piece of equipment for $200,000

6  was leased -- subject to a lease, correct?

7      A.    No.  This equipment we bought is cash.  But

8  we didn't know this equipment is still under the lease

9  with GCL so when --

10      Q.    Okay.

11      A.    -- GCL cannot pay the lease, the equipment

12  company come and reprocess our equipment.

13      Q.    So did they repossess the equipment?

14      A.    They did.

15      Q.    Okay.  So you don't have the equipment

16  anymore.

17      A.    No more.

18      Q.    Okay.  So how much was due on the lease?

19      A.    I don't know.

20      Q.    Why'd you let him take it if -- what if

21  only $10,000 was due on the lease?

22      A.    Well, my freight manager told me.  I

23  don't -- I don't recall how much it is, but my freight

24  manager told me it's not worth it to pay for it.

25      Q.    And who is your freight manager?

1      A.    Robert Amador.

2      Q.    Okay.

3      A.    And also Tony Ramirez.  I don't know if

4  Tony or Robert Amador advised me about that situation.

5      Q.    Okay.  So your point is that somebody made

6  a mistake, and you think it was Mr. Jordan.

7      A.    Yes.  Because -- because GCL belong to

8  Randy, which is his brother.  When he purchase an

9  equipment from his brother, he should have make sure

10  the equipment is clean so we can pay by cash.  He

11  might not know it's still under the least.  But as a

12  duty as a officer of a company, when you want to

13  purchase something, you've got to make sure.  You just

14  don't instruct me go ahead and pay without knowing if

15  the equipment is clean -- is -- is -- is clean or

16  whatever.

17        I -- for some reason, if you are my boss,

18  you tell me to do it, I do it, but I check with my

19  fleet manager if the equipment is useful in my field.

20  If it is -- if my freight manager say, Yes, we need

21  it, then I'll go buy it.  But I usually buy equipment

22  from manufacturer, not by a company.  But this time,

23  because he instruct me to do it, so I did it.

24        But you have to understand he bought it

25  from his brother.  He should know.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                Page 58
Alan Phang, 09/29/2023

1    Q.    Okay.  Well, it sounds as if somebody made

2  a mistake and as if you're trying to avoid liability

3  yourself for making the mistake, right?

4         MR. CHO:  Objection.  Lacks foundation.

5  It's argumentative.

6         Go ahead and answer if you know the --

7  understand the question.

8    A.    I don't understand.

9    Q.    Yeah.  Well, it's a simple question.

10        So, Mr. Jordan, you say, introduces you to

11  his brother, the idea that -- that Mowbray's will buy

12  this equipment for the benefit of Mowbray's from GCL,

13  correct?

14   A.    Yes.

15   Q.    Okay.  And the normal process would be that

16  you and your team would decide to put this equipment

17  into service, and apparently you did agree to that,

18  right?

19   A.    Yes.

20   Q.    And that no one on your team had apparently

21  the thought or idea that, Gee, we should check whether

22  or not this is subject to any debt or lease

23  obligation, correct?

24   A.    No, because Ronnie Jordan is my boss.  He

25  instruct me to do that.  He should have known.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 59
Alan Phang, 09/29/2023

1    Q.    Okay.

2    A.    Or you could have tack (phonetic).

3    Q.    Did you know --

4    A.    I don't -- I don't -- I can't question my

5  boss.  Why do you buy this machine?  Why do you do

6  that?  Is it missing clean (phonetic) or not?  I can't

7  do that.  I'm -- I just work under him.

8    Q.    Okay.  So did you determine what the value

9  of the equipment was worth?

10    A.    No.  But my freight manager does.

11    Q.    So that much they did, right?  So you

12  talked to your freight manager, and he said this is a

13  good deal, correct?

14    A.    I believe so.

15    Q.    Okay.  And did your freight manager relate

16  to you that this was equipment worth 400,000 that

17  we're buying for 200,000?

18    A.    No.

19    Q.    Did he say how much the equipment was

20  actually worth at the time?

21    A.    I don't recall.

22    Q.    But it was worth more than 200,000,

23  correct?

24    A.    I don't know.

25    Q.    Okay.  But you recall talking to him, and

1  the price being paid was not, in his view, excessive,

2  correct?

3         MR. CHO:  Objection.  Lacks foundation.

4      Q.   Go ahead.

5      A.   I don't know.  I don't recall that.

6      Q.   Well, you're the accounting manager.

7  You're asked to pay $200,000 for a piece of equipment.

8  Wouldn't you talk to your -- your equipment managers

9  and say, Is this equipment worth it?

10        MR. CHO:  Objection.  Lacks foundation.

11  Argumentative.

12        Go ahead and answer.

13      Q.   Go ahead.

14      A.    I probably did.  I don't remember.  But

15  usually it's the freight manager duty to tell me if it

16  is a good buy or bad buy.  I usually don't go in too

17  deep into if this worth how much, that worth how much,

18  and is this current market value or stuff like that

19  because we have -- each person have his own function.

20  I'm just a finance person.  I just do what the boss

21  say.  We need to buy this, I just finance it or pay

22  it.

23      Q.   Uh-huh.  Okay.  But you agree with me, the

24  equipment manager could have evaluated the value of

25  the equipment, could have evaluated himself whether or

1    not the equipment was subject to a lease or a lien,

2    correct?

3            MR. CHO:  Objection.  Lacks foundation.

4    Calls for speculation.

5            Go ahead and answer.

6    A.    I don't know that.

7    Q.    Okay.  You don't know one way or the other,

8    do you?

9    A.    I don't know.

10   Q.    Okay.  So now let's go to the fourth item.

11   A.    Yes.

12   Q.    Okay.  And the fourth item is this

13   discussion about some fault by Mr. Jordan related to

14   signing a contract with Southern California Edison

15   that would require wildfire coverage when the company

16   did not have wildfire coverage, correct?

17   A.    Yes.

18   Q.    Okay.  And is it accurate to say that the

19   company didn't have wildfire coverage at the time it

20   was entering into contracts in 2019?

21   A.    I don't remember the year, but I do

22   remember after a huge fire, Southern California start

23   requesting for wildfire protection insurance.  Before,

24   when I started with Mowbray Tree Service, Southern

25   California did not ask for those insurance.  They only

1    ask for general liability insurance.

2        Q.    Okay.  Well, let me ask you a question.

3            Do you know --

4        A.    Yes

5        Q.    -- a gentleman named Leo -- Leo Rodriguez?

6        A.    Yes.  He was with us for when I started

7    work with Mowbray's.

8        Q.    Okay.  And what is his role?

9        A.    He's our insurance agent who recommend what

10   we need to buy and how much we need to buy.

11        Q.    Okay.  Did he ever place any wildfire

12   coverage?

13        A.    No, because I talked to him because

14   Southern California contract never ask for wildfire

15   protection until I believe 2019, that when we renew

16   our contract, it's just put in there.  And Mr. Jordan

17   signed it without checking with the insurance agent

18   that we have wildfire insurance.  At that time, we

19   have switched our agent from Rio to HUB, and HUB was

20   recommended by Mr. Jordan.

21            The duty of an agent is when we have a

22   contract, like Mr. Leo, would check with our customer

23   to make sure we have enough coverage to satisfy the

24   contract.  But in that case, Mr. Jordan did not verify

25   with the agent or never talk to me.  I don't know they

1  have talked to Ricky or Robin about the contract, and

2  he have signed it.  So Southern California is very

3  upset when they found out we don't have wildfire

4  protection.  They send us a letter.  They almost

5  terminate our contract.  That's all I know about it.

6      Q.    Okay.  And are you saying that Leo

7  Rodriguez had placed wildfire coverage himself before

8  the transfer to Mr. Ship?

9      A.    No.

10     Q.    To your knowledge, he had not, correct?

11     A.    He has not because it's not required by SCE

12  at that time.

13     Q.    Okay.  So your position, at least from what

14  you know, is that Mr. Leo Rodriguez didn't make any

15  errors, correct?

16     A.    No, he did not make any error.

17     Q.    And Mr. -- you're saying Mr. Ship made

18  errors with respect to placing wildfire coverage or

19  failing to place wildfire coverage?

20     A.    Mr. Ship is not involved because he doesn't

21  know either.  But the person who signed the contract

22  with SCE should request and ask, Do we have that?  But

23  he signed without knowing we don't have.

24     Q.    Isn't it true that the lawyers for the

25  company reviewed the contract for SCE before it was

1   signed?

2      A.   Who review?  I don't understand what your

3   question is.

4      Q.   Isn't it true that the lawyers for the

5   company reviewed the SCE contract before it was

6   signed?

7      A.   The lawyer?

8      Q.   The lawyers.

9      A.   Yes and no.  If a person sign without

10  contacting the lawyer, that means he sign it on behalf

11  of his knowledge.  He did not discuss with anybody.

12  Not even me.  That's the frustration I have.

13     Q.   Okay.  And he -- and how much did Ronnie

14  Jordan make out of this signing of the contract?

15     A.   He didn't make any.  He -- it's his duty as

16  the CEO, he was paid 250,000 a year to do a job in

17  Mowbray's.  Why did he have to get extra money to sign

18  a contract?

19     Q.   How much are -- how much were you paid

20  during the course of your employment?

21     A.   I was pay first 100,000 a year.

22     Q.   100,000 a year?

23     A.   Yes.

24     Q.   Are you receiving any money now From

25  Mowbray's?

1    A.    No.

2    Q.    They're not paying you anything?

3    A.    No.

4    Q.    No retirement?

5    A.    No.

6    Q.    Okay.  Have you been promised anything for

7  your testimony in a certain manner?

8    A.    No.

9    Q.    So why are you piling on to Mr. Jordan?

10    A.    I'm not -- I'm not against him or whatever.

11  I'm telling you the truth what happened to Mowbray.  I

12  don't work for Mowbray's anymore.  But I have to tell

13  you the truth.  I can't lie to you.

14    Q.    Well, you could tell -- you could tell the

15  truth, and you can pick a version of the truth that

16  benefits Mowbray's, right?

17        MR. CHO:  Objection.  Argumentative.  Lacks

18  foundation.

19    Q.    Isn't that true, sir?

20    A.    I don't understand your question.

21    Q.    Well, for example, I asked you all about

22  this $500,000 invoice, Exhibit 46, and that version of

23  the truth puts all the blame on Mr. Jordan and none on

24  Anna Seing and none on yourself, correct?

25    A.    I'm just telling you the truth what is

1  going on.

2      Q.    No, sir.  You told me Anna Seing and your

3  version of the truth, didn't you?

4      A.    Yes.

5          MR. CHO:  Objection.  It's argumentative.

6  Lacks foundation.

7      Q.    In other words, Mr. Phang, you did not tell

8  us Mr. Jordan's version because you didn't talk to

9  him, correct?

10     A.    I did not talk to him.

11     Q.    Okay.  So you're picking and choosing the

12  version of the truth, true?

13         MR. CHO:  Objection.  Lacks foundation.

14  It's argumentative.

15         Go ahead and answer.

16     Q.    Go ahead.

17     A.    I don't know.

18     Q.    You don't know.

19         So let's go to number 2, and I want to ask

20  you about your version of the truth.

21         In version 2 -- in matter number 2, you're

22  saying you're blaming Mr. Jordan for 4 to 5 million

23  that Flexible withheld from Mowbray's under a claim

24  that Mr. Jordan had verified invoices that were to be

25  paid to GCL Land Company, correct?

1    A.    Yes.

2    Q.    And you told me all along that you didn't

3  sign a verification.  True so far?

4    A.    I did not.

5    Q.    And that to your knowledge, no one else.

6  You hadn't seen any -- a written verification anywhere

7  about this purported verification of these invoices,

8  correct?

9    A.    Yes.

10    Q.    Okay.  Yet you're concluding that somehow

11  Mr. Jordan is responsible for this, correct?

12    A.    Yes.

13    Q.    And even though there's no written

14  verification by Mr. Jordan, there's simply an

15  allegation by some lawyers in Exhibit 22, correct?

16    A.    No.  It was -- it was the letter you just

17  show me from Flexible Funding saying that Mr. Jordan

18  verified the invoice, not me.

19    Q.    Except, sir, you've told me repeatedly that

20  a verification by at least someone in accounting and

21  in business involves a written confirmation of an

22  obligation or contract, correct?

23    A.    I don't think so.

24    Q.    You don't think so.

25        So you think that the lawyers can simply

1  argue, well, Ronnie Jordan approved the invoice or

2  verified the invoice.  You think that holds up -- that

3  holds up to you?

4          MR. CHO:  Lacks foundation.  Calls for

5  speculation.  And it's argumentative.

6          Go ahead and answer.

7      A.    I guess so because otherwise they will have

8  defense on certain thing like, Alan, you verify the

9  invoice.  They -- they didn't say me, but they say,

10  Mr. Jordan.  Why do they say Mr. Jordan?  Tell me.

11     Q.    Well, I'll tell you.  Because they're

12  lying, that's why.  You know the version between

13  somebody telling the truth and someone telling a lie?

14  You do know there's a difference, don't you?

15     A.    I do.

16          MR. CHO:  Objection.  Lacks foundation.

17  It's argumentative.  It's irrelevant.

18          Go ahead and answer.

19          And I also need a break, Mr. Catanzarite,

20  whenever you get done with the line of questioning.

21          MR. CATANZARITE:  Sure.

22     Q.    Do you have the question in mind,

23  Mr. Phang?

24     A.    No, I don't have any question.

25     Q.    All right.  So we're talking about picking

1  versions of the truth.  That was our theme.  Okay?  So

2  I'm going to ask you a direct question.

3      A.    Okay.

4      Q.    It's true that -- that you're blaming

5  Mr. Jordan without investigating whether or not

6  Mr. Jordan actually verified an invoice as alleged in

7  the letter by the attorneys in Exhibit 22; isn't that

8  correct?

9      A.    Yes.  But I don't have to verify because it

10  is from the attorney on the Flexible because I told

11  them, You owe me the money.  They say, No, I don't owe

12  you the money.  Mr. Jordan verified it.  That's why I

13  believe them.  I -- I -- I need to get my money, so I

14  asked my attorney to sue them for that.

15          MR. CATANZARITE:  Move to strike everything

16  after "Yes."

17      Q.    Now I'm going to go to the $200,000.

18          Now, in the $200,000, you're placing blame

19  on Mr. Jordan because you're relying upon the belief

20  that when he told you to pay 200,000 for the

21  equipment, that the 200,000 would be free and clear.

22  He didn't use those words, did he?

23      A.    No, he did not.  But as a chief officer,

24  you instructed your people to buy something.  You

25  should have check it yourself, especially you buy it

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 70
Alan Phang, 09/29/2023

1  from your brother.  My friend, it's your brother.

2  It's not from somebody else.

3          MR. CATANZARITE:  Move to strike everything

4  after no he did not.

5      Q.   Now, we're down to number 4, the HUB

6  insurance issue.  Okay?  The HUB insurance protection

7  is really the wildfire issue.

8          You don't know whether or not the attorneys

9  reviewed the contract that Mr. Jordan signed, correct?

10     A.   I don't know.

11     Q.   Okay.  And yet you're blaming solely

12  Mr. Jordan, correct?

13     A.   I believe as an officer, when you sign a

14  contract, you got to understand what the requirement

15  is, and you got to discuss with at least some officer

16  of the company to find out if it is okay to sign.

17         MR. CATANZARITE:  Move to strike as

18  nonresponsive.

19     Q.   This is a yes-or-no question.

20         I asked you whether you knew.  That's a yes

21  or no.  Do you know whether or not that contract was

22  reviewed by the lawyers?

23     A.   I don't know.

24     Q.   Thank you.

25         MR. CATANZARITE:  Let's this take five.

1          MR. CHO:  Thank you.

2                  (Whereupon a recess was taken

3                  2:43 through 2:50.)

4     BY MR. CATANZARITE:

5      Q.    Okay, Mr. Phang, we're back on the record.

6             Mr. Phang, who handled the insurance

7     coverage for Mowbray's prior to Mr. Jordan coming on

8     board?

9      A.    I believe it is the CEO before and our

10    contract manager.

11     Q.    Okay.  So are you indicating that you had

12    no involvement with approving and paying for invoices

13    for coverage?

14     A.    I do.

15     Q.    You do.

16             Okay.  So tell me what your role was then

17    in the handling of insurance coverage prior to

18    Mr. Jordan becoming CEO.

19     A.    I was only paying the insurance premium

20    according to the agent submitting the invoice and

21    approved by the CEO.

22     Q.    Did you obtain the policies that

23    were purchased?

24     A.    Yes, I do.

25     Q.    You have the actual physical policies?

1    A.    Yes.

2    Q.    The complete physical policies.

3    A.    Yes.

4    Q.    In other words, you under -- you understand

5   there's a distinction between a physical policy of

6   insurance cover to cover with all of its attachments

7   and a certificate of insurance.

8    A.    I have both.

9    Q.    You had both.

10        So when Ronnie Jordan asked you for the

11   coverage, you would have had a file that contained all

12   these documents?

13    A.    I do.

14    Q.    Okay.  And are you familiar with an

15   insurance claim that was made based upon a wildfire

16   from 2015 or '16 that was resolved sometime after

17   Ronnie Jordan came on board?

18    A.    Yes.  I believe --

19    Q.    Okay.

20    A.    -- it's about 40 million.

21    Q.    Right.  And that coverage, was that a

22   wildfire?

23    A.    It's not a wildfire.  It's under general

24   liability of Mowbray Tree Service.

25    Q.    It was under general liability?

1    A.    Yes.

2    Q.    How much did they pay under general

3  liability?

4    A.    About 40 million.

5    Q.    They paid a $40 million claim under general

6  liability, not wildfire coverage?

7    A.    No.

8    Q.    Okay.  And then how did you -- then who

9  decided that wildfire coverage was needed?  How was

10  that communicated to Mowbray's?

11    A.    It was under Southern California new

12  contract, but I didn't know about it because I don't

13  review the contract before it signed.

14    Q.    Okay.  So was it -- was it something that

15  came -- some other announcement or anything that came

16  that said, Look it, we're not going to cover wildfires

17  under general liability anymore; we're going to insist

18  that you purchase wildfire coverage?  Where there --

19  was there a notice like that that came to Mowbray's?

20    A.    I don't know.  I'm not directly involved in

21  the contract issue with Southern California.  Our CEO

22  or contract manager or the owner might have.  I don't

23  know.  Can't answer you that.

24    Q.    Okay.  And did Mr. Rodriguez -- I'm sorry.

25  Did Mr. -- yeah.  Leo Rodriguez, yeah.  Did Leo

1 Rodriguez, did he inform you that there needed to be a

2 wildfire coverage?

3    A.    No.

4    Q.    Did Leo Rodriguez say -- ever say anything

5 about wildfire coverage?

6    A.    It does --

7        MR. CHO:  Vague as to -- objection.  Vague

8 as to time.

9        But go ahead and answer.

10   Q.    At any time.

11   A.    Yeah.  Yeah, it does.  But after we receive

12 a letter from Southern California Edison saying that

13 we don't have wildfire life insurance protection.

14   Q.    Uh-huh.  And was that a policy that

15 Mr. Rodriguez had placed or a policy that Mr. Ship had

16 placed?

17   A.    Mr. Rodriguez at that time.

18   Q.    Mr. Rodriguez.

19   A.    Yes.

20   Q.    And Mr. Rodriguez, I'm led to believe, has

21 quite a familiarity with these types of coverage,

22 right?

23   A.    Yes.

24   Q.    Or was he -- was he not generally aware of

25 the requirements for wildfire coverage?

1          MR. CHO:  Objection.  Lacks foundation.

2   Calls for speculation.

3          Answer if you know.

4     A.    My belief is Mr. Warrick was not --

5     Q.    Wait a minute.

6     A.    -- involved.

7     Q.    Wait a minute.  Wait a minute.  I want an

8   answer to the question, not -- not speculation.

9          To your knowledge, did he know?  That's a

10  yes or no.

11    A.    He doesn't know.

12    Q.    He doesn't know.  All right.

13         And -- but he's in the business, and he

14  notifies you later that, looky here, or something,

15  words to that effect, We should have had wildfire

16  coverage.

17         MR. CHO:  Objection.

18    Q.    Is that --

19         MR. CHO:  Lacks foundation.  Misstates

20  prior testimony.

21         Go ahead and answer if you understand.

22    A.    He, at the time in June, when we signed the

23  new insurance policy, SCE contract is still valid and

24  did not ask for wildfire.  But in December when they

25  ask for wildfire, Mr. Jordan signed a contract without

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE        Page 76
Alan Phang, 09/29/2023

1  checking with Mr. Rio to see if we have wildfire.

2  Mr. Rio told me at the time in June the SCE doesn't

3  require it, so he did not ask us to -- to purchase the

4  wildfire because it costs a lot of money.  You're

5  talking about $20 million extra.  So why do we buy it

6  if SCE don't request it?  But then at the end in

7  December, the new contract came in, and it -- and it

8  ask for it.  If Mr. Jordan have talked to Mr. Rio,

9  said, look, SCE need a wildfire.  Can we buy new

10 wildfire now?  He -- he might be assuming that we

11 already have wildfire.  We only have general

12 liability.  We don't have wildfire.  That make SCE

13 upset.  That's the facts I can tell you.  That's all I

14 know about it.

15      Q.    How much money was paid to SCE because it

16 didn't have wildfire coverage; do you know?

17           MR. CHO:  Lacks foundation.  Speculation.

18           Answer if you know.

19      A.    I know we did not pay anything.  All they

20 did is say, You must have wildfire protection and show

21 it to me before you continue our contract.  He did

22 not --

23      Q.    Okay.

24      A.    -- ask for money.

25      Q.    Okay.  And the contract continued, yes?

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 77
Alan Phang, 09/29/2023

1      A.    The contract continue, yes.

2      Q.    Okay.  So SCE wasn't damaged, correct?

3      A.    No.  But they --

4           MR. CHO:  Objection.  Lacks foundation.

5   Calls for speculation.

6           And I think you answered.  Go ahead.

7      A.    I don't --

8      Q.    And --

9      A.    -- think -- I don't --

10     Q.    Wait.

11     A.    I don't --

12     Q.    Wait a minute.  Wait.  Well, no question

13  pending.  You answered.

14          And the second question I have on that

15  subject is:  And Mowbray's wasn't damaged, correct?

16     A.    Yes.

17          MR. CHO:  Same objection.

18     Q.    Go ahead.

19     A.    Mowbray's is not damage.

20     Q.    Okay.  So if Mowbray's wasn't damaged and

21  SCE wasn't damaged, why are you complaining that this

22  is somehow a fault or problem for Mr. Jordan?

23          MR. CHO:  Objection.  Lacks foundation.

24  Calls for speculation.

25          Go ahead and answer.

1    A.    We are requested by our best customer,

2  they're saying we are violating the contract, which is

3  not a good thing.

4    Q.    Okay.  That's it, right?  That's all you

5  got.

6    A.    That's all I got.

7    Q.    Thank you.

8        Okay.  Let's change subjects.  I want to

9  ask a little bit about the financial condition of

10  Mowbray's in May of 2018.

11        Do you have an understanding of what the

12  financial condition of Mowbrays was in May of 2018?

13    A.    I don't remember that far away unless you

14  show me the financial, I might be able to understand.

15    Q.    I'm happy to do that.  And it was just --

16  but I was going to test your memory.

17    A.    Okay.

18    Q.    All right.  And I'm going to -- but I'm

19  going to show you a document.  Don't worry.  I have

20  one.

21    A.    Okay.

22    Q.    All right.  All right.  All right.  Here we

23  go.  I've just projected to the screen what I'll mark

24  in this deposition as Exhibit 2.  It is a --

25        MR. CATANZARITE:  We've used this before,

1   by the way, Stephen.

2       Q.    This is a multi-page document, and I -- if

3   you want me to go page by page so that you can take

4   your time and review it, I'm happy to do so.  I am

5   happy to send it to you.  I don't think I need to,

6   though, if you want to take a look.

7           Here's -- here's the very first page,

8   Monthly Payment Summary.

9                (Whereupon Exhibit 2, to be

10               later marked, was referenced.)

11      A.    Yes.

12      Q.    Do you recall preparing that?

13      A.    Yes, I do.

14      Q.    Okay.  In other words, everything that

15  appears on that page is your work; is that correct?

16      A.    Yes.

17      Q.    All right.  This says -- and it -- and it's

18  based upon, if I read this correctly, January of 2017

19  through August of 2017, as reflected in the summary at

20  the bottom of the page -- first page, correct?

21      A.    Yes.

22      Q.    Okay.  And at the top of -- top two-thirds

23  of the page, you have a summary of total vehicle

24  payments per month, 645,000; is that correct?

25      A.    Yes.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE                    Page 80
Alan Phang, 09/29/2023

1      Q.    You have a summary of total insurance

2  payments, 700,000 per month plus, correct?

3      A.    Yes.

4      Q.    And there's a payroll of 3.3 million,

5  roughly, correct?

6      A.    Yes.

7      Q.    And it says Credit Card Payments.  Now,

8  this is a pretty substantial amount of credit cards.

9           You don't have a personal credit card with

10  that kind of balance, do you?

11      A.    No.

12      Q.    Okay.  So that's quite a bit of money,

13  right, credit cards per month over 500,000, correct?

14      A.    Yes.

15      Q.    That's the people in the field that are

16  staying at various housing accommodations, correct?

17      A.    Yes.  Including the daily operating

18  expenses.

19      Q.    Yeah.  Okay.  And then we have fuel.

20           But the total -- you have a total -- grand

21  total monthly payments $6,452,529.40, and then you

22  say -- two asterisks, you say, "Our break-even point,"

23  and you say 6.5 per M per month.  That's 2.5 million

24  per month, correct?

25      A.    Yes.

1    Q.    Okay.  And is it fair to say that for

2  2000 -- all of 2017, there was a loss at Mowbray's?

3    A.    It was a loss, but at that point, we are

4  still okay.  In other word, in August of 2017, we kind

5  of ahead of the expenses by 2.6 million.

6    Q.    We're going to come to that.  Let's go to

7  the next page.

8    A.    Yes.

9    Q.    I understand your point.  I understand your

10  point though.  And so let's go to liabilities.

11        So I'm looking at total liabilities, at

12  least regarding equipment, property plant equipment,

13  it appears to be total owed on that of 35,900,000,

14  correct?

15    A.    Yes.

16    Q.    All right.  And that's where this 645,000

17  per month comes from, right?

18    A.    Yes.

19    Q.    Okay.  And when you left Mowbray's, how

20  much was owed on these types of items?

21    A.    I don't recall.

22    Q.    Don't recall?

23        Do you recall how much the monthly payments

24  were?

25    A.    Monthly payment, one -- I don't remember.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 82
Alan Phang, 09/29/2023

1    Q.    Was it more than 600,000?

2    A.    It can be.

3    Q.    Okay.  You mean it can -- your recollection

4  could be that it was that amount at the time you left

5  in May of 2023?

6    A.    It can be more; it can be less.  I -- I

7  couldn't recall that.

8    Q.    All right.  Let's go to 2018.

9        So 2018, there's payments roughly

10  600,000-plus again, correct?

11    A.    Yes.

12    Q.    And this shows a lower number.  You say

13  here that the breakeven is 6 million per month,

14  correct?

15    A.    Yes.

16    Q.    Now, did you -- was this prepared when you

17  met with Ronnie Jordan or a version of this presented

18  to him?

19    A.    I don't recall.  It might be requested by

20  Mr. Jordan from me and I produce this.  But I usually

21  produce this kind of statement and discuss with the

22  owner and the CEO and also the operation manager about

23  how the situation of the company from a financial

24  standpoint.

25    Q.    Okay.  All right.  So, the reason I ask is

1   because Mr. Jordan is there in May, and this has a run

2   of revenue through May.

3       A.   Yes.

4       Q.   But on this basis, it would be fair to say

5   Mowbray's is not doing so well.

6       A.   Yes.

7       Q.   On this basis, it would be fair to say that

8   Mowbray's is not able to pay its debts as they come

9   due, correct?

10      A.   Yes.

11      Q.   Now, then I have additional pages here in

12  Exhibit 2. I could try to get the whole page on here.

13          Okay.  So this is a comparison of January

14  to April 2018 and January to April 2017.  There's a

15  column for change and a change percent.

16          So looking at that first gross -- gross

17  income -- or total income January to April is 20

18  million, whereas January -- for '18, and for 2017,

19  it's 26 million, correct?

20      A.   Yes.

21      Q.   So you're off by 6 million.

22      A.   Yes.

23      Q.   Okay.  And then if we go down -- and

24  there's a rather -- and this was prepared, by the

25  way -- do you see in the upper left-hand corner, the

1  indication 9:18 a.m. on 5/9/2018?

2      A.    Yes.

3      Q.    Okay.  And it says "Accural basis"?

4      A.    Yes.

5      Q.    Oka.  Is it accurate to say you were the

6  one who was responsible for the chart of accounts?

7      A.    Yes.

8      Q.    In other words, you were the originator of

9  the chart of accounts or the holder of, shall we say,

10  the reclassification entries and the descriptions that

11  went with the chart of accounts?

12      A.    Yes.

13      Q.    Okay.  So is it accurate to say that the

14  entries that appear in this statement were at least

15  reviewed by you?

16      A.    Yes.

17      Q.    Okay.  So we come down here to profit and

18  loss previous year comparison, and according to this,

19  if I look at this bottom line, you see where in the

20  last third of the page it says, "Net ordinary income"

21  for 2018, that's year to date, for only four months,

22  roughly, according to this, $4,480,292 loss, correct?

23      A.    Yes.

24      Q.    And for the same period in 2017, the loss

25  had been 2,776,000, correct?

1    A.    Yes.

2    Q.    Okay.  So at the time Ronnie Jordan comes

3 to Mowbray's in May of 2018, Mowbray's is in a tough

4 financial spot, correct?

5    A.    Yes.  But that's the reason.

6    Q.    That's the reason he was brought over,

7 correct?

8    A.    No.

9    Q.    Oh.  He was brought over because he

10 happened to be available?  He was brought over because

11 he's handsome?  What was the reason he was brought

12 over?

13    A.    Because we need a CEO.  When --

14    Q.    Okay.

15    A.    -- Ryan Anderson retired in 2017, Mike Neal

16 was a temporary CEO, but we need a CEO full-time for

17 the company.  It can be Mr. Jordan.  It can be Ken.

18 It can be Alan Phang.  It can be somebody else.

19    Q.    Now, Mr. -- it could be Alan Phang?  You

20 were going to become CEO?

21    A.    If -- if they hire me, I'll do it.

22    Q.    Okay.  Did you put your hat in the ring, so

23 to speak?  Did you say, I'd like to be CEO?

24    A.    Nope.

25    Q.    Okay.  You feel you were as qualified as

1  Mr. Jordan to be CEO?

2      A.    No.

3      Q.    Okay.  Did you attend any meetings in 2018

4  where the subject of Mr. Jordan's compensation package

5  was discussed?

6      A.    No.

7      Q.    No?

8      A.    No.

9      Q.    Okay.  Did you ever hear reference to

10  Mr. Jordan receiving 10 percent of the profits?

11      A.    I do.

12      Q.    Okay.  When do you recall first hearing

13  that?

14      A.    I recalls hearing that from Mrs. GGloria

15  Mowbray, the owner of the company.  She discussed

16  everything with me.  And from that conversation, she

17  say that we never, never offer anybody any percentage

18  of a company nor profit sharing or whatever.  So she

19  say that she's not going to sign any contract that

20  stated this.  That's all she said to me.  Because I'm

21  a financial controller, that she need to inform me if

22  such thing happened.  But such thing did not happen.

23      Q.    So you're saying you believe Ms. GGloria

24  Mowbray when she said that no one had ever been paid a

25  percentage of the profits of the company, correct?

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 87
Alan Phang, 09/29/2023

1    A.    Yes.  I was there for 11 years and no such

2  thing has happened.

3    Q.    Well, that's not true, is it?

4    A.    Well, even the children didn't get any

5  percentage until the sales of the stock that from

6  GGloria to Robin.

7    Q.    So -- but you paid Mike Neal a percentage,

8  correct?

9    A.    No.  We pay him a salary.

10    Q.    I see.  So you're saying --

11    A.    My --

12    Q.    You're saying -- you're saying under oath

13  that Mike Neal wasn't to be paid a percentage of

14  profits, correct?

15    A.    No, I don't believe so.

16    Q.    Okay.  Well, wait a minute.  Which is it?

17  You just told me that you believe Gloria Mowbray when

18  she said to you -- I mean, she's alleged to have said

19  to you in substance and effect that Mowbray's had

20  never paid anyone a percentage of profits, right?

21    A.    Yes.

22    Q.    That's what you -- and then you told me

23  that, Gee, I believe that because I know for 12 years

24  no one was ever paid a percentage of profits, correct?

25    A.    Yes.

1    Q.   Okay.  And did Mike Neal sue the company

2 when he wasn't paid his percentage of profits?

3    A.   I don't recall that.  I don't remember.

4 They never discuss with me.

5    Q.   Then Mike Neal must have been paid his

6 percentage of profits, right?

7    A.   I don't --

8       MR. CHO:  Objection.  Lacks foundation.

9 Calls for speculation.

10      Answer if you know.

11    A.   I don't know.

12    Q.   Okay.  Do you know a gentleman named Dwight

13 Anderson?

14    A.   Yes.  He's my CEO for, I don't know, it's

15 four or five years.

16    Q.   Uh-huh.  And did he tell you that he agreed

17 to pay -- that he agreed to pay Mr. Neal two percent

18 of the profits?

19    A.   They didn't -- they did not discuss with

20 me.

21    Q.   Okay.  Here's Exhibit 34 that I published

22 to the screen.  This is June 3rd, 2016, a letter from

23 Dwight Anderson to Michael Neal.

24      Do you see that?

25       (Whereupon Exhibit 34, to be

1          later marked, was referenced.)

2     A.    Yes.

3     Q.    Okay.  Did you ever review this letter?

4     A.    No.

5     Q.    This letter says that Mr. Neal is going to

6  be paid a salary of $250,000.

7          Sound familiar?

8     A.    I don't recall that -- the amount.

9     Q.    Okay.  That was the same salary that you

10  all agreed to pay Mr. Jordan in 2018, correct?

11    A.    Yes.

12    Q.    Okay.  And then it says annual bonus.

13  "Annual bonus - 2 percent of the annual net profits

14  per the year-end P&L statement period."

15         So I read that correctly?

16    A.    Yes.

17    Q.    Okay.  So that's a percentage of the

18  profits of the company, the same as Mr. Jordan said

19  he's entitled to, correct?

20    A.    I don't know.  But I don't know this offer

21  because I'm not aware of this.  Nobody tell me about

22  this.

23    Q.    Okay.  Well, no one's telling you about it,

24  but you're seeing it, correct?

25    A.    I'm seeing it now that you show it to me.

1    Q.    Okay.  Do you know whether or not Mr. Neal

2  was paid his 2 percent?

3    A.    I don't think so.

4    Q.    Did Mowbray's renege on paying him his 2

5  percent?

6    A.    I don't know.

7    Q.    Or did Mowbray's not have any profit that

8  year?

9    A.    It might be no profit.  It might be --

10    Q.    There you go.

11          So now I'm coming to that, sir.  Now I'm

12  back to Exhibit 2.  Remember --

13    A.    Yes.

14    Q.    Remember, Exhibit 2, we showed that in

15  2017, there was no profit.  There's no profit in 2018.

16  That's when Neal's around, right?

17          And --

18    A.    Yeah.

19    Q.    -- do you know whether or not there was a

20  profit in 2016?

21    A.    No, there's no profit in 2016.  I know for

22  a fact.

23    Q.    All right.  So the truth of this is that

24  Ms. Gloria Mowbray just simply didn't expect there to

25  be any profit when -- when -- when there was an

1  authorization to pay Ronnie Jordan 10 percent of the

2  profits, right?

3          MR. CHO:  Objection.  Lacks foundation.

4  Calls for speculation

5          Answer if you know.

6      A.   I don't know.

7      Q.   Okay.  You don't know one way or the other,

8  right?

9      A.   I don't know.

10     Q.   All right.  Now, what I -- what I want to

11  get to is, after -- so for '16, '17, '18, the company

12  is losing money on a P&L basis, correct?

13     A.   Yes.

14     Q.   And in 2018, it's actually losing money on

15  a cash-flow basis because it's not covering its

16  breakeven that you outlined for us of 6 million a

17  month, correct?

18     A.   Yes.

19     Q.   All right.  Now, what happened after Ronnie

20  Jordan gets there?

21          MR. CHO:  Vague.  Ambiguous.

22          Go ahead and answer.

23     A.   Okay.  When Ronnie joined the company,

24  something happened because in 2016, we got fired by

25  Utility Tree Service as a contract -- subcontractor

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE         Page 92
Alan Phang, 09/29/2023

1  for Southern California Edison.  They fire us on June

2  of 2017 -- 2016.  So from 2016 to December of 2016, we

3  have no revenue from Southern California Edison, but

4  we keep our employee intact.  That's why in 2016, we

5  make a lot.  2000 -- no, 2017, I'm sorry.  And then

6  2018 in the first four month before Jordan came in, we

7  just started the new contract with SCE, and it start

8  growing, and it take time to train and grow and do a

9  lot of stuff.  So it's not in the positive way for

10  Mowbray.  But then after May, when Jordan came aboard,

11  everything changes, and we -- we moved forward to a

12  right direction.

13          I will give a little bit of credit to

14  Mr. Jordan for administration, but he's not the only

15  one who create all it.  It's Mowbray's.  All the

16  employee.

17      Q.    On a scale of one to ten, ten being the

18  most -- the highest contributor, when you said you

19  give them a little bit, what do you mean by a little

20  bit?  Do you mean five?  Do you mean seven?  Do you

21  mean what?

22      A.    I mean, probably five or six.

23      Q.    Okay.  Now, it's true that Mowbray's, while

24  Ronnie Jordan is CEO, had the greatest years that it

25  ever had historically.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 93
Alan Phang, 09/29/2023

1      A.    Yes.  Ken, you have to understand, when you

2  go to the right place at the right time, things

3  change.  I -- I -- you're smiling.  If I go to the --

4          MR. CATANZARITE:  Well -- well -- move to

5  just strike everything after --

6      A.    (Simultaneous speakers) --

7          MR. CATANZARITE:  Move to strike.

8      Q.    You can explain this at trial.  I've got to

9  move on.

10          MR. CATANZARITE:  Move to strike everything

11  else.

12      Q.    Okay.  So let me ask you to look at Exhibit

13  16.

14              (Whereupon Exhibit 16, to be

15              later marked, was referenced.)

16      A.    Okay.

17      Q.    Here's a -- this is a leadership team.

18  We've -- we've downloaded this 1/7 of '22.  "Our

19  leaders."  This is Ronnie Jordan leadership.

20          Have you ever seen the leader -- the "Meet

21  Our Team" reference that talks about Ronnie Jordan?

22      A.    I might.  I don't recall.

23      Q.    Okay.  So you don't know what -- you don't

24  have a specific recollection about Mr. Jordan's

25  achievements in the bark beetle project and the like,

1  correct?

2      A.    I don't know.  I don't know anything about

3  that.

4      Q.    Okay.  So that's Exhibit 16.  You don't

5  know anything about his background cited in Exhibit

6  16.

7      A.    No.

8      Q.    And I'm going to show you to place -- for

9  context, I'm going to show you Exhibit 19.  Exhibit 19

10  is an e-mail dated February 10, and it's -- but I

11  think you'll be able to tell me that it's 2000 --

12  you'll see it's Thursday, January -- see it right

13  here, it says --

14      A.    Yes.

15      Q.    -- Thursday, January 23rd, 2020.

16            Okay.  So I'm publishing Exhibit 19.  It

17  bears -- it's from Ricky Mowbray, who's Rick Mowbray's

18  son, correct?  You told us that?

