1
2
3
4
5

Robert P. Goe – State Bar No. 137019
Jeffrey W. Broker – State Bar No. 53226
**GOE FORSYTHE & HODGES LLP**
17701 Cowan, Building D, Suite 210
Irvine, CA 92614
Email: rgoe@goeforlaw.com
       jbroker@goeforlaw.com
Telephone:  (949) 798-2460
Facsimile:  (949) 955-9437

6

Attorneys for Creditor and Movant Ronnie Jordan

7

8

**UNITED STATES BANKRUPTCY COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

10

11

In re:

12

THE ORIGINIAL MOWBRAY'S TREE
SERVICE, INC.,

13

14

           Debtor and Debtor-in-Possession.

15

16

17

18

19

20

21

22

23

Case No.  8:24-bk-12674-SC
Chapter 11 Proceeding

**CREDITOR RONNIE JORDAN'S REPLY
TO DEBTOR'S OPPOSITION TO HIS
MOTION FOR ORDER TERMINATING
DEBTOR'S PERIODS OF EXCLUSIVITY
FOR THE FILING OF A PLAN AND
OBTAINING ACCEPTANCE THEREOF,
SO AS TO PERMIT THE FILING OF A
COMPETING PLAN BY JORDAN'S
MOWBRAY ACQUISITION LLC;
SUPPLEMENTAL DECLARATION OF
KENNETH J. CATANZARITE IN
SUPPORT THEREOF**

**Hearing:**
Date:         August 6, 2025
Time:        1:30 p.m.
Courtroom:  5C
Location:    411 W. Fourth Street
             Santa Ana, CA 92701
[Hearing to be conducted via ZoomGov]

24

25

26

27

28

**TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY
JUDGE, THE UNITED STATES TRUSTEE, THE ORIGINAL MOWBRAY'S TREE
SERVICE, INC. AND ITS ATTORNEYS, CREDITORS, AND ALL PARTIES IN
INTEREST:**

**PLEASE TAKE NOTICE** that Ronnie Jordan, an unsecured creditor in this case ("Jordan") hereby files his Reply ("Reply") to the Debtor's Opposition ("Opposition") to the Motion by Creditor Ronnie Jordan for Order Terminating Debtor's Periods of Exclusivity for the Filing of a Plan and Obtaining Acceptance Thereof, so as to Permit the Filing of a Competing Plan by Jordan's Mowbray Acquisition LLC (the "Motion").

<u>**MEMORANDUM OF POINTS & AUTHORITIES**</u>

**I.**

<u>**SUMMARY OF MOTION AND RELIEF SOUGHT**</u>

Jordan finds it perplexing that the estate professionals are so eager to protect the allegedly destitute chapter 11 debtor Robin Mowbray ("Robin") and her plan that provides for new value of a mere $100,000 to retain all of her equity in The Original Mowbray's Tree Service, Inc. ("Debtor" or "Mowbray's") and vehemently opposes any effort by Jordan to try to maximize the recovery to the general unsecured creditors ("GUC") in this case.  Jordan's Motion was an effort to 'float' (as specifically permitted by binding 9th Circuit authority[1]) a plan with Court permission if exclusivity is terminated that provides substantially more new value of $1,000,000 and $21 million in consideration to the estate to maximize the recovery by GUC as well as the voluntary deferral of Jordan's Allowed Claim filed in excess of $43 million.  Why would Debtor as a fiduciary to creditors oppose maximizing value through a competitive plan process?  Any allowed incremental administrative claims are far outweighed by the millions more the Jordan Plan will pay to creditors.

Jordan brings this Motion to terminate the exclusive period pursuant to Section 1121(d) of the Bankruptcy Code for the Court's permission to file his "Jordan Plan"(with its own discrete ECF Docket Number], and secure approval on his related Disclosure Statement ("Jordan DS" – again with its own discrete ECF Docket Number) and thereafter circulate for voting approval the

---

[1] As discussed below, the Opposition relies almost exclusively on two (2) Massachusetts bankruptcy level decisions that specifically rejected the "narrow approach" to solicitation of "<u>In re: Century Glove</u>", 860 F.2d 94 (3rd Cir. 1988), which the 9th Circuit followed "<u>In re: Jacobson</u>", 50 F.3d 1493 (9th Cir. 1995). Accordingly, the Court should ignore the Massachusetts bankruptcy cases.

Jordan Plan and Jordan DS concurrently with any Plan circulated by Debtor for voting purposes. At this time neither the Jordan DS or Jordan Plan were dated and filed, and no ballot was sent to creditors.  The Motion seeks the following specific relief by Court Order:

1.    Immediately terminating the exclusive period to obtain acceptances to Robin's Plan pursuant to Section 1121(d) of the Bankruptcy Code;

2.    That the Jordan Plan and accompanying Jordan DS be authorized to be separately ECF filed and served upon creditors and parties in interest with the Jordan DS approval process proceeding forward per the timelines in the FRBP and LBR; and

3.    That prior to or concurrently with approval of the Robin DS that same <u>not</u> be circulated until such time as the Jordan DS is approved in order for there to be simultaneous solicitation of votes and plan confirmation hearings pertaining to Robin's Plan in prospect and the competing Jordan Plan also in prospect.  (See, Motion, page 2, lines 8-19).

As explained in detail in the Motion and also hereinbelow, the Jordan Plan that the Motion seeks permission to file is objectively superior and provides:

(a) $21 million payable to the GUC which is an increase from the $15.7 million proposed by Robin in her plan for reorganizing the Debtor's financial affairs – the "Robin Plan" at ECF Docket No. 365 and the related Robin DS and Exhibits found at ECF Docket Nos. 363 and 364 respectively),

(b) a $1 million (versus Robin's Plan $100,000) "New Value" contribution on the "Effective Date" payable to the GUC to be applied against the $21 million,

(c) pursuit of claims against insiders which recoveries will inure to the benefit of the GUC,

(d) forecasted increased revenue aided by a $20 million Credit Facility to pay GUC in a projected 4 year timeframe with Jordan voluntarily waiving payment on his claim *only in the event of confirmation of the Jordan Plan* – compared to the Robin Plan with a term over 9 years to reach a payout of $15.6 million and 11 years to perhaps reach a payout $21 million,

(e) an experienced and seasoned vegetation management team with over 100 years of deep industry experience,

1   (f) not only saving jobs but offering former employees an opportunity to return as revenue

2   increases utilizing the talented Mowbray's workers, and

3   (g) saving the Mowbray's brand after 50 years of operation and continuing to provide

4   valued services.  (Jordan Declaration ¶ 21 filed concurrently with the Motion and Jordan Plan at

5   Exhibit 1 and Jordan DS at Exhibit 2 (of a total of eighteen (18) exhibits to the Jordan

6   Declaration.)

7   Robin's Plan proposed a 10% or $15.7 million to GUC starting 3 years from now in 2028

8   through 2034 with no upfront payment, no credit facility and no explanation of what happens with

9   a loss of the SCE contract.  However, the Robin Plan is now being pulled pursuant to the

10  Opposition making it a perfect time for parallel competing plan to be considered by creditors.  By

11  stating the Robin Plan is now to be a do-over without explaining any details, the Opposition

12  remarkably manages to succeed in leaving creditors with even more questions than when Jordan

13  filed the Motion.

14  The Motion was filed with its eighteen (18) exhibits collectively attached to the Jordan

15  Declaration to present an alternative to the Court that had substance to it based upon the belief that

16  a better result for creditors could be obtained through the Jordan Plan if exclusivity was terminated

17  and a competitive process put in place ultimately for the benefit of the GUC.  The Motion was

18  permissible in all respects under controlling Ninth Circuit authority that the Opposition failed to

19  even cite.  See, *Jacobson v. AEG Capital Corp*., 50 F.3d 1493 (9th Cir. 1995).  The filing of the

20  Motion was also permissible without the subsequent threat of penalty asserted by Debtor in its

21  Opposition, under the California *Litigation Privilege* found in California's Civil Code, Section

22  47.as explained in Section IV.C. hereinbelow.

