**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello, State Bar No. 244256
*rmarticello@raineslaw.com*
Michael L. Simon, State Bar No. 300822
*msimon@raineslaw.com*
4675 MacArthur Ct, Suite 1550
Newport Beach, CA 92660
Telephone:    (310) 440-4100
Facsimile:    (310) 499-4877

Counsel for The Original Mowbray's Tree Service,
Inc., Debtor and Debtor-In-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE ORIGINAL MOWBRAY'S TREE SERVICE, INC.,<br><br>         Debtor and Debtor-in-Possession. | Case No: 8:24-bk-12674-SC<br><br>Chapter 11<br><br>**INDEX OF EXHIBITS IN SUPPORT OF REPLY TO CREDITOR RONNIE JORDAN'S OBJECTION TO DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN OF REORGANIZATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISCLOSURE STATEMENT**<br><br>**Hearing Information:**<br>Date:  August 6, 2025<br>Time:  1:30 p.m.<br>Ctrm:  5C<br>       411 W Fourth Street<br>       Santa Ana, CA 92701 |

The Original Mowbray's Tree Service, Inc., the debtor and debtor-in-possession in the above-captioned case (the **"Debtor"**), hereby submits the following index of exhibits in support of ITS reply (the **"Reply"**) to *Creditor Ronnie Jordan's Objection to Disclosure Statement Describing Chapter 11 Plan of Reorganization* [Docket No. 569] (the **"Objection"**)

1

and memorandum of points and authorities in support of approval of its *Disclosure Statement*

*Describing Chapter 11 Plan of Reorganization* [Docket No. 363] (the "**Disclosure**

**Statement**").

| Exhibit No. | Title of Description of Exhibit |
|:---:|:---|
| 1 | Redline of First Amended Disclosure Statement Describing First Amended Chapter 11 Plan of Reorganization |
| 2 | Redline of First Amended Chapter 11 Plan of Reorganization |

DATED:  July 30. 2025                  RAINES FELDMAN LITTRELL LLP


By:      */s/ Michael L. Simon*
ROBERT S. MARTICELLO
MICHAEL L. SIMON
Attorneys for Debtor and Debtor-in-Possession
The Original Mowbray's Tree Service, Inc.

INDEX OF EXHIBITS

# EXHIBIT 1

**RAINES FELDMAN LITTRELL, LLP**
Robert S. Marticello, State Bar No. 244256
*rmarticello@raineslaw.com*
Michael L. Simon, State Bar No. 300822s
*msimon@raineslaw.com*
4675 MacArthur Ct, Suite 1500
Newport Beach, CA 92660
Telephone:    310 440-4100
Facsimile:    949-247-3998

Attorneys for The Original Mowbray's Tree
Service, Inc., Debtor and Debtor-In-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Case No: 8:24-bk-12674-TA |
| THE ORIGINAL MOWBRAY'S TREE SERVICE, INC., | Chapter 11 |
| Debtor and Debtor-in-Possession. | **FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION** |

## TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ..................................................................................1

   A.   The Purpose of This Document...........................................................3

   B.   Deadlines for Voting and Objecting; Date of Plan Confirmation
      Hearing ...............................................................................................4

      1.   Time and Place of the Confirmation Hearing ........................4

      2.   Deadline for Voting For or Against the Plan .........................5

      3.   Deadline for Objecting to Confirmation of the Plan ..............5

      4.   Identity of Person to Contact for More Information Regarding
          the Plan.................................................................................5

      5.   Disclaimer ............................................................................5

II.   BACKGROUND.............................................................................................6

   A.   Background Regarding the Debtor and Its Operations ......................6

   B.   The Debtor's Funded Debt...................................................................7

   C.   Events Leading to the Filing of the Case ...........................................8

      1.   The Debtor's Decline in Revenues .......................................8

      2.   The Debtor's Efforts to Improve Cash Flow .........................9

   D.   The Debtor's Affiliates .....................................................................11

      1.   Pino Tree Service, Inc. .......................................................11

          a.   The Line of Credit ..................................................12

          b.   Management Agreement ........................................12

          c.   Equipment Lease ...................................................12

          d.   Post-Petition PTS Payments.................................12

      2.   Phoenix Traffic Management, Inc........................................13

          a.   The PTM Equipment Lease....................................13

          b.   The PTM Loan........................................................13

          c.   Post-Petition PTM Payments ................................13

      3.   Mowbray Waterman Property, LLC ....................................14

          a.   MWP Loans............................................................14

          b.   MWP Real Property Leases ...................................14

   E.   Summary of the Debtor's Assets and Liabilities ..............................15

      1.   The Debtor's Assets ...........................................................15

      2.   The Debtor's Real Property .................................................15

      3.   The Debtor's Liabilities .......................................................15

   F.   Significant Events During the Bankruptcy Case...............................16

      1.   Bankruptcy Proceedings......................................................16

          a.   "First Day" Motions ................................................16

i

b.      Employment of Professionals...................................17

c.      Claims Bar Date ....................................................17

d.      Cash Collateral .....................................................17

e.      Motion to Reject Unexpired Leases and Servicing Agreement...............................................................18

f.      Motions for Relief From the Automatic Stay...........18

g.      The Judgment Creditors' Trustee and Substantive Consolidation Motion.............................................19

h.      Plan Support Agreements and Settlements .............20

i.      The Debtor's Schedules and Monthly Operating Reports ................................................................20

2.      Other Proceedings .......................................................21

a.      Related Bankruptcy Cases......................................21

b.      Potential Avoidance Actions ..................................21

G.      Historical and Current Financial Condition ......................................22

H.      Steps Taken to Resolve Financial Problems ....................................23

III.    PLAN SUMMARY ...................................................................................24

A.      The Plan Provides for a Reorganization of the Debtor and Its Affairs ......................................................................................................24

B.      What Creditors and Interest Holders Will Receive Under the Plan .24

C.      Allowance and Treatment of Unclassified Claims..........................25

1.      Administrative Claims..................................................25

a.      Ordinary Course Administrative Claims.................27

b.      Non-Ordinary Course Administrative Claims.........27

c.      Professional Fee Claims .................................2728

2.      Priority Tax Claims......................................................28

D.      Allowance and Treatment of Classified Claims and Interests .........30

1.      Summary of Classes .....................................................30

2.      Secured Claims.............................................................31

a.      Secured Claim of PNC Bank...................................31

b.      Secured Claim of Jacobus Pino...............................33

c.      Secured Claims Related to Vehicles or Equipment .34

3.      Classes of Priority Unsecured Claims ..........................60

4.      Classes of General Unsecured Claims ..........................61

5.      Class of Interest Holders ..............................................63

E.      Means for Implementation of the Plan .............................................64

1.      Funding of the Plan ......................................................64

2.      Payment of the GUC Payment Amount and the GUC Bonus64

ii

|  |  | **a.** | The GUC Payment Amount | 64 |
|  |  | **b.** | The GUC Bonus | 65 |
|  | **3.** | | The Compromise Among the Debtor, Robin Mowbray, MWP, and the Trust | 68 |
|  | **4.** | | Compromise with the Rodriguez Parties | 70 |
|  | **5.** | | Substantive Consolidation of MWP | 73 |
|  | **6.** | | Sale of Real Properties | 75 |
|  | **7.** | | The Plan Trust | 75 |
|  |  | **a.** | Establishment of the Plan Trust | 75 |
|  |  | **b.** | The Trust Assets | 76 |
|  |  | **c.** | The Term of the Plan Trust | 76 |
|  |  | **d.** | The Plan Trustee | 77 |
|  |  | **e.** | Trust Distributions | 80 |
|  |  | **f.** | Federal Income and Taxation of the Plan Trust | 80 |
|  |  | **g.** | Beneficiaries of the Plan Trust | 81 |
|  |  | **h.** | Plan Trust Retention of Professionals and Fees and Expenses | 82 |
|  |  | **i.** | Reporting to the Plan Trust by the Reorganized Debtor | 82 |
|  | **8.** | | Reorganized Debtor Retention of Professionals and Fees and Expenses | 83 |
|  | **9.** | | The Plan Trustee as Disbursing Agent | 83 |
|  | **10.** | | The Bond | 83 |
|  | **11.** | | Release of Liens | 83 |
|  | **12.** | | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 84 |
|  | **13.** | | The Reorganized Debtor's Post-Confirmation Management | 84 |
|  | **14.** | | Powers and Duties of the Reorganized Debtor | 84 |
| **F.** | | | Default on Obligations to Holders of Allowed Claims | 85 |
| **G.** | | | Procedures For Resolving Disputed Claims | 86 |
|  | **1.** | | Standing | 86 |
|  | **2.** | | No Distribution Pending Allowance | 87 |
|  | **3.** | | Reserves for Disputed Claims | 87 |
|  | **4.** | | Claims Paid By Third Parties | 87 |
| **H.** | | | Distributions | 88 |
|  | **1.** | | Distributions for Claims Allowed as of the Effective Date | 88 |
|  | **2.** | | Distributions on Account of Claims Allowed After the Effective Date | 88 |
|  |  | **a.** | Payments and Distributions on Disputed Claims | 88 |

iii

          **b.**    Special Rules for Distributions to Holders of Disputed Claims...........................................................................88

    **3.**    Delivery and Distributions and Undeliverable or Unclaimed Distributions ................................................................88

        **a.**    Delivery of Distributions in General .......................88

        **b.**    Undeliverable Distributions ....................................89

        **c.**    Distributions of Unclaimed Property ......................89

    **4.**    Compliance with Tax Requirements/Allocations ...............89

  **I.**    Treatment of Executory Contracts and Unexpired Leases..............90

    **1.**    Assumption of Executory Contracts and Unexpired Leases 90

    **2.**    Rejection of Executory Contracts or Unexpired Leases Not Assumed ............................................................................92

  **J.**    Preservation of Causes of Action and Avoidance Actions for the Reorganized Debtor.....................................................................93

  **K.**    Retention of Jurisdiction ....................................................95

**IV.**    CONFIRMATION REQUIREMENTS AND PROCEDURES....................96

  **A.**    Who May Vote on or Object to the Plan...................................97

  **B.**    Who May Vote to Accept or Reject the Plan.............................97

  **C.**    What Is an Allowed Claim or Interest......................................97

  **D.**    What Is an Impaired Claim or Interest.....................................97

  **E.**    Who Is Not Entitled to Vote...................................................98

  **F.**    Who Can Vote in More Than One Class....................................98

  **G.**    Votes Necessary to Confirm the Plan ......................................98

  **H.**    Votes Necessary for a Class to Accept the Plan.........................99

  **I.**    Treatment of Non-Accepting Classes ("Cramdown")...................99

  **J.**    Liquidation Analysis .........................................................100

  **K.**    Feasibility ........................................................................104

    **1.**    Effective Date Payments ..............................................105

    **2.**    Post-Effective Date Payments .......................................105

**V.**    EFFECT OF CONFIRMATION OF THE PLAN .......................................107

    **1.**    Binding Nature of Plan.................................................107

    **2.**    Discharge...................................................................107

    **3.**    Injunction ..................................................................108

    **4.**    Vesting of Property in the Reorganized Debtor ................109

    **5.**    Modification of the Plan...............................................109

    **6.**    Exculpations and Releases ...........................................109

    **7.**    Submission of Post-Confirmation Reports.......................110

    **8.**    Quarterly Fees ...........................................................110

iv

| | | |
|---|---|---|
| **9.** | Post-Confirmation Conversion/Dismissal | 110 |
| **10.** | Final Decree | 111 |

**VI.** **RISK FACTORS REGARDING THE PLAN** .......................................... 111

**VII.** **TAX CONSEQUENCES OF THE PLAN** .......................................... 113

**VIII.** **CONCLUSION** .......................................... 113

**TABLE OF DEFINITIONS** .......................................... 114

    **A.** Definitions .......................................... 114

    **B.** Rules of Construction .......................................... 124

    **C.** Rules of Interpretation .......................................... 125

    **D.** Disclosure Statement Exhibits .......................................... 126

~~I.~~ ~~EXECUTIVE SUMMARY~~ .......................................... 1

    ~~A.~~ ~~The Purpose of This Document~~ .......................................... 2

    ~~B.~~ ~~Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing~~ .......................................... 3

        ~~1.~~ ~~Time and Place of the Confirmation Hearing~~ .......................................... 4

        ~~2.~~ ~~Deadline for Voting For or Against the Plan~~ .......................................... 4

        ~~3.~~ ~~Deadline for Objecting to Confirmation of the Plan~~ .......................................... 4

        ~~4.~~ ~~Identity of Person to Contact for More Information Regarding the Plan~~ .......................................... 4

        ~~5.~~ ~~Disclaimer~~ .......................................... 4

~~II.~~ ~~BACKGROUND~~ .......................................... 5

    ~~A.~~ ~~Background Regarding the Debtor and Its Operations~~ .......................................... 5

    ~~B.~~ ~~The Debtor's Funded Debt~~ .......................................... 6

    ~~C.~~ ~~Events Leading to the Filing of the Case~~ .......................................... 7

        ~~1.~~ ~~The Debtor's Decline in Revenues~~ .......................................... 7

        ~~2.~~ ~~The Debtor's Efforts to Improve Cash Flow~~ .......................................... 8

    ~~D.~~ ~~The Debtor's Affiliates~~ .......................................... 10

        ~~1.~~ ~~Pino Tree Service, Inc.~~ .......................................... 10

            ~~a.~~ ~~The Line of Credit~~ .......................................... 11

            ~~b.~~ ~~Management Agreement~~ .......................................... 11

            ~~c.~~ ~~Equipment Lease~~ .......................................... 11

            ~~d.~~ ~~Post-Petition PTS Payments~~ .......................................... 11

        ~~2.~~ ~~Phoenix Traffic Management, Inc.~~ .......................................... 12

            ~~a.~~ ~~The PTM Equipment Lease~~ .......................................... 12

            ~~b.~~ ~~The PTM Loan~~ .......................................... 12

            ~~c.~~ ~~Post-Petition PTM Payments~~ .......................................... 12

        ~~3.~~ ~~Mowbray Waterman Property, LLC~~ .......................................... 13

v

a.    MWP Loans.................................................................13
b.    MWP Real Property Leases .........................................13
E.    Summary of the Debtor's Assets and Liabilities ......................14
1.    The Debtor's Assets .............................................14
2.    The Debtor's Real Property ...................................14
3.    The Debtor's Liabilities .......................................14
F.    Significant Events During the Bankruptcy Case......................15
1.    Bankruptcy Proceedings ......................................15
a.    "First Day" Motions ....................................15
b.    Employment of Professionals.........................16
c.    Claims Bar Date ........................................16
d.    Motion to Reject Unexpired Leases and Servicing
Agreement.................................................16
e.    Motions for Relief From the Automatic Stay..........17
f.    The Judgment Creditors' Trustee and Substantive
Consolidation Motion...................................17
g.    The Debtor's Schedules and Monthly Operating
Reports ...................................................18
2.    Other Proceedings ..............................................18
a.    Related Bankruptcy Cases.............................18
b.    Potential Avoidance Actions ..........................18
G.    Historical and Current Financial Condition ...........................19
H.    Steps Taken to Resolve Financial Problems ...........................20
III.    PLAN SUMMARY.....................................................................21
A.    The Plan Provides for a Reorganization of the Debtor and Its Affairs
..............................................................................21
B.    What Creditors and Interest Holders Will Receive Under the Plan .21
C.    Allowance and Treatment of Unclassified Claims......................22
1.    Administrative Claims..........................................22
a.    Ordinary Course Administrative Claims..............23
b.    Non-Ordinary Course Administrative Claims........24
c.    Professional Fee Claims ................................24
2.    Priority Tax Claims .............................................25
D.    Allowance and Treatment of Classified Claims and Interests .........27
1.    Summary of Classes ...........................................27
2.    Secured Claims..................................................28
a.    Secured Claim of PNC Bank...........................28
b.    Secured Claim of Jacobus Pino .......................29

vi

c.      Secured Claims Related to Vehicles or Equipment .30

3.    Classes of Priority Unsecured Claims ................................. 51

4.    Classes of General Unsecured Claims ................................ 51

5.    Class of Interest Holders ................................................... 52

E.    Means for Implementation of the Plan ....................................... 53

1.    Funding of the Plan .......................................................... 53

2.    New Value Contribution .................................................... 54

3.    Substantive Consolidation Option ..................................... 55

4.    Sale of Real Properties ..................................................... 56

5.    The Plan Trust .................................................................. 56

a.      Establishment of the Plan Trust .......................... 56

b.      The Trust Assets ................................................. 57

c.      The Term of the Plan Trust .................................. 57

d.      The Plan Trustee ................................................. 58

e.      Trust Distributions .............................................. 60

f.      Federal Income and Taxation of the Plan Trust ....... 61

g.      Beneficiaries of the Plan Trust ............................. 61

h.      Plan Trust Retention of Professionals and Fees and
        Expenses ............................................................ 62

6.    Reorganized Debtor Retention of Professionals and Fees and
      Expenses .......................................................................... 63

7.    The Plan Trustee as Disbursing Agent ............................... 63

8.    The Bond .......................................................................... 63

9.    Release of Liens ............................................................... 63

10.   Effectuating Documents; Further Transactions; Exemption
      from Certain Transfer Taxes ............................................. 64

11.   The Reorganized Debtor's Post-Confirmation Management 64

12.   Powers and Duties of the Reorganized Debtor .................. 64

F.    Default on Obligations to Holders of Allowed Claims ................. 65

G.    Procedures For Resolving Disputed Claims ................................ 66

1.    Standing ........................................................................... 66

2.    No Distribution Pending Allowance ................................... 66

3.    Reserves for Disputed Claims ........................................... 67

4.    Claims Paid By Third Parties ............................................ 67

H.    Distributions ........................................................................... 68

1.    Distributions for Claims Allowed as of the Effective Date .68

2.    Distributions on Account of Claims Allowed After the
      Effective Date .................................................................. 68

vii

     a.  Payments and Distributions on Disputed Claims .....68

     b.  Special Rules for Distributions to Holders of Disputed
       Claims ................................................................68

    3.  Delivery and Distributions and Undeliverable or Unclaimed
     Distributions .......................................................68

     a.  Delivery of Distributions in General .......................68

     b.  Undeliverable Distributions ...............................68

     c.  Distributions of Unclaimed Property ......................69

    4.  Compliance with Tax Requirements/Allocations ...............69

  I.  Treatment of Executory Contracts and Unexpired Leases ...............70

    1.  Assumption of Executory Contracts and Unexpired Leases 70

    2.  Rejection of Executory Contracts or Unexpired Leases Not
     Assumed ..............................................................72

  J.  Preservation of Causes of Action and Avoidance Actions for the
    Reorganized Debtor .......................................................73

  K.  Retention of Jurisdiction ...................................................74

IV.  CONFIRMATION REQUIREMENTS AND PROCEDURES ....................76

  A.  Who May Vote on or Object to the Plan ...................................76

  B.  Who May Vote to Accept or Reject the Plan ..............................76

  C.  What Is an Allowed Claim or Interest .....................................76

  D.  What Is an Impaired Claim or Interest ....................................77

  E.  Who Is Not Entitled to Vote ..............................................77

  F.  Who Can Vote in More Than One Class ...................................78

  G.  Votes Necessary to Confirm the Plan .....................................78

  H.  Votes Necessary for a Class to Accept the Plan ...........................78

  I.  Treatment of Non-Accepting Classes ("Cramdown") ....................78

  J.  Liquidation Analysis ......................................................79

  K.  Feasibility ................................................................83

    1.  Effective Date Payments ..........................................83

    2.  Post-Effective Date Payments ....................................84

V.  EFFECT OF CONFIRMATION OF THE PLAN ..............................85

    1.  Binding Nature of Plan ...........................................85

    2.  Discharge .........................................................85

    3.  Injunction .........................................................87

    4.  Vesting of Property in the Reorganized Debtor .................87

    5.  Modification of the Plan ..........................................88

    6.  Exculpations and Releases ........................................88

    7.  Submission of Post-Confirmation Reports .......................88

viii

8.     Quarterly Fees .................................................................88
9.     Post-Confirmation Conversion/Dismissal ..........................89
10.    Final Decree .....................................................................89
VI.    RISK FACTORS REGARDING THE PLAN .....................................89
VII.   TAX CONSEQUENCES OF THE PLAN .........................................91
VIII.  CONCLUSION .........................................................................92
TABLE OF DEFINITIONS ...................................................................93
A.     Definitions .......................................................................93
B.     Rules of Construction ......................................................101
C.     Rules of Interpretation ....................................................102
D.     Disclosure Statement Exhibits .........................................103

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ix

1    The Original Mowbray's Tree Service, Inc., the debtor and debtor-in-possession in the

2    above-captioned case (the **"Debtor"**), hereby submits this *Disclosure Statement Describing*

3    *Chapter 11 Plan of Reorganization* (the **"Disclosure Statement"**), pursuant to § 1125 of the

4    Bankruptcy Code, in connection with the solicitation of acceptances of the Debtor's *Chapter 11*

5    *Plan of Reorganization* (the **"Plan"**).  In support of the Disclosure Statement, the Debtor submits

6    the concurrently-filed index of exhibits (the **"Index"**).[1]

7    On October 18, 2024, (the **"Petition Date"**) the Debtor filed a voluntary petition for relief

8    under chapter 11 of the Bankruptcy Code, commencing the above-captioned case (the **"Chapter**

9    **11 Case"** or **"Case"**).

10   Chapter 11 allows debtors to propose a plan.  A plan may provide for a debtor to

11   reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of

12   both.  The Debtor is the proponent of the Plan that was sent to you in the same envelope as this

13   document.

14

15   I.    **EXECUTIVE SUMMARY**

16   The Plan is a reorganizing plan that saves the Debtor's business and the jobs of its

17   employees.[2]  The Plan enables the Debtor to restructure its obligations and continue operations,

18   providing essential vegetation management services and disaster relief assistance to communities

19   coast to coast.  The Plan also marshals significant value from all Estate assets for the benefit of

20   creditors.  Through the Debtor's ongoing operations, the Plan proposes to pay substantial value to

21   the Holders of Allowed Claims, an amount that exceeds $~~36~~47,000,000 over the term of the Plan.

22   The Plan contains fair and equitable treatment for all Classes of creditors, secured and

23   unsecured.  Each Holder of an Allowed Secured Claim will be paid in full.  In many respects, the

24   Plan adopts the contractual repayment terms that ~~give~~ gave rise to the Secured Claims or

25   consensual treatment negotiated with the Holders of the Secured Claims.

---

[1]   Unless otherwise provided below, all references to exhibits are to the exhibits attached to the
concurrently-filed Index.

[2]   Unless otherwise defined herein, the definition of any capitalized term may be found in the Table
of Definitions at the end of this Disclosure Statement.

The Holders of Allowed General Unsecured Claims will receive a *pro rata* share of of the the $15,674,000 25,000,000 GUC Payment Amount GUC Payment Amount.  The GUC Payment Amount is the *minimum* to be paid under the Plan to the Holders of Allowed General Unsecured Claims and it will be paid *with interest*.  As provided in more detail in the Plan, the GUC Payment Amount will be paid through a cash sweep mechanism—the Class 16 GUC Payment.  That is, all of the Reorganized Debtor's excess cash (as defined in the Plan) will be contributed to the GUC Payment Amount until it is paid in full.  The GUC Payment Amount is currently projected to be paid by the Reorganized Debtor within nine (9) years following the Effective Date and will be paid *with interest*.  The GUC Payment Amount can be paid earlier or later than projected based on the Reorganized Debtor's actual performance after the Effective Date.  The payment of the GUC Payment Amount is set forth in Section III.E.2.a. below.  Any distributions on account of Disputed Claims will be reserved and paid upon allowance.

In addition, under the Plan, Allowed General Unsecured Creditors will have the opportunity to share in the upside of the Reorganized Debtor's post-confirmation profits after the GUC Payment Amount is paid.  The Plan provides for the Reorganized Debtor to pay a GUC Bonus for the benefit of the Holders of Allowed General Unsecured Claims.  The GUC Bonus is detailed in Section III.E.2.b. below.  In short, the GUC Bonus equals fifty percent (50%) of the Reorganized Debtor's post-confirmation excess cash flow (as defined in the Plan) within five (5) years of the Effective Date and up to the cumulative sum (inclusive of the GUC Payment Amount) of **$55,000,000** or **40% of the Allowed General Unsecured Claims** (capped by the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), **whichever is greater**.  The amounts to be paid under the Plan to the Holders of Allowed General Unsecured Claims are the product of extensive negotiations and discussions by the Debtor with various parties in interest as well as settlements with certain key parties.

the The Plan also vests certain potential claims of the Estate , *i.e.*, Insider Avoidance Actions and Loan Causes of Action, in a Plan Trust for the Plan Trustee to investigate and, if appropriate, pursue.  The Holders of Allowed General Unsecured Claims will receive a *pro rata* share of any Net Recoveries from such actions.  This is in addition to the sums discussed above

2

1   ~~Distributions on account of Disputed Claims will be reserved and paid upon allowance.~~

2        The Reorganized Debtor's post-Effective Date operating cash flow includes significant

3   value from its affiliates.  The pre-petition loan owing from the Debtor's wholly-owned subsidiary,

4   Pino Tree Service, Inc. ("**PTS**"), ~~will~~ is projected to be paid in full ~~less than one~~within two year~~s~~

5   after the Effective Date.  The Reorganized Debtor is projected to receive management fees and

6   equipment rent from PTS of nearly $10.8 million per year, *plus* annual distributions.  The

7   projected annual distributions collectively exceed $14.5 million over the term of the Plan.  As

8   such, the Reorganized Debtor is receiving 100% of the economic benefit of PTS and essentially all

9   of its excess cash flow during the term of the Plan.  In addition, the Reorganized Debtor is

10  projected to receive over $700,000 annually from Phoenix Traffic Management, Inc. ("**PTM**"), on

11  account of management fees and equipment rent.  All of this value is benefiting the Holders of

12  Allowed Claims under the Plan.

13       The Reorganized Debtor's post-Effective Date projections are attached to the Index as

14  **Exhibit 1** (the "**Projections**").  The sums to be paid from affiliates during the term of the Plan are

15  set forth in the Projections.  The Debtor has also included post-Effective projections for PTS (the

16  "**PTS Projections**").  The PTS Projections are attached to the Index as **Exhibit 2**.

17       The Effective Date of the Plan will be the first Business Day that is fifteen (15) days after

18  the entry of an order confirming the Plan ("**Confirmation Order**"), provided there has been no

19  order staying the effectiveness of the Confirmation Order.

20       A.     **The Purpose of This Document**

21       This Disclosure Statement summarizes what is in the Plan and provides certain information

22  relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to

23  confirm the Plan.  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU**

24  **WANT TO KNOW ABOUT**:

25       **(1)     WHO CAN VOTE OR OBJECT TO THE PLAN;**

26       **(2)     WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, the projected**

27                 **payment on your claim if the Plan is confirmed), AND HOW THIS**

28                 **TREATMENT COMPARES TO THE PROJECTED TREATMENT OF**

3

**YOUR CLAIM IN LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE;**

(3)    **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE;**

(4)    **THE FACTORS THE BANKRUPTCY COURT WILL CONSIDER IN DECIDING WHETHER OR NOT TO CONFIRM THE PLAN;**

(5)    **WHAT IS THE EFFECT OF CONFIRMATION; AND**

(6)    **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the provisions of the Plan will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

B.    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

1.    **Time and Place of the Confirmation Hearing**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on _____ __, 2025 (the "**Confirmation Hearing**"), in Courtroom 5B of the

4

Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth Street, Santa Ana, California 92701.

### 2. Deadline for Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to do so on a timely basis by filling out the enclosed ballot and returning it in the enclosed envelope to Raines Feldman Littrell LLP, Attn: Michael L. Simon, 4675 MacArthur Ct, Suite 1550, Newport Beach, CA 92660 or by email to msimon@raineslaw.com.

Your ballot must be received by no later than \_\_\_\_ \_\_, **2025** (the "**Voting Deadline**"), or it will not be counted.

### 3. Deadline for Objecting to Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon counsel for the Debtor, Raines Feldman Littrell LLP, Attn: Robert S. Marticello, 4675 MacArthur Ct, Suite 1550, Newport Beach, CA 92660, or rmarticello@raineslaw.com.

Your objection must be received by the Debtor's counsel listed above by \_\_\_\_ \_\_, **2025**, or it will not be considered.  The Debtor will file with the Bankruptcy Court and serve the results of the voting by \_\_\_\_ \_\_, **2025**.

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for the Debtor, Raines Feldman Littrell LLP, Attn: Michael L. Simon, 4675 MacArthur Ct, Suite 1550, Newport Beach, CA 92660, or msimon@raineslaw.com.

### 5. Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's books and records which, unless otherwise indicated, are unaudited.  The information contained in this Disclosure Statement is provided by the Debtor.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS.  SUCH**

5

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.1 10585253.1 10585144.1 10468282.1    Exhibit 1, Page 17

STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE DEBTOR AND ITS ADVISORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTOR'S FUTURE CASH FLOW AVAILABLE FOR DISTRIBUTION TO CREDITORS. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTOR'S ACTUAL CASH FLOWS TO BE DIFFERENT FROM THOSE BEING PROJECTED, AND THE DEBTOR AND ITS ADVISORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

## II.    BACKGROUND

### A.    Background Regarding the Debtor and Its Operations

On the Petition Date, the Debtor commenced the Case. The Debtor is operating as the debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed.

Established in 1972 by Gloria and John Mowbray (the "**Founders**"), Mowbray's has been a cornerstone in California for providing vegetation management services for over 50 years. Mowbray's began as a modest venture and has grown into a resilient company, dedicated to safeguarding communities and the environment. Mowbray's continues to be a family owned and operated business, is a member of WMBE (Women and Minority Business Enterprise), and is committed to providing its client-partners with the safest and most efficient solution to their vegetation management needs.

John Mowbray suffered a catastrophic brain injury on the job in 1993, leaving him incapacitated. Gloria Mowbray stepped up to manage the business while also caring for John and

1   raising four children on her own.  Gloria Mowbray passed away in April 2021.  Gloria Mowbray

2   was the sole shareholder of the Debtor from 1993 until her passing, at which time Robin

3   Mowbray, her daughter, became the sole shareholder of the Debtor.

4          The services provided by the Debtor include, without limitation, manual and mechanical

5   clearing, integrated vegetation management, storm and emergency, right-of-way maintenance, and

6   high-hazard tree removal and crane services (collectively, "**Vegetation Management Services**").

7   Tree-trimming around power lines, clearing vegetation to prevent forest fires, removal of debris

8   and charred remains after major wildfires in California, and assisting with damage remediation in

9   response to hurricanes—these are the types of important services that the Debtor provides to the

10  communities in which it serves.  Historically, utility companies have been the Debtor's primary

11  clients, including California's largest energy utility, PG&E, as well as Southern California Edison

12  ("**SCE**").  The Debtor also provides services to governmental agencies and cooperatives.  The

13  Debtor is based in California and provides Vegetation Management Services throughout the state.

14  The Debtor also provides services in both North Carolina and Florida.

15         As discussed above, the Debtor is currently owned by Robin Mowbray, the youngest

16  daughter of the Founders.  Since 2021, Ms. Mowbray has been the Chairwoman of the Debtor's

17  Board.  Richard Mowbray (grandson of the Founders) has been the Debtor's Chief Executive

18  Officer since 2020.  Ruben Sainos has served as the Debtor's CFO since 2023.  Prior to the

19  Petition Date, the Debtor retained Brian Weiss of Force ~~10~~ Ten Partners, LLC ("**Force 10**"), as its

20  Chief Restructuring Officer ("**CRO**") to lead the Debtor through its formal restructuring process,

21  including this Case.

22      **B.      The Debtor's Funded Debt**

23         Pursuant to a loan agreement dated October 28, 2022 (the "**PNC Loan Agreement**")

24  between PNC Bank, N.A. ("**PNC**") and the Debtor, PNC provided the Debtor with a secured

25  revolving line of credit not to exceed $20,000,000 and letters of credit not to exceed $5,000,000

26  (the "**PNC Loan**").  As of the Petition Date, the Debtor owed PNC approximately $7,038,514

27  under the PNC Loan, which is secured by liens on all or substantially all of the Debtor's assets

28  (excluding real property).  The PNC Loan was guaranteed by Robin Mowbray and Mowbray's

1  Waterman Property, LLC (**"MWP"**), an affiliate of the Debtor.  The guaranty from MWP is

2  secured by two real properties that it owns.

3      The Debtor has significant debt secured by its equipment.  The Debtor has approximately

4  800 pieces of equipment and the Debtor is a party to approximately 200 equipment agreements.

5  The Debtor's equipment includes trucks with 40 to 100-ft aerial platforms and grapple trucks with

6  large cranes to remove debris.  Substantially all of the Debtor's equipment is leased or financed

7  with several lessors.  The Debtor's capital lease obligations are secured by the corresponding

8  equipment.  Altec Capital Services, LLC (**"Altec"**), and Bank of America (**"BOA"**) are the

9  Debtor's primary equipment counterparties, owed approximately $4.8 million and $6.8 million,

10  respectively.

11      **C.**      **Events Leading to the Filing of the Case**

12              **1.**      **The Debtor's Decline in Revenues**

13      By 2021, in response to California's unprecedented wildfire challenges, the Debtor

14  expanded significantly, employing over 1,300 professionals and managing an additional 500

15  subcontractors.  This period marked the Debtor's peak in operational capacity and industry

16  presence.

17      However, 2022 brought significant challenges.  The bankruptcy of PG&E, a major client at

18  that time, led to delayed payments to the Debtor.  In addition, PG&E used the bankruptcy to

19  renegotiate the Debtor's contract to a lower price causing severe financial strain.  For these

20  reasons, the Debtor made the difficult decision to terminate its contract with PG&E.  Towards the

21  end of 2023, another blow came when the Debtor was not awarded any vegetation management

22  contracts by SCE, resulting in a substantial loss of revenue for 2024.  The loss of PG&E and SCE

23  left the Debtor grappling with the payroll and excess equipment necessary for servicing these

24  former clients.

25      As a result of the foregoing, the Debtor experienced a substantial decline in revenue over

26  the past four years.  The Debtor's gross revenues and net income or loss on such revenues from

27  2020 to 2024 are set forth in the table below.  The Debtor incurred substantial net losses in 2022

28  and 2023 as the Debtor worked to transition to a much smaller company.

| Year | Gross Revenue | Net Income/(Loss) |
|------|---------------|-------------------|
| 2020 | $471 million | $69.2 million |
| 2021 | $281.9 million | $24.6 million |
| 2022 | $232 million | ($34 million) |
| 2023 | $127 million | ($28.9 million) |
| 2024[3] | $39.89 million | ($2,313)[4] |

## 2.    The Debtor's Efforts to Improve Cash Flow

In light of the financial difficulties facing the Debtor, it implemented several strategic actions to downsize operations consistent with its reduced revenue, including, among other things:

- Hiring a seasoned financial professional, Ruben Sainos, as its Chief Financial Officer, to analyze the Debtor's operations and to help lead the Debtor through its efforts to right-size its operations, address its financial challenges, stabilize its business, and strengthen its cash flow.

- Reducing the salaries of non-union personnel, including executives. The wages of the Debtor's non-union payroll totaled approximately $705,000 per week as of October 18, 2023.  The Debtor's payroll is currently approximately $180,000 per week.

- Conducting systematic layoffs of hundreds of employees.  As of October 18, 2023, the Debtor had approximately 440 employees. The Debtor reduced the number of its employees to approximately 180 as of the Petition Date and the Debtor currently has approximately 85 employees.

- Renegotiating contracts and suspending services and expenses that were no longer needed by the business.  The Debtor reduced the administrative services it received and moved to lower cost providers related to internet, phone, and IT services. The Debtor terminated leases for storing equipment and consolidated stored equipment on other existing storage yards.  The Debtor also closed a leased satellite office in Sacramento.

In addition to the foregoing, the Debtor worked with its creditors to reach consensual arrangements where possible.  In 2022, the Debtor was in default on the PNC Loan.  The Debtor reached a forbearance agreement with PNC (the "**Forbearance Agreement**").  Under the terms of the Forbearance Agreement, the maturity date was extended to December 31, 2024.  The

---

[3]    YTD Dec 31, 2024.

[4]    The figures for 2023 and 2024 are preliminary figures, subject to CPA review and revision.

9

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION    Exhibit 1, Page 21
10585253.110585253.110585144.110466262.1

Forbearance Agreement required certain interim payments to PNC, all of which the Debtor timely made.

The Debtor sold or returned idle equipment with the consent of the equipment leasing and financing partners.  Through selling equipment, the Debtor reduced its monthly lease expense with Altec by approximately $170,000 per month pre-petition. The Debtor returned all of its leased vehicles with Enterprise, which reduced the Debtor's monthly leasing cost by another $55,000. The Debtor sold equipment leased or financed with BOA worth approximately $4,700,000, and the proceeds were paid directly to BOA to reduce the balance owing.  The Debtor also sold certain other equipment with the proceeds paid to PNC.  The Debtor previously had more than three times the amount of equipment than it had as of the Petition Date.

Through all these efforts, the Debtor made substantial progress downsizing its operations and it markedly improved its cash flow.  The Debtor's progress can be seen from its financial turnaround from 2023 to 2024.  As reflected in the table above, the Debtor experienced a net loss of nearly $30 million in 2023.  However, in 2024, with substantially less revenue, the Debtor's operations were essentially break even (inclusive of substantial professional costs).  (*See* Ex. 1 at 10 of 18.)

Despite the Debtor's hard work to stabilize its operations, the Debtor was still carrying debt of the much larger company it once was.  The extended maturity date for the PNC Loan was looming as of the Petition Date and the Debtor did not expect to have the liquidity needed to pay in full at that time.  The Debtor's equipment debt remained significant and beyond the Debtor's financial ability to service on the contracted terms.  The Debtor was facing many lawsuits and the pending litigation was a drain on resources and there was no end in sight.

In addition, in July 2024, a jury returned a verdict awarding damages of nearly $84 million in favor of the plaintiffs in the matter of *Jaime Rodriguez, et al. v. The Original Mowbray's Tree Service, Inc., et al.* (San Bernardino County Superior Court Case Number CIVDS2003809) (the "**Rodriguez Matter**").  The Debtor could not satisfy the verdict and any attempt by the plaintiffs to collect a resulting judgement (pending the Debtor's efforts to pursue a new trial or an appeal) would have been severely disruptive to the Debtor's operations.

10

A second jury trial in San Bernardino County Superior Court was scheduled to begin in October 2024 in the matter of *Ronnie D. Jordan v. The Original Mowbray's Tree Service, Inc., et al.* (San Bernardino County Superior Court Case Number CIVSB2201281) (the "**Jordan Matter**").  In light of the other financial difficulties facing the Debtor, the Debtor did not believe incurring the significant cost of a trial in the Jordan Matter was warranted.

Against this backdrop, the Debtor filed this Case to preserve its operations, the jobs of its employees, and the services it provides.  In addition, with the protection of the Bankruptcy Court, the Debtor sought to continue its efforts to right-size its operations and work towards a more financially stable future, maximize value for the estate and all stakeholders, and to address its legitimate obligations in an orderly, fair, and equitable manner.  During this Case, the Debtor continued its efforts to work with its lenders and to develop a feasible restructuring plan based on the Debtor's current cash flow.

### D.    The Debtor's Affiliates

The Debtor has three affiliates, PTS, PTM, and MWP (collectively, the "**Affiliates**").

#### 1.    Pino Tree Service, Inc.

PTS is a wholly owned subsidiary of the Debtor.  PTS provides Vegetation Management Services.  In May 2022, the Debtor purchased all of the outstanding shares of PTS from its founder, Jacobus D Pino ("**Pino**"), pursuant to a Stock Purchase Agreement dated May 26, 2022 (the "**PTS Stock Agreement**").  The purchase price was $1,500,000.  Of this sum, $750,000 was paid by the Debtor in cash up front and $750,000 was reduced to a note payable to Pino (the "**Pino Note**").  Prior to the Debtor's acquisition of PTS, PTS served as a subcontractor for the Debtor.  Pino continues to serve as the CEO of PTS.  PTS's largest customer is SCE.

As of December 31, 2024, a balance of $126,007.10 remained due on the Pino Note.  The Debtor and Pino executed a Security Agreement dated July 1, 2022 (the "**Pino Security Agreement**"), purporting to grant a security interest in 50% of the stock purchased by the Debtor in PTS.  As provided in the Pino Security Agreement, upon an uncured default thereunder, and depending on the balance owing on the Pino Note at the time of any such uncured default, Pino

1  could assert an entitlement to a percentage of the Debtor's stock in PTS that was to serve as

2  collateral for the Pino Note in full satisfaction of the balance owing.

3       The PTS Stock Agreement, the Pino Security Agreement, and any other documents

4  executed by the Debtor and Pino in connection with the Debtor's purchase of the stock in Pino

5  shall be collectively referred to as the **"PTS Transaction Documents."**

6                    a.      **The Line of Credit**

7       The Debtor and PTS are parties to a line of credit agreement dated January 1, 2024 (the

8  **"PTS Loan"**).  Pre-petition, the Debtor provided PTS with the credit line to assist it with its

9  operations and working capital needs.  As of the Petition Date, the balance due by PTS to the

10  Debtor on the PTS Loan was $10,321,046.44.  Payments by PTS post-petition on account of the

11  PTS Loan are discussed below.

12                    b.      **Management Agreement**

13       The Debtor and PTS are parties to a Management Fee Agreement dated January 1, 2024

14  (the **"PTS Management Agreement"**).  Under the PTS Management Agreement, the Debtor

15  provides certain specific services to PTS in exchange for a management fee.

16                    c.      **Equipment Lease**

17       The Debtor and PTS are parties to a Master Vehicle and Equipment Lease Agreement

18  dated September 27, 2022 (the **"PTS Equipment Lease"**).  Under the PTS Equipment Lease, the

19  Debtor leases certain idle equipment to PTS.  The Debtor leases the equipment to PTS at the

20  Debtor's actual cost, plus a markup of 5 to 10% for ancillary costs and a small profit.

21                    d.      **Post-Petition PTS Payments**

22       PTS is making weekly payments to the Debtor.  In total, post-petition through ~~March 7~~July

23  25, 2025, PTS had paid the Debtor approximately $~~8,814,263~~13,943,099 in management fees,

24  equipment rent, interest, and PTS Loan principal repayments.  On account of the PTS Loan alone,

25  as of ~~March 7~~July 25, 2025, PTS has paid interest to the Debtor of approximately

26  $~~508,958~~287,427 and principal in the amount of $~~46,888~~088,000.  The latter amount includes a

27  $4,000,000 lump sum payment on the PTS Loan in December 2024.  As of ~~March 7~~July 25, 2025,

28  the balance owed by PTS to the Debtor on the PTS Loan is $~~5,367,725~~4,389,125.  The Debtor has

12

1   not loaned PTS any funds post-petition.  The Debtor projects that the PTS Loan will be paid

2   within two years less than one year after the Effective Date.  (*See* Ex. 1 at 7 of 18.)

### 2.    Phoenix Traffic Management, Inc.

4   PTM is owned by Robin Mowbray.  PTM provides traffic management services pursuant

5   to a contractor's license.  PTS's customers are the Debtor, PTS, and an unrelated third party.

6   Certain Vegetation Management Services jobs required outside traffic management services.  As

7   such, the services that the Debtor obtained from PTM are services that it would have needed to

8   obtain from a third party.  The Debtor has not used PTM's traffic management services post-

9   petition to date because it has not had a contract requiring such services.  The cost the Debtor paid

10  to PTM pre-petition was passed through to the Debtor's customer.

### a.    The PTM Equipment Lease

12  The Debtor leases certain equipment to PTM pursuant to a Master Vehicle and Equipment

13  Lease Agreement dated March 1, 2022 (the "**PTM Equipment Lease**").  The Debtor leases

14  certain trucks to PTM that it uses to provide traffic management services.  The trucks that the

15  Debtor leases to PTM would otherwise be idle and the Debtor leases the trucks to PTM at cost,

16  plus a markup of 5-10% for ancillary costs and a small profit.

### b.    The PTM Loan

18  Pre-petition, the Debtor made a loan to PTM (the "**PTM Loan**").  The PTM Loan reflects a

19  combination of advances by the Debtor to PTM to fund PTM's operating expenses and credits for

20  rent for equipment leased by the Debtor to PTM when PTM lacked the cash to pay such rent.  The

21  PTM Loan was not memorialized by a written agreement pre-petition.  Post-petition, the CRO,

22  with the assistance of the Debtor's CFO, evaluated the PTM Loan and implemented repayment

23  terms, including requiring interest at the market rate of prime, plus 2%.  The PTM Loan

24  repayment terms are being reduced to an agreement.

### c.    Post-Petition PTM Payments

26  During the Case through March 7, 2025, the Debtor has received approximately

27  $512,448 952,229 from PTM in management fees, equipment rent, and interest on the PTM Loan,

28

plus $130~~18~~,000 in repayment of principal on the PTM Loan, for a grand total of

$~~530,448~~1,082,229.  The current balance of the PTM Loan is $~~2,456,219~~2,350,365.

### 3. Mowbray Waterman Property, LLC

MWP is a real estate holding company that owns and leases real property.  Robin

Mowbray owns 51% of MWP and the Gloria Mowbray Separate Property Trust owns 49% of

MWP.  The current sole beneficiary of the trust is Robin Mowbray's father.  Robin Mowbray is

MWP's managing member.

### a. MWP Loans

The Debtor provided loans to MWP (the "**MWP Loan**").  As of the Petition Date, the

Debtor was owed $3,889,126.31 from MWP on account of the MWP Loan.

### b. MWP Real Property Leases

The Debtor leases certain real property from MWP pursuant to three written lease

agreements between the Debtor and MWP (collectively, the "**MWP Leases**") as follows:

- The second floor of the real property located at 686 E. Mill Dr., San Bernardino, CA 92408 (the "**Mill St. Property**"), constituting of approximately 10,000 square feet, for $10,000 per month, or approximately $1.00 per square foot per month.
- Certain real property parcels from MWP, APNs 0136-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, 0136-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, and 0136-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, to use as a parking yard for $3,000 per month.
- The real property located at 17332 Millwood Dr., Visalia, CA 93292, to use as a parking yard for $1,000 per month.

The Debtor does not pay rent to MWP in cash.  Rather, prior to MWP filing its own

bankruptcy case, each month, a book entry was made against the MWP Loan in the amount of

$14,000 for the monthly rent due under the MWP Leases.  This book entry ceased as of MWP's

bankruptcy filing to avoid a technical violation of the automatic stay arising from MWP's petition.

The Mill St. Property was purchased by MWP in July 2020 for $4,600,000 and the

purchase price was, in part, financed from a loan to MWP by Bank of ~~t~~The Sierra ("**Sierra Bank**")

in the amount of $2,990,000 secured by the Mill St. Property.  The loan from Sierra Bank was

guaranteed by the Debtor.  The Debtor advanced $1,821,000 to MWP in connection with the

purchase (via three deposits to escrow on February 13, June 25, and July 8, 2020).

1    A portion of the Mill St. Property (*i.e.*, approximately 19,844 square feet primarily on the

2    first floor) is leased to the County of San Bernardino (the "**County**") pursuant to a Lease

3    Agreement between the County and the prior owners of the Mill St. Property.  The term of lease

4    with the County expired and the County continues to occupy the premises on a month-to-month

5    basis at the rate of $35,124 per month, or approximately $1.77 per square foot per month.  MWP

6    pays approximately $15,153 to Sierra Bank per month.

7        **E.**    **Summary of the Debtor's Assets and Liabilities**

8            **1.**    **The Debtor's Assets**

9    The Debtor's assets primarily consist of the following:

10   - Cash;

11   - Accounts receivable;

12   - Approximately 800 pieces of financed and leased equipment;

13   - Three real property parcels (further discussed below);

14   - The right to any surplus on two letters of credit drawn against by two insurance

15   companies pre-petition;

16   - The Debtor's ownership in PTS; and

17   - The Debtor's loan receivables from the Affiliates.

18   The Debtor's assets are further set forth in the Liquidation Analysis attached to the Index as

19   **Exhibit 3** and the balance sheet included with the Projections attached to the Index as **Exhibit 1**.

20   (*See* Ex. 1 at 12.)

21           **2.**    **The Debtor's Real Property**

22   The Debtor owns three parcels of real property located in San Bernardino.  These parcels

23   have a collective book value of $245,000.  The Debtor also leases 11 properties (10 in California

24   and 1 in Florida).  This includes the property leased with MWP discussed above.  The Debtor's

25   leased real property is comprised of office space in California and yards upon which the

26   equipment is stored and maintained.

27           **3.**    **The Debtor's Liabilities**

28   The Debtor's primary liabilities consist of the following: (a) the current outstanding

15

1  balance of the PNC Loan in the approximate amount of $6.9 million; (b) operating and capital

2  lease obligations that currently collectively total approximately $16.2 million (primarily owed to

3  Altec and BOA); (c) trade debt owed to vendors incurred in the ordinary course of operations; and

4  (d) litigation claims, many of which are contingent, disputed, unliquidated, and in unknown

5  amounts.  The litigation claims include claims that are subject to pending litigation that is

6  proceeding post-petition such as the Rodriguez Matter.

7       **F.**    **Significant Events During the Bankruptcy Case**

8            **1.**    **Bankruptcy Proceedings**

9                 **a.**    **"First Day" Motions**

10       On October 18, 2024, the Debtor filed the following "first-day" motions: (1) motion for

11  entry of interim and final orders authorizing use of cash collateral [Docket No. 5] (the "**Cash**

12  **Collateral Motion**"); (2) motion for order authorizing continued used of Debtor's bank accounts

13  and cash management system [Docket No. 6] (the "**Cash Management Motion**"); (3) motion for

14  entry of order authorizing payment of certain pre-petition employee-related claims and granting

15  related relief [Docket No. 7] (the "**Payroll Motion**"); (4) motion for order authorizing Debtor to

16  continue insurance programs, honor terms of premium financing agreements, satisfy related pre-

17  petition obligations and granting related relief [Docket No. 8] (the "**Insurance Motion**"); (5)

18  motion for order: (a) prohibiting utility providers from altering, refusing or discontinuing service;

19  (b) deeming utilities adequately assured of future performance; and (c) establishing procedures for

20  determining adequate assurance of payment under 11 U.S.C. § 366 [Docket No. 9] (the "**Utilities**

21  **Motion**").  On October 24, 2024, the Court entered orders granting each of the foregoing motions

22  on an interim basis.  (*See* Docket Nos. 70-74.)  On November 25, 2024, the Court entered orders

23  granting the Cash Management Motion, the Payroll Motion, and the Utilities Motion on a final

24  basis.  (*See* Docket Nos. 184-186.)  On December 2, 2024, the Court entered an order granting the

25  Insurance Motion on a final basis.  (*See* Docket No. 201.)  On January 24, 2024, the Court entered

26  an order granting the Cash Collateral Motion on a final basis.  (*See* Docket No. 268.)

27       In connection with the Court's approval of the Cash Collateral Motion on a final basis, the

28  Debtor and PNC entered into a stipulation for use of cash collateral that was approved by the

16

1  Court [Docket No. 268] (the "**Cash Collateral Stipulation**").  Among other terms, the Cash

2  Collateral Stipulation provides for payments by the Debtor to PNC.

3      **b.**  **Employment of Professionals**

4     On November 25, 2024, the Court entered an order authorizing the Debtor to employ

5  Raines Feldman Littrell LLP as the Debtor's general bankruptcy counsel.  (*See* Docket No. 187.)

6     On November 25, 2024, the Court entered an order authorizing the Debtor to engage Force

7  Ten Partners, LLC to provide Brian Weiss as the Debtor's CRO and additional advisory personnel

8  to support the Debtor and the CRO.  (*See* Docket No. 188.)

9     On December 17, 2024, the Court entered an order authorizing the Debtor to employ

10  Grobstein Teeple LLP as the Debtor's financial advisors.  (*See* Docket No. 220.)

11     On December 19, 2024, the Court entered an order authorizing the Debtor to employ Hilco

12  Valuation Services, LLC to appraise certain machinery and equipment.  (*See* Docket No. 223.)

13     On April 16, 2025, the Court entered an order authorizing the Debtor to establish certain

14  procedures to retain and compensate ordinary court professionals in the ordinary course of

15  business.  (*See* Docket No. 409.)

16     On May 5, 2025, the Court entered an order authorizing the Examiner to employ Ringstad

17  & Sanders LLP as the Examiner's counsel.  (*See* Docket No. 435.)

18

19      **c.**  **Claims Bar Date**

20     On December 9, 2024, the Court entered a scheduling order setting a bar date of 60 days

21  following service of the bar date notice as the deadline for the Debtor to serve written notice of the

22  bar date.  (*See* Docket No. 206.)  On December 23, 2024, the Debtor served written notice of the

23  bar date.  (*See* Docket No. 235.)  Based on the date of service, the bar date was February 20, 2025

24  (the "**Claims Bar Date**").  (*See* Docket No. 232.)

25      **d.**  **Cash Collateral**

26     In connection with the Court's approval of the Cash Collateral Motion on a final basis, the

27  Debtor and PNC entered into a stipulation for use of cash collateral that was approved by the

28  Court [Docket No. 268] (the "**First Cash Collateral Stipulation**").  On May 27, 2025, the Court

17

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.1 10585253.1 10585144.1 10468262.1   Exhibit 1, Page 29

entered an order authorizing the Debtor to use cash collateral on a final basis in accordance with the budget attached thereto on the terms and condition of the *Stipulation Authorizing Use of Cash Collateral* [Docket No. 459] (the "**Second Cash Collateral Stipulation**").  On July 14, 2025, the Court authorized the Debtor to use cash collateral on a final basis in accordance with the budget attached thereto on the terms and condition of the *Stipulation Authorizing Use of Cash Collateral* [Docket No. 532] (the "**Third Cash Collateral Stipulation**").  Among other terms, the First, Second and Third Cash Collateral Stipulations provide for payments by the Debtor to PNC. Pursuant to the order approving the Third Cash Collateral Stipulation, the Debtor is authorized to use cash collateral through October 17, 2025.

### d.e.    Motion to Reject Unexpired Leases and Servicing Agreement

As part of its continued efforts to downsize, on November 12, 2024, the Debtor filed the *Motion for Order Authorizing Rejection of Certain Unexpired Leases Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, Effective as of the Petition Date* [Docket No. 166] (the "**Rejection Motion**").  By the Rejection Motion, the Debtor sought to reject certain unexpired leases and a servicing agreement in order to reduce the amount of leased equipment and the expenses related thereon.  On December 11, 2024, the Court entered an order granting the Rejection Motion.  (*See* Docket No. 212.)

### e.f.    Motions for Relief From the Automatic Stay

During the Case, four creditors have moved for and obtained stay relief to proceed with certain state court actions.

On February 3, 2025, the Court entered an order granting stay relief to allow the plaintiffs in the Rodriguez Matter (the "**Rodriguez Plaintiffs**") to proceed with such matter to final judgment, including any post-trial motions by the Debtor and any appeals.   (*See* Docket No. 236.) On January 21, 2025, a judgment was entered in the Rodriguez Matter (the "**Rodriguez Judgment**").  The Debtor filed a post-trial motion challenging Rodriguez Judgmentthe judgment entered in the Rodriguez Matter, which was denied by the superior court.  On May 6, 2025, the

1  Debtor filed a notice of appeal of the Rodriguez Judgment (the "**Rodriguez Appeal**"). that is
2  scheduled for hearing on April 3, 2025.

3      On February 3, 2025, the Court entered an order granting stay relief to allow Ronnie D.
4  Jordan to proceed with trial in the Jordan Matter. (*See* Docket No. 273.)

5      On February 24, 2025, the Court entered an order granting stay relief to allow Pamela
6  Metcalf-Kunelis to proceed to final judgment in the state court action in *Pamela Metcalf-Kunellis*
7  *v. Sacramento Municipal Utility District and The Original Mowbray's Tree Service, Inc.,* in the
8  Superior Court of California, County of Placer, Case No. S-CV-0049514. (*See* Docket No. 335.)

9      On March 12, 2025, the Court entered an order granting stay relief to allow Ping Liu and
10  Guifen He to proceed to final judgment in the state court action in *Liu, et al. v. The Original*
11  *Mowbray's Tree Service, Inc., et al.,* in the Superior Court of California, County of Sacramento,
12  Case No. 24CV000478. (*See* Docket No. 354.)

13      On June 25, 2025, the Court entered an order granting stay relief to AmeriCredit Financial
14  Services, Inc. dba GM Financial authorizing it to apply $4,914.88 in insurance proceeds to its
15  debt. (*See* Docket No. 504.)

16      Ford Motor Credit Company, LLC, has filed a number of motions for relief from stay, each
17  motion with respect to a single truck. The Debtor is working to resolve such motions and, if a
18  resolution, is not reached, the Debtor will be opposing the motions.

19      On July 24, 2025, Debra Danner filed a motion for relief from the automatic stay in order
20  to file suit against the Debtor alleging that, post-petition, an employee of the debtor caused an
21  accident injuring Ms. Danner. The Debtor will be opposing that motion and Ms. Danner's related
22  motion concerning the venue for her contemplated lawsuit.

23              **f.g.    The Judgment Creditors' Trustee and Substantive**
24                              **Consolidation Motion**

25      On February 7, 2025, judgment creditors Jaime Rodriguez and Ana Lidia Gomez (together,
26  the "~~Judgment Creditors~~**Rodriguez Plaintiffs**") filed the *Motion to Appoint a Chapter 11*
27  *Trustee Pursuant to 11 U.S.C. § 1104(a); and a Motion to Substantively Consolidate Pino Tree*
28  *Services, Inc., Mowbray Waterman Property, LLC, and Phoenix Traffic Management, Inc. With*

19

1    *the Debtor's Bankruptcy Case* [Docket No. 286] (the "**Trustee and Substantive Consolidation**

2    **Motion**").  The Trustee and Substantive Consolidation Motion was opposed by the Debtor, PTS,

3    MWP, PNC, and Sierra Bank.  (*See* Docket Nos. 308, 310, 312, 314 and 345.)  The Court denied

4    the Trustee and Substantive Consolidation Motion and ordered the appointment of an examiner

5    pursuant to 11 U.S.C. § 1104(c).  (*See* Docket No. 350.)

6           On March 14, 2025, the Court entered an order denying the Trustee Motion and directing

7    the United States Trustee to appoint an examiner (the "**Examiner Order**").  (*See* Docket No. 362.)

8    On March 18, 2025, the Court entered an order appointing Donald T. Fife as the examiner (the

9    "**Examiner**").  ~~Donald T. Fife was appointed as the examiner (the "Examiner").~~  The Examiner's

10   report was filed on July 14, 2025 [Docket No. 538] (the "**Report**").  As discussed in the Report,

11   the Debtor and its restructuring team discussed potential amendments to the Plan to improve the

12   treatment afforded to the Holders of General Unsecured Claims.  (*See* Report at 24:1-9.)  The

13   treatment herein reflects the discussions with the Examiner and his counsel, in addition to the

14   negotiations with the Rodriguez Plaintiffs.

15                              **h.      Plan Support Agreements and Settlements**

16          The Debtor has reached Plan Support Agreements with two parties.  First, the

17   Debtor entered into a Plan Support Agreement with Pathward, which was approved by the Court

18   by order entered on July 18, 2025 [Docket No. 561].  Second, the Debtor and Altec entered into a

19   Plan Support Agreement on or about July 29, 2025.  The Debtor also reached an agreement in

20   principle with the Rodriguez Plaintiffs, the terms of which are incorporated into the Plan.

21                              ~~g.      The entry of the Court's order and the appointment of the~~

22                              ~~examiner are pending.  The examiner's report will be due within~~

23                              ~~90 days following the entry of the order appointing the~~

24                              ~~examiner.~~

25                      ~~h.~~i.    **The Debtor's Schedules and Monthly Operating Reports**

26          The Debtor is in compliance with all of its duties under 11 U.S.C. §§ 521, Federal Rule of

27   Bankruptcy Procedure ("FRBP") 1006 and 1007, and the applicable Guidelines of the OUST.

28          On November 15, 2024, the Debtor filed its Schedules and SOFA.  (*See* Docket No. 170.)

                                              20

Additionally, pursuant to FRBP 2015.3, the Debtor is required to file reports of financial information on non-debtor entities in which he holds a controlling or substantial interest (the "**Rule 2015.3 Report**").  On December 19, 2024, the Debtor filed its first Rule 2015.3 Report.

The Debtor's 341(a) meeting of creditors was completed on January 3, 2025.  (*See* Docket No. 242.)  The Debtor has timely paid quarterly United States Trustee's fees and has filed its monthly operating reports.

**2.    Other Proceedings**

**a.    Related Bankruptcy Cases**

On February 19, 2025, MWP filed a Chapter 11 petition, commencing case no. 8:25-bk-10542-TA (the "**MWP Bankruptcy Case**").  Also on February 19, 2025, Robin Mowbray filed a Chapter 11 petition, commencing case no. 8:25-bj-10543-TA (the "**RM Bankruptcy Case**").

**b.    Potential Avoidance Actions**

Attached to the Index as **Exhibit 5 4** is the Debtor's SOFA, which includes all payments made to creditors during the 90-day period prior to the Petition Date and certain other pre-petition transfers within the one-year and two-year periods prior to the Petition Date based on the Debtor's books and records.  In addition, attached to the Index as **Exhibit 6 5** is a schedule (the "**Insider Payment Schedule**") prepared by the Debtor from its books and records of payments to or for the benefit of any insider within the four-year period prior to the Petition Date (collectively, the "**Insider Payments**").  The Insider Payment Schedule includes the payments listed in the Debtor's SOFA.

Avoidance Actions may exist against some or all of the creditors, insiders, or other transferees listed in the SOFA or the Insider Payment Schedule, and, unless expressly released by the Plan, all Avoidance Actions under 11 U.S.C. §§ 544 through 550, including, but not limited to, claims for the recovery of preferential transfers or fraudulent transfers, are hereby reserved against all entities for the benefit of the Estate.  The omission of the identity of a recipient of a potentially avoidable and recoverable transfer or of a particular payment from **Exhibits 5** or **6** is unintentional and shall not be deemed a waiver of the right of the estates to recover any distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy Code.  It is

21

1  possible that a significant majority of the payments are either not avoidable under the legal

2  standards of the Bankruptcy Code or subject to a valid affirmative defense.

3

4      The Debtor timely filed proofs of claim in the RM Bankruptcy Case and the MWP

5  Bankruptcy Case to preserve any claims the Estate may have, including based on payments

6  reflected in the Insider Payment Schedule.

7      As more fully described in Section III.E.3. below, u~~U~~nder the Plan, certain ~~all~~ Insider

8  Avoidance Actions are being released in connection with the compromise embodied in the Plan.

9  Any Insider Avoidance Actions, which are not Released Claims, and the Loan Causes of Action

10  against PTM (excluding the Excluded Claims) will vest in the Plan Trust and the Plan Trustee

11  shall have the authority to investigate and, if appropriate, pursue such actions in accordance with

12  Section III.E.5.d.iii.  Any Net Recoveries on the Trust Causes of Action will be paid to the

13  Holders of Allowed General Unsecured Claims on a *pro rata* basis.  This is in addition to such

14  Holders' Pro Rata Distribution of the GUC Payment Amount.

15  ~~The Debtor will file timely proofs of claim in the RM Bankruptcy Case and the MWP~~

16  ~~Bankruptcy Case to preserve any claims the Estate may have.~~

17      **G.**    **Historical and Current Financial Condition**

18      The Debtor's unaudited financial statement for the year ending December 31, 2024, is

19  included with the Projections.  (*See* Ex. 1 at 10 of 18.)  In 2024, the Debtor generated revenues of

20  $39,886,026 and incurred operating expenses of $28,780,892.  The Debtor's operations were

21  essentially breakeven, resulting in a small net loss of $2,313.  (*See id.*).  By comparison, in 2023,

22  the Debtor experienced a net loss of $28.9 million (with higher revenues).  Thus, the Debtor's

23  operations in 2024 marked an improvement from the significant losses in the preceding years.

24  Moreover, the small net loss in 2024 is inclusive of extraordinary accrued professional fees,

25  interest, and depreciation.  (*See id.*)

26      During this Case, the Debtor's net cash flow has continued to strengthen.  From the Petition

27  Date through March 7, 2025, the Debtor has generated positive cumulative operating cash flow of

28  approximately $7.6 million.  The Debtor has, post-petition, increased its cash on hand from $4.2

22

1    million to approximately $11.8 million.  This is so notwithstanding a projected decline in the

2    Debtor's annual tree service revenues from 2024 to 2025 due to the completion of the Debtor's

3    contract with Sacramento Municipal Utility District.  The Debtor's post-petition receipts from PTS

4    and PTM have contributed substantially to the Debtor's improved post-petition cash flow.  As of

5    March 7, 2025, the Debtor has received approximately $9.3415 million from PTS and PTM.  The

6    Debtor's most recent MOR is attached to the Index as **Exhibit 76.**

7         The Debtor's net positive performance is projected to continue after the Plan is confirmed.

8    Attached to the Index as **Exhibit 1** are the Debtor's projections of its post-Effective Date

9    operations through the term of the Plan.  With the exception Year 1, in which significant accrued

10   restructuring costs are expected to be paid, the Reorganized Debtor is projected to generate net

11   income on an annual basis.  (*See* Ex. 1 at 2 of 18.)  The Reorganized Debtor's projected net

12   income, in large part, is due to the expected amounts from PTS and PTM.  The Reorganized

13   Debtor's sales are projected to remain steady at just under $8 million per year.  (*See id.*)  The

14   Debtor's projected decline in annual tree service revenue from 2025 to 2026 is due to the exclusion

15   of work from FEMA, which is tied to disaster relief.  The Reorganized Debtor is projected to

16   receive management fees and equipment rent from PTS and PTM in the amount of approximately

17   $10.8 million and $720,000, respectively, per year.  (*See id.*)  The Reorganized Debtor is also to

18   receive significant annual distributions from PTS, which are projected to collectively exceed $14.5

19   million over the term of the Plan.  (*See id.* at 8 of 18; *see also* Ex. 2 at 8 of 10.)  PTS is projected

20   to repay the PTS Loan less than one yearwithin two years after the Effective Date.  (*See Ex. 2 at 8*

21   *of 10.*)

22        The Debtor's assets and their estimated values are discussed in the Liquidation Analysis

23   attached to the Index as **Exhibit 3.**

24        **H.    Steps Taken to Resolve Financial Problems**

25        The Debtor's financial distress was caused by a loss of revenues, resulting in outsized

26   expenses, the financial drain from pending litigation, and the threat of business disrupting

27   judgment collection.  Due to the Debtor's decline in revenues, its funded debt was not sustainable

28   without the restructuring a bankruptcy plan can provide.

Beginning pre-petition, the Debtor initiated a number of strategic actions to right-size operations consistent with its reduced revenue as discussed above. This process has continued post-petition. The Debtor rejected leases for unnecessary equipment and continued to fine tune its operations in order to generate positive cash flow. The Debtor has continued its efforts to secure new customers. The Debtor's post-petition tree service revenues include work from new customers secured in 2024. In addition, as discussed above, the Debtor is collecting on the pre-petition loans owed by PTS and PTM. The Debtor is receiving meaningful weekly payments from PTS and PTM on account of management fees and equipment rent. Due to these efforts, the Debtor has increased its cash on hand during this Case. The filing of the Case also halted litigation and the cash burn related thereto, allowing the Debtor to focus on its rehabilitation. The Plan provides a mechanism for preserving the Debtor's operations and the value of the Debtor's business.

The Plan enables the Debtor to restructure its secured debt on economically viable terms based on the Debtor's current and projected receipts. Following the Effective Date, the Reorganized Debtor will continue to receive substantial sums from PTS and PTM.

## III.    **PLAN SUMMARY**

The following is a summary of the Plan's material provisions.

### A.    **The Plan Provides for a Reorganization of the Debtor and Its Affairs**

The Plan is a reorganizing plan. Distributions to the Holders of Allowed Secured Claims will be made by the Reorganized Debtor. Distributions to the Holders of Allowed Unsecured Claims will be made by the Plan Trust. No Distributions will be made to the Holders of any Disputed Claims unless and until they become Allowed Claims.

### B.    **What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right of priority. The Plan states whether each Class of Claims or Interests is impaired or unimpaired. The Plan provides the treatment each Class will receive. In no event shall any creditor receive more than the creditor's Allowed Claim.

24

C.    **Allowance and Treatment of Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the following claims in a class:

1.    **Administrative Claims**

Administrative Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under § 507(a)(2) of the Bankruptcy Code. The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following chart lists all the Debtor's estimated § 507(a)(2) administrative claims and their treatment under this Plan:

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtor, including Administrative Tax Claims | Varies by day | Unless the Debtor objects to an Ordinary Course Administrative Claim, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of the Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |
| Clerk's Office | $0 | Any outstanding Clark's Office fees will be paid in full on the Effective Date from the cash of the Debtor. |
| OUST Fees | $0 | Any outstanding OUST Fees will be paid in full on the Effective Date from the cash of the Debtor. |
| Administrative Tax Claims | $0 | Unless the Debtor objects to an Administrative Tax Claim, each Administrative Tax Claim shall be allowed and paid in the ordinary course of the Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any |

25

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| | | Request for Payment of its Claim. |

| Professional Fee Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed[5]** | **Treatment** |
| Raines Feldman Littrell LLP, general bankruptcy counsel | $~~630~~~~1,200~~,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Grobstein Teeple LLP | $60,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Force Ten Partners, LLP | $~~1,000~~430,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Examiner | $~~150~~250,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Elkins Kalt Weintraub Reuben Gartside, LLP | $250,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| **Total** | $1,622~~,410~~,000 | |

The following applies to Administrative Claims asserted against the Estate:

---

[5]    These amounts are only estimates (including future estimates as of confirmation) and are subject to change. The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower.

26

### a.    <u>Ordinary Course Administrative Claims</u>

Unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim. However, any request for payment, or motion to allow a Claim as an Ordinary Course Administrative Claim must be filed with the Bankruptcy Court and served on the Reorganized Debtor and the OUST by no later than sixty (60) days after the Effective Date.

### b.    <u>Non-Ordinary Course Administrative Claims</u>

A Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor to the extent that it is allowed by the Bankruptcy Court only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both files with the Bankruptcy Court a request for allowance and payment of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel for the Reorganized Debtor and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows the Non-Ordinary Course Administrative Claim.

Any party-in-interest, including, but not limited to, the Reorganized Debtor, may file an objection to such a request for payment within the time provided by the Bankruptcy Rules or within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course Administrative Claims who do not timely file and serve a request for payment will be forever barred from asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estate, the Debtor, the Reorganized Debtor, the Plan Trust, the Plan Trustee, or their respective assets.

### c.    <u>Professional Fee Claims</u>

A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the

27

1    Effective Date (or such further date if extended by Court order), the Person holding the

2    Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and

3    payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of

4    the Bankruptcy Court. The Reorganized Debtor or any other party-in-interest may file an objection

5    to such an application within the time provided by the Bankruptcy Rules or within any other

6    period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do

7    not timely file and serve an application for allowance and payment will be forever barred from

8    asserting these Claims against the Estate, the Debtor, the Reorganized Debtor, the Plan Trust, the

9    Plan Trustee, or their respective assets.

10                  **2.    Priority Tax Claims**

11        Priority Tax Claims include certain unsecured income, sales, employment, and other taxes

12    described by section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each

13    holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in

14    deferred cash payments, over a period not exceeding five years from the order for relief, unless the

15    holder agrees to a different treatment.

16        The following charts list the Debtor's known section 507(a)(8) Priority Tax Claims and

17    their treatment under the Plan:

| Priority Tax Claims | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| California Department of Tax and Fee Administration ("**CDTFA**") | Claim Amount: $~~269~~1,496.00 per ~~Schedules~~Proof of Claim No. 161-1 filed by the CDTFA<br><br>Priority Claim Amount: $1,496~~269~~.00 per Proof of Claim No. 161- filed by the CDTFA~~Schedules~~ | Any Allowed Priority Tax Claim of the CDTFA will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the CDTFA is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Debtor shall have the right to prepay any Allowed Priority Tax Claim of the CDTFA in full at any |

28

| Priority Tax Claims | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | time and without penalty or fee, in its sole and absolute discretion. Any Allowed Claim of the CDTFA will receive the treatment afforded to Allowed Claims in Class 16. |
| Internal Revenue Service ("**IRS**") | Claim Amount: $0.00[6]63,589.17 per Proof of Claim 37-1 Priority Claim Amount: $0.0063,589.17 per Proof of Claim 37-1 | The proof of claim filed by the IRS, Proof of Claim 37-1, is for payroll taxes for the tax period ending December 31, 2024. Because those taxes have been paid, the IRS will not receive a further recovery on the Claim it asserts through Proof of Claim 37-1. Excluding the Claim asserted through Proof of Claim 37-1, any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. The Debtor shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in its sole and absolute discretion. Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| State of Florida – Department of Revenue ("**State of Florida**") | Claim Amount: $14.00 per Proof of Claim 142-1 Priority Claim Amount: $14.00 per Proof of Claim 142-1 | Any Allowed Priority Tax Claim of the State of Florida will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax |

---

[6]   The IRS filed Proof of Claim 37-1 in the amount of $63,589.17.  However, this sum was paid.

29

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.110585253.110585144.110466262.1                              Exhibit 1, Page 41

| Priority Tax Claims | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | Claim of the State of Florida is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Debtor shall have the right to prepay any Allowed Priority Tax Claim of the State of Florida in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the State of Florida in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief. Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

**D.    Allowance and Treatment of Classified Claims and Interests**

**1.    Summary of Classes**

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. The chart below lists Classes of Claims and Interests established under the Plan and indicates whether the Class is impaired or unimpaired by the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable,

30

and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| Summary of Classes | |
| --- | --- |
| Class | Claimant(s) |
| 1 | Secured Claim of PNC Bank, N.A. |
| 2 | Secured Claim of Jacobus Pino |
| 3 | Secured Claim of Albach Finanz AG |
| 4 | Secured Claim of Ally Bank |
| 5 | Secured Claim of Altec Capital Services, LLC |
| 6 | Secured Claim of FNB |
| 7a and b | Secured Claim of Pathward, National Association |
| 8 | Secured Claim of U.S. Bank Equipment Finance |
| 9 | Secured Claim of Bank of America, N.A. |
| 10 | Secured Claim of Ford Motor Credit Company, LLC |
| 11 | Secured Claim of General Motors |
| 12 | Secured Claim of John Deere |
| 13 | Secured Claim of ~~Samara Equipment~~Hanmi Bank |
| 14 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 15 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 16 | General Unsecured Claims |
| 17 | Sierra Bank |
| 18~~7~~ | Subordinated Insider Claims |
| 19~~8~~ | Interest Holder |

## 2.    Secured Claims

Secured Claims are Claims secured by valid liens on property of the Estate.

### a.    Secured Claim of PNC Bank

| Secured Claim of PNC Bank | | | | |
| --- | --- | --- | --- | --- |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | PNC Bank, N.A.<br><br>• Collateral: the PNC Collateral<br><br>• Total Claim Amount: $7,038,514.41 as of the Petition Date per the Cash Collateral Stipulation.<br><br>• Interest Rate: 6.57% | N | Y | PNC shall have an Allowed Secured Claim on the Effective Date in the amount that PNC is owed on such date under the PNC Loan Documents, inclusive of~~ any~~ interest at the non-default rate of 6.57% and reasonable costs and attorney's fees that accrue prior to the Effective Date and to which PNC is entitled in accordance with the terms of the PNC Loan Documents, the Cash Collateral Stipulation, and 11 U.S.C. § 506(b), less any recoveries, including Other Recoveries, and payments received by PNC before or after the Effective Date (the "**Allowed PNC Secured Claim**"). ~~—~~The Debtor projects that the Allowed PNC Secured Claim will total approximately $5,020,481 ~~6,386,587.68~~ as of the Effective |

31

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION    Exhibit 1, Page 43
10585253.1 10585253.1 10585141.1 10468262.1

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Date.[7] The Reorganized Debtor shall pay the PNC Secured Claim in full as follows: |
| | | | | **A.  Effective Date Payment**:  Within ten (10) Business Days after the Effective Date, the Reorganized Debtor shall make a payment to PNC on account of the PNC Secured Claim in the amount of $2,000,000 (the "**PNC Effective Date Payment**"). |
| | | | | **B.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the PNC Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $134,584.34 (a "**PNC Monthly Payment**"). |
| | | | | **C.  Maturity Date**:  The Reorganized Debtor shall pay the PNC Secured Claim in full by the date that is ~~three~~ two (~~3~~2) years after the Effective Date (the "**PNC Maturity Date**"). |
| | | | | **D.  Interest Rate**: 6.57% per annum simple interest. |
| | | | | **E.  Other Recoveries**.  If and to the extent that PNC receives any Other Recoveries on account of the PNC Secured Claim, then the PNC Secured Claim as to the Reorganized Debtor shall be automatically reduced accordingly by the amount of such Other Recoveries. |
| | | | | **F.  Default**:  If the Reorganized Debtor fails to make the PNC Effective Date Payment or a PNC Monthly Payment to PNC when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by PNC to the Reorganized Debtor and its counsel (collectively, an "**Uncured PNC Default**"), then PNC may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the PNC Collateral permitted under the PNC Loan Documents.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **G.  Plan Controls**:  If and to the extent that there is a conflict between the PNC Loan Documents and the Plan, the Plan shall control. |
| | | | | **H.  Lien**.  PNC shall retain the PNC Security Interests in the PNC Collateral in and to the same |

---

[7]  This is the amount the Debtor projects the PNC balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

32

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | extent, validity, and priority as of the Petition Date pending payment of the Allowed PNC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed PNC Secured Claim, PNC's Security Interests shall be released and the Reorganized Debtor shall retain title to the PNC Collateral free and clear of the PNC Security Interests. <br><br> The treatment proposed herein shall be in full settlement and satisfaction of the PNC Secured Claim. |

**b.    Secured Claim of Jacobus Pino**

| Secured Claim of Jacobus Pino | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2 | Jacobus Pino <br><br> • Collateral: Ownership interests in PTS <br><br> • Total Claim Amount: $167,673.76 as of the Petition Date per Schedules <br><br> • Interest Rate: 0.75% | N | Y | Jacobus Pino asserts a Claim in the amount of $167,007 on account of the remaining balance owed on the Pino Note (the **"Pino Claim"**).  As a compromise, including Pino waiving and releasing as of the Effective Date (i) any interest or fees to which Pino asserts he is entitled under the PTS Transaction Documents, and (ii) any right to assert that he is entitled to any portion of the Debtor's ownership interests in PTS, the Reorganized Debtor shall pay the Pino Claim in full as follows: <br><br> **A.  Monthly Payments:** Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Pino Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $21,~~047.15~~075.10.  The Pino Claim shall be paid in six (6) equal monthly payments of $21,~~047.15~~075.10.  The Pino Claim shall not accrue interest on or after the Effective Date. <br><br> **B.  Plan Controls**:  If and to the extent that there is a conflict between the PTS Transaction Documents and the Plan, the Plan shall control. <br><br> **C.  Lien**.  Any valid, enforceable, perfected, and unavoidable lien(s) held by Pino in any assets of the Estate shall be retained by Pino in and to the same extent, validity, and priority as of the Petition Date pending payment of the Pino Claim in full as provided herein. Upon full satisfaction of the Pino Claim, any and all liens of Pino on assets of the Reorganized Debtor shall be released and the |

| | | | | Secured Claim of Jacobus Pino |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Reorganized Debtor shall retain title to such assets free and clear of Pino's liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Pino Claim. |

### c.    <u>Secured Claims Related to Vehicles or Equipment</u>

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 3 | Albach Finanz AG<br><br>• Collateral: the "Machine" as defined in Exhibit A of Albach's proof of claim, Claim No. 144-1 (the "**Albach Collateral**")<br><br>• Total Claim Amount: $81,500.00 (projected as of the Effective Date) | N | Y | Class 3 consists of the Secured Claim of Albach Finanz AG ("**Albach**").  The Claim of Albach arises from the Operate Lease Agreement attached as Exhibit A (the "**Albach Agreement**") to its Proof of Claim No. 144-1.  The treatment herein is for all Claims asserted by Albach.<br><br>Albach shall have an Allowed Secured Claim in the collective amount of $81,500 as of the Effective Date, based on the net present value of the future payments due under the Albach Agreement, as calculated by the Debtor (the "**Allowed Albach Secured Claim**").[8]  Under no circumstances shall Albach receive more than the Allowed Albach Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Albach Secured Claim arising thereunder shall be paid as follows:<br><br>**A.  <u>Monthly Payments</u>**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall make a payment in the amount of $1,458.56 (an "**Albach Monthly Payment**").<br><br>**B.  <u>Maturity Date</u>**:  The Reorganized Debtor shall pay the Albach Secured Claim in full by the date that is five (5) years after the Effective Date (the "**Albach Maturity Date**").<br><br>**C.  <u>Purchase Options</u>**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to the Albach Secured Claim in the Albach Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized |

---

[8]    This is the amount the Debtor projects the collective Albach balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| colspan=5 | **Secured Claims Related to Vehicles or Equipment** | | | |

| | | | | Debtor shall be permitted to exercise such rights by the Albach Maturity Date. |
| | | | | **D.** **Interest Rate**: 2.84% per annum simple interest. |
| | | | | **E.** **Default**: Upon the Effective Date, the Albach Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make any Albach Monthly Payment on the Albach Secured Claim to Albach when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Albach to the Reorganized Debtor and its counsel (collectively, an "**Uncured Albach Default**"), then Albach may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to collateral securing the Albach Secured Claim permitted under the Albach Agreement. The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.** **Plan Controls**: If and to the extent that there is a conflict between the Albach Agreement and the Plan, the Plan shall control. |
| | | | | **G.** **Lien**. Any valid, enforceable, perfected, and unavoidable lien held by Albach in the Albach Colllateral shall be retained by Albach in and to the same extent, validity, and priority as of the Petition Date pending payment of the Albach Secured Claim in full as provided herein. Upon full satisfaction of the Albach Secured Claim, any and all liens of Albach on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the Albach Secured Claim. |
| 4 | Ally Bank<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $286,630.90 ~~295,486.77~~ (projected as of the Effective Date) | N | Y | Class 4 consists of the Secured Claims of Ally Bank ("**Ally**"). The Claims of Ally arise from various loan agreements with the Debtor, each of which was secured by a particular vehicle (each, an "**Ally Agreement**" and collectively, the "**Ally Agreements**"). The treatment herein is for all Claims asserted by Ally.<br><br>Ally shall have an Allowed Secured Claim in the collective amount of $286,630.90 ~~295,486.77~~ as of the Effective Date, based on the net present value of the future payments due under the Ally Agreements, as calculated by the Debtor (the |

35

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | "**Allowed Ally Secured Claim**").[9]  Under no circumstances shall Ally receive more than the Allowed Ally Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ally Secured Claim shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Ally Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $5,~~613.75~~,445.50 (an "**Ally Monthly Payment**").<br><br>**B.  Maturity Date**:  The Reorganized Debtor shall pay the Allowed Ally Secured Claim in full by the date that is five (5) years after the Effective Date (the "**Ally Maturity Date**").<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of vehicles or equipment under the Ally Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based by the Ally Maturity Date.<br><br>**D.  Interest Rate**: 5.28% blended rate per annum simple interest.<br><br>**F.  Default**:  Upon the Effective Date, the Ally Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a Ally Monthly Payment on the Allowed Ally Secured Claim to Ally when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ally to the Reorganized Debtor and its counsel (collectively, an "**Uncured Ally Default**"), then Ally may file and serve a motion with the Bankruptcy Court to  obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ally Agreement and serving as Ally's collateral as permitted under the Ally Agreements.  The Reorganized Debtor shall have the right to oppose such motion. |

---

[9]    This is the amount the Debtor projects the collective Ally balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

36

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION          Exhibit 1, Page 48
10585253.1.10585253.110585111.110466262.1

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| **Class** | **Description** | **Insiders (Y/N)** | **Impaired (Y/N)** | **Treatment** |
| | | | | **G. Plan Controls**: If and to the extent that there is a conflict between the Ally Agreements and the Plan, the Plan shall control. **H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ally in any assets of the Estate to secure the Allowed Ally Secured Claim shall be retained by Ally in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Ally Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ally Secured Claim, any and all liens of Ally on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of Ally's liens. The treatment proposed herein shall be in full settlement and satisfaction of the Ally Secured Claims. |
| 5 | Altec Capital Services, LLC • Collateral: Various equipment • Total Claim Amount: $9,068,099.33 4,816,724.31 (projected as of the Effective Dateinclusive of all future amounts due under the Altec Agreements) | N | Y | Class 5 consists of the Secured Claim(s) of Altec Capital Services, LLC ("**Altec**"). The Secured Claims of Altec arise from the agreements listed in Exhibit C to the Plan Support Agreement between MTS and Altec (each, an "**Altec Agreement**" and collectively, the "**Altec Agreements**"). The treatment herein is for all Claims asserted by Altec, including, without limitation, the Claims for which Altec is the servicer. The vehicles and other equipment subject to the Altec Agreements shall be referred to herein as the "**Altec Equipment**." The Plan Support Agreement between MTS and Altec shall be referred to herein as the "**Altec PSA**" and Exhibit B to the Altec PSA shall be referred to herein as the "**Altec Payment Schedule**." Altec shall have an Allowed Secured Claim in the amount of $9,068,099.33 as of July 1, 2025, less the payments made by the Debtor on July 1, 2025 and thereafter (the "**Allowed Altec Secured Claim**").[10] Under no circumstances shall Altec receive more than the Allowed Altec Secured Claim with interest after the Effective Date as provided herein. **A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall |

---

[10]   This sum is inclusive of all payments due in the future under the Altec Agreements.

37

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | make "Altec Monthly Payments" set forth in the Altec Payment Schedule due for such month under the corresponding Altec Agreements identified in the Altec Repayment Schedule (by Document #), and the Reorganized Debtor shall continue making such Altec Monthly Payments set forth in the Altec Payment Schedule each calendar month thereafter by the fifth (5th) of each such calendar month until such Altec Monthly Payments in the Altec Payment Schedule are completed (by corresponding Altec Agreement).  The Altec Monthly Payments required herein and reflected in the Altec Payment Schedule shall each be referred to as an "**Altec Monthly Payment**."  For avoidance of doubt, the Reorganized Debtor will not be required to make a payment set forth under the Altec Payment Schedule that was made prior to the Effective Date pursuant to the Altec PSA.

**B.  Residual Payments**:  Any "TRAC Amounts" or similar residual payments due under an Altec Agreement (each, a "**Residual Amount**") that became due and are unpaid as of the Effective Date shall be paid in full within thirty (30) days after the Effective Date or, at the Reorganized Debtor's election, which shall be provided to Altec before the expiration of such 30-day period, by the Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any Residual Amount under an Altec Agreement that becomes due after the Effective Date shall be paid by the date that is thirty (30) days after the Altec Maturity Date for such Altec Agreement (as defined below) or, at the Reorganized Debtor's election, which shall be provided to Altec before the expiration of such Altec Maturity Date, by the Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any "holdover" payments under an Altec Agreement (*i.e.*, monthly payments to Altec should term of such Altec Agreement extend for monthly holdover periods) by the Reorganized Debtor under an Altec Agreement shall reduce the "TRAC Amount" or similar residual amount due under such Altec Agreement.

The Reorganized Debtor shall pay any sales taxes and/or "sundries" due to Altec under any Altec Agreement as of the Petition Date and unpaid within sixty (60) days of the Effective Date.  Any sales taxes and/or sundries due under any Altec |

38

| | | Secured Claims Related to Vehicles or Equipment | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Agreement after the Effective Date shall be billed by Altec and paid by the Reorganized Debtor in the ordinary course and as provided under such Altec Agreement.<br><br>**C. Maturity Date**: With respect to each Altec Agreement, the maturity date, expiration date, "Interim Rent Cutoff Date," or similar end date with respect to such Altec Agreement shall be the "Maturity Date" set forth in the Altec Payment Schedule for such Altec Agreement (the "**Altec Maturity Date**").<br><br>**D. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of Altec Equipment under an Altec Agreement, including, without limitation, at or upon the Altec Maturity Date of such Altec Agreement, and the disposition of the proceeds related thereto are preserved for the Reorganized Debtor and the Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement.<br><br>The payment(s) by the Reorganized Debtor to Altec of Residual Amount due under an Altec Agreement in full shall be deemed the exercise by the Reorganized Debtor of its right to purchase the Altec Equipment under such Altec Agreements and, upon such payment(s), and the Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, such Altec Equipment. Upon such payment(s), Altec shall transfer title of such Altec Equipment to the Reorganized Debtor and the Reorganized Debtor and Altec shall execute such documents as necessary to accomplish the same.<br><br>**E. Interest Rate**: 6.98% blended rate per annum simple interest for Altec Secured Claims.<br><br>**F. Default**: Upon the Effective Date, the Altec Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to pay, when due herein, an Altec Monthly Payment under an Altec Agreement or a Residual Amount, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the Reorganized Debtor and its counsel (collectively, an "**Uncured Altec Default**"), then Altec shall be entitled to exercise its rights to repossession as to the particular Altec Equipment subject to such Altec Agreement and |

| | | | Secured Claims Related to Vehicles or Equipment | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | such Uncured Altec Default as permitted under such Altec Agreement. |
| | | | | **G.  Plan Controls**:  If and to the extent that there is a conflict between the Altec Agreements and the Plan, the Plan shall control. |
| | | | | **H.  Lien**:  With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.  Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | **I.  No Admission**.  Treatment set forth herein for Altec reflects a compromise between MTS and Altec and is without any admission as to either MTS or Altec as to whether the Altec Agreements are true leases or capital leases. |
| | | | | **J.  Assignment**.  Altec retains its rights to assign under the Altec Agreements; provided, however, any such assignment shall remain subject to the Plan, including, without limitation, the treatment herein for Altec. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Altec, in its individual capacity and as servicer. |
| | | | | ~~Class 5 consists of the Secured Claims of Altec. The Claims of Altec arise from various equipment leases or financing agreements between the Debtor and Altec (each, an "**Altec Agreement**" and collectively, the "**Altec Agreements**").  The treatment herein is for all Claims asserted by Altec, including, without limitation, Claims for which Altec is the servicer.~~ |
| | | | | ~~Altec shall have an Allowed Secured Claim in the collective amount of $4,011,253.23~~4,816,724.31 ~~as of the Effective Date, based on the net present value of the future payments due under the Altec Agreements, as calculated by the Debtor (the~~ |

40

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | "**Allowed Altec Secured Claim**").[11]  Under no circumstances shall Altec receive more that the Allowed Altec Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each Altec Agreement, Altec's Secured Claim arising thereunder (each, an "**Altec Secured Claim**") shall be paid as follows:<br><br>**A. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Altec Agreement for such Altec Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue making such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Altec Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an "**Altec Monthly Payment.**"<br><br>**B. Maturity Date**:  Any maturity date or expiration date with respect to such Altec Secured Claim in the corresponding Altec Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Altec Monthly Payment required by such Altec Agreement (the "**Altec Maturity Date**") and any lump sum payment due by the  Reorganized Debtor under such Altec Agreement upon the Altec Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Altec Agreement and subject to Paragraph C. below.<br><br>**C. Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such Altec Secured Claim in the corresponding Altec Agreement, including, without limitation, at the Altec Maturity Date in such Altec Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement. |

---

[11]  This is the amount the Debtor projects the collective Altec balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

41

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | D.  Interest Rate: 76.98.6% blended rate per annum simple interest for Altec Secured Claims. <br><br> E.  Default:   Upon the Effective Date, each Altec Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make an Altec Monthly Payment on an Altec Secured Claim to Altec when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the Reorganized Debtor and its counsel (collectively, an "Uncured Altec Default"), then Altec may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as Altec's collateral that is the subject to the Uncured Altec Default permitted under the subject Altec Agreement.  The Reorganized Debtor shall have the right to oppose such motion. <br><br> F.  Plan Controls:  If and to the extent that there is a conflict between the Altec Agreements and the Plan, the Plan shall control. <br><br> G.  Lien:  With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.  Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. <br><br> The treatment proposed herein shall be in full settlement and satisfaction of the Altec Secured Claims. |
| 6 | FNB Equipment Finance <br><br> • Collateral: Various equipment <br><br> • Total Claim Amount: $73,361.34 91,845.49 | N | Y | Class 6 consists of the Secured Claims of FNB Equipment Finance ("**FNB**").  The Claims of FNB arise from various equipment leases or financing agreements between the Debtor and FNB or FNB's predecessor in interest (each, an "**FNB Agreement**" and collectively, the "**FNB Agreements**").  The treatment herein is for all Claims asserted by FNB. |

42

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | (projected as of the Effective Date) | | | FNB shall have an Allowed Secured Claim in the collective amount of $73,361.3491,845.49 as of the Effective Date based on the net present value of the future payments due under the FNB Agreements, as calculated by the Debtor (the "**Allowed FNB Secured Claim**").[12]  Under no circumstances shall FNB receive more than the FNB Allowed Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each FNB Agreement, FNB's Secured Claim arising thereunder (each, an "**FNB Secured Claim**") shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the FNB Agreement for such FNB Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such FNB Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an "**FNB Monthly Payment**".<br><br>**B.  Maturity Date**:  Any maturity date or expiration date with respect to such FNB Secured Claim in the corresponding FNB Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final FNB Monthly Payment required by such FNB Agreement (the "**FNB Maturity Date**") and any lump sum payment due by the  Reorganized Debtor under such FNB Agreement upon the FNB Maturity Date shall be made at such time as extended herein and in accordance with the terms of such FNB Agreement and subject to Paragraph C. below.<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such FNB Secured Claim in the corresponding FNB Agreement, including, without limitation, at the FNB Maturity Date in such FNB Agreement, and the disposition of the |

---

[12]    This is the amount the Debtor projects the collective FNB balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

43

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| <u>Class</u> | <u>Description</u> | <u>Insiders</u><br>(Y/N) | <u>Impaired</u><br>(Y/N) | <u>Treatment</u> |
| | | | | proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the FNB Maturity Date for such FNB Agreement.<br><br>**D.  Interest Rate**: 6.25% blended rate per annum simple interest for all FNB Secured Claims.<br><br>**E.  Default**:  Upon the Effective Date, each FNB Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make an FNB Monthly Payment on an FNB Secured Claim to FNB when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by FNB to the Reorganized Debtor and its counsel (collectively, an **"Uncured FNB Default"**), then FNB may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as FNB's collateral that is the subject of the Uncured FNB Default permitted under the subject FNB Agreement.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the FNB Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  With respect to each FNB Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by FNB in any assets of the Estate to secure such FNB Secured Claim shall be retained by FNB in and to the same extent, validity, and priority as of the Petition Date pending payment of such FNB Secured Claim in full as provided herein. Upon full satisfaction of such FNB Secured Claim, any and all lien of FNB securing such FNB Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the FNB Secured Claims. |
| 7a | Pathward, National Association<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $651,124 ~~400,079.03~~ | N | Y | Class 7a consists of the Secured Claim of Pathward, N.A. ("Pathward"), based on the agreements acquired by Pathward from Altec Capital Services, LLC, specified at Page 4 of 90 of Proof of Claim No. 156-1 filed by Pathward (each, a "Pathward Agreement" and collectively, the "Pathward Agreements").  The treatment herein |

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | (projected as of the Effective Date), plus attorneys' fees and costs as provided herein. | | | is for any and all Claims asserted by Pathward, excluding the Claim of Pathward treated in Class 7b. |

Column-flow treatment text:

**A. The Pathward Claim**. Pathward shall have an Allowed Secured Claim based on the Pathward Agreements in the amount of all due but unpaid "Basic Rental Payments" under the Pathward Altec Agreements and all "TRAC Amounts" due under the Pathward Agreements, less payments made by MTS, including after the Petition Date, plus attorney's fees to which Pathward is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $112,500 (the **Allowed Pathward Secured Claim**").[13]

**B. Payment of the Pathward Claim**. The Allowed Pathward Secured Claim will be paid in full within in fifteen (15) calendar days after the Effective Date (the "**Pathward Payment Date**"); *provided*, *however*, that any "Basic Rental Payments" or "TRAC Amount" that are to become due under Pathward Agreement #767-15 (the "**December Pathward Contract**") after the Payment Date (the "**December Pathward Amount**") shall be paid by the Reorganized Debtor on the date set forth in the December Pathward Contract and in full by December 31, 2025 (the "**Pathward December Payment Date**").

**C. Transfer of Title**. The payment(s) by the Reorganized Debtor to Pathward shall be deemed the exercise by the Reorganized Debtor of its right to purchase the Pathward Equipment under the Pathward Agreements and, upon such payment(s), the Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, the Pathward Equipment. Upon such payment(s), Pathward shall transfer title of the Pathward Equipment to the Reorganized Debtor and shall execute such documents as necessary to accomplish the same.

**D. Default**: Upon the Effective Date, the Pathward Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to pay to Pathward the Allowed Pathward Secured Claim by the Pathward Payment Date or the December Pathward Amount by Pathward December Payment Date,, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward

---

[13]  This is the amount the Debtor projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | to the Reorganized Debtor and its counsel in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be granted relief from the automatic stay in order to exercise its rights of repossession and sale with respect to the Pathward Equipment subject to such Uncured Pathward Default as permitted under the Pathward Agreements and the 14-day say of the FRBP 4001(a)(3) is deemed waived.

**F.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Agreements and the Plan, the Plan shall control.

**G.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure the Allowed Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Pathward Secured Claim in full as provided herein.  Upon full satisfaction of the Allowed Pathward Secured Claim, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.

The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward, excluding the Claim treated in Class 7b.

Class 7 consists of the Secured Claims of Pathward, National Association ("**Pathward**").  The Claims of Pathward arise from various agreements for certain vehicles and equipment between the Debtor and Pathward's predecessor in interest (each, a "**Pathward Agreement**" and collectively, the "**Pathward Agreements**").  The treatment herein is for all Claims asserted by Pathward.

Pathward shall have an Allowed Secured Claim in the amount of $430,502.04 400,079.03 as of the Effective Date, based on the net present value of the future payments due under the Pathward Agreements as calculated by the Debtor (the "**Allowed Pathward Secured Claim**").[14]  Under no circumstances shall Pathward receive more than the Allowed Pathward Secured Claim with interest after the Effective Date as provided herein. |

---

[14]  This is the amount the Debtor projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

46

| | | | | | |
|---|---|---|---|---|---|
| | | Secured Claims Related to Vehicles or Equipment | | | |
| | Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | | As to each Pathward Agreement, Pathward's Secured Claim arising thereunder (each, a "**Pathward Secured Claim**" shall be paid as follows: |
| | | | | | A. **Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Pathward Agreement for such Pathward Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Pathward Agreement, as extended by the Plan. The monthly payments required herein shall each be referred to as a "**Pathward Monthly Payment**." |
| | | | | | B. **Maturity Date**: Any maturity date or expiration date with respect to such Pathward Secured Claim in the corresponding Pathward Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Pathward Monthly Payment required by such Pathward Agreement (the "**Pathward Maturity Date**") and any lump sum payment due by the Reorganized Debtor under such Pathward Agreement upon the Pathward Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Pathward Agreement and subject to Paragraph C. below. |
| | | | | | C. **Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Pathward Secured Claim in the corresponding Pathward Agreement, including, without limitation, at the Pathward Maturity Date in such Pathward Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Pathward Maturity Date for such Pathward Agreement. |
| | | | | | D. **Interest Rate**: 2.0% blended rate per annum simple interest for all Pathward Secured Claims. |
| | | | | | E. **Default**: Upon the Effective Date, each Pathward Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Pathward |

47

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Monthly Payment on a Pathward Secured Claim to Pathward when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel (collectively, an "**Uncured Pathward Default**"), then Pathward may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Pathward's collateral that is the subject of the Uncured Pathward Default permitted under the subject Pathward Agreement.  The Reorganized Debtor shall have the right to oppose such motion.  **G.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Agreements and the Plan, the Plan shall control.  **H.  Lien**:  With respect to each Pathward Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure such Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of such Pathward Secured Claim in full as provided herein. Upon full satisfaction of such Pathward Secured Claim, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.  The treatment proposed herein shall be in full settlement and satisfaction of the Pathward Secured Claims. |
| 7b | Pathward, National Association  • Collateral: Samsara equipment  • Total Claim Amount: $0.00 | N | Y | Class 7b consists of the Secured Claim of Pathward based on the agreement between the Debtor and Samsara attached to Proof of Claim No. 157-1 filed by Pathward (the "**Pathward Samsara Agreement**").  The equipment subject to the Pathward Samsara Agreement shall be referred to herein as the "**Samsara Equipment**."  The treatment herein is for all Claims asserted by Pathward under the Samsara Agreement.  **A.  Payment of the Pathward Claim**.  On and after the Effective Date, the Reorganized Debtor shall make the periodic payments required by the Pathward Samsara Agreement on dates required by the Pathward Samsara Agreement until the last periodic payment is made ("Samsara Payments"). |

48

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **C. Default**: Upon the Effective Date, the Pathward Samsara Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Samsara Payment when due under the Pathward Samsara Agreement, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be granted relief from the automatic stay in order to exercise its rights of repossession and sale solely with respect to the Samsara Equipment as permitted under the Pathward Samsara Agreement and the 14-day say of the FRBP 4001(a)(3) is deemed waived.<br><br>**E. Plan Controls**: If and to the extent that there is a conflict between the Pathward Samsara Agreement and the Plan, the Plan shall control.<br><br>**F. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure the Debtor's obligations under the Pathward Samsara Agreement shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending the Reorganized Debtor completing the periodic payments under the Pathward Samsara Agreement as provided herein. Upon full satisfaction of such payments, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward under the Pathward Samsara Agreement. The treatment in Classes 7a and 7b shall be in full settlement and satisfaction of any and all Claims of Pathward. |
| 8 | U.S Bank Equipment Finance<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $26,981.20 ~~50,160.65~~ | N | Y | Class 8 consists of the Secured Claims of U.S. Bank Equipment Finance ("**US Bank**"). The Claims of US Bank arise from various finance agreements between the Debtor and US Bank or US Bank's predecessor in interest (each, a "**US Bank Agreement**" and collectively, the "**US Bank Agreements**"). The treatment herein is for all Claims asserted by US Bank. |

49

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | (projected as of the Effective Date) | | | US Bank shall have an Allowed Secured Claim in the collective amount of $26,981.20 50,160.65 as of the Effective Date, based on the net present value of the future payments due under the US Bank Agreements, as calculated by the Debtor (the "**Allowed US Bank Secured Claim**").[15]  Under no circumstances shall US Bank receive more than the Allowed US Bank Secured Claim with interest after the Effective Date as provided herein. |
| | | | | As to each US Bank Agreement, US Bank's Secured Claim arising thereunder (each a "**US Bank Secured Claim**") shall be paid as follows: |
| | | | | **A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under US Bank Agreement for such US Bank Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such US Bank Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an (a "**US Bank Monthly Payment**"). |
| | | | | **B.  Maturity Date**:  Any maturity date or expiration date with respect to such US Bank Secured Claim in the corresponding US Bank Agreement shall be extended to the calendar month after the Reorganized Debtor makes the US Bank Altec Monthly Payment required by such US Bank Agreement (the "**US Bank Maturity Date**") and any lump sum payment due by the Reorganized Debtor under such US Bank Agreement upon the US Bank Maturity Date shall be made at such time as extended herein and in accordance with the terms of such US Bank Agreement and subject to Paragraph C. below. |
| | | | | **C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such US Bank Secured Claim in the corresponding US Bank Agreement, including, without limitation, at the US Bank Maturity Date |

---

[15]   This is the amount the Debtor projects the collective US Bank balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

50

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | in such US Bank Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the US Bank Maturity Date for such US Bank Agreement. **D. Interest Rate**: 6.57% blended rate per annum simple interest for all US Bank Secured Claims. **E. Default**:  Upon the Effective Date, each US Bank Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a US Bank Monthly Payment on a US Bank Secured Claim to US Bank when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by US Bank to the Reorganized Debtor and its counsel (collectively, an "**Uncured US Bank Default**"), then US Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment(s) serving as US Bank's collateral that is the subject of the Uncured US Bank Default permitted under the subject US Bank Agreements.  The Reorganized Debtor shall have the right to oppose such motion. **F. Plan Controls**:  If and to the extent that there is a conflict between the US Bank Agreements and the Plan, the Plan shall control. **G. Lien**:  With respect to each US Bank Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by US Bank in any assets of the Estate to secure such US Bank Secured Claim shall be retained by US Bank in and to the same extent, validity, and priority as of the Petition Date pending payment of such US Bank Secured Claim in full as provided herein. Upon full satisfaction of such US Bank Secured Claim, any and all liens of US Bank securing such US Bank Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the US Bank Secured Claims. |
| 9 | Bank of America, N.A. • Collateral: Various equipment | N | Y | Class 9 consists of the Secured Claim of BOA. The Claims of BOA arise from various equipment leases or financing agreements between the Debtor and BOA (each, a "**BOA Agreement**" and |

| Secured Claims Related to Vehicles or Equipment [16] | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Total Claim Amount: $4,663,089.00 6,866,127.94 (projected as of the Effective Date) | | | collectively, the "**BOA Agreements**"). The treatment herein is for all Claims asserted by BOA.<br><br>BOA shall have an Allowed Secured Claim in the collective amount of $4,663,089.00 6,866,127.94 as of the Effective Date, based on the net present value of the future payments due under the BOA Agreements, plus amounts due and unpaid as of the Petition Date under the BOA Agreements, as calculated by the Debtor (the "**Allowed BOA Secured Claim**").[16]  Under no circumstances shall BOA receive more that the Allowed BOA Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each BOA Agreement, BOA's Secured Claim arising thereunder (a "**BOA Secured Claim**") shall be paid as follows:<br><br>A. <u>**Maturity Date**</u>:  The maturity date or expiration date in such BOA Agreement shall be extended to the earlier of (i) the date that is equal to the number of months in which payments under such BOA Agreement have come due and were not made prior to the Effective Date, plus thirty-six (36) months, and (ii) the date that is sixty (60) months from the Effective Date (the "**BOA Repayment Period**").  Any lump sum payment due by the Reorganized Debtor under such BOA Agreement upon or at the end of the BOA Repayment Period shall be made in accordance with the terms of such BOA Agreement and subject to Paragraph C. below.<br><br>B. <u>**Monthly Payments**</u>:  The BOA Secured Claim arising under such BOA Agreement shall be paid in equal monthly installments amortized over the BOA Repayment Period for such BOA Agreement (each, a "**BOA Monthly Payment**").  The Reorganized Debtor shall make the first BOA Monthly Payment on the first Business Day of the first full calendar month after the Effective Date, and the BOA Monthly Payments shall continue each calendar month thereafter during the BOA Repayment Period and until the BOA Repayment Period ends.<br><br>C. <u>**Purchase Options**</u>:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment under such BOA Agreement, including, |

---

[16]   This is the amount the Debtor projects the collective BOA balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

52

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION          Exhibit 1, Page 64
10585253.110585253.110585144.110466262.1

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | without limitation, at the end of the BOA Repayment Period, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights at the time set forth in the BOA Agreement as adjusted and extended based on the BOA Repayment Period. **D.  Interest rate**: 5.47% per annum simple interest. **E.  Default**:   Upon the Effective Date, each BOA Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a BOA Monthly Payment to BOA on account of a BOA Secured Claim when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by BOA to the Reorganized Debtor and its counsel (collectively, a "**Uncured BOA Default**"), then BOA may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicle(s) or equipment subject to the BOA Agreement giving rise to such BOA Secured Claim as permitted under such BOA Agreement.  The Reorganized Debtor shall have the right to oppose such motion. **F.  Plan Controls**:  If and to the extent that there is a conflict between the BOA Agreements and the Plan, the Plan shall control. **G.  Lien**:  With respect to each BOA Secured Claim, any valid, perfected, and unavoidable lien of BOA shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of such BOA Secured Claim in full as provided herein.  Upon full satisfaction of such BOA Secured Claim, BOA's lien securing such BOA Secured Claim shall be released and the Reorganized Debtor shall retain title to the collateral subject to such lien free and clear of such lien. The treatment proposed herein shall be in full settlement and satisfaction of the BOA Secured Claims. |
| 10 | Ford Motor Credit Company, LLC  • Collateral: Various vehicles | N | Y | Class 10 consists of the Secured Claims of Ford Motor Credit Company ("**Ford**").  The Claims of Ford arise from various installment agreements with the Debtor, each of which was secured by a particular vehicle (each, a "**Ford Agreement**" and |

53

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Total Claim Amount: $1,497,964.63~~1,596,788.42~~ (projected as of the Effective Date) | | | collectively, the "**Ford Agreements**"). The treatment herein is for all Claims asserted by Ford.<br><br>Ford shall have an Allowed Secured Claim in the collective amount of $1,497,964.63~~1,596,788.42~~ as of the Effective Date, based on the net present value of the future payments due under the Ford Agreements, as calculated by the Debtor (the "**Allowed Ford Secured Claim**").[17]  Under no circumstances shall Ford receive more than the Allowed Ford Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ford Secured Claims shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, and continuing on the first Business Day of each calendar month thereafter until the Allowed Ford Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $28,338.33~~30,207.87~~ (a "**Ford Monthly Payment**").<br><br>**B.  Maturity Date**:  The Reorganized Debtor shall pay the Allowed Ford Secured Claim in full by the date that is 5 years after the Effective Date (the "**Ford Bank Maturity Date**").<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ford Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the Ford Maturity Date.<br><br>**D.  Interest Rate**: 5.1% blended rate per annum simple interest.<br><br>**E.  Default**:  Upon the Effective Date, the Ford Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a Ford Monthly Payment on the Allowed Ford Secured Claim to Ford when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ford to the Reorganized Debtor and its counsel (collectively, an "**Uncured Ford Default**"), then Ford may file and serve a motion with the Bankruptcy Court to obtain authorization to |

---

[17]  This is the amount the Debtor projects the collective Ford balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

54

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the Ford Agreements and the Plan, the Plan shall control. |
| | | | | **G.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Ford in any assets of the Estate to secure the Allowed Ford Secured Claim shall be retained by Ford in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ford Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ford Secured Claim, any and all liens of Ford securing the Allowed Ford Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ford Secured Claim. |
| 11 | AmeriCredit Financial Services, Inc. dba GM Financial<br><br>• Collateral: various vehicles<br><br>• Total Claim Amount: $121,388.59 (projected as of the Effective Date) | N | Y | Class 11 consists of the Secured Claims of AmeriCredit Financial Services, Inc. dba GM Financial ("**GM**").  The Claims of GM arise from various agreements between the Debtor and GM (each, a "**GM Agreement**" and collectively, the "**GM Agreements**")  The treatment herein is for all Claims asserted by GM.<br><br>GM shall have an Allowed Secured Claim in the collective amount of $121,388.59 as of the Effective Date, based on the net present value of the future payments due under the GM Agreements as calculated by the Debtor (the "**Allowed GM Secured Claim**").[18]  Under no circumstances shall GM receive more than the Allowed GM Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed GM Secured Claim shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first |

---

[18]    This is the amount the Debtor projects the collective GM balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

55

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Business Day of each calendar month thereafter until the Allowed GM Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $2,352.54 (a "**GM Monthly Payment**"). |
| | | | | **B.  Maturity Date**:  The Reorganized Debtor shall pay the Allowed GM Secured Claim in full by the date that is 5 years after the Effective Date (the "**GM Bank Maturity Date**"). |
| | | | | **C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the GM Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the GM Maturity Date. |
| | | | | **D.  Interest Rate**: 6.1% blended rate per annum simple interest. |
| | | | | **E.  Default**:  Upon the Effective Date, the GM Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a GM Monthly Payment on the Allowed GM Secured Claim to GM when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by GM to the Reorganized Debtor and its counsel (collectively, an "**Uncured GM Default**"), then GM may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the GM Installment Agreements and the Plan, the Plan shall control. |
| | | | | **G.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by GM in any assets of the Estate to secure the Allowed GM Secured Claim shall be retained by GM in and to the same extent, validity, and priority as of the Petition Date pending payment of such GM Secured Claim in full as provided herein. Upon full satisfaction of the Allowed GM Secured Claim, any and all liens of GM securing the Allowed GM Secured Claim on assets of the Reorganized Debtor shall be |

56

| | | | Secured Claims Related to Vehicles or Equipment | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the Allowed GM Secured Claim. |
| 12 | John Deere Construction & Forestry Company<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $155,035.68 ~~139,039.60~~ (projected as of the Effective Date), plus attorneys' fees and costs as provided herein. | N | Y | Class 12 consists of the Secured Claims of John Deere Construction & Forestry Company ("**John Deere**")_ ─The Claims of John Deere arise from various equipment agreements between the Debtor and John Deere (each, a "**John Deere Agreement**" and collectively, the "**John Deere Agreements**"). The treatment herein is for all Claims asserted by John Deere.<br><br>John Deere shall have an Allowed Secured Claim in the amount of $155,035.68 ~~139,039.60~~ as of the Effective Date, based on the net present value of the future payments due under the John Deere Agreements, as calculated by the Debtor, plus attorney's fees to with John Deere is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $25,000 (the "**Allowed John Deere Secured Claim**").[19]  Under no circumstances shall John Deere receive more than the Allowed John Deere Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed John Deere Secured Claim shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed John Deere Secured Claim is paid in full, the Reorganized Debtor shall ~~make a payment in the amount of $2,317.33~~resume payments in the amounts set forth in the John Deere Agreements (a "**John Deere Monthly Payment**").<br><br>**B.  Maturity Date**:  The Reorganized Debtor shall pay the Allowed John Deere Secured Claim in full by the date that is ~~5~~1 year~~s~~ after the Effective Date (the "**John Deere Maturity Date**").<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or |

---

[19]   This is the amount the Debtor projects the collective John Deere balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | equipment under the John Deere Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the John Deere Maturity Date.<br><br>**D.  Interest Rate**: 05.0% per annum simple interest.<br><br>**E.  Default**:  Upon the Effective Date, the John Deere Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a John Deere Monthly Payment to John Deere when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by John Deere to the Reorganized Debtor and its counsel (collectively, an **"Uncured John Deere Default"**), then John Deere may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the John Deere Agreements and serving as John Deere's collateral as permitted under the John Deere Agreements.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**G.  Plan Controls**:  If and to the extent that there is a conflict between the John Deere Installment Agreements and the Plan, the Plan shall control.<br><br>**H.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by John Deere in any assets of the Estate to secure the Allowed John Deere Secured Claim shall be retained by John Deere in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed John Deere Secured Claim in full as provided herein. Upon full satisfaction of the Allowed John Deere Secured Claim, any and all liens of John Deere securing the Allowed John Deere Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed John Deere Secured Claim. |
| 13 | Samsara Capital FinanceHanmi Bank<br><br>• Collateral: Various equipment | N | Y | Class 13 consists of the Secured Claims of Samsara Capital FinanceHanmi Bank ("HanmiSamsara").  The Claims of Samsara arise from made multiple equipment loans between the Debtor and Samsara (each, a "Samsara Hanmi |

58

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Total Claim Amount: $~~217,251.13~~158,000.00 (projected s of the Effective Date) | | | "~~Hanmi~~Samsara Agreements").  The treatment herein is for all Claims asserted by ~~Samsara~~Hanmi.

~~Samsara~~ Hanmi shall have an Allowed Secured Claim in the amount of $~~217,251.13~~158,000.00 as of the Effective Date, based on the net present value of the future payments due under the ~~Samsara~~ Hanmi Agreements, as calculated by the Debtor (the "**Allowed ~~Samsara~~ Hanmi Secured Claim**").[20]  Under no circumstances shall ~~Samsara~~ Hanmi receive more than the Allowed **S**Hanmi~~amsara~~ Secured Claim with interest after the Effective Date as provided herein.

As to each Hanmi ~~Samsara~~ Agreement, Hanmi's ~~Samsara's~~ Secured Claim arising thereunder (each, a "**~~Samsara~~ Hanmi Secured Claim**") shall be paid as follows:

**A.  Monthly Payments**:  Beginning on the first Business Day of the second full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until each ~~Samsara~~ Hanmi Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $19,750.10 (a "**~~Samsara~~ Hanmi Monthly Payment**").

**B.  Maturity Date**:  The Reorganized Debtor shall pay the ~~Samsara~~ Hanmi Secured Claims in full by the date that is ~~11~~ 8 months after the Effective Date (the "**~~Samsara~~ Hanmi Maturity Date**").

**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such ~~Samsara~~ Hanmi Secured Claim in the subject ~~Samsara~~ Hanmi Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by on the Hanmi ~~Samsara~~ Maturity Date for such Hanmi ~~Samsara~~ Agreement.

**D.  Interest Rate**: 0.0% per annum simple interest.

**E.  Default**:  Upon the Effective Date, each Samsara Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a ~~Samsara~~ Hanmi Monthly Payment to ~~Samsara~~ Hanmi when |

---

[20]  This is the amount the Debtor projects the collective ~~Samsara~~ Hanmi balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

59

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|  |  |  |  | due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by ~~Samsara~~ Hanmi to the Reorganized Debtor and its counsel (collectively, an "**Uncured ~~Samsara~~ Hanmi Default**"), then ~~Samsara~~ Hanmi may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as ~~Samsara's~~ Hanmi's collateral that is the subject of the Uncured ~~Samsara~~ Hanmi Default permitted under the subject ~~Samsara~~ Hanmi Agreement.  The Reorganized Debtor shall have the right to oppose such motion.  <br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the Hanmi ~~Samsara~~ Agreements and the Plan, the Plan shall control.  <br><br>**G.  Lien**:  With respect to each Hanmi~~Samsara~~ Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by ~~Samsara~~ Hanmi in any assets of the Estate to secure such ~~Samsara~~ Hanmi Secured Claim shall be retained by ~~Samsara~~ Hanmi in and to the same extent, validity, and priority as of the Petition Date pending payment of such ~~Samsara~~ Hanmi Secured Claim in full as provided herein. Upon full satisfaction of such ~~Samsara~~ Hanmi Secured Claim, any and all liens of ~~Samsara~~ Hanmi securing such ~~Samsara~~ Hanmi Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.  <br><br>The treatment proposed herein shall be in full settlement and satisfaction of the ~~Samsara~~ Hanmi Secured Claims. |

### 3.    Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes.  The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of Priority Unsecured Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

The Debtor is unaware of any Priority Unsecured Claims.  However, in an abundance of

60

caution, the following chart lists all Classes containing the Debtor's section 507(a)(4), (a)(5), (a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Classes of Priority Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5)<br><br>Estimated total amount of claims: $0.00[21] | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 4 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |
| 15 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 5 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |

### 4.    Classes of General Unsecured Claims

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 16 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims.<br><br>On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a *pro rata* share of the beneficial interests in the Plan Trust in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, which shall entitle such Holder to his, her, or its Pro Rata Distribution of the Available Trust Proceeds.<br><br>The Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions from Available Trust Proceeds as follows:<br><br>On each Quarterly Distribution Date until the Available Trust Proceeds are exhausted or the term |

---

[21]   The Debtor's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

61

| | | | | General Unsecured Claims |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | of the Plan Trust ends, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from any Available Trust Proceeds. The Reorganized Debtor will fund the GUC Payment Amount to the Plan Trust as provided in Section III.A. of the Plan. The treatment proposed herein shall be in full satisfaction of the Claims in Class 16. |
| 17 | Sierra Bank  Estimated amount: $2,653,647.96 | N | Y | This Class consists of the Claim of Sierra Bank. Sierra Bank's claim is secured by a lien against the Mill St. Property owned by MWP.  Sierra Bank filed Proof of Claim No. 159-1, attached to which is the Promissory Note dated July 1, 2020, between MWP and Sierra Bank (the "**Sierra Note**"). The Reorganized Debtor shall pay the Sierra Bank Claim in full as follows: **A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Sierra Bank's Claim is paid in full, the Reorganized Debtor shall make the payment required for such month set forth in the Sierra Note (a "**Sierra Monthly Payment**"). **C.  Maturity Date**:  The Reorganized Debtor shall pay the Sierra Bank Claim in full by the July 15, 2045 maturity date set forth in the Sierra Note (the "**Sierra Maturity Date**"). **C.  Interest Rate**: Simple interest on the Sierra Bank Claim will accrue on the outstanding balance of such Claim from the Effective Date until such Claim is paid in full at the non-default variable contract rates set forth in the Sierra Note. **D.  Default**:  If the Reorganized Debtor fails to make a Sierra Monthly Payment to PNC when due herein or pay the Sierra Bank Claim in full by the Sierra Maturity Date, and such failure is not cured within thirty (30) days after written notice thereof provided by Sierra Bank to the Reorganized Debtor and its counsel (collectively, an "**Uncured Sierra Default**"), then Sierra Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to its real property collateral permitted under the Sierra Note.  The Reorganized Debtor shall have the right to oppose such motion. |

62

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.110585253.110585144.110466262.1                Exhibit 1, Page 74

| General Unsecured Claims | | | |
|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **E. Plan Controls:** If and to the extent that there is a conflict between the Sierra Note (or any other loan documents with Sierra Bank) and the Plan, the Plan shall control.<br><br>**F. Lien.** Any valid, enforceable, perfected, and unavoidable lien held by Sierra Bank to secure Sierra Bank's Claim shall be retained by Sierra in and to the same extent, validity, and priority as of the Petition Date pending payment of the Sierra Bank Claim in full as provided herein. Upon full satisfaction of the Sierra Bank Claim, any and all liens of Sierra Bank securing the Sierra Bank Claim shall be released and title to such assets shall be retained free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Sierra Bank Claim. |
| 18 | Subordinated Insider Class | Y | Y | This Class consists of the Claims Insiders against the Debtor that are being consensually subordinated under the Plan. The Holders of Subordinated Claims shall not receive any Distributions under the Plan until and unless the Allowed General Unsecured Claims are paid in full. |

### 5.  Class of Interest Holders

Interest Holders are the parties who hold ownership Interests in the Debtor.  The following chart describes the treatment for Interest Holders in the Debtor.

| Class of Interests | | | |
|---|---|---|---|
| Class # | Description | Insiders | Impaired | Treatment |
| ~~18~~19 | Robin Mowbray | Y | Y | ~~On the Effective Date, Robin Mowbray shall retain all existing Equity Interests in the Debtor on account of the New Value Contribution or, alternatively, in the event a Winning Bid that is not held by Robin Mowbray, such Equity Interests will be transferred to the Winning Bidder with such Winning Bid.~~On the Effective Date, based on the Compromise set forth in Section III.E.3. herein and in exchange for the Settlement Consideration, Robin Mowbray shall retain all existing Equity Interests in the |

63

| | | | | Reorganized Debtor. |
|---|---|---|---|---|

### E.    Means for Implementation of the Plan

This Section is intended to explain how the Reorganized Debtor intends to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Plan after the occurrence of the Effective Date.  This Section provides information regarding the funding sources for the Plan obligations, the establishment of the Plan Trust, and other material issues bearing upon performance of the Plan.

#### 1.    Funding of the Plan

The payments under the Plan by the Reorganized Debtor will be funded from the Reorganized Debtor's operations.  As reflected in the Projections, the Distributions to the Holders of Secured Claims will be paid by the Reorganized Debtor from its post-Effective Date cash flow.

Distributions to the Holders of Allowed General Unsecured Claims will be made from the Plan Trust.  The Holders of Allowed General Unsecured Claims will receive a Pro Rata Distribution of Available Trust Proceeds.  Available Trust Proceeds are compromised of the GUC Payment Amount, the GUC Bonus, and any Net Recoveries.  The Reorganized Debtor will fund the GUC Payment Amount from its post-Effective Date operations as provided below.

#### 2.    Payment of the GUC Payment Amount and the GUC Bonus

##### a.    The GUC Payment Amount

The $25,000,000 GUC Payment Amount is the minimum amount to the paid under the Plan.  The Reorganized Debtor shall pay the GUC Payment Amount to the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims in Class 16) through the Class 16 GUC Payment as provided below.

The Class 16 GUC Payment is summarized and intended to work as follows:

The Class 16 GUC Payment requires the Reorganized Debtor to make the payments specified in the Plan Projections for the General Unsecured Creditors as adjusted based on the Reorganized Debtor's *actual* post-Effective Date performance (up to the GUC Payment Amount).  Thus, if and to the extent that the Reorganized Debtor's actual net income, inclusive of PTS and

64

after income tax distributions, for a particular period is greater than projected, then the payment to the Plan Trust on account of the GUC Payment Amount will be increased.  If and to the extent that the Reorganized Debtor's actual net income, inclusive of PTS and after income tax distributions, for a particular period is less than projected, then the payment to the Plan Trust on account of the GUC Payment Amount will be reduced.  However, the Reorganized Debtor is, by the Plan, committing to paying the GUC Payment Amount in full even if its post-Effective Date performance is worse than projected.  The time needed to pay the GUC Payment Amount may be shorter or longer than projected depending on the Reorganized Debtor's actual performance.  Based on the Plan Projections, the Reorganized Debtor projects funding the GUC Payment Amount within nine (9) years of the Effective Date.  (*See* Ex. 1 at 10 of 18.)

The Class 16 GUC Payment will be made quarterly.  The Class 16 GUC Payment will be calculated within thirty (30) days of the end of each Measurement Period (the "**Calculation Date**").  The Class 16 GUC Payment shall be paid by the Reorganized Debtor to the Plan Trust within fourteen (14) calendar days after such Calculation Date (the "**Payment Date**"); *provided, however*, with respect to any Class 16 GUC Payment, if the Reorganized Debtor believes that such Class 16 GUC Payment is not prudent in its business judgment based on its projected operating results over the next twelve (12) months, then it may withhold the Class 16 GUC Payment if the Plan Trustee approves such in writing by the Payment Date.  The Plan Trustee shall be the sole arbiter, as between the Reorganized Debtor and the Plan Trustee, as to whether the Reorganized Debtor may withhold a Class 16 GUC Payment (or any portion thereof).

Notwithstanding the foregoing, in any year in which the Projections project a payment to the Plan Trust on account of the GUC Payment Amount and until the GUC Payment Amount is paid to the Plan Trust in full, the Reorganized Debtor shall pay at least the sum of $350,000 (the "**GUC Annual Minium Payment**") within thirty (30) days after the end of such year.

### b.    The GUC Bonus

In addition to the GUC Payment Amount, the Reorganized Debtor will pay to the Plan Trust the GUC Bonus.  The GUC Bonus entitles the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims) to fifty percent (50%) of the Reorganized Debtor's post-

65

1    confirmation excess cash (defined as actual net income less income tax distributions and inclusive

2    of PTS), if any, after payment of the GUC Payment Amount subject to a maximum time period

3    and maximum amount.  The GUC Bonus will be paid by the Reorganized Debtor through the

4    Excess GUC Cash Payment.  By the Excess GUC Cash Payment, the Plan Trust could receive up

5    to the cumulative sum (inclusive of the GUC Payment Amount) of (a) $55,000,000 or (b) 40% of

6    the Allowed General Unsecured Claims (capped by the amount of the General Unsecured Claims

7    on the Claims Register as of July 31, 2025 if and to the extent Allowed),[22] whichever is greater

8    between (a) and (b), provided such cumulative sum is generated within five (5) years after the

9    Effective Date.  The GUC Bonus is inclusive of the GUC Payment Amount.

10    The GUC Bonus will be paid quarterly after the GUC Payment Amount is paid in full to

11    the Plan Trust.  The GUC Bonus will be calculated in accordance with the Plan by the Calculation

12    Date and paid by the Reorganized Debtor to the Plan Trust by the Payment Date

13    As an example, if the Reorganized Debtor pays the GUC Payment in full to the Plan Trust

14    within three (3) years after the Effective Date, then the Plan Trust would be entitled to the Excess

15    GUC Cash Payment for an additional two (2) years up to GUC Maximum Amount.  If the GUC

16    Maximum Amount is reached within the next year (*i.e.*, year four after the Effective Date), then

17    the payments by the Reorganize Debtor to the Plan Trust cease.  If the GUC Maximum Amount is

18    not reached within five (5) years after the Effective Date, then the payments by the Reorganized

19    Debtor to the Plan Trust cease.  If it takes the Reorganized Debtor more than five (5) years after

20    the Effective Date to pay the GUC Payment Amount to the Plan Trust, then the Reorganized

21    Debtor shall be required to pay only the GUC Payment Amount, and no GUC Bonus will be paid.

22    The Reorganized Debtor will pay the GUC Payment Amount as follows:  Beginning on the

23    GUC Payment Commencement Date, and continuing each year thereafter on the anniversary of the

24    GUC Payment Commencement Date until the GUC Payment Amount is fully funded, and cash

25    flow permitting as projected, the Reorganized Debtor will pay to the Plan Trustee the amount set

26    forth at page 10 of 18 of the Projections under "General Unsecured Claims" for such year (each, a

---

27    [22]  Based on the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025, and
28    assuming such Claims are Allowed, then 40% equals approximately $67 million (subject to the disallowance of
certain Disputed Claims).

66

1    "**Plan Trust Payment**").  The Reorganized Debtor projects funding the GUC Payment Amount

2    within nine (9) years of the Effective Date.  (*See* Ex. 1 at 10 of 18.)  The Reorganized Debtor shall

3    fully fund the GUC Payment Amount by the Plan Term End Date.  The Reorganized Debtor shall

4    have the right to prepay the GUC Payment Amount to the Plan Trust in full at any time and

5    without any penalty.  Upon the Reorganized Debtor fully funding the GUC Payment Amount and

6    paying any GUC Bonus required by the Plan to the Plan Trust, it the Reorganized Debtor shall

7    have no further obligation to the Plan Trust.  The Reorganized Debtor's obligation to make the

8    Class 16 GUC Payment and the Excess GUC Cash Payment, on the terms herein, are subject to the

9    default provision in Section III.F.

10    As reflected in the Projections, the Reorganized Debtor's post-Effective Date cash flow

11    includes substantial funds from PTS and PTM.  The Reorganized Debtor is projected to receive

12    nearly $10.8 million per year from PTS on account of management fees and equipment rent.  (*See*

13    Ex. 1 at 2 of 18.)  PTS is projected to repay the PTS Loan with interest less than one year within

14    two years after the Effective Date.  (*See* Ex. 2 at 8 of 10.)  In addition, the Reorganized Debtor is

15    to receive substantial annual distributions from PTS's available cash flow.  (*See* Ex. 1 at 8 of 18.)

16    The projected annual distributions from PTS collectively exceed $14.5 million over the term of the

17    Plan.  The Debtor is projected to receive approximately $720,000 on an annual basis from PTM in

18    management fees and equipment rent.  The projected amounts to be paid by PTM and PTS to the

19    Reorganized Debtor are based on the CRO's current understanding of the financial wherewithal of

20    both such companies and reflects the amounts that the CRO believes can reasonably be paid to the

21    Reorganized Debtor.

22    In addition, as provided in Section III.E.5.b. below, the Plan Trust will be vested with all

23    Trust Causes of Action, which are comprised o f all Insider Avoidance Actions Trust Causes of

24    Action and the Loan Causes of Action, excluding the Excluded Claims.  Any payments on the

25    PTM Loan and the MWP Loan within the amounts set forth in the Projections shall be paid to the

26    Reorganized Debtor.  The Holders of Allowed General Unsecured Claims will share *pro rata* in

27    any Net Recoveries on account of the Trust Causes of Action.

28    On the Effective Date, the Reorganized Debtor will pay to the Plan Trustee $50,000 (the

67

1    **"Initial Plan Trust Payment"**) for the initial costs of administration of the Plan Trust.  Any

2    payments on the PTM Loan and the MWP Loan within the amounts set forth in the Projections

3    shall be paid to the Reorganized Debtor.

4                    **3.        The Compromise Among the Debtor, Robin Mowbray, MWP, and the**

5                    **Trust**

6            The Plan represents a proposed settlement between the Debtor, Robin Mowbray, MWP,

7    and the Trust (the **"Compromise"**).  Such Compromise is the product of the Debtor's discussions

8    with the Examiner and the Debtor's negotiations with the Rodriguez Plaintiffs and is part of the

9    settlement between the Debtor and the Rodriguez Plaintiffs.  In exchange for the consideration,

10   value, and benefits provided under the Plan, including without limitation, the voluntary

11   substantive consolidation of MWP with the Debtor, voluntary subordination of claims against the

12   Debtor, the increase in the GUC Payment Amount, and the GUC Bonus (collectively, the

13   **"Settlement Consideration"**), Robin Mowbray, the Trust, Richard Mowbray, and any insider of

14   the Debtor or insider of any such insider, excluding PTM, MWP, and PTS (collectively, the

15   **"Released Parties"**), shall be deemed released and discharged, by the Debtor, the Estate, MWP,

16   and the MWP Estate, in each case, on behalf of themselves and their respective successors,

17   assigns, and representatives, and any and all persons that may purport to assert any cause of action

18   derivatively, by, through or on behalf of the Debtor or the Estate, from any and all claims,

19   obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses,

20   and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or

21   unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise,

22   including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the

23   Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner

24   arising from, in whole or in part, the Debtor, the Case, the Estate, MWP, the MWP Estate, and the

25   MWP Bankruptcy Case, any transfers listed in the Debtor's Schedules and Statement of Financial

26   Affairs, as may be amended, transfers listed in MWP's Schedules or Statement of Financial

27   Affairs, and any transfers disclosed in the Insider Payment Schedule attached to the Index of

28   Exhibits as **Exhibit 5** (collectively, the **"Released Claims"**).

68

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION        Exhibit 1, Page 80
10585253.1 10585253.1 10585144.1 10468262.1

1    For the avoidance of doubt, the releases herein shall not release PTM, PTS, and/or MWP

2    of any claims, including, without limitation, on account of the amounts loaned by the Debtor to

3    each such entity.  The Reorganized Debtor's rights to collect the PTM Loan, the PTS Loan, and

4    the MWP Loan are expressly preserved.

5    The Confirmation Order shall operate as a bar and injunction against the commencement

6    or pursuit of the Released Claims by any party against any Released Parties.

7    The Plan constitutes a good faith settlement and compromise, including of the Released

8    Claims, in exchange for the Settlement Consideration.  The Insider Payment Schedule attached to

9    the Index of Exhibit as **Exhibit 5** lists the payments to insiders within the four-year period prior to

10    the Petition Date from the Debtor's books and records.  Certain of the Insider Payments are

11    compensation to employees of the Debtor or are for services provided to the Debtor (such as, by

12    PTM and PTS).  The Insider Payments also include amounts loaned to PTM and PTS, which are

13    not being released under the Plan.  The net Insider Payments to Gloria Mowbray, Robin Mowbray,

14    Richard Mowbray, and the Trust collectively total $38,163,341.50 (excluding those marked as

15    compensation).  (*See* Index, Ex. 6.)

16    As noted in the Examiner's Report, there could be impediments to prevailing on certain

17    Insider Avoidance Actions and collecting on any judgment obtained.  (*See* Report at 25-30.)  For

18    example, it may be difficult to prove that the Debtor was insolvent at "different points in time."

19    (*See id.* at 28:1-2.)  Gloria Mowbray is deceased and Robin Mowbray is in her own bankruptcy

20    case.  (*See id.* at 27:23-26.)  Moreover, the majority of the Insider Payments to Robin Mowbray

21    and Gloria Mowbray were paid directly by the Debtor to taxing authorities, meaning neither Robin

22    Mowbray nor Gloria Mowbray received such payments.  Of the $25,135,211.58 Insider Payments

23    listed as to or for the benefit of Robin Mowbray, $20,416,770.08 were on account of taxes.  (*See*

24    Index of Exhibits, Ex. 5 at 21 of 22.)  Similarly, of the $10,702,367.55 net Insider Payments listed

25    as to or for the benefit of Gloria Mowbray, $10,552,674.60 were on account of taxes.  (*See id.* at

26    1-2 or 22.)  The Examiner concluded, in relevant part, as follows:

27    *The litigation and expert fees required to pursue and defend these*
*actions are projected to be significant as it will be difficult and time-*
28    *consuming to establish if and when insolvency occurred.  Even if*

69

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.110585253.110585144.110466262.1    Exhibit 1, Page 81

*the litigation is successful, collectability may be an issue as one potential defendant is deceased [and] another defendant is in a Chapter 11 proceeding.  A quick and reasonable settlement would be beneficial to all parties involved.*

(*See* Report at 30:17-22 (emphasis in original).)  This Plan is intended to accomplish a settlement of the type suggested by the Examiner.  The proposed settlement is the product of discussions with the Examiner and, also, settlement negotiations with the Rodriguez Plaintiffs, who assert the largest claim in the case by far.

According to the Debtor's Liquidation Analysis, the Holder of General Unsecured Claims would receive a *pro rata* portion of $15,674,000.  However, under the Plan, the Debtor is committing to pay at least $25,000,000 (*i.e.*, over $9,000,000 more).  In addition, the Holders of Allowed General Unsecured Claims will have the opportunity to share in any upside in the Reorganized Debtor's post-Effective Date performance via the GUC Bonus.  Assuming the GUC Maximum of the GUC Bonus is $55,000,000, the Holders of Allowed General Unsecured Claims could receive a *pro rata* share of an additional $30,000,000 above the GUC Payment Amount during the five-year period after the Effective Date.  Moreover, the settlement proposed herein avoids the costs and risks associated with litigation as discussed in the Examiner's Report.

Due to the Settlement Consideration, the Plan effectuates the voluntary substantive consolidation of the Debtor and MWP.  Upon the MWP Consolidation, the Reorganized Debtor will receive real estate of MWP.   The Debtor will also receive the benefit of the rental income paid by the County ($35,124 per month).  Moreover, the MWP Consolidation is not expected to materially increase the Debtor's debt.

Upon the Effective Date, any claims pending in any court to pursue any Released Claims shall be dismissed with prejudice.  Upon and after the Effective Date, the Debtor shall be empowered to take such action, file such pleadings, and record such instruments as needed to cause the dismissal with prejudice of any such claims.

### 4.    Compromise with the Rodriguez Parties

In addition to any Debtor/RP Settlement Agreement, the Plan constitutes and includes a settlement agreement and compromise between the Debtor, Robin Mowbray, PTS, PTM, MWP,

70

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.1 10585253.1 10585144.1 10466262.1

Exhibit 1, Page 82

the Trust, Richard Mowbray, and any other Released Party (each, a **"RP Released Party"** and collectively, the **"RP Released Parties"**), on the one hand, and the Rodriguez Plaintiffs on the other hand (the **"Rodriguez Compromise"**).  Pursuant to the Rodriguez Compromise, and in addition to the consideration provided by the terms of the Plan, including, without limitation, the Settlement Consideration:

     (i)     On the Effective Date, any and all assignable claims and causes of action, whether sounding in tort, contract, equity or otherwise, which Debtor may now have or hereafter acquire against Everest National Insurance Company (**"Everest"**) arising out of or related to Everest's handling of the Rodriguez Lawsuit and subsequent Rodriguez Judgment, including, but not limited to, any obligation of Everest to pay the Rodriguez Judgment or any component thereof under Policy No. EN4CA00458191 (the **"Insurance Policy"**), shall be deemed assigned to the Rodriguez Plaintiffs.

     (ii)     Within fourteen (14) days of the Effective Date, the Reorganized Debtor shall cause the pending appeal of the Rodriguez Judgment by the Debtor to be dismissed.

     (iii)     On the Effective Date, the Rodriguez Claim shall be deemed an Allowed General Unsecured Claim.

     (iv)     Reporting required under the Plan to the Plan Trustee in accordance with Section III.E.7.i. shall be provided to the Rodriguez Plaintiffs.

     (v)     Effective as of the Effective Date, the Rodriguez Parties shall be deemed to forever release and discharge each of the RP Released Parties from the Rodriguez Claim, the Rodriguez Judgment, and any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, the Debtor, the

71

1   Case, the Estate, MWP, the MWP Estate, Rodriguez Claim, the Rodriguez

2   Judgment, any transfers listed in the Debtor's Schedules and Statement of Financial

3   Affairs, as may be amended, MWP's Schedules and Statement of Financial Affairs,

4   and any transfers disclosed in the Insider Payment Schedule attached to the Index

5   of Exhibits as **Exhibit 5**, and the Rodriguez Plaintiffs agree that the sole source of

6   recovery on account of the Rodriguez Claim and the Rodriguez Judgment shall be

7   the treatment in Class 16 of the Plan and amounts to be paid thereunder; *provided*,

8   *however*, that the Rodriguez Plaintiffs shall not be prohibited from seeking to

9   collect from Everest (including on account of the assignment herein) or from

10   Jonathan Gonzalez-Varillas.

11   The Confirmation Order shall constitute approval of any Debtor/RP Settlement Agreement

12   (if and to the extent such is not approved by separate order of the Court entered prior to the

13   Effective Date) and the Rodriguez Compromise pursuant to Bankruptcy Rule 9019.

14   ~~2.    New Value Contribution~~

15   ~~On the Effective Date, Robin Mowbray or her assigns shall contribute to the Debtor the~~

16   ~~sum of $100,000 as a new value contribution, plus any additional consideration Robin Mowbray~~

17   ~~or her assigns provides in or as part of the Plan, including, without limitation, from the RM~~

18   ~~Bankruptcy Case or the MWP Bankruptcy Case (the "**New Value Contribution**"), in exchange for~~

19   ~~100% of the Equity Interests in the Reorganized Debtor (the "**Reorganized Debtor Equity**~~

20   ~~**Interests**"), unless there is a Winning Bidder who is not Robin Mowbray. If there is a Winning~~

21   ~~Bidder who is not Robin Mowbray or her assigns, then, on the Effective Date, such Winning~~

22   ~~Bidder shall contribute the amount set forth in the Winning Bid in cash (the "**Winning Bid**~~

23   ~~**Contribution**") and, in exchange for such Winning Bid Contribution, the Winning Bidder shall~~

24   ~~receive the Reorganized Debtor Equity Interests.~~

25   ~~The New Value Contribution or, if applicable, the Winning Bid Contribution shall be paid~~

26   ~~to the Reorganized Debtor to be used as part of the Reorganized Debtor's cash flow to pay~~

27   ~~operating expenses and/or make the Distributions required by the Plan.~~

28   ~~The New Value Contribution shall be subject to overbids in accordance with the Overbid~~

72

Procedures attached to the Index as **Exhibit 4**.  The Debtor intends to seek approval of the

Overbid Procedures in accordance with the Court's order approving the Disclosure Statement for

dissemination.  The material dates and deadlines set forth in the Overbid Procedures are as

follows:

       1.     Only Qualified Bidders may submit bids on the Reorganized Debtor Equity

            Interests;

       2.     All bids for the Reorganized Debtor Equity Interests must be Qualified Bids in

            accordance with the Overbid Procedures;

       3.     The Bid Deadline to submit Qualified Bids is five (5) Business Days after the

            Voting Deadline (and assuming an impaired Class of Allowed Unsecured Claims

            votes against the Plan);

       4.     Any Qualified Bid must exceed the value of the New Value Contribution by

            $50,000 in addition to meeting the other Qualified Bid requirements set forth in the

            Overbid Procedures;

       5.     The Auction on the Reorganized Debtor Equity Interests will occur on the date that

            is no later than three (3) Business Days before the deadline for the Debtor to file its

            memorandum in support of confirmation of the Plan;

       6.     Bids by Qualified Bidders during the Auction must exceed the previous bid by at

            least $25,000;

       7.     The Winning Bidder for the Reorganized Debtor Equity Interests shall be

            determined by the CRO after consultation with the Examiner and subject to

            approval of the Court at the Confirmation Hearing.

       **3.5.**     **Substantive Consolidation ~~Option~~of MWP**

As part of the settlements set forth in the Plan, the Confirmation Order shall approve the

substantive consolidation of MWP with the Debtor (the "**MWP Consolidation**").  Upon the

Effective Date, MWP (and its assets and liabilities) will be deemed substantively consolidated

with the Reorganized Debtor and the following shall be deemed to occur:

73

1      (i)     the unpaid balance of the MWP Loan and any claims between the Debtor and

2  MWP shall be deemed released, forgiven, and extinguished;

3      (ii)     any assets or property of MWP and/or the MWP Estate (including Avoidance

4  Actions or other causes of action and property recoverable or any other recoveries thereon) ~~The~~

5  ~~Debtor reserves the right to file a motion seeking to substantively consolidate the Estate of the~~

6  ~~Debtor with any Affiliate if the Debtor determines that the legal requirements for such substantive~~

7  ~~consolidation can be satisfied and that such substantive consolidation is in the best interests of the~~

8  ~~Estate and will not be detrimental to the Estate, including, without limitation, as part of a~~

9  ~~compromise to be approved with confirmation of the Plan.  In addition, should the Court, by Final~~

10  ~~Order in connection with confirmation of the Plan, substantively consolidate the Estate of the~~

11  ~~Debtor with any Affiliate (upon motion by the Debtor or otherwise), then the assets of such~~

12  ~~Affiliate~~ shall be deemed property of the Estate ~~as of the Effective Date and,~~ shall vest in the

13  Reorganized Debtor as of the Effective Date as provided in Section ~~III.3.~~V.4 below ~~of the Plan~~,

14  and shall be considered assets or property of the Reorganized Debtor under the Plan and shall be

15  subject to the terms and conditions of the Plan, including, without limitation, Sections V.1 – 3.

16  below;

17      (iii)     the Reorganized Debtor shall have the right to receive any amounts owing to

18  MWP, including any rent owed by the County;

19      (iv)     ~~and~~ any ~~the Claims~~ claims against ~~such Affiliate~~MWP, including any claims

20  scheduled or filed in the MWP Bankruptcy Case, shall be Claims against the Debtor and under and

21  subject to the Plan, shall be considered Disputed, Disallowed, or Allowed as provided in the Plan,

22  shall be subject to the terms and conditions of the Plan, including, without limitation, Sections V.1

23  – 3. below, and shall receive the treatment ~~treated~~ expressly set forth in the Plan for the holder of

24  such claim or in accordance with the treatment of similarly situated claims in the Plan, *i.e.*, any

25  General Unsecured Claims shall receive the treatment in Class 16, in full settlement and

26  satisfaction of such claims; and~~.~~

27      (v)     MWP shall be deemed dissolved, shall receive the discharge in Section III.2.

28  below, and shall be subject to the injunction granted in Section III.3. below.

74

The MWP Consolidation shall not impair or impact the rights of PNC to collect on its claims against the Reorganized Debtor, MWP, and/or the Reorganized Debtor's assets if otherwise permitted by order of the Bankruptcy Court following an Uncured PNC Default in accordance with the treatment in Class 1, including, without limitation, with respect to the one-action rule and the anti-deficiency rules set forth in California Code of Civil Procedure §§ 580 and 726 due to the MWP Consolidation.  The Debtor reserves the right to amend the Plan such that the MWP Consolidation will occur upon the later of the Effective Date and the payment of the Allowed PNC Secured Claim in full under the Plan.

### 4.6.    Sale of Real Properties

After the Effective Date, the Reorganized Debtor shall be authorized, but not required (except as otherwise expressly set forth below in this Section III.E.4.), to sell any Estate Real Property.  Pending the Plan Term End Date, the sale or encumbering of any Estate Real Property shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real Property shall not be sold or encumbered absent an order of the Court.  The Reorganized Debtor may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

As an alternative to the sale any Estate Real Property as provided or required herein, the Reorganized Debtor may incur or obtain financing secured by such property as necessary to pay Allowed Claims pursuant to an order of the Court.

Within one (1) year after the Effective Date and to the extent not sold prior thereto (the "**Sale Deadline**"), the Reorganized Debtor shall close sales of the real properties located 386 S. Allen St., San Bernardino, CA 92408 (the "**Allen St. Property**"), and 9546 Elder Creek Rd., Sacramento, CA 95829 (the "**Elder Creek Property**").  The Reorganized Debtor may extend the Sale Deadline for "cause" by motion filed with the Bankruptcy Court prior to the expiration of the Sale Deadline.

### 5.7.    The Plan Trust

#### a.    Establishment of the Plan Trust

On the Effective Date, a plan trust (the "**Plan Trust**") shall be created subject to the terms and conditions in the Plan and the Confirmation Order.  The Plan Trust shall be established and

75

become effective on the Effective Date.  The Plan Trust is created by the Plan and the Confirmation Order, and no separate trust instrument shall be required.  The sole purpose of the Plan Trust will be to hold, preserve, and administer the Trust Assets and to make the Distributions required of it by the Plan to the Holders of Allowed General Unsecured Claims.  Each creditor holding an Allowed General Unsecured Claim will receive in full satisfaction, settlement, release and discharge of such Claim a Trust Interest on a *pro rata* basis based on such creditor's Allowed General Unsecured Claim.  Holders of Allowed General Unsecured Claims will receive Distributions from the Plan Trust until, the Trust Assets are exhausted or abandoned, or the term of the Plan Trust expires.

<b>b.     The Trust Assets</b>

The Plan Trust will be funded with the Trust Assets.  The Trust Assets are comprised of only the following:

1.     The Initial Plan Trust Payment;

2.     The rights to the Plan Trust Payments by the Reorganized Debtor under the Plan to fund the GUC Payment Amount and the GUC Bonus as and when paid by the Reorganized Debtor in accordance with the terms of the Plan; and

~~3.     The Trust Causes of Action~~Any Loan Causes of Action.~~; and~~

~~4.~~3.     ~~Any Insider Avoidance Actions that are not Excluded Claims.~~

On the Effective Date, all Trust Assets (or the rights thereto) shall be deemed automatically transferred to and vested in the Plan Trust free and clear of all Claims, liens, encumbrances, or other interests (unless otherwise stated expressly in the Plan).  Proceeds from the Trust Assets, when realized, will be distributed by the Plan Trustee on Quarterly Distribution Dates determined by the Plan Trustee in accordance with the Plan.

Notwithstanding anything else set forth in the Plan, the Trust Assets shall exclude the Excluded Claims.

<b>c.     The Term of the Plan Trust</b>

The initial term of the Plan Trust shall be ten (10) years (the "**Initial Term**"); provided, however, that the term of the Plan Trust may be extended once for a further finite term for "cause"

76

as determined by the Court upon motion by the Plan Trustee.  The Plan Trustee may seek such an extension of the Plan Trust's term by filing a motion prior to the expiration of the term to be extended and serving the motion on the Reorganized Debtor's counsel.  Any party in interest shall have the right to oppose any such motion.  The Plan Trust may be terminated earlier than its scheduled termination if the Plan Trustee has completed all payments required by the Plan Trustee under the Plan, has paid any taxes, fees and penalties associated with the Plan Trustee's administration of the Trust Assets, has administered all assets of the Plan Trust (or abandoned all assets not administered), and has performed all other duties required by the Plan.  Upon the termination of the Plan Trust, the Plan Trustee shall be discharged and exonerated and any assets remaining in the Plan Trust shall revest in the Reorganized Debtor.

### d.    The Plan Trustee

#### (i)    Appointment

The appointment of the Plan Trustee shall be effective as of the Effective Date.  The individual to serve as the Plan Trustee will be identified prior to approval of the Disclosure Statement.  The Plan Trustee may resign upon sixty (60) days' advance written notice to the Reorganized Debtor so long as a replacement trustee has been appointed.  The Plan Trustee may be removed by order of the Court for "cause."

The Plan Trustee shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Plan Trust or to any person except for the Plan Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction.  In addition, the Plan Trustee shall be indemnified by the Plan Trust and from the Trust Assets against and held harmless by the Plan Trust from any losses, claims, damages, liabilities, or expenses (including without limitation, attorneys' fees, disbursements, and related expenses) to which the Plan Trustee may become subject to in connection with any action, suit, proceeding, or investigation brought or threatened against the Plan Trustee in connection with any matter arising out of or related to the Plan Trust (other than acts or omissions that constitute

fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction).  The Plan Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance at the expense of the Plan Trust and engage independent legal counsel and financial advisors to assist with the evaluation of any matters with respect to the Plan Trust as provided in Section III.E.5.h. below and at the expense of the Plan Trust.

(ii)    <b><u>Term of the Plan Trustee</u></b>

Unless the Plan Trustee resigns, dies or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan.  In the event the Plan Trustee resigns, dies or is removed by Court order prior to the termination of the Plan Trust, the Reorganized Debtor shall appoint a successor trustee.  Upon the termination of the Plan Trust, the Plan Trustee may destroy or otherwise dispose of the books and records of the Plan Trust.

(iii)    <b><u>The Plan Trustee's Powers and Duties</u></b>

On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in the Plan and the Confirmation Order.  The Plan Trustee shall be governed in all things by the terms of the Plan and the Confirmation Order, and the Plan Trustee shall administer the Plan Trust in accordance with the Plan.  The Plan Trustee shall be authorized, empowered and directed to do the following:

a.    Employ, retain, and replace one or more attorneys, accountants, investigators, and expert witnesses, as necessary to discharge the duties of the Plan Trustee under the Plan and to pay such professionals their reasonable and necessary fees and costs from the Trust Assets;

b.    Open, maintain and administer bank accounts for the Plan Trust to hold the Trust Assets and from which to make Distributions required of the Plan Trust under the Plan;

78

c.     Make Distributions to the Holders of Allowed General Unsecured Claims in accordance with the Plan;

d.     Administer or otherwise dispose of the Trust Assets held by the Plan Trust in accordance with the terms of the Plan;

e.     Incur and pay from the Trust Assets reasonable and necessary expenses in connection with the performance of the Plan Trustee's duties under the Plan;

f.     Represent the Plan Trust before the Court and other courts of competent jurisdiction with respect to matters concerning the Plan Trust;

g.     Comply with applicable orders of the Court and any other court of competent jurisdiction over the matters set forth in the Plan;

h.     Comply with all applicable laws and regulations concerning the matters set forth in the Plan;

i.     Execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Plan Trust;

j.     Seek a determination of tax liability under § 505 of the Code, pay taxes, if any, related to the Plan Trust, and file, if necessary, any and all tax and information returns required with respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a "grantor trust" pursuant to Treas. Reg. 1.671-4 or otherwise, make tax elections by and on behalf of the Plan Trust, and pay taxes, if any, payable by the Plan Trust; and

k.     Cause to be prepared and filed federal, state, and local tax returns to the Plan Trust as necessary.

In addition to the foregoing, the Plan Trustee shall be authorized, empowered, and directed to administer any Trust Causes of Action, including to investigate, enforce, file, litigate, prosecute, settle, and collect such Trust Causes of Action.  In connection with administering the Loan Causes of Action, the Plan Trustee shall consider the impact of such on the Reorganized Debtor's operations, the Plan, and the distributions to be made by the Reorganized Debtor under the Plan. The Plan reserves for, and vests in, the Plan Trust all rights to commence and pursue, as

79

appropriate, any and all Trust Causes of Action in any court or other tribunal.  On the Effective

Date, the Plan Trustee is vested with the sole authority to enforce, file, litigate, prosecute, settle,

and collect any Trust Causes of Action, although the Plan Trustee will not be required to do so

unless he or she determines that doing so would be in the best interests of the Plan Trust.  The

Trust Causes of Action reserved for, and vested in, the Plan Trustee to pursue after the Effective

Date under the Plan are comprised of any and all Insider Avoidance Actions, including, without

limitation, those based on the Insider Payments, and the Loan Cause of Action (in all cases,

excluding the Excluded Claims).

The Plan Trustee may settle or compromise any Trust Causes of Action without further

notice, motion, or order of the Bankruptcy Court.

### e.    Trust Distributions

The Plan Trustee will make the Distributions to the Holders of Allowed Unsecured Claims

in accordance with the terms of the Plan.  All Distributions to the Holders of Allowed General

Unsecured Claims pursuant to the Plan shall be from the Plan Trust.  The Plan Trustee shall not be

required to make more than one Distribution to the Holders of Allowed General Unsecured Claims

per calendar quarter.  All persons dealing with the Plan Trustee, or seeking to assert Claims

against the Debtor, the Reorganized Debtor, the Estate, or the Plan Trust—except for the Holders

of Allowed Secured Claims—shall look only to property of the Plan Trust to satisfy any liability

to such Persons, and the Plan Trustee shall have no personal or individual obligation to satisfy any

such liability.

### f.    Federal Income and Taxation of the Plan Trust

For federal income tax purposes, the Plan Trust is a "liquidating trust" within the meaning

of Treasury Income Tax Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45,

1994-2 C.B. 124.  The transfer of assets to the Plan Trust under the Plan is treated as a deemed

transfer to the persons entitled to receive Distributions from the Plan Trust followed by a deemed

transfer of assets by such persons to the Plan Trust.  The persons entitled to receive Distributions

under the Plan will be deemed the grantors and owners of the Plan Trust and its assets.  The Plan

Trust will be taxed as a "grantor trust" within the meaning of IRC Sections 671-677 (a non-taxable

pass-through tax entity) owned by the persons entitled to receive Distributions under the Plan. The Plan Trust will file federal income tax returns as a grantor trust under IRC Section 671 and Treasury Income Tax Regulation Section 1.671-4 and report, but not pay tax on, the Plan Trust's tax items of income, gain, loss deductions, and credits (**"Tax Items"**).  The persons entitled to receive Distributions under the Plan will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability.  The Plan Trust and the persons entitled to receive Distributions under the Plan will use consistent valuations of the assets transferred to the Plan Trust for all federal income tax purposes, such valuations to be determined by the Plan Trustee.  The taxation of the Plan Trust does not alter the Reorganized Debtor's obligations to file appropriate tax returns and pay taxes.

### g.    **Beneficiaries of the Plan Trust**

The Holders of Allowed General Unsecured Claims under the Plan, or any successors to such Holders' Allowed General Unsecured Claims (each a **"Beneficiary"**) shall own a beneficial interest in the Plan Trust as otherwise set forth in the Plan and shall, subject to the Plan, be entitled to a Distribution, if any, in the amounts, and at the times, set forth in the Plan.  Ownership of a beneficial interest in the Plan Trust shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Plan Trust by the Plan Trustee.  The ownership of a beneficial interest in the Plan Trust shall not entitle any Beneficiary to any title in or to the Trust Assets or to any right to call for a partition or division of the Trust Assets or to require an accounting.  The Plan Trustee shall make Distributions, if any, to the Beneficiaries in the manner provided in the Plan.  The rights of the Beneficiaries arising under the Plan Trust may be deemed "securities" under applicable law. However, such rights have not been defined as "securities" under the Plan because (a) the intent of the Plan is that such rights shall not be securities, and (b) if the rights arising under the Plan Trust are deemed to be "securities," the exemption from registration under § 1145 of the Bankruptcy Code is intended to be applicable to such securities.

h.    **Plan Trust Retention of Professionals and Fees and Expenses**

On or after the Effective Date, the Plan Trustee may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as he or she deems necessary and appropriate to assist in carrying out his or her rights or duties under the Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Plan Trustee.  For the services performed on and after the Effective Date, the professionals engaged by the Plan Trustee (the **"Plan Trustee Professionals"**) shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Plan Trustee to be paid solely from the Trust Assets.

The Plan Trustee and the Plan Trustee Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses paid from the Trust Assets.  The Plan Trustee shall be paid on an hourly basis at the Plan Trustee's customary hourly rate.  The Plan Trustee shall be authorized, without further order, notice, or application to the Court, to pay his or her reasonable fees and actual expenses, and the reasonable fees and actual expenses of any Plan Trustee Professionals, and all such reasonable fees and actual expenses shall be paid solely from the Trust Assets.  The Plan Trustee shall be authorized to reserve funds from the Trust Assets as is reasonable to pay the expenses and fees of the Plan Trustee and the Plan Trustee Professionals before making any Distributions under the Plan to the Holders of Allowed General Unsecured Claims.  The sole source of payment for the Plan Trustee and the Plan Trustee Professionals shall be the assets of the Plan Trust.

i.    **Reporting to the Plan Trust by the Reorganized Debtor**

Beginning with the first full Measurement Period after the Effective Date and continuing until the Reorganized Debtor completes the payment of the GUC Payment Amount and any GUC Bonus to the Plan Trust, within forty-five (45) days of each Measurement Period, the following shall be provided to the Plan Trustee:  a balance sheet, profit and loss statement, and cash flow statement for each the Reorganized Debtor, PTM, PTS, and MWP (pending the MWP Consolidation).  Such financial statements for the Reorganized Debtor and PTS may be provided on a consolidated basis.

82

### 6.8.    Reorganized Debtor Retention of Professionals and Fees and Expenses

On or after the Effective Date, the Reorganized Debtor may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as it deems necessary and appropriate to assist in carrying out its rights or duties under the Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtor.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtor (the "**Reorganized Debtor Professionals**") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtor.

The Reorganized Debtor Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses.  The Reorganized Debtor shall pay, without further order, notice, or application to the Court, the reasonable fees and actual expenses of any Reorganized Debtor Professionals.

### 7.9.    The Plan Trustee as Disbursing Agent

The Plan Trustee shall serve as the disbursing agent under the Plan for the Holders of Allowed General Unsecured Claims and shall be responsible for making all Distributions to the Holders of Allowed Unsecured Claims required under the Plan.

### 8.10.    The Bond

The Plan Trustee and the Reorganized Debtor shall not be required to post a bond or surety or other security for the performance of their duties under the Plan.

### 9.11.    Release of Liens

Except as otherwise expressly provided in the Plan for the Holders of Allowed Claims in Classes 1-13, or the Confirmation Order, or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against property of the Estate shall be released.  The Plan Trustee and the Reorganized Debtor shall be empowered to file such pleadings and/or record such documents or instruments as necessary to eliminate, expunge or release such liens from their respective assets.

10.12.  **Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

The Plan Trustee and the Reorganized Debtor may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption(s) specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan.

11.13.  **The Reorganized Debtor's Post-Confirmation Management**

On the Effective Date, Richard Mowbray will continue in his role as CEO of the Reorganized Debtor, Ruben Sainos will continue in his role as CFO of the Reorganized Debtor, and Robin Mowbray will continue in her role as Director of the Reorganized Debtor's Board of Directors.  To the extent that the Debtor's bylaws are inconsistent with the Plan, the Plan shall control.

12.14.  **Powers and Duties of the Reorganized Debtor**

On and after the Effective Date and except as otherwise set forth in the Plan, and notwithstanding anything to the contrary in the Debtor's bylaws, the Reorganized Debtor shall have the power and authority to take such actions as necessary to carry out and implement the terms of the Plan, including, without limitation, the following:

a. Making the Distributions required by the Reorganized Debtor under the Plan;

b. Filing motions or commencing proceedings to determine the allowability,

84

1    classification, and priority of Claims and Interests;

2    c.    Administering the terms of the Plan, the Confirmation Order, or any order of the

3    Court;

4    d.    Opening or closing any accounts the Reorganized Debtor determines reasonable,

5    necessary, or required under the Plan;

6    e.    Reviewing, approving, and paying the fees and costs incurred by the Reorganized

7    Debtor Professionals after the Effective Date;

8    f.    Operate and use its revenues and cash provided they comply with the payment

9    terms in the Plan;

10    g.    Filing, prosecuting, or compromising any Estate Claims, excluding the Trust

11    Causes of Action, which are vested in the Plan Trust;

12    h.    Filing motions or commencing proceedings to seek an injunction, judgment or

13    order, or taking any other action as may be necessary or appropriate to enforce the

14    terms of, or to restrain interference with, the Plan or the Confirmation Order; and

15    i.    Taking any other action reasonably necessary or appropriate, in the Reorganized

16    Debtor's discretion, related to the Debtor's operations or to implement the Plan.

17    On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and

18  approved in all respects, subject to the provisions of the Plan, by virtue of entry of the

19  Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without

20  any further requirement of further action by the Reorganized Debtor.

21    **F.**    **Default on Obligations to Holders of Allowed Claims**

22    The following shall be considered a "**Default**" under the Plan:  (1) ~~The~~ the failure of the

23  Reorganized Debtor to (i~~a~~) make a payment to the Holder of an Allowed Secured Claim, ~~or~~ (ii~~b~~)

24  make a Plan Trust Payment to the Plan Trust when such payment is due under the Plan, or (c) sell

25  the Allen St. Property or the Elder Creek Property by the Sale Deadline (as may be extended), or

26  (2) if, on any two (2) year anniversary of the Effective Date, the amount paid by the Reorganized

27  Debtor to the Plan Trust on account of the GUC Payment Amount (via the Class 16 GUC

28  Payment), on a cumulative basis by such anniversary, is forty percent (40%) less than projected to

85

1   be paid by the Reorganized Debtor by such anniversary under the Projections. ~~shall constitute a~~

2   ~~"Default" under the Plan.~~ Upon a Default, the Plan Trustee or the party to whom such payment

3   was required to be made ~~as the case may be (*i.e.*, the Holder of the Allowed Secured Claim under~~

4   ~~(i) or the Plan Trustee under (ii))~~, may, in such party's discretion, provide written notice of such

5   default to the Reorganized Debtor and its counsel.  If the Reorganized Debtor fails to cure such

6   Default within thirty (30) days of receipt of the written notice, then such Default shall be an

7   **"Uncured Default"** and the party noticing the Default may, after meeting and conferring with the

8   Reorganized Debtor in good faith to determine whether the Uncured Default can be consensually

9   resolved, file a motion with the Bankruptcy Court seeking dismissal or conversion of the Chapter

10  11 Cases under 11 U.S.C. § 1112(b) in accordance with Section VIII.9. of the Plan.  This remedy

11  is in addition to any remedy expressly granted to, or permitted by, the Holder of an Allowed

12  Secured Claim in the treatment in the Plan for such Holder.  The remedy provided by this Section

13  III.F. shall otherwise be the sole remedy for any Uncured Default under the Plan.

14  ### G.    **Procedures For Resolving Disputed Claims**

15  THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY

16  CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS

17  DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2025.

18  ### 1.    **Standing**

19  On the Effective Date, the Reorganized Debtor and any other party-in-interest shall have

20  standing to file objections to Claims.  An objection to any Claim, whether based on the Schedules

21  or any proof of claim, may be filed after the Effective Date by such parties by the Claim Objection

22  Deadline (as such deadline may be extended as provided herein).  The Reorganized Debtor and

23  any other party-in-interest may seek to extend the Claim Objection Deadline for "cause" by a

24  motion filed prior to the Claim Objection Deadline (as may be extended).  There is no limit to the

25  number of extensions that may be sought.  As used herein, the **"Claim Objection Deadline"** shall

26  mean the date that is one (1) year after the Effective Date.  The Reorganized Debtor may settle or

27  compromise any Disputed Claim without approval or order of the Court, notice, or hearing.  The

28  Reorganized Debtor shall be deemed the real party in interest in any objections to Claims

86

1  commenced prior to or after the Effective Date.

2  ### 2.    **No Distribution Pending Allowance**

3  No Claim shall be paid under the Plan unless it is an Allowed Claim.  Notwithstanding any

4  other provision of the Plan, no payments or Distributions shall be made with respect to all or any

5  portion of a Disputed Claim unless and until all objections to such Disputed Claim have been

6  settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some

7  portion thereof, has become an Allowed Claim.

8  ### 3.    **Reserves for Disputed Claims**

9  In the event that Disputed Claims are pending at the time of a Distribution under the Plan,

10  the Disbursing Agent shall establish and maintain a reserve for such Disputed Claims.  For

11  purposes of establishing a reserve for all Disputed Claims as otherwise required herein, Cash will

12  be set aside equal to the amount that would have been distributed to the Holders of the Disputed

13  Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of

14  Allowed Claims in the same Class or of the same priority as the Disputed Claims.  Unless

15  otherwise provided in the treatment with respect to a particular Claim, if a Disputed Claim

16  ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall

17  be distributed on the earlier of: (a) the Distribution Date following the date when the Disputed

18  Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an

19  Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim

20  because the Disputed Claim does not become an Allowed Claim shall be returned to the

21  Reorganized Debtor.

22  ### 4.    **Claims Paid By Third Parties**

23  To the extent that the Holder of a Claim receives any Other Recoveries (before or after the

24  Effective Date) on account of such Claim, (i) the Holder of such Claim shall be required to, within

25  thirty (30) days of the receipt of such Other Recoveries, file an amended Proof of Claim reflecting

26  a reduction of such Claim in the amount of such Other Recoveries, and (ii) whether or not such

27  amended Proof of Claim is filed, the Claim shall be deemed disallowed and reduced in the amount

28  of such Other Recoveries as of the Holder's receipt of such Other Recoveries without an objection

87

having to be filed and without any further notice, action, order, or approval by the Court, and any Pro Rata Distributions or Distributions to which such Holder is otherwise entitled under the Plan shall be adjusted accordingly.

### H.    Distributions

#### 1.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtor shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Effective Date.

#### 2.    Distributions on Account of Claims Allowed After the Effective Date

##### a.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

##### b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan, and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Plan Trustee or the Reorganized Debtor, as the case may be, shall establish appropriate reserves for potential payment of such Claims.

#### 3.    Delivery and Distributions and Undeliverable or Unclaimed Distributions

##### a.    Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtor and the Plan Trustee, as the case may be, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution or any Proof of Claim filed by that Holder.

b.    **Underdeliverable Distributions**

Distributions to Holders of Allowed Claims will be sent to the last known address set forth on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof of claim was filed.  Holders of Allowed Claims may change the address to which the distributions will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of the change of address on the Reorganized Debtor and the Plan Trustee.  If a distribution is returned as undeliverable, the Reorganized Debtor or the Plan Trustee, as the case may be, shall hold the distribution and shall not be required to take any further action with respect to the delivery of the distribution unless and until the Reorganized Debtor or the Plan Trustee is notified in writing of the then-current address of the person or entity entitled to receive the distribution. Unless and until the Reorganized Debtor or the Plan Trustee is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision below for distribution of Unclaimed Property.

c.    **Distributions of Unclaimed Property**

If any distributions are returned to the Reorganized Debtor or the Plan Trustee as undeliverable, then such distributions shall be deemed to be "Unclaimed Property."  Nothing contained in this Plan shall require the Reorganized Debtor, the Plan Trustee, or anyone else, to attempt to locate such person or entity.  The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtor or the Plan Trustee.  If such person or entity presents itself within six (6) months of the date of the payment returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity.  If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

4.    **Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Plan Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and

89

reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Plan Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

**I.      Treatment of Executory Contracts and Unexpired Leases**

**1.      Assumption of Executory Contracts and Unexpired Leases**

On the Effective Date, any executory contracts and unexpired leases identified on the schedule of executory contracts and unexpired leases to be assumed filed with the memorandum or pleading in support of confirmation of the Plan (the "**Schedule of Assumed Agreements**") shall be deemed assumed by the Reorganized Debtor, as the case may be.  The Schedule of Assumed Agreements will identify any amounts that must be paid to cure defaults under the executory contracts to be assumed under the Plan (the "**Cure Amount**").  The Debtor reserves the right to amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; (b) modify the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The Debtor will provide notice of any amendment to the Schedule of Assumed Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.

Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a final determination of the Cure Amount and a final determination that the Debtor has shown

adequate assurance of future performance.  Further, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults arising from, out of, or related to the executory contract or unexpired lease, including any claims that were or could have been asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and you object to the assumption of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must file and serve upon the Debtor and its counsel a written objection within the deadline for objecting to the confirmation of the Plan.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Plan for such non-debtor party. If a dispute arises regarding (a) whether the Debtor has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Debtor reserves the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of

91

Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative

Cure Amount (an "Alternative Cure Amount"), then the Debtor may amend the Schedule of

Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject

executory contract or unexpired lease and provide for its rejection.  Executory contracts or

unexpired leases not so deleted shall be conditionally assumed, subject to the right of the

Reorganized Debtor to either, up to the first (1st) Business Day that is at least sixty (60) days

following the Effective Date (the "**Cure Motion Deadline**"), (1) file a motion to determine the

appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely

forego assumption of, and, instead, reject the subject executory contract or unexpired lease. Any

such motion or notice of any such amendment will be served on the party to the executory contract

or unexpired lease affected by the motion (or its attorney, if any).  If the Reorganized Debtor does

not, by the Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or

amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead,

reject the subject executory contract or unexpired lease, then the Cure Amount will be the

Alternative Cure Amount and such amount will be paid to the applicable non-debtor party within

fifteen (15) days after the Cure Motion Deadline (unless otherwise expressly set forth in the Plan

for such non-debtor party).  If the Reorganized Debtor has filed such a motion and does not timely

amend the Schedule of Assumed Agreements within fifteen (15) days after entry of an order fixing

the Cure Amount, then the executory contract or unexpired lease shall be assumed, as of the

Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.

The Cure Amount will be paid to the applicable non-debtor party as soon as reasonably practicable

following the expiration of the 15-day deadline or as otherwise expressly set forth in the Plan for

such non-debtor party.

### 2.    Rejection of Executory Contracts or Unexpired Leases Not Assumed

On the Effective Date, the Reorganized Debtor will be deemed to have rejected any and all

executory contracts and unexpired leases not identified on the Schedule of Assumed Agreements.

The Confirmation Order will constitute a Court order approving the rejection, as of the Effective

Date, of such executory contracts and unexpired leases.  Any Claim for damages arising from the

92

rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the Reorganized Debtor and its counsel within thirty (30) days of the later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed Agreements by the Debtor to eliminate the executory contract or unexpired lease.  Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor, the Reorganized Debtor, the Estate and their respective property.  Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims.

IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN.

**J.**     **Preservation of Causes of Action and Avoidance Actions for the Reorganized Debtor**

The Plan reserves for the Reorganized Debtor all rights to commence and pursue, as appropriate, any and all Estate Claims. (excluding the Trust Causes of Action, which are vested in the Plan Trust and the Released Claims), whether arising prior to or after the Petition Date, in any court or other tribunal.  On the Effective Date, excluding the Trust Causes of Action vested in the Plan Trust and the Released Claims, the Reorganized Debtor is vested with authority to enforce, file, litigate, prosecute, settle and collect Estate Claims. (excluding the Trust Causes of Action, which are vested in the Plan Trust), including Avoidance Actions not vested in the Plan Trust(that are not Insider Avoidance Actions), although the Reorganized Debtor will not be required to do so unless it determines that doing so would be in the best interests of its creditors or Interest Holders.

While the Debtor has attempted to identify Estate Claims in the Disclosure Statement which may be pursued, and hereby incorporate by reference those disclosures and provisions, the failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to limit the rights of the Debtor or the Reorganized Debtor to pursue any Estate Claim that is expressly vested in such party in the Plan.  Unless an Estate Claim against any Person is expressly

93

waived, relinquished, releasedd, vested in the Plan Trust, compromised, or settled as provided or

identified in the Plan (like the Released Claims), any Confirmation Order or prior Bankruptcy

Court order, the Debtor and the Reorganized Debtor expressly reserve Estate Claims for later

adjudication (either by the Reorganized Debtor or the Plan Trustee, as the case may be).

Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata,

collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or

laches shall apply to any Estate Claim upon or after Confirmation or consummation of the Plan

(except with respect to the Released Claims).

All Estate Claims (excluding the Trust Causes of Action, which are vested in the Plan

Trust and the Released Claims) are preserved under the Plan for the benefit of the Estate and the

Reorganized Debtor, as applicable under the terms of the Plan.  The Reorganized Debtor may

settle or compromise any Estate Claims (excluding the Trust Causes of Action, which are vested

in the Plan Trust and the Released Claims) without further notice, motion, or order of the

Bankruptcy Court.  Any recoveries on Estate Claims (excluding the Trust Causes of Action, which

are vested in the Plan Trust) shall be paid to the Reorganized Debtor and be used to pay operating

expenses or make payments on account of Allowed Claims and/or Interests in accordance with the

terms of the Plan.  Notwithstanding anything herein to the contrary, the Released Claims are

released and discharged as provided in Section III.E.3. of the Plan.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF

THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE

ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR

RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER INFORMATION.

HOWEVER, ALL RIGHTS OF THE DEBTOR AND THE ESTATE ARE RESERVED WITH

RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE

UNDER THE BANKRUPTCY CODE OR OTHER LAW (OTHER THAN THE INSIDER

AVOIDANCE ACTIONS, WHICH ARE VESTED IN THE PLAN TRUST).

94

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.110585253.110585144.110466262.1                                          Exhibit 1, Page 106

**K.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all entities with respect to all matters related to the Case, the Debtor, the Reorganized Debtor, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any and all objections to the allowance or priority of any Claim;

2.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party;

4.      Resolve any issues related to any matters adjudicated in the Cases;

5.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Estate Claims that are pending as of the Effective Date or that may be commenced in the future, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan;

8.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

95

9.    Issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

10.    Enforce the terms of the Plan;

11.    Enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.    Resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan; and

13.    Enter an order concluding the Cases.

## IV.    <u>CONFIRMATION REQUIREMENTS AND PROCEDURES</u>

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a plan.  Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the plan is feasible.  These requirements are NOT the only requirements for confirmation.

### A.    Who May Vote on or Object to the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below, not everyone is entitled to vote to accept or reject the Plan.

### B.    Who May Vote to Accept or Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) Allowed or allowed for voting purposes, (2) classified in an impaired class, and (3) entitled to receive or retain some property on account of its Claim.

### C.    What Is an Allowed Claim or Interest

As noted above, a creditor or interest holder must first have an Allowed Claim or Interest to have the right to vote.  Generally, any Proof of Claim or Interest will be Allowed, unless a party in interest files an objection to the Claim or Interest.  When an objection to a Claim or Interest is filed, the Person holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE ON ACCOUNT OF PRE-PETITION CLAIMS WAS **FEBRUARY 20, 2025**.  A creditor may have an Allowed Claim even if a Proof of Claim was not timely filed. A Claim is deemed an Allowed Claim if (1) it is scheduled on the Debtor's Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim.  An Interest is deemed an Allowed Interest if it is scheduled and no party in interest has objected to the Interest.

### D.    What Is an Impaired Claim or Interest

As noted above, the Holder of an Allowed Claim only has the right to vote if it is in a Class that is impaired under the Plan.  A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what they are owed or otherwise impairs the legal rights of the Holders of the Claims.

In this case, the Debtor believes that Class 1-18 are impaired and therefore entitled to vote

97

to accept or reject the Plan. Parties who dispute the Debtor's characterization of their Claims or Interests as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

**E.    Who Is Not Entitled to Vote**

The following four types of claims are not entitled to vote: (1) Claims that are not Allowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE (AND UNABLE TO VOTE), YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**F.    Who Can Vote in More Than One Class**

A creditor whose Claim is an Allowed Claim in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim. Also, a creditor who has a Claim for wages or unpaid vacation, healthcare or retirement benefits may have both a Priority Claim up to the maximum specified in Bankruptcy Code section 507(a)(4) and (a)(5), provided the conditions for priority treatment as specified under Bankruptcy Code section 507(a) are met, and a General Unsecured Claim for all amounts exceeding the statutory maximum. The Holder of such a Claim may cast a ballot for the priority portion of the Claim and another ballot for the general unsecured portion of the Claim.

**G.    Votes Necessary to Confirm the Plan**

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class,

1    and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be

2    confirmed by "cramdown" on non-accepting Classes, as discussed below.

3         **H.    Votes Necessary for a Class to Accept the Plan**

4         A Class of Claims is considered to have accepted the Plan when more than one-half (1/2)

5    in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted

6    in favor of the Plan.  A Class of Interests is considered to have accepted the Plan when at least

7    two-thirds (2/3) in amount of the Interest Holders of such Class which actually voted, voted to

8    accept the Plan.

9         **I.    Treatment of Non-Accepting Classes ("Cramdown")**

10        If at least one impaired Class votes to accept the Plan, and other impaired Classes vote to

11   reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting Classes are

12   treated in the manner required by the Bankruptcy Code.  The process by which non-accepting

13   Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."

14   The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims

15   if it meets all consensual requirements except the voting requirements of Bankruptcy Code section

16   1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each

17   impaired Class that has not voted to accept the Plan as referred to in Bankruptcy Code section

18   1129(b) and applicable case law.

19        To meet the "fair and equitable" test set forth Bankruptcy Code § 1129(b), the Plan needs

20   to comply with the "absolute priority rule."  In other words, as to a dissenting Class of General

21   Unsecured Claims that will not be receiving or retaining property of a value that is equal to the

22   Allowed General Unsecured Claim, holders of any claims or interests that is junior to such Class

23   should not receive or retain any non-exempt property except those under § 1115.  However, under

24   the "new value exception," a junior class may still retain property and meet the requirements of the

25   absolute priority rule to the extent the junior class provides "new value," which is value that is: (1)

26   new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization,

27   and (5) reasonably equivalent to the value or interest received.

28        The Debtor will ask the Court to confirm the Plan by "cramdown" on all impaired Classes

1    if any of these Classes do not vote to accept the Plan.

2        The Debtor expects that tThe Plan satisfies the Absolute Priority Rule.  The Absolute

3    Priority Rule is an issue only if an impaired Class of Unsecured Claims votes to reject the Plan.  If

4    all impaired Classes vote to accept the Plan, then the Absolute Priority Rule is not triggered.

5    Based on the compromise included in the Plan, the Debtor anticipates and expects that all impaired

6    Classes will vote to accept the Plan.  In addition, a Assuming the Plan must comply with the

7    Absolute Priority Rule with respect to Class 16, it does so because no holder of any claim or

8    interest that is junior to Class 16 is receiving or retaining any property on account of such junior

9    claim or interest.  Instead, the equity in the Reorganized Debtor is being retained by Robin

10   Mowbray it does so because the Plan Provides for on account of and in exchange for the

11   Settlement Consideration and the Compromise embodied in the Plan Robin Mowbray to pay the

12   New Value Contribution, which shall be subject to overbid.  Accordingly, the Plan can be

13   confirmed whether or not the Absolute Priority Rule must be satisfied.

14       **J.**        **Liquidation Analysis**

15       To obtain confirmation of the Plan, the Debtor must show that the Plan meets the "Best

16   Interests of Creditors Test."  Under that test, if a claimant or interest holder is in an impaired

17   class and that claimant or interest holder does not vote to accept the Plan, then that claimant or

18   interest holder must receive or retain under the Plan property of a value not less than the amount

19   that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the

20   Bankruptcy Code.

21       In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee.  Secured

22   creditors are paid first from the proceeds of the sales of properties on which those creditors have

23   liens.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining

24   sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority

25   share in proportion to the amount of their allowed claim in relationship to the amount of total

26   allowed unsecured claims.  Finally, interest holders receive the balance that remains after all

27   creditors are paid, if any.

28       In order for the Court to be able to confirm this Plan, the Court must find that all creditors

100

1    and interest holders who do not accept the Plan will receive at least as much under the Plan as

2    such holders would receive under a Chapter 7 liquidation.

3        The Debtor believes that the Best Interests Test is met.  The Liquidation Analysis is

4    attached to the Index as **Exhibit 3**.   The Liquidation Analysis calculates high and low recovery

5    scenarios for the Holders of Allowed General Unsecured Claims in a liquidation of the Debtor in a

6    Chapter 7.  The average based on those high and low recovery scenarios is $15,674,000 (the

7    "**Estimated Chapter 7 Distribution Amount**").  The Plan , at a minimum, matches exceeds this

8    sum.  Under the Plan, the Holders of General Unsecured Claims will receive a *pro rata* share of

9    the GUC Payment Amount in the amount of $15,674 25,000,000, plus with interest at the GUC

10    Interest Rate, *plus* the GUC Bonus.   In addition, the Plan provides that the Holders of Allowed

11    General Unsecured Claims will receive a *pro rata* share of any Net Recoveries on account of the

12    Trust Causes of Action.

13        The Plan results in more value to creditors than a Chapter 7 liquidation for multiple

14    reasons.  First, the Plan simply pays more value to the Holders of Allowed General Unsecured

15    Claims.  Under the Plan, the Debtor is committing to pay the Plan Trust (for the benefit of the

16    Holders of Allowed General Unsecured Claims) the $25,000,000 GUC Payment Amount.  This

17    minimum sum alone exceeds the Estimated Chapter 7 Distribution Amount by over $9,000,000.

18    Moreover, the Plan provides for the Holders of Allowed General Unsecured Claims to share in the

19    GUC Bonus.  By the GUC Bonus, the Holders of Allowed General Unsecured Claims could

20    receive a *pro rata* share of up to another $30 million to $67 million (subject to the disallowance of

21    Claims) in addition to the GUC Payment Amount.

22        Second, t The Distributions through the Plan will be more efficient and less costly than the

23    liquidation of such assets in a Chapter 7, which would result in a trustee unfamiliar with this Case

24    and a new set of professionals representing the trustee.  The new professionals would need to

25    become familiar with this Case.  The appointment of a trustee and his or her retention of new

26    professionals could delay any distributions and would result in an additional layer of

27    administrative expenses.  Greater administrative expenses, in turn, would further reduce the

28    amount available to pay the Holders of Allowed Unsecured Claims.

101

1   Third, tThe Plan maximizes the value available for the Holders of Allowed Claims.  First,

2   The Holders of Allowed Claims will benefit from the value of the post-Effective Date operations

3   of the Debtor and , PTS, and PTM. .  As reflected in the PTS Projections, essentially all of PTS's

4   excess cash flow is being paid to the Debtor on an annual basis during the Plan term.  (*See* Ex. 2 at

5   8 of 10.)  In addition, Second, iIn a liquidation, it is unlikely that the Debtor and PTS would

6   realize the full value of their respective accounts receivable and existing contracts.  Many of the

7   customer contracts have onerous provisions that, upon an event of default, enable the customer to

8   withhold payment and offset amounts owing by any damages incurred.  Certain contacts go

9   further, requiring a return of payments already received.  The Plan preserves the business of the

10   Debtor and PTS, enabling both to perform their obligations under their respective customer

11   contracts, and, as a result, collect the proceeds for services rendered.  This value inures to the

12   benefit of the Holders of Allowed Claims under the Plan.

13   Fourth, the Plan includes value from non-estate sources.  Due to the compromise embodied

14   in the Plan and the Settlement Consideration, upon the MWP Consolidation, the assets of MWP

15   will become assets of the Reorganized Debtor.  The Reorganized Debtor will receive the real

16   property of MWP.  This is in addition to the future rental income from the County of $35,124 per

17   month.  The rental income will benefit the Holders of Allowed Claims

18

19   FurtherFifth, the Plan preserves the right of creditors to share in any Net Recoveries on the

20   Trust Causes of Action.  The Plan vests the Trust Causes of Action in the Plan Trust for the Plan

21   Trustee to investigate and, if appropriate, pursue.  The Trust Causes of Action include are

22   compromised of any Insider Avoidance Actions that are not Released Claims and the Loan Causes

23   of Action against PTM.  For example, all Insider Avoidance Actions and the Loan Causes of

24   Action, excluding the Excluded Claims.  wWhile the Plan contemplates payments on the PTM

25   Loan and the MWP Loan, the Plan Trustee will have the right to pursue PTM and MWP to collect

26   the projected unpaid balance, should he or she determine that it is in the best interests of the Plan

27   Trust to do so.  That is, under the Plan, the Holders of Allowed General Unsecured Claims are

28   receiving the liquidation value of the Affiliate LoansPTM Loan, *plus* the potential to collect the

102

1    full balance owing.  The MWP Loan will be extinguished upon the MWP Consolidation, but

2    MWP's real properties will become property of the Reorganized Debtor.

3    ~~In short, under the Plan, the Holders of Allowed Claims receive the best of all worlds, *i.e.*,~~

4    ~~the benefit of the operating businesses of the Debtor and PTS and the cash flow they generate *and*~~

5    ~~the Plan Trustee to investigate and, if appropriate, pursue the Trust Causes of Action as a Chapter~~

6    ~~7 trustee could.  Moreover, the Debtor is funding the Plan Trust with an initial amount to aid in the~~

7    ~~Plan Trustee's duties.~~

8    All amounts contained in the Liquidation Analysis and described in the notes to the

9    Liquidation Analysis are based on the information discussed above and are Force Ten's good faith

10   estimates of the projected amounts that a Chapter 7 trustee would receive from the liquidation of

11   the estate's assets.  The amounts, descriptions, and other information contained herein do not

12   constitute an admission of the amounts of any Claims or an admission or a denial of the existence

13   or values of the assets or liabilities, and are not to be used as such in any legal action,

14   administrative proceeding, or otherwise.  The projections, estimates and notes to this Liquidation

15   Analysis were prepared solely to assist the Bankruptcy Court in making the findings required

16   under Bankruptcy Code § 1129(a)(7) of the Bankruptcy Code and they may not be used or relied

17   upon for any other purpose.

18   The information contained in this Liquidation Analysis is projected and assumed as of the

19   Effective Date.  The Debtor is under no obligation, and expressly disclaim any obligation to

20   publicly update any of the information contained herein, whether as a result of new information,

21   future events, or otherwise.

22   THE DEBTOR BELIEVES THAT ANY ANALYSIS OF A HYPOTHETICAL

23   LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF

24   ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT

25   ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND

26   OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF

27   THE DEBTOR OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS,

28   NOR THE FINANCIAL INFORMATION OR NOTES ON WHICH IT IS BASED, HAS BEEN

1   EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE

2   WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED

3   PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS

4   WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN

5   THE LIQUIDATION ANALYSIS.

6        More specifically, the Debtor believes that there can be no assurance as to the values that

7   would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a

8   Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in

9   making its determinations under Bankruptcy Code ~~section~~ § 1129(a)(7).  For example, the

10  Liquidation Analysis necessarily contains an estimate of the amount of the Allowed Claims, which

11  is based on the amounts of the Claims as listed in the Debtor's Schedules or in the Proofs of

12  Claims filed by the claimants (some of which are subject to dispute by the Debtor), as well as

13  estimated Administrative Expense Claims, Priority Unsecured Claims, and Professional Fee

14  Claims.  These estimates are based solely upon the Debtor's analysis of the Schedules, the claims

15  asserted against the Debtor, and the Proofs of Claim on file, and the Debtor's estimates as to

16  additional Administrative Expense and other Claims that may arise in the event of a conversion of

17  the case from Chapter 11 to Chapter 7.  No order or finding has been entered by the Bankruptcy

18  Court or any other court estimating or otherwise fixing the amount of Claims at the projected

19  amounts of Allowed Claims set forth in the Liquidation Analysis.  The estimate of the amount of

20  Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other

21  purpose, including any determination of the value of any Distribution to be made on account of

22  Allowed Claims under the Plan.  The Liquidation Analysis is being provided solely to disclose to

23  Holders of Claims the potential recoveries in a hypothetical Chapter 7 liquidation of the Debtor,

24  subject to the assumptions set forth therein. Nothing herein or in the Liquidation Analysis shall be

25  deemed as an admission as to the allowed amount of any Claim.

26       **K.**     **Feasibility**

27       Another requirement for confirmation involves the feasibility of the Plan.  This means that

28  confirmation of the Plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.

### 1.      Effective Date Payments

The first aspect considers whether there will be enough cash on the Effective Date of the Plan to pay the amounts due on such date.  The Debtor expects to have cash of approximately $8.84 million as of the Effective Date of the Plan.  (*See* Ex. 1 at 5 of 18.)  As demonstrated by the Projections, the Debtor expects that this balance will be sufficient to make the payments required on the Effective Date in accordance with the Plan, including Allowed Administrative Claims, the Initial Plan Trust Payment, and the PNC Effective Date Payment.  (*See id.*, reflecting the Debtor's projected cash balance and the reduction of liabilities between Q2 and Q3 2025.)

### 2.      Post-Effective Date Payments

The second aspect of feasibility considers whether there will be enough cash over the life of the Plan to make the Distributions required by the Plan when required by the Plan.  The payments required under the Plan after the Effective Date generally fall into two categories, payments to the Holders of Allowed Secured Claims, and the Plan Trust Payment required to the Plan Trust.  Both categories of payments are feasible under the Plan.

The Reorganized Debtor is projected to operate on ~~A~~an operating cash flow positive basis post-Effective Date.  With the exception of 2025, in which extraordinary restructuring expenses are to be paid, the Reorganized Debtor is projected to generate net income on an annual basis. (*See* Ex. 1 at 2 of 18.)  The Projections demonstrate that the Reorganized Debtor will have sufficient net cash flow to repay its Allowed Secured Claims and to fund GUC Payment Amount, each as required under the Plan.  (*See id.* 2, 8, and 10 of 18.)  The Reorganized Debtor is projected to complete its obligations under the Plan by 2034, with ending cash on hand of approximately $3.3 million.  (*See id.* at 8 of 18.)  Moreover, the definition of the Class 16 GUC Payment helps to ensure that the payment of the GUC Payment Amount is feasible as it is based on the Reorganized Debtor's actual cash flow post-Effective Date.

The Reorganized Debtor is to receive substantial sums from PTS and PTM during the term

105

of the Plan.  The Reorganized Debtor is projected to receive management fees and equipment rent from PTS of nearly $10.8 million per year.  (*See* Ex. 1 at 2 of 18.)  The PTS Loan is projected to be repaid ~~less than one year~~within two years after the Effective Date.  (*See* Ex. 2 at 9 of 10.)  The projected annual distributions collectively exceed $14.5 million over the term the Plan.  (*See id.*) Essentially, all of PTS's net cash flow is being paid to the Reorganized Debtor.  The PTS Plan Projections demonstrate that PTS will be able to pay the projected sums to the Reorganized Debtor.  (*See id.* at 2 and 8 of 10.)  In addition, the Reorganized Debtor is projected to receive over $700,000 annually from PTM on account of management fees and equipment rent.  (*See* Ex. 1 at 2 of 10.)

The Debtor has included with this Disclosure Statement the Projections, projecting its post-Effective Date operations, and the PTS Projections, projecting PTS's post-Effective Date operations.  (*See* Exs. 1 & 2.)  While the projected revenues and expenses upon which the Plan is based are subject to a variety of unpredictable outside forces and circumstances that could adversely affect the projections, the Debtor believes that the Projections and the PTS Projections are based on reasonable assumptions.  Nonetheless, certain factors may be outside of the Debtors' present control.

FINANCIAL PROJECTIONS PROVIDED WITH THE DISCLOSURE STATEMENT WILL REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN ASSUMPTIONS SET FORTH WITH SUCH FINANCIAL PROJECTIONS.  THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND ANY FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR.  BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE PROPONENTS' CONTROL, THE REORGANIZED DEBTOR'S ACTUAL CASH FLOW MAY BE DIFFERENT FROM THAT PROJECTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

106

FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING
FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585253.1 10585253.1 10585144.1 10468262.1    Exhibit 1, Page 118

## V.    EFFECT OF CONFIRMATION OF THE PLAN

### 1.    Binding Nature of Plan

CONFIRMATION OF THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

### 2.    Discharge

The Debtor will receive a discharge upon the entry of the Confirmation Order.  Nothing herein shall limit the effect of confirmation as described in §§ 524 and/or 1141 of the Bankruptcy Code.  Upon discharge, the Reorganized Debtor and its assets will, to the fullest extent permitted by § 1141 of the Bankruptcy Code, including, without limitation as provided in § 1141(d)(1)(A) of the Bankruptcy Code, be deemed discharged and released from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities of any nature whatsoever, whether known or unknown, that arose before the Effective Date or that are based upon, arise from, or otherwise relate to acts, events, omissions, transactions, or other activities of any kind that occurred before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each case, regardless of whether: (1) a proof of claim based on such a debt is filed or deemed filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the person holding the Claim based on such a debt has accepted the Plan; provided, however, that in no event shall the Debtor be discharged of any obligations remaining under the Plan as of the Effective Date.

Except as expressly provided in the Plan, pursuant to § 1141(d)(5)(A), the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtor to the fullest extent allowed under § 1141 of the Bankruptcy Code.  The Reorganized Debtor will not be liable for any Claims and will only have any obligations that are specifically provided for in the Plan.

107

1  Holders of any Claims or debts against the Debtor will, upon the Effective Date, be enjoined from

2  taking any action to collect, recover, or offset any such Claim or debt against the Reorganized

3  Debtor or as a personal liability of the Reorganized Debtor.

4      Except as otherwise expressly provided in the Plan or the Confirmation Order, all persons

5  will be precluded from asserting or pursuing against the Reorganized Debtor, the Estate, the Plan

6  Trustee, or their respective property for any Claims based on, arising from, or in connection with

7  any act, event, omission, transaction, or other activity of any kind that occurred before the

8  Effective Date, and any debt of the Debtor or Claim against the Debtor, whether secured or

9  unsecured, which was in default up to the Effective Date, will no longer be deemed in default and

10  will be deemed in good standing.

11          **3.    Injunction**

12      All Persons or entities who have held, hold, or may hold Claims (other than Claims that are

13  unimpaired under the Plan), and all other parties in interest in the Case, along with their respective

14  current and former employees, agents, officers, directors, principals, and direct and indirect

15  affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any

16  Claims against the Debtor or cause of action treated, discharged, released, or settled under the

17  Plan, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit,

18  action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial,

19  arbitral, administrative, or other forum) on account of any such Claims or cause of action or

20  against the Reorganized Debtor; (ii) enforcing, levying, attaching, collecting, or otherwise

21  recovering by any manner or means, whether directly or indirectly, on account of any judgment,

22  award, decree, or order related to any such Claims against the Reorganized Debtor; (iii) creating,

23  perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against

24  the Reorganized Debtor on account of any such Claims; (iv) asserting any right of setoff,

25  subrogation, or recoupment of any kind, against any obligation due from the Reorganized Debtor,

26  or against the property or interests in property of the Debtor or Reorganized Debtor, on account of

27  such Claims; (v) commencing or continuing in any manner any action or other proceeding of any

28  kind on account of, in connection with, or with respect to any such Claims released or settled

pursuant to the Plan; or (vi) taking any act to obtain possession or collect from the respective

assets of the Reorganized Debtor or the Plan Trust on account of any such Claims or any act to

recover on account of any such Claims; provided, however, that nothing contained herein shall

preclude such entities from exercising their rights pursuant to and consistent with the terms of the

Plan.

### 4. Vesting of Property in the Reorganized Debtor

Except as otherwise provided in the Plan and excluding the Trust Causes of Action, the

confirmation of the Plan vests title to all property whatsoever of the Debtor and the Estate in the

Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but,

pending the payment of all Allowed Claims in full, subject to the express requirements,

obligations, and restrictions in the Plan.

### 5. Modification of the Plan

The Debtor may modify this Plan at any time before confirmation.  However, the

Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan.  The

Debtor may also seek to modify this Plan at any time after confirmation only if (1) this Plan has

not been substantially consummated, and (2) the Bankruptcy Court authorizes the proposed

modifications after notice and a hearing.

### 6. Exculpations and Releases

To the maximum extent permitted by law, and except to the extent arising from willful

misconduct, gross negligence, fraud or malpractice as construed under CA PRC 1.8.8., neither the

Debtor, the Reorganized Debtor, nor any of their its professionals employed or retained by any of

them it in the Case (collectively, the "**Exculpated Parties**"), shall have or incur liability to any

person or entity for any Official Actions taken or omission made in good faith in connection with

or related to the formulation and implementation of this Plan, or a contract, instrument, release, or

other agreement or document created in connection therewith, the solicitation of acceptances for or

confirmation of this Plan, or the consummation and implementation of this Plan, or and the

transactions contemplated thereby by the Plan related to the post-petition administration of the

Case prior to the Effective Date.

### 7.    Submission of Post-Confirmation Reports

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on each of the following or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties that receive notice of electronic filings in the Chapter 11 Cases.  Further status reports shall be filed every 120 days and served on the same entities.

### 8.    Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the entry of an order dismissing the Case or converting the Case to Chapter 7, at the rate in effect at the time such fees are due.

### 9.    Post-Confirmation Conversion/Dismissal

After the Plan is confirmed, a creditor or party in interest may bring a Motion, only after notice and a hearing, to convert or dismiss the Chapter 11 Case under Bankruptcy Code section 1112(b) if there is an Uncured Default as defined in Section III.F. above or other material default in performing the Plan.  If the Bankruptcy Court orders the Chapter 11 Case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the estate and vested in the Reorganized Debtor, and that has not been distributed under the Plan will revest in Chapter 7 estate.  The automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Bankruptcy Court during the Chapter 11 Case.

The Confirmation Order may also be revoked under very limited circumstances.  The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry of the Confirmation Order.

10. **Final Decree**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final decree to close the Chapter 11 Case.  The Reorganized Debtor shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

## VI.    RISK FACTORS REGARDING THE PLAN

Performance of the obligations under the Plan are subject to various factors and contingencies, some of which are described in this section.  The following discussion summarizes some of the material risks associated with the Plan, but is not intended to be exhaustive.  Moreover, it should be read in connection with the other disclosures contained in this Disclosure Statement and the Plan.  Each creditor, in conjunction with its advisors, should supplement the following discussion by analyzing and evaluating the Plan and the Disclosure Statement as a whole.  THE RISKS ASSOCIATED WITH THE PLAN MUST BE CAREFULLY CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE PLAN.

The Plan is funded from the post-Effective Date cash flow and operations of the Reorganized Debtor, including payments to the Reorganized Debtor from PTM and PTS.  In particular, the Reorganized Debtor's post-Effective Date cash flow includes management fees and equipment rent from PTS, the repayment of the PTS Loan, and projected distributions from PTS.  The ability of PTS to make such payments and distributions is based on its projected cash flow.  The PTS Projections are attached to the Index as **Exhibit 2**.

The Reorganized Debtor is projected to operate on a cash flow positive basis after the Effective Date.  (*See* Ex. 1.)  The projected payments from PTS and PTM contribute to such positive cash flow.  The Debtor believes that the Projections and the PTS Projections are reliable projections of their respective future cash flows.  However, each projection is a mere estimate and is based on certain assumptions.  The Debtor believes those assumptions are reasonable.  However, there is a risk that the Reorganized Debtor's actual post-Effective Date operations are materially different than projected.  Sales could be less than expected and/or expenses can be more

than expected, either of which could impact the ability of the Reorganized Debtor to make the payments contemplated by the Plan.  There is a similar risk that PTS's post-confirmation operations are different than projected.

There are risks associated with the future operations of the Reorganized Debtor, PTS, and PTM.  The Debtor currently has ten (10) customers.  In addition, the Debtor's customer contracts are, in general, of short duration, typically 2 years.  There is no guarantee that a particular customer will select the Debtor for future work after the expiration of the Debtor's current contract(s).  As discussed above, the financial distress that led to the Case was, in part, caused by a decline in revenues due to the Debtor's loss of certain customers, which left the Debtor with expenses it could not pay.  However, the Debtor has been attempting to secure additional work from current customers and prospective customers.  The revenues generated post-petition include new customers secured in 2024.

PTS's revenues are largely concentrated in one customer, SCE.  SCE represents approximately 99% of PTS's revenues.  The loss of SCE's contracts would result in a severe disruption to PTS's operations (absent PTS replacing the loss with revenues from another source).  Without SCE's contracts, PTS would lack the ability to make the projected payments to the Reorganized Debtor.  PTS's current SCE contracts expire December 31, 2026.  Similar to the Debtor, there is no guarantee that PTS will secure future work from SCE after the expiration of the current contracts.  However, PTS is attempting to extend its existing contracts with SCE and win work from other prospective customers.

While PTM has one third-party customer, historically, PTM's revenues were primarily derived from services provided to the Debtor and PTM.  The Debtor has not needed PTM's traffic management services after the Petition Date.  A decline in the work secured by the Debtor and/or PTS could, in turn, could impact the ability of PTM to pay the Reorganized  Debtor the amounts set forth in the Projections.

In addition, operations of PTS and PTM could be disrupted if the Debtor's operations ceased.  The Debtor provides assistance to both PTS and PTM in the form of management services and the rental of equipment, each pursuant to written agreements.  As such, if the Debtor's

112

operations cease, then both such entities' operations would be materially and adversely impacted.

## VII.    **TAX CONSEQUENCES OF THE PLAN**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

At this time, it is projected that there will be no federal or state income tax due from the implementation of the Plan.

## VIII.    **CONCLUSION**

The Debtor believes that the Plan is in the best interests of all stakeholders and urges the Holders of Allowed Claims to vote in favor of the Plan.

DATED:  March 14, 2025                 RAINES FELDMAN LITTRELL LLP


                                        By:    _/s/ Robert S. Marticello_
                                              ROBERT S. MARTICELLO
                                              MICHAEL L. SIMON
                                              Attorneys for Debtor and Debtor-in-Possession
                                              The Original Mowbray's Tree Service, Inc.

113

## **TABLE OF DEFINITIONS**

### A.    **Definitions**

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

"Administrative Claim" means a Claim for costs and expenses of the administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a Claim of a Professional employed at the expense of the Estate and any fees or charges asserted against the Estate under 28 U.S.C. § 1930.

"Administrative Tax Claim" means an Administrative Claim or other Claim that is not an Allowed Secured Claim and that a government unit asserts against the Debtors for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

"Affiliates" means, collectively, PTS, PTM, and MWP.

"Allowed" means a Claim that is either (a) listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (b) with respect to which a proof of claim has been filed by the Claims Bar Date, and as to which wither (i) no objection or motion to estimate was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (ii) any such objection has been determined with the Claim being allowed by a Final Order.  The amount of an Allowed Claim shall be as follows: (a) if the creditor did not file a proof of claim with the Bankruptcy Court on or before the Claims Bar Date, (1) the amount of the creditor's Claim as listed in the operative Schedules as not

114

disputed, contingent, unliquidated or unknown, or (2) the amount fixed by Final Order of the Bankruptcy Court in resolving any timely filed objection or other motion disputing the amount of such Claim; or (b) if the creditor filed a proof of claim with the Bankruptcy Court on or before the Claims Bar Date and the claim is not a Contingent Claim, (1) the amount stated in such proof of claim if no objection to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim for which a proof of claim is not filed by the Claims Bar Date and that is not listed in the Schedules or is listed in the Schedules as disputed, unliquidated, contingent or unknown shall be zero, and no distribution shall be made on account of such Claim.  An Allowed Claim shall not include any unmatured or post-petition interest unless otherwise stated in the Plan.

"Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim" means an Allowed Claim in the specified Class and/or of the specified type.

"Allowed Administrative Claim" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

"Allowed General Unsecured Claim" means an Allowed Unsecured Claim that is not entitled to priority.

"Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has as interest, or which is subject to setoff under Section 533 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the mount subject to any setoff as the case may be.

"Available Trust Proceeds" collectively refers to the GUC Payment Amount, the GUC Bonus, and Net Recoveries.

"Avoidance Action" means causes of action arising under 11 U.S.C. §§ 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common

115

law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bankruptcy Case" or "Case" means the bankruptcy case of the Debtor under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:24-bk-12674-TA.

"Bankruptcy Code" or "Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California.

"Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a).

"Calculation Date" means the date that is thirty (30) days after the end of a Measurement Period.

"Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

"Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and includes any claims based on, arising from, or connected with any work performed by the Debtor prior to the Petition Date, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claims Bar Date" means February 20, 2025, the date the Court set as the deadline for creditors to file proofs of claim against the Debtor's Estate.

"Class" means the group of Claims classified in the Plan pursuant to Sections 1122 and

116

1123 of the Bankruptcy Code.

"Class 16 GUC Payment" means, with respect to each Measurement Period after the Effective Date until the GUC Payment Amount is paid to the Plan Trust in full, the Projected GUC Payment for such Measurement Period (a) plus or minus, as the case may be, the difference between (i) the actual net income less income tax distributions of the Reorganized Debtor (inclusive of PTS) for such Measurement Period and (ii) the projected net income and income tax distributions as set forth in the Plan Projections for the same period, and (b) if and to the extent that such Projected GUC Payment (as may be augmented by subparagraph (a) of this definition) complies with the Minimum Working Capital Ratio and the Minimum Cash Threshold.  The Class 16 GUC Payments shall be calculated by the Reorganized Debtor in consultation with the Plan Trustee and approved by the Plan Trustee.

"Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the Plan.

"Debtor" means The Original Mowbray's Tree Service, Inc.

"Debtor/RP Settlement Agreement" means any written settlement agreement executed between the Debtor and the Rodriguez Plaintiffs and filed with the Court.

"Disclosure Statement" means the *Disclosure Statement Describing Chapter 11 Plan of Reorganization*, including as may be further amended or modified.

"Disputed Claim" means all or any part of a Claim that is the subject of a timely objection or request for estimation filed on or before the Claims Objection Deadline (as such deadline may be extended), which objection or request for estimation has not been withdrawn or determined by a Final Order of the Bankruptcy Court.  In addition, prior to the later of (a) the Claims Objection Deadline, (b) if prior to the Claim Objection Deadline, a motion to disallow or estimate the Claim is filed, then the date upon which such motion is determined by Final Order, or (c) if a proceeding is pending to determine the validity, amount, or characterization of the Claim before a court of competent jurisdiction (and if and to the extent that, prior to the Effective Date, the Bankruptcy

117

1    Court entered an order lifting the automatic stay to allow the proceeding to proceed to final

2    judgment), then the date upon which such proceeding, including, without limitation, any appeal or

3    remanded or further proceedings in or related to such proceeding, is resolved by a Final Order, any

4    Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

5    calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the

6    proof of claim is listed in the Schedules, (2) the Claim corresponding to the proof of claim is listed

7    in the Schedules as disputed, contingent, unliquidated, or unknown, (3) the amount of the Claim as

8    specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the

9    Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

10    priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

11    any corresponding Claim listed in the Schedules.

12    "Distribution" means the Cash that is required to be distributed under this Plan to the holders

13    of Allowed Claims and Interests.

14    "Effective Date" means the date that is the fifteenth (15th) day after entry of the

15    Confirmation Order.

16    "Estate" means the bankruptcy estate of the Debtor created under Section 541 of the

17    Bankruptcy Code in the Case.

18    "Estate Claims" means any and all claims and causes of action that constitute property of

19    the Estate including, but not limited to, any Avoidance Actions, equitable subordination or debt

20    recharacterization actions, any causes of action or claims for recovery of any amounts owing to the

21    Debtor or the Estate, and any claims or causes of action against the Debtor's insurance carriers.

22    "Estate Real Property" means any real property that an Estate has an interest in and any

23    real property of MWP.

24    "Examiner" refers to Donald T. Fife, in his capacity as the Court-appointed examiner under

25    the *Order Approving the U.S. Trustee's Application for the Appointment of an Examiner* [Docket

26    No. 374].

27    "Excluded Claims" means any (a) Estate Claims or Avoidance Actions against PTS,

28    including, without limitation, with respect to the PTS Loan or any Insider Payments to PTS, , and

118

(b) the Released Claims, and (c) any other Estate Claim or Avoidance Action that is released pursuant to a compromise approved by a Final Order of the Court.

"Excess GUC Cash Payment" means, with respect to each Measurement Period after the Reorganized Debtor pays the GUC Payment Amount in full to the Plan Trust, fifty percent (50%) of the actual net income less income tax distributions of the Reorganized Debtor (inclusive of PTS) for such Measurement Period in excess of and subject to the Minimum Working Capital Ratio and the Minimum Cash Threshold.  The GUC Excess Cash Payments shall be calculated by the Reorganized Debtor in consultation with the Plan Trustee and approved by the Plan Trustee.

"File," "Filed," or "Filing" means duly and properly filed with the Court and reflected on the Court's official docket.

"Final Order" means an order or judgment entered by the applicable court on its docket.

a.    That has not been reversed, rescinded, stayed, modified, or amended;

b.    That is in full force and effect;

c.    With respect to which the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; and

d.    With respect to which any appeal, motion or petition for review, remand, rehearing, or reconsideration, or writ of certiorari that is Filed has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, reconsideration, or a writ of certiorari was sought, and any remanded or further proceedings following such appeal, petition, or writ have been resolved by Final Order.

"General Unsecured Claim" means an unsecured Claim against the Debtor, however arising, not entitled to priority under § 507(a) of the Bankruptcy Code.

"GUC Bonus" means, if and to the extent that the GUC Payment Amount is satisfied within five (5) years after the Effective Date, then the Excess GUC Cash until the earlier or first to be reached of (a) the payment of the greater of (i) $55,000,000 (*i.e.*, another $30,000,000 in addition to the GUC Payment Amount) and (ii) an amount equal to 40% of the Allowed General

119

Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust inclusive of the GUC Payment Amount, and (b) the date that is five (5) years after the Effective Date.

"GUC Interest Rate" shall mean, for each year beginning on and after the Effective Date, the federal judgment rate for the first Business Day of such year.

"GUC Maximum Amount" means the greater of $55,000,000 and an amount equal to 40% of the Allowed General Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust inclusive of the GUC Payment Amount.

"GUC Payment Amount" means the lesser of (a) $~~15,674~~25,000,000, plus simple interest per annum on the balance of such amount not yet paid to the Plan Trust at the GUC Interest Rate, and (b) the total amount of Allowed General Unsecured Claims.

"GUC Payment Commencement Date" means the fifteenth (15th) Business Day after the third anniversary of the Effective Date.

"Holder" means an entity holding a Claim.

"Initial Plan Trust Payment" means the $50,000 payment by the Reorganized Debtor to the Plan Trust on the Effective Date.

"Insider" shall have the meaning in 11 U.S.C. § 101(31).

"Insider Avoidance Action" means any Avoidance Action against any Insider, excluding any Excluded Claim.

"Interest" means any "equity security" as provided by Section 101(16) of the Bankruptcy Code.

"Lien" means any lien, encumbrance, pledge or other charge against property.

"Liquidation Analysis" means the liquidation analysis setting forth what Holders of Allowed Claims will receive in a chapter 7 liquidation and attached to the Index as **Exhibit 3**.

1  "Loan Causes of Action" means any Estate Claims or Avoidance Actions against PTM ~~or~~

2  ~~MWP s~~olely to collect the ~~respective~~ balances on the PTM Loan ~~and MWP Loan~~ in excess of the

3  amounts to be paid to the Reorganized Debtor as set forth in and according to the Projections,

4  which amounts shall be the property of the Reorganized Debtor.

5  "Measurement Period" means each three-month period ending March 31, June 30,

6  September 30, and December 31 after the Effective Date and beginning with the first full such

7  three-month period after the Effective Date.

8  "Mill St. Property" means the real property located at 686 E. Mill Street, San Bernardino,

9  CA 92415.

10  "Minimum Cash Balance" means $3,000,000.

11  "Minimum Working Capital Ratio" a minimum working capital ratio of at least 1.25 to 1.0

12  as measured in accordance with Generally Accepted Accounting Principles in the United States

13  ("US GAAP").

14  "Motion" means a request asking a judge to issue a ruling or order on a legal and/or

15  equitable matter.

16  "MWP" means Mowbray Waterman Property, LLC.

17  "MWP Estate" means the bankruptcy estate of MWP created under Section 541 of the

18  Bankruptcy Code in the MWP Bankruptcy Case.

19  "Net Recoveries" means any proceeds recovered and received by the Plan Trust on any

20  Trust Causes of Action, net of all attorneys' fees and other costs incurred to recover such proceeds,

21  and less any Trust Costs.

22  "Non-Ordinary Course Administrative Claim(s)" means Administrative Claims that are not

23  Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims,

24  including Claims that may arise from agreements entered into with the Estate after the Petition

25  Date other than trade agreements.

26  "Ordinary-Course Administrative Claim" means Administrative Claims other than

27  Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative

28  Claims, based upon liabilities that Debtors incur in the ordinary course of their business.

121

"Other Recoveries" means any amount, property, value, or payment that the Holder of a Claim receives on account of such Claim from a Person who is not the Debtor or from property that is not property of the Estate, including, without limitation, from a co-obligor, insurer, primarily liable party, or guarantor.

"OUST" means the Office of the United States Trustee, Santa Ana Division.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official committee appointed by the OUST, unofficial committee of creditors or equity holders, or entity.

"Petition Date" means October 18, 2024, the day that the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"PNC Collateral" means the "Prepetition Collateral" as that term is defined in the First Cash Collateral Stipulation and any other assets of the Estate subject to PNC Security Interests.

"PNC Loan Documents" means the "Prepetition Loan Documents" as that term is defined in the First Cash Collateral Stipulation.

"PNC Security Interests" means the "Prepetition Liens" as that term is defined in the First Cash Collateral Stipulation and any replacement liens granted to PNC pursuant to Section 6.b. of the First Cash Collateral Stipulation.

"PTM" means Phoenix Traffic Management, Inc.

"PTS" means Pino Tree Service, Inc.

"Plan" means the *Chapter 11 Plan of Reorganization*, including as may be further amended or modified.

"Projected GUC Payment" means the Payments under General Unsecured Claims set forth at page 19 of 172 of the Projections.

"Projections" means the projections attached to the Index as **Exhibit 1.**

"Plan Term End Date" means the date that is ten (10) years after the Effective Date.

"Plan Trust" means the trust created under the Plan for the benefit of creditors holding Allowed General Unsecured Claims.

122

"Plan Trust Payments" means the ~~annual payments to be mad~~Class 16 GUC Payment, ~~e by the Reorganized Debtor to the Plan Trust to fund the GUC Payment Amount~~ the Excess GUC Cash Payment, and the GUC Annual Minimum Payment~~set forth at page 10 of 18 of the Projections under "General Unsecured Claims" as provided in Section III.A. of the Plan~~.

"Plan Trustee" means Donald T. Fife, the trustee appointed for the Plan Trust.

"Priority Unsecured Claim" means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

"Priority Tax Claim" means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code § 507(a)(8).

"Pro Rata Distribution" means the ratio (expressed as a percentage) of (i) the amount of an Allowed General Unsecured Claim (less any Other Recoveries) to (ii) the sum of the aggregate amounts of all Allowed General Unsecured Claims.

"Professional Fee Claim" means:

a.    A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred on the Estate's behalf, or

b.    A Claim either under Bankruptcy Code § 503(b)(4) for compensation for professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for expenses incurred in making a substantial contribution to the Estate.

"PTS Projections" are the projections attached to the Index as **Exhibit 2**.

"Quarterly Distribution Date" means the Business Day selected by the Plan Trustee, in his or her sole and absolute discretion, within forty-five (45) days after a particular calendar quarter to make a Distribution as required by the Plan.

"Released Claims" means as defined in Section III.E.3. of the Disclosure Statement.

"Reorganized Debtor" ~~in the~~ refers to the Debtor upon and after the Effective Date and as reorganized under the Plan.

"Request for Payment" means a request for the allowance and payment of a Non-Ordinary Course Administrative Claim pursuant to 11 U.S.C. § 503(a).

123

1    "Schedules" means the Schedules of Assets and Liabilities filed by the Debtor in the Case,

2    as required by § 521(a)(1) of the Code, Bankruptcy Rule 1007 (b)(l), and Official Bankruptcy

3    Form No. 6, as the Schedules of Assets and Liabilities may have been or may be amended from

4    time to time.

5    "SOFA" means the Statement of Financial Affairs filed by the Debtor in the Case as

6    required by § 521(a)(1) of the Code and Bankruptcy Rule 1007(b)(l), as the Statement of Financial

7    Affairs may have been or may be amended from time to time.

8    "Trust" means the Gloria Mowbray Separate Property Trust.

9    "Trust Available Proceeds" means (a) the Initial Trust Payment, less any Trust Costs, (b)

10   the Plan Trust Payments to fund the GUC Payment Amount, and (c) any Net Recoveries.

11   "Trust Causes of Action" means the Insider Avoidance Actions and the Loan Causes of

12   Action, excluding, in all cases, the Excluded Claims.

13   "Trust Costs" means the amount necessary or estimated to pay or reserve for, as

14   determined by the Plan Trustee, in full (a) all costs of administration of the Plan Trust, (b) the

15   reasonable fees and costs of the Plan Trustee and the Plan Trustee's Professionals, (c) the amounts

16   Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims

17   were to become Allowed Claims, and (d) all fees payable under section 1930 of chapter 123 of

18   title 28 of the United States Code.

19   **B.    Rules of Construction**

20   The rules of construction in Bankruptcy Code section 102 apply to this Disclosure

21   Statement and the Plan.  For the purpose of this Disclosure Statement and the Plan, unless

22   otherwise provided in this Disclosure Statement or the Plan, (i) whenever from the context it is

23   appropriate, each term, whether stated in the singular or the plural, shall include both the singular

24   and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the

25   masculine, feminine and neuter; (iii) any reference in this Disclosure Statement or the Plan to an

26   existing document, Exhibit or schedule filed or to be filed means such document or schedule as it

27   may have been or may be amended, modified or supplemented pursuant to this Disclosure

28   Statement and the Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes

124

that entity's successors and assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement and the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Disclosure Statement or the Plan, as the case may be; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure Statement or the Plan in its entirety rather than to a particular portion of this Disclosure Statement or the Plan, as the case may be; (vii) unless otherwise provided in this Disclosure Statement or the Plan, any reference in this Disclosure Statement or the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of this Disclosure Statement or the Plan, or any other provision in this Section.

**C.      Rules of Interpretation**

Except as otherwise provided in the Plan, Bankruptcy Rule 9006(a) applies when computing any time period under the Plan.

Any term used in the Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms or as amended by the terms thereof.

Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

1    Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer

2    to the Plan in its entirety rather than to only a portion of the Plan.

3    Unless otherwise specified, all references to Sections or Exhibits in the Disclosure

4    Statement are references to this Disclosure Statement's Sections or Exhibits, and all references to

5    Sections or Exhibits in the Plan are references to the Plan's Sections or Exhibits

6    Section captions and headings are used only as convenient references and do not affect this

7    Disclosure Statement's or the Plan's meaning.

8    **D.**    **Disclosure Statement Exhibits**

9    The Exhibits to the Disclosure Statement—attached to the concurrently-filed Index—are as

10    follows:

11    Exhibit 1 – Projections;

12    Exhibit 2 – PTS Projections;

13    Exhibit 3 – Liquidation Analysis;

14    Exhibit 4 – ~~Overbid Procedures;~~ The Debtor's SOFA;

15    Exhibit 5 – ~~The Debtor's SOFA~~; Insider Payment Schedule; and

16    Exhibit 6 – May 2025 Monthly Operating Report.~~Insider Payment Schedule; and~~

17    ~~Exhibit 7 – January 2025 Monthly Operating Report.~~

18

19

20

21

22

23

24

25

26

27

28

126

# EXHIBIT 2

**RAINES FELDMAN LITTRELL, LLP**
Robert S. Marticello, State Bar No. 244256
*rmarticello@raineslaw.com*
Michael L. Simon, State Bar No. 300822
*msimon@raineslaw.com*
4675 MacArthur Ct, Suite 1500
Newport Beach, CA 92660
Telephone:    310 440-4100
Facsimile:    949-247-3998

Attorneys for The Original Mowbray's Tree
Service, Inc., Debtor and Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No: 8:24-bk-12674-~~TA~~SC |
| THE ORIGINAL MOWBRAY'S TREE SERVICE, INC., | Chapter 11 |
| Debtor and Debtor-in-Possession. | **FIRST AMENDED** CHAPTER 11 PLAN OF REORGANIZATION |

**TABLE OF CONTENTS**

s

I. EXECUTIVE SUMMARY OF THE PLAN ................................................................1

II. THE PLAN ................................................................................................................3

    A. The Plan Provides for a Reorganization of the Debtor and Its Affairs 3

    B. What Creditors and Interest Holders Will Receive Under the Plan ... 3

    C. Allowance and Treatment of Unclassified Claims ................................ 3

        1. Administrative Claims ................................................................ 43

            a. Ordinary Course Administrative Claims .................... 5

            b. Non-Ordinary Course Administrative Claims ............ 6

            c. Professional Fee Claims .............................................. 6

        2. Priority Tax Claims .................................................................... 7

    D. Allowance and Treatment of Classified Claims and Interests .......... 9

        1. Summary of Classes .................................................................. 9

        2. Secured Claims ........................................................................ 10

            a. Secured Claim of PNC Bank ..................................... 10

            b. Secured Claim of Jacobus Pino ................................ 12

            c. Secured Claims Related to Vehicles or Equipment . 13

        3. Classes of Priority Unsecured Claims .................................... 39

        4. Classes of General Unsecured Claims .................................... 40

        5. Class of Interest Holders ........................................................ 42

III. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 43

    A. Funding of the Plan ............................................................................ 43

        1. Payment of the GUC Payment Amount and the GUC Bonus
            .............................................................................................. 4443

            a. The GUC Payment Amount ................................. 4443

            b. The GUC Bonus ................................................... 4544

        2. The Compromise Among the Debtor, Robin Mowbray, MWP,
            and the Trust ............................................................................ 47

        3. Compromise with the Rodriguez Parties ........................... 5049

    B. Substantive Consolidation of MWP ............................................... 5352

    C. Sale of Real Properties ...................................................................... 54

    D. The Plan Trust ................................................................................... 55

        1. Establishment of the Plan Trust ............................................. 55

        2. The Trust Assets .................................................................. 5655

        3. The Term of the Plan Trust .................................................... 56

        4. The Plan Trustee ................................................................. 5756

        5. Trust Distributions ................................................................. 59

i

6. Federal Income and Taxation of the Plan Trust ..............6059

7. Beneficiaries of the Plan Trust ........................................60

8. Plan Trust Retention of Professionals and Fees and Expenses ................................................................................6160

a. Reporting to the Plan Trust by the Reorganized Debtor ................................................................6261

E. Reorganized Debtor Retention of Professionals and Fees and Expenses ..................................................................6261

F. The Plan Trustee as Disbursing Agent ............................6362

G. The Bond ........................................................................6362

H. Release of Liens ..............................................................6362

I. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ....................................................6362

J. The Reorganized Debtor's Post-Confirmation Management .......6463

K. Powers and Duties of the Reorganized Debtor ..................6463

L. Default on Obligations to Holders of Allowed Claims ................6564

IV. CLAIM OBJECTIONS AND PROCEDURES FOR RESOLVING DISPUTED CLAIMS ..........................................................6665

A. Standing ..........................................................................6665

B. No Distribution Pending Allowance ...............................66

C. Reserves for Disputed Claims ........................................66

D. Claims Paid By Third Parties ........................................6766

V. DISTRIBUTIONS ..................................................................67

A. Distributions for Claims Allowed as of the Effective Date ............67

B. Distributions on Account of Claims Allowed After the Effective Date ................................................................................6867

1. Payments and Distributions on Disputed Claims .............6867

2. Special Rules for Distributions to Holders of Disputed Claims ................................................................6867

C. Delivery and Distributions and Undeliverable or Unclaimed Distributions ..................................................................6867

1. Delivery of Distributions in General ................................6867

2. Undeliverable Distributions .............................................68

3. Distributions of Unclaimed Property .............................6968

D. Compliance with Tax Requirements/Allocations ........................6968

V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................................7069

A. Assumption of Executory Contracts and Unexpired Leases ........7069

B. Rejection of Executory Contracts or Unexpired Leases Not Assumed ................................................................................7271

ii

VI.    PRESERVATION OF CAUSES OF ACTION AND AVOIDANCE
       ACTIONS FOR THE REORGANIZED DEBTOR...................7372

VII.   RETENTION OF JURISDICTION .............................................74

VIII.  EFFECT OF CONFIRMATION OF THE PLAN .................7675

       A.    Binding Nature of Plan...........................................7675

       B.    Discharge................................................................7675

       C.    Injunction ........................................................................77

       D.    Vesting of Property in the Reorganized Debtor ..........7877

       E.    Modification of the Plan.................................................78

       F.    Exculpations and Releases ..............................................78

       G.    Submission of Post-Confirmation Reports....................7978

       H.    Quarterly Fees ..............................................................7978

       I.    Post-Confirmation Conversion/Dismissal.......................79

       J.    Final Decree ...............................................................8079

IX.    CONCLUSION.................................................................80

TABLE OF DEFINITIONS ................................................................81

       A.    Definitions.....................................................................81

       B.    Rules of Construction.....................................................91

       C.    Rules of Interpretation ...................................................92

       D.    Exhibits...........................................................................93

I.     EXECUTIVE SUMMARY OF THE PLAN ...............................1

II.    THE PLAN..............................................................................2

       A.    The Plan Provides for a Reorganization of the Debtor and Its Affairs2

       B.    What Creditors and Interest Holders Will Receive Under the Plan ...2

       C.    Allowance and Treatment of Unclassified Claims...........2

             1.    Administrative Claims..........................................3

                   a.    Ordinary Course Administrative Claims...........4

                   b.    Non-Ordinary Course Administrative Claims...........5

                   c.    Professional Fee Claims ...........................5

             2.    Priority Tax Claims..............................................6

       D.    Allowance and Treatment of Classified Claims and Interests ...........8

             1.    Summary of Classes ...........................................8

             2.    Secured Claims......................................................9

                   a.    Secured Claim of PNC Bank...........................9

                   b.    Secured Claim of Jacobus Pino .......................10

                   c.    Secured Claims Related to Vehicles or Equipment .11

             3.    Classes of Priority Unsecured Claims....................32

iii

| | | | |
|---|---|---|---|
| | 4. | Classes of General Unsecured Claims | 32 |
| | 5. | Class of Interest Holders | 33 |
| III. | Means for Implementation of the Plan | | 34 |
| | A. | Funding of the Plan | 34 |
| | B. | New Value Contribution | 35 |
| | C. | Substantive Consolidation Option | 36 |
| | D. | Sale of Real Properties | 37 |
| | E. | The Plan Trust | 37 |
| | 1. | Establishment of the Plan Trust | 37 |
| | 2. | The Trust Assets | 38 |
| | 3. | The Term of the Plan Trust | 38 |
| | 4. | The Plan Trustee | 39 |
| | 5. | Trust Distributions | 41 |
| | 6. | Federal Income and Taxation of the Plan Trust | 42 |
| | 7. | Beneficiaries of the Plan Trust | 42 |
| | 8. | Plan Trust Retention of Professionals and Fees and Expenses | 43 |
| | F. | Reorganized Debtor Retention of Professionals and Fees and Expenses | 44 |
| | G. | The Plan Trustee as Disbursing Agent | 44 |
| | H. | The Bond | 44 |
| | I. | Release of Liens | 44 |
| | J. | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 45 |
| | K. | The Reorganized Debtor's Post-Confirmation Management | 45 |
| | L. | Powers and Duties of the Reorganized Debtor | 45 |
| | M. | Default on Obligations to Holders of Allowed Claims | 46 |
| IV. | Claim Objections and Procedures For Resolving Disputed Claims | | 47 |
| | A. | Standing | 47 |
| | B. | No Distribution Pending Allowance | 48 |
| | C. | Reserves for Disputed Claims | 48 |
| | D. | Claims Paid By Third Parties | 48 |
| V. | Distributions | | 49 |
| | A. | Distributions for Claims Allowed as of the Effective Date | 49 |
| | B. | Distributions on Account of Claims Allowed After the Effective Date | 49 |
| | 1. | Payments and Distributions on Disputed Claims | 49 |
| | 2. | Special Rules for Distributions to Holders of Disputed Claims | 49 |

iv

C.      Delivery and Distributions and Undeliverable or Unclaimed Distributions ................................................................................. 49

        1.      Delivery of Distributions in General ................................ 49

        2.      Undeliverable Distributions ............................................. 50

        3.      Distributions of Unclaimed Property ............................... 50

D.      Compliance with Tax Requirements/Allocations ...................... 50

V.      Treatment of Executory Contracts and Unexpired Leases .................... 51

A.      Assumption of Executory Contracts and Unexpired Leases .......... 51

B.      Rejection of Executory Contracts or Unexpired Leases Not Assumed ................................................................................. 53

VI.     Preservation of Causes of Action and Avoidance Actions for the Reorganized Debtor ..................................................................... 54

VII.    Retention of Jurisdiction ................................................................. 55

VIII.   EFFECT OF CONFIRMATION OF THE PLAN ................................ 57

A.      Binding Nature of Plan .......................................................... 57

B.      Discharge ................................................................................ 57

C.      Injunction ............................................................................... 58

D.      Vesting of Property in the Reorganized Debtor ....................... 59

E.      Modification of the Plan ......................................................... 59

F.      Exculpations and Releases ...................................................... 60

G.      Submission of Post-Confirmation Reports ............................. 60

H.      Quarterly Fees ........................................................................ 60

I.      Post-Confirmation Conversion/Dismissal ............................... 60

J.      Final Decree ........................................................................... 61

IX.     CONCLUSION .................................................................................. 61

TABLE OF DEFINITIONS ......................................................................... 62

A.      Definitions .............................................................................. 62

B.      Rules of Construction ............................................................. 70

C.      Rules of Interpretation ........................................................... 71

D.      Exhibits .................................................................................. 72

v

1    The Original Mowbray's Tree Service, Inc., the debtor and debtor-in-possession in the

2    above-captioned case (the "**Debtor**"), hereby submits this *Chapter 11 Plan of Reorganization* ((the

3    "**Plan**").[1]

4

5    ## I.    EXECUTIVE SUMMARY OF THE PLAN

6    The Plan is a reorganizing plan that saves the Debtor's business and the jobs of its

7    employees.[2]  The Plan enables the Debtor to restructure its obligations and continue operations,

8    providing essential vegetation management services and disaster relief assistance to communities

9    coast to coast.  The Plan also marshals significant value from all Estate assets for the benefit of

10    creditors.  Through the Debtor's ongoing operations, the Plan proposes to pay substantial value to

11    the Holders of Allowed Claims, an amount that exceeds $~~36,000,000~~47,000,000 over the term of

12    the Plan.

13    The Plan contains fair and equitable treatment for all Classes of creditors, secured and

14    unsecured.  Each Holder of an Allowed Secured Claim will be paid in full.  In many respects, the

15    Plan adopts the contractual repayment terms that ~~ga~~ive rise to the Secured Claims or consensual

16    treatment negotiated with the Holders of the Secured Claims.

17    The Holders of Allowed General Unsecured Claims will receive a *pro rata* share of the

18    $~~15~~25,~~674~~000,000 GUC Payment Amount.  The GUC Payment Amount is the *minimum* to be

19    paid under the Plan to the Holders of Allowed General Unsecured Claims and it will be paid *with*

20    *interest*.  As provided in more detail below, the GUC Payment Amount will be paid through a cash

21    sweep formula—the Class 16 GUC Payment.  That is, all of the Reorganized Debtor's excess cash

22    (as defined in the Plan) will be contributed to the GUC Payment Amount until it is paid in full.

23    The GUC Payment Amount is currently projected to be paid by the Reorganized Debtor within

24    nine (9) years of the Effective Date ~~and will be paid with interest~~.  The GUC Payment Amount can

25    be paid earlier or later than projected based on the Reorganized Debtor's actual performance after

26    _____

27    [1]    Unless otherwise provided herein, all references to exhibits are to the exhibits attached to the concurrently-filed index of exhibits (the "**Index**").

28    [2]    Unless otherwise defined herein, the definition of any capitalized term may be found in the Table of Definitions at the end of this Disclosure Statement.

the Effective Date.  The payment of the GUC Payment Amount is set forth in Section III.A.1.a.
below.  Any distributions on account of Disputed Claims will be reserved and paid upon
allowance.

In addition, under the Plan, Allowed General Unsecured Creditors will have the
opportunity to share in the upside of the Reorganized Debtor's post-confirmation profits after the
GUC Payment Amount is paid.  The Plan provides for the Reorganized Debtor to pay a GUC
Bonus for the benefit of the Holders of Allowed General Unsecured Claims.  The GUC Bonus is
detailed in Section III.A.1.b. below.  In short, the GUC Bonus equals fifty percent (50%) of the
Reorganized Debtor's post-confirmation excess cash flow (as defined below) within five (5) years
of the Effective Date and up to the cumulative sum (inclusive of the GUC Payment Amount) of
**$55,000,000 or 40% of the Allowed General Unsecured Claims** (capped by the amount of the
General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent
Allowed), **whichever is greater**.  The amounts to be paid under the Plan to the Holders of
Allowed General Unsecured Claims are the product of extensive negotiations and discussions with
various parties in interest as well as settlements with certain key parties. the Plan vests certain
potential claims of the Estate, *i.e.*, Insider Avoidance Actions and Loan Causes of Action, in a
Plan Trust for the Plan Trustee to investigate and, if appropriate, pursue.  The Holders of Allowed
General Unsecured Claims will receive a *pro rata* share of any Net Recoveries from such actions.
Distributions on account of Disputed Claims will be reserved and paid upon allowance.

The Plan also vests certain potential claims of the Estate in a Plan Trust for the Plan
Trustee to investigate and, if appropriate, pursue.  The Holders of Allowed General Unsecured
Claims will receive a *pro rata* share of any Net Recoveries from such actions.  This is in addition
to the sums discussed above.

The Reorganized Debtor's post-Effective Date operating cash flow includes significant
value from its affiliates.  The pre-petition loan owing from the Debtor's wholly-owned subsidiary,
Pino Tree Service, Inc. ("**PTS**"), will is projected to be paid in full less than one within two years
after the Effective Date.  The Reorganized Debtor is projected to receive management fees and
equipment rent from PTS of nearly $10.8 million per year, *plus* annual distributions.  The

2

projected annual distributions collectively exceed $14.5 million over the term of the Plan.  As such, the Reorganized Debtor is receiving 100% of the economic benefit of PTS and essentially all of its excess cash flow during the term of the Plan.  In addition, the Reorganized Debtor is projected to receive over $700,000 annually from Phoenix Traffic Management, Inc. ("**PTM**"), on account of management fees and equipment rent.  All of this value is benefiting the Holders of Allowed Claims under the Plan.

The Reorganized Debtor's post-Effective Date projections are attached hereto as **<u>Exhibit 1</u>** (the "**Projections**").  The sums to be paid from affiliates during the term of the Plan are set forth in the Projections.  The Debtor has also included post-Effective projections for PTS (the ("**PTS Projections**").  The PTS Projections are attached hereto as **<u>Exhibit 2</u>**.

The Effective Date of the Plan will be the first Business Day that is fifteen (15) days after the entry of an order confirming the Plan ("**Confirmation Order**"), provided there has been no order staying the effectiveness of the Confirmation Order.

## II.    <u>THE PLAN</u>

### A.    <u>The Plan Provides for a Reorganization of the Debtor and Its Affairs</u>

The Plan is a reorganizing plan.  Distributions to the Holders of Allowed Secured Claims will be made by the Reorganized Debtor.  Distributions to the Holders of Allowed Unsecured Claims will be made by the Plan Trust.  No Distributions will be made to the Holders of any Disputed Claims unless and until they become Allowed Claims.  The Projections supporting the Plan are attached hereto as **<u>Exhibit 1</u>**.

### B.    <u>What Creditors and Interest Holders Will Receive Under the Plan</u>

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right of priority.  The Plan states whether each Class of Claims or Interests is impaired or unimpaired.  The Plan provides the treatment each Class will receive.  In no event shall any creditor receive more than the creditor's Allowed Claim.

### C.    <u>Allowance and Treatment of Unclassified Claims</u>

Certain types of claims are not placed into voting classes; instead, they are unclassified.

They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following claims in a class:

### 1.    <u>Administrative Claims</u>

Administrative Claims are Claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under § 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The following chart lists all the Debtor's estimated § 507(a)(2) administrative claims and their treatment under this Plan:

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtor, including Administrative Tax Claims | Varies by day | Unless the Debtor objects to an Ordinary Course Administrative Claim, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of the Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |
| Clerk's Office | $0 | Any outstanding Clark's Office fees will be paid in full on the Effective Date from the cash of the Debtor. |
| OUST Fees | $0 | Any outstanding OUST Fees will be paid in full on the Effective Date from the cash of the Debtor. |
| Administrative Tax Claims | $0 | Unless the Debtor objects to an Administrative Tax Claim, each Administrative Tax Claim shall be allowed and paid in the ordinary course of the Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim. |

| Professional Fee Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed[3]** | **Treatment** |
| Raines Feldman Littrell LLP, general bankruptcy counsel | $~~1,200~~630,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Grobstein Teeple LLP | $60,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Force Ten Partners, LLP | $~~1,000~~430,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| Examiner | $~~2~~450,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| ~~_____~~Elkins Kalt Weintraub Reuben Gartside, LLP | $250,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the Reorganized Debtor and the Professional. |
| **Total** | $~~12,410622~~372,000 | |

The following applies to Administrative Claims asserted against the Estate:

### a.  **Ordinary Course Administrative Claims**

Unless the Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim.

---

[3]   These amounts are only estimates (including future estimates as of confirmation) and are subject to change. The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower.

5

1  However, any request for payment, or motion to allow a Claim as an Ordinary Course

2  Administrative Claim must be filed with the Bankruptcy Court and served on the Reorganized

3  Debtor and the OUST by no later than sixty (60) days after the Effective Date.

4  **b.    Non-Ordinary Course Administrative Claims**

5  A Non-Ordinary Course Administrative Claim will be paid by the Reorganized Debtor on

6  the Effective Date to the extent that prior to the Effective Date it has already been determined to

7  be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a

8  Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the

9  Reorganized Debtor to the extent that it is allowed by the Bankruptcy Court only if: (1) on or

10  before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course

11  Administrative Claim both files with the Bankruptcy Court a request for allowance and payment

12  of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel

13  for the Reorganized Debtor and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows

14  the Non-Ordinary Course Administrative Claim.

15  Any party-in-interest, including, but not limited to, the Reorganized Debtor, may file an

16  objection to such a request for payment within the time provided by the Bankruptcy Rules or

17  within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course

18  Administrative Claims who do not timely file and serve a request for payment will be forever

19  barred from asserting these Claims or sustaining any action seeking payment in any forum or from

20  any court deriving from these Claims against the Estate, the Debtor, the Reorganized Debtor, the

21  Plan Trust, the Plan Trustee, or their respective assets.

22  **c.    Professional Fee Claims**

23  A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the

24  Effective Date (or such further date if extended by Court order), the Person holding the

25  Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and

26  payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of

27  the Bankruptcy Court. The Reorganized Debtor or any other party-in-interest may file an objection

28  to such an application within the time provided by the Bankruptcy Rules or within any other

6

1   period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do

2   not timely file and serve an application for allowance and payment will be forever barred from

3   asserting these Claims against the Estate, the Debtor, the Reorganized Debtor, the Plan Trust, the

4   Plan Trustee, or their respective assets.

5            **2.**    **Priority Tax Claims**

6         Priority Tax Claims include certain unsecured income, sales, employment, and other taxes

7   described by section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each

8   holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in

9   deferred cash payments, over a period not exceeding five years from the order for relief, unless the

10  holder agrees to a different treatment.

11        The following charts list the Debtor's known section 507(a)(8) Priority Tax Claims and

12  their treatment under the Plan:

| Priority Tax Claims | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| California Department of Tax and Fee Administration ("**CDTFA**") | Claim Amount: $1,496269.00 per Schedules Proof of Claim No. 161-1 filed by the CDTFA<br><br>Priority Claim Amount: $1,496269.00 per Schedules Proof of Claim No. 161-1 filed by the CDTFA | Any Allowed Priority Tax Claim of the CDTFA will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the CDTFA is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Debtor shall have the right to prepay any Allowed Priority Tax Claim of the CDTFA in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the CDTFA will receive the treatment afforded to Allowed Claims in Class 16. |

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION

10585254.110585254.110488260.1

| Priority Tax Claims | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| Internal Revenue Service ("**IRS**") | Claim Amount: $~~0.00~~[4]~~63,589.17 per Proof of Claim 37-1~~<br><br>Priority Claim Amount: $~~63,589.17 per Proof of Claim 37-1~~0.00 | The proof of claim filed by the IRS, Proof of Claim 37-1, is for payroll taxes for the tax period ending December 31, 2024.  Because those taxes have been paid, the IRS will not receive a further recovery on the Claim it asserts through Proof of Claim 37-1.<br><br>Excluding the Claim asserted through Proof of Claim 37-1, any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Debtor shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| State of Florida – Department of Revenue ("**State of Florida**") | Claim Amount: $14.00 per Proof of Claim 142-1<br><br>Priority Claim Amount: $14.00 per Proof of Claim 142-1 | Any Allowed Priority Tax Claim of the State of Florida will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the State of Florida is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the |

---

[4]   The IRS filed Proof of Claim 37-1 in the amount of $63,589.17.  However, this sum was paid.

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION

10585254.1 10585254.1 10488260.1

| Priority Tax Claims | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>The Debtor shall have the right to prepay any Allowed Priority Tax Claim of the State of Florida in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the State of Florida in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

> **D.** **Allowance and Treatment of Classified Claims and Interests**

> **1.** **Summary of Classes**

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The chart below lists Classes of Claims and Interests established under the Plan and indicates whether the Class is impaired or unimpaired by the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| | Summary of Classes | |
|---|---|---|
| **Class** | **Claimant(s)** | |
| 1 | Secured Claim of PNC Bank, N.A. | |
| 2 | Secured Claim of Jacobus Pino | |
| 3 | Secured Claim of Albach Finanz AG | |
| 4 | Secured Claim of Ally Bank | |
| 5 | Secured Claim of Altec Capital Services, LLC | |
| 6 | Secured Claim of FNB | |
| 7a and b | Secured Claim of Pathward, National Association | |
| 8 | Secured Claim of U.S. Bank Equipment Finance | |
| 9 | Secured Claim of Bank of America, N.A. | |
| 10 | Secured Claim of Ford Motor Credit Company, LLC | |
| 11 | Secured Claim of General Motors | |
| 12 | Secured Claim of John Deere | |
| 13 | Secured Claim of ~~Samara Equipment~~Hanmi Bank | |
| 14 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) | |
| 15 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) | |
| 16 | General Unsecured Claims | |
| 17 | Sierra Bank | |
| 18~~7~~ | Subordinated Insider Claims | |
| 19~~8~~ | Interest Holder | |

## 2.   Secured Claims

Secured Claims are Claims secured by valid liens on property of the Estate.

### a.   Secured Claim of PNC Bank

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | PNC Bank, N.A.<br><br>• Collateral: the PNC Collateral<br><br>• Total Claim Amount: $7,038,514.41 as of the Petition Date per the Cash Collateral Stipulation.<br><br>• Interest Rate: 6.57% | N | Y | PNC shall have an Allowed Secured Claim on the Effective Date in the amount that PNC is owed on such date under the PNC Loan Documents, inclusive of  any interest at the non-default rate of 6.57% and reasonable costs and attorney's fees that accrue prior to the Effective Date and to which PNC is entitled in accordance with the terms of the PNC Loan Documents, the Cash Collateral Stipulation, and 11 U.S.C. § 506(b), less any recoveries, including Other Recoveries, and payments received by PNC before or after the Effective Date (the "**Allowed PNC Secured Claim**").   The Debtor projects that the Allowed PNC Secured Claim will total approximately $~~6,386,587.68~~5,020,481 as of the Effective Date.[5]<br><br>The Reorganized Debtor shall pay the PNC Secured Claim in full as follows: |

---

[5]   This is the amount the Debtor projects the PNC balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

10

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | **Secured Claim of PNC Bank** (spanning title) |

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | **A.  Effective Date Payment**:  Within ten (10) Business Days after the Effective Date, the Reorganized Debtor shall make a payment to PNC on account of the PNC Secured Claim in the amount of $2,000,000 (the **"PNC Effective Date Payment"**). |
| | | | | **B.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the PNC Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $134,584.34 (a **"PNC Monthly Payment"**). |
| | | | | **C.  Maturity Date**:  The Reorganized Debtor shall pay the PNC Secured Claim in full by the date that is ~~three~~ two (~~2~~3) years after the Effective Date (the **"PNC Maturity Date"**). |
| | | | | **D.  Interest Rate**: 6.57% per annum simple interest. |
| | | | | **E.  Other Recoveries**.  If and to the extent that PNC receives any Other Recoveries on account of the PNC Secured Claim, then the PNC Secured Claim as to the Reorganized Debtor shall be automatically reduced accordingly by the amount of such Other Recoveries. |
| | | | | **F.  Default**:  If the Reorganized Debtor fails to make the PNC Effective Date Payment or a PNC Monthly Payment to PNC when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by PNC to the Reorganized Debtor and its counsel (collectively, an **"Uncured PNC Default"**), then PNC may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the PNC Collateral permitted under the PNC Loan Documents.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **G.  Plan Controls**:  If and to the extent that there is a conflict between the PNC Loan Documents and the Plan, the Plan shall control. |
| | | | | **H.  Lien**.  PNC shall retain the PNC Security Interests in the PNC Collateral in and to the same extent, validity, and priority as of the Petition Date |

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | pending payment of the Allowed PNC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed PNC Secured Claim, PNC's Security Interests shall be released and the Reorganized Debtor shall retain title to the PNC Collateral free and clear of the PNC Security Interests.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the PNC Secured Claim. |

### b.    Secured Claim of Jacobus Pino

| Secured Claim of Jacobus Pino | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2 | Jacobus Pino<br><br>• Collateral: Ownership interests in PTS<br><br>• Total Claim Amount: $167,673.76 as of the Petition Date per Schedules<br><br>• Interest Rate: 0.75% | N | Y | Jacobus Pino asserts a Claim in the amount of $167,007 on account of the remaining balance owed on the Pino Note (the "**Pino Claim**").  As a compromise, including Pino waiving and releasing as of the Effective Date (i) any interest or fees to which Pino asserts he is entitled under the PTS Transaction Documents, and (ii) any right to assert that he is entitled to any portion of the Debtor's ownership interests in PTS, the Reorganized Debtor shall pay the Pino Claim in full as follows:<br><br>**A.  Monthly Payments:** Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Pino Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $21,~~047.15~~075.10.  The Pino Claim shall be paid in six (6) equal monthly payments of $21,~~047.15~~075.10.  The Pino Claim shall not accrue interest on or after the Effective Date.<br><br>**B.  Plan Controls**:  If and to the extent that there is a conflict between the PTS Transaction Documents and the Plan, the Plan shall control.<br><br>**C.  Lien**.  Any valid, enforceable, perfected, and unavoidable lien(s) held by Pino in any assets of the Estate shall be retained by Pino in and to the same extent, validity, and priority as of the Petition Date pending payment of the Pino Claim in full as provided herein. Upon full satisfaction of the Pino Claim, any and all liens of Pino on assets of the Reorganized Debtor shall be released and the |

12

| | | | | Secured Claim of Jacobus Pino |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Reorganized Debtor shall retain title to such assets free and clear of Pino's liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Pino Claim. |

### c.  <u>Secured Claims Related to Vehicles or Equipment</u>

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | Secured Claims Related to Vehicles or Equipment | | |
| 3 | Albach Finanz AG<br><br>• Collateral: the "Machine" as defined in Exhibit A of Albach's proof of claim, Claim No. 144-1 (the "**Albach Collateral**")<br><br>• Total Claim Amount: $81,500.00 (projected as of the Effective Date) | N | Y | Class 3 consists of the Secured Claim of Albach Finanz AG ("**Albach**").  The Claim of Albach arises from the Operate Lease Agreement attached as Exhibit A (the "**Albach Agreement**") to its Proof of Claim No. 144-1.  The treatment herein is for all Claims asserted by Albach.<br><br>Albach shall have an Allowed Secured Claim in the collective amount of $81,500 as of the Effective Date, based on the net present value of the future payments due under the Albach Agreement, as calculated by the Debtor (the "**Allowed Albach Secured Claim**").[6]  Under no circumstances shall Albach receive more than the Allowed Albach Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Albach Secured Claim arising thereunder shall be paid as follows:<br><br>**A.  <u>Monthly Payments</u>**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall make a payment in the amount of $1,458.56 (an "**Albach Monthly Payment**").<br><br>**B.  <u>Maturity Date</u>**:  The Reorganized Debtor shall pay the Albach Secured Claim in full by the date that is five (5) years after the Effective Date (the "**Albach Maturity Date**").<br><br>**C.  <u>Purchase Options</u>**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to the Albach Secured Claim in the Albach Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized |

---

[6]  This is the amount the Debtor projects the collective Albach balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Debtor shall be permitted to exercise such rights by the Albach Maturity Date. |
| | | | | **D. Interest Rate**: 2.84% per annum simple interest. |
| | | | | **E. Default**: Upon the Effective Date, the Albach Agreement shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make any Albach Monthly Payment on the Albach Secured Claim to Albach when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Albach to the Reorganized Debtor and its counsel (collectively, an **"Uncured Albach Default"**), then Albach may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to collateral securing the Albach Secured Claim permitted under the Albach Agreement. The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F. Plan Controls**: If and to the extent that there is a conflict between the Albach Agreement and the Plan, the Plan shall control. |
| | | | | **G. Lien**. Any valid, enforceable, perfected, and unavoidable lien held by Albach in the Albach Collateral shall be retained by Albach in and to the same extent, validity, and priority as of the Petition Date pending payment of the Albach Secured Claim in full as provided herein. Upon full satisfaction of the Albach Secured Claim, any and all liens of Albach on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Albach Secured Claim. |
| 4 | Ally Bank<br>• Collateral: Various vehicles<br>• Total Claim Amount: $~~295,486.77~~286,630.90 (projected as of the Effective Date) | N | Y | Class 4 consists of the Secured Claims of Ally Bank (**"Ally"**). The Claims of Ally arise from various loan agreements with the Debtor, each of which was secured by a particular vehicle (each, an **"Ally Agreement"** and collectively, the **"Ally Agreements"**). The treatment herein is for all Claims asserted by Ally.<br>Ally shall have an Allowed Secured Claim in the collective amount of $~~295,486.7~~286,630.907 as of |

14

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | the Effective Date, based on the net present value of the future payments due under the Ally Agreements, as calculated by the Debtor (the "**Allowed Ally Secured Claim**").[7]  Under no circumstances shal Ally receive more than the Allowed Ally Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ally Secured Claim shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Ally Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $5,~~613.75~~445.50 (an "**Ally Monthly Payment**").<br><br>**B.  Maturity Date**:  The Reorganized Debtor shall pay the Allowed Ally Secured Claim in full by the date that is five (5) years after the Effective Date (the "**Ally Maturity Date**").<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of vehicles or equipment under the Ally Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based by the Ally Maturity Date.<br><br>**D.  Interest Rate**: 5.28% per annum simple interest.<br><br>**F.  Default**:  Upon the Effective Date, the Ally Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a Ally Monthly Payment on the Allowed Ally Secured Claim to Ally when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ally to the Reorganized Debtor and its counsel (collectively, an "**Uncured Ally Default**"), then Ally may file and serve a motion with the Bankruptcy Court to  obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ally Agreement and serving as Ally's collateral as permitted under the |

---

[7]    This is the amount the Debtor projects the collective Ally balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

15

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Ally Agreements.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**G. Plan Controls**: If and to the extent that there is a conflict between the Ally Agreements and the Plan, the Plan shall control.<br><br>**H. Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Ally in any assets of the Estate to secure the Allowed Ally Secured Claim shall be retained by Ally in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Ally Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ally Secured Claim, any and all liens of Ally on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of Ally's liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Ally Secured Claims. |
| 5 | Altec Capital Services, LLC<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $~~4,816,724.31~~9,068,099.33 (~~projected as of the Effective Date~~inclusive of all future amounts due under the Altec Agreements) | N | Y | Class 5 consists of the Secured Claim(s) of Altec Capital Services, LLC ("**Altec**").  The Secured Claims of Altec arise from the agreements listed in Exhibit C to the Plan Support Agreement between MTS and Altec (each, an "**Altec Agreement**" and collectively, the "**Altec Agreements**").  The treatment herein is for all Claims asserted by Altec, including, without limitation, the Claims for which Altec is the servicer.  The vehicles and other equipment subject to the Altec Agreements shall be referred to herein as the "**Altec Equipment**."<br><br>The Plan Support Agreement between MTS and Altec shall be referred to herein as the "**Altec PSA**" and Exhibit B to the Altec PSA shall be referred to herein as the "**Altec Payment Schedule**."<br><br>Altec shall have an Allowed Secured Claim in the amount of $9,068,099.33 as of July 1, 2025, less the payments made by the Debtor on July 1, 2025 and thereafter (the "**Allowed Altec Secured Claim**").[8]  Under no circumstances shall Altec receive more than the Allowed Altec Secured Claim with interest after the Effective Date as provided herein. |

---

[8]   This sum is inclusive of all payments due in the future under the Altec Agreements.

16

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall make  "Altec Monthly Payments" set forth in the Altec Payment Schedule due for such month under the corresponding Altec Agreements identified in the Altec Repayment Schedule (by Document #), and the Reorganized Debtor shall continue making such Altec Monthly Payments set forth in the Altec Payment Schedule each calendar month thereafter by the fifth (5th) of each such calendar month until such Altec Monthly Payments in the Altec Payment Schedule are completed (by corresponding Altec Agreement).  The Altec Monthly Payments required herein and reflected in the Altec Payment Schedule shall each be referred to as an "**Altec Monthly Payment**."  For avoidance of doubt, the Reorganized Debtor will not be required to make a payment set forth under the Altec Payment Schedule that was made prior to the Effective Date pursuant to the Altec PSA.

**B.  Residual Payments**:  Any "TRAC Amounts" or similar residual payments due under an Altec Agreement (each, a "**Residual Amount**") that became due and are unpaid as of the Effective Date shall be paid in full within thirty (30) days after the Effective Date or, at the Reorganized Debtor's election, which shall be provided to Altec before the expiration of such 30-day period, by the Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any Residual Amount under an Altec Agreement that becomes due after the Effective Date shall be paid by the date that is thirty (30) days after the Altec Maturity Date for such Altec Agreement (as defined below) or, at the Reorganized Debtor's election, which shall be provided to Altec before the expiration of such Altec Maturity Date, by the Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any "holdover" payments under an Altec Agreement (*i.e.*, monthly payments to Altec should term of such Altec Agreement extend for monthly holdover periods) by the Reorganized Debtor under an Altec Agreement shall reduce the "TRAC Amount" or similar residual amount due under such Altec Agreement. |

17

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The Reorganized Debtor shall pay any sales taxes and/or "sundries" due to Altec under any Altec Agreement as of the Petition Date and unpaid within sixty (60) days of the Effective Date.  Any sales taxes and/or sundries due under any Altec Agreement after the Effective Date shall be billed by Altec and paid by the Reorganized Debtor in the ordinary course and as provided under such Altec Agreement.<br><br>**C.  Maturity Date**:  With respect to each Altec Agreement, the maturity date, expiration date, "Interim Rent Cutoff Date," or similar end date with respect to such Altec Agreement shall be the "Maturity Date" set forth in the Altec Payment Schedule for such Altec Agreement (the "**Altec Maturity Date**").<br><br>**D.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of Altec Equipment under an Altec Agreement, including, without limitation, at or upon the Altec Maturity Date of such Altec Agreement, and the disposition of the proceeds related thereto are preserved for the Reorganized Debtor and the Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement.<br><br>The payment(s) by the Reorganized Debtor to Altec of Residual Amount due under an Altec Agreement in full shall be deemed the exercise by the Reorganized Debtor of its right to purchase the Altec Equipment under such Altec Agreements and, upon such payment(s), and the Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, such Altec Equipment. Upon such payment(s), Altec shall transfer title of such Altec Equipment to the Reorganized Debtor and the Reorganized Debtor and Altec shall execute such documents as necessary to accomplish the same.<br><br>**E.  Interest Rate**: 6.98% blended rate per annum simple interest for Altec Secured Claims.<br><br>**F.  Default**:  Upon the Effective Date, the Altec Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to pay, when due herein, an Altec Monthly Payment under an Altec Agreement or a Residual Amount, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the Reorganized Debtor and |

18

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | its counsel (collectively, an "**Uncured Altec Default**"), then Altec shall be entitled to exercise its rights to repossession as to the particular Altec Equipment subject to such Altec Agreement and such Uncured Altec Default as permitted under such Altec Agreement.<br><br>**G.  Plan Controls**:  If and to the extent that there is a conflict between the Altec Agreements and the Plan, the Plan shall control.<br><br>**H.  Lien**:  With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.  Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>**I.  No Admission**.  Treatment set forth herein for Altec reflects a compromise between MTS and Altec and is without any admission as to either MTS or Altec as to whether the Altec Agreements are true leases or capital leases.<br><br>**J.  Assignment**.  Altec retains its rights to assign under the Altec Agreements; provided, however, any such assignment shall remain subject to the Plan, including, without limitation, the treatment herein for Altec.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Altec, in its individual capacity and as servicer.<br><br>Class 5 consists of the Secured Claims of Altec. The Claims of Altec arise from various equipment leases or financing agreements between the Debtor and Altec (each, an "**Altec Agreement**" and collectively, the "**Altec Agreements**").  The treatment herein is for all Claims asserted by Altec, including, without limitation, Claims for which Altec is the servicer. |

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Altec shall have an Allowed Secured Claim in the collective amount of $4,816,724.31 as of the Effective Date, based on the net present value of the future payments due under the Altec Agreements, as calculated by the Debtor (the "**Allowed Altec Secured Claim**").[9] Under no circumstances shall Altec receive more that the Allowed Altec Secured Claim with interest after the Effective Date as provided herein.

As to each Altec Agreement, Altec's Secured Claim arising thereunder (each, an "**Altec Secured Claim**") shall be paid as follows:

A.  **Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Altec Agreement for such Altec Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue making such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Altec Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an "**Altec Monthly Payment**."

B.  **Maturity Date**:  Any maturity date or expiration date with respect to such Altec Secured Claim in the corresponding Altec Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Altec Monthly Payment required by such Altec Agreement (the "**Altec Maturity Date**") and any lump sum payment due by the Reorganized Debtor under such Altec Agreement upon the Altec Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Altec Agreement and subject to Paragraph C. below.

C.  **Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such Altec Secured Claim in the corresponding Altec Agreement, including, without limitation, at the Altec Maturity Date in |

---

[9]   This is the amount the Debtor projects the collective Altec balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

20

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | such Altec Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement.<br><br>**D.  Interest Rate**: 7.6% blended rate per annum simple interest for Altec Secured Claims.<br><br>**E.  Default**:  Upon the Effective Date, each Altec Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make an Altec Monthly Payment on an Altec Secured Claim to Altec when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the Reorganized Debtor and its counsel (collectively, an **"Uncured Altec Default"**), then Altec may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as Altec's collateral that is the subject to the Uncured Altec Default permitted under the subject Altec Agreement.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the Altec Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.  Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Altec Secured Claims. |
| 6 | FNB Equipment Finance | N | Y | Class 6 consists of the Secured Claims of FNB Equipment Finance ("**FNB**").  The Claims of FNB arise from various equipment leases or financing agreements between the Debtor and FNB or FNB's |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various equipment<br>• Total Claim Amount: $91,845.4973,361.34 (projected as of the Effective Date) | | | predecessor in interest (each, an **"FNB Agreement"** and collectively, the **"FNB Agreements"**).  The treatment herein is for all Claims asserted by FNB.<br><br>FNB shall have an Allowed Secured Claim in the collective amount of $91,845.4973,361.34 as of the Effective Date based on the net present value of the future payments due under the FNB Agreements, as calculated by the Debtor (the **"Allowed FNB Secured Claim"**).[10]  Under no circumstances shall FNB receive more than the FNB Allowed Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each FNB Agreement, FNB's Secured Claim arising thereunder (each, an **"FNB Secured Claim"**) shall be paid as follows:<br><br>A.  <u>Monthly Payments</u>:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the FNB Agreement for such FNB Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such FNB Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an **"FNB Monthly Payment"**.<br><br>B.  <u>Maturity Date</u>:   Any maturity date or expiration date with respect to such FNB Secured Claim in the corresponding FNB Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final FNB Monthly Payment required by such FNB Agreement (the **"FNB Maturity Date"**) and any lump sum payment due by the  Reorganized Debtor under such FNB Agreement upon the FNB Maturity Date shall be made at such time as extended herein and in accordance with the terms of such FNB Agreement and subject to Paragraph C. below.<br><br>C.  <u>Purchase Options</u>:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or |

---

[10]    This is the amount the Debtor projects the collective FNB balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| <u>Class</u> | <u>Description</u> | <u>Insiders</u><br>(Y/N) | <u>Impaired</u><br>(Y/N) | <u>Treatment</u> |
| | | | | equipment giving rise to such FNB Secured Claim in the corresponding FNB Agreement, including, without limitation, at the FNB Maturity Date in such FNB Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the FNB Maturity Date for such FNB Agreement.<br><br>**D.  <u>Interest Rate</u>**: 6.25% blended rate per annum simple interest for all FNB Secured Claims.<br><br>**E.  <u>Default</u>**:  Upon the Effective Date, each FNB Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make an FNB Monthly Payment on an FNB Secured Claim to FNB when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by FNB to the Reorganized Debtor and its counsel (collectively, an **"Uncured FNB Default"**), then FNB may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as FNB's collateral that is the subject of the Uncured FNB Default permitted under the subject FNB Agreement.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  <u>Plan Controls</u>**:  If and to the extent that there is a conflict between the FNB Agreements and the Plan, the Plan shall control.<br><br>**G.  <u>Lien</u>**:  With respect to each FNB Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by FNB in any assets of the Estate to secure such FNB Secured Claim shall be retained by FNB in and to the same extent, validity, and priority as of the Petition Date pending payment of such FNB Secured Claim in full as provided herein. Upon full satisfaction of such FNB Secured Claim, any and all lien of FNB securing such FNB Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the FNB Secured Claims. |
| 7a | Pathward, National Association | N | Y | Class 7a consists of the Secured Claim of Pathward, N.A. ("**Pathward**"), based on the agreements acquired by Pathward from Altec |

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various equipment<br><br>• Total Claim Amount: $651,124 400,079.03 (projected as of the Effective Date) plus attorneys' fees and costs as provided herein. | | | Capital Services, LLC, specified at Page 4 of 90 of Proof of Claim No. 156-1 filed by Pathward (each, a "**Pathward Agreement**" and collectively, the "**Pathward Agreements**").  The treatment herein is for any and all Claims asserted by Pathward, excluding the Claim of Pathward treated in Class 7b.<br><br>**A.  The Pathward Claim**.  Pathward shall have an Allowed Secured Claim based on the Pathward Agreements in the amount of all due but unpaid "Basic Rental Payments" under the Pathward Altec Agreements and all "TRAC Amounts" due under the Pathward Agreements, less payments made by MTS, including after the Petition Date, plus attorney's fees to which Pathward is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $112,500 (the "**Allowed Pathward Secured Claim**").[11]<br><br>**B.  Payment of the Pathward Claim**.  The Allowed Pathward Secured Claim will be paid in full within in fifteen (15) calendar days after the Effective Date (the "**Pathward Payment Date**"); *provided*, *however*, that any "Basic Rental Payments" or "TRAC Amount" that are to become due under Pathward Agreement #767-15 (the "**December Pathward Contract**") after the Payment Date (the "**December Pathward Amount**") shall be paid by the Reorganized Debtor on the date set forth in the December Pathward Contract and in full by December 31, 2025 (the "**Pathward December Payment Date**").<br><br>**C.  Transfer of Title**.  The payment(s) by the Reorganized Debtor to Pathward shall be deemed the exercise by the Reorganized Debtor of its right to purchase the Pathward Equipment under the Pathward Agreements and, upon such payment(s), the Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, the Pathward Equipment.  Upon such payment(s), Pathward shall transfer title of the Pathward Equipment to the Reorganized Debtor and shall execute such documents as necessary to accomplish the same.<br><br>**D.  Default**:  Upon the Effective Date, the Pathward Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to pay to Pathward the Allowed Pathward Secured Claim by the Pathward |

---

[11]  This is the amount the Debtor projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION

10585254.1 10585254.1 10488260.1

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Payment Date or the December Pathward Amount by Pathward December Payment Date,, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be granted relief from the automatic stay in order to exercise its rights of repossession and sale with respect to the Pathward Equipment subject to such Uncured Pathward Default as permitted under the Pathward Agreements and the 14-day say of the FRBP 4001(a)(3) is deemed waived. |
| | | | | **F. Plan Controls**: If and to the extent that there is a conflict between the Pathward Agreements and the Plan, the Plan shall control. |
| | | | | **G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure the Allowed Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Pathward Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Pathward Secured Claim, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward, excluding the Claim treated in Class 7b. |
| | | | | ~~Class 7 consists of the Secured Claims of Pathward, National Association ("**Pathward**"). The Claims of Pathward arise from various agreements for certain vehicles and equipment between the Debtor and Pathward's predecessor in interest (each, a "**Pathward Agreement**" and collectively, the "**Pathward Agreements**"). The treatment herein is for all Claims asserted by Pathward.~~ |
| | | | | ~~Pathward shall have an Allowed Secured Claim in the amount of $400,079.03 as of the Effective Date, based on the net present value of the future payments due under the Pathward Agreements as calculated by the Debtor (the "**Allowed Pathward**~~ |

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION

10585254.110585254.110488260.1

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Secured Claim").¹²  Under no circumstances shall Pathward receive more than the Allowed Pathward Secured Claim with interest after the Effective Date as provided herein.

As to each Pathward Agreement, Pathward's Secured Claim arising thereunder (each, a "**Pathward Secured Claim**" shall be paid as follows:

A.  **Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under the Pathward Agreement for such Pathward Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such Pathward Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as a "**Pathward Monthly Payment**."

B.  **Maturity Date**:  Any maturity date or expiration date with respect to such Pathward Secured Claim in the corresponding Pathward Agreement shall be extended to the calendar month after the Reorganized Debtor makes the final Pathward Monthly Payment required by such Pathward Agreement (the "**Pathward Maturity Date**") and any lump sum payment due by the Reorganized Debtor under such Pathward Agreement upon the Pathward Maturity Date shall be made at such time as extended herein and in accordance with the terms of such Pathward Agreement and subject to Paragraph C. below.

C.  **Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Pathward Secured Claim in the corresponding Pathward Agreement, including, without limitation, at the Pathward Maturity Date in such Pathward Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the Pathward Maturity Date for such Pathward Agreement. |

---

¹²  This is the amount the Debtor projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | D.  Interest Rate: 2.0% blended rate per annum simple interest for all Pathward Secured Claims.  E.  Default:  Upon the Effective Date, each Pathward Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a Pathward Monthly Payment on a Pathward Secured Claim to Pathward when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel (collectively, an "Uncured Pathward Default"), then Pathward may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Pathward's collateral that is the subject of the Uncured Pathward Default permitted under the subject Pathward Agreement.  The Reorganized Debtor shall have the right to oppose such motion.  G.  Plan Controls: If and to the extent that there is a conflict between the Pathward Agreements and the Plan, the Plan shall control.  H.  Lien:  With respect to each Pathward Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure such Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of such Pathward Secured Claim in full as provided herein. Upon full satisfaction of such Pathward Secured Claim, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.  The treatment proposed herein shall be in full settlement and satisfaction of the Pathward Secured Claims. |
| 7b | Pathward, National Association  • Collateral: Samsara equipment  • Total Claim Amount: $0.00 | N | Y | Class 7b consists of the Secured Claim of Pathward based on the agreement between the Debtor and Samsara attached to Proof of Claim No. 157-1 filed by Pathward (the "Pathward Samsara Agreement").  The equipment subject to the Pathward Samsara Agreement shall be referred to herein as the "Samsara Equipment."  The treatment herein is for all Claims asserted by Pathward under the Samsara Agreement. |

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **A.  Payment of the Pathward Claim**.  On and after the Effective Date, the Reorganized Debtor shall make the periodic payments required by the Pathward Samsara Agreement on dates required by the Pathward Samsara Agreement until the last periodic payment is made ("Samsara Payments"). |
| | | | | **C.  Default**:  Upon the Effective Date, the Pathward Samsara Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a Samsara Payment when due under the Pathward Samsara Agreement, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the Reorganized Debtor and its counsel  in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be granted relief from the automatic stay in order to exercise its rights of repossession and sale solely with respect to the Samsara Equipment as permitted under the Pathward Samsara Agreement and the 14-day say of the FRBP 4001(a)(3) is deemed waived. |
| | | | | **E.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Samsara Agreement and the Plan, the Plan shall control. |
| | | | | **F.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure the Debtor's obligations under the Pathward Samsara Agreement shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending the Reorganized Debtor completing the periodic payments under the Pathward Samsara Agreement as provided herein.  Upon full satisfaction of such payments, any and all liens of Pathward on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward under the Pathward Samsara Agreement. The treatment in Classes 7a and 7b shall be in full settlement and satisfaction of any and all Claims of Pathward. |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 8 | U.S Bank Equipment Finance<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $50,160.65 26,981.20 (projected as of the Effective Date) | N | Y | Class 8 consists of the Secured Claims of U.S. Bank Equipment Finance ("**US Bank**"). The Claims of US Bank arise from various finance agreements between the Debtor and US Bank or US Bank's predecessor in interest (each, a "**US Bank Agreement**" and collectively, the "**US Bank Agreements**"). The treatment herein is for all Claims asserted by US Bank.<br><br>US Bank shall have an Allowed Secured Claim in the collective amount of $26,981.20 50,160.65 as of the Effective Date, based on the net present value of the future payments due under the US Bank Agreements, as calculated by the Debtor (the "**Allowed US Bank Secured Claim**").[13] Under no circumstances shall US Bank receive more than the Allowed US Bank Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each US Bank Agreement, US Bank's Secured Claim arising thereunder (each a "**US Bank Secured Claim**") shall be paid as follows:<br><br>A. <u>Monthly Payments</u>: Beginning on the first Business Day of the first full calendar month after the Effective Date, the Reorganized Debtor shall resume making the monthly payments or installments due under US Bank Agreement for such US Bank Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such US Bank Agreement, as extended by the Plan. The monthly payments required herein shall each be referred to as an (a "**US Bank Monthly Payment**").<br><br>B. <u>Maturity Date</u>: Any maturity date or expiration date with respect to such US Bank Secured Claim in the corresponding US Bank Agreement shall be extended to the calendar month after the Reorganized Debtor makes the US Bank Altec Monthly Payment required by such US Bank Agreement (the "**US Bank Maturity Date**") and any lump sum payment due by the Reorganized Debtor under such US Bank Agreement upon the US Bank Maturity Date shall be made at such time as extended herein and in |

---

[13]   This is the amount the Debtor projects the collective US Bank balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | accordance with the terms of such US Bank Agreement and subject to Paragraph C. below. |
| | | | | **C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such US Bank Secured Claim in the corresponding US Bank Agreement, including, without limitation, at the US Bank Maturity Date in such US Bank Agreement, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights based on the US Bank Maturity Date for such US Bank Agreement. |
| | | | | **D.  Interest Rate**: 6.57% blended rate per annum simple interest for all US Bank Secured Claims. |
| | | | | **E.  Default**:  Upon the Effective Date, each US Bank Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a US Bank Monthly Payment on a US Bank Secured Claim to US Bank when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by US Bank to the Reorganized Debtor and its counsel (collectively, an **"Uncured US Bank Default"**), then US Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment(s) serving as US Bank's collateral that is the subject of the Uncured US Bank Default permitted under the subject US Bank Agreements.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the US Bank Agreements and the Plan, the Plan shall control. |
| | | | | **G.  Lien**:  With respect to each US Bank Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by US Bank in any assets of the Estate to secure such US Bank Secured Claim shall be retained by US Bank in and to the same extent, validity, and priority as of the Petition Date pending payment of such US Bank Secured Claim in full as provided herein. Upon full satisfaction of such US Bank Secured Claim, any and all liens of US Bank securing such US Bank Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |

30

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the US Bank Secured Claims. |
| 9 | Bank of America, N.A.<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $6,866,127,944,663,089.00 (projected as of the Effective Date) | N | Y | Class 9 consists of the Secured Claim of BOA. The Claims of BOA arise from various equipment leases or financing agreements between the Debtor and BOA (each, a "**BOA Agreement**" and collectively, the "**BOA Agreements**").  The treatment herein is for all Claims asserted by BOA.<br><br>BOA shall have an Allowed Secured Claim in the collective amount of $6,866,127,944,663,089.00 as of the Effective Date, based on the net present value of the future payments due under the BOA Agreements, plus amounts due and unpaid as of the Petition Date under the BOA Agreements, as calculated by the Debtor (the "**Allowed BOA Secured Claim**").[14]  Under no circumstances shall BOA receive more that the Allowed BOA Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each BOA Agreement, BOA's Secured Claim arising thereunder (a "**BOA Secured Claim**") shall be paid as follows:<br><br>**A.  Maturity Date**:  The maturity date or expiration date in such BOA Agreement shall be extended to the earlier of (i) the date that is equal to the number of months in which payments under such BOA Agreement have come due and were not made prior to the Effective Date, plus thirty-six (36) months, and (ii) the date that is sixty (60) months from the Effective Date (the "**BOA Repayment Period**").  Any lump sum payment due by the Reorganized Debtor under such BOA Agreement upon or at the end of the BOA Repayment Period shall be made in accordance with the terms of such BOA Agreement and subject to Paragraph C. below.<br><br>**B.  Monthly Payments**:  The BOA Secured Claim arising under such BOA Agreement shall be paid in equal monthly installments amortized over the BOA Repayment Period for such BOA Agreement (each, a "**BOA Monthly Payment**").  The Reorganized Debtor shall make the first BOA Monthly Payment on the first Business Day of the first full calendar month after the Effective Date, and the BOA Monthly Payments shall continue |

---

[14]   This is the amount the Debtor projects the collective BOA balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

FIRST AMENDED CHATER 11 PLAN OF REORGANIZATION
10585254.110585254.110488260.1                                        Exhibit 2, Page 175

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | each calendar month thereafter during the BOA Repayment Period and until the BOA Repayment Period ends.<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment under such BOA Agreement, including, without limitation, at the end of the BOA Repayment Period, and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights at the time set forth in the BOA Agreement as adjusted and extended based on the BOA Repayment Period.<br><br>**D.  Interest rate**: 5.47% per annum simple interest.<br><br>**E.  Default**:   Upon the Effective Date, each BOA Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a BOA Monthly Payment to BOA on account of a BOA Secured Claim when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by BOA to the Reorganized Debtor and its counsel (collectively, a "**Uncured BOA Default**"), then BOA may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicle(s) or equipment subject to the BOA Agreement giving rise to such BOA Secured Claim as permitted under such BOA Agreement.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the BOA Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  With respect to each BOA Secured Claim, any valid, perfected, and unavoidable lien of BOA shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of such BOA Secured Claim in full as provided herein.  Upon full satisfaction of such BOA Secured Claim, BOA's lien securing such BOA Secured Claim shall be released and the Reorganized Debtor shall retain title to the collateral subject to such lien free and clear of such lien.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the BOA Secured Claims. |

32

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | |
| 10 | Ford Motor Credit Company, LLC<br><br>• Collateral: Various vehicles<br>• Total Claim Amount: $1,497,964.63~~1,596,788.42~~ (projected as of the Effective Date) | N | Y | Class 10 consists of the Secured Claims of Ford Motor Credit Company ("**Ford**"). The Claims of Ford arise from various installment agreements with the Debtor, each of which was secured by a particular vehicle (each, a "**Ford Agreement**" and collectively, the "**Ford Agreements**"). The treatment herein is for all Claims asserted by Ford.<br><br>Ford shall have an Allowed Secured Claim in the collective amount of $1,497,964.63~~1,596,788.42~~ as of the Effective Date, based on the net present value of the future payments due under the Ford Agreements, as calculated by the Debtor[15] (the "**Allowed Ford Secured Claim**").[15] Under no circumstances shall Ford receive more than the Allowed Ford Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ford Secured Claims shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date, and continuing on the first Business Day of each calendar month thereafter until the Allowed Ford Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $~~30,207.87~~28,338.33 (a "**Ford Monthly Payment**").<br><br>**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed Ford Secured Claim in full by the date that is 5 years after the Effective Date (the "**Ford Bank Maturity Date**").<br><br>**C. Purchase Options**: The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ford Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the Ford Maturity Date.<br><br>**D. Interest Rate**: 5.1% per annum simple interest.<br><br>**E. Default**: Upon the Effective Date, the Ford Agreements shall not be considered in default as to the Reorganized Debtor. If the Reorganized Debtor fails to make a Ford Monthly Payment on the Allowed Ford Secured Claim to Ford when due herein, and such failure is not cured within thirty |

[15] This is the amount the Debtor projects the collective Ford balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585254.1~~10585254.1~~10488260.1

Exhibit 2, Page 177

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | (30) days after written notice thereof provided by Ford to the Reorganized Debtor and its counsel (collectively, an "**Uncured Ford Default**"), then Ford may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements. The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F. Plan Controls**: If and to the extent that there is a conflict between the Ford Agreements and the Plan, the Plan shall control. |
| | | | | **G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ford in any assets of the Estate to secure the Allowed Ford Secured Claim shall be retained by Ford in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ford Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ford Secured Claim, any and all liens of Ford securing the Allowed Ford Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ford Secured Claim. |
| 11 | AmeriCredit Financial Services, Inc. dba GM Financial<br><br>• Collateral: various vehicles<br><br>• Total Claim Amount: $121,388.59 (projected as of the Effective Date) | N | Y | Class 11 consists of the Secured Claims of AmeriCredit Financial Services, Inc. dba GM Financial ("**GM**"). The Claims of GM arise from various agreements between the Debtor and GM (each, a "**GM Agreement**" and collectively, the "**GM Agreements**") The treatment herein is for all Claims asserted by GM.<br><br>GM shall have an Allowed Secured Claim in the collective amount of $121,388.59 as of the Effective Date, based on the net present value of the future payments due under the GM Agreements as calculated by the Debtor (the "**Allowed GM Secured Claim**").[16] Under no circumstances shall GM receive more than the Allowed GM Secured Claim with interest after the Effective Date as provided herein. |

---

[16] This is the amount the Debtor projects the collective GM balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

34

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | The Allowed GM Secured Claim shall be paid as follows:<br><br>**A. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed GM Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $2,352.54 (a "**GM Monthly Payment**").<br><br>**B. Maturity Date**:  The Reorganized Debtor shall pay the Allowed GM Secured Claim in full by the date that is 5 years after the Effective Date (the "**GM Bank Maturity Date**").<br><br>**C. Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the GM Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the GM Maturity Date.<br><br>**D. Interest Rate**: 6.1% per annum simple interest.<br><br>**E. Default**:  Upon the Effective Date, the GM Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a GM Monthly Payment on the Allowed GM Secured Claim to GM when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by GM to the Reorganized Debtor and its counsel (collectively, an "**Uncured GM Default**"), then GM may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Plan Controls**:  If and to the extent that there is a conflict between the GM Installment Agreements and the Plan, the Plan shall control.<br><br>**G. Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by GM in any assets of the Estate to secure the Allowed GM Secured Claim shall be retained by GM in and to the same extent, validity, and priority as of the Petition Date pending payment of such GM Secured Claim in |

35

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | full as provided herein. Upon full satisfaction of the Allowed GM Secured Claim, any and all liens of GM securing the Allowed GM Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the Allowed GM Secured Claim. |
| 12 | John Deere Construction & Forestry Company <br>• Collateral: Various equipment<br>• Total Claim Amount: $1~~39,039.60~~55,035.68 (projected as of the Effective Date), plus attorneys' fees and costs as provided herein. | N | Y | Class 12 consists of the Secured Claims of John Deere Construction & Forestry Company ("**John Deere**"). The Claims of John Deere arise from various equipment agreements between the Debtor and John Deere (each, a "**John Deere Agreement**" and collectively, the "**John Deere Agreements**"). The treatment herein is for all Claims asserted by John Deere. <br>John Deere shall have an Allowed Secured Claim in the amount of $~~139,039.60~~155,035.68 as of the Effective Date, based on the net present value of the future payments due under the John Deere Agreements, as calculated by the Debtor, plus attorneys' fees to which John Deere is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $25,000 (the "**Allowed John Deere Secured Claim**").[17] Under no circumstances shall John Deere receive more than the Allowed John Deere Secured Claim with interest after the Effective Date as provided herein. <br>The Allowed John Deere Secured Claim shall be paid as follows: <br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed John Deere Secured Claim is paid in full, the Reorganized Debtor shall ~~make a payment in the amount of $2,317.33~~resume payments in the amounts set forth in the John Deere Agreements (a "**John Deere Monthly Payment**"). <br>**B. Maturity Date**: The Reorganized Debtor shall pay the Allowed John Deere Secured Claim in full by the date that is 5 years after the Effective Date (the "**John Deere Maturity Date**"). |

---

[17] This is the amount the Debtor projects the collective John Deere balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

36

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **C. Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the John Deere Agreements and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by the John Deere Maturity Date. |
| | | | | **D. Interest Rate**: 0.0% per annum simple interest. |
| | | | | **E. Default**:  Upon the Effective Date, the John Deere Agreements shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a John Deere Monthly Payment to John Deere when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by John Deere to the Reorganized Debtor and its counsel (collectively, an **"Uncured John Deere Default"**), then John Deere may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the John Deere Agreements and serving as John Deere's collateral as permitted under the John Deere Agreements.  The Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **G. Plan Controls**:  If and to the extent that there is a conflict between the John Deere Installment Agreements and the Plan, the Plan shall control. |
| | | | | **H. Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by John Deere in any assets of the Estate to secure the Allowed John Deere Secured Claim shall be retained by John Deere in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed John Deere Secured Claim in full as provided herein. Upon full satisfaction of the Allowed John Deere Secured Claim, any and all liens of John Deere securing the Allowed John Deere Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed John Deere Secured Claim. |
| 13 | ~~Samsara Capital Finance~~Hanmi Bank | N | Y | Class 13 consists of the Secured Claims of ~~Samsara Capital Finance~~Hanmi Bank ("~~Samsara~~Hanmi").  The Claims of |

37

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various equipment<br><br>• Total Claim Amount: $~~217,251.13~~158,000.00 (projected s of the Effective Date) | | | Hanmi~~Samsara~~ arise from ~~made~~ multiple equipment loans between the Debtor and Samsara (each, a "~~Samsara~~ **Hanmi** **Agreement**" and collectively, the "~~Samsara~~ **Hanmi** **Agreements**"). The treatment herein is for all Claims asserted by ~~Samsara~~Hanmi.<br><br>Hanmi ~~Samsara~~ shall have an Allowed Secured Claim in the amount of $~~217,251.13~~158,000.00 as of the Effective Date, based on the net present value of the future payments due under the ~~Samsara~~ **Hanmi** Agreements, as calculated by the Debtor (the "**Allowed** **Hanmi** ~~Samsara~~ **Secured Claim**").[18]  Under no circumstances shall **Hanmi** ~~Samsara~~ receive more than the Allowed ~~Samsara~~ **Hanmi** Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each ~~Samsara~~ **Hanmi** Agreement, ~~Samsara's~~ **Hanmi's** Secured Claim arising thereunder (each, a "~~Samsara~~ **Hanmi** **Secured Claim**") shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the second full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until each ~~Samsara~~ **Hanmi** Secured Claim is paid in full, the Reorganized Debtor shall make a payment in the amount of $19,750.10 (a "~~Samsara~~ **Hanmi** **Monthly Payment**").<br><br>**B.  Maturity Date**:  The Reorganized Debtor shall pay the ~~Samsara~~ **Hanmi** Secured Claims in full by the date that is ~~11~~ 8 months after the Effective Date (the "**Hanmi**~~Samsara~~ **Maturity Date**").<br><br>**C.  Purchase Options**:  The Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such ~~Samsara~~ **Hanmi** Secured Claim in the subject ~~Samsara~~ **Hanmi** Agreement and the disposition of the proceeds related thereto are preserved and the Reorganized Debtor shall be permitted to exercise such rights by on the ~~Samsara~~ **Hanmi** Maturity Date for such ~~Samsara~~ **Hanmi** Agreement.<br><br>**D.  Interest Rate**: 0.0% per annum simple interest. |

---

[18]  This is the amount the Debtor projects the collective Hanmi~~Samsara~~ balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|  |  |  |  | **E.  Default**:  Upon the Effective Date, each ~~Samsara~~ Hanmi Agreement shall not be considered in default as to the Reorganized Debtor.  If the Reorganized Debtor fails to make a Hanmi ~~Samsara~~ Monthly Payment to Hanmi ~~Samsara~~ when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Hanmi ~~Samsara~~ to the Reorganized Debtor and its counsel (collectively, an "**Uncured Hanmi ~~Samsara~~ Default**"), then Hanmi ~~Samsara~~ may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Hanmi ~~Samsara~~'s collateral that is the subject of the Uncured Hanmi ~~Samsara~~ Default permitted under the subject Hanmi ~~Samsara~~ Agreement. The Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the Hanmi ~~Samsara~~ Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  With respect to each Hanmi ~~Samsara~~ Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Hanmi ~~Samsara~~ in any assets of the Estate to secure such Hanmi ~~Samsara~~ Secured Claim shall be retained by Samsara in and to the same extent, validity, and priority as of the Petition Date pending payment of such Hanmi ~~Samsara~~ Secured Claim in full as provided herein. Upon full satisfaction of such Hanmi ~~Samsara~~ Secured Claim, any and all liens of Hanmi ~~Samsara~~ securing such Hanmi ~~Samsara~~ Secured Claim on assets of the Reorganized Debtor shall be released and the Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Hanmi ~~Samsara~~ Secured Claims. |

### 3.    Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes.  The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective

39

Date equal to the allowed amount of such Claim.  However, a Class of Priority Unsecured Claims

may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the

Allowed amount of such Claims.

The Debtor is unaware of any Priority Unsecured Claims.  However, in an abundance of

caution, the following chart lists all Classes containing the Debtor's section 507(a)(4), (a)(5),

(a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Classes of Priority Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5) Estimated total amount of claims: $0.00[19] | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 4 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |
| 15 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7) Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 5 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |

**4.      Classes of General Unsecured Claims**

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 16 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims. On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a *pro rata* share of the beneficial interests in the Plan Trust in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, which shall entitle such Holder to his, her, or its Pro Rata Distribution of the Available Trust Proceeds. |

---

[19]   The Debtor's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

40

| General Unsecured Claims | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions from Available Trust Proceeds as follows:<br><br>On each Quarterly Distribution Date until the Available Trust Proceeds are exhausted or the term of the Plan Trust ends, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from any Available Trust Proceeds.<br><br>The Reorganized Debtor will fund the GUC Payment Amount to the Plan Trust as provided in Section III.A. of the Plan.<br><br>The treatment proposed herein shall be in full satisfaction of the Claims in Class 16. |
| 17 | Subordinated Insider Class | Y | Y | This Class consists of the Claims Insiders against the Debtor that are being consensually subordinated under the Plan.  The Holders of Subordinated Claims shall not receive any Distributions under the Plan until and unless the Allowed General Unsecured Claims are paid in full. |
| 17 | Sierra Bank<br><br>Estimated amount: $2,653,647.96 | N | Y | This Class consists of the Claim of Sierra Bank.  Sierra Bank's claim is secured by a lien against the Mill St. Property owned by MWP.  Sierra Bank filed Proof of Claim No. 159-1, attached to which is the Promissory Note dated July 1, 2020, between MWP and Sierra Bank (the "**Sierra Note**").<br><br>The Reorganized Debtor shall pay the Sierra Bank Claim in full as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Sierra Bank's Claim is paid in full, the Reorganized Debtor shall make the payment required for such month set forth in the Sierra Note (a "**Sierra Monthly Payment**").<br><br>**C.  Maturity Date**:  The Reorganized Debtor shall pay the Sierra Bank Claim in full by the July 15, 2045 maturity date set forth in the Sierra Note (the "**Sierra Maturity Date**").<br><br>**C.  Interest Rate**: Simple interest on the Sierra Bank Claim will accrue on the outstanding balance of such Claim from the Effective Date until such Claim is paid in full at the non-default variable contract rates set forth in the Sierra Note. |

41

| General Unsecured Claims | | | |
|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **D. Default**: If the Reorganized Debtor fails to make a Sierra Monthly Payment to PNC when due herein or pay the Sierra Bank Claim in full by the Sierra Maturity Date, and such failure is not cured within thirty (30) days after written notice thereof provided by Sierra Bank to the Reorganized Debtor and its counsel (collectively, an "**Uncured Sierra Default**"), then Sierra Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to its real property collateral permitted under the Sierra Note.  The Reorganized Debtor shall have the right to oppose such motion.<br><br>**E. Plan Controls**: If and to the extent that there is a conflict between the Sierra Note (or any other loan documents with Sierra Bank) and the Plan, the Plan shall control.<br><br>**F. Lien**.  Any valid, enforceable, perfected, and unavoidable lien held by Sierra Bank to secure Sierra Bank's Claim shall be retained by Sierra in and to the same extent, validity, and priority as of the Petition Date pending payment of the Sierra Bank Claim in full as provided herein. Upon full satisfaction of the Sierra Bank Claim, any and all liens of Sierra Bank securing the Sierra Bank Claim shall be released and title to such assets shall be retained free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Sierra Bank Claim. |
| 18 | Subordinated Insider Class | Y | Y | This Class consists of the Claims Insiders against the Debtor that are being consensually subordinated under the Plan.  The Holders of Subordinated Claims shall not receive any Distributions under the Plan until and unless the Allowed General Unsecured Claims are paid in full. |

## 5.    Class of Interest Holders

Interest Holders are the parties who hold ownership Interests in the Debtor.  The following chart describes the treatment for Interest Holders in the Debtor.

| Class of Interests | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders | Impaired | Treatment |
| ~~18~~19 | Robin Mowbray | Y | Y | On the Effective Date, based on the Compromise set forth in Section III.A.2. herein and in exchange for the Settlement Consideration, Robin Mowbray shall retain all existing Equity Interests in the Reorganized Debtor. ~~On the Effective Date, Robin Mowbray shall retain all existing Equity Interests in the Debtor on account of the New Value Contribution or, alternatively, in the event a Winning Bid that is not held by Robin Mowbray, such Equity Interests will be transferred to the Winning Bidder with such Winning Bid.~~ |

## III.   MEANS FOR IMPLEMENTATION OF THE PLAN

This Section is intended to explain how the Reorganized Debtor intends to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Plan after the occurrence of the Effective Date.  This Section provides information regarding the funding sources for the Plan obligations, the establishment of the Plan Trust, and other material issues bearing upon performance of the Plan.

### A.   Funding of the Plan

The payments under the Plan by the Reorganized Debtor will be funded from the Reorganized Debtor's operations.  As reflected in the Projections, the Distributions to the Holders of Secured Claims will be paid by the Reorganized Debtor from its post-Effective Date cash flow.

Distributions to the Holders of Allowed General Unsecured Claims will be made from the Plan Trust.  The Holders of Allowed General Unsecured Claims will receive a Pro Rata Distribution of Available Trust Proceeds.  Available Trust Proceeds are compromised of the GUC Payment Amount, the GUC Bonus, and any Net Recoveries.  The Reorganized Debtor will fund the GUC Payment Amount from its post-Effective Date operations as provided below.

1    **1.      Payment of the GUC Payment Amount and the GUC Bonus**

2    **a.      The GUC Payment Amount**

3    The $25,000,000 GUC Payment Amount is the minimum amount to the paid under the

4    Plan.  The Reorganized Debtor shall pay the GUC Payment Amount to the Plan Trust (for the

5    benefit of the Holders of Allowed General Unsecured Claims in Class 16) through the Class 16

6    GUC Payment as provided below.

7    The Class 16 GUC Payment is summarized and intended to work as follows:

8    The Class 16 GUC Payment requires the Reorganized Debtor to make the payments

9    specified in the Plan Projections for the General Unsecured Creditors as adjusted based on the

10    Reorganized Debtor's *actual* post-Effective Date performance (up to the GUC Payment Amount).

11    Thus, if and to the extent that the Reorganized Debtor's actual net income, inclusive of PTS and

12    after income tax distributions, for a particular period is greater than projected, then the payment to

13    the Plan Trust on account of the GUC Payment Amount will be increased.  If and to the extent that

14    the Reorganized Debtor's actual net income, inclusive of PTS and after income tax distributions,

15    for a particular period is less than projected, then the payment to the Plan Trust on account of the

16    GUC Payment Amount will be reduced.  However, the Reorganized Debtor is, by the Plan,

17    committing to paying the GUC Payment Amount in full even if its post-Effective Date

18    performance is worse than projected.  The time needed to pay the GUC Payment Amount may be

19    shorter or longer than projected depending on the Reorganized Debtor's actual performance.

20    Based on the Plan Projections, the Reorganized Debtor projects funding the GUC Payment

21    Amount within nine (9) years of the Effective Date.  (*See* Ex. 1 at 10 of 18.)

22    The Class 16 GUC Payment will be made quarterly.  The Class 16 GUC Payment will be

23    calculated within thirty (30) days of the end of each Measurement Period (the "**Calculation**

24    **Date**").  The Class 16 GUC Payment shall be paid by the Reorganized Debtor to the Plan Trust

25    within fourteen (14) calendar days after such Calculation Date (the "**Payment Date**"); *provided*,

26    *however*, with respect to any Class 16 GUC Payment, if the Reorganized Debtor believes that such

27    Class 16 GUC Payment is not prudent in its business judgment based on its projected operating

28    results over the next twelve (12) months, then it may withhold the Class 16 GUC Payment if the

44

Plan Trustee approves such in writing by the Payment Date.  The Plan Trustee shall be the sole arbiter, as between the Reorganized Debtor and the Plan Trustee, as to whether the Reorganized Debtor may withhold a Class 16 GUC Payment (or any portion thereof).

Notwithstanding the foregoing, in any year in which the Projections project a payment to the Plan Trust on account of the GUC Payment Amount and until the GUC Payment Amount is paid to the Plan Trust in full, the Reorganized Debtor shall pay at least the sum of $350,000 (the "**GUC Annual Minium Payment**") within thirty (30) days after the end of such year.

### b.    The GUC Bonus

In addition to the GUC Payment Amount, the Reorganized Debtor will pay to the Plan Trust the GUC Bonus.  The GUC Bonus entitles the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims) to fifty percent (50%) of the Reorganized Debtor's post-confirmation excess cash (defined as actual net income less income tax distributions and inclusive of PTS), if any, after payment of the GUC Payment Amount subject to a maximum time period and maximum amount.  The GUC Bonus will be paid by the Reorganized Debtor through the Excess GUC Cash Payment.  By the Excess GUC Cash Payment, the Plan Trust could receive up to the cumulative sum (inclusive of the GUC Payment Amount) of (a) $55,000,000 or (b) 40% of the Allowed General Unsecured Claims (capped by the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed),[20] whichever is greater between (a) and (b), provided such cumulative sum is generated within five (5) years after the Effective Date.  The GUC Bonus is inclusive of the GUC Payment Amount.

The GUC Bonus will be paid quarterly after the GUC Payment Amount is paid in full to the Plan Trust.  The GUC Bonus will be calculated in accordance with the Plan by the Calculation Date and paid by the Reorganized Debtor to the Plan Trust by the Payment Date

As an example, if the Reorganized Debtor pays the GUC Payment in full to the Plan Trust within three (3) years after the Effective Date, then the Plan Trust would be entitled to the Excess GUC Cash Payment for an additional two (2) years up to GUC Maximum Amount.  If the GUC

---

[20]  Based on the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025, and assuming such Claims are Allowed, then 40% equals approximately $67 million (subject to the disallowance of certain Disputed Claims).

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585254.110585254.110488260.1

1   Maximum Amount is reached within the next year (*i.e.*, year four after the Effective Date), then

2   the payments by the Reorganize Debtor to the Plan Trust cease.  If the GUC Maximum Amount is

3   not reached within five (5) years after the Effective Date, then the payments by the Reorganized

4   Debtor to the Plan Trust cease.  If it takes the Reorganized Debtor more than five (5) years after

5   the Effective Date to pay the GUC Payment Amount to the Plan Trust, then the Reorganized

6   Debtor shall be required to pay only the GUC Payment Amount, and no GUC Bonus will be paid.

7

8   ~~The Reorganized Debtor will pay the GUC Payment Amount as follows:  Beginning on the~~

9   ~~GUC Payment Commencement Date, and continuing each year thereafter on the anniversary of the~~

10  ~~GUC Payment Commencement Date until the GUC Payment Amount is fully funded, and cash~~

11  ~~flow permitting as projected, the Reorganized Debtor will pay to the Plan Trustee the amount set~~

12  ~~forth at page 10 of 18 of the Projections under "General Unsecured Claims" for such year (each, a~~

13  ~~**"Plan Trust Payment"**).  The Reorganized Debtor projects funding the GUC Payment Amount~~

14  ~~within nine (9) years of the Effective Date.  (*See* Ex. 1 at 10 of 18.)  The Reorganized Debtor shall~~

15  ~~fully fund the GUC Payment Amount by the Plan Term End Date.  The Reorganized Debtor shall~~

16  ~~have the right to prepay the GUC Payment Amount to the Plan Trust in full at any time and~~

17  ~~without any penalty.~~  Upon the Reorganized Debtor fully funding the GUC Payment Amount and

18  paying any GUC Bonus required by the Plan to the Plan Trust, the Reorganized Debtor~~, it~~ shall

19  have no further obligation to the Plan Trust.  The Reorganized Debtor's obligation to make the

20  Class 16 GUC Payment and the Excess GUC Cash Payment, on the terms herein, are subject to the

21  default provision in Section III.C.

22          As reflected in the Projections, the Reorganized Debtor's post-Effective Date cash flow

23  includes substantial funds from PTS and PTM.  The Reorganized Debtor is projected to receive

24  nearly $10.8 million per year from PTS on account of management fees and equipment rent.  (*See*

25  Ex. 1 at 2 of 18.)  PTS is projected to repay the PTS Loan with interest ~~less than one year~~within

26  two years after the Effective Date.  ~~(*See* Ex. 2 at 8 of 10.)~~  In addition, the Reorganized Debtor is

27  to receive substantial annual distributions from PTS's available cash flow.  (*See* Ex. 1 at 8 of 18.)

28  The projected annual distributions from PTS collectively exceed $14.5 million over the term of the

Plan.  The Debtor is projected to receive approximately $720,000 on an annual basis from PTM in management fees and equipment rent.  The projected amounts to be paid by PTM and PTS to the Reorganized Debtor are based on the CRO's current understanding of the financial wherewithal of both such companies and reflects the amounts that the CRO believes can reasonably be paid to the Reorganized Debtor.

In addition, as provided in Section III.~~E~~D.2. below, the Plan Trust will be vested with ~~all Trust Causes of Action, which are comprised of~~ all ~~Insider Avoidance Actions~~Trust Causes of Action ~~and the Loan Causes of Action~~, excluding the Excluded Claims.  ~~Any payments on the PTM Loan and the MWP Loan within the amounts set forth in the Projections shall be paid to the Reorganized Debtor.~~  The Holders of Allowed General Unsecured Claims will share *pro rata* in any Net Recoveries on account of the Trust Causes of Action.

On the Effective Date, the Reorganized Debtor will pay to the Plan Trustee $50,000 (the **"Initial Plan Trust Payment"**) for the initial costs of administration of the Plan Trust.  Any payments on the PTM Loan and the MWP Loan within the amounts set forth in the Projections shall be paid to the Reorganized Debtor.

### 2.      The Compromise Among the Debtor, Robin Mowbray, MWP, and the Trust

The Plan represents a proposed settlement between the Debtor, Robin Mowbray, MWP, and the Trust (the **"Compromise"**).  Such Compromise is the product of the Debtor's discussions with the Examiner and the Debtor's negotiations with the Rodriguez Plaintiffs and is part of the settlement between the Debtor and the Rodriguez Plaintiffs.  In exchange for the consideration, value, and benefits provided under the Plan, including without limitation, the voluntary substantive consolidation of MWP with the Debtor, voluntary subordination of claims against the Debtor, the increase in the GUC Payment Amount, and the GUC Bonus (collectively, the **"Settlement Consideration"**), Robin Mowbray, the Trust, Richard Mowbray, and any insider of the Debtor or insider of any such insider, excluding PTM, MWP, and PTS (collectively, the **"Released Parties"**), shall be deemed released and discharged, by the Debtor, the Estate, MWP, and the MWP Estate, in each case, on behalf of themselves and their respective successors,

47

assigns, and representatives, and any and all persons that may purport to assert any cause of action derivatively, by, through or on behalf of the Debtor or the Estate, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, the Debtor, the Case, the Estate, MWP, the MWP Estate, and the MWP Bankruptcy Case, any transfers listed in the Debtor's Schedules or Statement of Financial Affairs, as may be amended, transfers listed in MWP's Schedules or Statement of Financial Affairs, and any transfers disclosed in the Insider Payment Schedule attached to the Index of Exhibits as **Exhibit 5** (collectively, the "**Released Claims**").

For the avoidance of doubt, the releases herein shall not release PTM, PTS, and/or MWP of any claims, including, without limitation, on account of the amounts loaned by the Debtor to each such entity.  The Reorganized Debtor's rights to collect the PTM Loan, the PTS Loan, and the MWP Loan are expressly preserved.

The Confirmation Order shall operate as a bar and injunction against the commencement or pursuit of the Released Claims by any party against any Released Parties.

The Plan constitutes a good faith settlement and compromise, including of the Released Claims, in exchange for the Settlement Consideration.  The Insider Payment Schedule attached to the Index of Exhibit as **Exhibit 5** lists the payments to insiders within the four-year period prior to the Petition Date from the Debtor's books and records.  Certain of the Insider Payments are compensation to employees of the Debtor or are for services provided to the Debtor (such as, by PTM and PTS).  The Insider Payments also include amounts loaned to PTM and PTS, which are not being released under the Plan.  The net Insider Payments to Gloria Mowbray, Robin Mowbray, Richard Mowbray, and the Trust collectively total $38,163,341.50 (excluding those marked as compensation).  (*See* Index, Ex. 6.)

1    As noted in the Examiner's Report, there could be impediments to prevailing on certain

2    Insider Avoidance Actions and collecting on any judgment obtained.  (*See* Report at 25-30.)  For

3    example, it may be difficult to prove that the Debtor was insolvent at "different points in time."

4    (*See id.* at 28:1-2.)  Gloria Mowbray is deceased and Robin Mowbray is in her own bankruptcy

5    case.  (*See id.* at 27:23-26.)  Moreover, the majority of the Insider Payments to Robin Mowbray

6    and Gloria Mowbray were paid directly by the Debtor to taxing authorities, meaning neither Robin

7    Mowbray nor Gloria Mowbray received such payments.  Of the $25,135,211.58 Insider Payments

8    listed as to or for the benefit of Robin Mowbray, $20,416,770.08 were on account of taxes.  (*See*

9    Index of Exhibits, Ex. 5 at 21 of 22.)  Similarly, of the $10,702,367.55 net Insider Payments listed

10   as to or for the benefit of Gloria Mowbray, $10,552,674.60 were on account of taxes.  (*See id.* at

11   1-2 or 22.)  The Examiner concluded, in relevant part, as follows:

12       ***The litigation and expert fees required to pursue and defend these***
         ***actions are projected to be significant as it will be difficult and time-***
13       ***consuming to establish if and when insolvency occurred.  Even if***
         ***the litigation is successful, collectability may be an issue as one***
14       ***potential defendant is deceased [and] another defendant is in a***
         ***Chapter 11 proceeding.  A quick and reasonable settlement would***
15       ***be beneficial to all parties involved.***

16   (*See* Report at 30:17-22 (emphasis in original).)  This Plan is intended to accomplish a settlement

17   of the type suggested by the Examiner.  The proposed settlement is the product of discussions with

18   the Examiner and, also, settlement negotiations with the Rodriguez Plaintiffs, who assert the

19   largest claim in the case by far.

20       According to the Debtor's Liquidation Analysis, the Holder of General Unsecured Claims

21   would receive a *pro rata* portion of $15,674,000.  However, under the Plan, the Debtor is

22   committing to pay at least $25,000,000 (*i.e.*, over $9,000,000 more).  In addition, the Holders of

23   Allowed General Unsecured Claims will have the opportunity to share in any upside in the

24   Reorganized Debtor's post-Effective Date performance via the GUC Bonus.  Assuming the GUC

25   Maximum of the GUC Bonus is $55,000,000, the Holders of Allowed General Unsecured Claims

26   could receive a *pro rata* share of an additional $30,000,000 above the GUC Payment Amount

27   during the five-year period after the Effective Date.  Moreover, the settlement proposed herein

28   avoids the costs and risks associated with litigation as discussed in the Examiner's Report.

FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
10585254.110585254.110488260.1                                    Exhibit 2, Page 193

1    Due to the Settlement Consideration, the Plan effectuates the voluntary substantive

2  consolidation of the Debtor and MWP.  Upon the MWP Consolidation, the Reorganized Debtor

3  will receive real estate of MWP.   The Debtor will also receive the benefit of the rental income

4  paid by the County ($35,124 per month).  Moreover, the MWP Consolidation is not expected to

5  materially increase the Debtor's debt.

6    Upon the Effective Date, any claims pending in any court to pursue any Released Claims

7  shall be dismissed with prejudice.  Upon and after the Effective Date, the Debtor shall be

8  empowered to take such action, file such pleadings, and record such instruments as needed to

9  cause the dismissal with prejudice of any such claims.

10    **3.    Compromise with the Rodriguez Parties**

11    In addition to any Debtor/RP Settlement Agreement, the Plan constitutes and includes a

12  settlement agreement and compromise between the Debtor, Robin Mowbray, PTS, PTM, MWP,

13  the Trust, Richard Mowbray, and any other Released Party (each, a **"RP Released Party"** and

14  collectively, the **"RP Released Parties"**), on the one hand, and the Rodriguez Plaintiffs on the

15  other hand (the **"Rodriguez Compromise"**).  Pursuant to the Rodriguez Compromise, and in

16  addition to the consideration provided by the terms of the Plan, including, without limitation, the

17  Settlement Consideration:

18    (i)    On the Effective Date, any and all assignable claims and causes of action, whether

19        sounding in tort, contract, equity or otherwise, which Debtor may now have or

20        hereafter acquire against Everest National Insurance Company (**"Everest"**) arising

21        out of or related to Everest's handling of the Rodriguez Lawsuit and subsequent

22        Rodriguez Judgment, including, but not limited to, any obligation of Everest to pay

23        the Rodriguez Judgment or any component thereof under Policy No.

24        EN4CA00458191 (the **"Insurance Policy"**), shall be deemed assigned to the

25        Rodriguez Plaintiffs.

26    (ii)    Within fourteen (14) days of the Effective Date, the Reorganized Debtor shall

27        cause the pending appeal of the Rodriguez Judgment by the Debtor to be dismissed.

28

50

(iii)    On the Effective Date, the Rodriguez Claim shall be deemed an Allowed General Unsecured Claim.

(iv)    Reporting required under the Plan to the Plan Trustee in accordance with Section III.D.8.a. shall be provided to the Rodriguez Plaintiffs.

(v)    Effective as of the Effective Date, the Rodriguez Parties shall be deemed to forever release and discharge each of the RP Released Parties from the Rodriguez Claim, the Rodriguez Judgment, and any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, the Debtor, the Case, the Estate, MWP, the MWP Estate, Rodriguez Claim, the Rodriguez Judgment, any transfers listed in the Debtor's Schedules and Statement of Financial Affairs, as may be amended, MWP's Schedules and Statement of Financial Affairs, and any transfers disclosed in the Insider Payment Schedule attached to the Index of Exhibits as **Exhibit 5**, and the Rodriguez Plaintiffs agree that the sole source of recovery on account of the Rodriguez Claim and the Rodriguez Judgment shall be the treatment in Class 16 of the Plan and amounts to be paid thereunder; *provided, however*, that the Rodriguez Plaintiffs shall not be prohibited from seeking to collect from Everest (including on account of the assignment herein) or from Jonathan Gonzalez-Varillas.

The Confirmation Order shall constitute approval of any Debtor/RP Settlement Agreement (if and to the extent such is not approved by separate order of the Court entered prior to the Effective Date) and the Rodriguez Compromise pursuant to Bankruptcy Rule 9019.

**B.      New Value Contribution**

On the Effective Date, Robin Mowbray or her assigns shall contribute to the Debtor the sum of $100,000 as a new value contribution, plus any additional consideration Robin Mowbray or her assigns provides in or as part of the Plan, including, without limitation, from the RM Bankruptcy Case or the MWP Bankruptcy Case (the "**New Value Contribution**"), in exchange for 100% of the Equity Interests in the Reorganized Debtor (the "**Reorganized Debtor Equity Interests**"), unless there is a Winning Bidder who is not Robin Mowbray or her assigns.  If there is a Winning Bidder who is not Robin Mowbray or her assigns, then, on the Effective Date, such Winning Bidder shall contribute the amount set forth in the Winning Bid in cash (the "**Winning Bid Contribution**") and, in exchange for such Winning Bid Contribution, the Winning Bidder shall receive the Reorganized Debtor Equity Interests.

The New Value Contribution or, if applicable, the Winning Bid Contribution shall be paid to the Reorganized Debtor to be used as part of the Reorganized Debtor's cash flow to pay operating expenses and/or make the Distributions required by the Plan.

The New Value Contribution shall be subject to overbids in accordance with the Overbid Procedures attached hereto as **Exhibit 3**.  The Debtor intends to seek approval of the Overbid Procedures in accordance with the Court's order approving the Disclosure Statement for dissemination.  The material dates and deadlines set forth in the Overbid Procedures are as follows:

1.      Only Qualified Bidders may submit bids on the Reorganized Debtor Equity Interests;

2.      All bids for the Reorganized Debtor Equity Interests must be Qualified Bids in accordance with the Overbid Procedures;

3.      The Bid Deadline to submit Qualified Bids is five (5) Business Days after the Voting Deadline (and assuming an impaired Class of Allowed Unsecured Claims votes against the Plan);

4.      Any Qualified Bid must exceed the value of the New Value Contribution by $50,000 in addition to meeting the other Qualified Bid requirements set forth in the Overbid Procedures;

5.      The Auction on the Reorganized Debtor Equity Interests will occur on the date that is no later than three (3) Business Days before the deadline for the Debtor to file its memorandum in support of confirmation of the Plan;

6.      Bids by Qualified Bidders during the Auction must exceed the previous bid by at least $25,000;

7.      The Winning Bidder for the Reorganized Debtor Equity Interests shall be determined by the CRO after consultation with the Examiner and subject to approval of the Court at the Confirmation Hearing.

**C.B.    Substantive Consolidation ~~Option~~of MWP**

As part of the settlements set forth in the Plan, the Confirmation Order shall approve the substantive consolidation of MWP with the Debtor (the "**MWP Consolidation**").  Upon the Effective Date, MWP (and its assets and liabilities) will be deemed substantively consolidated with the Reorganized Debtor and the following shall be deemed to occur:

(i)      the unpaid balance of the MWP Loan and any claims between the Debtor and MWP shall be deemed released, forgiven, and extinguished;

(ii)     any assets or property of MWP and/or the MWP Estate (including Avoidance Actions or other causes of action and property recoverable or any other recoveries thereon) shall be deemed property of the Estate, shall vest in the Reorganized Debtor as of the Effective Date as provided in Section VIII.D below, and shall be considered assets or property of the Reorganized Debtor under the Plan and shall be subject to the terms and conditions of the Plan, including, without limitation, Sections VIII.A-C. below;

(iii)    the Reorganized Debtor shall have the right to receive any amounts owing to MWP, including any rent owed by the County;

(iv)     any claims against MWP, including any claims scheduled or filed in the MWP Bankruptcy Case, shall be Claims against the Debtor and under and subject to the Plan, shall be

53

considered Disputed, Disallowed, or Allowed as provided in the Plan, shall be subject to the terms
and conditions of the Plan, including, without limitation, Sections VIII.A-C.. below, and shall
receive the treatment expressly set forth in the Plan for the holder of such claim or in accordance
with the treatment of similarly situated claims in the Plan, *i.e.*, any General Unsecured Claims
shall receive the treatment in Class 16, in full settlement and satisfaction of such claims; and

(v)     MWP shall be deemed dissolved, shall receive the discharge in Sections VIII.C.
below, and shall be subject to the injunction granted in Section VIII.C. below.

The MWP Consolidation shall not impair or impact the rights of PNC to collect on its
claims against the Reorganized Debtor, MWP, and/or the Reorganized Debtor's assets if otherwise
permitted by order of the Bankruptcy Court following an Uncured PNC Default in accordance
with the treatment in Class 1, including, without limitation, with respect to the one-action rule and
the anti-deficiency rules set forth in California Code of Civil Procedure §§ 580 and 726 due to the
MWP Consolidation.  The Debtor reserves the right to amend the Plan such that the MWP
Consolidation will occur upon the later of the Effective Date and the payment of the Allowed PNC
Secured Claim in full under the Plan.

~~The Debtor reserves the right to file a motion seeking to substantively consolidate the
Estate of the Debtor with any Affiliate if the Debtor determines that the legal requirements for
such substantive consolidation can be satisfied and that such substantive consolidation is in the
best interests of the Estate and will not be detrimental to the Estate, including, without limitation,
as part of a compromise to be approved with confirmation of the Plan.  In addition, should the
Court, by Final Order in connection with confirmation of the Plan, substantively consolidate the
Estate of the Debtor with any Affiliate (upon motion by the Debtor or otherwise), then the assets
of such Affiliate shall be deemed property of the Estate as of the Effective Date and shall vest in
the Reorganized Debtor as provided in Section III.C. of the Plan, and the Claims against such
Affiliate shall be treated in accordance with the treatment of similarly situated claims in the Plan,
i.e., any General Unsecured Claims shall receive the treatment in Class 16.~~

~~D.~~**C.    Sale of Real Properties**

After the Effective Date, the Reorganized Debtor shall be authorized, but not required

54

(except as otherwise expressly set forth below in this Section III.DC.), to sell any Estate Real Property.  Pending the Plan Term End Date, the sale or encumbering of any Estate Real Property shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real Property shall not be sold or encumbered absent an order of the Court.  The Reorganized Debtor may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

As an alternative to the sale any Estate Real Property as provided or required herein, the Reorganized Debtor may incur or obtain financing secured by such property as necessary to pay Allowed Claims pursuant to an order of the Court.

Within one (1) year after the Effective Date and to the extent not sold prior thereto (the "**Sale Deadline**"), the Reorganized Debtor shall close sales of the real properties located 386 S. Allen St., San Bernardino, CA 92408 (the "**Allen St. Property**"), and 9546 Elder Creek Rd., Sacramento, CA 95829 (the "**Elder Creek Property**").  The Reorganized Debtor may extend the Sale Deadline for "cause" by motion filed with the Bankruptcy Court prior to the expiration of the Sale Deadline.

## E.D.    The Plan Trust

### 1.    Establishment of the Plan Trust

On the Effective Date, a plan trust (the "**Plan Trust**") shall be created subject to the terms and conditions in the Plan and the Confirmation Order.  The Plan Trust shall be established and become effective on the Effective Date.  The Plan Trust is created by the Plan and the Confirmation Order, and no separate trust instrument shall be required.  The sole purpose of the Plan Trust will be to hold, preserve, and administer the Trust Assets and to make the Distributions required of it by the Plan to the Holders of Allowed General Unsecured Claims.  Each creditor holding an Allowed General Unsecured Claim will receive in full satisfaction, settlement, release and discharge of such Claim a Trust Interest on a *pro rata* basis based on such creditor's Allowed General Unsecured Claim.  Holders of Allowed General Unsecured Claims will receive Distributions from the Plan Trust until, the Trust Assets are exhausted or abandoned, or the term of the Plan Trust expires.

### 2.    The Trust Assets

The Plan Trust will be funded with the Trust Assets.  The Trust Assets are comprised of only the following:

1.    The Initial Plan Trust Payment;

2.    The rights to the Plan Trust Payments by the Reorganized Debtor under the Plan to fund the GUC Payment Amount and the GUC Bonus as and when paid by the Reorganized Debtor in accordance with the terms of the Plan; and

3.    Any Loan Causes of Action; and The Trust Causes of Action.

4.3.    Any Insider Avoidance Actions that are not Excluded Claims.

On the Effective Date, all Trust Assets (or the rights thereto) shall be deemed automatically transferred to and vested in the Plan Trust free and clear of all Claims, liens, encumbrances, or other interests (unless otherwise stated expressly in the Plan).  Proceeds from the Trust Assets, when realized, will be distributed by the Plan Trustee on Quarterly Distribution Dates determined by the Plan Trustee in accordance with the Plan.

Notwithstanding anything else set forth in the Plan, the Trust Assets shall exclude the Excluded Claims.

### 3.    The Term of the Plan Trust

The initial term of the Plan Trust shall be ten (10) years (the "**Initial Term**"); provided, however, that the term of the Plan Trust may be extended once for a further finite term for "cause" as determined by the Court upon motion by the Plan Trustee.  The Plan Trustee may seek such an extension of the Plan Trust's term by filing a motion prior to the expiration of the term to be extended and serving the motion on the Reorganized Debtor's counsel.  Any party in interest shall have the right to oppose any such motion.  The Plan Trust may be terminated earlier than its scheduled termination if the Plan Trustee has completed all payments required by the Plan Trustee under the Plan, has paid any taxes, fees and penalties associated with the Plan Trustee's administration of the Trust Assets, has administered all assets of the Plan Trust (or abandoned all assets not administered), and has performed all other duties required by the Plan.  Upon the

termination of the Plan Trust, the Plan Trustee shall be discharged and exonerated and any assets remaining in the Plan Trust shall revest in the Reorganized Debtor.

### 4.    The Plan Trustee

#### (i)    Appointment

The appointment of the Plan Trustee shall be effective as of the Effective Date. The individual to serve as the Plan Trustee will be identified prior to approval of the Disclosure Statement. The Plan Trustee may resign upon sixty (60) days' advance written notice to the Reorganized Debtor so long as a replacement trustee has been appointed. The Plan Trustee may be removed by order of the Court for "cause."

The Plan Trustee shall act as a fiduciary and shall not be personally liable in connection with the affairs of the Plan Trust or to any person except for the Plan Trustee's acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction. In addition, the Plan Trustee shall be indemnified by the Plan Trust and from the Trust Assets against and held harmless by the Plan Trust from any losses, claims, damages, liabilities, or expenses (including without limitation, attorneys' fees, disbursements, and related expenses) to which the Plan Trustee may become subject to in connection with any action, suit, proceeding, or investigation brought or threatened against the Plan Trustee in connection with any matter arising out of or related to the Plan Trust (other than acts or omissions that constitute fraud, willful misconduct, or gross negligence, as determined by a court of competent jurisdiction). The Plan Trustee shall be entitled to obtain customary fiduciary and/or errors and omissions liability insurance at the expense of the Plan Trust and engage independent legal counsel and financial advisors to assist with the evaluation of any matters with respect to the Plan Trust as provided in Section III.D.E.8. below and at the expense of the Plan Trust.

#### (ii)    Term of the Plan Trustee

Unless the Plan Trustee resigns, dies or is removed by Court order earlier, the Plan Trustee's term shall expire upon termination of the Plan Trust pursuant to the Plan. In the event the Plan Trustee resigns, dies or is removed by Court order prior to the termination of the Plan Trust, the Reorganized Debtor shall appoint a successor trustee. Upon the termination of the Plan

57

1    Trust, the Plan Trustee may destroy or otherwise dispose of the books and records of the Plan

2    Trust.

3    **(iii)    The Plan Trustee's Powers and Duties**

4        On the Effective Date, the Plan Trustee shall have the rights, powers and duties set forth in

5    the Plan and the Confirmation Order.  The Plan Trustee shall be governed in all things by the

6    terms of the Plan and the Confirmation Order, and the Plan Trustee shall administer the Plan Trust

7    in accordance with the Plan.  The Plan Trustee shall be authorized, empowered and directed to do

8    the following:

9        a.    Employ, retain, and replace one or more attorneys, accountants, investigators, and

10   expert witnesses, as necessary to discharge the duties of the Plan Trustee under the Plan and to pay

11   such professionals their reasonable and necessary fees and costs from the Trust Assets;

12       b.    Open, maintain and administer bank accounts for the Plan Trust to hold the Trust

13   Assets and from which to make Distributions required of the Plan Trust under the Plan;

14       c.    Make Distributions to the Holders of Allowed General Unsecured Claims in

15   accordance with the Plan;

16       d.    Administer or otherwise dispose of the Trust Assets held by the Plan Trust in

17   accordance with the terms of the Plan;

18       e.    Incur and pay from the Trust Assets reasonable and necessary expenses in

19   connection with the performance of the Plan Trustee's duties under the Plan;

20       f.    Represent the Plan Trust before the Court and other courts of competent

21   jurisdiction with respect to matters concerning the Plan Trust;

22       g.    Comply with applicable orders of the Court and any other court of competent

23   jurisdiction over the matters set forth in the Plan;

24       h.    Comply with all applicable laws and regulations concerning the matters set forth in

25   the Plan;

26       i.    Execute any documents, instruments, contracts, and agreements necessary and

27   appropriate to carry out the powers and duties of the Plan Trust;

28

j.        Seek a determination of tax liability under § 505 of the Code, pay taxes, if any, related to the Plan Trust, and file, if necessary, any and all tax and information returns required with respect to the Plan Trust, including, if appropriate, treating the Plan Trust as a "grantor trust" pursuant to Treas. Reg. 1.671-4 or otherwise, make tax elections by and on behalf of the Plan Trust, and pay taxes, if any, payable by the Plan Trust; and

k.        Cause to be prepared and filed federal, state, and local tax returns to the Plan Trust as necessary.

In addition to the foregoing, the Plan Trustee shall be authorized, empowered, and directed to administer any Trust Causes of Action, including to investigate, enforce, file, litigate, prosecute, settle, and collect such Trust Causes of Action.  In connection with administering the Loan Causes of Action, the Plan Trustee shall consider the impact of such on the Reorganized Debtor's operations, the Plan, and the distributions to be made by the Reorganized Debtor under the Plan. The Plan reserves for, and vests in, the Plan Trust all rights to commence and pursue, as appropriate, any and all Trust Causes of Action in any court or other tribunal.  On the Effective Date, the Plan Trustee is vested with the sole authority to enforce, file, litigate, prosecute, settle, and collect any Trust Causes of Action, although the Plan Trustee will not be required to do so unless he or she determines that doing so would be in the best interests of the Plan Trust.  The Trust Causes of Action reserved for, and vested in, the Plan Trustee to pursue after the Effective Date under the Plan are comprised of any and all Insider Avoidance Actions, including, without limitation, those based on the Insider Payments, and the Loan Cause of Action (in all cases, excluding the Excluded Claims).

The Plan Trustee may settle or compromise any Trust Causes of Action without further notice, motion, or order of the Bankruptcy Court.

### 5.        Trust Distributions

The Plan Trustee will make the Distributions to the Holders of Allowed Unsecured Claims in accordance with the terms of the Plan.  All Distributions to the Holders of Allowed General Unsecured Claims pursuant to the Plan shall be from the Plan Trust.  The Plan Trustee shall not be required to make more than one Distribution to the Holders of Allowed General Unsecured Claims

59

1   per calendar quarter.  All persons dealing with the Plan Trustee, or seeking to assert Claims

2   against the Debtor, the Reorganized Debtor, the Estate, or the Plan Trust—except for the Holders

3   of Allowed Secured Claims—shall look only to property of the Plan Trust to satisfy any liability

4   to such Persons, and the Plan Trustee shall have no personal or individual obligation to satisfy any

5   such liability.

6   **6.    Federal Income and Taxation of the Plan Trust**

7         For federal income tax purposes, the Plan Trust is a "liquidating trust" within the meaning

8   of Treasury Income Tax Regulation Section 301.7701-4(d) and IRS Revenue Procedure 94-45,

9   1994-2 C.B. 124.  The transfer of assets to the Plan Trust under the Plan is treated as a deemed

10  transfer to the persons entitled to receive Distributions from the Plan Trust followed by a deemed

11  transfer of assets by such persons to the Plan Trust.  The persons entitled to receive Distributions

12  under the Plan will be deemed the grantors and owners of the Plan Trust and its assets.  The Plan

13  Trust will be taxed as a "grantor trust" within the meaning of IRC Sections 671-677 (a non-taxable

14  pass-through tax entity) owned by the persons entitled to receive Distributions under the Plan.

15  The Plan Trust will file federal income tax returns as a grantor trust under IRC Section 671 and

16  Treasury Income Tax Regulation Section 1.671-4 and report, but not pay tax on, the Plan Trust's

17  tax items of income, gain, loss deductions, and credits (**"Tax Items"**).  The persons entitled to

18  receive Distributions under the Plan will report such Tax Items on their federal income tax returns

19  and pay any resulting federal income tax liability.  The Plan Trust and the persons entitled to

20  receive Distributions under the Plan will use consistent valuations of the assets transferred to the

21  Plan Trust for all federal income tax purposes, such valuations to be determined by the Plan

22  Trustee.  The taxation of the Plan Trust does not alter the Reorganized Debtor's obligations to file

23  appropriate tax returns and pay taxes.

24  **7.    Beneficiaries of the Plan Trust**

25        The Holders of Allowed General Unsecured Claims under the Plan, or any successors to

26  such Holders' Allowed General Unsecured Claims (each a **"Beneficiary"**) shall own a beneficial

27  interest in the Plan Trust as otherwise set forth in the Plan and shall, subject to the Plan, be entitled

28  to a Distribution, if any, in the amounts, and at the times, set forth in the Plan.  Ownership of a

1   beneficial interest in the Plan Trust shall not be evidenced by any certificate, security, receipt, or

2   any other form or manner whatsoever, except as maintained on the books and records of the Plan

3   Trust by the Plan Trustee.  The ownership of a beneficial interest in the Plan Trust shall not entitle

4   any Beneficiary to any title in or to the Trust Assets or to any right to call for a partition or

5   division of the Trust Assets or to require an accounting.  The Plan Trustee shall make

6   Distributions, if any, to the Beneficiaries in the manner provided in the Plan.  The rights of the

7   Beneficiaries arising under the Plan Trust may be deemed "securities" under applicable law.

8   However, such rights have not been defined as "securities" under the Plan because (a) the intent of

9   the Plan is that such rights shall not be securities, and (b) if the rights arising under the Plan Trust

10  are deemed to be "securities," the exemption from registration under § 1145 of the Bankruptcy

11  Code is intended to be applicable to such securities.

12              **8.    Plan Trust Retention of Professionals and Fees and Expenses**

13          On or after the Effective Date, the Plan Trustee may, without further application or

14  Motion, notice, hearing, or Court order, engage or employ such professionals and experts as he or

15  she deems necessary and appropriate to assist in carrying out his or her rights or duties under the

16  Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of

17  employment to be determined by the Plan Trustee.  For the services performed on and after the

18  Effective Date, the professionals engaged by the Plan Trustee (the "**Plan Trustee Professionals**")

19  shall receive reasonable compensation and reimbursement of expenses in a manner to be

20  determined by the Plan Trustee to be paid solely from the Trust Assets.

21          The Plan Trustee and the Plan Trustee Professionals shall be entitled to reasonable

22  compensation for their services and reimbursement for expenses paid from the Trust Assets.  The

23  Plan Trustee shall be paid on an hourly basis at the Plan Trustee's customary hourly rate.  The Plan

24  Trustee shall be authorized, without further order, notice, or application to the Court, to pay his or

25  her reasonable fees and actual expenses, and the reasonable fees and actual expenses of any Plan

26  Trustee Professionals, and all such reasonable fees and actual expenses shall be paid solely from

27  the Trust Assets.  The Plan Trustee shall be authorized to reserve funds from the Trust Assets as is

28  reasonable to pay the expenses and fees of the Plan Trustee and the Plan Trustee Professionals

before making any Distributions under the Plan to the Holders of Allowed General Unsecured Claims.  The sole source of payment for the Plan Trustee and the Plan Trustee Professionals shall be the assets of the Plan Trust.

### a.     Reporting to the Plan Trust by the Reorganized Debtor

Beginning with the first full Measurement Period after the Effective Date and continuing until the Reorganized Debtor completes the payment of the GUC Payment Amount and any GUC Bonus to the Plan Trust, within forty-five (45) days of each Measurement Period, the following shall be provided to the Plan Trustee:  a balance sheet, profit and loss statement, and cash flow statement for each the Reorganized Debtor, PTM, PTS, and MWP (pending the MWP Consolidation).  Such financial statements for the Reorganized Debtor and PTS may be provided on a consolidated basis.

### F.E.   Reorganized Debtor Retention of Professionals and Fees and Expenses

On or after the Effective Date, the Reorganized Debtor may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as it deems necessary and appropriate to assist in carrying out its rights or duties under the Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtor.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtor (the "**Reorganized Debtor Professionals**") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtor.

The Reorganized Debtor Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses.  The Reorganized Debtor shall pay, without further order, notice, or application to the Court, the reasonable fees and actual expenses of any Reorganized Debtor Professionals.

### G.F.    The Plan Trustee as Disbursing Agent

The Plan Trustee shall serve as the disbursing agent under the Plan for the Holders of Allowed General Unsecured Claims and shall be responsible for making all Distributions to the Holders of Allowed Unsecured Claims required under the Plan.

### H.G.    The Bond

The Plan Trustee and the Reorganized Debtor shall not be required to post a bond or surety or other security for the performance of their duties under the Plan.

### I.H.    Release of Liens

Except as otherwise expressly provided in the Plan for the Holders of Allowed Claims in Classes 1 through 13, or the Confirmation Order, or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against property of the Estate shall be released.  The Plan Trustee and the Reorganized Debtor shall be empowered to file such pleadings and/or record such documents or instruments as necessary to eliminate, expunge or release such liens from their respective assets.

### J.I.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Plan Trustee and the Reorganized Debtor may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption(s) specifically

63

applies, without limitation, to all documents necessary to evidence and implement the provisions

of and the distributions to be made under the Plan.

### K.J.    The Reorganized Debtor's Post-Confirmation Management

On the Effective Date, Richard Mowbray will continue in his role as CEO of the

Reorganized Debtor, Ruben Sainos will continue in his role as CFO of the Reorganized Debtor,

and Robin Mowbray will continue in her role as Director of the Reorganized Debtor's Board of

Directors.  To the extent that the Debtor's bylaws are inconsistent with the Plan, the Plan shall

control.

### L.K.    Powers and Duties of the Reorganized Debtor

On and after the Effective Date and except as otherwise set forth in the Plan, and

notwithstanding anything to the contrary in the Debtor's bylaws, the Reorganized Debtor shall

have the power and authority to take such actions as necessary to carry out and implement the

terms of the Plan, including, without limitation, the following:

a.    Making the Distributions required by the Reorganized Debtor under the Plan;

b.    Filing motions or commencing proceedings to determine the allowability,
classification, and priority of Claims and Interests;

c.    Administering the terms of the Plan, the Confirmation Order, or any order of the
Court;

d.    Opening or closing any accounts the Reorganized Debtor determines reasonable,
necessary, or required under the Plan;

e.    Reviewing, approving, and paying the fees and costs incurred by the Reorganized
Debtor Professionals after the Effective Date;

f.    Operate and use its revenues and cash provided they comply with the payment
terms in the Plan;

g.    Filing, prosecuting, or compromising any Estate Claims, excluding the Trust
Causes of Action, which are vested in the Plan Trust;

h.    Filing motions or commencing proceedings to seek an injunction, judgment or
order, or taking any other action as may be necessary or appropriate to enforce the

64

1    terms of, or to restrain interference with, the Plan or the Confirmation Order; and

2    i.    Taking any other action reasonably necessary or appropriate, in the Reorganized

3    Debtor's discretion, related to the Debtor's operations or to implement the Plan.

4    On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and

5    approved in all respects, subject to the provisions of the Plan, by virtue of entry of the

6    Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without

7    any further requirement of further action by the Reorganized Debtor.

8    **~~M.~~L.    Default on Obligations to Holders of Allowed Claims**

9    The following shall be considered a "**Default**" under the Plan:  (1) ~~T~~the failure of the

10    Reorganized Debtor to (~~a~~i) make a payment to the Holder of an Allowed Secured Claim, ~~or (ii~~b)

11    make a Plan Trust Payment to the Plan Trust when such payment is due under the Plan, or (c)  sell

12    the Allen St. Property or the Elder Creek Property by the Sale Deadline (as may be extended), or

13    (2) if, on any two (2) year anniversary of the Effective Date, the amount paid by the Reorganized

14    Debtor to the Plan Trust on account of the GUC Payment Amount (via the Class 16 GUC

15    Payment), on a cumulative basis by such anniversary, is forty percent (40%) less than projected to

16    be paid by the Reorganized Debtor by such anniversary under the Projections.  ~~shall constitute a~~

17    ~~"**Default**" under the Plan~~.  Upon a Default, the  Plan Trustee or the  party to whom such payment

18    was required to be made ~~, as the case may be (*i.e.*, the Holder of the Allowed Secured Claim under~~

19    ~~(i) or the Plan Trustee under (ii),~~ may, in such party's discretion, provide written notice of such

20    default to the Reorganized Debtor and its counsel.  If the Reorganized Debtor fails to cure such

21    Default within thirty (30) days of receipt of the written notice, then such Default shall be an

22    "**Uncured Default**" and the party noticing the Default may, after meeting and conferring with the

23    Reorganized Debtor in good faith to determine whether the Uncured Default can be consensually

24    resolved, file a motion with the Bankruptcy Court seeking dismissal or conversion of the Chapter

25    11 Cases under 11 U.S.C. § 1112(b).  This remedy is in addition to any remedy expressly granted

26    to, or permitted by, the Holder of an Allowed Secured Claim in the treatment in the Plan for such

27    Holder.  The remedy provided by this Section III.~~M~~L. shall otherwise be the sole remedy for any

28    Uncured Default under the Plan.

1

2  **IV.**    **CLAIM OBJECTIONS AND PROCEDURES FOR RESOLVING DISPUTED**

3      **CLAIMS**

4      THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE BY

5  CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS

6  DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2025.

7      **A.**    **Standing**

8      On the Effective Date, the Reorganized Debtor and any other party-in-interest shall have

9  standing to file objections to Claims.  An objection to any Claim, whether based on the Schedules

10 or any proof of claim, may be filed after the Effective Date by such parties by the Claim Objection

11 Deadline (as such deadline may be extended as provided herein).  The Reorganized Debtor and

12 any other party-in-interest may seek to extend the Claim Objection Deadline for "cause" by a

13 motion filed prior to the Claim Objection Deadline (as may be extended).  There is no limit to the

14 number of extensions that may be sought.  As used herein, the **"Claim Objection Deadline"** shall

15 mean the date that is one (1) year after the Effective Date.  The Reorganized Debtor may settle or

16 compromise any Disputed Claim without approval or order of the Court, notice, or hearing.  The

17 Reorganized Debtor shall be deemed the real party in interest in any objections to Claims

18 commenced prior to or after the Effective Date.

19     **B.**    **No Distribution Pending Allowance**

20     No Claim shall be paid under the Plan unless it is an Allowed Claim.  Notwithstanding any

21 other provision of the Plan, no payments or Distributions shall be made with respect to all or any

22 portion of a Disputed Claim unless and until all objections to such Disputed Claim have been

23 settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some

24 portion thereof, has become an Allowed Claim.

25     **C.**    **Reserves for Disputed Claims**

26     In the event that Disputed Claims are pending at the time of a Distribution under the Plan,

27 the Disbursing Agent shall establish and maintain a reserve for such Disputed Claims.  For

28 purposes of establishing a reserve for all Disputed Claims as otherwise required herein, Cash will

be set aside equal to the amount that would have been distributed to the Holders of the Disputed

Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of

Allowed Claims in the same Class or of the same priority as the Disputed Claims.  Unless

otherwise provided in the treatment with respect to a particular Claim, if a Disputed Claim

ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall

be distributed on the earlier of: (a) the Distribution Date following the date when the Disputed

Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an

Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim

because the Disputed Claim does not become an Allowed Claim shall be returned to the

Reorganized Debtor.

### D.    Claims Paid By Third Parties

To the extent that the Holder of a Claim receives any Other Recoveries (before or after the

Effective Date) on account of such Claim, (i) the Holder of such Claim shall be required to, within

thirty (30) days of the receipt of such Other Recoveries, file an amended Proof of Claim reflecting

a reduction of such Claim in the amount of such Other Recoveries, and (ii) whether or not such

amended Proof of Claim is filed, the Claim shall be deemed disallowed and reduced in the amount

of such Other Recoveries as of the Holder's receipt of such Other Recoveries without an objection

having to be filed and without any further notice, action, order, or approval by the Court, and any

Pro Rata Distributions or Distributions to which such Holder is otherwise entitled under the Plan

shall be adjusted accordingly.

## V.    DISTRIBUTIONS

### A.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant

parties, the Reorganized Debtor shall make initial distributions under the Plan on account of

Claims Allowed before the Effective Date on or as soon as practicable after the Effective Date.

B.      **Distributions on Account of Claims Allowed After the Effective Date**

1.      **Payments and Distributions on Disputed Claims**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

2.      **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan, and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Plan Trustee or the Reorganized Debtor, as the case may be, shall establish appropriate reserves for potential payment of such Claims.

C.      **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

1.      **Delivery of Distributions in General**

Except as otherwise provided herein, the Reorganized Debtor and the Plan Trustee, as the case may be, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution or any Proof of Claim filed by that Holder.

2.      **Undeliverable Distributions**

Distributions to Holders of Allowed Claims will be sent to the last known address set forth on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof of claim was filed.  Holders of Allowed Claims may change the address to which the distributions will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of the change of address on the Reorganized Debtor and the Plan Trustee.  If a distribution is returned as undeliverable, the Reorganized Debtor or the Plan Trustee, as the case may be, shall hold the distribution and shall not be required to take any further action with respect to the delivery of the distribution unless and until the Reorganized Debtor or the Plan Trustee is notified in writing of

68

the then-current address of the person or entity entitled to receive the distribution. Unless and until the Reorganized Debtor or the Plan Trustee is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision below for distribution of Unclaimed Property.

### 3.    Distributions of Unclaimed Property

If any distributions are returned to the Reorganized Debtor or the Plan Trustee as undeliverable, then such distributions shall be deemed to be "Unclaimed Property."  Nothing contained in this Plan shall require the Reorganized Debtor, the Plan Trustee, or anyone else, to attempt to locate such person or entity.  The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtor or the Plan Trustee.  If such person or entity presents itself within six (6) months of the date of the payment returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity.  If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

### D.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Plan Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Plan Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

1

2 **V.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

3       **A.      Assumption of Executory Contracts and Unexpired Leases**

4       On the Effective Date, any executory contracts and unexpired leases identified on the

5 schedule of executory contracts and unexpired leases to be assumed filed with the memorandum or

6 pleading in support of confirmation of the Plan (the "**Schedule of Assumed Agreements**") shall

7 be deemed assumed by the Reorganized Debtor, as the case may be.  The Schedule of Assumed

8 Agreements will identify any amounts that must be paid to cure defaults under the executory

9 contracts to be assumed under the Plan (the "**Cure Amount**").  The Debtor reserves the right to

10 amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any

11 executory contract or unexpired lease and provide for its assumption and assignment; (b) modify

12 the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any

13 executory contract or unexpired lease and provide for its rejection at any time prior to the

14 Confirmation Hearing.  The Debtor will provide notice of any amendment to the Schedule of

15 Assumed Agreements to any party or parties to the executory contracts or unexpired leases

16 affected by the amendment.

17       Absent a timely objection as provided below, the Confirmation Order will constitute a

18 Court order approving the assumption, on the Effective Date, of the executory contracts and

19 unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a

20 final determination of the Cure Amount and a final determination that the Debtor has shown

21 adequate assurance of future performance.  Further, any Cure Amount ordered by the Court,

22 through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults

23 arising from, out of, or related to the executory contract or unexpired lease, including any claims

24 that were or could have been asserted by the non-debtor party to the contract or lease on or prior to

25 the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from

26 such defaults.

27       If you are a party to an executory contract or unexpired lease to be assumed and you object

28 to the assumption of your lease or contract and/or you dispute the Cure Amount related to your

lease or contract, then you must file and serve upon the Debtor and its counsel a written objection within the deadline for objecting to the confirmation of the Plan.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Plan for such non-debtor party. If a dispute arises regarding (a) whether the Debtor has provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Debtor reserves the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative Cure Amount (an "Alternative Cure Amount"), then the Debtor may amend the Schedule of Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the right of the Reorganized Debtor to either, up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date (the "**Cure Motion Deadline**"), (1) file a motion to determine the appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely

71

foreg assumption of, and, instead, reject the subject executory contract or unexpired lease. Any such motion or notice of any such amendment will be served on the party to the executory contract or unexpired lease affected by the motion (or its attorney, if any).  If the Reorganized Debtor does not, by the Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease, then the Cure Amount will be the Alternative Cure Amount and such amount will be paid to the applicable non-debtor party within fifteen (15) days after the Cure Motion Deadline (unless otherwise expressly set forth in the Plan for such non-debtor party).  If the Reorganized Debtor has filed such a motion and does not timely amend the Schedule of Assumed Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court. The Cure Amount will be paid to the applicable non-debtor party as soon as reasonably practicable following the expiration of the 15-day deadline or as otherwise expressly set forth in the Plan for such non-debtor party.

> **B.**    **Rejection of Executory Contracts or Unexpired Leases Not Assumed**

On the Effective Date, the Reorganized Debtor will be deemed to have rejected any and all executory contracts and unexpired leases not identified on the Schedule of Assume Agreements. The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contracts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the Reorganized Debtor and its counsel within thirty (30) days of the later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed Agreements by the Debtor to eliminate the executory contract or unexpired lease.  Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor, the Reorganized Debtor, the Estate and their respective property.  Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims.

1    IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU

2    OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE

3    AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE

4    CONFIRMATION OF THE PLAN.

5

6    **VI.    PRESERVATION OF CAUSES OF ACTION AND AVOIDANCE ACTIONS FOR**

7    **THE REORGANIZED DEBTOR**

8        The Plan reserves for the Reorganized Debtor all rights to commence and pursue, as

9    appropriate, any and all Estate Claims, (excluding the Trust Causes of Action, which are vested in

10    the Plan Trust and the Released Claims,), whether arising prior to or after the Petition Date, in any

11    court or other tribunal.  On the Effective Date, excluding the Trust Causes of Action vested in the

12    Plan trust and the Released Claims, the Reorganized Debtor is vested with authority to enforce,

13    file, litigate, prosecute, settle and collect Estate Claims, (excluding the Trust Causes of Action,

14    which are vested in the Plan Trust), including Avoidance Actions not vested in the Plan Trust(that

15    are not Insider Avoidance Actions), although the Reorganized Debtor will not be required to do so

16    unless it determines that doing so would be in the best interests of its creditors or Interest Holders.

17        While the Debtor has attempted to identify Estate Claims in the Disclosure Statement

18    which may be pursued, and hereby incorporate by reference those disclosures and provisions, the

19    failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to

20    limit the rights of the Debtor or the Reorganized Debtor to pursue any Estate Claim that is

21    expressly vested in such party in the Plan.  Unless an Estate Claim against any Person is expressly

22    waived, relinquished, released, vested in the Plan Trust, compromised or settled as provided or

23    identified in the Plan (like the Released Claims), any Confirmation Order or prior Bankruptcy

24    Court order, the Debtor and the Reorganized Debtor expressly reserve Estate Claims for later

25    adjudication (either by the Reorganized Debtor or the Plan Trustee, as the case may be).

26    Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata,

27    collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or

28    laches shall apply to any Estate Claim upon or after Confirmation or consummation of the Plan

73

(except with respect to the Released Claims).

All Estate Claims (excluding the Trust Causes of Action , which are vested in the Plan Trust and the Released Claims) are preserved under the Plan for the benefit of the Estate and the Reorganized Debtor, as applicable under the terms of the Plan.  The Reorganized Debtor may settle or compromise any Estate Claims (excluding the Trust Causes of Action, which are vested in the Plan Trust and the Released Claims) without further notice, motion, or order of the Bankruptcy Court.  Any recoveries on Estate Claims (excluding the Trust Causes of Action, which are vested in the Plan Trust) shall be paid to the Reorganized Debtor and be used to pay operating expenses or make payments on account of Allowed Claims and/or Interests in accordance with the terms of the Plan.  Notwithstanding anything herein to the contrary, the Released Claims are released and discharged as provided in Section III.A.2. of the Plan.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTOR'S SCHEDULES FOR FURTHER INFORMATION. HOWEVER, ALL RIGHTS OF THE DEBTOR AND THE ESTATE ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE OR OTHER LAW (OTHER THAN THE INSIDER AVOIDANCE ACTIONS, WHICH ARE VESTED IN THE PLAN TRUST).

**VII.    RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all entities with respect to all matters related to the Case, the Debtor, the Reorganized Debtor, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any and all objections to the allowance or priority of any Claim;

2.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party;

4.    Resolve any issues related to any matters adjudicated in the Cases;

5.    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Estate Claims that are pending as of the Effective Date or that may be commenced in the future, provided that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan;

8.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

9.    Issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

10.    Enforce the terms of the Plan;

11.    Enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.    Resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan; and

13.    Enter an order concluding the Cases.

## VIII.    EFFECT OF CONFIRMATION OF THE PLAN

### A.    Binding Nature of Plan

CONFIRMATION OF THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

### B.    Discharge

The Debtor will receive a discharge upon the entry of the Confirmation Order.  Nothing herein shall limit the effect of confirmation as described in §§ 524 and/or 1141 of the Bankruptcy Code.  Upon discharge, the Reorganized Debtor and its assets will, to the fullest extent permitted by § 1141 of the Bankruptcy Code, including, without limitation as provided in § 1141(d)(1)(A) of the Bankruptcy Code, be deemed discharged and released from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities of any nature whatsoever, whether known or unknown, that arose before the Effective Date or that are based upon, arise from, or otherwise relate to acts, events, omissions, transactions, or other activities of any kind that occurred before the Effective Date, and all debts of the kind

76

1    specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each case, regardless of whether: (1)

2    a proof of claim based on such a debt is filed or deemed filed; (2) a Claim based on such a debt is

3    allowable under Bankruptcy Code § 502; or (3) the person holding the Claim based on such a debt

4    has accepted the Plan; provided, however, that in no event shall the Debtor be discharged of any

5    obligations remaining under the Plan as of the Effective Date.

6        Except as expressly provided in the Plan, pursuant to § 1141(d)(5)(A), the Confirmation

7    Order will be a judicial determination of discharge of all liabilities of the Debtor to the fullest

8    extent allowed under § 1141 of the Bankruptcy Code.  The Reorganized Debtor will not be liable

9    for any Claims and will only have any obligations that are specifically provided for in the Plan.

10   Holders of any Claims or debts against the Debtor will, upon the Effective Date, be enjoined from

11   taking any action to collect, recover, or offset any such Claim or debt against the Reorganized

12   Debtor or as a personal liability of the Reorganized Debtor.

13       Except as otherwise expressly provided in the Plan or the Confirmation Order, all persons

14   will be precluded from asserting or pursuing against the Reorganized Debtor, the Estate, the Plan

15   Trustee, or their respective property for any Claims based on, arising from, or in connection with

16   any act, event, omission, transaction, or other activity of any kind that occurred before the

17   Effective Date, and any debt of the Debtor or Claim against the Debtor, whether secured or

18   unsecured, which was in default up to the Effective Date, will no longer be deemed in default and

19   will be deemed in good standing.

20       **C.    <u>Injunction</u>**

21       All Persons or entities who have held, hold, or may hold Claims (other than Claims that are

22   unimpaired under the Plan), and all other parties in interest in the Case, along with their respective

23   current and former employees, agents, officers, directors, principals, and direct and indirect

24   affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any

25   Claims against the Debtor or cause of action treated, discharged, released, or settled under the

26   Plan, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit,

27   action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial,

28   arbitral, administrative, or other forum) on account of any such Claims or cause of action or

against the Reorganized Debtor; (ii) enforcing, levying, attaching, collecting, or otherwise

recovering by any manner or means, whether directly or indirectly, on account of any judgment,

award, decree, or order related to any such Claims against the Reorganized Debtor; (iii) creating,

perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against

the Reorganized Debtor on account of any such Claims; (iv) asserting any right of setoff,

subrogation, or recoupment of any kind, against any obligation due from the Reorganized Debtor,

or against the property or interests in property of the Debtor or Reorganized Debtor, on account of

such Claims; (v) commencing or continuing in any manner any action or other proceeding of any

kind on account of, in connection with, or with respect to any such Claims released or settled

pursuant to the Plan; or (vi) taking any act to obtain possession or collect from the respective

assets of the Reorganized Debtor or the Plan Trust on account of any such Claims or any act to

recover on account of any such Claims; provided, however, that nothing contained herein shall

preclude such entities from exercising their rights pursuant to and consistent with the terms of the

Plan.

       **D.**    **Vesting of Property in the Reorganized Debtor**

    Except as otherwise provided in the Plan and excluding the Trust Causes of Action, the

confirmation of the Plan vests title to all property whatsoever of the Debtor and the Estate in the

Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but,

pending the payment of all Allowed Claims in full, subject to the express requirements,

obligations, and restrictions in the Plan.

       **E.**    **Modification of the Plan**

    The Debtor may modify this Plan at any time before confirmation.  However, the

Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan.  The

Debtor may also seek to modify this Plan at any time after confirmation only if (1) this Plan has

not been substantially consummated, and (2) the Bankruptcy Court authorizes the proposed

modifications after notice and a hearing.

       **F.**    **Exculpations and Releases**

    To the maximum extent permitted by law, and except to the extent arising from willful

78

1   misconduct, gross negligence, fraud or malpractice as construed under CA PRC 1.8.8., neither the

2   Debtor , the Reorganized Debtor, nor any of their its professionals employed or retained by any of

3   themit in the Case (collectively, the "**Exculpated Parties**"), shall have or incur liability to any

4   person or entity for any Official Actions taken or omission made in good faith in connection with

5   or related to the formulation and implementation of this Plan, or a contract, instrument, release, or

6   other agreement or document created in connection therewith, the solicitation of acceptances for or

7   confirmation of this Plan, or the consummation and implementation of this Plan, or  and the

8   transactions contemplated by the Plan related to the post-petition administration of the Case prior

9   to the Effective Date.thereby.

10      **G.      Submission of Post-Confirmation Reports**

11          Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file

12   a status report with the Bankruptcy Court explaining what progress has been made toward

13   consummation of the confirmed Plan.  The status report shall be served on each of the following

14   or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties that receive

15   notice of electronic filings in the Chapter 11 Cases.  Further status reports shall be filed every 120

16   days and served on the same entities.

17      **H.      Quarterly Fees**

18          Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to

19   the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6)

20   after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the

21   entry of an order dismissing the Case or converting the Case to Chapter 7, at the rate in effect at

22   the time such fees are due.

23      **I.      Post-Confirmation Conversion/Dismissal**

24          After the Plan is confirmed, a creditor or party in interest may bring a Motion, only after

25   notice and a hearing, to convert or dismiss the Chapter 11 Case under Bankruptcy Code section

26   1112(b) if there is an Uncured Default as defined in Section III.ML. above or other material

27   default in performing the Plan.  If the Bankruptcy Court orders the Chapter 11 Case converted to

28   Chapter 7 after the Plan is confirmed, then all property that had been property of the estate and

79

1  vested in the Reorganized Debtor, and that has not been distributed under the Plan will revest in

2  Chapter 7 estate.  The automatic stay will be reimposed upon the revested property only to the

3  extent that relief from stay was not previously authorized by the Bankruptcy Court during the

4  Chapter 11 Case.

5        The Confirmation Order may also be revoked under very limited circumstances.  The

6  Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in

7  interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry

8  of the Confirmation Order.

9        **J.**      **Final Decree**

10        Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the

11  Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final decree to close

12  the Chapter 11 Case.  The Reorganized Debtor shall be responsible for the timely payment of all

13  fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

14

15  **IX.**    **CONCLUSION**

16        The Debtor believes that the Plan is in the best interests of all stakeholders and urges the

17  Holders of Allowed Claims to vote in favor of the Plan.

18

19

20  DATED:  March 14, 2025         RAINES FELDMAN LITTRELL LLP

21              By:      */s/ Robert S. Marticello*

22                  ROBERT S. MARTICELLO
                MICHAEL L. SIMON

23                  Attorneys for Debtor and Debtor-in-Possession
                The Original Mowbray's Tree Service, Inc.

24

25

26

27

28

1    **TABLE OF DEFINITIONS**

2    A.    **Definitions**

3    The following defined terms are used in the Disclosure Statement and in this Plan.  Any

4    capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the

5    Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the

6    Bankruptcy Rules.

7    "Administrative Claim" means a Claim for costs and expenses of the administration of a

8    Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a

9    Claim of a Professional employed at the expense of the Estate and any fees or charges asserted

10    against the Estate under 28 U.S.C. § 1930.

11    "Administrative Tax Claim" means an Administrative Claim or other Claim that is not an

12    Allowed Secured Claim and that a government unit asserts against Debtors for taxes (or for related

13    interest or penalties) for any tax period that, either in whole or in part, falls within the period

14    beginning on the Petition Date and ending on the Effective Date.

15    "Affiliates" means, collectively, PTS, PTM, and MWP.

16    "Allowed" means a Claim that is either (a) listed in the Schedules filed with the

17    Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown

18    as to amount and as to which no timely objection has been filed; or (b) with respect to which a

19    proof of claim has been filed by the Claims Bar Date, and as to which wither (i) no objection or

20    motion to estimate was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy

21    Rules, the Plan or order of the Bankruptcy Court, or (ii) any such objection has been determined

22    with the Claim being allowed by a Final Order.  The amount of an Allowed Claim shall be as

23    follows: (a) if the creditor did not file a proof of claim with the Bankruptcy Court on or before the

24    Claims Bar Date, (1) the amount of the creditor's Claim as listed in the operative Schedules as not

25    disputed, contingent, unliquidated or unknown, or (2) the amount fixed by Final Order of the

26    Bankruptcy Court in resolving any timely filed objection or other motion disputing the amount of

27    such Claim; or (b) if the creditor filed a proof of claim with the Bankruptcy Court on or before the

28    Claims Bar Date and the claim is not a Contingent Claim, (1) the amount stated in such proof of

81

claim if no objection to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim for which a proof of claim is not filed by the Claims Bar Date and that is not listed in the Schedules or is listed in the Schedules as disputed, unliquidated, contingent or unknown shall be zero, and no distribution shall be made on account of such Claim.  An Allowed Claim shall not include any unmatured or post-petition interest unless otherwise stated in the Plan.

"Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim" means an Allowed Claim in the specified Class and/or of the specified type.

"Allowed Administrative Claim" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

"Allowed General Unsecured Claim" means an Allowed Unsecured Claim that is not entitled to priority.

"Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has as interest, or which is subject to setoff under Section 533 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the mount subject to any setoff as the case may be

"Available Trust Proceeds" collectively refers to the GUC Payment Amount, the GUC Bonus, and Net Recoveries.

"Avoidance Action" means causes of action arising under 11 U.S.C. §§ 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bankruptcy Case" or "Case" means the bankruptcy case of the Debtor under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central

82

1  District of California, Santa Ana Division, with Case No. 8:24-bk-12674-TA.

2      "Bankruptcy Code" or "Code" means Title 11 of the United States Code, as amended.

3      "Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Central

4  District of California, Santa Ana Division.

5      "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as

6  amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the

7  Central District of California.

8      "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday" as

9  defined in Federal Rule of Bankruptcy Procedure 9006(a).

10     "Calculation Date" means the date that is thirty (30) days after the end of a Measurement

11 Period.

12     "Cash" means cash and cash equivalents including, but not limited to, checks or similar

13 forms of payment or exchange.

14     "Claim" means (i) a right to payment from the Debtor, whether or not such right to

15 payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

16 disputed, undisputed, legal, equitable, secured, or unsecured, and includes any claims based on,

17 arising from, or connected with any work performed by the Debtor prior to the Petition Date, or

18 (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to

19 payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment,

20 liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or

21 unsecured.

22     "Claims Bar Date" means February 20, 2025, the date the Court set as the deadline for

23 creditors to file proofs of claim against the Debtor's Estate.

24     "Class" means the group of Claims classified in the Plan pursuant to Sections 1122 and

25 1123 of the Bankruptcy Code.

26     "Class 16 GUC Payment" means, with respect to each Measurement Period after the

27 Effective Date until the GUC Payment Amount is paid to the Plan Trust in full, the Projected GUC

28 Payment for such Measurement Period (a) plus or minus, as the case may be, the difference

83

1   between (i) the actual net income less income tax distributions of the Reorganized Debtor

2   (inclusive of PTS) for such Measurement Period and (ii) the projected net income and income tax

3   distributions as set forth in the Plan Projections for the same period, and (b) if and to the extent

4   that such Projected GUC Payment (as may be augmented by subparagraph (a) of this definition)

5   complies with the Minimum Working Capital Ratio and the Minimum Cash Threshold.  The Class

6   16 GUC Payments shall be calculated by the Reorganized Debtor in consultation with the Plan

7   Trustee and approved by the Plan Trustee.

8       "Confirmation Date" means the date on which the Bankruptcy Court enters the

9   Confirmation Order.

10       "Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the

11   Plan.

12       "Debtor" means The Original Mowbray's Tree Service, Inc.

13       "Debtor/RP Settlement Agreement" means any written settlement agreement executed

14   between the Debtor and the Rodriguez Plaintiffs and filed with the Court.

15       "Disclosure Statement" means the *Disclosure Statement Describing Chapter 11 Plan of*

16   *Reorganization*, including as may be further amended or modified.

17       "Disputed Claim" means all or any part of a Claim that is the subject of a timely objection

18   or request for estimation filed on or before the Claims Objection Deadline (as such deadline may

19   be extended), which objection or request for estimation has not been withdrawn or determined by

20   a Final Order of the Bankruptcy Court.  In addition, prior to the later of (a) the Claims Objection

21   Deadline, (b) if prior to the Claim Objection Deadline, a motion to disallow or estimate the Claim

22   is filed, then the date upon which such motion is determined by Final Order, or (c) if a proceeding

23   is pending to determine the validity, amount, or characterization of the Claim before a court of

24   competent jurisdiction (and if and to the extent that, prior to the Effective Date, the Bankruptcy

25   Court entered an order lifting the automatic stay to allow the proceeding to proceed to final

26   judgment), then the date upon which such proceeding, including, without limitation, any appeal or

27   remanded or further proceedings in or related to such proceeding, is resolved by a Final Order, any

28   Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

1   calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the

2   proof of claim is listed in the Schedules, (2) the Claim corresponding to the proof of claim is listed

3   in the Schedules as disputed, contingent, unliquidated, or unknown, (3) the amount of the Claim as

4   specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the

5   Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

6   priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

7   any corresponding Claim listed in the Schedules.

8        "Distribution" means the Cash that is required to be distributed under this Plan to the holders

9   of Allowed Claims and Interests.

10       "Effective Date" means the date that is the fifteenth (15th) day after entry of the

11  Confirmation Order.

12       "Estate" means the bankruptcy estate of the Debtor created under Section 541 of the

13  Bankruptcy Code in the Case.

14       "Estate Claims" means any and all claims and causes of action that constitute property of

15  the Estate including, but not limited to, any Avoidance Actions, equitable subordination or debt

16  recharacterization actions, any causes of action or claims for recovery of any amounts owing to the

17  Debtor or the Estate, and any claims or causes of action against the Debtor's insurance carriers.

18       "Estate Real Property" means any real property that an Estate has an interest in and any

19  real property of MWP.

20       "Examiner" refers to Donald T. Fife, in his capacity as the Court-appointed examiner under

21  the *Order Approving the U.S. Trustee's Application for the Appointment of an Examiner* [Docket

22  No. 374].

23

24       "Excluded Claims" means any (a) Estate Claims or Avoidance Actions against PTS,

25  including, without limitation, with respect to the PTS Loan or any Insider Payments to PTS, ~~and~~

26  (b) the Released Claims, and (c) any other Estate Claim or Avoidance Action that is released

27  pursuant to a compromise approved by a Final Order of the Court.

28       "Excess GUC Cash Payment" means, with respect to each Measurement Period after the

85

1  Reorganized Debtor pays the GUC Payment Amount in full to the Plan Trust, fifty percent (50%)

2  of the actual net income less income tax distributions of the Reorganized Debtor (inclusive of

3  PTS) for such Measurement Period in excess of and subject to the Minimum Working Capital

4  Ratio and the Minimum Cash Threshold.  The GUC Excess Cash Payments shall be calculated by

5  the Reorganized Debtor in consultation with the Plan Trustee and approved by the Plan Trustee.

6          "File," "Filed," or "Filing" means duly and properly filed with the Court and reflected on

7  the Court's official docket.

8          "Final Order" means an order or judgment entered by the applicable court on its docket.

9      a.    That has not been reversed, rescinded, stayed, modified, or amended;

10     b.    That is in full force and effect;

11     c.    With respect to which the time to appeal or to seek review, remand, rehearing, or a

12            writ of certiorari has expired and as to which no timely Filed appeal or petition for

13            review, rehearing, remand, or writ of certiorari is pending; and

14     d.    With respect to which any appeal, motion or petition for review, remand, rehearing,

15            or reconsideration, or writ of certiorari that is Filed has been dismissed or resolved

16            by the highest court to which the order or judgment was appealed or from which

17            review, rehearing, remand, reconsideration, or a writ of certiorari was sought, and

18            any remanded or further proceedings following such appeal, petition, or writ have

19            been resolved by Final Order.

20         "General Unsecured Claim" means an unsecured Claim against the Debtor, however

21  arising, not entitled to priority under § 507(a) of the Bankruptcy Code.

22         "GUC Bonus" means, if and to the extent that the GUC Payment Amount is satisfied

23  within five (5) years after the Effective Date, then the Excess GUC Cash until the earlier or first to

24  be reached of (a) the payment of the greater of (i) $55,000,000 (i.e., another $30,000,000 in

25  addition to the GUC Payment Amount) and (ii) an amount equal to 40% of the Allowed General

26  Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as

27  of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust

28  inclusive of the GUC Payment Amount, and (b) the date that is five (5) years after the Effective

1  Date.

2  "GUC Interest Rate" shall mean, for each year beginning on and after the Effective Date,

3  the federal judgment rate for the first Business Day of such year.

4  "GUC Maximum Amount" means the greater of $55,000,000 and an amount equal to 40%

5  of the Allowed General Unsecured Claims (up to the amount of the General Unsecured Claims on

6  the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor

7  to the Plan Trust inclusive of the GUC Payment Amount.

8  "GUC Payment Amount" means the lesser of (a) $~~15,674~~25,000,000, plus simple interest

9  per annum on the balance of such amount not yet paid to the Plan Trust at the GUC Interest Rate,

10  and (b) the total amount of Allowed General Unsecured Claims.

11  "GUC Payment Commencement Date" means the fifteenth (15th) Business Day after the

12  third anniversary of the Effective Date.

13  "Holder" means an entity holding a Claim.

14  "Initial Plan Trust Payment" means the $50,000 payment by the Reorganized Debtor to the

15  Plan Trust on the Effective Date.

16  "Insider" shall have the meaning in 11 U.S.C. § 101(31).

17  "Insider Avoidance Action" means any Avoidance Action against any Insider, excluding

18  any Excluded Claim.

19  "Interest" means any "equity security" as provided by Section 101(16) of the Bankruptcy

20  Code.

21  "Lien" means any lien, encumbrance, pledge or other charge against property.

22  "Liquidation Analysis" means the liquidation analysis setting forth what Holders of

23  Allowed Claims will receive in a chapter 7 liquidation and attached to the Index as **Exhibit 3**.

24  "Loan Causes of Action" means any Estate Claims or Avoidance Actions against PTM ~~or~~

25  ~~MWP~~ solely to collect the ~~respective~~ balance~~s~~ on the PTM Loan ~~and MWP Loan~~ in excess of the

26  amounts to be paid to the Reorganized Debtor as set forth in and according to the Projections,

27  which amounts shall be the property of the Reorganized Debtor.

28  "Measurement Period" means each three-month period ending March 31, June 30,

September 30, and December 31 after the Effective Date and beginning with the first full such three-month period after the Effective Date.

"Mill St. Property" means the real property located at 686 E. Mill Street, San Bernardino, CA 92415.

"Minimum Cash Balance" means $3,000,000.

"Minimum Working Capital Ratio" a minimum working capital ratio of at least 1.25 to 1.0 as measured in accordance with Generally Accepted Accounting Principles in the United States ("US GAAP").

"Motion" means a request asking a judge to issue a ruling or order on a legal and/or equitable matter.

"MWP" means Mowbray Waterman Property, LLC.

"MWP Estate" means the bankruptcy estate of MWP created under Section 541 of the Bankruptcy Code in the MWP Bankruptcy Case.

"Net Recoveries" means any proceeds recovered and received by the Plan Trust on any Trust Causes of Action, net of all attorneys' fees and other costs incurred to recover such proceeds, and less any Trust Costs.

"Non-Ordinary Course Administrative Claim(s)" means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

"Ordinary-Course Administrative Claim" means Administrative Claims other than Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative Claims, based upon liabilities that Debtors incur in the ordinary course of their business.

"Other Recoveries" means any amount, property, value, or payment that the Holder of a Claim receives on account of such Claim from a Person who is not the Debtor or from property that is not property of the Estate, including, without limitation, from a co-obligor, insurer, primarily liable party, or guarantor.

"OUST" means the Office of the United States Trustee, Santa Ana Division.

1    "Person" means any individual, corporation, general partnership, limited partnership,

2    limited liability company, association, joint-stock company, joint venture, estate, trust,

3    government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official

4    committee appointed by the OUST, unofficial committee of creditors or equity holders, or entity.

5    "Petition Date" means October 18, 2024, the day that the Debtor filed its voluntary petition

6    for relief under Chapter 11 of the Bankruptcy Code.

7    "PNC Collateral" means the "Prepetition Collateral" as that term is defined in the First

8    Cash Collateral Stipulation and any other assets of the Estate subject to PNC Security Interests.

9    "PNC Loan Documents" means the "Prepetition Loan Documents" as that term is defined

10    in the First Cash Collateral Stipulation.

11    "PNC Security Interests" means the "Prepetition Liens" as that term is defined in the First

12    Cash Collateral Stipulation and any replacement liens granted to PNC pursuant to Section 6.b. of

13    the First Cash Collateral Stipulation.

14    "PTM" means Phoenix Traffic Management, Inc.

15    "PTS" means Pino Tree Service, Inc.

16    "Plan" means the *Chapter 11 Plan of Reorganization*, including as may be further amended

17    or modified.

18    "Projected GUC Payment" means the Payments under General Unsecured Claims set forth

19    at page 19 of 172 of the Projections.

20    "Projections" means the projections attached hereto as **Exhibit 1.**

21    "Plan Term End Date" means the date that is ten (10) years after the Effective Date.

22    "Plan Trust" means the trust created under the Plan for the benefit of creditors holding

23    Allowed General Unsecured Claims.

24    "Plan Trust Payments" means the annual payments to be made by the Reorganized Debtor

25    to the Plan Trust to fund the GUC Payment Amount set forth at page 10 of 18 of the Projections

26    under "General Unsecured Claims" as provided in Section III.A. of the Plan.Class 16 GUC

27    Payment, the Excess GUC Cash Payment, and the GUC Annual Minimum Payment.

28    "Plan Trustee" means Donald T. Fife, the trustee appointed for the Plan Trust.

1    "Priority Unsecured Claim" means an Allowed Claim entitled to priority against the Estate

2    under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

3    "Priority Tax Claim" means an Allowed Claim entitled to priority against the Estate under

4    Bankruptcy Code § 507(a)(8).

5    "Pro Rata Distribution" means the ratio (expressed as a percentage) of (i) the amount of an

6    Allowed General Unsecured Claim (less any Other Recoveries) to (ii) the sum of the aggregate

7    amounts of all Allowed General Unsecured Claims.

8    "Professional Fee Claim" means:

9    a.    A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for

10          compensation for professional services rendered or expenses incurred on the

11          Estate's behalf, or

12   b.    A Claim either under Bankruptcy Code § 503(b)(4) for compensation for

13         professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for

14         expenses incurred in making a substantial contribution to the Estate.

15   "PTS Projections" are the projections attached hereto as **Exhibit 2**.

16   "Quarterly Distribution Date" means the Business Day selected by the Plan Trustee, in his

17   or her sole and absolute discretion, within forty-five (45) days after a particular calendar quarter to

18   make a Distribution as required by the Plan.

19   "Released Claims" means as defined in Section III.A.2. of the Plan.

20   "Reorganized Debtor" in the refers to the Debtor upon and after the Effective Date and as

21   reorganized under the Plan.

22   "Request for Payment" means a request for the allowance and payment of a Non-Ordinary

23   Course Administrative Claim pursuant to 11 U.S.C. § 503(a).

24   "Schedules" means the Schedules of Assets and Liabilities filed by the Debtor in the Case,

25   as required by § 521(a)(1) of the Code, Bankruptcy Rule 1007 (b)(l), and Official Bankruptcy

26   Form No. 6, as the Schedules of Assets and Liabilities may have been or may be amended from

27   time to time.

28

"SOFA" means the Statement of Financial Affairs filed by the Debtor in the Case as required by § 521(a)(1) of the Code and Bankruptcy Rule 1007(b)(l), as the Statement of Financial Affairs may have been or may be amended from time to time.

"Trust" means the Gloria Mowbray Separate Property Trust.

"Trust Available Proceeds" means (a) the Initial Trust Payment, less any Trust Costs, (b) the Plan Trust Payments to fund the GUC Payment Amount, and (c) any Net Recoveries.

"Trust Causes of Action" means the Insider Avoidance Actions and the Loan Causes of Action, excluding, in all cases, the Excluded Claims.

"Trust Costs" means the amount necessary or estimated to pay or reserve for, as determined by the Plan Trustee, in full (a) all costs of administration of the Plan Trust, (b) the reasonable fees and costs of the Plan Trustee and the Plan Trustee's Professionals, (c) the amounts Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims were to become Allowed Claims, and (d) all fees payable under section 1930 of chapter 123 of title 28 of the United States Code.

**B.    Rules of Construction**

The rules of construction in Bankruptcy Code section 102 apply to the Disclosure Statement and this Plan.  For the purpose of the Disclosure Statement and this Plan, unless otherwise provided in the Disclosure Statement or this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in the Disclosure Statement or this Plan to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to the Disclosure Statement and this Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in the Disclosure Statement and this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Disclosure Statement or this Plan, as the case may be; (vi) the words "herein," "hereunder" and "hereto" refer to the Disclosure Statement or this Plan in its

91

entirety rather than to a particular portion of the Disclosure Statement or this Plan, as the case may be; (vii) unless otherwise provided in the Disclosure Statement or this Plan, any reference in the Disclosure Statement or this Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Disclosure Statement or this Plan, or any other provision in this Section.

### C.    <u>Rules of Interpretation</u>

Except as otherwise provided in this Plan, Bankruptcy Rule 9006(a) applies when computing any time period under this Plan.

Any term used in this Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

The definition given to any term or provision in this Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms or as amended by the terms thereof.

Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of this Plan.

Unless otherwise specified, all references to Sections or Exhibits in the Disclosure Statement are references to this Disclosure Statement's Sections or Exhibits, and all references to Sections or Exhibits in the Plan are references to the Plan's Sections or Exhibits

1    Section captions and headings are used only as convenient references and do not affect this

2  Disclosure Statement's or the Plan's meaning.

3    **D.**    **Exhibits**

4    The following exhibits are attached hereto:

5    Exhibit 1 – Projections; and

6    Exhibit 2 – PTS Projections.; and

7    Exhibit 3 – Overbid Procedures.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **INDEX OF EXHIBITS IN SUPPORT OF REPLY**
**TO CREDITOR RONNIE JORDANN'S OBJECTION TO DISCLOSURE STATEMENT DESCRIBING CHAPTER 11**
**PLAN OF REORGANIZATION AND MEMORANUM OF POINTS AN AUTHORITIES IN SUPPORT OF DISCLOSURE**
**STATEMENT**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
**July 30, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 30, 2025**, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

**Personal Delvery**
Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 30, 2025 | Connie-Marie Santiago | /s/ Connie-Marie Santiago |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1.    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Jeffrey W Broker**    jbroker@brokerlaw.biz
- **Kenneth J Catanzarite**    kcatanzarite@catanzarite.com
- **Lauren N Gans**    lgans@elkinskalt.com, lmasse@elkinskalt.com
- **Jessica L Giannetta**    jessica@giannettaenrico.com, melanie@giannettaenrico.com
- **Robert P Goe**    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com
- **Marshall F Goldberg**    mgoldberg@glassgoldberg.com, jbailey@glassgoldberg.com
- **Alan Craig Hochheiser**    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Merdaud Jafarnia**    bkca@alaw.net, mjafarnia@ecf.inforuptcy.com
- **Raffi Khatchadourian**    raffi@hemar-rousso.com
- **Valery Loumber**    valloumlegal@gmail.com
- **Michael B Lubic**    michael.lubic@klgates.com,
  jonathan.randolph@klgates.com,klgatesbankruptcy@klgates.com
- **James MacLeod**    jmacleod@dunninglaw.com, nancy@dunninglaw.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Robert S Marticello**    rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Karen S. Naylor**    Becky@ringstadlaw.com, Karen@ringstadlaw.com;Arlene@ringstadlaw.com
- **Estela O Pino**    epino@epinolaw.com, staff@epinolaw.com;clerk@epinolaw.com
- **Donald W Reid**    don@donreidlaw.com, 5969661420@filings.docketbird.com
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Amitkumar Sharma**    amit.sharma@aisinfo.com
- **Jeffrey S Shinbrot**    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com;tanya@shinbrotfirm.com
- **Thomas E Shuck**    tshuck@pmcos.com, efilings@pmcos.com
- **Michael Simon**    msimon@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Ahren A Tiller**    ahren.tiller@blc-sd.com, 4436097420@filings.docketbird.com;brett.bodie@blc-sd.com;anika@blc-sd.com;derek@blc-sd.com;kreyes@blc-sd.com;megan@blc-sd.com;nicole@blc-sd.com;danny@blc-sd.com;angie@blc-sd.com;kreyes@blc-sd.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com,
  raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com
- **Jennifer C Wong**    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com
- **Mandy Youngblood**    csbk@gmfinancial.com
- **Roye Zur**    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**