**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
Michael L. Simon (State Bar No. 300822)
*msimon@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

Attorneys for The Original Mowbray's Tree Service,
Inc., Debtor and Debtor-In-Possession

**ELKINS KALT WEINTRAUB REUBEN
GARTSIDE LLP**
Roye Zur, State Bar No. 273875
*rzur@elkinskalt.com*
Lauren N. Gans, State Bar No. 247542
*lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Mowbray Waterman Property,
LLC, and Robin Elaine Mowbray, Debtors and
Debtors-in-Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA- SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:24-bk-12674-SC |
| THE ORIGINAL MOWBRAY'S TREE SERVICE, INC., a Delaware corporation, | Chapter: 11 |
| Debtor and Debtor-in-Possession. | (Jointly Administered with Case Nos. 8:25-bk-10542-SC and 8:25-bk-10543-SC) |
| In re: | **REPLY TO CREDITOR RONNIE JORDAN'S OMNIBUS OBJECTIONS TO FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISCLOSURE STATEMENT** |
| MOWBRAY WATERMAN PROPERTY, LLC, | |
| Debtor and Debtor-in-Possession. | |
| In re: | |
| ROBIN ELAINE MOWBRAY, | |
| Debtor and Debtor-in-Possession. | **Hearing Information:** |
| ☐   Affects THE ORIGINAL MOWBRAY TREE SERVICE, INC. | Date:   September 10, 2025<br>Time:   1:30 p.m.<br>Ctrm:   5C<br>            411 W Fourth Street<br>            Santa Ana, CA 92701 |

☐     Affects MOWBRAY WATERMAN PROPERTY, LLC

☐     Affects ROBIN ELAINE MOWBRAY

☒     Affects All Debtors

REPLY

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ........................................................................................................ 1

II.    BACKGROUND ......................................................................................................... 3

    A.    Additional Facts Regarding Substantive Consolidation ................................. 3

    B.    The Prior Disclosure Statement Hearing ........................................................ 4

III.    LEGAL STANDARD ................................................................................................. 4

IV.    THE AMENDED DISCLOSURE STATEMETN PROVIDES ADEQUATE
    INFORMATION .......................................................................................................... 5

    A.    The FADS Provides Detailed Information Concerning the Debtors'
        FAP .................................................................................................................. 5

V.    SEVERAL OF JORDAN'S OBJECTIONS WERE PREVIOUSLY
    ADDRESSED AND DEEMED RESOLVED ............................................................. 6

    A.    Jordan's Objection Concerning Asset Values Was Already Addressed ......... 7

    B.    Jordan's Objection Concerning Avoidance Actions Was Previously
        Addressed ........................................................................................................ 8

    C.    The Alleged Risks Concerning Jordan's Criticisms of Existing
        Management Were Previously Addressed ..................................................... 10

    E.    Robin Mowbray's Ownership in PTM Was Already Disclosed .................. 12

    F.    Jordan's Objection Regarding MTS's Borrowing Capacity Was Already
        Addressed ...................................................................................................... 12

    G.    The Disclosure Statement Contains Sufficient Information Regarding
        the Plan Trustee ............................................................................................ 13

VI.    JORDAN'S NEW DISCLOSURE STATEMENT OBJECTIONS SHOULD
    BE OVERRULED ..................................................................................................... 14

    A.    The Disclosure Statement Adequately Discloses the Rodriguez Claim
        and Compromise ........................................................................................... 14

    B.    The FADS Adequately Discloses the Substantive Consolidation of
        MTS and MWP ............................................................................................. 17

    C.    The Objection Concerning Information Related to the Trust Should be
        Overruled ...................................................................................................... 21

    D.    Certain Specific Objections ......................................................................... 22

VII.    JORDAN'S PLAN OBJECTIONS SHOULD BE OVERRULED ......................... 23

VIII.    JORDAN'S DISCOVERY REQUEST SHOULD BE REJECTED ........................ 27

IX.    CONCLUSION ......................................................................................................... 28

REPLY

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE:**

The Original Mowbray's Tree Service, Inc. ("**MTS**"), Mowbray Waterman Property, LLC ("**MWP**"), and Robin Elaine Mowbray ("**Robin Mowbray**" and collectively with MTS and MWP, the "**Debtors**"), the debtors and debtors-in-possession in the above-captioned jointly-administered cases, hereby submit this reply (the "**Reply**") to *Creditor Ronnie Jordan's Omnibus Objections to First Amended Joint Disclosure Statement Describing First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 798] (the "**Objection**") and memorandum of points and authorities in support of *First Amended Joint Disclosure Statement Describing First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 693] (the "**FADS**").[1][2]

## I.    <u>INTRODUCTION</u>

Following this Court's prior guidance, the Debtors have proposed herein to address Jordan's new "disclosure" objections with additional content in the FADS.  Although a written reply was not required, the Debtors filed this Reply to provide the Court with the specific language proposed to be included in the FADS in advance of the hearing.  In addition, to the extent that Jordan has repeated his prior objections, this Reply identifies the relevant language included in the FADS to address such objections.

Jordan's Objection should otherwise be overruled.  The FADS clearly contains adequate information—a fact confirmed by the Objection itself.  Jordan is largely restating the same arguments he previously made and that were specifically addressed in the FADS pursuant to the order of this Court.  Jordan does not argue that the prior amendments were inadequate.  He has simply ignored them, cutting and pasting his prior objections verbatim.  Moreover, Jordan's Objection omits critical facts.  ***This includes that Jordan submitted a***

---

[1]    Capitalized terms not expressly defined herein shall the meanings ascribed to them in the FADS.

[2]    Except as otherwise expressly provided herein, all citations to exhibits shall be to the *Index of Exhibits In Support of First Amended Joint Disclosure Statement Describing First Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 694] (the "**Index**").

1    ***declaration in support of the substantive consolidation of MWP and MTS—the aspect of***

2    ***the FAP that he now claims to so vehemently oppose***.  Jordan does not need or seek

3    additional information to make an informed decision on how to vote on the *First Amended*

4    *Joint Chapter 11 Plan of Reorganization* (the "**FAP**").  Jordan made his decision.  Jordan is

5    voting against the FAP and seeks to pursue his competing plan.  (*See, e.g.*, Obj. at 7:26-8:2.)

6         The FADS and FAP align the Debtors' three cases and move them forward in a

7    coordinated fashion towards a common and successful exit.  Moreover, the Debtors'

8    proposed conclusion to these Cases—the FAP—is one that reflects the Debtors' extensive

9    negotiations with the creditor body.  For many creditors, the FAP includes consensual

10   treatment they negotiated.

11        The FADS, as proposed to be amended, should be approved for dissemination.  The

12   FADS is a 151-page document supported by 204-pages of exhibits that collectively provide

13   substantial information regarding the Debtors, their assets, liabilities, and operations.  The

14   FADS includes financial projections and a liquidation analysis for each of the Debtors, as

15   well as MTS's wholly-owned subsidiary, PTS.  The projections and analyses accompanying

16   the FADS contain the detailed assumptions upon which they are based.  The financial

17   information supporting the FADS and the FAP reflect the thorough work and analysis of the

18   Debtors, MTS's CRO, and the Debtors' professionals.  The FADS contains "adequate

19   information"—information that is reasonable under the circumstances and allows creditors to

20   make an informed decision on the FAP.

21        The sole issue before the Court is whether the FADS contains adequate information

22   that allows creditors to make informed judgments about the FAP.  Consistent with the case

23   law Jordan cites and contrary to the arguments he makes, a disclosure statement is not

24   required to include *all* information and "complete disclosure of every fact[.]"  The FADS

25   must include reasonable information and it does so.  With relevant standard in mind, the

26   FADS, as proposed to be modified, should be approved.

27

28

2

## II.    BACKGROUND

### A.    Additional Facts Regarding Substantive Consolidation[3]

On February 7, 2025, judgment creditors Jaime Rodriguez and Ana Lidia Gomez (together, the "Rodriguez Plaintiffs") filed the *Motion to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a); and a Motion to Substantively Consolidate Pino Tree Services, Inc., Mowbray Waterman Property, LLC, and Phoenix Traffic Management, Inc. With the Debtor's Bankruptcy Case* [Docket No. 286] (the "**Trustee and Substantive Consolidation Motion**").

Jordan claims that the Debtors are taking inconsistent positions in agreeing to the substantive consolidation of MWP and MTS in the FAP and that the Debtors' prior declarants must recant their prior testimony.  First, as discussed in further detail below, Jordan's position is not true.  Second, consistent with this pattern to date of omitting material facts,[4] Jordan, in making this particular argument, has done so again.  Jordan filed a declaration in support of the Trustee and Substantive Consolidation Motion.  Moreover, the purpose of Jordan's declaration was to offer evidence in support of the substantive consolidation *of MWP and MTS*.  Jordan, who was the former CEO of MTS and who claims to be the sole general unsecured creditor of MWP, testified, in relevant part as follows:

> **While I was employed by MTS and MWP, I observed that the two companies were run by Robin Mowbray as if one company.  My joint-employment and buying the house for my wife and I are examples of the one company observations.**

(*See* Docket No. 286-2 at ¶ 5 (emphasis added).)

Thus, if any party is taking inconsistent positions and will need to recant his or her prior testimony, it is Jordan.  In fact, if Jordan's position is to be believed, his testimony,

---

[3]    This background is largely included in the FADS.  However, the Debtors have included it here for the Court's convenience as it is relevant to Jordan's objections concerning the substantive consolidation proposed through the FAP.

[4]    For example, in his motion to terminate exclusivity, Jordan argued that MTS was refusing to negotiate with him.  (*See* Docket No. 540 at 22:7-9.)  Jordan omitted the fact that both MWP and MTS had agreed to mediate with Jordan and were in the process of coordinating and scheduling the mediation.  However, Jordan withdrew from such mediation.

standing alone, justifies the substantive consolidation of MWP and MTS.  According to

Jordan, he is the only general unsecured creditor of MWP, and he viewed them as one and the

same, which would support one of the grounds for substantive consolidation.

### B.    The Prior Disclosure Statement Hearing

The initial hearing on the Debtor's Disclosure Statement proceeded on August 6, 2025

(the "**First DS Hearing**").  The Court instructed the Debtor to make certain amendments to

the Disclosure Statement to consensually address the prior objections by Jordan and a late-

filed objection by Debra Danner.  The Court continued the hearing on the Disclosure

Statement to September 10, 2025, and ordered the Debtor to file an amended disclosure

statement and plan by August 13, 2025.  On August 13, 2025, the Debtor filed the FAP and

FADS, which the Debtors believe reflect the changes that the Court ordered.  This includes

revisions that the Debtors understand resolved the prior objection of Ms. Danner.  (*See* FADS

at 23:7-24:12 and 33:6-11.)

## III.    LEGAL STANDARD

Adequate information is all the Bankruptcy Code requires.  *See In re Scioto Valley
Mortg. Co.*, 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988); *see also* 11 U.S.C. § 1125(a)(1).

Adequate information is defined as "information of a kind, and in sufficient detail, as far as is

reasonably practicable in light of the nature and history of the debtor and the condition of the

debtor's books and records" that would enable a hypothetical investor "to make an informed

judgment about the plan. . . ."  *See* 11 U.S.C. § 1125(a)(1).  "[I]n determining whether a

disclosure statement provides adequate information, the court shall consider the complexity

of the case, the benefit of additional information to creditors and other parties in interest, and

the cost of providing additional information. . . ."  11 U.S.C. § 1125(a)(1).

A disclosure statement must, as a whole, provide information that is "reasonably

practicable" to permit an "informed judgment" by creditors to vote on a plan of

reorganization.  *See In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 (2d Cir. 1994).  What

is "adequate information" must be determined on a case-by-case basis under a flexible and

4

practical standard, focusing on the unique facts and circumstances of each case.  *See In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988); *see also In re Phoenix Petroleum Co.,* 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001).  As stated in the legislative history:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation . . . .  In chapter 11 cases, there is frequently great uncertainty.  Therefore the need for flexibility is greatest.

