1  **RAINES FELDMAN LITTRELL, LLP**
   Robert S. Marticello, State Bar No. 244256
2  *rmarticello@raineslaw.com*
   Michael L. Simon, State Bar No. 300822
3  *msimon@raineslaw.com*
   4675 MacArthur Ct, Suite 1500
4  Newport Beach, CA 92660
   Telephone:      310 440-4100
5  Facsimile:      949-247-3998

6  Attorneys for The Original Mowbray's Tree
   Service, Inc., Debtor and Debtor-In-Possession
7
   **ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP**
8  Roye Zur, State Bar No. 273875
   *rzur@elkinskalt.com*
9  Lauren N. Gans, State Bar No. 247542
   *lgans@elkinskalt.com*
10 10345 W. Olympic Blvd.
   Los Angeles, California 90064
11 Telephone: 310.746.4400
   Facsimile: 310.746.4499
12
13 Attorneys for Mowbray Waterman Property, LLC,
   and Robin Elaine Mowbray, Debtors and Debtors-
14 in-Possession

15             **UNITED STATES BANKRUPTCY COURT**

16       **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

17

| | |
|---|---|
| In re: | Case No.: 8:24-bk-12674-SC |
| THE ORIGINAL MOWBRAY'S TREE SERVICE, INC., a Delaware corporation, | Chapter: 11 |
| | (Jointly Administered with Case Nos. 8:25-bk-10542-SC and 8:25-bk-10543-SC) |
| Debtor and Debtor-in-Possession. | |
| In re: | **SECOND AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION** |
| MOWBRAY WATERMAN PROPERTY, LLC, | |
| Debtor and Debtor-in-Possession. | **Disclosure Statement Hearing:** |
| In re: | Date:   September 10, 2025 |
| | Time:  1:30 p.m. |
| ROBIN ELAINE MOWBRAY, | Ctrm:  5C |
| | 411 W Fourth Street |
| | Santa Ana, CA 92701 |
| Debtor and Debtor-in-Possession. | |
| | **Plan Confirmation Hearing:** |
| | Date:  February 18, 2026 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

☐    Affects THE ORIGINAL MOWBRAY
TREE SERVICE, INC.

☐    Affects MOWBRAY WATERMAN
PROPERTY, LLC

☐    Affects ROBIN ELAINE MOWBRAY

☒    Affects All Debtors

Time:  1:30 p.m.
Ctrm:  5C
411 W Fourth Street
Santa Ana, CA 92701

---

SECOND AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ...................................................................1

    A. MTS Plan Summary .........................................................2

    B. MWP Plan Summary.........................................................4

    C. Robin Mowbray Plan Summary .........................................4

    D. The Purpose of This Document..........................................4

    E. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..............................................................................5

        1. Time and Place of the Confirmation Hearing ......................6

        2. Deadline for Voting For or Against the Plan ......................6

        3. Deadline for Objecting to Confirmation of the Plan .............6

        4. Identity of Person to Contact for More Information Regarding the Plan............................................................................6

        5. Disclaimer .......................................................................7

II. BACKGROUND..........................................................................7

    A. Background Regarding MTS and Its Operations ..................7

    B. MTS's Funded Debt..........................................................9

    C. Events Leading to the Filing of the MTS Case ...................9

        1. MTS's Decline in Revenues ..............................................9

        2. MTS's Efforts to Improve Cash Flow ...............................10

    D. MTS's Affiliates ............................................................13

        1. Pino Tree Service, Inc. ...................................................13

            a. The Line of Credit ...................................................14

            b. Management Agreement ...........................................14

            c. Equipment Lease ....................................................14

            d. Post-Petition PTS Payments....................................14

        2. Phoenix Traffic Management, Inc.....................................14

            a. The PTM Equipment Lease......................................15

            b. The PTM Loan .......................................................15

            c. Post-Petition PTM Payments ...................................15

        3. Mowbray Waterman Property, LLC ..................................16

            a. MWP Loans ...........................................................16

            b. MWP Real Property Leases .....................................16

    E. Summary of MTS's Assets and Liabilities ........................17

        1. MTS's Assets .................................................................17

        2. MTS's Real Property ......................................................17

        3. MTS's Liabilities ...........................................................17

i

| | | | |
|---|---|---|---|
| | F. | Summary of MWP's Assets and Liabilities | 18 |
| | | 1. MWP's Assets | 18 |
| | | 2. MWP's Liabilities | 19 |
| | G. | Summary of R. Mowbray's Assets and Liabilities | 19 |
| | | 1. Robin Mowbray's Assets | 19 |
| | | 2. Robin Mowbray's Liabilities | 20 |
| | H. | Significant Events During the MTS Case | 20 |
| | | 1. Bankruptcy Proceedings | 20 |
| | | a. "First Day" Motions | 20 |
| | | b. Employment of Professionals | 21 |
| | | c. Claims Bar Date | 21 |
| | | d. Cash Collateral | 21 |
| | | e. Motion to Reject Unexpired Leases and Servicing Agreement | 22 |
| | | f. Motions for Relief From the Automatic Stay | 22 |
| | | g. The Motions by Debra Danner | 23 |
| | | h. The Judgment Creditors' Trustee and Substantive Consolidation Motion | 24 |
| | | i. Plan Support Agreements and Settlements | 27 |
| | | j. MTS's Schedules and Monthly Operating Reports | 27 |
| | | 2. Jordan's Motion to Terminate Exclusivity | 27 |
| | | 3. MWP and Robin Mowbray Bankruptcy Proceedings | 28 |
| | | a. Employment of Professionals | 28 |
| | | b. Claims Bar Date | 28 |
| | | c. Cash Collateral | 28 |
| | | d. Cash Collateral | 28 |
| | | e. Jordan Adversary Proceeding | 29 |
| | | 4. Other Proceedings | 29 |
| | | a. Potential Avoidance Actions | 29 |
| | I. | Historical and Current Financial Condition | 30 |
| | J. | Steps Taken to Resolve Financial Problems | 32 |
| III. | | PLAN SUMMARY | 33 |
| | A. | The Plan Provides for a Reorganization of the Debtors and Their Affairs | 33 |
| | B. | The Plan Treats Claims Against All Three Estates | 33 |
| | C. | What Creditors and Interest Holders Will Receive Under the Plan | 33 |
| | D. | Allowance and Treatment of Unclassified Claims | 34 |
| | | 1. Administrative Claims | 34 |

a.      Ordinary Course Administrative Claims ................. 36

b.      Non-Ordinary Course Administrative Claims .......... 36

c.      Professional Fee Claims ............................. 37

2.    Priority Tax Claims ................................................ 38

E.    Allowance and Treatment of Classified Claims and Interests ......... 41

1.    Summary of Classes ............................................ 41

2.    Secured Claims -MTS & MWP ............................... 42

a.      Secured Claim of PNC Bank ......................... 42

b.      Secured Claim of Jacobus Pino ...................... 44

c.      Secured Claims Related to Vehicles or Equipment . 45

d.      Secured Claims – MWP ............................. 67

e.      Secured Claims – Robin Mowbray ................... 69

3.    Classes of Priority Unsecured Claims ....................... 70

4.    Classes of General Unsecured Claims ....................... 71

a.      MTS and MWP ...................................... 71

b.      Robin Mowbray ..................................... 72

5.    Class of Interest Holders .................................... 73

F.    Means for Implementation of the Plan ............................. 73

1.    Funding of the Plan ........................................... 73

2.    Payment of the GUC Payment Amount and the GUC Bonus 74

a.      The GUC Payment Amount ......................... 74

b.      The GUC Bonus ..................................... 75

3.    The Compromise Among MTS, Robin Mowbray, MWP, and the Trust ........................................................ 77

4.    Compromise with the Rodriguez Parties ..................... 82

5.    Substantive Consolidation of MWP .......................... 84

6.    Sale of Real Properties ....................................... 85

7.    The Plan Trust ............................................... 86

8.    Reporting to the Plan Trust by the MTS Reorganized Debtor 87

9.    The Reorganized Debtors Retention of Professionals and Fees and Expenses ................................................ 87

10.   The Plan Trustee as Disbursing Agent ...................... 87

11.   The Bond .................................................... 88

12.   Release of Liens ............................................. 88

13.   Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ................................ 88

14.   The MTS Reorganized Debtor's Post-Confirmation Management ................................................. 88

|   |   | **15.** | Powers and Duties of the Reorganized Debtors | 89 |
| | **G.** | | Default on Obligations to Holders of Allowed Claims | 90 |
| | **H.** | | Procedures For Resolving Disputed Claims | 91 |
| | | **1.** | Standing | 91 |
| | | **2.** | No Distribution Pending Allowance | 92 |
| | | **3.** | Reserves for Disputed Claims | 92 |
| | | **4.** | Claims Paid By Third Parties | 93 |
| | **I.** | | Distributions | 93 |
| | | **1.** | Distributions for Claims Allowed as of the Effective Date | 93 |
| | | **2.** | Distributions on Account of Claims Allowed After the Effective Date | 93 |
| | | | a. Payments and Distributions on Disputed Claims | 93 |
| | | | b. Special Rules for Distributions to Holders of Disputed Claims | 93 |
| | | **3.** | Delivery and Distributions and Undeliverable or Unclaimed Distributions | 94 |
| | | | a. Delivery of Distributions in General | 94 |
| | | | b. Undeliverable Distributions | 94 |
| | | | c. Distributions of Unclaimed Property | 94 |
| | | **4.** | Compliance with Tax Requirements/Allocations | 95 |
| | **J.** | | Treatment of Executory Contracts and Unexpired Leases | 95 |
| | | **1.** | Assumption of Executory Contracts and Unexpired Leases | 95 |
| | | **2.** | Rejection of Executory Contracts or Unexpired Leases Not Assumed | 98 |
| | **K.** | | Preservation of Causes of Action and Avoidance Actions for the Reorganized Debtors | 98 |
| | **L.** | | Retention of Jurisdiction | 100 |
| **IV.** | | | CONFIRMATION REQUIREMENTS AND PROCEDURES | 101 |
| | **A.** | | Who May Vote on or Object to the Plan | 102 |
| | **B.** | | Who May Vote to Accept or Reject the Plan | 102 |
| | **C.** | | What Is an Allowed Claim or Interest | 102 |
| | **D.** | | What Is an Impaired Claim or Interest | 103 |
| | **E.** | | Who Is Not Entitled to Vote | 103 |
| | **F.** | | Who Can Vote in More Than One Class | 103 |
| | **G.** | | Votes Necessary to Confirm the Plan | 104 |
| | **H.** | | Votes Necessary for a Class to Accept the Plan | 104 |
| | **I.** | | Treatment of Non-Accepting Classes ("Cramdown") | 104 |
| | **J.** | | Liquidation Analysis | 105 |
| | | **1.** | MTS Liquidation Analysis | 106 |

        2.      Robin Mowbray Liquidation Analysis ..............................111

        3.      MWP Liquidation Analysis ................................................112

  K.  Feasibility ....................................................................114

        1.      Feasibility – MTS and MWP ...........................................114

           a.    Effective Date Payments .........................................114

           b.    Post-Effective Date Payments..............................115

        2.      Feasibility – Robin Mowbray.............................................116

V.    EFFECT OF CONFIRMATION OF THE PLAN ....................................117

        1.      Binding Nature of Plan.......................................................117

        2.      Discharge...........................................................................117

        3.      Injunction ..........................................................................118

        4.      Vesting of Property in the Reorganized Debtors...............119

        5.      Modification of the Plan.....................................................119

        6.      Exculpations and Releases .................................................119

        7.      Submission of Post-Confirmation Reports........................120

        8.      Quarterly Fees ...................................................................120

        9.      Post-Confirmation Conversion/Dismissal........................120

        10.    Final Decree ......................................................................121

VI.   RISK FACTORS REGARDING THE PLAN ...........................................121

VII.  TAX CONSEQUENCES OF THE PLAN.................................................124

VIII.  CONCLUSION ......................................................................................125

TABLE OF DEFINITIONS ..................................................................126

  A.  Definitions....................................................................126

  B.  Rules of Construction................................................137

  C.  Rules of Interpretation...............................................138

  D.  Disclosure Statement Exhibits ......................................139

The Original Mowbray's Tree Service, Inc. (the "**MTS**"), the debtor and debtor-in-possession in the above-captioned case (the "**MTS Case**"), Mowbray Waterman Property, LLC ("**MWP**"), the debtor and debtor-in-possession in Case No. 8:25-bk-10542-SC (the "**MWP Case**"), and Robin Elaine Mowbray ("**Robin Mowbray**" and collectively with MTS and MWP, the "**Debtors**"), the debtor and debtor-in-possession in Case No. 8:25-bk-10543-SC (the "**RM Case**" and together with the MTS Case and the MWP Case, the "**Cases**") hereby submit this *Second Amended Joint Disclosure Statement Describing Second Amended Joint Chapter 11 Plan of Reorganization* (the "**Disclosure Statement**"), pursuant to § 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances of the Debtors' *Second Amended Joint Chapter 11 Plan of Reorganization* (the "**Plan**").  In support of the Disclosure Statement, the Debtors submit the concurrently-filed index of exhibits (the "**Index**").[1]

On October 18, 2024, (the "**MTS Petition Date**") MTS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case.  On February 19, 2025, MWP and Robin Mowbray filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing their respective cases.

Chapter 11 allows debtors to propose a plan.  A plan may provide for a debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtors are the proponents of the Plan that was sent to you in the same envelope as this document.

## I.     EXECUTIVE SUMMARY

The Plan is a joint plan proposed by three debtors, MTS, MWP, and Robin Mowbray, resolving all three bankruptcy cases and treating the Claims against each on fair and equitable terms.  As discussed in more detail below, the Plan should be viewed as two plans—one for a consolidated MTS and MWP and another for Robin Mowbray.  The Debtors are pursuing a joint plan because they believe their respective reorganizations are intertwined and a joint plan is the

---

[1]     Unless otherwise provided below, all references to exhibits are to the exhibits attached to the concurrently-filed Index.

1  most efficient and sensible method for the Debtors to move their three cases forward towards a

2  common and successful exit.

3      **A.**    **MTS Plan Summary**

4      As to MTS, the Plan is a reorganizing plan that saves MTS's business and the jobs of its

5  employees.[2]  The Plan enables MTS to restructure its obligations and continue operations,

6  providing essential vegetation management services and disaster relief assistance to communities

7  coast to coast.  The Plan also marshals significant value from all MTS Estate assets for the benefit

8  of creditors.  Through MTS's ongoing operations, the Plan proposes to pay substantial value to the

9  Holders of Allowed Claims, an amount that exceeds an estimated **$46,000,000** over the term of the

10  Plan.

11      The Plan contains fair and equitable treatment for all Classes of creditors, secured and

12  unsecured.  Each Holder of an Allowed Secured Claim will be paid in full.  In many respects, the

13  Plan is based on the contractual repayment terms that gave rise to the Secured Claims or

14  consensual treatment negotiated with the Holders of the Secured Claims.

15      The Holders of Allowed General Unsecured Claims will receive a *pro rata* share of the

16  **$25,000,000** GUC Payment Amount.  The GUC Payment Amount is the *minimum* to be paid

17  under the Plan to the Holders of Allowed General Unsecured Claims and it will be paid *with*

18  *interest*.  As provided in more detail in the Plan, the GUC Payment Amount will be paid through a

19  cash sweep mechanism—the Class 16 GUC Payment.  That is, all of the MTS Reorganized

20  Debtor's excess cash (as defined in the Plan) will be contributed to the GUC Payment Amount

21  until it is paid in full.  The GUC Payment Amount is currently projected to be paid by the MTS

22  Reorganized Debtor within nine (9) years following the Effective Date.  The GUC Payment

23  Amount can be paid earlier or later than projected based on the MTS Reorganized Debtor's actual

24  performance after the Effective Date.  The payment of the GUC Payment Amount is set forth in

25  Section III.F.2.a. below.  Any distributions on account of Disputed Claims will be reserved and

26  paid upon allowance.

27

28      [2]   Unless otherwise defined herein, the definition of any capitalized term may be found in the Table of Definitions at the end of this Disclosure Statement.

In addition, under the Plan, Allowed General Unsecured Creditors will have the opportunity to share in the upside of the MTS Reorganized Debtor's post-confirmation profits after the GUC Payment Amount is paid.  The Plan provides for the MTS Reorganized Debtor to pay a GUC Bonus for the benefit of the Holders of Allowed General Unsecured Claims.  The GUC Bonus is detailed in Section III.F.2.b. below.  In short, the GUC Bonus equals fifty percent (50%) of the MTS Reorganized Debtor's post-confirmation excess cash flow (as defined in the Plan) within five (5) years of the Effective Date (or, in certain circumstances, within one (1) year after the GUC Payment Amount is paid) and up to the cumulative sum (inclusive of the GUC Payment Amount) of **$55,000,000** or **40% of the Allowed General Unsecured Claims** (capped by the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), **whichever is greater**.  The amounts to be paid under the Plan to the Holders of Allowed General Unsecured Claims are the product of extensive negotiations and discussions by MTS with various parties in interest as well as settlements with certain key parties.

The Plan also vests certain potential claims of the MTS Estate in a Plan Trust for the Plan Trustee to investigate and, if appropriate, pursue.  The Holders of Allowed General Unsecured Claims will receive a *pro rata* share of any Net Recoveries from such actions.  This is in addition to the sums discussed above.

The MTS Reorganized Debtor's post-Effective Date operating cash flow includes significant value from its affiliates.  The pre-petition loan owing from MTS's wholly-owned subsidiary, Pino Tree Service, Inc. ("**PTS**"), is projected to be paid in full within two years after the Effective Date.  The MTS Reorganized Debtor is projected to receive management fees and equipment rent from PTS of approximately $10.3 million per year, *plus* additional distributions.  The projected distributions from PTS collectively exceed $6.0 million over the term of the Plan.  As such, the MTS Reorganized Debtor is receiving 100% of the economic benefit of PTS and essentially all of its excess cash flow during the term of the Plan.  In addition, the MTS Reorganized Debtor is projected to receive over $420,000 annually from Phoenix Traffic Management, Inc. ("**PTM**"), on account of management fees and equipment rent.  All of this value is benefiting the Holders of Allowed Claims under the Plan.

The MTS Reorganized Debtor's post-Effective Date projections are attached to the Index as **Exhibit 1** (the "**MTS Projections**").  The sums projected to be paid from affiliates during the term of the Plan are set forth in the Projections.  MTS has also included post-Effective projections for PTS (the ("**PTS Projections**").  The PTS Projections are attached to the Index as **Exhibit 2**.

### B.    MWP Plan Summary

Under the Plan, MWP's bankruptcy estate will be substantively consolidated and combined with MTS.  Such consolidation is part of the compromise embodied in the Plan.  As a result, upon the Effective Date, the assets and liabilities of MWP and its bankruptcy estate will become assets and liabilities of MTS.  The Plan treats the Claims asserted in the MWP Case as Claims against MTS.

### C.    Robin Mowbray Plan Summary

The Plan permits Robin Mowbray to reorganize her affairs and resolve the Claims asserted against her.  Robin Mowbray's debts largely, if not exclusively, arise from her ownership of MTS, and the most significant Claims asserted in her case are the same Claims asserted against MTS.  Under the Plan, Holders of Allowed General Unsecured Claims against Robin Mowbray will receive a *pro rata* share of the value of Robin Mowbray's projected disposable income for five years, a sum that is projected to be $135,385.  The payments to such Holders will be made by Robin Mowbray from her post-confirmation compensation.  Holders of Allowed General Unsecured Claims against Robin Mowbray will receive the treatment for such Claims under the Plan in addition to any distributions to be made on account of Allowed Claims such Holders may also have against MTS (up to payment in full).

The Effective Date of the Plan will be the first Business Day that is fifteen (15) days after the entry of an order confirming the Plan ("**Confirmation Order**"), provided there has been no order staying the effectiveness of the Confirmation Order.

### D.    The Purpose of This Document

This Disclosure Statement summarizes what is in the Plan and provides certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether or not to confirm the Plan.  **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU**

**WANT TO KNOW ABOUT**:

    **(1)**    **WHO CAN VOTE OR OBJECT TO THE PLAN;**

    **(2)**    **WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, the projected payment on your claim if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO THE PROJECTED TREATMENT OF YOUR CLAIM IN LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE;**

    **(3)**    **THE HISTORY OF THE DEBTORS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES;**

    **(4)**    **THE FACTORS THE BANKRUPTCY COURT WILL CONSIDER IN DECIDING WHETHER OR NOT TO CONFIRM THE PLAN;**

    **(5)**    **WHAT IS THE EFFECT OF CONFIRMATION; AND**

    **(6)**    **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the provisions of the Plan will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan.  The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.  Any party can now solicit votes for or against the Plan.

    **E.**    **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT

LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

### 1.   Time and Place of the Confirmation Hearing

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on **February 18, 2026 at 1:30 p.m.** (the "**Confirmation Hearing**"), in Courtroom 5C of the Ronald Reagan Federal Building and United States Courthouse located at 411 West Fourth Street, Santa Ana, California 92701.

### 2.   Deadline for Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to do so on a timely basis by filling out the enclosed ballot and returning it in the enclosed envelope to Raines Feldman Littrell LLP, Attn: Michael L. Simon, 4675 MacArthur Ct, Suite 1550, Newport Beach, CA 92660 or by email to msimon@raineslaw.com.

Each creditor or interest holder who is entitled to vote for or against the Plan will receive one ballot for each impaired Class in which such creditor's or interest holder's Claim or Interest is classified.

Your ballot must be received by no later than October 24, 2025, at 5 p.m. Pacific Time (the "**Voting Deadline**"), or it will not be counted.

### 3.   Deadline for Objecting to Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon counsel for MTS, Raines Feldman Littrell LLP, Attn: Robert S. Marticello, 4675 MacArthur Ct, Suite 1550, Newport Beach, CA 92660, or rmarticello@raineslaw.com and counsel for MWP and Robin Mowbray, Elkins Kalt Weintraub Reuben Gartside LLP, Attn: Roye Zur, 10345 W. Olympic Blvd., Los Angeles, CA 90064 or rzur@elkinskalt.com.

Your objection must be received by counsel for MTS, MWP, and Mowbray listed above by **January 16, 2026**, or it will not be considered.  The Debtors will file with the Bankruptcy Court and serve the results of the voting by **February 5, 2026**.

### 4.   Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for

MTS, Raines Feldman Littrell LLP, Attn: Michael L. Simon, 4675 MacArthur Ct, Suite 1550, Newport Beach, CA 92660, or msimon@raineslaw.com.

### 5. **Disclaimer**

The financial data relied upon in formulating the Plan is based on the Debtors' books and records which, unless otherwise indicated, are unaudited.  The information contained in this Disclosure Statement is provided by the Debtors.  The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE DEBTORS AND ITS ADVISORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE CASH FLOW AVAILABLE FOR DISTRIBUTION TO CREDITORS.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL CASH FLOWS TO BE DIFFERENT FROM THOSE BEING PROJECTED, AND THE DEBTORS AND ITS ADVISORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

## II.    **BACKGROUND**

### A.    **Background Regarding MTS and Its Operations**

On the Petition Date, MTS commenced the MTS Case.  MTS is operating as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed.

Established in 1972 by Gloria and John Mowbray (the "**Founders**"), Mowbray's has been a cornerstone in California for providing vegetation management services for over 50 years. Mowbray's began as a modest venture and has grown into a resilient company, dedicated to safeguarding communities and the environment.  Mowbray's continues to be a family owned and operated business, is a member of WMBE (Women and Minority Business Enterprise), and is committed to providing its client-partners with the safest and most efficient solution to their vegetation management needs.

John Mowbray suffered a catastrophic brain injury on the job in 1993, leaving him incapacitated.  Gloria Mowbray stepped up to manage the business while also caring for John and raising four children on her own.  Gloria Mowbray passed away in April 2021.  Gloria Mowbray was the sole shareholder of MTS from 1993 until her passing, at which time Robin Mowbray, her daughter, became the sole shareholder of MTS.

The services provided by MTS include, without limitation, manual and mechanical clearing, integrated vegetation management, storm and emergency, right-of-way maintenance, and high-hazard tree removal and crane services (collectively, "**Vegetation Management Services**"). Tree-trimming around power lines, clearing vegetation to prevent forest fires, removal of debris and charred remains after major wildfires in California, and assisting with damage remediation in response to hurricanes—these are the types of important services that MTS provides to the communities in which it serves.  Historically, utility companies have been MTS's primary clients, including California's largest energy utility, PG&E, as well as Southern California Edison ("**SCE**").  MTS also provides services to governmental agencies and cooperatives.  MTS is based in California and provides Vegetation Management Services throughout the state.  MTS also provides services in both North Carolina and Florida.

As discussed above, MTS is currently owned by Robin Mowbray, the youngest daughter of the Founders.  Since 2021, Robin Mowbray has been the Chairwoman of MTS's Board.  Richard Mowbray (grandson of the Founders and Robin Mowbray's nephew) has been MTS's Chief Executive Officer since 2020.  Ruben Sainos has served as MTS's CFO since 2023.  Prior to the Petition Date, MTS retained Brian Weiss of Force Ten Partners, LLC ("**Force 10**"), as its Chief

Restructuring Officer ("**CRO**") to lead MTS through its formal restructuring process, including the MTS Case.

### B.    MTS's Funded Debt

Pursuant to a loan agreement dated October 28, 2022 (the "**PNC Loan Agreement**") between PNC Bank, N.A. ("**PNC**") and MTS, PNC provided MTS with a secured revolving line of credit not to exceed $20,000,000 and letters of credit not to exceed $5,000,000 (the "**PNC Loan**").  As of the MTS Petition Date, MTS owed PNC approximately $7,038,514 under the PNC Loan, which is secured by liens on all or substantially all of MTS's assets (excluding real property).  The PNC Loan was guaranteed by Robin Mowbray and MWP, an affiliate of the Debtor.  The guaranty from MWP is secured by two real properties that it owns.

MTS has significant debt secured by its equipment.  MTS has approximately 800 pieces of equipment and MTS is a party to approximately 200 equipment agreements.  MTS's equipment includes trucks with 40 to 100-ft aerial platforms and grapple trucks with large cranes to remove debris.  Substantially all of MTS's equipment is leased or financed with several lessors.  MTS's capital lease obligations are secured by the corresponding equipment.  Altec Capital Services, LLC ("**Altec**"), and Bank of America ("**BOA**") are MTS's primary equipment counterparties.

### C.    Events Leading to the Filing of the MTS Case

#### 1.    MTS's Decline in Revenues

By 2021, in response to California's unprecedented wildfire challenges, MTS expanded significantly, employing over 1,300 professionals and managing an additional 500 subcontractors. This period marked MTS's peak in operational capacity and industry presence.

However, 2022 brought significant challenges.  The bankruptcy of PG&E, a major client at that time, led to delayed payments to MTS.  In addition, PG&E used the bankruptcy to renegotiate MTS's contract to a lower price causing severe financial strain.  For these reasons, MTS made the difficult decision to terminate its contract with PG&E.  Towards the end of 2023, another blow came when MTS was not awarded any vegetation management contracts by SCE, resulting in a substantial loss of revenue for 2024.  The loss of PG&E and SCE left MTS grappling with the payroll and excess equipment necessary for servicing these former clients.

Ronnie Jordan ("**Jordan**") disputes MTS's description of the facts herein surrounding the termination of MTS's business relationship with PG&E.  For more information on Jordan's position, parties may contact Jordan's legal counsel, Robert P. Goe of Goe Forsythe & Hodges, LLP, at (949) 798-2460.

As a result of the foregoing, MTS experienced a substantial decline in revenue over the past four years.  MTS's gross revenues and net income or loss on such revenues from 2020 to 2024 are set forth in the table below.  MTS incurred substantial net losses in 2022 and 2023 as MTS worked to transition to a much smaller company.

| Year | Gross Revenue | Net Income/(Loss) |
|------|---------------|-------------------|
| 2020 | $471 million | $70 million |
| 2021 | $282 million | $25 million |
| 2022 | $232 million | ($34 million) |
| 2023 | $125 million | ($114 million)[3] |
| 2024[4] | $39.9 million | ($2,313)[5] |

### 2.    MTS's Efforts to Improve Cash Flow

In light of the financial difficulties facing MTS, it implemented several strategic actions to downsize operations consistent with its reduced revenue, including, among other things:

- Hiring a seasoned financial professional, Ruben Sainos, as its Chief Financial Officer, to analyze MTS's operations and to help lead MTS through its efforts to right-size its operations, address its financial challenges, stabilize its business, and strengthen its cash flow.

- Reducing the salaries of non-union personnel, including executives. The wages of MTS's non-union payroll totaled approximately $705,000 per week as of October 18, 2023.  MTS's payroll is currently approximately $180,000 per week.

- Conducting systematic layoffs of hundreds of employees.  As of October 18, 2023, MTS had approximately 440 employees.  MTS reduced the number of its

---

[3]    This amount includes the booking of the judgment obtained by the Rodriguez Plaintiffs in the amount of $84 million.

[4]    YTD Dec 31, 2024.

[5]    The figures for 2024 are preliminary figures, subject to CPA review and revision.

employees to approximately 180 as of the Petition Date and MTS currently has approximately 85 employees.

- Renegotiating contracts and suspending services and expenses that were no longer needed by the business.  MTS reduced the administrative services it received and moved to lower cost providers related to internet, phone, and IT services.  MTS terminated leases for storing equipment and consolidated stored equipment on other existing storage yards.  MTS also closed a leased satellite office in Sacramento.

In addition to the foregoing, MTS worked with its creditors to reach consensual arrangements where possible.  In 2022, MTS was in default on the PNC Loan.  MTS reached a forbearance agreement with PNC (the "**Forbearance Agreement**").  Under the terms of the Forbearance Agreement, the maturity date was extended to December 31, 2024.  The Forbearance Agreement required certain interim payments to PNC, all of which MTS timely made.

