**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello, State Bar No. 244256
*rmarticello@raineslaw.com*
4675 MacArthur Ct, Suite 1500
Newport Beach, CA 92660
Telephone:    310 440-4100
Facsimile:      949-247-3998

Attorneys for The Original Mowbray's Tree
Service, Inc., Debtor and Debtor-In-Possession

**ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP**
Roye Zur, State Bar No. 273875
*rzur@elkinskalt.com*
Lauren N. Gans, State Bar No. 247542
*lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Mowbray Waterman Property, LLC,
and Robin Elaine Mowbray, Debtors and Debtors-
in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE ORIGINAL MOWBRAY'S TREE SERVICE, INC., a Delaware corporation,<br><br>      Debtor and Debtor-in-Possession. | Case No.: 8:24-bk-12674-SC<br><br>Chapter:  11<br><br>(Jointly Administered with Case Nos. 8:25-bk-10542-SC and 8:25-bk-10543-SC) |
| In re:<br><br>MOWBRAY WATERMAN PROPERTY, LLC,<br><br>      Debtor and Debtor-in-Possession. | **THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>**Continued Plan Confirmation Hearing:**<br>Date:  March 4, 2026<br>Time:  1:30 p.m. |
| In re:<br><br>ROBIN ELAINE MOWBRAY,<br><br>      Debtor and Debtor-in-Possession. | Ctrm:  5C<br>      411 W Fourth Street<br>      Santa Ana, CA 92701 |
| ☐   Affects THE ORIGINAL MOWBRAY TREE SERVICE, INC. | |

SECOND MODIFIED SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION

☐   Affects MOWBRAY WATERMAN
    PROPERTY, LLC

☐   Affects ROBIN ELAINE MOWBRAY

☒   Affects All Debtors

**TABLE OF CONTENTS**

I.    EXECUTIVE SUMMARY OF THE PLAN ...................................................................... 1
    A.    MTS Plan Summary ............................................................................................ 1
    B.    MWP Plan Summary .......................................................................................... 3
    C.    Robin Mowbray Plan Summary ........................................................................ 4
II.    THE PLAN ................................................................................................................... 4
    A.    The Plan Provides for a Reorganization of the Debtors and Their Affairs ..... 4
    B.    The Plan Treats Claims Against All Three Estates ........................................... 5
    C.    What Creditors and Interest Holders Will Receive Under the Plan ................ 5
    D.    Allowance and Treatment of Unclassified Claims ........................................... 5
        1.    Administrative Claims .......................................................................... 5
            a.    Ordinary Course Administrative Claims .................................. 8
            b.    Non-Ordinary Course Administrative Claims .......................... 8
            c.    Professional Fee Claims ........................................................... 9
        2.    Priority Tax Claims .............................................................................. 9
    E.    Allowance and Treatment of Classified Claims and Interests ........................ 13
        1.    Summary of Classes ............................................................................ 13
        2.    Secured Claims – MTS & MWP .......................................................... 14
            a.    Secured Claim of PNC Bank .................................................. 14
            b.    Secured Claim of Jacobus Pino .............................................. 16
            c.    Secured Claims Related to Vehicles or Equipment .................. 16
            d.    Secured Claims – MWP ......................................................... 41
            e.    Secured Claims – Robin Mowbray .......................................... 43
        3.    Classes of Priority Unsecured Claims ................................................. 43
        4.    Classes of General Unsecured Claims ................................................. 44
            a.    MTS ....................................................................................... 44
            b.    MWP ...................................................................................... 46
            c.    Robin Mowbray ..................................................................... 46
        5.    Class of Interest Holders ..................................................................... 47
III.    MEANS FOR IMPLEMENTATION OF THE PLAN .............................................. 48
    A.    Funding of the Plan ......................................................................................... 48
        1.    Payment of the GUC Payment Amount and the GUC Bonus ............. 49
            a.    The GUC Payment Amount .................................................... 49
            b.    The GUC Bonus ..................................................................... 51
        2.    The Compromise Among MTS, Robin Mowbray, MWP, and the
            Trust ..................................................................................................... 53
        3.    Compromise with the Rodriguez Parties ............................................. 58

i

B.    The MWP Pledge............................................................................................ 60

C.    Sale of Real Properties ................................................................................. 61

D.    The Plan Trust............................................................................................... 61

a.    Reporting to the Plan Trust by the MTS Reorganized Debtor62

E.    The Reorganized Debtors Retention of Professionals and Fees and Expenses62

F.    The Plan Trustee as Disbursing Agent....................................................... 63

G.    The Bond ....................................................................................................... 63

H.    Release of Liens ............................................................................................ 63

I.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes............................................................................................... 63

J.    The Reorganized Debtors' Post-Confirmation Management..................... 64

K.    Powers and Duties of the Reorganized Debtors ........................................ 64

L.    Default on Obligations to Holders of Allowed Claims .............................. 65

IV.    CLAIM OBJECTIONS AND PROCEDURES FOR RESOLVING DISPUTED CLAIMS.................................................................................................................. 66

A.    Standing......................................................................................................... 66

B.    No Distribution Pending Allowance ........................................................... 67

C.    Reserves for Disputed Claims ..................................................................... 68

D.    Claims Paid By Third Parties ..................................................................... 68

V.    DISTRIBUTIONS ................................................................................................. 69

A.    Distributions for Claims Allowed as of the Effective Date ....................... 69

B.    Distributions on Account of Claims Allowed After the Effective Date .......... 69

1.    Payments and Distributions on Disputed Claims................................ 69

2.    Special Rules for Distributions to Holders of Disputed Claims .......... 69

C.    Delivery and Distributions and Undeliverable or Unclaimed Distributions . 69

1.    Delivery of Distributions in General.................................................... 69

2.    Undeliverable Distributions ................................................................. 69

3.    Distributions of Unclaimed Property ................................................... 70

D.    Compliance with Tax Requirements/Allocations....................................... 70

V.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 71

A.    Assumption of Executory Contracts and Unexpired Leases..................... 71

B.    Rejection of Executory Contracts or Unexpired Leases Not Assumed .......... 73

VI.    PRESERVATION OF CAUSES OF ACTION AND AVOIDANCE ACTIONS FOR THE REORGANIZED DEBTORS ................................................................ 74

VII.    RETENTION OF JURISDICTION ..................................................................... 75

VIII.    EFFECT OF CONFIRMATION OF THE PLAN .............................................. 77

A.    Binding Nature of Plan ................................................................................ 77

B.    Discharge....................................................................................................... 77

C.      Injunction.............................................................................................................78
D.      Vesting of Property in the Reorganized Debtors..............................................79
E.      Prohibition of Non-Voting Securities ...............................................................80
F.      Modification of the Plan .....................................................................................80
G.      Exculpations and Releases..................................................................................80
H.      Submission of Post-Confirmation Reports .......................................................80
I.      Quarterly Fees .....................................................................................................81
J.      Post-Confirmation Conversion/Dismissal.........................................................81
K.      Final Decree .........................................................................................................81
IX.    CONCLUSION.................................................................................................................82
TABLE OF DEFINITIONS ......................................................................................................83
A.      Definitions ............................................................................................................83
B.      Rules of Construction..........................................................................................95
C.      Rules of Interpretation........................................................................................96
D.      Exhibits.................................................................................................................97

The Original Mowbray's Tree Service, Inc. (the "**MTS**"), the debtor and debtor-in-possession in the above-captioned case (the "**MTS Case**"), Mowbray Waterman Property, LLC ("**MWP**"), the debtor and debtor-in-possession in Case No. 8:25-bk-10542-SC (the "**MWP Case**"), and Robin Elaine Mowbray ("**Robin Mowbray**" and collectively with MTS and MWP, the "**Debtors**"), the debtor and debtor-in-possession in Case No. 8:25-bk-10543-SC (the "**RM Case**" and together with the MTS Case and the MWP Case, the "**Cases**"), hereby submit this *Third Amended Joint Chapter 11 Plan of Reorganization* (the "**Plan**").[1]

## I.     EXECUTIVE SUMMARY OF THE PLAN

The Plan is a joint plan proposed by three debtors, MTS, MWP, and Robin Mowbray, resolving all three bankruptcy cases and treating the Claims against each on fair and equitable terms.  The Debtors are pursuing a joint plan because they believe their respective reorganizations are intertwined and a joint plan is the most efficient and sensible method for the Debtors to move their three cases forward towards a common and successful exit.

### A.     MTS Plan Summary

As to MTS, the Plan is a reorganizing plan that saves MTS's business and the jobs of its employees.[2]  The Plan enables MTS to restructure its obligations and continue operations, providing essential vegetation management services and disaster relief assistance to communities coast to coast.  The Plan also marshals significant value from all MTS Estate assets for the benefit of creditors.  Through MTS's ongoing operations, the Plan proposes to pay substantial value to the Holders of Allowed Claims, an amount that exceeds an estimated **$46,000,000** over the term of the Plan.

The Plan contains fair and equitable treatment for all Classes of creditors, secured and unsecured.  Each Holder of an Allowed Secured Claim will be paid in full.  In many respects, the Plan is based on the contractual repayment terms that gave rise to the Secured Claims or

---

[1]   Unless otherwise provided herein, all references to exhibits are to the exhibits attached hereto.  All references to the Index are to the *Index of Exhibits In Support of First Amended Joint Disclosure Statement Describing First Amended Joint Chapter 11 Plan of Reorganization.*

[2]   Unless otherwise defined herein, the definition of any capitalized term may be found in the Table of Definitions at the end of this Plan.

1

consensual treatment negotiated with the Holders of the Secured Claims.

The Holders of Allowed General Unsecured Claims against MTS will receive a *pro rata* share of the **$25,000,000** GUC Payment Amount.  The GUC Payment Amount is the *minimum* to be paid under the Plan to the Holders of Allowed General Unsecured Claims and it will be paid *with interest*.  As provided in more detail in the Plan, the GUC Payment Amount will be paid through a cash sweep mechanism—the Class 16 GUC Payment.  That is, all of the MTS Reorganized Debtor's excess cash (as defined in the Plan) will be contributed to the GUC Payment Amount until it is paid in full.  The GUC Payment Amount is currently projected to be paid by the MTS Reorganized Debtor within nine (9) years following the Effective Date.  The GUC Payment Amount can be paid earlier or later than projected based on the MTS Reorganized Debtor's actual performance after the Effective Date.  The payment of the GUC Payment Amount is set forth in Section III.A.1.a. below.  Any distributions on account of Disputed Claims will be reserved and paid upon allowance.

In addition, under the Plan, Allowed General Unsecured Creditors will have the opportunity to share in the upside of the MTS Reorganized Debtor's post-confirmation profits after the GUC Payment Amount is paid.  The Plan provides for the MTS Reorganized Debtor to pay a GUC Bonus for the benefit of the Holders of Allowed General Unsecured Claims.  The GUC Bonus is detailed in Section III.A.1.b. below.  In short, the GUC Bonus equals fifty percent (50%) of the MTS Reorganized Debtor's post-confirmation excess cash flow (as defined in the Plan) within five (5) years of the Effective Date (or, in certain circumstances, within one (1) year after the GUC Payment Amount is paid in full) and up to the cumulative sum (inclusive of the GUC Payment Amount) of **$55,000,000** or **40% of the Allowed General Unsecured Claims** (capped by the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), **whichever is greater**.  The amounts to be paid under the Plan to the Holders of Allowed General Unsecured Claims are the product of extensive negotiations and discussions by MTS with various parties in interest as well as settlements with certain key parties.

The Plan also vests certain potential claims of the MTS Estate in a Plan Trust for the Plan Trustee to investigate and, if appropriate, pursue.  The Holders of Allowed General Unsecured

2

Claims of MTS will receive a *pro rata* share of any Net Recoveries from such actions from the Plan Trust.  This is in addition to the sums discussed above unless otherwise set forth expressly in the Plan.

The MTS Reorganized Debtor's post-Effective Date operating cash flow includes significant value from its affiliates.  The pre-petition loan owing from MTS's wholly-owned subsidiary, Pino Tree Service, Inc. ("**PTS**"), is projected to be paid in full within two years after the Effective Date.  The MTS Reorganized Debtor is projected to receive management fees and equipment rent from PTS of approximately $10.3 million per year, *plus* additional distributions.  The projected distributions from PTS collectively exceed $6.0 million over the term of the Plan.  As such, the MTS Reorganized Debtor is receiving 100% of the economic benefit of PTS and essentially all of its excess cash flow during the term of the Plan.  In addition, the MTS Reorganized Debtor is projected to receive over $420,000 annually from Phoenix Traffic Management, Inc. ("**PTM**"), on account of management fees and equipment rent.  All of this value is benefiting the Holders of Allowed Claims under the Plan.

The MTS Reorganized Debtor's post-Effective Date projections are attached hereto as **Exhibit 1** (the "**MTS Projections**").  The sums projected to be paid from affiliates during the term of the Plan are set forth in the Projections.  MTS has also included post-Effective projections for PTS (the ("**PTS Projections**").  The PTS Projections are attached hereto as **Exhibit 2**.

B.      **MWP Plan Summary**

Under the Plan, MWP's Allowed Secured Claims are being paid in full.  The Holders of Allowed General Unsecured Claims of MWP will receive a one-time *pro rata* distribution of $1,500,000, plus interest at the GUC Interest Rate on such sum until it is paid (the "**MWP GUC Payment**").  The MWP GUC Payment exceeds the value that would be distributed in a hypothetical Chapter 7 liquidation of MWP.  MWP Reorganized Debtor will make the MWP GUC Payment from its assets.  Real property of MWP that is not liquidated to make the MWP GUC Payment (excluding the Mill St. Property until such time as Sierra Bank's Allowed Secured Claim has been paid in full) will otherwise be pledged and administered by MWP to ensure that the payments required by the Plan to the Holders of Allowed Secured Claims encumbering such

3

properties and to the Holders of Allowed General Unsecured Claims of MTS are made.

C.      **Robin Mowbray Plan Summary**

The Plan permits Robin Mowbray to reorganize her affairs and resolve the Claims asserted against her.  Robin Mowbray's debts largely, if not exclusively, arise from her ownership of MTS, and the most significant Claims asserted in her case are the same Claims asserted against MTS. Under the Plan, Holders of Allowed General Unsecured Claims against Robin Mowbray will receive a *pro rata* share of the value of Robin Mowbray's projected disposable income for five years, a sum that is projected to be $135,385.  The payments to such Holders will be made by Robin Mowbray from her post-confirmation compensation.  Holders of Allowed General Unsecured Claims against Robin Mowbray will receive the treatment for such Claims under the Plan in addition to any distributions to be made on account of Allowed Claims such Holders may also have against MTS (up to payment in full).

The Effective Date of the Plan will be the first Business Day that is fifteen (15) days after the entry of an order confirming the Plan ("**Confirmation Order**"), provided there has been no order staying the effectiveness of the Confirmation Order.

II.      **THE PLAN**

A.      **The Plan Provides for a Reorganization of the Debtors and Their Affairs**

The Plan is a reorganizing plan.  The Plan reorganizes the respective affairs of MTS, MWP, and Robin Mowbray on the terms of the Plan.  Any Distributions on account of Allowed Secured Claims will be made by the applicable Reorganized Debtor.  Distributions to the Holders of Allowed Unsecured Claims against MTS will be made by the Plan Trust.  Distributions to the Holders of Allowed Unsecured Claims against MWP and Robin Mowbray will be made by the MWP Reorganized Debtor, and the RM Reorganized Debtor, respectively.  No Distributions will be made to the Holders of any Disputed Claims in any of the Cases unless and until they become Allowed Claims.

The Projections supporting the Plan are attached hereto as **Exhibits 1** through **3**.

**B.      The Plan Treats Claims Against All Three Estates**

The Plan provides treatment for the Claims against each of the Debtors' Estates.  Creditors asserting the same Claim against more than one Estate or Debtor will receive only one satisfaction of such Claim.

Unless otherwise expressly provided in the Plan, no Distributions will be made and no rights will be retained on account of any Claim or Interest that has not become an Allowed Claim or Allowed Interest.

**C.      What Creditors and Interest Holders Will Receive Under the Plan**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right of priority.  The Plan states whether each Class of Claims or Interests is impaired or unimpaired.  The Plan provides the treatment each Class will receive.  In no event shall any creditor receive more than the creditor's Allowed Claim.

**D.      Allowance and Treatment of Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have not placed the following claims in a class:

**1.      Administrative Claims**

Administrative Claims are Claims for costs or expenses of administering the Debtors' Chapter 11 cases which are allowed under § 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The following chart lists all the Debtors' estimated § 507(a)(2) administrative claims and their treatment under this Plan:

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| Ordinary Course Administrative Claims against the Debtors, including Administrative Tax Claims | Varies by day | Unless a Debtor objects to an Ordinary Course Administrative Claim asserted against that particular Debtor, each Ordinary Course Administrative Claim shall be allowed and paid in the ordinary course of operations of the |

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| | | applicable Debtor and in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim. |
| Clerk's Office | $0 | Any outstanding Clark's Office fees will be paid in full on the Effective Date from the cash of the applicable Debtor. |
| OUST Fees | $0 | Any outstanding OUST Fees will be paid in full on the Effective Date from the cash of the applicable Debtor. |
| Administrative Tax Claims | $0 | Unless a Debtor objects to an Administrative Tax Claim asserted against that Debtor, each Administrative Tax Claim shall be allowed and paid in the ordinary course of that Debtor's operations and in accordance with the terms and conditions of the particular transaction that gave rise to the Administrative Tax Claim, and the Person holding the Administrative Tax Claim need not file any Request for Payment of its Claim. |
| Debra Danner | Unliquidated | Debra Danner asserts an unliquidated personal injury Claim against MTS arising post-petition (the **"Danner Claim"**).  Any Allowed Administrative Claim of Debra Danner against MTS in excess of any amounts paid to Ms. Danner from insurance shall be paid in full upon later of (a) the Effective Date, and (b) the entry of a Final Order pursuant to which Ms. Danner's Claim becomes an Allowed Administrative Claim against MTS (the **"Danner Payment"**). Beginning on the Effective Date and continuing on each one-year anniversary thereafter, the MTS Reorganized Debtor shall reserve in a segregated bank account $200,000 on account of and for the Danner Claim should it become an Allowed Administrative Claim until such reserve reaches the collective amount of $1,000,000 (the **"Danner Reserve"**).  The Danner Reserve shall be released either (a) to Danner upon the Danner Payment Date up to the amount of any Allowed Administrative Claim held by Danner and in excess of any insurance proceeds received by Danner, or (b) to the MTS Reorganized Debtor upon a judgment in its favor that it is not liable to Danner. |

6

| Ordinary Course Administrative Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed** | **Treatment** |
| | | |

| Professional Fee Claims | | |
|---|---|---|
| **Name/Description** | **Amount Owed[3]** | **Treatment** |
| Raines Feldman Littrell LLP, general bankruptcy counsel | $530,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Grobstein Teeple LLP | $60,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Force Ten Partners, LLP | $330,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Examiner | $250,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Elkins Kalt Weintraub Reuben Gartside, LLP, general bankruptcy counsel for MWP | $210,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the MTS Reorganized Debtor and the Professional. |
| Elkins Kalt Weintraub Reuben Gartside, LLP, general bankruptcy counsel for Mowbray | $75,000 | This Professional Fee Claim will be Paid in Full (1) on the later of (a) the Effective Date, and (b) entry of an order by the Bankruptcy Court allowing the Professional Fee Claim, or (2) as otherwise agreed by the RM Reorganized Debtor and the Professional. |
| **Total** | $1,455,000 | |

---

3   These amounts are only estimates (including future estimates as of confirmation) and are subject to change. The unpaid amount of allowed final fees and costs for some Professionals may be higher and others may be lower.

7

The following applies to Administrative Claims asserted against the Estate:

### a.    Ordinary Course Administrative Claims

Unless the MTS Reorganized Debtor, the MWP Reorganized Debtor, or the RM Reorganized Debtor objects to an Ordinary Course Administrative Claim, the Claim will be deemed Allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Ordinary Course Administrative Claim, and the person holding the Ordinary Course Administrative Claim need not file any request for payment of its Claim. However, any request for payment, or motion to allow a Claim as an Ordinary Course Administrative Claim must be filed with the Bankruptcy Court and served on the applicable Reorganized Debtor and the OUST by no later than sixty (60) days after the Effective Date.

### b.    Non-Ordinary Course Administrative Claims

A Non-Ordinary Course Administrative Claim will be paid by the applicable Reorganized Debtor on the Effective Date to the extent that prior to the Effective Date it has already been determined to be an Allowed Non-Ordinary Course Administrative Claim by the Bankruptcy Court pursuant to a Final Order.  Any other Non-Ordinary Course Administrative Claim will be paid by the applicable Reorganized Debtor to the extent that it is allowed by the Bankruptcy Court only if: (1) on or before sixty (60) days after the Effective Date, the Person holding the Non-Ordinary Course Administrative Claim both files with the Bankruptcy Court a request for allowance and payment of the Non-Ordinary Course Administrative Claim and serves the request for payment on counsel for the applicable Reorganized Debtor and the OUST; and (2) the Bankruptcy Court, in a Final Order, allows the Non-Ordinary Course Administrative Claim.

Any party-in-interest, including, but not limited to, the applicable Reorganized Debtor, may file an objection to such a request for payment within the time provided by the Bankruptcy Rules or within any other period the Bankruptcy Court establishes.  Persons holding Non-Ordinary Course Administrative Claims who do not timely file and serve a request for payment will be forever barred from asserting these Claims or sustaining any action seeking payment in any forum or from any court deriving from these Claims against the Estates, the Debtors, the Reorganized Debtors, the Plan Trust, the Plan Trustee, or their respective assets.

### c.    **Professional Fee Claims**

A Professional Fee Claim will be paid only if: (a) on or before sixty (60) days after the Effective Date (or such further date if extended by Court order), the Person holding the Professional Fee Claim files with the Bankruptcy Court an application requesting allowance and payment of the Professional Fee Claim; and (b) the Professional Fee Claim is allowed by order of the Bankruptcy Court. The Reorganized Debtors or any other party-in-interest may file an objection to such an application within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes.  Persons holding Professional Fee Claims who do not timely file and serve an application for allowance and payment will be forever barred from asserting these Claims against the Estates, the Debtors, the Reorganized Debtors, the Plan Trust, the Plan Trustee, or their respective assets.

Allowed Administrative Claims (Ordinary Course, Non-Ordinary Course, and Professional Fee Claims) will be paid by the respective Reorganized Debtors.

### 2.    **Priority Tax Claims**

Priority Tax Claims include certain unsecured income, sales, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.  The Bankruptcy Code requires that each holder of a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five years from the order for relief, unless the holder agrees to a different treatment.

The following charts list the Debtors' known section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Priority Tax Claims – MTS & MWP | | |
| --- | --- | --- |
| **Description** | **Estimated Amount Owed** | **Treatment** |
| California Department of Tax and Fee Administration (**"CDTFA"**) | Claim Amount: $233.00 per Proof of Claim No. 161-2 filed by the CDTFA<br><br>Priority Claim Amount: $1,496.00 per Proof of Claim No. 161- 2 filed by the CDTFA | Any Allowed Priority Tax Claim of the CDTFA will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the CDTFA is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the |

9

| Priority Tax Claims – MTS & MWP | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>MTS shall have the right to prepay any Allowed Priority Tax Claim of the CDTFA in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the CDTFA will receive the treatment afforded to Allowed Claims in Class 16. |
| Internal Revenue Service ("**IRS**") | Claim Amount: $0.00[4]<br><br>Priority Claim Amount: $0.00 | The proof of claim filed by the IRS, Proof of Claim 37-1, is for payroll taxes for the tax period ending December 31, 2024. Because those taxes have been paid, the IRS will not receive a further recovery on the Claim it asserts through Proof of Claim 37-1.<br><br>Excluding the Claim asserted through Proof of Claim 37-1, any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>MTS shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment |

---

[4]    The IRS filed Proof of Claim 37-1 in the amount of $63,589.17. However, this sum was paid.

| Priority Tax Claims – MTS & MWP | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| | | afforded to Allowed Claims in Class 16. |
| State of Florida – Department of Revenue ("**State of Florida**") | Claim Amount: $14.00 per Proof of Claim 142-1<br><br>Priority Claim Amount: $14.00 per Proof of Claim 142-1 | Any Allowed Priority Tax Claim of the State of Florida will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the State of Florida is paid in full by the date that is five (5) years from the Petition Date.  Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>MTS shall have the right to prepay any Allowed Priority Tax Claim of the State of Florida in full at any time and without penalty or fee, in its sole and absolute discretion.<br><br>Any Allowed Claim of the State of Florida in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Class 16. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief.  Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

| Priority Tax Claims – Robin Mowbray | | |
|---|---|---|
| **Description** | **Estimated Amount Owed** | **Treatment** |
| IRS | Claim Amount: $180,000.00<br><br>Priority Claim Amount: $180,000.00 | The proof of claim filed by the IRS, Proof of Claim 4-1, is for estimated income taxes for the tax period ending December 31, 2024.<br><br>Any Allowed Priority Tax Claim of the IRS will be paid in full the allowed amount of such Claim in equal quarterly installments such that any Allowed Priority Tax Claim of the IRS is paid in full by the date that is five (5) years from the Petition Date. Any Allowed Priority Tax Claim shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim.<br><br>Ms. Mowbray shall have the right to prepay any Allowed Priority Tax Claim of the IRS in full at any time and without penalty or fee, in her sole and absolute discretion.<br><br>Any Allowed Claim of the IRS in excess of an Allowed Priority Tax Claim will receive the treatment afforded to Allowed Claims in Ms. Mowbray Class 4. |
| Any Other Priority Tax Claims | $0.00 | The Holders of Allowed Priority Tax Claims will be paid in full the allowed amount of their Claims on the Effective Date or as soon as reasonably practicable thereafter, but, in no event, more than five (5) years from the entry of the orders for relief. Allowed Priority Tax Claims shall accrue interest from the Effective Date on the unpaid balance of the Allowed Priority Tax Claim at the rate of required by 11 U.S.C. § 511 to provide "present value" of the Allowed Priority Tax Claim. |

**E.      Allowance and Treatment of Classified Claims and Interests**

**1.      Summary of Classes**

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority and other relative rights.  The chart below lists Classes of Claims and Interests established under the Plan and indicates whether the Class is impaired or unimpaired by the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable, and contractual rights to which the holders of Claims or Interests in the Class are entitled, with limited exceptions.

| **Summary of Classes – MTS & MWP** | |
| --- | --- |
| Class | Claimant(s) |
| 1 | Secured Claim of PNC Bank, N.A. |
| 2 | Secured Claim of Jacobus Pino |
| 3 | Secured Claim of Albach Finanz AG |
| 4 | Secured Claim of Ally Bank |
| 5 | Secured Claim of Altec Capital Services, LLC |
| 6 | Secured Claim of FNB |
| 7a and b | Secured Claim of Pathward, National Association |
| 8 | Secured Claim of U.S. Bank Equipment Finance |
| 9 | Secured Claim of Bank of America, N.A. |
| 10 | Secured Claim of Ford Motor Credit Company, LLC |
| 11 | Secured Claim of General Motors |
| 12 | Secured Claim of John Deere |
| 13 | Secured Claim of Hanmi Bank |
| 14 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 15 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 16 | General Unsecured Claims – MTS |
| 17 | Secured Claim of Sierra Bank |
| 18 | Secured Claim of Sacramento County Tax Collector |
| 19 | IBEW Local #47 |
| 20 | General Unsecured Claims – MWP |
| 21 | Subordinated Insider Claims |
| 22 | Interest Holder – MTS |
| 23 | Interest Holder – MWP |

| **Summary of Classes -Robin Mowbray** | |
| --- | --- |
| Class | Claimant(s) |
| 1 | Secured Claim of the Trust |
| 2 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(4)-(5) |
| 3 | Priority Unsecured Claims Pursuant to 11 U.S.C. §§ 507(a)(6)-(7) |
| 4 | General Unsecured Claims |
| 5 | Interest Holder |

13

### 2. Secured Claims – MTS & MWP

Secured Claims are Claims secured by valid liens on property of the Estate.

### a. Secured Claim of PNC Bank

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | PNC Bank, N.A.<br><br>• Collateral: the PNC Collateral<br><br>• Total Claim Amount: $7,038,514.41 as of the Petition Date per the Cash Collateral Stipulation.<br><br>• Interest Rate: Variable as set forth in PNC Loan Documents. | N | Y | PNC shall have an Allowed Secured Claim on the Effective Date calculated in the amount that PNC is owed on such date under the PNC Loan Documents, including, without limitation, any accrued interest, default interest, and reasonable costs and attorney's fees that accrue prior to the Effective Date and to which PNC is entitled in accordance with the terms of the PNC Loan Documents, the Cash Collateral Stipulation, and 11 U.S.C. § 506(b), less any recoveries, including Other Recoveries, and payments received by PNC before or after the Effective Date (the "**Allowed PNC Secured Claim**").  MTS projects that the Allowed PNC Secured Claim will total approximately $4,547,636 as of the Effective Date.[5]  The MTS Reorganized Debtor shall pay the PNC Secured Claim in full as follows:<br><br>A. **Effective Date Payment**:  Within ten (10) Business Days after the Effective Date, the MTS Reorganized Debtor shall make a payment to PNC on account of the PNC Secured Claim in the amount of $2,000,000 (the "**PNC Effective Date Payment**").<br><br>B. **Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the PNC Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $113,568.23 (a "**PNC Monthly Payment**").<br><br>C. **Maturity Date**:  The MTS Reorganized Debtor shall pay the PNC Secured Claim in full by the date that is two (2) years after the Effective Date (the "**PNC Maturity Date**").  MTS currently projects that if either real property that currently serves as PNC's collateral for PNC's loan to MTS is sold within the first year after the Effective Date, then the Allowed PNC Secured Claim shall be paid in full by such time. |

---

[5]  This is the amount MTS projects the PNC balance to be as of the Effective Date, inclusive of budgeted post-petition payments, and includes an estimate of $500,000 in legal fees.

14

| Secured Claim of PNC Bank | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **D. Interest Rate**: From and after the Effective Date, the non-default rate set forth in the PNC Loan Documents. |
| | | | | **E. Other Recoveries**. If and to the extent that PNC receives any Other Recoveries on account of the PNC Secured Claim, then the PNC Secured Claim as to the MTS Reorganized Debtor shall be automatically reduced accordingly by the amount of such Other Recoveries. |
| | | | | **F. Default**: If the MTS Reorganized Debtor fails to make the PNC Effective Date Payment or a PNC Monthly Payment to PNC when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by PNC to the MTS Reorganized Debtor and its counsel (collectively, an **"Uncured PNC Default"**), then PNC may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the PNC Collateral permitted under the PNC Loan Documents. The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **G. Plan Controls**: If and to the extent that there is a conflict between the PNC Loan Documents and the Plan, the Plan shall control. |
| | | | | **H. Lien**. PNC shall retain the PNC Security Interests in the PNC Collateral in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed PNC Secured Claim in full as provided herein. Upon full satisfaction of the Allowed PNC Secured Claim, PNC's Security Interests shall be released and the MTS Reorganized Debtor shall retain title to the PNC Collateral free and clear of the PNC Security Interests. |
| | | | | **I. Real Estate Collateral**. Upon the close of escrow of the Allen Street Property and the Elder Creek Property, the net sale proceeds from such sale(s) shall be paid from escrow to PNC on account of the Allowed PNC Secured Claim. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the PNC Secured Claim. |

15

**b.** **Secured Claim of Jacobus Pino**

| | Secured Claim of Jacobus Pino | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 2 | Jacobus Pino<br><br>• Collateral: Ownership interests in PTS<br><br>• Total Claim Amount: $148,104.43<br><br>• Interest Rate: 0.75% | N | Y | Jacobus Pino asserts a Claim in the amount of $148,104.43 on account of the remaining balance owed on the Pino Note (the "**Pino Claim**"). As a compromise, including Pino waiving and releasing as of the Effective Date (i) any interest or fees to which Pino asserts he is entitled under the PTS Transaction Documents, and (ii) any right to assert that he is entitled to any portion of MTS's ownership interests in PTS, the MTS Reorganized Debtor shall pay the Pino Claim in full as follows:<br><br>**A. Monthly Payments:** Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Pino Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $21,210.70. The Pino Claim shall be paid in seven (7) equal monthly payments of $21,210.70. The Pino Claim shall not accrue interest on or after the Effective Date.<br><br>**B. Plan Controls**: If and to the extent that there is a conflict between the PTS Transaction Documents and the Plan, the Plan shall control.<br><br>**C. Lien**. Any valid, enforceable, perfected, and unavoidable lien(s) held by Pino in any assets of the MTS Estate shall be retained by Pino in and to the same extent, validity, and priority as of the Petition Date pending payment of the Pino Claim in full as provided herein. Upon full satisfaction of the Pino Claim, any and all liens of Pino on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of Pino's liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Pino Claim. |

**c.** **Secured Claims Related to Vehicles or Equipment**

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 3 | Albach Finanz AG | N | Y | Class 3 consists of the Secured Claim of Albach Finanz AG ("**Albach**"). The Claim of Albach arises from the Operate Lease Agreement attached |

16

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: the "Machine" as defined in Exhibit A of Albach's proof of claim, Claim No. 144-1 (the "**Albach Collateral**")<br><br>• Total Claim Amount: $81,500.00 (projected as of the Effective Date) | | | as Exhibit A (the "**Albach Agreement**") to its Proof of Claim No. 144-1.  The treatment herein is for all Claims asserted by Albach.<br><br>Albach shall have an Allowed Secured Claim in the collective amount of $81,500 as of the Effective Date, based on the net present value of the future payments due under the Albach Agreement, as calculated by MTS (the "**Allowed Albach Secured Claim**").[6]  Under no circumstances shall Albach receive more than the Allowed Albach Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Albach Secured Claim arising thereunder shall be paid as follows:<br><br>A. **Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall make a payment in the amount of $1,458.56 (an "**Albach Monthly Payment**").<br><br>B. **Maturity Date**:  The MTS Reorganized Debtor shall pay the Albach Secured Claim in full by the date that is five (5) years after the Effective Date (the "**Albach Maturity Date**").<br><br>C. **Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to the Albach Secured Claim in the Albach Agreement and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the Albach Maturity Date.<br><br>D. **Interest Rate**: 2.84% per annum simple interest.<br><br>E. **Default**:  Upon the Effective Date, the Albach Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make any Albach Monthly Payment  on the Albach Secured Claim to Albach when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Albach to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Albach Default**"), then Albach may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as |

---

[6]    This is the amount MTS projects the collective Albach balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

17

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | to collateral securing the Albach Secured Claim permitted under the Albach Agreement. The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Plan Controls**: If and to the extent that there is a conflict between the Albach Agreement and the Plan, the Plan shall control.<br><br>**G. Lien**. Any valid, enforceable, perfected, and unavoidable lien held by Albach in the Albach Collateral shall be retained by Albach in and to the same extent, validity, and priority as of the Petition Date pending payment of the Albach Secured Claim in full as provided herein. Upon full satisfaction of the Albach Secured Claim, any and all liens of Albach on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the Albach Secured Claim. |
| 4 | Ally Bank<br><br>• Collateral: Various vehicles<br><br>• Total Claim Amount: $299,438.22 as of October 1, 2025 | N | Y | Class 4 consists of the Secured Claims of Ally Bank ("**Ally**"). The Claims of Ally arise from various loan agreements listed in Exhibit B to the Plan Support Agreement between MTS and Ally each of which was secured by a particular vehicle (each, an "**Ally Agreement**" and collectively, the "**Ally Agreements**"). The treatment herein is for all Claims asserted by Ally.<br><br>The Plan Support Agreement between MTS and Ally shall be referred to herein as the "**Ally PSA**" and Exhibit B to the Ally PSA shall be referred to herein as the "**Ally Payment Schedule**."<br><br>Ally shall have an Allowed Secured Claim in the collective amount of $299,438.22 as of October 1, 2025, less the payments made by MTS on October 2, 2025 and thereafter (the "**Allowed Ally Secured Claim**").[7] Under no circumstances shall Ally receive more than the Allowed Ally Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ally Secured Claims shall be paid as follows:<br><br>**A. Monthly Payments**: Beginning on the first Business Day of the first full calendar month after |

---

[7] This sum is inclusive of all payments due in the future under the Ally Agreements.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | the Effective Date, the MTS Reorganized Debtor shall make the "Ally Monthly Payments" set forth in the Ally Payment Schedule due for such month under the corresponding Ally Agreements identified in the Ally Payment Schedule (by Acct # and VIN #), and the MTS Reorganized Debtor shall continue making such Ally Monthly Payments set forth in the Ally Payment Schedule each calendar month thereafter by the fifth (5th) of each such calendar month until such Ally Monthly Payments in the Ally Payment Schedule are completed (by corresponding Ally Agreement). The Ally Monthly Payments required herein and reflected in the Ally Payment Schedule total $5,482.05/mo and shall each be referred to as an "**Ally Monthly Payment**."  For the avoidance of doubt, the MTS Reorganized Debtor will not be required to make a payment set forth under the Ally Payment Schedule that was made prior to the Effective Date pursuant to the Ally PSA.<br><br>**B.  Maturity Date**:  The MTS Reorganized Debtor shall pay the Allowed Ally Secured Claim in full by the date that is 5 years after the Effective Date (the "**Ally Bank Maturity Date**").<br><br>**C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ally Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the Ally Maturity Date.<br><br>**D.  Interest Rate**: 5.28% blended rate per annum simple interest for Allowed Ally Secured Claims.<br><br>**E.  Default**:  Upon the Effective Date, the Ally Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make an Ally Monthly Payment on the Allowed Ally Secured Claim to Ally when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ally to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Ally Default**"), then Ally may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicles or equipment subject to the missed Ally Monthly Payment and serving as Ally's collateral |

19

| | | | | Secured Claims Related to Vehicles or Equipment |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | as permitted under the Ally Agreements. The MTS Reorganized Debtor shall have the right to oppose such motion. **F. Plan Controls**: If and to the extent that there is a conflict between the Ally Agreements and the Plan, the Plan shall control. **G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ally in any assets of the Estate to secure the Allowed Ally Secured Claim shall be retained by Ally in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ally Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ally Secured Claim, any and all liens of Ally securing the Allowed Ally Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. **H. No Admission**: The treatment set forth herein for Ally reflects a compromise between MTS and Ally and is without any admission as to either MTS or Ally whatsoever as to the matters set forth in the Ally PSA. The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ally Secured Claim. |
| 5 | Altec Capital Services, LLC • Collateral: Various equipment • Total Claim Amount: $9,068,099.33 (inclusive of all future amounts due under the Altec Agreements) | N | Y | Class 5 consists of the Secured Claim(s) of Altec Capital Services, LLC ("**Altec**"). The Secured Claims of Altec arise from the agreements listed in Exhibit C to the Plan Support Agreement between MTS and Altec (each, an "**Altec Agreement**" and collectively, the "**Altec Agreements**"). The treatment herein is for all Claims asserted by Altec, including, without limitation, the Claims for which Altec is the servicer. The vehicles and other equipment subject to the Altec Agreements shall be referred to herein as the "**Altec Equipment**." The Plan Support Agreement between MTS and Altec shall be referred to herein as the "**Altec PSA**" and Exhibit B to the Altec PSA shall be referred to herein as the "**Altec Payment Schedule**." Altec shall have an Allowed Secured Claim in the amount of $9,068,099.33 as of July 1, 2025, less the payments made by MTS on July 1, 2025 and |

20

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | thereafter (the "**Allowed Altec Secured Claim**").[8] Under no circumstances shall Altec receive more than the Allowed Altec Secured Claim with interest after the Effective Date as provided herein. |
| | | | | **A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall make  "Altec Monthly Payments" set forth in the Altec Payment Schedule due for such month under the corresponding Altec Agreements identified in the Altec Repayment Schedule (by Document #), and the MTS Reorganized Debtor shall continue making such Altec Monthly Payments set forth in the Altec Payment Schedule each calendar month thereafter by the fifth (5th) of each such calendar month until such Altec Monthly Payments in the Altec Payment Schedule are completed (by corresponding Altec Agreement).  The Altec Monthly Payments required herein and reflected in the Altec Payment Schedule shall each be referred to as an "**Altec Monthly Payment**."  For avoidance of doubt, the MTS Reorganized Debtor will not be required to make a payment set forth under the Altec Payment Schedule that was made prior to the Effective Date pursuant to the Altec PSA. |
| | | | | **B.  Residual Payments**:  Any "TRAC Amounts" or similar residual payments due under an Altec Agreement (each, a "**Residual Amount**") that became due and are unpaid as of the Effective Date shall be paid in full within thirty (30) days after the Effective Date or, at the MTS Reorganized Debtor's election, which shall be provided to Altec before the expiration of such 30-day period, by the MTS Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any Residual Amount under an Altec Agreement that becomes due after the Effective Date shall be paid by the date that is thirty (30) days after the Altec Maturity Date for such Altec Agreement (as defined below) or, at the MTS Reorganized Debtor's election, which shall be provided to Altec before the expiration of such Altec Maturity Date, by the MTS Reorganized Debtor continuing to make the monthly payment provided by such Altec Agreement until such Residual Amount is paid in full.  Any "holdover" |

---

[8]    This sum is inclusive of all payments due in the future under the Altec Agreements.