19                (Whereupon Exhibit 19, to be

20                later marked, was referenced.)

21      A.    Yes.

22      Q.    And it's to a whole bunch of people.

23            Who are all these people?

24      A.    Based on my general foreman, my manager,

25  and I think I'm included in one of the recipient.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE        Page 95
Alan Phang, 09/29/2023

1    Q.    Mm-hmm.  And it says "All," and it says,

2   "As of this morning, Rick Mowbray is no longer

3   employed by the original Mowbray's Tree Service

4   Incorporated.  This is effective immediately."

5         Okay.  Have I read that correctly?

6    A.    Yes.

7    Q.    Okay.  Was this -- did -- was this a time

8   when there's a dispute between Rick Mowbray and Robin

9   and Ricky and potentially others at Mowbray's Tree

10  Service?

11   A.    I am not aware of that.

12   Q.    You're not aware of that?

13        Are you --

14   A.    Yeah.

15   Q.    Are you aware -- are you aware of a -- it

16  is a matter concerning a dispute with a tree service

17  company over a $4 million approximate invoice?

18   A.    No.

19   Q.    You don't recall a lawsuit over an unpaid

20  invoice from Mario's Tree service?

21   A.    Oh, I did, yes.

22   Q.    Okay.  And tell me what you recall about

23  that.

24   A.    Mario Tree Service sue us for an unpaid

25  invoice.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 96
Alan Phang, 09/29/2023

1      Q.    And Rick Mowbray didn't want to pay them,

2   correct?

3      A.    He indicate he doesn't want to pay, yes.

4      Q.    Okay.  And you shouldn't be paid because

5   you said there -- that you hadn't been paid on the

6   subcontract -- on the prime contract by which you

7   would felt there would be an obligation to pay them on

8   the subcontract; is that correct?

9      A.    Yes.

10     Q.    Okay.  And did you find out subsequently

11  that you were wrong?

12     A.    No.

13     Q.    In other words, you weren't wrong, that --

14  that -- that the prime had not paid the subcontract

15  amount so that you could pay the subcontractor; is

16  that correct?

17     A.    No.

18     Q.    That's not correct.

19     A.    No.

20     Q.    So I understand there was a lawsuit, and I

21  understand there was a settlement, correct?

22     A.    Yes.

23     Q.    And you were there when the case settled?

24     A.    Yes.

25     Q.    Okay.  And did you object and say, Gee, we

1  shouldn't pay them $4 million because we don't --

2  we -- we never got paid by the prime?

3      A.    The reason I agree with the 4 million is

4  there are invoices that we didn't get paid by Southern

5  California Edison, so I rejected those invoices.  But

6  they insist they want to get those money paid.  They

7  will over $5 million of invoices.  They claim that we

8  owe them.  And on top of that, they want interest, and

9  they want their attorney fees.  I rejected all of it.

10  I offered them to start with probably about $3 million

11  because I know there are some invoices are good, some

12  are bad.

13         The accounting department over there cannot

14  verify all the invoice to me, and when they submit

15  invoices to me, some of them is over a year.  I cannot

16  get the money from Southern California if the invoice

17  is over a year.

18         But do you understand?  They claim a lot of

19  money, but not all the money is true.  So I told them

20  this is what I can pay you.  That's why I sent the 4

21  million.

22      Q.    So in other words, you seem to be saying

23  that we did get paid.  We, Mowbray's, did get paid by

24  Southern California Edison on some of the Mario's Tree

25  Service work; is that correct?

1    A.    Yes.

2    Q.    Did you get paid in excess of $4 million?

3    A.    About -- about this -- the amount that I

4  offer them.

5    Q.    Okay.  And so you got paid from Southern

6  California Edison, and you agreed to pay about $4

7  million to Mario's Tree Service; is that correct?

8    A.    Yes.

9    Q.    Wasn't it -- wasn't it true that Rick

10  Mowbray didn't want to pay them anything because he

11  said you couldn't be paid on their work?

12    A.    Yes.

13    Q.    Was he correct?

14    A.    No.

15    Q.    Did you support him in his belief that you

16  could not be paid on their work, that is Rick

17  Mowbray's belief?

18    A.    No, I don't support him.

19    Q.    Did Ronnie Jordan, through those

20  negotiations regarding Mario's, get SCE to pay on what

21  you considered old invoices?

22    A.    I believe so, yes.

23    Q.    Okay.  So is it accurate to say that

24  Mowbray's Tree Service was paid on the invoices that

25  Mario's was contending it had not been paid on for its

1  subcontract work?

2      A.    Not all of it.  Some of it.

3      Q.    Would you say 90 percent of it?

4      A.    I'll -- I'll probably say 80 percent.

5      Q.    Okay.  And how much of that 80 percent was

6  a result of Ronnie Jordan's work?

7      A.    I -- I -- I don't know.  I can't tell you.

8  I -- we don't -- we don't measure by how much work you

9  do for the company.  You get paid on your payroll to

10 do a job.  Like me, I -- I work a lot, but I didn't

11 make sure how much I should get paid if I work this

12 much money, but I have a salary from the company.

13     Q.    Okay.  Let me -- let me ask you the

14 question a little bit differently.

15          What I meant to ask is, I didn't mean

16 Ronnie was getting the money.  Ronnie spoke to

17 Southern California Edison -- you agreed with this

18 statement -- and got some payments from the work

19 Mario's Tree Service had done that was, you felt, was

20 too old, correct?

21     A.    Yes.

22     Q.    And I'm just asking in a range or estimate,

23 was that half or more of the 4 million?

24     A.    A little bit more.

25     Q.    Thank you.

1          I'm going to show you -- I'm going to

2   publish Exhibit 27.  Exhibit 27 is a set of draft

3   financial statements for Mowbray's Tree Service for

4   the years ending December 31, 2019 and '18.

5          Have you ever seen a document like this,

6   sir?

7                (Whereupon Exhibit 27, to be

8                later marked, was referenced.)

9     A.    Of course.  This is my document.

10    Q.    Oh, it's your document.

11          So you -- you -- well, it says

12   "Accountant's Report."  So there's not an independent

13   accountant.  This is your accounting work, correct?

14    A.    No.  This is -- let me see.  This is a

15   review from our CPA, which sent it to me.

16    Q.    Correct.  And you confirm this, right?

17    A.    Yes.

18    Q.    Okay.  To your knowledge, were there

19   ever -- were there any material changes to this

20   Exhibit 27 presentation?

21    A.    I think there is a revise, I don't recall,

22   is because we invoice some fire work in January that

23   belonged to December of 2019 or '20.  I don't recall

24   that.  But to answer your question, there's some minor

25   changes.

1    Q.    Okay.  So I've got on the screen a page

2  from this report.  It is Bates page 74 -- Jordan 74.

3  It shows for 2018 income for the full year, gross

4  revenue of 92 million, correct?

5    A.    Yes.

6    Q.    And it shows income before taxes of

7  3,097,000.  Do you see that?

8    A.    Yes.

9    Q.    Okay.  And so you -- it's accurate to say

10  that after Mr. Jordan came on board in roughly the

11  beginning of June 2018, the Mowbray's company turned

12  around and actually made a profit for that year,

13  correct?

14    A.    Yes.

15    Q.    Then in 2019, the revenues doubled under

16  Mr. Jordan, CEO, work to 213 million, correct?

17    A.    Yes.

18    Q.    And the profits were 14,418,000, correct?

19    A.    Yes.

20    Q.    Okay.  And tell me, in the years that you

21  had been with Mowbray's, had its revenue ever exceeded

22  70 million?

23    A.    No.

24    Q.    Tell me what the highest -- prior to 2017,

25  which we saw earlier, what was the highest level of

1  revenue that Mowbray's had generated?

2      A.    I believe it's, like, 50-something million

3  before 2017, 2016.  That we -- we -- we did not become

4  a prime contractor from Southern California.  So we

5  only have, like, $15 million of subcontractor work

6  from UTS.  And we don't generate a lot of revenue.

7          All this revenue increases is because Rick

8  Mowbrays go out and get the job for us for PG&E and

9  APS.  APS is Arizona Public Services.  And then Mike

10  Neal also jump in and get us a contract for Pacific

11  Coast for Oregon and Utah, some of the work over

12  there.  So our revenue was kind of increased at the

13  time.

14      Q.    Uh-huh.

15      A.    Mr. Jordan kind of know PG&E and SCE also

16  jump in and contribute some of the revenue.  It's all

17  not by one person.  It's a group of people.  If you

18  don't do a good job for the customer, the customer

19  will not offer you the job or increase the job by

20  knowing who your CEO or CFO is.  It depend on how your

21  performance and then the -- they -- they do it for

22  you.

23          And in 2019, PG&E filed a bankruptcy.  They

24  owe me 10.2 million.  We stuck by the cash-flow issue;

25  however, a lot of -- I heard a lot of contractor tried

1  to run away from PG&E.  We did not.  We support them.

2  We told them, We'll work with you, even though you

3  file bankrupt.  So we continue to support them, so

4  they keep giving us more and more work from other

5  contractor who run away.  That's how our Mowbray's

6  Tree Service built on more and more revenue.

7      Q.    And that was Mr. Jordan's strategy,

8  correct?

9      A.    Not necessary.

10     Q.    What do you mean not necessarily?

11     A.    Because the --

12     Q.    Wait a minute.  Wait.  Wait a minute.  Wait

13  a minute.

14          He was the CEO, and that was his decision

15  to continue to work with PG&E post bankruptcy

16  petition, correct?

17     A.    Yes.  But it's a group decision.  We

18  discuss about this.  We, as a team of management team,

19  I offer -- I offer them some information.  My Chase

20  manager told me they give PG&E a lot of credit line

21  after the bankruptcy, like 5 billion.  So I was joking

22  with him and say, Why didn't you give me a billion

23  dollars?  I'll be, like, happy like hell.  But he say,

24  Go ahead and support them.  So I relayed the message

25  to a manage team -- management team that we should

1    support PG&E because they are filing Chapter 11, not

2    Chapter 7.  Chapter 11 is reorganization.  We will

3    probably get the money back in two years or maybe

4    three, but those money were coming back to us.

5            In the meantime, we need job, so we

6    continue to support them.  It's not like he make the

7    decision himself.  Everybody in the team, my manager,

8    I'm not sure what the -- this area manager of Southern

9    California Edison, Rick Mowbrays, operation, me,

10   finance, the owner, the CEO, we all sit down and talk

11   about this.

12           If you give the credit to just one person,

13   yes, he's the CEO.  He make the final decision, but we

14   all make the same decision.

15       Q.    Okay.  Let's look at Exhibit 28.  Publish

16   Exhibit 28.  This is Mowbrays Tree Service for

17   December 31, 2020.  That's the balance sheet.

18           Do you recall what the revenue was in 2020?

19                (Whereupon Exhibit 28, to be

20                later marked, was referenced.)

21       A.    2020.  We have over 400 million.  I think

22   it's about 450 or 470.  I don't recall that number.

23       Q.    470 --

24       A.    This is our history-breaking year for

25   Mowbray Tree Service.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE      Page 105
Alan Phang, 09/29/2023

1    Q.   Correct.  $472 million --

2    A.   Yeah.

3    Q.   -- correct?

4    A.   Yeah.  Yeah.  Yes.  470.

5    Q.   Profits were $69 million, correct?

6    A.   Yes.

7    Q.   Okay.  Now, I'm going to ask you a

8  question.  I want -- I want you to give me your best

9  recollection.

10        Did you ever discuss -- strike that.  I

11  want to go back now to the Gloria Mowbray discussion

12  that you claim occurred.

13        Place that in time for me, please.  What

14  year?

15    A.   2019?  The beginning of 2019?

16    Q.   Did you --

17    A.   I don't recall what exactly what date but

18  around that time.

19    Q.   Was it when -- let me see if you could

20  place it a little differently.

21        Was it when there was a tender of the -- of

22  a typewritten document?  And I'll show you the

23  document and see if you've ever seen it.

24        This document we'll publish as Exhibit 4,

25  the May 28, 2018 typewritten document, Employment

1  Contract, Ronnie Jordan, and Original Mowbray's Tree

2  Service.

3        Do you recall when that typewritten

4  document was handed or disclosed to the -- Gloria and

5  Robin, if you know?

6              (Whereupon Exhibit 4, to be

7              later marked, was referenced.)

8    A.   I don't know.

9    Q.   Okay.  Fair enough.

10        By the way, have you ever read this -- read

11  the sworn statement of Rick Mowbray?

12   A.   No.

13   Q.   Did you ever hear he gave his sworn

14  statement?

15   A.   No.

16   Q.   Okay.  Okay.  Let me go back to 28 now.

17        So for 28, that's the income.  Do you -- by

18  the way, do you know how much money distributions

19  Robin Mowbray took out of Mowbray's in 2019?

20   A.   I do not believe Robin get any

21  distribution.

22   Q.   Or Gloria?

23   A.   I -- I think -- I think she got

24  distribution in 2020, but those distribution to Gloria

25  and to Robin is for tax purpose because --

1    Q.    What tax was that?

2    A.    Because MTS, Mowbray Tree Service, was

3    subject S corporation.  All the profit go to the

4    individual tax return of the shareholder, which is the

5    owner.  And the shareholder have to fild a tax return,

6    and I file the tax return on behalf of them, and I

7    have to pay Franchise Tax Board and IRS money.

8        So when I -- when I post the entry from our

9    company bank to IRS, I have to post it as a

10    distribution to Mowbrays to either Robin or Gloria on

11    behalf of -- of their tax.  I do not write a check to

12    Robin, and say this is a distribution.  I did not

13    write a check to Gloria and say, Gloria, this is a

14    distribution.  All this money going to that -- to the

15    distribution is call tax distribution.

16        Do you understand, Mr. Ken?

17    Q.    Well, let me see if I understand it.  And

18    thank you for that.

19        Are you saying that you prepared the tax

20    returns for the company?

21    A.    Our CPA does, but they refer to me.  I give

22    them --

23    Q.    Okay.

24    A.    -- the information.

25    Q.    Got it.  And are you -- are you familiar

1  then with the personal tax returns of Gloria and

2  Robin?

3      A.    Yes.

4      Q.    Okay.  Did you do those returns perhaps?

5      A.    I do not, but the CPA does.

6      Q.    Okay.  Okay.  Yeah, so it would -- are you

7  familiar with the term marginal tax?

8      A.    No.

9      Q.    What is the highest tax rate a person pays

10  in the state of California, an individual?

11      A.    I don't recall that.

12      Q.    What is its highest federal rate?

13      A.    I think 48 percent.

14      Q.    Okay.  It sounds like that's the combined

15  amount.

16          The highest rate is 37 percent, and the

17  state rate is 11.

18          Does that refresh your recollection?

19      A.    Yes.  Around 48, yes.

20      Q.    Yeah.  So roughly -- roughly half the

21  profits would need to be paid in taxes, correct?

22      A.    Yes.  Unless --

23      Q.    So --

24      A.    Unless -- Mr. Ken, unless there are other

25  deduction that I don't even know, because CPA is

1  continue doing the tax return.  You have depreciation

2  of -- of certain things.  You have -- you have some

3  loss on investment.  I don't know those.  But you're

4  right, if the company makes 69 -- 69 million, those

5  pass to Mrs. Gloria, and Mrs. Gloria is supposed to

6  pay about, let's say, 70 is 35 million.  So it's about

7  30 to $35 million I need to pay.  And when the company

8  pay for those tax, I have to post it at distribution

9  to the owner, but not giving them cash or money.

10     Q.    Okay.  Let's just talk about the economics

11  then.

12          So I ask you a question.

13     A.    Yes.

14     Q.    So any deduction -- any deduction on the --

15  from -- on Mobray's in 2000 from it's profits in '18,

16  19, and '20, any of those deductions would result in

17  a deduction from the taxable income and would reduce

18  Gloria and Robin's taxes that would be otherwise about

19  50 percent, correct?

20     A.    Yes.

21     Q.    Okay.  So looking at 2020, Exhibit 28,

22  ordinary -- net ordinary income of $69,630,755, if

23  they paid Ronnie Jordan 10 percent of that, or

24  6,963,000, roughly -- roughly -- roughly $7 million,

25  they would have saved 3.5 million in tax, correct?

1      A.    If, yes.

2      Q.    Okay.  So now let's go to Exhibit 21.

3    Let's see, maybe I'm saying it wrong.  Exhibit 29.  So

4    I'm going to publish Exhibit 29.  This is -- Exhibit

5    20 -- Exhibit 29 is for 2021.  Marking this as Exhibit

6    29.  This is another one of -- and I should say,

7    Exhibit 20 -- Exhibit 28, which was the 2020 financial

8    statements, you prepared those as well, correct?

9                 (Whereupon Exhibit 29, to be

10                later marked, was referenced.)

11     A.    Yes.

12     Q.    And Exhibit 29, you prepared these as well,

13   correct?

14     A.    Yes.

15     Q.    All right.  And so when we look at Exhibit

16   29, and we look at this page, which is PO -- TOMTS --

17   I can hardly read it.  But it -- we'll just go to the

18   page that's the income statement -- profit and loss

19   statement.

20                And do you see it says, year to date, 284

21   million?

22     A.    Yes.

23     Q.    Okay.  So that was another terrific year,

24   Correct?

25     A.    Not if you compared to 2020.

1    Q.    Okay.  Fair enough.  You don't need to be

2  an accountant to know that, but you got me there.

3        Okay.  And so now I look at -- I look at

4  the EBITDA and EBIT.  And you have total operating

5  expenses.  You had earnings before depreciation,

6  interest, and taxes of $53,980,927.00, correct?

7    A.    Yes.

8    Q.    Okay.  And then you had deposition expense

9  quite significant, yes?  22 million?

10    A.    Yes.

11    Q.    So earnings before interest and taxes would

12  be 31,052,850, and net income would be 26,679,000,

13  correct?

14    A.    Yes.

15    Q.    This is the year they took out a bunch of

16  money, correct?

17    A.    I beg your pardon?  This is the year what?

18    Q.    They took out a bunch of money.  A lot of

19  distributions in '21 as well, correct?

20    A.    Yes.  Those are for tax.

21    Q.    Okay.

22    A.    But -- but, Mr. Ken, when you pay tax, it's

23  not in the operating P&L.  It only show in the balance

24  sheet because you pay tax.  It's not an operating

25  income or -- or expenses.

1    Q.    I understand.

2    A.    Okay.

3    Q.    I understand.

4    A.    Okay.

5    Q.    I understand.

6          So let's look at -- you raised a point.

7  Let's look at stockholders equity, right?  The

8  stockholders equity section --

9    A.    Yeah.

10   Q.    -- showed that -- and you have these handy

11 accounts, the GL, general ledger account,

12 39040-distributions-dash-Gloria, tax, $12,484,318,

13 correct?

14   A.    Right.

15   Q.    And you have the same type of category for

16 distributions, Robin tax, $21,598,025.

17         Have I read that correctly?

18   A.    Yes.

19   Q.    Okay.  And you have your net income number

20 on there.

21         But shareholder's equity is still $68

22 million, correct?

23   A.    Yes.

24   Q.    Now when I -- when I look at this, did you

25 write the checks yourself to Gloria for tax and Robin

 1  for tax?

 2      A.    No.  No.  We write --

 3      Q.    Did --

 4      A.    -- them to IRS and Franchise Tax Board.

 5      Q.    You're saying you actually wrote those

 6  checks out and sent the checks to those entities?  You

 7  didn't send any of the money to Robin or Gloria; is

 8  that correct?

 9      A.    Yes.

10      Q.    None of the money.  They didn't get a

11  penny.

12      A.    They get money from the payroll, not from

13  distribution.

14      Q.    Payroll only.  That's what you're saying.

15      A.    Yes.

16      Q.    And then 2020 -- and how much did they pay

17  themselves as wages then?

18      A.    I'm not sure.

19      Q.    Give me a range --

20      A.    I don't --

21      Q.    -- or estimate.

22      A.    I don't recall.

23      Q.    Give me a range or estimate, please.

24      A.    I don't recall.

25      Q.    You can certainly -- you're good with

1   numbers.  Everyone knows that.  So tell me -- give me

2   a range or estimate of how much they took.

3       A.   What year?

4       Q.   2020.

5       A.   2020.  I don't remember exactly.  I

6   couldn't remember.  Sorry.

7       Q.   Give me a range or estimate.

8       A.   I can't -- I -- I -- I don't remember.

9       Q.   Do they -- do they pay -- did Gloria, for

10  example, pay herself 5 million and Robin 5 million?

11      A.   No.

12      Q.   Am I warm?

13      A.   I -- I think you're saying too high.

14      Q.   What was it?  What was it 4 million apiece?

15      A.   No.  Not even that.

16      Q.   3 million?

17      A.   No.

18      Q.   I'm talking about each of them.

19      A.   I think it's less than a million.  I -- I

20  have to check the payroll, but I don't think so.

21           At that time, Robin have 51 percent of --

22  at the end of December 2020, Robin had 51 percent of

23  the share of Mowbray Tree Service, and I don't

24  remember her salary.  I don't remember Gloria salary,

25  but they all get salary from the company.

1    Q.    Including Rick, right?

2    A.    Yes, including Rick.

3    Q.    And by Rick, I mean the father of Ricky,

4  correct?

5    A.    Yes.

6    Q.    All right.  Were you around when there was

7  a discussion of paying Ronnie Jordan three and a half

8  million dollars?

9    A.    About what?  Why do we pay him three and a

10  half million?

11    Q.    I'm just asking you a question.

12          Here's the settlement agreement draft, and

13  it says you're going to pay -- Mowbray's going to pay

14  three and a half million dollars.

15          Do you see that?

16              (Whereupon Exhibit 30, to be

17              later marked, was referenced.)

18    A.    Yes, I did.

19    Q.    Okay.  Does that refresh your recollection

20  that there was a discussion of paying him three and a

21  half million dollars?

22    A.    Kind of remember now.  But I don't know if

23  that three and a half million including the two -- the

24  house and the two car or excluding.  I don't remember.

25    Q.    Okay.  Fair enough.

1    He was entitled to the Lucas Lane property,

2  correct?

3    MR. CHO:  Objection.  Lacks foundation.

4  Calls for speculation.

5    Go ahead and answer.

6    A.    Yes, if he fulfill his duty as the CEO for

7  three years.

8    Q.    Hmm.  You do the financial statements for

9  Mowbray's Waterman Properties?

10    A.    Yes.

11    Q.    So I'll call that MWP.

12    A.    Okay.

13    Q.    Okay?  Mowbray's Waterman's Properties, was

14  rent paid from -- rent paid from -- for the buildings

15  and land, was rent paid to Mowbray's Waterman

16  Properties from Mowbray's Tree Service?

17    A.    Yes.

18    Q.    Okay.  And do you know how much?

19    A.    No.  I don't remember.  I don't recall.

20    Q.    Okay.  Well, let's look and see if we

21  have -- do you recall what the gross revenue was of

22  Mowbray's Water -- Mowbray -- MWP was?

23    A.    The revenue is only generated like the rent

24  to Mowbray's because they bought the office, and we

25  rented a office, and I don't think there's other

1  revenue that the Waterman property generated.

2     Q.    Does the Waterman property also have a

3  lower floor that's leased to -- is leased to a

4  governmental entity?

5     A.    It's the -- it's the same building under

6  the -- the first floor, we rented to the county, and

7  the second floor is rented by us.

8     Q.    And how much -- how much does the county

9  pay in rent?

10    A.    Close to 35,000 a month.

11    Q.    Okay.  How long is that lease?

12    A.    Expire.  But they haven't renewed it yet

13  when I left.

14    Q.    Okay.  Was there negotiations to renew?

15    A.    Yes.  But county's very slow.

16    Q.    Okay.  And how much then was MTS paying to

17  MWP for the upper floor?

18    A.    I don't recall.  It cost me about 21,000, I

19  believe.

20    Q.    21,000?

21    A.    Yeah.

22    Q.    So did you ever put on a financial

23  statement what the value of that property was?

24    A.    From the Waterman property?

25    Q.    Yes, sir.

1    A.    It was -- it was purchased at 4.5 million.

2  I think that's the value.

3    Q.    Okay.  Yeah, I know it was purchased for

4  4.5 million, but --

5    A.    Yeah

6    Q.    But it was improved, then it was leased.

7         Did you ever value it on a financial

8  statement?

9    A.    No.

10   Q.    What is the value of it?

11   A.    I am not sure.

12   Q.    What's the -- what's the fair market value?

13   A.    I'm not sure.

14   Q.    How many square feet is the building?

15   A.    Those is about 30, 31,000 square feet.

16  Upstair is about 15,000 square feet, half -- half of

17  it.

18        But I was trying to refinance the property

19  when we have a cash-flow problem, but the bank that I

20  deal with is called Serial -- Serial (phonetic) Bank.

21  They're not going to refinance because the property is

22  not up a lot.  The property is, like, probably close

23  to what we bought, like, 4 -- 4.5.  So they couldn't

24  give me an estimate.

25        Initially, they told me they're going to be

1  about 6 million, but, no, after that, they said no,

2  it's not that number.  After they review all the rent,

3  all the income, and everything, they say, no, that

4  probably is not worth that much.  So they didn't give

5  me a refinance.

6      Q.    What's the -- what was the debt on it when

7  you left?

8      A.    I would say about 2.5 million from the 4 by

9  5.

10     Q.    Uh-huh.  I want to show you Exhibit 43.

11 Exhibit 43 is a list -- one-page list of various

12 Mowbray Waterman properties.

13              (Whereupon Exhibit 43, to be

14              later marked, was referenced.)

15     A.    Yes.

16     Q.    And you may -- you may know about these.

17          1515 Lucas Lane is the property that Ronnie

18 and his wife live in, correct?

19     A.    Yes.

20     Q.    686 East Mill is the commercial office

21 building that we've been talking about.

22     A.    Yes.

23     Q.    Had a downstairs -- the downstairs to the

24 county, upstairs to Mowbrays Tree Service.

25          Tell me about each of these other ones, if

1  you know them.

2        East Rialto Avenue, what is that?

3      A.    It was a piece of property next to the

4  Waterman property we have for years.  I told the

5  realtor to -- to investigate nearby the land.  I want

6  to buy all the land so I can build my office over

7  there.  But then the management, like, the owner, they

8  all tell me we're not going to build an office

9  building there.  We're going to buy an office

10  building.  That's why we buy 686.  Before we bought

11  this building, I bought all this land.

12      Q.    Oh, you bought it all.

13      A.    I mean, Waterman Property bought it all.

14      Q.    Right.  And Water -- and can you tell me if

15  you recall what these are, East Rialto Avenue since

16  you bought it?  How big a parcel is that?

17      A.    It's, like, half an acre, or an acre piece

18  of land.  It a vacant land.  And I bought it very

19  cheap because those land was inherited by the

20  ancestor, and they never use it.  And there's a lot of

21  homeless people there.  So I had my agent talk to them

22  to sell it to me so I can extend my yard for parking,

23  for purpose of my business.

24      Q.    How big is that site?

25      A.    There are several pieces together.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 121
Alan Phang, 09/29/2023

1  Probably about two acre.  Two to three acres.

2      Q.    And can you identify them on this sheet,

3  which ones they are?

4      A.    Yes.  So the East Rialto Avenue, the

5  Waterman Avenue, then the one that -- on the third one

6  say, Waterman, no address available, San Bernardino,

7  that one is a commercial vacant land.  And then --

8      Q.    When you say vacant land, right, vacant

9  land.

10     A.    Yeah.  Yeah, it's all vacant land.

11     Q.    How big a parcel is that one?

12     A.    Probably half an acre.  I -- I -- I -- I

13  can't recall that, but I know it's between an acre to

14  half an acre.

15     Q.    Okay.  San Felipe Road, what is that?

16     A.    It's the same vacant land near to my

17  Waterman property.

18     Q.    Okay.  How big is that?

19     A.    It probably half an acre.

20     Q.    Then you've got four Allen Street parcels.

21         Are those --

22     A.    That --

23     Q.    -- adjacent?

24     A.    No.

25     Q.    Go ahead.

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE        Page 122
Alan Phang, 09/29/2023

1      A.    That was -- that was a property we bought

2  to start a new company called Phoenix Tree --

3  Phoenix -- Phoenix Traffic Management Company.  We

4  form a new company to do work.  We lease it to the

5  Phoenix Tree Company to park their vehicles.  It's all

6  empty land.

7      Q.    How big is -- how big is the four in

8  combination?

9      A.    Two acres.

10      Q.    How much is paid on the lease?

11      A.    I don't remember.  I thing is $2 million,

12  something like that.

13      Q.    The lease -- okay.  Maybe you misunderstood

14  me.

15          How much is paid on the lease?

16      A.    Oh.  I don't recall.  I don't recall how

17  much we pay.

18      Q.    Well, Phoenix Tree Service is making the

19  payment, right?

20      A.    Yes.

21      Q.    Okay.  Now, do you guys -- did the

22  Mowbray's folks control Phoenix Tree Service?

23      A.    Yes.

24      Q.    Do they still own Phoenix Tree Service?

25      A.    Yes.

1    Q.    Okay.  And how much money does Phoenix Tree

2  Service make each year?

3    A.    When I left, it just started the business.

4  I'm not sure.

5    Q.    It just started?

6    A.    Yes.

7    Q.    Okay.  Okay.  Then you have Mowbray

8  Waterman -- you have -- you had a no address

9  available.

10        Is that adjacent to Allen Street?

11    A.    Yeah -- no.  That one is under Waterman --

12  Waterman Property, I believe.

13    Q.    No.  But I mean, is it close to Allen

14  Street?

15    A.    No, it's not.  It's on -- the 171 Waterman

16  Avenue, like, on the -- on the third and the fourth

17  one, those are all empty -- commercial empty land.

18    Q.    Okay.  How big a piece of -- parcel is

19  that?

20    A.    Half an acre to an acre.

21    Q.    Okay.  Did you ever evaluate -- or can you

22  tell me in your opinion, having been in the area for a

23  long time and worked having acquired these things for

24  the company, what are they worth?

25        MR. CHO:  Objection.  Lacks foundation.

 1   Calls for speculation.

 2          Answer if you know.

 3      A.   I don't know.

 4      Q.   You can't give me an estimate?

 5      A.   No.  I'm not a realtor.

 6      Q.   Well, I know you're not a realtor, but

 7   you're -- you're the guy who bought them, and you --

 8   you -- I would imagine you'd have some idea of what

 9   they'd be worth.

10      A.   I bought them for the purpose of business.

11   I don't bought them for the purpose of investment.  I

12   don't intend to sell them.  I just bought it to use.

13   So I don't care how much it's going to become.  Either

14   higher value or lower value doesn't matter to me.  It

15   matter to me is I need it.

16      Q.   Okay.  Then we have -- in Visalia, we have

17   a single-family residence.

18          Who lives there?

19      A.   Nobody live there.  We bought that property

20   for the office for my general foreman and my worker

21   that work around the area.  We also use that for

22   parking.

23      Q.   Also used for parking?

24          How much --

25      A.   Yeah.

1    Q.    -- did you pay for it?

2    A.    We pay cash for it.

3    Q.    Okay.  Go ahead -- so let's see.

4          How much did you pay for that property in

5    Visalia?

6    A.    The Visalia is -- I don't remember.  It's

7    about 250 to 300,000.

8    Q.    What year?

9    A.    Three years ago.

10   Q.    Any debt on that?

11   A.    21 -- no, cash.

12   Q.    Cash.  Is there any debt on any of the

13   vacant land we've talked about?

14   A.    No.  Except Allen Street and the Sacramento

15   one, the last one.  No, the last one, Sacramento, we

16   pay cash.

17   Q.    How much did you pay cash for that?

18   A.    I don't recall.  Probably over a million

19   dollars.

20   Q.    How big a parcel is that?

21   A.    Seven or eight acre.  I don't remember.

22   Q.    Eight acres?

23   A.    I -- I think so.  Approximately.  I don't

24   remember.

25         MR. CATANZARITE:  Okay.  Why don't we take

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE          Page 126
Alan Phang, 09/29/2023

1    10 minutes.  We've been going a while.

2          MR. CHO:  Thank you.

3          THE WITNESS:  Thank you.

4              (Whereupon a recess was taken

5              4:02 through 4:13.)

6              (Off-the-record discussion.)

7          MR. CATANZARITE:  All right.  So back on

8    the record.  I have no further questions of Mr. Phang,

9    and I do thank and appreciate his putting up with me

10   today.

11         THE WITNESS:  Thank you.

12         MR. CHO:  And I have no further -- and I

13   have no further questions.  And I also need a

14   transcript and exhibits, please.

15         THE COURT REPORTER:  All right, thank you.

16         MR. CATANZARITE:  And, Cindie, I'm going to

17   send you the exhibits then, right?

18         THE COURT REPORTER:  Yes, please.

19         MR. CATANZARITE:  I have them all on my

20   screen.  I'll just pick them off and send them to you.

21         THE COURT REPORTER:  That would be

22   wonderful.  Thank you.

23              (Whereupon the deposition

24              of ALAN PHANG, adjourned

25              at 4:13 p.m.)

RONNIE D. JORDAN vs THE ORIGINAL MOWBRAY'S TREE SERVICE      Page 127
Alan Phang, 09/29/2023

1  (Signature reserved.)

2      -oOo-



1          IN THE SUPERIOR COURT OF CALIFORNIA

2          FOR THE COUNTY OF SAN BERNARDINO

3    _____

4    RONNIE D. JORDAN, an          ) Case No. CIVSB2201281
     individual,                   )
5                                  )
                Plaintiff,         )
6                                  )
        vs.                        )
7                                  )
     THE ORIGINAL MOWBRAY'S TREE   )
8    SERVICE, INCORPORATED, et al., )
                                   )
9             Defendants.  )
     _____)
10

11          I, ALAN PHANG, state that I am the deponent

12   in the aforesaid deposition held on SEPTEMBER 29,

13   2023, that I have read the foregoing transcript of my

14   deposition, and that the foregoing is a true and

15   correct transcript of my testimony so given except as

16   I have so indicated on the errata sheets provided

17   herein.

18          I declare under the penalties of perjury of

19   the State of California that the foregoing is true and

20   correct.

21          _____
            ALAN PHANG
22

23

24   No corrections (please initial) _____

25   Number of errata sheets submitted _____ pages

1              DEPOSITION ERRATA SHEET

2   Page No. _____ Line No. _____

3   Change: _____

4   Page No. _____ Line No. _____

5   Change: _____

6   Page No. _____ Line No. _____

7   Change: _____

8   Page No. _____ Line No. _____

9   Change: _____

10  Page No. _____ Line No. _____

11  Change: _____

12  Page No. _____ Line No. _____

13  Change: _____

14  Page No. _____ Line No. _____

15  Change: _____

16  Page No. _____ Line No. _____

17  Change: _____

18  Page No. _____ Line No. _____

19  Change: _____

20  Page No. _____ Line No. _____

21  Change: _____

22

23

24          _____
            ALAN PHANG

25             Dated: _____

1          REPORTER'S CERTIFICATE

2

3          This is to certify that I, Cynthia A.
Kennedy, Registered Professional Reporter and
4  California Certified Shorthand Reporter, reported the
within and foregoing VIDEOCONFERENCE DEPOSITION of
5  ALAN PHANG, on FRIDAY, SEPTEMBER 29, 2023;

6          That the witness was first duly sworn by me;
that said examination was taken by me stenographically
7  and thereafter transcribed by me or under my
supervision; and that the transcript of the deposition
8  is a full, true, and correct transcript of said
witness, including all questions, answers, and
9  objections, if any, of counsel to the best of my
ability due to the nature of remote depositions and
10  the sometimes unpredictable audio malfunctions,
interruptions, and disturbances therefrom.

11
          I further certify that I am not a relative
12  or employee of counsel or any of the parties, nor am I
financially interested in the outcome of the cause.

13
          The dismantling, unsealing, or unbinding of
14  the original transcript will render the Deposition
Officer's Certificate null and void.