23  Commencement of the disclosure statement approval process for the Jordan Plan was

24  specifically part of the relief sought in the Motion.  It is in the best interests of the GUC in this

25  case that the Motion be granted and the Jordan Plan and Jordan DS be permitted to go forward

26  towards the plan confirmation process concurrently with the Court's consideration of any Robin

27  DS and the Robin Plan as prayed for in the Motion.

28

The Motion should be granted because it is in the best interest of all creditors, not just the secured creditors and Rodriguez. The Motion has already triggered the Debtor to allegedly taking steps to filing a new plan that will be different from that originally proposed. Any incremental additional costs to the estate will be far outweighed by having competing plans that provide additional value and payment in a shorter timeframe than that presently being offered to the GUC.

## II.

## SUMMARY OF DEBTOR'S OPPOSITION

As of August 6, 2025, Debtor has already had 292 days of exclusivity yet now admits the Robin Plan is being withdrawn, which is a tacit admission it simply cannot address the overwhelming deficiencies set out in the Motion. Debtor tries to keep its new plan terms a secret and while it has cozied up to the Rodriguez Creditors has failed to address Jordan's objections grounded upon the deficient management of Mowbray's that in Jordan's objective evidence discounts the Robin Plan completely. The promise in the Robin DS and Plan with its 10% payment of GUC claims and $15.7 million where payments do not commence for 3 years until 2028 and are forecast to continue for 9 years through 2034 is a bridge too far. Stated simply, without a new management team Jordan is certain Mowbray's fails and none of the GUC will be paid any of the $15.7 million, unless of course Debtor pays some money to Rodriguez now to secure its vote. The entire support for the Robin Plan forecast is **$57 million coming from one customer (SCE through PTS)** to combine with 2-3 Mowbray's customers for $10 million (down from $471 million in 2020 under Jordan as CEO) when that SCE contract ends in 2026. Debtor does not address how it acquires any new replacement customers after it burned bridges with PGE nor where it gets the capital to do so. Jordan wants to offer a competing plan with a management team heads and shoulders above the failing team Debtor offers, $1 million up front, $21 million to GUC, business expansion financed by a $20 million credit facility and new management with current prime contracts with PGE and other utilities to grow the Mowbray's vegetation management business.

Further, Rodriguez has already been paid $1 million on its claim from insurance that neither it nor the Robin Plan have addressed. Still further, the Rodriguez claim of $91 million

REPLY TO OPPOSITION TO MOTION FOR ORDER TERMINATING EXCLUSIVITY

1  includes $49 million of subordinated punitive damages that must be addressed in relation to GUC

2  holding economic claims where only 10% is proposed to be paid. The Opposition does not

3  explain how the do-over will benefit the GUC. Clearly the GUC will benefit from allowing other

4  creditors to submit a competing plan that will pay them more, and sooner, at the end of the day.

5       Jordan disputes Debtor's assertion that the attachment of the Jordan Plan, DS and Exhibits

6  to the DS as part of the eighteen (18) exhibits collectively attached to the Jordan Declaration filed

7  in support of the Motion constitute a 'solicitation' in violation of Sections 1121(b) and 1125(b) of

8  the Bankruptcy Code. Jordan's Motion was completely proper based upon Ninth Circuit authority

9  set out in *Jacobson, Id.* Jordan further contends that 'cause' in fact exists to terminate exclusivity

10 and that the Motion should be granted in order for a competitive process that will benefit the GUC

11 can commence in this case.

12      While Debtor's Opposition argues Jordan's Motion is not supported by admissible

13 evidence, that argument is plainly contradicted by the supporting Declarations of Jordan and

14 Catanzarite filed in support of the Motion without evidentiary objection. It is <u>Debtor</u> that

15 notwithstanding attaching declarations in support of its Opposition utterly fails to counter or even

16 address the reasons for the Motion and cited deficiencies in the Robin DS and Plan. Debtor is in

17 the vegetation management business, not leasing equipment or management of contractors

18 providing vegetation management. Debtor does not with competent evidence explain the collapse

19 of revenues from 2020 nor the loss of PGE contracts, leaving how it grows or even maintains its

20 vegetation management business without at least a $20 million credit source which Jordan has

21 arranged. All Debtor counters with is to say the Robin Plan will be revised to address unknown

22 treatment of only one unsecured creditor, the Rodriguez Claim, but no others.

23                          **III.**

24            <u>**FACTUAL BACKGROUND AND THE ROBIN PLAN**</u>

25      A.    <u>**Factual Background**</u>

26      The Factual Background is found at pages 8-17 in the Motion that are incorporated by

27 reference.

28 / / /

**B.    Exclusivity**

On March 20, 2025, the Court entered its Order granting the Debtor's Motion to extend Exclusivity Periods ("Exclusivity Order") (ECF Docket No. 380 – RJN 11).  The Debtor filed its Plan on March 14, 2025 (with such time extended pursuant to 11 U.S.C. §1121(b) through and including March 18, 2025).  The Exclusivity Order also provided: "The Debtor's exclusive period to solicit acceptances of a chapter 11 plan pursuant to 11 U.S.C. §1121(c)(3) is extended through and including August 15, 2025." (ECF Docket No. 380 – RJN 11.)  The Motion was filed for the purpose of the Court allowing a competing Jordan Plan to be circulated after disclosure statements were approved and that exclusivity be terminated in order for that competitive process to begin.

**C.    The Robin Plan.**

The Opposition discloses that the Robin Plan is going to be amended to address a settlement in prospect with the Rodriguez creditor, the holder of a general unsecured claim with economic, noneconomic and punitive damages components.  Since the current Robin Plan (and corresponding Robin DS) are going to be amended to address the settlement of the Rodriguez Claim, the floating of an alternative plan did no violence to the existent plan as it is no longer on the table.

The <u>current</u> Robin DS represents that Mowbray's proposes "Through the Debtor's ongoing operations, the [Robin] Plan proposes to pay substantial value to the Holders of Allowed Claims, an amount that exceeds **$36,000,000** over the term of the Plan." (*Bold in original,* See Robin DS numbered pages 1-2, Exhibit 4). "The Holders of Allowed General Unsecured Claims will receive a pro rata share of the **$15,674,000** GUC Payment Amount.  The GUC Payment Amount is projected to be paid by the Reorganized Debtor <u>within nine years following the Effective Date</u> and will be paid *with interest*." (*Bold and italics in original.*  (See Robin DS numbered pages 1-2, RJN Exhibits 4 and 5 at Internal Exhibit 2).  The Robin Plan GUC Payment Amount is purportedly supported by the liquidation analysis at Robin DS Exhibits 3 (RJN Exhibit 5 Internal Exhibit 3).

Mowbray's gross revenues and net income or loss on such revenues from 2020 to 2024 are set forth in the table below.

/ / /

| Year | Gross Revenue | Net Income/(Loss) |
|------|---------------|-------------------|
| 2020 | $471 million | $69.2 million |
| 2021 | $281.9 million | $24.6 million |
| 2022 | $232 million | ($34 million) |
| 2023 | $127 million | ($28.9 million) |
| 2024 | $39.89 million | ($2,313) |

(See Robin DS numbered page 8, RJN Exhibit 2).