*See* H.R. Rep. 595, at 408-09 (1977).  Courts are vested with wide discretion to determine whether a disclosure statement contains "adequate information" within the meaning of § 1125(a).  *See Kirk v. Texaco, Inc.,* 82 B.R. 678, 682 (S.D.N.Y. 1988); *see also In re Oxford Homes,* 204 B.R. 264, 267 (Bankr. D.Me. 1977).

Confirmation issues, such as the feasibility of a plan, should not be adjudicated at the disclosure statement stage.  *See, e.g., In re Sunshine Precious Metals, Inc.*, 142 B.R. 918, 920 (Bankr. D. Idaho 1992) ("[Classification and feasibility] are also confirmation issues, and the record at present does not justify the conclusion that the proposed chapter 11 plan is not confirmable on these grounds as a matter of law."); *In re Scioto Valley Mortg. Co.*, 88 B.R. at 171 ("If creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation.").

## IV.    THE AMENDED DISCLOSURE STATEMETN PROVIDES ADEQUATE INFORMATION

### A.    The FADS Provides Detailed Information Concerning the Debtors' FAP

The FADS contains adequate information.  The FADS contains a thorough and lengthy narrative of the events leading to the Debtors' cases and the Debtors' assets and liabilities.  (*See* FADS at 9:10-20:3.)  The FADS extensively discusses the potential risks of the FAP.  (*See id.* at 124:15-127:2.)  As discussed below, this includes adding the alleged

risks previously argued by Jordan, such as related to Mr. Jacobus Pino and Jordan's criticisms of MTS's management.  (*See id.* at 125:20-22.)  As ordered by the Court, the Debtors also included that Jordan disagrees with certain statements of MTS concerning the termination of its business relationship with PG&E and the contact information for Jordan's counsel should any party want more information regarding Jordan's position.  (*See id.* at 9:22-25.)

The FADS is accompanied by detailed liquidation analyses and financial projections supporting confirmation of the FAP.  (*See* Index, Exs. 1-6.)  Both the liquidation analyses and the financial projections specify, in significant detail, the assumptions upon which they are based.  The FADS includes separate financial projections and liquidation analyses for the Debtors and MTS's subsidiary, PTS.  (*See id.*)  For MTS and PTS, the financial projections include significant detail, including a forecasted income statement, balance sheet, and cash flow statement, and tax calculations.  (*See* Ex. 1.)

The FADS contains substantial information concerning the Debtors' affiliates, including inter-company transactions.  (*See* FADS at 12:22-16:21.)  The FADS includes the Insider Payment Schedule prepared from MTS's books and records of payments to or for the benefit of any insider within the four-year period prior to the MTS Petition Date.  (*See* Ex. 10.)  The Insider Payment Schedule was previously included with the Disclosure Statement. The Debtors have added a detailed analysis in the FADS of the value of the potential Insider Avoidance Actions supported by a separate "Claims Analysis" prepared by Force 10 Partners.  (*See* FADS at 77:27—79:23; Ex. 11.)  In short, the Debtors have provided extensive information in and with the FADS.

## V.  <u>SEVERAL OF JORDAN'S OBJECTIONS WERE PREVIOUSLY ADDRESSED AND DEEMED RESOLVED</u>

Jordan asserts several objections that are largely copied and pasted from his prior objection [Docket No. 569] (the "**Prior Jordan Objection**"), despite the fact that these objections were previously addressed or deemed resolved at the prior hearing.

**A.      Jordan's Objection Concerning Asset Values Was Already Addressed**

Through the Prior Jordan Objection, Jordan objected to the Disclosure Statement on the basis that the Disclosure Statement allegedly did not adequately describe the Debtor's assets or their values.  (*See* Prior Obj. at 22:27-23:19.)  As previously stated by MTS in response to the Prior Jordan Objection, the Disclosure Statement contains a detailed narrative of MTS's assets and MTS's assets are further described and valued in the balance sheet included with the MTS Projections and the MTS Liquidation Analysis.  This remains the case in the FADS.  In addition, in connection with the First DS Hearing, the Debtor agreed to resolve Jordan's objection by adding a statement that Jordan disputes the asset values.  MTS revised the Disclosure Statement to provide as follows:

> Jordan asserts that MTS's "description of its assets and their values is [sic] woefully inadequate and appears to be purposefully misleading, even with the assistance of the CRO." MTS disputes Jordan's assertion.  From MTS's perspective, the description of its assets and their values are complete and accurate.  Jordan has not provided any specifics to support his assertion.

(*See* FADS at 112:12-15.)

Jordan has again objected on this same basis and again has done so without providing any specifics or evidence to the contrary.  (*See* Obj. at 18:9-19:3.)  Moreover, as discussed in further detail below, the Debtors propose to include in the FADS the following with respect to the Rodriguez Compromise:

> MTS is informed that the Rodriguez Plaintiffs have been paid $1 million from Everest Insurance on account of the Rodriguez Judgment.

> MTS does not believe that any alleged claim against Everest for bad faith exists because, to MTS's knowledge, Everest fulfilled its duties to MTS and, as such, values any such claim(s) at $0.00. Jordan asserts that MTS's claims against Everest could be worth millions.

Jordan argues that MWP has five parcels of property and that such properties have certain values based on MWP's schedules.  (*See* Obj. at 18:23-27.)  Jordan asserts that the Bank of Sierra secured debt is $2,633,573, that the Examiner has reported that PNC is oversecured, and that the equity in MWP's real property is $7,063,777.  (*See* Obj. at 18:23-

7

19:3.)  However, Jordan makes these arguments without claiming there is anything that needs to be done with respect to the FADS.  Moreover, MWP valued its real property in its liquidation analysis.  (*See* Index, Ex. 5 at 55.)  The Debtors also included valuations of MWP's real properties individually and collectively, and the expected equity after satisfaction of the Bank of the Sierra's secured debt, in its Claim Analysis.  (*See id.*, Ex. 11 at 139.)

### B.    Jordan's Objection Concerning Avoidance Actions Was Previously Addressed

Jordan's argument that the "Debtor fails to provide virtually any information about significant claims it possesses" and that the Debtor "ascribes no value to these claims" are false and ignore the amendments in the FADS.  Jordan objected to the Disclosure Statement on the basis that the Disclosure Statement did not adequately describe preferential or otherwise voidable transfers.  (*See* Prior Obj. at 23:8-28.)  At the direction of the Court, the FADS now contains significant information concerning the potential value of any Avoidance Actions of MTS against insiders.  First, the FADS (like the original Disclosure Statement) is accompanied by the Insider Payment Schedule prepared from MTS's books and records with all payments to or for the benefit of an insider within the four-year period prior to the Petition Date.  Second, the FADS contains a new extensive discussion of the value of potential Insider Avoidance Actions, backed by a separate analysis prepared by Force 10 Partners, *i.e.*, the Claims Analysis with detailed assumptions.  (*See* FADS 76:23-79:23; *see also* Index to FADS, Ex. 11.)  The upshot of this analysis is that the estimated gross value of the potential Insider Avoidance Actions is $380,893.  (*See* FADS 78:10-12.)  This is compared to a net collective value of MWP's real estate to be contributed under the FAP of $6,893,847.  (*See id.* at 79:5-7; *see also* Index to FADS, Ex. 11 at 150 of 204.)

Jordan ignores the information included in the FADS to specifically address and resolve this objection.  Jordan does not identify any specific transfers that were omitted or additional information that must be provided.  (*See* Obj. at 19:4-20:2.)  In fact, the following

excerpt in the Objection was copied and pasted from the Prior Jordan Objection with very

minor modifications:

> Debtor, which again is completely controlled by Robin, ascribes no value to these claims (*see e.g.* Debtor's Liquidation Analysis at Exhibit 3 to the Robin DS, page 41 thereof, where Debtor ascribes no value to any alleged insider claims or non-insider claims when it states: **'The Debtor has not estimated recoveries for any avoidance actions or other litigation'**). This statement is astonishing in view of the massive amount of legal and accounting fees and CRO consulting fees incurred (and paid) thus far in the Debtor's case. As demonstrated below, these assets are valuable and more information must be supplied to enable creditors to meaningfully analyze the potential claims, especially the pursuit of the $2.5 million receivable owing to the Debtor by Phoenix which is 100% owned by Robin and potential $10 million plus in assets of the Gloria Trust.

(*See* Obj. at 19:22-20:2 (emphasis in original); *compare with* Prior Obj. at 23:11-19.)

Information concerning the assets of Richard Mowbray, Kim Mowbray, and the Trust

is not necessary. First, each of these persons is a non-debtor. Second, Jordan's argument is

based on the faulty premise that the value of the Insider Avoidance Actions is based on an

alleged "<u>collection risk</u>." (*See* Obj. at 7:15-16 (emphasis in original). This is false as

demonstrated by the detailed analysis in the FADS and the Claims Analysis. The estimated

gross value of the potential Insider Avoidance Actions of $380,893 is "*without* taking into

consideration any reduction of the potential recoveries based on costs of litigation, asserted

defenses, and financial wherewithal of any defendant to satisfy a judgment obtained." (*See*

FADS at 78:10-14 (emphasis in original).)

While Jordan claims that the definitions related to the claims vested in the Plan Trust

are confusing, his recitation of the same proves the opposite. The Plan Trust will be vested

with the Trust Causes of Action. Unsurprisingly, the Trust Causes of Action exclude the

Released Claims, *i.e.*, the claims released based on the Compromise included in the FAP,

including the released Insider Avoidance Actions. (*See* FADS at 140:15-16 and 134:10-13.)

The approval of such Compromise is a matter for the Court to consider in connection with

confirmation of the FAP. Moreover, the testimony by Kenneth Catanzarite that the

1   Examiner's report contains no analysis of the assets of the Trust is false.  (*See* Catanzarite

2   Decl. at ¶ 5.)  The Examiner detailed in the Report real property titled in the Trust, further

3   undermining Jordan's claimed need for additional information (even assuming it was

4   relevant).  (*See* Report [Docket No. 538] at 28-29.)

5       Nevertheless, the Debtors propose to amend the FADS to *further* address this

6   argument to include the following:

7

8           Jordan asserts that MTS is settling substantially all of the Insider
            Avoidance Actions of over $38,000,000 for zero.  Jordan further
9           asserts that the Plan Trust is illusory and will hold no Insider
            Avoidance Actions due to the releases in the Plan.

10          Insider Avoidance Actions are released by the Compromise in
            the Plan as provided expressly therein and in the Disclosure
11          Statement.  This excludes any claims against PTM, PTS, and
            MWP, which are preserved by the Plan.  The Debtors disagree
12          with Jordan's calculus of the value of the consideration being
            exchanged in the Compromise as set forth in the Plan.
13

14  **C.**      **The Alleged Risks Concerning Jordan's Criticisms of Existing**

15           **Management Were Previously Addressed**

16       Jordan previously objected to the Disclosure Statement's description of risks under the

17  Plan, stating that "[m]ore information is required to enable GUC to understand this obvious

18  risk and the reasons why nothing will change management-wise after confirmation as pointed

19  out in detail hereinabove."  (*See* Prior Obj. at 24:1-6.)  MTS included in the FADS additional

20  content to specifically address this objection as follows:

21          Jordan asserts there is a risk of default under the Plan because the
            management of MTS under the Plan remains the same as during
22          the MTS Case and Jordan claims that such management created
            MTS's financial problems.  MTS notes that the three largest
23          asserted claims in the MTS Case stem from the period of time
            that Jordan served as the CEO of MTS (including the disputed
24          claim that Jordan asserts).  In addition, MTS believes that MTS's
            current management has been instrumental in MTS's ability to
25          weather the pre-petition decline in revenues discussed above, to
            maintain operations, and to strengthen its cash flow during the
26          MTS Case.  Ultimately, MTS believes that creditors can make
            their own decision with respect to MTS's management based on
27          the information herein.