MTS sold or returned idle equipment with the consent of the equipment leasing and financing partners.  Through selling equipment, MTS reduced its monthly lease expense with Altec by approximately $170,000 per month pre-petition. MTS returned all of its leased vehicles with Enterprise, which reduced MTS's monthly leasing cost by another $55,000.  MTS sold equipment leased or financed with BOA worth approximately $4,700,000, and the proceeds were paid directly to BOA to reduce the balance owing.  MTS also sold certain other equipment with the proceeds paid to PNC.  MTS previously had more than three times the amount of equipment than it had as of the Petition Date.

Through all these efforts, MTS made substantial progress downsizing its operations and it markedly improved its cash flow.  MTS's progress can be seen from its financial turnaround from 2023 to 2024.  As reflected in the table above, MTS experienced a net loss of nearly $114 million in 2023, including the judgment obtained by the Rodriguez Plaintiffs in the amount of $84 million. However, in 2024, with substantially less revenue, MTS's operations were essentially break even (inclusive of substantial professional costs).  (*See* Ex. 1.)

Despite MTS's hard work to stabilize its operations, MTS was still carrying debt of the much larger company it once was.  The extended maturity date for the PNC Loan was looming as of the Petition Date and MTS did not expect to have the liquidity needed to pay in full at that time. MTS's equipment debt remained significant and beyond MTS's financial ability to service on the

contracted terms.  MTS was facing many lawsuits and the pending litigation was a drain on resources and there was no end in sight.

In addition, in July 2024, a jury returned a verdict awarding damages of nearly $84 million in favor of the plaintiffs in the matter of *Jaime Rodriguez, et al. v. The Original Mowbray's Tree Service, Inc., et al*. (San Bernardino County Superior Court Case Number CIVDS2003809) (the "**Rodriguez Matter**").  MTS could not satisfy the verdict and any attempt by the plaintiffs to collect a resulting judgment (pending MTS's efforts to pursue a new trial or an appeal) would have been severely disruptive to MTS's operations.

A second jury trial in San Bernardino County Superior Court was scheduled to begin in October 2024 in the matter of *Ronnie D. Jordan v. The Original Mowbray's Tree Service, Inc., et al*. (San Bernardino County Superior Court Case Number CIVSB2201281) (the "**Jordan Matter**").  MWP and Robin Mowbray are named as defendants in the Jordan Matter on alleged "alter ego" and "joint employer" theories.

In light of the other financial difficulties facing MTS, MTS did not believe incurring the significant cost of a trial in the Jordan Matter was warranted.

Against this backdrop, MTS filed the MTS Case to preserve its operations, the jobs of its employees, and the services it provides.  In addition, with the protection of the Bankruptcy Court, MTS sought to continue its efforts to right-size its operations and work towards a more financially stable future, maximize value for the estate and all stakeholders, and to address its legitimate obligations in an orderly, fair, and equitable manner.  During this Case, MTS continued its efforts to work with its lenders and to develop a feasible restructuring plan based on MTS's current cash flow.

As discussed above, Robin Mowbray and MWP were named in the Jordan Matter as defendants.  The Jordan Matter was to proceed to trial.  Both MWP and Robin Mowbray dispute any liability in connection therewith (as does MTS).  However, neither MWP nor Mowbray had the financial wherewithal to fund the cost of defense or to satisfy the alleged damages sought (should Jordan have prevailed).  As such, Mowbray and MWP filed their Cases to protect and preserve the value of their respective assets for the benefit of all legitimate creditors, while

restructuring their obligations in an orderly and fair and equitable manner.

### D.    MTS's Affiliates

MTS has three affiliates, PTS, PTM, and MWP (collectively, the "**Affiliates**").

#### 1.    Pino Tree Service, Inc.

PTS is a wholly owned subsidiary of MTS.  PTS provides Vegetation Management Services.  In May 2022, MTS purchased all of the outstanding shares of PTS from its founder, Jacobus D Pino ("**Pino**"), pursuant to a Stock Purchase Agreement dated May 26, 2022 (the "**PTS Stock Agreement**").  The purchase price was $1,500,000.  Of this sum, $750,000 was paid by MTS in cash up front and $750,000 was reduced to a note payable to Pino (the "**Pino Note**").  Prior to MTS's acquisition of PTS, PTS served as a subcontractor for MTS.  Pino continues to serve as the CEO of PTS.  PTS's largest customer is SCE.

As of December 31, 2024, a balance of $148,104.43 remained due on the Pino Note.  MTS and Pino executed a Security Agreement dated July 1, 2022 (the "**Pino Security Agreement**"), purporting to grant a security interest in 50% of the stock purchased by MTS in PTS.  As provided in the Pino Security Agreement, upon an uncured default thereunder, and depending on the balance owing on the Pino Note at the time of any such uncured default, Pino could assert an entitlement to a percentage of MTS's stock in PTS that was to serve as collateral for the Pino Note in full satisfaction of the balance owing.

The PTS Stock Agreement, the Pino Security Agreement, and any other documents executed by MTS and Pino in connection with MTS's purchase of the stock in Pino shall be collectively referred to as the "**PTS Transaction Documents.**"

Jordan asserts that the Contractors State Licensing Board (the "**CSLB**") reports that Pino "owns 10 percent or more of the voting stock" of PTS.  However, this assertion is based on the page from the CSLB's website attached to the Index as **Exhibit 15**.  According to that page, it appears that the "[e]ffective date" of the statement on CSLB's website that Pino owns 10% or more of PTS is January 10, 2012.  This date is prior to MTS's purchase of 100% of the stock of PTS in 2022.  MTS's position is that, notwithstanding anything to the contrary on the CSLB's website, MTS owns 100% of the stock of PTS.

### a.     The Line of Credit

MTS and PTS are parties to a line of credit agreement dated January 1, 2024 (the "**PTS Loan**").  Pre-petition, MTS provided PTS with the credit line to assist it with its operations and working capital needs.  As of the Petition Date, the balance due by PTS to MTS on the PTS Loan was $10,321,046.44.  Payments by PTS post-petition on account of the PTS Loan are discussed below.

### b.     Management Agreement

MTS and PTS are parties to a Management Fee Agreement dated January 1, 2024 (the "**PTS Management Agreement**").  Under the PTS Management Agreement, MTS provides certain specific services to PTS in exchange for a management fee.

### c.     Equipment Lease

MTS and PTS are parties to a Master Vehicle and Equipment Lease Agreement dated September 27, 2022 (the "**PTS Equipment Lease**").  Under the PTS Equipment Lease, MTS leases certain idle equipment to PTS.  MTS leases the equipment to PTS at MTS's actual cost, plus a markup of 5 to 10% for ancillary costs and a small profit.

### d.     Post-Petition PTS Payments

PTS is making weekly payments to MTS.  In total, post-petition through July 25, 2025, PTS had paid MTS approximately $13,943,099 in management fees, equipment rent, interest, and PTS Loan principal repayments.  On account of the PTS Loan alone, as of July 25, 2025, PTS has paid interest to MTS of approximately $508,958 and principal in the amount of $6,088,000.  The latter amount includes a $4,000,000 lump sum payment on the PTS Loan in December 2024.  As of July 25, 2025, the balance owed by PTS to MTS on the PTS Loan is $4,389,125.  MTS has not loaned PTS any funds post-petition.  MTS projects that the PTS Loan will be paid within two years after the Effective Date.

### 2.     Phoenix Traffic Management, Inc.

PTM is owned by Robin Mowbray.  PTM provides traffic management services pursuant to a contractor's license.  PTS's customers are MTS, PTS, and an unrelated third party.  Certain Vegetation Management Services jobs require outside traffic management services.  As such, the

services that MTS obtained from PTM are services that it would have needed to obtain from a third party.  MTS has not used PTM's traffic management services post-petition to date because it has not had a contract requiring such services.  The cost MTS paid to PTM pre-petition was passed through to MTS's customer.

### a.    The PTM Equipment Lease

MTS leases certain equipment to PTM pursuant to a Master Vehicle and Equipment Lease Agreement dated March 1, 2022 (the "**PTM Equipment Lease**").  MTS leases certain trucks to PTM that it uses to provide traffic management services.  The trucks that MTS leases to PTM would otherwise be idle and MTS leases the trucks to PTM at cost, plus a markup of 5-10% for ancillary costs and a small profit.

### b.    The PTM Loan

Pre-petition, MTS made a loan to PTM (the "**PTM Loan**").  The PTM Loan reflects a combination of advances by MTS to PTM to fund PTM's operating expenses and credits for rent for equipment leased by MTS to PTM when PTM lacked the cash to pay such rent.  The PTM Loan was not memorialized by a written agreement pre-petition.  Post-petition, the CRO, with the assistance of MTS's CFO, evaluated the PTM Loan and implemented repayment terms, including requiring interest at the market rate of prime, plus 2%.  The PTM Loan repayment terms are being reduced to an agreement.

### c.    Post-Petition PTM Payments

During the MTS Case through July 25, 2025, MTS has received approximately $1,407,010 from PTM in management fees, equipment rent, and interest on the PTM Loan, plus $223,000 in repayment of principal on the PTM Loan, for a grand total of $1,630,010.  The balance of the PTM Loan as of July 25, 2025, is $2,350,365.

Jordan asserts there is "wholly inadequate information as to why Robin should retain the profits from PTM while it owes $2.5 million to Mowbray's, nor a reason why it should even be a sister company rather than a wholly owed subsidiary like PTS."  The CRO believes that, based on PTM's current operating losses, PTM, as a wholly owned subsidiary of MTS, may be a liability of MTS, as opposed to creating any additional value for MTS.  Also, as discussed above, under the

MTS Projections, MTS projects that PTM will pay to the MTS Reorganized Debtor approximately $420,000 per year after the Effective Date on account of equipment rent, management fees, and repayment of the PTM Loan.  The claim to collect from PTM the balance of the PTM Loan that is not projected to be paid to the MTS Reorganized Debtor is to be vested in the Plan Trust.

### 3. Mowbray Waterman Property, LLC

MWP is a real estate holding company that owns and leases real property.  Robin Mowbray owns 51% of MWP and the Gloria Mowbray Separate Property Trust (the "**Trust**") owns 49% of MWP.  The current sole beneficiary of the Trust is Robin Mowbray's father.  Robin Mowbray is MWP's managing member.  MWP's assets and liabilities are discussed in more detail below.  MTS leases certain real property from MWP and it made loans to MWP.

Ronnie Jordan believes the assets of the Trust should be disclosed because he asserts that the primary beneficiary of the Trust, Robin Mowbray's father, John Mowbray, is elderly and infirm and Robin Mowbray's presently inchoate interest in the Trust may ripen literally at any moment.

#### a. MWP Loans

MTS provided loans to MWP (the "**MWP Loan**").  As of the MTS Petition Date, MTS was owed $3,889,126.31 from MWP on account of the MWP Loan.

#### b. MWP Real Property Leases

MTS leases certain real property from MWP pursuant to three written lease agreements between MTS and MWP (collectively, the "**MWP Leases**") as follows:

- The second floor of the real property located at 686 E. Mill Dr., San Bernardino, CA 92408 (the "**Mill St. Property**"), constituting of approximately 10,000 square feet, for $10,000 per month, or approximately $1.00 per square foot per month.

- Certain real property parcels from MWP, APNs 0136-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, 0136-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, and 0136-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, to use as a parking yard for $3,000 per month.

- The real property located at 17332 Millwood Dr., Visalia, CA 93292, to use as a parking yard for $1,000 per month.

MTS does not pay rent to MWP in cash.  Rather, prior to MWP filing its own bankruptcy case, each month, a book entry was made against the MWP Loan in the amount of $14,000 for the

monthly rent due under the MWP Leases.  This book entry ceased as of MWP's bankruptcy filing to avoid a technical violation of the automatic stay arising from MWP's petition.

**E.    Summary of MTS's Assets and Liabilities**

**1.    MTS's Assets**

MTS's assets primarily consist of the following:

- Cash;

- Accounts receivable;

- Approximately 800 pieces of financed and leased equipment;

- Three real property parcels (further discussed below);

- The right to any surplus on two letters of credit drawn against by two insurance companies pre-petition;

- MTS's ownership in PTS; and

- MTS's loan receivables from the Affiliates.

MTS's assets are further set forth in the MTS Liquidation Analysis attached to the Index as **Exhibit 4** and the balance sheet included with the MTS Projections attached to the Index as **Exhibit 1**.  (*See* Ex. 1 at 8.)

**2.    MTS's Real Property**

MTS owns three parcels of real property located in San Bernardino.  These parcels have a collective book value of $245,000.  MTS also leases 11 properties (10 in California and 1 in Florida).  This includes the property leased with MWP discussed above.  MTS's leased real property is comprised of office space in California and yards upon which the equipment is stored and maintained.

**3.    MTS's Liabilities**

MTS's primary liabilities consist of the following: (a) the current outstanding balance of the PNC Loan in the approximate amount of $6 million; (b) operating and capital lease obligations that currently collectively total approximately $15.2 million (primarily owed to Altec and BOA);[6]

---

[6]    The approximate balances of the PNC Loan and the operating and capital lease obligations are as of approximately June 30, 2025.

1  (c) trade debt owed to vendors incurred in the ordinary course of operations; and (d) litigation

2  claims, many of which are contingent, disputed, unliquidated, and in unknown amounts.  The

3  litigation claims include claims that are subject to pending litigation that is proceeding post-

4  petition such as the Rodriguez Matter.

5        **F.**     **Summary of MWP's Assets and Liabilities**

6        **1.**     **MWP's Assets**

7       MWP owns the following real properties:  (a) the Mill St. Property; (b) 386 Allen St., San

8  Bernardino, CA 92408 (the "**Allen St. Property**"); (c) 9546 Elder Creek Rd., Sacramento, CA

9  95829 (the "**Elder Creek Property**"); (d) 17332 Millwood St., Visalia, CA 93292 (the "**Millwood**

10  **Property**"); and (e) 171 S. Waterman Ave., San Bernardino, CA 92408 (the "**MWP Waterman**

11  **Yard Property**").

12       The Allen St. Property is 1.9 acres of vacant commercial property comprising five separate

13  parcels (APNs 0136-251-28, 02136-251-29, 0136-251-30, 0136-251-31, 0136-251-40).  The Elder

14  Creek Property is 8.16 acres of vacant commercial property (APN 066-0010-032-000).  There is

15  currently no tenant on either property.  PNC has a lien on both the Allen St. Property and the Elder

16  Creek Property in order to secure MWP's guaranty of the PNC Loan.  Both the Allen St. Property

17  and the Elder Creek Property are listed for sale.  The net proceeds from the sale of either such

18  property would pay down the claim of PNC (asserted against both MWP and MTS).

19       The Millwood Property is a single-family residence comprising two units totaling

20  approximately 2,500 square feet, on a lot of approximately one acre.  In its current condition, the

21  house on the Millwood Property is not habitable.  The Millwood Property is unencumbered.  As

22  discussed above, the Millwood Property is leased to MTS as a parking yard.

23       The Mill St. Property is a commercial building in San Bernardino, California.  As

24  discussed above, the second floor of the Mill St. Property is leased to MTS.  In addition, a portion

25  of the Mill St. Property (*i.e.*, approximately 19,844 square feet primarily on the first floor) is

26  leased to the County of San Bernardino (the "**County**") pursuant to a Lease Agreement between

27  the County and the prior owners of the Mill St. Property.  The term of the lease with the County

28

expired and the County continues to occupy the premises on a month-to-month basis at the rate of $35,124 per month, or approximately $1.77 per square foot per month.

The Mill St. Property was purchased by MWP in July 2020 for $4,600,000. The purchase price was, in part, financed from a loan to MWP by Bank of the Sierra ("**Sierra Bank**") in the amount of $2,990,000 secured by the Mill St. Property. The loan from Sierra Bank was guaranteed by MTS, Mowbray, and Mowbray's now-deceased mother, Gloria Mowbray. MTS advanced $1,821,000 to MWP in connection with the purchase (via three deposits to escrow on February 13, June 25, and July 8, 2020). MWP pays approximately $15,153 to Sierra Bank per month.

The Waterman Yard Property is a group of undeveloped lots used by certain of its affiliates in their operations. The MWP Waterman Yard Property is unencumbered. As discussed above, the Waterman Yard Property is leased to MTS for use as a parking yard.

### 2.    MWP's Liabilities

MWP's debts are primarily compromised of the claims of Sierra Bank, PNC, and MTS (all discussed above). In addition, MWP was named as a defendant in the Jordan Matter. Jordan has filed a claim in the MWP Case in the amount of $63,833,202.00. The Rodriguez Plaintiffs (defined below) have also filed a claim in the MWP Case in the amount of $91,269,853.20.

### G.    Summary of R. Mowbray's Assets and Liabilities

### 1.    Robin Mowbray's Assets

Robin Mowbray's assets are primarily comprised of her ownership interests in three companies: (a) 100% in MTS; (b) 100% in PTM; and (c) 51% in MWP. Robin Mowbray also owns 50% of the real property located at 34086 Avenue H, Yucaipa, CA 92399. The remainder of such real property is owned by her brother. Robin Mowbray asserts an unsecured claim against MTS based on a loan in the amount of approximately $6.2 million. The loan by Robin Mowbray to MTS was made in May and August of 2023, when Robin Mowbray caused two IRS tax refunds due to her (in the amounts of $1,868,882.00 and $3,967,245.84, respectively) to be deposited in MTS's operating account. This claim is to be subordinated under the Plan as part of the Compromise (as defined below) embodied in the Plan.

Robin Mowbray is the remainder beneficiary of the Trust in the event that her father John Mowbray passes away.  Such remainder interest has no current economic value and does not entitle Robin Mowbray to any amount or property.

### 2. Robin Mowbray's Liabilities

Robin Mowbray's liabilities include her guaranties of the PNC Loan and MWP's loan from Sierra Bank.  Robin Mowbray also owes the Trust approximately $22.8 million, secured by all of her interests in MTS based on an April 2021 stock purchase agreement pursuant to which Robin Mowbray acquired 49% of the shares in MTS from the Trust for a purchase price of $29.59 million.  The Rodriguez Plaintiffs and Jordan assert general unsecured claims against Robin Mowbray in the approximate amounts of $91.2 million and $63.8 million, respectively.  Robin Mowbray also has approximately $60,000 in credit card debt.  Finally, the IRS asserts a priority claim against Robin Mowbray in the amount of $180,000.

### H. Significant Events During the MTS Case

#### 1. Bankruptcy Proceedings

##### a. "First Day" Motions

On October 18, 2024, MTS filed the following "first-day" motions: (1) motion for entry of interim and final orders authorizing use of cash collateral [Docket No. 5] (the "**Cash Collateral Motion**"); (2) motion for order authorizing continued used of MTS's bank accounts and cash management system [Docket No. 6] (the "**Cash Management Motion**"); (3) motion for entry of order authorizing payment of certain pre-petition employee-related claims and granting related relief [Docket No. 7] (the "**Payroll Motion**"); (4) motion for order authorizing MTS to continue insurance programs, honor terms of premium financing agreements, satisfy related pre-petition obligations and granting related relief [Docket No. 8] (the "**Insurance Motion**"); (5) motion for order: (a) prohibiting utility providers from altering, refusing or discontinuing service; (b) deeming utilities adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of payment under 11 U.S.C. § 366 [Docket No. 9] (the "**Utilities Motion**").  On October 24, 2024, the Court entered orders granting each of the foregoing motions on an interim basis.  (*See* Docket Nos. 70-74.)  On November 25, 2024, the Court entered orders

1    granting the Cash Management Motion, the Payroll Motion, and the Utilities Motion on a final

2    basis. (*See* Docket Nos. 184-186.)  On December 2, 2024, the Court entered an order granting the

3    Insurance Motion on a final basis. (*See* Docket No. 201.)  On January 24, 2024, the Court entered

4    an order granting the Cash Collateral Motion on a final basis. (*See* Docket No. 268.)

5                    **b.    Employment of Professionals**

6          On November 25, 2024, the Court entered an order authorizing the Debtor to employ

7    Raines Feldman Littrell LLP as MTS's general bankruptcy counsel. (*See* Docket No. 187.)

8          On November 25, 2024, the Court entered an order authorizing MTS to engage Force Ten

9    Partners, LLC to provide Brian Weiss as MTS's CRO and additional advisory personnel to support

10   MTS and the CRO. (*See* Docket No. 188.)

11         On December 17, 2024, the Court entered an order authorizing MTS to employ Grobstein

12   Teeple LLP as MTS's financial advisors. (*See* Docket No. 220.)

13         On December 19, 2024, the Court entered an order authorizing MTS to employ Hilco

14   Valuation Services, LLC to appraise certain machinery and equipment. (*See* Docket No. 223.)

15         On April 16, 2025, the Court entered an order authorizing MTS to establish certain

16   procedures to retain and compensate ordinary court professionals in the ordinary course of

17   business. (*See* Docket No. 409.)

18         On May 5, 2025, the Court entered an order authorizing the Examiner to employ Ringstad

19   & Sanders LLP as the Examiner's counsel. (*See* Docket No. 435.)

20                    **c.    Claims Bar Date**

21         On December 9, 2024, the Court entered a scheduling order setting a bar date of 60 days

22   following service of the bar date notice as the deadline for MTS to serve written notice of the bar

23   date. (*See* Docket No. 206.)  On December 23, 2024, MTS served written notice of the bar date.

24   (*See* Docket No. 235.)  Based on the date of service, the bar date was February 20, 2025 (the

25   "**MTS Claims Bar Date**"). (*See* Docket No. 232.)

26                    **d.    Cash Collateral**

27         In connection with the Court's approval of the Cash Collateral Motion on a final basis,

28   MTS and PNC entered into a stipulation for use of cash collateral that was approved by the Court

[Docket No. 268] (the "**First Cash Collateral Stipulation**").  On May 27, 2025, the Court entered an order authorizing MTS to use cash collateral on a final basis in accordance with the budget attached thereto on the terms and condition of the *Stipulation Authorizing Use of Cash Collateral* [Docket No. 459] (the "**Second Cash Collateral Stipulation**").  On July 14, 2025, the Court authorized MTS to use cash collateral on a final basis in accordance with the budget attached thereto on the terms and condition of the *Stipulation Authorizing Use of Cash Collateral* [Docket No. 532] (the "**Third Cash Collateral Stipulation**").  Among other terms, the First, Second and Third Cash Collateral Stipulations provide for payments by MTS to PNC.  Pursuant to the order approving the Third Cash Collateral Stipulation, MTS is authorized to use cash collateral through October 17, 2025.

### e.    Motion to Reject Unexpired Leases and Servicing Agreement

As part of its continued efforts to downsize, on November 12, 2024, MTS filed the *Motion for Order Authorizing Rejection of Certain Unexpired Leases Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, Effective as of the Petition Date* [Docket No. 166] (the "**Rejection Motion**").  By the Rejection Motion, MTS sought to reject certain unexpired leases and a servicing agreement in order to reduce the amount of leased equipment and the expenses related thereon.  On December 11, 2024, the Court entered an order granting the Rejection Motion.  (*See* Docket No. 212.)

### f.    Motions for Relief From the Automatic Stay

During the MTS Case, four creditors have moved for and obtained stay relief to proceed with certain state court actions.

On February 3, 2025, the Court entered an order granting stay relief to allow the plaintiffs in the Rodriguez Matter to proceed with such matter to final judgment, including any post-trial motions by MTS and any appeals.  (*See* Docket No. 236.)  On January 21, 2025, a judgment was entered in the Rodriguez Matter (the "**Rodriguez Judgment**").  MTS filed a post-trial motion challenging Rodriguez Judgment, which was denied by the superior court.  On May 6, 2025, MTS filed a notice of appeal of the Rodriguez Judgment (the "**Rodriguez Appeal**").

1  On February 3, 2025, the Court entered an order granting stay relief to allow Ronnie

2 Jordan to proceed with trial in the Jordan Matter.  (*See* Docket No. 273.)

3  On February 24, 2025, the Court entered an order granting stay relief to allow Pamela

4 Metcalf-Kunelis to proceed to final judgment in the state court action in *Pamela Metcalf-Kunellis*

5 *v. Sacramento Municipal Utility District and The Original Mowbray's Tree Service, Inc.,* in the

6 Superior Court of California, County of Placer, Case No. S-CV-0049514.   (*See* Docket No. 335.)

7  On March 12, 2025, the Court entered an order granting stay relief to allow Ping Liu and

8 Guifen He to proceed to final judgment in the state court action in *Liu, et al. v. The Original*

9 *Mowbray's Tree Service, Inc., et al.,* in the Superior Court of California, County of Sacramento,

10 Case No. 24CV000478.   (*See* Docket No. 354.)

11  On June 25, 2025, the Court entered an order granting stay relief to AmeriCredit Financial

12 Services, Inc. dba GM Financial authorizing it to apply \$4,914.88 in insurance proceeds to its

13 debt. (*See* Docket No. 504.)

14  Ford Motor Credit Company, LLC, has filed a number of motions for relief from stay, each

15 motion with respect to a single vehicle.  MTS is working to resolve such motions and, if a

16 resolution, is not reached, MTS will be opposing the motions.

17     **g.  The Motions by Debra Danner**

18  On July 24, 2025, Debra Danner filed two motions, which, taken together, seek relief from

19 the automatic stay to commence and litigate a lawsuit in the U.S. District Court for the Western

20 District of North Carolina to liquidate Ms. Danner's asserted personal injury claim against MTS by

21 jury trial.  MTS filed limited responses to Ms. Danner's motions.  MTS did not oppose Ms.

22 Danner's requests for relief from the automatic stay to liquidate her asserted claim in the U.S.

23 District Court for the Western District of North Carolina.

24  Ms. Danner asserts an unliquidated personal injury claim against MTS.  Ms. Danner

25 asserts that her claim in the MTS Case is entitled to administrative priority pursuant to 11 U.S.C. §

26 503(b) because it arose post-petition pursuant to the United States Supreme Court's decision

27 *Reading Co. v. Brown*, 391 US 471, 485 (1968).  According to Ms. Danner, under *Reading Co.*,

28 and cases following it: "the person running the debtor is liable for postpetition torts caused by

negligent or intentional misconduct of the person running the debtor."  Ms. Danner further asserts

that for the Plan to be confirmable any judgment she obtains against MTS must be paid in the full

judgment amount (or if settlement, the full settlement amount) on the Effective Date of the Plan, if

the judgment is final before the Effective Date of the Plan, or must be paid as soon as the

judgment is final, if the judgment is not final by the Effective Date of the Plan.  Ms. Danner

asserts that the accident in question caused her serious personal injury and, in particular, eye and

facial injuries that could be permanent, and that she may obtain a high jury verdict and judgment

against MTS that could be above a million dollars.  Ms. Danner asserts that, absent a settlement, it

may be impossible for MTS to confirm the Plan, unless MTS has liability insurance sufficient to

pay any judgment in Danner's favor and against MTS.  Ms. Danner's bankruptcy attorney and

personal injury attorney have each requested information from MTS regarding the amount of

insurance available.

MTS does not believe that it will have any liability for Ms. Danner's claim and asserts that

it has zero fault or responsibility for the accident involving Ms. Danner.  From MTS's perspective,

this fact is confirmed by the police report from the incident, which is attached to the Index as

**Exhibit 14**.  MTS provided Ms. Danner's counsel with the applicable insurance policy and has

reached out to Ms. Danner's counsel to explore settlement as Ms. Danner requested.  MTS intends

to continue settlement discussions with Ms. Danner through counsel with the hope that a

settlement can be reached.  MTS does not believe that Ms. Danner's asserted claim is an

impediment to confirmation of the Plan.  MTS reserves any and all rights with respect to the

allowance and priority of any judgment obtained by Ms. Danner against MTS (should a judgment

be obtained).  Ms. Danner has not filed a proof of claim in the MTS Case.

### h.  The Judgment Creditors' Trustee and Substantive Consolidation Motion

On February 7, 2025, judgment creditors Jaime Rodriguez and Ana Lidia Gomez (together,

the "**Rodriguez Plaintiffs**") filed the *Motion to Appoint a Chapter 11 Trustee Pursuant to 11*

*U.S.C. § 1104(a); and a Motion to Substantively Consolidate Pino Tree Services, Inc., Mowbray*

*Waterman Property, LLC, and Phoenix Traffic Management, Inc. With the Debtor's Bankruptcy*

*Case* [Docket No. 286] (the **"Trustee and Substantive Consolidation Motion"**).  By the Trustee and Substantive Consolidation Motion, the Rodriguez Plaintiffs sought multiple forms of relief, *i.e.*, the appointment of a trustee in MTS's Case and substantive consolidation of MTS, MWP, PTS, and PTM.  Moreover, the Rodriguez Plaintiffs sought such relief based on very serious allegations of misconduct, allegations that, from the Debtors' perspective, were not true.

The Trustee and Substantive Consolidation Motion was opposed by MTS, PTS, MWP, PNC, and Sierra Bank.  (*See* Docket Nos. 308, 310, 312, 314 and 345.)  MTS opposed all of the relief requested in the Trustee and Substantive Consolidation and did so vigorously.  MTS and MWP opposed the Trustee and Substantive Consolidation Motion because they believed that the allegations therein were not true and that the required legal standards were not satisfied as set forth in their respective oppositions.  In the introduction of MTS's opposition to the Trustee and Substantive Consolidation Motion, MTS argued the following:

> The Motion should be summarily denied. The Motion is premised on inaccurate statements of fact and misleading allegations, all of which were recklessly made (if not intentionally so) and without the type of careful inquiry and reasonable basis required under Rule 9011 of the Federal Rules of Bankruptcy Procedure. The story told by the Movants is only that—a story. It is not true and is far from it. The Movants' allegations are contrary to the evidence in their possession and are not supported by the exhibits that they cite. The Movants' requests for relief fail (and do so miserably) under the exacting legal standards required.

On March 14, 2025, the Court entered an order denying the Trustee Motion and directing the United States Trustee to appoint an examiner (the **"Examiner Order"**).  (*See* Docket No. 362.)  On March 18, 2025, the Court entered an order appointing Donald T. Fife as the examiner (the **"Examiner"**).  The Examiner's report was filed on July 14, 2025 [Docket No. 538] (the **"Report"**).  As discussed in the Report, MTS and its restructuring team discussed potential amendments to the Plan to improve the treatment afforded to the Holders of General Unsecured Claims.  (*See* Report at 24:1-9.)  The treatment herein reflects the discussions with the Examiner and his counsel, in addition to the negotiations with the Rodriguez Plaintiffs.