21

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | payments under an Altec Agreement (*i.e.*, monthly payments to Altec should term of such Altec Agreement extend for monthly holdover periods) by the MTS Reorganized Debtor under an Altec Agreement shall reduce the "TRAC Amount" or similar residual amount due under such Altec Agreement.<br><br>The MTS Reorganized Debtor shall pay any sales taxes and/or "sundries" due to Altec under any Altec Agreement as of the Petition Date and unpaid within sixty (60) days of the Effective Date.  Any sales taxes and/or sundries due under any Altec Agreement after the Effective Date shall be billed by Altec and paid by the MTS Reorganized Debtor in the ordinary course and as provided under such Altec Agreement.<br><br>**C.  Maturity Date**:  With respect to each Altec Agreement, the maturity date, expiration date, "Interim Rent Cutoff Date," or similar end date with respect to such Altec Agreement shall be the "Maturity Date" set forth in the Altec Payment Schedule for such Altec Agreement (the "**Altec Maturity Date**").<br><br>**D.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of Altec Equipment under an Altec Agreement, including, without limitation, at or upon the Altec Maturity Date of such Altec Agreement, and the disposition of the proceeds related thereto are preserved for the MTS Reorganized Debtor and the MTS Reorganized Debtor shall be permitted to exercise such rights based on the Altec Maturity Date for such Altec Agreement.<br><br>The payment(s) by the MTS Reorganized Debtor to Altec of Residual Amount due under an Altec Agreement in full shall be deemed the exercise by the MTS Reorganized Debtor of its right to purchase the Altec Equipment under such Altec Agreements and, upon such payment(s), and the MTS Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, such Altec Equipment.  Upon such payment(s), Altec shall transfer title of such Altec Equipment to the MTS Reorganized Debtor and the MTS Reorganized Debtor and Altec shall execute such documents as necessary to accomplish the same. |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **E. Interest Rate**: 6.98% blended rate per annum simple interest for Altec Secured Claims. |
| | | | | **F. Default**:  Upon the Effective Date, the Altec Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to pay, when due herein, an Altec Monthly Payment under an Altec Agreement or a Residual Amount, and such failure is not cured within thirty (30) days after written notice thereof provided by Altec to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Altec Default**"), then Altec shall be entitled to exercise its rights to repossession as to the particular Altec Equipment subject to such Altec Agreement and such Uncured Altec Default as permitted under such Altec Agreement. |
| | | | | **G. Plan Controls**:  If and to the extent that there is a conflict between the Altec Agreements and the Plan, the Plan shall control. |
| | | | | **H. Lien**:  With respect to each Altec Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Altec in any assets of the MTS Estate to secure such Altec Secured Claim shall be retained by Altec in and to the same extent, validity, and priority as of the Petition Date pending payment of such Altec Secured Claim in full as provided herein.  Upon full satisfaction of such Altec Secured Claim, any and all lien of Altec securing such Altec Secured Claim (including liens that Altec services) on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. |
| | | | | **I. No Admission**.  Treatment set forth herein for Altec reflects a compromise between MTS and Altec and is without any admission as to either MTS or Altec as to whether the Altec Agreements are true leases or capital leases. |
| | | | | **J. Assignment**.  Altec retains its rights to assign under the Altec Agreements; provided, however, any such assignment shall remain subject to the Plan, including, without limitation, the treatment herein for Altec. |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Altec, in its individual capacity and as servicer. |

23

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 6 | FNB Equipment Finance<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $66,881.74 (projected as of the Effective Date) | N | Y | Class 6 consists of the Secured Claims of FNB Equipment Finance ("**FNB**").  The Claims of FNB arise from various equipment leases or financing agreements between MTS and FNB or FNB's predecessor in interest (each, an "**FNB Agreement**" and collectively, the "**FNB Agreements**").  The treatment herein is for all Claims asserted by FNB.<br><br>FNB shall have an Allowed Secured Claim in the collective amount of $66,881.74 as of the Effective Date based on the net present value of the future payments due under the FNB Agreements, as calculated by MTS (the "**Allowed FNB Secured Claim**").[9]  Under no circumstances shall FNB receive more than the FNB Allowed Secured Claim with interest after the Effective Date as provided herein.<br><br>As to each FNB Agreement, FNB's Secured Claim arising thereunder (each, an "**FNB Secured Claim**") shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall resume making the monthly payments or installments due under the FNB Agreement for such FNB Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the MTS Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such FNB Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an "**FNB Monthly Payment**".<br><br>**B.  Maturity Date**:  Any maturity date or expiration date with respect to such FNB Secured Claim in the corresponding FNB Agreement shall be extended to the calendar month after the MTS Reorganized Debtor makes the final FNB Monthly Payment required by such FNB Agreement (the "**FNB Maturity Date**") and any lump sum payment due by the MTS Reorganized Debtor under such FNB Agreement upon the FNB Maturity Date shall be made at such time as extended herein and in accordance with the terms |

---

[9]    This is the amount MTS projects the collective FNB balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

24

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | of such FNB Agreement and subject to Paragraph C. below.

**C. Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicle or equipment giving rise to such FNB Secured Claim in the corresponding FNB Agreement, including, without limitation, at the FNB Maturity Date in such FNB Agreement, and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights based on the FNB Maturity Date for such FNB Agreement.

**D. Interest Rate**: 6.25% blended rate per annum simple interest for all FNB Secured Claims.

**E. Default**:  Upon the Effective Date, each FNB Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make an FNB Monthly Payment on an FNB Secured Claim to FNB when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by FNB to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured FNB Default**"), then FNB may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicle(s) or equipment serving as FNB's collateral that is the subject of the Uncured FNB Default permitted under the subject FNB Agreement.  The MTS Reorganized Debtor shall have the right to oppose such motion.

**F. Plan Controls**:  If and to the extent that there is a conflict between the FNB Agreements and the Plan, the Plan shall control.

**G. Lien**:  With respect to each FNB Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by FNB in any assets of the MTS Estate to secure such FNB Secured Claim shall be retained by FNB in and to the same extent, validity, and priority as of the Petition Date pending payment of such FNB Secured Claim in full as provided herein. Upon full satisfaction of such FNB Secured Claim, any and all lien of FNB securing such FNB Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. |

| | Secured Claims Related to Vehicles or Equipment | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the FNB Secured Claims. |
| 7a | Pathward, National Association<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $651,124 (projected as of the Effective Date inclusive of the Claim in Class 7b), plus attorneys' fees and costs as provided herein. | N | Y | Class 7a consists of the Secured Claim of Pathward, N.A. ("**Pathward**"), based on the agreements acquired by Pathward from Altec Capital Services, LLC, specified at Page 4 of 90 of Proof of Claim No. 156-1 filed by Pathward (each, a "**Pathward Agreement**" and collectively, the "**Pathward Agreements**").  The treatment herein is for any and all Claims asserted by Pathward, excluding the Claim of Pathward treated in Class 7b.<br><br>**A.  The Pathward Claim**.  Pathward shall have an Allowed Secured Claim based on the Pathward Agreements in the amount of all due but unpaid "Basic Rental Payments" under the Pathward Altec Agreements and all "TRAC Amounts" due under the Pathward Agreements, less payments made by MTS, including after the Petition Date, plus attorney's fees to which Pathward is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $112,500 (the "**Allowed Pathward Secured Claim**").[10]   The cap or maximum amount on Pathward's attorney's fees specified in the preceding sentence shall not prejudice Pathward's rights to recover uncompensated legal fees and costs from any non- debtor guarantor or additional non-debtor obligor.<br><br>**B.  Payment of the Pathward Claim**.  The Allowed Pathward Secured Claim will be paid in full within in fifteen (15) calendar days after the Effective Date (the "**Pathward Payment Date**"); *provided*, *however*, that any "Basic Rental Payments" or "TRAC Amount" that are to become due under Pathward Agreement #767-15 (the "**December Pathward Contract**") after the Payment Date (the "**December Pathward Amount**") shall be paid by the MTS Reorganized Debtor on the date set forth in the December Pathward Contract and in full by December 31, 2025 (the "**Pathward December Payment Date**").<br><br>**C.  Transfer of Title**.  The payment(s) by the MTS Reorganized Debtor to Pathward shall be |

---

[10]   This is the amount MTS projects the collective Pathward balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

26

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | deemed the exercise by the MTS Reorganized Debtor of its right to purchase the Pathward Equipment under the Pathward Agreements and, upon such payment(s), the MTS Reorganized Debtor shall acquire all title to, and shall be deemed the owner of, the Pathward Equipment. Upon such payment(s), Pathward shall transfer title of the Pathward Equipment to the MTS Reorganized Debtor and shall execute such documents as necessary to accomplish the same.<br><br>**D.  Default**:  Upon the Effective Date, the Pathward Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to pay to Pathward the Allowed Pathward Secured Claim by the Pathward Payment Date or the December Pathward Amount by Pathward December Payment Date, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the MTS Reorganized Debtor and its counsel in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be granted relief from the automatic stay in order to exercise its rights of repossession and sale  with respect to the Pathward Equipment subject to such Uncured Pathward Default as permitted under the Pathward Agreements and the 14-day say of the FRBP 4001(a)(3) is deemed waived.<br><br>**F.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Agreements and the Plan, the Plan shall control.<br><br>**G.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the MTS Estate to secure the Allowed Pathward Secured Claim shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed Pathward Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Pathward Secured Claim, any and all liens of Pathward on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward, excluding the Claim treated in Class 7b. |

| | | | | **Secured Claims Related to Vehicles or Equipment** |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 7b | Pathward, National Association<br><br>• Collateral: Samsara equipment<br><br>• Total Claim Amount: $0.00 | N | Y | Class 7b consists of the Secured Claim of Pathward based on the agreement between the Debtor and Samsara attached to Proof of Claim No. 157-1 filed by Pathward (the "**Pathward Samsara Agreement**").  The equipment subject to the Pathward Samsara Agreement shall be referred to herein as the "**Samsara Equipment**."  The treatment herein is for all Claims asserted by Pathward under the Samsara Agreement.<br><br>**A.  Payment of the Pathward Claim**.  On and after the Effective Date, the MTS Reorganized Debtor shall make the periodic payments required by the Pathward Samsara Agreement on dates required by the Pathward Samsara Agreement until the last periodic payment is made ("Samsara Payments").<br><br>**C.  Default**:  Upon the Effective Date, the Pathward Samsara Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a Samsara Payment when due under the Pathward Samsara Agreement, and such failure is not cured within five (5) business days after written notice thereof provided by Pathward to the MTS Reorganized Debtor and its counsel  in accordance with Paragraph 26 of the Plan Support Agreement between the parties (collectively, an "**Uncured Pathward Default**"), then Pathward shall be  granted relief from the automatic stay in order to exercise its rights of repossession and sale solely with respect to the Samsara Equipment as permitted under the Pathward Samsara Agreement and the 14-day say of the FRBP 4001(a)(3) is deemed waived.<br><br>**E.  Plan Controls**:  If and to the extent that there is a conflict between the Pathward Samsara Agreement and the Plan, the Plan shall control.<br><br>**F.  Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by Pathward in any assets of the Estate to secure the Debtor's obligations under the Pathward Samsara Agreement shall be retained by Pathward in and to the same extent, validity, and priority as of the Petition Date pending the MTS Reorganized Debtor completing the periodic payments under the Pathward Samsara Agreement as provided herein.  Upon full satisfaction of such payments, any and all liens of Pathward on assets of the MTS Reorganized Debtor shall be released |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of any and all Claims of Pathward under the Pathward Samsara Agreement. The treatment in Classes 7a and 7b shall be in full settlement and satisfaction of any and all Claims of Pathward. |
| 8 | U.S Bank Equipment Finance <br> • Collateral: Various equipment <br> • Total Claim Amount: $14,430.24 (projected as of the Effective Date) | N | Y | Class 8 consists of the Secured Claims of U.S. Bank Equipment Finance ("**US Bank**").  The Claims of US Bank arise from various finance agreements between MTS and US Bank or US Bank's predecessor in interest (each, a "**US Bank Agreement**" and collectively, the "**US Bank Agreements**").  The treatment herein is for all Claims asserted by US Bank. US Bank shall have an Allowed Secured Claim in the collective amount of $14,430.24 as of the Effective Date, based on the net present value of the future payments due under the US Bank Agreements, as calculated by MTS (the "**Allowed US Bank Secured Claim**").[11]  Under no circumstances shall US Bank receive more than the Allowed US Bank Secured Claim with interest after the Effective Date as provided herein. As to each US Bank Agreement, US Bank's Secured Claim arising thereunder (each a "**US Bank Secured Claim**") shall be paid as follows: **A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall resume making the monthly payments or installments due under US Bank Agreement for such US Bank Secured Claim starting with the monthly payment or installment due and unpaid as of the Petition Date, and the MTS Reorganized Debtor shall continue such monthly payments or installments each calendar month thereafter until such monthly payments or installments are completed under the terms of such US Bank Agreement, as extended by the Plan.  The monthly payments required herein shall each be referred to as an (a "**US Bank Monthly Payment**"). |

---

[11]  This is the amount MTS projects the collective US Bank balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **B.** **Maturity Date**:  Any maturity date or expiration date with respect to such US Bank Secured Claim in the corresponding US Bank Agreement shall be extended to the calendar month after the MTS Reorganized Debtor makes the US Bank Altec Monthly Payment required by such US Bank Agreement (the "**US Bank Maturity Date**") and any lump sum payment due by the MTS Reorganized Debtor under such US Bank Agreement upon the US Bank Maturity Date shall be made at such time as extended herein and in accordance with the terms of such US Bank Agreement and subject to Paragraph C. below.<br><br>**C.** **Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such US Bank Secured Claim in the corresponding US Bank Agreement, including, without limitation, at the US Bank Maturity Date in such US Bank Agreement, and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights based on the US Bank Maturity Date for such US Bank Agreement.<br><br>**D.** **Interest Rate**: 6.83% blended rate per annum simple interest for all US Bank Secured Claims.<br><br>**E.** **Default**:  Upon the Effective Date, each US Bank Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a US Bank Monthly Payment on a US Bank Secured Claim to US Bank when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by US Bank to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured US Bank Default**"), then US Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment(s) serving as US Bank's collateral that is the subject of the Uncured US Bank Default permitted under the subject US Bank Agreements.  The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**F.** **Plan Controls**:  If and to the extent that there is a conflict between the US Bank Agreements and the Plan, the Plan shall control.<br><br>**G.** **Lien**:  With respect to each US Bank Secured Claim, any valid, enforceable, perfected, and |

30

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | unavoidable lien held by US Bank in any assets of the MTS Estate to secure such US Bank Secured Claim shall be retained by US Bank in and to the same extent, validity, and priority as of the Petition Date pending payment of such US Bank Secured Claim in full as provided herein. Upon full satisfaction of such US Bank Secured Claim, any and all liens of US Bank securing such US Bank Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the US Bank Secured Claims. |
| 9 | Bank of America, N.A.<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $4,526,707.00 (projected as of the Effective Date) | N | Y | Class 9 consists of the Secured Claim of Bank of America, N.A., and its related affiliates, subsidiaries, and other businesses including, but not limited to, Banc of America Leasing & Capital, LLC (collectively, "**BOA**"). The Secured Claim of BOA arises from various leases or financing agreements between MTS and BOA (each, a "**BOA Agreement**" and collectively, the "**BOA Agreements**"). The treatment herein is for all secured claims arising out of the BOA Agreements.<br><br>The Plan Support Agreement between the Debtor and BOA shall be referred to herein as the "**BOA PSA**."<br><br>BOA shall have an Allowed Secured Claim in the total collective amount of $4,526,707.00 as of the Effective Date (the "**Allowed BOA Secured Claim**").[12] In addition to the Allowed BOA Secured Claim, BOA shall have an Allowed General Unsecured Claim in the amount of $1,452,235, which shall be treated in Class 16.<br><br>The Allowed BOA Secured Claim shall be treated and paid as follows:<br><br>**A. Secured Term Loan Agreement**: The BOA Agreements will be replaced and superseded by a mutually agreeable forms of Credit Agreement and a Security Agreement (the "**Claim Agreements**"), both executed by BOA and the MTS Reorganized Debtor. The security interests |

---

[12] This sum is inclusive of all payments due in the future under the BOA Agreements.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | granted in the Claim Agreements shall not expand the BOA Collateral (as defined in Section F below) securing the Allowed BOA Secured Claim.<br><br>**B. Maturity Date**:  The Allowed BOA Secured Claim will be fully amortized over sixty (60) months.  Accordingly, the maturity date shall be the date that is sixty (60) months after the due date of the first BOA Monthly Payment as provided in Section C below (the "**BOA Maturity Date**").<br><br>**C. Monthly Payments**:  The Allowed BOA Secured Claim shall be paid in sixty (60) equal monthly installments of principal and interest, with each monthly payment in the amount of $88,570.22 (the "**BOA Monthly Payment**").  The first BOA Monthly Payment shall be due on the first Business Day of the first full calendar month after the Effective Date, and all subsequent BOA Monthly Payments shall be due on the first Business Day of each calendar month thereafter. The final BOA Monthly Payment shall be made on the BOA Maturity Date.<br><br>**D. Interest Rate**: From the Effective Date and until the Allowed BOA Secured Claim is paid in full, the outstanding balance of the Allowed BOA Secured Claim shall accrue simple interest at the non-default rate of 6.5% per annum.  Default interest may accrue upon an Uncured BOA Default (as defined in Section G below) at the rate set forth in the Claim Agreements.<br><br>**E. Prepayment Option**:  The MTS Reorganized Debtor may prepay the Allowed BOA Secured Claim at any time without penalty.  The proceeds of any sale or other disposition of the BOA Collateral (as defined in Section F below) in an amount less than the entire outstanding balance owed shall be applied to the last BOA Monthly Payments and, in this way, reduce the number of required BOA Monthly Payments; and shall not be applied to immediately upcoming BOA Monthly Payments such that the MTS Reorganized Debtor is entitled to enjoy a "payment holiday."<br><br>**F. Collateral**:  As of the Effective Date, ownership of the personal property subject to the BOA Agreements (the "**BOA Collateral**") shall constitute property of the MTS Reorganized Debtor.  Any valid, perfected, and unavoidable |

32

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | lien of BOA in the BOA Collateral shall be retained to secure repayment of the Allowed BOA Secured Claim to the same extent, validity, and priority as of the Petition Date.  BOA may, but shall not be required to, take any further action to perfect its lien interests that existed as of the Petition Date.  Upon payment in full of the Allowed BOA Secured Claim, BOA's liens securing the Allowed BOA Secured Claim shall be released and the MTS Reorganized Debtor shall retain title to the BOA Collateral free and clear of such liens.  The MTS Reorganized Debtor may sell or dispose of any or all of the BOA Collateral only with BOA's express written consent, which will not be unreasonably withheld, and subject to a reasonable lien release payment to BOA. <br><br> **G.  Default**: If the MTS Reorganized Debtor fails to make a BOA Monthly Payment in full within ten (10) days after it becomes due, and such failure is not cured within fourteen (14) days after written notice thereof provided by BOA to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured BOA Default**"), then BOA may, without the need to first seek Bankruptcy Court or other court authorization, exercise its rights and remedies under the Claim Agreements and applicable non-bankruptcy law including to: (i) accelerate the BOA Maturity Date and demand payment in full of the entire outstanding balance then owing; (ii) charge interest at the default rate provided in the Claim Agreements; and/or (iii) enforce its lien rights in and to the BOA Collateral. <br><br> **H.  Plan Controls**: If and to the extent there is a conflict between the Claim Agreements and the Plan, the Plan shall control. <br><br> **I.  No Admission**: The treatment set forth herein for BOA reflects a compromise between MTS and BOA and is without any admission as to either MTS or BOA whatsoever as to the matters set forth in the BOA PSA. <br> The treatment proposed herein shall be in full settlement and satisfaction of the Allowed BOA Secured Claim. |
| 10 | Ford Motor Credit Company, LLC | N | Y | Class 10 consists of the Secured Claims of Ford Motor Credit Company ("**Ford**").  The Claims of Ford arise from various installment agreements listed in Exhibit B to the Plan Support Agreement between MTS and Ford each of which was secured |

33

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Collateral: Various vehicles<br>• Total Claim Amount: $1,619,194.20 as of October 1, 2025 | | | by a particular vehicle (each, a "**Ford Agreement**" and collectively, the "**Ford Agreements**").  The treatment herein is for all Claims asserted by Ford.<br><br>The Plan Support Agreement between MTS and Ford shall be referred to herein as the "**Ford PSA**" and Exhibit B to the Ford PSA shall be referred to herein as the "**Ford Payment Schedule**."<br><br>Ford shall have an Allowed Secured Claim in the collective amount of $1,619,194.20 as of October 1, 2025, less the payments made by the Debtor on October 2, 2025 and thereafter (the "**Allowed Ford Secured Claim**").[13]  Under no circumstances shall Ford receive more than the Allowed Ford Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed Ford Secured Claims shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date, the MTS Reorganized Debtor shall make the "Ford Monthly Payments" set forth in the Ford Payment Schedule due for such month under the corresponding Ford Agreements identified in the Ford Payment Schedule (by Acct #, VIN #, and Document #), and the MTS Reorganized Debtor shall continue making such Ford Monthly Payments set forth in the Ford Payment Schedule each calendar month thereafter by the fifth (5th) of each such calendar month until such Ford Monthly Payments in the Ford Payment Schedule are completed (by corresponding Ford Agreement).  The Ford Monthly Payments required herein and reflected in the Ford Payment Schedule total $28,911.16/mo and shall each be referred to as a "**Ford Monthly Payment**."  For the avoidance of doubt, the MTS Reorganized Debtor will not be required to make a payment set forth under the Ford Payment Schedule  that was made prior to the Effective Date pursuant to the Ford PSA.<br><br>**B.  Maturity Date**:  The MTS Reorganized Debtor shall pay the Allowed Ford Secured Claim in full by the date that is 5 years after the Effective Date (the "**Ford Bank Maturity Date**"). |

---

[13]  This sum is inclusive of all payments due in the future under the Ford Agreements.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|  |  |  |  | **C. Purchase Options**: The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles under the Ford Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the Ford Maturity Date.<br><br>**D. Interest Rate**: 5.1% blended rate per annum simple interest for Allowed Ford Secured Claims.<br><br>**E. Default**: Upon the Effective Date, the Ford Agreements shall not be considered in default as to the MTS Reorganized Debtor. If the MTS Reorganized Debtor fails to make a Ford Monthly Payment on the Allowed Ford Secured Claim to Ford when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Ford to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Ford Default**"), then Ford may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular vehicles or equipment subject to the missed Ford Monthly Payment and serving as Ford's collateral as permitted under the Ford Agreements. The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Plan Controls**: If and to the extent that there is a conflict between the Ford Agreements and the Plan, the Plan shall control.<br><br>**G. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by Ford in any assets of the Estate to secure the Allowed Ford Secured Claim shall be retained by Ford in and to the same extent, validity, and priority as of the Petition Date pending payment of such Ford Secured Claim in full as provided herein. Upon full satisfaction of the Allowed Ford Secured Claim, any and all liens of Ford securing the Allowed Ford Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>**H. No Admission**: The treatment set forth herein for Ford reflects a compromise between MTS and Ford and is without any admission as to either MTS or Ford whatsoever as to the matters set forth in the Ford PSA. |

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Ford Secured Claim. |
| 11 | AmeriCredit Financial Services, Inc. dba GM Financial<br><br>• Collateral: various vehicles<br><br>• Total Claim Amount: $121,388.59 (projected as of the Effective Date) | N | Y | Class 11 consists of the Secured Claims of AmeriCredit Financial Services, Inc. dba GM Financial ("**GM**").  The Claims of GM arise from various agreements between MTS and GM (each, a "**GM Agreement**" and collectively, the "**GM Agreements**").  The treatment herein is for all Claims asserted by GM.<br><br>GM shall have an Allowed Secured Claim in the collective amount of $121,388.59 as of the Effective Date, based on the net present value of the future payments due under the GM Agreements as calculated by the Debtor (the "**Allowed GM Secured Claim**").[14]  Under no circumstances shall GM receive more than the Allowed GM Secured Claim with interest after the Effective Date as provided herein.<br><br>The Allowed GM Secured Claim shall be paid as follows:<br><br>**A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed GM Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $2,352.54 (a "**GM Monthly Payment**").<br><br>**B.  Maturity Date**:  The MTS Reorganized Debtor shall pay the Allowed GM Secured Claim in full by the date that is 5 years after the Effective Date (the "**GM Bank Maturity Date**").<br><br>**C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the GM Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the GM Maturity Date.<br><br>**D.  Interest Rate**: 6.1% blended rate per annum simple interest. |

---

[14]  This is the amount MTS projects the collective GM balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| | | | | Secured Claims Related to Vehicles or Equipment |
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
|---|---|---|---|---|
| | | | | **E. Default**:  Upon the Effective Date, the GM Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a GM Monthly Payment on the Allowed GM Secured Claim to GM when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by GM to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured GM Default**"), then GM may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the Ford Agreements and serving as Ford's collateral as permitted under the Ford Agreements.  The MTS Reorganized Debtor shall have the right to oppose such motion.<br><br>**F. Plan Controls**:  If and to the extent that there is a conflict between the GM Installment Agreements and the Plan, the Plan shall control.<br><br>**G. Lien**:  Any valid, enforceable, perfected, and unavoidable lien held by GM in any assets of the Estate to secure the Allowed GM Secured Claim shall be retained by GM in and to the same extent, validity, and priority as of the Petition Date pending payment of such GM Secured Claim in full as provided herein. Upon full satisfaction of the Allowed GM Secured Claim, any and all liens of GM securing the Allowed GM Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Allowed GM Secured Claim. |
| 12 | John Deere Construction & Forestry Company<br><br>• Collateral: Various equipment<br><br>• Total Claim Amount: $145,532.82 (projected as of the Effective Date), plus attorney's fees and costs as provided herein. | N | Y | Class 12 consists of the Secured Claims of John Deere Construction & Forestry Company ("**John Deere**").  The Claims of John Deere arise from various equipment agreements between the Debtor and John Deere (each, a "**John Deere Agreement**" and collectively, the "**John Deere Agreements**"). The treatment herein is for all Claims asserted by John Deere.<br><br>John Deere shall have an Allowed Secured Claim in the amount of $145,532.82 as of the Effective Date, based on the net present value of the future payments due under the John Deere Agreements, |

37

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | as calculated by the Debtor, plus attorney's fees to with John Deere is entitled under 11 U.S.C. § 506(b) up to the maximum amount of $25,000 (the "**Allowed John Deere Secured Claim**").[15]  Under no circumstances shall John Deere receive more than the Allowed John Deere Secured Claim with interest after the Effective Date as provided herein. |
| | | | | The Allowed John Deere Secured Claim shall be paid as follows: |
| | | | | **A.  Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until the Allowed John Deere Secured Claim is paid in full, the MTS Reorganized Debtor shall resume payments in the amounts set forth in the John Deere Agreements (a "**John Deere Monthly Payment**"). |
| | | | | **B.  Maturity Date**:  The MTS Reorganized Debtor shall pay the Allowed John Deere Secured Claim in full by the date that is 1 year after the Effective Date (the "**John Deere Maturity Date**"). |
| | | | | **C.  Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the vehicles or equipment under the John Deere Agreements and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by the John Deere Maturity Date. |
| | | | | **D.  Interest Rate**: 5.0% per annum simple interest. |
| | | | | **E.  Default**:  Upon the Effective Date, the John Deere Agreements shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a John Deere Monthly Payment to John Deere when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by John Deere to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured John Deere Default**"), then John Deere may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the vehicles or equipment subject to the John Deere Agreements and serving as John Deere's collateral |

---

[15]  This is the amount MTS projects the collective John Deere balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | as permitted under the John Deere Agreements. The MTS Reorganized Debtor shall have the right to oppose such motion. **G. Plan Controls**: If and to the extent that there is a conflict between the John Deere Installment Agreements and the Plan, the Plan shall control. **H. Lien**: Any valid, enforceable, perfected, and unavoidable lien held by John Deere in any assets of the MTS Estate to secure the Allowed John Deere Secured Claim shall be retained by John Deere in and to the same extent, validity, and priority as of the Petition Date pending payment of the Allowed John Deere Secured Claim in full as provided herein. Upon full satisfaction of the Allowed John Deere Secured Claim, any and all liens of John Deere securing the Allowed John Deere Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the Allowed John Deere Secured Claim. |
| 13 | Hanmi Bank • Collateral: Various equipment • Total Claim Amount: $98,750.50 (projected s of the Effective Date) | N | Y | Class 13 consists of the Secured Claims of Hanmi Bank (**"Hanmi"**).  The Claims of Samsara arise from made multiple equipment loans between MTS and Samsara (each, a **"Hanmi Agreement"** and collectively, the **"Hanmi Agreements"**).  The treatment herein is for all Claims asserted by Hanmi. Hanmi shall have an Allowed Secured Claim in the amount of $98,750.50 as of the Effective Date, based on the net present value of the future payments due under the Hanmi Agreements, as calculated by MTS (the **"Allowed Hanmi Secured Claim"**).[16]  Under no circumstances shall Hanmi receive more than the Allowed Hanmi Secured Claim with interest after the Effective Date as provided herein. As to each Hanmi Agreement, Hanmi's Secured Claim arising thereunder (each, a **"Hanmi Secured Claim"**) shall be paid as follows: |

[16]   This is the amount MTS projects the collective Hanmi balance to be as of the Effective Date, inclusive of budgeted post-petition payments.