15
          IN WITNESS WHEREOF, I have set my hand this
16  19th day of October 2023.

17

18          _____

19          Cynthia A. Kennedy, CSR, RPR

20

21

22

23

24  NCRA Registered Professional Reporter
California Certified Shorthand Reporter No. 10415
25  License effective until November 30, 2024

**$**

**$10,000**
56:21

**$12**
22:1

**$12,484,318**
112:12

**$15**
102:5

**$2**
122:11

**$20**
76:5

**$200,000**
22:13 53:24 56:5 60:7
69:17,18

**$200.00**
40:1

**$21,598,025**
112:16

**$250,000**
89:6

**$3**
97:10

**$35**
109:7

**$4**
53:11 95:17 97:1 98:2,6

**$4,152,715.91**
47:12

**$4,480,292**
84:22

**$40**
73:5

**$472**
105:1

**$5**
22:4 97:7

**$500,000**
65:22

**$53,980,927.00**
111:6

**$6,452,529.40**
80:21

**$68**
112:21

**$69**
105:5

**$69,630,755**
109:22

**$7**
109:24

**$700,000**
40:2

**-**

**-ooo-**
6:4 127:2

**1**

**1**
31:12

**1/7**
93:18

**10**
22:1 37:2,5 86:10 91:1
94:10 109:23 126:1

**10.2**

102:24

**100,000**
64:21,22

**11**
87:1 104:1,2 108:17

**12**
87:23

**14**
30:21

**14,418,000**
101:18

**15**
14:16,17

**15,000**
118:16

**1515**
119:17

**16**
72:16 91:11 93:13,14
94:4,6

**17**
91:11

**171**
123:15

**18**
36:5 83:18 91:11 100:4
109:15

**19**
19:6 94:9,16,19 109:16

**1:05**
6:3

**2**

**2**
39:24 40:4 46:6 53:8

66:19,21 78:24 79:9
83:12 89:13 90:2,4,12,14

**2,776,000**
84:25

**2.5**
80:23 119:8

**2.6**
81:5

**20**
19:12 24:1 83:17 100:23
109:16 110:5,7

**200,000**
54:3 59:17,22 69:20,21

**2000**
11:20 14:2,3 81:2 92:5
94:11 109:15

**2007**
14:4

**2012**
12:25 13:1,3 35:20

**2015**
72:16

**2016**
88:22 90:20,21 91:24
92:2,4 102:3

**2017**
36:5 79:18,19 81:2,4
83:14,18 84:24 85:15
90:15 92:2,5 101:24
102:3

**2018**
11:20 16:13,14,15 19:6,
11,23 36:21 78:10,12
82:8,9 83:14 84:21 85:3
86:3 89:10 90:15 91:14
92:6 101:3,11 105:25

**2019**
19:12 24:1,2,8 61:20
62:15 100:4,23 101:15
102:23 105:15 106:19

**2020**
12:21 19:9,11,24 24:2
34:24 42:10 43:15 46:24
47:11 94:15 104:17,18,
21 106:24 109:21 110:7,
25 113:16 114:4,5,22

**2021**
110:5

**2023**
6:2 8:6 12:23 82:5

**21**
24:1,2 110:2 111:19
125:11

**21,000**
117:18,20

**213**
101:16

**22**
46:19,20,21 53:12 67:15
69:7 93:18 111:9

**23rd**
94:15

**24**
47:11

**250**
125:7

**250,000**
64:16

**26**
83:19

**26,679,000**
111:12

**27**
100:2,7,20

**28**
46:24 104:15,16,19
105:25 106:16,17 109:21
110:7

**284**
110:20

**29**
6:2 110:3,4,5,6,9,12,16

**2:43**
71:3

**2:50**
71:3

---

**3**

**3**
39:24 40:4 114:16

**3,097,000**
101:7

**3.3**
80:4

**3.5**
109:25

**30**
109:7 115:16 118:15

**300,000**
125:7

**31**
100:4 104:17

**31,000**
118:15

**31,052,850**
111:12

**34**
88:21,25

**35**
109:6

**35,000**
117:10

**35,900,000**
81:13

**37**
108:16

**39040-distributions-dash-gloria**
112:12

**3rd**
88:22

---

**4**

**4**
22:4 48:3 66:22 70:5
97:3,20 99:23 105:24
106:6 114:14 118:23
119:8

**4-million-plus**
47:25

**4.5**
118:1,4,23

**40**
72:20 73:4

**400**
104:21

**400,000**
59:16

**43**
119:10,11,13

**450**
104:22

**46**
30:22,24 39:14 42:18
45:8,12 65:22

**470**
104:22,23 105:4

**48**
108:13,19

**4:02**
126:5

**4:13**
126:5,25

---

**5**

**5**
34:24 66:22 103:21
114:10 119:9

**5/9/2018**
84:1

**50**
109:19

**50-something**
102:2

**500,000**
26:20 33:17 80:13

**51**
114:21,22

---

**6**

**6**
82:13 83:21 91:16 119:1

**6,963,000**
109:24

**6.5**
80:23

**600,000**
82:1

**600,000-plus**
82:10

**645,000**
79:24 81:16

**65**
8:15 12:23

**686**
119:20 120:10

**69**
109:4

---

**7**

**7**
104:2

**70**
101:22 109:6

**700,000**
80:2

**74**
101:2

---

**8**

**80**
27:20 31:18 99:4,5

**80-percent**
39:17

---

**9**

**90**
99:3

**92**
  101:4

**9:18**
  84:1

---

**A**

**A-L-A-N**
  6:16

**A-N-N-A**
  25:11

**a.m.**
  84:1

**ability**
  10:5

**able**
  46:20 78:14 83:8 94:11

**aboard**
  38:6 92:10

**about**
  8:10 9:10 10:13 12:21
  16:11 19:6 20:1,19 22:13
  24:16,17,19,23,24 25:9
  28:12 32:17 33:17 37:2
  38:3 39:25 40:22 42:10,
  20 43:11,18 48:19 53:7,
  22 54:19,25 55:17 57:4
  61:13 63:1,5 65:21 66:20
  67:7 68:25 72:20 73:4,12
  74:5 76:5,14 78:9 82:22
  89:21,23 93:21,24 94:2,5
  95:22 97:10 98:3,6
  103:18 104:11,22 109:6,
  10,18 114:18 115:9
  117:18 118:15,16 119:1,
  8,16,21,25 121:1 125:7,
  13

**accent**

40:23

**access**
  29:14

**accommodations**
  80:16

**according**
  71:20 84:18,22

**account**
  15:10 112:11

**accountant**
  14:23 15:3,4,6,7,8 16:1,
  2,5,8 48:17,25 100:13
  111:2

**Accountant's**
  100:12

**accounting**
  14:20,23 16:1,10,11,16,
  20 28:24 49:16 60:6
  67:20 97:13 100:13

**accounts**
  84:6,9,11 112:11

**accuracy**
  50:4

**Accural**
  84:3

**accurate**
  18:5 47:19 51:6 61:18
  84:5,13 98:23 101:9

**accusing**
  42:9

**achievements**
  93:25

**acknowledgement**
  7:23 49:12

**acquired**

123:23

**acre**
  120:17 121:1,12,13,14,
  19 123:20 125:21

**acres**
  121:1 122:9 125:22

**act**
  49:1,12

**action**
  8:23 9:1

**actual**
  71:25

**actually**
  31:16 59:20 69:6 91:14
  101:12 113:5

**additional**
  83:11

**address**
  121:6 123:8

**adjacent**
  121:23 123:10

**adjourned**
  126:24

**administration**
  92:14

**admit**
  44:17

**admonitions**
  8:18 9:23

**advance**
  39:17 52:25

**advances**
  47:16

**advice**
  10:20

**advised**
57:4

**affect**
10:5

**affidavit**
44:3

**after**
17:16 23:19,20,21,22
43:9 61:22 69:16 70:4
72:16 74:11 91:11,19
92:10 93:5 101:10
103:21 119:1,2

**afternoon**
6:13

**again**
13:15 17:12 20:20 82:10

**against**
7:8 20:6 21:8 24:4 39:17
53:11 65:10

**agency**
21:25

**agent**
21:17 27:22,23 62:9,17,
19,21,25 71:20 120:21

**aging**
39:16 49:2,4

**ago**
8:21 16:11 125:9

**agree**
58:17 60:23 97:3

**agreed**
88:16,17 89:10 98:6
99:17

**agreement**
26:8 54:6 55:24 115:12

**agreements**
55:20

**ahead**
19:21 21:21 26:22 27:13
34:10 35:3 42:3 45:17
48:14 49:21 53:4 55:16
57:14 58:6 60:4,12,13
61:5 66:15,16 68:6,18
74:9 75:21 77:6,18,25
81:5 91:22 103:24 116:5
121:25 125:3

**ain't**
49:17 51:4

**Alan**
6:5,16 15:1 20:10 43:3
48:9 68:8 85:18,19
126:24

**all**
8:4 11:12 13:23 15:11
19:13 21:7 22:20 23:17
25:7 27:25 30:16 31:2
35:13 39:13,25 40:4 41:8
42:17 46:6 48:24 49:15
50:3 51:16 53:6,18 55:18
63:5 65:21,23 67:2 68:25
72:6,11 75:12 76:13,19
78:4,6,18,22 79:17 81:2,
16 82:8,25 86:20 89:10
90:23 91:10,19 92:15
94:23 95:1 97:9,14,19
99:2 102:7,16 104:10,14
107:3,14 110:15 114:25
115:6 119:2,3 120:6,8,
11,12,13 121:10 122:5
123:17 126:7,15,19

**allegation**
46:11 67:15

**allege**
28:22

**alleged**
69:6 87:18

**Allen**
121:20 123:10,13 125:14

**allowed**
39:16 54:21

**almost**
23:1 63:4

**along**
67:2

**already**
30:12 34:11 38:8,11
39:10 45:19 49:22 76:11

**also**
12:8 17:7 40:15 57:3
68:19 82:22 102:10,15
117:2 124:21,23 126:13

**am**
7:7,16,20 8:10 11:14
36:16 37:6 79:4 95:11
114:12 118:11

**Amador**
57:1,4

**ambiguous**
35:2,7 91:21

**amount**
27:25 39:18 40:1 47:25
80:8 82:4 89:8 96:15
98:3 108:15

**an**
7:23 10:7 11:5,16 12:8
14:12 16:2 19:18 20:1
21:11 22:12 25:9,14,19,
21,24 26:5,8,12,19,23,25
27:5,18 29:10 32:14
38:7,18 39:16,17 42:8
46:11 48:25 49:3 57:8

62:21 67:14,21 69:6
70:13 72:14 75:7 78:11
90:25 94:10 95:19,24
96:7 100:12 108:10
111:2,24 118:24 120:8,9,
17 121:12,13,14,19
123:20 124:4

**ancestor**
120:20

**and**
6:14,20 7:7,9,14,22 8:17
9:8,18,25 10:13,15,18,24
11:1,7,16,20 12:8,22
13:4,15 14:2,18,21,23
15:11,17,19,24,25 16:16,
23 17:5,9,12,16,18,23
18:8,11,14,16,21 19:10,
18,21 20:9 21:2,13,14,
15,16 22:3,4,5,6,13,15,
16,17,18 23:1,7 24:1,2,7,
13,17,18,24 25:9,13,18
26:1,2,10,11,21,22 27:2,
13,18 28:1,5,11 29:9
30:1,7,8,13 31:14,24
32:2 33:8,13,16 34:2,10,
24 35:3,7 36:5,9,15,21,
25 37:1,7,10,12,14,21,24
38:1,7,11,19 39:1,2,4,20,
25 41:11 42:3,14,17,18
43:2,12,24 44:2,17,20
45:1,17 47:2,3,15,20
48:10,18,22 49:4,5,9,15,
16,21 50:18,25 51:4,13,
19,21,22 53:4,23,24
54:5,6,10,14,16 55:6,7,9,
10,16,19 56:2,3,12,25
57:3,6,14 58:2,6,15,16,
17,20 59:12,15,25 60:9,
12,18 61:5,12,18 62:8,
10,16,19 63:1,6,17,22
64:9,13 65:15,22,23,24

66:2,11,15,19 67:2,5,13,
20 68:5,6,13,18,19 69:21
70:11,15 71:9,12,20
72:7,14,21 73:8,24 74:9,
14,20 75:13,21,23 76:7,
20,25 77:6,8,14,15,20,25
78:15,18 79:2,4,17,22
80:4,7,19,21,23 81:1,10,
16,19 82:12,20,21,22
83:1,14,15,18,23,24
84:3,10,17,18,24 86:16
87:1,19,22 88:1,16 89:12
90:17 91:14,22 92:5,7,8,
11 93:25 94:8,10,22,25
95:1,8,9,22 96:1,4,10,20,
23,25 97:8,14 98:5,6
99:5,18,22 100:4,16
101:6,9,12,18,20 102:6,
8,9,10,11,15,16,21,23
103:4,6,7,14,22,24
104:10 105:22,23 106:1,
4,25 107:5,6,7,12,13,17,
25 108:1,16 109:5,7,16,
17,18 110:6,12,15,16,18,
20 111:3,4,6,8,11,12
112:10,15,19,25 113:4,6,
16 114:10,23 115:3,7,9,
12,14,20,23,24 116:5,15,
18,20,24,25 117:6,8,16
119:3,16,18 120:14,18,
20 121:2,7 123:1,16,23
124:7,20 125:14 126:9,
12,13,14,16,20

**Anderson**
17:9,17,20,21 18:14
38:25 85:15 88:13,23

**Anna**
25:11,12,13 26:17,19,21,
22 27:4,17 28:1,2,5 31:5,
15,24 41:17 42:13 43:6,
11,17 44:3 65:24 66:2

**announcement**
38:8 73:15

**annual**
89:12,13

**another**
8:21 16:9 28:15 35:14
110:6,23

**answer**
15:1 19:21 21:6 27:13
34:10 35:3,8 42:3 44:23
45:1,18,20,21 46:4 48:10
49:21 50:1,8 51:10,20
52:17 53:4 55:16 58:6
60:12 61:5 66:15 68:6,18
73:23 74:9 75:3,8,21
76:18 77:25 88:10 91:5,
22 100:24 116:5 124:2

**answered**
11:9 34:11 48:12 77:6,13

**any**
6:17 10:4,13,19 11:18,25
12:11,13 16:6 23:12
24:19,20 26:20 27:4,5
32:5,8 41:6 44:2 47:16,
20,24 50:4 52:7 53:17
55:13,19,24 58:22 62:11
63:14,16 64:15,24 67:6
68:24 74:10 86:3,17,19
87:4 90:7,25 100:19
106:20 109:14,16 113:7
125:10,12

**anybody**
64:11 86:17

**anymore**
29:15 37:20 56:16 65:12
73:17

**anyone**
10:15,18,19 17:6 24:14

32:11,13 38:2 43:21
87:20

**anything**
10:12 22:11,21 23:9 38:3
42:20 44:6 53:7,10 55:25
65:2,6 73:15 74:4 76:19
94:2,5 98:10

**anywhere**
67:6

**apiece**
114:14

**apparently**
58:17,20

**appear**
84:14

**appears**
79:15 81:13

**appreciate**
126:9

**approval**
25:15,17

**approve**
22:5,9 51:22,23,24

**approved**
22:10 25:14 27:5,6 49:13
68:1 71:21

**approving**
71:12

**approximate**
95:17

**Approximately**
125:23

**April**
12:25 13:2,3 83:14,17

**APS**

102:9

**AR**
21:12,25 27:19,22,23

**are**
7:6,14 8:14 10:4,7 12:11
21:9 23:10,24 27:15
32:20 33:14 35:12 37:19
40:15 46:20 48:15 49:9
57:17 63:6 64:19,24 65:9
71:11 72:14 77:21 78:1,2
80:15 81:3 94:23 95:13,
15 97:4,11,12 104:1
107:19,25 108:6,24
111:20 120:15,25 121:3,
21 123:17,24

**area**
104:8 123:22 124:21

**argue**
68:1

**argumentative**
27:11 58:5 60:11 65:17
66:5,14 68:5,17

**Arizona**
102:9

**around**
12:25 19:5 34:25 42:10
48:17 90:16 101:12
105:18 108:19 115:6
124:21

**as**
6:9 9:21 10:1 11:20 12:6,
18 15:3 16:1,5,8 20:21,
22 22:14 23:3 28:19
30:21 34:2,22 37:23,25
38:1,11,17,18,21 39:9,11
41:17 44:24 47:11 48:17,
18 49:16 51:23 52:20
57:11,12 58:1,2 64:15

69:6,23 70:13,17 74:7,8
78:24 79:19 83:8 85:25
89:18 91:25 95:2 103:18
105:24 107:9 110:5,8,12
111:19 113:17 116:6

**ask**
10:24 11:8 15:12 19:13
28:15 29:16 37:24 43:2,
17,21 49:5 52:1 61:25
62:1,2,14 63:22 66:19
69:2 75:24,25 76:3,8,24
78:9 82:25 93:12 99:13,
15 105:7 109:12

**asked**
10:1 11:23 15:13,19
27:18 31:6 46:17 60:7
65:21 69:14 70:20 72:10

**asking**
42:8 44:24 99:22 115:11

**Asplin**
9:3,6

**assisting**
47:3

**assuming**
76:10

**asterisks**
80:22

**at**
10:2 12:8,13 14:18 17:8
19:9 22:19 25:7,15 28:2
29:17,18,25 30:1 31:20
34:25 35:5,24 38:7 39:1,
20 40:6 46:9,17 51:25
53:12,18 59:20 61:19
62:18 63:12,13 67:20
70:15 74:10,17 75:22
76:2,6 79:19,22 80:16
81:2,3,11 82:4 83:16

84:14,19 85:2 93:2,8,12
95:9 102:12 104:15
109:8,21 110:15,16
111:3 112:6,7,24 114:21,
22 118:1 126:25

**attached**
40:3

**attachments**
72:6

**attend**
86:3

**attorney**
7:7,24 10:8 24:22,24
69:10,14 97:9

**attorneys**
10:13 24:19 69:7 70:8

**audio**
20:11 49:6

**August**
79:19 81:4

**authorization**
91:1

**available**
85:10 121:6 123:9

**Avenue**
120:2,15 121:4,5 123:16

**avoid**
21:24 58:2

**aware**
74:24 89:21 95:11,12,15

**away**
22:2,18 54:11 78:13
103:1,5

## B

**back**
13:14 14:1,2,3 20:25
21:2,5 39:13 41:8 43:2,
10 71:5 90:12 104:3,4
105:11 106:16 126:7

**background**
8:16 48:20 94:5

**backup**
26:20,25 28:3,11 31:25
32:2 43:3

**bad**
60:16 97:12

**balance**
47:12 53:12 80:10
104:17 111:23

**bank**
22:1 107:9 118:19,20

**bankrupt**
103:3

**bankruptcy**
51:14 53:15 102:23
103:15,21

**bark**
93:25

**based**
25:19,24 48:19 72:15
79:18 94:24

**basis**
46:11 83:4,7 84:3 91:12,
15

**Bates**
101:2

**be**
10:1 12:21 14:2,3 20:11,

14 23:2 24:9 25:3 27:9
30:24 33:25 38:16 40:1,
13 43:4 46:21 47:19 48:6
50:10 51:23 52:12,24,25
58:15 66:24 69:21 74:1
76:10 78:14 79:9 81:13
82:2,4,6,19 83:4,7 85:10,
17,18,19,23 86:1 87:13
88:25 89:6 90:9,25 93:14
94:11,19 96:4,7 97:22
98:11,16 100:7 103:23
104:19 106:6 108:21
109:18 110:9 111:1,12
115:16 118:25 119:13
124:9 126:21

**bears**
94:17

**became**
16:11,23

**because**
15:16,22 20:9 21:17,25
23:6,23 24:23 27:17,20,
24 29:14 38:4,25 39:7
41:4 42:23 43:1,4 48:4
51:13 52:12,13 54:8
57:7,23 58:24 60:19
62:13 63:11,20 66:8
68:7,11 69:9,10,19 73:12
76:4,15 83:1 85:9,10,13
86:20 87:23 89:21 91:15,
24 96:4 97:1,11 98:10
100:22 102:7 103:11
104:1 106:25 107:2
108:25 111:24 116:24
118:21 120:19

**become**
16:10 85:20 102:3
124:13

**becoming**
71:18

**been**
6:6,17 10:14 12:18 16:13
29:2 30:9,12 38:8,11
39:10 40:6 48:16,17
53:25 65:6 84:25 86:24
88:5 96:5 98:25 101:21
119:21 123:22 126:1

**beetle**
93:25

**before**
8:20 10:8 14:5 20:22
23:6 28:4 32:6 33:24
47:15 55:13 61:23 63:7,
25 64:5 71:9 73:13 76:21
78:25 92:6 101:6 102:3
111:5,11 120:10

**beg**
8:24 16:7 17:19 111:17

**begin**
25:7

**beginning**
25:8 38:5 101:11 105:15

**behalf**
23:4 32:13 64:10 107:6,
11

**being**
9:6 37:17 41:18 46:1
60:1 92:17

**belief**
69:19 75:4 98:15,17

**believe**
14:16 19:9 24:1 41:19
42:14 51:21 53:16 59:14
62:15 69:13 70:13 71:9
72:18 74:20 86:23 87:15,
17,23 98:22 102:2
106:20 117:19 123:12

**belong**
57:7

**belonged**
100:23

**benefit**
58:12

**benefits**
65:16

**Bernardino**
121:6

**best**
11:14,19 12:1 29:7 78:1
105:8

**better**
13:15 20:11 21:24

**between**
11:15,20 34:1 68:12 72:5
95:8 121:13

**big**
120:16,24 121:11,18
122:7 123:18 125:20

**bill**
39:24 40:10,11,15,16,17,
18 54:6,21

**billed**
31:16

**billing**
21:10,13 25:18,19 26:10,
11 28:25 31:24 39:23
40:6 54:17

**billion**
103:21,22

**bit**
13:14 20:23 78:9 80:12
92:13,19,20 99:14,24

**blame**
53:24 65:23 69:18

**blaming**
66:22 69:4 70:11

**blank**
33:19

**board**
39:7 71:8 72:17 101:10
107:7 113:4

**bonus**
89:12,13

**boss**
24:10 27:15 51:2 54:9
57:17 58:24 59:5 60:20

**both**
22:15 26:3 72:8,9

**bottom**
79:20 84:19

**bought**
56:7 57:24 116:24
118:23 120:10,11,12,13,
16,18 122:1 124:7,10,11,
12,19

**breach**
9:18

**break**
11:6,7 20:8 30:2,5 68:19

**break-even**
80:22

**breakeven**
82:13 91:16

**briefly**
30:7

**brother**
22:15 57:8,9,25 58:11
70:1

**brought**
85:6,9,10,11

**build**
33:6 120:6,8

**building**
39:23 117:5 118:14
119:21 120:9,10,11

**buildings**
116:14

**built**
103:6

**bunch**
94:22 111:15,18

**bundle**
40:12,13,18,22

**business**
20:3 67:21 75:13 120:23
123:3 124:10

**but**
8:9 10:14 11:13 16:20
19:21 20:5,23 21:16
22:16 24:16,21 26:18
27:15 28:7,18,19 31:20
33:3,14,23 35:13 38:15,
17,24 39:3,6,9,24 40:9
41:20 42:5,6 43:7 44:23
47:9 48:12 51:2 52:19,20
55:12,24,25 56:7,23
57:11,18,21,22,24 59:10,
22,25 60:14,23 61:21
62:24 63:21,22 65:12
68:9 69:9,23 73:12 74:9,
11 75:13,24 76:6 77:3
78:16,18 80:20 81:3
82:20 83:4 85:5,16 86:22
87:7 89:20,24 92:3,10,14
94:10 97:5,18,19 99:10,
12 100:24 103:17,23

104:4,13 105:17 106:24
107:21 108:5 109:3,9
110:17 111:2,22 112:21
114:20,25 115:22
117:12,15 118:4,6,18,19
119:1 120:7 121:13
123:13 124:6

**buy**
36:7 54:10 55:13,24
57:21 58:11 59:5 60:16,
21 62:10 69:24,25 76:5,9
120:6,9,10

**buying**
55:17 59:17

**by**
6:6,12,17 7:17 8:5 12:24
20:17 21:8,15 22:10,14
23:2 26:2 27:2,5,7,17
28:10 30:19 31:5,15 32:3
34:1,3 38:14,16,20 42:13
43:6,7 44:20 45:3,8,12
46:16 51:6 52:8,14,23
53:10 57:10,22 61:13
62:20 63:11 67:14,15,20
69:7 70:22 71:4,21 78:1
79:1,3 81:5 82:19 83:21,
24 84:15 91:24 92:19
95:3 96:6 97:2,4,23 99:8
102:17,19,24 106:10,17
115:3 117:7 119:8
120:19

---

# C

**C-H-O-N-G**
6:19

**California**
9:20 26:2,7 31:17 33:1,6,
21 34:3 39:22 44:21
45:11 61:14,22,25 62:14

63:2 73:11,21 74:12
92:1,3 97:5,16,24 98:6
99:17 102:4 104:9
108:10

**call**
10:18 30:6,7,8 35:14
37:1 107:15 116:11

**called**
9:3 17:22 33:1 35:13
40:19 118:20 122:2

**Calls**
27:11 45:15 46:3 48:11
50:7 51:9,19 52:16 61:4
68:4 75:2 77:5,24 88:9
91:4 116:4 124:1

**came**
25:13 39:15 41:4 72:17
73:15,19 76:7 92:6,10
101:10

**can**
9:13,15 19:21 20:8,10
23:10 27:13 29:16,18,19,
20,21,22 30:8,14 31:17
33:6,25 40:1,13 41:16
48:10 51:21 55:25 57:10
65:15 67:25 76:9,13 79:3
82:2,3,6 85:17,18 93:8
97:20 110:17 113:25
120:6,14,22 121:2
123:21

**can't**
11:19,25 24:9 59:4,6
65:13 73:23 99:7 114:8
121:13 124:4

**Cannon**
39:6

**cannot**
9:13 24:10 29:14 56:11

97:13,15

**Cantonese**
41:3

**capital**
32:21 33:9

**car**
115:24

**card**
80:7,9

**cards**
80:8,13

**care**
124:13

**case**
7:8 8:22 9:9,12,16 29:2
62:24 96:23

**cases**
56:2,3

**cash**
56:7 57:10 109:9 125:2,
11,12,16,17

**cash-flow**
91:15 102:24 118:19

**Catanzarite**
6:12 7:6,7 13:21 14:9
20:13,17 21:1 29:22
30:4,15,19 34:11,16 43:8
45:19,23 49:22,25 68:19,
21 69:15 70:3,17,25 71:4
78:25 93:4,7,10 125:25
126:7,16,19

**category**
112:15

**caught**
21:13,16 44:20

**cause**
20:11 23:1

**CEO**
12:6 17:7,8,10,11,12,15,
22 20:22 23:3 27:18
35:24 37:23,25 38:1,12,
21,24 39:1,2,5,11 42:9
43:7 47:19 51:23 64:16
71:9,18,21 73:21 82:22
85:13,16,20,23 86:1
88:14 92:24 101:16
102:20 103:14 104:10,13
116:6

**certain**
48:25 55:25 65:7 68:8
109:2

**certainly**
113:25

**certificate**
72:7

**Certified**
6:7

**CFO**
12:18,21 48:18 51:24
102:20

**change**
16:5,8 78:8 83:15 93:3

**changed**
17:9

**changes**
16:9 92:11 100:19,25

**Chapter**
104:1,2

**chart**
84:6,9,11

**Chase**
103:19

**cheap**
120:19

**check**
30:12 54:3 55:6,9 57:18
58:21 62:22 69:25
107:11,13 114:20

**checking**
62:17 76:1

**checks**
112:25 113:6

**chief**
12:19 15:4,6 48:17 69:23

**children**
87:4

**Chinese**
41:2,3 50:12

**Cho**
7:20,21,24 8:4 9:5 10:8,
13,15,17,21 13:20 14:11
15:1,7 18:3 19:20 20:8
24:22 27:10 29:24 30:11,
16 34:6,14 35:1,7 42:2
45:15 46:2 47:4 48:8
49:20 50:6 51:8,18 52:15
53:3 55:15 58:4 60:3,10
61:3 65:17 66:5,13 68:4,
16 71:1 74:7 75:1,17,19
76:17 77:4,17,23 88:8
91:3,21 116:3 123:25
126:2,12

**Chong**
6:19

**choosing**
66:11

**Cindie**
20:25 21:1 34:12 45:19
49:23 126:16

**cited**
94:5

**claim**
29:6 50:22,24 53:12,14,
17 66:23 72:15 73:5
97:7,18 105:12

**clarification**
13:8 14:25 29:4 40:21

**clean**
44:25 52:1 57:10,15 59:6

**clear**
39:10 55:9 69:21

**clerk**
25:10

**close**
13:13 22:3 117:10
118:22 123:13

**Coast**
102:11

**collect**
21:11 31:18 51:13

**collection**
21:25

**column**
32:19 83:15

**combination**
122:8

**combined**
108:14

**come**
10:19 15:18 22:18 28:9
36:7 38:5 43:2 56:12
81:6 83:8 84:17

**comes**
81:17 85:2

**coming**
13:4 71:7 90:11 104:4

**comment**
20:18

**commercial**
119:20 121:7 123:17

**communicated**
73:10

**company**
9:3,6 15:16 17:4,7,22
21:13,18,24 22:3 27:20
34:25 35:6 36:14 37:1,24
38:24 39:2 43:14 46:14
48:4 49:3 56:12 57:12,22
61:15,19 63:25 64:5
66:25 70:16 82:23 85:17
86:15,18,25 88:1 89:18
91:11,23 95:17 99:9,12
101:11 107:9,20 109:4,7
114:25 122:2,3,4,5
123:24

**compared**
110:25

**comparison**
83:13 84:18

**compensation**
86:4

**complaining**
77:21

**complete**
6:14 72:2

**completed**
26:1 34:1

**concerning**
95:16

**concluding**
67:10

**conclusion**
51:19

**concurrence**
33:25

**condition**
78:9,12

**conducting**
37:22

**conference**
37:1,2,9

**confirm**
48:25 100:16

**confirmation**
67:21

**confirmed**
34:2

**confront**
24:8,9

**connect**
20:10

**considered**
98:21

**consists**
39:25

**constantly**
24:23

**constitute**
52:22

**contacting**
64:10

**contained**
72:11

**contending**
98:25

**context**
94:9

**continue**
30:1 40:17 76:21 77:1
103:3,15 104:6 109:1

**continued**
76:25

**contract**
9:18 22:24 23:2,3,6
32:25 33:5,7,20 61:14
62:14,16,22,24 63:1,5,
21,25 64:5,14,18 67:22
70:9,14,21 71:10 73:12,
13,21,22 75:23,25 76:7,
21,25 77:1 78:2 86:19
91:25 92:7 96:6 102:10
106:1

**contractor**
9:21 102:4,25 103:5

**contracts**
23:6 61:20

**contribute**
102:16

**contributor**
92:18

**control**
122:22

**controller**
12:15,16 16:14,15,23
48:18 86:21

**conversation**
86:16

**cooperation**
26:6

**cooperatively**
27:7

**copy**
28:19 29:12,13

**corner**
83:25

**Corona**
13:7,11,18

**corporate**
24:22

**corporation**
107:3

**correct**
8:2,6 19:24 24:5 26:13
27:24 28:4 29:7 31:7,22
34:4 37:8 38:9,12,14
39:11,18 42:15 43:4,25
44:4,7,18 45:4,9,13
46:11,14 47:4 48:6,20
49:13 50:16 52:8,14 53:1
54:1 55:1 56:3,6 58:13,
23 59:13,23 60:2 61:2,16
63:10,15 65:24 66:9,25
67:8,11,15,22 69:8 70:9,
12 77:2,15 79:15,20,24
80:2,5,13,16,24 81:14
82:10,14 83:9,19 84:22,
25 85:4,7 86:25 87:8,14,
24 89:10,19,24 91:12,17
94:1,18 96:2,8,16,18,21
97:25 98:7,13 99:20
100:13,16 101:4,13,16,
18 103:8,16 105:1,3,5
108:21 109:19,25 110:8,
13,24 111:6,13,16,19
112:13,22 113:8 115:4
116:2 119:18

**correctly**
47:21 79:18 89:15 95:5
112:17

**cost**
117:18

**costs**
76:4

**could**
30:5,6,7 59:2 60:24,25
65:14 82:4 83:12 85:19
96:15 98:16 105:19

**couldn't**
82:7 98:11 114:6 118:23

**counter**
9:17,19

**county**
48:4 49:4 52:7 117:6,8
119:24

**county's**
117:15

**couple**
9:10

**course**
10:20,23 11:13 23:25
64:20 100:9

**court**
9:4 13:8 14:25 21:4 29:4
34:13 40:21 45:21 49:24
126:15,18,21

**cover**
72:6 73:16

**coverage**
61:15,16,19 62:12,23
63:7,18,19 71:7,13,17
72:11,21 73:6,9,18 74:2,
5,21,25 75:16 76:16

**covering**
91:15

**CPA**

100:15 107:21 108:5,25

**create**
25:19,21,22,24 92:15

**created**
31:15

**credit**
22:2 80:7,8,9,13 92:13
103:20 104:12

**crew**
20:3 31:12,25 33:11,12,
13,14

**crews**
33:14

**crosstalk**
29:1

**crying**
21:15 28:5 41:19

**current**
60:18

**customer**
62:22 78:1 102:18

**cut**
54:3

---

**D**

---

**daily**
80:17

**damage**
77:19

**damaged**
77:2,15,20,21

**date**
84:21 105:17 110:20

**dated**
46:24 94:10

**day**
19:16

**deal**
21:18 22:3 59:13 118:20

**debt**
47:25 58:22 119:6
125:10,12

**debts**
83:8

**December**
46:24 47:11 75:24 76:7
92:2 100:4,23 104:17
114:22

**decide**
39:7 58:16

**decided**
73:9

**decision**
39:4 103:14,17 104:7,13,
14

**deduction**
108:25 109:14,17

**deductions**
109:16

**deep**
60:17

**defendants**
7:12

**defense**
68:8

**defenses**
47:20

**delete**
28:18 42:25

**deleted**

28:17

**department**
25:18,19 26:11 28:24,25
97:13

**depend**
40:2,11 102:20

**deposition**
7:24 8:19,21 9:8 10:9
11:13 30:21 78:24 111:8
126:23

**depreciation**
109:1 111:5

**describe**
33:22

**description**
32:18,20

**descriptions**
84:10

**detail**
21:14

**detector**
41:25

**determine**
47:23 59:8

**devil**
27:8 46:1

**did**
10:18 12:13,22 13:5
14:5,15 15:14 16:3,5,8,
21,24 17:5 19:3,5,10
20:6,19 21:2 22:8,16,17,
19 23:12,14,15,18 24:4,
7,8,9,17,18 27:8 28:9,13,
14 32:11,13 35:21 36:1,
3,15,17,20 37:7 38:2,19
41:16 42:17,19,23 43:13,
17,21 44:20 46:14,16

47:6,23 49:16,18,22
52:19 53:10,14,17 54:4,
5,8,14,15,16 55:6,14,17,
19,22,23,24 56:13,14
57:23 58:17 59:3,8,11,
15,19 60:14 61:16,25
62:11,24 63:16 64:11,13,
17 66:7,10 67:4 69:22,23
70:4 71:22 73:2,8,24,25
74:1,4 75:9,24 76:3,19,
20,21 82:16 85:22,23
86:3,9,22 88:1,16,19
89:3 90:4,7 95:7,21
96:10,25 97:23 98:2,15,
19 102:3 103:1 105:10,
16 106:13 107:12 108:4
112:24 113:3,16 114:9
115:18 117:22 118:7
122:21 123:21 125:1,4,
17

**didn't**
14:8 38:23 43:24 44:2,6,
11 50:13,25 51:13,22
52:12 55:8 56:8 61:19
63:14 64:15 66:3,8 67:2
68:9 69:22 73:12 76:16
87:4 88:19 90:24 96:1
97:4 98:10 99:10,15
103:22 113:7,10 119:4

**difference**
11:15 68:14

**differently**
99:14 105:20

**Dimas**
14:7,11

**direct**
69:2

**direction**
92:12

**directly**
73:20

**director**
39:8

**disclosed**
106:4

**discuss**
10:9 23:12,15,18,23
24:17 64:11 70:15 82:21
88:4,19 103:18 105:10

**discussed**
86:5,15

**discussion**
23:4 61:13 105:11 115:7,
20 126:6

**disposition**
9:11,15

**dispute**
95:8,16

**disruption**
35:5

**distinction**
72:5

**distortion**
49:6

**distribution**
106:21,24 107:10,12,14,
15 109:8 113:13

**distributions**
106:18 111:19 112:16

**do**
7:11,13,22 9:11,22 10:11
11:3,15,17 12:3,4,5,11
14:9 18:9,25 19:2,7,17,
18 20:1 21:1,11,16,25
23:7 25:21,22 26:19,24,

25 27:14,15,18,24 28:7,
10 29:12,14,18,20 30:1,
2,14,15,23 31:1 32:3,22
34:13 35:10 36:4,13,22,
23 37:17 41:1,24 42:16
44:6 45:25 46:10 47:13
49:24 51:24 52:20 54:5
57:18,23 58:25 59:5,7
60:20 61:8,21 62:3 63:22
64:16 68:10,14,15,22
70:21 71:14,15,24 72:13
76:5,16 78:11,15 79:4,
12,13 80:10 81:23 83:25
85:21 86:11,12 88:12,24
90:1,19 92:8,19,20 97:18
99:9,10 101:7 102:18,21
103:10 104:18 106:3,17,
18,20 107:11,16 108:4,5
110:20 114:9 115:9,15
116:8,18,21 122:4,21,24
126:9

**document**
31:25 32:2 78:19 79:2
100:5,9,10 105:22,23,24,
25 106:4

**documents**
72:12

**does**
28:20 29:6 32:24 33:10
36:9 47:7 48:25 59:10
74:6,11 107:21 108:5,18
115:19 117:2,8 123:1

**doesn't**
27:3 33:24 38:5 63:20
75:11,12 76:2 96:3
124:14

**doing**
20:5,21 21:8 24:9 36:5
41:5 42:19 83:5 109:1

**dollars**
47:25 103:23 115:8,14,
21 125:19

**don't**
10:12,25 11:1,12 15:9
18:17 20:6 24:16,21
26:18 27:16 28:11 29:11,
24 31:21 33:2,12,21
34:12 35:4,9 36:19
37:18,19 38:4,15 39:3,6
40:8 41:6 42:12 45:20
46:5,18 47:9 50:9,15,18,
19 51:1,24 52:18 54:18
56:15,19,23 57:3,14 58:8
59:4,21,24 60:5,14,16
61:6,7,9,21 62:25 63:3,
23 64:2 65:12,20 66:17,
18 67:23,24 68:14,24
69:9,11 70:8,10,23
73:12,20,22 74:13 76:6,
12 77:7,9,11 78:13,19
79:5 80:9 81:21,22,25
82:19 87:15 88:3,7,11,14
89:8,20 90:3,6 91:6,7,9
93:22,23 94:2,4 95:19
97:1 98:18 99:7,8
100:21,23 102:6,18
104:22 105:17 106:8
108:11,25 109:3 111:1
113:20,22,24 114:5,8,20,
23,24 115:22,24 116:19,
25 117:18 122:11,16
124:3,11,12,13 125:6,18,
21,23,25

**done**
25:18,20 40:13,18 68:20
99:19

**double**
30:12

**doubled**
101:15

**down**
53:6 70:5 83:23 84:17
104:10

**downloaded**
93:18

**downstairs**
119:23

**draft**
100:2 115:12

**DRI**
31:12,25 32:21 33:22

**drivers**
7:1

**driving**
6:18,21,25

**drought**
33:1,3

**drugs**
10:4

**due**
47:12 53:12 56:18,21
83:9

**duly**
6:6

**during**
10:20,23 11:13 64:20

**duty**
55:8 57:12 60:15 62:21
64:15 116:6

**Dwight**
17:9,17,21 18:14 38:25
88:12,23

## E

**e-mail**
49:8 94:10

**each**
60:19 114:18 119:25
123:2

**earlier**
8:11 101:25

**early**
8:13

**earnings**
111:5,11

**East**
119:20 120:2,15 121:4

**EBIT**
111:4

**EBITDA**
111:4

**economics**
109:10

**Edison**
9:21 26:7 31:17 33:21
39:22 45:11 61:14 74:12
92:1,3 97:5,24 98:6
99:17 104:9

**Edison's**
34:3

**effect**
9:25 75:15 87:19

**effective**
95:4

**eight**
125:21,22

**either**
39:5 44:21 51:5 52:14
63:21 107:10 124:13

**elder**
35:17

**else**
22:11,21 23:9 24:14,16
37:17 53:7 67:5 70:2
85:18 93:11

**employed**
7:14,16 12:6 35:20 95:3

**employee**
21:10 33:7 92:4,16

**employment**
12:9,20 15:15 64:20
105:25

**empty**
122:6 123:17

**end**
15:15 19:9,24 76:6
114:22

**ending**
100:4

**endurance**
11:5

**enough**
38:25 62:23 106:9 111:1
115:25

**entering**
61:20

**enterprises**
15:17

**entertainment**
14:12,13

**entities**
113:6

**entitled**
11:14 89:19 116:1

**entity**
117:4

**entries**
84:10,14

**entry**
107:8

**equipment**
22:13,16,18 53:20,23,25
54:10,14,16,20,22 55:3,
4,5,7,13,18 56:1,5,7,8,
11,12,13,15 57:9,10,15,
19,21 58:12,16 59:9,16,
19 60:7,8,9,24,25 61:1
69:21 81:12

**equity**
112:7,8,21

**error**
63:16

**errors**
63:15,18

**especially**
69:25

**essentially**
46:12

**estimate**
11:14,16 19:6 99:22
113:21,23 114:2,7
118:24 124:4

**ethic**
20:2

**evaluate**
123:21

**evaluated**
60:24,25

**evaluation**
49:16

**even**
27:24 31:21 33:25 42:12
64:12 67:13 87:4 103:2
108:25 114:15

**event**
23:19,21 38:22 42:10
43:19

**events**
11:20 12:1 23:24 24:15,
20 34:24 43:11

**ever**
6:17 8:19 12:18 17:5
18:24 24:18 29:2 32:4
36:1,3,20 43:13 47:7
62:11 74:4 86:9,24 87:24
89:3 92:25 93:20 100:5,
19 101:21 105:10,23
106:10,13 117:22 118:7
123:21

**every**
27:22 37:24 39:23 40:16

**Everybody**
104:7

**Everyone**
114:1

**everything**
38:17 43:8 69:15 70:3
79:14 86:16 92:11 93:5,
10 119:3

**exactly**
23:5 105:17 114:5

**EXAMINATION**
6:11

**example**
49:3 65:21 114:10

**exceeded**
101:21

**Except**
67:19 125:14

**excess**
98:2

**excessive**
60:1

**excluding**
115:24

**executive**
38:18

**Exhibit**
30:21,22,24 39:14 42:18
45:8 46:19,20,21 53:12
65:22 67:15 69:7 78:24
79:9 83:12 88:21,25
90:12,14 93:12,14 94:4,
5,9,16,19 100:2,7,20
104:15,16,19 105:24
106:6 109:21 110:2,3,4,
5,7,9,12,15 115:16
119:10,11,13