The current Robin Plan proposes that she contribute a paltry $100,000 as the 'new value' component of her current Plan when she is herself in a Chapter 11 Bankruptcy, lives off her credit cards and leaves to question her wholly owned Phoenix Traffic Control, Inc. ("PTM") which owes Mowbray's $2,500,000 and yet proposes to accept payments of *interest only by PTM to Mowbray's* on that substantial debt. (See Robin DS numbered page 2, RJN Exhibit 4, Robin Bankruptcy Petition and Schedules attached to the RJN as Exhibits 8 and 9 and her Status Report Exhibit 10 "…. As a result, the Debtor has recently struggled to cover her living expenses and is incurring mounting credit card debt."). As a result, creditors are in the dark as to where the Debtor is going and, more importantly, when it is going there.

### D.     The Jordan Plan.

As described in the Motion, the Jordan Plan projections pay the GUCs **in 4 years** when Jordan's payment deferral is considered. In contrast, the Robin Plan, if paying the same $21 million payout requires an unfeasible and speculative 11-year payment to the GUC. (See Jordan Decl. ¶28, Jordan DS pages 6-7 and 25 and Jordan Exhibits 4 and 5.)

The Jordan Plan pays **$42 million** collectively to all creditors including **$21 million to the GUC** with an initial $1 million from a New Value capital infusion on the Effective Date, will expand revenue with **a $20 million credit facility** and pay all the GUC an additional $20,000,000 (plus interest) significantly sooner (4 years) while deferring payment on Jordan's claim upon confirmation. (See Jordan Decl. ¶25, Jordan DS pages 8, 25-33 and Jordan Exhibits 18).

### E.     No Plan Negotiations with Jordan.

There have been no post-petition negotiations on the part of the Debtor with Jordan who holds an Allowed Claim in this case in the amount of **$43,395,996.00**. The Jordan litigation is pending in San Bernardino Superior Court and stay relief has been obtained. As the holder of

1 such a substantial claim his exclusion from the negotiation process is remarkable.  (Catanzarite

2 Declaration ¶29.  RJN 7.)  Since the Robin Plan was filed, Jordan, his management team and his

3 counsel have continued to receive the 'silent treatment' from the Debtor and its professionals.

**IV.**

**THE MOTION DOES NOT VIOLATE SECTIONS 1121 OR 1125**

**AND WAS PRIVILEGED IN ALL RESPECTS**

A.    **The Motion does not Violate Sections 1121 or 1125 Under Controlling Ninth**

**Circuit Authority**

9     The Ninth Circuit has endorsed the narrower reading of these statutes, specifically citing

10 the Third Circuit's *Century Glove* decision, in *Jacobson v. AEG Capital Corp*., 50 F.3d 1493 (9th

11 Cir. 1995).  *Jacobson* is not cited in the Opposition, for good reason, since it eviscerates the

12 Debtor's arguments.  Specifically, the Ninth Circuit in *Jacobson* explained,

> "Even after a reorganization plan is unveiled dissatisfied equity holders have many
> options.  Interested parties, i.e. creditors and shareholders (§ 1121(c)), acting in good
> faith, can circulate opposition to the debtor's plan.  *Century Glove, Inc. v. First Am.
> Bank of New York,* 860 F.2d 94, 100 (3d Cir. 1988).  Moreover, Bankruptcy Rule
> 3016(a) provides that "any party in interest other than the debtor, who is authorized to
> file a plan under Section 1121(c) of the Code, may file a plan at any time before the
> conclusion of the hearing on the disclosure statement or thereafter with leave of
> court."[2]  **In order to aid negotiations, bankruptcy courts have given interested
> parties relatively wide latitude to "float" (as opposed to solicit votes for)
> alternative plans**.  *See, e.g., In re Snyder,* 51 Bankr. 432, 437 (Bankr. D. Utah 1985).
> Although by filing this post-confirmation suit Jacobson and Fury have registered their
> opposition to Siliconix's plan, during the reorganization they did not circulate
> opposition to the plan, nor did they offer alternative plans."  (Emphasis added).

21 *Id*. at 1500 (emphasis added).  *Jacobson* is the law in the Ninth Circuit, having been cited with

22 approval in 161 subsequent cases (per Westlaw).

23     In *In re Snyder*, 51 B.R. 432 (Bankr. D. Utah, 1985), cited with approval by the *Jacobson*

24 panel of the Ninth Circuit (*Id*. at 1500 quoted above), the court explained that,

25 / / /

---

27 [2]  This section of the Rules of Bankruptcy Procedure has been amended.  However, it is still
instructive in the Opinion because leave of court was requested in the instant Motion under
28 consideration.

1
2
3
4
5

> "It follows that an unauthorized "solicitation" would include **a specific request for an official vote** for or against a plan of reorganization (a) that is made before dissemination to parties in interest of an approved disclosure statement, or (b) that is made after the dissemination of a disclosure statement, and which contains misrepresentations or deliberate falsehoods and misleading statements calculated to deceive parties entitled to vote, or (c) that refers to a plan of reorganization predicated upon arrangements that were arrived at by fraud or that were not adequately disclosed to the court and to parties in interest in the approved disclosure statement."

6 Id. at 437, emphasis added.

7 Here, *there was no request by Jordan for* ***an official vote*** in favor or against any plan by

8 virtue of the filing of the Motion or by the *floating* of an intended competing plan as one of

9 eighteen (18) exhibits attached collectively to the Jordan Declaration, and scenarios (b) and (c) set

10 forth in *Snyde*r, cited with approval by the *Jacobson* panel, do not apply.  There was and is no

11 ballot sitting on a creditor's desk with which to provide *an official vote* to return to the soliciting

12 party.  Rather, Jordan's to-be-formally-proposed Plan has been disclosed via the Motion to

13 achieve the end of Debtor's exclusivity that he contends is crippling the GUC through a

14 speculative reorganization.  The *floating* of it as an Exhibit to the Motion to showcase a potential

15 better option is permissible under *Jacobsen*.  The end of exclusivity to provide a better plan is the

16 end toward which the Motion is focused.  The attachment of the Jordan Plan as an exhibit to the

17 Motion is at most a "float" of an alternative plan that is completely permissible under *Jacobson*,

18 especially in view of the disclosure in the Opposition pleadings that the Robin Plan is going to be

19 amended as a result of an "agreement in principle" with Rodriguez *that is in the process of being*

20 *documented*.   Indeed, this new admission is further cause to terminate exclusivity promptly.

21 Any argument that there is a specific request for an "official" vote against the Robin Plan

22 (there is none) is moot and irrelevant, given that the Debtor's Opposition papers disclose that the

23 Robin Plan [ECF Docket No. 365] is no longer the operative plan that it seeks to confirm.  It is

24 represented that a future amended plan and amended disclosure statement is forthcoming from the

25 Debtor at some unspecified future time.  There is nothing to vote on to either accept or reject at

26 this time.  There is no Robin DS for the Court to approve on August 6, 2025.  To date there is no

27 disclosure of what the change in treatment as to the Rodriguez general unsecured claim may be.