28

(*See* FADS at 125:20-28.)  This is in addition to the extensive information in the Disclosure Statement concerning MTS's historical operations and operations during this Case under existing management.  The FADS also includes a three-page risk-factor discussion.  (*See* FADS at 124:15-127:2.)

Jordan again ignored the revisions in the FADS and repeated the same objection that "[m]ore information is required to enable GUC to understand this obvious risk and the reasons why nothing will change management-wise after confirmation as pointed out in detail hereinabove and why creditors should believe that any future payouts can possibly happen." (*See* Obj. at 20:10-13.)

The only additional risk that it seems Jordan wants disclosed is the alleged risk *to him* from the proposed substantive consolidation of MWP and MTS.  (*See* Obj. at 20:9-10).  The Debtors will include in the FADS the following statement:

> Jordan asserts that there is an obvious risk to him to have all of the MWP equity disappear into MTS.

**D.    The Alleged Risks Raised by Jordan Concerning Jacobus Pino's Employment Was Already Addressed**

Jordan previously objected to the Disclosure Statement on the basis that it did not disclose the risk that Jacobus Pino, PTS's CEO, could leave PTS.  (*See* Prior Obj. at 13:2-14:14.)  At the First DS Hearing, the Debtor stated that it would amend the Disclosure Statement to disclose such alleged risk to resolve the objection.  Through the FADS, the Debtor added the following:

> Jordan asserts there is a risk that Pino could leave "Mowbray's and start[] a competing company to bid on SCE job for his own benefit" or he could join "another company with equipment and capital to bid on the SCE job competing with Mowbray's." However, Pino has an employment contract with PTS to serve as PTS's CEO.  In addition, the PTS Stock Agreement dated May 26, 2022, includes a non-compete provision applicable to Pino that lasts for a two-year period after he is no longer an employee. To MTS's knowledge, Pino has no intention to leave PTS.

11

1    (*See* FADS at 126:9-15.)

2    However, Jordan again objected on this basis, copying and pasting large portions of its

3    prior objection verbatim.  (*Compare* Obj. at 21:4-22:17; *with* Prior Obj. at 13:2-14:14.)

4    Jordan again alleges that the FADS does not disclose whether there is a non-compete

5    agreement with Mr. Pino, which is clearly inaccurate as reflected above.  (*See id.* at 21:25-

6    22:9.)  The Debtors believe this objection has been addressed.

7    **E.    Robin Mowbray's Ownership in PTM Was Already Disclosed**

8    Jordan previously objected to the Disclosure Statement regarding an alleged conflict

9    of interest between Robin Mowbray and PTM, an entity Robin owns.  (*See* Prior Obj. at

10    14:15-15:4.)   At the First DS Hearing, the Debtor explained that the Disclosure Statement

11    disclosed Robin Mowbray's ownership interest in PTM and, based on the dialogue at the

12    hearing, understood that no revisions were necessary.  In addition, the FADS discloses the

13    fact that PTM owes MTS on account of the PTM Loan (as did the Disclosure Statement).

14    (*See* FADS at 15:7-19.)  Claims to collect the balance of the PTM Loan (to the extent such

15    loan is not to be paid post-confirmation as reflected in the MTS Projections) are being vested

16    in the Plan Trust to pursue.  (*See id.* at 15:27-28.)  However, Jordan copied and pasted the

17    same objection near verbatim into his new Objection.  (*See* Obj. at 23:1-15.)  The Debtor

18    believes that Robin Mowbray's ownership interest in PTM and the amounts that PTM owes to

19    MTS have been adequately disclosed.  As he does throughout the Objection, Jordan does not

20    request any specific information to add to the FADS, but, instead, simply complains about the

21    terms of FAP.

22    By restating his Prior Objection, Jordan inaccurately asserts that "[n]one of the

23    financial statements of Phoenix have been attached to the DS. . . ."  (*See* Obj. at 23:9.)  PTM's

24    financial statements were included with the FADS as Exhibit 12 to the Index.

25    **F.    Jordan's Objection Regarding MTS's Borrowing Capacity Was Already**

26    **Addressed**

27    Jordan previously objected to the Disclosure Statement on the basis that it did not

28    disclose a funding source.  (*See* Prior Obj. at 16:19-17:6.)  At the First DS Hearing, the

1   Debtor explained that the Disclosure Statement disclosed that the payments under the Plan by

2   the MTS Reorganized Debtor will be funded by the MTS Reorganized Debtor's operations.

3   The Debtor understood that this objection was deemed resolved at the hearing.  However,

4   Jordan copied and pasted the same objection near verbatim into the Objection.  (*See* Obj. at

5   23:16-24:3.)  Nevertheless, the Debtors propose to include the following in the Risk Section

6   of the FADS to resolve this objection:

7               Jordan asserts that MTS must disclose a funding source or
8               explain that there is an increased risk of default under the Plan
                should cash flow go negative as a result of ongoing operations
9               associated with receivable collections or loss in present business.
                The risk associated with the businesses of MTS and PTS are
10              discussed above.  There is currently no financing source for MTS
                to disclose.  As reflected in the MTS and PTS Projections, MTS
11              does not believe that financing is required for MTS to make the
                payments required by the Plan.  However, MTS believes that it
12              and/or PTS can obtain accounts receivable financing after the
                Effective Date should such become advisable or required.

13      **G.      The Disclosure Statement Contains Sufficient Information Regarding the**

14              **Plan Trustee**

15          Jordan previously objected to the Disclosure Statement on the basis that it should

16  disclose the identity of the Plan Trustee.  (*See* Prior Obj. at 19:3-20:10.)  At the First DS

17  Hearing, the Debtor explained that the FADS now identified Doanld T. Fife, the Examiner,

18  as the proposed Plan Trustee.  The Debtor understand that this disclosure resolved the

19  objection.  Moreover, as MTS previously explained, Robin Mowbray did not interview

20  anyone for the Plan Trustee role and, as such, there is nothing to disclose in this regard.  Mr.

21  Fife was chosen as the Plan Trustee because he is now familiar with the operations of the

22  Debtor and the parties in this Case.  Moreover, nothing in § 321(b) prohibits Mr. Fife from

23  serving as the trustee under the Plan, as opposed to as a trustee pre-confirmation in the Case.

24

25

26

27

28

## VI.    JORDAN'S NEW DISCLOSURE STATEMENT OBJECTIONS SHOULD BE OVERRULED

### A.    The Disclosure Statement Adequately Discloses the Rodriguez Claim and Compromise

The Amended Plan constitutes a settlement among the Debtors and the Rodriguez Plaintiffs. This is a good thing. The Rodriguez Plaintiffs assert the largest general unsecured claim in all three cases. Despite Jordan's self-serving attempts to claim credit, the settlement with the Rodriguez Plaintiffs resulted in improved treatment for the general unsecured creditors under the FAP. Moreover, it is entirely appropriate for a plan to include and be premised upon one or more settlements. *See* 11 U.S.C. § 1123(b)(3)(A). Whether the settlement between the Debtors and the Rodriguez Plaintiffs included in the FAP should be approved is a confirmation issue, *i.e.*, the Court will be asked to approve the terms of the settlement in connection with confirmation of the FAP. However, the FAP can be confirmed whether or not the Rodriguez Settlement is approved by the Court.

Through his Objection, Jordan has requested that the Debtors make certain disclosures to the FADS related to the Rodriguez Claim and the Rodriguez Compromise. Those requests and the Debtors' amendments in response are as follows:

1.    Jordan asserts that the Disclosure Statement should disclose that the Rodriguez Plaintiffs never sued MWP and that the Rodriguez Plaintiffs attempted in the Rodriguez Matter to add Robin Mowbray (but not MWP) as a defendant as MTS's alter ego, which was denied by a ruling by the state court on a motion for summary adjudication. (*See* Obj. at 11:19-21.) The Debtors will modify the FADS to include both assertions as follows:

> The Rodriguez Plaintiffs filed a proof of claim in the MWP Case. However, pre-petition, the Rodriguez Plaintiffs did not name MWP in their complaint. The Rodriguez Plaintiffs did name Robin Mowbray as a defendant in their complaint. However, Robin Mowbray was dismissed from the Rodriguez Matter upon a motion for summary adjudication that she and other defendants filed.

14

REPLY

2.      Jordan asserts that a copy of any Debtor/RP Settlement Agreement should be attached to the Disclosure Statement.  (*See* Obj. at 11:23-24.)  The FAP is the settlement agreement between the Debtors and the Rodriguez Plaintiffs.  The terms of the Rodriguez Compromise are set forth in both the FADS and the FAP.  (*See* FADS at 80:1-81:20; FAP at 53:9-54:28.)  While the FAP provides for the flexibility for the Debtors and the Rodriguez Plaintiffs to seek approval from this Court of a standalone settlement agreement by a separate motion should the parties decide to do so, such is not required.  *See* 11 U.S.C. § 1123(b)(3)(A).  The FAP and FADS simply reflect that possibility.  As it now stands, there is no separate settlement agreement between the Debtors and the Rodriguez Plaintiffs and, as such, nothing further to disclose.  The Debtors will revise the FADS to state:  "At present, there is not Debtor/RP Settlement Agreement."

3.      Jordan asserts that the Rodriguez Compromise "is a one-way street with MTS getting nothing but Rodriguez getting everything to sign off on a plan."  (*See* Obj. at 25-27.)  The Debtors disagree.  However, the Debtors will revise the FADS as follows:

> Jordan asserts that the Rodriguez Compromise is a one-way street with MTS getting nothing but Rodriguez getting everything to sign off on a plan.  The Debtors disagree with Jordan's assessment of the Rodriguez Compromise.

4.      Jordan argues that the FADS does not include any valuation of the alleged "Bad Faith Claim" to be assigned to the Rodriguez Plaintiffs under the Rodriguez Compromise.  Jordan also asserts that "Estate claims against Everest could be worth millions."  (*See* Obj. at 12:1.)  The Debtors will revise the FADS to state the following:

> MTS does not believe there is any meritorious bad faith Estate Claim against Everest because, to MTS's knowledge, Everest fulfilled its duties to MTS and, as such, MTS believes that any such claim(s) has/have a value of $0.00.  Jordan asserts that "Estate claims against Everest could be worth millions of dollars."

5.      Jordan asserts that "MTS needs to provide disclosure why it is not objecting to the penalty portion of the Rodriguez Claim or the calculation of $6 million of interest and proposes to allow the entirety of the Rodriguez Claim as an Allowed Claim in all three cases."

15

1    (*See* Obj. at 12:10-13.)  The Debtors are not objecting to the Rodriguez Claim because the

2    parties are settling on the terms in the FAP.  Under the FAP, the Reorganized Debtors "and

3    any other party-in-interest shall have standing to file motions to commence adversary

4    proceedings to object to Claims. . . ."  (*See* FADS at 94:15; *see also* FAP at 67:14-17.)  The

5    Debtors will amend the FADS as follows:

> MTS is not objecting to the Rodriguez Claim because the parties
> have reached a settlement on the terms and conditions of Plan
> and the Rodriguez Compromise set forth therein.

8    The Debtors note that Jordan's arguments concerning the punitive damage portion of the

9    Rodriguez Claim would apply equally to the quadrupled portion of his claim based on

10    unawarded penalties and punitive damages.

11            6.        Jordan asserts that, by substantive consolidation, the Debtors are making "a

12    gift of the $7 million equity in MWP to Rodriguez. . . ."  (*See* Obj. at 6:10.)  Jordan also

13    argues that the FADS "does not provide any information how allowing Rodriguez to share in

14    the 7-million dollars ($7,000,000) of equity in the MWP assets is legally confirmable to

15    Jordan and other general unsecured creditors of MWP as a part of the voluntary Sub-Con

16    efforts on behalf of MTS and MWP.  Additional disclosures are required."  (*See* Obj. at

17    13:10-13.)