From the Debtors' perspective, the Report vindicated the Debtors.  In many respects, the Debtors assert that the Examiner found that the allegations in the Trustee and Substantive

1    Consolidation Motion were not accurate, and that MTS's responses were true.  Among other things,

2    the Examiner found that MTS did not engage in a concerted plan to transfer assets and revenues to

3    its subsidiary, PTS.  The Examiner also did not find that MTS was promoting the interests of its

4    affiliates at the expense of its creditors and bankruptcy estate.

5        With respect to the substantive consolidation of MWP and MTS, the Report stated that "***[a]

6    strong argument can be made for substantive consolidation of MWP with [MTS].***" (*See* Report

7    at 23:9-11 (emphasis in original).)  The Examiner also stated that there "***would appear to be few if

8    any adverse consequences to either MWP or its creditors or [MTS] and its creditors by

9    substantively consolidating the two entities.  The Examiner therefore believes that substantive

10    consolidation of MWP with the estate of [MTS] should be given strong consideration***." (*See*

11    Report at 23:20-23 (emphasis in original).)

12        The Plan provides for the substantive consolidation of MWP and MTS.  As suggested by

13    the Examiner, the Debtors gave the substantive consolidation of MTS and MWP strong

14    consideration.  In addition, the Debtors agreed to the consolidation of MTS and MWP in connection

15    with the compromise embodied in the Plan with the Rodriguez Plaintiffs.  The Debtors believe that

16    substantive consolidation is in the best interests of the respective estates of both MWP and MTS

17    and that the applicable legal requirements for the Court to approve substantive consolidation of

18    MWP and MTS pursuant to the Plan and the Rodriguez Compromise can be satisfied.  Moreover,

19    the Debtors believe that the substantive consolidation of MWP and MTS can be approved without

20    any Debtor taking inconsistent positions and without any person who submitted a declaration in

21    support of MTS's opposition to the Trustee and Substantive Consolidation Motion recanting their

22    testimony.  The Debtors do not request that the prior position of MWP or MTS in relation to the

23    Trustee and Substantive Consolidation Motin be totally disregarded in an about-face (as Ronnie

24    Jordan contends).  The Debtors believe the Plan can be confirmed whether the MWP Consolidation

25    is approved or not and the treatment in the Plan will not change.

26        In contrast, Ronnie Jordan asserts that the economic value of MWP is being gifted to MTS

27    and, in particular, to the Rodriguez Plaintiffs, for no consideration.  Ronnie Jordan asserts that he

28    is the only general unsecured creditor of MWP and that he is being discriminated against and

harmed economically by the substantive consolidation of MWP and MTS.  Ronnie Jordan asserts that MTS, MWP, and the Rodriguez Plaintiffs are barred by judicial estoppel from seeking the substantive consolidation of MWP and MTS.  The Debtors disagree with Ronnie Jordan's position.

### i.    Plan Support Agreements and Settlements

MTS has reached Plan Support Agreements with two parties.  First, MTS entered into a Plan Support Agreement with Pathward, which was approved by the Court by order entered on July 18, 2025 [Docket No. 561].  Second, MTS and Altec entered into a Plan Support Agreement on or about July 29, 2025.  MTS also reached an agreement in principle with the Rodriguez Plaintiffs, the terms of which are incorporated into the Plan.

### j.    MTS's Schedules and Monthly Operating Reports

MTS is in compliance with all of its duties under 11 U.S.C. §§ 521, Federal Rule of Bankruptcy Procedure ("FRBP") 1006 and 1007, and the applicable Guidelines of the OUST.

On November 15, 2024, MTS filed its Schedules and SOFA.  (*See* Docket No. 170.) Additionally, pursuant to FRBP 2015.3, MTS is required to file reports of financial information on non-debtor entities in which he holds a controlling or substantial interest (the "**Rule 2015.3 Report**").  On December 19, 2024, MTS filed its first Rule 2015.3 Report.

MTS's 341(a) meeting of creditors was completed on January 3, 2025.  (*See* Docket No. 242.)  MTS has timely paid quarterly United States Trustee's fees and has filed its monthly operating reports.

### 2.    Jordan's Motion to Terminate Exclusivity

On July 16, 2025, Jordan filed the *Motion By Creditor Ronnie Jordan for Order Terminating Debtor's Periods of Exclusivity for the Filing of a Plan and Obtaining Acceptance Thereof, So As to Permit the Filing of a Competing Plan By Jordan's Mowbray Acquisition LLC* [Docket No. 540] (the "**Motion to Terminate Exclusivity**").  MTS filed its opposition to the Motion to Terminate Exclusivity on July 23, 2025.  (Docket No. 575.)  The Court continued the hearing on the Motion to Terminate Exclusivity from August 6, 2025, to September 10, 2025.

On August 12, 2025, MTS filed a motion to extend its exclusivity to solicit acceptances on the Plan from August 15, 2025 to December 15, 2025.

**3.** **MWP and Robin Mowbray Bankruptcy Proceedings**

**a.** **Employment of Professionals**

On April 8, 2025, the Court entered separate orders authorizing MWP and Robin Mowbray to employ Elkins Kalt Weintraub Reuben Gartside LLP as their general bankruptcy counsel.  (*See* Docket No. 41 in Case No. 8:25-bk-10542-SC and Docket No. 39 in Case No. 8:25-bk-10543-SC.)

On April 28, 2025, the Court entered an order authorizing MWP to employ Lee & Associates Walnut Creek Commercial Real Estate Services, Inc. and Lee & Associates Commercial Real Estate Services, Inc. – Riverside as brokers to market and sell the Elder Creek Property and Allen St. Property, respectively.  (*See* Docket No. 61 in Case No. 8:25-bk-10542-SC.)

On May 22, 2025, the Court entered an order authorizing MWP to employ Keller Williams Realty Tulare County as broker to market and sell the Millwood Property.  (*See* Docket No. 70 in Case No. 8:25-bk-10542-SC.)

On July 22, 2025, MWP filed a motion for an order authorizing MWP to establish certain procedures to retain and compensate ordinary court professionals in the ordinary course of business.  (*See* Docket No. 99 in Case No. 8:25-bk-10542-SC.)

**b.** **Claims Bar Date**

On May 15, 2025, MWP and Robin Mowbray served written notice of the July 14, 2025, claims bar date in their cases.  (*See* Docket No. 65 in Case No. 8:25-bk-10542-SC and Docket No. 56 in Case No. 8:25-bk-10543-SC.)

**c.** **Cash Collateral**

MWP and Sierra Bank have entered into two stipulations for use of cash collateral that have been approved by the Court.  (*See* Docket Nos. 24 and 92 in Case No. 8:25-bk-10542-SC.) The current cash collateral budget runs through the week of September 26, 2025.

**d.** **Cash Collateral**

On April 9, 2025, Jordan filed motions for relief from the automatic stay in the MWP Case and RM Case to proceed with the Jordan Matter to judgment.  The parties entered into multiple

28

stipulations to continue the hearing on that motion to engage in settlement discussions and attend a mediation with the Honorable Martin Barash.  (*See* Docket Nos. 55 and 75 in Case No. 8:25-bk-10542-SC.)  Several weeks before the mediation was to take place, Jordan withdrew from the mediation.  MWP and Robin Mowbray have filed oppositions to Jordan's motions for relief from stay.  A hearing on those motions is scheduled for August 20, 2025.

### e.    Jordan Adversary Proceeding

On June 26, 2025, MWP filed a complaint against Jordan commencing the adversary proceeding entitled *Mowbray Waterman Property, LLC v. Jordan, et al.*, Adv. No. 8:25-ap-01249-SC (the "**Jordan Adversary Proceeding**").  By its complaint, MWP seeks to avoid and recover the pre-petition transfer of its real property located at 1515 Lucas Lane, Redlands, CA 92374 (the "**Lucas Lane Property**") from Jordan, to disallow Jordan's claim under § 502(d) of the Bankruptcy Code, and for equitable subordination of Jordan's claim under § 510(c) of the Bankruptcy Code.

On July 28, 2025, Jordan filed a motion to dismiss MWP's complaint, which MWP has opposed.  A hearing on Jordan's motion to dismiss is scheduled for August 20, 2025.

### 4.    Other Proceedings

#### a.    Potential Avoidance Actions

Attached to the Index as **Exhibit 7** is MTS's SOFA, which includes all payments made to creditors during the 90-day period prior to the MTS Petition Date and certain other pre-petition transfers within the one-year and two-year periods prior to the MTS Petition Date based on MTS's books and records.

Attached to the Index as **Exhibits 8** and **9** are the MWP SOFA and the Mowbray SOFA, respectively, which includes all pre-petition payments made by MWP and Robin Mowbray for the periods detailed therein.

In addition, attached to the Index as **Exhibit 10** is a schedule (the "**Insider Payment Schedule**") prepared by MTS from its books and records of payments to or for the benefit of any insider within the four-year period prior to the Petition Date (collectively, the "**Insider Payments**").  The Insider Payment Schedule includes the payments listed in MTS's SOFA.

Avoidance Actions may exist against some or all of the creditors, insiders, or other transferees listed in the aforementioned SOFAs or the Insider Payment Schedule, and, unless expressly released by the Plan, all Avoidance Actions under 11 U.S.C. §§ 544 through 550, including, but not limited to, claims for the recovery of preferential transfers or fraudulent transfers, are hereby reserved against all entities for the benefit of the Estates.  The omission of the identity of a recipient of a potentially avoidable and recoverable transfer or of a particular payment from **Exhibits 7** through **10** is unintentional and shall not be deemed a waiver of the right of the estates to recover any distribution(s), payment(s), or transfer(s) from any entity under any provision of the Bankruptcy Code.  It is possible that a significant majority of the payments are either not avoidable under the legal standards of the Bankruptcy Code or subject to a valid affirmative defense.

MTS timely filed proofs of claim in the RM Case and the MWP Case to preserve any claims the MTS Estate may have, including based on payments reflected in the Insider Payment Schedule.

As more fully described in Section III.F.3. below, under the Plan, certain Insider Avoidance Actions are being released in connection with the compromise embodied in the Plan. Any Insider Avoidance Actions, which are not Released Claims, and the Loan Causes of Action against PTM (excluding the Excluded Claims) will vest in the Plan Trust and the Plan Trustee shall have the authority to investigate and, if appropriate, pursue such actions in accordance with the Plan Trust Agreement attached to the Index at **Exhibit 17**.  Any Net Recoveries on the Trust Causes of Action will be paid to the Holders of Allowed General Unsecured Claims on a *pro rata* basis.  This is in addition to such Holders' Pro Rata Distribution of the GUC Payment Amount.

### I.     Historical and Current Financial Condition

MTS's unaudited financial statement for the year ending December 31, 2024, is included with the Projections.  (*See* Ex. 1 at 5.)  In 2024, MTS generated revenues of $39,886,026 and incurred operating expenses of $28,780,892.  MTS's operations were essentially breakeven, resulting in a small net loss of $2,313.  (*See id.*)  By comparison, in 2023, MTS experienced a net loss of $28.9 million (with higher revenues).  Thus, MTS's operations in 2024 marked an

1   improvement from the significant losses in the preceding years.  Moreover, the small net loss in

2   2024 is inclusive of extraordinary accrued professional fees, interest, and depreciation.  (*See id.*)

3       During this MTS Case, MTS's net cash flow has continued to strengthen.  From the MTS

4   Petition Date through August 1, 2025, MTS has generated positive cumulative operating cash flow

5   of approximately $11.8 million.  MTS has, post-petition through August 1, 2025, increased its

6   cash on hand from approximately $4.2 million to approximately $9.9 million.  This is so

7   notwithstanding a projected decline in MTS's annual tree service revenues from 2024 to 2025 due

8   to the completion of MTS's contract with Sacramento Municipal Utility District.  MTS's post-

9   petition receipts from PTS and PTM have contributed substantially to MTS's improved post-

10  petition cash flow.  As of August 1, 2025, MTS has received approximately $15.3 million from

11  PTS and PTM.  MTS's most recent MOR is attached to the Index as **Exhibit 6.**

12      MTS's net positive performance is projected to continue after the Plan is confirmed.

13  Attached to the Index as **Exhibit 1** are MTS's projections of its post-Effective Date operations

14  through the term of the Plan.  With the exception Year 1, in which significant accrued

15  restructuring costs are expected to be paid, the MTS Reorganized Debtor is projected to generate

16  net income on an annual basis.  (*See* Ex. 1 at 5.)  The MTS Reorganized Debtor's projected net

17  income, in large part, is due to the projected amounts from PTS and PTM.  The MTS Reorganized

18  Debtor's tree service revenues are projected to remain steady at just over $9.3 million per year.

19  (*See id.*)  MTS's projected decline in annual tree service revenue from 2025 to 2026 is due to the

20  exclusion of work from FEMA, which is tied to disaster relief.  The MTS Reorganized Debtor is

21  projected to receive management fees and equipment rent from PTS and PTM in the amount of

22  approximately $10.3 million and $420,000, respectively, per year.  (*See id.*)  MTS and PTS are

23  actively pursuing new customers.  The MTS Reorganized Debtor is also to receive significant

24  additional distributions from PTS, which are projected to collectively exceed $6.0 million over the

25  term of the Plan.  (*See id.* at 11.)  PTS is projected to repay the PTS Loan within two years after

26  the Effective Date.

27      MTS's assets and their estimated values are discussed in the MTS Liquidation Analysis

28  attached to the Index as **Exhibit 4**.

MWP's assets and their estimated values are discussed in the MWP Liquidation Analysis attached to the Index as **Exhibit 5**.

Robin Mowbray's assets and their estimated values are discussed in the Robin Liquidation Analysis attached to the Index as **Exhibit 6**.

**J.**      **Steps Taken to Resolve Financial Problems**

MTS's financial distress was caused by a loss of revenues, resulting in outsized expenses, the financial drain from pending litigation, and the threat of business disrupting judgment collection. Due to MTS's decline in revenues, its funded debt, inclusive of the debt tied to MTS's numerous equipment leases and loans, was not sustainable without the restructuring a bankruptcy plan can provide.

Beginning pre-petition, MTS initiated a number of strategic actions to right-size operations consistent with its reduced revenue as discussed above. This process has continued post-petition. MTS rejected leases for unnecessary equipment and continued to fine tune its operations in order to generate positive cash flow. MTS has also sold some unnecessary equipment. MTS has continued its efforts to secure new customers. MTS's post-petition tree service revenues include work from new customers secured in 2024. In addition, as discussed above, MTS is collecting on the pre-petition loans owed by PTS and PTM. MTS is receiving meaningful weekly payments from PTS and PTM on account of management fees and equipment rent. Due to these efforts, MTS has increased its cash on hand during the MTS Case. The filing of the MTS Case also halted litigation and the cash burn related thereto, allowing MTS to focus on its rehabilitation. The Plan provides a mechanism for preserving MTS's operations and the value of MTS's business.

The Plan enables MTS to restructure its secured debt on economically viable terms based on MTS's current and projected receipts. Following the Effective Date, the Reorganized Debtor will continue to receive substantial sums from PTS and PTM.

To assist MTS in improving its cash flow, prior to the MTS Petition Date, Robin Mowbray substantially reduced her salary from MTS, which resulted in Robin Mowbray operating at an unsustainable negative cash flow of her own. Since that time, Robin Mowbray has adjusted her income and expenses such that she is operating on a cash flow-positive basis. Additionally, the

filing of the MWP Case and the RM Case stayed the litigation proceeding against MWP and

Robin Mowbray, and has enabled Robin Mowbray to allocate her financial resources away from

litigation and towards a reorganization and restructuring of her debts.

III.    **PLAN SUMMARY**

The following is a summary of the Plan's material provisions.

A.    **The Plan Provides for a Reorganization of the Debtors and Their Affairs**

The Plan is a reorganizing plan.  The Plan consolidates the Estates and of MTS and MWP

and reorganizes the respective affairs of MTS, MWP, and Robin Mowbray on the terms of the

Plan.  Any Distributions on account of Allowed Secured Claims will be made by the applicable

Reorganized Debtor.  Distributions to the Holders of Allowed Unsecured Claims against MTS or

MWP will be made by the Plan Trust and against Robin Mowbray will be made by Robin

Mowbray.  No Distributions will be made to the Holders of any Disputed Claims in any of the

Cases unless and until they become Allowed Claims.

B.    **The Plan Treats Claims Against All Three Estates**

The Plan provides treatment for the Claims against each of the Debtors' Estates.  As

detailed in Section III.F.5. below, the Plan provides for the substantive consolidation of MWP

(and its assets and liabilities) with the MTS Reorganized Debtor as of the Effective Date.  The

Plan contains essentially two (2) separate plans of reorganization, one for MTS and MWP, as

substantively consolidated, and one for Robin Mowbray.  Creditors asserting the same Claim

against more than one Estate or Debtor will receive only one satisfaction of such Claim.

Unless otherwise expressly provided in the Plan, no Distributions will be made and no

rights will be retained on account of any Claim or Interest that has not become an Allowed Claim

or Allowed Interest.

C.    **What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various

Classes according to their right of priority.  The Plan states whether each Class of Claims or

Interests is impaired or unimpaired.  The Plan provides the treatment each Class will receive.  In

no event shall any creditor receive more than the creditor's Allowed Claim.

### D. **Allowance and Treatment of Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class:

### 1. **Administrative Claims**

Administrative Claims are Claims for costs or expenses of administering the Debtors' Chapter 11 cases which are allowed under § 507(a)(2) of the Bankruptcy Code. The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following chart lists all the Debtors' estimated § 507(a)(2) administrative claims and their treatment under this Plan:

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtors, including Administrative Tax Claims | Varies by day | Unless a Debtor objects to an Ordinary Course Administrative Claim asserted against that particular Debtor, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of the applicable Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |
| Clerk's Office | $0 | Any outstanding Clark's Office fees will be paid in full on the Effective Date from the cash of the applicable Debtor. |
| OUST Fees | $0 | Any outstanding OUST Fees will be paid in full on the Effective Date from the cash of the applicable Debtor. |
| Administrative Tax Claims | $0 | Unless a Debtor objects to an Administrative Tax Claim asserted against that Debtor, each Administrative Tax Claim shall be allowed and paid in the ordinary course of that Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave |

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| | | rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim. |
| Debra Danner | Unliquidated | Debra Danner asserts an unliquidated personal injury Claim against MTS arising post-petition (the "**Danner Claim**"). Any Allowed Administrative Claim of Debra Danner against MTS in excess of any amounts paid to Ms. Danner from insurance shall be paid in full upon later of (a) the Effective Date, and (b) the entry of a Final Order pursuant to which Ms. Danner's Claim becomes an Allowed Administrative Claim against MTS. |

| Professional Fee Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed[7]** | **Treatment** |
| Raines Feldman Littrell LLP, general bankruptcy counsel | $530,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Grobstein Teeple LLP | $60,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Force Ten Partners, LLP | $330,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Examiner | $250,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as |

---

[7] These amounts are only estimates (including future estimates as of confirmation) and are subject to change. The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower.

| Professional Fee Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed[7]** | **Treatment** |
| | | otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Elkins Kalt Weintraub Reuben Gartside, LLP, general bankruptcy counsel for MWP | $210,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MWP Reorganized Debtor and the Professional. |
| Elkins Kalt Weintraub Reuben Gartside, LLP, general bankruptcy counsel for Mowbray | $75,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the RM Reorganized Debtor and the Professional. |
| **Total** | $1,455,000 | |

The following applies to Administrative Claims asserted against the Estate:

### a.    <u>Ordinary Course Administrative Claims</u>

Unless the MTS Reorganized Debtor or the RM Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim. However, any request for payment, or motion to allow a Claim as an Ordinary Course Administrative Claim must be filed with the Bankruptcy Court and served on the applicable Reorganized Debtor and the OUST by no later than sixty (60) days after the Effective Date.

### b.    <u>Non-Ordinary Course Administrative Claims</u>

A Non-Ordinary Course Administrative Claim will be paid by the applicable Reorganized Debtor on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the applicable Reorganized Debtor to the extent that it is allowed by the Bankruptcy Court

only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both files with the Bankruptcy Court a request for allowance and payment of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel for the applicable Reorganized Debtor and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows the Non-Ordinary Course Administrative Claim.

Any party-in-interest, including, but not limited to, the applicable Reorganized Debtor, may file an objection to such a request for payment within the time provided by the Bankruptcy Rules or within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course Administrative Claims who do not timely file and serve a request for payment will be forever barred from asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estates, the Debtors, the Reorganized Debtors, the Plan Trust, the Plan Trustee, or their respective assets.

**c.**     **Professional Fee Claims**

A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the Effective Date (or such further date if extended by Court order), the Person holding the Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of the Bankruptcy Court. The Reorganized Debtors or any other party-in-interest may file an objection to such an application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do not timely file and serve an application for allowance and payment will be forever barred from asserting these Claims against the Estates, the Debtors, the Reorganized Debtors, the Plan Trust, the Plan Trustee, or their respective assets.

Allowed Administrative Claims (Ordinary Course, Non-Ordinary Course, and Professional Fee Claims) of MTS or MWP will be paid by MTS, as MTS and MWP are being consolidated. Allowed Administrative Claims (Ordinary Course, Non-Ordinary Course, and Professional Fee Claims) of Robin Mowbray will be paid by Robin Mowbray.

### 2. Priority Tax Claims

Priority Tax Claims include certain unsecured income, sales, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code requires that each holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five years from the order for relief, unless the holder agrees to a different treatment.

The following charts list the Debtors' known section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Priority Tax Claims – MTS & MWP | | |
| --- | --- | --- |
| **Description** | **Estimated Amount Owed** | **Treatment** |
| California Department of Tax and Fee Administration ("**CDTFA**") | Claim Amount: $213.00 per Proof of Claim No. 161-2 filed by the CDTFA<br><br>Priority Claim Amount: $213.00 per Proof of Claim No. 161-2 filed by the CDTFA | Any Allowed Priority Tax Claim of the CDTFA will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the CDTFA is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>MTS shall have the right to prepay any Allowed Priority Tax Claim of the CDTFA in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the CDTFA will receive the treatment afforded to Allowed Claims in Class 16. |
| Internal Revenue Service ("**IRS**") | Claim Amount: $0.00[8]<br><br>Priority Claim Amount: $0.00 | The proof of claim filed by the IRS, Proof of Claim 37-1, is for payroll taxes for the tax period ending December 31, 2024. Because those taxes have been paid, the IRS will not receive a further recovery on the Claim it asserts through Proof of Claim 37-1. |

---

[8] The IRS filed Proof of Claim 37-1 in the amount of $63,589.17. However, this sum was paid.

| Priority Tax Claims – MTS & MWP | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | Excluding the Claim asserted through Proof of Claim 37-1, any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>MTS shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| State of Florida – Department of Revenue (**"State of Florida"**) | Claim Amount: $14.00 per Proof of Claim 142-1<br><br>Priority Claim Amount: $14.00 per Proof of Claim 142-1 | Any Allowed Priority Tax Claim of the State of Florida will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the State of Florida is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>MTS shall have the right to prepay any Allowed Priority Tax Claim of the State of Florida in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the State of Florida in excess of an Allowed |

| Priority Tax Claims – MTS & MWP | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

| Priority Tax Claims – Robin Mowbray | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| IRS | Claim Amount: $180,000.00<br><br>Priority Claim Amount: $180,000.00 | The proof of claim filed by the IRS, Proof of Claim 4-1, is for estimated income taxes for the tax period ending December 31, 2024.<br><br>Any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>Ms. Mowbray shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in her sole and absolute discretion. |

| Priority Tax Claims – Robin Mowbray | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Ms. Mowbray Class 4. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

### E.    Allowance and Treatment of Classified Claims and Interests

#### 1.    Summary of Classes

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The chart below lists Classes of Claims and Interests established under the Plan and indicates whether the Class is impaired or unimpaired by the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| Summary of Classes -MTS & MWP | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of PNC Bank, N.A. |
| 2 | Secured Claim of Jacobus Pino |
| 3 | Secured Claim of Albach Finanz AG |
| 4 | Secured Claim of Ally Bank |
| 5 | Secured Claim of Altec Capital Services, LLC |
| 6 | Secured Claim of FNB |
| 7a and b | Secured Claim of Pathward, National Association |
| 8 | Secured Claim of U.S. Bank Equipment Finance |
| 9 | Secured Claim of Bank of America, N.A. |

| Summary of Classes -MTS & MWP | |
|---|---|
| 10 | Secured Claim of Ford Motor Credit Company, LLC |
| 11 | Secured Claim of General Motors |
| 12 | Secured Claim of John Deere |
| 13 | Secured Claim of Hanmi Bank |
| 14 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 15 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 16 | General Unsecured Claims |
| 17 | Secured Claim of Sierra Bank |
| 18 | Secured Claim of Sacramento County Tax Collector |
| 19 | IBEW Local #47 |
| 20 | Subordinated Insider Claims |
| 21 | Interest Holder |

| Summary of Classes -Robin Mowbray | |
|---|---|
| Class | Claimant(s) |
| 1 | Secured Claim of the Trust |
| 2 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 3 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 4 | General Unsecured Claims |
| 5 | Interest Holder |

## 2. Secured Claims -MTS & MWP

Secured Claims are Claims secured by valid liens on property of the Estate.

### a. Secured Claim of PNC Bank

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | PNC Bank, N.A.<br><br>• Collateral: the PNC Collateral<br><br>• Total Claim Amount: $7,038,514.41 as of the Petition Date per the Cash Collateral Stipulation.<br><br>• Interest Rate: 6.57% | N | Y | PNC shall have an Allowed Secured Claim on the Effective Date in the amount that PNC is owed on such date under the PNC Loan Documents, inclusive of any interest at the non-default rate of 6.57% and reasonable costs and attorney's fees that accrue prior to the Effective Date and to which PNC is entitled in accordance with the terms of the PNC Loan Documents, the Cash Collateral Stipulation, and 11 U.S.C. § 506(b), less any recoveries, including Other Recoveries, and payments received by PNC before or after the Effective Date (the "**Allowed PNC Secured Claim**").  MTS projects that the Allowed PNC Secured Claim will total approximately $4,547,636 as of the Effective Date.[9]  The MTS Reorganized |

---

[9]    This is the amount MTS projects the PNC balance to be as of the Effective Date, inclusive of budgeted post-petition payments, and includes an estimate of $500,000 in legal fees.

| | | | | Secured Claim of PNC Bank |
| --- | --- | --- | --- | --- |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Debtor shall pay the PNC Secured Claim in full as follows:<br><br>**A. Effective Date Payment**:  Within ten (10) Business Days after the Effective Date, the MTS Reorganized Debtor shall make a payment to PNC on account of the PNC Secured Claim in the amount of $2,000,000 (the **"PNC Effective Date Payment"**).<br><br>**B. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the PNC Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $113,568.23 (a **"PNC Monthly Payment"**).<br><br>**C. Maturity Date**:  The MTS Reorganized Debtor shall pay the PNC Secured Claim in full by the date that is two (2) years after the Effective Date (the **"PNC Maturity Date"**).  MTS currently projects that if either real property that currently serves as PNC's collateral for PNC's loan to MTS is sold within the first year after the Effective Date, then the Allowed PNC Secured Claim shall be paid in full by such time.<br><br>**D. Interest Rate**: 6.57% per annum simple interest.<br><br>**E. Other Recoveries**.  If and to the extent that PNC receives any Other Recoveries on account of the PNC Secured Claim, then the PNC Secured Claim as to the MTS Reorganized Debtor shall be automatically reduced accordingly by the amount of such Other Recoveries.<br><br>**F. Default**:  If the MTS Reorganized Debtor fails to make the PNC Effective Date Payment or a PNC Monthly Payment to PNC when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by PNC to the MTS Reorganized Debtor and its counsel (collectively, an **"Uncured PNC Default"**), then PNC may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the PNC Collateral permitted under the PNC Loan Documents.  The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**G. Plan Controls**:  If and to the extent that there is a conflict between the PNC Loan Documents and the Plan, the Plan shall control. |

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **H.  Lien**.  PNC shall retain the PNC Security Interests in the PNC Collateral in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed PNC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed PNC Secured Claim, PNC's Security Interests shall be released and the MTS Reorganized Debtor shall retain title to the PNC Collateral free and clear of the PNC Security Interests. |
| | | | | **I.  Real Estate Collateral**.  Upon the close of escrow of the Allen Street Property and the Elder Creek Property, the net sale proceeds from such sale(s) shall be paid from escrow to PNC on account of the Allowed PNC Secured Claim. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the PNC Secured Claim. |

### b.    Secured Claim of Jacobus Pino

| Secured Claim of Jacobus Pino | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2 | Jacobus Pino<br><br>• Collateral: Ownership interests in PTS<br><br>• Total Claim Amount: $148,104.43<br><br>• Interest Rate: 0.75% | N | Y | Jacobus Pino asserts a Claim in the amount of $148,104.43 on account of the remaining balance owed on the Pino Note (the "**Pino Claim**").  As a compromise, including Pino waiving and releasing as of the Effective Date (i) any interest or fees to which Pino asserts he is entitled under the PTS Transaction Documents, and (ii) any right to assert that he is entitled to any portion of MTS's ownership interests in PTS, the MTS Reorganized Debtor shall pay the Pino Claim in full as follows:<br><br>**A.  Monthly Payments:** Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Pino Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $21,210.70.  The Pino Claim shall be paid in seven (7) equal monthly payments of $21,210.70.  The Pino Claim shall not accrue interest on or after the Effective Date.<br><br>**B.  Plan Controls**: If and to the extent that there is a conflict between the PTS Transaction Documents and the Plan, the Plan shall control. |

| Secured Claim of Jacobus Pino | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **C. Lien**.  Any valid, enforceable, perfected, and unavoidable lien(s) held by Pino in any assets of the MTS Estate shall be retained by Pino in and to the same extent, validity, and priority as of the Petition Date pending payment of the Pino Claim in full as provided herein. Upon full satisfaction of the Pino Claim, any and all liens of Pino on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of Pino's liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Pino Claim. |

c.  **Secured Claims Related to Vehicles or Equipment**

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 3 | Albach Finanz AG<br><br>• Collateral: the "Machine" as defined in Exhibit A of Albach's proof of claim, Claim No. 144-1 (the "**Albach Collateral**")<br><br>• Total Claim Amount: $81,500.00 (projected as of the Effective Date) | N | Y | Class 3 consists of the Secured Claim of Albach Finanz AG ("**Albach**").  The Claim of Albach arises from the Operate Lease Agreement attached as Exhibit A (the "**Albach Agreement**") to its Proof of Claim No. 144-1.  The treatment herein is for all Claims asserted by Albach.<br><br>Albach shall have an Allowed Secured Claim in the collective amount of $81,500 as of the Effective Date, based on the net present value of the future payments due under the Albach Agreement, as calculated by MTS (the "**Allowed Albach Secured Claim**").[10]  Under no circumstances shall Albach receive more than the Allowed Albach Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Albach Secured Claim arising thereunder shall be paid as follows:<br><br>**A. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall make a payment in the amount of $1,458.56 (an "**Albach Monthly Payment**").<br><br>**B. Maturity Date**:  The MTS Reorganized Debtor shall pay the Albach Secured Claim in full by the |

---

[10]  This is the amount MTS projects the collective Albach balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | date that is five (5) years after the Effective Date (the "**Albach Maturity Date**"). |
| | | | | **C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to the Albach Secured Claim in the Albach Agreement and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the Albach Maturity Date. |
| | | | | **D.  Interest Rate**: 2.84% per annum simple interest. |
| | | | | **E.  Default**:  Upon the Effective Date, the Albach Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make any Albach Monthly Payment  on the Albach Secured Claim to Albach when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Albach to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Albach Default**"), then Albach may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to collateral securing the Albach Secured Claim permitted under the Albach Agreement.  The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the Albach Agreement and the Plan, the Plan shall control. |
| | | | | **G.  Lien**.  Any valid, enforceable, perfected, and unavoidable lien held by Albach in the Albach Collateral shall be retained by Albach in and to the same extent, validity, and priority as of the Petition Date pending payment of the Albach Secured Claim in full as provided herein.  Upon full satisfaction of the Albach Secured Claim, any and all liens of Albach on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.  The treatment proposed herein shall be in full settlement and satisfaction of the Albach Secured Claim. |
| 4 | Ally Bank • Collateral: Various vehicles | N | Y | Class 4 consists of the Secured Claims of Ally Bank ("**Ally**").  The Claims of Ally arise from various loan agreements with MTS, each of which was secured by a particular vehicle (each, an "**Ally** |

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Total Claim Amount: $286,081.35 (projected as of the Effective Date) | | | **Agreement**" and collectively, the "**Ally Agreements**"). The treatment herein is for all Claims asserted by Ally. |

Ally shall have an Allowed Secured Claim in the collective amount of $286,081.35 as of the Effective Date, based on the net present value of the future payments due under the Ally Agreements, as calculated by MTS (the "**Allowed Ally Secured Claim**").[11] Under no circumstances shall Ally receive more than the Allowed Ally Secured Claim with interest after the Effective Date as provided herein.