39

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | **A.** **Monthly Payments**:  Beginning on the first Business Day of the second full calendar month after the Effective Date and continuing on the first Business Day of each calendar month thereafter until each Hanmi Secured Claim is paid in full, the MTS Reorganized Debtor shall make a payment in the amount of $19,750.10 (a "**Hanmi Monthly Payment**"). |
| | | | | **B.** **Maturity Date**:  The MTS Reorganized Debtor shall pay the Hanmi Secured Claims in full by the date that is 8 months after the Effective Date (the "**Hanmi Maturity Date**"). |
| | | | | **C.** **Purchase Options**:  The MTS Reorganized Debtor's rights under any provisions governing the purchase, return, or sale of the equipment giving rise to such Hanmi Secured Claim in the subject Hanmi Agreement and the disposition of the proceeds related thereto are preserved and the MTS Reorganized Debtor shall be permitted to exercise such rights by on the Hanmi Maturity Date for such Hanmi Agreement. |
| | | | | **D.** **Interest Rate**: 0.0% per annum simple interest. |
| | | | | **E.** **Default**:  Upon the Effective Date, each Samsara Agreement shall not be considered in default as to the MTS Reorganized Debtor.  If the MTS Reorganized Debtor fails to make a Hanmi Monthly Payment to Hanmi when due herein, and such failure is not cured within thirty (30) days after written notice thereof provided by Hanmi to the MTS Reorganized Debtor and its counsel (collectively, an "**Uncured Hanmi Default**"), then Hanmi may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to the particular equipment serving as Hanmi's collateral that is the subject of the Uncured Hanmi Default permitted under the subject Hanmi Agreement.  The MTS Reorganized Debtor shall have the right to oppose such motion. |
| | | | | **F.** **Plan Controls**:  If and to the extent that there is a conflict between the Hanmi Agreements and the Plan, the Plan shall control. |
| | | | | **G.** **Lien**: With respect to each Hanmi Secured Claim, any valid, enforceable, perfected, and unavoidable lien held by Hanmi in any assets of the Estate to secure such Hanmi Secured Claim shall be retained by Hanmi in and to the same extent, validity, and priority as of the Petition Date |

40

| Secured Claims Related to Vehicles or Equipment | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | pending payment of such Hanmi Secured Claim in full as provided herein. Upon full satisfaction of such Hanmi Secured Claim, any and all liens of Hanmi securing such Hanmi Secured Claim on assets of the MTS Reorganized Debtor shall be released and the MTS Reorganized Debtor shall retain title to such assets free and clear of such liens. The treatment proposed herein shall be in full settlement and satisfaction of the Hanmi Secured Claims. |

### d.    Secured Claims – MWP

| Secured Claims – MWP | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 17 | Sierra Bank Estimated amount: $2,552,152.83 (projected as of the Effective Date) Collateral:  Mills St. Property | N | Y | This Class consists of the Claim of Bank of the Sierra ("**Sierra Bank**").  Sierra Bank's claim is secured by a lien against the Mill St. Property owned by MWP.  Sierra Bank filed Proof of Claim No. 1-1 in the MWP Case and Proof of Claim No. 159-1 in the MTS Case, attached to each of which is the Promissory Note dated July 1, 2020, between MWP and Sierra Bank (the "**Sierra Note**"). The MWP Reorganized Debtor shall pay the Sierra Bank Claim in full as follows: **A. Monthly Payments**:  Beginning on the first Business Day of the first full calendar month after the Effective Date and continuing on the fifteenth day of each calendar month thereafter until Sierra Bank's Claim is paid in full, the MWP Reorganized Debtor shall make a payment in the amount of $15,153.63, as well as an additional payment of $3,000.00, the latter of which shall be credited entirely to the principal amount of Sierra Bank's Claim (each, a "**Sierra Monthly Payment**"). **C. Maturity Date**:  The MWP Reorganized Debtor shall pay the Sierra Bank Claim in full by March 31, 2033 (the "**Sierra Maturity Date**"). **C. Interest Rate**: Simple interest on the Sierra Bank Claim will accrue on the outstanding balance of such Claim from the Effective Date until such Claim is paid in full at the rate of 5.00% through August 14, 2030, at which time the rate of interest shall reset on |

| | Secured Claims – MWP | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | August 15, 2030, to the then-current Wall Street Journal Prime rate, as set forth in the Sierra Note.<br><br>**D. Default**: If the MWP Reorganized Debtor fails to make a Sierra Monthly Payment to Sierra Bank when due herein or pay the Sierra Bank Claim in full by the Sierra Maturity Date, and such failure is not cured within thirty (30) days after written notice thereof provided by Sierra Bank to the MWP Reorganized Debtor and its counsel (collectively, an **"Uncured Sierra Default"**), then Sierra Bank may file and serve a motion with the Bankruptcy Court to obtain authorization to exercise any remedies as to its real property collateral permitted under the Sierra Note. The MWP Reorganized Debtor shall have the right to oppose such motion. Additionally, upon the occurrence of an Uncured Sierra Default, Sierra Bank shall be deemed to have an Allowed Class 16 General Unsecured Claim in the remaining amount owing to Sierra Bank at the time of such Uncured Sierra Default.<br><br>**E. Plan Controls**: If and to the extent that there is a conflict between the Sierra Note (or any other loan documents with Sierra Bank) and the Plan, the Plan shall control.<br><br>**F. Lien**. Any valid, enforceable, perfected, and unavoidable lien held by Sierra Bank to secure Sierra Bank's Claim shall be retained by Sierra in and to the same extent, validity, and priority as of the Petition Date pending payment of the Sierra Bank Claim in full as provided herein. Upon full satisfaction of the Sierra Bank Claim, any and all liens of Sierra Bank securing the Sierra Bank Claim shall be released and title to such assets shall be retained free and clear of such liens.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Sierra Bank Claim. |
| 18 | Sacramento County Tax Collector<br><br>• Collateral: Elder Creek Property<br><br>• Total Claim Amount: $40,025.20 per Claim No. 5-1 in MWP Case. | N | Y | The Sacramento County Tax Collector ("**SCTC**") shall have an Allowed Secured Claim on the Effective Date in the amount of $40,025.20, less any recoveries and payments received by the SCTC before or after the Effective Date (the "**Allowed SCTC Secured Claim**").<br><br>**Lien**. The SCTC shall retain its lien on the Elder Creek Property in and to the same extent, validity, and priority as of MWP bankruptcy filing, pending payment of the Allowed SCTC Secured Claim in full |

| Secured Claims – MWP | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | • Interest Rate: 18.00% per annum | | | as provided herein. Upon full satisfaction of the Allowed SCTC Secured Claim, the SCTC lien on the Elder Creek Property shall be released. **Payment.** Upon the close of escrow of the the Elder Creek Property, the net sale proceeds from such sale(s) shall be paid from escrow to the SCTC on account of the Allowed SCTC Secured Claim. The treatment proposed herein shall be in full settlement and satisfaction of the Allowed SCTC Secured Claim. |

### e.    Secured Claims – Robin Mowbray

| Secured Claims – Robin Mowbray | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 1 | Gloria Mowbray Separate Property Trust (*i.e.*, the Trust) • Collateral: 100% of Mowbray's shares in MTS • Total Claim Amount: $22,793,934.42 | Y | N | Class 1 in the RM Case consists of the Secured Claim of the Trust.  The Claim of the Trust arises from that certain Stock Purchase Agreement, Promissory Note, and Stock Pledge Agreement dated April 2, 2021 between the Trust and Mowbray for Mowbray's purchase of 49% of the equity interest in MTS.  The Secured Claim of the Trust is secured solely by Robin Mowbray's equity interests in MTS. The Secured Claim of the Trust is not a Claim of MTS and is not secured by any assets of MTS. The Trust shall have an Allowed Secured Claim in the amount of $22,793,934.42 as of the Effective Date (the "**Allowed Trust Secured Claim**").  On account of the Allowed Trust Secured Claim, and as part of the Compromise embodied in the Plan, upon the Effective Date, the Trust shall receive all of Equity Interests in MTS in full settlement and satisfaction of the Allowed Trust Secured Claim. The treatment proposed herein shall be in full settlement and satisfaction of the Allowed Trust Secured Claim. |

### 3.    Classes of Priority Unsecured Claims

Certain priority Claims that are referred to in Bankruptcy Code section 507(a)(4), (a)(5), (a)(6), and (a)(7) are required to be placed in Classes.  The Bankruptcy Code requires that each holder of such claims, which do not include Priority Tax Claims, receive cash on the Effective Date equal to the allowed amount of such Claim.  However, a Class of Priority Unsecured Claims

43

may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

The Debtors are unaware of any legitimate Priority Unsecured Claims. However, in an abundance of caution, the following chart lists all Classes containing the Debtors' section 507(a)(4), (a)(5), (a)(6), and (a)(7) Priority Unsecured Claims and their treatment under the Plan.

| Classes of Priority Unsecured Claims – MTS & MWP | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 14 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(4) – (5)<br><br>Estimated total amount of claims: $0.00[17] | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 14 shall be paid up to the $15,150 statutory maximum, in Cash, on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |
| 15 | Allowed Priority Unsecured Claims Pursuant to 11 U.S.C. § 507(a)(6) – (7)<br><br>Estimated total amount of claims: $0.00 | N | Y | Any unpaid Allowed Priority Unsecured Claims in Class 15 shall be paid in full, subject to any statutory maximum, in Cash on the later of the following dates: (i) the Effective Date; and (ii) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Claim. Any Allowed Claim amounts in excess of the applicable statutory maximum will be subject to the treatment afforded the Claims in Class 16. |

### 4.    Classes of General Unsecured Claims

#### a.    MTS

| General Unsecured Claims – MTS | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 16 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims against MTS.<br><br>On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a *pro rata* share of the beneficial interests in the Plan Trust in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, which shall entitle such Holder to his, her, or its Pro Rata Distribution of the Available Trust Proceeds. |

---

[17]  MTS's pre-petition wage claims were paid pursuant to the order of the Bankruptcy Court.

44

| General Unsecured Claims – MTS | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | The Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions from Available Trust Proceeds as follows: On each Quarterly Distribution Date until the Available Trust Proceeds are exhausted or the term of the Plan Trust ends, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from any Available Trust Proceeds. The MTS Reorganized Debtor will fund the GUC Payment Amount to the Plan Trust as provided in Section III.A. of the Plan. The treatment proposed herein shall be in full satisfaction of the Claims in Class 16. |
| 19 | IBEW Local #47 Amount: $880,024.51 | N | Y | The Class consists of the General Unsecured Claim of IBEW Local #47 (the "**Union**") in the amount of $880,024.51 (the "**Union Claim**") pursuant to the Agreement between MTS and the Union with the term June 1, 2022 through September 30, 2027 (the "**Union Agreement**"). The Union Claim shall be paid in twenty-four (24) equal monthly installments of 36,667.69 beginning with the fifteenth (15th) of the first full calendar month after the Effective Date and continuing thereafter until the Union Claim is paid in full. The Union Agreement shall be deemed in full force and effect as of the Effective Date. The treatment herein shall be in full settlement and satisfaction of the Union Claim. |
| 21 | Subordinated Insider Class | Y | Y | This Class consists of the Claims of Insiders against MTS that are being consensually subordinated under the Plan.  The Holders of Subordinated Claims shall not receive any Distributions under the Plan until and unless the Allowed General Unsecured Claims are paid in full. |

### b. **MWP**

| | General Unsecured Claims – MWP | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 20 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims against MWP.<br><br>On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata Distribution from the MWP GUC Payment up to the full amount of such Holder's Allowed General Unsecured Claim; provided, however, that MWP shall be permitted to refrain from making such Distribution until the Litigation Resolution Date.<br><br>The treatment proposed herein shall be in full settlement and satisfaction of the Claims in Class 20. |

### c. **Robin Mowbray**

| | General Unsecured Claims – Robin Mowbray | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| 4 | General Unsecured Claims | N | Y | This Class consists of the General Unsecured Claims in the RM Case. Each Holder of an Allowed General Unsecured Claim in the RM Case shall receive, in full and final settlement and satisfaction of such Claim, a cash payment equal to its prorated share of Robin Mowbray's net disposable income over the five-year period commencing as of the Effective Date (the "**RM Net Disposable Income**").<br><br>Upon confirmation of the Plan, the amount of $135,385, as set forth on **Exhibit 3** to the Plan, shall be and is conclusively determined to be the RM Net Disposable Income. Each Holder of an Allowed General Unsecured Claim in Class 4 shall receive a *pro rata* share of the RM Net Disposable Income in the total amount of $135,385.<br><br>The RM Net Disposable Income will be paid on a *pro rata* basis to the Holders of Allowed General Unsecured Claims in Class 4 on an annual basis in equal annual payments beginning on the date that is the one (1) year anniversary of the Effective Date and continuing each anniversary thereafter for four (4) years. Robin Mowbray will make such payments to the Holders of Allowed General Unsecured Claims. |

| General Unsecured Claims – Robin Mowbray | | | | |
|---|---|---|---|---|
| Class | Description | Insiders (Y/N) | Impaired (Y/N) | Treatment |
| | | | | Holders of Allowed General Unsecured Claims in Class 4 will not receive interest on their Claims. Robin Mowbray may prepay the Net Disposable Income to Holders of Allowed General Unsecured Claims in Class 4 at any time without a prepayment penalty. The treatment set forth in this Class 4 shall be in full settlement and satisfaction of the Allowed General Unsecured Claims in the RM Case. |

## 5.        Class of Interest Holders

Interest Holders are the parties who hold ownership Interests.  The following chart describes the treatment for Interest Holders in the MTS Case, the MWP Case, and the RM Case.

| Class of Interests – MTS | | | | |
|---|---|---|---|---|
| Class # | Description | Insiders | Impaired | Treatment |
| 21 | Robin Mowbray | Y | Y | On the Effective Date, based on the Compromise set forth in Section III.A.2. herein and in exchange for the Settlement Consideration, all existing Equity Interests in MTS shall be cancelled and 100% of the Equity Interests in the MTS Reorganized Debtor shall be issued to the Trust. |
| Class of Interests – MWP | | | | |
| Class # | Description | Insiders | Impaired | Treatment |
| 22 | Robin Mowbray and the Trust | Y | Y | On the Effective Date, 100% of the existing Equity Interests in MWP shall revest in the RM Reorganized Mowbray and in the Trust in accordance with the current allocation subject to the terms of the Plan. |
| Class of Interests – Robin Mowbray | | | | |
| Class # | Description | Insiders | Impaired | Treatment |
| 5 | Robin Mowbray | Y | Y | On the Effective Date, property of the Mowbray Estate shall revest in the RM Reorganized Mowbray subject to the terms of the Plan. |

47

**III.    MEANS FOR IMPLEMENTATION OF THE PLAN**

This Section is intended to explain how the Reorganized Debtors intend to effectuate the Plan and fund the obligations to Creditors with Allowed Claims and Interest Holders undertaken in the Plan after the occurrence of the Effective Date.  This Section provides information regarding the funding sources for the Plan obligations, the establishment of the Plan Trust, and other material issues bearing upon performance of the Plan.

**A.    Funding of the Plan**

The payments under the Plan by the MTS Reorganized Debtor will be funded from the MTS Reorganized Debtor's operations.  As reflected in the MTS Projections, the Distributions to the Holders of Secured Claims will be paid by the MTS Reorganized Debtor from its post-Effective Date cash flow.

Distributions to the Holders of Allowed General Unsecured Claims of MTS will be made from the Plan Trust.  The Holders of Allowed General Unsecured Claims of MTS will receive a Pro Rata Distribution of Available Trust Proceeds.  Available Trust Proceeds are comprised of the GUC Payment Amount, the GUC Bonus, and any Net Recoveries.  The MTS Reorganized Debtor will fund the GUC Payment Amount from its post-Effective Date operations as provided below. The payments by MTS on account of the Allowed Secured Claims of PNC and to the Plan Trust on account of the GUC Payment Amount will be backstopped by the MWP Pledge (as provided and defined below).

The Allowed Secured Claim of Sierra Bank is being paid in full in accordance with the respective treatment in the Plan.  Rental income that MWP receives from the County will be used on a monthly basis to make the monthly payments required by the Plan to Sierra Bank.  The MWP GUC Payment will be funded by MWP from its real property assets.

Distributions to the Holders of Allowed Claims against Robin Mowbray will be made directly by Robin Mowbray.  Robin Mowbray will fund such payments from her post-Effective Date compensation.

**1.** **Payment of the GUC Payment Amount and the GUC Bonus**

**a.** **The GUC Payment Amount**

The $25,000,000 GUC Payment Amount is the minimum amount to be paid under the Plan.  The MTS Reorganized Debtor shall pay the GUC Payment Amount to the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims in Class 16) through the Class 16 GUC Payment as provided below.

The Class 16 GUC Payment is summarized and intended to work as follows:

The Class 16 GUC Payment requires the MTS Reorganized Debtor to make the payments specified in the Projections for the General Unsecured Creditors as adjusted based on the MTS Reorganized Debtor's *actual* post-Effective Date performance (up to the GUC Payment Amount).  Thus, if and to the extent that the MTS Reorganized Debtor's actual net income, inclusive of PTS and after income tax distributions, for a particular period is greater than projected, then the payment to the Plan Trust on account of the GUC Payment Amount will be increased.  If and to the extent that the MTS Reorganized Debtor's actual net income, inclusive of PTS and after income tax distributions, for a particular period is less than projected, then the payment to the Plan Trust on account of the GUC Payment Amount will be reduced.  However, the MTS Reorganized Debtor is, by the Plan, committing to paying the GUC Payment Amount in full even if its post-Effective Date performance is worse than projected.  The time needed to pay the GUC Payment Amount may be shorter or longer than projected depending on the MTS Reorganized Debtor's actual performance.  Based on the Projections, the MTS Reorganized Debtor projects funding the GUC Payment Amount within nine (9) years of the Effective Date.  (*See* Ex. 1 at 13.)

The Class 16 GUC Payment will be made quarterly.  The Class 16 GUC Payment will be calculated within thirty (30) days of the end of each Measurement Period (the "**Calculation Date**").  The Class 16 GUC Payment shall be paid by the MTS Reorganized Debtor to the Plan Trust within fourteen (14) calendar days after such Calculation Date (the "**Payment Date**"); *provided*, *however*, with respect to any Class 16 GUC Payment, if the MTS Reorganized Debtor believes that such Class 16 GUC Payment is not prudent in its business judgment based on its projected operating results over the next twelve (12) months, then it may withhold the Class 16

49

GUC Payment if the Plan Trustee approves such in writing by the Payment Date.  The Plan Trustee shall be the sole arbiter, as between the MTS Reorganized Debtor and the Plan Trustee, as to whether the MTS Reorganized Debtor may withhold a Class 16 GUC Payment (or any portion thereof).

Until the GUC Payment Amount is paid by the MTS Reorganized Debtor to the Plan Trustee in full, upon the written request of a Holder of an Allowed General Unsecured Claim made within fourteen (14) days after the Payment Date, the Plan Trustee shall, within fourteen (14) days of such request, provide such Holder with a written calculation for the Class 16 GUC Payment made on such date.  If such Holder disputes the amount of such Class 16 GUC Payment on the basis that such Class 16 GUC Payment should be greater based on the terms of the Plan and such dispute cannot be resolved after meeting and conferring with the Plan Trustee and the MTS Reorganized Debtor in good faith, then, within fourteen (14) days after such Holder's receipt of the Plan Trustee's written calculation, such Holder may file with the Court and serve on the Plan Trustee and the MTS Reorganized Debtor and their respective counsel a regularly noticed motion for the Court to resolve such dispute.

Until the GUC Payment Amount is paid by the Reorganized MTS Debtor to the Plan Trustee in full, upon the written request of a Holder of an Allowed General Unsecured Claim made within fourteen (14) days after the Payment Date, the Plan Trustee shall, within fourteen (14) days of such request, provide such Holder with a written calculation for the Class 16 GUC Payment made on such date.  If such Holder disputes the amount of such Class 16 GUC payment on the basis that such Class 16 GUC payment should be greater based on the terms of the Plan and such dispute cannot be resolved after meeting and conferring with the Plan Trustee and the Reorganized MTS Debtor in good faith, then, within fourteen (14) days after such Holder's receipt of the Plan Trustee's written calculation, such Holder may file with the Court and serve on the Plan Trustee and the Reorganized MTS Debtor and their respective counsel a regularly noticed motion for the Court to resolve such dispute.

Notwithstanding the foregoing, in any year in which the Projections project a payment to the Plan Trust on account of the GUC Payment Amount and until the GUC Payment Amount is

50

paid to the Plan Trust in full, the MTS Reorganized Debtor shall pay at least the sum of $350,000 (the "**GUC Annual Minium Payment**") within thirty (30) days after the end of such year.

<b>b.    The GUC Bonus</b>

In addition to the GUC Payment Amount, the MTS Reorganized Debtor will pay to the Plan Trust the GUC Bonus.  The GUC Bonus entitles the Plan Trust (for the benefit of the Holders of Allowed General Unsecured Claims) to fifty percent (50%) of the MTS Reorganized Debtor's post-confirmation excess cash (defined as actual net income less income tax distributions and inclusive of PTS), if any, after payment of the GUC Payment Amount subject to a maximum time period and maximum amount.  The GUC Bonus will be paid by the MTS Reorganized Debtor through the Excess GUC Cash Payment.  By the Excess GUC Cash Payment, the Plan Trust could receive up to the cumulative sum (inclusive of the GUC Payment Amount) of (a) $55,000,000 or (b) 40% of the Allowed General Unsecured Claims (capped by the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed),[18] whichever is greater between (a) and (b), provided such cumulative sum is generated within five (5) years after the Effective Date (subject to the one-year extension set forth in the definition of the GUC Bonus if the GUC Payment Amount is paid in full by the MTS Reorganized Debtor to the Plan Trust in the fifth (5th) year after the Effective or later).  The GUC Bonus is inclusive of the GUC Payment Amount.

The GUC Bonus will be paid quarterly after the GUC Payment Amount is paid in full to the Plan Trust.  The GUC Bonus will be calculated in accordance with the Plan by the Calculation Date and paid by the MTS Reorganized Debtor to the Plan Trust by the Payment Date.

As an example, if the MTS Reorganized Debtor pays the GUC Payment in full to the Plan Trust within three (3) years after the Effective Date, then the Plan Trust would be entitled to the Excess GUC Cash Payment for an additional two (2) years up to GUC Maximum Amount.  If the GUC Maximum Amount is reached within the next year (*i.e.*, year four after the Effective Date), then the payments by the MTS Reorganize Debtor to the Plan Trust cease.  If the GUC Maximum

---

[18]  Based on the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025, and assuming such Claims are Allowed, then 40% equals approximately $67 million (subject to the disallowance of certain Disputed Claims).

51

Amount is not reached within five (5) years after the Effective Date, then the payments by the MTS Reorganized Debtor to the Plan Trust cease.  If it takes the MTS Reorganized Debtor more than five (5) years after the Effective Date to pay the GUC Payment Amount to the Plan Trust, then the Plan Trust would be entitled to the Excess GUC Cash Payment for one (1) year after the MTS Reorganized Debtor pays the GUC Payment Amount in full.

Upon the MTS Reorganized Debtor fully funding the GUC Payment Amount and paying any GUC Bonus required by the Plan to the Plan Trust, the MTS Reorganized Debtor shall have no further obligation to the Plan Trust.  The MTS Reorganized Debtor's obligation to make the Class 16 GUC Payment and the Excess GUC Cash Payment, on the terms herein, are subject to the default provision in Section III.L.

As reflected in the MTS Projections, the MTS Reorganized Debtor's post-Effective Date cash flow includes substantial funds from PTS and PTM.  The MTS Reorganized Debtor is projected to receive approximately $10.3 million per year from PTS on account of management fees and equipment rent.  (*See* Ex. 1 at 5.)  PTS is projected to repay the PTS Loan with interest within two years after the Effective Date.  In addition, the MTS Reorganized Debtor is to receive substantial distributions from PTS's available cash flow.  (*See* Ex. 1 at 11.)  The projected distributions from PTS collectively exceed $6 million over the term of the Plan.  The MTS Reorganized Debtor is projected to receive approximately $420,000 on an annual basis from PTM in management fees and equipment rent.  The projected amounts to be paid by PTM and PTS to the MTS Reorganized Debtor are based on the CRO's current understanding of the financial wherewithal of both such companies and reflects the amounts that the CRO believes can reasonably be paid to the MTS Reorganized Debtor.

In addition, as provided in the Plan Trust Agreement attached to the Index as **Exhibit 17**, the Plan Trust will be vested with all Trust Causes of Action, excluding the Excluded Claims.  The Holders of Allowed General Unsecured Claims will share *pro rata* in any Net Recoveries on account of the Trust Causes of Action.  On the Effective Date, the MTS Reorganized Debtor will pay to the Plan Trustee $50,000 (the "**Initial Plan Trust Payment**") for the initial costs of administration of the Plan Trust.  Any payments on the PTM Loan and the MWP Loan within the

52

amounts set forth in the MTS Projections shall be paid to the MTS Reorganized Debtor.

**2.      The Compromise Among MTS, Robin Mowbray, MWP, and the Trust**

The Plan represents a proposed settlement among MTS, Robin Mowbray, MWP, and the Trust (the "**Compromise**").  Such Compromise is the product of MTS's discussions with the Examiner and MTS's negotiations with the Rodriguez Plaintiffs and is part of the settlement with the Rodriguez Plaintiffs.  The consideration for the Compromise is the value and benefits provided under the Plan, including without limitation, the MWP Pledge, the voluntary subordination of claims against MTS, and the increase in the GUC Payment Amount, and the inclusion of the GUC Bonus (collectively, the "**Settlement Consideration**").

The Mowbray Claims (as defined below) shall be vested in the Plan Trust to pursue, in the Plan Trustee's discretion, as needed to ensure that MTS pays the GUC Payment Amount in full as and when required by the Plan, backstopped by the MWP Pledge.  Any Net Recoveries on account of the Mowbray Claims shall be a credit against the GUC Payment Amount.

The "**Mowbray Claims**" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, MTS, the MTS Case, the MTS Estate, MWP, the MWP Estate, the MWP Case, Robin Mowbray, the RM Case, and the RM Estate any transfers listed in MTS's Schedules and Statement of Financial Affairs, as may be amended, transfers listed in MWP's Schedules or Statement of Financial Affairs, transfers listed in Robin Mowbray's Schedules or Statement of Financial Affairs, and any transfers disclosed in the Insider Payment Schedule attached to the Index of Exhibits as **Exhibit 10** against Robin Mowbray, the Trust, Richard Mowbray, and any insider of MTS or insider of any such insider, excluding PTM, MWP, and PTS, held by MTS, the MTS Estate, MWP, the MWP Estate, Robin Mowbray, and the RM Estate, their respective successors, assigns, and representatives, and any and all persons that may purport to assert any cause of action derivatively,

53

by, through or on behalf of the MTS, the MTS Estate, MWP, the MWP Estate, Robin Mowbray, or the RM Estate.

For the avoidance of doubt, the Mowbray Claims do not include any claims against PTM, PTS, and/or MWP, including, without limitation, on account of the amounts loaned by MTS to each such entity. The MTS Reorganized Debtor's rights to collect the PTM Loan, the PTS Loan, and the MWP Loan are expressly preserved.

**The Mowbray Claims shall be vested in the Plan Trust upon the Effective Date**. The Confirmation Order shall operate as a bar and injunction against the commencement or pursuit of the Mowbray Claims by any party other than the Plan Trustee.

The Insider Payment Schedule attached to the Index as **Exhibit 10** lists the payments to or for the benefit of insiders within the four-year period prior to the MTS Petition Date from MTS's books and records. Certain of the Insider Payments were made by MTS in the ordinary course of business for compensation to employees of MTS or for services provided to MTS (such as, by PTM and PTS) and, therefore, are presumed to be not avoidable under the Bankruptcy Code. The Insider Payments also include amounts loaned to PTM and PTS, which are not being released under the Plan. The net Insider Payments to Gloria Mowbray, Robin Mowbray, Richard Mowbray, Kim Mowbray, and the Trust during the four-year period prior to the MTS Petition Date collectively total $38,187,758.78 (excluding those marked as compensation). (*See* Index, Ex. 6.)

As noted in the Examiner's Report, there could be impediments to prevailing on certain Insider Avoidance Actions and collecting on any judgment obtained. (*See* Report [Docket No. 538] at 25-30.) For example, it may be difficult to prove that MTS was insolvent at "different points in time." (*See id.* at 28:1-2.) Gloria Mowbray is deceased and Robin Mowbray is a debtor in her own bankruptcy case. (*See id.* at 27:23-26.) Moreover, the majority of the Insider Payments to Robin Mowbray and Gloria Mowbray were paid directly by MTS to taxing authorities on account of MTS's taxable income and neither Robin Mowbray nor Gloria Mowbray received such payments. Of the $25,135,211.58 Insider Payments listed as to or for the benefit of Robin Mowbray, $20,416,770,08 were on account of taxes attributable to MTS's taxable income.

54

(*See* Index of Exhibits, Ex. 10 at 137; Ex. 11 at 140.)  Similarly, of the $10,702,367.55 net Insider Payments listed as to or for the benefit of Gloria Mowbray, $10,552,674.60 were on account of taxes attributable to MTS's taxable income.  (*See* Ex. 11 at 140.)  The Examiner concluded, in relevant part, as follows:

> ***The litigation and expert fees required to pursue and defend these actions are projected to be significant as it will be difficult and time-consuming to establish if and when insolvency occurred.  Even if the litigation is successful, collectability may be an issue as one potential defendant is deceased [and] another defendant is in a Chapter 11 proceeding.  A quick and reasonable settlement would be beneficial to all parties involved.***

(*See* Report at 30:17-22 (emphasis in original).)  This Plan is intended to accomplish a settlement of the type suggested by the Examiner.  The proposed settlement is the product of discussions with the Examiner and, also, settlement negotiations with the Rodriguez Plaintiffs, who assert the largest claim in the case by far.

In addition to the foregoing, Force 10 prepared an analysis of the potential Insider Avoidance Actions against Robin Mowbray, Gloria Mowbray, the Trust, Richard Mowbray, and Kim Mowbray based on the Insider Payment Schedule.  A true and correct copy of Force 10's analysis is attached to the Index as **Exhibit 11** (the "**Claims Analysis**").  The Claims Analysis assumes that Insider Payments made in 2020, 2021, and 2022 may not be avoidable because, based on a preliminary analysis of MTS's CPA reviewed consolidated financials, MTS was likely solvent in such years.  (*See* Index, Ex. 11.)  The Claims Analysis assumes that MTS was insolvent in 2023 and 2024 based on MTS's CPA reviewed consolidated financials for 2023 and MTS's unaudited financial statements for 2024.  In 2023 and 2024, the Insider Payments collectively totaled $2,437,351.  (*See id.*)  Thus, based on the Claims Analysis, the gross value of the potential Insider Avoidance Actions against Robin Mowbray, Gloria Mowbray, the Trust, Richard Mowbray, and Kim Mowbray is $2,437,351 (with compensation included).  Excluding compensation, which is presumably not avoidable, the gross value of such Insider Avoidance Actions is $380,893.  (*See id.*)  The stated gross value is also *without* taking into consideration any reduction of the potential recoveries based on costs of litigation, asserted defenses, and the financial wherewithal of any defendant to satisfy a judgment obtained.  For these reasons, the

actual net amount that could be collected on such Insider Avoidance Actions is likely materially less.  As discussed below, this gross value is less than the value to be received under the Plan.

The Claims Analysis is provided solely for purposes of evaluating the Compromise and for estimating the value of potential Insider Avoidance Actions for purposes of the Best Interests of Creditors Test, and, as such, is without any admission whatsoever, including, without limitation, as to the merits of any Insider Avoidance Actions.

According to MTS's Liquidation Analysis, the Holder of General Unsecured Claims against MTS would receive a *pro rata* portion of $15,674,000 in a Chapter 7 case.  However, under the Plan, MTS is committing to pay at least $25,000,000 (*i.e.*, over $9,000,000 more).  In addition, the Holders of Allowed General Unsecured Claims against MTS will have the opportunity to share in any upside in the MTS Reorganized Debtor's post-Effective Date performance via the GUC Bonus.  Assuming the GUC Maximum of the GUC Bonus is $55,000,000, the Holders of Allowed General Unsecured Claims could receive a *pro rata* share of an additional $30,000,000 above the GUC Payment Amount.  Moreover, the settlement proposed herein avoids the costs and risks associated with litigation as discussed in the Examiner's Report.

Due to the MWP Pledge, the unliquidated real property of MWP, excluding the Mill St. Property until such time as Sierra Bank's Allowed Secured Claim has been paid in full, will provide a backstop for the payments required under the Plan on account of the Allowed Secured Claims of PNC and Sierra Bank, and to the Plan Trust by MTS on account of the GUC Payment Amount for Class 16.   As reflected in the Claims Analysis, MTS estimates that the collective value of the contribution of MWP's real estate, net of Sierra Bank's Secured Claim, is $6,893,847, excluding the lien of PNC against two of MWP's real properties (the Elder Creek Property and the Allen Street Property).  This collective value, standing alone, is $4,456,496 more than the gross value of the potential Insider Avoidance Actions pursuant to the Claims Analysis (inclusive of compensation).  (*See* Index, Ex. 11.)  If compensation is excluded from the gross value of the potential Insider Avoidance Actions, then the estimated value of MWP's real properties exceeds such gross value by $6,512,954.  (*See id.*)

The SOFAs of MWP and Robin Mowbray are attached to the Index as **Exhibits 8** and **9**. Such SOFAs list relatively minimal payments that could be avoidable within the two-year period prior to MWP and Robin Mowbray Petition Date.  MWP's SOFA lists payments of approximately $142,000 for the benefit of the Trust and $32,000 to Robin Mowbray in management fees.  The payments listed by Robin Mowbray in her SOFA are to MTS and constitute the loan by Robin Mowbray to MTS.  Thus, based foregoing, the Compromise is fair and equitable taking into consideration such payments by MWP and Robin Mowbray in addition those discussed above with respect to MTS.

As provided below in Section III.D., the Mowbray Claims are vested in the Plan Trust upon the Effective Date.  Upon the payment of the GUC Payment Amount in full by the MTS Reorganized Debtor to the Plan Trust (the "**Release Effective Date**"), the Mowbray Claims shall be released.

Upon the Effective Date, any claims pending in any court to pursue any Mowbray Claims by any third party (who is not the Plan Trustee) shall be dismissed; *provided*, *however*, out of abundance of caution, this provision does not require the dismissal of the causes of action currently asserted by Ronnie Jordan in the lawsuit pending in Superior Court of California for the County of San Bernardino, Case No. CIVSB22201281, to liquidate his Disputed Claims against the Debtors.  Upon and after the Effective Date, the Plan Trustee shall be empowered to take such action, file such pleadings, and record such instruments as needed to cause the dismissal of any such claims.

On the business day that is seven (7) days prior to the deadline to commence an action to pursue the Mowbray Claims in 11 U.S.C. § 546 (the "**Avoidance Action SOL**") and on each one year anniversary of such business day thereafter until the earlier of the Release Effective Date or the date upon which the Court enters an order converting the MTS Case, the Avoidance Action SOL shall automatically extend as to the Mowbray Claims for a one-year period.  Upon the Release Effective Date, the tolling and extensions of the Avoidance Action SOL provided by this paragraph shall be null and void and of no further effect.

**3.    Compromise with the Rodriguez Parties**

In addition to any Debtor/RP Settlement Agreement, the Plan constitutes and includes a settlement agreement and compromise between MTS, Robin Mowbray, PTS, PTM, MWP, the Trust, Richard Mowbray, and any other Released Party (each, a "**RP Released Party**" and collectively, the "**RP Released Parties**"), on the one hand, and Ana Lidia Gomez and Jaime Rodriguez (collectively, the "**Rodriguez Plaintiffs**") on the other hand (the "**Rodriguez Compromise**").  Pursuant to the Rodriguez Compromise, and in addition to the consideration provided by the terms of the Plan, including, without limitation, the Settlement Consideration:

(i)     On the Effective Date, any and all assignable claims which MTS may have against Everest National Insurance Company ("**Everest**") arising out of or related to Everest's contractual obligation under Policy No. EN4CA00458191 (the "**Everest Policy**") to pay the covered portion of the judgment and interest/cost award (the "**Rodriguez Judgment**") entered in San Bernardino County Superior Court Case No. CIVDS2003809 (the "**Rodriguez Lawsuit**") shall be deemed assigned to the Rodriguez Plaintiffs.  The MTS Reorganized Debtor shall retain any and all claims it may have for breach of the implied covenant of good faith and faith dealings (aka "bad faith") or any other extra contractual claims for damages arising out of Everest's defense of the Rodriguez Lawsuit, including any claims arising out of or related to allegations that Everest breached its obligation to settle and is thereby liable for the entire Rodriguez Judgment.

(ii)    Within fourteen (14) days of the Effective Date, the MTS Reorganized Debtor shall cause the pending appeal of the Rodriguez Judgment by MTS to be dismissed.

(iii)   On the Effective Date, Proof of Claim No. 143-1 filed by the Rodriguez Plaintiffs (the "**Rodriguez Claim**") shall be deemed an Allowed General Unsecured Claim.

(iv)    Reporting required under the Plan to the Plan Trustee in accordance with Section III.D.a. shall be provided to the Rodriguez Plaintiffs.

(v)     Effective as of the Release Effective Date, the Rodriguez Plaintiffs shall be deemed to forever release and discharge each of the RP Released Parties from the

58

Rodriguez Claim, the Rodriguez Judgment, and any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, existing or hereinafter arising, in law, equity, or otherwise, including, without limitation, pursuant to 11 U.S.C. §§ 544, 547, 548, 549, and/or 550 of the Bankruptcy Code and analogous non-bankruptcy law, based on, relating to, or in any manner arising from, in whole or in part, MTS, the MTS Case, the MTS Estate, MWP, the MWP Estate, the MWP Case, Robin Mowbray, the RM Case, the RM Estate, the Rodriguez Claim, the Rodriguez Judgment, any transfers listed in MTS's Schedules and Statement of Financial Affairs, as may be amended, any transfers in MWP's Schedules and Statement of Financial Affairs, any transfers in Robin Mowbray's Schedules and Statement of Financial Affairs, and any transfers disclosed in the Insider Payment Schedule attached to the Index of Exhibits as **Exhibit 10**, and the Rodriguez Plaintiffs agree that the sole source of recovery on account of the Rodriguez Claim and the Rodriguez Judgment shall be the treatment in Class 16 of MTS and amounts to be paid thereunder and any amounts paid under Class 4 of Robin Mowbray on account of any Allowed General Unsecured Claim of the Rodrigeuz Plaintiffs in the RM Case; *provided*, *however*, that, with respect to Everest, the Rodriguez Compromise shall not apply to any portion of the Rodriguez Judgment or cost/interest award that is payable by Everest pursuant to its obligations under the Insurance Policy, but, as to Everest, only to the extent payable under said policy.  Nothing in the Rodriguez Compromise or the Plan shall extinguish any debt payable by Evest nor bar the Rodriguez Plaintiffs from collecting amounts payable under the Insurance Policy from Everest (including on account of the assignment herein).  Nothing in the Rodriguez Compromise or the Plan shall extinguish any debt owed by Jonathan Gonzalez-Varillas to the Rodriguez

Plaintiffs nor prohibit the Rodriguez Plaintiffs from collecting such debt from Jonathan Gonzalez-Varillas.

The Confirmation Order shall constitute approval of any Debtor/RP Settlement Agreement (if and to the extent such is not approved by separate order of the Court entered prior to the Effective Date) and the Rodriguez Compromise pursuant to Bankruptcy Rule 9019. At present, there is no Debtor/RP Settlement Agreement.

### B.   The MWP Pledge

As part of the settlements set forth in the Plan, MWP agrees that its real properties and the value therein (in excess of and junior to (i) the Allowed Secured Claims of PNC and Sierra Bank encumbering any such real properties and (ii) the MWP GUC Payment), excluding the Mill St. Property until such time as Sierra Bank's Allowed Secured Claim has been paid, shall be pledged under the Plan and administered by MWP as needed to ensure that the payments under the Plan on account of the Allowed Secured Claims of PNC and Sierra Bank, and the payments to be made to the Holders of Allowed General Unsecured Claims of Class 16 of MTS are made in the amounts and when required by the Plan (the "**MWP Pledge**"). The MWP Reorganized Debtor shall execute such documents and instruments requested by the MTS Reorganized Debtor and/or the Plan Trustee to create and record one or more liens on MWP's real properties to reflect the MWP Pledge, and the MTS Reorganized Debtor and/or the Plan Trustee, as applicable, shall be permitted to record such documents. The MWP Pledge shall end upon the later of the payment of the Allowed Secured Claim of Sierra Bank in full and the payment of the GUC Payment Amount in full.

Any lien to be recorded on any real property subject to a lien in favor of PNC shall be junior to such lien and will be recorded with the express written consent of PNC, exercised in its respective sole and absolute discretion, until the Allowed Secured Claims of PNC is paid in full under and as required by the Plan.

Notwithstanding anything to the contrary contained herein or in the Confirmation Order, the Mill St. Property shall be expressly excluded from the MWP Pledge, and no lien shall exist or

be recorded on or against the Mill St. Property in connection with the MWP Pledge, unless and until such time as Sierra Bank's Allowed Secured Claim has been paid in full.

### C.      Sale of Real Properties

After the Effective Date, the Reorganized Debtors shall be authorized, but not required (except as otherwise expressly set forth below in this Section III.C), to sell any Estate Real Property.  Pending the Plan Term End Date, the sale or encumbering of any Estate Real Property shall require an order of the Court pursuant to 11 U.S.C. § 363 and Estate Real Property shall not be sold or encumbered absent an order of the Court.  The Reorganized Debtors may seek to sell Estate Real Property free and clear of liens as provided in 11 U.S.C. § 363(f).

As an alternative to the sale any Estate Real Property as provided or required herein, the Reorganized Debtors may incur or obtain financing secured by such property as necessary to pay Allowed Claims pursuant to an order of the Court.

Within one (1) year after the Effective Date and to the extent not sold prior thereto (the "**Sale Deadline**"), the MWP Reorganized Debtor shall close sales of Allen Street Property and the Elder Creek Property. The MWP Reorganized Debtor will cause the sale of the Elder Creek Property as needed to fund the MWP GUC Payment was required in the Plan.  The MWP Reorganized Debtor may extend the Sale Deadline for "cause" by motion filed with the Bankruptcy Court prior to the expiration of the Sale Deadline.