**exhibits**
126:14,17

**exist**
29:6

**expanded**
20:23

**expect**
27:8 90:24

**expense**
111:8

**expenses**
80:18 81:5 111:5,25

**Expire**

117:12

**explain**
31:9 93:8

**extend**
120:22

**extent**
34:9 45:17

**extra**
64:17 76:5

---

### F

**face**
37:8

**fact**
45:2 50:5 90:22

**facts**
76:13

**failing**
63:19

**fair**
50:13 81:1 83:4,7 106:9
111:1 115:25 118:12

**familiar**
48:15 72:14 89:7 107:25
108:7

**familiarity**
74:21

**far**
22:14 24:5 38:18 67:3
78:13

**father**
35:16 115:3

**fault**
28:14 51:17,25 61:13
77:22

**February**
94:10

**federal**
108:12

**feel**
85:25

**fees**
97:9

**feet**
118:14,15,16

**Felipe**
121:15

**felt**
96:7 99:19

**few**
40:8

**field**
20:4 26:5 27:6,7 34:1
36:12 54:16,21 55:6,8
57:19 80:15

**fild**
107:5

**file**
29:14 53:14 72:11 103:3
107:6

**filed**
102:23

**filing**
104:1

**filled**
33:18

**final**
45:25 104:13

**finance**
60:20,21 104:10

**financial**
12:19 78:9,12,14 82:23
85:4 86:21 100:3 110:7
116:8 117:22 118:7

**financing**
21:12,17 27:19

**find**
23:5 70:16 96:10

**finish**
40:11

**fire**
28:6,7,13,14 41:20 61:22
92:1 100:22

**fired**
19:8 27:17 91:24

**firing**
35:6

**firm**
46:25

**first**
8:18 10:14 12:24 15:11
17:8,14 18:16 24:7 64:21
79:7,20 83:16 86:12 92:6
117:6

**five**
13:6,11,12,18 14:2,3
16:9,11 29:21 70:25
88:15 92:20,22

**fleet**
57:19

**Flexible**
21:12 28:4 31:6,18 39:18
42:23 43:2 44:21 45:7
46:8,10,12 47:16,17 49:3
52:6,25 53:8,11 66:23
67:17 69:10

**floor**
117:3,6,7,17

**focused**
35:16

**folks**
7:11 122:22

**follow**
27:16

**followed**
17:20,25 18:2,6

**follows**
6:9

**for**
6:14 7:7,24 8:22 9:18,19
10:15 13:4,6,10,11,12,
17,18 14:6,15 15:3,22,
23,24 17:23 20:8 21:14
22:16 24:19 25:4,15
26:19 27:7,11,18 28:5
32:22,24 33:3,4,6 34:21
36:13 37:25 39:17 40:1
42:24 43:14,18,21 44:22
45:15 46:3,12,13 48:11,
18 49:3,17 50:7,22 51:9,
19 52:16 53:24,25 54:3,
21 56:5,24 57:17 58:3,12
59:17 60:7 61:4,23,25
62:1,6,14 63:24,25 64:4
65:6,12,21 66:22 67:11
68:4 69:14,20 71:7,12,13
72:10 74:25 75:2,24,25
76:8,24 77:5,22,24 81:1
83:15,18 84:6,21,24
85:16 87:1,23 88:9,14
90:21 91:4,11,16 92:1,9,
14 94:8 95:24 98:25 99:9
100:3 101:3,12 102:8,10,
11,18,21 104:16,24
105:13 106:17,25

107:18,20 109:8 110:5
111:20 112:15,25 113:1
114:9 116:4,6,8,14
117:17 118:3 120:4,22,
23 123:22,23 124:1,10,
11,20,21,23 125:1,2,4,17

**force**
9:25

**foreman**
25:25 26:3,6,7,16 27:6,7
34:2,4 94:24 124:20

**form**
122:4

**forward**
13:16 92:11

**found**
34:6 63:3

**foundation**
27:10 34:7 35:1 42:2
45:16 46:2 48:8,11 49:20
50:6 51:8,18 52:15 53:3
55:15 58:4 60:3,10 61:3
65:18 66:6,13 68:4,16
75:1,19 76:17 77:4,23
88:8 91:3 116:3 123:25

**four**
7:11 23:15,24 24:15,20
53:11 84:21 88:15 92:6
121:20 122:7

**fourth**
61:10,12 123:16

**Franchise**
107:7 113:4

**frankly**
27:3

**fraud**
42:24

**free**
55:9 69:21

**freight**
55:6 56:22,23,25 57:20
59:10,12,15 60:15

**FRIDAY**
6:2

**friend**
70:1

**from**
9:20 19:23 21:12 22:2,7,
13 24:2 25:25 28:9 39:18
41:4 44:3 46:11,25 47:18
48:19 49:2 50:25 53:23
57:9,22,25 58:12 62:19
63:13 64:24 66:23 67:17
69:10 70:1,2 72:16 74:12
81:17 82:20,23 86:14,16
87:5 88:22 92:2,3 94:17
95:20 97:16 98:5 99:12,
18 100:15 101:2 102:4,6
103:1,4 107:8 109:15,17
113:12 114:25 116:14,16
117:24 119:8

**frustration**
64:12

**fuel**
80:19

**fulfill**
116:6

**full**
101:3

**full-time**
85:16

**function**
14:18,22 15:25 37:25
55:7 60:19

**fund**
22:6

**funding**
21:12,25 22:3 28:5 31:7,
18 39:18 42:24 43:2
44:22 45:7 46:8,10,12
47:16,17 52:6 53:8 67:17

**Funding's**
52:25

**further**
33:23 55:8 126:8,12,13

**future**
48:12

---

**G**

---

**gave**
106:13

**GCL**
22:5,6,13,14,17 46:13
48:5 50:25 52:23 53:23
56:9,11 57:7 58:12 66:25

**Gee**
38:2,19 58:21 87:23
96:25

**general**
25:25 26:2,6,7,16 27:6,7
34:2,3 62:1 72:23,25
73:2,5,17 76:11 94:24
112:11 124:20

**generally**
74:24

**generate**
32:14 102:6

**generated**
102:1 116:23 117:1

**gentleman**
47:3 62:5 88:12

**gentlemen**
48:2

**get**
8:16 9:20 14:8 21:18
22:2 27:17,20 29:22 30:8
41:12,14 44:25 64:17
68:20 69:13 83:12 87:4
91:11 97:4,6,16,23 98:2,
20 99:9,11 102:8,10
104:3 106:20 113:10,12
114:25

**gets**
91:20

**getting**
21:24 29:25 99:16

**GF**
26:2

**GGLORIA**
16:4,22,25 17:1,6 18:21
86:14,23 87:6

**girl**
26:1

**give**
8:17 11:19,25 21:21
41:25 92:13,19 103:20,
22 104:12 105:8 107:21
113:19,23 114:1,7
118:24 119:4 124:4

**given**
8:9

**giving**
44:25 103:4 109:9

**GL**
112:11

**Gloria**
87:17 90:24 105:11
106:4,22,24 107:10,13
108:1 109:5,18 112:25
113:7 114:9,24

**go**
9:23 14:17 19:9,21 20:9
21:20,21 27:13 28:1,17
30:6,16 34:10 35:3 42:3,
17 45:17,24 48:14 49:21
53:4 54:16 55:8,16
57:14,21 58:6 60:4,12,
13,16 61:5,10 66:15,16,
19 68:6,18 69:17 74:9
75:21 77:6,18,25 78:23
79:3 81:6,10 82:8 83:23
90:10 91:22 93:2,3 102:8
103:24 105:11 106:16
107:3 110:2,17 116:5
121:25 125:3

**goes**
26:22 33:23

**going**
10:24 21:24 34:20 39:21
41:12,14,20 45:24 47:11
48:3 66:1 69:2,17 73:16,
17 78:16,18,19 81:6
85:20 86:19 89:5 94:8,9
100:1 105:7 107:14
110:4 115:13 118:21,25
120:8,9 124:13 126:1,16

**good**
6:13 11:18 20:22 25:3,6
49:9 51:12 54:10 59:13
60:16 78:3 97:11 102:18
113:25

**got**
9:22 14:14 15:9,22 26:13
27:20 45:20 49:23 57:13
70:14,15 78:5,6 91:24

93:8 97:2 98:5 99:18
101:1 106:23 107:25
111:2 121:20

**governmental**
117:4

**Graham**
46:13 47:16,17 48:4 49:4
52:7

**grand**
80:20

**greatest**
92:24

**grid**
40:12

**grids**
40:12,19

**gross**
83:16 101:3 116:21

**group**
102:17 103:17

**grow**
92:8

**growing**
92:8

**guess**
11:12,15 29:25 68:7

**guide**
36:13

**guy**
124:7

**guys**
122:21

**H**

**had**
8:19 10:7 24:3 25:14
28:22 32:4,8 33:25 39:10
40:6 55:12,13 58:20
63:7,10 66:24 71:11
72:9,11 74:15 75:15
84:25 86:24 87:19 92:24,
25 96:14 98:25 99:19
101:21 102:1 111:5,8
114:22 119:23 120:21
123:8

**hadn't**
67:6 96:5

**hair**
13:15

**half**
99:23 108:20 115:7,10,
14,21,23 118:16 120:17
121:12,14,19 123:20

**hand**
38:19,23

**handed**
106:4

**handled**
71:6

**handling**
71:17

**handsome**
85:11

**handy**
112:10

**happen**
28:20 86:22

**happened**

9:16,17 23:5,22 65:11
85:10 86:22 87:2 91:19,
24

**happy**
30:5 78:15 79:4,5 103:23

**hard**
6:22

**hardly**
110:17

**harm**
42:25

**harmed**
44:17 45:3,6,8,12

**Harriman**
13:19

**has**
26:4 33:8 34:21 38:8,16
51:23 63:11 74:20 83:1
87:2

**hasn't**
38:21

**hat**
85:22

**have**
6:17 7:3 8:19,21 10:7,14
12:18 15:17 16:13 17:5,
21 18:17,24 19:18 20:1,
10,25 21:17 22:1,7 23:4,
8,24 24:10,23,24 26:13
27:22,24 28:18,19 29:12
30:9,12 31:2,21 32:17,25
33:5,20,21 34:12 35:19
36:7 38:3 39:3,16 40:16
45:25 46:10 47:21 48:9
49:2 51:5 52:5 56:15
57:9,24 58:25 59:2
60:19,24,25 61:16,19

62:18,19,21,23 63:1,2,3,
22,23 64:12,17 65:6,12
68:7,22,24 69:9,25 71:25
72:8,11 73:22 74:13
75:15 76:1,8,11,12,16,20
77:14 78:11,19 79:23
80:1,9,19,20 83:11 87:18
88:5 90:7 92:3 93:1,20,
24 95:5 99:12 100:5
102:5 104:21 106:10
107:5,7,9 109:1,2,8,25
111:4 112:10,15,17,19
114:20,21 116:21 117:2
118:19 120:4 123:7,8
124:8,16 126:8,12,13,19

**haven't**
117:12

**having**
6:5,22 44:4 53:25
123:22,23

**he**
8:1 9:5 12:6 19:9 20:4,
21,24 21:2,10 22:23,24
24:10 26:17 30:5,7
34:11,20 35:21 36:5,6,7,
15,17 37:12 38:1,11,14
41:14 49:22 55:10,13,14,
17,19,25 57:8,9,10,23,
24,25 58:24,25 59:12,19
62:6,11 63:2,10,11,16,
20,23 64:10,11,13,15,16,
17 69:20,22,23 70:4
74:1,24 75:9,11,12,13,22
76:3,10,21 85:6,9,10,11
88:2,16,17 96:3 98:10,13
103:14,23 104:6,13
106:13 116:1,6

**he's**
17:15 20:3,5 26:16 62:9
75:13 85:11 88:14 89:19

92:14 104:13

**hear**
9:13 86:9 106:13

**heard**
13:20 102:25

**hearing**
6:23 15:9 86:12,14

**hell**
103:23

**her**
23:16 25:10 26:24 27:18
28:13,14 41:20,25 42:5,
14 44:4,7,9 114:24

**here**
7:19 9:24 10:9 32:18
33:18 34:20,21 42:9
49:17 52:1 75:14 78:22
82:13 83:11,12 84:17
94:13

**here's**
79:7 88:21 93:17 115:12

**herein**
6:5

**herself**
114:10

**Hey**
24:9

**high**
114:13

**higher**
124:14

**highest**
92:18 101:24,25 108:9,
12,16

**highlighted**
47:15

**him**
  21:8 24:9 35:18,19 38:1,
  15 42:18 56:20 59:7,25
  62:13 65:10 66:9,10
  82:18 87:9 90:4 98:15,18
  103:22 115:9,20

**himself**
  60:25 63:7 104:7

**hire**
  12:25 17:23 35:21 38:15
  39:3,7 85:21

**hired**
  12:14,24 15:12 16:1
  17:16 35:23 38:8,11,14,
  16,20 39:11

**hiring**
  38:18

**his**
  32:8 37:25 57:8,9,25
  58:11 60:1,19 62:8
  64:11,15 88:2,5 90:2,4
  94:5 98:15 103:14
  106:13 116:6 119:18
  126:9

**historically**
  92:25

**history-breaking**
  104:24

**Hmm**
  116:8

**hold**
  12:11,13 22:4 29:25 34:6

**holder**
  84:9

**holds**
  68:2,3

**homeless**
  120:21

**honest**
  41:18,19

**hourly**
  40:15,16

**hours**
  9:9,10

**house**
  115:24

**housing**
  80:16

**how**
  7:6,14 8:14 9:8,9 10:9
  12:5,22 14:15 15:14
  23:25 25:21 26:15 27:8
  28:9 35:19 38:20 39:22
  40:6,9,25 41:11,24 48:24
  50:3,21 51:16 56:18,23
  59:19 60:17 62:10 64:13,
  19 73:2,8,9 76:15 81:19,
  23 82:23 99:5,8,11
  102:20 103:5 106:18
  113:16 114:2 116:18
  117:8,11,16 118:14
  120:16,24 121:11,18
  122:7,10,15,16 123:1,18
  124:13,24 125:4,17,20

**however**
  102:25

**HUB**
  62:19 70:5,6

**HUBS**
  22:23

**huge**
  15:17 61:22

**Huh**

15:5

**human**
  38:16,21

---

**I**

**I'D**
  85:23

**I'LL**
  18:4 30:20 39:4 43:4,12
  55:10 57:21 68:11 78:23
  85:21 99:4 103:23
  105:22 116:11 126:20

**I'M**
  6:22 7:6 8:15 10:24
  14:20,23 18:4 19:1 20:11
  23:23 29:9 30:5,22 35:16
  37:3 38:18,20 39:6,7
  41:8,20 42:6,8 44:24
  45:24 46:9 59:7 60:20
  65:10,11,25 69:2,17
  73:20,24 74:20 78:15,18
  79:4 81:11 86:20 89:21,
  25 90:11 92:5 94:8,9,16,
  25 99:22 100:1 104:8
  105:7 110:3,4 113:18
  114:18 115:11 118:13
  123:4 124:5 126:16

**I'VE**
  29:9 30:20 78:23 93:8
  101:1

**I-R-O-N-M-A-N**
  13:11,22

**idea**
  58:11,21 124:8

**ideally**
  17:8

**identify**

30:21 121:2

**if**
10:25 11:6,8 13:15 14:1,
3 20:10 23:3 25:3 27:12,
15,16 28:3,6 29:11,20
30:8,13 33:12 35:8 37:18
43:1 46:4 49:9 50:4,8,13
51:10,20,22 52:11,17,18
55:9 56:20 57:3,14,17,
19,20 58:1,2,6 60:15,17
64:9 70:16 75:3,21 76:1,
6,8,18 77:20 79:2,6,18
83:23 84:19 85:21 86:21
88:10 91:5 93:3 97:16
99:11 102:17 104:12
105:19,23 106:5 107:17
109:4,22 110:1,25
115:22 116:6,20 119:25
120:14 124:2

**imagination**
31:22

**imagine**
124:8

**immediately**
95:4

**important**
30:8 42:9

**improved**
118:6

**in**
7:17 8:5,23,25 9:8,16,20
12:23 13:1,7,11,17 14:7,
11 16:5,13,14 19:11,24
20:3,4,16 23:21 24:8,12,
14,18 26:1,6,15 27:6,7,8
29:2 30:18 31:20 32:1,9
33:18,25 34:22,23 35:20
36:5,9,21 37:1,2,5,8,9,12
38:5,15,18 39:6 40:9,10,

11,13 42:9,10 43:14
47:25 48:2,12 49:11,16
50:3,4,10,12 52:5 53:12,
14 54:20 55:7 56:2,3
57:19 60:1,16 61:20
62:16,24 64:16 65:7
66:7,21 67:15,20,21
68:22 69:6,7,18 71:17
72:4 73:20 75:13,22,24
76:2,6,7 78:10,12,24
79:14,19 80:15 81:4 82:5
83:1,11,25 84:8,14,19,24
85:3,15,22 86:3 87:19
89:10 90:14,15,20,21
91:14,24 92:4,6,9 93:25
94:5,25 96:13 97:22
98:2,15 99:22 100:22
101:10,15,20 102:10,16,
23 104:3,5,7,18 105:13
106:19,24 108:10,21
109:15,16,25 111:19,23
117:9 119:18 122:7
123:22 124:16 125:4

**included**
94:25

**including**
80:17 115:1,2,23

**income**
83:17 84:20 101:3,6
106:17 109:17,22 110:18
111:12,25 112:19 119:3

**Incorporated**
95:4

**increase**
102:19

**increased**
102:12

**increases**
102:7

**independent**
100:12

**indicate**
96:3

**indicating**
71:11

**indication**
84:1

**individual**
107:4 108:10

**inform**
74:1 86:21

**information**
8:17 26:4 103:19 107:24

**inherited**
120:19

**initial**
15:25

**Initially**
118:25

**input**
32:14

**inside**
37:3

**insist**
73:17 97:6

**insofar**
52:20

**inspection**
33:2,4

**instruct**
22:15 55:10,25 57:14,23
58:25

**instructed**
21:10,15 26:19 27:2

28:10 32:3,5 43:7 55:12
69:24

**instruction**
27:16

**insurance**
22:22,23,25 23:1,7
61:23,25 62:1,9,17,18
70:6 71:6,17,19 72:6,7,
15 74:13 75:23 80:1

**intact**
92:4

**intend**
124:12

**interact**
36:3

**interest**
24:5 97:8 111:6,11

**interesting**
38:2

**International**
22:24

**into**
10:18,19 32:14 51:14
54:16 58:17 60:17 61:20

**introduce**
37:23

**introduced**
36:25

**introduces**
58:10

**introducing**
38:1

**investigate**
120:5

**investigating**

69:5

**investment**
109:3 124:11

**invoice**
21:11,14,16 22:6 25:9,
14,19,21,23,24 26:5,12,
19,23,25 27:5,18,19,21,
24,25 28:3,4,9,10,16,17,
19,22 29:6,10,17,23 30:8
31:4,15,16,17,20,23
32:1,3,5,8,15 33:25
39:13,14,15 40:3 41:9,
12,15 42:24 43:1,3,5,14
44:19,21 45:3,8,12 49:4,
9 51:1,22 65:22 67:18
68:1,2,9 69:6 71:20
95:17,20,25 97:14,16
100:22

**invoices**
22:9,10 25:15,17 31:21
39:25 47:17,19 48:5
50:24 51:24 52:8,23
66:24 67:7 71:12 97:4,5,
7,11,15 98:21,24

**invoicing**
39:21

**involved**
24:14 26:15 38:18 63:20
73:20 75:6

**involvement**
71:12

**involves**
67:21

**Ironman**
13:6,10,17,20,21,24
14:6,22 15:3,19,20,21

**irrelevant**
68:17

**IRS**
107:7,9 113:4

**is**
6:16,19 7:8,19,23 8:1,6,
10,25 9:2,3,17,19,24,25
10:1 11:5,8,18,23,25
13:19 17:8,15 18:5 20:7
21:10,12,23,24 22:12,13,
14,15 24:3,10,11,22
25:15,17,20 26:1,5,15
27:24 28:4,8,21 29:5,7
31:4,7,9,11,16,22,25
32:1,20 33:3,12,13,22
35:12 37:14,19 38:7,20
39:14 40:17,18,25 41:3
42:14,19 43:4 44:19
46:1,11,24 47:3,10 48:22
49:13 50:3,21 51:2,16,25
52:5,22 53:6,19,23 54:8,
10 55:3,9 56:7,8,23,25
57:5,8,10,15,19,20
58:22,24 59:6,12 60:9,
16,18 61:12,18 62:8,21
63:2,14,20 64:3 65:25
67:11 69:10 70:7,15,16,
19 71:9 75:4,18,23 76:20
77:15,19,22 78:2,24
79:2,15,24 80:8 81:1
82:13,25 83:1,5,8,13,17
84:5,13 85:3 87:3,16
88:22 89:5 90:23 91:11,
12 92:24 93:17,19 94:10
95:2,4,16 96:8,15 97:3,
15,17,19,20,25 98:7,16,
23 99:15 100:2,9,13,14,
21,22 101:2 102:7,9,20
104:2,16,24 106:25
107:4,12,13,15 108:9,12,
16,17,25 109:5,6 110:4,
5,6,16 111:15,17 112:21
113:7 116:23 117:3,7,11

118:10,14,15,16,20,21,
22 119:4,11,17,20 120:2,
16,24 121:7,11,15,18
122:7,10,11,15,18
123:10,11,13,18 124:15
125:6,12,20

**isn't**
51:6 52:3 63:24 64:4
65:19 69:7

**issue**
21:23 22:1 24:24 46:10
53:8,20 70:6,7 73:21
102:24

**it**
9:22 12:20 14:14 16:9
17:9,16 18:5 19:11 20:25
21:13,16 23:22 25:18
26:3 28:4,12,21 29:11,
12,13,18 30:9,11,23
32:9,10,12 33:3,8,11,23,
24 34:20 36:24 37:1,13
38:3,7,16 39:9,24,25
40:1,2,8,11 41:24 42:20,
25 46:9,17 47:7,8 51:3,
22,23 52:3,12,19 54:12,
25 55:7,10,11 56:20,23,
24 57:6,18,20,21,23,24
58:1 59:6,22 60:9,15,21,
22 61:18,19 62:17 63:2,
5,24,25 64:4,5,10 67:16
69:9,12,25 70:16 71:9
72:25 73:11,12,13,14,16
74:6,11 76:3,4,5,6,7,8,
14,15,21 78:4,15,24
79:4,5,17 80:7 81:1,3,13
82:1,2,3,4,6,19 83:4,7
84:3,5,13,20 85:17,18,
19,21 87:3,16 89:12,23,
24,25 90:9 92:7,8,15,24
94:12,13,16 95:1,15 97:9

98:9,23,25 99:2,3
100:11,15 101:2,3,6
102:20,21 105:19,20,21,
23 107:9,17,25 108:6,14
109:8 110:3,17,20
111:23 114:14 115:13
117:12,18 118:1,3,6,7,
10,17 119:6 120:3,12,13,
16,18,20,22 121:19
122:4 123:3,5,13 124:12,
14,15 125:1,2

**it's**
13:7 14:12,16 20:14 22:1
26:8 27:1,11 28:14,24
29:2,25 31:14 32:25
33:1,5 40:19 42:24,25
43:5 45:2,5,7,11 47:2
50:13 51:2,21 52:3,12
55:5,8,9 56:24 57:11
58:5,9 60:15 62:16 63:11
64:15 66:5,14 68:5,17
69:4 70:1,2 72:20,23
79:17 83:19 88:14 91:14,
15 92:9,15,23 94:10,11,
12,17,22 100:10 101:9
102:2,16,17 103:17
104:6,22 109:6,15
111:22,24 114:19 117:5
119:2 120:17 121:10,13,
16 122:5 123:15 124:13
125:6

**item**
53:19 61:10,12

**items**
81:20

**its**
72:6 83:8 91:15 98:25
101:21 108:12

## J

**January**
79:18 83:13,14,17,18
94:12,15 100:22

**job**
9:20 15:22 25:17,20 26:1
40:17 64:16 99:10 102:8,
18,19 104:5

**joined**
91:23

**joking**
103:21

**Jordan**
7:7 12:3,5,14 18:3,5,8
19:7,8,16,19,23 21:15
22:10,14 24:4,8 26:15,
18,19 27:2 28:10,22
32:3,4,8 36:21,25 37:14,
23,24 38:5,8,20 39:5,10
41:12 42:14,17 43:24
47:18 48:5 50:21 51:3,6,
21,23,25 52:8,13,14,18,
23 53:25 54:9 55:10,12,
24 57:6 58:10,24 61:13
62:16,20,24 64:14 65:9,
23 66:22,24 67:11,14,17
68:1,10 69:5,6,12,19
70:9,12 71:7,18 72:10,17
75:25 76:8 77:22 82:17,
20 83:1 85:2,17 86:1,10
89:10,18 91:1,20 92:6,
10,14,24 93:19,21 98:19
101:2,10,16 102:15
106:1 109:23 115:7

**Jordan's**
12:9 20:1 32:13 37:13
51:16 66:8 86:4 93:24
99:6 103:7

**Jordans**
17:24

**jump**
102:10,16

**June**
75:22 76:2 88:22 92:1
101:11

**junior**
35:13

**just**
7:16,22 13:14 21:21 27:4
30:4,6 39:3 42:25 44:4
46:9 52:11 57:13 59:7
60:20,21 62:16 65:25
67:16 78:15,23 87:17
90:24 92:7 93:5 99:22
104:12 109:10 110:17
115:11 123:3,5 124:12
126:20

---

### K

**keep**
48:3 92:4 103:4

**Ken**
7:7 27:14 38:24 85:17
93:1 107:16 108:24
111:22

**Kenneth**
27:15

**Kim**
24:22 34:21 47:2

**kind**
40:2 55:5 80:10 81:4
82:21 102:12,15 115:22

**knew**
70:20

**know**
7:11 9:11 10:12 11:7,15
12:3,5 14:9 15:9 19:7
22:14 24:16,17 26:18
28:11 29:11 32:22 35:10,
11,18 36:19 37:18 38:5,
15,24 39:6 41:21,24
42:7,24 46:4,5 48:22
50:8,9,11,24 51:10,11,20
52:17,18,20 56:8,19
57:3,11,25 58:6 59:3,24
60:5 61:6,7,9 62:3,25
63:5,14,21 66:17,18
68:12,14 70:8,10,21,23
73:12,20,23 75:3,9,11,12
76:14,16,18,19 87:23
88:10,11,12,14 89:20
90:1,6,19,21 91:5,6,7,9
93:23 94:2,5 97:11 99:7
102:15 106:5,8,18
108:25 109:3 111:2
115:22 116:18 118:3
119:16 120:1 121:13
124:2,3,6

**knowing**
22:25 57:14 63:23
102:20

**knowledge**
24:14 29:7 32:5,14 37:22
63:10 64:11 67:5 75:9
100:18

**known**
6:17 24:23 35:19 58:25

**knows**
114:1

---

### L

**Lacks**
27:10 34:6,7 35:1 42:2

**45:16 46:2 48:8,11 49:20**
50:6 51:8,18 52:15 53:3
55:15 58:4 60:3,10 61:3
65:17 66:6,13 68:4,16
75:1,19 76:17 77:4,23
88:8 91:3 116:3 123:25

**lady**
25:10

**land**
46:13 48:4 52:7 66:25
116:15 120:5,6,11,18,19
121:7,8,9,10,16 122:6
123:17 125:13

**Lane**
116:1 119:17

**languages**
41:1,6

**last**
21:2 84:20 125:15

**later**
20:5 22:17 30:25 46:22
75:14 79:10 89:1 93:15
94:20 100:8 104:20
106:7 110:10 115:17
119:14

**law**
46:25

**lawsuit**
95:19 96:20

**lawyer**
64:7,10

**lawyers**
43:14 46:12 63:24 64:4,8
67:15,25 70:22

**leader**
93:20

**leaders**
93:19

**leadership**
93:17,19

**leaning**
13:16

**lease**
22:17,18 54:1 55:1 56:3,
6,8,11,18,21 58:22 61:1
117:11 122:4,10,13,15

**leased**
56:6 117:3 118:6

**least**
57:11 63:13 67:20 70:15
81:12 84:14

**leave**
15:14,16,19,21

**led**
37:10 74:20

**ledger**
112:11

**left**
15:13 81:19 82:4 117:13
119:7 123:3

**left-hand**
83:25

**legal**
6:18 51:19

**legitimate**
50:4

**Leo**
62:5,22 63:6,14 73:25
74:4

**less**
40:11 47:11 82:6 114:19

**let**
8:16,17 9:22 11:7,23
15:12 19:9,13,22 28:15
29:24 30:12 44:23 51:24
52:1 56:20 62:2 93:12
99:13 100:14 105:19
106:16 107:17

**let's**
14:17 20:13 25:7 30:13,
15,16 44:23,25 52:20
61:10 66:19 70:25 78:8
81:6,10 82:8 104:15
109:6,10 110:2,3 112:6,7
116:20 125:3

**letter**
33:8 46:16,24 47:6,10
50:4 53:12 63:4 67:16
69:7 74:12 88:22 89:3,5

**letters**
32:21

**level**
101:25

**liabilities**
81:10,11

**liability**
58:2 62:1 72:24,25 73:3,
6,17 76:12

**license**
6:18,20,21,24,25 7:1

**lie**
41:25 65:13 68:13

**lien**
61:1

**life**
74:13

**like**
14:16 20:24 26:25 28:17

32:15 33:13 37:2 38:23
60:18 62:22 68:8 73:19
85:23 93:25 99:10 100:5
102:2,5 103:21,23 104:6
108:14 116:23 118:22,23
120:7,17 122:12 123:16

**line**
22:2 68:20 84:19 103:20

**list**
46:6 119:11

**little**
6:23 8:16 13:13,14 20:23
33:23 54:24 78:9 92:13,
19 99:14,24 105:20

**live**
119:18 124:19

**lives**
124:18

**located**
13:7

**long**
9:8 12:22 14:15 17:23
35:19 117:11 123:23

**longer**
95:2

**look**
28:2 29:18 31:20 46:17
73:16 76:9 79:6 84:19
93:12 104:15 110:15,16
111:3 112:6,7,24 116:20

**looking**
46:9 81:11 83:16 109:21

**looky**
75:14

**losing**
91:12,14

**loss**
81:2,3 84:18,22,24 109:3
110:18

**lot**
40:10 76:4 92:5,9 97:18
99:10 102:6,25 103:20
111:18 118:22 120:20

**lower**
82:12 117:3 124:14

**Lucas**
116:1 119:17

**lying**
68:12

### M

**machine**
55:9 59:5

**machinery**
55:17

**made**
20:18 26:4 43:6 44:20
47:16 57:5 58:1 63:17
72:15 101:12

**make**
27:3 29:21 30:7 39:4
43:5 57:9,13 62:23
63:14,16 64:14,15 76:12
92:5 99:11 104:6,13,14
123:2

**makes**
30:6 109:4

**making**
58:3 122:18

**Malay**
41:4

**Malaysia**
41:4

**manage**
103:25

**management**
103:18,25 120:7 122:3

**manager**
14:20,24 16:10,12,17,20
21:11,14 31:24 36:6,9,11
37:19,24 49:17 55:6
56:22,24,25 57:19,20
59:10,12,15 60:6,15,24
71:10 73:22 82:22 94:24
103:20 104:7,8

**managers**
37:2,5 60:8

**manner**
65:7

**manufacturer**
57:22

**many**
9:9 40:6,9,25 42:5 48:18
118:14

**March**
34:24 42:10 43:14

**marginal**
108:7

**Mario**
95:24

**Mario's**
95:20 97:24 98:7,20,25
99:19

**mark**
78:23

**marked**
30:20,25 46:22 79:10

89:1 93:15 94:20 100:8
104:20 106:7 110:10
115:17 119:14

**market**
60:18 118:12

**Marking**
110:5

**material**
100:19

**matter**
66:21 95:16 124:14,15

**may**
7:17 8:6 12:23 20:14
36:21 78:10,12 82:5
83:1,2 85:3 92:10 105:25
119:16

**maybe**
6:23 13:14 20:10,24 30:1
104:3 110:3 122:13

**Mckay**
46:25

**me**
8:4,10,16,17 9:15,22
10:14 11:1,19,23,25
15:10,12 17:16 19:13,22
20:20 21:7,16,21 22:1,9,
15 24:24 25:15 26:21
27:4,15 28:6,15 29:24
30:12 32:2 33:24 34:20,
22 36:7 39:20 41:16,23
43:2 44:20,23,25 48:19
49:3,4,5,8 51:1,21 52:1,
12 53:7 54:3 55:10,25
56:22,24 57:4,14,18,23
58:25 60:15,23 62:2,25
64:12 66:2 67:2,17,18,19
68:9,10 69:11 71:16
76:2,21 78:14 79:3 82:20

85:21 86:16,20,21 87:17,
22 88:4,20 89:21,25
93:12 94:11 95:22 97:14,
15 99:10,13 100:14,15
101:20,24 102:24
103:20,22 104:9 105:8,
13,19 106:16 107:17,21
111:2 113:19,23 114:1,7
117:18 118:24,25 119:5,
25 120:8,14,22 122:14
123:22 124:4,14,15
126:9

**mean**
25:1 33:10 36:9 37:1
39:22 44:6 82:3 87:18
92:19,20,21,22 99:15
103:10 115:3 120:13
123:13

**means**
15:10 33:11,14 36:11
40:12 47:17 64:10

**meant**
21:8 99:15

**meantime**
104:5

**measure**
99:8

**medication**
10:4

**meet**
10:8 36:20 93:20

**meeting**
10:16,19,20 36:23,24
37:10,12,22 38:6,7

**meetings**
86:3

**member**

37:4

**memorandum**
43:18,22

**memory**
78:16

**message**
103:24

**met**
82:17

**Michael**
34:21 47:2 88:23

**might**
10:14 20:11 24:23 27:16
28:6 30:11 47:9 50:11
57:11 73:22 76:10 78:14
82:19 90:9 93:22

**Mike**
17:22 18:6,11,13 85:15
87:7,13 88:1,5 102:9

**Mill**
119:20

**million**
22:1,4 40:4 48:3 53:11
66:22 72:20 73:4,5 76:5
80:4,23 81:5 82:13
83:18,19,21 91:16 95:17
97:1,3,7,10,21 98:2,7
99:23 101:4,16,22 102:2,
5,24 104:21 105:1,5
109:4,6,7,24,25 110:21
111:9 112:22 114:10,14,
16,19 115:8,10,14,21,23
118:1,4 119:1,8 122:11
125:18

**millions**
39:24

**mind**

21:1 31:20 68:22

**minor**
100:24

**minute**
21:20 75:5,7 77:12 87:16
103:12,13

**minutes**
29:21 126:1

**misconduct**
42:12

**misnomer**
44:10

**missing**
59:6

**Misstates**
34:7 75:19

**mistake**
28:8 42:19 57:6 58:2,3

**misunderstood**
122:13

**Mm-hmm**
95:1

**Mobray's**
9:2 109:15

**money**
21:11,18 22:4,6,7 27:20
28:5 31:19 39:22 41:11
42:24 44:22 48:3,5
50:14,15,19 51:2 52:7
54:11 64:17,24 69:11,12,
13 76:4,15,24 80:12
91:12,14 97:6,16,19
99:12,16 104:3,4 106:18
107:7,14 109:9 111:16,
18 113:7,10,12 123:1

**month**

13:1 39:23,24 40:5,10,
11,14 79:24 80:2,13,23,
24 81:17 82:13 91:17
92:6 117:10

**monthly**
79:8 80:21 81:23,25

**months**
40:6,8,9,13,14 84:21

**more**
13:9 21:11 22:12 54:25
56:17 59:22 82:1,6
99:23,24 103:4,6

**morning**
95:2

**most**
92:18

**move**
43:8 69:15 70:3,17 93:4,
7,9,10

**moved**
92:11

**Mowbray**
7:9,17 8:22 12:7 15:22
17:1,6,25 18:2,22,24
19:4,11,12 23:13 35:6,
10,11,13,15,17 36:1,3,20
37:21 38:14 39:9 42:25
55:23 61:24 65:11 72:24
86:15,24 87:17 90:24
92:10 94:17 95:2,8 96:1
98:10 104:25 105:11
106:11,19 107:2 114:23
116:22 119:12 123:7

**Mowbray's**
7:8 8:5 12:24 13:4 15:24
17:15 20:5,6 21:8 22:19
23:4 24:5,19 25:1,2
29:17 30:1 39:5,8 44:17,

19 45:2 47:18 48:3
50:14,15 52:21,24 53:14
58:11,12 62:7 64:17,25
65:12,16 66:23 71:7
73:10,19 77:15,19,20
78:10 81:2,19 83:5,8
85:3 87:19 90:4,7 92:15,
23 94:17 95:3,9 97:23
98:17,24 100:3 101:11,
21 102:1 103:5 106:1,19
115:13 116:9,13,15,16,
22,24 122:22

**Mowbrays**
16:4,22,25 35:12,14
36:24 37:7,11 78:12
102:8 104:9,16 107:10
119:24

**Mr**
6:12,13 7:4,6,20,22 8:4,
14 9:5 10:8,13,15,17,21
12:9 13:14,20,21 14:9,11
15:1,7 18:2,3 19:16,19,
20,23 20:1,8,13,17,18
21:1,7,15 24:4,8,22
26:18,19 27:2,3,10,12,14
28:10,22 29:5,22,24
30:4,11,15,16,19,20
32:3,4,8,13 34:6,11,14,
15,16,18 35:1,7 36:25
37:23,24 38:5,8,20,24
39:1,5,6,9 41:1,8 42:2,8
43:8,24 45:15,19,23 46:2
47:4 48:5,8,15 49:20,22,
25 50:1,6 51:8,18 52:8,
13,14,15,18,23 53:3 54:9
55:9,10,12,15,24 57:6
58:4,10 60:3,10 61:3,13
62:16,20,22,24 63:8,14,
17,20 65:9,17,23 66:5,7,
8,13,22,24 67:11,14,17
68:4,10,16,19,21,23

69:5,6,12,15,19 70:3,9,
12,17,25 71:1,4,5,6,7,18
73:24,25 74:7,15,17,18,
20 75:1,4,17,19,25 76:1,
2,8,17 77:4,17,22,23
78:25 82:20 83:1 85:17,
19 86:1,4,10 88:8,17
89:5,10,18 90:1 91:3,21
92:14 93:4,7,10,24
101:10,16 102:15 103:7
107:16 108:24 111:22
116:3 123:25 125:25
126:2,7,8,12,16,19

**Mrs**
55:23 86:14 109:5

**Ms**
31:5 43:17 86:23 90:24

**MTS**
24:25 25:1,3,6 27:8
107:2 117:16

**much**
39:22 41:11 56:18,23
59:11,19 60:17 62:10
64:13,19 73:2 76:15
81:20,23 99:5,8,11,12
106:18 113:16 114:2
116:18 117:8,16 119:4
122:10,15,17 123:1
124:13,24 125:4,17