28

1  There is, as a result, no 'official act' that can take place on the part of any creditor with regard to

2  the Robin Plan (to vote to either accept or reject it) as it presently exists.  There has/have been no

3  Bankruptcy Code violation(s) in 'floating' an alternative plan to a plan that according to the

4  Debtor is no longer the subject of a bid for confirmation.

5      **B.**      **The BAP's Decision in _In Re California Fidelity, Inc._ Supports the Narrow**

6           **Interpretation of Solicitation**

7      Debtor also relies upon _In re California Fidelity, Inc_., 198 B.R. 567 (9th Cir. BAP, 1996),

8  which centered upon the Debtor's president _sending a letter to creditors_ after two competing plans

9  had been proposed before approval of the plan proponents' disclosure statement soliciting votes

10  for debtor's plan and "advising them, _inter alia_, to reject the plan." (_Id_. at 569). There was no

11  motion to terminate exclusivity in that case tied to the letter.  The author of that letter did not seek

12  Court approval to 'officially' circulate it in connection with the plan confirmation process.  Rather,

13  the entire purpose of the letter was to solicit a rejection of an existing plan and a vote in favor of

14  the president's plan and the letter was an express solicitation of these specific votes.  Here, Jordan

15  filed the Motion with the Court to end exclusivity and specifically sought permission from the

16  Court in the prayer thereof to pursue the confirmation process (in tandem with the Debtor) of the

17  Jordan Plan and obtain permission to do so upon the Motion being granted.

18      The BAP in California Fidelity again reiterated the Ninth Circuit standard cited in

19  _Jacobson_ by holding:

20      "The term solicitation as used in § 1125(b) has been narrowly interpreted to mean nothing
21  short of a "specific request for an official vote." _Id._ at 101; _In re Snyder_, 51 Bankr. 432, 437
    (Bankr. D. Utah 1985).  Most courts have reasoned that a broader construction of the term would
22  curtail free and honest negotiations among creditors and, therefore, inhibit creditor participation in
    the debtor's reorganization.  _Century Glove,_ 860 F.2d 15 100-01.
23

24  Id. At 571-72.

25      The evidence Jordan attached includes what would be his competing plan that he intends to

26  file (_thereafter with its own discrete ECF Docket Number_) and thus after approval of the

27  companion Disclosure Statement and Index of Exhibits (_also thereafter with their own discrete_

28

1   *ECF Docket Numbers*), to then have the Jordan Plan officially voted on after voting solicitation, if

2   his pending Motion was/is granted.

3          *All* of the evidence in support of the Motion is offered to demonstrate good cause for

4   terminating exclusivity, which has been maintained for nearly nine (9) months, and which Jordan

5   asserts is harming creditors because an alternative and better deal would be possible but for this

6   restriction which the Court can eliminate.  By virtue of merely attaching his intended competing

7   plan to the Jordan Declaration as an Exhibit thereto, creditors cannot vote on Jordan's plan

8   because the draft plan was not 'filed' within the express meaning of Section 1121 and no vote can

9   be solicited until the Jordan DS is approved in connection therewith.

10          **C.      The Cases Cited by Debtor Regarding the Alleged Violation of Exclusivity on**

11          **the Part of Jordan are Contrary to *Jacobson's* Narrow Approach and Not**

12          **Binding Upon this Court**

13         The primary case relied on by Debtor in arguing that Jordan violated exclusivity

14   restrictions set forth in Section 1121 is *In re Charles Street African Methodist Episcopal Church*

15   *of Boston*, 499 B.R. 126 (Bankr. D. Mass. 2013) ("*Charles St.*").  *Charles St.* is a bankruptcy level

16   opinion out of Massachusetts that is distinguishable on the facts specifically rejected the Century

17   Glove narrow interpretation, which is the law in the Ninth Circuit.

18         In *Charles St.*, a secured lender (the "Bank") filed a motion, just 3 weeks into the debtor's

19   case, seeking to end exclusivity.  The Bank attached to its motion an unsigned draft of its

20   intended, competing plan.  The bankruptcy court described the features of the Bank's competing

21   plan as hopeless because it was "dependent […] on an unwilling third party's voluntary payment

22   of all creditors with its own funds, could not possibly have been confirmed."  *Id.* at 129 (emphasis

23   added).  Because the Bank's plan was hopeless and unworkable and the bankruptcy court

24   determined the Bank would not propose a plan that would provide a better distribution to

25   unsecured creditors using its own funds, the bankruptcy court cured the violation of section 1121

26   that it found to have occurred by prohibiting the Bank from filing a plan.

27         The *Charles St.* facts are starkly different from the facts of this case where the intended

28   competing plan of Jordan would repay creditors from Debtor's future earnings under alternative

1    and more competent management, plus a massive cash infusion for the equity interest in the

2    Debtor that is 10x that proposed by the Debtor in the plan Debtor has filed, but is now abandoning

3    in favor of a forthcoming replacement plan in any event.  Instead of the insular *Charles St.*

4    interpretation of the exclusivity and solicitation restrictions, which adopted the analysis of another

5    Bankruptcy Court in Massachusetts (*In re Clamp-All Corp.*, 233 B.R. 198 (Bankr. D. Mass 1999)),

6    the Ninth Circuit has endorsed a narrower reading of those statutes.  See, *In re Jacobson, supra.*

7    Debtor's argument that a violation of Section 1121 occurred in this case because of the technical

8    attachment of Jordan's competing plan to the Motion is also a minority view that does not appear

9    to extend beyond the bankruptcy courts for the District of Massachusetts.

10    More specifically, in "In re Clamp-All", the Court specifically rejected the narrow

11    approach by holding  "The Court believes that the Century Glove analysis fails to recognize . . ."

12    Id at 207[3].

13    Section 1121 speaks to the act of filing clearly for the purpose of the presentation of a plan

14    for consideration and approval.  No such thing happened in this matter as (i) there is no separate

15    plan presented for any official act other than it being contained within eighteen (18) Exhibits

16    attached to the Jordan Declaration and (ii) nothing was presented for creditors (secured and

17    unsecured) to vote on.  As the Third Circuit explained, Section 1121 "provides only that the debtor

18    temporarily has the exclusive right to file a plan **(and thus have it voted on)**." *Century Glove,*

19    *Inc. v. First American Bank*, 860 F.2d 94, 102 (3rd Cir. 1988) (emphasis added).

20    *Charles St.'s* expansive interpretation of what it means to "file" a document in furtherance

21    of exercising a statutory right or fulfilling a statutory duty also does not comport with other

22    provisions of the Bankruptcy Code which call for the actual filing of documents.  For example,

23    one does not satisfy the requirements of Sections 301, 302 or 303 of the Code for case

24    commencement by appending petitions to other documents.  In ordinary circumstances, one does

25    not file a claim in accordance with Section 502 by appending the claim for something else, such as

26

27 ──────────────

28    [3] This ruling was after the In re: Clamp-All court canvassed the law on solicitation specifically
     citing to California Fidelity as embracing the narrow approach. Id at 205.

1  a motion.  One does not satisfy the requirement of Section 521 to file schedules, by attaching those

2  as an exhibit to a declaration in support of a motion.  Discrete ECF Docket Numbers are required.

3    **D.    <u>The Filing of the Motion and Attachments of Exhibits Containing, *inter alia*,</u>**

4    **<u>the Jordan Plan and Jordan DS Did Not Violate Sections 1121 or 1125 as They</u>**

5    **<u>Were Subject to the California Litigation Privilege</u>**

6    California Civil Code §47(b) provides:

7        "A privileged publication or broadcast is one made:

8        …

9        (b) in any … (2) judicial proceeding …"

10    The California litigation privilege applies in Bankruptcy cases.  *In re Cedar Funding*, 419

11  B.R. 807, 824 (9th Cir. BAP 2009).  "There is a four-part test that must be met for application of

12  the privilege: the communication must be "(1) made in judicial or quasi-judicial proceedings; (2)

13  by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and

14  (4) that [has] some connection or logical relation to the action." *Id.*  (*Silberg v. Anderson*, 50 Cal.