18            Jordan's assertion is based on the false premise that equity in MWP is being gifted to

19    the Rodriguez Plaintiffs.  This is not so.  Nothing in the FAP provides that any assets of MWP

20    are being gifted or otherwise transferred or paid to the Rodriguez Plaintiffs.  Rather, the FAP

21    provides that MWP and MTS are being consolidated.  (*See* FAP at 55:3-5.)  That is, the

22    consolidated estate is receiving any net equity, as opposed to any particular creditor.

23    Separately, the FAP increased GUC Payment Amount to $25,000,000, *i.e.*, the minimum to

24    be paid to the Holders of Allowed General Unsecured Claims, and added the GUC Bonus,

25    and it did so for *all* Holders of Allowed General Unsecured Claims.  Moreover, while Jordan

26    claims that this information is allegedly needed for "other general unsecured creditors of

27    MWP[,]" Jordan also asserts that *he* "is the only general unsecured creditor ("GUC") of

28

MWP. . . ." (*See* Obj. at 6:17.)  The substantive consolidation of MTS and MWP is discussed further below.  The Debtors do not believe any further disclosure is needed on this point.

7.      Jordan asserts "[n]o disclosure is made of the $1,000,000 already paid from MTS insurance to Rodriguez." (*See* Obj. at 13:15-19.)  The Debtors will revise the FADS to disclose that:

> The Debtors are informed that the Rodriguez Parties received $1,000,000 from Everest on account of the Rodriguez Claim.

The Debtors believe that the revisions proposed herein should resolve Jordan's objections concerning the Rodriguez Compromise and the Rodriguez Claim.

**B.      The FADS Adequately Discloses the Substantive Consolidation of MTS and MWP**

The FADS adequately discloses the fact that, under the FAP, MWP and MTS will be substantively consolidated (the "**MWP Consolidation**").  (*See* FADS at 81:23-25.)  The FADS and the FAP detail the implications of the MWP Consolidation.  (*See id.* at 81:27-82:25.)  The MWP Consolidation, as contemplated by the FAP, reflects the appropriate exercise of the Debtors' business decision making, the fulfillment of their respective fiduciary duties, and their willingness to work with creditors towards a consensual plan.  The inclusion of the MWP Consolidation in the FAP is the product of the compromise among the Debtors and the Rodriguez Plaintiffs.  It also reflects the Debtors willingness to adopt the recommendations of the Examiner.  (*See* Report [Docket No. 538] at 23, "***A strong argument can be made for substantive consolidation of MWP with the Debtor.***" (emphasis in original).)  The Debtors believe that the MWP Consolidation pursuant to the FAP and as part of the Rodriguez Compromise is in the best interests of the respective estates of both MWP and MTS.

Contrary to Jordan's unsupported arguments, it is entirely proper for a plan to provide for substantive consolidation.  *See* 11 U.S.C. § 1123(a)(5)(C) (stating a plan shall provide adequate means of implementation, such as the "merger or consolidation of the debtor with one or more persons.").  Based on § 1123, bankruptcy courts have held that consolidation is

17

1   *expressly* authorized by the Bankruptcy Code.  *See In re Stone & Webster*, 286 B.R. 532, 546

2   (Bankr. D. Del. 2002) (finding "that § 1123(a)(5)(C) clearly authorizes a bankruptcy court to

3   confirm a Chapter 11 plan containing a provision which substantively consolidates the estates

4   of the two or more debtors."); *see also In re Ward*, 558 B.R. 771, n. 24 (Bankr. N.D. Tex.

5   2016) ("The Bankruptcy Code clearly permits consolidation within a plan context.").  Thus,

6   the Debtors can voluntarily agree to the MWP Consolidation through the FAP and as part the

7   settlement embodied in the FAP provided the FAP meets the requirements for confirmation.

8   *See In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 92–93 (Bankr. N.D. Tex. 2017)

9   ("[A]rguably, to the extent the court is determining whether substantive consolidation in a

10  ***plan*** is appropriate, pursuant to section 1123(a)(5)(C), the only 'real requirement' for

11  exercising such authority should be that section 1129 of the Bankruptcy Code is complied

12  with. . . ." (emphasis in original)).  Jordan will have a chance to be heard thereon in

13  opposition to confirmation of the FAP.  *See In re Stone & Webster*, 286 B.R. at 544-45

14  (holding that, prior to plan confirmation, an argument that a plan including substantive

15  consolidation does not satisfy § 1129(a)(7) is not ripe for adjudication).

16      Substantive consolidation is not a gating issue, nor is a separate motion required.

17  Jordan's demand that confirmation of the FAP be delayed pending a separate motion for

18  substantive consolidation is just that—an effort to delay confirmation of the FAP.  As

19  discussed above, substantive consolidation through a plan is expressly permitted by the Code.

20  Moreover, the FAP can and should be confirmed whether or not the Court approves the MWP

21  Consolidation.  As reflected by the terms of the FAP itself, the treatment in the FAP is the

22  same either way and is not impacted the MWP Consolidation.  Jordan has not provided any

23  specifics to the contrary.

24      Jordan's arguments for "all facts" that support consolidation in the FADS should be

25  rejected for numerous reasons.  First, the FADS must include *adequate* information, not *all*

26  information, facts, and particulars as requested by Jordan.  Second, further information

27  concerning substantive consolidation is not required to provide creditors with sufficient

28  information to make an informed decision on the FAP.  Jordan is taking inconsistent

positions.  He claims that "*creditors*" need disclosure of *every* fact related to the MWP

Consolidation.  However, according to Jordan, he is the *only* general unsecured creditor of

MWP.  (*See* Obj. at 6:17.)  Jordan is not seeking additional information to make an informed

decision on the FAP.  He is trying to delay confirmation of the FAP by any means necessary.

This includes by arguing for disclosures that, according to Jordan, affect only him and which

he already intends to oppose.  Third, Jordan was previously so knowledgeable on the

consolidation of MWP and MTS, *that he supported it*, offering a declaration to establish the

grounds for the consolidation of MWP and MTS.  (*See* Docket No. 286-2 at ¶ 5 (emphasis

added).)  In short, no further information is needed regarding the MWP Consolidation in the

FADS.

The Debtors are not barred by judicial estoppel from requesting the MWP

Consolidation.  MTS and MWP are not taking inconsistent positions.  Even assuming MTS

and/or MWP were taking inconsistent positions (and they are not), the Court did not accept

their prior position.  Jordan is again not providing the Court with a complete picture of the

prior proceedings.  In denying the Trustee and Substantive Consolidation Motion, the Court

appointed an Examiner, including to analyze the parties' disputes concerning the Rodriguez

Parties' request for substantive consolidation.  Moreover, in refusing to grant the Rodriguez

Plaintiffs' request for the immediate consolidation of MWP and MTS, the Court left open the

possibility of a different result based on the outcome of the Examiner's Report.  Based on the

audio recording from the hearing on the Trustee and Substantive Consolidation Motion, the

Court stated that with respect to the consolidation of MWP and MTS:  "[t]hat could be on the

table later.  It depends a lot on what the examiner tells me."

As discussed above, if any person is taking inconsistent positions with respect to

substantive consolidation, it is Jordan.  Jordan submitted a declaration in support of the

Trustee and Substantive Consolidation Motion.  Furthermore, Jordan offered testimony

specifically in support of the consolidation of MTS and MWP and in order to prove the

requirements for such consolidation.  (*See* Docket No. 286-2 at ¶ 5 (emphasis added).)

However, to address Jordan's objection on this point, the Debtors propose to include the following in the FADS:

> By the Trustee and Substantive Consolidation Motion, the Rodriguez Plaintiffs sought multiple forms of relief, *i.e.*, the appointment of a trustee in MTS's Case and substantive consolidation of MTS, MWP, PTS, and PTM. Moreover, the Rodriguez Plaintiffs sought such relief based on very serious allegations of misconduct, allegations that, from the Debtors' perspective, were not true.  MTS opposed all of the relief requested in the Trustee and Substantive Consolidation and did so vigorously.  MTS and MWP opposed the Trustee and Substantive Consolidation Motion because they believed that the allegations therein were not true and that the required legal standards were not satisfied as set forth in their respective oppositions.  In the introduction of MTS's opposition to the Trustee and Substantive Consolidation Motion, MTS argued the following:

>> The Motion should be summarily denied. The Motion is premised on inaccurate statements of fact and misleading allegations, all of which were recklessly made (if not intentionally so) and without the type of careful inquiry and reasonable basis required under Rule 9011 of the Federal Rules of Bankruptcy Procedure. The story told by the Movants is only that—a story. It is not true and is far from it. The Movants' allegations are contrary to the evidence in their possession and are not supported by the exhibits that they cite. The Movants' requests for relief fail (and do so miserably) under the exacting legal standards required.

> The Court denied the Trustee and Substantive Consolidation Motion and ordered the appointment of an examiner pursuant to 11 U.S.C. § 1104(c). (*See* Docket No. 314.)  The Examiner's report was filed on July 14, 2025 [Docket No. 538] (the "**Report**").  From the Debtors' perspective, the Report vindicated the Debtors.  In many respects, the Debtors assert that the Examiner found that the allegations in the Trustee and Substantive Consolidation Motion were not accurate, and that MTS's responses were true.  Among other things, the Examiner found that MTS did not engage in a concerted plan to transfer assets and revenues to its subsidiary, PTS.  The Examiner also did not find that MTS was promoting the interests of its affiliates at the expense of its creditors and bankruptcy estate.

> With respect to the substantive consolidation of MWP and MTS, the Report stated that "***[a] strong argument can be made for substantive consolidation of MWP with [MTS].***"  (*See* Report at 23:9-11 (emphasis in original).)  The Examiner also stated that there "***would appear to be few if any adverse consequences to either MWP or its creditors or [MTS] and its creditors by***

20

*substantively consolidating the two entities. The Examiner therefore believes that substantive consolidation of MWP with the estate of [MTS] should be given strong consideration*." (*See* Report at 23:20-23 (emphasis in original).)

As suggested by the Examiner, the Debtors gave the substantive consolidation of MTS and MWP strong consideration. In addition, the Debtors agreed to the consolidation of MTS and MWP in connection with the compromise embodied in the Plan with the Rodriguez Plaintiffs. The Debtors believe that substantive consolidation is in the best interests of the respective estates of both MWP and MTS and that the applicable legal requirements for the Court to approve substantive consolidation of MWP and MTS pursuant to the Plan and the Rodriguez Compromise can be satisfied. Moreover, the Debtors believe that the substantive consolidation of MWP and MTS can be approved without any Debtor taking inconsistent positions and without any person who submitted a declaration in support of MTS's opposition to the Trustee and Substantive Consolidation Motion recanting their testimony. The Debtors do not request that the prior position of MWP or MTS in relation to the Trustee and Substantive Consolidation Motin be totally disregarded in an about-face (as Jordan contends). The Debtors believe the Plan can be confirmed whether the MWP Consolidation is approved or not and the treatment in the Plan will not change.

In contrast, Jordan asserts that the economic value of MWP is being gifted to MTS and, in particular, to the Rodriguez Plaintiffs, for no consideration. Jordan asserts that he is the only general unsecured creditor of MWP and that he is being discriminated against and harmed economically by the substantive consolidation of MWP and MTS. Jordan asserts that MTS, MWP, and the Rodriguez Plaintiffs are barred by judicial estoppel from seeking the substantive consolidation of MWP and MTS. The Debtors disagree with Jordan's position.

The Debtors submit that this addition should address Jordan's disclosure objections related to the MWP Consolidation.