The Allowed Ally Secured Claim shall be paid as follows:

**A.** **Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Ally Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $5,435.06 (an "**Ally Monthly Payment**").

**B.** **Maturity Date**: The MTS Reorganized Debtor shall pay the Allowed Ally Secured Claim in full by the date that is five (5) years after the Effective Date (the "**Ally Maturity Date**").

**C.** **Purchase Options**: The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of vehicles or equipment under the Ally Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights based by the Ally Maturity Date.

**D.** **Interest Rate**: 5.28% blended rate per annum simple interest.

**F.** **Default**: Upon the Effective Date, the Ally Agreements shall not be considered in default as to the MTS Reorganized Debtor. If the MTS Reorganized Debtor fails to make a Ally Monthly Payment on the Allowed Ally Secured Claim to Ally when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ally to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Ally**

---

[11] This is the amount MTS projects the collective Ally balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **Default"**), then Ally may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ally Agreement and serving as Ally's collateral as permitted under the Ally Agreements. The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **G. Plan Controls**: If and to the extent that there is a conflict between the Ally Agreements and the Plan, the Plan shall control. |
| | | | | **H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ally in any assets of the MTS Estate to secure the Allowed Ally Secured Claim shall be retained by Ally in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Ally Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ally Secured Claim, any and all liens of Ally on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of Ally's liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Ally Secured Claims. |
| 5 | Altec Capital Services, LLC<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $9,068,099.33 (inclusive of all future amounts due under the Altec Agreements) | N | Y | Class 5 consists of the Secured Claim(s) of Altec Capital Services, LLC (**"Altec"**). The Secured Claims of Altec arise from the agreements listed in Exhibit C to the Plan Support Agreement between MTS and Altec (each, an **"Altec Agreement"** and collectively, the **"Altec Agreements"**). The treatment herein is for all Claims asserted by Altec, including, without limitation, the Claims for which Altec is the servicer. The vehicles and other equipment subject to the Altec Agreements shall be referred to herein as the **"Altec Equipment."**<br><br>The Plan Support Agreement between MTS and Altec shall be referred to herein as the **"Altec PSA"** and Exhibit B to the Altec PSA shall be referred to herein as the **"Altec Payment Schedule."**<br><br>Altec shall have an Allowed Secured Claim in the amount of $9,068,099.33 as of July 1, 2025, less the payments made by MTS on July 1, 2025 and thereafter (the **"Allowed Altec Secured Claim"**).[12] |

---

[12]  This sum is inclusive of all payments due in the future under the Altec Agreements.

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Under no circumstances shall Altec receive more than the Allowed Altec Secured Claim with interest after the Effective Date as provided herein.<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall make  "Altec Monthly Payments" set forth in the Altec Payment Schedule due for such month under the corresponding Altec Agreements identified in the Altec Repayment Schedule (by Document #), and the MTS Reorganized Debtor shall continue making such Altec Monthly Payments set forth in the Altec Payment Schedule each calendar month thereafter by the fifth (5th) of each such calendar month until such Altec Monthly Payments in the Altec Payment Schedule are completed (by corresponding Altec Agreement).  The Altec Monthly Payments required herein and reflected in the Altec Payment Schedule shall each be referred to as an "**Altec Monthly Payment**."  For avoidance of doubt, the MTS Reorganized Debtor will not be required to make a payment set forth under the Altec Payment Schedule that was made prior to the Effective Date pursuant to the Altec PSA.<br><br>**B.  Residual Payments**:  Any "TRAC Amounts" or similar residual payments due under an Altec Agreement (each, a "**Residual Amount**") that became due and are unpaid as of the Effective Date shall be paid in full within thirty (30) days after the Effective Date or, at the MTS Reorganized Debtor's election, which shall be provided to Altec before the expiration of such 30-day period, by the MTS Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any Residual Amount under an Altec Agreement that becomes due after the Effective Date shall be paid by the date that is thirty (30) days after the Altec Maturity Date for such Altec Agreement (as defined below) or, at the MTS Reorganized Debtor's election, which shall be provided to Altec before the expiration of such Altec Maturity Date, by the MTS Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any "holdover" payments under an Altec Agreement (*i.e.*, monthly payments to Altec should term of such Altec Agreement extend for monthly holdover periods) by the MTS Reorganized Debtor under an Altec |

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Agreement shall reduce the "TRAC Amount" or similar residual amount due under such Altec Agreement. |
| | | | | The MTS Reorganized Debtor shall pay any sales taxes and/or "sundries" due to Altec under any Altec Agreement as of the Petition Date and unpaid within sixty (60) days of the Effective Date.  Any sales taxes and/or sundries due under any Altec Agreement after the Effective Date shall be billed by Altec and paid by the MTS Reorganized Debtor in the ordinary course and as provided under such Altec Agreement. |
| | | | | **C.  Maturity Date**:  With respect to each Altec Agreement, the maturity date, expiration date, "Interim Rent Cutoff Date," or similar end date with respect to such Altec Agreement shall be the "Maturity Date" set forth in the Altec Payment Schedule for such Altec Agreement (the "**Altec Maturity Date**"). |
| | | | | **D.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of Altec Equipment under an Altec Agreement, including, without limitation, at or upon the Altec Maturity Date of such Altec Agreement, and the disposition of the proceeds related thereto are preserved for the MTS Reorganized Debtor and the MTS Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement. |
| | | | | The payment(s) by the MTS Reorganized Debtor to Altec of Residual Amount due under an Altec Agreement in full shall be deemed the exercise by the MTS Reorganized Debtor of its right to purchase the Altec Equipment under such Altec Agreements and, upon such payment(s), and the MTS Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, such Altec Equipment.  Upon such payment(s), Altec shall transfer title of such Altec Equipment to the MTS Reorganized Debtor and the MTS Reorganized Debtor and Altec shall execute such documents as necessary to accomplish the same. |
| | | | | **E.  Interest Rate**: 6.98% blended rate per annum simple interest for Altec Secured Claims. |
| | | | | **F.  Default**:  Upon the Effective Date, the Altec Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS |

50

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Reorganized Debtor fails to pay, when due herein, an Altec Monthly Payment under an Altec Agreement or a Residual Amount, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Altec Default**"), then Altec shall be entitled to exercise its rights to repossession as to the particular Altec Equipment subject to such Altec Agreement and such Uncured Altec Default as permitted under such Altec Agreement. **G.  Plan Controls**:  If and to the extent that there is a conflict between the Altec Agreements and the Plan, the Plan shall control. **H.  Lien**:  With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the MTS Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.  Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. **I.  No Admission**.  Treatment set forth herein for Altec reflects a compromise between MTS and Altec and is without any admission as to either MTS or Altec as to whether the Altec Agreements are true leases or capital leases. **J.  Assignment**.  Altec retains its rights to assign under the Altec Agreements; provided, however, any such assignment shall remain subject to the Plan, including, without limitation, the treatment herein for Altec. The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Altec, in its individual capacity and as servicer. |
| 6 | FNB Equipment Finance | N | Y | Class 6 consists of the Secured Claims of FNB Equipment Finance ("**FNB**").  The Claims of FNB arise from various equipment leases or financing agreements between MTS and FNB or FNB's predecessor in interest (each, an "**FNB** |

51

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various equipment<br><br>• Total Claim Amount: $66,881.74 (projected as of the Effective Date) | | | **Agreement**" and collectively, the "**FNB Agreements**").  The treatment herein is for all Claims asserted by FNB.<br><br>FNB shall have an Allowed Secured Claim in the collective amount of $66,881.74 as of the Effective Date based on the net present value of the future payments due under the FNB Agreements, as calculated by MTS (the "**Allowed FNB Secured Claim**").[13]  Under no circumstances shall FNB receive more than the FNB Allowed Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each FNB Agreement, FNB's Secured Claim arising thereunder (each, an "**FNB Secured Claim**") shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall resume making the monthly payments or installments due under the FNB Agreement for such FNB Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the MTS Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such FNB Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an "**FNB Monthly Payment**".<br><br>**B.  Maturity Date**:  Any maturity date or expiration date with respect to such FNB Secured Claim in the corresponding FNB Agreement shall be extended to the calendar month after the MTS Reorganized Debtor makes the final FNB Monthly Payment required by such FNB Agreement (the "**FNB Maturity Date**") and any lump sum payment due by the MTS Reorganized Debtor under such FNB Agreement upon the FNB Maturity Date shall be made at such time as extended herein and in accordance with the terms of such FNB Agreement and subject to Paragraph C. below.<br><br>**C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or |

---

[13]    This is the amount MTS projects the collective FNB balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | **Secured Claims Related to Vehicles or Equipment** | | | |
|---|---|---|---|---|
| <u>Class</u> | <u>Description</u> | <u>Insiders</u><br>(Y/N) | <u>Impaired</u><br>(Y/N) | <u>Treatment</u> |
| | | | | equipment giving rise to such FNB Secured Claim in the corresponding FNB Agreement, including, without limitation, at the FNB Maturity Date in such FNB Agreement, and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights based on the FNB Maturity Date for such FNB Agreement.<br><br>**D.  <u>Interest Rate</u>**: 6.25% blended rate per annum simple interest for all FNB Secured Claims.<br><br>**E.  <u>Default</u>**:  Upon the Effective Date, each FNB Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make an FNB Monthly Payment on an FNB Secured Claim to FNB when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by FNB to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured FNB Default**"), then FNB may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as FNB's collateral that is the subject of the Uncured FNB Default permitted under the subject FNB Agreement.  The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  <u>Plan Controls</u>**:  If and to the extent that there is a conflict between the FNB Agreements and the Plan, the Plan shall control.<br><br>**G.  <u>Lien</u>**:  With respect to each FNB Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by FNB in any assets of the MTS Estate to secure such FNB Secured Claim shall be retained by FNB in and to the same extent, validity, and priority as of the Petition Date pending payment of such FNB Secured Claim in full as provided herein. Upon full satisfaction of such FNB Secured Claim, any and all lien of FNB securing such FNB Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the FNB Secured Claims. |
| 7a | Pathward, National Association | N | Y | Class 7a consists of the Secured Claim of Pathward, N.A. (**"Pathward"**), based on the |

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various equipment<br><br>• Total Claim Amount: $651,124 (projected as of the Effective Date inclusive of the Claim in Class 7b), plus attorneys' fees and costs as provided herein. | | | agreements acquired by Pathward from Altec Capital Services, LLC, specified at Page 4 of 90 of Proof of Claim No. 156-1 filed by Pathward (each, a "**Pathward Agreement**" and collectively, the "**Pathward Agreements**").  The treatment herein is for any and all Claims asserted by Pathward, excluding the Claim of Pathward treated in Class 7b.<br><br>**A.  The Pathward Claim**.  Pathward shall have an Allowed Secured Claim based on the Pathward Agreements in the amount of all due but unpaid "Basic Rental Payments" under the Pathward Altec Agreements and all "TRAC Amounts" due under the Pathward Agreements, less payments made by MTS, including after the Petition Date, plus attorney's fees to which Pathward is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $112,500 (the "**Allowed Pathward Secured Claim**").[14]<br><br>**B.  Payment of the Pathward Claim**.  The Allowed Pathward Secured Claim will be paid in full within fifteen (15) calendar days after the Effective Date (the "**Pathward Payment Date**"); *provided*, *however*, that any "Basic Rental Payments" or "TRAC Amount" that are to become due under Pathward Agreement #767-15 (the "**December Pathward Contract**") after the Payment Date (the "**December Pathward Amount**") shall be paid by the MTS Reorganized Debtor on the date set forth in the December Pathward Contract and in full by December 31, 2025 (the "**Pathward December Payment Date**").<br><br>**C.  Transfer of Title**.  The payment(s) by the MTS Reorganized Debtor to Pathward shall be deemed the exercise by the MTS Reorganized Debtor of its right to purchase the Pathward Equipment under the Pathward Agreements and, upon such payment(s), the MTS Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, the Pathward Equipment. Upon such payment(s), Pathward shall transfer title of the Pathward Equipment to the MTS Reorganized Debtor and shall execute such documents as necessary to accomplish the same.<br><br>**D.  Default**:  Upon the Effective Date, the Pathward Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the |

---

[14]    This is the amount MTS projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | | |
|---|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment | |
| | | | | MTS Reorganized Debtor fails to pay to Pathward the Allowed Pathward Secured Claim by the Pathward Payment Date or the December Pathward Amount by Pathward December Payment Date, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the MTS Reorganized Debtor and its counsel in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be granted relief from the automatic stay in order to exercise its rights of repossession and sale  with respect to the Pathward Equipment subject to such Uncured Pathward Default as permitted under the Pathward Agreements and the 14-day say of the FRBP 4001(a)(3) is deemed waived.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the MTS Estate to secure the Allowed Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Pathward Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Pathward Secured Claim, any and all liens of Pathward on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward, excluding the Claim treated in Class 7b. | |
| 7b | Pathward, National Association<br><br>• Collateral: Samsara equipment<br><br>• Total Claim Amount: $0.00 | N | Y | Class 7b consists of the Secured Claim of Pathward based on the agreement between the Debtor and Samsara attached to Proof of Claim No. 157-1 filed by Pathward (the "**Pathward Samsara Agreement**").  The equipment subject to the Pathward Samsara Agreement shall be referred to herein as the "**Samsara Equipment**."  The treatment herein is for all Claims asserted by Pathward under the Samsara Agreement.<br><br>**A.  Payment of the Pathward Claim**.  On and after the Effective Date, the MTS Reorganized Debtor shall make the periodic payments required | |

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | by the Pathward Samsara Agreement on dates required by the Pathward Samsara Agreement until the last periodic payment is made ("Samsara Payments").

**C.  Default**:  Upon the Effective Date, the Pathward Samsara Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a Samsara Payment when due under the Pathward Samsara Agreement, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the MTS Reorganized Debtor and its counsel  in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be  granted relief from the automatic stay in order to exercise its rights of repossession and sale solely with respect to the Samsara Equipment as permitted under the Pathward Samsara Agreement and the 14-day say of the FRBP 4001(a)(3) is deemed waived.

**E.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Samsara Agreement and the Plan, the Plan shall control.

**F.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure the Debtor's obligations under the Pathward Samsara Agreement shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending the MTS Reorganized Debtor completing the periodic payments under the Pathward Samsara Agreement as provided herein.  Upon full satisfaction of such payments, any and all liens of Pathward on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.

The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward under the Pathward Samsara Agreement. The treatment in Classes 7a and 7b shall be in full settlement and satisfaction of any and all Claims of Pathward. |
| 8 | U.S Bank Equipment Finance | N | Y | Class 8 consists of the Secured Claims of U.S. Bank Equipment Finance ("**US Bank**").  The Claims of US Bank arise from various finance agreements between MTS and US Bank or US |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various equipment<br><br>• Total Claim Amount: $14,430.24 (projected as of the Effective Date) | | | Bank's predecessor in interest (each, a **"US Bank Agreement"** and collectively, the **"US Bank Agreements"**).  The treatment herein is for all Claims asserted by US Bank.<br><br>US Bank shall have an Allowed Secured Claim in the collective amount of $14,430.24 as of the Effective Date, based on the net present value of the future payments due under the US Bank Agreements, as calculated by MTS (the **"Allowed US Bank Secured Claim"**).[15]  Under no circumstances shall US Bank receive more than the Allowed US Bank Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each US Bank Agreement, US Bank's Secured Claim arising thereunder (each a **"US Bank Secured Claim"**) shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall resume making the monthly payments or installments due under US Bank Agreement for such US Bank Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the MTS Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such US Bank Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an (a **"US Bank Monthly Payment"**).<br><br>**B.  Maturity Date**:  Any maturity date or expiration date with respect to such US Bank Secured Claim in the corresponding US Bank Agreement shall be extended to the calendar month after the MTS Reorganized Debtor makes the US Bank Altec Monthly Payment required by such US Bank Agreement (the **"US Bank Maturity Date"**) and any lump sum payment due by the MTS Reorganized Debtor under such US Bank Agreement upon the US Bank Maturity Date shall be made at such time as extended herein and in accordance with the terms of such US Bank Agreement and subject to Paragraph C. below.<br><br>**C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the |

---

[15]  This is the amount MTS projects the collective US Bank balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | purchase, return, or sale of the equipment giving rise to such US Bank Secured Claim in the corresponding US Bank Agreement, including, without limitation, at the US Bank Maturity Date in such US Bank Agreement, and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights based on the US Bank Maturity Date for such US Bank Agreement.<br><br>**D.  Interest Rate**: 6.83% blended rate per annum simple interest for all US Bank Secured Claims.<br><br>**E.  Default**:  Upon the Effective Date, each US Bank Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a US Bank Monthly Payment on a US Bank Secured Claim to US Bank when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by US Bank to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured US Bank Default**"), then US Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment(s) serving as US Bank's collateral that is the subject of the Uncured US Bank Default permitted under the subject US Bank Agreements.  The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the US Bank Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  With respect to each US Bank Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by US Bank in any assets of the MTS Estate to secure such US Bank Secured Claim shall be retained by US Bank in and to the same extent, validity, and priority as of the Petition Date pending payment of such US Bank Secured Claim in full as provided herein. Upon full satisfaction of such US Bank Secured Claim, any and all liens of US Bank securing such US Bank Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the US Bank Secured Claims. |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 9 | Bank of America, N.A.<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $4,526,707.00 (projected as of the Effective Date) | N | Y | Class 9 consists of the Secured Claim of BOA. The Claims of BOA arise from various equipment leases or financing agreements between the Debtor and BOA (each, a **"BOA Agreement"** and collectively, the **"BOA Agreements"**).  The treatment herein is for all Claims asserted by BOA.<br><br>BOA shall have an Allowed Secured Claim in the collective amount of $4,526,707.00 as of the Effective Date, based on the net present value of the future payments due under the BOA Agreements, plus amounts due and unpaid as of the Petition Date under the BOA Agreements, as calculated by the Debtor (the **"Allowed BOA Secured Claim"**).[16]  Under no circumstances shall BOA receive more that the Allowed BOA Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each BOA Agreement, BOA's Secured Claim arising thereunder (a **"BOA Secured Claim"**) shall be paid as follows:<br><br>**A. <u>Maturity Date</u>**:  The maturity date or expiration date in such BOA Agreement shall be extended to the earlier of (i) the date that is equal to the number of months in which payments under such BOA Agreement have come due and were not made prior to the Effective Date, plus thirty-six (36) months, and (ii) the date that is sixty (60) months from the Effective Date (the **"BOA Repayment Period"**).  Any lump sum payment due by the MTS Reorganized Debtor under such BOA Agreement upon or at the end of the BOA Repayment Period shall be made in accordance with the terms of such BOA Agreement and subject to Paragraph C. below.<br><br>**B. <u>Monthly Payments</u>**:  The BOA Secured Claim arising under such BOA Agreement shall be paid in equal monthly installments amortized over the BOA Repayment Period for such BOA Agreement (each, a **"BOA Monthly Payment"**).  The MTS Reorganized Debtor shall make the first BOA Monthly Payment on the first Business Day of the first full calendar month after the Effective Date, and the BOA Monthly Payments shall continue each calendar month thereafter during the BOA Repayment Period and until the BOA Repayment Period ends. |

---

[16]   This is the amount MTS projects the collective BOA balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | |
|---|---|---|---|---|
| **Secured Claims Related to Vehicles or Equipment** | | | | |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment under such BOA Agreement, including, without limitation, at the end of the BOA Repayment Period, and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights at the time set forth in the BOA Agreement as adjusted and extended based on the BOA Repayment Period. |
| | | | | **D.  Interest rate**: 5.47% per annum simple interest. |
| | | | | **E.  Default**:   Upon the Effective Date, each BOA Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a BOA Monthly Payment to BOA on account of a BOA Secured Claim when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by BOA to the MTS Reorganized Debtor and its counsel (collectively, a "**Uncured BOA Default**"), then BOA may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicle(s) or equipment subject to the BOA Agreement giving rise to such BOA Secured Claim as permitted under such BOA Agreement. The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the BOA Agreements and the Plan, the Plan shall control. |
| | | | | **G.  Lien**:  With respect to each BOA Secured Claim, any valid, perfected, and unavoidable lien of BOA shall be retained to the same extent, validity, and priority as of the Petition Date pending payment of such BOA Secured Claim in full as provided herein.  Upon full satisfaction of such BOA Secured Claim, BOA's lien securing such BOA Secured Claim shall be released and the MTS Reorganized Debtor shall retain title to the collateral subject to such lien free and clear of such lien. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the BOA Secured Claims. |

| | **Secured Claims Related to Vehicles or Equipment** | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 10 | Ford Motor Credit Company, LLC<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $1,546,179.16 (projected as of the Effective Date) | N | Y | Class 10 consists of the Secured Claims of Ford Motor Credit Company ("**Ford**").  The Claims of Ford arise from various installment agreements with MTS, each of which was secured by a particular vehicle (each, a "**Ford Agreement**" and collectively, the "**Ford Agreements**").  The treatment herein is for all Claims asserted by Ford.<br><br>Ford shall have an Allowed Secured Claim in the collective amount of $1,546,179.16 as of the Effective Date, based on the net present value of the future payments due under the Ford Agreements, as calculated by MTS (the "**Allowed Ford Secured Claim**").[17]  Under no circumstances shall Ford receive more than the Allowed Ford Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ford Secured Claims shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, and continuing on the first Business Day of each calendar month thereafter until the Allowed Ford Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $29,250.45 (a "**Ford Monthly Payment**").<br><br>**B.  Maturity Date**:  The MTS Reorganized Debtor shall pay the Allowed Ford Secured Claim in full by the date that is 5 years after the Effective Date (the "**Ford Bank Maturity Date**").<br><br>**C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ford Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the Ford Maturity Date.<br><br>**D.  Interest Rate**: 5.1% blended rate per annum simple interest.<br><br>**E.  Default**:  Upon the Effective Date, the Ford Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a Ford Monthly Payment on the Allowed Ford Secured Claim to Ford when due herein, and such failure is not |

---

[17]   This is the amount MTS projects the collective Ford balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | cured within thirty (30) days after written notice thereof provided by Ford to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Ford Default**"), then Ford may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements.  The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the Ford Agreements and the Plan, the Plan shall control. |
| | | | | **G.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Ford in any assets of the Estate to secure the Allowed Ford Secured Claim shall be retained by Ford in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ford Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ford Secured Claim, any and all liens of Ford securing the Allowed Ford Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ford Secured Claim. |
| 11 | AmeriCredit Financial Services, Inc. dba GM Financial <br><br> • Collateral: various vehicles <br><br> • Total Claim Amount: $121,388.59 (projected as of the Effective Date) | N | Y | Class 11 consists of the Secured Claims of AmeriCredit Financial Services, Inc. dba GM Financial ("**GM**").  The Claims of GM arise from various agreements between MTS and GM (each, a "**GM Agreement**" and collectively, the "**GM Agreements**").  The treatment herein is for all Claims asserted by GM. <br><br> GM shall have an Allowed Secured Claim in the collective amount of $121,388.59 as of the Effective Date, based on the net present value of the future payments due under the GM Agreements as calculated by the Debtor (the "**Allowed GM Secured Claim**").[18]  Under no circumstances shall GM receive more than the |

---

[18]   This is the amount MTS projects the collective GM balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Allowed GM Secured Claim with interest after the Effective Date as provided herein.

The Allowed GM Secured Claim shall be paid as follows:

**A. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed GM Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $2,352.54 (a "**GM Monthly Payment**").

**B. Maturity Date**:  The MTS Reorganized Debtor shall pay the Allowed GM Secured Claim in full by the date that is 5 years after the Effective Date (the "**GM Bank Maturity Date**").

**C. Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the GM Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the GM Maturity Date.

**D. Interest Rate**: 6.1% blended rate per annum simple interest.

**E. Default**:  Upon the Effective Date, the GM Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a GM Monthly Payment on the Allowed GM Secured Claim to GM when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by GM to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured GM Default**"), then GM may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements.  The MTS Reorganized Debtor shall have the right to oppose such motion.

**F. Plan Controls**:  If and to the extent that there is a conflict between the GM Installment Agreements and the Plan, the Plan shall control.

**G. Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by GM in any assets of the Estate to secure the Allowed GM Secured Claim |

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | shall be retained by GM in and to the same extent, validity, and priority as of the Petition Date pending payment of such GM Secured Claim in full as provided herein. Upon full satisfaction of the Allowed GM Secured Claim, any and all liens of GM securing the Allowed GM Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed GM Secured Claim. |
| 12 | John Deere Construction & Forestry Company<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $145,532.82 (projected as of the Effective Date), plus attorney's fees and costs as provided herein. | N | Y | Class 12 consists of the Secured Claims of John Deere Construction & Forestry Company ("**John Deere**"). The Claims of John Deere arise from various equipment agreements between the Debtor and John Deere (each, a "**John Deere Agreement**" and collectively, the "**John Deere Agreements**"). The treatment herein is for all Claims asserted by John Deere.<br><br>John Deere shall have an Allowed Secured Claim in the amount of $145,532.82 as of the Effective Date, based on the net present value of the future payments due under the John Deere Agreements, as calculated by the Debtor, plus attorney's fees to with John Deere is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $25,000 (the "**Allowed John Deere Secured Claim**").[19] Under no circumstances shall John Deere receive more than the Allowed John Deere Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed John Deere Secured Claim shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed John Deere Secured Claim is paid in full, the MTS Reorganized Debtor shall resume payments in the amounts set forth in the John Deere Agreements (a "**John Deere Monthly Payment**").<br><br>**B. Maturity Date**: The MTS Reorganized Debtor shall pay the Allowed John Deere Secured Claim |

---

[19] This is the amount MTS projects the collective John Deere balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | in full by the date that is 1 year after the Effective Date (the "**John Deere Maturity Date**"). <br><br> **C. Purchase Options**: The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the John Deere Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the John Deere Maturity Date. <br><br> **D. Interest Rate**: 5.0% per annum simple interest. <br><br> **E. Default**: Upon the Effective Date, the John Deere Agreements shall not be considered in default as to the MTS Reorganized Debtor. If the MTS Reorganized Debtor fails to make a John Deere Monthly Payment to John Deere when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by John Deere to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured John Deere Default**"), then John Deere may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the John Deere Agreements and serving as John Deere's collateral as permitted under the John Deere Agreements. The MTS Reorganized Debtor shall have the right to oppose such motion. <br><br> **G. Plan Controls**: If and to the extent that there is a conflict between the John Deere Installment Agreements and the Plan, the Plan shall control. <br><br> **H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by John Deere in any assets of the MTS Estate to secure the Allowed John Deere Secured Claim shall be retained by John Deere in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed John Deere Secured Claim in full as provided herein. Upon full satisfaction of the Allowed John Deere Secured Claim, any and all liens of John Deere securing the Allowed John Deere Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. <br><br> The treatment proposed herein shall be in full settlement and satisfaction of the Allowed John Deere Secured Claim. |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 13 | Hanmi Bank<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $98,750.50 (projected s of the Effective Date) | N | Y | Class 13 consists of the Secured Claims of Hanmi Bank ("**Hanmi**"). The Claims of Samsara arise from made multiple equipment loans between MTS and Samsara (each, a "**Hanmi Agreement**" and collectively, the "**Hanmi Agreements**"). The treatment herein is for all Claims asserted by Hanmi.<br><br>Hanmi shall have an Allowed Secured Claim in the amount of $98,750.50 as of the Effective Date, based on the net present value of the future payments due under the Hanmi Agreements, as calculated by MTS (the "**Allowed Hanmi Secured Claim**").[20] Under no circumstances shall Hanmi receive more than the Allowed Hanmi Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each Hanmi Agreement, Hanmi's Secured Claim arising thereunder (each, a "**Hanmi Secured Claim**") shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the second full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until each Hanmi Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $19,750.10 (a "**Hanmi Monthly Payment**").<br><br>**B. Maturity Date**: The MTS Reorganized Debtor shall pay the Hanmi Secured Claims in full by the date that is 8 months after the Effective Date (the "**Hanmi Maturity Date**").<br><br>**C. Purchase Options**: The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Hanmi Secured Claim in the subject Hanmi Agreement and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by on the Hanmi Maturity Date for such Hanmi Agreement.<br><br>**D. Interest Rate**: 0.0% per annum simple interest.<br><br>**E. Default**: Upon the Effective Date, each Samsara Agreement shall not be considered in default as to the MTS Reorganized Debtor. If the MTS Reorganized Debtor fails to make a Hanmi |

---

[20]   This is the amount MTS projects the collective Hanmi balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Monthly Payment to Hanmi when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Hanmi to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Hanmi Default**"), then Hanmi may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Hanmi's collateral that is the subject of the Uncured Hanmi Default permitted under the subject Hanmi Agreement.  The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.  Plan Controls**:  If and to the extent that there is a conflict between the Hanmi Agreements and the Plan, the Plan shall control. |
| | | | | **G.  Lien**:  With respect to each Hanmi Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Hanmi in any assets of the Estate to secure such Hanmi Secured Claim shall be retained by Hanmi in and to the same extent, validity, and priority as of the Petition Date pending payment of such Hanmi Secured Claim in full as provided herein. Upon full satisfaction of such Hanmi Secured Claim, any and all liens of Hanmi securing such Hanmi Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Hanmi Secured Claims. |

### d.    Secured Claims – MWP

| Secured Claims – MWP | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 17 | Sierra Bank

Estimated amount: $2,552,152.83 (projected as of the Effective Date)

Collateral:  Mills St. Property | N | Y | This Class consists of the Claim of Sierra Bank. Sierra Bank's claim is secured by a lien against the Mill St. Property owned by MWP.  Sierra Bank filed Proof of Claim No. 159-1, attached to which is the Promissory Note dated July 1, 2020, between MWP and Sierra Bank (the "**Sierra Note**").