### D.      The Plan Trust

On the Effective Date, a plan trust (the "**Plan Trust**") shall be created pursuant to the Plan Trust Agreement attached to the Index as Exhibit 17 and shall be subject to the terms and conditions in the Plan and the Confirmation Order.  All Distributions to the Holders of Allowed General Unsecured Claims of MTS and MWP pursuant to the Plan shall be from the Plan Trust. The Plan Trustee shall not be required to make more than one Distribution to such Holders of Allowed General Unsecured Claims per calendar quarter.  All Persons dealing with the Plan Trustee, or seeking to assert General Unsecured Claims against MTS, MWP, the MTS Reorganized Debtor, the MTS Estate, the MWP Estate, or the Plan Trust shall look only to property of the Plan Trust (and in accordance with the terms of the Plan) to satisfy any liability to

61

such Persons, and the Plan Trustee shall have no personal or individual obligation to satisfy any such liability.

Upon and as of the Effective Date, the Mowbray Claims shall be automatically transferred to and vested in the Plan Trust and shall be included in the Trust Assets and the Trust Causes of Action (as such capitalized terms are defined in the Plan Trust Agreement) to be investigated and pursued as provided in the Plan Trustee Agreement, in the Plan Trustee's sole discretion, as needed to ensure that the payment by MTS of the GUC Payment Amount to the Plan Trust is made when and as required by the Plan.

### a. **Reporting to the Plan Trust by the MTS Reorganized Debtor**

Beginning with the first full Measurement Period after the Effective Date and continuing until the MTS Reorganized Debtor completes the payment of the GUC Payment Amount and any GUC Bonus to the Plan Trust, within forty-five (45) days of each Measurement Period, the following shall be provided to the Plan Trustee: a balance sheet, profit and loss statement, and cash flow statement for each of the MTS Reorganized Debtor, PTM, PTS, and MWP (pending the MWP Consolidation).  Such financial statements for the MTS Reorganized Debtor and PTS may be provided on a consolidated basis.

### E. **The Reorganized Debtors Retention of Professionals and Fees and Expenses**

On or after the Effective Date, the Reorganized Debtors may, without further application or Motion, notice, hearing, or Court order, engage or employ such professionals and experts as it deems necessary and appropriate to assist in carrying out its rights or duties under the Plan.  Such professionals and experts may be employed on any reasonable terms and conditions of employment to be determined by the Reorganized Debtors.  For the services performed on and after the Effective Date, the professionals engaged by the Reorganized Debtors (the "**Reorganized Debtors' Professionals**") shall receive reasonable compensation and reimbursement of expenses in a manner to be determined by the Reorganized Debtors.

The Reorganized Debtors' Professionals shall be entitled to reasonable compensation for their services and reimbursement for expenses.  The Reorganized Debtors shall pay, without

62

further order, notice, or application to the Court, the reasonable fees and actual expenses of any Reorganized Debtors' Professionals.

### F. The Plan Trustee as Disbursing Agent

The Plan Trustee shall serve as the disbursing agent under the Plan for the Holders of Allowed General Unsecured Claims against MTS, and shall be responsible for making all Distributions to the Holders of Allowed General Unsecured Claims of MTS required under the Plan.

### G. The Bond

The Plan Trustee and the Reorganized Debtors shall not be required to post a bond or surety or other security for the performance of their duties under the Plan.

### H. Release of Liens

Except as otherwise expressly provided in the Plan for the Holders of Allowed Claims in MTS and MWP Classes 1-13 and 17-18, RM Class 1, or the Confirmation Order, or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens, or other security interests in or against property of the Estate shall be released.  The Plan Trustee and the Reorganized Debtor shall be empowered to file such pleadings and/or record such documents or instruments as necessary to eliminate, expunge or release such liens from their respective assets.

### I. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Plan Trustee and the Reorganized Debtors may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials

63

or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption(s) specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan.

**J.      The Reorganized Debtors' Post-Confirmation Management**

On the Effective Date, Richard Mowbray will continue in his role as CEO of the MTS Reorganized Debtor, Ruben Sainos will continue in his role as CFO of the MTS Reorganized Debtor, and Robin Mowbray will continue in her role as Director of the MTS Reorganized Debtor's Board of Directors.  To the extent that MTS's bylaws are inconsistent with the Plan, the Plan shall control.

On the Effective Date, the MWP Reorganized Debtor shall continue to be managed by Robin Mowbray as the managing member of MWP.

**K.      Powers and Duties of the Reorganized Debtors**

On and after the Effective Date and except as otherwise set forth in the Plan, and notwithstanding anything to the contrary in their bylaws, the Reorganized Debtors shall have the power and authority to take such actions as necessary to carry out and implement the terms of the Plan, including, without limitation, the following:

a.      Making the Distributions required by the Reorganized Debtors under the Plan;

b.      Filing motions or commencing proceedings to determine the allowability, classification, and priority of Claims and Interests;

c.      Administering the terms of the Plan, the Confirmation Order, or any order of the Court;

d.      Opening or closing any accounts the Reorganized Debtors determine reasonable, necessary, or required under the Plan;

e.      Reviewing, approving, and paying the fees and costs incurred by the Reorganized Debtor Professionals after the Effective Date;

f.      Operate and use its revenues and cash provided they comply with the payment

64

terms in the Plan;

g.    Filing, prosecuting, or compromising any Estate Claims, excluding the Trust Causes of Action, which are vested in the Plan Trust;

h.    Filing motions or commencing proceedings to seek an injunction, judgment or order, or taking any other action as may be necessary or appropriate to enforce the terms of, or to restrain interference with, the Plan or the Confirmation Order; and

i.    Taking any other action reasonably necessary or appropriate, in the Reorganized Debtors' discretion, related to the Reorganized Debtors' operations or to implement the Plan.

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, subject to the provisions of the Plan, by virtue of entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without any further requirement of further action by the Reorganized Debtors.

**L.    Default on Obligations to Holders of Allowed Claims**

The following shall be considered a "**Default**" under the Plan:  (1) the failure of a Reorganized Debtor to (a) make a payment to the Holder of an Allowed Secured Claim, (b) make a Plan Trust Payment to the Plan Trust when such payment is due under the Plan, or (c)  sell the Allen St. Property or the Elder Creek Property by the Sale Deadline (as may be extended), or (2) if, on any two (2) year anniversary of the Effective Date, the amount paid by the MTS Reorganized Debtor to the Plan Trust on account of the GUC Payment Amount (via the Class 16 GUC Payment), on a cumulative basis by such anniversary, is forty percent (40%) less than projected to be paid by the MTS Reorganized Debtor by such anniversary under the Projections. Upon a Default, the Plan Trustee or the party to whom such payment was required to be made may, in such party's discretion, provide written notice of such default to the applicable Reorganized Debtor and its counsel.  If the applicable Reorganized Debtor fails to cure such Default within thirty (30) days of receipt of the written notice, then such Default shall be an "**Uncured Default**" and the party noticing the Default may, after meeting and conferring with the applicable Reorganized Debtor in good faith to determine whether the Uncured Default can be

65

consensually resolved, file a motion with the Bankruptcy Court seeking dismissal or conversion of the Chapter 11 Cases under 11 U.S.C. § 1112(b).  This remedy is in addition to any remedy expressly granted to, or permitted by, the Holder of an Allowed Secured Claim in the treatment in the Plan for such Holder.  The remedy provided by this Section III.L. shall otherwise be the sole remedy for any Uncured Default under the Plan.

## IV.  CLAIM OBJECTIONS AND PROCEDURES FOR RESOLVING DISPUTED CLAIMS

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE MTS CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS FEBRUARY 20, 2025.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE MWP CASE AND THE RM CASE BY CLAIMANTS WHOSE CLAIMS WERE NOT SCHEDULED OR WERE SCHEDULED AS DISPUTED, CONTINGENT OR UNLIQUIDATED WAS JULY 14, 2025.

### A.  Standing

The Reorganized Debtors reserve the right to object to any Claim, to estimate any Claim, and to seek to subordinate any Claim after the Effective Date.  On the Effective Date, the Reorganized Debtors and any other party-in-interest shall have standing to file motions or commence adversary proceedings to object to Claims, to estimate Claims, and/or to subordinate Claims pursuant to 11 U.S.C. § 510 (any such motion or adversary proceeding, a "**Claim Objection**").  An objection to any Claim, whether such Claim is based on the Schedules or any proof of claim, or a motion or adversary proceeding to subordinate a Claim pursuant to 11 U.S.C. § 510 may be filed after the Effective Date by such parties by the Claim Objection Deadline (as such deadline may be extended as provided herein).  The Reorganized Debtors and any other party-in-interest may seek to extend the Claim Objection Deadline for "cause" by a motion filed prior to the Claim Objection Deadline (as may be extended).  There is no limit to the number of extensions that may be sought.  As used herein, the "**Claim Objection Deadline**" shall mean the date that is one (1) year after the Effective Date.  The Reorganized Debtors have standing to settle

or compromise any Claim Objection they filed or commenced or are pursuing or any Disputed Claim; provided, however, any such settlement or compromise shall require an order of the Court approving such settlement or compromise pursuant to a noticed motion.  No other party in interest may settle or compromise a Claim Objection filed or commenced by such party absent an order of the Court on a regularly noticed motion filed and served on the MTS Reorganized Debtor, the MWP Reorganized Debtor, the RM Reorganized Debtor, and their respective counsel.  The MTS Reorganized Debtor shall be deemed the real party in interest in any objections to Claims commenced prior to the Effective Date by MTS in the MTS Case.  The MWP Reorganized Debtor shall be deemed the real party in interest in any objections to Claims commenced prior to the Effective Date by MWP in the MWP Case.  The RM Reorganized Debtor shall be deemed the real party in interest in any objections to Claims commenced prior to the Effective Date by RM in the RM Case.  A person who asserts a personal injury tort or wrongful death claim arising post-petition against MTS may, in accordance with 11 U.S.C. § 157(b)(5), have such claim liquidated and tried in the U.S. District Court for the Central District of California or in the U.S. District Court in which the claim arose, as determined by the U.S. District Court for the Central District of California.

B.    No Distribution Pending Allowance

No Claim shall be paid under the Plan unless it is or becomes an Allowed Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections and motions as to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.  If a Disputed Claim does not become an Allowed pursuant to a Final Order adjudicating an objection to such Claim or a motion or adversary proceeding to subordinate or estimate such Claim, then no Distribution shall be made on account of such Claim.  If a Claim is, pursuant to Final Order, disallowed in its entirety or subordinated in its entirety to the General Unsecured Claims in a Case, then no Distribution shall be made on account of such Claim.

67

## C.      Reserves for Disputed Claims

In the event that Disputed Claims are pending at the time of a Distribution under the Plan, the Disbursing Agent shall establish and maintain a reserve for such Disputed Claims.  For purposes of establishing a reserve for all Disputed Claims as otherwise required herein, Cash will be set aside equal to the amount that would have been distributed to the Holders of the Disputed Claims had the Disputed Claims been Allowed on the date a Distribution is made to the Holders of Allowed Claims in the same Class or of the same priority as the Disputed Claims.  Unless otherwise provided in the treatment with respect to a particular Claim, if a Disputed Claim ultimately becomes an Allowed Claim, the amount of Cash reserved for that Disputed Claim shall be distributed on the earlier of: (a) the Distribution Date following the date when the Disputed Claim becomes an Allowed Claim, or (b) ninety (90) days after such Disputed Claim becomes an Allowed Claim.  Any reserved Cash not ultimately distributed to the Holder of a Disputed Claim because the Disputed Claim does not become an Allowed Claim shall be returned to the applicable Reorganized Debtor.

## D.      Claims Paid By Third Parties

To the extent that the Holder of a Claim receives any Other Recoveries (before or after the Effective Date) on account of such Claim, (i) the Holder of such Claim shall be required to, within thirty (30) days of the receipt of such Other Recoveries, file an amended Proof of Claim reflecting a reduction of such Claim in the amount of such Other Recoveries, and (ii) whether or not such amended Proof of Claim is filed, the Claim shall be deemed disallowed and reduced in the amount of such Other Recoveries as of the Holder's receipt of such Other Recoveries without an objection having to be filed and without any further notice, action, order, or approval by the Court, and any Pro Rata Distributions or Distributions to which such Holder is otherwise entitled under the Plan shall be adjusted accordingly.

## V.    DISTRIBUTIONS

### A.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, the Reorganized Debtor shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Effective Date.

### B.    Distributions on Account of Claims Allowed After the Effective Date

#### 1.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

#### 2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan, and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Plan Trustee or the applicable Reorganized Debtor, as the case may be, shall establish appropriate reserves for potential payment of such Claims.

### C.    Delivery and Distributions and Undeliverable or Unclaimed Distributions

#### 1.    Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtors and the Plan Trustee, as the case may be, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution or any Proof of Claim filed by that Holder.

#### 2.    Undeliverable Distributions

Distributions to Holders of Allowed Claims will be sent to the last known address set forth on such Holder's proof of claim filed with the Bankruptcy Court, or on the Schedules, if no proof of claim was filed.  Holders of Allowed Claims may change the address to which the distributions

will be sent by filing a written change of address with the Bankruptcy Court and serving a copy of the change of address on the applicable Reorganized Debtor and the Plan Trustee.  If a distribution is returned as undeliverable, the applicable Reorganized Debtor or the Plan Trustee, as the case may be, shall hold the distribution and shall not be required to take any further action with respect to the delivery of the distribution unless and until the applicable Reorganized Debtor or the Plan Trustee is notified in writing of the then-current address of the person or entity entitled to receive the distribution. Unless and until the applicable Reorganized Debtor or the Plan Trustee is so notified, such distribution shall be deemed to be "Unclaimed Property" and shall be dealt with in accordance with the provision below for distribution of Unclaimed Property.

### 3.    Distributions of Unclaimed Property

If any distributions are returned to the Reorganized Debtor or the Plan Trustee as undeliverable, then such distributions shall be deemed to be "Unclaimed Property."  Nothing contained in this Plan shall require the Reorganized Debtor, the Plan Trustee, or anyone else, to attempt to locate such person or entity.  The Unclaimed Property shall be set aside and, in the case of cash, held in a segregated account to be maintained by the Reorganized Debtor or the Plan Trustee.  If such person or entity presents itself within six (6) months of the date of the payment returned as undeliverable, then the Unclaimed Property shall be distributed to such person or entity.  If such person or entity does not present itself within six (6) months of the date of payment returned undeliverable, then any such Unclaimed Property shall be redistributed to other Holders of Allowed Claims or Interests.

### D.    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtor and the Plan Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Plan Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable

70

withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

## V.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.     Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, any executory contracts and unexpired leases identified on the schedule of executory contracts and unexpired leases to be assumed filed with the memorandum or pleading in support of confirmation of the Plan (the "**Schedule of Assumed Agreements**") shall be deemed assumed by the applicable Reorganized Debtor, as the case may be.  The Schedule of Assumed Agreements will identify any amounts that must be paid to cure defaults under the executory contracts to be assumed under the Plan (the "**Cure Amount**").  The Debtors reserve the right to amend the Schedule of Assumed Agreements prior to the Confirmation Hearing to: (a) add any executory contract or unexpired lease and provide for its assumption and assignment; (b) modify the Cure Amount for any particular executory contract or unexpired lease; or (c) delete any executory contract or unexpired lease and provide for its rejection at any time prior to the Confirmation Hearing.  The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to any party or parties to the executory contracts or unexpired leases affected by the amendment.

Absent a timely objection as provided below, the Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of the executory contracts and unexpired leases then identified on the Schedule of Assumed Agreements, and shall constitute a final determination of the Cure Amount and a final determination that the Debtor has shown adequate assurance of future performance.  Further, any Cure Amount ordered by the Court, through entry of the Confirmation Order, and paid, shall be deemed to satisfy any and all defaults arising from, out of, or related to the executory contract or unexpired lease, including any claims

71

that were or could have been asserted by the non-debtor party to the contract or lease on or prior to the entry of the Confirmation Order, and all actual or pecuniary losses that have resulted from such defaults.

If you are a party to an executory contract or unexpired lease to be assumed and you object to the assumption of your lease or contract and/or you dispute the Cure Amount related to your lease or contract, then you must file and serve upon the Debtors and their counsel a written objection within the deadline for objecting to the confirmation of the Plan.  An objection to the Cure Amount must also set forth the amount you contend to be the correct Cure Amount and contain evidence to support such amount.  Failure to timely file an objection as provided herein shall be deemed consent to the proposed assumption, assignment, and Cure Amount, and a waiver of any and all rights to challenge such assumption, assignment and Cure Amount.

With respect to each executory contract and unexpired lease identified on the Schedule of Assumed Agreements, if no dispute arises regarding the Cure Amount, adequate assurances, or some other matter related to the assumption of the executory contract or unexpired lease, then the Cure Amount set forth in the Schedule of Assumed Agreements shall be paid to the applicable non-debtor party on the Effective Date or as soon as reasonably practicable thereafter or as otherwise expressly set forth in the Plan for such non-debtor party. If a dispute arises regarding (a) whether the Debtors have provided adequate assurance of future performance of an executory contract or unexpired lease to be assumed, or (b) any other matter pertaining to a proposed assumption and assignment, the Cure Amount will be paid within thirty (30) days after entry of a Final Order resolving the dispute and approving the assumption and assignment; provided, however, if a dispute arises regarding any of the foregoing, the Debtors reserve the right to completely forego assumption of and, instead, reject the subject executory contract or unexpired lease.

If a party to an executory contract or unexpired lease identified on the Schedule of Assumed Agreements files an objection disputing the Cure Amount and asserting an alternative Cure Amount (an "Alternative Cure Amount"), then the Debtors may amend the Schedule of Assumed Agreements at any time prior to the Confirmation Hearing to delete the subject

72

executory contract or unexpired lease and provide for its rejection.  Executory contracts or unexpired leases not so deleted shall be conditionally assumed, subject to the right of the Reorganized Debtors to either, up to the first (1st) Business Day that is at least sixty (60) days following the Effective Date (the **"Cure Motion Deadline"**), (1) file a motion to determine the appropriate Cure Amount, or (2) amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease. Any such motion or notice of any such amendment will be served on the party to the executory contract or unexpired lease affected by the motion (or its attorney, if any).  If the Reorganized Debtors do not, by the Cure Motion Deadline, file a motion to determine the appropriate Cure Amount or amend the Schedule of Assumed Agreements to completely forego assumption of, and, instead, reject the subject executory contract or unexpired lease, then the Cure Amount will be the Alternative Cure Amount and such amount will be paid to the applicable non-debtor party within fifteen (15) days after the Cure Motion Deadline (unless otherwise expressly set forth in the Plan for such non-debtor party).  If the Reorganized Debtors have filed such a motion and does not timely amend the Schedule of Assumed Agreements within fifteen (15) days after entry of an order fixing the Cure Amount, then the executory contract or unexpired lease shall be assumed, as of the Effective Date, and the Cure Amount shall be fixed as the Cure Amount ordered by the Court.  The Cure Amount will be paid to the applicable non-debtor party as soon as reasonably practicable following the expiration of the 15-day deadline or as otherwise expressly set forth in the Plan for such non-debtor party.

### B.    <u>Rejection of Executory Contracts or Unexpired Leases Not Assumed</u>

On the Effective Date, the Reorganized Debtors will be deemed to have rejected any and all executory contracts and unexpired leases not identified on the Schedule of Assumed Agreements.  The Confirmation Order will constitute a Court order approving the rejection, as of the Effective Date, of such executory contracts and unexpired leases.  Any Claim for damages arising from the rejection under the Plan of any executory contract or unexpired lease must be filed with the Court and served upon the Reorganized Debtors and their counsel within thirty (30) days of the later of (a) the Confirmation Date, and (b) the amendment of the Schedule of Assumed

Agreements by the Debtors to eliminate the executory contract or unexpired lease. Any such damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtors, the Reorganized Debtors, the Estates and their respective property. Persons holding these Claims who fail to timely file Claims will be barred from receiving any Distributions under the Plan on account of their requested damage Claims.

IF YOU ARE A PARTY TO A LEASE OR CONTRACT TO BE REJECTED AND YOU OBJECT TO THE REJECTION OF YOUR LEASE OR CONTRACT, THEN YOU MUST FILE AND SERVE YOUR OBJECTION WITHIN THE DEADLINE FOR OBJECTING TO THE CONFIRMATION OF THE PLAN.

**VI.     PRESERVATION OF CAUSES OF ACTION AND AVOIDANCE ACTIONS FOR THE REORGANIZED DEBTORS**

The Plan reserves for the Reorganized Debtors all rights to commence and pursue, as appropriate, any and all Estate Claims, excluding the Trust Causes of Action vested in the Plan Trust, whether arising prior to or after the Petition Date, in any court or other tribunal. On the Effective Date, excluding the Trust Causes of Action vested in the Plan Trust, the Reorganized Debtors are vested with authority to enforce, file, litigate, prosecute, settle and collect Estate Claims, including Avoidance Actions not vested in the Plan Trust, although the Reorganized Debtors will not be required to do so unless it determines that doing so would be in the best interests of its creditors or Interest Holders.

While the Debtors have attempted to identify Estate Claims in the Disclosure Statement which may be pursued, and hereby incorporate by reference those disclosures and provisions, the failure to list any potential Estate Claim or defendant, generally or specifically, is not intended to limit the rights of the Debtors or the Reorganized Debtors to pursue any Estate Claim that is expressly vested in such party in the Plan. Unless an Estate Claim against any Person is expressly waived, relinquished, released, compromised, or settled as provided or identified in the Plan, any Confirmation Order or prior Bankruptcy Court order, the Debtors and the Reorganized Debtors expressly reserve Estate Claims for later adjudication (either by the Reorganized Debtors or the Plan Trustee, as the case may be). Therefore, no preclusion doctrine, including, without

74

limitation, the doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to any Estate Claim upon or after Confirmation or consummation of the Plan.

All Estate Claims (excluding the Trust Causes of Action vested in the Plan Trust) are preserved under the Plan for the benefit of the Estates and the Reorganized Debtors, as applicable under the terms of the Plan.  The Reorganized Debtors may settle or compromise any Estate Claims (excluding the Trust Causes of Action vested in the Plan Trust) without further notice, motion, or order of the Bankruptcy Court.  Any recoveries on Estate Claims (excluding the Trust Causes of Action, which are vested in the Plan Trust) shall be paid to the applicable Reorganized Debtor and be used to pay operating expenses or make payments on account of Allowed Claims and/or Interests in accordance with the terms of the Plan.

ANY CREDITORS THAT BELIEVE THEY RECEIVED A TRANSFER OR SETOFF THAT IS AVOIDABLE UNDER THE CODE OR THAT HOLD A CLAIM AGAINST THE ESTATE THAT COULD BE SUBJECT TO AN OBJECTION BASED UPON FAILURE TO RETURN AN AVOIDABLE TRANSFER OR SETOFF, ARE DIRECTED TO REVIEW THEIR RECORDS AND/OR THE DEBTORS' SCHEDULES FOR FURTHER INFORMATION. HOWEVER, ALL RIGHTS OF THE DEBTORS AND THE ESTATES ARE RESERVED WITH RESPECT TO ANY AND ALL TRANSFERS OR SETOFFS WHICH MAY BE AVOIDABLE UNDER THE BANKRUPTCY CODE OR OTHER LAW (OTHER THAN THE INSIDER AVOIDANCE ACTIONS, WHICH ARE VESTED IN THE PLAN TRUST).

## VII.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all entities with respect to all matters related to the Cases, the Debtors, the Reorganized Debtors, and the Plan as legally permissible, including, without limitation, jurisdiction to:

1. Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any and all objections to the allowance or priority of any Claim;

2. Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3. Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party;

4. Resolve any issues related to any matters adjudicated in the Cases;

5. Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6. Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Estate Claims that are pending as of the Effective Date or that may be commenced in the future, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan;

8. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

9. Issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

10. Enforce the terms of the Plan;

11. Enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

12. Resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan; and

13. Enter an order concluding the Cases.

## VIII. EFFECT OF CONFIRMATION OF THE PLAN

### A. Binding Nature of Plan

CONFIRMATION OF THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE BANKRUPTCY CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

### B. Discharge

MTS and MWP will receive a discharge upon the entry of the Confirmation Order.  Robin Mowbray will receive a discharge upon the completion of her payment of the RM Net Disposable Income.  Nothing herein shall limit the effect of confirmation as described in §§ 524 and/or 1141 of the Bankruptcy Code.  Upon discharge, the Reorganized Debtors and their assets will, to the fullest extent permitted by § 1141 of the Bankruptcy Code, including, without limitation as provided in § 1141(d)(1)(A) of the Bankruptcy Code, be deemed discharged and released from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities of any nature whatsoever, whether known or unknown, that arose before the Effective Date or that are based upon, arise from, or otherwise relate to acts,

77

events, omissions, transactions, or other activities of any kind that occurred before the Effective Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), in each case, regardless of whether: (1) a proof of claim based on such a debt is filed or deemed filed; (2) a Claim based on such a debt is allowable under Bankruptcy Code § 502; or (3) the person holding the Claim based on such a debt has accepted the Plan; provided, however, that in no event shall the Debtors be discharged of any obligations remaining under the Plan as of the Effective Date.

Except as expressly provided in the Plan, pursuant to § 1141(d)(5)(A), the Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtors to the fullest extent allowed under § 1141 of the Bankruptcy Code.  The Reorganized Debtors will not be liable for any Claims and will only have any obligations that are specifically provided for in the Plan. Holders of any Claims or debts against the Debtors will, upon the Effective Date, be enjoined from taking any action to collect, recover, or offset any such Claim or debt against the Reorganized Debtors or as a personal liability of the Reorganized Debtors.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all persons will be precluded from asserting or pursuing against the Reorganized Debtors, the Estates, the Plan Trustee, or their respective property for any Claims based on, arising from, or in connection with any act, event, omission, transaction, or other activity of any kind that occurred before the Effective Date, and any debt of the Debtors or Claim against the Debtors, whether secured or unsecured, which was in default up to the Effective Date, will no longer be deemed in default and will be deemed in good standing.

## C.    **Injunction**

All Persons or entities who have held, hold, or may hold Claims (other than Claims that are unimpaired under the Plan), and all other parties in interest in the Case, along with their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates, are permanently enjoined, from and after the Effective Date, from, in respect of any Claims against the Debtors treated, discharged, released, or settled under the Plan, (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral,

78

administrative, or other forum) on account of any such Claims against the Reorganized Debtors; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, on account of any judgment, award, decree, or order related to any such Claims against the Reorganized Debtors; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Reorganized Debtors on account of any such Claims; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Reorganized Debtors, or against the property or interests in property of the Debtors or Reorganized Debtors, on account of such Claims; (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Plan; or (vi) taking any act to obtain possession or collect from the respective assets of the Reorganized Debtors or the Plan Trust on account of any such Claims or any act to recover on account of any such Claims; provided, however, that nothing contained herein shall preclude such entities from exercising their rights pursuant to and consistent with the terms of the Plan.

### D.    <u>Vesting of Property in the Reorganized Debtors</u>

Except as otherwise provided in the Plan and excluding the Trust Causes of Action, the confirmation of the Plan vests title to all property whatsoever of MTS, and the MTS Estate in the MTS Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but, pending the payment of all Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the Plan.

Except as otherwise provided in the Plan and excluding the Trust Causes of Action, the confirmation of the Plan vests title to all property whatsoever of MWP, and the MWP Estate in the MWP Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but, pending the payment of all Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the Plan.

Except as otherwise provided in the Plan, the confirmation of the Plan vests title to all property whatsoever of Mowbray and the RM Estate in the RM Reorganized Debtor on and after the Effective Date, free and clear of all claims and interests, but, pending the payment of all

Allowed Claims in full, subject to the express requirements, obligations, and restrictions in the Plan.

### E.   Prohibition of Non-Voting Securities

To the extent required by § 1123(a)(6) of the Bankruptcy Code, upon the Effective Date, the charter of MTS shall be deemed amended to prohibit the issuance of nonvoting equity securities.

### F.   Modification of the Plan

The Debtor may modify this Plan at any time before confirmation.  However, the Bankruptcy Court may require a new disclosure statement and/or re-voting on this Plan.  The Debtor may also seek to modify this Plan at any time after confirmation only if (1) this Plan has not been substantially consummated, and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### G.   Exculpations and Releases

To the maximum extent permitted by law, and except to the extent arising from willful misconduct, gross negligence, fraud or malpractice as construed under CA PRC 1.8.8., neither the Debtor nor any of its professionals employed or retained it in the Case (collectively, the "**Exculpated Parties**"), shall have or incur liability to any person or entity for any Official Actions taken or omission made in good faith in connection with or related to the formulation and implementation of this Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of this Plan, the consummation and implementation of this Plan, or the transactions contemplated by the Plan related to the post-petition administration of the Case prior to the Effective Date.

### H.   Submission of Post-Confirmation Reports

Within 120 days of the entry of the Confirmation Order, the Reorganized Debtor shall file a status report with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on each of the following or their counsel via notice of electronic filing: (a) the OUST; and (b) and such parties that receive notice of electronic filings in the Chapter 11 Cases.  Further status reports shall be filed every 120

days and served on the same entities.

### I.    Quarterly Fees

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) prior to confirmation shall be paid to the OUST on or before the Effective Date.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the OUST by the Reorganized Debtor until a final decree, or the entry of an order dismissing the Case or converting the Case to Chapter 7, at the rate in effect at the time such fees are due.

### J.    Post-Confirmation Conversion/Dismissal

After the Plan is confirmed, a creditor or party in interest may bring a Motion, only after notice and a hearing, to convert or dismiss the Chapter 11 Case under Bankruptcy Code section 1112(b) if there is an Uncured Default as defined in Section III.L. above or other material default in performing the Plan.  If the Bankruptcy Court orders the one of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the estate and vested in a Reorganized Debtor, and that has not been distributed under the Plan will revest in the Chapter 7 estate, including, without limitation, prior to the Release Effective Date, any Released Claims  The automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously authorized by the Bankruptcy Court during the Case.

The Confirmation Order may also be revoked under very limited circumstances.  The Bankruptcy Court may revoke the Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke the confirmation within 180 days after the entry of the Confirmation Order.

### K.    Final Decree

Once the Estate has been fully administered as referred to in Bankruptcy Rule 3022, the applicable Reorganized Debtor will file a motion with the Bankruptcy Court to obtain a final decree to close the applicable Case.  The Reorganized Debtors shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

## IX.    CONCLUSION

The Debtors believe that the Plan is in the best interests of all stakeholders and urge the Holders of Allowed Claims to vote in favor of the Plan.

DATED:  March 10, 2026                    RAINES FELDMAN LITTRELL LLP

                                          By:  */s/ Robert S. Marticello*
                                               ROBERT S. MARTICELLO
                                               MICHAEL L. SIMON
                                               Counsel for The Original Mowbray's Tree
                                               Service, Inc.


DATED:  March 10, 2026                    ELKINS KALT WEINTRAUB REUBEN
                                          GARTSIDE LLP


                                          By:
                                               ROYE SUR
                                               LAUREN N. GANS
                                               Attorneys for Debtor and Debtor-in-Possession
                                               Mowbray Waterman Property, LLP.

82

## TABLE OF DEFINITIONS

**A.    Definitions**

The following defined terms are used in the Disclosure Statement and in this Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

The following defined terms are used in the Disclosure Statement and in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy code or in the Bankruptcy Rules shall have the meaning ascribed that term in the Bankruptcy Code or the Bankruptcy Rules.

"Administrative Claim" means a Claim for costs and expenses of the administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a Claim of a Professional employed at the expense of the Estate and any fees or charges asserted against the Estate under 28 U.S.C. § 1930.

"Administrative Tax Claim" means an Administrative Claim or other Claim that is not an Allowed Secured Claim and that a government unit asserts against the Debtor for taxes (or for related interest or penalties) for any tax period that, either in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

"Affiliates" means, collectively, PTS, PTM, and MWP.

"Allowed" means a Claim that is either (a) listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection, motion to estimate, or motion to subordinate has been filed; or (b) with respect to which a proof of claim has been filed by the Claims Bar Date, and as to which either (i) no objection, motion to estimate, or motion to subordinate was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (ii) any such objection, motion to estimate, or motion to subordinate has been determined with the Claim being allowed by a Final Order.  The amount of an Allowed Claim shall be as follows: (a) if the creditor did not file a proof of claim with the Bankruptcy

83

Court on or before the Claims Bar Date, (1) the amount of the creditor's Claim as listed in the operative Schedules as not disputed, contingent, unliquidated or unknown, or (2) the amount fixed by Final Order of the Bankruptcy Court in resolving any timely filed objection, motion to estimate, or motion to subordinate, or other motion disputing the amount of such Claim; or (b) if the creditor filed a proof of claim with the Bankruptcy Court on or before the Claims Bar Date, (1) the amount stated in such proof of claim if no objection, motion to estimate, or motion to subordinate with respect to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection, motion to estimate, or motion to subordinate with respect to such proof of claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim for which a proof of claim is not filed by the Claims Bar Date and that is not listed in the Schedules or is listed in the Schedules as disputed, unliquidated, contingent or unknown shall be zero, and no distribution shall be made on account of such Claim.  An Allowed Claim shall not include any unmatured or post-petition interest unless otherwise stated in the Plan.

"Allowed [Class Designation and/or Secured, Priority, or General Unsecured] Claim" means an Allowed Claim in the specified Class and/or of the specified type.

"Allowed Administrative Claim" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

"Allowed General Unsecured Claim" means an Allowed Unsecured Claim that is not entitled to priority.

"Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has as interest, or which is subject to setoff under Section 533 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the mount subject to any setoff as the case may be.

"Available Trust Proceeds" collectively refers to the GUC Payment Amount, the GUC Bonus, and Net Recoveries.

"Avoidance Action" means causes of action arising under 11 U.S.C. §§ 510, 541, 542, 544, 545, 547, 548, 549, 550, 551 and/or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bankruptcy Code" or "Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" or "Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California.

"Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a).

"Calculation Date" means the date that is thirty (30) days after the end of a Measurement Period.

"Case" in the singular refers to either the MTS Case, the MWP Case, or the Robin Mowbray Case and, in the plural, refers to the MTS Case, the MWP Case, and the Robin Mowbray Case collectively.

"Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

"Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and includes any claims based on, arising from, or connected with any work performed by the Debtor prior to the Petition Date, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claims Bar Date" means as follows: as to MTS, February 20, 2025, the date the Court set

as the deadline for creditors to file proofs of claim against MTS Estate; and, as to MWP and Mowbray, May 15, 2025, the date the Court set as the deadline for creditors to file proofs of claim against the MWP Estate and the RM Estate.

"Class" means the group of Claims classified in the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

"Class 16 GUC Payment" means, with respect to each Measurement Period after the Effective Date until the GUC Payment Amount is paid to the Plan Trust in full, the Projected GUC Payment for such Measurement Period (a) plus or minus, as the case may be, the difference between (i) the actual net income less income tax distributions of the Reorganized Debtor (inclusive of PTS) for such Measurement Period and (ii) the projected net income and income tax distributions as set forth in the Plan Projections for the same period, and (b) if and to the extent that such Projected GUC Payment (as may be augmented by subparagraph (a) of this definition) complies with the Minimum Working Capital Ratio and the Minimum Cash Threshold.  The Class 16 GUC Payments shall be calculated by the Reorganized Debtor in consultation with the Plan Trustee and approved by the Plan Trustee.

"Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

"Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the Plan.

"Debtor" in the singular refers to either MTS, MWP, or Robin Mowbray and, in the plural, refers to MTS, MWP, and Robin Mowbray collectively.

"Debtor/RP Settlement Agreement" means any written settlement agreement executed between the Debtor and the Rodriguez Plaintiffs and filed with the Court.

"Disclosure Statement" means the *Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization*, including as may be further amended or modified.

"Disputed Claim" means all or any part of a Claim that is the subject of a timely objection, request for estimation, or motion to subordinate pursuant to 11 U.S.C. § 510 filed on or before the Claims Objection Deadline (as such deadline may be extended), which objection, request for

estimation, or motion to subordinate has not been withdrawn or determined by a Final Order of the Bankruptcy Court.  In addition, prior to the later of (a) the Claims Objection Deadline, (b) if prior to the Claim Objection Deadline, a motion to disallow, estimate, or subordinate the Claim is filed, then the date upon which such motion is determined by Final Order, or (c) if a proceeding is pending to determine the validity, amount, or characterization of the Claim before a court of competent jurisdiction (and if and to the extent that, prior to the Effective Date, the Bankruptcy Court entered an order lifting the automatic stay to allow the proceeding to proceed to final judgment), then the date upon which such proceeding, including, without limitation, any appeal or remanded or further proceedings in or related to such proceeding, is resolved by a Final Order, any Claim that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of calculating and making any Distributions under this Plan if: (1) no Claim corresponding to the proof of claim is listed in the Schedules, (2) the Claim corresponding to the proof of claim is listed in the Schedules as disputed, contingent, unliquidated, or unknown, (3) the amount of the Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the priority or classification of the Claim as specified in the Proof of Claim differs from the priority of any corresponding Claim listed in the Schedules.

"Distribution" means the Cash that is required to be distributed under this Plan to the holders of Allowed Claims and Interests.

"Effective Date" means the date that is the fifteenth (15th) day after entry of the Confirmation Order.

"Estate Claims" means any and all claims and causes of action that constitute property of the Estate including, but not limited to, any Avoidance Actions, equitable subordination or debt recharacterization actions, any causes of action or claims for recovery of any amounts owing to the Debtor or the Estate, and any claims or causes of action against the Debtor's insurance carriers.

"Estate Real Property" means any real property that an Estate has an interest in and any real property of MWP.