**multi-page**
79:2

**must**
52:12 76:20 88:5

**MWP**
116:11,22 117:17

**my**
6:16,18 8:9 9:3 10:25
12:20 15:18 20:4 21:10,

25 22:4,18 24:10 27:15,
18 29:5,14 30:13 31:20,
22,24 38:23 40:22 46:9
54:9 55:6,8 56:22,23
57:17,18,19,20 58:24
59:4,10 69:13,14 70:1
75:4 87:11 88:14 94:24
100:9 103:19 104:7
120:6,21,22,23 121:16
124:20 126:19

**myself**
38:4

---

**N**

---

**N-Z**
25:11

**Nacho**
37:18

**name**
6:14,16,17,18 13:9 14:10
18:16 25:10

**named**
62:5 88:12

**narrative**
44:25

**Neal**
17:22,25 18:2,6,12,13
85:15 87:7,13 88:1,5,17,
23 89:5 90:1 102:10

**Neal's**
90:16

**near**
121:16

**nearby**
120:5

**necessarily**

103:10

**necessary**
103:9

**need**
7:23 10:25 11:6 23:4,7
28:2,3 33:21 36:7,13
39:2 43:3 54:9,11 57:20
60:21 62:10 68:19 69:13
76:9 79:5 85:13,16 86:21
104:5 108:21 109:7
111:1 124:15 126:13

**needed**
73:9 74:1

**needs**
38:24

**negotiations**
98:20 117:14

**net**
84:20 89:13 109:22
111:12 112:19

**never**
29:9 43:12 55:12,24
62:14,25 86:17 87:20
88:4 97:2 120:20

**new**
17:22 38:1,24 73:11
75:23 76:7,9 92:7 122:2,
4

**next**
17:18,20 34:14 39:5 81:7
120:3

**no**
10:6,17,22 12:2,10 15:7
26:17 28:7 32:7,10,16
35:9,22 36:2 42:1,3,5,21,
25 43:16,20,23 44:1,5
46:18 47:11 48:1 49:17

50:5,10,12 51:2,5 52:13
53:9,13,18 55:21 56:7,17
58:20,24 59:10,18 62:13
63:9,16 64:9 65:1,3,4,5,8
66:2 67:5,13,16 68:24
69:11,23 70:4,21 71:12
73:7 74:3 75:10 77:3,12
80:11 85:8 86:2,6,7,8,24
87:1,9,15,24 89:4,23
90:9,15,21 92:3,5 94:7
95:2,18 96:12,17,19
98:14,18 100:14 101:23
106:12,15 108:8 113:2
114:11,15,17 116:19
118:9 119:1,3 121:6,24
123:8,11,13,15 124:5
125:11,14,15 126:8,12,
13

**Nobody**
89:21 124:19

**none**
65:23,24 113:10

**nonresponsive**
70:18

**Nope**
85:24

**nor**
86:18

**normal**
58:15

**not**
7:16 8:9 10:15,20 11:5
17:22 20:21 21:16 22:8,
17,19 23:8 26:16 27:2,24
28:7,11,14,20 29:2,14,24
31:22 36:16 38:18 39:6,7
41:17 42:14,23 43:4
44:20 45:3,5,6,7,12
47:20,24 50:11 52:12,13,

19 55:8 56:24 57:11,22
58:22 59:6 60:1 61:1,16,
25 62:24 63:10,11,16,20
64:11,12 65:2,10 66:7,10
67:4,18 69:5,23 70:2,4,8,
21 72:23 73:6,16,20
74:24 75:4,8,24 76:3,19,
22 77:19 78:3 83:5,8
86:19,22 87:3 88:19
89:21 90:1,7,19 91:15
92:9,14 95:11,12 96:14,
18 97:19 98:16,25 99:2
100:12 102:3,17,19
103:1,9,10 104:1,6,8
106:20 107:11,12 108:5
109:9 110:25 111:23,24
113:12,18 114:15
118:11,13,21,22 119:2,4
120:8 123:4,15 124:5,6

**Notably**
47:15

**note**
33:16

**notes**
46:9

**nothing**
41:13,14 44:3 52:5,22

**notice**
73:19

**notifies**
75:14

**notify**
43:13,24

**now**
10:12 16:3 19:13 22:6
23:11,12 29:21 30:3,14
31:9 32:17 43:10 44:9
45:24 46:1 47:6,7,23

53:19 54:24 55:3 61:10
64:24 69:17,18 70:5
76:10 80:7 82:16 83:11
85:19 89:25 90:11 91:10,
19 92:23 105:7,11
106:16 110:2 111:3
112:24 115:22 122:21

**NT**
31:12

**number**
21:19 31:21 33:17,18
46:6 53:7 66:19,21 70:5
82:12 104:22 112:19
119:2

**numbers**
114:1

---

## O

**O'NEAL**
39:1

**oath**
6:8 9:25 44:11 87:12

**object**
55:15 96:25

**objection**
27:10 34:6,7 35:1 42:2
45:15 46:2 48:8,10,13
49:20 50:6 51:8,18 52:15
53:3 58:4 60:3,10 61:3
65:17 66:5,13 68:16 74:7
75:1,17 77:4,17,23 88:8
91:3 116:3 123:25

**obligation**
58:23 67:22 96:7

**observe**
24:3

**obtain**
44:2 71:22

**obtained**
47:18

**obtaining**
54:6

**occur**
23:19,21

**occurred**
34:23 105:12

**occurring**
34:24

**occurs**
34:23

**of**
7:3 8:6 9:11,18,25 10:2,
20,23 11:13,20 12:1,6,9,
20,23,25 13:3 17:4,7
19:9,18,24 21:9,14,21
22:1,4 23:4,10,12,15,17,
25 24:5,12,14,19,20,24
25:17 26:5 27:1,21,25
28:3,19 29:7,12,13,25
31:5,18 32:2,5 33:17
35:6 36:21,23 37:3,23
39:5,7,8,21,25 40:2,12,
13 41:3,6,12,14 42:10,12
43:3,11,14,15 45:3,8,12
46:11 47:3,11,24,25
48:3,25 49:4,12 50:4
52:21 53:24 54:6,8,22
55:3,5 56:5 57:12 58:12
59:9 60:7,24 62:21
64:11,14,20 65:15,22
66:3,12,20 67:7,21 68:20
69:1 70:16 71:17 72:5,6,
7,24 74:21,24 76:4 78:9,
10,11,12 79:18,19,20,22,
23 80:1,4,8,10,12 81:2,4,

5,13,20 82:5,17,21,23
83:2,13 84:6,8,9,11,20
85:3 86:4,10,15,18,25
87:5,13,20,24 88:2,6,18
89:6,13,17,18,21 90:23
91:1,16 92:2,9,13,17
93:18 94:22,25 95:2,11,
12,15 97:7,8,9,15,18,24
98:2 99:2,3,5,6,23 100:2,
9,23 101:4,6,11,25
102:5,6,11,12,15,16,17,
25 103:18,20 104:8
105:15,21 106:11,19
107:4,6,11 108:1,10
109:2,16,22,23 110:6
111:6,15,18 112:15
113:7,10 114:2,18,21,22,
23 115:3,7,20,22 116:21
117:23 118:10,16
119:11,25 120:3,18,20,
23 123:18 124:8,10,11
125:12 126:8,24

**off**
20:9,15 30:6,16 34:20
83:21 126:20

**off-the-record**
126:6

**offer**
10:19 86:17 89:20 98:4
102:19 103:19

**offered**
97:10

**office**
26:1 30:13 116:24,25
119:20 120:6,8,9 124:20

**officer**
12:8,19 57:12 69:23
70:13,15

**offset**
47:20

**Oh**
7:1 48:15 85:9 95:21
100:10 120:12 122:16

**Oka**
84:5

**okay**
7:3,4,14,18,21 8:4,12,16
9:11,22 10:4,12,18,23
11:10,18 12:8,22 13:3,24
14:14,21 15:10,19,23
16:23 17:3,5,11,25 18:14
19:3,7,10,13,18 20:15,
18,23 21:6,23 22:11
23:12,15 24:2,7,12,18
25:3,6,7,13 26:4,10,15
28:15,21 29:16,20 30:20
31:9,13,15 32:4 33:8,16
34:14,18,22 35:16,17,21
36:1,5,15,20,23 37:4,10,
12,21 38:7,11 39:9,13
40:4,24 41:8,10 43:24
44:16,23 45:24 46:16,19
47:6,10,23 48:15 49:9,25
50:21 51:4 53:6,14,19
54:5,14,24 55:19 56:2,5,
10,15,18 57:2,5 58:1,15
59:1,8,15,25 60:23 61:7,
10,12,18 62:2,8,11 63:6,
13 64:13 65:6 66:11
67:10 69:1,3 70:6,11,16
71:5,11,16 72:14,19
73:8,14,24 76:23,25
77:2,20 78:4,8,17,21
79:14,22 80:12,19 81:1,
4,19 82:3,25 83:13,23
84:3,13,17 85:2,14,22,25
86:3,9,12 87:16 88:1,12,
21 89:3,9,12,17,23 90:1

91:7,23 92:23 93:12,16,
23 94:4,16 95:5,7,22
96:4,10,25 98:5,23 99:5,
13 100:18 101:1,9,20
104:15 105:7 106:9,16
107:23 108:4,6,14
109:10,21 110:2,23
111:1,3,8,21 112:2,4,19
115:19,25 116:12,13,18,
20 117:11,14,16 118:3
121:15,18 122:13,21
123:1,7,18,21 124:16
125:3,25

**old**
8:14,15 38:25 98:21
99:20

**on**
6:18 7:23 10:4 20:5
22:17 23:3 25:14,19,24
30:1 31:2,25 32:8,13
33:6,15 34:7,21,23 35:16
38:6 39:14 40:2,6,11
44:7 46:6,9 47:17 48:5,
10,13,19 49:8 52:8
53:11,17 55:5 56:18,21
58:20 64:10 65:9,23,24
66:1 68:8 69:10,19 71:5,
7 72:17 77:14 79:15
81:13,20 83:4,7,12 84:1
90:4 91:12,14 92:1,17
93:9 94:24 96:5,6,7 97:8,
24 98:11,16,20,24,25
99:9 101:1,10 102:20
103:6 107:6,10 109:3,14,
15 112:20 117:22 118:7
119:6 121:2,5 122:10,15
123:15,16 125:10,12
126:7,19

**one**
7:3 13:9 14:17 17:16

21:9 22:12 24:8 35:6,12,
13,14 37:3 40:14 45:25
46:19 58:20 61:7 67:5
78:20 81:25 84:6 86:24
87:24 91:7 92:15,17
94:25 102:17 104:12
110:6 121:5,7,11 123:11,
17 125:15

**one's**
89:23

**one-page**
119:11

**ones**
119:25 121:3

**only**
10:17 11:8 56:21 61:25
71:19 76:11 84:21 92:14
102:5 111:23 113:14
116:23

**operating**
80:17 111:4,23,24

**operation**
36:6,11 82:22 104:9

**operations**
36:9

**opinion**
8:10 19:18 20:1,4 27:19
123:22

**opportunity**
10:8

**opposed**
44:24

**or**
10:4,13,14 11:12 15:14
16:9 19:6,11 22:1 23:5,
22 24:2,22 25:11,12,14
26:5,6,17,20,25 28:8

30:2,7 31:5 33:2,4,11,13
36:13 39:24 40:14,18
41:17 42:10 43:18,22
44:3,14,21 47:20,24
49:1,2,4,12 52:19 54:6
57:4,15 58:21,22 59:2,6
60:16,18,21,25 61:1,7
62:25 63:1,18 65:10
67:22 68:1 69:5 70:8,21
72:16 73:15,22 74:15,24
75:10,14 77:22 82:17
83:17 84:9 86:18 88:15
90:1,7,19 91:7 92:22
99:22,23 100:23 102:19,
20 104:3,22 106:4,22
107:10 109:9,23 111:25
113:7,21,23 114:2,7
115:24 120:17 123:21
124:14 125:21

**order**
9:20 26:20

**ordinary**
27:1 84:20 109:22

**Oregon**
102:11

**organization**
38:16

**original**
12:6 95:3 106:1

**originator**
84:8

**other**
6:17,24 9:3 10:13,15
17:6 23:22 24:12 34:24
44:6 48:2 49:11 50:10
54:20 61:7 66:7 72:4
73:15 79:14 81:4 84:8
91:7 96:13 97:22 103:4
108:24 116:25 119:25

**others**
95:9

**otherwise**
20:14 68:7 109:18

**our**
12:6 21:12,24 23:2 24:22
25:25 26:2 28:24 36:25
37:23 38:15 40:9 56:12
62:9,16,19,22 63:5 69:1
71:9 73:21 76:21 78:1
80:22 92:4 93:18,21
100:15 102:12 103:5
104:24 107:8,21

**out**
20:14 23:5 25:22 27:1
39:21 41:12,14 63:3
64:14 70:16 96:10 102:8
106:19 111:15,18 113:6

**outlined**
91:16

**outside**
36:12

**over**
22:13 23:24 26:17 28:1
29:17 31:6 80:13 85:6,9,
10,12 95:17,19 97:7,13,
15,17 102:11 104:21
120:6 125:18

**Overbroad**
19:20

**overlooking**
28:8

**owe**
50:19 51:1 69:11 97:8
102:24

**owed**
50:14 52:7 81:13,20

**owes**
48:5 50:15

**own**
15:17 32:9 60:19 122:24

**owner**
17:4 24:11 73:22 82:22
86:15 104:10 107:5
109:9 120:7

---

**P**

---

**P&I**
89:14 91:12 111:23

**P-A-H-L**
46:25

**P-H-A-N-G**
6:16,19

**p.m.**
6:3 126:25

**pace**
40:7

**Pacific**
102:10

**package**
86:4

**page**
79:3,7,15,20,23 81:7
83:12 84:20 101:1,2
110:16,18

**pages**
83:11

**Pahl**
46:25

**paid**
27:9 47:19 48:6 52:25
60:1 64:16,19 66:25 73:5

76:15 86:24 87:7,13,20,
24 88:2,5 89:6 90:2 96:4,
5,14 97:2,4,6,23 98:2,5,
11,16,24,25 99:9,11
108:21 109:23 116:14,15
122:10,15

**parcel**
120:16 121:11 123:18
125:20

**parcels**
121:20

**pardon**
8:24 16:7 17:19 111:17

**parent**
9:6

**park**
14:12,13 122:5

**Parker**
17:8,15,16 18:17,18,19
35:24

**parking**
120:22 124:22,23

**part**
12:20 13:6,17 31:5 41:3

**partner**
47:3

**Parts**
13:11,24

**pass**
109:5

**pause**
11:7 20:16 30:18

**pay**
22:15,17 49:10 51:1
55:10,11 56:11,24 57:10,
14 60:7,21 64:21 69:20

73:2 76:19 83:8 87:9
88:17 89:10 91:1 96:1,3,
7,15 97:1,20 98:6,10,20
107:7 109:6,7,8 111:22,
24 113:16 114:9,10
115:9,13 117:9 122:17
125:1,2,4,16,17

**paying**
65:2 71:12,19 90:4
115:7,20 117:16

**payment**
53:17,18 79:8 81:25
122:19

**payments**
79:24 80:2,7,21 81:23
82:9 99:18

**payroll**
80:4 99:9 113:12,14
114:20

**pays**
108:9

**pending**
11:9 77:13

**penny**
113:11

**people**
15:18 38:17 69:24 80:15
94:22,23 102:17 120:21

**per**
79:24 80:2,13,23,24
81:17 82:13 89:14

**percent**
27:20 31:18 83:15 86:10
88:17 89:13 90:2,5 91:1
99:3,4,5 108:13,16
109:19,23 114:21,22

**percentage**

86:17,25 87:5,7,13,20,24
88:2,6 89:17

**performance**
102:21

**performed**
34:3

**perhaps**
13:13 108:4

**period**
23:25 36:10 84:24 89:14

**person**
26:5 36:17 37:3,8 60:19,
20 63:21 64:9 102:17
104:12 108:9

**personal**
80:9 108:1

**personally**
8:1

**petition**
103:16

**PG&E**
102:8,15,23 103:1,15,20
104:1

**Phang**
6:5,13,16,19 7:4,22 8:14
13:14 20:18 21:7 27:3,4,
12 29:5 30:20 34:15,18
41:1,8 42:8 48:15 50:1
66:7 68:23 71:5,6 85:18,
19 126:8,24

**Phoenix**
122:2,3,5,18,22,24 123:1

**phone**
20:10 30:6 49:7

**phonetic**
37:18 59:2,6 118:20

**phrase**
50:11

**Phyllis**
36:21,25 37:14

**physical**
71:25 72:2,5

**pick**
65:15 126:20

**picking**
66:11 68:25

**picture**
34:21

**piece**
56:5 60:7 120:3,17
123:18

**pieces**
120:25

**piling**
65:9

**place**
10:10 15:18 62:11 63:19
93:2 94:8 105:13,20

**placed**
63:7 74:15,16

**placing**
63:18 69:18

**plaintiff**
8:23,25 9:2

**plan**
9:20

**plant**
81:12

**please**
6:14 11:1 13:1,16 17:12
20:20 48:12 105:13

113:23 126:14,18

**plus**
80:2

**PO**
33:18,21 110:16

**point**
33:17 57:5 80:22 81:3,9,
10 112:6

**policies**
71:22,25 72:2

**policy**
72:5 74:14,15 75:23

**position**
14:18,21 15:25 16:5,8
39:6 63:13

**positive**
92:9

**post**
103:15 107:8,9 109:8

**potentially**
95:9

**preferred**
43:11

**preliminary**
15:12

**premium**
71:19

**preparation**
32:5 45:3,8,12

**prepare**
28:23 43:18,21

**prepared**
27:5 32:8 82:16 83:24
107:19 110:8,12

**prepares**

26:11,22

**preparing**
79:12

**presence**
24:19

**present**
10:14,15 37:13,14,17

**presentation**
100:20

**presented**
31:5 82:17

**pretty**
80:8

**previous**
84:18

**price**
40:17,18 60:1

**prime**
9:21 96:6,14 97:2 102:4

**prior**
13:4 16:16 18:11,14,16,
21 34:8 71:7,17 75:20
101:24

**probably**
24:21 60:14 92:22 97:10
99:4 104:3 118:22 119:4
121:1,12,19 125:18

**problem**
77:22 118:19

**procedure**
10:10

**proceeding**
10:24

**proceedings**
6:1 20:16 30:18

**process**
25:15 27:1 58:15

**produce**
82:20,21

**produced**
29:2

**product**
26:5

**professional**
20:7

**profit**
84:17 86:18 90:7,9,15,
20,21,25 101:12 107:3
110:18

**profits**
86:10,25 87:14,20,24
88:2,6,18 89:13,18 91:2
101:18 105:5 108:21
109:15

**project**
33:15,22 54:21 93:25

**projected**
78:23

**promised**
65:6

**promoted**
12:21

**pronounced**
46:25

**properties**
7:10 116:9,13,16 119:12

**property**
81:12 116:1 117:1,2,23,
24 118:18,21,22 119:17
120:3,4,13 121:17 122:1
123:12 124:19 125:4

**protect**
22:19

**protection**
9:19 22:22,23 23:1,7
61:23 62:15 63:4 70:6
74:13 76:20

**provide**
32:14

**provided**
30:9,12

**Public**
102:9

**publish**
100:2 104:15 105:24
110:4

**published**
46:19 88:21

**publishing**
94:16

**purchase**
22:12 54:6 55:19,25 56:3
57:8,13 73:18 76:3

**purchased**
53:23 71:23 118:1,3

**purported**
67:7

**purpose**
106:25 120:23 124:10,11

**put**
25:14 32:9 48:9,13 58:16
62:16 85:22 117:22

**puts**
65:23

**putting**
126:9

## Q

**qualified**
85:25

**question**
10:25 11:8,9 15:12 21:13
26:24 27:12 28:2,15
29:5,25 32:17 34:10,14,
15 35:4 41:17 42:9 43:10
44:24 45:1,25 52:1 58:7,
9 59:4 62:2 64:3 65:20
68:22,24 69:2 70:19 75:8
77:12,14 99:14 100:24
105:8 109:12 115:11

**questioned**
22:5,8

**questioning**
68:20

**questions**
10:24 31:2 126:8,13

**quit**
15:14

**quite**
41:5 74:21 80:12 111:9

## R

**race**
11:6

**Raging**
14:7,11,19 15:13

**raise**
38:19,23

**raised**
46:1 112:6

**Ramirez**

57:3

**Randy**
22:14 57:8

**range**
99:22 113:19,23 114:2,7

**rate**
108:9,12,16,17

**rather**
83:24

**reach**
25:22

**read**
20:25 21:5 47:21 79:18
89:15 95:5 106:10
110:17 112:17

**reading**
21:2

**realize**
27:23

**really**
70:7

**realtor**
120:5 124:5,6

**reason**
8:9 11:19,23,25 57:17
82:25 85:5,6,11 97:3

**recall**
10:5 24:21 36:6,23
37:17,20 38:4 40:9 44:4
46:18 47:9 56:23 59:21,
25 60:5 79:12 81:21,22,
23 82:7,19 86:12 88:3
89:8 93:22 95:19,22
100:21,23 104:18,22
105:17 106:3 108:11
113:22,24 116:19,21
117:18 120:15 121:13

122:16 125:18

**recalls**
86:14

**receive**
49:2 53:17 54:14 55:7
74:11

**receiving**
64:24 86:10

**recess**
71:2 126:4

**recipient**
94:25

**reclassification**
84:10

**recollection**
11:19 12:1 47:8 82:3
93:24 105:9 108:18
115:19

**recommend**
62:9

**recommended**
62:20

**record**
6:15 7:23 20:9,15 21:5
30:6,17 38:17 48:10,13
52:21 71:5 126:8

**recover**
22:7

**recovered**
53:11

**reduce**
109:17

**refer**
107:21

**reference**

86:9 93:21

**referenced**
30:25 46:22 79:10 89:1
93:15 94:20 100:8
104:20 106:7 110:10
115:17 119:14

**referred**
12:18

**refinance**
118:18,21 119:5

**reflected**
79:19

**refresh**
47:7 108:18 115:19

**regarding**
81:12 98:20

**rejected**
97:5,9

**relate**
59:15

**related**
35:6 61:13

**relayed**
103:24

**rely**
44:7

**relying**
69:19

**remember**
33:2,12 60:14 61:21,22
78:13 81:25 88:3 90:12,
14 114:5,6,8,24 115:22,
24 116:19 122:11 125:6,
21,24

**REMOTE**
6:1

**renege**
90:4

**renew**
62:15 117:14

**renewed**
117:12

**rent**
116:14,15,23 117:9
119:2

**rented**
116:25 117:6,7

**reorganization**
104:2

**repeat**
9:14 15:1,2

**repeatedly**
67:19

**rephrase**
11:2,24 18:4 19:22 43:12

**report**
16:3,4,21,22,24 17:9
19:3,11 36:1,15,17
43:18,21 100:12 101:2

**reported**
17:6,7,11 18:8,11,21,24
36:18 38:21 42:13

**reporter**
6:7 9:4 13:8 14:25 21:4
29:4 34:13 40:21 45:21
49:24 126:15,18,21

**reporting**
23:23

**reports**
26:22

**repossess**
56:13

**representing**
7:19

**represents**
8:1

**reprocess**
56:12

**request**
9:4 29:21 31:25 36:8
39:17 49:2,8 54:8 63:22
76:6

**requested**
21:5 78:1 82:19

**requesting**
61:23

**require**
22:25 61:15 76:3

**required**
63:11

**requirement**
70:14

**requirements**
74:25

**reserved**
127:1

**residence**
124:17

**resigned**
15:21

**resolved**
72:16

**resources**
38:17,21

**respect**
63:18

**responsible**

46:13 50:21 67:11 84:6

**restoration**
33:1,4

**result**
99:6 109:16

**retire**
8:10,11,12 39:1

**retired**
17:21 85:15

**retirement**
65:4

**return**
107:4,5,6 109:1

**returns**
107:20 108:1,4

**revenue**
83:2 92:3 101:4,21
102:1,6,7,12,16 103:6
104:18 116:21,23 117:1

**revenues**
101:15

**review**
52:21 64:2 73:13 79:4
89:3 100:15 119:2

**reviewed**
63:25 64:5 70:9,22 84:15

**revise**
100:21

**Rialto**
120:2,15 121:4

**Richard**
7:9 35:6,10,12,13

**Rick**
35:11,14,17 36:1,3,20,24
37:7,11,16,21 38:14 39:9

94:17 95:2,8 96:1 98:9,
16 102:7 104:9 106:11
115:1,2,3

**Ricky**
35:14 63:1 94:17 95:9
115:3

**right**
8:4 11:12 13:23 15:11
19:5,13 21:7 23:11,19,
20,21 25:7 26:8 30:16
31:2 37:8 39:13 40:4
41:8 42:4,17 44:12 46:6,
9 48:22,24 49:11,15
50:3,19 51:14,16 52:10
53:6 54:11 58:3,18 59:11
65:16 68:25 72:21 74:22
75:12 78:4,18,22 79:17
80:13 81:16,17 82:8,25
87:20 88:6 90:16,23
91:2,8,10,19 92:12 93:2
94:12 100:16 109:4
110:15 112:7,14 115:1,6
120:14 121:8 122:19
126:7,15,17

**ring**
85:22

**Rio**
62:19 76:1,2,8

**Road**
121:15

**Robert**
23:23 57:1,4

**Robin**
7:8 18:24 19:3,11,12
23:13,23 24:11,13,17,23
37:19 63:1 87:6 95:8
106:5,19,20,25 107:10,
12 108:2 112:16,25
113:7 114:10,21,22

**Robin's**
109:18

**Rodriguez**
62:5 63:7,14 73:24,25
74:1,4,15,17,18,20

**role**
62:8 71:16

**Ronnie**
7:7 12:3,5,13 17:23,25
18:2,3,5,8 19:7,8 20:19
21:2 22:10,15,19 26:15
36:21 37:13 39:10 41:12
42:14,17 47:18 50:21
51:3,5,6,16,21,23,25
52:4 53:24 58:24 64:13
68:1 72:10,17 82:17 85:2
91:1,19,23 92:24 93:19,
21 98:19 99:6,16 106:1
109:23 115:7 119:17

**room**
37:2,5,9

**roughly**
80:5 82:9 84:22 101:10
108:20 109:24

**round**
33:17

**run**
22:14 39:2,16 83:1
103:1,5

**Ryan**
85:15

---

**S**

**S-A-I-Z-N**
25:11

**S-E-I-N-G**
25:12

**S-O-Y**
6:19

**Sacramento**
125:14,15

**said**
6:20 9:5 20:24 21:2
26:24 27:1 28:9 34:23
42:3 44:4,9 51:2,4 52:11
59:12 73:16 76:9 86:20,
24 87:18 89:18 92:18
96:5 98:11 119:1

**salary**
87:9 89:6,9 99:12
114:24,25

**sale**
54:6,7 55:20

**sales**
87:5

**same**
9:25 10:1 16:25 36:17
77:17 84:24 89:9,18
104:14 112:15 117:5
121:16

**San**
14:7,11 121:6,15

**satisfy**
62:23

**saved**
109:25

**saw**
39:15 47:8 52:4 101:25

**say**
18:5 19:5 21:15 22:5,9
23:7 24:3 25:9,13 27:14
28:2,6,7 38:2,3,19 39:3,
15 42:18,20 46:12 48:2
49:16,18 50:13,14 51:25

52:11 54:25 57:20 58:10
59:19 60:9,21 61:18
68:9,10 69:11 74:4 76:20
80:22,23 81:1 82:12
83:4,7 84:5,9,13 85:23
86:17,19 96:25 98:23
99:3,4 101:9 103:22,23
107:12,13 109:6 110:6
119:3,8 121:6,8

**saying**
22:8 24:8 50:25 54:9
63:6,17 66:22 67:17
74:12 78:2 86:23 87:10,
12 97:22 107:19 110:3
113:5,14 114:13

**says**
32:19 46:7 47:10 79:17
80:7 84:3,20 89:5,12
94:13 95:1 100:11
110:20 115:13

**scale**
92:17

**scared**
27:17

**SCE**
22:24,25 23:2 26:6,7
27:8 63:11,22,25 64:5
75:23 76:2,6,9,12,15
77:2,21 92:7 98:20
102:15

**schedule**
36:11

**screen**
39:15 78:23 88:22 101:1
126:20

**second**
20:9 21:23 46:19 77:14
117:7

**section**
112:8

**see**
13:15 20:9 26:17,18
29:24 30:8,10,13,23 32:1
33:16 39:4 43:3 46:16,20
47:7,13 52:20 76:1 83:25
84:19 87:10 88:24 94:12
100:14 101:7 105:19,23
107:17 110:3,20 115:15
116:20 125:3

**seeing**
89:24,25

**seem**
50:10 97:22

**seen**
29:9 52:6,22 67:6 93:20
100:5 105:23

**Seing**
25:11,12,13 31:5 41:17
42:14 43:6,17 44:3 65:24
66:2

**Seing's**
43:11

**sell**
120:22 124:12

**send**
15:17 28:4 29:11,17
31:6,17 49:3,4,8 63:4
79:5 113:7 126:17,20

**senior**
14:23 15:3,7,8,10 35:12,
17

**sense**
27:4 34:23

**sent**
25:18 26:10 46:17 49:15

97:20 100:15 113:6

**sentence**
47:21

**separate**
33:8

**SEPTEMBER**
6:2

**Serial**
118:20

**service**
7:8,17 8:5,22 9:2,6 12:7
15:22 25:2 39:8 43:1
45:2 50:14,15 52:24
58:17 61:24 72:24 91:25
95:3,10,16,20,24 97:25
98:7,24 99:19 100:3
103:6 104:16,25 106:2
107:2 114:23 116:16
119:24 122:18,22,24
123:2

**Services**
13:6,11,17,24 102:9

**set**
100:2

**settled**
96:23

**settlement**
96:21 115:12

**seven**
92:20 125:21

**several**
21:9 37:19 120:25

**shall**
84:9

**share**
114:23

**shareholder**
107:4,5

**shareholder's**
112:21

**sharing**
86:18

**she**
21:14,15 27:1 28:5,9
32:2 41:17,19,20,23
44:11,14,15,16 86:15,16,
18,20,21,24 87:18
106:23

**she's**
86:19 87:18

**sheet**
104:17 111:24 121:2

**Ship**
63:8,17,20 74:15

**short**
30:5

**Shorthand**
6:7

**should**
30:9 57:9,25 58:21,25
63:22 69:25 75:15 99:11
103:25 110:6

**shouldn't**
96:4 97:1

**show**
42:18 67:17 76:20 78:14,
19 89:25 94:8,9 100:1
105:22 111:23 119:10

**showed**
90:14 112:10

**shows**
82:12 101:3,6

**shrinking**
50:11,12

**sic**
39:1

**sign**
22:24 23:3,6 26:3 55:19
64:9,10,17 67:3 70:13,16
86:19

**signature**
127:1

**signed**
26:1,2 55:24 62:17 63:2,
21,23 64:1,6 70:9 73:13
75:22,25

**significant**
111:9

**signing**
61:14 64:14

**simple**
58:9

**simply**
67:14,25 90:24

**simultaneous**
29:1 93:6

**since**
24:7 35:20 120:15

**single-family**
124:17

**sir**
7:14 13:9 29:9 31:8 41:5
46:20 47:23 48:14 65:19
66:2 67:19 90:11 100:6
117:25

**sit**
104:10

**site**
120:24

**situation**
57:4 82:23

**six**
92:22

**size**
39:21

**slide**
13:14

**slow**
117:15

**slower**
6:23

**smiling**
93:3

**so**
8:4,10 11:6 14:1,17 16:9,
13 19:3 21:7,18,23 22:2,
6 23:22,24 24:2,5,12
25:3,7 26:4,7,15,21 27:8,
17,23 28:1,13,15 29:17
30:1,9,12,20 31:2,17,21,
24 32:19 34:22 35:16
37:10 38:7,14,19 39:3
40:4 41:6,8,11,14,16,21
42:5,24 44:20 46:6 47:10
49:15 50:3,13,21 51:16
52:11 53:16 54:3,12 55:8
56:9,13,15,18 57:5,10,23
58:10 59:8,11,14 61:10
63:2,13 65:9 66:11,19
67:3,23,24,25 68:7,25
69:1,13 71:11,16 72:10
73:14 76:3,5 77:2,20
79:3,4 80:12 81:10,11
82:9,25 83:5,13,16,21
84:13,17 85:2,22 86:18,

23 87:7,10,15 89:15,17
90:3,11,23 91:11 92:2,9
93:12,23 94:4,16 96:15,
20 97:5,19,22 98:5,22,23
100:11,12 101:1,9 102:4,
12 103:3,21,24 104:5
106:17 107:8 108:6,20,
23 109:6,12,14,21 110:2,
3,15,23 111:3,11 112:6
114:1,20 116:11 117:22
118:23 119:4 120:6,21,
22 121:4 124:13 125:3,
23 126:7

**sold**
15:16

**solely**
42:13 70:11

**some**
8:17 10:24 25:9 27:20
31:2 42:10,12 44:24
46:12 49:12 55:5 56:2,3
57:17 61:13 67:15 70:15
73:15 97:11,15,24 99:2,
18 100:22,24 102:11,16
103:19 109:2 124:8

**somebody**
29:16 57:5 58:1 68:13
70:2 85:18

**somehow**
48:5 67:10 77:22

**someone**
7:19 18:16 28:22 29:25
67:20 68:13

**something**
19:14 20:6,19,24 21:3,8
24:4 25:9 27:16 33:2,4,
13 36:7 44:24 46:13 49:7
57:13 69:24 73:14 75:14
91:24 122:12

**sometime**
19:24 72:16

**sometimes**
40:10 55:23

**son**
94:18

**sorry**
18:4 19:1 30:22 40:22
73:24 92:5 114:6

**sort**
49:12

**Sound**
89:7

**sounds**
58:1 108:14

**sources**
25:22

**Southern**
9:20 26:2,7 31:17 32:25
33:6,20 34:3 39:21 44:21
45:11 61:14,22,24 62:14
63:2 73:11,21 74:12
92:1,3 97:4,16,24 98:5
99:17 102:4 104:8

**Soy**
6:19

**speak**
41:1,2,4,6 43:13 85:23

**speakers**
93:6

**specific**
93:24

**speculate**
11:13

**speculation**
27:11 45:16 46:3 48:11

50:7 51:9,19 52:16 61:4
68:5 75:2,8 76:17 77:5,
24 88:9 91:4 116:4 124:1

**spell**
6:14

**spoke**
39:9 43:12 99:16

**spot**
85:4

**square**
118:14,15,16

**stand**
32:24 33:3,4

**standpoint**
82:24

**stands**
32:22

**start**
19:10 21:15 28:1,5 32:2
61:22 92:7 97:10 122:2

**started**
20:4 61:24 62:6 92:7
123:3,5

**state**
6:14 108:10,17

**stated**
32:1 86:20

**statement**
82:21 84:14 89:14 99:18
106:11,14 110:18,19
117:23 118:8

**statements**
100:3 110:8 116:8

**staying**
80:16

**Stephen**
29:22 34:17 79:1

**Steven**
7:20,21,24 14:9 17:8,15,
16 18:18,19 35:24

**still**
22:16 28:18 56:8 57:11
75:23 81:4 112:21
122:24

**stock**
87:5

**stockholders**
112:7,8

**stopped**
21:18

**straining**
20:11

**strategy**
103:7

**Street**
121:20 123:10,14 125:14

**strike**
12:12 43:8 48:16 52:3,4
69:15 70:3,17 93:5,7,10
105:10

**strikes**
34:22

**string**
21:21

**stuck**
43:4 102:24

**stuff**
26:25 60:18 92:9

**subcontract**
96:6,8,14 99:1

**subcontractor**
91:25 96:15 102:5

**subject**
47:20 53:25 54:17,25
56:6 58:22 61:1 77:15
86:4 107:3

**subjects**
78:8

**submit**
21:17 27:19,22,23 39:17
42:23 43:1 44:20 97:14

**submitted**
27:21

**submitting**
71:20

**subsequently**
96:10

**substance**
87:19

**substantial**
80:8

**subtract**
14:1,3

**such**
26:23,25 29:10 86:22
87:1

**sue**
9:17,18 50:23 51:11
69:14 88:1 95:24

**suit**
9:19

**sum**
53:24

**summary**
31:6 79:8,19,23 80:1

**summation**
25:25

**support**
37:24 52:25 98:15,18
103:1,3,24 104:1,6

**supposed**
109:5

**sure**
21:22 35:5 36:16 57:9,13
62:23 68:21 99:11 104:8
113:18 118:11,13 123:4

**surprised**
38:20

**switch**
22:23

**switched**
62:19

**sworn**
6:6 44:11 106:11,13

**system**
28:18 32:9,14

---

**T**

---

**tack**
59:2

**take**
10:10 11:6,7 14:1 15:18
20:8,13 29:20,21 30:2,5
37:13 56:20 70:25 79:3,6
92:8 125:25

**taken**
8:19 71:2 126:4

**talk**
6:23 24:10,18 55:17 60:8
62:25 66:8,10 104:10
109:10 120:21

**talked**
24:24 59:12 62:13 63:1
76:8 125:13

**talking**
54:18 59:25 68:25 76:5
114:18 119:21

**talks**
93:21

**tax**
106:25 107:1,4,5,6,7,11,
15,19 108:1,7,9 109:1,8,
25 111:20,22,24 112:12,
16,25 113:1,4

**taxable**
109:17

**taxes**
101:6 108:21 109:18
111:6,11

**team**
23:5 58:16,20 93:17,21
103:18,25 104:7

**tell**
9:15 10:14,25 20:20
21:7,16 25:14,25 27:2,15
28:6 39:20 41:16 44:12
53:7 54:3 57:18 60:15
65:12,14 66:7 68:10,11
71:16 76:13 88:16 89:21
94:11 95:22 99:7 101:20,
24 114:1 119:25 120:8,
14 123:22

**telling**
26:21 28:11 29:9 32:2
65:11,25 68:13 89:23

**temporary**
39:1 85:16

**ten**

92:17

**tender**
105:21

**term**
108:7

**terminate**
63:5

**terminated**
7:16,18 8:5,8 12:23

**terrific**
110:23

**test**
41:25 78:16

**testified**
6:8

**testify**
10:1 11:21

**testifying**
34:16

**testimony**
9:24 34:8 44:7,9 65:7
75:20

**than**
10:15 17:6 33:23 44:7
47:12 59:22 82:1 114:19

**thank**
12:3 13:23 15:23 16:19
18:10 41:7 45:23 70:24
71:1 78:7 99:25 107:18
126:2,3,9,11,15,22

**that**
8:1,5,6,23,25 9:2,8,11,16
10:5,13,20 11:1,3,9,19
12:12 13:15,19 14:1,2,8,
9,17 15:2,10,23 16:13,16
17:8 18:5,11,14,16,21

20:4,10,19,20,23 22:5,8,
9,19,25 23:1,8,24 24:4
25:3,13 26:3,13,16,22
27:1,3,4,5,23 28:8,22
29:7,17,18,20,21,23
30:2,14,15 31:4,6,7 32:3,
19,22,24 33:6,10,14,16,
24,25 34:9,12,23 36:10,
19,23,24 38:4,8,18,21,23
39:2,7,10,16,20 40:2,7,
15 41:20 42:15 44:17,25
45:2,7,11 46:11,12,16,17
47:3,7,8,10,13,16,19,21
48:5,16 49:12,18,23
50:18 51:4,6,16,24 52:3,
4,5,6,21,22,23,25 53:22
54:5,8,9,21,25 55:5 57:4,
5 58:11,15,17,20,21,25
59:6,7,11,16 60:5,17,18
61:6,15,18 62:15,18,24
63:6,12,14,22,24 64:4,10
65:15,19,22 66:23,24
67:2,5,10,17,19,25 68:2
69:1,4,7,14,20,21 70:9,
21 71:11,22 72:11,15,16,
21 73:9,10,14,15,16,18,
19,23 74:1,12,14,15,17
75:14,15,18 76:10,12
77:14,21 78:13,15 79:3,
12,14,15,24 80:10,15
81:1,3,6,13 82:4,7,13
83:7,16 84:10,13,14
86:13,14,16,17,19,21,24
87:5,13,17,19,23 88:3,
16,17,21,24 89:5,8,9,15,
25 90:7,11,14,23 91:16
92:23,24 93:21 94:3,11,
18 95:5,11,12,23 96:5,8,
11,13,14,15,16 97:4,7,8,
23,25 98:3,7,9,15,16,23,
24 99:5,19,23 100:22,24
101:7,10,12,20 102:1,3