15  3d 205, 212 (1990)) at 212, 266 Cal.Rptr. 638, 786 P.2d 365.  The *Silberg* court stated that the

16  third and fourth requirements are construed together; "that the communication be in furtherance of

17  the objects of the litigation is, in essence, simply part of the requirement that the communication

18  be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the

19  action." *Id.* at 219–20, 266 Cal.Rptr. 638, 786 P.2d 365.  It is also noted that the third requirement

20  is not "a test of a participant's motives, morals, ethics or intent." *Id.*  We finally observe that the

21  privilege protects only "communicative" conduct and is broadly applied with all doubts "resolved

22  in favor of the privilege." *Lambert v. Carneghi,* 158 Cal.App.4th 1120 at 1138, 70 Cal.Rptr.3d 626

23  (citation omitted)."  *In re Cedar Funding,* at *824.*

24    The District Court, *In re Albert-Sheridan*, 602 F. Supp. 3d 1338, 1346 (C.D. Cal. 2022,

25  (citing to *In re Cedar Funding* in affirming a lower court decision by the Hon. Scott Clarkson),

26  ruled "Additionally and alternatively, the litigation privilege would likely operate to bar Albert-

27  Sheridan's claims to **the extent they are based on the mere filing of documents in a court**

28  **case**").  (Emphasis added).

1    The four-part test for the establishment of the litigation privilege has been satisfied in

2    connection with the Motion.  The filing of eighteen (18) Exhibits at issue collectively attached to

3    the Jordan Declaration in connection with the Motion (i) occurred in this case, (ii) by a

4    litigant/authorized participant, (iii) in furtherance of the claims asserted in the Motion and (iv) is

5    logically related to the bankruptcy case.  There is no separate and discrete ECF Docketing for

6    either the Jordan Plan or the Jordan DS as they were presented as part of a group of eighteen (18)

7    separately numbered Exhibits collectively attached to the Jordan Declaration [ECF Docket No.

8    542] to provide evidence of the bona fides of the Motion.  Specific Court approval was requested

9    in the Motion for the Jordan Plan and Jordan DS to be 'formally filed' <u>as separate operative filings</u>

10   <u>with discrete ECF Docket Numbers in the Debtor's case</u>.  The litigation privilege applies to the

11   Jordan Plan and Jordan DS as they were not separately filed as contemplated by Sections 1121 and

12   1125 and therefore the Motion satisfies the four-part test in all particulars.

**V.**

**<u>JORDAN'S RESPONSE TO MISSTATEMENTS IN THE DEBTOR'S OPPOSITION</u>**

    A.    **<u>Objections to the Rodriguez Claim Are Appropriate Given the $49 Million of Punitive Damages, and Other Objectionable Charges</u>**

17   The Opposition asserts that Rodriguez is the largest general unsecured creditor.  However,

18   that remains to be determined. The Rodriguez Claim No. 143 is $91,269,853 with supporting

19   attachments. Attachment 3 summarily lists elements including $49,000,000 of punitive damages,

20   and prejudgment interest from the December 6, 2022 CCP 998 offer of $6,876,662,

21   The Rodriquez Claim is believed to be $35,745,555 when punitive damages and excess

22   interest are removed. Further, Rodriguez has already received a $1 million payment.

23   Section 726(a)(4) as incorporated in chapter 11 through Section 1129(a)(7) subordinates

24   punitive damages as a penalty.

25   Whether Rodriguez or Jordan is the largest claimant in the estate will depend upon to be

26   filed and determined claim objections.

27   / / /

28   / / /

B.    **Jordan Litigation with Debtor, MWP and Robin**

1.    **The Jordan State Court Litigation.**

Jordan has tried to get his case to trial against the co-defendants Mowbray's, MWP, Robin and Richard J. for years. He has also tried to get it resolved including two lengthy private mediations one in October 2023 at which a settlement was reached and then co-defendants reneged. Further, a Mandatory Settlement Conference was held in San Bernardino on September 6, 2024 and no agreement was reached.

The Amended Jordan Proof of Claim No. 148 described in the Opposition at 7:18-26 refers to Jordan's schedule "spreadsheet stating that Jordan is entitled to profits and wages of $12,462,350 and interest of $2,821,695 for a grand total of $15,284,046." (See Jordan Proof of Claim No. 148 at 2 of 54.) from damages expert Kenneth Creal CPA with interest at 10% simple as of May 31, 2023. While Jordan's claim does include what will be requested as punitive damages of a minimum of 2 x the contract damages there is a refinement to consider. Labor Code §§ 970 and 972 call for statutory double damages and attorneys fees for his relocation from the State of Florida to California. While Jordan expects Debtor will seek the punitive damage claim of Jordan be subordinated, it is curious no such action has been taken by Debtor to subordinate the $49 million Rodriguez Claim punitive damages.

Jordan will further amend his proof of claim to refine his double contract damages claim under Labor Code 970, interest thereon, attorneys' fees, the Lucas Lane residence and SUV ownership claims, other compensatory damages and costs which will exceed in the aggregate $39 million *before* his separate punitive damage claim. It is expected that after trial Jordan is the largest GUC. While Jordan has received $1.2 million of consideration for a trial extension as a credit to his anticipated judgment against the co-defendants that amount is  an agreed credit.

2.    **The MWP Fraudulent Transfer Lawsuit is Premature and Reasonably Equivalent Value Was Provided for the Trial Continuance**

Jordan has moved to dismiss the adversary complaint filed by MWP on the grounds of Federal Rules of Civil Procedure Rules ("FRCP") 12(b)(1) for lack of subject matter jurisdiction due to lack of ripeness as Plaintiff has not received a judgment in what the Adversary refers to as

1   the "Jordan Litigation", and FRCP 12(b)(6) as the Adversary fails to state a claim upon which

2   relief may be granted.

3         **C.**     **<u>Debtor's Position That Jordan Withdrew From a Mediation is Explainable</u>**

4               **<u>Because Jordan Does Not Believe Existing Management Can Succeed and He</u>**

5               **<u>Would Not be Paid on his Claim</u>**

6         For reasons stated in the Jordan DS and Plan, Jordan and his management team have zero

7   confidence that the Robin Plan has any chance of success given Robin's dismal management

8   history.  As such the forecasts of the Robin DS that rely upon successful operations including

9   between 2028 through 2034 are unlikely to pay the GUC the $15.7 million proposed. The

10  derogatory comments about Jordan's "misplaced self-confidence in his performance—that are

11  entirely irrelevant" misses the point.  Jordan does not believe the Robin Plan management, *rather*

12  *the lack thereof*, will succeed and nothing or virtually nothing will be paid to the GUC.  Recall the

13  Robin DS and Plan Exhibit 1 projections shows $0 paid to the GUC until some time in 2028.

14  This is 2 years after the SCE current contract ends. That SCE contract amounts to 87% of

15  vegetation management revenue of $57 million of the forecast revenue of roughly $65 million.

16        The Opposition then falsely states the Jordan Motion relies upon "repeated false

17  allegations unsupported by any admissible evidence".  The contention fails in the face of Jordan's

18  declaration factually supported by financial and historical exhibits, deposition testimony extracts

19  and two expert opinions.

20        What is clear about the Opposition is that not a single statement is made that Jordan and

21  his team are somehow not of superior experience and expertise, not a word.  Further, nothing

22  explains the collapse of revenue including the loss of the PGE contract due to its purported

23  bankruptcy which occurred between January 2019 and July 2020.  Nothing offered in any of the

24  declarations in support of the Opposition refute Jordan's remarkable turnaround achievement of

25  $1 billion of revenues and $111 million in profits over his 4 years, nor a word about how Debtor's

26  existing team is superior to Jordan's, why there is no forecast of new or increased revenue sources

27  and how to finance increased revenues without a comparable credit facility of $20 million.