**C.    The Objection Concerning Information Related to the Trust Should be Overruled**

Jordan's objections concerning the Trust should be overruled. Under the Plan, upon the Effective Date, all existing equity interests in MTS shall be cancelled and 100% of the equity interests in the MTS Reorganized Debtor will be issued to the Trust. (*See* FADS at 71:8-12.) The FADS details that the Trust has a secured claim of $22,793,934.42 against Robin Mowbray pursuant to a certain Stock Purchase Agreement, Promissory Note, and Stock Pledge Agreement (collectively, the "**Trust Claim Documents**"). (*See id.* at 67:17-

21

22.)  The Trust's claim is secured by all of Robin Mowbray's interests in MTS.  (*See id.* at 19:25-26.)  The FADS specifically identifies that Robin Mowbray's father, John Mowbray, is the current sole beneficiary of the Trust and that Robin Mowbray is the remainder beneficiary of the Trust if her father passes away.  (*See id.* at 16:4 and 19:22.)  As such, Robin Mowbray's current interest in the assets of the Trust is zero (as stated in the FADS), making the assets of the Trust irrelevant for purposes of the FAP.  (*See id.* at 19:21-22.)  Jordan does not dispute this fact, but, instead, argues that Robin Mowbray's interest *could* ripen at any moment.  The FADS also specifically identifies Mr. Mowbray's health status, *i.e.,* that he has been incapacitated.  (*See id.* at 8:1-2.)

The Debtors will add copies of the Trust Claim Documents to the Index of Exhibits in support of the FADS.  Such documents are attached hereto as **Exhibit 1**.  Moreover, the Debtors will include the following in the FADS:

> Jordan believes the assets of the Trust should be disclosed because he asserts that the primary beneficiary of the Trust, Robin Mowbray's father, John Mowbray, is elderly and infirm and Robin Mowbray's presently inchoate interest in the Trust may ripen literally at any moment.

The Debtors submit that any further information concerning the Trust is irrelevant and that this objection should be overruled.

### D. **Certain Specific Objections**

Jordan makes the following objections related to the structure of the FAP that are phrased as questions.  The Debtors address each as follows:

- Jordan claims to be confused by the joint nature of the FAP and that there is no disclosure why the Debtors structured the FAP in such a manner.  (*See* Obj. at 25:19-22.)  The Debtors will amend the FADS to state that:  "The Debtors are pursuing a joint plan because they believe their respective reorganizations are intertwined and a joint plan is the most efficient and sensible method for the Debtors to move their three cases forward towards a common and successful exit."

1       •   Jordan asks whether there will be multiple ballots.  (*See* Obj. at 25:22.)  The

2      answer:  yes.  The FADS makes clear that a creditor or interest holder may

3      vote for or against the Plan if that creditor or interest holder has a claim or

4      interest that is "(1) Allowed or allow for voting purposes, (2) classified in an

5      impaired class, and (3) entitled to receive or retain some property on account

6      of its Claim." (*See* FADS at 105:11-15.)  The FADS will be revised to provide

7      that, "[E]ach creditor or interest holder who is entitled to vote for or against the

8      Plan will receive one ballot for each impaired Class in which such creditor's or

9      interest holder's claim or interest is classified."  The FADS also contains

10     typical instructions regarding creditors voting in more than one Class if and to

11     the extent they have claims in more than one class.  (*See* FADS at 106-107.)

12     Jordan's repeated questions regarding the approval of the MWP Consolidation and the

13 Rodriguez Compromise are addressed above.

14

15 **VII.    JORDAN'S PLAN OBJECTIONS SHOULD BE OVERRULED**

16     "[W]here a plan is on its face nonconfirmable, as a matter of law, it is appropriate for

17 the court to deny approval of the disclosure statement describing the nonconfirmable plan."

18 *In re Silberkraus,* 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000).  "A plan is patently

19 unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting

20 results' and (2) those defects 'concern matters upon which all material facts are not in dispute

21 or have been fully developed at the disclosure statement hearing."  *In re American Capital*

22 *Equipment, LLC,* 688 F.3d 145, 154-55 (3d. Cir. 2012) quoting *In re Monroe Well Serv.,* 80

23 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

24     Jordan's objections that the Plan is unconfirmable are premature and do not meet the

25 high standard for denying approval of the Disclosure Statement.  The Plan must ultimately

26 satisfy 11 U.S.C. § 1129, and the Debtors believe they will meet that burden at the

27 appropriate time.  Nonetheless, because such objections are without merit and should be

28 overruled, the Debtors address them below.

### A.    The Plan Will Not Violate the Absolute Priority Rule

The FAP does not violate the absolute priority rule.  First, Jordan's objection on this point is premature.  *See In re Annicott Excellence, LLC*, 258 B.R. 278, 283 n.6 (Bankr. M.D. Fla. 2001) ("The Court agrees with Debtor that this objection is premature. The new value exception, 11 U.S.C. § 1129(b)(2)(B)(ii) does not come into play until a debtor attempts cramdown of a rejecting class of impaired, unsecured creditors.  Until such time as an impaired, unsecured class actually rejects the Plan, triggering a cramdown, the rule of *203 N. LaSalle* need not be considered."); *see also In re Dakota Rail, Inc.*, 104 B.R. 138, 144 (Bankr. D. Minn. 1989) ("The court believes that, while there may be significant doubt as to whether the plan can be confirmed as proposed, this is not a facial deficiency. It is premature to prejudge this issue, since it may not arise, in any event. It is an issue to be addressed at confirmation.").

As stated expressly in the FADS, based on the settlements set forth in the FAP, MTS expects to confirm the FAP without resort to cram down in § 1129(b) with respect to the Class of general unsecured creditors of MTS (Class 16).  Moreover, assuming the FAP must satisfy the absolute priority rule with respect Class 16, it does so because no holder of any claim or interest that is junior to Class 16 is receiving or retaining any property on account of such junior claim or interest.  Instead, the equity in the MTS is being cancelled and 100% of the equity interest in the MTS Reorganized Debtor shall be issued to the Trust on account of and in exchange for the Settlement Consideration and the Compromise embodied in the FAP. (*See* FADS at 108:18-21).  As discussed and detailed in the FADS, the Compromise is fair, equitable, and reasonable.  (*See id.* at 77:19-28 and 79:21-23.)  Thus, the FAP satisfies the absolute priority rule assuming it is triggered.

### B.    The Plan Satisfies the "Best Interests of Creditors Test"

The FAP satisfies the "best interests of creditors test" under 11 U.S.C. § 1129(a)(7). The FADS includes liquidation analyses for MTS, PTS, MWP, and Robin Mowbray.  The assumptions used in those analyses are fully explained.  (*See* FADS Index, Exs. 4-6.)

1   As detailed in MTS's Liquidation Analysis, the Holders of Allowed General Unsecured

2   Claims would receive a *pro rata* share of $15,674,000 in a Chapter 7 liquidation.  (*See* Ex. 4

3   at 47.)  The FAP clearly beats this sum and does so by a wide margin.  The FAP proposes a

4   minimum return of $25,000,000.  Moreover, under the FAP, the Holders of Allowed General

5   Unsecured Claims will have the opportunity to share in the MTS Reorganized Debtor's post-

6   confirmation profits.  By the GUC Bonus, the Holders of Allowed General Unsecured

7   Claims could receive a *pro rata* distribution of up to $55,000,000 (inclusive of the

8   $25,000,000 GUC Payment Amount).  (*See* Ex. 1 at 65:25-66-9.)  The improvement in the

9   value to be paid under the FAP is the product of the Debtor's extensive discussions with the

10  Examiner and the settlement negotiations with the Rodriguez Plaintiffs.

11       Jordan's arguments to the contrary are inaccurate and unsupported by evidence.  First,

12  Jordan argues that the Debtors have not ascribed any value to MTS's avoidance actions.  This

13  is false.  As discussed above, Jordan is simply restating the same prior argument while

14  ignoring the revisions included in the FADS.  As demonstrated in the FADS, with the

15  estimated value of the potential Insider Avoidance Actions, the FAP satisfies the best interest

16  of creditors test. (*See* FADS at 77:27-79:23; *see also id.* at 11:20-114-11; Ex. 11.)  Second,

17  Jordan's conclusory arguments that there is no hope for the promised payments under the FAP

18  is a question of feasibility, not the best interests of creditors test.  Third, Jordan's assertion

19  that the FAP does not provide for the subordination of the punitive portion of the Rodriguez

20  Claim does not mean that the FAP does not meet the best interests of creditors test.  Jordan

21  has not demonstrated that with any and all asserted punitive damage and penalty claims

22  subordinated (including his own), he would receive more in a Chapter 7 liquidation than

23  under the FAP.

24       Jordan does not provide any evidence to demonstrate that the liquidation analyses are

25  inaccurate or that the Debtors do not meet the best interests of creditors test.  In any event, §

26  1129(a)(7) is a confirmation issue that can be addressed at confirmation.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    The FAP Does Not Violate *Purdue Pharma*

Jordan, in two separate sections of his Objection, argues that the "Released Claims" against the "Released Parties" under the Plan violates *Harrington v. Purdue Pharma LLP* 603 U.S. 204 (2024), without any detail or reasoned explanation.  (*See* Obj. at 17:21-18:8; and 29:18-27.)

Jordan's assertion is inaccurate.  The FAP does not release claims held by Jordan or any other creditor against non-debtors.  Jordan is focusing on the wrong terms.  The FAP prohibits any party from pursuing only the "*Released* Claims."  (*See* FADS at 76:21-22 (emphasis added).)  The "Released Claims" are limited to claims of belong to the Debtors and their estates, *i.e.*, MTS, the MTS Estate, MWP, and the MWP Estate, Robin Mowbray, and the RM Estate, which are being released as part of the Compromise under the FADS. (*See* 75:23-76:16.)  The Debtors undoubtedly have the ability to compromise and release *estate* claims, such as, avoidance claims in a plan.  *See* 11 U.S.C. § 1123(b)(3)(A).  The releases in the Plan do not violate *Purdue Pharma*.  In any event, the propriety of the releases and the Compromise are confirmation issues.

### D.    The Plan Complies with 11 U.S.C. § 1123(a)(4)

Jordan's assertion that the FAP assigns "all estate claims against Everest" and thus, violates § 1123(a)(4), is a red herring.  All Holders of General Unsecured Claims (if and to the extent allowed) are receiving the same treatment under the FAP (Jordan and the Rodriguez Plaintiffs included).  (*See* FAP at 42:9-22.)  To the extent MTS proposes to assign certain claims against Everest, if any, it is doing so pursuant to the Rodriguez Compromise. (*See* FAP at 53:17-24.)  As explained above in the FADS, MTS believes any alleged bad faith claims against Everest are worth $0.  As required by § 1123(a)(4), the Holders of Allowed Unsecured Claims against MTS are receiving the same treatment under the FAP.   (*See* FAP at 42:9-21.)  In any event, this is a confirmation issue.

## VIII.   <u>JORDAN'S DISCOVERY REQUEST SHOULD BE REJECTED</u>

Jordan's request that the hearing on the confirmation of the FAP be set out at least 90 days to permit discovery should be overruled.  The Bankruptcy Rules require only 28 day's notice of the deadline to object to confirmation of the FAP and the hearing to consider confirmation of the FAP.  *See* Fed. R. Bankr. P. 2002.  Moreover, the only item identified in the Objection upon which Jordan claims to need discovery is the proposed substantive consolidation of MWP and MTS.  As discussed above, Jordan previously felt so sufficiently comfortable and knowledgeable concerning the substantive consolidation of MWP and MTS that he supported it and offered a declaration to establish the grounds for such consolidation. Jordan has also been on notice since July 30, 2025, that the consolidation of MWP and MTS was proposed in MTS's plan and he has taken no discovery.