The MTS Reorganized Debtor shall pay the Sierra Bank Claim in full as follows: |

**A. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until Sierra Bank's Claim is paid in full, the MTS Reorganized Debtor shall make the payment required for such month set forth in the Sierra Note (a "**Sierra Monthly Payment**").

**C. Maturity Date**:  The MTS Reorganized Debtor shall pay the Sierra Bank Claim in full by the July 15, 2045 maturity date set forth in the Sierra Note (the "**Sierra Maturity Date**").

**C. Interest Rate**: Simple interest on the Sierra Bank Claim will accrue on the outstanding balance of such Claim from the Effective Date until such Claim is paid in full at the non-default variable contract rates set forth in the Sierra Note.

**D. Default**:  If the MTS Reorganized Debtor fails to make a Sierra Monthly Payment to PNC when due herein or pay the Sierra Bank Claim in full by the Sierra Maturity Date, and such failure is not cured within thirty (30) days after written notice thereof provided by Sierra Bank to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Sierra Default**"), then Sierra Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to its real property collateral permitted under the Sierra Note. The MTS Reorganized Debtor shall have the right to oppose such motion.

**E. Plan Controls**:  If and to the extent that there is a conflict between the Sierra Note (or any other loan documents with Sierra Bank) and the Plan, the Plan shall control.

**F. Lien**.  Any valid, enforceable, perfected, and unavoidable lien held by Sierra Bank to secure Sierra Bank's Claim shall be retained by Sierra in and to the same extent, validity, and priority as of the Petition Date pending payment of the Sierra Bank Claim in full as provided herein. Upon full satisfaction of the Sierra Bank Claim, any and all liens of Sierra Bank securing the Sierra Bank Claim shall be released and title to such assets shall be retained free and clear of such liens.

The treatment proposed herein shall be in full settlement and satisfaction of the Sierra Bank Claim.

| 18 | Sacramento County Tax Collector | N | Y | The Sacramento County Tax Collector ("**SCTC**") shall have an Allowed Secured Claim on the Effective Date in the amount of $40,025.20, less any |

| | | | | recoveries and payments received by the SCTC before or after the Effective Date (the "**Allowed SCTC Secured Claim**"). |
|---|---|---|---|---|
| • Collateral: Elder Creek Property<br><br>• Total Claim Amount: $40,025.20 per Claim No. 5-1 in MWP Case.<br><br>• Interest Rate: 18.00% per annum | | | | **Lien**.  The SCTC shall retain its lien on the Elder Creek Property in and to the same extent, validity, and priority as of MWP bankruptcy filing, pending payment of the Allowed SCTC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed SCTC Secured Claim, the SCTC lien on the Elder Creek Property shall be released. |
| | | | | **Payment.**  Upon the close of escrow of the the Elder Creek Property, the net sale proceeds from such sale(s) shall be paid from escrow to the SCTC on account of the Allowed SCTC Secured Claim. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed SCTC Secured Claim. |

e.    **Secured Claims – Robin Mowbray**

| | Secured Claims – Robin Mowbray | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | Gloria Mowbray Separate Property Trust (*i.e.*, the Trust)<br><br>• Collateral: 100% of Mowbray's shares in MTS<br><br>• Total Claim Amount: $22,793,934.42 | Y | N | Class 1 in the RM Case consists of the Secured Claim of the Trust.  The Claim of the Trust arises from that certain Stock Purchase Agreement, Promissory Note, and Stock Pledge Agreement dated April 2, 2021 between the Trust and Mowbray for Mowbray's purchase of 49% of the equity interest in MTS.  The Secured Claim of the Trust is secured solely by Robin Mowbray's equity interests in MTS.  The Secured Claim of the Trust is not a Claim of MTS and is not secured by any assets of MTS.<br><br>The Trust shall have an Allowed Secured Claim in the amount of $22,793,934.42 as of the Effective Date (the "**Allowed Trust Secured Claim**").  On account of the Allowed Trust Secured Claim, and as part of the Compromise embodied in the Plan, upon the Effective Date, the Trust shall receive all of Equity Interests in MTS in full settlement and satisfaction of the Allowed Trust Secured Claim.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Trust Secured Claim. |

### 3.    Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes.  The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of Priority Unsecured Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

The Debtors are unaware of any legitimate Priority Unsecured Claims.  However, in an abundance of caution, the following chart lists all Classes containing the Debtors' section 507(a)(4), (a)(5), (a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Classes of Priority Unsecured Claims – MTS & MWP | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5)<br><br>Estimated total amount of claims: $0.00[21] | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 14 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |
| 15 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 15 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |

[21]  MTS's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

70

### 4.    Classes of General Unsecured Claims

### a.    MTS and MWP

| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| **General Unsecured Claims – MTS and MWP** | | | | |
| 16 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims against MTS or MWP. |
| | | | | On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a *pro rata* share of the beneficial interests in the Plan Trust in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, which shall entitle such Holder to his, her, or its Pro Rata Distribution of the Available Trust Proceeds. |
| | | | | The Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions from Available Trust Proceeds as follows: |
| | | | | On each Quarterly Distribution Date until the Available Trust Proceeds are exhausted or the term of the Plan Trust ends, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from any Available Trust Proceeds. |
| | | | | The MTS Reorganized Debtor will fund the GUC Payment Amount to the Plan Trust as provided in Section III.A. of the Plan. |
| | | | | The treatment proposed herein shall be in full satisfaction of the Claims in Class 16. |
| 19 | IBEW Local #47<br><br>Amount: $880,024.51 | N | Y | The Class consists of the General Unsecured Claim of IBEW Local #47 (the "**Union**") in the amount of $880,024.51 (the "**Union Claim**") pursuant to the Agreement between MTS and the Union with the term June 1, 2022 through September 30, 2027 (the "**Union Agreement**"). |
| | | | | The Union Claim shall be paid in twenty-four (24) equal monthly installments of 36,667.69 beginning with the fifteenth (15th) of the first full calendar month after the Effective Date and continuing thereafter until the Union Claim is paid in full. |
| | | | | The Union Agreement shall be deemed in full force and effect as of the Effective Date. |
| | | | | The treatment herein shall be in full settlement and satisfaction of the Union Claim. |
| 20 | Subordinated Insider Class | Y | Y | This Class consists of the Claims Insiders against the Debtor that are being consensually |

| General Unsecured Claims – MTS and MWP | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | subordinated under the Plan. The Holders of Subordinated Claims shall not receive any Distributions under the Plan until and unless the Allowed General Unsecured Claims are paid in full. |

### b.    Robin Mowbray

| General Unsecured Claims – Robin Mowbray | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 4 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims in the RM Case. Each Holder of an Allowed General Unsecured Claim in the RM Case shall receive, in full and final settlement and satisfaction of such Claim, a cash payment equal to its prorated share of Robin Mowbray's net disposable income over the five-year period commencing as of the Effective Date (the "**RM Net Disposable Income**").<br><br>Upon confirmation of the Plan, the amount of $135,385, as set forth on __Exhibit 3__ to the Plan, shall be and is conclusively determined to be the RM Net Disposable Income. Each Holder of an Allowed General Unsecured Claim in Class 4 shall receive a *pro rata* share of the RM Net Disposable Income in the total amount of $135,385.<br><br>The RM Net Disposable Income will be paid on a *pro rata* basis to the Holders of Allowed General Unsecured Claims in Class 4 on an annual basis in equal annual payments beginning on the date that is the one (1) year anniversary of the Effective Date and continuing each anniversary thereafter for four (4) years. Robin Mowbray will make such payments to the Holders of Allowed General Unsecured Claims.<br><br>Holders of Allowed General Unsecured Claims in Class 4 will not receive interest on their Claims.<br><br>Robin Mowbray may prepay the Net Disposable Income to Holders of Allowed General Unsecured Claims in Class 4 at any time without a prepayment penalty.<br><br>The treatment set forth in this Class 4 shall be in full settlement and satisfaction of the Allowed General Unsecured Claims in the RM Case. |

### 5.    Class of Interest Holders

Interest Holders are the parties who hold ownership Interests.  The following chart describes the treatment for Interest Holders in the MTS Case and the RM Case.  The Interests in MWP will be cancelled upon the MWP Consolidation (as defined below) as MWP is to be dissolved.

| Class of Interests – MTS | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders | Impaired | Treatment |
| 21 | Robin Mowbray | Y | Y | On the Effective Date, based on the Compromise set forth in Section III.F.3. herein and in exchange for the Settlement Consideration, all existing Equity Interests in MTS shall be cancelled and 100% of the Equity Interests in the MTS Reorganized Debtor shall be issued to the Trust. |

| Class of Interests – Robin Mowbray | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders | Impaired | Treatment |
| 5 | Robin Mowbray | Y | Y | On the Effective Date, property of the Mowbray Estate shall revest in the RM Reorganized Mowbray subject to the terms of the Plan. |

### F.    Means for Implementation of the Plan

This Section is intended to explain how the Reorganized Debtors intend to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Plan after the occurrence of the Effective Date.  This Section provides information regarding the funding sources for the Plan obligations, the establishment of the Plan Trust, and other material issues bearing upon performance of the Plan.

### 1.    Funding of the Plan

The payments under the Plan by the MTS Reorganized Debtor will be funded from the MTS Reorganized Debtor's operations.  As reflected in the MTS Projections, the Distributions to the Holders of Secured Claims will be paid by the MTS Reorganized Debtor from its post-

1    Effective Date cash flow.

2        Distributions to the Holders of Allowed General Unsecured Claims will be made from the

3    Plan Trust.  The Holders of Allowed General Unsecured Claims will receive a Pro Rata

4    Distribution of Available Trust Proceeds.  Available Trust Proceeds are compromised of the GUC

5    Payment Amount, the GUC Bonus, and any Net Recoveries.  The MTS Reorganized Debtor will

6    fund the GUC Payment Amount from its post-Effective Date operations as provided below.

7        As provided in Section III.F.5. below, due to the substantive consolidation of MWP and

8    MTS provided in the Plan, any Allowed Claims of MWP will receive the treatment expressly

9    provided for such Claims in the Plan or for similarly situated Claims of MTS.

10        Distributions to the Holders of Allowed Claims against Robin Mowbray will be made

11    directly by Robin Mowbray.  Robin Mowbray will fund such payments from her post-Effective

12    Date compensation.

13            **2.        Payment of the GUC Payment Amount and the GUC Bonus**

14                **a.        The GUC Payment Amount**

15        The $25,000,000 GUC Payment Amount is the minimum amount to be paid under the

16    Plan.  The MTS Reorganized Debtor shall pay the GUC Payment Amount to the Plan Trust (for

17    the benefit of the Holders of Allowed General Unsecured Claims in Class 16) through the Class 16

18    GUC Payment as provided below.

19        The Class 16 GUC Payment is summarized and intended to work as follows:

20        The Class 16 GUC Payment requires the MTS Reorganized Debtor to make the payments

21    specified in the Projections for the General Unsecured Creditors as adjusted based on the MTS

22    Reorganized Debtor's *actual* post-Effective Date performance (up to the GUC Payment Amount).

23    Thus, if and to the extent that the MTS Reorganized Debtor's actual net income, inclusive of PTS

24    and after income tax distributions, for a particular period is greater than projected, then the

25    payment to the Plan Trust on account of the GUC Payment Amount will be increased.  If and to

26    the extent that the MTS Reorganized Debtor's actual net income, inclusive of PTS and after

27    income tax distributions, for a particular period is less than projected, then the payment to the Plan

28    Trust on account of the GUC Payment Amount will be reduced.  However, the MTS Reorganized

Debtor is, by the Plan, committing to paying the GUC Payment Amount in full even if its post-Effective Date performance is worse than projected. The time needed to pay the GUC Payment Amount may be shorter or longer than projected depending on the MTS Reorganized Debtor's actual performance. Based on the Projections, the MTS Reorganized Debtor projects funding the GUC Payment Amount within nine (9) years of the Effective Date. (*See* Ex. 1 at 13.)

The Class 16 GUC Payment will be made quarterly. The Class 16 GUC Payment will be calculated within thirty (30) days of the end of each Measurement Period (the "**Calculation Date**"). The Class 16 GUC Payment shall be paid by the Reorganized Debtor to the Plan Trust within fourteen (14) calendar days after such Calculation Date (the "**Payment Date**"); *provided, however*, with respect to any Class 16 GUC Payment, if the MTS Reorganized Debtor believes that such Class 16 GUC Payment is not prudent in its business judgment based on its projected operating results over the next twelve (12) months, then it may withhold the Class 16 GUC Payment if the Plan Trustee approves such in writing by the Payment Date. The Plan Trustee shall be the sole arbiter, as between the Reorganized Debtor and the Plan Trustee, as to whether the MTS Reorganized Debtor may withhold a Class 16 GUC Payment (or any portion thereof).

Notwithstanding the foregoing, in any year in which the Projections project a payment to the Plan Trust on account of the GUC Payment Amount and until the GUC Payment Amount is paid to the Plan Trust in full, the MTS Reorganized Debtor shall pay at least the sum of $350,000 (the "**GUC Annual Minium Payment**") within thirty (30) days after the end of such year.

### b.    The GUC Bonus

In addition to the GUC Payment Amount, the MTS Reorganized Debtor will pay to the Plan Trust the GUC Bonus. The GUC Bonus entitles the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims) to fifty percent (50%) of the MTS Reorganized Debtor's post-confirmation excess cash (defined as actual net income less income tax distributions and inclusive of PTS), if any, after payment of the GUC Payment Amount subject to a maximum time period and maximum amount. The GUC Bonus will be paid by the MTS Reorganized Debtor through the Excess GUC Cash Payment. By the Excess GUC Cash Payment, the Plan Trust could receive up to the cumulative sum (inclusive of the GUC Payment Amount) of (a) $55,000,000 or

1  (b) 40% of the Allowed General Unsecured Claims (capped by the amount of the General

2  Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed),[22]

3  whichever is greater between (a) and (b), provided such cumulative sum is generated within five

4  (5) years after the Effective Date (subject to the one-year extension set forth in the definition of

5  the GUC Bonus if GUC Payment Amount is paid in full by the MTS Reorganized Debtor to the

6  Plan Trust in the fifth (5th) year after the Effective or late ).  The GUC Bonus is inclusive of the

7  GUC Payment Amount.

8      The GUC Bonus will be paid quarterly after the GUC Payment Amount is paid in full to

9  the Plan Trust.  The GUC Bonus will be calculated in accordance with the Plan by the Calculation

10  Date and paid by the MTS Reorganized Debtor to the Plan Trust by the Payment Date

11      As an example, if the MTS Reorganized Debtor pays the GUC Payment in full to the Plan

12  Trust within three (3) years after the Effective Date, then the Plan Trust would be entitled to the

13  Excess GUC Cash Payment for an additional two (2) years up to GUC Maximum Amount.  If the

14  GUC Maximum Amount is reached within the next year (*i.e.*, year four after the Effective Date),

15  then the payments by the MTS Reorganize Debtor to the Plan Trust cease.  If the GUC Maximum

16  Amount is not reached within five (5) years after the Effective Date, then the payments by the

17  MTS Reorganized Debtor to the Plan Trust cease.  If it takes the MTS Reorganized Debtor more

18  than five (5) years after the Effective Date to pay the GUC Payment Amount to the Plan Trust,

19  then the Plan Trust would be entitled to the Excess GUC Cash Payment for one (1) year after the

20  MTS Reorganized Debtor pays the GUC Payment Amount in full.

21      Upon the MTS Reorganized Debtor fully funding the GUC Payment Amount and paying

22  any GUC Bonus required by the Plan to the Plan Trust, the MTS Reorganized Debtor shall have

23  no further obligation to the Plan Trust.  The MTS Reorganized Debtor's obligation to make the

24  Class 16 GUC Payment and the Excess GUC Cash Payment, on the terms herein, are subject to the

25  default provision in Section III.G.

26      As reflected in the Projections, the MTS Reorganized Debtor's post-Effective Date cash

27

28  [22]  Based on the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025, and assuming such Claims are Allowed, then 40% equals approximately $67 million (subject to the disallowance of certain Disputed Claims).

1    flow includes substantial funds from PTS and PTM.  The MTS Reorganized Debtor is projected to

2    receive approximately $10.3 million per year from PTS on account of management fees and

3    equipment rent.  (*See* Ex. 1 at 5.)  PTS is projected to repay the PTS Loan with interest within two

4    years after the Effective Date.  In addition, the MTS Reorganized Debtor is to receive substantial

5    distributions from PTS's available cash flow.  (*See* Ex. 1 at 11.)  The projected distributions from

6    PTS collectively exceed $6 million over the term of the Plan.  The MTS Reorganized Debtor is

7    projected to receive approximately $420,000 on an annual basis from PTM in management fees

8    and equipment rent.  The projected amounts to be paid by PTM and PTS to the MTS Reorganized

9    Debtor are based on the CRO's current understanding of the financial wherewithal of both such

10   companies and reflects the amounts that the CRO believes can reasonably be paid to the MTS

11   Reorganized Debtor.

12          In addition, as provided in the Plan Trust Agreement attached to the Index as **Exhibit 17**,

13   the Plan Trust will be vested with all Trust Causes of Action, excluding the Excluded Claims.  The

14   Holders of Allowed General Unsecured Claims will share *pro rata* in any Net Recoveries on

15   account of the Trust Causes of Action.  On the Effective Date, the MTS Reorganized Debtor will

16   pay to the Plan Trustee $50,000 (the "**Initial Plan Trust Payment**") for the initial costs of

17   administration of the Plan Trust.  Any payments on the PTM Loan and the MWP Loan within the

18   amounts set forth in the MTS Projections shall be paid to the MTS Reorganized Debtor.

19          **3.       The Compromise Among MTS, Robin Mowbray, MWP, and the Trust**

20          The Plan represents a proposed settlement between MTS, Robin Mowbray, MWP, and the

21   Trust (the "**Compromise**").  Such Compromise is the product of MTS's discussions with the

22   Examiner and MTS's negotiations with the Rodriguez Plaintiffs and is part of the settlement with

23   the Rodriguez Plaintiffs.  In exchange for the consideration, value, and benefits provided under the

24   Plan, including without limitation, the voluntary substantive consolidation of MWP with MTS,

25   voluntary subordination of claims against MTS, the increase in the GUC Payment Amount, and

26   the GUC Bonus (collectively, the "**Settlement Consideration**"), Robin Mowbray, the Trust,

27   Richard Mowbray, and any insider of MTS or insider of any such insider, excluding PTM, MWP,

28   and PTS (collectively, the "**Released Parties**"), shall, effective upon the payment of the GUC

Payment Amount, be deemed released and discharged, by MTS, the MTS Estate, MWP, and the

MWP Estate, in each case, on behalf of themselves and their respective successors, assigns, and

representatives, and any and all persons that may purport to assert any cause of action derivatively,

by, through or on behalf of the MTS, the MTS Estate, MWP, the MWP Estate, Robin Mowbray,

or the RM Estate, from any and all claims, obligations, suits, judgments, damages, demands,

debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or

unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or

hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11

U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy

law, based on, relating to, or in any manner arising from, in whole or in part, MTS, the MTS Case,

the MTS Estate, MWP, the MWP Estate, the MWP Case, Robin Mowbray, the RM Case, and the

RM Estate any transfers listed in MTS's Schedules and Statement of Financial Affairs, as may be

amended, transfers listed in MWP's Schedules or Statement of Financial Affairs, transfers listed in

Robin Mowbray's Schedules or Statement of Financial Affairs, and any transfers disclosed in the

Insider Payment Schedule attached to the Index of Exhibits as **Exhibit 10** (collectively, the

**"Released Claims"**).

For the avoidance of doubt, the releases herein shall not release PTM, PTS, and/or MWP

of any claims, including, without limitation, on account of the amounts loaned by MTS to each

such entity.  The MTS Reorganized Debtor's rights to collect the PTM Loan, the PTS Loan, and

the MWP Loan are expressly preserved.

The Confirmation Order shall operate as a bar and injunction against the commencement

or pursuit of the Released Claims by any party against any Released Parties.

Ronnie Jordan asserts that MTS is settling substantially all of the Insider Avoidance

Actions of over $38,000,000 for zero.  Ronnie Jordan further asserts that the Plan Trust is illusory

and will hold no Insider Avoidance Actions due to the releases in the Plan.

Insider Avoidance Actions are released by the Compromise in the Plan as provided

expressly therein and in this Disclosure Statement above.  This excludes any claims against PTM,

PTS, and MWP, which are preserved by the Plan.  The Debtors disagree with Ronnie Jordan's

1    calculus of the value of the consideration being exchanged in the Compromise as set forth in the

2    Plan.  The Debtors' analysis of the Compromise is below.

3        The Plan constitutes a good faith settlement and compromise of the Released Claims in

4    exchange for the Settlement Consideration.  The Insider Payment Schedule attached to the Index

5    as **Exhibit 10** lists the payments to or for the benefit of insiders within the four-year period prior

6    to the MTS Petition Date from MTS's books and records.  Certain of the Insider Payments were

7    made by MTS in the ordinary course of business for compensation to employees of MTS or for

8    services provided to MTS (such as, by PTM and PTS) and, therefore, are presumed to be not

9    avoidable under the Bankruptcy Code.  The Insider Payments also include amounts loaned to PTM

10   and PTS, which are not being released under the Plan.  The net Insider Payments to Gloria

11   Mowbray, Robin Mowbray, Richard Mowbray, Kim Mowbray, and the Trust during the four-year

12   period prior to the MTS Petition Date collectively total $38,187,758.78 (excluding those marked

13   as compensation).  (*See* Index, Ex. 6.)

14       As noted in the Examiner's Report, there could be impediments to prevailing on certain

15   Insider Avoidance Actions and collecting on any judgment obtained.  (*See* Report [Docket No.

16   538] at 25-30.)  For example, it may be difficult to prove that MTS was insolvent at "different

17   points in time."  (*See id.* at 28:1-2.)  Gloria Mowbray is deceased and Robin Mowbray is a debtor

18   in her own bankruptcy case.  (*See id.* at 27:23-26.)  Moreover, the majority of the Insider

19   Payments to Robin Mowbray and Gloria Mowbray were paid directly by MTS to taxing

20   authorities on account of MTS's taxable income and neither Robin Mowbray nor Gloria Mowbray

21   received such payments.  Of the $25,135,211.58 Insider Payments listed as to or for the benefit of

22   Robin Mowbray, $20,416,770,08 were on account of taxes attributable to MTS's taxable income.

23   (*See* Index of Exhibits, Ex. 10 at 137; Ex. 11 at 140.)  Similarly, of the $10,702,367.55 net Insider

24   Payments listed as to or for the benefit of Gloria Mowbray, $10,552,674.60 were on account of

25   taxes attributable to MTS's taxable income.  (*See* Ex. 11 at 140.)  The Examiner concluded, in

26   relevant part, as follows:

27           ***The litigation and expert fees required to pursue and defend these
             actions are projected to be significant as it will be difficult and time-***
28           ***consuming to establish if and when insolvency occurred.  Even if***

1

2

*the litigation is successful, collectability may be an issue as one potential defendant is deceased [and] another defendant is in a Chapter 11 proceeding.  A quick and reasonable settlement would be beneficial to all parties involved.*

3

4

(*See* Report at 30:17-22 (emphasis in original).)  This Plan is intended to accomplish a settlement

5

of the type suggested by the Examiner.  The proposed settlement is the product of discussions with

6

the Examiner and, also, settlement negotiations with the Rodriguez Plaintiffs, who assert the

7

largest claim in the case by far.

8

In addition to the foregoing, Force 10 prepared an analysis of the potential Insider

9

Avoidance Actions against Robin Mowbray, Gloria Mowbray, the Trust, Richard Mowbray, and

10

Kim Mowbray based on the Insider Payment Schedule.  A true and correct copy of Force 10's

11

analysis is attached to the Index as **Exhibit 11** (the "**Claims Analysis**").  The Claims Analysis

12

assumes that Insider Payments made in 2020, 2021, and 2022 may not be avoidable because,

13

based on a preliminary analysis of MTS's CPA reviewed consolidated financials, MTS was likely

14

solvent in such years.  (*See* Index, Ex. 11.)  The Claims Analysis assumes that MTS was insolvent

15

in 2023 and 2024 based on MTS's CPA reviewed consolidated financials for 2023 and MTS's

16

unaudited financial statements for 2024.  In 2023 and 2024, the Insider Payments collectively

17

totaled $2,437,351.  (*See id.*)  Thus, based on the Claims Analysis, the gross value of the potential

18

Insider Avoidance Actions against Robin Mowbray, Gloria Mowbray, the Trust, Richard

19

Mowbray, and Kim Mowbray is $2,437,351.  Excluding compensation, which is presumably not

20

avoidable, the gross value of such Insider Avoidance Actions is $380,893.  (*See id.*)  The stated

21

gross value is also *without* taking into consideration any reduction of the potential recoveries

22

based on costs of litigation, asserted defenses, and the financial wherewithal of any defendant to

23

satisfy a judgment obtained.  For these reasons, the actual net amount that could be collected on

24

such Insider Avoidance Actions is likely materially less.  As discussed below, this gross value is

25

less than the value to be received under the Plan.

26

The Claims Analysis is provided solely for purposes of evaluating the Compromise and for

27

estimating the value of potential Insider Avoidance Actions for purposes of the Best Interests of

28

Creditors Test, and, as such, is without any admission whatsoever, including, without limitation, as to the merits of any Insider Avoidance Actions.

According to MTS's Liquidation Analysis, the Holder of General Unsecured Claims against MTS would receive a *pro rata* portion of $15,674,000 in a Chapter 7 case. However, under the Plan, MTS is committing to pay at least $25,000,000 (*i.e.*, over $9,000,000 more). In addition, the Holders of Allowed General Unsecured Claims against MTS will have the opportunity to share in any upside in the MTS Reorganized Debtor's post-Effective Date performance via the GUC Bonus. Assuming the GUC Maximum of the GUC Bonus is $55,000,000, the Holders of Allowed General Unsecured Claims could receive a *pro rata* share of an additional $30,000,000 above the GUC Payment Amount. Moreover, the settlement proposed herein avoids the costs and risks associated with litigation as discussed in the Examiner's Report.

Due to the Settlement Consideration, the Plan effectuates the voluntary substantive consolidation of MTS and MWP. Upon the MWP Consolidation, the MTS Reorganized Debtor will receive MWP's real properties. As reflected in the Claims Analysis, MTS estimates that the collective value of the contribution of MWP's real estate, net of Sierra Bank's Secured Claim, is $6,893,847, excluding the lien of PNC against two of MWP's real properties (the Elder Creek Property and the Allen Street Property). This collective value, standing alone, is $4,456,496 more than the gross value of the potential Insider Avoidance Actions pursuant to the Claims Analysis (inclusive of compensation). (*See* Index, Ex. 11.) If compensation is excluded from the gross value of the potential Insider Avoidance Actions, then the estimated value of MWP's real properties exceeds such gross value by $6,512,954. (*See id.*) In addition, upon the MWP Consolidation, the MTS Reorganized Debtor will receive the monthly rental income paid by the County ($35,124 per month). The MWP Consolidation is also not expected to materially increase MTS's debt.

The SOFAs of MWP and Robin Mowbray are attached to the Index as **Exhibits 8** and **9**. Such SOFAs list relatively minimal payments that could be avoidable within the two-year period prior to MWP and Robin Mowbray Petition Date. MWP's SOFA lists payments of approximately $142,000 for the benefit of the Trust and $32,000 to Robin Mowbray in management fees. The

payments listed by Robin Mowbray in her SOFA are to MTS and constitute the loan by Robin Mowbray to MTS.  Thus, based foregoing, the Compromise is fair and equitable taking into consideration such payments by MWP and Robin Mowbray in addition those discussed above with respect to MTS.