"Estates" means, collectively, the MTS Estate, the MWP Estate, and the RM Estate.

"Examiner" refers to Donald T. Fife, in his capacity as the Court-appointed examiner under the *Order Approving the U.S. Trustee's Application for the Appointment of an Examiner* [Docket No. 374].

"Excess GUC Cash Payment" means, with respect to each Measurement Period after the Reorganized Debtor pays the GUC Payment Amount in full to the Plan Trust, fifty percent (50%) of the actual net income less income tax distributions of the Reorganized Debtor (inclusive of PTS) for such Measurement Period in excess of and subject to the Minimum Working Capital Ratio and the Minimum Cash Threshold. The GUC Excess Cash Payments shall be calculated by the Reorganized Debtor in consultation with the Plan Trustee and approved by the Plan Trustee.

"Excluded Claims" means any (a) Estate Claims or Avoidance Actions against PTS, including, without limitation, with respect to the PTS Loan or any Insider Payments to PTS, and (b) any other Estate Claim or Avoidance Action that is released pursuant to a compromise approved by a Final Order of the Court.

"File," "Filed," or "Filing" means duly and properly filed with the Court and reflected on the Court's official docket.

"Final Order" means an order or judgment entered by the applicable court on its docket.

    a.    That has not been reversed, rescinded, stayed, modified, or amended;

    b.    That is in full force and effect;

    c.    With respect to which the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely Filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; and

    d.    With respect to which any appeal, motion or petition for review, remand, rehearing, or reconsideration, or writ of certiorari that is Filed has been dismissed or resolved by the highest court to which the order or judgment was appealed or from which review, rehearing, remand, reconsideration, or a writ of certiorari was sought, and any remanded or further proceedings following such appeal, petition, or writ have been resolved by Final Order.

"General Unsecured Claim" means an unsecured Claim against a Debtor, however arising, not entitled to priority under § 507(a) of the Bankruptcy Code.

"GUC Bonus" means, if and to the extent that the GUC Payment Amount is satisfied within five (5) years after the Effective Date, then the Excess GUC Cash until the earlier or first to be reached of (a) the payment of the greater of (i) $55,000,000 (*i.e.*, another $30,000,000 in addition to the GUC Payment Amount) and (ii) an amount equal to 40% of the Allowed General Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust inclusive of the GUC Payment Amount, and (b) the date that is five (5) years after the Effective Date; provided, however, if GUC Payment Amount is paid in full by the Reorganized Debtor to the Plan Trust in the fifth (5th) year after the Effective or later, then (b) of this definition shall be extended from five (5) years after the Effective Rate for one (1) year after the GUC Payment Amount is paid in full.

"GUC Interest Rate" shall mean, for each year beginning on and after the Effective Date, the federal judgment rate for the first Business Day of such year.

"GUC Maximum Amount" means the greater of $55,000,000 and an amount equal to 40% of the Allowed General Unsecured Claims (up to the amount of the General Unsecured Claims on the Claims Register as of July 31, 2025 if and to the extent Allowed), by the Reorganized Debtor to the Plan Trust inclusive of the GUC Payment Amount.

"GUC Payment Amount" means the lesser of (a) $25,000,000, plus simple interest per annum on the balance of such amount not yet paid to the Plan Trust at the GUC Interest Rate, and (b) the total amount of Allowed General Unsecured Claims.

"GUC Payment Commencement Date" means the fifteenth (15th) Business Day after the third anniversary of the Effective Date.

"Holder" means an entity holding a Claim.

"Initial Plan Trust Payment" means the $50,000 payment by the MTS Reorganized Debtor to the Plan Trust on the Effective Date.

"Insider" shall have the meaning in 11 U.S.C. § 101(31).

89

"Insider Avoidance Action" means any Avoidance Action against any Insider, excluding any Excluded Claim.

"Interest" means any "equity security" as provided by § 101(16) of the Bankruptcy Code.

"Lien" means any lien, encumbrance, pledge or other charge against property.

"Litigation Resolution Date" means the later of (1) the date upon which a Final Order is entered resolving the Jordan Matter; (2) the date upon which a Final Order is entered resolving the *Joint Motion of Mowbray Waterman Property, LLC and Robin Elaine Mowbray for Order Disallowing, Subordinating, and/or Estimating Proof of Claim No. 4-2 (Against Waterman) and Proof of Claim No. 8-2 (Against Robin) Filed By Ronnie Jordan* [Docket No. 1133] (the **"Objection to Jordan Claim"**); (3) the date upon which a Final Order is entered resolving the claims commenced by MWP in Adv. No. 8:25-ap-01249-SC (the **"MWP Fraudulent Transfer Action"**); (4) the date upon which a Final Order is entered in any subsequent appeal of a Final Order in the Jordan Matter, the Objection to Jordan Claim, or the MWP Fraudulent Transfer Action; and (5) the date upon which a Final Order is entered in any remanded or further proceedings in or related to the Jordan Matter, the Objection to Jordan Claim, or the MWP Fraudulent Transfer Action.

"Loan Causes of Action" means any Estate Claims or Avoidance Actions against PTM solely to collect the balance on the PTM Loan in excess of the amounts to be paid to the MTS Reorganized Debtor as set forth in and according to the Projections, which amounts shall be the property of the MTS Reorganized Debtor.

"Measurement Period" means each three-month period ending March 31, June 30, September 30, and December 31 after the Effective Date and beginning with the first full such three-month period after the Effective Date.

"Mill St. Property" means the real property located at 686 E. Mill Street, San Bernardino, CA 92415.

"Minimum Cash Balance" means $3,000,000.

"Minimum Working Capital Ratio" a minimum working capital ratio of at least 1.25 to 1.0 as measured in accordance with Generally Accepted Accounting Principles in the United States

("**US GAAP**").

"Motion" means a request asking a judge to issue a ruling or order on a legal and/or equitable matter.

"Mowbray" or "Ms. Mowbray" means Robin Elaine Mowbray.

"MTS" means The Original Mowbray's Tree Service, Inc.

"MTS Bankruptcy Case" or "MTS Case" means the bankruptcy case of the MTS Debtor under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:24-bk-12674-SC.

"MTS Estate" means the bankruptcy estate of MTS created under Section 541 of the Bankruptcy Code in the MTS Case.

"MTS Liquidation Analysis" means the liquidation analysis setting forth what Holders of Allowed Claims will receive in a chapter 7 liquidation of MTS and attached to the Index as **Exhibit 4**.

"MTS Petition Date" means October 18, 2024, the day that MTS filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

"MTS Projections" means the projections attached to the Index as **Exhibit 1.**

"MTS Reorganized Debtor" refers to MTS upon and after the Effective Date and as reorganized under the Plan.

"MWP" means Mowbray Waterman Property, LLC.

"MWP Bankruptcy Case" or "MWP Case" means the bankruptcy case of MWP under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:25-bk-10542-SC.

"MWP Estate" means the bankruptcy estate of MWP created under Section 541 of the Bankruptcy Code in the MWP Case.

"MWP GUC Payment" means the *pro rata* distribution of $1,500,000, plus interest at the GUC Interest Rate, by the MWP Reorganized Debtor to the Holders of Allowed General Unsecured Claims of MWP until such sum is paid.

"MWP Liquidation Analysis" means the liquidation analysis setting forth what Holders of

Allowed Claims will receive in a chapter 7 liquidation of MWP and attached to the Index as **Exhibit 5**.

"MWP Pledge" means, as detailed in the Plan, the pledge by MWP of its real properties and the value therein (in excess of and junior to (i) the Allowed Secured Claims of PNC and Sierra Bank encumbering any such real properties and (ii) the MWP GUC Payment) as needed to ensure that the payments under the Plan on account of the Allowed Secured Claims of PNC and Sierra Bank, and the payments to be made to the Holders of Allowed General Unsecured Claims of Class 16 of MTS are made in the amounts and when required by the Plan.

"MWP Reorganized Debtor" refers to MWP upon and after the Effective Date and as reorganized under the Plan.

"Net Recoveries" means any proceeds recovered and received by the Plan Trust on any Trust Causes of Action, net of all attorneys' fees and other costs incurred to recover such proceeds, and less any Trust Costs.

"Non-Ordinary Course Administrative Claim(s)" means Administrative Claims that are not Ordinary Course Administrative Claims, Administrative Tax Claims, or Professional Fee Claims, including Claims that may arise from agreements entered into with the Estate after the Petition Date other than trade agreements.

"Ordinary-Course Administrative Claim" means Administrative Claims other than Administrative Tax Claims, Professional-Fee Claims, and Non-Ordinary-Course Administrative Claims, based upon liabilities that Debtor incurs in the ordinary course of its business.

"Other Recoveries" means any amount, property, value, or payment that the Holder of a Claim receives on account of such Claim from a Person who is not the Debtor or from property that is not property of the Estate, including, without limitation, from a co-obligor, insurer, primarily liable party, or guarantor.

"OUST" means the Office of the United States Trustee, Santa Ana Division.

"Person" means any individual, corporation, general partnership, limited partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, government, political subdivision, governmental unit (as defined in the Bankruptcy Code), official

committee appointed by the OUST, unofficial committee of creditors or equity holders, or entity.

"Plan" means the *Third Amended Joint Chapter 11 Plan of Reorganization*, including as may be further amended or modified.

"Plan Trust Agreement" means the trust agreement attached to the Index as Ex. 17.

"PNC Collateral" means the "Prepetition Collateral" as that term is defined in the First Cash Collateral Stipulation and any other assets of the Estate subject to PNC Security Interests.

"PNC Loan Documents" means the "Prepetition Loan Documents" as that term is defined in the First Cash Collateral Stipulation.

"PNC Security Interests" means the "Prepetition Liens" as that term is defined in the First Cash Collateral Stipulation and any replacement liens granted to PNC pursuant to Section 6.b. of the First Cash Collateral Stipulation.

"PTM" means Phoenix Traffic Management, Inc.

"PTS" means Pino Tree Service, Inc.

"PTS Projections" means the projections attached to the Index as **Exhibit 2.**

"Projected GUC Payment" means the Payments under General Unsecured Claims set forth at page 19 of 172 of the Projections.

"Plan Trust" means the trust created under the Plan for the benefit of creditors holding Allowed General Unsecured Claims.

"Plan Trust Payments" means the Class 16 GUC Payment, the Excess GUC Cash Payment, and the GUC Annual Minimum Payment.

"Plan Trustee" means Jeremy Richards of Keller Benvenutti Kim, the trustee appointed for the Plan Trust.

"Priority Unsecured Claim" means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code §§ 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7).

"Priority Tax Claim" means an Allowed Claim entitled to priority against the Estate under Bankruptcy Code § 507(a)(8).

"Pro Rata Distribution" means the ratio (expressed as a percentage) of (i) the amount of an Allowed General Unsecured Claim (less any Other Recoveries) to (ii) the sum of the aggregate

93

amounts of all Allowed General Unsecured Claims.

"Professional Fee Claim" means:

a.   A Claim under Bankruptcy Code §§ 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred on the Estate's behalf, or

b.   A Claim either under Bankruptcy Code § 503(b)(4) for compensation for professional services rendered or under Bankruptcy Code § 503(b)(3)(D) for expenses incurred in making a substantial contribution to the Estate.

"PTS Projections" are the projections attached to the Index as **Exhibit 2**.

"Quarterly Distribution Date" means the Business Day selected by the Plan Trustee, in his or her sole and absolute discretion, within forty-five (45) days after a particular calendar quarter to make a Distribution as required by the Plan.

"Released Claims" means as defined in Section III.F.3. of the Disclosure Statement.

"Reorganized Debtors" refers to the MTS Reorganized Debtor, the MWP Reorganized Debtor, and RM Reorganized Debtor.

"Request for Payment" means a request for the allowance and payment of a Non-Ordinary Course Administrative Claim pursuant to 11 U.S.C. § 503(a).

"RM Bankruptcy Case" or "RM Case" means the bankruptcy case of Robin Elaine Mowbray under chapter 11 of the Bankruptcy Code that is pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division, with Case No. 8:25-bk-10543-SC.

"RM Estate" means the bankruptcy estate of Ms. Mowbray created under Section 541 of the Bankruptcy Code in the RM Case.

"RM Liquidation Analysis" means the liquidation analysis setting forth what Holders of Allowed Claims will receive in a chapter 7 liquidation of Robin Mowbray and attached to the Index as **Exhibit 6**.

"RM Projections" means the projections attached to the Index as **Exhibit 3.**

"RM Reorganized Debtor" refers to Ms. Mowbray, upon and after the Effective Date and as reorganized under the Plan.

"Schedules" means the Schedules of Assets and Liabilities filed by the Debtor in its or her Case, as required by § 521(a)(1) of the Code, Bankruptcy Rule 1007 (b)(l), and Official Bankruptcy Form No. 6, as the Schedules of Assets and Liabilities may have been or may be amended from time to time.

"SOFA" means the Statement of Financial Affairs filed by the Debtor in its or her Case as required by § 521(a)(1) of the Code and Bankruptcy Rule 1007(b)(l), as the Statement of Financial Affairs may have been or may be amended from time to time.

"Trust" means the Gloria Mowbray Separate Property Trust.

"Trust Available Proceeds" means (a) the Initial Trust Payment, less any Trust Costs, (b) the Plan Trust Payments to fund the GUC Payment Amount, and (c) any Net Recoveries.

"Trust Causes of Action" means the Insider Avoidance Actions, the Loan Causes of Action, and the Mowbray Claims, excluding, in all cases, the Excluded Claims.

"Trust Costs" means the amount necessary or estimated to pay or reserve for, as determined by the Plan Trustee, in full (a) all costs of administration of the Plan Trust, (b) the reasonable fees and costs of the Plan Trustee and the Plan Trustee's Professionals, (c) the amounts Holders of Disputed Claims would be entitled to receive under the Plan if such Disputed Claims were to become Allowed Claims, and (d) all fees payable under section 1930 of chapter 123 of title 28 of the United States Code.

### B.    Rules of Construction

The rules of construction in Bankruptcy Code section 102 apply to the Disclosure Statement and this Plan.  For the purpose of the Disclosure Statement and this Plan, unless otherwise provided in the Disclosure Statement or this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in the Disclosure Statement or this Plan to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it

may have been or may be amended, modified or supplemented pursuant to the Disclosure Statement and this Plan; (iv) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in the Disclosure Statement and this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Disclosure Statement or this Plan, as the case may be; (vi) the words "herein," "hereunder" and "hereto" refer to the Disclosure Statement or this Plan in its entirety rather than to a particular portion of the Disclosure Statement or this Plan, as the case may be; (vii) unless otherwise provided in the Disclosure Statement or this Plan, any reference in the Disclosure Statement or this Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Disclosure Statement or this Plan, or any other provision in this Section.

### C. Rules of Interpretation

Except as otherwise provided in this Plan, Bankruptcy Rule 9006(a) applies when computing any time period under this Plan.

Any term used in this Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable, unless the context requires otherwise.

The definition given to any term or provision in this Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms or as amended by the terms thereof.

96

Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of this Plan.

Unless otherwise specified, all references to Sections or Exhibits in the Disclosure Statement are references to the Disclosure Statement's Sections or Exhibits, and all references to Sections or Exhibits in the Plan are references to this Plan's Sections or Exhibits

Section captions and headings are used only as convenient references and do not affect the Disclosure Statement's or this Plan's meaning.

**D.    Exhibits**

The following exhibits are attached hereto:

Exhibit 1 – MTS Projections;

Exhibit 2 – PTS Projections; and

Exhibit 3 – RM Projections.

# EXHIBIT 1

Mowbray's Tree Service, Inc.

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | |
| Tree Service Revenues | 3,004,146 | 2,704,151 | 2,217,459 | 2,217,459 | 2,328,784 | 2,328,784 | 2,328,784 | 2,328,784 |
| Pino Mgmt. Fees / Leases | 2,578,968 | 2,684,351 | 2,582,786 | 2,582,786 | 2,582,786 | 2,582,786 | 2,582,786 | 2,582,786 |
| Phoenix Mgmt. Fees / Leases | 231,969 | 207,358 | 105,521 | 105,521 | 105,521 | 105,521 | 105,521 | 105,521 |
| Rental Income | - | - | - | - | 135,132 | 135,132 | 135,132 | 135,132 |
| **Total Revenues** | **5,815,084** | **5,595,859** | **4,905,766** | **4,905,766** | **5,152,223** | **5,152,223** | **5,152,223** | **5,152,223** |
| Salaries & Wages | 1,736,878 | 1,414,330 | 1,189,164 | 1,187,311 | 1,138,223 | 1,138,223 | 1,138,223 | 1,138,223 |
| Health Insurance | 166,014 | 166,466 | 136,494 | 136,281 | 127,892 | 127,892 | 127,892 | 127,892 |
| Workers' Comp Insurance | 117,673 | 149,244 | 141,682 | 141,461 | 132,753 | 132,753 | 132,753 | 132,753 |
| Union Dues | 257,205 | 249,666 | 194,208 | 193,967 | 184,465 | 184,465 | 184,465 | 184,465 |
| Occupancy | 88,821 | 45,966 | 66,073 | 66,073 | 24,073 | 24,073 | 24,073 | 24,073 |
| Insurance | 743,297 | 1,168,150 | 1,041,162 | 948,239 | 759,750 | 663,252 | 723,406 | 843,713 |
| Advertising | - | - | - | - | - | - | - | - |
| Utilities | 124,251 | 156,962 | 99,366 | 99,366 | 102,419 | 181,331 | 220,787 | 220,787 |
| Repair and Maintenance | 66,222 | 47,252 | 47,729 | 47,729 | 50,000 | 50,000 | 50,000 | 50,000 |
| Office Supplies | 83,546 | 83,608 | 83,395 | 83,395 | 83,545 | 83,545 | 83,545 | 83,545 |
| Vehicles Expenses | 659,604 | 697,408 | 591,371 | 591,371 | 597,344 | 592,000 | 628,306 | 587,411 |
| Traffic Control Services | - | - | - | - | - | - | - | - |
| OC Professionals | 149,831 | 74,054 | 74,851 | 74,851 | 78,113 | 78,113 | 78,113 | 78,113 |
| Tools and Supplies | 74,202 | 51,218 | 49,918 | 49,918 | 52,785 | 52,785 | 52,785 | 52,785 |
| Property Taxes | 28,483 | 60,455 | 46,248 | 47,173 | 47,173 | 60,589 | 47,173 | 61,800 |
| Bank Expenses | 6,846 | 4,206 | 4,735 | 4,735 | 5,438 | 5,438 | 5,438 | 5,438 |
| Travel & Lodging | 389,001 | 377,493 | 311,089 | 311,089 | 328,955 | 328,955 | 328,955 | 328,955 |
| Other | 19,193 | 145,745 | 35,696 | 35,696 | 35,905 | 35,905 | 35,905 | 35,905 |
| (Gain)/Loss on Disposal of Assets | (86,603) | - | - | - | 22,500 | - | - | 97,000 |
| **Total Operating Expenses** | **4,624,463** | **4,892,224** | **4,113,180** | **4,018,654** | **3,771,330** | **3,739,316** | **3,861,815** | **4,052,856** |
| Force Ten Partners (CRO) | 436,819 | 545,453 | 375,000 | 250,000 | 62,500 | - | - | - |
| Raines Feldman (Debtor's Counsel) | 340,000 | 250,000 | 375,000 | 250,000 | 62,500 | - | - | - |
| Grobstein Teeple | 67,455 | 20,000 | 30,000 | 30,000 | 10,000 | - | - | - |
| Examiner / Plan Trustee | - | - | - | 250,000 | 62,500 | 12,500 | 12,500 | 12,500 |
| UST Fees | 59,069 | - | 49,690 | 45,225 | 45,258 | 66,619 | 45,669 | 45,613 |
| Restructuring Charges | - | - | - | 8,238,243 | - | - | - | - |
| **Total Restructuring Expenses** | **903,343** | **815,453** | **829,690** | **9,063,467** | **242,758** | **79,119** | **58,169** | **58,113** |
| **Operating Income** | **287,277** | **(111,818)** | **(37,105)** | **(8,176,356)** | **1,138,135** | **1,333,788** | **1,232,238** | **1,041,254** |
| Depreciation | 1,346,511 | 975,819 | 816,092 | 629,328 | 86,595 | 112,166 | 116,540 | 129,163 |
| Interest Expense (Income) | (319,686) | 503,569 | 759,896 | 744,090 | 277,621 | 271,372 | 266,762 | 264,503 |
| Income Taxes | - | - | - | - | 11,609 | 14,254 | 12,734 | 9,714 |
| **Non-Operating Expenses** | **1,026,825** | **1,479,388** | **1,575,987** | **1,373,418** | **375,825** | **397,792** | **396,036** | **403,380** |
| **NET INCOME (LOSS)** | **(739,548)** | **(1,591,206)** | **(1,613,092)** | **(9,549,774)** | **762,310** | **935,996** | **836,202** | **637,874** |

Exhibit 1, Page 98

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | | | | |
| Tree Service Revenues | 31,877,368 | 10,143,215 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 |
| Pino Mgmt. Fees / Leases | 7,208,527 | 10,428,890 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 |
| Phoenix Mgmt. Fees / Leases | 800,131 | 650,369 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 |
| Rental Income | - | - | 540,528 | 540,528 | 540,528 | 540,528 | 540,528 | 540,528 | 540,528 | 540,528 | 540,528 |
| **Total Revenues** | **39,886,026** | **21,222,475** | **20,608,891** | **20,608,891** | **20,608,891** | **20,608,891** | **20,608,891** | **20,608,891** | **20,608,891** | **20,608,891** | **20,608,891** |
| Salaries & Wages | 13,827,619 | 5,527,683 | 4,552,890 | 4,552,890 | 4,552,890 | 4,552,890 | 4,552,890 | 4,552,890 | 4,552,890 | 4,552,890 | 4,552,890 |
| Health Insurance | 695,336 | 605,255 | 511,567 | 511,567 | 511,567 | 511,567 | 511,567 | 511,567 | 511,567 | 511,567 | 511,567 |
| Workers' Comp Insurance | 1,825,341 | 550,059 | 531,011 | 531,011 | 531,011 | 531,011 | 531,011 | 531,011 | 531,011 | 531,011 | 531,011 |
| Union Dues | 4,509,667 | 895,045 | 737,861 | 737,861 | 737,861 | 737,861 | 737,861 | 737,861 | 737,861 | 737,861 | 737,861 |
| Occupancy | 232,264 | 266,933 | 96,293 | 96,293 | 96,293 | 96,293 | 96,293 | 96,293 | 96,293 | 96,293 | 96,293 |
| Insurance | 3,259,102 | 3,900,848 | 2,990,121 | 3,936,876 | 4,024,899 | 4,065,070 | 4,105,643 | 4,146,622 | 4,188,011 | 4,229,814 | 4,272,034 |
| Advertising | 2,141 | - | - | - | - | - | - | - | - | - | - |
| Utilities | 524,599 | 479,946 | 725,323 | 883,147 | 883,147 | 883,147 | 883,147 | 883,147 | 883,147 | 883,147 | 883,147 |
| Repair and Maintenance | 371,254 | 208,931 | 199,999 | 199,999 | 199,999 | 199,999 | 199,999 | 199,999 | 199,999 | 199,999 | 199,999 |
| Office Supplies | 367,022 | 333,944 | 334,180 | 334,180 | 334,180 | 334,180 | 334,180 | 334,180 | 334,180 | 334,180 | 334,180 |
| Vehicles Expenses | 3,772,385 | 2,539,753 | 2,405,060 | 2,156,119 | 2,032,844 | 2,042,997 | 2,105,070 | 1,933,094 | 1,933,094 | 1,933,094 | 1,933,094 |
| Traffic Control Services | 126,788 | - | - | - | - | - | - | - | - | - | - |
| OC Professionals | 2,042,196 | 373,588 | 312,450 | 312,450 | 312,450 | 312,450 | 312,450 | 312,450 | 312,450 | 312,450 | 312,450 |
| Tools and Supplies | 412,689 | 225,256 | 211,140 | 211,140 | 211,140 | 211,140 | 211,140 | 211,140 | 211,140 | 211,140 | 211,140 |
| Property Taxes | 257,800 | 182,359 | 216,734 | 221,069 | 225,490 | 230,000 | 234,600 | 239,292 | 244,078 | 248,959 | 253,938 |
| Bank Expenses | 33,271 | 20,523 | 21,750 | 21,750 | 21,750 | 21,750 | 21,750 | 21,750 | 21,750 | 21,750 | 21,750 |
| Travel & Lodging | 2,471,914 | 1,388,672 | 1,315,819 | 1,315,819 | 1,315,819 | 1,315,819 | 1,315,819 | 1,315,819 | 1,315,819 | 1,315,819 | 1,315,819 |
| Other | (201,325) | 236,330 | 143,619 | 143,619 | 143,619 | 143,619 | 143,619 | 143,619 | 143,619 | 143,619 | 143,619 |
| (Gain)/Loss on Disposal of Assets | (5,749,172) | (86,603) | 119,500 | - | - | 390,500 | - | - | - | - | - |
| **Total Operating Expenses** | **28,780,892** | **17,648,522** | **15,425,317** | **16,165,790** | **16,134,960** | **16,580,294** | **16,297,040** | **16,170,734** | **16,216,909** | **16,263,593** | **16,310,793** |
| Force Ten Partners (CRO) | 287,597 | 1,607,272 | 62,500 | - | - | - | - | - | - | - | - |
| Raines Feldman (Debtor's Counsel) | 287,597 | 1,215,000 | 62,500 | - | - | - | - | - | - | - | - |
| Grobstein Teeple | - | 147,455 | 10,000 | - | - | - | - | - | - | - | - |
| Examiner / Plan Trustee | - | 250,000 | 100,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| UST Fees | - | 153,984 | 203,159 | 192,971 | - | - | - | - | - | - | - |
| Restructuring Charges | - | 8,238,243 | - | - | - | - | - | - | - | - | - |
| **Total Restructuring Expenses** | **575,194** | **11,611,954** | **438,159** | **242,971** | **50,000** | **50,000** | **50,000** | **50,000** | **50,000** | **50,000** | **50,000** |
| **Operating Income** | **10,529,940** | **(8,038,001)** | **4,745,415** | **4,200,130** | **4,423,931** | **3,978,597** | **4,261,851** | **4,388,156** | **4,341,982** | **4,295,297** | **4,248,098** |
| Depreciation | 10,573,432 | 3,767,750 | 444,465 | 703,822 | 703,417 | 628,553 | 581,591 | 681,708 | 623,893 | 544,291 | 475,466 |
| Interest Expense (Income) | (41,180) | 1,687,869 | 1,080,258 | 1,056,668 | 1,079,857 | 851,206 | 632,618 | 444,345 | 279,812 | 108,460 | (69,992) |
| Income Taxes | - | - | 48,310 | 36,595 | 39,610 | 37,483 | 45,715 | 48,932 | 51,574 | 54,638 | 57,639 |
| **Non-Operating Expenses** | **10,532,252** | **5,455,618** | **1,573,033** | **1,797,085** | **1,822,884** | **1,517,241** | **1,259,924** | **1,174,985** | **955,279** | **707,389** | **463,114** |
| **NET INCOME (LOSS)** | **(2,313)** | **(13,493,620)** | **3,172,382** | **2,403,045** | **2,601,046** | **2,461,355** | **3,001,926** | **3,213,172** | **3,386,702** | **3,587,908** | **3,784,984** |

Exhibit 1, Page 99

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | |
| Tree Service Revenues | 51.7% | 48.3% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% |
| Pino Mgmt. Fees / Leases | 44.3% | 48.0% | 52.6% | 52.6% | 50.1% | 50.1% | 50.1% | 50.1% |
| Phoenix Mgmt. Fees / Leases | 4.0% | 3.7% | 2.2% | 2.2% | 2.0% | 2.0% | 2.0% | 2.0% |
| Rental Income | 0.0% | 0.0% | 0.0% | 0.0% | 2.6% | 2.6% | 2.6% | 2.6% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Salaries & Wages | 29.9% | 25.3% | 24.2% | 24.2% | 22.1% | 22.1% | 22.1% | 22.1% |
| Health Insurance | 2.9% | 3.0% | 2.8% | 2.8% | 2.5% | 2.5% | 2.5% | 2.5% |
| Workers' Comp Insurance | 2.0% | 2.7% | 2.9% | 2.9% | 2.6% | 2.6% | 2.6% | 2.6% |
| Union Dues | 4.4% | 4.5% | 4.0% | 4.0% | 3.6% | 3.6% | 3.6% | 3.6% |
| Occupancy | 1.5% | 0.8% | 1.3% | 1.3% | 0.5% | 0.5% | 0.5% | 0.5% |
| Insurance | 12.8% | 20.9% | 21.2% | 19.3% | 14.7% | 12.9% | 14.0% | 16.4% |
| Utilities | 2.1% | 2.8% | 2.0% | 2.0% | 2.0% | 3.5% | 4.3% | 4.3% |
| Repair and Maintenance | 1.1% | 0.8% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Office Supplies | 1.4% | 1.5% | 1.7% | 1.7% | 1.6% | 1.6% | 1.6% | 1.6% |
| Vehicles Expenses | 11.3% | 12.5% | 12.1% | 12.1% | 11.6% | 11.5% | 12.2% | 11.4% |
| Traffic Control Services | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Management Fees | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| OC Professionals | 2.6% | 1.3% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Tools and Supplies | 1.3% | 0.9% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Property Taxes | 0.5% | 1.1% | 0.9% | 1.0% | 0.9% | 1.2% | 0.9% | 1.2% |
| Bank Expenses | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Travel & Lodging | 6.7% | 6.7% | 6.3% | 6.3% | 6.4% | 6.4% | 6.4% | 6.4% |
| Other | 0.3% | 2.6% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Gain/Loss on Disposal of Assets | -1.5% | 0.0% | 0.0% | 0.0% | 0.4% | 0.0% | 0.0% | 1.9% |
| **Total Operating Expenses** | **79.5%** | **87.4%** | **83.8%** | **81.9%** | **73.2%** | **72.6%** | **75.0%** | **78.7%** |
| Force Ten Partners (CRO) | 7.5% | 9.7% | 7.6% | 5.1% | 1.2% | 0.0% | 0.0% | 0.0% |
| Raines Feldman (Debtor's Counsel) | 5.8% | 4.5% | 7.6% | 5.1% | 1.2% | 0.0% | 0.0% | 0.0% |
| Grobstein Teeple | 1.2% | 0.4% | 0.6% | 0.6% | 0.2% | 0.0% | 0.0% | 0.0% |
| Examiner / Plan Trustee | 0.0% | 0.0% | 0.0% | 5.1% | 1.2% | 0.2% | 0.2% | 0.2% |
| UST Fees | 1.0% | 0.0% | 1.0% | 0.9% | 0.9% | 1.3% | 0.9% | 0.9% |
| Restructuring Charges | 0.0% | 0.0% | 0.0% | 167.9% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Restructuring Expenses** | **15.5%** | **14.6%** | **16.9%** | **184.8%** | **4.7%** | **1.5%** | **1.1%** | **1.1%** |
| **Operating Income** | **4.9%** | **-2.0%** | **-0.8%** | **-166.7%** | **22.1%** | **25.9%** | **23.9%** | **20.2%** |
| Depreciation | 23.2% | 17.4% | 16.6% | 12.8% | 1.7% | 2.2% | 2.3% | 2.5% |
| Interest Expense (Income) | -5.5% | 9.0% | 15.5% | 15.2% | 5.4% | 5.3% | 5.2% | 5.1% |
| Income Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.3% | 0.2% | 0.2% |
| **Non-Operating Expenses** | **17.7%** | **26.4%** | **32.1%** | **28.0%** | **7.3%** | **7.7%** | **7.7%** | **7.8%** |
| **NET INCOME (LOSS)** | **-12.7%** | **-28.4%** | **-32.9%** | **-194.7%** | **14.8%** | **18.2%** | **16.2%** | **12.4%** |

Exhibit 1, Page 100

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | | | | |
| Tree Service Revenues | 79.9% | 47.8% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% | 45.2% |
| Pino Mgmt. Fees / Leases | 18.1% | 49.1% | 50.1% | 50.1% | 50.1% | 50.1% | 50.1% | 50.1% | 50.1% | 50.1% | 50.1% |
| Phoenix Mgmt. Fees / Leases | 2.0% | 3.1% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% |
| Rental Income | 0.0% | 0.0% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Salaries & Wages | 34.7% | 26.0% | 22.1% | 22.1% | 22.1% | 22.1% | 22.1% | 22.1% | 22.1% | 22.1% | 22.1% |
| Health Insurance | 1.7% | 2.9% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Workers' Comp Insurance | 4.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% |
| Union Dues | 11.3% | 4.2% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% |
| Occupancy | 0.6% | 1.3% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| Insurance | 8.2% | 18.4% | 14.5% | 19.1% | 19.5% | 19.7% | 19.9% | 20.1% | 20.3% | 20.5% | 20.7% |
| Utilities | 1.3% | 2.3% | 3.5% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% |
| Repair and Maintenance | 0.9% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Office Supplies | 0.9% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% | 1.6% |
| Vehicles Expenses | 9.5% | 12.0% | 11.7% | 10.5% | 9.9% | 9.9% | 10.2% | 9.4% | 9.4% | 9.4% | 9.4% |
| Traffic Control Services | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Management Fees | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| OC Professionals | 5.1% | 1.8% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Tools and Supplies | 1.0% | 1.1% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Property Taxes | 0.6% | 0.9% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.2% | 1.2% | 1.2% | 1.2% |
| Bank Expenses | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Travel & Lodging | 6.2% | 6.5% | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% | 6.4% |
| Other | -0.5% | 1.1% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Gain/Loss on Disposal of Assets | -14.4% | -0.4% | 0.6% | 0.0% | 0.0% | 1.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Expenses** | **72.2%** | **83.2%** | **74.8%** | **78.4%** | **78.3%** | **80.5%** | **79.1%** | **78.5%** | **78.7%** | **78.9%** | **79.1%** |
| Force Ten Partners (CRO) | 0.7% | 7.6% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Raines Feldman (Debtor's Counsel) | 0.7% | 5.7% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Grobstein Teeple | 0.0% | 0.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Examiner / Plan Trustee | 0.0% | 1.2% | 0.5% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| UST Fees | 0.0% | 0.7% | 1.0% | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Restructuring Charges | 0.0% | 38.8% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Restructuring Expenses** | **1.4%** | **54.7%** | **2.1%** | **1.2%** | **0.2%** | **0.2%** | **0.2%** | **0.2%** | **0.2%** | **0.2%** | **0.2%** |
| **Operating Income** | **26.4%** | **-37.9%** | **23.0%** | **20.4%** | **21.5%** | **19.3%** | **20.7%** | **21.3%** | **21.1%** | **20.8%** | **20.6%** |
| Depreciation | 26.5% | 17.8% | 2.2% | 3.4% | 3.4% | 3.0% | 2.8% | 3.3% | 3.0% | 2.6% | 2.3% |
| Interest Expense (Income) | -0.1% | 8.0% | 5.2% | 5.1% | 5.2% | 4.1% | 3.1% | 2.2% | 1.4% | 0.5% | -0.3% |
| Income Taxes | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.3% | 0.3% | 0.3% |
| **Non-Operating Expenses** | **26.4%** | **25.7%** | **7.6%** | **8.7%** | **8.8%** | **7.4%** | **6.1%** | **5.7%** | **4.6%** | **3.4%** | **2.2%** |
| **NET INCOME (LOSS)** | **0.0%** | **-63.6%** | **15.4%** | **11.7%** | **12.6%** | **11.9%** | **14.6%** | **15.6%** | **16.4%** | **17.4%** | **18.4%** |