103:7,14,25 104:22
105:10,12,13,18 106:3
107:1,14,18,19 108:11,
18,25 109:18,23 110:23
111:2 112:10,17 113:8
114:1,15,21 115:15,19,
20,23 116:11 117:1,11,
23 118:19 119:1,2,3,4,
17,21 120:2,16,24 121:5,
7,11,13,15,18,22 122:1,
12 123:10,11,19 124:19,
21 125:4,10,17,20
126:21

**that's**

6:22 13:15 21:6 26:10
28:11 31:21 38:2 40:24
42:13 44:9 47:2 50:11,23
51:7,11,25 52:10,13 63:5
64:12 68:12 69:12 70:20
75:9 76:13 78:4,6 80:12,
15,23 81:16 84:21 85:5,6
86:20 87:3,22 89:17
90:16 92:4 94:4 96:18
97:20 103:5 104:17
106:17 108:14 110:18
113:14 117:3 118:2
120:10

**the**

6:6,14 7:11,23 8:23,25
9:6,11,15,18,20,23,25
10:1,2,18,19,20,23 11:8,
9,13,15 12:6,8,13,16,18,
21 13:9 14:20,23 15:1,9,
16 16:15,16,20,23 17:4,
7,8,10,12,14,15 19:9,24
20:3,9,10,15,22 21:2,4,5,
6,9,13,14,16,17,18,21,
23,25 22:2,3,16,17,24
23:5,6,10,15,19,21,24
24:4,7,11,12,18,19,24
25:8,15,18,19,24,25

26:1,5,6,10,11,16 27:1,6,
7,8,12,19,25 28:2,6,18,
19,24 29:2,7 30:2,6,7,8,
16 31:4,11,18,20 32:1,5,
9,17,20 33:5,6,7,14,15,
16,17,18,22 34:1,3,7,9,
13,21,22,25 35:5,6,16,
17,24 36:6,12,13,17
37:1,2,3,5,9,10,23 38:1,
5,6,11,16,24 39:2,4,5,6,
14,21 40:1,3,12,13,17,
18,22 41:21,23,24 42:9,
25 43:1,2,3,14,18 44:12,
22,23,25 45:3,8,12,17,
20,21 46:1,11,16 47:2,3,
12,17,19,25 48:9,10,12,
13 49:3,8,11,12,13,16,24
50:3,14,15,24,25 51:1,
22,23 52:8,21,23 53:8,
10,17,19,24,25 54:3,8,
11,14,16,20,21,22 55:5,
7,9,18 56:8,11,13,15,18,
21 57:10,11,15,19 58:3,
6,7,11,12,15,21 59:8,9,
19,20 60:1,6,15,20,23,
24,25 61:1,7,10,12,15,
18,19,21 62:17,21,23,25
63:1,8,21,24,25 64:4,5,7,
8,10,12,14,16,20 65:11,
13,14,15,23,25 66:3,11,
12,20 67:16,18,25 68:1,
2,8,12,13,20,22 69:1,7,
10,11,12,17,18,19,20,21
70:5,6,7,8,9,14,16,22
71:5,6,9,17,19,20,21,22,
25 72:2,10 73:13,21,22
74:25 75:8,13,22 76:2,3,
6,7,13,25 77:1,14 78:2,9,
11,14,23 79:1,7,19,20,
22,23 80:15,17,20 81:5,
7,23 82:4,13,21,22,23,25
83:12,24,25 84:5,6,8,9,

10,11,13,19,20,24 85:2,
5,6,11,17,22 86:4,10,15,
25 87:4,5 88:1,18,22
89:8,9,13,14,17,18 90:23
91:1,7,11,23 92:6,7,9,14,
15,17,18,24 93:2,3,20,25
94:25 95:3 96:5,6,8,14,
15,23 97:2,3,13,14,16,
19,20,24 98:3,24 99:9,
12,13,16,18,23 100:4
101:1,3,10,11,15,18,20,
24,25 102:8,11,12,16,18,
19,21,24 103:11,14,21,
24 104:3,5,6,7,8,10,12,
13,14,17,18 105:11,15,
21,22,25 106:4,10,11,17,
18 107:3,4,5,6,8,14,19,
20,24 108:1,5,7,9,10,14,
16,20 109:1,4,7,9,10,14,
17 110:7,17,18 111:4,15,
17,23 112:7,11,15,25
113:6,7,10,12 114:20,22,
23,25 115:3,12,23,24
116:1,6,8,14,21,23,24
117:1,2,5,6,7,8,17,23,24
118:2,10,12,14,18,19,21,
22 119:2,3,6,8,17,20,23
120:3,4,5,6,7,19 121:4,5,
16 122:4,7,10,13,15,18,
21 123:3,15,16,22,24
124:7,10,11,20,21 125:6,
12,14,15 126:3,8,11,15,
17,18,21,23

**their**
9:19 15:17 49:4 97:9
98:11,16 107:11 122:5

**them**
9:17,18 14:15 21:21
22:5,8 23:17,18 28:18
36:13 37:20 39:23 50:18,
23 51:11 69:11,13,14

92:19 96:1,7 97:1,8,10,
15,19 98:4,10 103:1,2,3,
19,24 104:6 107:6,22
109:9 113:4 114:18
120:1,21 121:2 124:7,10,
11,12 126:19,20

**theme**
69:1

**themselves**
113:17

**then**
11:9 17:9,23 18:6 22:6
24:7 26:10,11 28:6 33:8
43:4 47:15 48:10 53:6
57:21 71:16 73:8 76:6
80:19,21 83:11,23 87:22
88:5 89:12 92:5,10
101:15 102:9,21 108:1
109:11 111:8 113:16,17
117:16 118:6 120:7
121:5,7,20 123:7 124:16
126:17

**there**
11:18,23,25 21:9 32:20
33:25 35:5,11,25 37:19
40:15 47:24 52:5,21 53:7
62:16 73:18,19 74:1 81:2
83:1 87:1 90:10,15,19,
24,25 91:20 96:5,7,20,
21,23 97:4,11,13 100:18,
19,21 102:12 105:21
108:24 111:2 112:20
115:6,20 117:14 120:7,9,
21,25 124:18,19 125:12

**there's**
11:8 32:19 40:12 50:5
51:5 52:13 67:13,14
68:14 72:5 80:4 82:9
83:14,24 90:15,21 95:8
100:12,24 116:25 120:20

**these**
23:12 24:15,20 48:2 49:9
67:7 72:12 74:21 81:20
94:23 110:12 112:10
119:16,25 120:15 123:23

**they**
8:10,12 9:17 15:17
17:21,23 22:3,5,6,9,15,
18 25:21,22,24 29:3,11
33:14 36:13 39:2,3,4
43:2 46:17 49:8 50:18,24
51:2,13 53:17 56:13,14
59:11 61:25 62:25 63:3,4
68:7,9,10 69:11 73:2,5
75:24 76:19 77:3 83:8
85:21 88:4,19 92:1 97:6,
7,8,9,14,18 102:21,23
103:4,20 104:1 107:21
109:23,25 111:15,18
113:10,12,16 114:2,9,25
116:24 117:12 118:23,25
119:1,2,3,4 120:7,20
121:3 122:24 123:24

**they'd**
124:9

**they're**
35:13 65:2 68:11 78:2
118:21,25

**thing**
11:8 22:12 23:10 49:15
68:8 78:3 86:22 87:2
122:11

**things**
21:9,10 93:2 109:2
123:23

**think**
9:5 12:21 20:6 22:1,19
23:3,10 24:21 27:17
30:11 31:21 41:5 42:3

48:11 50:13,15 57:6
67:23,24,25 68:2 77:6,9
79:5 90:3 94:11,25
100:21 104:21 106:23
108:13 114:13,19,20
116:25 118:2 125:23

**thinking**
41:20

**third**
53:19 84:20 121:5
123:16

**this**
7:8,24 10:9,16,23 11:5,
13 21:14 22:6,7,9 24:9,
14,16,17,23 25:15,22
26:4 27:23 28:3,9,10,16,
17,20,21 29:5,6,17 30:8,
21 31:3,4,9,10,11,15,16,
17,22 32:2,3,15 33:18
34:9,22,23,25 37:8,12,22
38:7,20 39:13,14,15,18
41:9,12,14,17 42:19,23
43:1,3,4,10,14 44:19,20
45:3,8,12 46:1,10,11,24
47:6,7,10 49:15,17 50:3,
19,22 51:1 53:11,12,19,
23 54:9,10,25 55:3,4
56:5,7,8 57:22 58:12,16,
22 59:5,12,16 60:9,17,
18,21 61:12 64:14 65:22
67:7,11 70:19,25 77:21
78:24,25 79:2,17,18 80:8
81:16 82:12,16,17,20,21
83:1,4,7,13,24 84:14,18,
19,22 86:20 88:22 89:3,
5,20,21,22 90:23 93:8,
17,18,19 95:2,4,7 97:20
98:3 99:11,17 100:5,9,
13,14,16,19 101:2 102:7
103:18 104:8,11,16,24

105:24 106:10 107:12,
13,14 110:4,5,6,16
111:15,17 112:24 120:11
121:2

**those**
7:3,11 22:9 23:6,10 41:6
61:25 69:22 97:5,6 98:19
104:4 106:24 108:4
109:3,4,8,16 110:8
111:20 113:5,6 118:15
120:19 121:21 123:17

**though**
67:13 79:6 81:10 103:2

**thought**
20:19,21 30:4 58:21

**thousand**
39:25

**threatening**
50:4

**three**
32:20 40:13 104:4 115:7,
9,14,20,23 116:7 121:1
125:9

**three-man**
33:13

**through**
71:3 79:19 83:2 98:19
126:5

**throwing**
34:20

**Thursday**
94:12,15

**time**
6:22 10:2 12:9,13 13:9
17:8,14,23 23:25 25:16
27:25 34:25 35:24 36:10
39:2,20 55:18 57:22

59:20 61:19 62:18 63:12
74:8,10,17 75:22 76:2
79:4 82:4 85:2 92:8 93:2
95:7 102:13 105:13,18
114:21 123:23

**title**
12:11,13

**to**
8:10,12 9:20,23 10:1,5,8,
9,12,24,25 11:2,6,12,14
12:18,21 13:4 14:2,3,5
15:13,16,17,18,19,24
16:3,4,16,21,22,24 17:6,
7,9,11 18:5,8,11,14,16,
21,24 19:3,11,16 20:9,
11,25 21:11,16,17,18,24,
25 22:2,4,7,9,15,18,23
23:2,4,5,23 24:2,10,11
25:14,18,22 26:10,17,18,
19,22 27:2,8,15,18,19,
20,22,23 28:1,2,3,4,10,
17,18,19 29:7,17 30:1,2,
5,9,13,21,24 31:5,6,16,
18,24 32:1,3,4,13,14
33:21,25 34:9 35:6 36:1,
7,8,13,15,17,18,25 37:8,
21,23,24,25 38:3,16,25
39:2,4,7,10,13,15,16,21
40:3,4,16 41:9,12,14,17,
20,21 42:13,17,18,23,25
43:1,2,3,8,10,12,17,21
44:12,21,24 45:17,24,25
46:17,20,21 47:2,11,16,
20 48:3,9 49:2,9,10
50:10,13,24 51:1,23
52:6,24 53:6,7,25 54:10,
11,17,21,24,25 55:8,10,
12,24,25 56:6,24 57:7,
12,13,18,23,24 58:2,10,
16,17,22,25 59:12,16,25
60:7,8,15,21 61:1,10,13,

18 62:10,13,19,23,25
63:1,8,10,18,19 64:16,17
65:9,11,12,13 66:8,10,
19,22,24,25 67:5 68:3
69:2,9,13,14,15,17,20,24
70:3,5,14,15,16,17 71:7,
17,20 72:6 73:10,16,17,
19 74:1,7,8,20 75:8,9,15
76:1,3,8,15,21 78:8,14,
15,16,18,19,23 79:3,4,5,
6,9 81:1,6,10,13 82:8,18
83:4,7,8,12,14,17 84:5,
13,17,18,21,22 85:3,10,
20,23 86:1,9,19,20,21
87:6,13,18,19 88:17,22,
23,25 89:5,10,19,25
90:11,12,24 91:1,10,11
92:2,8,11,13,17 93:1,2,3,
4,7,8,10,12,14 94:8,9,11,
19,22 96:1,3,7 97:6,10,
14,15,22 98:6,7,10,20,23
99:9,15,16 100:1,7,15,
18,19,23,24 101:9,16,24
103:1,3,15,25 104:4,6,
12,19 105:7,8,11 106:4,
6,16,24,25 107:3,5,7,9,
10,11,13,14,21 108:21
109:5,7,8,9 110:2,4,9,17,
20,25 111:1,2 112:25
113:4,6,7 114:20 115:13,
16 116:1,15,24 117:3,6,
10,14,16 118:18,21,23,
25 119:10,13,23,24
120:3,5,6,8,9,21,22
121:1,13,16 122:2,4,5
123:10,13,20 124:12,13,
14,15 125:7 126:16,20

**today**
7:6,15,19 8:14 9:24 10:9
11:20,21 12:1,23 29:7
126:10

**together**
29:18 120:25

**told**
8:4 27:4 33:24 41:23
48:19 50:18 53:22 56:22,
24 66:2 67:2,19 69:10,20
76:2 87:17,22 94:18
97:19 103:2,20 118:25
120:4

**TOMTS**
110:16

**Tony**
57:3,4

**too**
13:13 60:16 99:20
114:13

**took**
9:25 22:18 106:19
111:15,18 114:2

**top**
79:22 97:8

**total**
79:23 80:1,20,21 81:11,
13 83:17 111:4

**tough**
85:3

**Traffic**
122:3

**train**
92:8

**transaction**
28:20 49:1,13,18

**transcript**
30:22 126:14

**transfer**
63:8

**tree**
7:8,17 8:5,22 9:2,5 12:7
15:22 25:2 39:8 42:25
45:2 50:14,15 52:24
61:24 72:24 91:25 95:3,
9,16,20,24 97:24 98:7,24
99:19 100:3 103:6
104:16,25 106:1 107:2
114:23 116:16 119:24
122:2,5,18,22,24 123:1

**trial**
10:2 93:8

**tried**
22:2 102:25

**trigger**
31:22

**true**
45:7,11 51:4 52:3,13
63:24 64:4 65:19 66:12
67:3 69:4 87:3 92:23
97:19 98:9

**trust**
55:10

**truth**
28:6 41:21,23,24 44:12
65:11,13,15,23,25 66:3,
12,20 68:13 69:1 90:23

**try**
11:1 13:15 21:11,24
83:12

**trying**
58:2 118:18

**turned**
101:11

**two**
21:19 24:12 35:12 40:13,
16 80:22 88:17 104:3

115:23,24 121:1 122:9

**two-man**
33:12

**two-thirds**
79:22

**type**
55:3 112:15

**types**
74:21 81:20

**typewritten**
105:22,25 106:3

---

### U

**Uh-huh**
40:20 41:22 47:1 60:23
74:14 88:16 102:14
119:10

**under**
6:8 22:17 33:7 44:11
56:8 57:11 59:7 66:23
72:4,23,25 73:2,5,11,17
87:12 101:15 117:5
123:11

**understand**
9:24 10:25 11:1,3,5
20:12 27:12,14 34:9
35:4,8,9 42:13 45:17
54:18,24 57:24 58:7,8
64:2 65:20 70:14 72:4
75:21 78:14 81:9 93:1
96:20,21 97:18 107:16,
17 112:1,3,5

**understanding**
78:11

**unit**
40:17

**unless**
78:13 108:22,24

**unpaid**
95:19,24

**until**
19:23 38:5 39:4 48:9,12
62:15 87:5

**unusual**
34:22

**up**
42:18 43:5,6 68:2,3
118:22 126:9

**upon**
69:19 72:15 79:18

**upper**
83:25 117:17

**upset**
63:3 76:13

**Upstair**
118:16

**upstairs**
119:24

**us**
9:18 11:7 14:1 20:25
29:17,22 30:9 48:5 53:22
62:6 63:4 66:8 76:3
91:16 92:1 94:18 95:24
102:8,10 103:4 104:4
117:7

**use**
25:3 54:22 55:5 69:22
120:20 124:12,21

**used**
54:20 78:25 124:23

**useful**
57:19

**using**
9:19

**usually**
57:21 60:15,16 82:20

**Utah**
102:11

**Utility**
9:5 91:25

**UTS**
102:6

---

### V

**vacant**
120:18 121:7,8,10,16
125:13

**Vague**
19:20 35:2,7 74:7 91:21

**valid**
49:9 75:23

**value**
59:8 60:18,24 117:23
118:2,7,10,12 124:14

**varies**
40:1

**various**
80:16 119:11

**vehicle**
79:23

**vehicles**
122:5

**verbal**
44:7

**verification**
44:3 47:18,24 48:22,24,
25 49:11,17 50:5 51:5

52:6,14 67:3,6,7,14,20

**verified**
48:6 50:24 51:3 52:19
66:24 67:18 68:2 69:6,12

**verify**
28:3 49:9 50:25 52:12,19
62:24 68:8 69:9 97:14

**verifying**
52:23

**version**
43:11 65:15,22 66:3,8,
12,20,21 68:12 82:17

**versions**
69:1

**very**
11:18 20:5 25:6 51:12
63:2 79:7 117:15 120:18

**via**
20:10

**view**
60:1

**violating**
78:2

**violet**
50:11,12

**Visalia**
124:16 125:5,6

**void**
23:2 28:19

**voluntarily**
15:21

---

**W**

---

**wages**
113:17

**wait**
21:20 39:4 48:9,12 75:5,
7 77:10,12 87:16 103:12

**walk**
28:1

**want**
7:22 10:12 11:12 20:9
30:1,2,9,13 32:1 41:21
50:24 51:1 53:7 54:24
57:12 66:19 75:7 78:8
79:3,6 91:10 96:1,3 97:6,
8,9 98:10 105:8,11
119:10 120:5

**wanted**
8:10,12

**warm**
114:12

**Warrick**
75:4

**was**
7:16 8:9,23 9:8 10:20
12:6,14,15,20,21,25
14:18,21 15:16,25 16:1,
14 17:12,16,18,20,22
19:8,9,11 20:20,21
21:14,15 22:10,16 24:4,8
25:10,18 27:2,4,17,19
28:9,17 30:25 31:4,5,15
32:3 34:1,2,20 35:5,20
36:5,6,24 37:1,8,21 38:1,
11,14,25 39:1,10,21
40:2,8 41:11,14,17,19,
20,24 44:14,19 45:2,7,
12,21 46:22 47:3,24
49:15 50:1,25 52:6,7
53:10 54:12,16,20,25
55:4,7 56:6,18,21 57:6
59:9,16,19,22 60:1 61:1,
20 62:6,19 63:25 64:5,

16,21 67:16 69:1 70:21
71:2,16,19 72:15,16,21,
25 73:9,11,14,19 74:14,
24 75:4 76:15 78:12,15,
16 79:10 81:2,3,20 82:1,
4,16 83:24 84:6 85:6,9,
10,11,16 86:5 87:1,24
89:1,9 90:2,15,19,25
93:15 94:20 95:7 96:20,
21 98:13,24,25 99:5,16,
19,23 100:8 101:25
102:12 103:7,14,21
104:18,20 105:19,21
106:4,7 107:1,2 110:7,
10,23 114:14 115:6,17,
20 116:1,13,15,21,22
117:14,16,23 118:1,3,6,
18 119:6,14 120:3,19
122:1 126:4

**wasn't**
27:5,6 44:11,14,15,16,17
77:2,15,20,21 87:13 88:2
98:9

**Wata**
37:18

**watch**
36:12

**water**
14:12,13 116:22 120:14

**Waterman**
7:9 116:9,15 117:1,2,24
119:12 120:4,13 121:5,6,
17 123:8,11,12,15

**Waterman's**
116:13

**Waters**
14:7,11,19 15:13

**way**

16:6 46:16 53:10 61:7
79:1 83:25 91:7 92:9
106:10,18

**we**
9:17,18 11:12 14:1 20:8,
10 22:5,12 23:7,24
27:20,21,24 29:17,20,21
30:4,6,8,13,14 31:17,21
32:25 33:5,6,20,21 35:14
38:5 39:24 40:15 44:20
46:17 50:23,24 51:11
54:9,15 55:6,17 56:7,8
57:10,20 58:21 60:19,21
62:10,15,18,21,23 63:3,
22,23 74:11,13 75:15,22
76:1,5,9,10,11,12,19
78:1,2,22 80:19 81:3,4
83:23 84:9,17 85:13,16
86:17 87:9 90:14 91:24
92:2,4,6,11 96:25 97:1,2,
4,7,23 99:8 100:22
101:25 102:3,4,6,24
103:1,2,3,17,18,25
104:2,5,10,13,21 110:15,
16 113:2 115:9 116:20,
24 117:6 118:19,23
120:4,10 122:1,3,4,17
124:16,19,21 125:2,15,
25

**we'll**
11:7 20:24 103:2 105:24
110:17

**we're**
20:15 47:10 48:3 53:6
59:17 68:25 70:5 71:5
73:16,17 81:6 120:8,9

**we've**
78:25 93:18 119:21
125:13 126:1

**week**
23:22 27:22

**weeks**
40:16

**well**
6:18 8:9 9:13 19:7 20:3,
5,24 21:9 26:21 27:3
30:4 33:23 40:24 41:3,5,
24 42:6 45:25 48:2,24
50:23 52:1 56:22 58:1,9
60:6 62:2 65:14,21 68:1,
11 77:12 83:5 87:3,4,16
89:23 93:4 100:11
107:17 110:8,12 111:19
116:20 122:18 124:6

**well-known**
20:3

**went**
14:5 15:24 26:17 31:24
51:13 84:11

**were**
7:18 8:5,8 10:15 12:8,16,
23,24 15:11,12,13,19
16:15,16,20 31:6 34:24
37:4 39:22 42:18,19
47:19,20 52:24 64:19
66:24 71:23 81:24 84:5,
8,14 85:20,25 96:11,23
100:18,19 101:18 104:4
105:5 115:6

**weren't**
96:13

**what**
6:20,24 9:15,17 10:13
13:1 14:18,21 15:25
17:12 21:7 23:5,20,25
24:3 25:10,15,22 27:4,
14,21 30:10,20 31:9
32:1,22,24 33:2,10,22

34:1,2,24 36:5,9,12,13,
23 39:20 40:2,25 42:18
44:4 48:19,22 54:18 55:3
56:20 59:8 60:20 62:8,9
63:13 64:2 65:11,25
70:14 71:16 78:11,23
85:11 87:22 91:10,19
92:19,21 93:23 95:22
97:20 98:20 99:15
101:24,25 103:10 104:8,
18 105:13,17 107:1
108:9,12 111:17 113:14
114:3,14 115:9 116:21
117:23 118:10,23 119:6
120:2,15 121:15 123:24
124:8 125:8

**what's**
118:12 119:6

**whatever**
57:16 65:10 86:18

**when**
12:24 15:11,13,24 16:20,
23 17:5,21 19:3,8,10
20:4 21:23 22:3,23
23:18,22 25:17 26:24
27:23 31:20 33:20 36:7
37:12 38:21 39:15 40:11,
16,17,18 44:9 49:15
52:11 56:9 57:8,12
61:15,24 62:6,15,21 63:3
69:20 70:13 72:10 75:22,
24 81:19 82:16 85:13
86:12,24 87:17 88:2
90:16,25 91:23 92:10,18
93:1 95:8 96:23 97:14
105:19,21 106:3 107:8
109:7 110:15 111:22
112:24 115:6 117:13
118:19 119:6 121:8
123:3

**whenever**
68:20

**where**
12:7 13:5 14:5 21:2
28:21 37:7 73:18 81:16
84:19 86:4

**Where's**
28:16 33:18

**whereas**
83:18

**whereupon**
21:4 30:24 46:21 71:2
79:9 88:25 93:14 94:19
100:7 104:19 106:6
110:9 115:16 119:13
126:4,23

**whether**
10:14 41:17 47:24 58:21
60:25 69:5 70:8,20,21
90:1,19

**which**
20:6 21:10,12 22:13,14,
19 23:15 24:4,11,22
25:25 31:25 39:14 42:12
51:2 57:8 78:2 87:16
96:6 100:15 101:25
107:4 110:7,16 121:3

**while**
30:5 92:23 126:1

**who**
8:23,25 16:3,21,24
17:12,16,18,20 24:16
26:18,22 33:7 35:23
36:15 37:10,17 38:15,17
39:3,7 50:24 51:23 54:3
55:22 56:25 62:9 63:21
64:2 71:6 73:8 84:6
92:15 94:23 102:20

103:5 124:7,18

**who's**
15:9 35:19 39:5 94:17

**whole**
83:12 94:22

**whose**
18:16

**why**
8:8 22:22 26:24 28:7,11
29:24 37:21 42:19,22
43:11 46:1 50:23 51:7,
11,25 54:5 59:5 64:17
65:9 68:10,12 69:12 76:5
77:21 92:4 97:20 103:22
115:9 120:10 125:25

**Why'd**
56:20

**wife**
119:18

**wildfire**
22:23 23:1,7 61:15,16,
19,23 62:11,14,18 63:3,
7,18,19 70:7 72:15,22,23
73:6,9,18 74:2,5,13,25
75:15,24,25 76:1,4,9,10,
11,12,16,20

**wildfires**
73:16

**wildlife**
9:19 22:25

**will**
10:10 11:1 22:4 25:3,19
28:7 49:3,8 58:11 68:7
92:13 97:7 102:19 104:2

**wire**
54:11,12

**with**
8:21 10:8 14:17,22 17:15
19:16,23 20:4 22:24
23:5,13,16,23 26:6 27:8
28:24 30:13 32:25 33:5,
20 36:3,20 37:2,4 42:5
49:7 54:8 55:6 56:9
57:18 60:23 61:14,24
62:6,7,17,22,25 63:18,22
64:11 68:20 70:15 71:12
72:6,14 73:21 74:21 76:1
80:9 82:17,21 84:11
86:16 88:4,19 92:7 95:16
97:3,10 99:17 101:21
103:2,15,22 108:1,7
113:25 118:20 126:9

**withheld**
66:23

**withhold**
47:11

**without**
13:16 22:24 26:20,25
28:10 54:5 57:14 62:17
63:23 64:9 69:5 75:25

**witness**
6:5 40:22 126:3,11

**wonderful**
126:22

**word**
23:22 81:4

**words**
24:12 48:2 49:11 50:10
54:20 66:7 69:22 72:4
75:15 79:14 84:8 96:13
97:22

**work**
12:7 13:4,5,6,10,17 14:5,
7,15 15:3,24 17:14 19:16

20:2 26:20 33:7,14 34:1,
2 35:25 40:9,12,13,15
42:5 59:7 62:7 65:12
79:15 97:25 98:11,16
99:1,6,8,10,11,18
100:13,22 101:16 102:5,
11 103:2,4,15 122:4
124:21

**worked**
19:23 123:23

**worker**
36:12 124:20

**working**
17:23

**workplace**
40:9

**works**
40:2

**world**
50:3

**worn**
20:14

**worry**
78:19

**worst**
15:9

**worth**
56:24 59:9,16,20,22
60:9,17 119:4 123:24
124:9

**would**
6:13 10:1,5 11:8 14:1,2,3
15:2 16:13 19:5,16 20:20
39:16 47:19 48:6 50:14
52:22,25 56:2,3 58:15,16
61:15 62:22 69:21 72:11
83:4,7 96:7 99:3 108:6,

21 109:16,17,18,25
111:11,12 119:8 124:8
126:21

**Wouldn't**
60:8

**write**
107:11,13 112:25 113:2

**writing**
52:5,23

**written**
44:2 47:24 49:12 67:6,
13,21

**wrong**
21:3 45:5 49:7 96:11,13
110:3

**wrote**
113:5

---

**Y**

---

**yard**
120:22

**yeah**
12:15 20:13 21:20 30:11,
15 40:22 58:9 73:25
74:11 80:19 90:18 95:14
105:2,4 108:6,20 112:9
117:21 118:3,5 121:10
123:11 124:25

**year**
8:21 17:13 61:21 64:16,
21,22 84:18,21 90:8
97:15,17 101:3,12
104:24 105:14 110:20,23
111:15,17 114:3 123:2
125:8

**year-end**
89:14

**years**
8:15 13:7,12,18 14:2,3,
16,17 16:9,11 42:5 48:18
87:1,23 88:15 92:24
100:4 101:20 104:3
116:7 120:4 125:9

**yes**
7:2,5,13,25 8:3,7 9:7
10:3,11 11:4,11,17,22
12:4,17,20 13:25 16:18
17:2 18:1,7,9,13,15,20,
23 19:2,15,17,25 22:12
24:6 25:2,5 26:9,14,24
29:5,8,19 31:1,8 32:23
34:5,11,19 35:18 36:4,22
37:6,9,15 38:10,13
39:12,19 42:11 43:7,9
44:6,8,13,19 45:5,10,14,
21,22 46:15,23 47:5,14,
22 48:7,12,21,23 49:14,
19,22 50:1,2,17,20 51:15
52:2,9 53:2,5,21 54:2,13,
15,23 55:2 56:4 57:7,20
58:14,19 61:11,17 62:4,6
64:9,23 66:4 67:1,9,12
69:9,16 70:20 71:24
72:1,3,18 73:1 74:19,23
75:10 76:25 77:1,16
79:11,13,16,21,25 80:3,
6,14,17,25 81:8,15,18
82:11,15 83:3,6,10,20,22
84:2,4,7,12,16,23 85:1,5
87:1,21,25 88:14 89:2,
11,16 90:13 91:13,18
93:1 94:14,21 95:6,21
96:3,9,22,24 98:1,8,12,
22 99:21 100:17 101:5,8,
14,17,19 103:17 104:13
105:4,6 108:3,19,22
109:13,20 110:1,11,14,
22 111:7,9,10,14,20

112:18,23 113:9,15
115:2,5,18 116:6,10,17
117:15,25 119:15,19,22
121:4 122:20,23,25
123:6 126:18

**yes-or-no**
70:19

**yet**
67:10 70:11 117:12

**you**
6:13,17,20,23 7:6,11,14,
18,19,22 8:1,4,5,8,12,14,
17,19 9:11,13,15,22,24,
25 10:1,4,7,13,15,24,25
11:1,3,5,6,7,9,12,15,19,
21,23,25 12:3,5,8,11,13,
16,18,22,23,24 13:5,23
14:5,9,15 15:2,11,13,14,
19,23,24 16:3,11,15,16,
19,20,21,23,24 17:5,11
18:8,10,11,21,24 19:3,7,
10,13,16,18,21,23 20:1,
18,19,20,23,24 21:1,7
23:3,4,6,12,15,18 24:2,3,
7,8,9,12,18 25:1,4,9,13
26:22,25 27:2,4,8,12,13,
14,15,17 28:6,7,11,13,22
29:6,9,12,16,18,20,21,22
30:1,2,7,13,23 31:5,6
32:22 33:24 34:9,12,21,
23 35:8,10,19,21,23
36:1,3,11,12,13,17,20,23
37:4,17 38:19 39:10,15,
16,22 40:6,10,11,16,17,
18 41:1,7,16,24,25 42:3,
8,13,14,17,18,19 43:11,
12,13,17,18,21,24 44:2,
4,6,11,17 45:17,20,23
46:4,6,16,20 47:3,6,7,8,
13,23 48:9,10,11,15,22

49:2,16,18,23 50:8,10,
11,13,14,18 51:1,4,5,10,
13,20,24 52:1,4,5,11,17,
20 53:7,10,22,24 54:5,
14,21,25 55:12 56:2,3,
15,20 57:6,12,13,17,18,
24 58:6,10,16,17 59:2,3,
5,8,11,16,25 60:8,23
61:7,8 62:2,3 63:6,14
64:19,24 65:2,6,9,11,13,
14,15,21,25 66:2,3,7,8,
18,20 67:2,6,16,24,25
68:2,3,8,11,12,14,20,22
69:2,11,12,20,24,25
70:8,13,14,15,20,21,24
71:1,11,15,22,25 72:4,9,
10,11,14 73:8,18,23 74:1
75:3,14,21 76:13,16,18,
20,21 77:6,13,21 78:4,7,
11,13,19 79:3,5,6,12,23
80:1,9,10,20,21,22,23
81:19,23 82:3,4,12,16
83:25 84:5,8,15,19
85:19,22,23,25 86:3,9,
12,23 87:7,17,18,19,22
88:10,12,16,24 89:3,9,
23,25 90:1,10,19 91:5,7,
16 92:18,19,20 93:1,8,
12,20,23 94:4,8,9,18
95:13,15,19,22 96:4,5,6,
10,11,13,15,23,25 97:18,
20,22 98:2,5,6,11,15,21
99:3,7,8,9,13,17,19,25
100:1,5,11,16 101:7,9,20
102:17,19,22 103:2,10,
22 104:12,18 105:7,8,10,
12,16,19,22 106:3,5,10,
13,17,18 107:16,18,19,
25 108:4,6 109:1,2,12
110:8,12,20,25 111:1,2,
4,5,8,22,24 112:6,10,15,
19,24 113:5,6,25 115:6,

11,15 116:8,18,21
117:22 118:7 119:7,10,
16 120:1,12,14,15,16
121:2,8 122:13,21 123:7,
8,21 124:2,4,7,8 125:1,4,
17 126:2,3,11,15,17,20,
22

**you'd**
124:8

**you'll**
94:11,12

**you're**
12:23 13:13 26:21 34:16
37:13 41:5 42:9 44:25
46:13 50:10,12 54:18
58:2 60:6,7 63:17 66:11,
21,22 67:10 69:4,18,19
70:11 76:4 83:21 86:23
87:10,12 89:24 93:3
95:12 109:3 113:5,14,25
114:13 115:13 124:6,7

**you've**
45:19 48:16,17,19 52:22
57:13 67:19 105:23
121:20

**your**
6:14,22 7:23 8:19,24 9:8,
24 10:5,8,9 11:14,19,25
14:18,21 15:14,25 16:5,
7,8 17:19 26:5 27:16
29:7 32:4,13 33:16 34:1
35:4 36:11 37:21 38:19
40:25 46:6 47:7 48:19
49:7,16 50:1 51:2,24
52:20 56:25 57:5 58:16,
20 59:12,15 60:8 63:10,
13 64:2,20 65:7,20 66:2,
20 67:5 69:24 70:1 71:16
75:9 78:16 79:4,15 81:9
82:3 85:22 99:9 100:10,

13,18,24 102:20 105:8
108:18 111:17 112:19
115:19 123:22

**yourself**
24:13 58:3 65:24 69:25
112:25

---

### Z

---

**zoom**
49:6

# EXHIBIT "17"

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

Santa Ana

| | | |
|---|---|---|
| In Re. The Original Mowbray's Tree Service, Inc | § | Case No. 24-12674 |
| | § | |
| | § | |
| Debtor(s) | § | ☐ Jointly Administered |

# Monthly Operating Report

Chapter 11

Reporting Period Ended: 05/31/2025          Petition Date: 10/18/2024

Months Pending: 8          Industry Classification: **0 8 5 1**

Reporting Method:          Accrual Basis ◉          Cash Basis ○

Debtor's Full-Time Employees (current):          74

Debtor's Full-Time Employees (as of date of order for relief):          157

**Supporting Documentation** (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

- ☒ Statement of cash receipts and disbursements
- ☒ Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
- ☒ Statement of operations (profit or loss statement)
- ☒ Accounts receivable aging
- ☐ Postpetition liabilities aging
- ☐ Statement of capital assets
- ☐ Schedule of payments to professionals
- ☐ Schedule of payments to insiders
- ☒ All bank statements and bank reconciliations for the reporting period
- ☐ Description of the assets sold or transferred and the terms of the sale or transfer

/s/ Robert S. Marticello
_____
Signature of Responsible Party

07/01/2025
_____
Date

Robert S. Marticello
_____
Printed Name of Responsible Party

4675 MacArthur Ct, Suite 1550
Newport Beach, CA 92660
_____
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (12/01/2021)          1

Debtor's Name The Original Mowbray's Tree Service, Inc   Case No. 24-12674

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a. Cash balance beginning of month | $11,972,864 | |
| b. Total receipts (net of transfers between accounts) | $2,224,106 | $27,350,551 |
| c. Total disbursements (net of transfers between accounts) | $2,526,220 | $20,099,033 |
| d. Cash balance end of month (a+b-c) | $11,670,749 | |
| e. Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f. Total disbursements for quarterly fee calculation (c+e) | $2,526,220 | $20,099,033 |

| Part 2: Asset and Liability Status<br>(Not generally applicable to Individual Debtors. See Instructions.) | Current Month |
|---|---|
| a. Accounts receivable (total net of allowance) | $4,194,262 |
| b. Accounts receivable over 90 days outstanding (net of allowance) | $432,615 |
| c. Inventory (Book ○ Market ○ Other ◉ (attach explanation)) | $0 |
| d. Total current assets | $17,395,350 |
| e. Total assets | $36,517,639 |
| f. Postpetition payables (excluding taxes) | $6,762,094 |
| g. Postpetition payables past due (excluding taxes) | $0 |
| h. Postpetition taxes payable | $7,663 |
| i. Postpetition taxes past due | $0 |
| j. Total postpetition debt (f+h) | $6,769,757 |
| k. Prepetition secured debt | $28,997,057 |
| l. Prepetition priority debt | $256,881 |
| m. Prepetition unsecured debt | $7,648,218 |
| n. Total liabilities (debt) (j+k+l+m) | $43,671,914 |
| o. Ending equity/net worth (e-n) | $-7,154,275 |

| Part 3: Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a. Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b. Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c. Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4: Income Statement (Statement of Operations)<br>(Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a. Gross income/sales (net of returns and allowances) | $2,189,004 | |
| b. Cost of goods sold (inclusive of depreciation, if applicable) | $0 | |
| c. Gross profit (a-b) | $2,189,004 | |
| d. Selling expenses | $0 | |
| e. General and administrative expenses | $856,366 | |
| f. Other expenses | $0 | |
| g. Depreciation and/or amortization (not included in 4b) | $316,080 | |
| h. Interest | $276,150 | |
| i. Taxes (local, state, and federal) | $42,825 | |
| j. Reorganization items | $213,244 | |
| k. Profit (loss) | $-241,914 | $-3,126,437 |

Debtor's Name  The Original Mowbray's Tree Service, Inc                                    Case No.  24-12674

| **Part 5:  Professional Fees and Expenses** | | | | | | |
|---|---|---|---|---|---|---|
| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
| a. | Debtor's professional fees & expenses (bankruptcy)  *Aggregate Total* | | $0 | $0 | $0 | $0 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Force 10 Partners | Other | $0 | $0 | $0 | $0 |
| ii | Rains Feldman Littrell LLP | Lead Counsel | $0 | $0 | $0 | $0 |
| iii | Grobstein Teeple LLP | Financial Professional | $0 | $0 | $0 | $0 |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |

Debtor's Name The Original Mowbray's Tree Service, Inc                    Case No. 24-12674

| xxxvii | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |

Debtor's Name The Original Mowbray's Tree Service, Inc                     Case No.  24-12674

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxiii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvii | | | | | | |
| lxxxvii | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | | | |
| | *Itemized Breakdown by Firm* | | | | |
| | Firm Name | Role | | | |
| i | | | | | |
| ii | | | | | |
| iii | | | | | |
| iv | | | | | |
| v | | | | | |
| vi | | | | | |
| vii | | | | | |
| viii | | | | | |
| ix | | | | | |
| x | | | | | |
| xi | | | | | |
| xii | | | | | |
| xiii | | | | | |
| xiv | | | | | |

Debtor's Name The Original Mowbray's Tree Service, Inc                    Case No. 24-12674

| | | | | | |
|---|---|---|---|---|---|
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |

Debtor's Name The Original Mowbray's Tree Service, Inc                           Case No.  24-12674

| | | | | | |
|-----|---|---|---|---|---|
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |

Debtor's Name  The Original Mowbray's Tree Service, Inc                                    Case No.  24-12674

| | | | | | | |
|---|---|---|---|---|---|---|
| | xcix | | | | | |
| | c | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | | |

| **Part 6:  Postpetition Taxes** | **Current Month** | **Cumulative** |
|---|---|---|
| a. Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. Postpetition employer payroll taxes accrued | $7,663 | $117,787 |
| d. Postpetition employer payroll taxes paid | $35,161 | $394,549 |
| e. Postpetition property taxes paid | $0 | $79,008 |
| f. Postpetition other taxes accrued (local, state, and federal) | $0 | $38,611 |
| g. Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

**Part 7: Questionnaire - During this reporting period:**

a.  Were any payments made on prepetition debt?  (if yes, see Instructions)    Yes ◉  No ◯

b.  Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions)    Yes ◯  No ◉

c.  Were any payments made to or on behalf of insiders?    Yes ◉  No ◯

d.  Are you current on postpetition tax return filings?    Yes ◉  No ◯

e.  Are you current on postpetition estimated tax payments?    Yes ◉  No ◯

f.  Were all trust fund taxes remitted on a current basis?    Yes ◉  No ◯

g.  Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions)    Yes ◯  No ◉

h.  Were all payments made to or on behalf of professionals approved by the court?    Yes ◯  No ◯  N/A ◉

i.  Do you have:        Worker's compensation insurance?    Yes ◉  No ◯

        If yes, are your premiums current?    Yes ◉  No ◯  N/A ◯  (if no, see Instructions)

        Casualty/property insurance?    Yes ◉  No ◯

        If yes, are your premiums current?    Yes ◉  No ◯  N/A ◯  (if no, see Instructions)

        General liability insurance?    Yes ◉  No ◯

        If yes, are your premiums current?    Yes ◉  No ◯  N/A ◯  (if no, see Instructions)

j.  Has a plan of reorganization been filed with the court?    Yes ◉  No ◯

k.  Has a disclosure statement been filed with the court?    Yes ◉  No ◯

l.  Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?    Yes ◉  No ◯

Debtor's Name The Original Mowbray's Tree Service, Inc                                    Case No. 24-12674

**Part 8: Individual Chapter 11 Debtors (Only)**

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)? | Yes ◯  No ◉ |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ◯  No ◯  N/A ◉ |

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

/s/ Brian Weiss                                              Brian Weiss
_____                  _____
Signature of Responsible Party                      Printed Name of Responsible Party

Chief Restructuring Officer                           07/01/2025
_____                  _____
Title                                                       Date

| Debtor's Name | The Original Mowbray's Tree Service, Inc | | Case No. | 24-12674 |



PageOnePartOne



PageOnePartTwo



PageTwoPartOne



PageTwoPartTwo

Debtor's Name The Original Mowbray's Tree Service, Inc          Case No. 24-12674



Bankruptcy1to50

Bankruptcy51to100

NonBankruptcy1to50

NonBankruptcy51to100

Debtor's Name  The Original Mowbray's Tree Service, Inc                    Case No.  24-12674



PageThree



PageFour

## STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
### The Original Mowbray's Tree Services, Inc.
### May 2025

| SUMMARY: | Beginning Balance | Deposits Receipts | Transfers | Disbursements Disbursements | Transfers | Ending Balance |
|---|---|---|---|---|---|---|
| Petty Cash | 10,386.00 | 10,395.00 | - | 9,300.00 | - | 11,481.00 |
| Chase Payroll | - | - | - | - | - | - |
| xx1754 (Payroll) | - | - | - | - | - | - |
| xx1762 (Op) | - | - | - | - | - | - |
| xx1762 (Sweep) | - | - | - | - | - | - |
| xx1607 (Payroll - DIP) | 80,245.84 | - | 470,000.00 | 474,158.90 | - | 76,086.94 |
| xx1594 (DIP) | 11,833,181.83 | 2,148,896.58 | - | 1,933,934.46 | 470,000.00 | 11,578,143.95 |
| xx1594 (Sweep) | - | - | - | - | - | - |
| Cash Clearing | 49,050.00 | 64,814.01 | - | 108,827.00 | - | 5,037.01 |
| Total | **11,972,863.67** | **2,224,105.59** | **470,000.00** | **2,526,220.36** | **470,000.00** | **11,670,748.90** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS<br>The Original Mowbray's Tree Service - ACCOUNT xx1754<br>May 2025 | | | | | | | | | |
| Date<br>mm/dd/yyyy | Account # | Check<br>Number | Payee/Payor | Purpose | Deposits | | Disbursements | | |
| | | | | | Receipts | Transfers | Disbursements | Transfers | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | Total for Account xx1754 | | | | - | - | - | - | |

| | | | | | STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS | | | | | |
| | | | | | The Original Mowbray's Tree Service - ACCOUNT xx1762 (Op) | | | | | |
| | | | | | May 2025 | | | | | |

| Date | | | | | Deposits | | Disbursements | |
| mm/dd/yyyy | Account # | Check Number | Payee/Payor | Purpose | Receipts | Transfers | Disbursements | Transfers |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Total for Account xx1762 (Op) | | | | - | - | - | - |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS | | | | |
| | | | The Original Mowbray's Tree Service - ACCOUNT xx1762 (Sweep) | | | | |
| | | | May 2025 | | | | |

| Date mm/dd/yyyy | Account # | Check Number | Payee/Payor | Purpose | Deposits | | Disbursements | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Receipts | Transfers | Disbursements | Transfers |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Total for Account xx1762 (Sweep) | | | | - | - | - | - |

STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1594
May 2025

| Date mm/dd/yyyy | Check Account # Number | Payee/Payor | Purpose | Deposits Receipts | Transfers | Disbursements Disbursements | Transfers |
|---|---|---|---|---|---|---|---|
| 5/1/2025 | | PNC VISA | pnc card payment made mid-period | - | | 20,000.00 | |
| 5/1/2025 | | PHOENIXTM | 2025-03 - INTEREST FOR LINE OF CREDIT | 19,480.28 | | - | |
| 5/1/2025 | | PHOENIXTM | 2025-03 TECHNOLOGY REIMBURSEMENT FEE | 2,000.00 | | - | |
| 5/1/2025 | | PHOENIXTM | PHOENIX TRAFFIC MANAGEMENT - PAYMENT TOWARDS PRINCIPAL LOAN | 7,500.00 | | - | |
| 5/1/2025 | | DUKE | Electronic Payment - AP0002313085 | 68,239.40 | | - | |
| 5/1/2025 | | YOURSIX, I | SERVICES | - | | 140.00 | |
| 5/1/2025 | | SPECIALIZE | SERVICES | - | | 3,498.12 | |
| 5/1/2025 | | SNIDER | SERVICES | - | | 4,463.12 | |
| 5/1/2025 | | LLOYD PEST | SERVICES | - | | 66.00 | |
| 5/1/2025 | | DOCU-TRUST | SERVICES | - | | 673.26 | |
| 5/1/2025 | | CORP BILLI | SERVICES | - | | 1,050.08 | |
| 5/1/2025 | | CHINO MOWE | SERVICES | - | | 132.39 | |
| 5/1/2025 | | G SANDOVAL | SERVICES | - | | 4,403.92 | |
| 5/1/2025 | | VESTIS | SERVICES | - | | 152.91 | |
| 5/1/2025 | | SO CAL GAS | UTULITIES | - | | 33.79 | |
| 5/1/2025 | | MOUNTDISP | SERVICES | - | | 245.91 | |
| 5/1/2025 | | MOUNTDISP | SERVICES | - | | 245.91 | |
| 5/1/2025 | | FIDELITY S | BENEFITS | - | | 440.08 | |
| 5/1/2025 | | UEC | SERVICES | - | | 2,110.00 | |
| 5/1/2025 | | FRONTIER | SERVICES | - | | 780.00 | |
| 5/1/2025 | | FRONTIER | SERVICES | - | | 51.74 | |
| 5/1/2025 | | FRONTIER | SERVICES | - | | 80.47 | |
| 5/1/2025 | | BURRTEC WA | SERVICES | - | | 418.93 | |
| 5/1/2025 | | BURRTEC WA | SERVICES | - | | 651.12 | |
| 5/1/2025 | | STUBBS COO | SUBCONTRACTED SERVICES | - | | 8,820.00 | |
| 5/1/2025 | | PNC BANK | Principal Payment to PNC Line of Credit | - | | 115,128.67 | |
| 5/1/2025 | | AERI TREE | WIRE PAYMENT FROM AERI - DEC 2024 & JAN 2025 | 33,233.33 | | - | |
| 5/1/2025 | | CORETREECA | WIRE PAYMENT FORM CORE | 23,096.70 | | - | |
| 5/2/2025 | | DUKE | Electronic Payment - AP0002313409 | 18,415.50 | | - | |
| 5/2/2025 | | BVES | BEAR VALLEY ELECTRIC SERVICE, W/E 3/29/2025, WORK DONE FOR BVES, CONTRACT 3095-000 | 67,099.28 | | - | |
| 5/2/2025 | | SAMSARACAP | Agreement #3407-002 - Monthly Payment | - | | 19,705.46 | |
| 5/2/2025 | | MOTOR VEHI | REGISTRATION FOR 1 UNIT | - | | 1,467.00 | |
| 5/2/2025 | | PNC Bank | PNC MERCHANT DISCOUNT 373339186992 | - | | 24.70 | |
| 5/2/2025 | | PNC Bank | PNC MERCHANT INTERCHNG 373339186992 | - | | 26.73 | |
| 5/2/2025 | | PNC Bank | PNC MERCHANT FEE 373339186992 | - | | 15.75 | |
| 5/5/2025 | | PNC VISA | pnc card payment made mid-period | - | | 20,000.00 | |
| 5/5/2025 | | FORCE 10 P | DECEMBER 2024 - MARCH 2025 FEES | - | | 278,503.00 | |
| 5/5/2025 | | SAMSARA CA | GPS CONTRACT 40433561-1 | - | | 19,750.10 | |
| 5/5/2025 | | PITNEY BOW | 8000-9090-0328-7351 | - | | 50.00 | |
| 5/5/2025 | | CESAR ROSA | HQ Electric Repairs | - | | 639.88 | |
| 5/6/2025 | | CORETREECA | WEEK 19 - SENNEBOGEN RENTAL | 7,612.50 | | - | |
| 5/6/2025 | | DUKE | DUKE ENERGY, MARTIN WEST TO WILLINSTON NORTH, SERVICE DATES : 7/1/2024 - 7/6/2024 | 3,380.93 | | - | |
| 5/6/2025 | | PNC Visa | PNC VISA REBATE | 4,801.67 | | - | |
| 5/6/2025 | | PAYTRACE | April 2025 Statement for Mowbray's Tree Service | - | | 20.20 | |
| 5/6/2025 | | GUST DOMIN | IBEW Local 47 settlement compliance | - | | 2,677.66 | |
| 5/6/2025 | | HUGO MENDO | IBEW Local 47 settlement compliance | - | | 2,266.65 | |
| 5/6/2025 | | MANUEL VAR | IBEW Local 47 settlement compliance | - | | 2,283.03 | |
| 5/6/2025 | | MARCELIONV | IBEW Local 47 settlement compliance | - | | 2,615.19 | |
| 5/6/2025 | | MARLON ELI | IBEW Local 47 settlement compliance | - | | 2,292.65 | |
| 5/6/2025 | | MATEO VAZQ | IBEW Local 47 settlement compliance | - | | 2,697.40 | |
| 5/6/2025 | | SERGIO ROD | IBEW Local 47 settlement compliance | - | | 2,375.71 | |
| 5/6/2025 | | TOMAS P. G | IBEW Local 47 settlement compliance | - | | 2,295.90 | |
| 5/7/2025 | | SUNBELT RE | SERVICES | - | | 12,207.26 | |
| 5/7/2025 | | JOAN PARKE | SERVICES | - | | 2,800.00 | |
| 5/7/2025 | | Transfer - xx1607 | Transfer from OP to DIP Payroll | - | | | 145,000.00 |

| | | | STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS | | | | | |
| | | | The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1594 | | | | | |
| | | | May 2025 | | | | | |

| Date | Check | | | | Deposits | | Disbursements | |
| mm/dd/yyyy | Account # Number | | Payee/Payor | Purpose | Receipts | Transfers | Disbursements | Transfers |
|---|---|---|---|---|---|---|---|---|
| 5/7/2025 | | | MOTOR VEHI | SERVICES | - | | 7,727.00 | |
| 5/8/2025 | | | UNIVOIP IN | SERVICES | - | | 242.16 | |
| 5/8/2025 | | | UNITED SIT | SERVICES | - | | 320.40 | |
| 5/8/2025 | | | FIRST INSU | INSURANCE | - | | 241,337.90 | |
| 5/8/2025 | | | SUNBELT RE | SERVICES | - | | 6,905.17 | |
| 5/8/2025 | | | SNIDER | SERVICES | - | | 5,948.80 | |
| 5/8/2025 | | | FAIRFIELD | LODDGING | - | | 256.50 | |
| 5/8/2025 | | | CORP BILLI | SERVICES | - | | 1,491.29 | |
| 5/8/2025 | | | CHINO MOWE | SERVICES | - | | 1,223.53 | |
| 5/8/2025 | | | CBIZ | SERVICES | - | | 1,623.47 | |
| 5/8/2025 | | | CALIFORNIA | SERVICES | - | | 1,352.47 | |
| 5/8/2025 | | | PINO TREES | MONTHLY PROPERTY TAX CHARGE REIMBURSEMENT | 304.21 | | - | |
| 5/8/2025 | | | PINO TREES | 2025-04 - TECHNOLOGY CHARGES | 21,549.35 | | - | |
| 5/8/2025 | | | PINO TREES | 2025-04 HEALTHCARE REIMBURSEMENT | 41,544.10 | | - | |
| 5/8/2025 | | | PINO TREES | 2025-04 - INTEREST FOR LINE OF CREDIT | 43,941.04 | | - | |
| 5/8/2025 | | | PINO TREES | 2025-04 PINO EQUIPMENT LEASE | 60,000.00 | | - | |
| 5/8/2025 | | | DUKE | DUKE ENERGY, VTNOF, SERVICE DATES : 1/20/2025 - 1/25/2025 | 56,343.20 | | - | |
| 5/8/2025 | | | PHOENIXTM | 2025-03 TECHNOLOGY REIMBURSEMENT FEE | 834.67 | | - | |
| 5/8/2025 | | | PHOENIXTM | 2025-04 PHOENIX EQUIPMENT LEASE | 20,000.00 | | - | |
| 5/8/2025 | | | PHOENIXTM | PHOENIX TRAFFIC MANAGEMENT - PAYMENT TOWARDS PRINCIPAL LOAN | 7,500.00 | | - | |
| 5/8/2025 | | | | PINO INTERCOMPANY LOAN PRINCIPAL PAYMENT - TRANS# 11171887863 | 60,000.00 | | - | |
| 5/8/2025 | | | AMERICAN E | Acct -7-65006 | - | | 3,000.00 | |
| 5/8/2025 | | | AMAZON | SERVICES | - | | 681.93 | |
| 5/8/2025 | | | CESAR ROSA | HQ AC Electric Repairs | - | | 330.25 | |
| 5/8/2025 | | | PATHWARD | WIRE PAYMENT TO PATHWARD | - | | 9,846.11 | |
| 5/8/2025 | | | AMERICAN E | Acct -7-65006 | - | | 3,000.00 | |
| 5/8/2025 | | | AMERICAN E | WRONG DATE | 3,000.00 | | - | |
| 5/9/2025 | | | RANCHOTREE | 2025-05 RENT DUE TORREY RD. | 880.00 | | - | |
| 5/9/2025 | | | BVES | BEAR VALLEY ELECTRIC SERVICE, W/E 04/05/2025, WORK DONE FOR BVES, CONTRACT 3095-000 | 67,099.28 | | - | |
| 5/9/2025 | | | DUKE | DUKE ENERGY, DEF, HELENE STORM, SERVICE DATES : 9/23/2024 - 9/28/2024 | 126,802.58 | | - | |
| 5/9/2025 | | | GRAND TERRACE | CHECK DEPOSIT PNC BANK GRAND TERRACE | 54,550.00 | | - | |
| 5/12/2025 | | | CORETREECA | WIRE PAYMENT 05/18/2025 | 14,480.10 | | - | |
| 5/12/2025 | | | DUKE | DUKE ENERGY, DISSTON - 40TH UG PHASE III, SERVICE DATES : 1/13/2025 - 1/18/2025 | 7,550.32 | | - | |
| 5/12/2025 | | | PNC VISA | pnc card payment made mid-period | - | | 10,000.00 | |
| 5/12/2025 | | | CHASE | PAYMENT TO CHASE CREDIT CARD | - | | 2,406.62 | |
| 5/12/2025 | | | VERIZON WI | Charge | - | | 257.02 | |
| 5/13/2025 | | | CORETREECA | WEEK 20 - SENNEBOGEN RENTAL | 7,612.50 | | - | |
| 5/14/2025 | | | DUKE | DUKE ENERGY, VTNOF, SERVICE DATES : 2/3/2025 - 2/8/2025 | 34,727.16 | | - | |
| 5/14/2025 | | | PINO TREES | 2025-04 - STORM T&E EQUIPMENT CHARGES | 25,739.36 | | - | |
| 5/14/2025 | | | PINO TREES | 2025-04 PINO EQUIPMENT LEASE | 135,000.00 | | - | |
| 5/14/2025 | | | PINO TREES | PINO INTERCOMPANY LOAN PRINCIPAL PAYMENT - TRANS# 11172597997 | 60,000.00 | | - | |
| 5/14/2025 | | | Transfer - xx1607 | Transfer from OP to DIP Payroll | - | | | 110,000.00 |
| 5/14/2025 | | | US PREMIUM | INSURANCE | - | | 96,975.48 | |
| 5/14/2025 | | | MIDWESTERN | INSURANCE | - | | 41,325.97 | |
| 5/14/2025 | | | PYRO-COMM | SERVICES | - | | 225.00 | |
| 5/14/2025 | | | WESTERN DE | SERVICES | - | | 134.29 | |
| 5/14/2025 | | | THURSTON E | SERVICES | - | | 163.00 | |
| 5/14/2025 | | | THURSTON E | SERVICES | 163.00 | | - | |
| 5/14/2025 | | | STUBBS COO | SUBCONTRACTED SERVICES | - | | 27,156.99 | |
| 5/14/2025 | | | SPECIALIZE | SERVICES | - | | 3,498.12 | |
| 5/14/2025 | | | ROGER JENK | LODDGING | - | | 3,060.00 | |
| 5/14/2025 | | | RIGHT CLIM | SERVICES | - | | 203.00 | |
| 5/14/2025 | | | PLANET AUT | SERVICES | - | | 1,188.00 | |
| 5/14/2025 | | | LINE INDUS | UNION BENEFITS | - | | 38,217.73 | |
| 5/14/2025 | | | METLIFE - | BENEFITS | - | | 3,437.14 | |

STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1594
May 2025

| Date mm/dd/yyyy | Account # | Check Number | Payee/Payor | Purpose | Deposits Receipts | Transfers | Disbursements Disbursements | Transfers |
|---|---|---|---|---|---|---|---|---|
| 5/14/2025 | | | FLEET IT | SERVICES | - | | 665.10 | |
| 5/14/2025 | | | FAIRFIELD | LODDGING | - | | 490.52 | |
| 5/14/2025 | | | CORP BILLI | SERVICES | - | | 292.92 | |
| 5/14/2025 | | | CHINO MOWE | SERVICES | - | | 2,500.00 | |
| 5/14/2025 | | | ESG LAND | SERVICES | - | | 18,879.84 | |
| 5/14/2025 | | | MOTOR VEHI | SERVICES | - | | 9,909.00 | |
| 5/14/2025 | | | BIG BEAR D | RENT | - | | 101.73 | |
| 5/14/2025 | | | MASTER'S R | SERVICES | - | | 130.50 | |
| 5/14/2025 | | | SAN BERNAR | SERVICES | - | | 907.95 | |
| 5/14/2025 | | | BANDERAS P | SERVICES | - | | 2,550.00 | |
| 5/14/2025 | | | JAMES RIVE | SERVICES | - | | 2,328.26 | |
| 5/15/2025 | | | PHOENIXTM | 2025-04 HEALTH PLAN REIMBURSEMENT | 1,939.71 | | - | |
| 5/15/2025 | | | PHOENIXTM | 2025-04 PHOENIX EQUIPMENT LEASE | 19,000.00 | | - | |
| 5/15/2025 | | | PHOENIXTM | PHOENIX TRAFFIC MANAGEMENT - PAYMENT TOWARDS PRINCIPAL LOAN | 7,500.00 | | - | |
| 5/15/2025 | | | PNC VISA | pnc card payment made mid-period | - | | 20,000.00 | |
| 5/15/2025 | | | CESAR ROSA | REPLACEMENT OF 2X4 FLUORESCENT LIGHTS | - | | 201.60 | |
| 5/15/2025 | | | BANK OF AM | PAYOFF - CUSTOMER SHORTFALL - Customer No. 4138721 /Schedule No(s). 022 VIN 1XPCDP9X8KD276222 | - | | 10,367.72 | |
| 5/15/2025 | | | SC FUELS | SC FUEL BI-MONTHLY CARDLOCK BILL | - | | 21,049.08 | |
| 5/15/2025 | | | THURSTON E | client # 2198 Elevator Maintenance Service | - | | 163.00 | |
| 5/16/2025 | | | BVES | BEAR VALLEY ELECTRIC SERVICE, W/E 4/12/2025, WORK DONE FOR BVES, CONTRACT 3095-000 | 64,109.36 | | - | |
| 5/16/2025 | | | Core Tree | WIRE RECEIVED FROM CORE TREE 5/16/2025 | 14,897.44 | | - | |
| 5/16/2025 | | | CHRISTINER | DEPOSIT REFUND | 380.00 | | - | |
| 5/16/2025 | | | AERI TREE | 2025-02 EQUIPMENT CHARGES | 32,400.00 | | - | |
| 5/19/2025 | | | SAMBA | SERVICES | - | | 414.34 | |
| 5/20/2025 | | | DUKE | DUKE ENERGY, VTCOF, SERVICE DATES : 2/10/25 - 2/15/2025 | 39,067.00 | | - | |
| 5/20/2025 | | | GRAND TERRACE | CHECK DEPOSIT PNC BANK GRAND TERRACE | 8,625.00 | | - | |
| 5/20/2025 | | | MOTOR VEHI | PURCHASE OF ASSET ID 001146 - 2016 Ford F-250 4x4 VIN 1FT7W2BT6GEC57127 | 9,000.00 | | - | |
| 5/21/2025 | | | MOTOR VEHI | REGISTRATION FOR 6 UNIT | - | | 5,445.00 | |
| 5/21/2025 | | | PINO TREES | 2025-04 PINO EQUIPMENT LEASE | 135,000.00 | | - | |
| 5/21/2025 | | | PINO TREES | 2025-04 MANAGEMENT FEES | 25,000.00 | | - | |
| 5/21/2025 | | | PINO TREES | PINO INTERCOMPANY LOAN PRINCIPAL PAYMENT - TRANS# 11172597997 | 60,000.00 | | - | |
| 5/21/2025 | | | Transfer - xx1607 | Transfer from OP to DIP Payroll | - | | | 105,000.00 |
| 5/21/2025 | | | CORETREECA | PAYMENT APPLICATION FOR 5/16/2025 | - | | - | |
| 5/22/2025 | | | PHOENIXTM | 2025-04 - INTEREST FOR LINE OF CREDIT | 19,075.07 | | - | |
| 5/22/2025 | | | PHOENIXTM | PHOENIX TRAFFIC MANAGEMENT - PAYMENT TOWARDS PRINCIPAL LOAN | 7,500.00 | | - | |
| 5/22/2025 | | | AMAZON | SERVICES | - | | 1,389.50 | |
| 5/22/2025 | | | BAY ALARM | SERVICES | - | | 80.29 | |
| 5/22/2025 | | | ADT SECURI | SERVICES | - | | 88.54 | |
| 5/22/2025 | | | BLUE SHIEL | BENEFITS | - | | 8,284.39 | |
| 5/22/2025 | | | KAISER PER | BENEFITS | - | | 1,511.60 | |
| 5/22/2025 | | | KAISER PER | BENEFITS | - | | 51,999.04 | |
| 5/22/2025 | | | SO CAL EDI | UTILITIES | - | | 531.72 | |
| 5/22/2025 | | | SO CAL EDI | UTILITIES | - | | 5,739.39 | |
| 5/22/2025 | | | VESTIS | SERVICES | - | | 458.73 | |
| 5/22/2025 | | | TECH WORKS | SERVICES | - | | 3,450.00 | |
| 5/22/2025 | | | SO CAL GAS | UTILITIES | - | | 51.76 | |
| 5/22/2025 | | | APPRIVER L | SERVICES | - | | 2,842.78 | |
| 5/22/2025 | | | STUBBS COO | SUBCONTRACTED SERVICES | - | | 3,420.00 | |
| 5/22/2025 | | | SPECIALIZE | SERVICES | - | | 3,498.12 | |
| 5/22/2025 | | | SNIDER | SERVICES | - | | 3,480.09 | |
| 5/22/2025 | | | INTER TIRE | SERVICES | - | | 196.00 | |
| 5/22/2025 | | | ESG LAND | SERVICES | - | | 11,492.64 | |
| 5/22/2025 | | | FAIRFIELD | LODDGING | - | | 517.52 | |

STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1594
May 2025

| Date mm/dd/yyyy | Check Account # Number | Payee/Payor | Purpose | Deposits Receipts | Transfers | Disbursements Disbursements | Transfers |
|---|---|---|---|---|---|---|---|
| 5/22/2025 | | CORP BILLI | SERVICES | - | | 292.92 | |
| 5/22/2025 | | APEX ENTER | SERVICES | - | | 9,728.50 | |
| 5/22/2025 | | HEAVYQUIP | SERVICES | - | | 13,778.61 | |
| 5/22/2025 | | PHOENIXTM | 2025-04 DMV registration paid by MTS for Phoenix | 2,000.00 | | - | |
| 5/22/2025 | | Core Tree | WIRE RECEIVED FROM CORE TREE 5/22/2025 | 11,897.36 | | - | |
| 5/23/2025 | | BVES | BVES PAYMENT REF# 935771 | 64,009.28 | | - | |
| 5/23/2025 | | US BANK | 2025-05 Adequate Protection Payment - US BANK | - | | 1,688.95 | |
| 5/23/2025 | | FNB | 2025-05 Adequate Protection Payment - FNB | - | | 4,520.47 | |
| 5/23/2025 | | ALTEC | 2025-05 Adequate Protection Payment - ALTEC | - | | 147,244.35 | |
| 5/23/2025 | | BOA | 2025-05 Adequate Protection Payment - BOA | - | | 118,359.22 | |
| 5/27/2025 | | LESS TRAVE | ACH - JUDY ASCOUGH | - | | 6,300.00 | |
| 5/28/2025 | | DOMINGO RA | SERVICES | - | | 850.00 | |
| 5/28/2025 | | PINO TREES | 2025-04 PINO EQUIPMENT LEASE ADD-ON | 440.00 | | - | |
| 5/28/2025 | | PINO TREES | 2025-04 - REIMBURSEMENT FOR PURCHASES FROM MOWBRAY'S STOCK | 10,606.79 | | - | |
| 5/28/2025 | | PINO TREES | 2025-04 DMV registration paid by MTS for Pino | 27,705.00 | | - | |
| 5/28/2025 | | PINO TREES | 2025-04 PINO EQUIPMENT LEASE | 45,000.00 | | - | |
| 5/28/2025 | | PINO TREES | 2025-04 MANAGEMENT FEES | 71,600.00 | | - | |
| 5/28/2025 | | DUKE | DUKE ENERGY, VTNOF, SERVICE DATES : 2/17/2025 - 2/22/2025 | 34,325.80 | | - | |
| 5/28/2025 | | CORETREECA | WEEK 21 - SENNEBOGEN RENTAL | 15,225.00 | | - | |
| 5/28/2025 | | PINO TREES | PINO INTERCOMPANY LOAN PRINCIPAL PAYMENT - TRANS# 11174112025 | 60,000.00 | | - | |
| 5/28/2025 | | Transfer - xx1607 | Transfer from OP to DIP Payroll | - | | | 110,000.00 |
| 5/28/2025 | | CESAR ROSA | A/C Unit Troubleshooting & Repair | - | | 712.46 | |
| 5/29/2025 | | PHOENIXTM | 2025-04 DMV registration paid by MTS for Phoenix | 3,000.00 | | - | |
| 5/29/2025 | | PHOENIXTM | PHOENIX TRAFFIC MANAGEMENT - PAYMENT TOWARDS PRINCIPAL LOAN | 5,000.00 | | - | |
| 5/29/2025 | | TRIWIN PRO | RENT | - | | 1,000.00 | |
| 5/29/2025 | | DUKE | DUKE ENERGY, VTCOF, SERVICE DATES : 2/17/25 - 2/22/25 | 37,788.60 | | - | |
| 5/29/2025 | | SPECIALIZE | SERVICES | - | | 3,498.12 | |
| 5/29/2025 | | SNIDER | SERVICES | - | | 3,752.96 | |
| 5/29/2025 | | ROGER JENK | LODDGING | - | | 2,870.00 | |
| 5/29/2025 | | JOSEPH P. | RENT | - | | 300.00 | |
| 5/29/2025 | | JACK HOPSO | RENT | - | | 1,000.00 | |
| 5/29/2025 | | GLORIA TRU | RENT | - | | 700.00 | |
| 5/29/2025 | | GLORIA TRU | RENT | - | | 1,067.11 | |
| 5/29/2025 | | PNC LOAN | PNC LOAN PRINCIPAL PAYMENT - WIRE TRACE# 202505323437 | - | | 200,000.00 | |
| 5/29/2025 | | ESG LAND | SERVICES | - | | 11,609.28 | |
| 5/29/2025 | | CORP BILLI | SERVICES | - | | 130.95 | |
| 5/29/2025 | | CHINO MOWE | SERVICES | - | | 3,236.29 | |
| 5/29/2025 | | CALIFORNIA | SERVICES | - | | 487.02 | |
| 5/29/2025 | | AC TREE SE | SUBCONTRACTED SERVICES | - | | 21,293.10 | |
| 5/29/2025 | | APEX ENTER | SERVICES | - | | 9,000.00 | |
| 5/29/2025 | | STUBBS COO | SUBCONTRACTED SERVICES | - | | 13,923.04 | |
| 5/29/2025 | | BIG BEAR A | RENT | - | | 1,200.00 | |
| 5/29/2025 | | Pilot Travel Centers | PILOT TRAVEL CENTERS AUTOMATED REBATE - INV FP0120250507478321 0089 - 05/19/25 | 35.97 | | - | |
| 5/29/2025 | | VESTIS | SERVICES | - | | 305.82 | |
| 5/29/2025 | | VERIZON WI | SERVICES | - | | 6,291.65 | |
| 5/29/2025 | | FIDELITY S | BENEFITS | - | | 440.08 | |
| 5/29/2025 | | FRONTIER | SERVICES | - | | 51.51 | |
| 5/29/2025 | | FRONTIER | SERVICES | - | | 80.23 | |
| 5/29/2025 | | FRONTIER | SERVICES | - | | 780.00 | |
| 5/29/2025 | | GM FINANCI | LEASE | - | | 26.15 | |
| 5/29/2025 | | PHOENIXTM | 2025-04 PHOENIX EQUIPMENT LEASE | 17,760.00 | | - | |
| 5/29/2025 | | GRAND TERRACE | CHECK DEPOSIT PNC BANK GRAND TERRACE | 45,652.00 | | - | |
| 5/29/2025 | | MOTOR VEHI | SERVICES | - | | 6,237.00 | |
| 5/29/2025 | | COUNTY SER | RENT | - | | 744.00 | |
| 5/29/2025 | | AMERICAN E | SERVICES | - | | 3,000.00 | |
| 5/29/2025 | | PNC VISA | CREDIT CARD | - | | 30,000.00 | |

| | | | STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS | | | | | |
| | | | The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1594 | | | | | |
| | | | May 2025 | | | | | |
| Date | Check | | | Deposits | | | Disbursements | |
| mm/dd/yyyy | Account # | Number | Payee/Payor | Purpose | Receipts | Transfers | Disbursements | Transfers |
| 5/30/2025 | | | DUKE | DUKE ENERGY, VTCOF, SERVICE DATES : 2/3/25 - 2/8/2025 | 40,031.30 | | - | |
| 5/30/2025 | | | BVES | BEAR VALLEY ELECTRIC SERVICE, W/E 4/26/2025, WORK DONE FOR BVES, CONTRACT 3095-000 | 64,936.24 | | - | |
| 5/30/2025 | | | CORETREECA | WEEK 18 HURRICANE HELENE CLEAN UP-WATAUGA COUNTY-NC-C&D | 11,509.20 | | - | |
| 5/30/2025 | | | ALEXIS COR | RESIGNATION | - | | 281.60 | |
| 5/30/2025 | | | PNC Bank | PNC Miscellaneous Fees | - | | 1,022.64 | |
| 5/30/2025 | | | SC FUELS | SC FUEL BI-MONTHLY CARDLOCK BILL | - | | 23,445.32 | |
| 5/30/2025 | | | AERI TREE | 2025-03 EQUIPMENT CHARGES | 32,400.00 | | - | |
| 5/31/2025 | | | PNC LOAN | INTEREST PAYMENT ON CREDIT LINE - PNC COMMERCIAL LOAN | - | | 35,420.41 | |
| | | | | | | | | |
| | **Total for Account xx1594** | | | | **2,148,896.58** | **-** | **1,933,934.46** | **470,000.00** |

| | | | | STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS | | | | |
| | | | | The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1594 | | | | |
| | | | | May 2025 | | | | |

| Date mm/dd/yyyy | Account # | Check Number | Payee/Payor | Purpose | Deposits Receipts | Transfers | Disbursements Disbursements | Transfers |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Total for Account xx1594 | | | | - | - | - | - |

| | | | | STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS<br>The Orginal Mowbray's Tree Service, Inc. - ACCOUNT xx1607<br>May 2025 | | | | |
|---|---|---|---|---|---|---|---|---|
| Date | Check | | | | Deposits | | Disbursements | |
| mm/dd/yyyy | Account # | Number | Payee/Payor | Purpose | Receipts | Transfers | Disbursements | Transfers |
| 5/2/2025 | | | JOHN HANDC | PAYROLL 050225 MTS 401K | | - | 1,775.51 | |
| 5/7/2025 | | | Transfer - xx1594 | Transfer from OP to DIP Payroll | | 145,000.00 | - | |
| 5/7/2025 | | | MTS PAYROLL | PAYROLL W#17 APR 27, 2025 - MAY 03, 2025 PAYDATE MAY 09, 2025 - CASH REQUIREMENTS | | - | 135,432.49 | |
| 5/9/2025 | | | JOHN HANDC | PAYROLL 050925 MTS 401K | | - | 1,776.46 | |
| 5/14/2025 | | | Transfer - xx1594 | Transfer from OP to DIP Payroll | | 110,000.00 | - | |
| 5/14/2025 | | | MTS PAYROLL | PAYROLL W#18 MAY 04, 2025 - MAY 10, 2025 PAYDATE MAY 16, 2025 - CASH REQUIREMENTS | | - | 110,090.26 | |
| 5/16/2025 | | | JOHN HANDC | PAYROLL 051625 MTS 401K | | - | 1,776.66 | |
| 5/21/2025 | | | Transfer - xx1594 | Transfer from OP to DIP Payroll | | 105,000.00 | - | |
| 5/21/2025 | | | MTS PAYROLL | PAYROLL W#19 MAY 11, 2025 - MAY 17, 2025 PAYDATE MAY 23, 2025 - CASH REQUIREMENTS | | - | 108,276.19 | |
| 5/23/2025 | | | JOHN HANDC | PAYROLL 052325 MTS 401K | | - | 1,777.55 | |
| 5/28/2025 | | | Transfer - xx1594 | Transfer from OP to DIP Payroll | | 110,000.00 | - | |
| 5/28/2025 | | | MTS PAYROLL | PAYROLL W#20 MAY 18, 2025 - MAY 24, 2025 PAYDATE MAY 30, 2025 - CASH REQUIREMENTS | | - | 111,473.92 | |
| 5/30/2025 | | | JOHN HANDC | PAYROLL 053025 MTS 401K | | - | 1,779.86 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Total for Account xx | | | | - | 470,000.00 | 474,158.90 | - |

**The Original Mowbray's Tree Service, Inc.**

**Case No.: 24-12674**

Part 7.a. Were any payments made on prepetition debt?

| Date Cleared | Bank Account | Check Number | Payee | Amount | Reason |
|---|---|---|---|---|---|
| 5/1/2025 | xx1594 | 45974 | PNC BANK | 115,128.67 | Adequate Protection Payment |
| 5/8/2025 | xx1594 | ACH | PATHWARD | 9,846.11 | Adequate Protection Payment |
| 5/15/2025 | xx1594 | 46046 | BANK OF AMERICA | 10,367.72 | Adequate Protection Payment |
| 5/23/2025 | xx1594 | ACH | US BANK | 1,688.95 | Adequate Protection Payment |
| 5/23/2025 | xx1594 | ACH | FIRST NATIONAL BANK | 4,520.47 | Adequate Protection Payment |
| 5/23/2025 | xx1594 | ACH | ALTEC CAPITAL | 147,244.35 | Adequate Protection Payment |
| 5/23/2025 | xx1594 | ACH | BANK OF AMERICA | 118,359.22 | Adequate Protection Payment |
| 5/29/2025 | xx1594 | ACH | PNC LOAN | 200,000.00 | Adequate Protection Payment |
| 5/29/2025 | xx1594 | 46109 | GM FINANCIAL | 26.15 | Adequate Protection Payment |
| 5/31/2025 | xx1594 | 611075847 | PNC LOAN | 35,420.41 | Adequate Protection Payment |

# Corporate Business Account Statement



Page 1 of 1
Account Number:  XX-XXXX-1754

**For the period   05/01/2025 to 05/30/2025**

THE ORIGINAL MOWBRAYS CASE # 24-1267
TREE SERVICE INC
DEBTOR IN POSSESSION
FL 2
686 E MILL ST
SAN BERNARDINO CA 92408-1610