28  / / /

As examples: Brian Weiss confirms that he is a CPA and has no experience whatsoever in vegetation management. (ECF Docket No. 576). Richard J. Mowbray ("Richard J.") confirms he replaced Jordan as CEO and fired Jordan for reasons allegedly set out in a letter attached but does not refute Robin and the Robin DS' excuse of revenue decline as from the PGE bankruptcy nor that in fact there was a breach by Debtor when it demanded and received $250,000 from PGE and then abandoned the PGE job with adverse long term consequences. (ECF Docket No. 577). Alan Phang ("Phang") the Mowbray's CFO in 2018 when Jordan was recruited to rescue the company as CEO does not refute anything Jordan attributed to him as part of the Jordan DS. All Phang musters up is that to the best of his recollection he did not state Mowbray's would have to file bankruptcy if Jordan did not turn the company around. (ECF Docket No. 578). Strikingly, Phang does not dispute the financial statement handed to Jordan as Exhibit 8 to the Jordan Exhibits clearly showing insolvency including an operating and cash flow loss both on a Grand total and monthly basis "** WE NEED TO GENERATE $6.5M PER MONTH TO BREAK-EVEN" and Jan 2018 to May 2018 Total Revenue of $25,839,872 or $5,165,974 per month average was well below the $6.5 million stated in Phang's own words of amount Mowbray's needed to break even. (See Jordan ¶22, Jordan DS pages 28-34 and Jordan Exhibits 8, 11, 12, 16.) In fact, the $5,165,974 per month annualized when Jordan was desperately hired was an annual rate of $62 million which is only slightly less than the $65 million Robin DS forecasts. Phang does not refute that Mowbray's was not able to pay its bills as they came due in May 2018 when Jordan was hired and today after tremendous downsizing is slightly positive after selling off millions in equipment. Of course, Phang can make his "I do not recall mentioning bankruptcy" then when Jordan says otherwise because Jordan came out of the blocks like a rocket to ever increasing historical revenue and profits including hundreds of millions with PGE until he was wrongfully terminated.

### D.    Debtor's Argument of a Connection Between the Rodriguez Claim and the Flexible Claim Have No Evidence in Support. Argument is Not Evidence

Importantly, the sole evidence from persons employed when Jordan was employed in Opposition to the Jordan Motion are declarations by Richard J. and Phang. Remarkably Robin offers no declaration to counter Jordan's evidence that she knew of his 10% bonus contract and

REPLY TO OPPOSITION TO MOTION FOR ORDER TERMINATING EXCLUSIVITY

1    failed to make the payments. (Jordan Decl. ¶22 and Jordan Exhibits 8, 11 and 12.) The Exhibit 1

2    letter attached to the Richard J. Declaration at ECF Docket No. 577 is vague and has been the

3    subject of extensive deposition testimony of Richard J., Robin, Phang and others in the Jordan

4    Litigation pending in the San Bernardino Superior Court. Not one of those persons ever said

5    Jordan had any responsibility for the Rodriguez claim (or they would have produced it) and the

6    Exhibit 1 letter says nothing of the sort.  Jordan's deposition was taken in the Rodriguez case and

7    he testified at trial.  Argument by counsel for Debtor is not evidence.

8         The Flexible Funding Proof of Claim No. 158 for $18 million is subject to objection.

9    Unlike the Rodriguez Claim, Mowbray's did assert that Jordan was somehow responsible for

10   Flexible Funding's assertion that he had verbally verified invoices. This was the subject of

11   extensive depositions taken in the Jordan Litigation. At trial the evidence will establish that at no

12   time did Jordan ever verify any of his brother's company's invoices to Flexible verbal or

13   otherwise. Based upon review of the record by trial counsel for Jordan who has taken and

14   defended every deposition on the San Bernardino Superior Court Litigation, there is no writing to

15   establish a verification and no notice by Flexible before purchasing the receivables that it was

16   relying upon Jordan's statements of verification. (*See* attached Catanzarite Declaration.)

17                                     **VI.**

18                **THIS COURT CAN AND SHOULD TERMINATE**

19                **THE DEBTOR'S PLAN EXCLUSIVITY RIGHTS**

20        Section 1121(d) of the Bankruptcy Code provides, in part, as follows:

21        …on request of a party in interest made within the respective periods specified in
          subsections (b) and (c) of this section and after notice and a hearing, the court may
22        for cause reduce or increase the 120-day period or the 180-day period referred to
          in this section.
23
24   11 U.S.C. § 1121(d).

25        Section 1121(d) was intended to provide bankruptcy courts with flexibility in cases and to

26   democratize the reorganizational process.  *In re Kun,* 15 B.R. 852, 854 (Bankr. D. Ariz. 1981).

27   The Bankruptcy Code "recognizes the legitimate interest of creditors, whose money is in the

28   enterprise as much as the debtor's, to have a say in the future of the company."  *H. R. Rep.*

1 *No. 595,* 95th Cong., 1st Sess., 231-32 (1977).  In fact, the Fifth Circuit Court of Appeals expressly

2 stated that Section 1121 "was designed, and should be faithfully interpreted, to limit the delay that

3 makes creditors the hostages of Chapter 11 debtors."  *United Savings Ass'n v. Timbers of Inwood*

4 *Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 808 F.2d 363, 372 (5th Cir.

5 1987) aff'd sub nom. 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

6        The accepted standard to reduce the exclusivity periods, supported by the legislative history

7 of Section 1121, is whether such adjustment will "facilitate moving the case forward towards a fair

8 and equitable resolution."  *Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l*

9 *Hosp.),* 282 B.R. 444, 453 (9th Cir. BAP 2002).

10        As has been demonstrated, this Court can and should terminate the Debtor's exclusive

11 period to solicit acceptances to the Debtor's Plan in this case for 'cause' demonstrated in this

12 Motion.  The conclusion is inescapable that the GUC in this case will substantially benefit from

13 the opportunity to consider and vote favorably for the competing Jordan Plan since <u>they will</u>

14 <u>receive substantially more real money much sooner thereunder.</u>

15 **VII.**

16 **<u>TERMINATION OF EXCLUSIVITY TO SOLICIT ACCEPTANCES</u>**

17 **<u>TO THE DEBTOR'S (ROBIN'S) PLAN WILL MOVE THE CASE FORWARD</u>**

18 **<u>TO A FAIR AND EQUITABLE RESOLUTION</u>**

19     A.    **<u>The Robin Plan is Not Confirmable.</u>**

20        The Robin Plan shows no change in the vegetation management side of the business with

21 the inexperienced Richard J. remaining in charge after having overseen revenue declines from

22 $471 million to less than $70 million, coincidently the same position as his father Richard E.

23 found himself in May 2018 when he desperately recruited Jordan to move to California from

24 Florida.  (See Robin DS generally and Robin Exhibits 1-2 and Jordan Decl. ¶31, Jordan DS pages

25 <u>32-35</u>).  Further, the Robin Plan forecasts flat to down revenues and shows no available financing

26 to grow the business.  (See Robin DS and Robin Exhibits 1-2).  Finally, the Robin Plan admits

27 payment of even the $15.7 million to GUCs will take <u>9 years</u> and if they were to pay $21 million

28

1  that would take 11 years as shown in Jordan Exhibits 4 and 5. (Jordan Decl. ¶32, Jordan DS 35

2  and Jordan Exhibits 4-5.)

3       **B.    Cause Exists to Terminate the Debtor's Plan Exclusivity Rights.**

4       In addition to the fact that terminating the Debtor's plan exclusivity rights will facilitate

5  moving this case forward to an equitable and fair resolution, applying the other factors cited

6  hereinabove which are weighed by courts to determine whether cause exists to terminate a

7  debtor's plan exclusivity rights makes evident that the Court should terminate the Debtor's plan

8  exclusivity rights in this case at this time.