Jordan's request to allow the state court action involving his claim to conclude should be overruled.  (*See* Obj. 30:7-10.)  There is no reason to delay the confirmation of the FAP pending the liquidation of Jordan's disputed general unsecured claim, nor has Jordan offered any such reason.  The FAP addresses and treats Jordan's asserted claim in compliance with the Code regardless of the outcome of the Jordan Matter.

///

///

///

///

///

///

///

///

///

///

REPLY

## IX.    <u>CONCLUSION</u>

Based on the foregoing, the Debtors request that FADS, as proposed to be modified, be approved.

Respectfully submitted,

DATED:  September 9, 2025          RAINES FELDMAN LITTRELL LLP


By:      */s/ Robert S. Marticello*
         ROBERT S. MARTICELLO
         MICHAEL L. SIMON
         Counsel for MTS, Debtor and Debtor-in-Possession

DATED:  September 9, 2025          ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP


By:
         ROYE E. ZUR
         LAUREN N. GANS
         Counsel for MWP and Robin Mowbray, Debtors and Debtors-in-Possession

REPLY

# EXHIBIT 1

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement ("*Agreement*") is made as of April 2, 2021, at San Bernardino, California, among Robin Mowbray ("*Buyer*"), and Robin Mowbray, Successor Trustee of the Gloria Mowbray Separate Property Trust dated January 4, 2001 ("*Seller*").  The transaction contemplated by this Agreement involves the purchase and sale of shares in The Original Mowbray's Tree Service, Incorporated, a California corporation ("*Corporation*").  All parties to this Agreement may be individually referred to as "*Party*" or collectively referred to as "*Parties*."

## RECITALS

A.    Corporation owns and operates a tree service.

B.    Corporation currently has a total of 6,000 shares of capital stock issued and outstanding.  Seller currently owns forty-nine percent (49%) of all issued and outstanding shares.  Buyer currently owns fifty-one percent (51%) of all issued and outstanding shares.

C.    Seller is a Shareholder of the Corporation.  Buyer is a Shareholder, Officer, Director and Employee of the Corporation.

D.    Buyer desires to purchase from Seller and Seller desires to sell all of its shares to Buyer.

NOW THEREFORE, in consideration of the mutual covenants, agreements, representations, and warranties contained in this Agreement, the Parties agree as follows:

### Article 1
### Purchase and Sale of Shares

1.1.    <u>Sale of Stock</u>.  Subject to the terms and conditions set forth in this Agreement, on the closing date, Seller will transfer to Buyer two thousand nine hundred forty (2,940) shares of the Corporation (the "*Shares*"), which represents all of the Seller's shares.

1.2.    <u>Consideration for Shares</u>.  As payment for the transfer of the Shares in accordance with the provisions of Section 1.1, Buyer agrees to pay Seller Twenty-Nine Million Five Hundred Ninety Thousand Dollars ($29,590,000.00) ("*Purchase Price*").  The Purchase Price has been established by an independent appraisal and shall be payable to Seller pursuant to the Promissory Note executed concurrently herewith.

### Article 2
### Warranties of Seller

2.1.    <u>Seller Warranties</u>.  Seller warrants that the representations and warranties contained in this Agreement are true and accurate to the best of Seller's knowledge.

2.2.     <u>Title to Shares</u>.  Seller is the owner, beneficially and of record, of forty-nine percent (49%) of all the shares as stated in the Recitals above.  Seller has full power to transfer the Shares indicated in Section 1.1 to Buyer without obtaining the consent or approval of any other person or governmental authority.  Seller acknowledges that she is transferring all of her interest in the Corporation and understands that she is not entitled to nor can she claim any further interest in the Corporation or its assets.

2.3.     <u>Sale on Own Account</u>.  The sale of the Shares is for Seller's own account and does not provide any direct or indirect benefit to the Corporation.

2.4.     <u>Organization, Standing, and Qualification of Corporation</u>.  The Corporation is duly organized, validly existing, and in good standing under the laws of California and has all necessary powers to own its properties and operate its business as now owned and operated by it.  Neither the ownership of its properties nor the nature of its business requires the Corporation to be qualified in any jurisdiction other than the state of its incorporation.

2.5.     <u>Subsidiaries</u>.  The Corporation does not own, directly or indirectly, any interest or investment (whether equity or debt) in any other corporation, partnership, business, trust, or other entity.

2.6.     <u>Financial Statements</u>.  Buyer and Seller have had the opportunity to review the financial records of the Corporation.  Both Buyer and Seller have been involved with the Corporation and understand its business.

2.7.     <u>Compliance with Laws</u>.  The Corporation has not received notice of any violation of any applicable federal, state, or local statute, law, or regulation (including any applicable building, zoning, environmental protection, or other law, ordinance, or regulation) affecting its properties or the operation of its business; and to the best of the knowledge of Seller there are no such violations.

2.8.     <u>Litigation</u>.  There is no pending, or, to the best knowledge of Seller, threatened, suit, action, arbitration, or legal, administrative, or other proceeding, or governmental investigation against or affecting the Corporation, or any of its businesses, assets, or financial conditions.

2.9.     <u>Corporate Documents</u>.  The Parties have had an opportunity to review: (1) copies of the Articles of Incorporation and Bylaws of the Corporation; and (2) the minute book of the Corporation containing all records required to be set forth of all proceedings, consents, actions, and meetings of the shareholders and boards of directors of the Corporation.

**Article 3**
**Warranties of Buyer**

3.1.     <u>No Other Consent Necessary</u>.  Buyer need not make or obtain consent, approval, or authorization of, or declaration, filing, or registration with, any federal or state

governmental or regulatory authority in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

3.2.  <u>Investment for Own Account</u>.  Buyer is aware of the Corporation's business affairs and financial condition and has acquired sufficient information about the Corporation to reach an informed and knowledgeable decision to acquire the Shares.

3.3.  <u>Securities Registration</u>.  Buyer understands that the Shares purchased have not been registered under federal securities laws or qualified under California securities laws because of applicable exemptions from registration and qualifications.  Buyer understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws Buyer cannot transfer the Shares unless they are registered or qualified, or unless an exemption from such registration or qualification is available.  Buyer acknowledges that Seller and the Corporation have no obligation to register or qualify the Shares.

3.4.  <u>Tax Consequences</u>.  Buyer understands that Buyer may suffer tax consequences as a result of Buyer's purchase or disposition of the Shares.  Buyer is not relying on Seller or the Corporation for any tax advice.

**Article 4**
**Closing**

4.1.  <u>Time and Place</u>.  The transfer of the Shares by Seller to Buyer (the closing) will take place at the Corporation's principal place of business, or at such other time and place as the parties may agree to (the closing date).

4.2.  <u>Seller's Obligations at Closing</u>.  Seller shall instruct the Corporation's transfer agent to reflect the transaction contemplated in this Agreement and transfer the Shares to the name of the Buyer in the corporate records.  Seller shall take any steps that may be necessary to accomplish the transfer of the Shares.

**Article 5**
**Costs**

5.1.  <u>No Finder's or Broker's Fees</u>.  Each Party represents and warrants that it has dealt with no broker or finder in connection with any transaction contemplated by this Agreement, and, as far as it knows, no broker or other person is entitled to any commission or finder's fee in connection with any of these transactions.

5.2.  <u>Expenses</u>.  Each Party will solely bear their own costs and expenses incurred or to be incurred in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

## Article 6
## Termination of Agreement

6.1.  <u>Conditions Permitting Termination</u>.  Any Party may on the closing date terminate this Agreement, without liability to any other:

(a)  If any bona fide action or proceeding will be pending against any Party on the closing date that could result in an unfavorable judgment, decree, or order that would prevent or make unlawful the performance of this Agreement; or if any agency of the federal or of any state government has objected at or before the closing date to this acquisition or to any other action required by or in connection with this Agreement.

6.2.  <u>Defaults Permitting Termination</u>.  If either Buyer or Seller materially defaults in the due and timely performance of any of their warranties or agreements under this Agreement, the non-defaulting Party may on the closing date give notice of termination of this Agreement, in the manner provided in Section 8.9.  The notice will specify with particularity the default or defaults on which the notice is based.  The termination will be effective five days after the closing date, unless the specified default or defaults have been cured on or before this effective date for termination.

## Article 7
## Dispute Resolution

7.1.  <u>Mediation Required</u>.  Before invoking the binding dispute mechanism set forth in Section 7.3 of this Agreement, the Parties shall first participate in mediation of any dispute arising under this Agreement.

7.2.  <u>Mechanics of Mediation</u>.  The mediator shall be chosen by the Parties in good faith.  The mediation shall be held in the city of Riverside, California.  The cost of mediation shall be borne by the Parties equally.

At least ten (10) business days before the date of the mediation, each side shall provide the mediator with a statement of its position and copies of all supporting documents. Each Party shall send to the mediation a person who has authority to bind the party.  If a subsequent dispute will involve third parties, they shall also be asked to participate in the mediation.

If a Party has participated in the mediation and is dissatisfied with the outcome, that party may invoke the dispute resolution provisions in Section 7.3 of this Agreement.

7.3.  <u>Mandatory Arbitration</u>.  Any controversy or claim relating to this Agreement (whether contract, tort, or both), or the breach of this Agreement, shall be arbitrated by and in accordance with the then existing arbitration rules of IVAMS at an office the Parties agree to.  The Parties shall choose an arbitrator who shall be a retired judge experienced

in negotiating, making, and consummating acquisition agreements who will preside over the proceedings. If the Parties are unable to choose an arbitrator, then the Parties shall so notify IVAMS and an arbitrator shall be appointed.

No one who has ever had any business, financial, family, or social relationship with any Party to this Agreement shall serve as an arbitrator unless the related party informs the other Party of the relationship and the other Party consents in writing to the use of that arbitrator.

7.4.    Arbitrator's Power. The arbitrator shall have the following powers:

(a)    To issue subpoenas for the attendance of witnesses and subpoenas duces tecum for the production of books, records, documents, and other evidence;

(b)    To order depositions to be used as evidence;

(c)    To enforce the rights, remedies, procedures, duties, liabilities, and obligations of discovery as if the arbitration were a civil action before a California superior court;

(d)    To conduct a hearing on the arbitrable issues;

(e)    To administer oaths to parties and witnesses;

(f)    To enter and serve a written award within five (5) business days after the arbitration hearing is concluded; and

(g)    To correct the award on the grounds for correction stated in California Code of Civil Procedure §1286.6(a) and (c) within 10 days after serving a signed copy of the award on the party asking for correction.

7.5.    Cost of Arbitration. Each Party to the arbitration shall pay a pro-rata share of the arbitrator's expenses and fees, and the other arbitration expenses incurred or approved by the arbitrator, excluding attorney fees, witness fees, and other expenses incurred by a party for his or her own benefit.

The arbitrator may award the prevailing party his or her expenses and fees of arbitration, including reasonable attorney fees and witness fees, in such proportion as the arbitrator decides.

Despite any statute to the contrary, any claim arising from or relating to this Agreement (whether contract, tort, or both) shall be brought within one (1) year after it arises, provided that any negotiations or mediation undertaken by the parties under Section 7.1 of this Agreement shall toll the time period within which the claim must be brought.

BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THIS AGREEMENT DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHT YOU MIGHT POSSES TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL.  BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION.  IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER APPLICABLE LAWS.  YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED HEREIN TO NEUTRAL ARBITRATION.

_____     _____
        Initials                           Initials

## Article 8
### General Provisions

8.1.   <u>Headings</u>.  The subject headings of the paragraphs and subparagraphs of this Agreement are included for convenience only and will not affect the construction or interpretation of any of its provisions.

8.2.   <u>Word Usage</u>.  Unless the context clearly requires otherwise, (a) the plural and singular numbers shall each be deemed to include the other; (b) the masculine, feminine and neuter genders shall each be deemed to include the others; (c) "shall," "will," or "agrees" are mandatory, and "may" is permissive; (d) "or" is not exclusive; and (e) "includes" and "including" are not limiting.