Upon the Effective Date, any claims pending in any court to pursue any Released Claims shall be dismissed with prejudice.  Upon and after the Effective Date, the MTS Debtor Reorganized Debtor shall be empowered to take such action, file such pleadings, and record such instruments as needed to cause the dismissal with prejudice of any such claims.

### 4.    Compromise with the Rodriguez Parties

In addition to any Debtor/RP Settlement Agreement, the Plan constitutes and includes a settlement agreement and compromise between MTS, Robin Mowbray, PTS, PTM, MWP, the Trust, Richard Mowbray, and any other Released Party (each, a "**RP Released Party**" and collectively, the "**RP Released Parties**"), on the one hand, and the Rodriguez Plaintiffs on the other hand (the "**Rodriguez Compromise**").  Pursuant to the Rodriguez Compromise, and in addition to the consideration provided by the terms of the Plan, including, without limitation, the Settlement Consideration:

(i)    On the Effective Date, any and all assignable claims and causes of action, whether sounding in tort, contract, equity or otherwise, which MTS may now have or hereafter acquire against Everest National Insurance Company ("**Everest**") arising out of or related to Everest's handling of the Rodriguez Lawsuit and subsequent Rodriguez Judgment, including, but not limited to, any obligation of Everest to pay the Rodriguez Judgment or any component thereof under Policy No. EN4CA00458191 (the "**Insurance Policy**"), shall be deemed assigned to the Rodriguez Plaintiffs.

(ii)    Within fourteen (14) days of the Effective Date, the MTS Reorganized Debtor shall cause the pending appeal of the Rodriguez Judgment by MTS to be dismissed.

(iii)    On the Effective Date, the Rodriguez Claim shall be deemed an Allowed General Unsecured Claim.

(iv)    Reporting required under the Plan to the Plan Trustee in accordance with Section III.F.8. shall be provided to the Rodriguez Plaintiffs.

(v)    Effective as of the Effective Date, the Rodriguez Parties shall be deemed to forever release and discharge each of the RP Released Parties from the Rodriguez Claim, the Rodriguez Judgment, and any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, MTS, the MTS Case, the MTS Estate, MWP, the MWP Estate, the MWP Case, Robin Mowbray, the RM Case, the RM Estate, the Rodriguez Claim, the Rodriguez Judgment, any transfers listed in MTS's Schedules and Statement of Financial Affairs, as may be amended, any transfers in MWP's Schedules and Statement of Financial Affairs, any transfers in Robin Mowbray's Schedules and Statement of Financial Affairs, and any transfers disclosed in the Insider Payment Schedule attached to the Index of Exhibits as **Exhibit 10**, and the Rodriguez Plaintiffs agree that the sole source of recovery on account of the Rodriguez Claim and the Rodriguez Judgment shall be the treatment in Class 16 of MTS and amounts to be paid thereunder and any amounts paid under Class 4 of Robin Mowbray on account of any Allowed General Unsecured Claim of the Rodrigeuz Plaintiffs in the RM Case; *provided*, *however*, that the Rodriguez Plaintiffs shall not be prohibited from seeking to collect from Everest (including on account of the assignment herein) or from Jonathan Gonzalez-Varillas.

MTS is informed that the Rodriguez Plaintiffs have been paid $1 million from Everest on account of the Rodriguez Judgment.

1    MTS does not believe that any alleged claim against Everest for bad faith exists because, to

2  MTS's knowledge, Everest fulfilled its duties to MTS and, as such, MTS values any such claim(s)

3  at $0.00.  Ronnie Jordan asserts that MTS's claims against Everest could be worth millions of

4  dollars.

5    MTS is not objecting to the Rodrigez Claim because the parties have reached a settlement

6  on the terms and conditions of Plan and the Rodriguez Compromise set forth therein.

7    The Rodriguez Plaintiffs filed a proof of claim in the MWP Case.  However, pre-petition,

8  the Rodriguez Plaintiffs did not name MWP in their complaint.  The Rodriguez Plaintiffs did

9  name Robin Mowbray as a defendant in their complaint.  However, Robin Mowbray was

10  dismissed from the Rodriguez Matter upon a motion for summary adjudication that she and other

11  defendants filed.

12    Jordan asserts that the Rodriguez Compromise is a one-way street with MTS getting

13  nothing but Rodriguez getting everything to sign off on the Plan.  The Debtors disagree with

14  Jordan's assessment of the Rodriguez Compromise.

15    The Confirmation Order shall constitute approval of any Debtor/RP Settlement Agreement

16  (if and to the extent such is not approved by separate order of the Court entered prior to the

17  Effective Date) and the Rodriguez Compromise pursuant to Bankruptcy Rule 9019.  At present,

18  there is no Debtor/RP Settlement Agreement.

19    **5.    Substantive Consolidation of MWP**

20    As part of the settlements set forth in the Plan, the Confirmation Order shall approve the

21  substantive consolidation of MWP with MTS (the "**MWP Consolidation**").  Upon the Effective

22  Date, MWP (and its assets and liabilities) will be deemed substantively consolidated, *nunc pro*

23  *tunc* to the Petition Date, with the MTS Reorganized Debtor and the following shall be deemed to

24  occur:

25    (i)    the unpaid balance of the MWP Loan and any claims between MTS and MWP

26  shall be deemed released, forgiven, and extinguished;

27    (ii)    any assets or property of MWP and/or the MWP Estate (including Avoidance

28  Actions or other causes of action and property recoverable or any other recoveries thereon) shall

be deemed property of the MTS Estate, shall vest in the MTS Reorganized Debtor as of the

Effective Date as provided in Section V.4 below, and shall be considered assets or property of the

MTS Reorganized Debtor under the Plan and shall be subject to the terms and conditions of the

Plan, including, without limitation, Sections V.1 –3. below;

(iii)    the MTS Reorganized Debtor shall have the right to receive any amounts owing to

MWP, including any rent owed by the County;

(iv)    any claims against MWP, including any claims scheduled or filed in the MWP

Case, shall be Claims against MTS and under and subject to the Plan, shall be considered

Disputed, Disallowed, or Allowed as provided in the Plan, shall be subject to the terms and

conditions of the Plan, including, without limitation, Sections V.1 – 3. below, and shall receive the

treatment expressly set forth in the Plan for the holder of such claim or in accordance with the

treatment of similarly situated claims in the Plan, *i.e.*, any General Unsecured Claims shall receive

the treatment in Class 16, in full settlement and satisfaction of such claims; and

(v)    MWP shall be deemed dissolved, shall receive the discharge in Section V.2. below,

and shall be subject to the injunction granted in Section V.3. below.

The MWP Consolidation shall not impair or impact the rights of PNC to collect on its

claims against the MTS Reorganized Debtor, MWP, and/or the MTS Reorganized Debtor's assets

if otherwise permitted by order of the Bankruptcy Court following an Uncured PNC Default in

accordance with the treatment in Class 1, including, without limitation, with respect to the one-

action rule and the anti-deficiency rules set forth in California Code of Civil Procedure §§ 580 and

726 due to the MWP Consolidation.  The Debtors reserve the right to amend the Plan such that the

MWP Consolidation will occur upon the later of the Effective Date and the payment of the

Allowed PNC Secured Claim in full under the Plan.

### 6.    Sale of Real Properties

After the Effective Date, the Reorganized Debtors shall be authorized, but not required

(except as otherwise expressly set forth below in this Section III.F.6.), to sell any Estate Real

Property.  Pending the Plan Term End Date, the sale or encumbering of any Estate Real Property

shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real Property shall not

be sold or encumbered absent an order of the Court.  The Reorganized Debtors may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

As an alternative to the sale any Estate Real Property as provided or required herein, the Reorganized Debtors may incur or obtain financing secured by such property as necessary to pay Allowed Claims pursuant to an order of the Court.

Within one (1) year after the Effective Date and to the extent not sold prior thereto (the **"Sale Deadline"**), the MTS Reorganized Debtor shall close sales of Allen St. Property and the Elder Creek Property.  The MTS Reorganized Debtor may extend the Sale Deadline for "cause" by motion filed with the Bankruptcy Court prior to the expiration of the Sale Deadline.

MWP is currently seeking to sell both the Allen St. Property and the Elder Creek Property. Jordan believes that MTS is using the Elder Creek Property for an equipment yard and, as such, MTS will need to find replacement property for the Elder Creek Property.  MTS's position is that Jordan's assertion is inaccurate.  MTS is not using the Elder Creek Property as an equipment yard. Jordan also asserts that he will oppose any sale of MWP's real estate and that there is no reason to sell MWP's real property to pay PNC.

### 7.    The Plan Trust

On the Effective Date, a plan trust (the "Plan Trust") shall be created pursuant to the Plan Trust Agreement attached to the Index as Exhibit 17 and shall be subject to the terms and conditions in the Plan and the Confirmation Order.

All Distributions to the Holders of Allowed General Unsecured Claims of MTS and MWP pursuant to the Plan shall be from the Plan Trust.  The Plan Trustee shall not be required to make more than one Distribution to such Holders of Allowed General Unsecured Claims per calendar quarter.  All Persons dealing with the Plan Trustee, or seeking to assert General Unsecured Claims against MTS, MWP, the MTS Reorganized Debtor, the MTS Estate, the MWP Estate, or the Plan Trust shall look only to property of the Plan Trust (and in accordance with the terms of the Plan) to satisfy any liability to such Persons, and the Plan Trustee shall have no personal or individual obligation to satisfy any such liability.

8. **Reporting to the Plan Trust by the MTS Reorganized Debtor**

Beginning with the first full Measurement Period after the Effective Date and continuing until the MTS Reorganized Debtor completes the payment of the GUC Payment Amount and any GUC Bonus to the Plan Trust, within forty-five (45) days of each Measurement Period, the following shall be provided to the Plan Trustee: a balance sheet, profit and loss statement, and cash flow statement for each of the MTS Reorganized Debtor, PTM, PTS, and MWP (pending the MWP Consolidation).  Such financial statements for the MTS Reorganized Debtor and PTS may be provided on a consolidated basis.

9. **The Reorganized Debtors Retention of Professionals and Fees and Expenses**

On or after the Effective Date, the Reorganized Debtors may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as it deems necessary and appropriate to assist in carrying out its rights or duties under the Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtors.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtors (the "**Reorganized Debtors' Professionals**") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtors.

The Reorganized Debtors' Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses.  The Reorganized Debtors shall pay, without further order, notice, or application to the Court, the reasonable fees and actual expenses of any Reorganized Debtors' Professionals.

10. **The Plan Trustee as Disbursing Agent**

The Plan Trustee shall serve as the disbursing agent under the Plan for the Holders of Allowed General Unsecured Claims against MTS and/or MWP, and shall be responsible for making all Distributions to the Holders of Allowed General Unsecured Claims required under the Plan.

### 11. The Bond

The Plan Trustee and the Reorganized Debtors shall not be required to post a bond or surety or other security for the performance of their duties under the Plan.

### 12. Release of Liens

Except as otherwise expressly provided in the Plan for the Holders of Allowed Claims in MTS and MWP Classes 1-13 and 17-18, RM Class 1, or the Confirmation Order, or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against property of the Estate shall be released.  The Plan Trustee and the Reorganized Debtors shall be empowered to file such pleadings and/or record such documents or instruments as necessary to eliminate, expunge or release such liens from their respective assets.

### 13. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Plan Trustee and the Reorganized Debtors may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption(s) specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan.

### 14. The MTS Reorganized Debtor's Post-Confirmation Management

On the Effective Date, Richard Mowbray will continue in his role as CEO of the MTS

Reorganized Debtor, Ruben Sainos will continue in his role as CFO of the MTS Reorganized Debtor, and Robin Mowbray will continue in her role as Director of the MTS Reorganized Debtor's Board of Directors.  To the extent that MTS's bylaws are inconsistent with the Plan, the Plan shall control.

### 15.    Powers and Duties of the Reorganized Debtors

On and after the Effective Date and except as otherwise set forth in the Plan, and notwithstanding anything to the contrary in MTS's bylaws, the MTS Reorganized Debtor shall have the power and authority to take such actions as necessary to carry out and implement the terms of the Plan, including, without limitation, the following:

a.    Making the Distributions required by the Reorganized Debtors under the Plan;

b.    Filing motions or commencing proceedings to determine the allowability, classification, and priority of Claims and Interests;

c.    Administering the terms of the Plan, the Confirmation Order, or any order of the Court;

d.    Opening or closing any accounts the Reorganized Debtors determine reasonable, necessary, or required under the Plan;

e.    Reviewing, approving, and paying the fees and costs incurred by the Reorganized Debtors' Professionals after the Effective Date;

f.    Operate and use its revenues and cash provided they comply with the payment terms in the Plan;

g.    Filing, prosecuting, or compromising any Estate Claims, excluding the Trust Causes of Action, which are vested in the Plan Trust;

h.    Filing motions or commencing proceedings to seek an injunction, judgment or order, or taking any other action as may be necessary or appropriate to enforce the terms of, or to restrain interference with, the Plan or the Confirmation Order; and

i.    Taking any other action reasonably necessary or appropriate, in the Reorganized Debtors' discretion, related to the MTS Reorganized Debtor's operations or to implement the Plan.

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, subject to the provisions of the Plan, by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without any further requirement of further action by the Reorganized Debtors.

### G.    Default on Obligations to Holders of Allowed Claims

The following shall be considered a **"Default"** under the Plan:  (1) the failure of a Reorganized Debtor to (a) make a payment to the Holder of an Allowed Secured Claim, (b) make a Plan Trust Payment to the Plan Trust when such payment is due under the Plan, or (c) sell the Allen St. Property or the Elder Creek Property by the Sale Deadline (as may be extended), or (2) if, on any two (2) year anniversary of the Effective Date, the amount paid by the MTS Reorganized Debtor to the Plan Trust on account of the GUC Payment Amount (via the Class 16 GUC Payment), on a cumulative basis by such anniversary, is forty percent (40%) less than projected to be paid by the MTS Reorganized Debtor by such anniversary under the Projections. Upon a Default, the Plan Trustee or the party to whom such payment was required to be made may, in such party's discretion, provide written notice of such default to the applicable Reorganized Debtor and its counsel.  If the applicable Reorganized Debtor fails to cure such Default within thirty (30) days of receipt of the written notice, then such Default shall be an **"Uncured Default"** and the party noticing the Default may, after meeting and conferring with the applicable Reorganized Debtor in good faith to determine whether the Uncured Default can be consensually resolved, file a motion with the Bankruptcy Court seeking dismissal or conversion of the Chapter 11 Cases under 11 U.S.C. § 1112(b) in accordance with the Plan.  This remedy is in addition to any remedy expressly granted to, or permitted by, the Holder of an Allowed Secured Claim in the treatment in the Plan for such Holder.  The remedy provided by this Section III.G. shall otherwise be the sole remedy for any Uncured Default under the Plan.

1

**H.**    **Procedures For Resolving Disputed Claims**

2    THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE MTS CASE BY

3 CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS

4 DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2025.

5    THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE MWP CASE AND THE

6 RM CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE

7 SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS JULY 14, 2025.

8    **1.**    **Standing**

9    The Reorganized Debtors reserve the right to object to any Claim, to estimate any Claim,

10 and to seek to subordinate any Claim after the Effective Date.  On the Effective Date, the

11 Reorganized Debtors and any other party-in-interest shall have standing to file motions or

12 commence adversary proceedings to object to Claims, to estimate Claims, and/or to subordinate

13 Claims pursuant to 11 U.S.C. § 510.  An objection to any Claim, whether such Claim is based on

14 the Schedules or any proof of claim, or a motion or adversary proceeding to subordinate a Claim

15 pursuant to 11 U.S.C. § 510 may be filed after the Effective Date by such parties by the Claim

16 Objection Deadline (as such deadline may be extended as provided herein).  The Reorganized

17 Debtors and any other party-in-interest may seek to extend the Claim Objection Deadline for

18 "cause" by a motion filed prior to the Claim Objection Deadline (as may be extended).  There is

19 no limit to the number of extensions that may be sought.  As used herein, the "**Claim Objection**

20 **Deadline**" shall mean the date that is one (1) year after the Effective Date.  The Reorganized

21 Debtors have standing settle or compromise any Disputed Claim; provided, however, any

22 settlement or compromise of a Disputed Claim shall require an order of the Court approving such

23 settlement or compromise pursuant to a noticed motion.  The MTS Reorganized Debtor shall be

24 deemed the real party in interest in any objections to Claims commenced prior to or after the

25 Effective Date in the MTS Case or the MWP Case.  The RM Reorganized Debtor shall be deemed

26 the real party in interest in any objections to Claims commenced prior to or after the Effective

27 Date in the RM Case.

28    A person who asserts a personal injury tort or wrongful death claim arising post-petition

against MTS may, in accordance with 11 U.S.C. § 157(b)(5), have such claim liquidated and tried

in the U.S. District Court for the Central District of California or in the U.S. District Court in

which the claim arose, as determined by the U.S. District Court for the Central District of

California.

### 2. <u>No Distribution Pending Allowance</u>

No Claim shall be paid under the Plan unless it is or becomes an Allowed Claim.

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with

respect to all or any portion of a Disputed Claim unless and until all objections and motions as to

such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and

the Disputed Claim, or some portion thereof, has become an Allowed Claim.  If a Disputed Claim

does not become an Allowed pursuant to a Final Order adjudicating an objection to such Claim or

a motion or adversary proceeding to subordinate or estimate such Claim, then no Distribution shall

be made on account of such Claim.  If a Claim is, pursuant to Final Order, disallowed in its

entirety or subordinated in its entirety to the General Unsecured Claims in a Case, then no

Distribution shall be made on account of such Claim.

### 3. <u>Reserves for Disputed Claims</u>

In the event that Disputed Claims are pending at the time of a Distribution under the Plan,

the Disbursing Agent shall establish and maintain a reserve for such Disputed Claims.  For

purposes of establishing a reserve for all Disputed Claims as otherwise required herein, Cash will

be set aside equal to the amount that would have been distributed to the Holders of the Disputed

Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of

Allowed Claims in the same Class or of the same priority as the Disputed Claims.  Unless

otherwise provided in the treatment with respect to a particular Claim, if a Disputed Claim

ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall

be distributed on the earlier of: (a) the Distribution Date following the date when the Disputed

Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an

Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim

because the Disputed Claim does not become an Allowed Claim shall be returned to the applicable

1 Reorganized Debtor.

2 **4. Claims Paid By Third Parties**

3 To the extent that the Holder of a Claim receives any Other Recoveries (before or after the

4 Effective Date) on account of such Claim, (i) the Holder of such Claim shall be required to, within

5 thirty (30) days of the receipt of such Other Recoveries, file an amended Proof of Claim reflecting

6 a reduction of such Claim in the amount of such Other Recoveries, and (ii) whether or not such

7 amended Proof of Claim is filed, the Claim shall be deemed disallowed and reduced in the amount

8 of such Other Recoveries as of the Holder's receipt of such Other Recoveries without an objection

9 having to be filed and without any further notice, action, order, or approval by the Court, and any

10 Pro Rata Distributions or Distributions to which such Holder is otherwise entitled under the Plan

11 shall be adjusted accordingly.

12 **I. Distributions**

13 **1. Distributions for Claims Allowed as of the Effective Date**

14 Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant

15 parties, the Reorganized Debtors shall make initial distributions under the Plan on account of

16 Claims Allowed before the Effective Date on or as soon as practicable after the Effective Date.

17 **2. Distributions on Account of Claims Allowed After the Effective Date**

18 **a. Payments and Distributions on Disputed Claims**

19 Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant

20 parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed

21 Claim after the Effective Date shall be made as soon as practicable after the Disputed Claim

22 becomes an Allowed Claim.

23 **b. Special Rules for Distributions to Holders of Disputed Claims**

24 Notwithstanding any provision otherwise in the Plan, and except as otherwise agreed to by

25 the relevant parties, no partial payments and no partial distributions shall be made with respect to a

26 Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved

27 by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication

28 and resolution, the Plan Trustee or the Reorganized Debtors, as the case may be, shall establish

93

appropriate reserves for potential payment of such Claims.

### 3. Delivery and Distributions and Undeliverable or Unclaimed Distributions

#### a. Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtors and the Plan Trustee, as the case may be, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution or any Proof of Claim filed by that Holder.

#### b. Undeliverable Distributions

Distributions to Holders of Allowed Claims will be sent to the last known address set forth on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof of claim was filed. Holders of Allowed Claims may change the address to which the distributions will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of the change of address on the applicable Reorganized Debtor and the Plan Trustee. If a distribution is returned as undeliverable, the applicable Reorganized Debtor or the Plan Trustee, as the case may be, shall hold the distribution and shall not be required to take any further action with respect to the delivery of the distribution unless and until the applicable Reorganized Debtor or the Plan Trustee is notified in writing of the then-current address of the person or entity entitled to receive the distribution. Unless and until the applicable Reorganized Debtor or the Plan Trustee is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision below for distribution of Unclaimed Property.

#### c. Distributions of Unclaimed Property

If any distributions are returned to the Reorganized Debtors or the Plan Trustee as undeliverable, then such distributions shall be deemed to be "Unclaimed Property." Nothing contained in this Plan shall require the Reorganized Debtors, the Plan Trustee, or anyone else, to attempt to locate such person or entity. The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtors or the Plan Trustee. If such person or entity presents itself within six (6) months of the date of the payment

returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity.  If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

### 4.  Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Plan Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Plan Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

### J.  Treatment of Executory Contracts and Unexpired Leases

### 1.  Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, any executory contracts and unexpired leases identified on the schedule of executory contracts and unexpired leases to be assumed filed with the memorandum or pleading in support of confirmation of the Plan (the "**Schedule of Assumed Agreements**") shall be deemed assumed by the applicable Reorganized Debtor, as the case may be.  The Schedule of Assumed Agreements will identify any amounts that must be paid to cure defaults under the executory contracts to be assumed under the Plan (the "**Cure Amount**").  The Debtors reserve the right to amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; (b) modify the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any

executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing. The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.

Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a final determination of the Cure Amount and a final determination that the Debtor has shown adequate assurance of future performance. Further, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults arising from, out of, or related to the executory contract or unexpired lease, including any claims that were or could have been asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and you object to the assumption of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must file and serve upon the Debtors and their counsel a written objection within the deadline for objecting to the confirmation of the Plan. An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount. Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Plan for such non-debtor party. If a dispute arises regarding (a)

whether the Debtors have provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Debtors reserve the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative Cure Amount (an "Alternative Cure Amount"), then the Debtors may amend the Schedule of Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the right of the Reorganized Debtors to either, up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date (the "**Cure Motion Deadline**"), (1) file a motion to determine the appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease. Any such motion or notice of any such amendment will be served on the party to the executory contract or unexpired lease affected by the motion (or its attorney, if any).  If the Reorganized Debtors do not, by the Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease, then the Cure Amount will be the Alternative Cure Amount and such amount will be paid to the applicable non-debtor party within fifteen (15) days after the Cure Motion Deadline (unless otherwise expressly set forth in the Plan for such non-debtor party).  If the Reorganized Debtors have filed such a motion and does not timely amend the Schedule of Assumed Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the

97

Court.  The Cure Amount will be paid to the applicable non-debtor party as soon as reasonably practicable following the expiration of the 15-day deadline or as otherwise expressly set forth in the Plan for such non-debtor party.

**2.**    **Rejection of Executory Contracts or Unexpired Leases Not Assumed**

On the Effective Date, the Reorganized Debtors will be deemed to have rejected any and all executory contracts and unexpired leases not identified on the Schedule of Assumed Agreements.  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contracts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the Reorganized Debtors and their counsel within thirty (30) days of the later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed Agreements by the Debtors to eliminate the executory contract or unexpired lease.  Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtors, the Reorganized Debtors, the Estates and their respective property.  Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims.

IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN.

**K.**    **Preservation of Causes of Action and Avoidance Actions for the Reorganized Debtors**

The Plan reserves for the Reorganized Debtors all rights to commence and pursue, as appropriate, any and all Estate Claims, excluding the Trust Causes of Action vested in the Plan Trust and the Released Claims, whether arising prior to or after the Petition Date, in any court or other tribunal.  On the Effective Date, excluding the Trust Causes of Action vested in the Plan Trust and the Released Claims, the Reorganized Debtors are vested with authority to enforce, file, litigate, prosecute, settle and collect Estate Claims, including Avoidance Actions not vested in the

98

Plan Trust, although the Reorganized Debtors will not be required to do so unless it determines that doing so would be in the best interests of its creditors or Interest Holders.

While the Debtors have attempted to identify Estate Claims in the Disclosure Statement which may be pursued, and hereby incorporate by reference those disclosures and provisions, the failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to limit the rights of the Debtors or the Reorganized Debtors to pursue any Estate Claim that is expressly vested in such party in the Plan.  Unless an Estate Claim against any Person is expressly waived, relinquished, released, compromised, or settled as provided or identified in the Plan (like the Released Claims), any Confirmation Order or prior Bankruptcy Court order, the Debtors and the Reorganized Debtors expressly reserve Estate Claims for later adjudication (either by the Reorganized Debtors or the Plan Trustee, as the case may be).  Therefore, no preclusion doctrine, including, without limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to any Estate Claim upon or after Confirmation or consummation of the Plan (except with respect to the Released Claims).

All Estate Claims (excluding the Trust Causes of Action vested in the Plan Trust and the Released Claims) are preserved under the Plan for the benefit of the Estates and the Reorganized Debtors, as applicable under the terms of the Plan.  The Reorganized Debtors may settle or compromise any Estate Claims (excluding the Trust Causes of Action vested in the Plan Trust and the Released Claims) without further notice, motion, or order of the Bankruptcy Court.  Any recoveries on Estate Claims (excluding the Trust Causes of Action, which are vested in the Plan Trust) shall be paid to the applicable Reorganized Debtor and be used to pay operating expenses or make payments on account of Allowed Claims and/or Interests in accordance with the terms of the Plan.  Notwithstanding anything herein to the contrary, the Released Claims are released and discharged as provided in Section III.A.2. of the Plan.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO

RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR

RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION.

HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH

RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE

UNDER THE BANKRUPTCY CODE OR OTHER LAW (OTHER THAN THE INSIDER

AVOIDANCE ACTIONS, WHICH ARE VESTED IN THE PLAN TRUST).

L.    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the

Chapter 11 Cases and all entities with respect to all matters related to the Cases, the Debtor,s the

Reorganized Debtors, and the Plan as legally permissible, including, without limitation,

jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or

secured or unsecured status of any Claim, including, without limitation, the

resolution of any and all objections to the allowance or priority of any Claim;

2.    Grant or deny any applications for allowance of compensation or reimbursement of

expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods

ending on or before the Confirmation Date;

3.    Resolve any matters related to the assumption, assignment or rejection of any

Executory Contract or Unexpired Lease to which a Debtor is a party;

4.    Resolve any issues related to any matters adjudicated in the Cases;

5.    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant

to the provisions of the Plan;

6.    Decide or resolve any motions, adversary proceedings, contested or litigated

matters and any other Estate Claims that are pending as of the Effective Date or

that may be commenced in the future, provided that the Reorganized Debtors shall

reserve the right to commence actions in all appropriate forums and jurisdictions;

7.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan;

8.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

9.    Issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

10.    Enforce the terms of the Plan;

11.    Enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12.    Resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan; and

13.    Enter an order concluding the Cases.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as deadlines for filing claims. The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

1    Many requirements must be met before the Bankruptcy Court can confirm a plan.  Some of

2    the requirements include that the plan must be proposed in good faith, acceptance of the plan,

3    whether the plan pays creditors at least as much as creditors would receive in a Chapter 7

4    liquidation, and whether the plan is feasible.  These requirements are NOT the only requirements

5    for confirmation.

6        **A.    Who May Vote on or Object to the Plan**

7    Any party in interest may object to the confirmation of the Plan, but as explained below,

8    not everyone is entitled to vote to accept or reject the Plan.

9        **B.    Who May Vote to Accept or Reject the Plan**

10    A creditor or interest holder has a right to vote for or against the Plan if that creditor or

11    interest holder has a claim or interest which is both (1) Allowed or allowed for voting purposes,

12    (2) classified in an impaired class, and (3) entitled to receive or retain some property on account of

13    its Claim.

14        **C.    What Is an Allowed Claim or Interest**

15    As noted above, a creditor or interest holder must first have an Allowed Claim or Interest

16    to have the right to vote.  Generally, any Proof of Claim or Interest will be Allowed, unless a party

17    in interest files an objection to the Claim or Interest.  When an objection to a Claim or Interest is

18    filed, the Person holding the Claim or Interest cannot vote unless the Bankruptcy Court, after

19    notice and a hearing, either overrules the objection or allows the Claim or Interest for voting

20    purposes.

21    THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE MTS CASE ON

22    ACCOUNT OF PRE-PETITION CLAIMS WAS **FEBRUARY 20, 2025**.  THE BAR DATE FOR

23    FILING A PROOF OF CLAIM IN THE MWP CASE AND THE RM CASE ON ACCOUNT OF

24    PRE-PETITION CLAIMS WAS **JULY 14, 2025**.  A creditor may have an Allowed Claim even if

25    a Proof of Claim was not timely filed. A Claim is deemed an Allowed Claim if (1) it is scheduled

26    on the Debtor's Schedules and such Claim is not scheduled as disputed, contingent, or

27    unliquidated, and (2) no party in interest has objected to the Claim.  An Interest is deemed an

28    Allowed Interest if it is scheduled and no party in interest has objected to the Interest.

**D.      What Is an Impaired Claim or Interest**

As noted above, the Holder of an Allowed Claim only has the right to vote if it is in a Class that is impaired under the Plan.  A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is impaired if the Plan fails to pay the members of that Class 100% of what they are owed or otherwise impairs the legal rights of the Holders of the Claims.

In this case, the Debtors believes that MTS and MWP Classes 1-19 and RM Classes 1-4 are impaired and therefore entitled to vote to accept or reject the Plan.  Parties who dispute the Debtors' characterization of their Claims or Interests as being impaired or unimpaired may file an objection to the Plan contending that the Debtors have incorrectly characterized the class.