Exhibit 1, Page 101

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

## BALANCE SHEET

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| Cash & Cash Equivalents | 12,368,859 | 10,487,686 | 9,137,297 | 8,467,319 | 3,036,110 | 2,711,765 | 2,618,952 | 3,163,713 |
| Account Receivable | 3,416,739 | 3,889,013 | 3,409,411 | 3,343,110 | 3,417,983 | 3,530,460 | 3,530,460 | 3,417,983 |
| Prepaid Expenses | 1,464,625 | 1,506,069 | 1,172,598 | 646,913 | 1,093,775 | 1,087,974 | 1,164,788 | 944,454 |
| **Total Current Assets** | 17,250,223 | 15,882,768 | 13,719,306 | 12,457,343 | 7,547,868 | 7,330,199 | 7,314,199 | 7,526,149 |
| **Total Fixed Assets and Real Property** | 4,797,046 | 3,903,552 | 3,096,249 | 11,227,202 | 12,011,058 | 12,219,100 | 12,403,663 | 10,946,012 |
| Deposits | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 |
| Insurance Collateral | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 |
| Investment in Pino | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Affiliate Notes Receivable | 11,630,681 | 11,263,597 | 11,263,597 | 7,398,588 | 6,826,707 | 6,239,682 | 5,637,113 | 5,018,587 |
| **Total Other Assets** | 16,158,458 | 15,791,374 | 15,791,374 | 11,926,365 | 11,354,484 | 10,767,459 | 10,164,890 | 9,546,364 |
| **Total Assets** | 38,205,727 | 35,577,694 | 32,606,929 | 35,610,909 | 30,913,410 | 30,316,757 | 29,882,752 | 28,018,525 |
| Accounts Payable | 605,510 | 630,349 | 558,773 | 637,655 | 651,785 | 714,505 | 724,721 | 672,654 |
| Accrued Expenses | 255,725 | 740,689 | 499,388 | 308,722 | 268,767 | 167,576 | 215,692 | 223,637 |
| Accrued Payroll | 270,481 | 215,105 | 202,349 | 202,549 | 197,027 | 197,027 | 197,027 | 197,027 |
| Accrued Ch 11 Professional Fees | 1,242,388 | 952,748 | 877,748 | 1,378,949 | - | - | - | - |
| **Total Current Liabilities** | 2,374,105 | 2,538,892 | 2,138,258 | 2,527,875 | 1,117,579 | 1,079,109 | 1,137,441 | 1,093,319 |
| PNC Bank | 6,723,284 | 5,977,521 | 5,020,481 | - | - | - | - | - |
| Equipment Loans | 15,797,566 | 15,189,894 | 15,189,894 | - | - | - | - | - |
| Pre-Petition AP & Other Payables | 13,275,090 | 13,426,911 | 13,426,911 | - | - | - | - | - |
| Insider Notes Payable | 6,462,302 | 6,462,302 | 6,462,302 | - | - | - | - | - |
| **Total Liabilities Subject to Compromise** | 42,258,242 | 41,056,629 | 40,099,589 | - | - | - | - | - |
| Restructured PNC Bank | - | - | - | 4,547,636 | 2,247,137 | 1,941,675 | 1,631,168 | - |
| Restructured Bank of the Sierra | - | - | - | 2,552,153 | 2,529,283 | 2,506,209 | 2,482,930 | 2,459,443 |
| Restructured Equipment Loans | - | - | - | 10,442,037 | 8,968,666 | 7,793,215 | 6,760,819 | 5,886,143 |
| Jacobus Pino Note | - | - | - | 148,104 | 84,710 | 21,197 | - | - |
| Priority Tax Claims | - | - | - | 23,999 | - | - | - | - |
| Union Claim | - | - | - | 880,025 | 770,021 | 660,018 | 550,015 | 440,012 |
| General Unsecured Claims | - | - | - | 25,000,000 | 25,255,868 | 25,514,355 | 25,775,487 | 26,039,292 |
| Insider Claims | - | - | - | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |
| **Total Restructured Debts** | - | - | - | 49,930,081 | 46,191,813 | 44,772,797 | 43,536,547 | 41,161,019 |
| **Total Liabilities** | 44,632,348 | 43,595,521 | 42,237,847 | 52,457,956 | 47,309,392 | 45,851,906 | 44,673,988 | 42,254,337 |
| **Total Shareholder's Equity** | (6,426,621) | (8,017,826) | (9,630,918) | (16,847,047) | (16,395,981) | (15,535,149) | (14,791,236) | (14,235,812) |
| **Total Liabilities & Shareholder's Equity** | 38,205,727 | 35,577,694 | 32,606,929 | 35,610,909 | 30,913,410 | 30,316,757 | 29,882,752 | 28,018,525 |
| *DSO* | 53 | 65 | 63 | 63 | 62 | 62 | 62 | 62 |
| *DPO (AP+Accrued)* | 37 | 37 | 37 | 43 | 44 | 43 | 43 | 43 |

Exhibit 1, Page 102

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | | | | |
| Cash & Cash Equivalents | 11,282,434 | 8,467,319 | 3,163,713 | 5,633,926 | 3,602,770 | 4,335,783 | 3,730,975 | 3,013,887 | 3,598,378 | 3,381,944 | 1,961,320 |
| Account Receivable | 4,996,909 | 3,343,110 | 3,417,983 | 3,417,983 | 3,417,983 | 3,417,983 | 3,417,983 | 3,417,983 | 3,417,983 | 3,417,983 | 3,417,983 |
| Prepaid Expenses | 412,828 | 646,913 | 944,454 | 1,001,770 | 1,010,927 | 1,020,176 | 1,029,517 | 1,038,952 | 1,048,481 | 1,058,106 | 1,067,826 |
| **Total Current Assets** | 16,692,172 | 12,457,343 | 7,526,149 | 10,053,678 | 8,031,680 | 8,773,942 | 8,178,475 | 7,470,821 | 8,064,842 | 7,858,032 | 6,447,129 |
| **Total Fixed Assets and Real Property** | 6,117,981 | 11,227,202 | 10,946,012 | 11,899,078 | 11,231,609 | 8,710,376 | 8,370,443 | 9,111,713 | 8,523,768 | 8,015,425 | 7,575,908 |
| Deposits | 243,699 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 | 240,849 |
| Insurance Collateral | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 | 2,786,928 |
| Investment in Pino | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Affiliate Notes Receivable | 12,115,349 | 7,398,588 | 5,018,587 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 |
| **Total Other Assets** | 16,645,976 | 11,926,365 | 9,546,364 | 6,904,079 | 6,904,079 | 6,904,079 | 6,904,079 | 6,904,079 | 6,904,079 | 6,904,079 | 6,904,079 |
| **Total Assets** | **39,456,128** | **35,610,909** | **28,018,525** | **28,856,835** | **26,167,369** | **24,388,397** | **23,452,997** | **23,486,613** | **23,492,689** | **22,777,537** | **20,927,116** |
| Accounts Payable | 1,110,611 | 637,655 | 672,654 | 652,392 | 652,392 | 652,911 | 647,246 | 642,507 | 642,507 | 642,507 | 642,507 |
| Accrued Expenses | 214,039 | 308,722 | 223,637 | 226,683 | 229,790 | 232,959 | 236,191 | 239,488 | 242,851 | 246,281 | 249,780 |
| Accrued Payroll | 195,250 | 202,549 | 197,027 | 197,027 | 197,027 | 197,027 | 197,027 | 197,027 | 197,027 | 197,027 | 197,027 |
| Accrued Ch 11 Professional Fees | 575,194 | 1,378,949 | - | - | - | - | - | - | - | - | - |
| **Total Current Liabilities** | **2,095,094** | **2,527,875** | **1,093,319** | **1,076,102** | **1,079,209** | **1,082,897** | **1,080,464** | **1,079,022** | **1,082,385** | **1,085,815** | **1,089,314** |
| PNC Bank | 6,983,741 | - | - | - | - | - | - | - | - | - | - |
| Equipment Loans | 16,173,971 | - | - | - | - | - | - | - | - | - | - |
| Pre-Petition AP & Other Payables | 13,428,260 | - | - | - | - | - | - | - | - | - | - |
| Insider Notes Payable | 6,462,135 | - | - | - | - | - | - | - | - | - | - |
| **Total Liabilities Subject to Compromise** | **43,048,106** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Restructured PNC Bank | - | 4,547,636 | - | - | - | - | - | - | - | - | - |
| Restructured Bank of the Sierra | - | 2,552,153 | 2,459,443 | 2,363,388 | 2,263,865 | 2,160,751 | 2,053,914 | 1,943,221 | 1,828,533 | 1,709,706 | 1,586,590 |
| Restructured Equipment Loans | - | 10,442,037 | 5,886,143 | 4,034,531 | 2,505,847 | 1,070,976 | 0 | 0 | 0 | 0 | 0 |
| Jacobus Pino Note | - | 148,104 | - | - | - | - | - | - | - | - | - |
| Priority Tax Claims | - | 23,999 | - | - | - | - | - | - | - | - | - |
| Union Claim | - | 880,025 | 440,012 | 0 | - | - | - | - | - | - | - |
| General Unsecured Claims | - | 25,000,000 | 26,039,292 | 27,121,789 | 23,704,255 | 20,144,649 | 16,437,063 | 12,575,348 | 8,553,094 | 4,363,629 | 0 |
| Insider Claims | - | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 | 6,336,128 |
| **Total Restructured Debts** | **-** | **49,930,081** | **41,161,019** | **39,855,835** | **34,810,095** | **29,712,503** | **24,827,105** | **20,854,697** | **16,717,755** | **12,409,462** | **7,922,718** |
| **Total Liabilities** | **45,143,201** | **52,457,956** | **42,254,337** | **40,931,937** | **35,889,304** | **30,795,400** | **25,907,569** | **21,933,719** | **17,800,140** | **13,495,278** | **9,012,031** |
| **Total Shareholder's Equity** | **(5,687,073)** | **(16,847,047)** | **(14,235,812)** | **(12,075,102)** | **(9,721,935)** | **(6,407,003)** | **(2,454,572)** | **1,552,894** | **5,692,549** | **9,282,259** | **11,915,085** |
| **Total Liabilities & Shareholder's Equity** | **39,456,128** | **35,610,909** | **28,018,525** | **28,856,835** | **26,167,369** | **24,388,397** | **23,452,997** | **23,486,613** | **23,492,689** | **22,777,537** | **20,927,116** |
| *DSO* | 87 | 63 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 |
| *DPO (AP+Accrued)* | 55 | 43 | 43 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |

Exhibit 1, Page 103

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | |
| Net Income (Loss) | (739,548) | (1,591,206) | (1,613,092) | (9,549,774) | 762,310 | 935,996 | 836,202 | 637,874 |
| Non-Cash Restructuring Charges | - | - | - | 8,238,243 | - | - | - | - |
| Depreciation | 1,346,511 | 975,819 | 816,092 | 629,328 | 86,595 | 112,166 | 116,540 | 129,163 |
| Change in Operating Assets & Liabilities | | | | | | | | |
| Accounts Receivable | 1,580,170 | (472,273) | 479,601 | 109,981 | (74,873) | (112,477) | - | 112,477 |
| Other Current Assets | (1,051,796) | (41,445) | 333,471 | 529,487 | (446,862) | 5,801 | (76,813) | 220,334 |
| Accounts Payable | (679,769) | 153,138 | (71,576) | (18,025) | 14,130 | 62,720 | 10,216 | (52,067) |
| Other Current Liabilities | 116,918 | 429,588 | (254,058) | (190,466) | (45,476) | (101,191) | 48,116 | 7,945 |
| Accrued Ch 11 Professional Fees | 667,194 | (289,640) | (75,000) | 225,000 | (1,378,949) | | | |
| **Total Operating Cash Flows** | 1,239,680 | (836,019) | (384,561) | (26,227) | (1,083,126) | 903,016 | 934,261 | 1,055,725 |
| | | | | | | | | |
| Capital Expenditures (incl Future Buy Out Amounts) | (25,576) | (82,325) | (8,788) | (8,788) | (870,451) | (320,207) | (301,104) | 1,328,488 |
| Change in Affiliate Notes Receivable | 484,667 | 367,085 | - | - | 571,881 | 587,025 | 602,569 | 618,526 |
| Change in Other Long-term Assets | 2,850 | 0 | - | - | - | - | - | - |
| **Total Investing Cash Flows** | 461,941 | 284,759 | (8,788) | (8,788) | (298,570) | 266,817 | 301,465 | 1,947,013 |
| | | | | | | | | |
| Debt Repayments (excl Future Buy Out Amounts) | (615,196) | (1,329,913) | (957,040) | (972,846) | (3,738,268) | (1,419,015) | (1,236,250) | (2,375,528) |
| Substantive Consolidation of MWP Cash | 0 | - | - | 337,882 | - | - | - | - |
| Contributions from Pino | - | - | - | - | - | - | - | - |
| Tax Contributions (Distributions), net | - | - | - | - | (311,245) | (75,164) | (92,289) | (82,449) |
| **Total Financing Cash Flows** | (615,196) | (1,329,913) | (957,040) | (634,964) | (4,049,513) | (1,494,179) | (1,328,540) | (2,457,978) |
| | | | | | | | | |
| Net Cash Flows | 1,086,425 | (1,881,173) | (1,350,389) | (669,978) | (5,431,209) | (324,345) | (92,813) | 544,761 |
| Beginning Cash | 11,282,434 | 12,368,859 | 10,487,686 | 9,137,297 | 8,467,319 | 3,036,110 | 2,711,765 | 2,618,952 |
| **Ending Cash** | **12,368,859** | **10,487,686** | **9,137,297** | **8,467,319** | **3,036,110** | **2,711,765** | **2,618,952** | **3,163,713** |
| | | | | | | | | |
| **EQUITY ROLLFORWARD** | | | | | | | | |
| Beginning Equity | (5,687,073) | (6,426,621) | (8,017,826) | (9,630,918) | (16,847,047) | (16,395,981) | (15,535,149) | (14,791,236) |
| Net Income (Loss) | (739,548) | (1,591,206) | (1,613,092) | (9,549,774) | 762,310 | 935,996 | 836,202 | 637,874 |
| Direct Charges to Equity | - | - | - | - | - | - | - | - |
| Substantive Consolidation of MWP Equity | 0 | - | - | 2,333,646 | - | - | - | - |
| Contributions from Pino | - | - | - | - | - | - | - | - |
| Tax Contributions from Pino | - | - | - | - | 915,802 | 68,909 | (76,861) | 177,956 |
| Tax Distributions to Owner | - | - | - | - | (1,227,047) | (144,072) | (15,428) | (260,405) |
| **Ending Equity** | **(6,426,621)** | **(8,017,826)** | **(9,630,918)** | **(16,847,047)** | **(16,395,981)** | **(15,535,149)** | **(14,791,236)** | **(14,235,812)** |

Exhibit 1, Page 104

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | | | | |
| Net Income (Loss) | (2,313) | (13,493,620) | 3,172,382 | 2,403,045 | 2,601,046 | 2,461,355 | 3,001,926 | 3,213,172 | 3,386,702 | 3,587,908 | 3,784,984 |
| Non-Cash Restructuring Charges | - | 8,238,243 | - | - | - | - | - | - | - | - | - |
| Depreciation | 10,573,432 | 3,767,750 | 444,465 | 703,822 | 703,417 | 628,553 | 581,591 | 681,708 | 623,893 | 544,291 | 475,466 |
| Change in Operating Assets & Liabilities | | | | | | | | | | | |
| Accounts Receivable | 14,067,373 | 1,697,479 | (74,873) | - | - | - | - | - | - | - | - |
| Other Current Assets | 462,612 | (230,283) | (297,541) | (57,316) | (9,157) | (9,249) | (9,341) | (9,435) | (9,529) | (9,624) | (9,721) |
| Accounts Payable | 268,392 | (616,232) | 35,000 | (20,262) | - | 519 | (5,666) | (4,739) | (0) | - | 0 |
| Other Current Liabilities | (1,727,985) | 101,982 | (90,606) | 3,046 | 3,107 | 3,169 | 3,232 | 3,297 | 3,363 | 3,430 | 3,499 |
| Accrued Ch 11 Professional Fees | 575,194 | 527,554 | (1,378,949) | - | - | - | - | - | - | - | - |
| **Total Operating Cash Flows** | 24,216,706 | (7,127) | 1,809,877 | 3,032,335 | 3,298,413 | 3,084,348 | 3,571,743 | 3,884,003 | 4,004,430 | 4,126,005 | 4,254,228 |
| | | | | | | | | | | | |
| Capital Expenditures (incl Future Buy Out Amounts) | 5,471,966 | (125,477) | (163,275) | (1,656,889) | (35,949) | 1,892,680 | (241,659) | (1,422,978) | (35,949) | (35,949) | (35,949) |
| Change in Affiliate Notes Receivable | 1,905,503 | 851,752 | 2,380,001 | 2,642,285 | - | - | - | - | - | - | - |
| Change in Other Long-term Assets | (2,863,699) | 2,850 | - | - | - | - | - | - | - | - | - |
| **Total Investing Cash Flows** | 4,513,770 | 729,125 | 2,216,726 | 985,396 | (35,949) | 1,892,680 | (241,659) | (1,422,978) | (35,949) | (35,949) | (35,949) |
| | | | | | | | | | | | |
| Debt Repayments (excl Future Buy Out Amounts) | (20,032,791) | (3,874,995) | (8,769,062) | (1,305,184) | (5,045,740) | (5,097,592) | (4,885,397) | (3,972,408) | (4,136,942) | (4,308,293) | (4,486,745) |
| Substantive Consolidation of MWP Cash | - | 337,882 | - | - | - | - | - | - | - | - | - |
| Contributions from Pino | - | - | - | - | - | 1,128,186 | 1,212,822 | 1,099,238 | 1,081,850 | 931,904 | 606,142 |
| Tax Contributions (Distributions), net | (16,111) | - | (561,147) | (242,335) | (247,879) | (274,609) | (262,317) | (304,944) | (328,897) | (930,101) | (1,758,300) |
| **Total Financing Cash Flows** | (20,048,902) | (3,537,113) | (9,330,210) | (1,547,518) | (5,293,620) | (4,244,015) | (3,934,893) | (3,178,114) | (3,383,990) | (4,306,490) | (5,638,903) |
| | | | | | | | | | | | |
| Net Cash Flows | 8,681,574 | (2,815,115) | (5,303,607) | 2,470,213 | (2,031,155) | 733,013 | (604,809) | (717,088) | 584,491 | (216,434) | (1,420,624) |
| Beginning Cash | 2,600,860 | 11,282,434 | 8,467,319 | 3,163,713 | 5,633,926 | 3,602,770 | 4,335,783 | 3,730,975 | 3,013,887 | 3,598,378 | 3,381,944 |
| **Ending Cash** | **11,282,434** | **8,467,319** | **3,163,713** | **5,633,926** | **3,602,770** | **4,335,783** | **3,730,975** | **3,013,887** | **3,598,378** | **3,381,944** | **1,961,320** |
| | | | | | | | | | | | |
| **EQUITY ROLLFORWARD** | | | | | | | | | | | |
| Beginning Equity | (5,668,649) | (5,687,073) | (16,847,047) | (14,235,812) | (12,075,102) | (9,721,935) | (6,407,003) | (2,454,572) | 1,552,894 | 5,692,549 | 9,282,259 |
| Net Income (Loss) | (2,313) | (13,493,620) | 3,172,382 | 2,403,045 | 2,601,046 | 2,461,355 | 3,001,926 | 3,213,172 | 3,386,702 | 3,587,908 | 3,784,984 |
| Direct Charges to Equity | (16,111) | - | - | - | - | - | - | - | - | 0 | 0 |
| Substantive Consolidation of MWP Equity | - | 2,333,646 | - | - | - | - | - | - | - | - | - |
| Contributions from Pino | - | - | - | - | - | 1,128,186 | 1,212,822 | 1,099,238 | 1,081,850 | 931,904 | 606,142 |
| Tax Contributions from Pino | - | - | 1,085,806 | 142,518 | 147,485 | 132,937 | 116,799 | 100,230 | 90,549 | 385,880 | 397,304 |
| Tax Distributions to Owner | - | - | (1,646,953) | (384,852) | (395,364) | (407,546) | (379,117) | (405,174) | (419,447) | (1,315,981) | (2,155,604) |
| **Ending Equity** | **(5,687,073)** | **(16,847,047)** | **(14,235,812)** | **(12,075,102)** | **(9,721,935)** | **(6,407,003)** | **(2,454,572)** | **1,552,894** | **5,692,549** | **9,282,259** | **11,915,085** |

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **DEBT ROLL FORWARDS** | | | | | | | | |
| **Restructured PNC Bank** | | | | | | | | |
| Beginning Balance | - | - | - | - | 4,547,636 | 2,247,137 | 1,941,675 | 1,631,168 |
| Interest Expense | - | - | - | - | 40,206 | 35,243 | 30,198 | 25,070 |
| Payments | - | - | - | - | (2,340,705) | (340,705) | (340,705) | (1,656,238) |
| Ending Balance | - | - | - | 4,547,636 | 2,247,137 | 1,941,675 | 1,631,168 | - |
| **Restructured Bank of the Sierra** | | | | | | | | |
| Beginning Balance | - | - | - | - | 2,552,153 | 2,529,283 | 2,506,209 | 2,482,930 |
| Interest Expense | - | - | - | - | 22,589 | 22,386 | 22,180 | 21,973 |
| Payments | - | - | - | - | (45,459) | (45,459) | (45,459) | (45,459) |
| Ending Balance | - | - | - | 2,552,153 | 2,529,283 | 2,506,209 | 2,482,930 | 2,459,443 |
| **Restructured Equipment Loans** | | | | | | | | |
| Beginning Balance | - | - | - | - | 10,442,037 | 8,968,666 | 7,793,215 | 6,760,819 |
| Interest Expense | - | - | - | - | 142,018 | 123,291 | 105,847 | 90,308 |
| Payments | - | - | - | - | (1,615,389) | (1,298,741) | (1,138,244) | (964,983) |
| Ending Balance | - | - | - | 10,442,037 | 8,968,666 | 7,793,215 | 6,760,819 | 5,886,143 |
| Future Buy Out Amounts (excl from above) | - | - | - | 6,152,377 | 4,915,912 | 4,604,692 | 4,312,576 | 3,485,050 |
| **Jacobus Pino Note** | | | | | | | | |
| Beginning Balance | - | - | - | - | 148,104 | 84,710 | 21,197 | - |
| Interest Expense | - | - | - | - | 238 | 119 | 13 | - |
| Payments | - | - | - | - | (63,632) | (63,632) | (21,211) | - |
| Ending Balance | - | - | - | 148,104 | 84,710 | 21,197 | - | - |
| **Priority Tax Claims** | | | | | | | | |
| Beginning Balance | - | - | - | - | 23,999 | - | - | - |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | - | - | (23,999) | - | - | - |
| Ending Balance | - | - | - | 23,999 | - | - | - | - |
| **Union Claim** | | | | | | | | |
| Beginning Balance | - | - | - | - | 880,025 | 770,021 | 660,018 | 550,015 |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | - | - | (110,003) | (110,003) | (110,003) | (110,003) |
| Ending Balance | - | - | - | 880,025 | 770,021 | 660,018 | 550,015 | 440,012 |
| **General Unsecured Claims** | | | | | | | | |
| Beginning Balance | - | - | - | - | 25,000,000 | 25,255,868 | 25,514,355 | 25,775,487 |
| Interest Expense | - | - | - | - | 255,868 | 258,487 | 261,132 | 263,805 |
| Payments | - | - | - | - | - | - | - | - |
| Ending Balance | - | - | - | 25,000,000 | 25,255,868 | 25,514,355 | 25,775,487 | 26,039,292 |

Exhibit 1, Page 106

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEBT ROLL FORWARDS** | | | | | | | | | | | |
| **Restructured PNC Bank** | | | | | | | | | | | |
| Beginning Balance | - | 4,547,636 | - | - | - | - | - | - | - | - | - |
| Interest Expense | - | 130,717 | - | - | - | - | - | - | - | - | - |
| Payments | - | (4,678,352) | - | - | - | - | - | - | - | - | - |
| Ending Balance | 4,547,636 | - | - | - | - | - | - | - | - | - | - |
| **Restructured Bank of the Sierra** | | | | | | | | | | | |
| Beginning Balance | - | 2,552,153 | 2,459,443 | 2,363,388 | 2,263,865 | 2,160,751 | 2,053,914 | 1,943,221 | 1,828,533 | 1,709,706 | |
| Interest Expense | - | 89,128 | 85,782 | 82,315 | 78,722 | 75,001 | 71,144 | 67,149 | 63,010 | 58,721 | |
| Payments | - | (181,837) | (181,837) | (181,837) | (181,837) | (181,837) | (181,837) | (181,837) | (181,837) | (181,837) | |
| Ending Balance | 2,552,153 | 2,459,443 | 2,363,388 | 2,263,865 | 2,160,751 | 2,053,914 | 1,943,221 | 1,828,533 | 1,709,706 | 1,586,590 | |
| **Restructured Equipment Loans** | | | | | | | | | | | |
| Beginning Balance | - | 10,442,037 | 5,886,143 | 4,034,531 | 2,505,847 | 1,070,976 | (0) | (0) | (0) | (0) | |
| Interest Expense | - | 461,464 | 266,818 | 180,160 | 97,173 | 30,287 | 0 | 0 | 0 | 0 | |
| Payments | - | (5,017,357) | (2,118,430) | (1,708,844) | (1,532,044) | (1,101,263) | (0) | - | - | - | |
| Ending Balance | 10,442,037 | 5,886,143 | 4,034,531 | 2,505,847 | 1,070,976 | (0) | (0) | (0) | (0) | (0) | |
| Future Buy Out Amounts (excl from above) | 6,152,377 | 3,485,050 | 1,864,110 | 1,864,110 | 1,592,739 | 1,387,029 | 0 | 0 | 0 | 0 | |
| **Jacobus Pino Note** | | | | | | | | | | | |
| Beginning Balance | - | 148,104 | - | - | - | - | - | - | - | - | - |
| Interest Expense | - | 370 | - | - | - | - | - | - | - | - | - |
| Payments | - | (148,475) | - | - | - | - | - | - | - | - | - |
| Ending Balance | 148,104 | - | - | - | - | - | - | - | - | - | - |
| **Priority Tax Claims** | | | | | | | | | | | |
| Beginning Balance | - | 23,999 | - | - | - | - | - | - | - | - | - |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - |
| Payments | - | (23,999) | - | - | - | - | - | - | - | - | - |
| Ending Balance | 23,999 | - | - | - | - | - | - | - | - | - | - |
| **Union Claim** | | | | | | | | | | | |
| Beginning Balance | - | 880,025 | 440,012 | - | (0) | (0) | (0) | (0) | (0) | (0) | |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | |
| Payments | - | (440,012) | (440,012) | (0) | - | - | - | - | - | - | |
| Ending Balance | 880,025 | 440,012 | - | (0) | (0) | (0) | (0) | (0) | (0) | (0) | |
| **General Unsecured Claims** | | | | | | | | | | | |
| Beginning Balance | - | 25,000,000 | 26,039,292 | 27,121,789 | 23,704,255 | 20,144,649 | 16,437,063 | 12,575,348 | 8,553,094 | 4,363,629 | |
| Interest Expense | - | 1,039,292 | 1,082,497 | 1,043,131 | 901,058 | 753,080 | 598,949 | 438,411 | 271,199 | 97,036 | |
| Payments | - | - | - | (4,460,665) | (4,460,665) | (4,460,665) | (4,460,665) | (4,460,665) | (4,460,665) | (4,460,665) | |
| Ending Balance | 25,000,000 | 26,039,292 | 27,121,789 | 23,704,255 | 20,144,649 | 16,437,063 | 12,575,348 | 8,553,094 | 4,363,629 | (0) | |

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | |
| **Albach** | | | | | | | | |
| Beginning Balance | - | - | - | - | 81,500 | 77,693 | 73,860 | 69,999 |
| Interest Expense | - | - | - | - | 569 | 542 | 515 | 487 |
| Payments | - | - | - | - | (4,376) | (4,376) | (4,376) | (4,376) |
| Ending Balance | - | - | - | 81,500 | 77,693 | 73,860 | 69,999 | 66,111 |
| Future Buy Out Amounts (excl from above) | - | - | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| **Ally** | | | | | | | | |
| Beginning Balance | - | - | - | - | 286,081 | 273,495 | 260,742 | 247,820 |
| Interest Expense | - | - | - | - | 3,719 | 3,552 | 3,383 | 3,212 |
| Payments | - | - | - | - | (16,305) | (16,305) | (16,305) | (16,305) |
| Ending Balance | - | - | - | 286,081 | 273,495 | 260,742 | 247,820 | 234,726 |
| **Altec** | | | | | | | | |
| Beginning Balance | - | - | - | - | 3,227,432 | 2,486,583 | 1,780,614 | 1,128,050 |
| Interest Expense | - | - | - | - | 52,039 | 39,227 | 27,158 | 16,597 |
| Payments | - | - | - | - | (792,888) | (745,196) | (679,721) | (523,442) |
| Ending Balance | - | - | - | 3,227,432 | 2,486,583 | 1,780,614 | 1,128,050 | 621,205 |
| Future Buy Out Amounts (excl from above) | - | - | - | 3,770,220 | 2,999,945 | 2,688,725 | 2,458,302 | 1,722,240 |
| **Bank of America** | | | | | | | | |
| Beginning Balance | - | - | - | - | 4,526,707 | 4,298,899 | 4,067,962 | 3,833,852 |
| Interest Expense | - | - | - | - | 60,867 | 57,738 | 54,565 | 51,349 |
| Payments | - | - | - | - | (288,675) | (288,675) | (288,675) | (288,675) |
| Ending Balance | - | - | - | 4,526,707 | 4,298,899 | 4,067,962 | 3,833,852 | 3,596,526 |
| Future Buy Out Amounts (excl from above) | - | - | - | 1,712,810 | 1,712,810 | 1,712,810 | 1,712,810 | 1,712,810 |
| **FNB** | | | | | | | | |
| Beginning Balance | - | - | - | - | 66,882 | 41,366 | 15,449 | 0 |
| Interest Expense | - | - | - | - | 912 | 512 | 116 | 0 |
| Payments | - | - | - | - | (26,428) | (26,428) | (15,565) | - |
| Ending Balance | - | - | - | 66,882 | 41,366 | 15,449 | 0 | 0 |
| Future Buy Out Amounts (excl from above) | - | - | - | 122,310 | 122,310 | 122,310 | 91,463 | - |
| **Ford** | | | | | | | | |
| Beginning Balance | - | - | - | - | 1,546,179 | 1,477,859 | 1,408,663 | 1,338,581 |
| Interest Expense | - | - | - | - | 19,431 | 18,556 | 17,670 | 16,772 |
| Payments | - | - | - | - | (87,751) | (87,751) | (87,751) | (87,751) |
| Ending Balance | - | - | - | 1,546,179 | 1,477,859 | 1,408,663 | 1,338,581 | 1,267,602 |

Exhibit 1, Page 108

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | | | | |
| **Albach** | | | | | | | | | | | |
| Beginning Balance | - | 81,500 | 66,111 | 50,279 | 33,992 | 17,237 | - | - | - | - | - |
| Interest Expense | - | 2,113 | 1,671 | 1,216 | 748 | 266 | - | - | - | - | - |
| Payments | - | (17,503) | (17,503) | (17,503) | (17,503) | (17,503) | - | - | - | - | - |
| Ending Balance | 81,500 | 66,111 | 50,279 | 33,992 | 17,237 | - | - | - | - | - | - |
| Future Buy Out Amounts (excl from above) | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | - | - |
| **Ally** | | | | | | | | | | | |
| Beginning Balance | - | 286,081 | 234,726 | 180,595 | 123,537 | 63,394 | (0) | (0) | (0) | (0) | |
| Interest Expense | - | 13,866 | 11,089 | 8,163 | 5,078 | 1,827 | 0 | - | - | - | |
| Payments | - | (65,221) | (65,221) | (65,221) | (65,221) | (65,221) | (0) | - | - | - | |
| Ending Balance | 286,081 | 234,726 | 180,595 | 123,537 | 63,394 | (0) | (0) | (0) | (0) | (0) | |
| **Altec** | | | | | | | | | | | |
| Beginning Balance | - | 3,227,432 | 621,205 | 137,799 | 52,544 | 0 | 0 | 0 | 0 | 0 | |
| Interest Expense | - | 135,021 | 18,364 | 6,928 | 1,230 | 0 | 0 | 0 | 0 | 0 | |
| Payments | - | (2,741,247) | (501,770) | (92,184) | (53,774) | - | - | - | - | - | |
| Ending Balance | 3,227,432 | 621,205 | 137,799 | 52,544 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Future Buy Out Amounts (excl from above) | 3,770,220 | 1,722,240 | 101,300 | 101,300 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Bank of America** | | | | | | | | | | | |
| Beginning Balance | - | 4,526,707 | 3,596,526 | 2,614,169 | 1,576,710 | 621,531 | (0) | (0) | (0) | (0) | |
| Interest Expense | - | 224,520 | 172,344 | 117,241 | 61,132 | 17,772 | - | - | - | - | |
| Payments | - | (1,154,701) | (1,154,701) | (1,154,701) | (1,016,311) | (639,303) | - | - | - | - | |
| Ending Balance | 4,526,707 | 3,596,526 | 2,614,169 | 1,576,710 | 621,531 | (0) | (0) | (0) | (0) | (0) | |
| Future Buy Out Amounts (excl from above) | 1,712,810 | 1,712,810 | 1,712,810 | 1,712,810 | 1,542,739 | 1,337,029 | - | - | - | - | |
| **FNB** | | | | | | | | | | | |
| Beginning Balance | - | 66,882 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Interest Expense | - | 1,540 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Payments | - | (68,422) | - | - | - | - | - | - | - | - | |
| Ending Balance | 66,882 | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Future Buy Out Amounts (excl from above) | 122,310 | - | - | - | - | - | - | - | - | - | |
| **Ford** | | | | | | | | | | | |
| Beginning Balance | - | 1,546,179 | 1,267,602 | 974,475 | 666,040 | 341,495 | 0 | 0 | 0 | 0 | |
| Interest Expense | - | 72,428 | 57,879 | 42,569 | 26,461 | 9,510 | - | - | - | - | |
| Payments | - | (351,005) | (351,005) | (351,005) | (351,005) | (351,005) | - | - | - | - | |
| Ending Balance | 1,546,179 | 1,267,602 | 974,475 | 666,040 | 341,495 | 0 | 0 | 0 | 0 | 0 | |

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | |
| **GM** | | | | | | | | |
| Beginning Balance | - | - | - | - | 121,389 | 116,156 | 110,844 | 105,450 |
| Interest Expense | - | - | - | - | 1,825 | 1,745 | 1,664 | 1,581 |
| Payments | - | - | - | - | (7,058) | (7,058) | (7,058) | (7,058) |
| Ending Balance | - | - | - | 121,389 | 116,156 | 110,844 | 105,450 | 99,973 |
| **Hanmi** | | | | | | | | |
| Beginning Balance | - | - | - | - | 98,750 | 39,500 | - | - |
| Interest Expense | - | - | - | - | - | - | - | - |
| Payments | - | - | - | - | (59,250) | (39,500) | - | - |
| Ending Balance | - | - | - | 98,750 | 39,500 | - | - | - |
| **John Deere** | | | | | | | | |
| Beginning Balance | - | - | - | - | 145,533 | 109,828 | 73,674 | 37,067 |
| Interest Expense | - | - | - | - | 1,671 | 1,223 | 769 | 309 |
| Payments | - | - | - | - | (37,376) | (37,376) | (37,376) | (37,376) |
| Ending Balance | - | - | - | 145,533 | 109,828 | 73,674 | 37,067 | - |
| **Pathward** | | | | | | | | |
| Beginning | - | - | - | - | 327,154 | 39,313 | 0 | 0 |
| Interest Expense | - | - | - | - | 774 | 98 | 0 | 0 |
| Payments | - | - | - | - | (288,616) | (39,411) | 0 | 0 |
| Ending | - | - | - | 327,154 | 39,313 | 0 | 0 | 0 |
| Future Buy Out Amounts (excl from above) | - | - | - | 437,081 | - | - | - | - |
| **US Bank** | | | | | | | | |
| Beginning | - | - | - | - | 14,430 | 7,975 | 1,408 | - |
| Interest Expense | - | - | - | - | 210 | 99 | 8 | (0) |
| Payments | - | - | - | - | (6,665) | (6,665) | (1,416) | - |
| Ending | - | - | - | 14,430 | 7,975 | 1,408 | - | (0) |
| Future Buy Out Amounts (excl from above) | - | - | - | 59,955 | 30,847 | 30,847 | - | - |

Exhibit 1, Page 110

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DEBT ROLLFORWARDS - Restructured Equipment Loans** | | | | | | | | | | | |
| **GM** | | | | | | | | | | | |
| Beginning Balance | - | 121,389 | 99,973 | 77,213 | 53,025 | 27,319 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense | - | 6,815 | 5,471 | 4,042 | 2,525 | 911 | - | - | - | - | - |
| Payments | - | (28,230) | (28,230) | (28,230) | (28,230) | (28,230) | - | - | - | - | - |
| Ending Balance | 121,389 | 99,973 | 77,213 | 53,025 | 27,319 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Hanmi** | | | | | | | | | | | |
| Beginning Balance | - | 98,750 | - | - | - | - | - | - | - | - | - |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - |
| Payments | - | (98,750) | - | - | - | - | - | - | - | - | - |
| Ending Balance | 98,750 | - | - | - | - | - | - | - | - | - | - |
| **John Deere** | | | | | | | | | | | |
| Beginning Balance | - | 145,533 | - | - | - | - | - | - | - | - | - |
| Interest Expense | - | 3,972 | - | - | - | - | - | - | - | - | - |
| Payments | - | (149,504) | - | - | - | - | - | - | - | - | - |
| Ending Balance | 145,533 | - | - | - | - | - | - | - | - | - | - |
| **Pathward** | | | | | | | | | | | |
| Beginning | - | 327,154 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Expense | - | 873 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payments | - | (328,027) | - | - | - | - | - | - | - | - | - |
| Ending | 327,154 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Future Buy Out Amounts (excl from above) | 437,081 | - | - | - | - | - | - | - | - | - | - |
| **US Bank** | | | | | | | | | | | |
| Beginning | - | 14,430 | - | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Interest Expense | - | 317 | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Payments | - | (14,747) | - | - | - | - | - | - | - | - | - |
| Ending | 14,430 | - | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| Future Buy Out Amounts (excl from above) | 59,955 | - | - | - | - | - | - | - | - | - | - |

Mowbray's Tree Service, Inc.