Number of enclosures:     0
Tax ID Number: XX-XXX3041

☎ For Client Services:
    Call 1-800-669-1518

💻 Visit us at PNC.com/treasury

✉ Write to:  Treas Mgmt Client Care
    500 1St Ave
    Locator P7-Pfsc-03-B
    Pittsburgh PA 15219-3128

## Account Summary Information

### Balance Summary

| | Beginning balance | Deposits and other credits | Checks and other debits | Ending balance |
|---|---|---|---|---|
| | .00 | .00 | .00 | .00 |

| Deposits and Other Credits | | | Checks and Other Debits | | |
|---|---|---|---|---|---|
| Description | Items | Amount | Description | Items | Amount |
| Deposits | 0 | .00 | Checks | 0 | .00 |
| National Lockbox | 0 | .00 | Returned Items | 0 | .00 |
| ACH Credits | 0 | .00 | ACH Debits | 0 | .00 |
| Funds Transfers In | 0 | .00 | Funds Transfers Out | 0 | .00 |
| Trade Services | 0 | .00 | Trade Services | 0 | .00 |
| Investments | 0 | .00 | Investments | 0 | .00 |
| Zero Balance Transfers | 0 | .00 | Zero Balance Transfers | 0 | .00 |
| Adjustments | 0 | .00 | Adjustments | 0 | .00 |
| Other Credits | 0 | .00 | Other Debits | 0 | .00 |
| Total | 0 | .00 | Total | 0 | .00 |

### Ledger Balance

| Date | Ledger balance |
|---|---|
| 05/01 | .00 |

Member FDIC                    🏠 Equal Housing Lender

# Corporate Business Account Statement



Page 1 of 1
Account Number:  XX-XXXX-1762

**For the period    05/01/2025 to 05/31/2025**

THE ORIGINAL MOWBRAYS CASE # 24-1267
TREE SERVICE INC
DEBTOR IN POSSESSION
FL 2
686 E MILL ST
SAN BERNARDINO CA 92408-1610

Number of enclosures:    0
Tax ID Number: XX-XXX3041

☎ For Client Services:
    Call 1-800-669-1518

💻 Visit us at PNC.com/treasury

✉ Write to:  Treas Mgmt Client Care
    500 1St Ave
    Locator P7-Pfsc-03-B
    Pittsburgh PA 15219-3128

---

## Account Summary Information

### Balance Summary

| | Beginning balance | Deposits and other credits | Checks and other debits | Ending balance |
|---|---|---|---|---|
| | .00 | .00 | .00 | .00 |

| Deposits and Other Credits | | | Checks and Other Debits | | |
|---|---|---|---|---|---|
| Description | Items | Amount | Description | Items | Amount |
| Deposits | 0 | .00 | Checks | 0 | .00 |
| National Lockbox | 0 | .00 | Returned Items | 0 | .00 |
| ACH Credits | 0 | .00 | ACH Debits | 0 | .00 |
| Funds Transfers In | 0 | .00 | Funds Transfers Out | 0 | .00 |
| Trade Services | 0 | .00 | Trade Services | 0 | .00 |
| Investments | 0 | .00 | Investments | 0 | .00 |
| Zero Balance Transfers | 0 | .00 | Zero Balance Transfers | 0 | .00 |
| Adjustments | 0 | .00 | Adjustments | 0 | .00 |
| Other Credits | 0 | .00 | Other Debits | 0 | .00 |
| Total | 0 | .00 | Total | 0 | .00 |

### Ledger Balance

| Date | Ledger balance |
|---|---|
| 05/01 | .00 |

---

Member FDIC                            🏠 Equal Housing Lender

# Corporate Business Account Statement

 PNC BANK

Page 1 of 9
Account Number:  XX-XXXX-1594

**For the period    05/01/2025  to  05/31/2025**

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC
DEBTOR IN POSSESSION
FL 2
686 E MILL ST
SAN BERNARDINO CA 92408-1610

Number of enclosures:    0
Tax ID Number: XX-XXX3041
☎ For Client Services:
  Call 1-800-669-1518

💻 Visit us at PNC.com/treasury

✉ Write to:  Treas Mgmt Client Care
  500 1St Ave
  Locator P7-Pfsc-03-B
  Pittsburgh PA 15219-3128

## Account Summary Information

### Balance Summary

| | Beginning balance | Deposits and other credits | Checks and other debits | Ending balance |
|---|---|---|---|---|
| | 11,834,946.61 | 2,145,751.97 | 2,350,212.09 | 11,630,486.49 |

| Deposits and Other Credits | | | Checks and Other Debits | | |
|---|---|---|---|---|---|
| Description | Items | Amount | Description | Items | Amount |
| Deposits | 5 | 118,261.36 | Checks | 19 | 26,305.25 |
| National Lockbox | 0 | .00 | Returned Items | 0 | .00 |
| ACH Credits | 59 | 1,929,457.28 | ACH Debits | 107 | 1,078,458.63 |
| Funds Transfers In | 3 | 98,033.33 | Funds Transfers Out | 12 | 774,358.39 |
| Trade Services | 0 | .00 | Trade Services | 0 | .00 |
| Investments | 0 | .00 | Investments | 0 | .00 |
| Zero Balance Transfers | 0 | .00 | Zero Balance Transfers | 0 | .00 |
| Adjustments | 0 | .00 | Adjustments | 0 | .00 |
| Other Credits | 0 | .00 | Other Debits | 8 | 471,089.82 |
| Total | 67 | 2,145,751.97 | Total | 146 | 2,350,212.09 |

### Ledger Balance

| Date | Ledger balance | Date | Ledger balance | Date | Ledger balance |
|---|---|---|---|---|---|
| 05/01 | 11,847,850.76 | 05/12 | 11,728,336.56 | 05/21 | 11,868,402.17 |
| 05/02 | 11,888,585.72 | 05/13 | 11,723,542.44 | 05/22 | 11,907,485.10 |
| 05/05 | 11,589,098.54 | 05/14 | 11,855,842.94 | 05/23 | 11,643,572.32 |
| 05/06 | 11,584,873.44 | 05/15 | 11,614,452.75 | 05/27 | 11,556,809.95 |
| 05/07 | 11,417,139.18 | 05/16 | 11,706,037.95 | 05/28 | 11,709,445.89 |
| 05/08 | 11,699,186.60 | 05/19 | 11,703,164.85 | 05/29 | 11,538,577.59 |
| 05/09 | 11,706,306.14 | 05/20 | 11,758,847.17 | 05/30 | 11,630,486.49 |

## Deposits and Other Credits

### Deposits

**5 transactions for a total of $118,261.36**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/09 | 54,568.39 | Deposit | 037760244 |
| 05/16 | 380.00 | Deposit | 038014052 |
| 05/20 | 9,000.00 | Deposit | 038662978 |
| 05/20 | 8,625.00 | Deposit | 038662980 |
| 05/29 | 45,687.97 | Deposit | 037826743 |

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**    05/01/2025  to  05/31/2025
Account number:  XX-XXXX-1594
Page 2 of 9

---

## Deposits and Other Credits  * continued*

### ACH Credits

**59 transactions for a total of $1,929,457.28**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/01 | 68,239.40 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002313085 | 00025120016189281 |
| 05/01 | 19,480.28 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025119004734296 |
| 05/01 | 7,500.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025118007242852 |
| 05/01 | 2,000.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025118007242846 |
| 05/01 | 23,096.70 | Corporate ACH ACH Pmt<br>Core Tree Care, 11171071838 | 00025121012989082 |
| 05/02 | 67,099.28 | Corporate ACH Vendor Pay Bves Inc.<br>00935443 | 00025121011624728 |
| 05/02 | 18,415.50 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002313409 | 00025121010421651 |
| 05/06 | 7,612.50 | Corporate ACH ACH Pmt<br>Core Tree Care, 11171531143 | 00025125014959005 |
| 05/06 | 3,380.93 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002315684 | 00025125010000789 |
| 05/06 | 4,801.67 | Corporate ACH Cardrebate Comm Card<br>Rebate 23908 | 00025126006795870 |
| 05/08 | 60,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11171886412 | 00025127010605355 |
| 05/08 | 60,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11171887863 | 00025127010605365 |
| 05/08 | 56,343.20 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002317085 | 00025127003939590 |
| 05/08 | 43,941.04 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11171888121 | 00025127010605359 |
| 05/08 | 41,544.10 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11171887533 | 00025127010605361 |
| 05/08 | 21,549.35 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11171886884 | 00025127010605357 |
| 05/08 | 20,000.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025127007503769 |
| 05/08 | 7,500.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025127009462940 |
| 05/08 | 834.67 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025127009462943 |
| 05/08 | 304.21 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11171886646 | 00025127010605363 |
| 05/09 | 126,802.58 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002317378 | 00025128002301277 |
| 05/09 | 67,099.28 | Corporate ACH Vendor Pay Bves Inc.<br>00935575 | 00025128003270148 |
| 05/09 | 880.00 | Corporate ACH Mowbray'Sn Rancho Tree<br>Serv | 00025128005609637 |
| 05/12 | 14,480.10 | Corporate ACH ACH Pmt<br>Core Tree Care, 11172269705 | 00025129013493631 |

ACH Credits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period    05/01/2025 to 05/31/2025**
Account number:  XX-XXXX-1594
Page 3 of 9

---

## Deposits and Other Credits  *ontinued*

### ACH Credits   *- continued*                   **59 transactions for a total of $1,929,457.28**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/12 | 7,550.32 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002318002 | 00025129009362973 |
| 05/13 | 7,612.50 | Corporate ACH ACH Pmt<br>Core Tree Care, 11172412934 | 00025132012400852 |
| 05/14 | 135,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11172597847 | 00025133009894572 |
| 05/14 | 60,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11172597997 | 00025133009894570 |
| 05/14 | 34,727.16 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002320312 | 00025133004475077 |
| 05/14 | 25,739.36 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11172597958 | 00025133009894568 |
| 05/15 | 19,000.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025133008869592 |
| 05/15 | 7,500.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025133005044622 |
| 05/15 | 1,939.71 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025133005044625 |
| 05/16 | 64,109.36 | Corporate ACH Vendor Pay Bves Inc.<br>00935660 | 00025135012307897 |
| 05/16 | 14,897.44 | Corporate ACH ACH Pmt<br>Core Tree Care, 11172999363 | 00025135016317271 |
| 05/20 | 39,067.00 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002323761 | 00025139008600141 |
| 05/21 | 135,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11173404964 | 00025140010188970 |
| 05/21 | 60,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11173405075 | 00025140010188972 |
| 05/21 | 25,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11173407096 | 00025140010188974 |
| 05/22 | 19,075.07 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025140009302941 |
| 05/22 | 7,500.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025140008083114 |
| 05/22 | 2,000.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025140008083111 |
| 05/22 | 11,897.36 | Corporate ACH ACH Pmt<br>Core Tree Care, 11173634740 | 00025142012801800 |
| 05/23 | 64,009.28 | Corporate ACH Vendor Pay Bves Inc.<br>00935771 | 00025142012820665 |
| 05/28 | 71,600.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11174112195 | 00025147014065131 |
| 05/28 | 60,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11174112025 | 00025147014065141 |
| 05/28 | 45,000.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11174111166 | 00025147014065133 |
| 05/28 | 34,325.80 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002327649 | 00025147008372563 |

ACH Credits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**   05/01/2025  to  05/31/2025
Account number:  XX-XXXX-1594
Page 4 of 9

---

## Deposits and Other Credits  *continued*

### ACH Credits  *- continued*                59 transactions for a total of $1,929,457.28

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/28 | 27,705.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11174111637 | 00025147014065137 |
| 05/28 | 15,225.00 | Corporate ACH ACH Pmt<br>Core Tree Care, 11174090876 | 00025147014065153 |
| 05/28 | 10,606.79 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11174111883 | 00025147014065139 |
| 05/28 | 440.00 | Corporate ACH ACH Pmt<br>Pino Tree Servic 11174117100 | 00025147014065135 |
| 05/29 | 37,788.60 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002328369 | 00025148006716766 |
| 05/29 | 5,000.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025148013622008 |
| 05/29 | 3,000.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025148013622005 |
| 05/29 | 17,760.00 | Corporate ACH Payments<br>Phoenix Traffic Mts Op Acct | 00025149009069670 |
| 05/30 | 64,936.24 | Corporate ACH Vendor Pay Bves Inc.<br>00935928 | 00025149009781478 |
| 05/30 | 40,031.30 | Corporate ACH EDI Pymnts<br>De Florida Procu Ap0002329168 | 00025149007395140 |
| 05/30 | 11,509.20 | Corporate ACH ACH Pmt<br>Core Tree Care, 11174643297 | 00025150005268938 |

### Funds Transfer In                3 transactions for a total of $98,033.33

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/01 | 33,233.33 | Domestic Incoming Wire<br>2551I295728M4K57 | W2551I295728M4K57 |
| 05/16 | 32,400.00 | Domestic Incoming Wire 255GI2915Eo74L6J | W255GL2915EO74L6J |
| 05/30 | 32,400.00 | Domestic Incoming Wire<br>255UI44295Wb42Tg | W255UL44295WB42TG |

## Checks and Other Debits

### Checks and Substitute Checks                19 transactions for a total of $26,305.25

| Date posted | Check number | Amount | Reference number | Date posted | Check number | Amount | Reference number | Date posted | Check number | Amount | Reference number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/01 | 59400064 | 70.00 | 009314982 | 05/19 | 59400080 | 130.50 | 019232587 | 05/27 | 59400077 | 2,550.00 | 011881647 |
| 05/05 | 59400061 | 744.00 | 011494721 | 05/20 | 59400079 | 907.95 | 019833238 | 05/27 | 59400069 | 2,615.19 | 011923853 |
| 05/08 | 99004912 | 681.93 | 079537854 | 05/20 | 59400078 | 101.73 | 009108717 | 05/27 | 59400071 | 2,697.40 | 011917339 |
| 05/08 | 59400065 | 639.88 | 013530554 | 05/22 | 99448225 | 1,389.50 | 072426727 | 05/27 | 59400070 | 2,292.65 | 012729431 |
| 05/09 | 59400076 | 330.25 | 014329779 | 05/27 | 59400066 | 2,677.66 | 011505840 | 05/28 | 59400067 | 2,266.65 | 012817081 |
| 05/14 | 59400075 | 3,000.00 | 017093337 | 05/27 | 59400073 | 2,295.90 | 011718385 | 05/30 | 59400083 | 712.46 | 014543251 |
| 05/16 | 59400081 | 201.60 | 018610019 | | | | | | | | |

### ACH Debits                107 transactions for a total of $1,078,458.63

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/01 | 8,820.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871430 |
| 05/01 | 4,463.12 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871426 |
| 05/01 | 4,403.92 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871428 |

ACH Debits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**    05/01/2025  to  05/31/2025
Account number:  XX-XXXX-1594
Page 5 of 9

---

## Checks and Other Debits    *ontinued*

### ACH Debits    *- continued*                    107 transactions for a total of $1,078,458.63

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/01 | 3,498.12 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871429 |
| 05/01 | 2,110.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871425 |
| 05/01 | 1,050.08 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871427 |
| 05/01 | 673.26 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871424 |
| 05/01 | 140.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871421 |
| 05/01 | 132.39 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871422 |
| 05/01 | 66.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025121016871423 |
| 05/01 | 90.00 | Corporate ACH Cdtfa Epmt Ca Dept Tax Fee 20920318 | 00025120017977628 |
| 05/02 | 19,705.46 | Corporate ACH Leasechg Pathward, Nation 7420 | 00025121013029849 |
| 05/02 | 20,000.00 | Corporate ACH Payment PNC Visa Online 61002 | 00025121015066253 |
| 05/02 | 1,467.00 | Corporate ACH Payment Motor Vehicle So 52899 | 00025121014487453 |
| 05/02 | 879.40 | ACH Web Epay Chase Credit Crd 8372675092 | 00025121013027061 |
| 05/02 | 780.00 | Corporate ACH Bill Pay Frontier Communi 20955720011 | 00025121016453667 |
| 05/02 | 651.12 | ACH Web Webpayment Burrtecmillst | 00025122007902677 |
| 05/02 | 418.93 | ACH Web Webpayment Burrtecmillst | 00025122007902678 |
| 05/02 | 245.91 | ACH Web Webpayment Burrtecmountain | 00025122007902675 |
| 05/02 | 245.91 | ACH Web Webpayment Burrtecmountain | 00025122007902674 |
| 05/02 | 152.91 | Corporate ACH Account St Aramark Uniform 105122074101263 | 00025121011615972 |
| 05/02 | 80.47 | Corporate ACH Bill Pay Frontier Communi 20955742941 | 00025121016453666 |
| 05/02 | 51.74 | Corporate ACH Bill Pay Frontier Communi 14074190321 | 00025121016453665 |
| 05/02 | 33.79 | ACH Web Paid Scgc So Cal Gas 1528160085 | 00025121016462391 |
| 05/05 | 50.00 | Corporate ACH Payment Pitney Bowes 800090900328735 | 00025122009493107 |
| 05/05 | 19,750.10 | Corporate ACH Lease Pymt Lease Services Ct-Bund40433561 | 00025122014326458 |
| 05/05 | 440.08 | ACH Debit Eyemed Eyemed 532020069576 | 00025122008822078 |
| 05/06 | 20,000.00 | Corporate ACH Payment PNC Visa Online 61239 | 00025125013465744 |
| 05/06 | 20.20 | Corporate ACH Payment Paytrace Pymt 108880Pyt | 00025125011853810 |

ACH Debits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**   05/01/2025  to  05/31/2025
Account number:  XX-XXXX-1594
Page 6 of 9

---

## Checks and Other Debits   *ontinued*

### ACH Debits   *- continued*                    107 transactions for a total of $1,078,458.63

| Date posted | Amount | Transaction description | Reference number |
|---|---:|---|---|
| 05/07 | 12,207.26 | ACH Settlement Payments Orig Mowbrays Ts | 00025127010919002 |
| 05/07 | 2,800.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025127010919001 |
| 05/07 | 7,727.00 | Corporate ACH Payment Motor Vehicle So 52899 | 00025126010611912 |
| 05/08 | 6,905.17 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268891 |
| 05/08 | 5,948.80 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268893 |
| 05/08 | 1,623.47 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268896 |
| 05/08 | 1,491.29 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268892 |
| 05/08 | 1,352.47 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268897 |
| 05/08 | 1,223.53 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268895 |
| 05/08 | 256.50 | ACH Settlement Payments Orig Mowbrays Ts | 00025128007268894 |
| 05/09 | 241,337.90 | Corporate ACH Insurance First Insurance 900-103281937 | 00025128007005130 |
| 05/09 | 320.40 | ACH Web United Sit United Site Serv St-B6R1O0D6L4M8 | 00025128005568791 |
| 05/09 | 242.16 | ACH Debit Purchase Univoip Inc 310 747 3232 | 00025129007994439 |
| 05/13 | 10,000.00 | Corporate ACH Payment PNC Visa Online 61690 | 00025132010985639 |
| 05/13 | 2,406.62 | ACH Web Epay Chase Credit Crd 8400797611 | 00025132009626553 |
| 05/14 | 9,909.00 | Corporate ACH Payment Motor Vehicle So 52899 | 00025133008417514 |
| 05/14 | 257.02 | ACH Web Bill Pymnt Achma Visb 4460766 | 00025133004489807 |
| 05/15 | 38,217.73 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619543 |
| 05/15 | 27,156.99 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619877 |
| 05/15 | 18,879.84 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619544 |
| 05/15 | 3,498.12 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619619 |
| 05/15 | 3,060.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619618 |
| 05/15 | 2,500.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619616 |
| 05/15 | 1,188.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619615 |
| 05/15 | 665.10 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619620 |

ACH Debits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**  05/01/2025 to 05/31/2025
Account number:  XX-XXXX-1594
Page 7 of 9

---

## Checks and Other Debits  *ontinued*

### ACH Debits   *- continued*

**107 transactions for a total of $1,078,458.63**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/15 | 490.52 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619621 |
| 05/15 | 292.92 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619622 |
| 05/15 | 203.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619617 |
| 05/15 | 163.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619727 |
| 05/15 | 134.29 | ACH Settlement Payments Orig Mowbrays Ts | 00025135016619623 |
| 05/15 | 96,975.48 | Corporate ACH Drafts Uspremiumfinance 24164635 | 00025134008995965 |
| 05/15 | 41,325.97 | Corporate ACH Payments Midwestern Insur 24164709 | 00025134009045307 |
| 05/15 | 21,049.08 | Corporate ACH Arinvoices Cfs - Cardlock F 000035983 | 00025134006954460 |
| 05/15 | 225.00 | Corporate ACH Pyro-Comm Pyro-Comm System | 00025135009854714 |
| 05/16 | 20,000.00 | Corporate ACH Payment PNC Visa Online 61976 | 00025135015103118 |
| 05/19 | 2,328.26 | ACH Settlement Payments Orig Mowbrays Ts | 00025139013646255 |
| 05/19 | 414.34 | ACH Settlement Payments Orig Mowbrays Ts | 00025139013646189 |
| 05/21 | 5,445.00 | Corporate ACH Payment Motor Vehicle So 52899 | 00025140008964153 |
| 05/23 | 147,244.35 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012933061 |
| 05/23 | 11,492.64 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012933062 |
| 05/23 | 3,498.12 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932943 |
| 05/23 | 3,480.09 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932939 |
| 05/23 | 3,420.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932944 |
| 05/23 | 2,842.78 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932941 |
| 05/23 | 517.52 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932938 |
| 05/23 | 292.92 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932942 |
| 05/23 | 196.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025143012932940 |
| 05/23 | 5,739.39 | ACH Web Bill Paymt So Cal Edison Co 700933611001 | 00025142015740803 |
| 05/23 | 531.72 | ACH Web Bill Paymt So Cal Edison Co 700933601604 | 00025142015740802 |

ACH Debits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**    05/01/2025  to  05/31/2025
Account number:  XX-XXXX-1594
Page 8 of 9

---

## Checks and Other Debits  *ontinued*

### ACH Debits   *- continued*                    107 transactions for a total of $1,078,458.63

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/23 | 458.73 | Corporate ACH Account St<br>Aramark Uniform 106956252258936 | 00025142015728297 |
| 05/23 | 80.29 | Corporate ACH Vendor<br>Bay Alarm Compan 2N8Hss9Kmt | 00025142015743084 |
| 05/23 | 51.76 | ACH Web Paid Scgc So Cal Gas<br>0641219913 | 00025142015685566 |
| 05/27 | 6,300.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025147014344805 |
| 05/27 | 51,999.04 | ACH Web Internet<br>Kaiser Group Due 043000097955352 | 00025143800640499 |
| 05/27 | 1,511.60 | ACH Web Internet<br>Kaiser Group Due 043000097955312 | 00025143800640494 |
| 05/27 | 8,284.39 | ACH Web Blueshield Blue Shield Ca<br>W01214721000 | 00025143007290409 |
| 05/27 | 3,450.00 | ACH Debit J2532 Ooff<br>Techworks Inv-48 Cz10000F0Tn3C | 00025143012638150 |
| 05/27 | 88.54 | ACH Tel Adtpapach Adt Security Ser<br>48200266 | 00025143012528350 |
| 05/29 | 21,293.10 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239369 |
| 05/29 | 13,923.04 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239357 |
| 05/29 | 11,609.28 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239365 |
| 05/29 | 3,752.96 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239358 |
| 05/29 | 3,498.12 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239359 |
| 05/29 | 3,236.29 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239363 |
| 05/29 | 2,870.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239368 |
| 05/29 | 1,067.11 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239367 |
| 05/29 | 1,000.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239360 |
| 05/29 | 1,000.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239364 |
| 05/29 | 700.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239366 |
| 05/29 | 487.02 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239361 |
| 05/29 | 300.00 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239362 |
| 05/29 | 130.95 | ACH Settlement Payments Orig Mowbrays Ts | 00025149013239356 |
| 05/29 | 6,237.00 | Corporate ACH Payment Motor Vehicle So<br>52899 | 00025148012695615 |

ACH Debits continued on next page

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

For the period    05/01/2025  to  05/31/2025
Account number:  XX-XXXX-1594
Page 9 of 9

---

## Checks and Other Debits  *ontinued*

### ACH Debits  *- continued*

**107 transactions for a total of $1,078,458.63**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/30 | 281.60 | ACH Settlement Payments Orig Mowbrays Ts | 00025150009978434 |
| 05/30 | 30,000.00 | Corporate ACH Payment PNC Visa Online 62791 | 00025149011821716 |
| 05/30 | 23,445.32 | Corporate ACH Arinvoices<br>Cfs - Cardlock F 000035983 | 00025149011541761 |
| 05/30 | 1,200.00 | Corporate ACH Sale Big Bear Airport | 00025150004092405 |
| 05/30 | 305.82 | Corporate ACH Account St<br>Aramark Uniform 107559339977269 | 00025149012947000 |

---

### Funds Transfers Out

**12 transactions for a total of $774,358.39**

| Date posted | Amount | Transaction description | | Reference number |
|---|---|---|---|---|
| 05/01 | 115,128.67 | Domestic Assist Wire | Commercial Loans | W2551K26025XN5S1D |
| 05/05 | 278,503.00 | Domestic Assist Wire Llc | Force Ten Partners | W2555K2551KUM3W6N |
| 05/08 | 9,846.11 | Domestic Assist Wire Ass | Pathward, National | W2558H0515EE185HR |
| 05/15 | 3,437.14 | Domestic Assist Wire Insu | Metropolitan Life | W255FF0341BB56K1W |
| 05/15 | 10,367.72 | Domestic Assist Wire Leasin | Banc Of America | WPA5FG093545F2NYW |
| 05/23 | 9,728.50 | Domestic Assist Wire Inc | Apex Enterprises, | W255NF0724M4B301O |
| 05/23 | 13,778.61 | Domestic Assist Wire | Heavyquip | WPA5NF1356G8F269L |
| 05/23 | 1,688.95 | Domestic Assist Wire Fina | US Bank Equipment | W255NJ1818KWD1MNJ |
| 05/23 | 4,520.47 | Domestic Assist Wire Finance | Fnb Equipment | W255NJ2656IWB6S9Q |
| 05/23 | 118,359.22 | Domestic Assist Wire Leasin | Banc Of America | WPA5NF51089NG35YR |
| 05/29 | 200,000.00 | Domestic Assist Wire | Commercial Loans | W255TH0223C8C4O9N |
| 05/29 | 9,000.00 | Domestic Assist Wire Inc. | Apex Enterprises, | W255TH32218GC61XO |

---

### Other Debits

**8 transactions for a total of $471,089.82**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/02 | 26.73 | PNC Merchant Interchng  373339186992 | 373339186992  IND |
| 05/02 | 24.70 | PNC Merchant Discount  373339186992 | 373339186992  IND |
| 05/02 | 15.75 | PNC Merchant Fee  373339186992 | 373339186992  IND |
| 05/07 | 145,000.00 | Account Transfer To ███████1607 | THE ORIGINAL MO |
| 05/14 | 110,000.00 | Account Transfer To ███████1607 | THE ORIGINAL MO |
| 05/21 | 105,000.00 | Account Transfer To ███████1607 | THE ORIGINAL MO |
| 05/28 | 110,000.00 | Account Transfer To ███████1607 | THE ORIGINAL MO |
| 05/30 | 1,022.64 | Corporate Account Analysis Charge | 0000000000000062991 |

---

# Corporate Business Account Statement



Page 1 of 2
Account Number:  XX-XXXX-1607

**For the period   05/01/2025 to 05/30/2025**

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC
DEBTOR IN POSSESSION
FL 2
686 E MILL ST
SAN BERNARDINO CA 92408-1610

Number of enclosures:    0
Tax ID Number: XX-XXX3041
☎ For Client Services:
    Call 1-800-669-1518

🖥 Visit us at PNC.com/treasury

✉ Write to:  Treas Mgmt Client Care
    500 1St Ave
    Locator P7-Pfsc-03-B
    Pittsburgh PA 15219-3128

---

## Account Summary Information

### Balance Summary

| | Beginning balance | Deposits and other credits | Checks and other debits | Ending balance |
|---|---|---|---|---|
| | 80,245.84 | 470,000.00 | 474,158.90 | 76,086.94 |

| Deposits and Other Credits | | | Checks and Other Debits | | |
|---|---|---|---|---|---|
| Description | Items | Amount | Description | Items | Amount |
| Deposits | 0 | .00 | Checks | 0 | .00 |
| National Lockbox | 0 | .00 | Returned Items | 0 | .00 |
| ACH Credits | 0 | .00 | ACH Debits | 5 | 8,886.04 |
| Funds Transfers In | 0 | .00 | Funds Transfers Out | 4 | 465,272.86 |
| Trade Services | 0 | .00 | Trade Services | 0 | .00 |
| Investments | 0 | .00 | Investments | 0 | .00 |
| Zero Balance Transfers | 0 | .00 | Zero Balance Transfers | 0 | .00 |
| Adjustments | 0 | .00 | Adjustments | 0 | .00 |
| Other Credits | 4 | 470,000.00 | Other Debits | 0 | .00 |
| Total | 4 | 470,000.00 | Total | 9 | 474,158.90 |

### Ledger Balance

| Date | Ledger balance | Date | Ledger balance | Date | Ledger balance |
|---|---|---|---|---|---|
| 05/01 | 80,245.84 | 05/14 | 86,171.12 | 05/23 | 79,340.72 |
| 05/02 | 78,470.33 | 05/16 | 84,394.46 | 05/28 | 77,866.80 |
| 05/07 | 88,037.84 | 05/21 | 81,118.27 | 05/30 | 76,086.94 |
| 05/12 | 86,261.38 | | | | |

---

## Deposits and Other Credits

### Other Credits                                    4 transactions for a total of $470,000.00

| Date posted | | Transaction description | Reference number |
|---|---|---|---|
| 05/07 | 145,000.00 | Account Transfer From ▪▪▪▪1594 | THE ORIGINAL MO |
| 05/14 | 110,000.00 | Account Transfer From ▪▪▪▪1594 | THE ORIGINAL MO |
| 05/21 | 105,000.00 | Account Transfer From ▪▪▪▪1594 | THE ORIGINAL MO |
| 05/28 | 110,000.00 | Account Transfer From ▪▪▪▪1594 | THE ORIGINAL MO |

# Corporate Business Account Statement

THE ORIGINAL MOWBRAYS CASE #24-12674
TREE SERVICE INC

**For the period**   05/01/2025  to  05/30/2025
Account number:  XX-XXXX-1607
Page 2 of 2

## Checks and Other Debits

### ACH Debits

**5 transactions for a total of $8,886.04**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 05/02 | 1,775.51 | Corporate ACH ACH Debit John Hancock 0138739 | 00025121014566563 |
| 05/12 | 1,776.46 | Corporate ACH ACH Debit John Hancock 0138739 | 00025129013425477 |
| 05/16 | 1,776.66 | Corporate ACH ACH Debit John Hancock 0138739 | 00025135014821501 |
| 05/23 | 1,777.55 | Corporate ACH ACH Debit John Hancock 0138739 | 00025142015700833 |
| 05/30 | 1,779.86 | Corporate ACH ACH Debit John Hancock 0138739 | 00025149011542814 |

### Funds Transfers Out

**4 transactions for a total of $465,272.86**

| Date posted | Amount | Transaction description | | Reference number |
|---|---|---|---|---|
| 05/07 | 135,432.49 | Domestic Assist Wire | Paycom Client Trust | W2557I091919Y4G9X |
| 05/14 | 110,090.26 | Domestic Assist Wire | Paycom Client Trust | W255EI2246FL66IAQ |
| 05/21 | 108,276.19 | Domestic Assist Wire | Paycom Client Trust | W255LI0818NKB2I4V |
| 05/28 | 111,473.92 | Domestic Assist Wire | Paycom Client Trust | W255SI07435DC0Q57 |

Member FDIC                Equal Housing Lender

**AR Aging (Summary)**

Company/Bra MOWBRAY

Aged On:    5/31/2025

| Statement Cycle | Last Statement Date | Description | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | | End of Month | | | | | |

| Customer | Customer Name | Current | 1 - 30 Days | Past Due 31 - 60 Days | 61 - 90 Days | Over 90 Days | Balance |
|---|---|---|---|---|---|---|---|
| AERI TREE | ASOMEO ENVIRONMENTAL RESTORATION INDUSTRY, LLC | 0.00 | 33,549.38 | 33,549.38 | 0.00 | 0.00 | 67,098.76 |
| BRAVO TREE | BRAVO TREE SERVICE | 0.00 | 20,336.25 | 20,336.25 | 18,700.00 | 11,166.67 | 70,539.17 |
| BVES | BEAR VALLEY ELECTRIC SERVICE | 303,402.96 | 0.00 | 0.00 | 0.00 | 0.00 | 303,402.96 |
| CORETREECA | CORE TREE CARE | 108,472.40 | 399,766.00 | 222,441.66 | 102,640.63 | 186,280.44 | 1,019,601.13 |
| DUKE | DUKE ENERGY | 818,288.45 | 78,917.07 | 70,348.10 | 5,428.92 | 37,064.80 | 1,010,047.34 |
| MWPLLC | MOWBRAY'S WATERMAN PROPERTY, LLC. | 0.00 | 13,775.40 | 13,775.40 | 13,775.40 | 198,104.54 | 239,430.74 |
| PHOENIXTM | PHOENIX TRAFFIC MANAGEMENT INC. | 14,000.00 | 105,218.71 | 8,076.47 | 0.00 | 0.00 | 127,295.18 |
| PINO TREES | PINO TREE SERVICE | 953,965.98 | 331,066.51 | 0.00 | 0.00 | 0.00 | 1,285,032.49 |
| | Statement Cycle Total: | 2,198,129.79 | 982,629.32 | 368,527.26 | 140,544.95 | 432,616.45 | 4,122,447.77 |
| | Accounts Receivable Accrual | | | | | | 71,814.32 |
| | Company Total: | | | | | | 4,194,262.09 |

**The Original Mowbray's Tree Service, Inc.**
**Balance Sheet**

| Assets | May 25 | As of Petition Date 10/18/2024 |
|---|---|---|
| Current Assets | | |
| Cash & Cash Equivalents | 11,670,749 | 4,238,502 |
| Accounts Receivable | 4,194,262 | 6,815,559 |
| Prepaid Expenses | 1,530,339 | 887,456 |
| Total Current Asset | 17,395,350 | 11,941,517 |
| Fixed Assets | | |
| Accumulated Depreciation | (60,880,282) | (57,419,466) |
| Buildings & Improvements | 261,008 | 261,008 |
| Equipment, furniture, fixtures, software, & autos | 64,605,651 | 64,679,399 |
| Land | 245,000 | 245,000 |
| Other Assets | | |
| Deposits | 238,199 | 126,526 |
| Insurance Collateral | 1,797,624 | 1,797,624 |
| Investment in Pino | 1,500,000 | 1,500,000 |
| Long-term Receivables | 11,355,090 | 16,646,728 |
| **Total Assets** | **36,517,639** | **39,778,337** |
| | | |
| **Liabilities** | | |
| Current Liabilities | | |
| Post Petition Payable | 5,446,102 | 594,702 |
| Restructuring Accruals | 1,315,992 | - |
| Total Current Liabilities | 6,762,094 | 594,702 |
| Pre-Petition Liabilities | | |
| Accrued Expenses | 6,456,141 | 6,565,675 |
| Equipment Loans | 11,525,749 | 16,623,453 |
| Insider Notes Payable | 6,462,302 | 6,503,802 |
| Line Of Credit Payable - PNC | 6,294,962 | 7,038,514 |
| Other Accrued Expenses | 118,959 | 256,612 |
| Pre-Petition AP & Other Payables | 6,141,361 | 6,409,964 |
| Pre Petition Payable | 29,963 | - |
| Other Payables | - | - |
| **Total Liabilities** | **43,791,531** | **43,992,722** |
| | | |
| **Shareholders' Equity** | | |
| Tax Distribution | (12,316,513) | (12,376,130) |
| Net Income / (Loss) | (1,579,971) | 1,312,707 |
| Retained Earnings | 6,622,592 | 6,849,038 |
| **Total Shareholders' Equity** | **(7,273,891)** | **(4,214,385)** |
| | | |
| **Total Liabilities & Shareholders' Equity** | **36,517,639** | **39,778,337** |

Note: This attached balance sheet is based on the Debtor's internal financial records and General Ledger
and includes historical accruals for estimated litigation and other reserves. Those obligations were
scheduled as being of "Unknown" amount in the Debtor's most recently filed bankruptcy schedules.
Accordingly, the Total Liabilities and Equity reflected in Part 2 of the MOR (which is based on the Debtor's
bankruptcy schedules) will not agree to this attachment.

Note: No tax distributions have been made since the petition date.

EXHIBIT "18"



June 30th, 2025

Ronnie Jordan, CEO
Mowbray Acquisition LLC
2331 West Lincoln Avenue
Anaheim, CA 92801
kcatanzarite@catanzarite.com

### RE: Accounts Receivables Financing Proposal.

Dear Mr. Jordan,

Thank you for your recent inquiry on behalf of **Mowbray Acquisition LLC**.("Company"). The Company will propose its own reorganization plan in the bankruptcy case of The Original Mowbray's Tree Service Incorporated ("Mowbray's") in order to acquire all of the debtor's assets and stock. We have preliminarily reviewed the pertinent information you have supplied to REV Capital and/or Assigns ("REV") and we are now pleased to present the following proposal subject to the terms, conditions and contingencies expressed herein as follows;

### I. Basic Terms and Conditions:

**Maximum Amount Advanced:** $20,000,000.00

**Term: 12** Months

**Funding Fee: 0.045% per day**

**Advance rate: 85%** of eligible accounts

**II. Subject to Due Diligence:** The proposal outlined herein is subject to the review and verification of all previously or hereinafter requested documentation and/or other information relating to Mowbray's and the Company and their subject transactions, account debtors and invoices. REV's acceptance may be withheld at the sole discretion of REV for any reason or for no reason. This LOI is under the condition that Ronnie Jordan and Jacob Morrow are principal owners of both Acquisition and Mowbray's and have full control of the operations of said entities.

**III. Subject to Legal Documentation:** The Proposal contained herein is subject to the full execution, by an authorized officer of Company, of both Company and Mowbray's proposed legal documentation relating hereto in a form satisfactory to REV in its sole and exclusive discretion.

| | |
|---|---|
| Application | Security Agreement |
| Certificate of Officers | Purchase & Sale Agreement |
| Factoring Agreement | UCC filing removals or subordination's |

**IV. Subject to Lien and Judgment Searches:** This proposal is subject to the receipt and analysis of acceptable county and state lien and judgment and bankruptcy searches. The data contained within the searches will be received, either directly or through an intermediary, from the applicable County Clerk and state Secretary of State.

\*      \*      \*      \*      \*      \*      \*

Your signature on the acknowledgment and acceptance page at the end of this contingent proposal shall serve as your acceptance of the terms hereof. Any offers contained herein shall be valid through the close of business (5:00pm PST) on the fifth business day following the hearing on Company's plan of reorganization for Mowbray's (but not later than September 30, 2025 and shall be deemed revoked thereafter unless otherwise expressly provided in writing by REV. The undersigned grants REV Capital /or Assigns the right to: (1) run personal credit reports; (2) file UCC financing statements; (3) run public record searches; and (4) conduct standard due diligence. By signing below, applicant warrants that all information provided is true and accurate and understands that REV Capital /or Assigns is relying on this information to make their credit decisions.

Very truly yours,
REV CAPITAL

Paul D'Luca
CGO

## ACKNOWLEDGMENT & ACCEPTANCE

I have read the forgoing contingent letter of proposal and hereby acknowledge and accept the terms contained therein.

Date: July 2, 2025

Mowbray Acquisition LLC
By: _____
Ronnie Jordan CEO