9       **1.    Size and Complexity of the Debtor's Case.**  The Debtor's Chapter 11 case

10  is neither particularly large nor complex.  The only real unsecured creditors are Jordan and

11  Rodriguez.  The balance of creditors are secured by equipment/vehicles and will be unimpaired.

12  Jordan has rescued the Debtor before from financial ruin and again is prepared, along with the

13  acquisition team, to do it again.  Jordan Decl. ¶¶10-36.  The resolution of the Debtor's case should

14  have been relatively simple: if the Debtor had acted as a fiduciary for creditors, the Debtor could

15  have and should have proposed a plan that provides for the orderly payment of a reasonably

16  calculated value that is viable.  Instead, the Debtor has chosen to pursue confirmation of a plan

17  that is fanciful, benefits an insider, and contrary to the interest of creditors.  In so doing, the

18  Debtor has consumed, and will continue to consume, a substantial amount of estate assets

19  pursuing the self-interest of Robin, at the expense of the interests of creditors.  The Jordan Plan is

20  feasible and provides a significant additional recovery based upon a proven track record in the

21  industry, not the unsupportable assumptions of the insider parties that drove the Debtor's

22  operations into the ground in the first place.

23       **2.    Time Sufficient to Negotiate a Plan of Reorganization and to Prepare**

24  **Adequate Information.**  The Debtor's case is now more than **9 months old**.  The Debtor has had

25  ample opportunity to negotiate with its major creditors regarding the terms of a plan.  As set forth

26  in the Catanzarite Declaration and the Jordan Declaration, there have been no attempts on the part

27  of Debtor to negotiate with Jordan the terms of a consensual plan.  Well prior to the Debtor

28  spiraling further into insolvency, the concept of Jordan returning to run the Debtor's operations

1  was raised and there was *no interest on the part of the Debtor*.  The Debtor's operations continue

2  to founder, and it lacks the capacity to take on any significant new work for two major reasons:

3  lack of credibility in the marketplace and lack of working capital to fund growth.  Therefore, there

4  should be no question that the Debtor has had an adequate opportunity to negotiate the terms of a

5  viable plan with the GUC in this case.  Catanzarite Declaration ¶29 and Jordan Declaration ¶¶1-

6  36.

7  **3.    Lack of Good Faith Progress Toward Reorganization.**  There has been a

8  lack of good faith progress toward a resolution of this case for the benefit of creditors.  It appears

9  as if the Debtor is simply manipulating financial information in this case to suit its own purposes

10  for Robin.  Creditors simply cannot rely upon the accuracy and completeness of financial

11  information provided by the Debtor in the Robin Disclosure Statement.  <u>No</u> progress has been

12  made toward a resolution of this case for the benefit of creditors.  On the contrary, with no support

13  from Jordan this case is deadlocked.  Jordan intends to oppose vigorously the confirmation of the

14  Debtor's Plan while at the same time pursuing confirmation of the competing Jordan Plan that

15  provides more money sooner to the GUC while at the same time subordinating the Jordan Claim.

16  **4.    Debtor's Payment of Expenses of the Case.**  The Debtor has paid, or

17  incurred administrative debt, in excess of $1 million.  These fees are incurred to pursue a

18  resolution of this case that promotes the self-interest of Robin, the principal of the Debtor will not

19  benefit general unsecured creditors at the end of the day since the Debtor's Plan is simply not

20  confirmable.  In effect, the Debtor is squandering estate assets pursuing confirmation of a plan

21  designed to promote only the principal of the Debtor's self-interest, at the expense of the interests

22  of the Debtor's creditors.

23  **5.    The Debtor Has Made No Progress in Negotiations with Jordan.**  While

24  the Debtor's case is now more than 9 months old, the Debtor has made no progress negotiating a

25  consensual plan with the Debtor's major general unsecured creditor Jordan.  Jordan has <u>no</u>

26  confidence in the Debtor, does <u>not</u> trust the Debtor because of the actions of management that led

27  to his ignominious termination, and <u>the case is going nowhere</u>.  (Jordan Decl. ¶35.)  The Jordan

28  Plan will be the only way in which general unsecured creditors will have a reasonable return of

$21 million to GUC, with a $1 million down payment and a forecast 4 years repayment of an additional $20 million to the GUC (with additional interest), with Jordan's deferral of payment on his claim *in the event the Jordan Plan is confirmed in this case.*

6.    **The Amount of Time Which Has Elapsed in the Debtor's Case.**    The Debtor's case is now more than **9 months** old.  The Debtor has had more than enough time to negotiate with creditors, and to file a plan that can be based upon any reasonable assumptions (there are none) that can *possibly* be supported by Jordan.  Instead, the Debtor has chosen to pursue confirmation of a plan that benefits Robin, which has no support from Jordan.

7.    **The Debtor Is Seeking an Extension of Exclusivity in Order to Pressure Creditors to Submit to the Debtor's Reorganization Demands.**    The Debtor has a short window of exclusivity regarding Plan Acceptance and this Motion seeks to have that window <u>closed</u>.  The Jordan Plan must be put on a track that will be next to the Debtor's Plan so that there can be a fair resolution of the treatment of GUC in the context of a competing Plan.

There should be no question that the principal of the Debtor (Robin Mowbray, who is in her own Chapter 11 case and professing poverty in her most recent Status Report) is attempting to retain control over the plan process in this case in order to extract some misguided perceived leverage over creditors in this case.  As set forth in the Jordan Declaration (at ¶¶10-37) and Catanzarite Declaration (at ¶29-30), if the Debtor's plan exclusivity rights are terminated in this case, there will be a level playing field for all GUC to vote on <u>two very different Plans</u>:  One for the benefit of an insider (the Debtor's Plan) and *one for the benefit of creditors with more real money devoted to it and payments in a significantly shorter period of time* (the Jordan Plan).

Under the circumstances, the Debtor's control over the plan process in this case should be terminated.

8.    **No Unresolved Contingency Exists in This Case.**    There does not exist in this case any unresolved contingency which justifies the Debtor's retaining plan exclusivity rights in this case.  On the contrary, the resolution of this case requires only the <u>concurrent presentation</u> of the Jordan Plan for the benefit of the Debtor's creditors to arrive at an equitable result for the benefit of general unsecured creditors.

1    Based upon the foregoing, this Court should terminate immediately the Debtor's plan

2   exclusivity rights.  The Debtor is pursuing confirmation of the Robin Plan that is contrary to the

3   interest of creditors and is based upon flawed economic and business assumptions.  Allowing the

4   Debtor to retain control over the plan process will considerably delay a reasonable monetary

5   recovery by the GUC and will increase substantially the cost of administration of the Debtor's

6   case, to the severe detriment to all of the Debtor's creditors.  The Debtor's stranglehold over the

7   plan process <u>should be broken</u> so that Jordan has a fair opportunity to pursue confirmation of the

8   competing Jordan Plan which will provide for a resolution of the GUC on terms that are much

9   more favorable and realistic (based upon his proven track record and stature in the industry) than

10   that provided by the Debtor's Plan.

11                                                **VIII.**

12                                         <u>**CONCLUSION**</u>

13    Jordan urges the Court to grant the Motion and <u>terminate</u> the remaining Debtor's Plan

14   Exclusivity Rights.  In addition, Jordan requests via this Motion that the Court further Order that

15   the Jordan Plan and accompanying Jordan DS is authorized to be separately ECF filed and served

16   upon creditors and parties in interest with the Jordan DS approval process proceed forward per the

17   timelines in the FRBP and LBR.  Jordan further requests that prior to or concurrently with

18   approval of Debtor's Disclosure Statement that the same <u>not</u> be circulated until such time as the

19   Jordan DS is approved in order for there to be the simultaneous solicitation of votes and plan

20   confirmation hearings pertaining to the Debtor's Plan in prospect and the competing Jordan Plan

21   also in prospect.