8.3.   <u>Entire Agreement; Modification; Waiver</u>.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.  No supplement, modification, or amendment of this Agreement will be binding unless executed in writing by all the parties.  No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.  No waiver will be binding unless executed in writing by the party making the waiver.

8.4.   <u>Counterparts</u>.  This Agreement may be executed in counterparts and, as so executed, shall constitute one agreement binding on all parties.  A facsimile of a signature on this Agreement shall have the same force and effect as an original ink signature.

8.5.   <u>Parties in Interest</u>.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other

than the Parties to it and their respective successors and assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement. No provision gives any third persons any right of subrogation or action against any party to this Agreement.

8.6.    Assignment. This Agreement will be binding on, and will inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors, and assigns; provided, however, that Buyer may not assign any of its rights under this Agreement.

8.7.    Governing Law. This Agreement will be construed in accordance with, and governed by, the laws of the State of California as applied to contracts that are executed and performed entirely in California.

8.8.    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of final jurisdiction, it is the intent of the parties that all other provisions of this Agreement be construed to remain fully valid, enforceable, and binding on the parties.

8.9.    Notices.    All notices, requests, demands, and other communications under this Agreement must be in writing and will be considered to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the fifth day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

| IF TO BUYER: | IF TO SELLER: |
|---|---|
| **Robin Mowbray** | **Gloria Mowbray Separate Property Trust dated January 4, 2001** |
| 960 Sunset Hill Lane | 686 E. Mill Street, 2nd Floor |
| Redlands, California 92373 | San Bernardino, California 92408 |

Any party may change its address for purposes of this paragraph by giving the other parties written notice of the new address in the manner set forth above.

IN WITNESS WHEREOF, the parties to this Agreement for Purchase and Sale of Stock have duly executed it on the day and year first above written.

**BUYER:**

**SELLER:**
**Gloria Mowbray Separate Property Trust dated January 4, 2001**

_____
Robin Mowbray

_____
Robin Mowbray, Successor Trustee

**PROMISSORY NOTE**

$29,590,000.00                    San Bernardino, California                    April 2, 2021

The undersigned, Robin Mowbray ("**Borrower**"), promises to pay to the Gloria Mowbray Separate Property Trust dated January 4, 2001, or order ("**Lender**"), the principal sum of Twenty-Nine Million Five Hundred Ninety Thousand Dollars ($29,590,000.00), together with interest on the unpaid principal balance from time to time outstanding at an annual rate of 2.14%, with all unpaid principal and interest due and payable on April 2, 2041.

This Note shall be subject to the following additional provisions:

1. <u>Payments.</u>  Payments of interest only shall be paid in annual installments payable on the second (2nd) day of April commencing on April 2, 2022 and continuing until the April 2, 2040. Each annual payment shall be in the sum of Six Hundred Thirty-Nine Thousand Four Hundred Seventy-Three Dollars and Ninety-Six Cents ($639,473.96) or more.  All payments shall be delivered to 686 E. Mill Street, 2nd Floor, San Bernardino, California 92408.  The final payment on this Note shall be a balloon payment of the principal plus interest due, payable on or before April 2, 2041.

2. <u>Balloon Notice.</u>  This Note is subject to Section 2966 of the Civil Code, which provides that the Holder of this Note shall give written notice of prescribed information at least ninety (90) days and not more than one hundred fifty (150) days before any balloon payment is due.

3. <u>Pledge Agreement.</u>  This Note is secured by a pledge agreement of even date where Borrower pledges her stock owned in The Original Mowbray's Tree Service, Incorporated a California corporation, as collateral.

4. <u>Prepayment.</u>  This Note may be prepaid, at any time, in whole or in part, without premium or penalty, as long as any principal prepayment is accompanied by a payment of interest accrued to the date of prepayment on the amount prepaid.

5. <u>Application of Payments.</u>  Each payment under this Note shall be credited first to interest then due and any remainder to principal.  All payments of principal under this Note shall be applied to the most remote principal installment then unpaid.

6. <u>Default.</u>  On (a) Borrower's failure to pay any sum due under this Note when it becomes due and payable or (b) any breach of any other promise or obligation in this Note or in any other instrument now or after this date securing the indebtedness evidenced in this Note (collectively, a "**Default**"), then, and in any of such event, Lender may at its option, after providing Borrower with a seven (7) day written notice and opportunity to cure the Default, declare this Note (including, without limitation, all accrued interest) to be immediately due and payable.  Borrower expressly waives notice of the exercise of this option.

7. <u>Costs of Collection.</u>  If this Note is not paid when due Borrower promises to pay all collection costs, including, but not limited to, attorney fees and court costs, whether or not suit is filed on this Note.

Exhibit 1, Page 36

8. <u>Waiver of Presentment</u>. Borrower and all persons liable or to become liable on this Note waive presentment, protest, and demand; notice of protest, demand, and dishonor; and any and all other notices or matters of a like nature.

9. <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the State of California.

10. <u>Usury</u>. All agreements between Borrower and Lender are expressly limited, so that in no event or contingency, whether because of the advancement of the proceeds of this Note, acceleration of maturity of the unpaid principal balance, or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance, or retention of the money to be advanced under this Note exceed the highest lawful rate permissible under applicable usury laws. If, under any circumstances, fulfillment of any provision of this Note or any other agreement pertaining to this Note, after timely performance of such provision is due, shall involve exceeding the limit of validity prescribed by law that a court of competent jurisdiction deems applicable, then the obligations to be fulfilled shall be reduced to the limit of such validity. If under any circumstances, Lender shall ever receive as interest an amount that exceeds the highest lawful rate, the amount that would be excessive interest shall be applied to reduce the unpaid principal balance under this Note and not to pay interest, or, if such excessive interest exceeds the unpaid principal balance under this Note, such excess shall be refunded to Borrower. This provision shall control every other provision of all agreements between Borrower and Lender.

11. <u>Mandatory Arbitration</u>. Unless otherwise provided in this Agreement, any controversy or claim arising out of, or relating to, this Agreement, or the making, performance, or interpretation of it, will be settled exclusively by final and binding arbitration in San Bernardino, California under the commercial arbitration rules of the American Arbitration Association then existing, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. The Parties agree to have a single arbitrator preside over the arbitration proceeding who will be a retired judge experienced in negotiating, making, and consummating acquisition agreements. The prevailing Party in the proceeding shall be awarded its costs and expenses, including reasonable attorneys' fees. The Parties will preserve the confidentiality of the arbitration award, including the nature and content of the proceedings leading to the arbitration award.

THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ THIS AGREEMENT AND THE PROVISIONS OF THIS SECTION, UNDERSTAND ITS TERMS, AND HAVE HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY OR OTHER ADVISOR BEFORE SIGNING THIS AGREEMENT. BY INITIALING IN THE SPACE PROVIDED BELOW, THE PARTIES AGREE TO HAVE ANY DISPUTE ARISING FROM THIS AGREEMENT DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY THE PROVISIONS OF THIS AGREEMENT AND CALIFORNIA LAW, AND ANY RIGHTS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL ARE EXPRESSLY WAIVED.

_____          _____
(Initials)                                        (Initials)

12. <u>Lawful Money of the United States</u>.  Principal and interest payable under this Note shall be paid in cash, or cash equivalents, in lawful money of the United States of America.

13. <u>Time Is of the Essence</u>.  Time is of the essence with respect to all obligations of Borrower under this Note, provided however that Lender shall provide Borrower with a seven (7) day written notice and opportunity to cure a Default.

14. <u>Interpretation</u>.  Each party should seek independent counsel.  Accordingly, any rule of law, including without limitation California Civil Code Section 1654, or any other statue, legal decision, or common law principal of similar effect, that would require interpretation of any ambiguities in this Agreement against any party that has drafted it is of no application and hereby is expressly waived.  This Agreement and its provisions shall be interpreted in a reasonable manner to affect the parties' intentions.

IN WITNESS WHEREOF, Borrower has executed this Promissory Note as of the date first written above.

**BORROWER:**

Dated: April 2, 2021

Robin Mowbray

# STOCK PLEDGE AGREEMENT

This Stock Pledge Agreement ("**Agreement**") is made as of April 2, 2021, among Robin Mowbray ("**Pledgor**"), in consideration of the financial accommodations given, to be given, or continued, hereby grants to Robin Mowbray, Successor Trustee of the Gloria Mowbray Separate Property Trust dated January 4, 2001 ("**Secured Party**") a security interest in the property described below, upon the representation, warranties and agreements set forth herein.

## RECITALS

A.     "**Company**" means The Original Mowbray's Tree Service, Incorporated, a California corporation.

B.     "**Shares**" means the shares of stock of the Company that are pledged.

C.     "**Pledgeholder**" means The Law Office of Fullerton Lemann Schaefer & Dominick, LLP, who, pursuant to this Agreement, shall be in possession of the certificates representing the Shares.

D.     "**Purchase Agreement**" means that Agreement for Purchase and Sale of Stock entered into by Pledgor and Secured Party on the same date as this Agreement, pursuant to which Pledgor agreed to purchase the Shares from Secured Party.

E.     "**Promissory Note**" means that Promissory Note given pursuant to the Purchase Agreement by Pledgor to Secured Party as part of the consideration for the Shares.

## ARTICLE 1
## TERMS OF PLEDGE

1.1.     Grant of Security Interest. Pledgor hereby grants to Secured Party a security interest in any and all shares of capital stock now owned or hereafter acquired of the Company represented by any share certificates held in the name of Pledgor.

1.2.     Pledgeholder. Upon the execution of this Agreement, Pledgor shall execute and deliver to Pledgeholder an Assignment Separate from Certificate, assigning the Shares specified in Section 1.1 to the Pledgeholder and further agrees to deliver to said Pledgeholder all future and issued outstanding Shares of the Company not hereby pledged, all of which Shares are hereinafter sometimes called "the collateral."

1.3.     Note. The security interest granted in this Agreement is to secure the performance of the obligations contained in the promissory note entered into by Pledgor and Secured Party on the same date of this Agreement for the total principal amount of Twenty-Nine Million Five Hundred Ninety Thousand Dollars ($29,590,000.00).

1.4.     Collateral Held Until Note Paid in Full. Until such date as the obligations contained in the Promissory Note are paid in full by Pledgor, the Shares shall remain in the possession

of Pledgeholder.  The Pledgeholder may rely on and shall be protected in acting or refraining from acting upon any written notice, instruction, or request furnished to it hereunder, and believed by Pledgeholder to be genuine and to have been signed or presented by the party or parties purporting to have executed or presented such document or documents.

1.5.  Pledgor Warranties.  Pledgor represents and warrants to Secured Party that as of the time the security interest attaches to the collateral, no person other than Secured Party and Pledgor will have in or to the collateral, or any part thereof, any right, title, lien, encumbrances, adverse claim or interest whatsoever.

1.6.  Defense by Secured Party.  Secured Party will, at Secured Party's own expense, appear in and defend any action or proceeding which may affect Pledgor's interest in or Secured Party's beneficial interest in or to any of the collateral.

1.7.  Non-Liability of Pledgeholder.  The Pledgeholder shall not be liable for any action taken by Pledgeholder in good faith and believed to be authorized or within the rights or powers conferred upon Pledgeholder by this Agreement only, and may consult with counsel and shall have full and complete authorization and protection for any action taken or suffered by Pledgeholder hereunder in good faith and in accordance with the opinion of such counsel.

1.8.  Resignation of Pledgeholder.  The Pledgeholder may resign and be discharged from Pledgeholder's duties or obligations hereunder by giving notice in writing of such resignation specifying a date when such resignation shall take effect.  In such event, the parties shall appoint a successor Pledgeholder, or upon their failure to do so within ten days after the effective date of the Pledgeholder's resignation, the Superior Court of the State of California in and for the County of San Bernardino  shall have jurisdiction to appoint a successor to the Pledgeholder upon application of any or all of the parties.