**E.      Who Is Not Entitled to Vote**

The following four types of claims are not entitled to vote: (1) Claims that are not Allowed; (2) Claims in unimpaired classes; (3) Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE (AND UNABLE TO VOTE), YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**F.      Who Can Vote in More Than One Class**

A creditor whose Claim is an Allowed Claim in part as a Secured Claim and in part as a General Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured portion of the Claim and another ballot for the unsecured portion of the Claim.  Also, a creditor who has a Claim for wages or unpaid vacation, healthcare or retirement benefits may have both a Priority Claim up to the maximum specified in Bankruptcy Code section

507(a)(4) and (a)(5), provided the conditions for priority treatment as specified under Bankruptcy Code section 507(a) are met, and a General Unsecured Claim for all amounts exceeding the statutory maximum. The Holder of such a Claim may cast a ballot for the priority portion of the Claim and another ballot for the general unsecured portion of the Claim.

### G.    Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed below.

### H.    Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan.  A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest Holders of such Class which actually voted, voted to accept the Plan.

### I.    Treatment of Non-Accepting Classes ("Cramdown")

If at least one impaired Class votes to accept the Plan, and other impaired Classes vote to reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner required by the Bankruptcy Code.  The process by which non-accepting Classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting Classes of Claims if it meets all consensual requirements except the voting requirements of Bankruptcy Code section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan as referred to in Bankruptcy Code section 1129(b) and applicable case law.

To meet the "fair and equitable" test set forth Bankruptcy Code § 1129(b), the Plan needs to comply with the "absolute priority rule."  In other words, as to a dissenting Class of General Unsecured Claims that will not be receiving or retaining property of a value that is equal to the

Allowed General Unsecured Claim, holders of any claims or interests that is junior to such Class should not receive or retain any non-exempt property except those under § 1115. However, under the "new value exception," a junior class may still retain property and meet the requirements of the absolute priority rule to the extent the junior class provides "new value," which is value that is: (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value or interest received.

The Debtors will ask the Court to confirm the Plan by "cramdown" on all impaired Classes if any of these Classes do not vote to accept the Plan.

The Debtors expect that the Plan satisfies the Absolute Priority Rule. The Absolute Priority Rule is an issue only if an impaired Class of Unsecured Claims votes to reject the Plan. If all impaired Classes vote to accept the Plan, then the Absolute Priority Rule is not triggered. Based on the Compromise included in the Plan and the substantial value to be paid under the Plan, the Debtors anticipate and expect that all impaired Classes will vote to accept the Plan. In addition, assuming the Plan must comply with the Absolute Priority Rule with respect to Class 16, it does so because no holder of any claim or interest that is junior to Class 16 is receiving or retaining any property on account of such junior claim or interest. Instead, the equity in the MTS is being cancelled and 100% of the equity interest in the MTS Reorganized Debtor shall be issued to the Trust on account of and in exchange for the Settlement Consideration and the Compromise embodied in the Plan. As to Robin Mowbray, the Plan complies with the Absolute Priority Rule because Robin Mowbray is proposing to pay the Holders of Allowed Unsecured Claims in Robin Mowbray Class 4 the value of her projected disposable income to be received during the 5-year period following the Effective Date of the Plan, in accordance with 11 U.S.C. § 1129(a)(15). Accordingly, the Plan can be confirmed whether or not the Absolute Priority Rule must be satisfied.

### J.    <u>Liquidation Analysis</u>

To obtain confirmation of the Plan, the Debtors must show that the Plan meets the "Best Interests of Creditors Test" Under that test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest

holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the proceeds of the sales of properties on which those creditors have liens. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

In order for the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation.

### 1. **MTS Liquidation Analysis**

The Debtors believes that the Best Interests of Creditors Test is met with respect to each Estate. The MTS Liquidation Analysis is attached to the Index as **Exhibit 4**. The Liquidation Analysis calculates high and low recovery scenarios for the Holders of Allowed General Unsecured Claims in a liquidation of MTS in a Chapter 7. The average based on those high and low recovery scenarios is $15,674,000 (the "**MTS Estimated Chapter 7 Distribution Amount**"). The Plan exceeds this sum. Under the Plan, the Holders of General Unsecured Claims will receive a *pro rata* share of the GUC Payment Amount in the amount of $25,000,000, with interest at the GUC Interest Rate, *plus* the GUC Bonus. In addition, the Plan provides that the Holders of Allowed General Unsecured Claims will receive a *pro rata* share of any Net Recoveries on account of the Trust Causes of Action.

The Plan results in more value to creditors than a Chapter 7 liquidation for multiple reasons. First, the Plan simply pays more value to the Holders of Allowed General Unsecured Claims. Under the Plan, the MTS Reorganized Debtor is committing to pay the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims) the $25,000,000 GUC Payment

Amount.  This minimum sum alone exceeds the MTS Estimated Chapter 7 Distribution Amount by over $9,000,000.  Moreover, the Plan provides for the Holders of Allowed General Unsecured Claims to share in the GUC Bonus.  By the GUC Bonus, the Holders of Allowed General Unsecured Claims could receive a *pro rata* share of up to another $30 million to $67 million (subject to the disallowance of Claims) in addition to the GUC Payment Amount.

Second, the Distributions through the Plan will be more efficient and less costly than the liquidation of such assets in a Chapter 7, which would result in a trustee unfamiliar with this Case and a new set of professionals representing the trustee.  The new professionals would need to become familiar with the MTS Case.  The appointment of a trustee and his or her retention of new professionals could delay any distributions and would result in an additional layer of administrative expenses.  Greater administrative expenses, in turn, would further reduce the amount available to pay the Holders of Allowed Unsecured Claims.

Third, the Plan maximizes the value available for the Holders of Allowed Claims.  The Holders of Allowed Claims will benefit from the value of the post-Effective Date operations of the MTS Reorganized Debtor and PTS.  As reflected in the PTS Projections, essentially all of PTS's excess cash flow is being paid to MTS on an annual basis during the Plan term.  (*See* Ex. 2 at 35.)  In addition, in a liquidation, it is unlikely that MTS and PTS would realize the full value of their respective accounts receivable and existing contracts.  Many of the customer contracts have onerous provisions that, upon an event of default, enable the customer to withhold payment and offset amounts owing by any damages incurred.  Certain contacts go further, requiring a return of payments already received.  The Plan preserves the business of MTS and PTS, enabling both to perform their obligations under their respective customer contracts, and, as a result, collect the proceeds for services rendered.  This value inures to the benefit of the Holders of Allowed Claims under the Plan.

Fourth, the Plan includes value from non-estate sources.  Due to the compromise embodied in the Plan and the Settlement Consideration, upon the MWP Consolidation, the assets of MWP will become assets of the MTS Reorganized Debtor.  As such, the MTS Reorganized Debtor will receive the MWP's real properties.  As reflected in the Claims Analysis attached to the Index as

**Exhibit 11**, MTS estimates that the collective value of MWP's real properties, net of Sierra Bank's Secured Claim, is $6,893,847. This value excludes the debt of PNC secured by two of MWP's real properties (the Elder Creek Property and the Allen Street Property). The value of MWP's real estate is in addition to the future rental income from the County of $35,124 per month. The rental income will benefit the Holders of Allowed Claims.

Fifth, the Plan preserves the right of creditors to share in any Net Recoveries on the Trust Causes of Action. The Plan vests the Trust Causes of Action in the Plan Trust for the Plan Trustee to investigate and, if appropriate, pursue. The Trust Causes of Action are compromised of any Insider Avoidance Actions that are not Released Claims and the Loan Causes of Action against PTM. For example, while the Plan contemplates payments on the PTM Loan, the Plan Trustee will have the right to pursue PTM to collect the projected unpaid balance, should he determine that it is in the best interests of the Plan Trust to do so. That is, under the Plan, the Holders of Allowed General Unsecured Claims are receiving the liquidation value of the PTM Loan, *plus* the potential to collect the full balance owing. The MWP Loan will be extinguished upon the MWP Consolidation, but MWP's real properties will become property of the MTS Reorganized Debtor.

Jordan asserts that MTS valued PTS at $338,000 and that such value should be higher. According to MTS, the MTS Liquidation Analysis values PTS at between $7,779,000 and $10,649,000. (*See* Index, Ex. 4.) The $338,000 figure represents the projected distribution on account of MTS's ownership interest in PTS from PTS's liquidation *after* the payment of PTS's debt, including the PTS Loan (in the low amount of $4,256,000 and the high amount of $5,954,000). (*See id.*; *see also id.* at 43 of 172.) Thus, MTS assert that Jordan's position is incorrect.

MTS believes that its methodology for valuing PTS is appropriate. MTS respectfully disagrees with the Examiner's suggestion that PTS must be valued as a going concern. The Liquidation Analysis assumes that, upon MTS's liquidation in a Chapter 7, PTS would also cease operations. MTS believes that, notwithstanding the Examiner's Report [Docket No. 538], this assumption remains sound. MTS's reasons for this are summarized in the Liquidation Analysis. (*See* Index, Ex. 4 at 46.) MTS believes that the liquidation of MTS would cause PTS to lose

infrastructure, services, and equipment critical to its operations.  (*See id.*)  MTS would cease

providing the management and administrative support services set forth in the PTS Management

Agreement.  This includes officer and director services, financial oversight and planning, human

resources, payroll, and employee benefits services, and fleet management.  In addition, the

majority of the equipment being utilized by PTS for the services it provides is leased from MTS.

PTS is currently leasing over 300 pieces of equipment.  A significant portion of the equipment that

PTS leases from MTS is leased from, or is subject to secured financing with, third parties.  Thus,

the liquidation of MTS's equipment in a hypothetical Chapter 7 occurring on the Effective Date of

the Plan, would deprive PTS of the equipment it needs to continue servicing its clients.

From MTS's perspective, the Examiner's contrary suggested valuation is based on a series

of hypothetical assumptions, such as a Chapter 7 trustee being able to continue PTS's operations

and equipment leasing pending a sale and locating a buyer with the significant capital PTS would

need.  (*See* Examiner's Report at 39-40 of 64.)

Jordan asserts that MTS's "description of its assets and their values is [sic] woefully

inadequate and appears to be purposefully misleading, even with the assistance of the CRO."

MTS disputes Jordan's assertion.  From MTS's perspective, the description of its assets and their

values are complete and accurate.  Jordan has not provided any specifics to support his assertion.

The Insider Payment Schedule attached to the Index as **Exhibit 10** lists the payments to

insiders within the four-year period prior to the Petition Date from MTS's books and records.

MTS has valued the Insider Avoidance Actions in the gross amount of $2,437,351 (including

compensation) based on the Claims Analysis prepared by Force 10 and attached to the Index as

**Exhibit 10** (the **"Insider AA Value"**).  Certain of the Insider Payments were ordinary course

payments for compensation to employees of MTS or for services provided to MTS (such as, by

PTM and PTS) and, therefore, are presumed to be not avoidable.  The Insider Payments also

include amounts loaned to PTM and PTS, which are not being released under the Plan.  The PTS

Loan is to be paid in full under the Plan.  As discussed above, the Loan Cause of Action against

PTM is to be vested in the Plan Trust.  The net Insider Payments to Gloria Mowbray, Robin

Mowbray, Richard Mowbray, Kim Mowbray, and the Trust during the four-year period prior to

1   the MTS Petition Date collectively total $38,187,758.78 (excluding those marked as

2   compensation).  (*See* Index, Ex. 6.)

3            For purposes of valuing the Insider Avoidance Actions for the Best Interests of Creditors

4   Test in this Disclosure Statement, Force 10 performed the Claims Analysis.  The Claims Analysis

5   estimates the potential value of Insider Avoidance Actions against Robin Mowbray, Gloria

6   Mowbray, the Trust, Richard Mowbray, and Kim Mowbray based on the Insider Payment

7   Schedule.  (*See* Index, Ex. 11.)  The Claims Analysis assumes that, in a Chapter 7 liquidation, a

8   trustee may not prevail on Insider Avoidance Actions for payments made in 2020, 2021, and 2022

9   because, based on the preliminary analysis of the MTS's CPA reviewed consolidated financials,

10  MTS was likely solvent at such time.  (*See id*.)  However, the position that MTS was solvent in

11  2020, 2021, and 2022 is subject to a legal dispute concerning the value or amount ascribed to the

12  claim of the Rodriguez Plaintiffs in those years, *i.e.*, while their lawsuit was pending but before

13  any judgment was obtained.  *See, e.g.*, *In re Imagine Fulfillment Servs., LLC*, 489 B.R. 136, 146

14  (Bankr. C.D. Cal. 2013) ("'For purposes of the insolvency test, if there is a contingent asset or

15  contingent liability, that asset or liability must be reduced to its present, or expected value.'").  As

16  reflected in the Examiner's Report:

> [A]n allowance would most likely be required for the claim of
> Rodriguez and Gomez but the quantification of the claim at different
> point[s] of time would not be easy.   And even if the full
> Rodriguez/Gomez claim were allowed as a liability in an insolvency
> analysis, it is not clear that the Debtor would be insolvent if value at
> the time on a going concern basis.

21  (*See* Report [Docket No. 538] at 28:4-8.)

22            The Claims Analysis assumes that MTS was insolvent in 2023 and 2024 based on MTS's

23  CPA reviewed consolidated financials for 2023 and MTS's unaudited financial statements for

24  2024.  In 2023 and 2024, the Insider Payments collectively totaled $2,437,351.  (*See* Index, Ex.

25  10.)  Thus, based on the Claims Analysis, the gross value of the potential Insider Avoidance

26  Actions against Robin Mowbray, Gloria Mowbray, the Trust, Richard Mowbray, and Kim

27  Mowbray is $2,437,351 (with compensation included).  Excluding compensation, which is

28  presumably not avoidable, the gross value of such Insider Avoidance Actions is $380,893.  (*See*

*id.*)  The stated gross value is also *without* taking into consideration any reduction in the potential recoveries based on costs of litigation, asserted defenses, and the financial wherewithal of any defendant to satisfy a judgment obtained.  For these reasons, the actual net amount that could be collected on such Insider Avoidance Actions is likely materially less.

The Estimated Chapter 7 Distribution Amount of $15,674,000, plus the Insider AA Value totals $18,111,351 ($15,674,000 + $2,437,351).  This combined total is still less than the value committed under the Plan.   Under the Plan, the Holders of General Unsecured Claims will receive a *pro rata* share of the GUC Payment Amount in the amount of $25,000,000, with interest at the GUC Interest Rate, *plus* the GUC Bonus.

The Claims Analysis is provided solely for purposes of evaluating the Compromise and for estimating the value of Insider Avoidance Actions for purposes of the Best Interests of Creditors Test in the Disclosure Statement, and, as such, is without any admission whatsoever, including, without limitation, as to the merits of any Insider Avoidance Actions.

All amounts contained in the Liquidation Analysis and described in the notes to the Liquidation Analysis are based on the information discussed above and are Force Ten's good faith estimates of the projected amounts that a Chapter 7 trustee would receive from the liquidation of the estate's assets.  The amounts, descriptions, and other information contained herein do not constitute an admission of the amounts of any Claims or an admission or a denial of the existence or values of the assets or liabilities, and are not to be used as such in any legal action, administrative proceeding, or otherwise.  The projections, estimates and notes to this Liquidation Analysis were prepared solely to assist the Bankruptcy Court in making the findings required under Bankruptcy Code § 1129(a)(7) of the Bankruptcy Code and they may not be used or relied upon for any other purpose.

### 2.    Robin Mowbray Liquidation Analysis

The RM Liquidation Analysis is attached to the Index as **Exhibit 6**.   Based on the RM Liquidation Analysis, the Holders of Allowed General Unsecured Claims would receive a *pro rata* share of $9,000 in a liquidation Chapter 7.  This projected distribution is primarily driven by the value of Robin Mowbray's real property.  Robin Mowbray's ownership interests in MTS, PTM,

and MWP are assumed to have no value in a Chapter 7 liquidation.  Under the Plan, the Holders of General Unsecured Claims will receive a *pro rata* share of $135,385, which sum exceeds the expected distribution in a Chapter 7 liquidation.

Robin Mowbray's ownership in MTS is assumed to have no value for two reasons.  First, based on the asserted Claims in the MTS Case, MTS currently has negative shareholder's equity.  Second, 100% of Robin Mowbray's shares in MTS is secured by the $22,793,934.42 Secured Claim of the Trust against Robin Mowbray.  As such, for a Chapter 7 trustee to liquidate Robin Mowbray's shares in MTS, the sale proceeds would need to exceed $22,793,934.42, which is extremely implausible.  In this scenario, the $22,793,934.42 Secured Claim of the Trust would be treated as a General Unsecured Claim and would further dilute the recoveries of the General Unsecured Creditors.  By contrast, under the Plan, the Secured Claim of the Trust is eliminated entirely.

Robin Mowbray's ownership in PTM is assumed to have no value because PTM is currently operating at a loss.  Attached to the Index as **Exhibit 12** are a current Profit & Loss Statement and Balance Sheet for PTM for the period ending June 30, 2025, which reflect net losses of $225,612.58 and total equity of negative $947,587.86.  Like the shareholder's equity of MTS, PTM's shareholder's equity is negative.

With respect to MWP, it is assumed that in a Chapter 7 liquidation of Robin Mowbray's Estate, a Chapter 7 trustee would seek to liquidate MWP and its real properties.  As discussed below, a liquidation of MWP's assets would result in net proceeds available for the Holders of General Unsecured Claims against MWP of $1,184,000.  As the Claims asserted against MWP (including Disputed Claims) exceed this sum, it is projected that there would be no distribution to Robin Mowbray's Estate on account of her 51% ownership in MWP.  The outstanding balance of the MWP Loan owed to MTS alone exceeds the projected net proceeds.  As such, it is assumed that Robin Mowbray's 51% ownership in MWP has no value.

### 3.    **MWP Liquidation Analysis**

The MWP Liquidation Analysis is attached to the Index as **Exhibit 5**.  Based on the MWP Liquidation Analysis, the Holders of Allowed General Unsecured Claims would receive a *pro rata*

share of $1,211,000 in a Chapter 7.  Due to the MWP Consolidation in the Plan, the Holders of

Allowed Claims of MWP will benefit from the MTS Reorganized Debtor's cash flow and the

value to be paid to MTS's creditors.  MWP's Secured Claim Holders, Sierra Bank and PNC, are to

be paid in full under the Plan.  The Holders of Allowed General Unsecured Claims of MWP will

receive far more under the Plan than in a Chapter 7 liquidation.  Under the Plan, the Holders of

General Unsecured Claims of MWP will be treated as creditors of MTS and will receive a *pro rata*

share of the GUC Payment Amount in the amount of $25,000,000, with interest at the GUC

Interest Rate, *plus* the GUC Bonus.

The information contained in this Liquidation Analyses is projected and assumed as of the

Effective Date.  The Debtors are under no obligation, and expressly disclaim any obligation to

publicly update any of the information contained herein, whether as a result of new information,

future events, or otherwise.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL

LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF

ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT

ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND

OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF

THE DEBTORS OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS,

NOR THE FINANCIAL INFORMATION OR NOTES ON WHICH IT IS BASED, HAS BEEN

EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE

WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED

PUBLIC ACCOUNTANTS.  THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS

WILL NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN

THE LIQUIDATION ANALYSIS.

More specifically, the Debtors believe that there can be no assurance as to the values that

would actually be realized in a Chapter 7 liquidation, nor can there be any assurance that a

Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in

making its determinations under Bankruptcy Code § 1129(a)(7).  For example, the Liquidation

Analyses necessarily contain an estimate of the amount of the Allowed Claims, which is based on the amounts of the Claims as listed in the Debtors' Schedules or in the Proofs of Claims filed by the claimants (some of which are subject to dispute by the Debtor), as well as estimated Administrative Expense Claims, Priority Unsecured Claims, and Professional Fee Claims.  These estimates are based solely upon the Debtors' analysis of the Schedules, the claims asserted against the Debtors, and the Proofs of Claim on file, and the Debtors' estimates as to additional Administrative Expense and other Claims that may arise in the event of a conversion of the case from Chapter 11 to Chapter 7.  No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any Distribution to be made on account of Allowed Claims under the Plan.  The Liquidation Analysis is being provided solely to disclose to Holders of Claims the potential recoveries in a hypothetical Chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. Nothing herein or in the Liquidation Analysis shall be deemed as an admission as to the allowed amount of any Claim.

### K.      Feasibility

Another requirement for confirmation involves the feasibility of the Plan.  This means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.

### 1.      Feasibility – MTS and MWP

### a.      Effective Date Payments

The first aspect considers whether there will be enough cash on the Effective Date of the Plan to pay the amounts due on such date.  MTS expects to have cash of approximately $8.5 million as of the Effective Date of the Plan.  (*See* Ex. 1 at 10.)  As demonstrated by the Projections, MTS expects that this balance will be sufficient to make the payments required on the

Effective Date in accordance with the Plan, including Allowed Administrative Claims, the Initial

Plan Trust Payment, and the PNC Effective Date Payment. (*See id.*, reflecting MTS's projected

cash balance and the reduction of liabilities between Q2 and Q3 2025.)

**b.** **Post-Effective Date Payments**

The second aspect of feasibility considers whether there will be enough cash over the life

of the Plan to make the Distributions required by the Plan when required by the Plan. The

payments required under the Plan after the Effective Date generally fall into two categories,

payments to the Holders of Allowed Secured Claims, and the Plan Trust Payment required to the

Plan Trust. Both categories of payments are feasible under the Plan. The Holders of Allowed

Claims against MTS or MWP will be paid from the MTS Reorganized Debtor as provided in the

Plan.

The MTS Reorganized Debtor is projected to operate on an operating cash flow positive

basis post-Effective Date. With the exception of 2025, in which extraordinary restructuring

expenses are to be paid, the MTS Reorganized Debtor is projected to generate net income on an

annual basis. (*See* Ex. 1 at 5.) The MTS Projections demonstrate that the MTS Reorganized

Debtor will have sufficient net cash flow to repay its Allowed Secured Claims and to fund GUC

Payment Amount, each as required under the Plan. (*See id.* 5, 11 and 13.) The MTS Reorganized

Debtor is projected to complete its obligations under the Plan by 2034,[23] with ending cash on hand

of approximately $2.0 million. (*See id.* at 11.) Moreover, the definition of the Class 16 GUC

Payment helps to ensure that the payment of the GUC Payment Amount is feasible as it is based

on the MTS Reorganized Debtor's actual cash flow post-Effective Date.

The MTS Reorganized Debtor is to receive substantial sums from PTS and PTM during

the term of the Plan. The MTS Reorganized Debtor is projected to receive management fees and

equipment rent from PTS of nearly $10.3 million per year. (*See* Ex. 1 at 5.) The PTS Loan is

projected to be repaid within two years after the Effective Date. (*See* Ex. 2 at 36.) The projected

distributions collectively exceed $6 million over the term the Plan. (*See id.*) Essentially, all of

PTS's net cash flow is being paid to the MTS Reorganized Debtor. The PTS Plan Projections

---

[23] This statement excludes the Claim of Sierra Bank, which is to mature in 2045.

1   demonstrate that PTS will be able to pay the projected sums to the MTS Reorganized Debtor.

2   (*See id.* at 29 and 35.)  In addition, the MTS Reorganized Debtor is projected to receive over

3   $420,000 annually from PTM on account of management fees and equipment rent.  (*See* Ex. 1 at

4   5.)

5       MTS has included with this Disclosure Statement the MTS Projections, projecting its post-

6   Effective Date operations, and the PTS Projections, projecting PTS's post-Effective Date

7   operations.  (*See* Exs. 1 & 2.)  While the projected revenues and expenses upon which the Plan is

8   based are subject to a variety of unpredictable outside forces and circumstances that could

9   adversely affect the projections, MTS believes that the MTS Projections and the PTS Projections

10  are based on reasonable assumptions.  Nonetheless, certain factors may be outside of MTS's

11  present control.

12              **2.    <u>Feasibility – Robin Mowbray</u>**

13      Robin Mowbray expects to have sufficient cash as of the Effective Date to pay Allowed

14  Administrative Claims as required by the Plan.  Robin Mowbray's post-confirmation income will

15  be comprised of wages from MTS.  Thus, as the Plan is feasible as to MTS, it is as to Robin

16  Mowbray.  As reflected in the RM Projections attached to the Index as **<u>Exhibit 3</u>**, Robin Mowbray

17  expects her income from MTS to be sufficient to cover her ordinary course operating expenses and

18  to make the payments required during the term of the Plan on account of her Allowed General

19  Unsecured Claims.

20      FINANCIAL PROJECTIONS PROVIDED WITH THE DISCLOSURE STATEMENT

21  WILL REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON

22  CERTAIN ASSUMPTIONS SET FORTH WITH SUCH FINANCIAL PROJECTIONS.  THESE

23  FUTURE EVENTS MAY OR MAY NOT OCCUR, AND ANY FINANCIAL PROJECTIONS

24  MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE

25  ACTUAL RESULTS WHICH WILL OCCUR.  BECAUSE OF THE UNCERTAINTIES

26  INHERENT IN PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE

27  PROPONENTS' CONTROL, THE REORGANIZED DEBTORS' ACTUAL CASH FLOW MAY

28  BE DIFFERENT FROM THAT PROJECTED, AND SUCH DIFFERENCE MAY BE

1    MATERIAL AND ADVERSE TO THE INTERESTS OF CREDITORS.

2

3    **V.**    **EFFECT OF CONFIRMATION OF THE PLAN**

4        **1.**    **Binding Nature of Plan**

5        CONFIRMATION OF THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND

6    INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW,

7    NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR

8    RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS

9    FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASES OR (III)

10    FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE

11    PLAN.

12        **2.**    **Discharge**

13        MTS and MWP will receive a discharge upon the entry of the Confirmation Order.  Robin

14    Mowbray will receive a discharge upon the completion of her payment of the RM Net Disposable

15    Income.  Nothing herein shall limit the effect of confirmation as described in §§ 524 and/or 1141

16    of the Bankruptcy Code.  Upon discharge, the Reorganized Debtors and their assets will, to the

17    fullest extent permitted by § 1141 of the Bankruptcy Code, including, without limitation as

18    provided in § 1141(d)(1)(A) of the Bankruptcy Code, be deemed discharged and released from

19    any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of

20    action, remedies, losses, and liabilities of any nature whatsoever, whether known or unknown, that

21    arose before the Effective Date or that are based upon, arise from, or otherwise relate to acts,

22    events, omissions, transactions, or other activities of any kind that occurred before the Effective

23    Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each

24    case, regardless of whether: (1) a proof of claim based on such a debt is filed or deemed filed; (2)

25    a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the person holding

26    the Claim based on such a debt has accepted the Plan; provided, however, that in no event shall the

27    Debtors be discharged of any obligations remaining under the Plan as of the Effective Date.

28        Except as expressly provided in the Plan, pursuant to § 1141(d)(5)(A), the Confirmation

Order will be a judicial determination of discharge of all liabilities of the Debtors to the fullest extent allowed under § 1141 of the Bankruptcy Code.  The Reorganized Debtors will not be liable for any Claims and will only have any obligations that are specifically provided for in the Plan. Holders of any Claims or debts against the Debtors will, upon the Effective Date, be enjoined from taking any action to collect, recover, or offset any such Claim or debt against the Reorganized Debtors or as a personal liability of the Reorganized Debtors.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all persons will be precluded from asserting or pursuing against the Reorganized Debtors, the Estates, the Plan Trustee, or their respective property for any Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Effective Date, and any debt of the Debtors or Claim against the Debtors, whether secured or unsecured, which was in default up to the Effective Date, will no longer be deemed in default and will be deemed in good standing.

### 3. **Injunction**

All Persons or entities who have held, hold, or may hold Claims (other than Claims that are unimpaired under the Plan), and all other parties in interest in the Case, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claims against the Debtors treated, discharged, released, or settled under the Plan, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) on account of any such Claims against the Reorganized Debtors; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, on account of any judgment, award, decree, or order related to any such Claims against the Reorganized Debtors; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Reorganized Debtors on account of any such Claims; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Reorganized Debtors, or against the property or interests

in property of the Debtors or Reorganized Debtors, on account of such Claims; (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Plan; or (vi) taking any act to obtain possession or collect from the respective assets of the Reorganized Debtors or the Plan Trust on account of any such Claims or any act to recover on account of any such Claims; provided, however, that nothing contained herein shall preclude such entities from exercising their rights pursuant to and consistent with the terms of the Plan.

### 4. **Vesting of Property in the Reorganized Debtors**

Except as otherwise provided in the Plan and excluding the Trust Causes of Action, the confirmation of the Plan vests title to all property whatsoever of MTS, MWP, the MTS Estate, and the MWP Estate in the MTS Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but, pending the payment of all Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the Plan.

Except as otherwise provided in the Plan, the confirmation of the Plan vests title to all property whatsoever of Mowbray and the RM Estate in the RM Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but, pending the payment of all Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the Plan.

### 5. **Modification of the Plan**

The Debtors may modify this Plan at any time before confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan.  The Debtors may also seek to modify this Plan at any time after confirmation only if (1) this Plan has not been substantially consummated, and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6. **Exculpations and Releases**

To the maximum extent permitted by law, and except to the extent arising from willful misconduct, gross negligence, fraud or malpractice as construed under CA PRC 1.8.8., neither the Debtors, nor any of its professionals employed or retained by it in the Case (collectively, the

"Exculpated Parties"), shall have or incur liability to any person or entity for any Official Actions taken or omission made in good faith in connection with or related to the formulation and implementation of this Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of this Plan, the consummation and implementation of this Plan, or the transactions contemplated by the Plan related to the post-petition administration of the Cases prior to the Effective Date.

### 7.    Submission of Post-Confirmation Reports

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtors shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on each of the following or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties that receive notice of electronic filings in the Chapter 11 Cases.  Further status reports shall be filed every 120 days and served on the same entities.

### 8.    Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Reorganized Debtors until a final decree, or the entry of an order dismissing the Cases or converting the Cases to Chapter 7, at the rate in effect at the time such fees are due.

### 9.    Post-Confirmation Conversion/Dismissal

After the Plan is confirmed, a creditor or party in interest may bring a Motion, only after notice and a hearing, to convert or dismiss the Chapter 11 Case under Bankruptcy Code section 1112(b) if there is an Uncured Default as defined in Section III.G. above or other material default in performing the Plan.  If the Bankruptcy Court orders the one of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the estate and vested in a Reorganized Debtor, and that has not been distributed under the Plan will revest in the Chapter 7 estate.  The automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Bankruptcy Court during the Case.