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **TOTAL REVENUES BREAKDOWN** | | | | | | | | |
| **Tree Service Revenues** | | | | | | | | |
| Customer 1 | - | - | - | - | - | - | - | - |
| Customer 2 | (26) | - | - | - | - | - | - | - |
| Customer 3 | 800,420 | 770,514 | 1,147,500 | 1,147,500 | 1,147,500 | 1,147,500 | 1,147,500 | 1,147,500 |
| Customer 4 | 840,299 | 787,428 | 790,911 | 790,911 | 790,911 | 790,911 | 790,911 | 790,911 |
| Customer 5 | 71,814 | - | - | - | 111,325 | 111,325 | 111,325 | 111,325 |
| Customer 6 | 1,053,010 | 867,449 | - | - | - | - | - | - |
| Other Customers | 238,630 | 278,760 | 279,048 | 279,048 | 279,048 | 279,048 | 279,048 | 279,048 |
| **Total Tree Service Revenues** | 3,004,146 | 2,704,151 | 2,217,459 | 2,217,459 | 2,328,784 | 2,328,784 | 2,328,784 | 2,328,784 |
| **Pino Mgmt. Fees / Leases** | | | | | | | | |
| Mgmt Fee - Administrative Support | 289,800 | 243,200 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| Mgmt Fee - Computer and Telecom Charges | 130,836 | 129,104 | 129,970 | 129,970 | 129,970 | 129,970 | 129,970 | 129,970 |
| Equipment Leases + Other Vehicle Charges | 2,158,333 | 2,312,047 | 2,302,816 | 2,302,816 | 2,302,816 | 2,302,816 | 2,302,816 | 2,302,816 |
| **Total Pino Mgmt. Fees / Leases** | 2,578,968 | 2,684,351 | 2,582,786 | 2,582,786 | 2,582,786 | 2,582,786 | 2,582,786 | 2,582,786 |
| **Phoenix Mgmt. Fees / Leases** | | | | | | | | |
| Mgmt Fee - Administrative Support | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 |
| Mgmt Fee - Computer and Healthcare Charges | 13,625 | 12,161 | 12,893 | 12,893 | 12,893 | 12,893 | 12,893 | 12,893 |
| Equipment Leases + Other Vehicle Charges | 176,344 | 153,197 | 50,628 | 50,628 | 50,628 | 50,628 | 50,628 | 50,628 |
| **Total Phoenix Mgmt. Fees / Leases** | 231,969 | 207,358 | 105,521 | 105,521 | 105,521 | 105,521 | 105,521 | 105,521 |
| | | | | | | | | |
| **AFFILIATE NOTES RECEIVABLE ROLLFORWARDS** | | | | | | | | |
| **Pino Tree Services** | | | | | | | | |
| Beginning Balance | 5,983,824 | 5,307,006 | 5,022,286 | 5,022,286 | 5,022,286 | 4,450,405 | 3,863,380 | 3,260,811 |
| Interest Income | 470,475 | 164,682 | 131,835 | 131,835 | 126,860 | 111,716 | 96,172 | 80,216 |
| Payments | (1,147,294) | (449,402) | (131,835) | (131,835) | (698,741) | (698,741) | (698,741) | (698,741) |
| Ending Balance | 5,307,006 | 5,022,286 | 5,022,286 | 5,022,286 | 4,450,405 | 3,863,380 | 3,260,811 | 2,642,285 |
| **Phoenix Traffic Management** | | | | | | | | |
| Beginning Balance | 2,461,853 | 2,435,646 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 |
| Interest Income | 58,413 | 49,427 | 56,437 | 56,437 | 56,437 | 56,437 | 56,437 | 56,437 |
| Payments | (84,620) | (108,771) | (56,437) | (56,437) | (56,437) | (56,437) | (56,437) | (56,437) |
| Ending Balance | 2,435,646 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 |

Exhibit 1, Page 112

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL REVENUES BREAKDOWN** | | | | | | | | | | | |
| **Tree Service Revenues** | | | | | | | | | | | |
| Customer 1 | 16,447,866 | - | - | - | - | - | - | - | - | - | - |
| Customer 2 | 5,872,538 | (26) | - | - | - | - | - | - | - | - | - |
| Customer 3 | 5,337,432 | 3,865,934 | 4,590,000 | 4,590,000 | 4,590,000 | 4,590,000 | 4,590,000 | 4,590,000 | 4,590,000 | 4,590,000 | 4,590,000 |
| Customer 4 | 3,071,499 | 3,209,549 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 | 3,163,644 |
| Customer 5 | - | 71,814 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 | 445,299 |
| Customer 6 | - | 1,920,458 | - | - | - | - | - | - | - | - | - |
| Other Customers | 1,148,033 | 1,075,486 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 | 1,116,192 |
| **Total Tree Service Revenues** | 31,877,368 | 10,143,215 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 | 9,315,135 |
| **Pino Mgmt. Fees / Leases** | | | | | | | | | | | |
| Mgmt Fee - Administrative Support | | 833,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| Mgmt Fee - Computer and Telecom Charges | | 519,879 | 519,879 | 519,879 | 519,879 | 519,879 | 519,879 | 519,879 | 519,879 | 519,879 | 519,879 |
| Equipment Leases + Other Vehicle Charges | | 9,076,011 | 9,211,264 | 9,211,264 | 9,211,264 | 9,211,264 | 9,211,264 | 9,211,264 | 9,211,264 | 9,211,264 | 9,211,264 |
| **Total Pino Mgmt. Fees / Leases** | | 10,428,890 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 | 10,331,143 |
| **Phoenix Mgmt. Fees / Leases** | | | | | | | | | | | |
| Mgmt Fee - Administrative Support | | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 | 168,000 |
| Mgmt Fee - Computer and Healthcare Charges | | 51,572 | 51,572 | 51,572 | 51,572 | 51,572 | 51,572 | 51,572 | 51,572 | 51,572 | 51,572 |
| Equipment Leases + Other Vehicle Charges | | 430,797 | 202,512 | 202,512 | 202,512 | 202,512 | 202,512 | 202,512 | 202,512 | 202,512 | 202,512 |
| **Total Phoenix Mgmt. Fees / Leases** | | 650,369 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 | 422,084 |
| **AFFILIATE NOTES RECEIVABLE ROLLFORWARDS** | | | | | | | | | | | |
| **Pino Tree Services** | | | | | | | | | | | |
| Beginning Balance | | 5,983,824 | 5,022,286 | 2,642,285 | - | - | - | - | - | - | - |
| Interest Income | | 898,827 | 414,964 | 152,680 | - | - | - | - | - | - | - |
| Payments | | (1,860,365) | (2,794,965) | (2,794,965) | - | - | - | - | - | - | - |
| Ending Balance | | 5,022,286 | 2,642,285 | - | - | - | - | - | - | - | - |
| **Phoenix Traffic Management** | | | | | | | | | | | |
| Beginning Balance | | 2,461,853 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 |
| Interest Income | | 220,714 | 225,749 | 225,749 | 225,749 | 225,749 | 225,749 | 225,749 | 225,749 | 225,749 | 225,749 |
| Payments | | (306,266) | (225,749) | (225,749) | (225,749) | (225,749) | (225,749) | (225,749) | (225,749) | (225,749) | (225,749) |
| Ending Balance | | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 | 2,376,302 |

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | |
| | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | |
| Operating Income | 287,277 | (111,818) | (37,105) | (8,176,356) | 1,138,135 | 1,333,788 | 1,232,238 | 1,041,254 |
| Depreciation & Amortization | (1,346,511) | (975,819) | (816,092) | (629,328) | (86,595) | (112,166) | (116,540) | (129,163) |
| Interest (Expense) Income | 319,686 | (503,569) | (759,896) | (744,090) | (277,621) | (271,372) | (266,762) | (264,503) |
| Taxable Income | (739,548) | (1,591,206) | (1,613,092) | (9,549,774) | 773,919 | 950,250 | 848,936 | 647,588 |
| CA LLC & S-Corp Tax Rate | 0.0% | 0.0% | 0.0% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | - | - | - | - | 11,609 | 14,254 | 12,734 | 9,714 |
| | | | | | | | | |
| **Flow Through Taxable Income and NOLs** | | | | | | | | |
| Debtor Net Income | (739,548) | (1,591,206) | (1,613,092) | (9,549,774) | 762,310 | 935,996 | 836,202 | 637,874 |
| Direct Charges to Equity | - | - | - | - | - | - | - | - |
| Pino Net Income | (69,940) | (1,503,222) | 1,114,636 | (894,942) | 698,870 | (779,521) | 1,804,823 | (354,341) |
| Debtor Flow Through Taxable Income | (809,488) | (3,094,428) | (498,456) | (10,444,717) | 1,461,180 | 156,476 | 2,641,024 | 283,533 |
| Owner Personal Income | 320,608 | (418,307) | 83,081 | (75,343) | 27,729 | (54,015) | 96,842 | (28,904) |
| Personal Taxable Income | (488,880) | (3,512,735) | (415,375) | (10,520,059) | 1,488,910 | 102,461 | 2,737,866 | 254,629 |
| Maximum % Applied to NOL | 100.0% | 100.0% | 100.0% | 100.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| Personal Taxable Income Applied to NOL | (488,880) | (3,512,735) | (415,375) | (10,520,059) | 1,191,128 | 81,969 | 2,190,293 | 203,703 |
| Personal Taxable Income Subject to Taxes | - | - | (0) | - | 297,782 | 20,492 | 547,573 | 50,926 |
| | | | | | | | | |
| Beginning NOL | (9,812,805) | (10,301,685) | (13,814,420) | (14,229,794) | (24,749,854) | (23,558,726) | (23,476,757) | (21,286,465) |
| Personal Taxable Income Applied to NOL | (488,880) | (3,512,735) | (415,375) | (10,520,059) | 1,191,128 | 81,969 | 2,190,293 | 203,703 |
| Ending NOL | (10,301,685) | (13,814,420) | (14,229,794) | (24,749,854) | (23,558,726) | (23,476,757) | (21,286,465) | (21,082,761) |
| | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | |
| Total Debtor Flow Through Taxable Income | (809,488) | (3,094,428) | (498,456) | (10,444,717) | 1,461,180 | 156,476 | 2,641,024 | 283,533 |
| % NOT Applied to NOL | 0.0% | 0.0% | 0.0% | 0.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Debtor Flow Through Taxable Income Subject to Taxes | 0 | - | (0) | - | 292,236 | 31,295 | 528,205 | 56,707 |
| Estimated Personal Tax Rate | 0.0% | 0.0% | 0.0% | 0.0% | 49.3% | 49.3% | 49.3% | 49.3% |
| Tax Distributions Due to Owner | - | - | - | - | 144,072 | 15,428 | 260,405 | 27,956 |
| | | | | | | | | |
| Beginning Tax Distributions Due to Owner | 1,227,047 | 1,227,047 | 1,227,047 | 1,227,047 | 1,227,047 | 144,072 | 15,428 | 260,405 |
| Tax Distributions Due to Owner | - | - | - | - | 144,072 | 15,428 | 260,405 | 27,956 |
| Tax Distributions to Owner | - | - | - | - | (1,227,047) | (144,072) | (15,428) | (260,405) |
| Ending Tax Distributions Due to Owner | 1,227,047 | 1,227,047 | 1,227,047 | 1,227,047 | 144,072 | 15,428 | 260,405 | 27,956 |

Exhibit 1, Page 114

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | | | | |
| Operating Income | (8,038,001) | 4,745,415 | 4,200,130 | 4,423,931 | 3,978,597 | 4,261,851 | 4,388,156 | 4,341,982 | 4,295,297 | 4,248,098 | |
| Depreciation & Amortization | (3,767,750) | (444,465) | (703,822) | (703,417) | (628,553) | (581,591) | (681,708) | (623,893) | (544,291) | (475,466) | |
| Interest (Expense) Income | (1,687,869) | (1,080,258) | (1,056,668) | (1,079,857) | (851,206) | (632,618) | (444,345) | (279,812) | (108,460) | 69,992 | |
| Taxable Income | (13,493,620) | 3,220,692 | 2,439,640 | 2,640,656 | 2,498,838 | 3,047,641 | 3,262,103 | 3,438,277 | 3,642,546 | 3,842,623 | |
| CA LLC & S-Corp Tax Rate | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | - | 48,310 | 36,595 | 39,610 | 37,483 | 45,715 | 48,932 | 51,574 | 54,638 | 57,639 | |
| | | | | | | | | | | | |
| **Flow Through Taxable Income and NOLs** | | | | | | | | | | | |
| Debtor Net Income | (13,493,620) | 3,172,382 | 2,403,045 | 2,601,046 | 2,461,355 | 3,001,926 | 3,213,172 | 3,386,702 | 3,587,908 | 3,784,984 | |
| Direct Charges to Equity | - | - | - | - | - | - | - | - | 0 | 0 | |
| Pino Net Income | (1,353,468) | 1,369,831 | 1,473,834 | 1,467,909 | 1,307,435 | 1,142,677 | 973,504 | 905,976 | 759,655 | 594,076 | |
| Debtor Flow Through Taxable Income | (14,847,088) | 4,542,213 | 3,876,879 | 4,068,956 | 3,768,791 | 4,144,603 | 4,186,676 | 4,292,678 | 4,347,563 | 4,379,060 | |
| Owner Personal Income | (89,961) | 41,653 | 47,118 | 47,118 | 47,118 | 47,118 | 54,019 | 57,312 | 57,312 | 57,312 | |
| Personal Taxable Income | (14,937,049) | 4,583,866 | 3,923,997 | 4,116,074 | 3,815,909 | 4,191,721 | 4,240,695 | 4,349,990 | 4,404,875 | 4,436,373 | |
| Maximum % Applied to NOL | 100.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 31.1% | 0.0% | |
| Personal Taxable Income Applied to NOL | (14,937,049) | 3,667,093 | 3,139,198 | 3,292,859 | 3,052,727 | 3,353,377 | 3,392,556 | 3,479,992 | 1,372,053 | - | |
| Personal Taxable Income Subject to Taxes | - | 916,773 | 784,799 | 823,215 | 763,182 | 838,344 | 848,139 | 869,998 | 3,032,822 | 4,436,373 | |
| | | | | | | | | | | | |
| Beginning NOL | (9,812,805) | (24,749,854) | (21,082,761) | (17,943,564) | (14,650,705) | (11,597,978) | (8,244,601) | (4,852,045) | (1,372,053) | - | |
| Personal Taxable Income Applied to NOL | (14,937,049) | 3,667,093 | 3,139,198 | 3,292,859 | 3,052,727 | 3,353,377 | 3,392,556 | 3,479,992 | 1,372,053 | - | |
| Ending NOL | (24,749,854) | (21,082,761) | (17,943,564) | (14,650,705) | (11,597,978) | (8,244,601) | (4,852,045) | (1,372,053) | - | - | |
| | | | | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | | | | |
| Total Debtor Flow Through Taxable Income | (14,847,088) | 4,542,213 | 3,876,879 | 4,068,956 | 3,768,791 | 4,144,603 | 4,186,676 | 4,292,678 | 4,347,563 | 4,379,060 | |
| % NOT Applied to NOL | 0.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 68.4% | 100.0% | |
| Debtor Flow Through Taxable Income Subject to Taxes | 0 | 908,443 | 775,376 | 813,791 | 753,758 | 828,921 | 837,335 | 858,536 | 2,972,116 | 4,379,060 | |
| Estimated Personal Tax Rate | 0.0% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | |
| Tax Distributions Due to Owner | - | 447,862 | 382,260 | 401,199 | 371,603 | 408,658 | 412,806 | 423,258 | 1,465,253 | 2,158,877 | |
| | | | | | | | | | | | |
| Beginning Tax Distributions Due to Owner | 1,227,047 | 1,227,047 | 27,956 | 25,364 | 31,199 | (4,744) | 24,797 | 32,430 | 36,241 | 185,513 | |
| Tax Distributions Due to Owner | - | 447,862 | 382,260 | 401,199 | 371,603 | 408,658 | 412,806 | 423,258 | 1,465,253 | 2,158,877 | |
| Tax Distributions to Owner | - | (1,646,953) | (384,852) | (395,364) | (407,546) | (379,117) | (405,174) | (419,447) | (1,315,981) | (2,155,604) | |
| Ending Tax Distributions Due to Owner | 1,227,047 | 27,956 | 25,364 | 31,199 | (4,744) | 24,797 | 32,430 | 36,241 | 185,513 | 188,786 | |

Exhibit 1, Page 115

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

**FINANCIAL PROJECTIONS**

The financial projections have been developed based on the Debtor's current business conditions and projected operating performance ("Financial Projections"). The financial information for 2024 is unaudited. The Financial Projections include the years beginning in 2025 through the duration of the plan (the "Projection Period").

The Financial Projections were prepared by the Debtor's management with the assistance of the Debtor's restructuring advisors and are based upon a number of assumptions made with respect to the future performance of the Debtor's operations. Although the Financial Projections were prepared in good faith with reasonable assumptions, there can be no assurance the projected financial performance will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtor's actual financial performance versus the Financial Projections. Accordingly, the Financial Projections should be reviewed in conjunction with consideration of the risk factors set forth in the Disclosure Statement and the assumptions described therein, including all relevant qualifications and footnotes. Additionally, the Debtor does not anticipate that it will, and it disclaims any obligation to, furnish updated projections to the holders of Claims or Equity Interests after the date of the Disclosure Statement, or to otherwise make such information public.

The Debtor believes that the *Plan of Reorganization of The Original Mowbray's Tree Service, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan. In connection with the formulation and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in these Financial Projections and, accordingly, neither the Debtor nor any independent auditor has expressed an opinion or any other form of assurance on such information or the ability of the Debtor to meet the Financial Projections. The Debtor's independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

Principal Assumptions for Financial Projections

The Financial Projections are based on, and assume the successful implementation of, the Debtor's long-term business plan. Both the business plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtor, emergence from Chapter 11 bankruptcy, its ability to retain existing customer contracts, gain new customer contracts, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtor, including but not limited to weather patterns and wildfires. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period may vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Reorganized Debtor to achieve the projected results.

While the Debtor believes that the Financial Projections are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.

Safe Harbor Under the Private Securities Litigation Reform Act of 1995

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the United States Securities Exchange Act of 1934. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtor and its management with respect to the timing of, completion of, and scope of the current restructuring, Plan, business plan, market conditions, and the Debtor's future liquidity, as well as the assumptions upon which such statements are based.

While the Debtor believes that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

Select Risk Factors Related to the Financial Projections

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtor's management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements.

Exhibit 1, Page 116

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

**FINANCIAL PROJECTIONS**

General Assumptions and Methodology

The Financial Projections include the combined projected cash flows of the Debtor and its wholly owned subsidiary, Pino Tree Service, Inc. ("Pino").  In addition, it is assumed that the operations of Mowbray's Waterman Properties LLC ("Waterman") are substantively consolidated into those of the Debtor as of the Effective Date.  The Financial Projections include the Debtor's unaudited actual operating results, balance sheets, and cash flows for the year ending December 31, 2024 and the projected operating results, balance sheets, and cash flows for the years 2025 through the Plan term. The Financial Projections were developed by analyzing historical operting trends as adjusted for operational changes made to drive efficiencies and overall revenue growth and cost savings.

Projected Allowed Claims and their respective Plan treatments are described below.  The Financial Projections assume an Effective Date of January 1, 2026.

*Creditor Treatment*

| Creditor Class | Projected Allowed Claim ($m) | Term (in years) | Interest Rate (in years) | Notes |
|---|---|---|---|---|
| A.  Secured Creditors | | | | |
| 1.  PNC Bank | 4.5 | 2 | 6.57% | Fully secured |
| 2.  Bank of the Sierra | 2.6 | 19.5 | 3.55% | Fully secured; Waterman debt to be paid by the Debtor upon substantive consolidation |
| 2.  Equipment Loans | 10.4 | Up to 5 years | Varies | Mix of capital and operating leases, excludes future buy-out amounts |
| 3.  Jacobus Pino Note Payable | 0.1 | 0.6 | 0.75% | To be paid per original terms |
| B.  Administrative Claims | | | | |
| 1.  Trade and Other | 1.0 | N/A | N/A | To be paid in full in the ordinary course of business based on contractual payment terms or historical practices |
| 2.  Chapter 11 Professional and US Trustee Fees | 1.4 | N/A | N/A | To be paid in full on the later of the Effective Date or allowance by the Bankruptcy Court |
| C.  Priority Unsecured Claims | | | | |
| 1.  Tax Claims | 0.0 | N/A | N/A | Paid in full within 30 days of the Effective Date |
| 2.  Employee Claims | 0.1 | N/A | N/A | Accrued paid time off will be paid in full in the ordinary course; pre-petition wages were paid post-petition, as approved by the Bankruptcy Court |
| D.  Union Claim | 0.9 | 2 | 0.00% | Paid in full within 2 years |
| E.  General Unsecured Claims | 25.0 | 9 | 4.08% | To be paid over time with interest at the federal default judgement rate (average 1-year constant maturity (nominal) Treasury yield, as published by the Board of Governors of the Federal Reserve System) |
| F.  Insider Claims | 6.3 | N/A | N/A | To be paid after all other claims paid in full |
| **Projected Claims** | **52.5** | | | |

The claims above exclude $2.6 million of pre-petition workers compensation claims that are fully collateralized by letters of credit totaling $5.4 million for the benefit of the insurance carriers, that were drawn upon by Berkshire Hathaway Homestate and Starr Speciality Insurance in 2024.  The Debtor does not project it will need to provide additional collateral to satisfy these claims.

The Plan will be funded primarily by cash flows generated through ongoing business operations, including Pino.

Exhibit 1, Page 117

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

**FINANCIAL PROJECTIONS**

**Analysis of Comparable Recovery under the Debtor's Plan versus a Hypothetical Chapter 7 Liquidation Scenario**

The Plan provides for a recovery to creditors the same or in excess of the amounts to be recovered in a hypothetical Chapter 7 Liquidation as set forth below.

| | Plan of Reorganization | Hypothetical Chapter 11 Liquidation Analysis | Difference | Higher (Lower) or Same | |
|---|---|---|---|---|---|
| Secured | 100% | 100% | 0.0% | SAME | Shown in % recovery |
| Administrative | 100% | 100% | 0.0% | SAME | Shown in % recovery |
| Priority Unsecured | 100% | 100% | 0.0% | SAME | Shown in % recovery |
| General Unsecured | 25.0 | 15.7 | 9.3 | HIGHER | Shown in $m |
| Insiders | NA - any recovery to Insiders is deferred until after all other creditors have been paid in full | | | | |

Exhibit 1, Page 118

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| Substantive Consolidation | As of the Effective Date, the assets and liabilties of Waterman are consolidated into the Debtor, after considering applicable elimination entries for transactions between the two debtors; thereafter, the Debtor's income and expenses are projected inclusive of Waterman's operating results | NA |

Income Statement

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| Tree Service Revenues | Based on the current contracts in place and the expected future revenues to be generated in FY 25 and FY 26 (held flat thereafter) | Based on the current contracts in place, including one main customer, and the expected future revenues to be generated in FY 25 and FY 26 (held flat thereafter) |
| Pino Management Fees & Equipment Lease Income | Projected based on management's budget, includes monthly fees charged for management and other services (eg, health insurance offered to Pino employees through Mowbray's insurance policies) plus monthly vehicle leases for Mowbray's vehicles being used to service Pino jobs | NA |
| Phoenix Management Fees & Equipment Lease Income | Projected based on management's budget, includes monthly fees charged for management services plus monthly vehicle leases for Mowbray's vehicles being used to service Phoenix jobs | NA |
| Rental Income | Based on the current rent roll; post-Effective Date, excludes approximately $14k for space rented by Mowbray's from Waterman | NA |
| Salaries & Wages | Job related wages are projected based on trailing 3 month ("T3M") trends as a % of tree service revenues, inclusive of recent changes in customer contracts, and corporate wages are projected based on current headcount in place | Projected based on trailing 12 month ("TTM") trends as a % of revenues, inclusive of recent changes in customer contracts, since approximately 97% of personnel costs are job related |
| Health Insurance | Projected based on TTM trends as a % of salaries and wages, inclusive of amounts subsequently charged to Pino or Phoenix via Management Fees | Projected based on TTM trends as a % of salaries and wages for amounts incurred directly by Pino, plus projected amounts to be charged by Mowbray's as part of the Management Fees |
| Workers' Comp Insurance | Projected based on TTM trends as a % of salaries and wages | Projected based on TTM trends as a % of salaries and wages |
| Union Dues | Projected based on T3M trends as a % of job related / union wages | Projected based on T3M trends as a % of job related / union wages |
| Occupancy | Projected based on amounts currently being charged by landlords; pre-Effective Date, includes approximately $14k / month charged by Waterman | Projected based on amounts currently being charged by landlords; includes approximately $6k / month charged by Waterman |
| Insurance | Includes auto, general liability, and other business insurance; projected inclusive of recent annual increases, adjusted for anticipated annual increases and also as a % of revenues to reflect anticipated changes in customer contracts and volume of assets or operations needing to be covered | Includes auto, general liability, and other business insurance; projected inclusive of recent annual increases, adjusted for anticipated annual increases and also as a % of revenues to reflect anticipated changes in customer contracts and volume of assets or operations needing to be covered |
| Advertising | Projected based on TTM trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Utilities | Projected based on T3M monthly trends | Projected based on T3M monthly trends |
| Repair and Maintenance | Projected based on T6M trends as a % of revenues | Projected based on T6M trends as a % of revenues |
| Office Supplies | Projected based on T3M monthly trends | Projected based on T3M monthly trends |
| Vehicles Expenses | Includes day-to-day vehicle related expenses (eg, fuel, repairs, maintenance, registration) projected based on TTM trends as a % of revenues | Includes monthly vehicle leases from Mowbray's projected based on current leases in effect, plus day-to-day vehicle related expenses (eg, fuel, repairs, maintenance, registration) projected based on TTM trends as a % of revenues |
| Traffic Control Services | None currently anticipated based on current mix of customer jobs | Includes traffic management services projected based on TTM trends as a % of revenues |
| Management Fees | NA | Monthly management fees projected based on management's budget |
| OC Professionals | Includes ordinary course legal, accounting, and tax services projected based on T3M monthly trends | N/A |
| Tools and Supplies | Projected based on T6M trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Property Taxes | Projected based on 2024 property tax invoices | NA |

Exhibit 1, Page 119

**Mowbray's Tree Service, Inc.**

Financial Projections

*(USD$)*

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| Bank Expenses | Projected based on T6M monthly trends | Projected based on T3M monthly trends |
| Travel & Lodging | Projected based on T6M trends as a % of revenues | Projected based on TTM trends as a % of revenues |
| Other | Projected based on T6M monthly trends | Projected based on TTM trends as a % of revenues, plus projected amounts to be charged by Mowbray's as part of the Management Fees |
| (Gain)/Loss on Disposal of Assets | Projected based on current preliminary indications of interest for certain Waterman real property that is projected to be sold | No future asset sales or disposals are currently anticipated |
| Restructuring Expenses | Includes monthly fee estimates for Ch 11 professionals (projected to remain fully outstanding through the Effective Date), the court-appointed Examiner, and quarterly UST Fees (projected to be paid quarterly in arrears at 0.8% of projected disbursements), plus Restructuring Charges for recording additional obligations owed to creditors as of the Effective Date as per the Plan | NA |
| Depreciation | Projected based on estimated 7 year useful life for new or existing equipment or vehicles, up until such assets are fully depreciated | Projected based on estimated 7 year useful life for new or existing equipment or vehicles, up until such assets are fully depreciated |
| Interest Expense (Income) | Interest expense includes currently proposed adequate protection payments plus projected amounts to service the Plan obligations; interest income includes amounts due from Pino, Phoenix Traffic Management, and Waterman based on the terms of the underlying agreements | Includes interest charged on amounts due to Mowbray's per the terms of that line of credit agreement |
| Income Taxes | Projected at 1.5% of pre-tax income for California S-Corp & LLC taxes | Projected at 1.5% of pre-tax income for California S-Corp & LLC taxes |

Balance Sheet

| | Mowbray's | Pino |
|---|---|---|
| Accounts Receivable | Projected based on T3M customer payment trends | Projected based on expected customer payment trends, including a return to contracted terms during 2025 |
| Prepaid Expenses | Projected based on contractual payment terms as set forth under insurance premium financing agreements, less amounts utilized (time lapse) as of the end of each period | Projected based on contractual payment terms as set forth under insurance premium financing agreements, less amounts utilized (time lapse) as of the end of each period |
| Fixed Assets | Projected based on 2023 and 2024 capital expenditure trends for Mowbray's and Pino, net of Depreciation expense (see above), plus additional amounts for expected future buyouts of existing equipment leases; certain Waterman real property is assumed to be sold with the net proceeds used to pay down secured creditors or used for general liquidity purposes | Equipment to be leased from the Debtor as needed based on historical practice; additional amounts projected based on 2023 and 2024 capital expenditure trends for Mowbray's and Pino, net of Depreciation expense (see above) |
| Long-term Assets, incl Deposits, Insurance Collateral, and Investment in Pino | No changes are projected; note that the Insurance Collateral represents fully drawn upon letters of credit held by Berkshire Hathaway Homestate and Starr Specialty Insurance and is shown net of recent actuarial estimates for the related workers' compensation claims | No changes are projected |
| Long-term Receivables | Pino: see Due to (from) Mowbray's below<br><br>Phoenix: projected inclusive of monthly interest at prime + 2% less monthly interest-only payments | NA |
| Accounts Payable | Projected based on T6M vendor payment trends | Projected based on T3M vendor payment trends |
| Accrued Expenses | Includes outstanding balances on credit cards (assumed to be held flat based on most recent balances), and other accrued expenses | Includes outstanding balances on credit cards (assumed to be held flat based on most recent balances), and other accrued expenses |
| Accrued Payroll | Includes estimated payroll-related accruals and employee paid time off; projected at current levels going forward | Includes estimated payroll-related accruals and employee paid time off; projected at current levels going forward |
| Accrued Chapter 11 Professional Fees | Includes previously incurred Chapter 11 Professional and Examiner Fees that are unpaid pending court approval | NA |
| Liabilities Subject to Compromise | See Creditor Treatment | NA |

Exhibit 1, Page 120

**Mowbray's Tree Service, Inc.**
Financial Projections
*(USD$)*

| Financial Statement Line Item | Mowbray's | Pino |
|---|---|---|
| Restructured Debts | See Creditor Treatment | NA |
| Vehicle Loans | NA, see above for Liabilities Subject to Compromise or Restructured Debts | Projected based on recent payments until paid in full |
| Due to (from) Mowbray's | NA | Interest is projected on outstanding amounts due to or from Mowbray's at current terms (prime + 3%); monthly payments are interest-only until maturity, after which the outstanding amount is assumed to be paid over time including interest |
| Equity - Other Contributions from Subsidiary / Other Distribution | Reflects cash received by Mowbray's from Pino based on cash in excess of working capital needs | Reflects cash received by Mowbray's from Pino based on cash in excess of working capital needs |
| Equity - Tax Contributions from Subsidiary | Reflects cash received by Mowbray's from Pino for estimated income taxes due on Pino's operating profits (see Tax Distributions) | NA |
| Equity - Tax Distributions to Owner | Projected at 49.3% (maximum combined personal rate for federal + state income taxes) of taxable income, if positive; based on 20% of taxable income if any personal NOLs remain in place, otherwise based on 100% of taxable income; distributions to owners are anticipated to be made each quarter | Projected at 49.3% (maximum combined personal rate for federal + state income taxes) of taxable income, if positive; based on 20% of taxable income if any personal NOLs remain in place, otherwise based on 100% of taxable income; distributions to Mowbray's are anticipated to be made each quarter |
| | Note: These tax distributions will be made based on the actual flow through tax liabilities which may or may not differ from these projected amounts | |

Exhibit 1, Page 121

# EXHIBIT 2

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

|  | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | |
| Tree Service Revenues | 12,330,449 | 8,915,736 | 15,759,281 | 9,661,713 | 14,658,515 | 9,929,163 | 18,110,068 | 11,290,935 |
| **Total Revenues** | **12,330,449** | **8,915,736** | **15,759,281** | **9,661,713** | **14,658,515** | **9,929,163** | **18,110,068** | **11,290,935** |
| Salaries & Wages | 4,612,588 | 3,846,136 | 6,594,818 | 4,043,156 | 6,134,178 | 4,155,077 | 7,578,556 | 4,724,940 |
| Health Insurance | - | 81,766 | 122,088 | 120,426 | 121,788 | 120,499 | 122,729 | 120,870 |
| Workers' Comp Insurance | 305,807 | 254,992 | 437,225 | 268,055 | 406,686 | 275,475 | 502,446 | 313,256 |
| Union Dues | 1,452,583 | 1,211,214 | 2,076,821 | 1,273,259 | 1,931,758 | 1,308,505 | 2,386,617 | 1,487,965 |
| Occupancy | 51,060 | 53,060 | 54,060 | 54,060 | 54,060 | 54,060 | 54,060 | 54,060 |
| Insurance | 1,327,471 | 1,117,191 | 1,071,951 | 1,127,208 | 1,127,208 | 1,127,208 | 1,138,480 | 1,161,024 |
| Advertising | 41,414 | 14,763 | 24,657 | 15,116 | 22,934 | 15,535 | 28,335 | 17,665 |
| Utilities | 80,846 | 69,783 | 57,991 | 53,667 | 57,211 | 53,857 | 59,658 | 54,823 |
| Repair and Maintenance | 42,352 | 30,295 | 42,586 | 26,109 | 39,611 | 26,831 | 48,938 | 30,511 |
| Office Supplies | 94,077 | 26,658 | 26,658 | 26,658 | 26,658 | 26,658 | 26,658 | 26,658 |
| Vehicles Expenses | 2,620,403 | 2,735,133 | 2,908,012 | 2,661,361 | 2,863,485 | 2,672,179 | 3,003,102 | 2,727,264 |
| Traffic Control Services | 751,031 | 428,430 | 647,311 | 396,854 | 602,097 | 407,839 | 743,869 | 463,774 |
| Management Fees | 305,923 | 252,127 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| OC Professionals | - | - | - | - | - | - | - | - |
| Tools and Supplies | 61,653 | 68,279 | 125,967 | 89,717 | 119,423 | 91,307 | 139,942 | 99,402 |
| Property Taxes | - | - | - | - | - | - | - | - |
| Bank Expenses | 480 | 347 | 347 | 347 | 347 | 347 | 347 | 347 |
| Travel & Lodging | 546,336 | 63,303 | 105,780 | 64,851 | 98,391 | 66,647 | 121,558 | 75,787 |
| Other | (44,325) | 12,023 | 35,364 | 21,681 | 32,894 | 22,281 | 40,639 | 25,337 |
| Gain/Loss on Disposal of Assets | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **12,249,700** | **10,265,501** | **14,481,635** | **10,392,525** | **13,788,728** | **10,574,305** | **16,145,935** | **11,533,683** |
| **Operating Income** | **80,750** | **(1,349,765)** | **1,277,646** | **(730,812)** | **869,787** | **(645,141)** | **1,964,133** | **(242,749)** |
| Depreciation | - | 20,161 | 31,175 | 32,295 | 33,414 | 34,534 | 35,653 | 36,773 |
| Interest Expense (Income) | 150,689 | 133,296 | 131,835 | 131,835 | 126,860 | 111,716 | 96,172 | 80,216 |
| Income Taxes | - | - | - | - | 10,643 | (11,871) | 27,485 | (5,396) |
| **Total Non-Operating Expenses** | **150,689** | **153,457** | **163,010** | **164,130** | **170,917** | **134,380** | **159,310** | **111,593** |
| **NET INCOME (LOSS)** | **(69,940)** | **(1,503,222)** | **1,114,636** | **(894,942)** | **698,870** | **(779,521)** | **1,804,823** | **(354,341)** |

Exhibit 2, Page 122

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | | | | |
| | | | | | | | | | | | |
| Tree Service Revenues | 57,920,723 | 46,667,178 | 53,988,681 | 53,988,681 | 53,988,681 | 53,988,681 | 53,988,681 | 53,988,681 | 53,988,681 | 53,988,681 | 53,988,681 |
| **Total Revenues** | **57,920,723** | **46,667,178** | **53,988,681** | **53,988,681** | **53,988,681** | **53,988,681** | **53,988,681** | **53,988,681** | **53,988,681** | **53,988,681** | **53,988,681** |
| | | | | | | | | | | | |
| Salaries & Wages | 19,554,957 | 19,096,698 | 22,592,751 | 22,592,751 | 22,592,751 | 22,592,751 | 22,592,751 | 22,592,751 | 22,592,751 | 22,592,751 | 22,592,751 |
| Health Insurance | 20,702 | 324,280 | 485,885 | 485,885 | 485,885 | 485,885 | 485,885 | 485,885 | 485,885 | 485,885 | 485,885 |
| Workers' Comp Insurance | 1,296,461 | 1,266,079 | 1,497,862 | 1,497,862 | 1,497,862 | 1,497,862 | 1,497,862 | 1,497,862 | 1,497,862 | 1,497,862 | 1,497,862 |
| Union Dues | 6,158,191 | 6,013,877 | 7,114,844 | 7,114,844 | 7,114,844 | 7,114,844 | 7,114,844 | 7,114,844 | 7,114,844 | 7,114,844 | 7,114,844 |
| Occupancy | 213,857 | 212,240 | 216,240 | 216,240 | 216,240 | 216,240 | 216,240 | 216,240 | 216,240 | 216,240 | 216,240 |
| Insurance | 4,765,503 | 4,643,820 | 4,553,919 | 4,692,704 | 4,833,485 | 4,978,489 | 5,127,844 | 5,281,679 | 5,440,130 | 5,603,334 | 5,771,434 |
| Advertising | 45,375 | 95,951 | 84,469 | 84,469 | 84,469 | 84,469 | 84,469 | 84,469 | 84,469 | 84,469 | 84,469 |
| Utilities | 279,687 | 262,288 | 225,548 | 225,548 | 225,548 | 225,548 | 225,548 | 225,548 | 225,548 | 225,548 | 225,548 |
| Repair and Maintenance | 110,172 | 141,342 | 145,892 | 145,892 | 145,892 | 145,892 | 145,892 | 145,892 | 145,892 | 145,892 | 145,892 |
| Office Supplies | 244,076 | 174,053 | 106,634 | 106,634 | 106,634 | 106,634 | 106,634 | 106,634 | 106,634 | 106,634 | 106,634 |
| Vehicles Expenses | 7,807,144 | 10,924,908 | 11,266,030 | 11,266,030 | 11,266,030 | 11,266,030 | 11,266,030 | 11,266,030 | 11,266,030 | 11,266,030 | 11,266,030 |
| Traffic Control Services | 4,718,267 | 2,223,626 | 2,217,580 | 2,217,580 | 2,217,580 | 2,217,580 | 2,217,580 | 2,217,580 | 2,217,580 | 2,217,580 | 2,217,580 |
| Management Fees | 712,229 | 858,051 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| OC Professionals | - | - | - | - | - | - | - | - | - | - | - |
| Tools and Supplies | 323,825 | 345,615 | 450,074 | 450,074 | 450,074 | 450,074 | 450,074 | 450,074 | 450,074 | 450,074 | 450,074 |
| Property Taxes | - | - | - | - | - | - | - | - | - | - | - |
| Bank Expenses | 1,902 | 1,522 | 1,389 | 1,389 | 1,389 | 1,389 | 1,389 | 1,389 | 1,389 | 1,389 | 1,389 |
| Travel & Lodging | 1,450,239 | 780,270 | 362,383 | 362,383 | 362,383 | 362,383 | 362,383 | 362,383 | 362,383 | 362,383 | 362,383 |
| Other | 61,867 | 24,742 | 121,150 | 121,150 | 121,150 | 121,150 | 121,150 | 121,150 | 121,150 | 121,150 | 121,150 |
| Gain/Loss on Disposal of Assets | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | **47,764,451** | **47,389,360** | **52,042,651** | **52,181,435** | **52,322,217** | **52,467,221** | **52,616,576** | **52,770,411** | **52,928,862** | **53,092,065** | **53,260,165** |
| | | | | | | | | | | | |
| **Operating Income** | **10,156,272** | **(722,182)** | **1,946,030** | **1,807,246** | **1,666,465** | **1,521,460** | **1,372,105** | **1,218,270** | **1,059,820** | **896,616** | **728,516** |
| | | | | | | | | | | | |
| Depreciation | - | 83,631 | 140,375 | 158,288 | 176,201 | 194,114 | 212,028 | 229,941 | 140,048 | 125,393 | 125,393 |
| Interest Expense (Income) | 868,218 | 547,655 | 414,964 | 152,680 | - | - | - | - | - | - | - |
| Income Taxes | - | - | 20,860 | 22,444 | 22,354 | 19,910 | 17,401 | 14,825 | 13,797 | 11,568 | 9,047 |
| **Total Non-Operating Expenses** | **868,218** | **631,286** | **576,199** | **333,412** | **198,555** | **214,025** | **229,429** | **244,766** | **153,844** | **136,961** | **134,439** |
| | | | | | | | | | | | |
| **NET INCOME (LOSS)** | **9,288,054** | **(1,353,468)** | **1,369,831** | **1,473,834** | **1,467,909** | **1,307,435** | **1,142,677** | **973,504** | **905,976** | **759,655** | **594,076** |