22                                                   **GOE FORSYTHE & HODGES LLP**

23   Dated: July 30, 2025                       /s/ Robert P. Goe
                                                    By:  Robert P. Goe
24                                                    Jeffrey W. Broker
                                                 Attorneys for Creditor and Movant Ronnie
25                                               Jordan

26

27

28

1  Robert P. Goe – State Bar No. 137019
   Jeffrey W. Broker – State Bar No. 53226
2  **GOE FORSYTHE & HODGES LLP**
   17701 Cowan, Building D, Suite 210
3  Irvine, CA 92614
   Email: rgoe@goeforlaw.com
4         jbroker@goeforlaw.com
   Telephone: (949) 798-2460
5  Facsimile: (949) 955-9437

6  Attorneys for Creditor and Movant Ronnie Jordan

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **SANTA ANA DIVISION**

11

12 In re:                              Case No. 8:24-bk-12674-SC
                                        Chapter 11 Proceeding
13 THE ORIGINAL MOWBRAY'S TREE
   SERVICE, INC.,                       **SUPPLEMENTAL DECLARATION OF**
14                                      **KENNETH J. CATANZARITE IN**
                                        **SUPPORT OF REPLY BY CREDITOR**
15     Debtor and Debtor-in-Possession. **RONNIE JORDAN ("JORDAN") TO**
                                        **DEBTOR'S OPPOSITION TO HIS**
16                                      **MOTION FOR ORDER TERMINATING**
                                        **DEBTOR'S PERIODS OF EXCLUSIVITY**
17                                      **FOR THE FILING OF A PLAN AND**
                                        **OBTAINING ACCEPTANCE THEREOF,**
18                                      **SO AS TO PERMIT THE FILING OF A**
                                        **COMPETING PLAN BY JORDAN'S**
19                                      **MOWBRAY ACQUISITION LLC**

20                                      **Hearing:**
21                                      Date:        August 6, 2025
                                        Time:        1:30 p.m.
22                                      Courtroom:   5C
                                        Location:    411 W. Fourth Street
23                                                   Santa Ana, CA 92701
                                        [Hearing to be conducted via ZoomGov]
24

25

26         **SUPPLEMENTAL DECLARATION OF KENNETH J. CATANZARITE**

27        I, Kenneth J. Catanzarite, have personal knowledge of each fact set forth in this declaration

28 based upon my observation of, participation in, and recollection of, the matters and events to

**Jordan Reply to Opposition to Motion for Order Terminating Exclusivity**

1  which I declare.  I could and would competently testify to each fact set forth in this declaration if

2  called and duly sworn by this Court.  I certify and declare as follows:

3      1.      I am over the age of eighteen and licensed to appear before this court and the courts

4  of the State of California.

5      2.      I am a principal at Catanzarite Law Corporation attorneys for Ronnie Jordan, an

6  Unsecured Creditor in this case ("Jordan") as well as in his state court action against The Original

7  Mowbray's Tree Service Incorporated ("Mowbray's"), Mowbray Waterman Property LLC

8  ("MWP"), Robin Mowbray ("Robin") and Richard J. Mowbray ("Richard J.").

9      3.      Myself and member of my firm filed and have continuously represented the

10  Plaintiff in Ronnie D. Jordan v. The Original Mowbray's Tree Service, Inc., et al. (San Bernardino

11  County Superior Court Case Number CIVSB2201281) in the case against Mowbray's, MWP,

12  Robin and Richard J (the "Jordan Matter").

13      4.      I have reviewed all discovery produced by the parties in the Jordan Matter and have

14  taken and defended every deposition in the San Bernardino Superior Court Litigation, and there is

15  no writing to establish a verification and no notice by Flexible Funding before purchasing the

16  receivables that it was relying upon Jordan's purported statement of verification.

17

18      I certify and declare under penalty of perjury under the laws of the State of California and

19  the United States that the foregoing is true and correct.

20

21      Executed July 30, 2025 at Anaheim, California.

22

23  _____

24  Kenneth J. Catanzarite.

25

26

27

28

1

**Catanzarite Suppl. Decl ISO Reply to Opp to Motion for Order Terminating Exclusivity**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 17701 Cowan, Suite 210, Building D, Irvine, CA 92614

A true and correct copy of the foregoing document entitled (*specify*): **CREDITOR RONNIE JORDAN'S REPLY TO DEBTOR'S OPPOSITION TO HIS MOTION FOR ORDER TERMINATING DEBTOR'S PERIODS OF EXCLUSIVITY FOR THE FILING OF A PLAN AND OBTAINING ACCEPTANCE THEREOF, SO AS TO PERMIT THE FILING OF A COMPETING PLAN BY JORDAN'S MOWBRAY ACQUISITION LLC; SUPPLEMENTAL DECLARATION OF KENNETH J. CATANZARITE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 30, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) July 30, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) July 30, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Scott Clarkson, USBC, 411 West Fourth Street, Suite 5130, Santa Ana, CA 92701

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 30, 2025 | Kerry A. Murphy | /s/Kerry A. Murphy |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

REPLY TO OPPOSITION TO MOTION FOR ORDER TERMINATING EXCLUSIVITY

# Mailing Information for Case 8:24-bk-12674-SC

Electronic Mail Notice List

The following is the list of <u>parties</u> who are currently on the list to receive email notice/service for this case.

- Jeffrey W Broker    jbroker@brokerlaw.biz
- Kenneth J Catanzarite    kcatanzarite@catanzarite.com
- Lauren N Gans    lgans@elkinskalt.com, lmasse@elkinskalt.com
- Jessica L Giannetta    jessica@giannettaenrico.com, melanie@giannettaenrico.com
- Robert P Goe    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goe
  forlaw.com
- Marshall F Goldberg    mgoldberg@glassgoldberg.com, jbailey@glassgoldberg.com
- Alan Craig Hochheiser    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- Merdaud Jafarnia    bkca@alaw.net, mjafarnia@ecf.inforuptcy.com
- Raffi Khatchadourian    raffi@hemar-rousso.com
- Valery Loumber    valloumlegal@gmail.com
- Michael B Lubic    michael.lubic@klgates.com,
  jonathan.randolph@klgates.com,klgatesbankruptcy@klgates.com
- James MacLeod    jmacleod@dunninglaw.com, nancy@dunninglaw.com
- Kathleen P March    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- Robert S Marticello    rmarticello@raineslaw.com,
  bclark@raineslaw.com;csantiago@raineslaw.com
- David W. Meadows    david@davidwmeadowslaw.com
- Karen S. Naylor    Becky@ringstadlaw.com, Karen@ringstadlaw.com;Arlene@ringstadlaw.com
- Estela O Pino    epino@epinolaw.com, staff@epinolaw.com;clerk@epinolaw.com
- Donald W Reid    don@donreidlaw.com, 5969661420@filings.docketbird.com
- Todd C. Ringstad    becky@ringstadlaw.com, arlene@ringstadlaw.com
- Amitkumar Sharma    amit.sharma@aisinfo.com
- Jeffrey S Shinbrot    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com;tanya@shinbrotfirm.com
- Thomas E Shuck    tshuck@pmcos.com, efilings@pmcos.com
- Michael Simon    msimon@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- Ahren A Tiller    ahren.tiller@blc-sd.com, 4436097420@filings.docketbird.com;brett.bodie@blc-
  sd.com;anika@blc-sd.com;derek@blc-sd.com;kreyes@blc-sd.com;megan@blc-
  sd.com;nicole@blc-sd.com;danny@blc-sd.com;angie@blc-sd.com;kreyes@blc-sd.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Sharon Z. Weiss    sharon.weiss@bclplaw.com,
  raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com,sharon-weiss-
  7104@ecf.pacerpro.com
- Jennifer C Wong    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com
- Mandy Youngblood    csbk@gmfinancial.com
- Roye Zur    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse
  @elkinskalt.com

REPLY TO OPPOSITION TO MOTION FOR ORDER TERMINATING EXCLUSIVITY