1.9.  Indemnification of Pledgeholder.  All parties to this Agreement jointly and severally agree to indemnify Pledgeholder and to hold Pledgeholder harmless from and against any loss, liability, or expense incurred without gross negligence or bad faith on the part of Pledgeholder, arising out of or in connection with Pledgeholder entering into this Agreement and carrying out the duties and responsibilities hereunder, including the costs of defending Pledgeholder against any claim or liability, and to pay or reimburse the Pledgeholder upon request for all of Pledgeholder's fees, expenses, disbursements, advances, including the cost of reasonable attorneys' fees incurred or made by Pledgeholder in connection with carrying out Pledgeholder's duties hereunder.  Without limitation of the foregoing, all parties to this Agreement expressly authorize the Pledgeholder to resort to any of the pledged Shares held hereunder to recoup any of such losses, liabilities, costs, expenses, disbursements or advances if such indemnification payment or reimbursement is not made as herein provided.

1.10.  Pledgeholder Duties.  Pledgeholder undertakes to perform only such duties as are expressly set forth herein.  If Pledgeholder becomes involved in litigation or for any

reason finds it necessary to become involved in litigation, Pledgeholder is authorized to deposit with the clerk of the court in which such litigation is pending any and all funds, securities or other property held by Pledgeholder or to interplead all interested parties in any court of competent jurisdiction and to deposit with the clerk of such court any funds, securities or other property held by Pledgeholder pursuant to this Agreement. Upon the happening of either of the above, Pledgeholder shall stand fully relieved and discharged of any further duties hereunder with respect to the shares.

## ARTICLE 2
## REMEDIES ON DEFAULT

2.1.  Remedies on Default.  In the event of a default of the Promissory Note, Secured Party shall then, or at any time thereafter, at Secured Party's election be allowed to:

(a)  Exercise all rights and remedies available to a secured creditor after default, including but not limited to the rights and remedies of secured creditors under the California Commercial Code;

(b)  Choose to accept the collateral after giving notice of such proposal to Pledgor and to any other person with a security interest in the above described collateral, and such acceptance shall discharge the obligation of Pledgor, providing neither Pledgor nor any other person with a security interest in such collateral objects in writing to such proposal within thirty (30) days from receipt of such notice

(c)  At its option and without notice to Pledgor, transfer and register the collateral or any part of it in Secured Party's name or the name of its nominees; collect and enforce payment with respect to the collateral; exercise all rights, options, and privileges with respect to the collateral, and deliver it in that connection to any appropriate person or agency; and vote the collateral as Pledgor's proxy, that proxy to be irrevocable until this Agreement is terminated. Until such default, Pledgor's right to vote the collateral will not be impaired by this Agreement.

(d)  Conduct a "commercially reasonable" private sale or other disposition of the collateral although a higher price might have been obtained for it at a public sale under the Securities Act of 1933, as amended, or in compliance with any other applicable laws or regulations.

Secured Party's notice of the time and place of public sale of the collateral, or the time on or after which a private sale or other disposition of the collateral will be made, is reasonable if sent to Pledgor in the manner for giving notice at least 10 days before the public or private sale.

2.2.  Proceeds from Sale of Collateral.  The proceeds of sale of any of the Shares, and all sums received or collected by Secured Party from or on account of any sales thereof, shall be applied to the payment of all reasonable expenses incurred in connection with any sale, transfer or delivery of the Shares, to the payment of any other costs, charges, taxes, liens,

assessments, attorneys' fees or expenses incurred or paid by Secured Party in exercising any right, power or remedy conferred by this Agreement, or under the law, and to the payment of said obligations or any part thereof.

2.3.    Proceeds in Excess of Amounts Owed.  If the Secured Party sells the Shares for an amount in excess of the amount owed to Secured Party, then such excess, reduced by the amount of costs of sale, attorneys' fees and expenses as described in paragraph 2.2, shall be delivered to Pledgor.

2.4.    Rights Reserved by Pledgor.  Unless and until default shall occur, Pledgor shall reserve and retain the right to vote the Shares in the affairs of the Company, and to receive any dividends declared by the Company and payable with reference to said shares.  Upon default under the Promissory Note secured by this Agreement, Secured Party shall be vested with the right to vote the shares in the affairs of the Company and to receive any dividends declared by the Company.

2.5.    Default Defined.  A "default" as used herein, shall refer to and mean the occurrence of any one of the following events:

(a)    The failure by Pledgor to pay any installment on the unpaid balance of the purchase price of the Shares as provided in the Purchase Agreement and the Promissory Note as well as the prompt and complete performance of any obligation or breach of any covenant, warranty or condition as provided in the Purchase Agreement.

(b)    Upon the filing of a voluntary or involuntary petition in bankruptcy, or the initiation of any proceeding of the bankruptcy laws against or with respect to Pledgor.

(c)    Upon the attempted sale, assignment, or the transfer of any or all of the Shares of the Company owned of record, and/or beneficially by Pledgor unless specifically provided for in this Agreement or the Purchase Agreement.

## ARTICLE 3
## NOTICES

3.1.    Notices.  All notices or consents to be given by any party to this Agreement to any other party or parties shall be given in writing, by personal service, by registered or certified mail, postage prepaid, or by courier service or messenger.  Any notice given to any party shall include the transmission or delivery of a copy of the notice to the Pledgeholder. Notice given other than by personal service shall be duly addressed to the address shown for the party set forth in the signature provisions at the end of this document, or shall be directed to such other address as any party may hereafter specify in writing.

3.2.    Notice Timing.  Any such notice to any party deposited in the mail for delivery by the U.S. Postal Service shall be deemed for all purposes hereunder to have been given 48

hours after such deposit.  Notice delivered by personal service shall be deemed given upon delivery.

## ARTICLE 4
## GENERAL PROVISIONS

4.1.  <u>Entire Agreement; Modification; Waiver</u>.  This Agreement, and any other agreements or documents referenced in this Agreement, constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties.  No supplement, modification, or amendment of this Agreement will be binding unless executed in writing by all the parties.  No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.  No waiver will be binding unless executed in writing by the party making the waiver.

4.2.  <u>Headings</u>.  The subject headings of the paragraphs and subparagraphs of this Agreement are included for convenience only and will not affect the construction or interpretation of any of its provisions.

4.3.  <u>Word Usage</u>.  Unless the context clearly requires otherwise, (a) the plural and singular numbers shall each be deemed to include the other; (b) the masculine, feminine and neuter genders shall each be deemed to include the others; (c) "shall," "will," or "agrees" are mandatory, and "may" is permissive; (d) "or" is not exclusive; and (e) "includes" and "including" are not limiting.

4.4.  <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument.

4.5.  <u>Assignment</u>.  This Agreement will be binding on, and will inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors, and assigns; provided, however, that Buyer may not assign any of its rights under this Agreement.

4.6.  <u>Governing Law</u>.  This Agreement will be construed in accordance with, and governed by, the laws of the State of California as applied to contracts that are executed and performed entirely in California.

4.7.  <u>Attorney's Fees</u>.  In the event a dispute between parties arises out of this Agreement, the prevailing party shall be entitled to obtain from the non-prevailing party reasonable and necessary costs and expenses (including attorneys' fees) incurred to pursue or protect the Prevailing party's rights in such dispute.

4.8.  <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of final jurisdiction, it is the intent of the parties that all other provisions of this Agreement be construed to remain fully valid, enforceable, and binding on the parties.

STOCK PLEDGE AGREEMENT

4.9.   <u>Interpretation</u>.  Each party is being represented by independent counsel.  Accordingly, any rule of law, including without limitation California Civil Code Section 1654, or any other statue, legal decision, or common law principal of similar effect, that would require interpretation of any ambiguities in this Agreement against any party that has drafted it is of no application and hereby is expressly waived.  This Agreement and its provisions shall be interpreted in a reasonable manner to affect the parties' intentions.

IN WITNESS WHEREOF, the parties to this Stock Pledge Agreement have duly executed it on the day and year first above written.

**PLEDGOR**

Dated: April 2, 2021

Robin Mowbray

**SECURED PARTY**

**GLORIA MOWBRAY SEPARATE PROPERTY TRUST DATED JANUARY 4, 2001**

Dated: April 2, 2021

Robin Mowbray, Successor Trustee

## STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED, the undersigned hereby sell, assign and transfer unto:**

ROBIN MOWBRAY

Two Thousand Nine Hundred Forty (2,940) shares of common stock of THE ORIGINAL MOWBRAY'S TREE SERVICE, INCORPORATED standing in the name of the GLORIA MOWBRAY SEPARATE PROPERTY TRUST DATED JANUARY 4, 2001 on the books of said Corporation represented by Certificate number one (1) and do hereby irrevocably constitute and appoint Craig E. Wilson of Fullerton, Lemann, Schaefer & Dominick, LLP, attorneys to transfer the said stock on the books of the within named Corporation with full power of substitution.

**GLORIA MOWBRAY SEPARATE PROPERTY
TRUST DATED JANUARY 4, 2001**

Dated: April 2, 2021

Robin Mowbray, Successor Trustee

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, California 92660

A true and correct copy of the foregoing document entitled (*specify*): **REPLY TO CREDITOR RONNIE JORDAN'S OMNIBUS OBJECTIONS TO FIRST AMENDED DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DISCLOSURE STATEMENT**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 9, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **September 9, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Personal Delvery**
Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 9, 2025 | Connie-Marie Santiago | /s/ Connie-Marie Santiago |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1.    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Shraddha Bharatia**    notices@becket-lee.com
- **Jeffrey W Broker**    jbroker@brokerlaw.biz
- **Kenneth J Catanzarite**    kcatanzarite@catanzarite.com
- **Lauren N Gans**    lgans@elkinskalt.com, lmasse@elkinskalt.com
- **Jessica L Giannetta**    jessica@giannettalawcorp.com, melanie@giannettaenrico.com
- **Robert P Goe**    rgoe@goeforlaw.com,
  kmurphy@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com
- **Marshall F Goldberg**    mgoldberg@glassgoldberg.com, jbailey@glassgoldberg.com
- **Alan Craig Hochheiser**    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Merdaud Jafarnia**    bkca@alaw.net, mjafarnia@ecf.inforuptcy.com
- **Raffi Khatchadourian**    raffi@hemar-rousso.com
- **Valery Loumber**    valloumlegal@gmail.com
- **Michael B Lubic**    michael.lubic@klgates.com,
  jonathan.randolph@klgates.com,klgatesbankruptcy@klgates.com
- **James MacLeod**    jmacleod@dunninglaw.com, nancy@dunninglaw.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Robert S Marticello**    rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Karen S. Naylor**    Becky@ringstadlaw.com, Karen@ringstadlaw.com;Arlene@ringstadlaw.com
- **Estela O Pino**    epino@epinolaw.com, staff@epinolaw.com;clerk@epinolaw.com
- **Donald W Reid**    don@donreidlaw.com, 5969661420@filings.docketbird.com
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Amitkumar Sharma**    amit.sharma@aisinfo.com
- **Jeffrey S Shinbrot**    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com;tanya@shinbrotfirm.com
- **Thomas E Shuck**    tshuck@pmcos.com, efilings@pmcos.com
- **Michael Simon**    msimon@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Ahren A Tiller**    ahren.tiller@blc-sd.com, 4436097420@filings.docketbird.com;brett.bodie@blc-
  sd.com;anika@blc-sd.com;derek@blc-sd.com;kreyes@blc-sd.com;megan@blc-sd.com;nicole@blc-
  sd.com;danny@blc-sd.com;angie@blc-sd.com;kreyes@blc-sd.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com,
  raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com
- **Jennifer C Wong**    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com
- **Mandy Youngblood**    csbk@gmfinancial.com
- **Roye Zur**    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                     **F 9013-3.1.PROOF.SERVICE**