1    The Confirmation Order may also be revoked under very limited circumstances. The

2  Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in

3  interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry

4  of the Confirmation Order.

5                    **10.    Final Decree**

6    Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the

7  applicable Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final

8  decree to close the applicable Case. The Reorganized Debtors shall be responsible for the timely

9  payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

10

11  **VI.    RISK FACTORS REGARDING THE PLAN**

12    Performance of the obligations under the Plan are subject to various factors and

13  contingencies, some of which are described in this section. The following discussion summarizes

14  some of the material risks associated with the Plan, but is not intended to be exhaustive.

15  Moreover, it should be read in connection with the other disclosures contained in this Disclosure

16  Statement and the Plan. Each creditor, in conjunction with its advisors, should supplement the

17  following discussion by analyzing and evaluating the Plan and the Disclosure Statement as a

18  whole. THE RISKS ASSOCIATED WITH THE PLAN MUST BE CAREFULLY

19  CONSIDERED IN DETERMINING WHETHER TO ACCEPT THE PLAN.

20    The Plan is funded from the post-Effective Date cash flow and operations of the MTS

21  Reorganized Debtor, including payments to the MTS Reorganized Debtor from PTM and PTS. In

22  particular, the MTS Reorganized Debtor's post-Effective Date cash flow includes management

23  fees and equipment rent from PTS, the repayment of the PTS Loan, and projected distributions

24  from PTS. The ability of PTS to make such payments and distributions is based on its projected

25  cash flow. The PTS Projections are attached to the Index as **Exhibit 2**.

26    The MTS Reorganized Debtor is projected to operate on a cash flow positive basis after the

27  Effective Date. (*See* Ex. 1.) The projected payments from PTS and PTM contribute to such

28  positive cash flow. MTS believes that the MTS Projections and the PTS Projections are reliable

projections of their respective future cash flows.  However, each projection is a mere estimate and is based on certain assumptions.  MTS believes those assumptions are reasonable.  However, there is a risk that the MTS Reorganized Debtor's actual post-Effective Date operations are materially different than projected.  Sales could be less than expected and/or expenses can be more than expected, either of which could impact the ability of the MTS Reorganized Debtor to make the payments contemplated by the Plan.  There is a similar risk that PTS's post-confirmation operations are different than projected.

There are risks associated with the future operations of the MTS Reorganized Debtor, PTS, and PTM.  MTS currently has ten (10) customers.  In addition, MTS's customer contracts are, in general, of short duration, typically 2 years.  There is no guarantee that a particular customer will select MTS for future work after the expiration of MTS's current contract(s).  As discussed above, the financial distress that led to the MTS Case was, in part, caused by a decline in revenues due to MTS's loss of certain customers, which left the MTS with expenses it could not pay.  However, MTS has been attempting to secure additional work from current customers and prospective customers.  The revenues generated post-petition include new customers secured in 2024.

Jordan asserts there is a risk of default under the Plan because the management of MTS under the Plan remains the same as during the MTS Case and Jordan claims that such management created MTS's financial problems.  MTS notes that the three largest asserted claims in the MTS Case stem from the period of time that Jordan served as the CEO of MTS (including the disputed claim that Jordan asserts).  In addition, MTS believes that MTS's current management has been instrumental in MTS's ability to weather the pre-petition decline in revenues discussed above, to maintain operations, and to strengthen its cash flow during the MTS Case.  Ultimately, MTS believes that creditors can make their own decision with respect to MTS's management based on the information herein.

PTS's revenues are largely concentrated in one customer, SCE.  SCE currently represents approximately 99% of PTS's revenues.  The loss of SCE's contracts would result in a severe disruption to PTS's operations (absent PTS replacing the loss with revenues from another source).  Without SCE's contracts, PTS would lack the ability to make the projected payments to the

Reorganized Debtor.  PTS's current SCE contracts expire December 31, 2026.  Similar to the

Debtor, there is no guarantee that PTS will secure future work from SCE after the expiration of the

current contracts.  However, PTS is attempting to extend its existing contracts with SCE and win

work from other prospective customers.

Jordan asserts there is a risk that Pino could leave "Mowbray's and start[] a competing

company to bid on SCE job for his own benefit" or he could join "another company with

equipment and capital to bid on the SCE job competing with Mowbray's."  However, Pino has an

employment contract with PTS to serve as PTS's CEO.  In addition, the PTS Stock Agreement

dated May 26, 2022, includes a non-compete provision applicable to Pino that lasts for a two-year

period after he is no longer an employee.  To MTS's knowledge, Pino has no intention to leave

PTS.

While PTM has one third-party customer, historically, PTM's revenues were primarily

derived from services provided to MTS and PTS.  MTS has not needed PTM's traffic management

services after the MTS Petition Date.  A decline in the work secured by MTS and/or PTS could, in

turn, could impact the ability of PTM to pay the MTS Reorganized Debtor the amounts set forth in

the Projections.

In addition, operations of PTS and PTM could be disrupted if MTS's operations ceased.

MTS provides assistance to both PTS and PTM in the form of management services and the rental

of equipment, each pursuant to written agreements.  As such, if MTS's operations cease, then both

such entities' operations would be materially and adversely impacted.

Jordan asserts that MTS must disclose a funding source or explain that there is an

increased risk of default under the Plan should cash flow go negative as a result of ongoing

operations associated with receivable collections or loss in present business.  The risks associated

with the businesses of MTS and MTS are discussed above.  As reflected in the MTS and PTS

Projections, MTS does not believe that financing is required for MTS to make the payments

required by the Plan.  However, MTS believes that it and/or PTS can obtain accounts receivable

financing after the Effective Date should such become advisable or required.

The MWP Estate is being substantively consolidated with MTS.  Any Allowed Claims

against MWP will be paid by the MTS Reorganized Debtor as provided in the Plan.  As such, the risks stated with respect to MTS apply equally to MWP.  Jordan asserts that there is an obvious risk to him to have all of the MWP equity disappear into MTS.

Robin Mowbray's primary source of income is MTS.  Thus, if and to the extent any of the risks above with respect to MTS occur, it could impact Robin Mowbray's income and, as a result, her ability to fund the payments required under the Plan.

## VII.    TAX CONSEQUENCES OF THE PLAN

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtors.  The Debtors CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

At this time, it is projected that there will be no federal or state income tax due from the implementation of the Plan.

///

///

///

///

///

///

///

///

///

## VIII.  <u>CONCLUSION</u>

The Debtors believe that the Plan is in the best interests of all stakeholders and urge the Holders of Allowed Claims to vote in favor of the Plan.

DATED:  September 18, 2025          RAINES FELDMAN LITTRELL LLP

By:    */s/ Robert S. Marticello*
     ROBERT S. MARTICELLO
     MICHAEL L. SIMON
     Counsel for The Original Mowbray's Tree
     Service, Inc.

DATED:  September 18, 2025          ELKINS KALT WEINTRAUB REUBEN
                                   GARTSIDE LLP

By:
     ROYE ZUR
     LAUREN N. GANS
     Attorneys for Debtor and Debtor-in-Possession
     Mowbray Waterman Property, LLP.

## <u>TABLE OF DEFINITIONS</u>

A.      <u>Definitions</u>

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

"<u>Administrative Claim</u>" means a Claim for costs and expenses of the administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a Claim of a Professional employed at the expense of the Estate and any fees or charges asserted against the Estate under 28 U.S.C. § 1930.

"<u>Administrative Tax Claim</u>" means an Administrative Claim or other Claim that is not an Allowed Secured Claim and that a government unit asserts against the Debtor for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

"<u>Affiliates</u>" means, collectively, PTS, PTM, and MWP.

"<u>Allowed</u>" means a Claim that is either (a) listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection, motion to estimate, or motion to subordinate has been filed; or (b) with respect to which a proof of claim has been filed by the Claims Bar Date, and as to which either (i) no objection, motion to estimate, or motion to subordinate was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (ii) any such objection, motion to estimate, or motion to subordinate has been determined with the Claim being allowed by a Final Order.  The amount of an Allowed Claim shall be as follows: (a) if the creditor did not file a proof of claim with the Bankruptcy

126

Court on or before the Claims Bar Date, (1) the amount of the creditor's Claim as listed in the operative Schedules as not disputed, contingent, unliquidated or unknown, or (2) the amount fixed by Final Order of the Bankruptcy Court in resolving any timely filed objection, motion to estimate, or motion to subordinate, or other motion disputing the amount of such Claim; or (b) if the creditor filed a proof of claim with the Bankruptcy Court on or before the Claims Bar Date, (1) the amount stated in such proof of claim if no objection, motion to estimate, or motion to subordinate with respect to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection, motion to estimate, or motion to subordinate with respect to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim for which a proof of claim is not filed by the Claims Bar Date and that is not listed in the Schedules or is listed in the Schedules as disputed, unliquidated, contingent or unknown shall be zero, and no distribution shall be made on account of such Claim.  An Allowed Claim shall not include any unmatured or post-petition interest unless otherwise stated in the Plan.

"<u>Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim</u>" means an Allowed Claim in the specified Class and/or of the specified type.

"<u>Allowed Administrative Claim</u>" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

"<u>Allowed General Unsecured Claim</u>" means an Allowed Unsecured Claim that is not entitled to priority.

"<u>Allowed Secured Claim</u>" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has as interest, or which is subject to setoff under Section 533 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the mount subject to any setoff as the case may be.

"<u>Available Trust Proceeds</u>" collectively refers to the GUC Payment Amount, the GUC Bonus, and Net Recoveries.

"Avoidance Action" means causes of action arising under 11 U.S.C. §§ 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bankruptcy Code" or "Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California.

"Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a).

"Calculation Date" means the date that is thirty (30) days after the end of a Measurement Period.

"Case" in the singular refers to either the MTS Case, the MWP Case, or the Robin Mowbray Case and, in the plural, refers to the MTS Case, the MWP Case, and the Robin Mowbray Case collectively.

"Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

"Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and includes any claims based on, arising from, or connected with any work performed by the Debtor prior to the Petition Date, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claims Bar Date" means as follows: as to MTS, February 20, 2025, the date the Court set

as the deadline for creditors to file proofs of claim against MTS Estate; and, as to MWP and

Mowbray, May 15, 2025, the date the Court set as the deadline for creditors to file proofs of claim

against the MWP Estate and the RM Estate.

"Class" means the group of Claims classified in the Plan pursuant to Sections 1122 and

1123 of the Bankruptcy Code.

"Class 16 GUC Payment" means, with respect to each Measurement Period after the

Effective Date until the GUC Payment Amount is paid to the Plan Trust in full, the Projected GUC

Payment for such Measurement Period (a) plus or minus, as the case may be, the difference

between (i) the actual net income less income tax distributions of the Reorganized Debtor

(inclusive of PTS) for such Measurement Period and (ii) the projected net income and income tax

distributions as set forth in the Plan Projections for the same period, and (b) if and to the extent

that such Projected GUC Payment (as may be augmented by subparagraph (a) of this definition)

complies with the Minimum Working Capital Ratio and the Minimum Cash Threshold.  The Class

16 GUC Payments shall be calculated by the Reorganized Debtor in consultation with the Plan

Trustee and approved by the Plan Trustee.

"Confirmation Date" means the date on which the Bankruptcy Court enters the

Confirmation Order.

"Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the

Plan.

"Debtor" in the singular refers to either MTS, MWP, or Robin Mowbray and, in the plural,

refers to MTS, MWP, and Robin Mowbray collectively.

"Debtor/RP Settlement Agreement" means any written settlement agreement executed

between the Debtor and the Rodriguez Plaintiffs and filed with the Court.

"Disclosure Statement" means the *Disclosure Statement Describing Joint Chapter 11 Plan

of Reorganization*, including as may be further amended or modified.

"Disputed Claim" means all or any part of a Claim that is the subject of a timely objection,

request for estimation, or motion to subordinate pursuant to 11 U.S.C. § 510 filed on or before the

Claims Objection Deadline (as such deadline may be extended), which objection, request for

129

estimation, or motion to subordinate has not been withdrawn or determined by a Final Order of the

Bankruptcy Court.  In addition, prior to the later of (a) the Claims Objection Deadline, (b) if prior

to the Claim Objection Deadline, a motion to disallow, estimate, or subordinate the Claim is filed,

then the date upon which such motion is determined by Final Order, or (c) if a proceeding is

pending to determine the validity, amount, or characterization of the Claim before a court of

competent jurisdiction (and if and to the extent that, prior to the Effective Date, the Bankruptcy

Court entered an order lifting the automatic stay to allow the proceeding to proceed to final

judgment), then the date upon which such proceeding, including, without limitation, any appeal or

remanded or further proceedings in or related to such proceeding, is resolved by a Final Order, any

Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the

proof of claim is listed in the Schedules, (2) the Claim corresponding to the proof of claim is listed

in the Schedules as disputed, contingent, unliquidated, or unknown, (3) the amount of the Claim as

specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the

Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

any corresponding Claim listed in the Schedules.

"Distribution" means the Cash that is required to be distributed under this Plan to the holders

of Allowed Claims and Interests.

"Effective Date" means the date that is the fifteenth (15th) day after entry of the

Confirmation Order.

"Estate Claims" means any and all claims and causes of action that constitute property of

the Estate including, but not limited to, any Avoidance Actions, equitable subordination or debt

recharacterization actions, any causes of action or claims for recovery of any amounts owing to the

Debtor or the Estate, and any claims or causes of action against the Debtor's insurance carriers.

"Estate Real Property" means any real property that an Estate has an interest in and any

real property of MWP.

"Estates" means, collectively, the MTS Estate, the MWP Estate, and the RM Estate.

"Examiner" refers to Donald T. Fife, in his capacity as the Court-appointed examiner under the *Order Approving the U.S. Trustee's Application for the Appointment of an Examiner* [Docket No. 374].

"Excess GUC Cash Payment" means, with respect to each Measurement Period after the Reorganized Debtor pays the GUC Payment Amount in full to the Plan Trust, fifty percent (50%) of the actual net income less income tax distributions of the Reorganized Debtor (inclusive of PTS) for such Measurement Period in excess of and subject to the Minimum Working Capital Ratio and the Minimum Cash Threshold.  The GUC Excess Cash Payments shall be calculated by the Reorganized Debtor in consultation with the Plan Trustee and approved by the Plan Trustee.

"Excluded Claims" means any (a) Estate Claims or Avoidance Actions against PTS, including, without limitation, with respect to the PTS Loan or any Insider Payments to PTS, (b) the Released Claims, and (c) any other Estate Claim or Avoidance Action that is released pursuant to a compromise approved by a Final Order of the Court.

"File," "Filed," or "Filing" means duly and properly filed with the Court and reflected on the Court's official docket.

"Final Order" means an order or judgment entered by the applicable court on its docket.

a.    That has not been reversed, rescinded, stayed, modified, or amended;

b.    That is in full force and effect;

c.    With respect to which the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; and

d.    With respect to which any appeal, motion or petition for review, remand, rehearing, or reconsideration, or writ of certiorari that is Filed has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, reconsideration, or a writ of certiorari was sought, and any remanded or further proceedings following such appeal, petition, or writ have been resolved by Final Order.

"General Unsecured Claim" means an unsecured Claim against a Debtor, however arising, not entitled to priority under § 507(a) of the Bankruptcy Code.

"GUC Bonus" means, if and to the extent that the GUC Payment Amount is satisfied within five (5) years after the Effective Date, then the Excess GUC Cash until the earlier or first to be reached of (a) the payment of the greater of (i) $55,000,000 (*i.e.*, another $30,000,000 in addition to the GUC Payment Amount) and (ii) an amount equal to 40% of the Allowed General Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust inclusive of the GUC Payment Amount, and (b) the date that is five (5) years after the Effective Date; provided, however, if GUC Payment Amount is paid in full by the Reorganized Debtor to the Plan Trust in the fifth (5th) year after the Effective or later, then (b) of this definition shall be extended from five (5) years after the Effective Rate for one (1) year after the GUC Payment Amount is paid in full.

"GUC Interest Rate" shall mean, for each year beginning on and after the Effective Date, the federal judgment rate for the first Business Day of such year.

"GUC Maximum Amount" means the greater of $55,000,000 and an amount equal to 40% of the Allowed General Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust inclusive of the GUC Payment Amount.

"GUC Payment Amount" means the lesser of (a) $25,000,000, plus simple interest per annum on the balance of such amount not yet paid to the Plan Trust at the GUC Interest Rate, and (b) the total amount of Allowed General Unsecured Claims.

"GUC Payment Commencement Date" means the fifteenth (15th) Business Day after the third anniversary of the Effective Date.

"Holder" means an entity holding a Claim.

"Initial Plan Trust Payment" means the $50,000 payment by the Reorganized Debtor to the Plan Trust on the Effective Date.

"Insider" shall have the meaning in 11 U.S.C. § 101(31).

1    "Insider Avoidance Action" means any Avoidance Action against any Insider, excluding

2    any Excluded Claim.

3        "Interest" means any "equity security" as provided by § 101(16) of the Bankruptcy Code.

4        "Lien" means any lien, encumbrance, pledge or other charge against property.

5        "Loan Causes of Action" means any Estate Claims or Avoidance Actions against PTM

6    solely to collect the balance on the PTM Loan in excess of the amounts to be paid to the MTS

7    Reorganized Debtor as set forth in and according to the Projections, which amounts shall be the

8    property of the MTS Reorganized Debtor.

9        "Measurement Period" means each three-month period ending March 31, June 30,

10   September 30, and December 31 after the Effective Date and beginning with the first full such

11   three-month period after the Effective Date.

12       "Mill St. Property" means the real property located at 686 E. Mill Street, San Bernardino,

13   CA 92415.

14       "Minimum Cash Balance" means $3,000,000.

15       "Minimum Working Capital Ratio" a minimum working capital ratio of at least 1.25 to 1.0

16   as measured in accordance with Generally Accepted Accounting Principles in the United States

17   ("**US GAAP**").

18       "Motion" means a request asking a judge to issue a ruling or order on a legal and/or

19   equitable matter.

20       "Mowbray" or "Ms. Mowbray" means Robin Elaine Mowbray.

21       "MTS" means The Original Mowbray's Tree Service, Inc.

22       "MTS Bankruptcy Case" or "MTS Case" means the bankruptcy case of the MTS Debtor

23   under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy

24   Court for the Central District of California, Santa Ana Division, with Case No. 8:24-bk-12674-SC.

25       "MTS Estate" means the bankruptcy estate of MTS created under Section 541 of the

26   Bankruptcy Code in the MTS Case.

27       "MTS Liquidation Analysis" means the liquidation analysis setting forth what Holders of

28   Allowed Claims will receive in a chapter 7 liquidation of MTS and attached to the Index as

**Exhibit 4**.

"MTS Petition Date" means October 18, 2024, the day that MTS filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"MTS Projections" means the projections attached to the Index as **Exhibit 1.**

"MTS Reorganized Debtor" refers to MTS, as substantively consolidated with MWP, upon and after the Effective Date and as reorganized under the Plan.

"MWP" means Mowbray Waterman Property, LLC.

"MWP Bankruptcy Case" or "MWP Case" means the bankruptcy case of MWP under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:25-bk-10542-SC.

"MWP Estate" means the bankruptcy estate of MWP created under Section 541 of the Bankruptcy Code in the MWP Case.

"MWP Liquidation Analysis" means the liquidation analysis setting forth what Holders of Allowed Claims will receive in a chapter 7 liquidation of MWP and attached to the Index as **Exhibit 5**.

"Net Recoveries" means any proceeds recovered and received by the Plan Trust on any Trust Causes of Action, net of all attorneys' fees and other costs incurred to recover such proceeds, and less any Trust Costs.

"Non-Ordinary Course Administrative Claim(s)" means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

"Ordinary-Course Administrative Claim" means Administrative Claims other than Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative Claims, based upon liabilities that Debtor incurs in the ordinary course of its business.

"Other Recoveries" means any amount, property, value, or payment that the Holder of a Claim receives on account of such Claim from a Person who is not the Debtor or from property that is not property of the Estate, including, without limitation, from a co-obligor, insurer,

134

1    primarily liable party, or guarantor.

2         "OUST" means the Office of the United States Trustee, Santa Ana Division.

3         "Person" means any individual, corporation, general partnership, limited partnership,

4    limited liability company, association, joint-stock company, joint venture, estate, trust,

5    government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official

6    committee appointed by the OUST, unofficial committee of creditors or equity holders, or entity.

7         "Plan" means the *Joint Chapter 11 Plan of Reorganization*, including as may be further

8    amended or modified.

9         "PNC Collateral" means the "Prepetition Collateral" as that term is defined in the First

10   Cash Collateral Stipulation and any other assets of the Estate subject to PNC Security Interests.

11        "PNC Loan Documents" means the "Prepetition Loan Documents" as that term is defined

12   in the First Cash Collateral Stipulation.

13        "PNC Security Interests" means the "Prepetition Liens" as that term is defined in the First

14   Cash Collateral Stipulation and any replacement liens granted to PNC pursuant to Section 6.b. of

15   the First Cash Collateral Stipulation.

16        "PTM" means Phoenix Traffic Management, Inc.

17        "PTS" means Pino Tree Service, Inc.

18        "PTS Projections" means the projections attached to the Index as **Exhibit 2.**

19        "Projected GUC Payment" means the Payments under General Unsecured Claims set forth

20   at page 19 of 172 of the Projections.

21        "Plan Trust" means the trust created under the Plan for the benefit of creditors holding

22   Allowed General Unsecured Claims.

23        "Plan Trust Agreement" means the trust agreement attached to the Index as Ex. 17.

24        "Plan Trust Payments" means the Class 16 GUC Payment, the Excess GUC Cash Payment,

25   and the GUC Annual Minimum Payment.

26        "Plan Trustee" means Donald T. Fife, the trustee appointed for the Plan Trust.

27        "Priority Unsecured Claim" means an Allowed Claim entitled to priority against the Estate

28   under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

1    "Priority Tax Claim" means an Allowed Claim entitled to priority against the Estate under

2    Bankruptcy Code § 507(a)(8).

3    "Pro Rata Distribution" means the ratio (expressed as a percentage) of (i) the amount of an

4    Allowed General Unsecured Claim (less any Other Recoveries) to (ii) the sum of the aggregate

5    amounts of all Allowed General Unsecured Claims.

6    "Professional Fee Claim" means:

7    a.    A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for

8            compensation for professional services rendered or expenses incurred on the

9            Estate's behalf, or

10    b.    A Claim either under Bankruptcy Code § 503(b)(4) for compensation for

11            professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for

12            expenses incurred in making a substantial contribution to the Estate.

13    "PTS Projections" are the projections attached to the Index as **Exhibit 2**.

14    "Quarterly Distribution Date" means the Business Day selected by the Plan Trustee, in his

15    or her sole and absolute discretion, within forty-five (45) days after a particular calendar quarter to

16    make a Distribution as required by the Plan.

17    "Released Claims" means as defined in Section III.F.3. of the Disclosure Statement.

18    "Reorganized Debtors" refers to the MTS Reorganized Debtor and RM Reorganized

19    Debtor.

20    "Request for Payment" means a request for the allowance and payment of a Non-Ordinary

21    Course Administrative Claim pursuant to 11 U.S.C. § 503(a).

22    "RM Bankruptcy Case" or "RM Case" means the bankruptcy case of Robin Elaine

23    Mowbray under chapter 11 of the Bankruptcy Code that is pending before the United States

24    Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:25-

25    bk-10543-SC.

26    "RM Estate" means the bankruptcy estate of Ms. Mowbray created under Section 541 of

27    the Bankruptcy Code in the RM Case.

28    "RM Liquidation Analysis" means the liquidation analysis setting forth what Holders of

Allowed Claims will receive in a chapter 7 liquidation of Robin Mowbray and attached to the Index as **Exhibit 6**.

"RM Projections" means the projections attached to the Index as **Exhibit 3.**

"RM Reorganized Debtor" refers to Ms. Mowbray, upon and after the Effective Date and as reorganized under the Plan.

"Schedules" means the Schedules of Assets and Liabilities filed by the Debtor in its or her Case, as required by § 521(a)(1) of the Code, Bankruptcy Rule 1007 (b)(l), and Official Bankruptcy Form No. 6, as the Schedules of Assets and Liabilities may have been or may be amended from time to time.

"SOFA" means the Statement of Financial Affairs filed by the Debtor in its or her Case as required by § 521(a)(1) of the Code and Bankruptcy Rule 1007(b)(l), as the Statement of Financial Affairs may have been or may be amended from time to time.

"Trust" means the Gloria Mowbray Separate Property Trust.

"Trust Available Proceeds" means (a) the Initial Trust Payment, less any Trust Costs, (b) the Plan Trust Payments to fund the GUC Payment Amount, and (c) any Net Recoveries.

"Trust Causes of Action" means the Insider Avoidance Actions and the Loan Causes of Action, excluding, in all cases, the Excluded Claims.

"Trust Costs" means the amount necessary or estimated to pay or reserve for, as determined by the Plan Trustee, in full (a) all costs of administration of the Plan Trust, (b) the reasonable fees and costs of the Plan Trustee and the Plan Trustee's Professionals, (c) the amounts Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims were to become Allowed Claims, and (d) all fees payable under section 1930 of chapter 123 of title 28 of the United States Code.

**B.** **Rules of Construction**

The rules of construction in Bankruptcy Code section 102 apply to this Disclosure Statement and the Plan.  For the purpose of this Disclosure Statement and the Plan, unless otherwise provided in this Disclosure Statement or the Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular

and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in this Disclosure Statement or the Plan to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to this Disclosure Statement and the Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement and the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Disclosure Statement or the Plan, as the case may be; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure Statement or the Plan in its entirety rather than to a particular portion of this Disclosure Statement or the Plan, as the case may be; (vii) unless otherwise provided in this Disclosure Statement or the Plan, any reference in this Disclosure Statement or the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of this Disclosure Statement or the Plan, or any other provision in this Section.

## C.    Rules of Interpretation

Except as otherwise provided in the Plan, Bankruptcy Rule 9006(a) applies when computing any time period under the Plan.

Any term used in the Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms or as amended by the terms thereof.

Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

Unless otherwise specified, all references to Sections or Exhibits in the Disclosure Statement are references to this Disclosure Statement's Sections or Exhibits, and all references to Sections or Exhibits in the Plan are references to the Plan's Sections or Exhibits

Section captions and headings are used only as convenient references and do not affect this Disclosure Statement's or the Plan's meaning.

**D.    <u>Disclosure Statement Exhibits</u>**

The Exhibits to the Disclosure Statement—attached to the concurrently-filed Index—are as follows:

Exhibit 1 – MTS Projections;

Exhibit 2 – PTS Projections;

Exhibit 3 – RM Projections;

Exhibit 4 - MTS and PTS Liquidation Analyses;

Exhibit 5 – MWP Liquidation Analysis;

Exhibit 6 – Robin Liquidation Analysis;

Exhibit 7 - MTS SOFA;

Exhibit 8 – MWP SOFA;

Exhibit 9 – Mowbray SOFA;

Exhibit 10 – Insider Payment Schedule;

Exhibit 11 – Claims Analysis;

Exhibit 12 – PTM Financials;

Exhibit 13 – June 2025 Monthly Operating Report;

Exhibit 14 – Police Report Related to Danner Accident;

Exhibit 15 – CSLB Contractor's License Detail for PTS;

Exhibit 16 – Trust Claim Documents; and

Exhibit 17 – Plan Trust Agreement.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
4675 MacArthur Ct., Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **SECOND AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 9/18/2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Shraddha Bharatia**    notices@becket-lee.com
- **Jeffrey W Broker**    jbroker@brokerlaw.biz
- **Kenneth J Catanzarite**    kcatanzarite@catanzarite.com
- **Lauren N Gans**    lgans@elkinskalt.com, lmasse@elkinskalt.com
- **Jessica L Giannetta**    jessica@giannettalawcorp.com, melanie@giannettaenrico.com
- **Robert P Goe**    rgoe@goeforlaw.com,
  kmurphy@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com
- **Marshall F Goldberg**    mgoldberg@glassgoldberg.com, jbailey@glassgoldberg.com
- **Alan Craig Hochheiser**    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Merdaud Jafarnia**    bkca@alaw.net, mjafarnia@ecf.inforuptcy.com
- **Raffi Khatchadourian**    raffi@hemar-rousso.com
- **Valery Loumber**    valloumlegal@gmail.com
- **Michael B Lubic**    michael.lubic@klgates.com, jonathan.randolph@klgates.com,klgatesbankruptcy@klgates.com
- **James MacLeod**    jmacleod@dunninglaw.com, nancy@dunninglaw.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Robert S Marticello**    rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Karen S. Naylor**    Becky@ringstadlaw.com, Karen@ringstadlaw.com;Arlene@ringstadlaw.com
- **Estela O Pino**    epino@epinolaw.com, staff@epinolaw.com;clerk@epinolaw.com
- **Donald W Reid**    don@donreidlaw.com, 5969661420@filings.docketbird.com
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Amitkumar Sharma**    amit.sharma@aisinfo.com
- **Jeffrey S Shinbrot**    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com;tanya@shinbrotfirm.com
- **Thomas E Shuck**    tshuck@pmcos.com, efilings@pmcos.com
- **Michael Simon**    msimon@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Derek A Simpson**    derek@dsimpsonlegal.com
- **Ahren A Tiller**    ahren.tiller@blc-sd.com, 4436097420@filings.docketbird.com;brett.bodie@blc-sd.com;anika@blc-sd.com;derek@blc-sd.com;kreyes@blc-sd.com;megan@blc-sd.com;nicole@blc-sd.com;danny@blc-sd.com;angie@blc-sd.com;kreyes@blc-sd.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,REC_KM_ECF_SMO@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com
- **Jennifer C Wong**    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com
- **Mandy Youngblood**    csbk@gmfinancial.com
- **Roye Zur**    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                              **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**:

On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 9/18/2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
United States Bankruptcy Court
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/18/2025 | Bambi Clark | /s/ Bambi Clark |
|-----------|-------------|-----------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**