Exhibit 2, Page 123

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

|  | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | |
| Tree Service Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Salaries & Wages | 37.4% | 43.1% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% |
| Health Insurance | 0.0% | 0.9% | 0.8% | 1.2% | 0.8% | 1.2% | 0.7% | 1.1% |
| Workers' Comp Insurance | 2.5% | 2.9% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% |
| Union Dues | 11.8% | 13.6% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% |
| Occupancy | 0.4% | 0.6% | 0.3% | 0.6% | 0.4% | 0.5% | 0.3% | 0.5% |
| Insurance | 10.8% | 12.5% | 6.8% | 11.7% | 7.7% | 11.4% | 6.3% | 10.3% |
| Advertising | 0.3% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Utilities | 0.7% | 0.8% | 0.4% | 0.6% | 0.4% | 0.5% | 0.3% | 0.5% |
| Repair and Maintenance | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Office Supplies | 0.8% | 0.3% | 0.2% | 0.3% | 0.2% | 0.3% | 0.1% | 0.2% |
| Vehicles Expenses | 21.3% | 30.7% | 18.5% | 27.5% | 19.5% | 26.9% | 16.6% | 24.2% |
| Traffic Control Services | 6.1% | 4.8% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% |
| Management Fees | 2.5% | 2.8% | 1.0% | 1.6% | 1.0% | 1.5% | 0.8% | 1.3% |
| OC Professionals | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Tools and Supplies | 0.5% | 0.8% | 0.8% | 0.9% | 0.8% | 0.9% | 0.8% | 0.9% |
| Property Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Bank Expenses | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Travel & Lodging | 4.4% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Other | -0.4% | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Gain/Loss on Disposal of Assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Disbursements** | **99.3%** | **115.1%** | **91.9%** | **107.6%** | **94.1%** | **106.5%** | **89.2%** | **102.1%** |
| **Operating Income** | **0.7%** | **-15.1%** | **8.1%** | **-7.6%** | **5.9%** | **-6.5%** | **10.8%** | **-2.1%** |
| Depreciation | 0.0% | 0.2% | 0.2% | 0.3% | 0.2% | 0.3% | 0.2% | 0.3% |
| Interest Expense (Income) | 1.2% | 1.5% | 0.8% | 1.4% | 0.9% | 1.1% | 0.5% | 0.7% |
| Income Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | -0.1% | 0.2% | 0.0% |
| **Total Non-Operating Expenses** | **1.2%** | **1.7%** | **1.0%** | **1.7%** | **1.2%** | **1.4%** | **0.9%** | **1.0%** |
| **NET INCOME (LOSS)** | **-0.6%** | **-16.9%** | **7.1%** | **-9.3%** | **4.8%** | **-7.9%** | **10.0%** | **-3.1%** |

Exhibit 2, Page 124

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT - COMMON SIZED** | | | | | | | | | | | |
| Tree Service Revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Total Revenues** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Salaries & Wages | 33.8% | 40.9% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% | 41.8% |
| Health Insurance | 0.0% | 0.7% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% | 0.9% |
| Workers' Comp Insurance | 2.2% | 2.7% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% | 2.8% |
| Union Dues | 10.6% | 12.9% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% | 13.2% |
| Occupancy | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| Insurance | 8.2% | 10.0% | 8.4% | 8.7% | 9.0% | 9.2% | 9.5% | 9.8% | 10.1% | 10.4% | 10.7% |
| Advertising | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Utilities | 0.5% | 0.6% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| Repair and Maintenance | 0.2% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| Office Supplies | 0.4% | 0.4% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Vehicles Expenses | 13.5% | 23.4% | 20.9% | 20.9% | 20.9% | 20.9% | 20.9% | 20.9% | 20.9% | 20.9% | 20.9% |
| Traffic Control Services | 8.1% | 4.8% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% | 4.1% |
| Management Fees | 1.2% | 1.8% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% | 1.1% |
| OC Professionals | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Tools and Supplies | 0.6% | 0.7% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% |
| Property Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Bank Expenses | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Travel & Lodging | 2.5% | 1.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% | 0.7% |
| Other | 0.1% | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Gain/Loss on Disposal of Assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Operating Disbursements** | **82.5%** | **101.5%** | **96.4%** | **96.7%** | **96.9%** | **97.2%** | **97.5%** | **97.7%** | **98.0%** | **98.3%** | **98.7%** |
| **Operating Income** | **17.5%** | **-1.5%** | **3.6%** | **3.3%** | **3.1%** | **2.8%** | **2.5%** | **2.3%** | **2.0%** | **1.7%** | **1.3%** |
| Depreciation | 0.0% | 0.2% | 0.3% | 0.3% | 0.3% | 0.4% | 0.4% | 0.4% | 0.3% | 0.2% | 0.2% |
| Interest Expense (Income) | 1.5% | 1.2% | 0.8% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Income Taxes | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Total Non-Operating Expenses** | **1.5%** | **1.4%** | **1.1%** | **0.6%** | **0.4%** | **0.4%** | **0.4%** | **0.5%** | **0.3%** | **0.3%** | **0.2%** |
| **NET INCOME (LOSS)** | **16.0%** | **-2.9%** | **2.5%** | **2.7%** | **2.7%** | **2.4%** | **2.1%** | **1.8%** | **1.7%** | **1.4%** | **1.1%** |

Exhibit 2, Page 125

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | |
| | | | | | | | | |
| Cash & Cash Equivalents | 8,614,458 | 7,897,393 | 3,817,784 | 7,063,124 | 2,279,932 | 5,073,518 | 199,593 | 3,698,804 |
| Accounts Receivable | 8,131,746 | 6,987,019 | 12,177,712 | 7,485,654 | 11,581,336 | 7,775,418 | 13,986,634 | 8,739,335 |
| Prepaid Expenses | 870,475 | 696,215 | 791,914 | 917,649 | 1,043,384 | 751,472 | 815,671 | 945,178 |
| **Total Current Assets** | **17,616,679** | **15,580,628** | **16,787,409** | **15,466,427** | **14,904,652** | **13,600,407** | **15,001,898** | **13,383,317** |
| | | | | | | | | |
| PP&E, Gross | 831,107 | 852,006 | 883,354 | 914,702 | 946,050 | 977,398 | 1,008,747 | 1,040,095 |
| Accumulated Depreciation | (457,825) | (477,986) | (509,161) | (541,456) | (574,870) | (609,404) | (645,058) | (681,831) |
| **Total Fixed Assets** | **373,282** | **374,020** | **374,193** | **373,246** | **371,180** | **367,994** | **363,689** | **358,264** |
| | | | | | | | | |
| **Total Assets** | **17,989,962** | **15,954,647** | **17,161,602** | **15,839,673** | **15,275,832** | **13,968,401** | **15,365,587** | **13,741,581** |
| | | | | | | | | |
| Accounts Payable | 2,091,024 | 1,988,633 | 2,098,136 | 1,700,886 | 1,933,121 | 2,073,870 | 2,203,336 | 1,758,321 |
| Accrued Expenses | 269,158 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 |
| Accrued Payroll | 594,363 | 499,033 | 501,602 | 490,236 | 498,245 | 500,792 | 504,670 | 491,774 |
| Other Current Liabilities | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | **2,954,544** | **2,728,524** | **2,840,596** | **2,431,979** | **2,672,224** | **2,815,519** | **2,948,863** | **2,490,952** |
| | | | | | | | | |
| Vehicle Loans | 223,734 | 202,383 | 182,629 | 164,260 | 148,987 | 133,715 | 118,442 | 103,170 |
| Mowbray's Line of Credit | 5,307,006 | 5,022,286 | 5,022,286 | 5,022,286 | 4,450,405 | 3,863,380 | 3,260,811 | 2,642,285 |
| **Total Long Term Liabilities** | **5,530,740** | **5,224,669** | **5,204,915** | **5,186,545** | **4,599,392** | **3,997,095** | **3,379,253** | **2,745,455** |
| | | | | | | | | |
| **Total Liabilities** | **8,485,284** | **7,953,192** | **8,045,511** | **7,618,524** | **7,271,615** | **6,812,614** | **6,328,116** | **5,236,407** |
| | | | | | | | | |
| Retained Earnings | 9,574,617 | 9,574,617 | 9,574,617 | 9,574,617 | 8,221,148 | 8,221,148 | 8,221,148 | 8,221,148 |
| Distributions to Mowbray's | - | - | - | - | - | - | - | - |
| Tax Distributions | - | - | - | - | (915,802) | (984,711) | (907,850) | (1,085,806) |
| Net Income (Loss) | (69,940) | (1,573,162) | (458,526) | (1,353,468) | 698,870 | (80,651) | 1,724,172 | 1,369,831 |
| **Total Shareholder's Equity** | **9,504,677** | **8,001,455** | **9,116,091** | **8,221,148** | **8,004,216** | **7,155,787** | **9,037,471** | **8,505,174** |
| | | | | | | | | |
| **Total Liabilities & Shareholder's Equity** | **17,989,961** | **15,954,647** | **17,161,601** | **15,839,673** | **15,275,832** | **13,968,401** | **15,365,587** | **13,741,581** |
| | | | | | | | | |
| *DSO* | 73 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| *DPO* | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |

Exhibit 2, Page 126

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE SHEET** | | | | | | | | | | | |
| | | | | | | | | | | | |
| Cash & Cash Equivalents | 3,094,093 | 7,063,124 | 3,698,804 | 2,351,026 | 3,671,968 | 3,763,782 | 3,649,314 | 3,623,472 | 3,468,687 | 3,009,023 | 2,699,672 |
| Accounts Receivable | 15,752,939 | 7,485,654 | 8,739,335 | 8,739,335 | 8,739,335 | 8,739,335 | 8,739,335 | 8,739,335 | 8,739,335 | 8,739,335 | 8,739,335 |
| Prepaid Expenses | 734,509 | 917,649 | 945,178 | 971,367 | 998,341 | 1,026,124 | 1,054,741 | 1,084,217 | 1,114,576 | 1,145,847 | 1,178,055 |
| **Total Current Assets** | **19,581,541** | **15,466,427** | **13,383,317** | **12,061,728** | **13,409,644** | **13,529,241** | **13,443,390** | **13,447,023** | **13,322,598** | **12,894,204** | **12,617,062** |
| | | | | | | | | | | | |
| PP&E, Gross | 831,107 | 914,702 | 1,040,095 | 1,165,487 | 1,290,880 | 1,416,273 | 1,541,665 | 1,667,058 | 1,792,450 | 1,917,843 | 2,043,236 |
| Accumulated Depreciation | (457,825) | (541,456) | (681,831) | (840,119) | (1,016,320) | (1,210,434) | (1,422,462) | (1,652,403) | (1,792,450) | (1,917,843) | (2,043,236) |
| **Total Fixed Assets** | **373,282** | **373,246** | **358,264** | **325,369** | **274,560** | **205,838** | **119,203** | **14,655** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Total Assets** | **19,954,823** | **15,839,673** | **13,741,581** | **12,387,096** | **13,684,204** | **13,735,079** | **13,562,593** | **13,461,678** | **13,322,598** | **12,894,204** | **12,617,062** |
| | | | | | | | | | | | |
| Accounts Payable | 2,922,299 | 1,700,886 | 1,758,321 | 1,771,553 | 1,785,182 | 1,799,220 | 1,813,679 | 1,938,727 | 2,066,070 | 2,195,805 | 2,328,032 |
| Accrued Expenses | 544,409 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 | 240,857 |
| Accrued Payroll | 715,377 | 490,236 | 491,774 | 491,774 | 491,774 | 491,774 | 491,774 | 491,774 | 491,774 | 491,774 | 491,774 |
| Other Current Liabilities | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | **4,182,086** | **2,431,979** | **2,490,952** | **2,504,184** | **2,517,813** | **2,531,851** | **2,546,310** | **2,671,358** | **2,798,701** | **2,928,436** | **3,060,663** |
| | | | | | | | | | | | |
| Vehicle Loans | 244,198 | 164,260 | 103,170 | 46,422 | 9,475 | - | - | - | - | - | - |
| Mowbray's Line of Credit | 5,953,923 | 5,022,286 | 2,642,285 | - | - | - | - | - | - | - | - |
| **Total Long Term Liabilities** | **6,198,121** | **5,186,545** | **2,745,455** | **46,422** | **9,475** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Total Liabilities** | **10,380,206** | **7,618,524** | **5,236,407** | **2,550,606** | **2,527,288** | **2,531,851** | **2,546,310** | **2,671,358** | **2,798,701** | **2,928,436** | **3,060,663** |
| | | | | | | | | | | | |
| Retained Earnings | 286,563 | 9,574,617 | 8,221,148 | 9,590,979 | 11,064,813 | 12,532,723 | 13,840,158 | 14,982,835 | 15,956,339 | 16,862,315 | 17,621,970 |
| Distributions to Mowbray's | - | - | - | - | - | (1,128,186) | (2,341,007) | (3,440,246) | (4,522,095) | (5,453,999) | (6,060,141) |
| Tax Distributions | - | - | (1,085,806) | (1,228,323) | (1,375,808) | (1,508,745) | (1,625,544) | (1,725,774) | (1,816,323) | (2,202,203) | (2,599,507) |
| Net Income (Loss) | 9,288,054 | (1,353,468) | 1,369,831 | 1,473,834 | 1,467,909 | 1,307,435 | 1,142,677 | 973,504 | 905,976 | 759,655 | 594,076 |
| **Total Shareholder's Equity** | **9,574,617** | **8,221,148** | **8,505,174** | **9,836,490** | **11,156,915** | **11,203,228** | **11,016,284** | **10,790,320** | **10,523,896** | **9,965,768** | **9,556,398** |
| | | | | | | | | | | | |
| **Total Liabilities & Shareholder's Equity** | **19,954,823** | **15,839,673** | **13,741,581** | **12,387,096** | **13,684,203** | **13,735,079** | **13,562,593** | **13,461,678** | **13,322,598** | **12,894,204** | **12,617,061** |
| | | | | | | | | | | | |
| *DSO* | 79 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| *DPO* | 31 | 35 | 35 | 35 | 35 | 35 | 35 | 37 | 40 | 42 | 44 |

Exhibit 2, Page 127

Pino Tree Service, Inc.
Financial Projections
(USD$)

|  | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | |
| Net income (Loss) | (69,940) | (1,503,222) | 1,114,636 | (894,942) | 698,870 | (779,521) | 1,804,823 | (354,341) |
| Depreciation | - | 20,161 | 31,175 | 32,295 | 33,414 | 34,534 | 35,653 | 36,773 |
| Change in Operating Assets & Liabilities | | | | | | | | |
| Accounts Receivable | 7,621,193 | 1,144,727 | (5,190,693) | 4,692,057 | (4,095,682) | 3,805,918 | (6,211,217) | 5,247,299 |
| Other Current Assets | (135,966) | 174,260 | (95,698) | (125,735) | (125,735) | 291,912 | (64,199) | (129,507) |
| Accounts Payable | (831,276) | (102,391) | 109,503 | (397,251) | 232,235 | 140,749 | 129,466 | (445,015) |
| Other Current Liabilities | (396,265) | (123,630) | 2,569 | (11,366) | 8,009 | 2,547 | 3,878 | (12,896) |
| **Total Operating Cash Flows** | **6,187,745** | **(390,095)** | **(4,028,508)** | **3,295,058** | **(3,248,888)** | **3,496,139** | **(4,301,595)** | **4,342,313** |
| Capital Expenditures | - | (20,899) | (31,348) | (31,348) | (31,348) | (31,348) | (31,348) | (31,348) |
| **Total investing Cash Flows** | **-** | **(20,899)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** | **(31,348)** |
| Vehicle Loans | (20,464) | (21,351) | (19,754) | (18,370) | (15,272) | (15,272) | (15,272) | (15,272) |
| Mowbray's Line of Credit | (646,917) | (284,720) | - | - | (571,881) | (587,025) | (602,569) | (618,526) |
| Distributions to Mowbray's | - | - | - | - | - | - | - | - |
| Tax Distributions | - | - | - | - | (915,802) | (68,909) | 76,861 | (177,956) |
| **Total Financing Cash Flows** | **(667,381)** | **(306,071)** | **(19,754)** | **(18,370)** | **(1,502,956)** | **(671,206)** | **(540,981)** | **(811,753)** |
| Net Cash Flows | 5,520,365 | (717,065) | (4,079,609) | 3,245,340 | (4,783,192) | 2,793,586 | (4,873,925) | 3,499,211 |
| Beginning Cash | 3,094,093 | 8,614,458 | 7,897,393 | 3,817,784 | 7,063,124 | 2,279,932 | 5,073,518 | 199,593 |
| **Ending Cash** | **8,614,458** | **7,897,393** | **3,817,784** | **7,063,124** | **2,279,932** | **5,073,518** | **199,593** | **3,698,804** |
| **SHAREHOLDER'S EQUITY ROLLFORWARD** | | | | | | | | |
| Beginning Equity | 9,574,617 | 9,504,677 | 8,001,455 | 9,116,091 | 8,221,148 | 8,004,216 | 7,155,787 | 9,037,471 |
| Net Income (Loss) | (69,940) | (1,503,222) | 1,114,636 | (894,942) | 698,870 | (779,521) | 1,804,823 | (354,341) |
| Distributions to Mowbray's | - | - | - | - | - | - | - | - |
| Tax Distributions | - | - | - | - | (915,802) | (68,909) | 76,861 | (177,956) |
| **Ending Equity** | **9,504,677** | **8,001,455** | **9,116,091** | **8,221,148** | **8,004,216** | **7,155,787** | **9,037,471** | **8,505,174** |
| **DEBT ROLLFORWARDS** | | | | | | | | |
| **Vehicle Loans** | | | | | | | | |
| Beginning Balance | 244,198 | 223,734 | 202,383 | 182,629 | 164,260 | 148,987 | 133,715 | 118,442 |
| Interest | - | - | - | - | - | - | - | - |
| Payments | (20,464) | (21,351) | (19,754) | (18,370) | (15,272) | (15,272) | (15,272) | (15,272) |
| Ending Balance | 223,734 | 202,383 | 182,629 | 164,260 | 148,987 | 133,715 | 118,442 | 103,170 |
| **Mowbray's Line of Credit** | | | | | | | | |
| Beginning Balance | 5,953,923 | 5,307,006 | 5,022,286 | 5,022,286 | 5,022,286 | 4,450,405 | 3,863,380 | 3,260,811 |
| Interest | 297,020 | 134,326 | 131,835 | 131,835 | 126,860 | 111,716 | 96,172 | 80,216 |
| Payments | (943,937) | (419,046) | (131,835) | (131,835) | (698,741) | (698,741) | (698,741) | (698,741) |
| Ending Balance | 5,307,006 | 5,022,286 | 5,022,286 | 5,022,286 | 4,450,405 | 3,863,380 | 3,260,811 | 2,642,285 |

Exhibit 2, Page 128

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATEMENT OF CASH FLOWS** | | | | | | | | | | | |
| Net income (Loss) | 9,288,054 | (1,353,468) | 1,369,831 | 1,473,834 | 1,467,909 | 1,307,435 | 1,142,677 | 973,504 | 905,976 | 759,655 | 594,076 |
| Depreciation | - | 83,631 | 140,375 | 158,288 | 176,201 | 194,114 | 212,028 | 229,941 | 140,048 | 125,393 | 125,393 |
| Change in Operating Assets & Liabilities | | | | | | | | | | | |
| Accounts Receivable | (14,983,633) | 8,267,285 | (1,253,681) | - | - | - | - | - | - | - | - |
| Other Current Assets | (288,488) | (183,140) | (27,529) | (26,188) | (26,974) | (27,783) | (28,617) | (29,475) | (30,360) | (31,270) | (32,209) |
| Accounts Payable | 2,179,935 | (1,221,414) | 57,435 | 13,232 | 13,629 | 14,038 | 14,459 | 125,048 | 127,343 | 129,735 | 132,227 |
| Other Current Liabilities | 1,011,139 | (528,693) | 1,538 | - | - | - | - | - | - | - | - |
| **Total Operating Cash Flows** | **(2,792,993)** | **5,064,201** | **287,968** | **1,619,165** | **1,630,765** | **1,487,804** | **1,340,546** | **1,299,018** | **1,143,007** | **983,512** | **819,487** |
| | | | | | | | | | | | |
| Capital Expenditures | (40,000) | (83,595) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) | (125,393) |
| **Total investing Cash Flows** | **(40,000)** | **(83,595)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** | **(125,393)** |
| | | | | | | | | | | | |
| Vehicle Loans | (79,113) | (79,938) | (61,090) | (56,748) | (36,947) | (9,475) | - | - | - | - | - |
| Mowbray's Line of Credit | 5,684,833 | (931,637) | (2,380,001) | (2,642,285) | - | - | - | - | - | - | - |
| Distributions to Mowbray's | - | - | - | - | - | (1,128,186) | (1,212,822) | (1,099,238) | (1,081,850) | (931,904) | (606,142) |
| Tax Distributions | - | - | (1,085,806) | (142,518) | (147,485) | (132,937) | (116,799) | (100,230) | (90,549) | (385,880) | (397,304) |
| **Total Financing Cash Flows** | **5,605,720** | **(1,011,575)** | **(3,526,896)** | **(2,841,551)** | **(184,431)** | **(1,270,598)** | **(1,329,621)** | **(1,199,468)** | **(1,172,399)** | **(1,317,784)** | **(1,003,446)** |
| | | | | | | | | | | | |
| Net Cash Flows | 2,772,727 | 3,969,031 | (3,364,320) | (1,347,778) | 1,320,942 | 91,814 | (114,467) | (25,843) | (154,785) | (459,664) | (309,351) |
| Beginning Cash | 321,366 | 3,094,093 | 7,063,124 | 3,698,804 | 2,351,026 | 3,671,968 | 3,763,782 | 3,649,314 | 3,623,472 | 3,468,687 | 3,009,023 |
| **Ending Cash** | **3,094,093** | **7,063,124** | **3,698,804** | **2,351,026** | **3,671,968** | **3,763,782** | **3,649,314** | **3,623,472** | **3,468,687** | **3,009,023** | **2,699,672** |
| | | | | | | | | | | | |
| **SHAREHOLDER'S EQUITY ROLLFORWARD** | | | | | | | | | | | |
| Beginning Equity | 287,747 | 9,574,617 | 8,221,148 | 8,505,174 | 9,836,490 | 11,156,915 | 11,203,228 | 11,016,284 | 10,790,320 | 10,523,896 | 9,965,768 |
| Net Income (Loss) | 9,288,054 | (1,353,468) | 1,369,831 | 1,473,834 | 1,467,909 | 1,307,435 | 1,142,677 | 973,504 | 905,976 | 759,655 | 594,076 |
| Distributions to Mowbray's | - | - | - | - | - | (1,128,186) | (1,212,822) | (1,099,238) | (1,081,850) | (931,904) | (606,142) |
| Tax Distributions | - | - | (1,085,806) | (142,518) | (147,485) | (132,937) | (116,799) | (100,230) | (90,549) | (385,880) | (397,304) |
| **Ending Equity** | **9,574,617** | **8,221,148** | **8,505,174** | **9,836,490** | **11,156,915** | **11,203,228** | **11,016,284** | **10,790,320** | **10,523,896** | **9,965,768** | **9,556,398** |
| | | | | | | | | | | | |
| **DEBT ROLLFORWARDS** | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Vehicle Loans** | | | | | | | | | | | |
| Beginning Balance | 323,311 | 244,198 | 164,260 | 103,170 | 46,422 | 9,475 | - | - | - | - | - |
| Interest | - | - | - | - | - | - | - | - | - | - | - |
| Payments | (79,113) | (79,938) | (61,090) | (56,748) | (36,947) | (9,475) | - | - | - | - | - |
| Ending Balance | 244,198 | 164,260 | 103,170 | 46,422 | 9,475 | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Mowbray's Line of Credit** | | | | | | | | | | | |
| Beginning Balance | 269,090 | 5,953,923 | 5,022,286 | 2,642,285 | - | - | - | - | - | - | - |
| Interest | 658,903 | 695,016 | 414,964 | 152,680 | - | - | - | - | - | - | - |
| Payments | 5,025,930 | (1,626,653) | (2,794,965) | (2,794,965) | - | - | - | - | - | - | - |
| Ending Balance | 5,953,923 | 5,022,286 | 2,642,285 | - | - | - | - | - | - | - | - |

Exhibit 2, Page 129

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | Q1 2025 Actual | Q2 2025 Forecast | Q3 2025 Forecast | Q4 2025 Forecast | Q1 2026 Forecast | Q2 2026 Forecast | Q3 2026 Forecast | Q4 2026 Forecast |
|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | |
| | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | |
| Operating Income | 80,750 | (1,349,765) | 1,277,646 | (730,812) | 869,787 | (645,141) | 1,964,133 | (242,749) |
| Depreciation & Amortization | (2,462) | (34,058) | (31,175) | (32,295) | (33,414) | (34,534) | (35,653) | (36,773) |
| Interest (Expense) Income | (150,689) | (133,296) | (131,835) | (131,835) | (126,860) | (111,716) | (96,172) | (80,216) |
| Taxable Income | (72,402) | (1,517,119) | 1,114,636 | (894,942) | 709,513 | (791,392) | 1,832,308 | (359,737) |
| CA LLC & S-Corp Tax Rate | 0.0% | 0.0% | 0.0% | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | - | - | - | - | 10,643 | (11,871) | 27,485 | (5,396) |
| | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | |
| Pino Flow Through Net Income | (69,940) | (1,503,222) | 1,114,636 | (894,942) | 698,870 | (779,521) | 1,804,823 | (354,341) |
| % NOT Applied to NOL | 0.0% | 0.0% | 0.0% | 0.0% | 20.0% | 20.0% | 20.0% | 20.0% |
| Pino Flow Through Taxable Income Subject to Taxes | 0 | - | (0) | - | 139,774 | (155,904) | 360,965 | (70,868) |
| Estimated Personal Tax Rate | 49.3% | 0.0% | 49.3% | 0.0% | 49.3% | 49.3% | 49.3% | 49.3% |
| Tax Distributions Due to Mowbray's | 0 | - | (0) | - | 68,909 | (76,861) | 177,956 | (34,938) |
| | | | | | | | | |
| Beginning Tax Distributions Due to Mowbray's | 915,802 | 915,802 | 915,802 | 915,802 | 915,802 | 68,909 | (76,861) | 177,956 |
| Tax Distributions Due to Mowbray's | 0 | - | (0) | - | 68,909 | (76,861) | 177,956 | (34,938) |
| Tax Distributions to Mowbray's | - | - | - | - | (915,802) | (68,909) | 76,861 | (177,956) |
| Ending Tax Distributions Due to Mowbray's | 915,802 | 915,802 | 915,802 | 915,802 | 68,909 | (76,861) | 177,956 | (34,938) |

Exhibit 2, Page 130

**Pino Tree Service, Inc.**
Financial Projections
*(USD$)*

| | FYE 2024 Actual | FYE 2025 Forecast | FYE 2026 Forecast | FYE 2027 Forecast | FYE 2028 Forecast | FYE 2029 Forecast | FYE 2030 Forecast | FYE 2031 Forecast | FYE 2032 Forecast | FYE 2033 Forecast | FYE 2034 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME TAX CALCULATIONS** | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Taxes = CA LLC & S-Corp Income Tax Expense** | | | | | | | | | | | |
| Operating Income | (722,182) | 1,946,030 | 1,807,246 | 1,666,465 | 1,521,460 | 1,372,105 | 1,218,270 | 1,059,820 | 896,616 | 728,516 | |
| Depreciation & Amortization | (99,990) | (140,375) | (158,288) | (176,201) | (194,114) | (212,028) | (229,941) | (140,048) | (125,393) | (125,393) | |
| Interest (Expense) Income | (547,655) | (414,964) | (152,680) | - | - | - | - | - | - | - | |
| Taxable Income | (1,369,827) | 1,390,691 | 1,496,278 | 1,490,263 | 1,327,346 | 1,160,078 | 988,329 | 919,772 | 771,223 | 603,123 | |
| CA LLC & S-Corp Tax Rate | 0.0% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | |
| Income Taxes = CA LLC & S-Corp Income Tax Exp | - | 20,860 | 22,444 | 22,354 | 19,910 | 17,401 | 14,825 | 13,797 | 11,568 | 9,047 | |
| | | | | | | | | | | | |
| **Tax Distributions to Owner for Flow Through Taxes** | | | | | | | | | | | |
| Pino Flow Through Net Income | (1,353,468) | 1,369,831 | 1,473,834 | 1,467,909 | 1,307,435 | 1,142,677 | 973,504 | 905,976 | 759,655 | 594,076 | |
| % NOT Applied to NOL | 0.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 20.0% | 68.2% | 100.0% | |
| Pino Flow Through Taxable Income Subject to Taxes | (0) | 273,966 | 294,767 | 293,582 | 261,487 | 228,535 | 194,701 | 181,195 | 517,847 | 594,076 | |
| Estimated Personal Tax Rate | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | 49.3% | |
| Tax Distributions Due to Mowbray's | (0) | 135,065 | 145,320 | 144,736 | 128,913 | 112,668 | 95,988 | 89,329 | 255,299 | 292,880 | |
| | | | | | | | | | | | |
| Beginning Tax Distributions Due to Mowbray's | 915,802 | 915,802 | (34,938) | (32,136) | (34,884) | (38,908) | (43,040) | (47,282) | (48,502) | (179,083) | |
| Tax Distributions Due to Mowbray's | (0) | 135,065 | 145,320 | 144,736 | 128,913 | 112,668 | 95,988 | 89,329 | 255,299 | 292,880 | |
| Tax Distributions to Mowbray's | - | (1,085,806) | (142,518) | (147,485) | (132,937) | (116,799) | (100,230) | (90,549) | (385,880) | (397,304) | |
| Ending Tax Distributions Due to Mowbray's | 915,802 | (34,938) | (32,136) | (34,884) | (38,908) | (43,040) | (47,282) | (48,502) | (179,083) | (283,507) | |

Exhibit 2, Page 131

# EXHIBIT 3

**Robin E Mowbray**
# Financial Projections
**(USD$)**

| | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | |
| **Income** | | | | | | |
| Management | 96,000 | 0 | 0 | 0 | 0 | 0 |
| Salary | 95,351 | 201,880 | 201,880 | 201,880 | 201,880 | 201,880 |
| **Total Income** | 191,351 | 201,880 | 201,880 | 201,880 | 201,880 | 201,880 |
| Expenses (all annual) | | | 0 | 0 | 0 | 0 |
| Bank Service Charges | 536 | 840 | 840 | 840 | 840 | 840 |
| Charitable Donations | 1,800 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 |
| Federal, State & SS Taxes | 13,814 | 23,375 | 23,375 | 23,375 | 23,375 | 23,375 |
| Food & Housekeeping Supplies | 17,768 | 20,712 | 20,712 | 20,712 | 20,712 | 20,712 |
| Housing Costs | | | | | | |
| Landscape | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| Pool Maintenance | 6,450 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 |
| Housing Costs - Other | 5,242 | 8,880 | 8,880 | 8,880 | 8,880 | 8,880 |
| **Total Taxes & Housing Costs** | 17,692 | 68,207 | 68,207 | 68,207 | 68,207 | 68,207 |
| Insurance Expense | 626 | 840 | 840 | 840 | 840 | 840 |
| Meals and Entertainment | 5,438 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 |
| Personal Care | 8,174 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 |
| Professional Fees | 3,302 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 |
| Rent Expense | 39,600 | 50,076 | 50,076 | 50,076 | 50,076 | 50,076 |
| REORGANIZATION FEES | 0 | 0 | 0 | 0 | 0 | 0 |
| US TRUSTEE FEES | 750 | 0 | 0 | 0 | 0 | 0 |
| REORGANIZATION FEES - Other | 88,138 | 0 | 0 | 0 | 0 | 0 |
| **Total REORGANIZATION FEES** | 88,888 | 0 | 0 | 0 | 0 | 0 |
| Repairs and Maintenance | 3,780 | 3,780 | 3,780 | 3,780 | 3,780 | 3,780 |
| Utilities | 17,006 | 28,800 | 28,800 | 28,800 | 28,800 | 28,800 |
| **Total Expense** | 218,423 | 174,803 | 174,803 | 174,803 | 174,803 | 174,803 |
| **Net Ordinary Income** | -27,072 | 27,077 | 27,077 | 27,077 | 27,077 | 27,077 |
| **Net Disposable Income** | **-27,072** | **27,077** | **27,077** | **27,077** | **27,077** | **27,077** |

Exhibit 3, Page 132    **Page 1 of 1**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660


A true and correct copy of the foregoing document entitled (*specify*): **THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 10, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **March 10, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Personal Delvery**
Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 10, 2026 | Connie-Marie Santiago | /s/ Connie-Marie Santiago |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

**1**.    <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- **Shraddha Bharatia**    notices@becket-lee.com
- **Jeffrey W Broker**    jbroker@brokerlaw.biz
- **Kenneth J Catanzarite**    kcatanzarite@catanzarite.com
- **Lauren N Gans**    lgans@elkinskalt.com, lmasse@elkinskalt.com
- **Jessica L Giannetta**    jessica@giannettalawcorp.com, melanie@giannettaenrico.com
- **Robert P Goe**    rgoe@goeforlaw.com,
  kmurphy@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com
- **Marshall F Goldberg**    mgoldberg@glassgoldberg.com, jbailey@glassgoldberg.com
- **Alan Craig Hochheiser**    ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com
- **Merdaud Jafarnia**    bkca@alaw.net, mjafarnia@ecf.inforuptcy.com
- **Raffi Khatchadourian**    raffi@hemar-rousso.com
- **Valery Loumber**    valloumlegal@gmail.com
- **Michael B Lubic**    michael.lubic@klgates.com,
  jonathan.randolph@klgates.com,klgatesbankruptcy@klgates.com
- **James MacLeod**    jmacleod@dunninglaw.com, nancy@dunninglaw.com
- **Charity J Manee**    cmanee@goeforlaw.com, kmurphy@goeforlaw.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Robert S Marticello**    rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **Karen S. Naylor**    Becky@ringstadlaw.com, Karen@ringstadlaw.com;Arlene@ringstadlaw.com
- **Estela O Pino**    epino@epinolaw.com, staff@epinolaw.com;clerk@epinolaw.com
- **Donald W Reid**    don@donreidlaw.com, angie@donreidlaw.com;don@ecf.courtdrive.com
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Amitkumar Sharma**    amit.sharma@aisinfo.com
- **Jeffrey S Shinbrot**    jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com;tanya@shinbrotfirm.com
- **Thomas E Shuck**    tshuck@pmcos.com, efilings@pmcos.com
- **Michael Simon**    msimon@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Derek A Simpson**    derek@dsimpsonlegal.com
- **Stephen Sommers**    ssommers@justice4you.com
- **Ahren A Tiller**    ahren.tiller@blc-sd.com, 4436097420@filings.docketbird.com;brett.bodie@blc-sd.com;anika@blc-sd.com;derek@blc-sd.com;kreyes@blc-sd.com;megan@blc-sd.com;nicole@blc-sd.com;danny@blc-sd.com;angie@blc-sd.com;kreyes@blc-sd.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com
- **Jennifer C Wong**    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com
- **Mandy Youngblood**    csbk@gmfinancial.com
- **Roye Zur**    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse@elkinskalt.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.